**Exhibit A**

IN THE UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DENNIS CAUCHON,<br>327 East Broadway,<br>Granville, Ohio 43023 | ) | JUDGE Edmund A. Sargus |
| DENNIS CAUCHON, derivatively by and on behalf of<br>HARM REDUCTION OHIO<br>1500 West Third Avenue, Suite 126<br>Columbus, Ohio 43212 | ) | CASE NO.: 2:25-cv-0075 |
| Plaintiff, | ) | |
| v. | ) | |
| DWAYNE STEWARD,<br>1345 Hildreth Avenue,<br>Columbus, Ohio 43203 | ) | |
| and | ) | |
| RAINA (WILLIAM) GOLDEN,<br>3610 Barber Road<br>Cedarville, OH 45314 | ) | |
| and | ) | |
| TASHA TURNER-BICKNELL,<br>528 Terrace Avenue,<br>Cincinnati, Ohio 45220 | ) | |
| and | ) | |
| HARM REDUCTION OHIO,<br>1500 West Third Avenue, Suite 126<br>Columbus, Ohio 43212 | ) | |
| Defendants. | ) | |

**Plaintiff Dennis Cauchon's Second Amended Complaint**

**Exhibit A**

Dennis Cauchon ("**Mr. Cauchon** alleges as follows below for his Second Amended Complaint against Defendant Harm Reduction Ohio ("**HRO**"), Dwayne Steward ("**Mr. Steward**"), Raina (William) Golden ("**Mr. Golden**"), and Tasha Turner-Bicknell ("**Ms. Turner-Bicknell**,") (collectively, "**Defendants**"):

## Preliminary Statement

1. This action arises from the improper and retaliatory conduct of Defendants in relation to Mr. Cauchon's efforts to protect HRO and uncover the egregious self-dealing and potential fraud by AmandaLynn Reese ("**Ms. Reese**"), who oversaw a multi-year, federally funded state government Contract to distribute naloxone statewide ("**Contract**").

2. As detailed below, Mr. Cauchon is the founder, president and a board member of HRO, a non-profit which is the largest distributor in Ohio of the overdose-reversing drug naloxone. In November 2023, under Mr. Cauchon's guidance, HRO was awarded the Contract from the Ohio Department of Health ("**ODH**").

3. In July 2024, Mr. Cauchon discovered that Ms. Reese, who oversaw the Contract and the acquisition of naloxone, had an undisclosed employment relationship with a lobbying firm that promotes the sale of the Kloxxado brand of naloxone to government agencies. While Ms. Reese was overseeing the execution of the Contract, she increased HRO's orders of Kloxxado significantly, at great expense to state and federal taxpayers, while being compensated by the lobbying firm.

4. Ms. Reese and Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell, three members of HRO's Board of Directors friendly to Ms. Reese, actively obstructed Mr. Cauchon's efforts to obtain details of the potential conflict of interest and to disclose Ms. Reese's conflict to ODH, as required by the Contract. Mr. Cauchon, the Contract's

compliance officer, accurately and in good faith disclosed Ms. Reese's conflict on September 3, 2024, to ODH. In response and retaliation, Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell, acting on behalf of HRO acted *ultra vires* to suspend and terminate Mr. Cauchon and remove him from the HRO Board of Directors.

5. Mr. Steward, Ms. Turner-Bicknell, and Mr. Golden breached their fiduciary duties by engaging in a series of actions that were legally unenforceable and blatantly violated HRO's standing corporate bylaws, policies, and the Contract's terms.

6. Now, Mr. Cauchon seeks adjudication of his claims, including a declaration that his termination and removal from the HRO Board of Directors is invalid and unlawful. Mr. Cauchon further asks the Court to find that the adverse employment actions taken against him were an unlawful retaliation related to Mr. Cauchon engaging in protected activities under the False Claims Act.

## I. Parties

7. Plaintiff Dennis Cauchon, who brings this Verified Complaint is an Ohio resident, residing at 327 East Broadway, Granville, Ohio 43023. Mr. Cauchon is the founder, president and board member of HRO, which is the target of Defendants' unlawful and improper conduct.

8. Defendant Harm Reduction is an Ohio 501(c)(3) organization, with its principal place of business located at 1500 West Third Avenue, Suite 126 Columbus, Ohio 43212.

9. Defendant Dwayne Steward is an HRO board member and is an Ohio resident, residing at 1345 Hildreth Avenue, Columbus, Ohio 43203.

**Exhibit A**

10. Defendant Raina (William) Golden is an HRO board member and an Ohio resident, residing at 3610 Barber Road, Cedarville, Ohio 45314.

11. Defendant Tasha Turner-Bicknell is an HRO board member and an Ohio resident, residing at 528 Terrace Avenue, Cincinnati, Ohio 45220.

12. Non-party, AmandaLynn Reese is HRO's Chief Program Officer and Contract Project Manager who is responsible for overseeing the Contract and ordering naloxone from the Ohio state pharmacy.

13. Although Ms. Reese is not a defendant in this action, her conduct, conflict of interests, unlawful use of federal funds, and retaliatory allegations are at the heart of this dispute, as detailed throughout this Second Amended Complaint. Third-party discovery from Velocity BioGroup confirms that, while working full-time as HRO's Project Manager on the federally funded naloxone contract, Ms. Reese simultaneously worked full-time as Director of Government Advocacy for Velocity, a registered lobbyist for Hikma Pharmaceuticals. At HRO, Ms. Reese controlled the ordering of government-funded naloxone—including Kloxxado, Hikma's product—and ordered Kloxxado heavily during her undisclosed dual employment. Velocity paid Ms. Reese a [redacted] annual salary using Hikma funds, while HRO paid her $62,500 per year using federal funds passed through the state.

14. Over two years, Ms. Reese worked at least dozens—likely hundreds—of days for Velocity while claiming to work full-time to perform her regular HRO duties from her home office in Cincinnati. Expense records show she took numerous business trips to 14 states and Washington, D.C. from January 2023 through September 2024. She did not take time off from HRO to make these trips. Velocity reimbursed Ms. Reese for travel expenses. On at least

**Exhibit A**

five trips, Ms. Reese double-billed travel expenses to both HRO and Velocity, thus submitting false reimbursement claims to HRO to be reimbursed with federal funds.

## II. Jurisdiction

15. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331, as Plaintiff is asserting a claim arising under the laws of the United States. This Court has supplemental subject matter jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367(a).

16. This Court can exercise personal jurisdiction over Defendants because the primary acts giving rise to the claim occurred in this District.

## III. Factual Background

### A. Harm Reduction Ohio's Background.

17. In March 2017, Mr. Cauchon founded non-profit HRO to reduce overdose death and other harms related to drug use in Ohio. Mr. Cauchon, a national reporter and editor at USA TODAY newspaper for 27 years, took early retirement to start HRO and has donated substantial amounts of money to the organization.

18. Today, HRO is best known as Ohio's largest distributor of naloxone nasal spray (*i.e.*, Narcan), a drug that reverses opioid overdoses. Mr. Cauchon obtained a Terminal Distributor of Dangerous Drugs License, a physician-authorized medical protocol, and other regulatorily required documents that allowed HRO to pioneer large-scale naloxone distribution in Ohio. From 2018 to 2021, HRO was the only lay organization legally authorized to distribute naloxone throughout Ohio.

**Exhibit A**

19. HRO distributes about 40,000 naloxone kits annually across all 88 Ohio counties through an online ordering site and a statewide network of lay distributors. HRO has reversed more than 10,000 overdoses since its founding.

**B. Harm Reduction Ohio's Naloxone Funding and Federally Funded State Contract.**

20. HRO's largest funding source is federal money that passes through ODH's Project DAWN (Deaths Avoided With Naloxone) Program. ODH supports 225 Project DAWN programs. HRO is the largest, distributing 15% to 20% of Project DAWN's naloxone, depending on the year.

21. The State of Ohio buys most of the naloxone that HRO distributes at federal government expense and at no cost to HRO. From October 2019 through November 2024, HRO received 122,367 naloxone kits from the State of Ohio. The State of Ohio spent more than $5 million in federal funds for the naloxone provided to HRO.

22. In addition to naloxone, HRO has received more than $1 million in cash payments since November 2019 to cover naloxone distribution expenses. All these funds originate from the federal government's State Opioid Response ("**SOR**") Grants, which are awarded by the federal Substance Abuse and Mental Health Services Administration ("**SAMHSA**") to the Ohio Department of Mental Health and Addiction Services[1] and then transferred to the ODH through an interagency agreement.

[1] *See e.g.*, U.S. DEP'T. HEALTH & HUM. SERV., SUBSTANCE ABUSE & MENTAL HEALTH SERV. ADMIN., GRANTS DASHBOARD, Award No. TI087745-01 (2024), https://www.samhsa.gov/grants/grants-dashboard?grants_dashboard__search=TI087745-01; Press Release, Ohio Dep't Mental Health & Addiction Serv., Governor DeWine Announces $100 Million in Federal Funding to Fight Opioid Use, Prevent Overdoes Deaths in Ohio (Nov. 12, 2024), https://mha.ohio.gov/about-us/media-center/news/pressrelease-2024.11.12.

**Exhibit A**

23. In June 2023, the Ohio Department of Administrative Services ("**ODAS**"), in conjunction with ODH, issued a Request for Proposal ("**RFP**") seeking bids for a multi-year Contract for a Statewide Naloxone Mail Order & Lay Distributor Network.[2]

24. Under Mr. Cauchon's supervision, HRO submitted a 128-page application[3] for the Contract on July 24, 2023. ODAS awarded the competitively-bid contract to HRO on November 15, 2023. ODH administers the Contract, which is 100% federally funded. Under 2 CFR 200, ODH is a pass-through entity and HRO is a sub-recipient of federal funds

25. Under Plaintiff's supervision, HRO successfully completed the Contract's first year Work Plan and was paid $650,000.

26. On August 29, 2024, Mr. Cauchon and ODAS signed a two-year contract extension that would pay HRO $850,000 per year, effective October 1, 2024. The RFP and HRO's application are incorporated by reference into the Contract and its extension, which apply the federal contracting regulations in 2 CFR 200.

27. The RFP's terms and conditions language describe conflicts of interests that must be disclosed to the funding agency:

> **No Personnel of the Contractor may voluntarily acquire any personal interest that conflicts with their responsibilities under this Contract.** Additionally, the Contractor will not knowingly permit any public official or public employee who has any responsibilities related to this Contract or the Project to acquire an interest in anything or any entity under the Contractor's control if such an interest would conflict with that official's or employee's duties. **The Contractor will disclose to the State knowledge of any such person who acquires an incompatible or conflicting personal interest related to this Contract. The Contractor will take steps to ensure that such a person does not participate in any action affecting the work under this Contract.** This will not apply when the State has determined, in light of the personal

[2] Unless noted otherwise, all references to Exhibits in this Complaint as being "attached" refers to exhibits that are attached to the initial Complaint, which are of-record in the case and are incorporated by reference as if re-attached to this Amended Complaint. A copy of the RFP is attached as "**Exhibit 1**" to the initial Complaint.

[3] A copy of the application and the letter is attached as "**Exhibit 2**."

> interest disclosed, that person's participation in any such action would not be contrary to the public interest.

(Ex. 1 at 45) (Emphasis added.)

28. The RFP also required a bidder to provide a Conflict-of-Interest Statement that disclosed all potential conflicts of interest:

> **Each Proposal must include a statement indicating whether the Offeror or any people that may work on the Project through the Offeror have a possible conflict of interest (e.g., employed by the State, etc.) and, if so, the nature of that conflict.** The State has the right to reject a Proposal in which a conflict is disclosed or cancel the Contract if any interest is later discovered that could give the appearance of a conflict.

(*Id.* at 25)

29. In the RFP, HRO submitted a Conflict-of-Interest Statement that stated: "Harm Reduction Ohio confirms that no employee or contractors associated with the organization have a conflict of interest working on the statewide Naloxone project." (Ex. 2 at 109.)

30. Mr. Cauchon subsequently learned that the Conflict-of-Interest Statement was false and Ms. Reese's conflict should have been disclosed to the State of Ohio in the Contract application.

**C. Naloxone Products and Harm Reduction Ohio's Use of Kloxxado.**

31. HRO distributes three types of naloxone nasal spray: Narcan, Kloxxado, and generic naloxone.

32. Narcan charged $75 per two-dose kit when it was the only naloxone nasal spray available. Kloxxado came on the market in August 2021 and a generic naloxone nasal spray followed in August 2022. The competition resulted in falling prices and price differences between brands. (*See* Fig. 1)

| Naloxone Prices | | |
|---|---|---|
| Unit price paid by ODH's Project DAWN to buy naloxone for HRO. | | |
| **Brand** | **February 2023** | **January 2025** |
| Generic | $36.60 | $26.21 |
| Narcan | $45.57 | $32.64 |
| Kloxxado | $57.56 | $41.48 |

**Figure 1.**

33. HRO orders naloxone from the State of Ohio, and the state pharmacy delivers the naloxone to HRO's office, where kits are packaged and distributed statewide. The state pharmacy purchases HRO's naloxone kits using federal SOR grant funds.

34. Ms. Reese has handled ordering naloxone for HRO since July 2023. In that capacity, she determines the quantities of each brand of naloxone that HRO orders from the Ohio state pharmacy.

35. Mr. Cauchon and former Operations Director Mallory Bolen ("**Ms. Bolen**") handled naloxone ordering before Ms. Reese assumed the role.

36. As established by Mr. Cauchon, HRO policy is to order the least expensive brand of naloxone available, usually generic naloxone. However, sometimes generic naloxone nasal spray was unavailable, making Narcan the cheapest available for HRO to order.

37. Under HRO policy, Kloxxado was ordered in limited quantities because the drug is both controversial and more expensive. Few harm reduction organizations distribute

Kloxxado because its 8 mg dose—twice that of Narcan and the generic version—is considered excessively potent and potentially harmful.[4] NEXT Distro, which runs HRO's online ordering site, refuses to list Kloxxado as an option on HRO's ordering page. As a result, HRO does not distribute Kloxxado to Ohio residents placing online naloxone orders.

38. HRO originally declined to distribute Kloxxado altogether. However, Mr. Cauchon authorized distributing Kloxxado in limited cases, partly because Ms. Reese told him people were requesting Kloxxado by name.

39. Kloxxado accounted for a small share of naloxone ordered by HRO under Mr. Cauchon and Ms. Bolen. That changed immediately and dramatically when Ms. Reese assumed naloxone ordering authority in July 2023.

**D. Kloxxado Orders Skyrocket Under Ms. Reese's Direction.**

40. Ms. Reese took over naloxone ordering at HRO in July 2023, replacing Ms. Bolen who moved to California.

41. State pharmacy data, obtained in a public records request, show Ms. Reese significantly increased the volume of Kloxxado ordered for HRO. (*See* Fig. 2).[5]

---

[4] https://pmc.ncbi.nlm.nih.gov/articles/PMC8454200/pdf/main.pdf

[5] In response to a public records request, the state pharmacy provided an Excel file with all naloxone shipments made throughout Ohio from January 1, 2020, through November 30, 2024. HRO was one of 502 customers supplied naloxone by the state pharmacy during this period.

**Exhibit A**

**Harm Reduction Ohio**
Kloxxado Shipments from State Pharmacy

| Order Number | Pharmacy Shipment Date | # of Kits | Orderer |
|---|---|---|---|
| 1 | 11/18/21 | 1,000 | Mallory Bolen |
| 2 | 05/17/22 | 200 | Mallory Bolen |
| 3 | 06/17/22 | 200 | Mallory Bolen |
| 4 | 09/09/22 | 700 | Mallory Bolen |
| 5 | 03/15/23 | 346 | Mallory Bolen |
| 6 | 04/12/23 | 500 | Mallory Bolen |
| 7 | 06/21/23 | 500 | Mallory Bolen |
| 8 | 08/15/23 | 500 | AmandaLynn Reese |
| 9 | 08/17/23 | 1,500 | AmandaLynn Reese |
| 10 | 02/02/24 | 2,500 | AmandaLynn Reese |
| 11 | 4/24/24 | 3,500 | AmandaLynn Reese |
| 12 | 06/14/24 | 3,500 | AmandaLynn Reese |

Source: Ohio Department of Mental Health and Addication Services Pharmacy

**Figure 2.**

42. Ms. Reese ordered 11,500 Kloxxado kits in 12 months vs. Ms. Bolen ordering 3,446 Kloxxado kits over 22 months of ordering authority. (*Id.*) HRO's total naloxone volume did not change significantly during this period.

43. During Ms. Reese's period of heavy Kloxxado ordering, unbeknownst to Mr. Cauchon or the State of Ohio, Ms. Reese had entered into an employment contract in December 2022 to be the Director of Government Advocacy for Velocity, a registered lobbyist in Ohio and more than 20 other states for Kloxxado manufacturer Hikma Pharmaceuticals. Ms. Reese's Kloxxado ordering rate was a six-fold increase from her predecessor. (*See* Fig. 3). Under Ms. Reese, Kloxxado accounted for 52.3% of the 22,000 naloxone kits that Ms. Reese ordered over a 12-month period for HRO, a stark contrast to Kloxxado making up just 7.8% of the 44,437 naloxone kits Ms. Bolen ordered over a 22-month period. (*Id.*)[6]

[6] This data set excludes those months before Kloxxado became available in August 2021, so as to avoid false comparison to any time period when Kloxxado was not on the market.

**Exhibit A**

| HRO Naloxone Orders<br>September 1, 2021 - July 15, 2024 | | | | |
|---|---|---|---|---|
| **Orderer** | **Kits Ordered** | **Narcan** | **Generic** | **Kloxxado** |
| Dennis Cauchon | 16,500 | 0% | 100% | 0% |
| Mallory Bolen | 44,437 | 58.3% | 34.0% | 7.8% |
| AmandaLynn Reese | 22,000 | 25.0% | 22.7% | 52.3% |

**Figure 3.**

44. On July 17, 2024, in a phone conversation. Mr. Cauchon informed Ms. Reese that he had learned of her employment as Director of Government Advocacy for Kloxxado's lobbying firm and had concerns about her outside employment.

45. After the July 17, 2024, conversation, Ms. Reese's instantly stopped ordering Kloxxado. State of Ohio pharmacy data show Ms. Reese ordered 9,800 naloxone kits for HRO from the time of Mr. Cauchon's phone call when the public records request's fulfillment ( November 30, 2024). (*See* Figure 4). None of the 9,800 naloxone kits were Kloxxado.

| Reese Naloxone Orders | | | | |
|---|---|---|---|---|
| **Order Timing** | **Kits Ordered** | **Narcan** | **Generic** | **Kloxxado** |
| Pre-conflict discovery | 22,000 | 25.0% | 22.7% | 52.3% |
| Post-conflict discovery | 9,800 | 15.3% | 84.7% | 0.0% |

**Figure 4.**

**E. Discovery of Ms. Reese's Conflict of Interest and the Investigation and Coverup.**

46. On July 15, 2024, Mr. Cauchon discovered through social media that Ms. Reese was employed at Velocity. An Internet search immediately showed Velocity was a lobbying firm that promoted Kloxxado and had interacted with both HRO and ODH as part of its lobbying efforts. Mr. Cauchon had not been informed that Ms. Reese, a full-time HRO employee and the Contract's Project Manager, held this outside job.

47. On July 16, 2024, Mr. Cauchon sent an email[7] with the subject line "AmandaLynn...potential conflicts and disclosure" to Mr. Steward, who was Vice Chair of the HRO Board of Directors and a paid consultant to HRO. (*See* Ex. 3.) In the email, Mr. Cauchon said Ms. Reese's outside work was "problematic if she has an undisclosed relationship with a firm promoting Hikma and Kloxxado." (*Id.*)

48. On July 17, 2024, Mr. Cauchon met virtually with Ms. Reese about her contract to be Director of Government Advocacy for Velocity BioGroup and the potential conflict it posed with her role ordering naloxone for HRO and supervising the ODH Contract.

49. In that Zoom meeting, Ms. Reese promised to be transparent and disclose to Mr. Cauchon all relevant information regarding her employment with Velocity. She promised to end the conflict, if warranted. Velocity records show Ms. Reese was meeting with Mr. Cauchon during a break in a three-city, nine-day Velocity business trip, part of her undisclosed practice of working for Velocity on HRO time.

50. On July 18, 2024, Mr. Cauchon updated HRO Administrator Cecile Katz ("**Ms. Katz**") about his conversation with Ms. Reese and the potential need for revisions to HRO's conflict policy and creation of a formal conflict disclosure form to help HRO avoid future problems. Ms. Katz created a conflict disclosure form[8] consistent with HRO's existing

---

[7] A copy of this email is attached as "**Exhibit 3**."
[8] A copy of the email is attached as "**Exhibit 4**."

internal conflict policy for Mr. Cauchon to review. (*See* Ex. 4.) HRO's existing conflict-of-interest policy[9] had been approved by the HRO Board of Directors, including Mr. Steward, Mr. Golden, Ms. Turner-Bicknell, and Mr. Cauchon, on October 1, 2022. (Ex. 5 at 43-44.) Compliance was based on trust and self-disclosure. HRO did not have a disclosure form at the time Ms. Reese's conflict was discovered. (*Id.*) F

51. Despite Ms. Reese's promise to disclose the full extent of her work for Velocity to Mr. Cauchon, she did not do so by July 22, 2024, the agreed deadline, or any other date. Instead, unbeknownst to Mr. Cauchon and without authority, Ms. Reese contacted Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell, board members she considered friendly to her—for help with avoiding disclosure of her outside work to Mr. Cauchon or ODH.

52. On August 8, 2024, Ms. Katz distributed a formal Conflict of Interest Disclosure Form to HRO staff, including Ms. Reese. Completing the form would have required Ms. Reese to disclose details of her Velocity BioGroup work in writing.

53. On August 16, 2024, Ms. Turner-Bicknell emailed[10] the HRO's Board of Directors to request a meeting of the full board to discuss the Conflict Disclosure Form. (*See* Ex. 7). This email is how Mr. Cauchon learned that Ms. Reese had launched a behind-the-scenes effort to seek protection from Defendants.

54. In that email, Ms. Turner-Bicknell asked whether the Conflict Disclosure Form could "become a barrier to employment for some." Ms. Turner-Bicknell did not mention Ms. Reese's conflict by name but, in a later meeting, made clear that her primary concern was trying to have the board obstruct Mr. Cauchon's effort to obtain information on Ms. Reese's outside employment for disclosure to ODH.

---

[9] A copy of the conflict-of-interest policy is attached as "**Exhibit 5**."
[10] A copy of this email is attached as "**Exhibit 6**."

55. Upon information and belief, Mr. Steward, Ms. Turner-Bicknell, and Mr. Golden conspired with Ms. Reese to help her fight Mr. Cauchon's investigation and avoid disclosing her conflict of interest to Mr. Cauchon and ODH. When Mr. Cauchon refused to withhold information from ODH and filed the Conflict Disclosure Notice, the three directors wrongly retaliated against Mr. Cauchon and removed him as HRO's President on September 5, 2024, and from HRO's Board of Directors on October 27, 2024.

56. A large volume of correspondence demonstrates Defendants' efforts to cover up Ms. Reese's conflict of interest and retaliate against Mr. Cauchon for investigating the conflict and reporting to ODH.

57. On August 19, 2024, Mr. Steward and Ms. Turner-Bicknell insisted that HRO halt creation of an HRO conflict-disclosure form and halt any change in policy until it could be reviewed by independent legal counsel. (*Id.*) But the notion that an HRO policy change would be needed to require disclosure from Ms. Reese is false. HRO's existing policy already required full disclosure of conflicts of interest, and the conflict policy relevant to this case was set by the Contract, not HRO's internal policy.

58. During July and August 2024, Mr. Cauchon was negotiating a two-year extension to the Contract and an increase in funding from $650,000 to $850,000 per year. Mr. Cauchon believed correctly that HRO was required to disclose Ms. Reese's conflict to ODH to comply with the soon-to-be signed Contract extension agreement.

59. On August 19-20, 2024, Mr. Cauchon and Mr. Steward engaged in an extended written exchange[11] regarding HRO's duty to disclose conflicts to ODH. Mr. Cauchon reiterated HRO's duty to promptly disclose conflicts. Mr. Cauchon wrote: "We are

[11] A copy of this email chain is attached as "**Exhibit 7**."

required to report all conflict and possible conflicts when we learn of them. AL's [Ms. Reese's] paid work for the advocacy firm is clearly a possible conflict. We have currently submitted all documents for a two-year contract renewal. We need to disclose conflicts promptly as part of this renewal." (*See* Ex. 8.)

60. In response, Mr. Steward miscast Mr. Cauchon's due diligence into Ms. Reese's conflict of interest as an overreaction, declaring that ODH did not require the disclosure of "perceived conflicts" and that such a disclosure "may put [HRO's] largest grant in jeopardy." Mr. Steward's statement illustrates his intent to withhold conflict information that he knew was relevant and consequential enough for the funding agency to void HRO's contract (*Id.*)

61. Perplexingly, Mr. Steward claimed that uniform implementation of the Conflict Disclosure Form to better enforce the Contract's conflict policy could lead to a sex or age discrimination claim by Ms. Reese and give HRO a bad reputation for "blocking the earning potential of its staff." (*Id.*) This suggestion was entirely without merit and made clear that Mr. Steward was failing to meet his fiduciary duties to HRO, considering that Ms. Reese's objective conflict was causing HRO to breach its obligations under the Contract.

62. Mr. Steward defended Ms. Reese's blatant conflict of interest by stating,

> Personally, I believe that we should be supporting any employee that chooses to bring their work with a nonprofit into their personal advocacy and board work . . . I think the good far outweighs any concerns in these situations. I'm not saying we should ignore [conflicts of interests], the law clearly says otherwise, but I'm just saying we should be taking a more people-first approach in how we define and police them.
>
> As I keep saying, I really think we need to tread lightly here Dennis. Let me know if you want to schedule some one on one time to talk through this more.

(*Id.*). As an HRO Director, Mr. Steward has a fiduciary duty to prioritize the interests of HRO over those of Ms. Reese. In this exchange, he does otherwise.

63. Mr. Cauchon responded to Mr. Steward and made this clear:

> The issue here is whether a conflict exist[s]. We do not know because [Ms. Reese] has declined to provide details on her arrangement as Director of Government Advocacy for a lobbying company that represents Hikma, the pharmaceutical company that makes Kloxxado. We need to know the details of this arrangement before we can make a decision. It is worrisome that [Ms. Reese] has declined to disclose[] details of her work and may have enlisted [Ms. Turner-Bicknell] to try to get the board to stop fact-gathering. (*Id.*)

64. The exchange continued over text[12]:

> **Mr. Steward:** I saw your email response. Several staff at HRO have contacted the board. Not just AmandaLynn. I just don't think this (conflict) is worth a staff walkout and jeopardizing the agency's largest grant. I think there are other ways to manage this. That's just my two cents.
>
> **Mr. Cauchon:** We need the facts before we make a decision. It is concerning that the effort is to stop us from knowing. That is different from the decision.
>
> This information should have been disclosed under the existing policy and as a matter of trust. It was not. So be it. So we put in a policy that routinizes disclosure. I do not believe the board should stop fact gathering. Facts first, decision next.

(*See* Ex. 8.)

65. Mr. Steward then revealed for the first time that Ms. Reese had already told him about her work for Velocity, and that Mr. Steward had failed to share the information with Mr. Cauchon.

> **Mr. Steward:** She's already shared the details with me dennis. This is not about a refusal to share information. This is about staff no longer feeling protected or safe at HRO because of decisions they've made outside of work. A fact finding mission isn't going to change that. This is a larger culture problem.
>
> **Mr. Cauchon:** Have you seen the contract [between Ms. Reese and Velocity BioGroup] and determined what was done, money paid, etc.?

---

[12] A copy of this text exchange is attached as "**Exhibit 8**."

> **Mr. Steward:** I have not seen documents but I have received the information verbally. I don't think the amount of money matters truthfully (unless the policy has stated a cap, which I don't think it does) and I don't think we are legally allowed to ask for external contracts. We can only ask for self reported COI information. OSU doesn't ask me to share my contracts from my external activities.
>
> I think we need to take a beat dennis before this gets out of our control.

(*Id.*)

66. Mr. Steward's statements illustrate how he acted outside the scope of his board member authority and considered himself a safe haven for Ms. Reese to disclose conflict information outside HRO's established structure, the authority assigned to Mr. Cauchon in HRO Bylaws, and the terms of the ODH Contract.

67. HRO's governing Bylaws delegate operational tasks to Mr. Cauchon, the President, and give the full board responsibility "for overall policy and direction." An individual board member has no lawful authority to directly involve himself in Contract compliance or conflict disclosure—and certainly no authority to obstruct an investigation of an objective conflict that HRO is contractually required to investigate and disclose.

68. Mr. Steward's statements illustrate his and Defendants' attempt to thwart Mr. Cauchon's inquiry into Ms. Reese's conduct by falsely characterizing Mr. Cauchon's effort to follow the law and his fiduciary duties to HRO as one about "staff no longer feeling safe" and a "culture problem" at HRO. (*Id.*)

69. On August 21, 2024, Mr. Cauchon informed[13] Mr. Steward that he uncovered more information about Ms. Reese's advocacy work on behalf of Velocity including that she had done outside work for Velocity on HRO time (i.e., while being paid by HRO for working

[13] A copy of this text exchange is attached as "**Exhibit 9**."

on the Contract.) (*See* Ex. 9.) Ms. Reese's salary is paid entirely with federal funds that pass through the State of Ohio.

70. Mr. Steward responded that he knew Ms. Reese was doing Velocity work on HRO time. Mr. Steward sought to negotiate on Ms. Reese's behalf, telling Mr. Cauchon that Ms. Reese was willing to give up this impermissible conduct of doing outside work on HRO time if Mr. Cauchon would drop the conflict inquiry. (*Id.*) "I shared with her that none of her external work could be done on HRO time anymore and she was fine with that." (*Id.*)

71. Mr. Steward's acceptance of Ms. Reese doing outside work on HRO time was improper and he knew it. Prior to learning that Ms. Reese was double-dipping, on July 16, 2024, Mr. Steward emailed Mr. Cauchon suggestions on how to speak with Ms. Reese about the conflict. He advised Mr. Cauchon to say, "These activities are not allowed on company time, and company resources cannot be used for these activities." Later, in a text exchange on August 21, 2024, Mr. Steward said, "I agree that a line should be drawn and there should be clear separation for external and internal work for all staff." (*Id.*)

72. In the August 21, 2024, text exchange, Mr. Cauchon again raised that the "issue is [Ms. Reese] needs to disclose [her relationship with Hikma]." (*Id.*) Mr. Steward then asked, "[a]re you to a point where you think all this is egregious enough to separate [Ms. Reese] from HRO altogether? What is the end goal? I think that's what the board and I are most interested in, which I'm hoping we can figure out in our meeting tomorrow." (*Id.*)

73. On August 22, 2024, Mr. Cauchon met virtually with Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell. It became immediately clear that Defendants were interested in Ms. Reese's satisfaction with the situation, not with following the Contract's

conflict policy or implementing a form to carry out the policy, as Ms. Turner-Bicknell had claimed in her August 16, 2024, email to the board.

74. During the August 22 meeting, Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell minimized Ms. Reese's conflict by equating her outside employment at a lobbying firm to being the same as working at Target. Mr. Cauchon said HRO needed to know what Ms. Reese did as Director of Government Advocacy for Velocity BioGroup and whether "she had been paid $1 or $100,000." Ms. Turner-Bicknell stated it did not matter what Ms. Reese did or how much she was paid: "She has the right to take care of her family." Mr. Steward added that HRO did not cap outside earnings for HRO employees. Defendants' willful blindness, and persecution of Mr. Cauchon for asking the right questions, fell well below compliance with their fiduciary duties to HRO.

75. After the August 22, 2024, meeting, Defendants' requested and Mr. Cauchon's acquiesced to telling the staff to disregard the Conflict Disclosure Form sent on August 8, 2024, which all employees were to submit to Ms. Katz by August 23, 2024.

76. To help understand if Defendants' efforts to downplay the conflict were legitimate, Mr. Cauchon consulted with three national harm reduction leaders during the week of August 26, 2024, for outside perspectives.

77. In California, Tracey Helton, a pioneer of naloxone distribution and a public health manager in San Francisco, said, "I would 100% be fired if I did that." In New York, Jamie Favaro, founder of NEXT Distro, which processes online naloxone orders for HRO, said the conflict was "morally egregious." In North Carolina, Roxanne Saucier, program officer at a foundation that has supported HRO and serves as a board member of other harm reduction organizations, said, "The employment is clearly problematic."

**Exhibit A**

78. On August 26, 2024, with Defendants' agreement, Mr. Cauchon hired David Ball, an attorney specializing in non-profits and employment law, to help guide HRO on these issues.

79. On August 29, 2024, Mr. Cauchon signed HRO's two-year Contract extension agreement. A virtual meeting was scheduled to meet with ODH on September 3, 2024, to discuss the extended Contract.

80. On August 30, 2024, Mr. Cauchon and Ms. Katz met with Ms. Reese over Zoom to update her on the status of HRO's review of her conflict and HRO's conflict policy. Ms. Reese was told her duties would remain the same while HRO attorney David Ball reviewed and revised HRO's conflict policy for Board review and approval. During the meeting, Ms. Reese said she had provided disclosure material to Mr. Steward and was surprised that Mr. Steward had not shared it with Mr. Cauchon.

81. On August 31, 2024, Mr. Cauchon emailed[14] Mr. Steward, "AmandaLynn said she had fully disclosed all potential conflicts to you. She seemed surprised that I had not seen this disclosure material. If this is so, I think it makes sense to forward the material to me, Cecile and Dave Ball." (*See* Ex. 10.)

82. Mr. Steward responded, "I think it's best if AL (Ms. Reese) sends her COI form to you and Cecile directly after the COI policy is completed and approved by the board." (*Id.*)

83. In effect, Ms. Reese and Mr. Steward's claim that she had completed her required disclosure only for it to be kept private among Ms. Reese's colluders was a mere

[14] A copy of this email is attached as "**Exhibit 10**."

continuation of a six-week-old campaign to delay Mr. Cauchon from receiving information necessary for disclosure to ODH.

84. On Labor Day Weekend, Mr. Cauchon was increasingly anxious about having not disclosed Ms. Reese's conflict prior to the scheduled meeting with ODH on September 3, 2024. Mr. Cauchon had worked transparently with ODH since 2019 while ODH's financial support for HRO grew from $30,000 to $850,000 annually. To fulfill his Contract compliance obligation, Mr. Cauchon personally researched HRO's actual legal duty to report employee conflicts on a federally funded state contract.

85. On September 2, 2024, Mr. Cauchon went to HRO's office before dawn. At 6:23 a.m., he emailed Mr. Steward asking to talk: "Cecile and I have a meeting tomorrow with our ODH grant manager on another topic. I think we need to disclose what we know. The meaning of the conflict, if any, is their decision, not ours. I think we have a duty to disclose." Mr. Steward responded and stated that he was not available to talk that day.

86. Mr. Cauchon researched conflict disclosure rules for seven hours. All sources confirmed that newly discovered conflicts—whether possible, potential, perceived or actual—required prompt disclosure to the funding agency.

**F. Mr. Cauchon Discloses the Conflict of Interest to ODH.**

87. Around 8 a.m. on September 3, 2024, Mr. Cauchon called and texted Mr. Steward to talk. In a 10:32 a.m. call, Mr. Cauchon told Mr. Steward that HRO was required to disclose the conflict and was overdue in doing so. At 10:58 a.m. Mr. Cauchon emailed[15] Mr. Steward a draft of the Conflict Disclosure Notice.[16] (*See* Exs. 11 and 12.)

[15] A copy of the email is attached at "**Exhibit 11**."
[16] A copy of the Conflict Disclosure Notice is attached as "**Exhibit 12**."

88. At 11:47 a.m., Mr. Steward responded: "I would suggest removing any language that says she refused to disclose. There isn't anything in writing that says she didn't plan to disclose and by your own admission she said she thought she already had disclosed by sending the information to me." (*See* Ex. 11.) Mr. Cauchon did not make the requested change.

89. Mr. Cauchon then emailed HRO's program manager at ODH, Brittany Burns ("Ms. Burns"): "I recently learned of a conflict-of-interest HRO has related to our contract and want to start our required disclose (sic)"[17] (*See* Ex. 13.) Mr. Cauchon called Ms. Burns to verbally explain Ms. Reese's employment situation with Hikma's lobbying firm and Ms. Burns response was, "Oh my."

90. Ms. Katz then emailed Ms. Burns the Conflict Disclosure Notice.

91. At 1:30 p.m., Mr. Cauchon and Ms. Katz met with Ms. Reese over Zoom. They had met with Mr. Ball that morning to use legally compliant language to place Ms. Reese on paid leave. Using Mr. Ball's recommended language, Mr. Cauchon and Ms. Katz placed Ms. Reese on paid administrative leave.

92. At 1:57 p.m., Mr. Cauchon emailed HRO's Board of Directors about the Conflict Disclosure Notice and placing Ms. Reese on administrative leave.[18] (*See* Ex. 14). "I am optimistic that by being forthright and forthcoming with ODH that we can resolve this issue in [a] way that protects our organization, staff, volunteers and the people we serve," Mr. Cauchon wrote. (*Id.*)

---

[17] A copy of this email is attached as "**Exhibit 13**."
[18] A copy of the email is attached as "**Exhibit 14**."

93. On September 4, 2024, Mr. Cauchon sent Mr. Steward, Ms. Katz, and Mr. Ball a proposed timeline[19] for resolving the conflict problem. (*See* Ex. 15.) The email proposed requiring Ms. Reese to promptly disclose details of her outside work, including the contract and invoices with Velocity. (*Id.*) The email said HRO was applying for a $500,000 to $750,000 federally funded state grant on September 23, 2024, and Ms. Reese's conflict would need to be disclosed in that grant application. (*Id.*)

94. In an email sent on September 4, 2024, at 4 p.m. to Mr. Cauchon, Mr. Steward and Ms. Katz, HRO attorney David Ball gave his approval to Mr. Cauchon requesting that Ms. Reese provide a copy of her Velocity employment contract and payment documentation.

95. On September 5, 2024, at 9:30 a.m., Mr. Steward responded:[20] "I think asking for [Ms. Reese's] contracts and the amounts of money is egregious." (*See* Ex. 16.) At the time, unbeknownst to Mr. Cauchon, Ms. Katz, or HRO's attorney, Mr. Steward was secretly seeking board member support to block the request to seek Ms. Reese's Velocity contract.

96. On September 5, 2024, at 12:31 p.m., Mr. Cauchon emailed[21] the HRO Board of Directors with an update on how the Contract would be managed in Ms. Reese's absence and his proposed Conflict Mitigation Plan. (*See* Ex. 17.) The mitigation plan had three parts: (a) end the employment of the conflicted employee, (b) review and strengthen HRO's conflict and outside employment policies and forms, and (c) pause Kloxxado purchases for 12 months while reviewing HRO ordering policies. (*Id.*) Mr. Cauchon told the board that the mitigation plan had been presented verbally to ODH and favorably received. (*Id.*)

[19] A copy of the timeline and email are attached as "**Exhibit 15**."
[20] A copy of the email is attached as "**Exhibit 16**."
[21] A copy of this email is attached as "**Exhibit 17**."

**Exhibit A**

97. At the time, Mr. Cauchon did not know of Ms. Reese's anomalous Kloxxado ordering pattern when he filed HRO's Conflict Disclosure Notice. He had filed a public records request on August 22, 2024, to check whether Ms. Reese's ordering decisions had been poisoned by her employment by Velocity, but the records request was not fulfilled until September 16, 2024, after Mr. Cauchon had been invalidly suspended in retaliation for pursuing details of Ms. Reese's conflict of interest and self-dealing.

98. In the Conflict Disclosure Notice, Mr. Cauchon wrote: "At present, I have no reason to believe that AmandaLynn's outside contract influenced her ordering decisions." (Ex. 12 at 1.) Mr. Cauchon's measured language reflected the fact that despite his suspicions that Ms. Reese's ordering decisions could have been influenced, he had not yet received state pharmacy data to verify those suspicions.

99. Indeed, once in possession of the state pharmacy data to verify those suspicions, it was clear Ms. Reese had an actual conflict of interest that prevented her from ordering naloxone under the Contract for HRO which resulted in HRO's six-fold increase of Kloxxado orders.

100. It defies logic to suggest that Ms. Reese's high-volume Kloxxado ordering was not linked to her employment as Director of Government Advocacy at Velocity BioGroup. Defendants' obstruction of Mr. Cauchon's efforts to learn about Velocity BioGroup payments to Ms. Reese and what work Ms. Reese performed for those payments was detrimental to HRO and the government.

101. At a minimum, HRO was required to disclose Ms. Reese's conflict and ordering pattern for the funding agency to determine the importance of the conflict.

**G. False Allegations and Retaliatory Actions Against Mr. Cauchon.**

102. Immediately after Mr. Cauchon notified Mr. Steward of his intent to disclose Mr. Reese's conflict with ODH on September 3, 2024, Mr. Steward informed Mr. Golden and Ms. Turner-Bicknell, and they began coordinating an unauthorized emergency board meeting to retaliate against Mr. Cauchon.

103. On September 5, 2024, at 1:03 p.m., Mr. Steward and Mr. Golden sent Mr. Cauchon an email with the subject line "Cease and Desist."[22] (*See* Ex. 18.) Mr. Steward and Mr. Golden alleged there were "several complaints from staff alleging a hostile work environment" and ordered Mr. Cauchon "to cease and desist all activities related to conflict of interest matters, including but not limited to communications with funders, staff, and community partners." (*Id.*)

104. HRO Bylaws[23] provide no authority for a Chair or Vice Chair to exercise any of the authority claimed in the email. (*See* Ex. 19.) Further, Mr. Golden was not Chair at the time, as the email claimed, having resigned the position in writing to the full board effective July 31, 2024.

105. That same day, without notice to Mr. Cauchon and in violation of Article III, Sections 3 and 10 of HRO's Bylaws which require at least a two-week notice to each board member for a board meeting to be held, HRO's Board of Directors unexpectedly met without

[22] A copy of the email is attached as "**Exhibit 18**."
[23] A copy of HRO's Bylaws is attached as "**Exhibit 19**."

inviting Mr. Cauchon to the meeting. (*Id.*) Mr. Cauchon did not waive his right as a director to receive the required notice for this meeting.

106. Then on September 5, 2024, at 2:24 p.m., Mr. Steward sent a second email[24] to Mr. Cauchon which stated "the HRO Board of Directors met …. [and] unanimously decided to place you on paid admin leave until the completion of an investigation." (*See* Ex. 20.) Mr. Cauchon was ordered to leave HRO's office and to stop work immediately. In the email, Mr. Steward, acting *ultra vires*, claimed to be the new HRO board Chair.

107. In fact, the HRO Board had not met and acted unanimously or otherwise because Mr. Cauchon, a voting board member, had not been noticed. Further, no board member had received the required two weeks' advance notice. As a result, the September 5, 2024 meeting was invalid, as were all actions taken at the meeting.

108. Later that day, Mr. Steward, acting *ultra vires*, sent an email[25] notifying HRO staff that Mr. Cauchon was placed on administrative leave. In the email, Mr. Steward invited HRO's staff and board members to "office hours" for "updates regarding chain of command and interim leadership." (*See* Ex. 21.)

109. In a telling example of bias, Mr. Steward included Ms. Reese as a hidden bcc recipient of the September 5, 2024 email. (*Id.*)

110. Upon information and belief, Mr. Steward secretly included Ms. Reese on this and other emails to HRO's staff and Board about Mr. Cauchon's fate because they were colluding with each other. Mr. Steward repeatedly acted *ultra vires* with one goal: to protect

[24] A copy of the email is attached as "**Exhibit 20**."
[25] A copy of the email is attached as "**Exhibit 21**."

Ms. Reese and her conflict and to retaliate against Mr. Cauchon for reporting her conflict to the government.

111. HRO Board of Directors' decision to place Mr. Cauchon on administrative leave violates Article III, Sections 1 of HRO's Bylaws as the "board is responsible for overall policy and direction of the organization and delegates responsibility of day-to-day operations to the staff and committees." (*See* Ex. 19.) Operational authority, including dealing with alleged employment issues, is not within purview of the HRO Board of Directors' authority. (*Id*.) HRO Bylaws further state in Article V, Section 1: "The President has day-to-day responsibilities for the organization, including carrying out the organization's goals and policies." (*Id*.)

112. At 3:32 p.m., acting *ultra vires* and improperly claiming to speak for HRO, Mr. Steward emailed[26] ODH stating the Conflict Disclosure Notice contained inaccurate information. (*See* Ex. 22.) Mr. Steward stated that HRO had received "official complaints" from staff regarding Mr. Cauchon that required a third-party investigation. (*Id.*)

113. Rather than hire an independent investigator, Mr. Steward hired a friend, attorney Maritza Nelson, to conduct a sham investigation into the alleged "official complaints." Meeting minutes show no board action hiring Ms. Nelson.

114. In the investigation that Ms. Nelson was purportedly hired to conduct, Ms. Reese was the lead complainant, claiming that Mr. Cauchon had created a hostile work environment and retaliated against her, presumably for disclosing her improper relationship with Hikma's lobbying firm.

[26] A copy of this email is attached as "**Exhibit 22**."

115. It was immediately clear that Defendants' conduct, including improperly placing Mr. Cauchon on leave, was retaliation for reporting Ms. Reese's conflict of interest.

116. In fact, Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell received Ms. Reese's formal self-serving hostile work environment grievance on September 4, 2024, *after* they had already begun coordinating their opposition to Mr. Cauchon's disclosure to ODH on September 3, 2024. Defendants nevertheless gleefully used Ms. Reese's sham complaint as a pretext for their retaliation.

117. On September 6, 2024, Mr. Cauchon texted Mr. Steward the following message:[27] "To be clear, I consider this action to be retaliation for reporting the conflict" (*See* Ex. 23.) Mr. Steward responded: "I'm really sorry you feel that way."

118. On October 23, 2024, consistent with HRO's Employee Handbook, Mr. Cauchon filed a written and signed retaliation claim[28] with HRO Administrator Cecile Katz and HRO Board Secretary Colleen Garlock." (*See* Ex. 24.) In the detailed, four-page retaliation claim, Mr. Cauchon asserted that Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell actively blocked Mr. Cauchon from investigating Ms. Reese's conflict of interest and obstructed disclosure of the conflict to ODH. (*Id.*)

119. Defendants failed to review or investigate Mr. Cauchon's retaliation claims. Mr. Cauchon was not interviewed or even asked about his detailed internal retaliation report. Rather, Defendants ignored the retaliation report, and communications among Defendants and HRO's board members confirm that no serious inquiry or investigation into Mr. Cauchon's complaint of retaliation was ever contemplated.

---

[27] A copy of this text is attached as "**Exhibit 23**."
[28] A copy of the Retaliation Claim letter is attached as "**Exhibit 24**."

120. On November 4, 2024, Mr. Cauchon received a termination letter[29] from HRO's partial Board of Directors stating that Mr. Cauchon was fired effective immediately for disclosing Ms. Reese's conflict to ODH. (*See* Ex. 25.) The purported board action was not valid, having not been done with proper notice to each board member, as HRO Bylaws require

121. The termination letter unambiguously cites Mr. Cauchon's disclosure to ODH as **the reason** for his termination. (*Id.*) The letter claims Mr. Cauchon did not act in good faith or have reasonable grounds for making the disclosure. (*Id.*)

122. The termination letter says, "The (Nelson) investigation determined AmandaLynn does not have a conflict of interest with respect to the Ohio Department of Health ("ODH") contract" and that Mr. Cauchon violated HRO's policy requiring that, when making such a disclosure, he be "acting in good faith *and have reasonable grounds for believing the information indicates a violation*. (*Id.*) Any allegations that prove not to be substantiated and which prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense. Your September 3 report to ODH violated this policy." (*Id.*) (Emphasis in original.)

123. The evidence provides overwhelming proof otherwise. The evidence clearly shows that at the time of disclosure: (a) Mr. Cauchon acted in good faith, (b) filed an accurate, even-tempered description of Ms. Reese's conflict, and (c) did so with proper authority in the proper manner, to the proper agency, and following proper procedures.

124. Post-disclosure research has found Ms. Reese's conflict to be far more egregious than known at the time of the September 3, 2024, disclosure. In addition to her anomalous

[29] A copy of the Termination letter is attached as "**Exhibit 25**."

Kloxxado ordering, Ms. Reese was found to be a highly paid, full-time employee of Velocity and to have taken many out-of-state trips for Velocity BioGroup on days when she was paid by HRO for working on the Contract. She also had her own company email, amandalynnar@velocitybiogroup.com, that she used simultaneously with her HRO email.

125. The termination letter does not cite any of the claims made against Mr. Cauchon as a factor in his termination. (*Id.*) Moreover, the hostile work environment claim against Mr. Cauchon was false, a retaliatory ruse for Defendants to protect Ms. Reese from being held accountable for her improper conflict of interest and to punish Mr. Cauchon for investigating it. The termination letter said Ms. Reese's hostile work environment and retaliation allegations against Mr. Cauchon, as well as "several complaints from other current and former employees," were investigated. (*Id.*) In fact, the hostile work environment claim was made only by Ms. Reese and her best friend, who worked from Ms. Reese's home office in Cincinnati. The termination letter does not cite a finding that the employment claims were valid and, in response to multiple interrogatories during this lawsuit, Defendants admitted the employment claims were not a factor in Mr. Cauchon's termination. (*Id.*)

## H. Defendants Held Unnoticed and Unlawful Meetings and Acted *Ultra Vires* to Terminate Mr. Cauchon as President and Remove Him as an HRO Director.

126. HRO's Board of Directors purports to have held official meetings on September 5, 2024, September 7, 2024, September 15, 2024, October 13, 2024, October 27, 2024, November 5, 2024, and November 12, 2024, according to HRO's Board of Directors' meeting minutes.

127. None of the meetings referenced in the paragraph immediately above complied with HRO's Bylaws since Mr. Cauchon, a properly serving board member, was never given

notice of the six special meetings. At no time did Mr. Cauchon waive his right to be noticed or consent to the unauthorized, improperly noticed meetings.

128. In August, at Mr. Cauchon's direction before his suspension, Ms. Katz had properly noticed a general meeting for September 15, 2024. However, in furtherance of their retaliatory plot against Mr. Cauchon, Mr. Steward, Mr. Golden, and/or Ms. Turner-Bicknell changed the meeting's Zoom link to prevent Mr. Cauchon from attending. Mr. Cauchon was the only HRO board member who did not receive the new meeting hyperlink. Mr. Steward, Mr. Golden, and/or Ms. Turner-Bicknell changed the virtual place of the meeting solely to prevent Mr. Cauchon from exercising his rights as an HRO Director.

129. Mr. Cauchon is a former Board Chair and the only Director to have attended all 21 properly noticed meetings held since 2018. He timely and repeatedly asserted his rights as a board member to attend and participate in meetings.

130. On September 11, 2024, Mr. Cauchon emailed all fellow board members asserting his "legal right to be informed of and participate in board meetings and activities." He requested meeting notices, agendas, minutes and other documents provided to board. (*See* Ex. 26)[30]

131. On September 18, 2024, Mr. Cauchon again asserted his rights as board member by demanding board meeting notices, minutes and agendas, and a list of all actions purported to have been taken by HRO's Board of Directors. (*See* Ex. 27)[31]

132. On October 4, 2024, Mr. Cauchon emailed[32] board members to ask that two Directors join him in requesting a properly noticed meeting. (*See* Ex. 28.) Under Article III,

---

[30] A copy of this email is attached as "**Exhibit 26**."
[31] A copy of this email is attached as "**Exhibit 27**."
[32] A copy of this email is attached as "**Exhibit 28**."

Section 1 of HRO's Bylaws, three board members can call a board meeting. Mr. Cauchon wrote: "As you may realize, the Board of Directors has not held a board meeting or otherwise taken any formal action since the quarterly board meeting held almost seven months ago on March 9, 2024." (*Id.*) The next day, Mr. Cauchon followed up with texts and voicemails to HRO board members. No director would join Mr. Cauchon in requesting a properly noticed meeting.

133. Despite Mr. Cauchon's and his counsel's efforts to assert his rights, HRO actively blocked his participation in all HRO board matters, as confirmed by communications among Defendants and HRO's Board of Directors.

134. On October 14, 2024, Mr. Cauchon sent another email[33] to fellow HRO Directors requesting a board meeting to discuss concerns regarding Ms. Reese's conflict of interest, the Contract, and other pressing HRO matters. (*See* Ex. 29.) Later that day, Mr. Steward responded "[t]he Harm Reduction Ohio Board of Directors agrees that there are several key issues facing the agency that need to be addressed." (*See* Ex. 30.)[34]

135. On October 15, 2024, Mr. Steward sent Mr. Cauchon an invitation for a board meeting that was to occur virtually on October 27, 2024. Later that day, Mr. Cauchon responded to Mr. Steward and other board members explaining that each board member was supposed to receive meeting notice at least 14 days in advance of any meeting.[35] (*See* Ex. 31.)

136. Pursuant to Article III, Sections 3 and 10 of HRO's Bylaws, the HRO Board of Directors' notice for the October 27, 2024, meeting was untimely. (*See* Ex. 19.)

---

[33] A copy of this email is attached as "**Exhibit 29**."
[34] A copy of this email is attached as "**Exhibit 30**."
[35] A copy of this email is attached as "**Exhibit 31**."

137. On October 26, 2024, board member Colleen Garlock sent the meeting agenda[36] for the October 27, 2024, meeting. (*See* Ex. 32.) Nowhere did the agenda list the true and sole purpose of the special meeting: to remove Mr. Cauchon from HRO's Board of Directors. (*Id.*)

138. Later that day, Mr. Cauchon responded[37] to all board members, thanking the board for acknowledging that he was an active voting member of HRO's Board of Directors. (*See* Ex. 33.) Based on the lack of timely notice as required under Article III, Section 3 and 10 of HRO's Bylaws, Mr. Cauchon objected to any claim that the October 27 gathering was an official HRO board meeting. (*Id.*) He stated: "I do not waive proper notice for a board meeting to be held tomorrow."

139. At the October 27, 2024, gathering, Mr. Cauchon objected on the record that the meeting was not properly noticed pursuant to HRO's Bylaws.[38] (Ex. 34 at 2-4). Moreover, Mr. Cauchon expressly stated that he did not waive his right to proper notice. (*Id.*) Mr. Steward acknowledged Mr. Cauchon's objection and stated that everyone had "different definition(s) of proper notice." (*Id.* at 4.) Despite Mr. Cauchon's valid objections, Mr. Steward improperly proceeded with the meeting. (*Id.*)

140. During the meeting, Mr. Steward acknowledged Mr. Cauchon was a voting HRO Director and explicitly admitted that HRO's Board of Directors had actively prevented his attendance at board meetings. (*Id.* at 2.)

141. Mr. Cauchon did not participate except to ask that he be recorded as not participating and not waiving his right that meetings be properly noticed.

---

[36] A copy of this meeting agenda is attached as "**Exhibit 32**."
[37] A copy of this email is attached as "**Exhibit 33**."
[38] A copy of this October 27, 2024, transcript is attached as "**Exhibit 34**."

142. At Mr. Steward's request, board member Anne Trinh put forward "a motion for Dennis to be removed as an official board member." (*Id.* at 4.) Mr. Steward thanked her. Ms. Garlock seconded the motion. (*Id.*) There was no discussion regarding the motion. (*Id.*) The six board members present, including Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell, voted to remove Mr. Cauchon from the HRO board and the eight-minute meeting was adjourned. (*See id.*)

143. HRO's Board of Directors, at the behest and direction of Mr. Steward, Ms. Turner-Bicknell, and Mr. Golden, voted to remove Mr. Cauchon.

## I. HRO's Board of Directors Conspired to Hide the Reckless and Harmful Conduct of Ms. Reese.

144. Since improperly suspending Mr. Cauchon on September 5, 2024, illegally removing him from HRO's Board of Directors on October 27, 2024, and wrongfully terminating Mr. Cauchon on November 4, 2024, HRO's Board of Directors have engaged in conduct that is reckless and will lead to irreparable harm to HRO.

145. The HRO Board, acting *ultra vires* and without proper notice, improperly reinstated Ms. Reese to her position on October 16, 2024, and today she is the ODH Contract's Project Manager whose duties include ordering Kloxxado.

146. The HRO Board, acting *ultra vires* and without proper notice, appointed Ms. Turner-Bicknell as HRO Executive Director, purporting to replace Mr. Cauchon, HRO's President, who she conspired to have terminated for disclosing Ms. Reese's conflict of interest.

147. Ms. Turner-Bicknell and Ms. Reese acted *ultra vires* and asked the Ohio Secretary of State on January 22, 2025, to make them agents of the Corporation and remove Mr. Cauchon from that role.

**Exhibit A**

148. Upon information and belief, the HRO Board of Directors has authorized leases, contracts and agreements with outside parties unaware that Defendants are acting without authority and placing the outside parties at financial risk.

149. Upon information and belief, Defendants have misrepresented Board actions to third parties in further efforts to change control of various HRO assets, causing one bank to freeze an HRO bank account and other parties, including another bank and HRO building's landlord, to reject the claims.

150. In November 2024, Chase Bank refused to transfer control of HRO's primary checking account to Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell because they failed to submit proper documentation. On January 6, 2025, $100,000 was transferred from HRO's Chase account to an unknown account at Huntington Bank for an unknown purpose. On January 7, 2025, an additional $19,144 was transferred to the unknown Huntington account. Upon information and belief, Ms. Turner-Bicknell caused these transfers to occur. These transfers are without justification and put a strain on HRO's financial liquidity.

151. Most egregiously, Ms. Turner-Bicknell and Ms. Reese have indefinitely paused HRO's 2023 financial audit because HRO's financial books have fallen into disarray. The Contract requires HRO to be audited. The HRO Board of Director's failure to conduct timely financial audits directly puts HRO at risk of losing the Contract.

152. Upon information and belief, HRO's Board of Directors has consistently failed to properly categorize and document expenditures and income pursuant to internal accounting procedures and failed to make required payments to Ohio's workers' compensation fund and HRO's retirement plan.

153. HRO's Board of Directors failed to file HRO's Form 990 tax return by the November 2024 deadline, forcing Mr. Cauchon to complete the tax return himself despite having purportedly been "terminated."

154. Mr. Steward, Ms. Turner-Bicknell, Mr. Golden and other directors breached the fiduciary duties of care, loyalty and good faith by removing HRO attorney David Ball from his role providing legal guidance to inappropriately replace him with a friend of Mr. Steward, attorney Maritza Nelson.

155. Mr. Steward then falsely claimed to the government that Ms. Nelson conducted a thorough impartial investigation that determined Ms. Reese did not have a conflict of interest and Mr. Steward did not retaliate against Mr. Cauchon.

156. Ms. Nelson's investigation was not thorough, impartial or independent in any sense as claimed to the government. Ms. Nelson failed to exercise due diligence by failing to (a) examine readily available documents regarding Ms. Reese's Velocity employment or Kloxxado ordering patterns, (b) examine efforts by Mr. Steward, Ms. Turner-Bicknell and Mr. Golden to protect Ms. Reese and (c) investigate Mr. Cauchon's formal, detailed retaliation complaint against Mr. Steward, despite having claimed to do so.

157. Without reason or justification, Defendants failed to apply for $500,000+ federally funded state grant that HRO had worked on for a year and had strong likelihood of receiving. The grant application required disclosing Ms. Reese's conflict of interest. This failure imposes an imminent threat upon HRO and its mission.

158. Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell's mismanagement and improper conduct continues to harm HRO and the thousands of individuals suffering with

substance use that depend on HRO's lifesaving education, advocacy, and support services in the State of Ohio.

159. Ms. Turner-Bicknell had herself named as Director of HRO, taking a paid position as a direct benefit from her retaliation against Mr. Cauchon for reporting Ms. Reese's conflict of interest. Ms. Turner-Bicknell is now Ms. Reese's direct supervisor, continuing the role of protecting Ms. Reese's malfeasance at the expense of taxpayers.

160. Mr. Cauchon built HRO from scratch and operated it for seven years with a high degree of competence and honesty, serving as President and Board of Directors member from inception of HRO until Defendants improperly removed him.

### J. Information Discovered During Litigation Vindicates Plaintiff's Concerns About Ms. Reese's Conflict of Interest

161. As a result of his unlawful termination, Mr. Cauchon commenced this lawsuit against Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell on January 28, 2025.

162. Since that time, Defendants have continued to deny to the government—and in this case—that Ms. Reese's employment by Velocity posed an actual conflict of interest with her duties at HRO. But discovery in this lawsuit has uncovered incontrovertible evidence to the contrary.

163. With the benefit of discovery, Mr. Cauchon issued a subpoena to Velocity to uncover the details of its employment relationship with Ms. Reese on March 26, 2025. Although, to date, Velocity is still in the progress of completing its response to Mr. Cauchon's subpoena, on June 24, 2025, Velocity produced its employment agreements with Ms. Reese, along with correspondingW-2's it issued to her regarding her employment lobbying for Hikma.

**Exhibit A**

164. Even without the benefit of Velocity's complete production of records, the details of Ms. Reese's employment agreement with Velocity completely vindicate Mr. Cauchon's contention that Ms. Reese's employment by Velocity presented a brazen conflict of interest.[39]

165. Under Ms. Reese's employment agreements with Velocity, she had an annual salary of over [redacted] and was required to act in "[redacted]," by, among other things, [redacted], [redacted] that she ordered through federally backed dollars at HRO. (Ex. 35 at 39.) Under the employee agreements, Ms. Reese's duties included:

- [redacted]." *Id.* at 40.
- Promoting Kloxxado [redacted] *Id.* at 43.
- [redacted]" *Id.* at 39.
- Understanding [redacted]" *Id.* at 41.
- "[redacted]" *Id.* at 40.
- [redacted] *Id.*

[39] Copies of Ms. Reese's employment agreements with Velocity are attached as "**Exhibit 35**," which is filed concurrently with Plaintiff Cauchon's Second Amended Complaint.

166. Ms. Reese's dual employment by HRO and Velocity, therefore, was a flagrant and textbook example of a conflict of interest. Ms. Reese's conflict of interest resulted in HRO's six-fold increase in purchases of the more expensive brand name Kloxxado under Ms. Reese's direction instead of less costly generic alternatives. By allowing her conflict of interest to influence the purchase the more costly Kloxxado at six times the prior rate, instead of the less costly generic, Ms. Reese submitted false claims for payment by the federal funds that financed those purchases.

167. Likewise, the money Ms. Reese received as a result of her fraudulent expense requests to HRO also constitute false claims for the payment of federal dollars, in addition to her federally funded HRO salary that Ms. Reese would not have received but for her fraudulent non-disclosure of her employment by Velocity.

168. Although Ms. Reese's employment with Velocity alone justified Mr. Cauchon's investigation and disclosure to ODH, the details of her employment agreements with Velocity further confirm Mr. Cauchon's actions were reasonable, accurate and made in good faith. By contrast, those same details emphasize the gross misconduct exhibited by Defendants—and Mr. Steward in particular—through their attempts to protect Ms. Reese from investigation and prevent Mr. Cauchon from disclosing her conflict of interest to ODH.

169. Put differently, Mr. Cauchon correctly believed Ms. Reese to possess a flagrant conflict of interest through her employment by Velocity. Mr. Cauchon's efforts to investigate and disclose this belief were intended to prevent HRO from providing ODH with false information that Ms. Reese's conflict of interest did not exist and further prevent Ms. Reese from improperly using federal funds to purchase Kloxxado over less costly generics, when those ordering decisions were driven by Ms. Reese's own employment with Velocity.

170. Mr. Cauchon did the right thing, even if that disclosure may have been "jeopardizing the agency's largest grant[,]" as Mr. Steward put it. (Ex. 8.). Nevertheless, Defendants punished Mr. Cauchon for refusing to lie and for reasonably asking to see Ms. Reese's employment contract.

171. Given Ms. Reese's now-verified egregious conflict of interest, Defendants' efforts to protect Ms. Reese and retaliate against Mr. Cauchon for investigating and disclosing that conflict prove that Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell failed to act in HRO's best interests.

172. Mr. Reese's verified conflict of interest also shows that Defendants' investigation (through attorney Maritza Nelson) concluding no conflict of interest by Ms. Reese was a complete sham, which was self-driven to justify Defendants' retaliation against Mr. Cauchon. Spending just five minutes looking at Ms. Reese's employment agreement with Velocity makes it clear that she had an irredeemable conflict. Yet, Defendants chose to be willfully blind to the conflict and succeeded in convincing Maritza Nelson to do the same.

**Count One: Retaliation under the False Claims Act and Anti-Kickback Statute, 31 U.S.C. § 3730(h); 42 U.S.C. § 1320a-7b(b)(1)(B).**
**(By Plaintiff As to All Defendants)**

173. Mr. Cauchon realleges the allegations set forth in all preceding paragraphs as if fully rewritten here.

174. The Anti-Kickback Statute ("AKS") prohibits "knowingly and willfully receiv[ing] any remuneration . . . in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program[.]" 42 U.S.C. § 1320a-7b(b)(1)(B).

**Exhibit A**

175. AKS violations can constitute False Claims Act ("FCA") violations where a claim submitted to the government for reimbursement includes items or services resulting from a violation of the AKS." § 1320a-7b(g).

176. The FCA prohibits retaliation against an "employee, contractor, or agent" in response to "efforts to stop 1 or more violations of [the FCA]. 31 U.S.C. § 3730(h)."

177. At all times, HRO received federal funds derived from SOS Grants awarded by SAMHSA. These funds were used to, among other things, reimburse the state of Ohio for naloxone and Kloxxado ordered by HRO as part of the Contract.

178. At all times following discovery of Ms. Reese's employment with Velocity, Mr. Cauchon possessed a good faith belief that Ms. Reese's conflict of interest could amount to an illegal use of federal funds by HRO due to Ms. Reese being paid for advocacy on behalf of Hikma Pharmaceuticals, submitting improper expense requests, and having chosen to purchase Hikma's products with government funds, while Ms. Reese was in a position to personally benefit from directing those purchases.

179. At all times following discovery of Ms. Reese's employment with Velocity, Mr. Cauchon possessed a good faith belief that HRO's current, continued, and future receipt of federal funding was conditioned on disclosing to Ms. Reese's conflict to ODH.

180. At all times, Mr. Cauchon's conduct prior to, during, and after his submission of the Conflict Disclosure Notice to ODH comprised efforts to stop one or more violations of applicable law, and therefore, constitute protected activity under the False Claims Act, 31 U.S.C. § 3279, et seq. These protected activities included, but were not limited to, efforts to prevent and/or investigate potential violations of law that would result from: HRO receiving federal funds by submitting false information, either affirmatively or through

omission under a duty to disclose, to ODH; Ms. Reese's illegally influenced orders of Kloxxado; and Ms. Reese's fraudulent federally funded expense requests to HRO, including her salary received under false pretenses.

181. At all times, Defendants were aware that Mr. Cauchon was engaged in protected activity that was the direct result of Mr. Cauchon's commitment to HRO's legal obligations to disclose conflicts of interest and safeguard federal funds from illegal or improper use. Defendants' initial suspension, "independent" investigation, and subsequent termination of Mr. Cauchon were a direct result of Mr. Cauchon's protected activity aimed at disclosing, investigating, and remedying Ms. Reese's conflict of interest.

182. As a result, Mr. Cauchon seeks all relief afforded to him at law, including without limitation, reinstatement, two (2) times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

**Count Two: Declaratory Judgment**
**(By Plaintiff As to All Defendants)**

183. Mr. Cauchon realleges the allegations set forth in all preceding paragraphs as if fully rewritten here.

184. An actual, present, and justiciable controversy exists concerning whether HRO's Board of Directors' termination and removal of Mr. Cauchon as President of HRO and board member is proper pursuant to HRO's bylaws and the laws of the State of Ohio.

185. Mr. Cauchon requests that the Court declare that:

- All actions and decisions undertaken by HRO's Board of Directors at general and special board meetings since September 5, 2024, are invalid as none of those meetings complied with Article III, Sections 3 and 10 of HRO's Bylaws or Ohio law;

**Exhibit A**

- Defendants lacked authority to suspend Mr. Cauchon at the September 5, 2024 meeting and lacked authority to remove Mr. Cauchon from HRO's Board of Directors at the October 27, 2024, board meeting since the meeting was not properly noticed under Article III, Section 10 of HRO's Bylaws; and
- HRO's Board of Directors' suspension and termination of Mr. Cauchon was retaliatory and invalid under HRO's Bylaws, Ohio law, and Federal law because Defendants retaliated against Mr. Cauchon for investigating and reporting potential misuse of government funds by Ms. Reese relating to her conflict of interest leading her to make self-dealing decisions to order Kloxxado.

**Count Three: Breach of Fiduciary Duty**
**(Derivative Action on Behalf of HRO as to Mr. Steward, Mr. Golden, and Ms. Turner-Bicknell)**

186. Mr. Cauchon realleges the allegations set forth in all preceding paragraphs as if fully rewritten here.

187. As members of HRO's Board of Directors, Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden have a duty to exercise candor, good faith, and loyalty in the management and administration of HRO's business, operations, and affairs.

188. Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision when they formulated and executed a plan to cover up Ms. Reese's conflict of interest and improper Kloxxado ordering related to that conflict.

189. Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden violated and breached their fiduciary duties when they improperly terminated and removed Mr. Cauchon as President of HRO and an active board member.

190. Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden breached their fiduciary duties by falsifying documents and concealing information regarding Ms. Reese's conflict of interest to the ODH and other governmental entities.

191. Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden breached their fiduciary duties when they failed to correct and caused HRO to fail to correct the false and misleading statements and omissions of material fact made to the ODH and other governmental entities.

192. Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of HRO and all individuals and entities associated with HRO, including Mr. Cauchon.

193. Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden had actual or constructive knowledge that they were engaged in a plan to cover up Ms. Reese's conflict of interest and improper ordering.

194. Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden had actual or constructive knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants committed those material misrepresentations and omissions knowingly or recklessly and for the purpose of hiding information from the ODH and other government agencies.

195. In carrying out the actions discussed under this Count, Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden's actions failed to act in good-faith and failed to exercise prudent business judgment to protect and promote HRO's best interests.

196. As a direct and proximate result of Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden's breaches of their fiduciary obligations, HRO and all individuals and entities associated with HRO, including Mr. Cauchon, and will continue to sustain significant damages.

197. Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden's committed these acts in bad faith and with the deliberate intent to cause injury to HRO, or with reckless disregard for the best interests of HRO.

198. As a result of the misconduct alleged herein, Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden are liable to HRO and all individuals and entities associated with HRO, including Mr. Cauchon.

## PRAYER FOR RELIEF

Based on the Counts above, Mr. Cauchon prays for the following relief:

1. Compensatory damages, including two times the amount of back pay, interest on the back pay, and compensation for any special damages, arising from Mr. Cauchon's claim pursuant to 31 U.S.C. § 3730(h); 42 U.S.C. § 1320a-7b(b)(1)(B);

2. An award of Mr. Cauchon's attorneys' fees and costs incurred to address Defendants' wrongful retaliation and improper handling of Mr. Cauchon's removal and termination;

3. An order finding that: (a) HRO's Board of Directors lack authority to suspend Mr. Cauchon at the attempted September 5, 2024 meeting and lacked authority to remove Mr. Cauchon from the HRO's Board of Directors at the attempted October 27, 2024, board meeting since the meetings were not properly noticed under Article III, Section 3 or 10 of HRO's Bylaws, (b) HRO's Board of Directors' termination of Mr. Cauchon was retaliatory and invalid under HRO's Bylaws, Ohio law, and Federal law, and, (c) all actions and decisions undertaken by HRO's Board of Directors at general and special board meetings since September 5, 2024, are invalid as none of those meetings complied Article III, Sections 3 and 10 of HRO's Bylaws or Ohio law;

4. An order requiring Mr. Cauchon's reinstatement pursuant to 31 U.S.C. § 3730(h); 42 U.S.C. § 1320a-7b(b)(1)(B); and

5. All other relief that the Court deems just and equitable.

Respectfully submitted,

/s/ [signature]

Christopher W. Tackett (0087776)
Evan C. Ecos (0097742)

**Exhibit A**

Adrian Radilla (0104701)
**Bailey Cavalieri LLC**
10 West Broad Street, Suite 2100
Columbus, Ohio 43215
Tel: (614) 229-3286
Fax: (614) 221-3155
Email: ctackett@baileycav.com
eecos@baileycav.com
aradilla@baileycav.com

*Counsel for Plaintiff Dennis Cauchon*

# EXHIBIT 35