**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DENNIS CAUCHON, | : | Case No. 2:25-cv-00075 |
| | : | |
| Plaintiff, | : | Judge Edmund A. Sargus, Jr. |
| | : | |
| v. | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| DWAYNE STEWARD, *et al.*, | : | |
| | : | |
| Defendants. | : | |

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT COUNT TWO (DECLARATORY JUDGMENT) — ALL DEFENDANTS COUNT ONE (FALSE CLAIMS ACT RETALIATION) — HARM REDUCTION OHIO

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iv
GLOSSARY OF PERSONS AND ENTITIES .......... vi
SUMMARY OF PRINCIPAL ARGUMENTS (S.D. Ohio Civ. R. 7.2(a)(3)) .......... vii
**I. INTRODUCTION: LIMITED RULINGS ON TWO COUNTS** .......... 1
**II. SUMMARY JUDGMENT STANDARD** .......... 3
**III. STATEMENT OF UNDISPUTED FACTS — COUNT TWO (SOF ¶¶ 1–29)** .......... 4
(a) Bylaws' requirement: an official Board meeting requires two weeks' written notice to each director .......... 4
(b) HRO's records identify Cauchon as a director throughout the challenged period .......... 5
(c) Defendants' admissions on when notice provided and to whom .......... 7
(d) September 5, 2024: Defendants' verified interrogatory answers show one day's notice; Cauchon received none .......... 9
(e) October 13, 2024: Defendants' verified interrogatory answers show two days' notice; Cauchon received none .......... 11
(f) October 27, 2024: Defendants' verified answer shows twelve days' notice; Cauchon objected in writing and orally .......... 11
(g) November 4, 2024: the record identifies no meeting, waiver, or unanimous written consent as required for corporate action .......... 13

(h) The records show no waiver, no unanimous written consent, and no emergency-meeting procedure for three meetings at issue ........ 13

**IV. ARGUMENT — COUNT TWO: THE CHALLENGED BOARD ACTIONS WERE NOT VALIDLY AUTHORIZED (ALL DEFENDANTS)** ........ 15

1. Count Two asks whether identified past Board actions were validly authorized; it does not seek current control of HRO ........ 15

2. HRO's Bylaws required two weeks' written notice; without that notice, Ohio law allowed only waiver or unanimous written consent. ........ 16

3. HRO's contemporaneous corporate records establish that Cauchon was a director entitled to notice on each relevant date. ........ 17

4. The September 5 suspension was not validly authorized — on either view of what happened. ........ 20

5. The October 13 termination vote was not validly authorized: Defendants claim two days' notice, and Cauchon received none. ........ 21

6. The October 27 removal was not validly authorized: notice was twelve days, and Cauchon expressly objected. ........ 21

7. The November 4 termination was not validly authorized: it either implemented the defective October 13 vote or lacked unanimous written consent. ........ 22

8. Defendants' remaining defenses do not cure the defects. ........ 23

**V. COUNT ONE — THE MATTERS PRESENTED AND THE ADDITIONAL UNDISPUTED FACTS (DEFENDANT HRO ONLY)** ........ 25

A. The motion seeks four Count One determinations and reserves ultimate causation, pretext, and damages for trial. ........ 25

B. Statement of Additional Undisputed Facts — Count One (SOF ¶¶ 30–87). ........ 26

(a) Federal funding of HRO's naloxone distribution contract ........ 26

(b) Cauchon's protected activity ........ 28

(c) HRO's knowledge of the protected activity ........ 33

(d) HRO's stated termination rationale ........ 35

(e) Deposition testimony of HRO's Rule 30(b)(6) representative, Steward, and Reese ........ 35

**VI. ARGUMENT — COUNT ONE: THE FOUR FCA COMPONENTS PRESENTED ARE ESTABLISHED AS A MATTER OF LAW (DEFENDANT HRO ONLY)** ........ 38

1. Federal funds financed the statewide naloxone contract, and HRO requested payment under it. ........ 38

2. Cauchon engaged in protected activity by investigating and reporting an undisclosed conflict that implicated HRO's contract representations and payment requests. ....39

3. HRO knew of Cauchon's protected activity before the October 13 vote and received additional FCA-specific notice before the November 4 termination. ....43

4. HRO's termination letter and Rule 30(b)(6) testimony expressly link the September 3 report to the termination, establishing the prima facie causal connection. ....45

**VII. RELIEF REQUESTED** ....47

A. Count Two — partial summary judgment against all Defendants. ....47

B. Count One — partial summary judgment against Defendant HRO. ....48

C. Matters reserved for trial. ....49

D. In the alternative, an order under Rule 56(g). ....50

## TABLE OF AUTHORITIES

### Cases

*Am. Hungarian Fedn. v. Nadas*, 35 Ohio App.3d 72 (8th Dist. 1987) .......... 17, 21

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 4, 20, 21

*Calderone v. United States*, 799 F.2d 254 (6th Cir. 1986) .......... 3

*Calvary Congregational Church, Inc. v. Eppinger*, 8th Dist. No. 75011, 2000 WL 193216 (Feb. 17, 2000) .......... 21

*Campbell v. Hospitality Motor Inns, Inc.*, 24 Ohio St.3d 54 (1986) .......... 25

*Carlson v. Rabkin*, 152 Ohio App.3d 672, 2003-Ohio-2071 (1st Dist.) .......... 15, 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 3

*Fanslow v. Chicago Mfg. Ctr., Inc., 384 F.3d 469 (7th Cir. 2004)* .......... *40, 42*

*Ferguson v. Neighborhood Hous. Servs. of Cleveland, Inc.*, 780 F.2d 549 (6th Cir. 1986) .......... 25

*Fire-Dex, LLC v. Admiral Ins. Co.*, 139 F.4th 519 (6th Cir. 2025) .......... 15

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409 (2005)* .......... *40*

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323 (6th Cir. 1984) .......... 15

*Jones-McNamara v. Holzer Health Sys., 630 F. App'x 394 (6th Cir. 2015)* .......... *3, 40, 45*

*Jovenall v. Zerco Sys. Internatl., Inc.*, 11th Dist. No. 2003-T-0091, 2004-Ohio-3932 .......... 16, 17, 23

*Kirby v. Oatts*, 2d Dist. No. 28455, 2020-Ohio-301 .......... 15, 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......... 20

*McKenzie v. BellSouth Telecomms., Inc., 219 F.3d 508 (6th Cir. 2000)* .......... *25, 40, 41, 45*

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) .......... 15

*Mt. Eaton Cmty. Church, Inc. v. Ladrach*, 9th Dist. No. 07CA0092, 2009-Ohio-77 .......... 17, 20, 21, 22

*Niehaus v. Columbus Maennerchor*, 10th Dist. No. 07AP-1024, 2008-Ohio-4067 .......... 17, 20, 21, 22, 23, 25

*Pullins v. Holmes*, 5th Dist. No. 06CA000037, 2007-Ohio-4603 .......... 16, 17, 21

*Sander v. Country Brook Homeowners' Assn., Inc.*, 12th Dist. Warren No. CA2019-08-079, 2020-Ohio-1555 .......... 17, 22

*State ex rel. Gmoser v. Village at Beckett Ridge Condo. Owners' Assn.*, 12th Dist. No. CA2016-02-035, 2016-Ohio-8451 .......... 15, 17, 22, 23

*State ex rel. Salim v. Ayed*, 141 Ohio St.3d 129, 2014-Ohio-4736 .......... 16

*United States ex rel. Crockett v. Complete Fitness Rehab., Inc., 721 F. App'x 451 (6th Cir. 2018)* .......... *41*

*United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943)* .......... *38*

*United States ex rel. Marlar v. BWXT Y-12, L.L.C., 525 F.3d 439 (6th Cir. 2008)* .......... *43*

*United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731 (D.C. Cir. 1998)* .......... *40*

*Vander Boegh v. EnergySolutions, Inc., 536 F. App'x 522 (6th Cir. 2013)* .......... *43*

*Wisconsin Bell, Inc. v. United States ex rel. Heath, 604 U.S. 140 (2025)* .......... *38, 39*

*Yuhasz v. Brush Wellman, Inc., 341 F.3d 559 (6th Cir. 2003)* .......... *25, 44*

**Statutes**

31 U.S.C. § 3729(b)(2)(A)(ii) ........ 25, 38, 48
31 U.S.C. § 3730(h) ........ 3, 25, 39, 43, 49
Ohio Rev. Code § 1701.01(U) ........ 14, 24
Ohio Rev. Code § 1702.01(K) ........ 18
Ohio Rev. Code § 1702.11(C), (G) ........ 14, 24
Ohio Rev. Code § 1702.19 ........ 17, 21, 24, 47
Ohio Rev. Code § 1702.25 ........ 9, 17, 22, 48
Ohio Rev. Code § 1702.28(A) ........ 23
Ohio Rev. Code § 1702.29(B) ........ 17, 21
Ohio Rev. Code § 1702.31(C) ........ 16, 47
Ohio Rev. Code § 1702.32 ........ 23

**Rules**

Fed. R. Civ. P. 30(b)(6) ........ passim
Fed. R. Civ. P. 30(e) ........ 5
Fed. R. Civ. P. 56 ........ 3, 4, 26, 50, 51
Fed. R. Evid. 201 ........ 14
S.D. Ohio Civ. R. 7.2(a)(3) ........ vii

## GLOSSARY OF PERSONS AND ENTITIES

*Roles are stated as of 2023–2024, the period at issue, except as noted.*

**Parties**

**Dennis Cauchon** — Plaintiff. HRO's founder, President, and director; elected Board Chairman at the original board meeting, September 14, 2018; terminated November 4, 2024.

**Harm Reduction Ohio (HRO)** — Defendant. Ohio nonprofit corporation; awarded statewide naloxone distribution Contract CSP016816, effective November 15, 2023.

**Dwayne Steward** — Defendant. HRO director and Board Vice Chair; recorded as "Interim Board Chair" beginning September 5, 2024.

**Billy Golden** — Defendant. HRO director; former Board Chair; stepped down as Chair at the end of July 2024.

**Tasha Turner-Bicknell** — Defendant. HRO director; HRO's Rule 30(b)(6) deposition designee.

**Other Individuals**

**AmandaLynn Reese** — HRO's Chief Program Officer and the contract's full-time Project Manager; also Director of Government Advocacy for Velocity BioGroup.

**Colleen Garlock, Anne Trinh, Jamie Decker, Molly B. True** — HRO directors; Garlock also Board Secretary-Treasurer.

**Laura Cash** — HRO director and Board Secretary, September 2018 through December 2022.

**Cecile Katz** — HRO Administrator.

**Maritza S. Nelson** — Attorney; author of HRO's October 9, 2024 investigation report.

**David Ball** — Attorney; advised HRO on the Reese conflict review from August 2024.

**Brittany Burns** — Public Health Consultant, ODH; received HRO's September 3, 2024 disclosure.

**Sierra Dantzler** — Administrator, Project DAWN, ODH; also a recipient of that disclosure.

**Entities and Agencies**

**Velocity BioGroup** — Lobbying firm that employed Reese; registered as a lobbyist for Hikma Pharmaceuticals in Ohio and more than 20 other states.

**Hikma Pharmaceuticals** — Manufacturer of Kloxxado, one of the naloxone brands HRO distributed.

**Ohio Department of Health (ODH)** — State agency that oversaw HRO's naloxone contract; recipient of HRO's invoices and HRO's conflict disclosure notice on September 3, 2024.

**Ohio Department of Administrative Services (DAS)** — State agency that awarded Contract CSP016816 on ODH's behalf.

**Ohio Department of Mental Health and Addiction Services (OMHAS)** — State agency; recipient of the federal State Opioid and Stimulant Response ("SOS") grant; transferred $650,000 for the contract and $1,486,000 for naloxone to ODH.

**Substance Abuse and Mental Health Services Administration (SAMHSA)** — Federal agency; awarded the SOS grant to OMHAS.

## SUMMARY OF PRINCIPAL ARGUMENTS (S.D. Ohio Civ. R. 7.2(a)(3))

Because this memorandum exceeds twenty pages, this summary identifies the main sections, principal arguments, primary authority, and page ranges as required by S.D. Ohio Civ. R. 7.2(a)(3).

**Part I — Introduction (p. 1).** Count Two asks whether three specified 2024 Board meetings complied with HRO's two-week written-notice rule and whether the suspension, termination vote and November 4 implementation, and Board-removal vote were validly authorized. Count One, against HRO only, seeks four determinations: that HRO's payment requests were FCA "claims" involving federal funds; that Cauchon engaged in protected activity; that HRO knew of it; and that the record establishes the causal connection required for the prima facie case. 31 U.S.C. §§ 3729(b)(2)(A)(ii), 3730(h)(1). The motion does not seek a ruling on present control of HRO and reserves ultimate causation, pretext, damages, and other unpresented Count One issues.

**Part II — Summary Judgment Standard (p. 3).** Rule 56 permits judgment on part of a claim and, alternatively, an order establishing undisputed facts. Fed. R. Civ. P. 56(a), (g); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

**Part III — Statement of Undisputed Facts, Count Two (pp. 4–15).** SOF ¶¶ 1–29 collect the Bylaws, the corporate records identifying Cauchon as a director, Defendants' verified notice dates (Table 1, SOF ¶ 13), and the September 5 through November 4 events.

**Part IV — Argument: Count Two (pp. 15–25).** Count Two presents a live controversy over identified past actions intertwined with claims the Court must adjudicate; it does not ask who holds HRO office today or seek anyone's ouster. *Fire-Dex, LLC v. Admiral Ins. Co.*, 139 F.4th 519, 529 (6th Cir. 2025), cert. denied, No. 25-245 (U.S. Jan. 12, 2026); *Carlson v. Rabkin*, 152 Ohio App.3d 672, 2003-Ohio-2071, ¶ 35 (1st Dist.); *Kirby v. Oatts*, 2d Dist. No. 28455, 2020-Ohio-301, ¶¶ 27–28, 35, 37–41; *Jovenall v. Zerco Sys. Internatl., Inc.*, 11th Dist. No. 2003-T-0091, 2004-Ohio-3932, ¶¶ 17–18. On the merits, HRO's fourteen-day notice rule controls under Ohio Rev. Code § 1702.31(C); the record shows neither waiver under § 1702.19 nor unanimous written consent under § 1702.25. *Mt. Eaton Cmty. Church, Inc. v. Ladrach*, 9th Dist. No. 07CA0092, 2009-Ohio-77, ¶ 13; *Sander v. Country Brook Homeowners' Assn., Inc.*, 12th Dist. Warren No. CA2019-08-079, 2020-Ohio-1555, ¶¶ 15, 23. HRO's records consistently identify Cauchon as a director; Defendants' verified answers show only one, two, and twelve days' notice; and the asserted term-expiration, majority-vote, "emergency," waiver, estoppel, acquiescence, and ratification theories do not cure the defects.

**Part V — Count One: Matters Presented and Additional Facts (pp. 25–38).** Section 3730(h) requires protected activity, employer knowledge, and discharge or discrimination as a result. *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 514 (6th Cir. 2000). HRO's pleading admits Cauchon's employment and November 4 discharge, so the motion treats those matters as

admitted background and limits the requested rulings to the four disputed matters. SOF ¶¶ 30–87 set out the Count One record.

**Part VI — Argument: Count One (pp. 38–47).** State records trace federal funds to the statewide naloxone contract and match HRO's invoice to a payment booked to "Federal Public Health Programs"; a request to a state recipient qualifies as a claim when the money advances a Government program or interest and the United States supplied any portion of the requested money. 31 U.S.C. § 3729(b)(2)(A)(ii); *Wisconsin Bell, Inc. v. United States ex rel. Heath*, 604 U.S. 140, 149–50 (2025). On the undisputed record, no reasonable jury could find Cauchon's investigation, ODH disclosure, mitigation efforts, October 4 FCA notice, and October 22 complaint unprotected: they were undertaken in good faith on an objectively reasonable belief of possible fraud, and an actual FCA violation need not be proved. *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 399–401 (6th Cir. 2015); *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 416 & n.1 (2005). HRO's witnesses corroborate the reasonableness of investigating the apparent conflict. The directors' writings establish notice before both candidate decision dates. *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449–50 (6th Cir. 2008). Finally, HRO's termination letter and Rule 30(b)(6) testimony identify the September 3 ODH report among the grounds leading to termination, establishing the prima facie causal connection. *McKenzie*, 219 F.3d at 514; *Jones-McNamara*, 630 F. App'x at 397–98. The requested ruling would complete the prima facie case only; ultimate causation and pretext remain for trial.

**Part VII — Relief Requested (pp. 47–52).** Plaintiff seeks seven Count Two declarations against all Defendants and four Count One determinations against HRO only, while reserving the matters listed in Part VII.C. Alternatively, Rule 56(g) permits an order establishing the corresponding undisputed facts identified in Part VII.D. Fed. R. Civ. P. 56(g). None of the requested rulings would decide present control of HRO, pretext, ultimate causation, or damages.

## I. INTRODUCTION: LIMITED RULINGS ON TWO COUNTS

Plaintiff Dennis Cauchon founded Harm Reduction Ohio (HRO) in 2017 after a long career in journalism, including 27 years as a national reporter and editor at *USA Today*. His post-journalism goal was to help solve problems he used to write about. He chose reducing overdose deaths in his home state of Ohio. Using retirement savings and boundless energy, Cauchon built HRO into Ohio's largest distributor of the overdose-reversing drug naloxone (i.e., Narcan) and one of the largest distributors of naloxone in the country.

The explosive growth of HRO's naloxone effort — about 40,000 kits per year in all 88 Ohio counties — was made possible by the Congressionally authorized State Opioid Response (SOR) grants. Because of Ohio's high overdose death rates, the SOR grant formula directed $101 million a year to Ohio, more than any state other than Florida and triple what Michigan received. The DeWine administration — and the governor himself, personally — was committed to widespread naloxone distribution from the start. The federal SOR grant has been the primary funder of naloxone in Ohio. This plentiful flow of federal money has allowed for an unlimited supply of naloxone (versus scarcity in other states) and the creation of the state's Project DAWN (Deaths Avoided With Naloxone), arguably the best naloxone distribution effort in the country. SOR funds have paid for virtually every naloxone kit that HRO and Project DAWN have distributed, and nearly all the money the state has directed to HRO for distribution costs.

The partnership culminated in November 2023 when HRO won a competitively bid state contract to operate a statewide naloxone distribution network and online service. In fact, HRO was already operating such a system at a great financial loss, subsidized by financial contributions from Plaintiff and a patchwork of grants. The new ODH naloxone contract paid $650,000 cash in the first 10 months and $850,000 per year for the following two federal fiscal

years. In addition, the state supplied HRO with an unlimited amount of naloxone to distribute. The cash payments and naloxone were all paid for with SOR funds.

On July 15, 2024, Plaintiff saw a reference in a social media post describing HRO's naloxone contract manager, AmandaLynn Reese, as Director of Government Advocacy for Velocity BioGroup, a lobbyist for Hikma Pharmaceuticals, manufacturer of Kloxxado, an expensive and controversial brand of naloxone. This outside employment had not been disclosed to the state in HRO's bid for the contract, which imposed a continuing obligation to disclose "possible conflicts . . . that could give the appearance of a conflict" (Exs. 38, 44). Cauchon was the contract signatory, HRO's President responsible for day-to-day operations, and Reese's immediate supervisor. He began an inquiry into Reese's outside employment.

Reese, to put it kindly, was not forthright or forthcoming about her Velocity employment. In a Zoom call on July 17, 2024, to discuss her Velocity employment, Reese did not disclose that she was calling from an Indian reservation in northern Minnesota while on a weeklong, multi-city Velocity business trip, rather than calling from her HRO-paid home office in Cincinnati, where she was paid with government funds to work full-time on the contract. What Cauchon did know was that Reese's refusal to provide details of her outside employment was a warning sign that required further investigation. Cauchon began investigating two questions: (a) whether Reese's employment with Kloxxado's lobbyist influenced the types of naloxone she ordered from the state pharmacy, and (b) whether Reese conducted Velocity work while being paid to work on the state contract. This Memorandum and the attached exhibits detail Cauchon's inquiry, which he asserts was protected activity under the False Claims Act (FCA).

Reese enlisted the help of three directors she considered friends to block Cauchon's inquiry into her Velocity employment — which turned out to be a full-time position that paid

double her HRO salary and involved extensive travel across the country — and to block the disclosure of details to the government. To execute this fraud on the government, the directors organized meetings without notifying Cauchon, a director and former Board chair, as required by HRO's Bylaws, and took operational control of the organization in contravention of the Bylaws.

Somewhat unusually, Count Two comes first in this Memorandum because whether Board meetings were lawfully held is a threshold issue that shapes the entire case. Specifically, Count Two seeks a determination on the validity of three specific meetings that violated HRO's Bylaw requirement that each director receive notice of Board meetings at least two weeks in advance. Defendants have given shifting explanations for why Cauchon, a director, was not given notice and why meetings did not comply with other requirements in HRO's Bylaws.

The Count One request asks for determinations on select parts of Plaintiff's FCA, 31 U.S.C. § 3730(h) retaliation claim: the involvement of federal funds, the protected activity and knowledge elements, and the prima facie requirement of causation that shifts the burden under *Jones-McNamara*. Issues of ultimate causation, pretext, and damages are reserved for trial.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," and may be entered on "part of each claim or defense." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Because Cauchon bears the burden of proof on the matters presented, his showing must be "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Court views the evidence and draws reasonable inferences in Defendants' favor, but only a genuine dispute concerning a fact that "might affect the outcome of the suit under the governing law" precludes

judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). If the Court does not grant all requested relief, Rule 56(g) permits it to enter an order stating any material fact that is not genuinely disputed and treating that fact as established in the case.

## III. STATEMENT OF UNDISPUTED FACTS — COUNT TWO (SOF ¶¶ 1–29)

The facts on which Count Two rests are set out below in numbered paragraphs and cited as "SOF ¶ __." The facts on which Count One rests continue this numbering in Part V.B (SOF ¶¶ 30–87).

### (a) Bylaws' requirement: an official Board meeting requires two weeks' written notice to each director

1. Harm Reduction Ohio ("HRO") is a nonprofit corporation. Its Articles of Incorporation, filed with the Ohio Secretary of State on February 26, 2018, name Dennis Cauchon as the initial trustee. (Ex. 1, CAUCHON_000975–979 (certified copy, Ohio Sec'y of State Doc. No. 201805703424).)

2. HRO's Bylaws provide: "An official board meeting requires that each board member have written notice at least two weeks in advance." (Ex. 2, CAUCHON_000015, Art. III, § 3.) Article III, Section 10 states that notices of special meetings "shall be sent out by the secretary to each board member at least two weeks in advance." (*Id.* at CAUCHON_000016, Art. III, § 10.)

3. (a) Article II, Section 1 of HRO's Bylaws states that HRO's "[m]embership shall consist of the board of directors." (Ex. 2, CAUCHON_000015.)

   (b) The Bylaws contain no provision creating an "emergency meeting" category or a shortened-notice procedure. (Ex. 2, CAUCHON_000015–17.)

   (c) Plaintiff produced a copy of the Bylaws at CAUCHON_000015–17. Defendants produced a copy at HRO_000765–767. The operative language quoted above is the same in both copies. (Cauchon Decl. ¶ 2.)

**(b) HRO's records identify Cauchon as a director throughout the challenged period**

4. The minutes of HRO's first board meeting, September 14, 2018, list Cauchon as a board member and record his election as Chairman. The same roster lists Tasha Turner-Bicknell and Laura Cash as board members in attendance. (Ex. 3, CAUCHON_000932–933.)

5. HRO board-meeting minutes identify Cauchon on board rosters from the September 14, 2018 meeting through the March 9, 2024 meeting, the last board meeting before the contested meetings. The March 9 minutes state: "Board members in attendance: Dennis Cauchon, Jamie Decker, Tasha Turner Bicknell, Anne Trinh, Dwayne Steward, Billy Gold[en]." (Ex. 4; see also Ex. 3; Ex. 5, CAUCHON_000945–948.)

6. (a) In HRO's Rule 30(b)(6) deposition, Turner-Bicknell was asked to identify the board members in September 2024. She named seven — Trinh, Garlock, Golden, Steward, Decker, True, and herself — and did not name Cauchon. Asked, "Was Mr. Cauchon a board member?" she answered, "No." Asked whether Cauchon had ever been a board member, she answered, "Not to my knowledge." (Ex. 6, Turner-Bicknell 30(b)(6) Dep. 12:14–13:2.)[1]

(b) In his individual deposition, Steward was asked whether Cauchon was "a member of the board of directors of the organization." He answered, "My recollection is, no," and testified that he did "not recall any references to Mr. Cauchon being a board member." (Ex. 7, Steward Dep. 16:7–15; see also *id.* at 18:16–19.)

---

[1] Exhibits 6, 7, and 64 are excerpts of certified transcripts. Each witness reserved signature, and the thirty-day periods under Fed. R. Civ. P. 30(e)(1) to review the transcripts and submit errata — running from the court reporter's August 18 and 20, 2026 notices that the transcripts were available — had not expired as of this filing; Plaintiff will promptly file any errata sheet served as a supplement to the affected exhibit. (Cauchon Decl. ¶¶ 25–26, 38.)

(c) Steward also testified that he "was provided all the meeting minutes during [his] time on the board" and had seen them. (Steward Dep. 20:16–21:2.)

7. The September 14, 2018 minutes list Turner-Bicknell on the same board roster as Cauchon at the meeting that elected him Chairman. The July 26, 2019 minutes record Cauchon and Turner-Bicknell jointly making and seconding motions to elect HRO officers — Turner-Bicknell seconding Cauchon's nomination of the Vice-Chair, and Cauchon seconding her nomination of the Secretary. (Ex. 3; Ex. 5.)

8. HRO records outside the meeting minutes also identify Cauchon as a director:

(a) HRO's 2022 Form 990 identifies Cauchon as a director: Part VII's table of officers, directors, and trustees lists "Dennis Cauchon — President" with both the individual-trustee/director box and the officer box checked. The Form 990 was transmitted by email to the full Board on November 14, 2023. (Ex. 8, CAUCHON_002859, CAUCHON_002870.)

(b) In April 2024, HRO's administrator sent HRO's independent auditor a "2023 HRO Board Members" list that included Cauchon. (Ex. 9, CAUCHON_002900–903.)

(c) HRO's internal board rosters from September 2018, January 2019, July 2019, and April 2023, and its 2019 reports to a funder, likewise list Cauchon as a director. (Exs. 10–15.)

(d) HRO's public website listed Cauchon as a director on its board page on every day captured by the Internet Archive from April 26, 2020 through December 4, 2024. Captures beginning January 3, 2025 no longer list him. (Ex. 16, CAUCHON_001011–013, 001020–025, 001088–089; Cauchon Decl. ¶ 16.)

(e) No produced record reflects an objection by any director, before September 2024, to Cauchon's identification as a director in the records described in ¶¶ 4–9; and when Cauchon wrote all seven other directors on September 11 and September 18, 2024, asserting his Board membership, no director responded disputing it. (Ex. 33, HRO_000159; Ex. 34, HRO_000160.)

9. Laura Cash, HRO's founding secretary and a director from September 2018 through December 2022, states in her affidavit that Cauchon participated, voted, and made and seconded motions as a director during her tenure and that she is aware of no action removing or replacing him. (Ex. 17, Cash Aff. ¶¶ 2, 4, 6–8.)

10. (a) No produced record shows a resignation by Cauchon, a removal of him before October 27, 2024, or the election of a successor to his seat.

(b) HRO's term-tracking chart, transmitted to HRO administrators, identifies three directors for re-election at the December 23, 2022 meeting. (Ex. 18, CAUCHON_002854–858; Cauchon Decl. ¶ 18.)

(c) The December 23, 2022 meeting record states that three directors were "Reelected by majority vote." (Ex. 19, CAUCHON_000966.)

(d) The minutes of HRO's subsequent meetings in the record identify no further election or re-election of any director. (Ex. 4; Ex. 20, HRO_000100–101; Ex. 21, HRO_000108–109.)

**(c) Defendants' admissions on when notice provided and to whom**

11. Paragraph 126 of the Second Amended Complaint states that HRO's Board "purports to have held official meetings on September 5, 2024, September 7, 2024, September 15, 2024, October 13, 2024, October 27, 2024, November 5, 2024, and November 12, 2024." (ECF No. 59,

PageID 1116, ¶ 126.) Defendants "admit that the Board held meetings on the dates listed." (ECF No. 62, PageID 1216, ¶ 126.)

12. HRO alleges in its Counterclaim: "On November 4, 2024, Counterclaim Defendant was terminated from his employment as president of HRO. A copy of the unanimous board action terminating Counterclaim Defendant's employment is attached as Exhibit 1." (ECF No. 62, PageID 1226, Countercl. ¶ 12.) Defendants produced the letter, together with the November 4, 2024 email transmitting it, at HRO_000189–192. (Ex. 22.)

13. Defendants' verified supplemental response to Interrogatory No. 13, signed under oath by Steward, Golden, and Turner-Bicknell, states the notice Defendants claim for each challenged action. Their counsel's meet-and-confer email identifies the produced documents Defendants say gave that notice. (Ex. 23 at 2–3, 6–8; Ex. 24.) Measured against the Bylaws' requirement of written notice to each Board member two weeks in advance (¶ 2), Defendants' own sworn record shows:

**Table 1 — Notice of the challenged actions (Defendants' verified interrogatory answers)**

| Challenged action | Notice per Defendants' verified interrogatory answers (Ex. 23) | Days' notice | Bylaws require | Notice to Cauchon |
|---|---|---|---|---|
| Sept. 5, 2024 — cease-and-desist; administrative leave | "[N]oticed on Sept. 4, 2024, via email." Counsel identifies HRO_001436 — a calendar entry, not an email; its guest list names seven directors. (Ex. 24 at 3.) | 1 day | 14 days | None. (Decl. ¶ 20; Ex. 20 (listed "Absent").) |
| Oct. 13, 2024 — termination vote | "[N]oticed on October 11, 2024, via text." Counsel's list identifies no Bates-numbered Oct. 11 notice; the produced texts contain none. (Ex. 24; Decl. ¶ 39.) | 2 days | 14 days | None. (Decl. ¶¶ 20, 22.) |

| Challenged action | Notice per Defendants' verified interrogatory answers (Ex. 23) | Days' notice | Bylaws require | Notice to Cauchon |
|---|---|---|---|---|
| Oct. 27, 2024 — removal vote | Noticed "via email on Oct. 14, 2024, and Oct. 15, 2024"; counsel identifies the Oct. 15 email. (Ex. 24; Ex. 25, HRO_000167.) | 12 days | 14 days | Oct. 15 email. Written objection Oct. 26; on-record objection Oct. 27. (¶¶ 20–22.) |
| Nov. 4, 2024 — termination letter | No board meeting identified for November 4. (Ex. 23 at 2–3; Ex. 24.) | — | 14 days, or unanimous written consent (§ 1702.25) | No meeting; no waiver; no signed consent. (¶¶ 25–28.) |

The verified response labels each listed meeting — including the October 27, 2024 meeting — an "emergency board meeting." The produced September 5 and October 13 minutes do not describe either meeting as an "emergency meeting." (Ex. 23 at 2–3; Ex. 20; Ex. 21.)

**(d) September 5, 2024: Defendants' verified interrogatory answers show one day's notice; Cauchon received none**

14. (a) On September 5, 2024, at 1:02 p.m., Steward emailed Cauchon that he and Golden were "sending this message to you as the acting Board Chair and Board Vice Chair" and that "You are directed by the board of directors to cease and desist all activities related to conflict of interest matters, including but not limited to communications with funders, staff, and community partners." (Ex. 26, HRO_000149.)

(b) HRO's Bylaws provide that the chair "shall convene regularly scheduled board meetings, shall preside or arrange for other members of the Executive Committee to preside at each meeting," that the vice-chair "shall chair committees on special subjects as designated by the board," and that the president "has day-to-day responsibilities for the organization, including carrying out the organization's goals

and policies." (Ex. 2, CAUCHON_000016–17, Art. III, § 7; Art. V, § 1.) The Bylaws contain no provision authorizing the chair or vice-chair, individually or jointly, to direct the President to cease performing his duties or to suspend him. (*Id.*)

15. The minutes of the September 5 gathering list Cauchon on the board roster as "Absent," record a vote installing Steward as "Interim Board Chair," record an executive session from 1:05 to 2:05 p.m., and record adjournment at 2:07 p.m. The minutes contain no motion, second, vote, or action concerning a cease-and-desist order or placing Cauchon on administrative leave. (Ex. 20.)

16. At 2:24 p.m., seventeen minutes after the recorded adjournment, Steward emailed Cauchon: "All members of the HRO Board of Directors met today during an emergency meeting where it was unanimously decided to place you on paid admin leave until the completion of an investigation." The signature block reads "Board of Directors, Chair." (Ex. 27, HRO_000150.)

17. Cauchon received no advance written notice of the September 5 meeting, and its minutes list him as "Absent." (Cauchon Decl. ¶ 20; Ex. 20.) When the gathering was held, a Board meeting had already been scheduled and noticed for September 15, 2024. (Ex. 28, CAUCHON_003012–018; Cauchon Decl. ¶ 24; Ex. 24.) The September 5 meeting itself was planned two days in advance, in writing, and without notice to Cauchon. On September 3, 2024, at 10:49 a.m., Steward texted directors Golden and Turner-Bicknell: "Just fyi, Dennis is going to be sending an email to the board letting folks know that he's disclosing the conflict with AmandaLynn to ODH," and wrote: "I think we should do an emergency meeting of the board without him after he sends the email." Golden responded: "I agree as well/ punishment and

emergency board meeting." On September 4, Steward confirmed: "1 pm works for everyone. . . . I'll send an agenda and video invite." (Ex. 29, HRO_001275, 001277–278, 001281–283.)

**(e) October 13, 2024: Defendants' verified interrogatory answers show two days' notice; Cauchon received none**

18. Defendants' verified supplemental response states that the October 13 meeting was noticed on October 11, 2024, via text. Their counsel's notice-document list identifies no Bates-numbered October 11 notice, and the produced board texts contain no October 11 message providing notice of the meeting. (Ex. 23 at 3; Ex. 24; HRO_000844–HRO_001337; Cauchon Decl. ¶ 39.) Cauchon received no advance notice of the October 13 meeting. Neither he nor his attorney was informed of the termination vote until the termination letter arrived at 4:53 p.m. on November 4, 2024. (Cauchon Decl. ¶¶ 20, 22.)

19. (a) The October 13 minutes list Cauchon, together with director Anne Trinh, in the "Absent" column of the "Board members" attendance table. The minutes state that Garlock "entered a motion to terminate Dennis Cauchon as Executive Director/President of Harm Reduction Ohio," that Turner-Bicknell seconded the motion, and that "[a]ll remaining present board members voted unanimously to terminate Dennis Cauchon," with "the terms of dismissal . . . pending." (Ex. 21, HRO_000108–109.)

(b) The minutes list an action item for Steward to "work with law firm to finalize reinstatemnt [sic] of AmandaLynn and termination of Dennis through his attorney," with an October 16 due date. (Ex. 21, HRO_000108–109.)

**(f) October 27, 2024: Defendants' verified answer shows twelve days' notice; Cauchon objected in writing and orally**

20. On October 14, 2024, Cauchon wrote to his "Fellow Directors" asking that the Board formally meet. On October 15 at 11:39 a.m., Steward emailed Cauchon that the Board was

"available on Oct. 27 at 10 am" and that an invitation containing the meeting link had been sent. (Ex. 30 at 1–3, HRO_001512–1514.) Defendants' counsel identifies this October 15 email as the meeting notice. (Ex. 24; Ex. 25, HRO_000167.)

21. On October 26 at 4:54 p.m., Cauchon sent the Board a written objection stating: "I do not waive proper notice for a board meeting to be held tomorrow. I object to any claim that tomorrow's gathering is an HRO board meeting. The lack of proper notice and equal access to board materials denies me adequate time and information to prepare for a board meeting." (Ex. 30 at 10, HRO_001520 (emphasis in original).)

22. (a) At the start of the October 27 meeting, Cauchon asked: "Am I recognized at this meeting as a voting board member?" Steward answered: "Yes. Actually, yes." Cauchon then stated: "I do not waive proper notice and object to this meeting. This meeting was improperly convened under Ohio law and our bylaws." (Ex. 30 at 11–12, CAUCHON_000902–903 (transcript).)[2]

(b) Steward acknowledged the dispute — "(It) sounds like we have a different definition of proper notice" — and proceeded over the objection: "And so I put forward — or I request — a motion for dismissal." (Ex. 30 at 14, CAUCHON_000905.)[3]

(c) HRO's retained counsel, Maritza Nelson, advised the Board in writing that, to the extent Cauchon was a voting member, a vote to remove him as a director

---

[2]The transcript is the citation aid; the underlying recording, produced by Defendants in native form as HRO_000110.mp4, will be made available to the Court and filed conventionally with the Clerk if the Court so directs. Cauchon's declaration authenticates the transcript and confirms that Defendants' produced recording contains the same recorded meeting. (Cauchon Decl. ¶ 11.)

[3]The meeting minutes record the same statement in slightly abbreviated form. (Ex. 30 at 18, HRO_001531.)

should be taken pursuant to Article III, Section 9 — that is, "[a]fter providing two weeks' notice of a regular or special board meeting." (Ex. 31 at 9, HRO_001430.)

23. At the October 27 meeting, Steward stated that Cauchon had not attended previous meetings because, "[d]uring your administrative leave, the board felt it unethical for you to be a part of the investigation that was about you, which is why you weren't in attendance." (Ex. 30 at 12.) Cauchon had not been given notice of those meetings. (¶¶ 13, 17–18.)

24. At the October 27 meeting, Trinh moved "for Dennis to be removed as an official board member." Garlock seconded the motion. Six directors voted aye. Cauchon did not participate in the vote. (Ex. 30 at 14–15, CAUCHON_000905–906.) The meeting minutes record the same motion, second, and 6–0 vote. (*Id.* at 17–18, HRO_001530–1531.)

**(g) November 4, 2024: the record identifies no meeting, waiver, or unanimous written consent as required for corporate action**

25. On November 4, 2024, at 4:53 p.m., Cauchon received the Board's termination email stating: "The HRO Board of Directors have voted unanimously to terminate your employment at Harm Reduction Ohio, effective immediately." The attached letter included the signatures of Steward, Decker, Garlock, True, Trinh, Turner-Bicknell, and Golden. The acknowledgment page prepared for Cauchon's signature was blank. (Ex. 22, HRO_000189–192.)

26. Defendants' verified supplemental response identifies no board meeting on November 4, 2024. (Ex. 23 at 2–3.) Cauchon did not sign the termination letter or its acknowledgment page, did not transmit a written vote or approval authorizing his termination, and did not authorize anyone to approve it on his behalf. (Cauchon Decl. ¶ 13.)

**(h) The records show no waiver, no unanimous written consent, and no emergency-meeting procedure for three meetings at issue**

27. Cauchon did not sign or send a written waiver of notice for the September 5, October 13, or October 27, 2024 meetings. He did not attend the September 5 or October 13 gatherings.

He attended the October 27 gathering after making the written objection described in ¶ 21 and the on-the-record objection described in ¶ 22. (Cauchon Decl. ¶¶ 20–21; Ex. 30 at 10–12.)

28. No produced document reflects written approval by all directors of the challenged actions. Cauchon did not sign or send a written approval authorizing those actions. (Cauchon Decl. ¶ 13; Ex. 23.)

29. (a) Ohio Rev. Code § 1701.01(U) supplies the definition of "emergency" that governs emergency corporate action under Ohio Rev. Code § 1702.11(C) and (G): an emergency exists only when the governor proclaims that "an attack on the United States or any nuclear, atomic, or other disaster" has caused an emergency for corporations, and it continues until terminated by proclamation. No such gubernatorial proclamation was in effect between September and November 2024 — a fact accurately and readily determinable from Ohio's official executive records and subject to judicial notice under Fed. R. Evid. 201(b)(2).

(b) HRO did not adopt emergency regulations under Ohio Rev. Code § 1702.11(C), and had no emergency-meeting policy or procedure of any kind. (Cauchon Decl. ¶ 23.)

(c) HRO's Rule 30(b)(6) designee, Turner-Bicknell, testified that she could not identify a Bylaw provision allowing emergency meetings and knew of no HRO policy or procedure governing how emergency meetings were held or conducted. (Turner-Bicknell 30(b)(6) Dep. 28:23–29:1, 29:16–30:1, 35:10–13.)

## IV. ARGUMENT — COUNT TWO: THE CHALLENGED BOARD ACTIONS WERE NOT VALIDLY AUTHORIZED (ALL DEFENDANTS)

### 1. Count Two asks whether identified past Board actions were validly authorized; it does not seek current control of HRO.

Actual controversy. An "actual controversy" exists over the validity of the challenged actions. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Defendants deny both that a controversy exists and that the actions were invalid (ECF No. 62, PageID 1221, ¶¶ 184–185), while HRO prosecutes counterclaims premised on termination by unanimous board action (*id.*, PageID 1226, Countercl. ¶ 12). The same question — whether the challenged actions were validly authorized — underlies Count One's termination, HRO's counterclaims, and Defendants' defenses. In such "mixed" actions, where the coercive and declaratory claims are tightly linked, abstaining on the declaratory claim "would most likely be an abuse of discretion." *Fire-Dex, LLC v. Admiral Ins. Co.*, 139 F.4th 519, 529 (6th Cir. 2025), cert. denied, No. 25-245 (U.S. Jan. 12, 2026); see *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (listing as the first two factors whether the declaratory action would settle the controversy and clarify the legal relations in issue). The declarations sought will settle that question as to three discrete past actions.

Not *quo warranto*. Ohio treats *quo warranto* as "the proper and exclusive remedy for determining the legal right of an officer of an incorporated nonprofit association to hold office," *Carlson v. Rabkin*, 152 Ohio App.3d 672, 2003-Ohio-2071, ¶ 35 (1st Dist.), and looks to the substance of the relief sought, not the label on the claim. *Kirby v. Oatts*, 2d Dist. No. 28455, 2020-Ohio-301, ¶¶ 27–28; *State ex rel. Gmoser v. Village at Beckett Ridge Condo. Owners' Assn.*, 12th Dist. No. CA2016-02-035, 2016-Ohio-8451, ¶ 38. Count Two seeks none of the relief those cases reserve to *quo warranto*: Cauchon does not ask the Court to declare who holds HRO office today, to declare him presently entitled to office, or to oust anyone. He asks whether

three discrete past actions that injured him personally were validly authorized when taken — relief Ohio courts grant in closely similar circumstances. *Jovenall* ¶¶ 17–18 (abuse of discretion to deny declaratory relief; a court may declare corporate action invalid though it may not oust); *Pullins* ¶¶ 31–32 (removed director's personal action adjudicated on the merits); *Carlson* ¶¶ 13–14 (rights personal to the member, as distinct from injury to the corporation, are direct claims). Nor is there an alternative state remedy to defer to: only the Attorney General or a prosecuting attorney may bring *quo warranto* against the officers of a private nonprofit corporation. *State ex rel. Salim v. Ayed*, 141 Ohio St.3d 129, 2014-Ohio-4736, ¶¶ 11–12. *Kirby* therefore held it error to stay, pending a *quo warranto* action private parties cannot bring, a claim that could be adjudicated without determining who validly held office. 2020-Ohio-301, ¶¶ 35, 37–41.

The supporting record for this Part is collected at SOF ¶¶ 11–13.

**2. HRO's Bylaws required two weeks' written notice; without that notice, Ohio law allowed only waiver or unanimous written consent.**

Ohio Rev. Code § 1702.31(C) supplies the default notice rule for directors' meetings "[u]nless otherwise provided in the articles, regulations, or bylaws." HRO's Bylaws do provide otherwise and therefore control. The Bylaws state that an "official board meeting requires that each board member have written notice at least two weeks in advance," and that special-meeting notices likewise must be sent "to each board member at least two weeks in advance" (SOF ¶ 2). The fourteen-day requirement applies however the challenged gatherings are classified — regular or special. HRO's own witnesses read the Bylaws the same way. Its Rule 30(b)(6) representative, asked whether the provision requires two weeks' notice, answered: "[a]t least two weeks in advance is what it says." Steward, asked whether regular and special meetings require a fourteen-day notice period, answered: "[a]ccording to this document." Ohio law supplies two alternatives to a properly noticed meeting: (a) a written waiver or attendance without timely

protest by each director not properly noticed, Ohio Rev. Code § 1702.19, or (b) action without a meeting by unanimous written consent of all directors, *id.* § 1702.25.

Ohio courts enforce these requirements as written. On notice: *Mt. Eaton Cmty. Church, Inc. v. Ladrach*, 9th Dist. No. 07CA0092, 2009-Ohio-77, ¶ 13 (unnoticed time change invalidated meeting); *Niehaus v. Columbus Maennerchor*, 10th Dist. No. 07AP-1024, 2008-Ohio-4067, ¶¶ 45, 56 (transaction "not valid as a matter of law" without required notice, despite majority votes and a later "ratification"); *Am. Hungarian Fedn. v. Nadas*, 35 Ohio App.3d 72, 74–75 (8th Dist. 1987) (meeting invalid where notice was not sent to all members), closely analogous because HRO's Bylaws make the directors its only members (SOF ¶ 3). On action without a meeting: *Sander v. Country Brook Homeowners' Assn., Inc.*, 12th Dist. Warren No. CA2019-08-079, 2020-Ohio-1555, ¶¶ 15, 23 (noncompliance with § 1702.25 rendered action "ineffective"); *Gmoser*, 2016-Ohio-8451, ¶ 26 (removal outside a meeting failed for want of signed writings); *Jovenall v. Zerco Sys. Internatl., Inc.*, 11th Dist. No. 2003-T-0091, 2004-Ohio-3932, ¶ 17 (under the parallel for-profit statute, action without every director's signed approval, "and any subsequent actions of the board, are invalid"). And removal must follow the governing documents. Ohio Rev. Code § 1702.29(B); *Pullins v. Holmes*, 5th Dist. No. 06CA000037, 2007-Ohio-4603 (reinstatement affirmed where removal failed bylaw-defined grounds). Each challenged action was therefore valid only if taken at a properly noticed meeting, after a valid waiver of notice, or by unanimous written consent. None was.

The supporting record for this Part is collected at SOF ¶¶ 1–3, 27–29.

**3. HRO's contemporaneous corporate records establish that Cauchon was a director entitled to notice on each relevant date.**

The documentary record of Cauchon's directorship runs unbroken from HRO's constitutive document through the challenged actions. HRO's Articles of Incorporation name

him the initial trustee, which made him a director under Ohio law, Ohio Rev. Code § 1702.01(K) (directors are those vested with authority to conduct the corporation's affairs "irrespective of the name, such as trustees, by which they are designated"). (SOF ¶ 1.) The minutes of HRO's first board meeting record his election as Chairman, and every set of minutes in the record thereafter carries him as a director on the board roster, most recently at the March 9, 2024 meeting immediately preceding the contested gatherings. (SOF ¶¶ 4–5.)

HRO made the same representation that Cauchon was a director outside its minutes, including:

- its 2022 IRS Form 990, transmitted to the full Board, which checked both the individual-trustee/director box and the officer box for Cauchon (SOF ¶ 8(a));
- its "2023 HRO Board Members" list provided in April 2024 to its independent auditor (SOF ¶ 8(b));
- internal board rosters from September 2018, January 2019, July 2019, and April 2023, and a 2019 report to a funder (SOF ¶ 8(c)); and
- its website, which listed him as a director on every day captured by the Internet Archive from April 2020 through December 4, 2024 (SOF ¶ 8(d)).

HRO circulated these internal and external records for six years, and the produced record identifies no objection by any director, before September 2024, to his identification as a director. (SOF ¶ 8(e).) Laura Cash, HRO's board secretary and director from September 2018 through December 2022, confirms that Cauchon participated, voted, and made and seconded motions as a director throughout her tenure. (SOF ¶ 9.) Fact discovery has closed, and no produced record shows a resignation, a removal before October 27, 2024, or the election of a successor to his seat.

A December 2022 re-election of three other directors left his seat untouched. (SOF ¶ 10.) Defendants' post-litigation term-expiration theory is addressed in Part IV.8(i).

Defendants' own records during the challenged period continued to treat him as a director: the September 5 and October 13 minutes list him among the directors as "Absent." At the outset of the October 27 meeting, the presiding officer answered "Yes. Actually, yes" when Cauchon asked whether he was recognized as a voting board member. The meeting voted on a motion "for Dennis to be removed as an official board member." (SOF ¶¶ 15, 19, 22, 24.) Steward's stated reason for excluding Cauchon from earlier board meetings — that it would have been "unethical" for him to attend — was an admission, not a justification: nothing in the Bylaws or Chapter 1702 suspends a director's right to notice because he is under investigation, and the rationale presupposes the very directorship Defendants now deny. (SOF ¶ 23.) Cauchon, for his part, asserted his membership in writing to all other directors on September 11 and September 18, 2024; no director responded disputing it. (SOF ¶ 8(e).) Defendants excluded a director from notice and then removed the director; they were not dealing with someone who never held a seat.

Defendants' testimony denies Cauchon's directorship but identifies no corporate act or record supporting the denial. HRO's Rule 30(b)(6) designee answered "No" when asked whether Cauchon was a board member in September 2024, and "Not to my knowledge" when asked whether he had ever been one. (SOF ¶ 6(a).) Yet the designee attended, as a fellow board member, the 2018 meeting that elected Cauchon Chairman and jointly made and seconded motions with him at the July 2019 meeting. (SOF ¶¶ 4, 7.) Steward's disclaimer — "My recollection is, no" — comes from a director who testified he was provided and had seen all meeting minutes. (SOF ¶ 6(b)–(c).) Neither witness identified any corporate act ending Cauchon's service.

These litigation positions must be measured against HRO's formal record: the Articles, six years of board rosters, Form 990, and Defendants' own September and October 2024 meeting records. Bare disclaimers of recollection set against that uniform record would not permit a reasonable factfinder to find that Cauchon was "never" a director. *Anderson*, 477 U.S. at 248, 252; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As a matter of fact and law, Cauchon was a director entitled to two weeks' written notice of every meeting at issue.

The supporting record for this Part is collected at SOF ¶¶ 1, 4–10, 15, 19, 22–24.

**4. The September 5 suspension was not validly authorized — on either view of what happened.**

By Defendants' own verified account, the September 5 gathering had one day's notice, and Cauchon received none. (¶ 13, Table 1.) Nor was it spontaneous: on September 3, Steward proposed in writing "an emergency meeting of the board without him after he sends the email." Golden responded, "I agree as well/ punishment and emergency board meeting." On September 4 the organizers polled every director except Cauchon. (¶ 17.) One day is not two weeks. The gathering was not a validly convened official Board meeting, and nothing decided there was validly authorized Board action. *Mt. Eaton* ¶ 13; *Niehaus* ¶¶ 45, 56. As for the suspension, the minutes record no motion, second, or vote authorizing it. Steward announced it in an email to Cauchon seventeen minutes after the recorded adjournment, asserting it had been "unanimously decided." (¶¶ 15–16.) And if the suspension was instead Steward's unilateral act as self-described "acting Board Chair," the Bylaws vest day-to-day authority in the President and contain no provision authorizing the chair or vice-chair, individually or jointly, to suspend him. (¶ 14.) Either way the suspension fails. Any affidavit asserting an unrecorded executive-session

vote merely relocates the vote to the same unnoticed meeting, making the factual dispute immaterial. *Anderson*, 477 U.S. at 248.

**5. The October 13 termination vote was not validly authorized: Defendants claim two days' notice, and Cauchon received none.**

Defendants' verified interrogatory answers claim two days' notice for the October 13 gathering; Cauchon received none and did not waive notice. (¶ 13, Table 1; ¶¶ 18, 27.) The minutes record a motion, second, and unanimous vote of those present to terminate him, with Cauchon listed "Absent" and "the terms of dismissal . . . pending." (¶ 19.) Two days is not two weeks. Neither Cauchon nor his attorney learned of the vote until the termination letter arrived on November 4 — twenty-two days later. (¶ 18.) A termination voted at a meeting convened without the required notice is invalid. *Mt. Eaton* ¶ 13; *Niehaus* ¶¶ 45, 56; *Nadas*, 35 Ohio App.3d at 74–75. Defendants' own account thus falls twelve days short of the Bylaws' notice requirement, and Cauchon received no notice at all.

**6. The October 27 removal was not validly authorized: notice was twelve days, and Cauchon expressly objected.**

The October 27 record is conceded: twelve days' notice. (¶ 13, Table 1; ¶ 20.) Twelve days is not two weeks. Cauchon objected in writing the day before the meeting — "I do not waive proper notice for a board meeting to be held tomorrow" — and again at its commencement, so attendance waived nothing. Ohio Rev. Code § 1702.19(B) (attendance waives defective notice only absent protest "prior to or at the commencement of the meeting"). (¶¶ 21–22.) Steward acknowledged the dispute on the record — "(It) sounds like we have a different definition of proper notice" — and proceeded over the objection. (¶ 22.) A removal vote at a meeting not validly convened, and outside the governing procedure, is invalid. Ohio Rev. Code § 1702.29(B); *Pullins*; *Calvary Congregational Church, Inc. v. Eppinger*, 8th Dist. No. 75011, 2000 WL 193216 (Feb. 17, 2000) (attempted removal void where the meeting failed to comply with

statutory notice requirements). Defendants' own counsel had given the same advice: any vote to remove Cauchon as a director should come "[a]fter providing two weeks' notice of a regular or special board meeting." (¶ 22.) The term-expiration and never-a-member theories appeared only in litigation and are addressed in Parts IV.3 and IV.8(i). Because notice was twelve days and Cauchon expressly declined to waive the defect, the October 27 removal vote was not validly authorized.

**7. The November 4 termination was not validly authorized: it either implemented the defective October 13 vote or lacked unanimous written consent.**

The transmittal email for the November 4 termination letter reports a completed vote: the Board "ha[s] voted unanimously to terminate your employment." The only recorded meeting vote to terminate is October 13's — which left "the terms of dismissal . . . pending" — and Defendants' verified interrogatory answers identify no November 4 meeting. (¶ 13, Table 1; ¶¶ 12, 19, 25–26.) The letter therefore fails either way. As implementation of the October 13 vote, it rests on a meeting convened without the required notice (Part IV.5). *Mt. Eaton* ¶ 13; *Niehaus* ¶¶ 45, 56. As a corporate act without a meeting, it was valid only "with the affirmative vote or approval of, and in a writing or writings signed by, all of the . . . directors . . . who would be entitled to notice of a meeting for that purpose." Ohio Rev. Code § 1702.25(A); *Sander*, 2020-Ohio-1555, ¶¶ 15, 23 (unanimity, a signed writing from each director, and entry upon the corporate records all required; noncompliant action "ineffective"); *Gmoser*, 2016-Ohio-8451, ¶ 26. Eight directors were entitled to notice: the seven signers and Cauchon, who remained a director on November 4 (Parts IV.3, IV.6, IV.8(i)). Cauchon never signed the letter or its acknowledgment page and never transmitted any approval. (¶¶ 25–27.) Seven of eight is not all. Either way, the November 4 termination was not validly authorized.

**8. Defendants' remaining defenses do not cure the defects.**

**(i) Defendants' expired-term theory does not defeat Cauchon's director status.** At the February 18, 2025 conference, Defendants contended that Cauchon's two-year term ended in July 2024. (Hr'g Tr., ECF No. 27, PageID 570–71.) But no successor was elected. Ohio Rev. Code § 1702.28(A) provides a default under which a director serves through the next annual meeting and until a successor is elected unless the articles or regulations provide a different term. HRO's Bylaws specify two-year terms but do not state that passage of the stated date automatically vacates a seat when no successor is elected. *Jovenall*, applying the parallel for-profit statute, likewise held that directors whose fixed terms expired "maintain their status as board members" until successors are elected. 2004-Ohio-3932, ¶¶ 14–15. (SOF ¶ 10.)

Defendants cannot have it both ways. Five of HRO's eight directors had listed dates that passed before the challenged meetings. Turner-Bicknell's listed term ended the same day as Cauchon's, yet she seconded the October 13 termination motion. Trinh's had ended more than a year earlier, yet she moved Cauchon's October 27 board removal. (Ex. 18; SOF ¶¶ 19, 24.) If a listed term-expiration date automatically ended Cauchon's status as a director, the same rule would invalidate votes Defendants rely on as Board action.

**(ii) A majority cannot cure defective notice.** HRO's Bylaws require two weeks' written notice to each Board member. (Ex. 2, Art. III, §§ 3, 10.) Ohio Rev. Code § 1702.32 makes a majority's act the act of the Board only "at a meeting at which a quorum is present." A majority — or even unanimity among those present — cannot supply notice to an omitted director. *Niehaus*, 2008-Ohio-4067, ¶¶ 45, 56; *Gmoser*, 2016-Ohio-8451, ¶¶ 23–27. The number of votes does not convert an improperly noticed gathering into an official Board meeting.

**(iii) Calling the gatherings "emergency meetings" did not shorten the notice requirement.** HRO could have adopted a different notice procedure for emergency meetings, but it did not. Its Bylaws contain no emergency-meeting category or shortened-notice procedure. HRO's Rule 30(b)(6) designee testified that she was unaware of any HRO document addressing how emergency meetings may occur or any policy or procedure governing them. Steward, asked whether the Bylaws contemplate emergency meetings, testified: "I do not see that here." (SOF ¶¶ 3, 29; Ex. 6, Turner-Bicknell 30(b)(6) Dep. 29:16–30:1, 35:10–13; Ex. 7, Steward Dep. 56:16–17.) Because HRO had no shorter-notice rule, Chapter 1702 supplies the applicable exception to the ordinary notice requirement. That exception applies only during an "emergency" as defined in Ohio Rev. Code § 1701.01(U) — a gubernatorial proclamation that an attack on the United States or a nuclear, atomic, or other disaster has caused an emergency for corporations. Ohio Rev. Code § 1702.11(C), (G). No such proclamation was in effect. Even during such an emergency, Ohio law still requires notice to directors whom it is feasible to reach. Defendants emailed Cauchon twice on September 5. (SOF ¶¶ 14, 16, 29.) Calling a gathering "special" does not help either: Article III, Section 10 independently requires two weeks' notice.

**(iv) No waiver, estoppel, acquiescence, or ratification cured the notice defects.** Ohio Rev. Code § 1702.19 permits waiver in writing or by attendance without protest before or at the meeting's commencement. Cauchon did not attend the September 5 or October 13 gatherings, signed no written waiver, and objected to the October 27 notice both beforehand in writing and verbally at the meeting's commencement. (SOF ¶¶ 21–22, 27.) On October 4, he had already requested a meeting "consistent with the two-week advance notice requirement in the HRO Bylaws." (Ex. 35, HRO_000162; SOF ¶ 73.) That record defeats waiver and is inconsistent with acquiescence or estoppel.

Nor does the record establish ratification. *Campbell v. Hospitality Motor Inns, Inc.* permits implied ratification of an officer's unauthorized contract based on knowing acquiescence. It did not involve defective notice to a sitting director. 24 Ohio St.3d 54, 56–57 (1986). *Niehaus* likewise upheld invalidity despite a later Board ratification because the required member notice and authorization were absent. 2008-Ohio-4067, ¶¶ 45, 56. Defendants identify no later, validly convened Board action ratifying the challenged acts. *Campbell* therefore does not establish that later conduct cures the notice defect at an earlier Board meeting.

## V. COUNT ONE — THE MATTERS PRESENTED AND THE ADDITIONAL UNDISPUTED FACTS (DEFENDANT HRO ONLY)

### A. The motion seeks four Count One determinations and reserves ultimate causation, pretext, and damages for trial.

An FCA retaliation claim has three elements: (1) the employee engaged in protected activity; (2) the employer knew of it; and (3) the employer discharged or otherwise discriminated against the employee as a result. *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 514 (6th Cir. 2000); *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003).

Two matters need no ruling. HRO admits in its Counterclaim that Cauchon "was terminated from his employment as president of HRO" on November 4, 2024. (SOF ¶¶ 12, 30.) That admission binds HRO. *Ferguson v. Neighborhood Hous. Servs. of Cleveland, Inc.*, 780 F.2d 549, 551 (6th Cir. 1986). Section 3730(h)(1) expressly protects an employee who is "discharged." Plaintiff therefore does not seek rulings on employee status or whether the termination was adverse. Plaintiff seeks four determinations against HRO:

1. **Federal funding.** HRO's requests for payment under the statewide naloxone contract were claims within 31 U.S.C. § 3729(b)(2)(A)(ii);
2. **Protected activity.** Cauchon engaged in protected activity under § 3730(h)(1);

3. **Knowledge/notice.** HRO knew of Cauchon's protected activity before the October 13 vote and had additional notice before the November 4 termination; and

4. **Prima facie causation.** The undisputed evidence establishes the causal connection required for the prima facie case.

The motion reserves for trial ultimate causation, pretext, damages, the other adverse acts alleged in Count One, and all other Count One issues not presented here.

Count One stands on its own record. Nearly every fact below comes from HRO's own pleadings, its produced documents, its witnesses' sworn testimony, or public records, each stated in a numbered paragraph (SOF ¶¶ 30–87). The Board-action defects in Part IV are not offered as evidence of retaliatory motive. If the Court denies any requested determination, Plaintiff alternatively asks for a Rule 56(g) order establishing the facts cited in that sub-part (Part VII.D).

**B. Statement of Additional Undisputed Facts — Count One (SOF ¶¶ 30–87).**

The additional undisputed facts on which Count One rests are set out below, continuing the numbering of Part III.

30. HRO's Counterclaim states that, on November 4, 2024, Cauchon "was terminated from his employment as president of HRO." HRO's October 25, 2024 payroll record, captioned "Employee Pay Stub," identifies Cauchon as an "Employee." (ECF No. 62, PageID 1226, Countercl. ¶ 12; Ex. 36, CAUCHON_002925.)

**(a) Federal funding of HRO's naloxone distribution contract**

31. HRO distributes the opioid overdose-reversing drug naloxone as part of the Ohio Department of Health Project DAWN program. (ECF No. 62, PageID 1204, Answer ¶ 20.)

32. The Ohio Department of Administrative Services awarded the contract (CSP016816) on behalf of the Ohio Department of Health (ODH) to HRO effective November 15, 2023. (Ex. 37, CAUCHON_002990–993.)

33. HRO completed the first-year work plan under the contract on September 30, 2024 and was paid $650,000. (ECF No. 62, PageID 1205, Answer ¶ 25.)

34. The State renewed Contract CSP016816 for an additional twenty-four months, from October 1, 2024 through September 30, 2026. (Ex. 39, CAUCHON_002997, 003000.)

35. The Ohio Treasurer's website, checkbook.ohio.gov, records HRO's contract payments under the appropriation line item "Federal Public Health Programs." (Ex. 40, CAUCHON_002994.)

36. On August 5, 2024, HRO filed an invoice to ODH under Contract CSP016816 requesting payment of $59,319.14 for July 2024 contract services. (Ex. 41, CAUCHON_002988–989.)

37. The Ohio Treasurer's website records an ODH payment to HRO of $59,319.14 on August 12, 2024 — matching the invoice amount in ¶ 36 — and identifies the appropriation line item name as "Federal Public Health Programs." (Ex. 40.)

38. On December 28, 2023, OMHAS and ODH executed an Interagency Agreement applying funds OMHAS received from the federal State Opioid and Stimulant Response ("SOS")[4] 3.0 Year II grant — awarded by the Substance Abuse and Mental Health Services Administration (SAMHSA) — to naloxone distribution through Project DAWN, allocating

[4] The federal opioid response grant (Assistance Listing Number 93.788) has been called the State Targeted Opioid Response Grant (STR), the State Opioid Response Grant (SOR) and the State Opioid and Stimulant Response Grant (SOS) at various times.

$650,000 to the "Statewide Mail-Order & Lay Dist. Contract." (Ex. 42, CAUCHON_002982, 002984, 002987.)

39. The State of Ohio's FY2025 Single Audit of federal spending identifies Assistance Listing 93.788 as "Opioid STR" and reports $4,856,921 in expenditures by ODH under that federal program. (Ex. 43, CAUCHON_002980–981.)

40. Defendants admit that HRO "receives some funding through federal grants." (ECF No. 62, PageID 1221, Answer ¶ 177.)

**(b) Cauchon's protected activity**

41. HRO's contract application included a required Conflict of Interest Statement certifying that "no employees or contractors associated with the organization have a conflict of interest working on the statewide Naloxone project." (Ex. 44, HRO_000579.)

42. The conflict-of-interest rule, included in the Request for Proposals and incorporated by reference into the contract, stated:

> Conflict of Interest Statement. Each Proposal must include a statement indicating whether the Offeror or any people that may work on the Project through the Offeror have a possible conflict of interest (e.g., employed by the State, etc.) and, if so, the nature of that conflict. The State has the right to reject a Proposal in which a conflict is disclosed or cancel the Contract if any interest is later discovered that could give the appearance of a conflict.

(Ex. 38 at 2, RFP p. 25, § 10; Ex. 38 at 4, RFP p. 46 (the Contract "will consist of this RFP including all attachments"); Ex. 37, CAUCHON_002990.)

43. The application's staffing plan designated AmandaLynn Reese, HRO's chief program officer, as the contract-funded Project Manager working 1.0 FTE (40 hours per week) on the contract. (Ex. 45, HRO_000471–472, 000532–534.)

44. On July 23, 2023, Reese returned to Cauchon a signed statement for the contract application that she would "work fulltime on the project and not have my ability to execute the project reduced by other duties." (Ex. 46, CAUCHON_001214, 001216.)

45. The required Conflict of Interest Statement in HRO's contract application did not disclose that Reese, the contract's Project Manager, was employed as Director of Government Advocacy for Velocity BioGroup, a lobbyist for Hikma Pharmaceuticals, the maker of the Kloxxado brand of naloxone. (Ex. 44; Ex. 31, HRO_001423.)

46. On July 16, 2024, Cauchon emailed Steward that he had seen a public biography on social media that identified Reese as Director of Government Advocacy at Velocity and it was "problematic if she has an undisclosed relationship with a firm promoting Hikma and Kloxxado." Steward responded the same day. (Ex. 47, CAUCHON_002966–971.)

47. On July 17, 2024, Cauchon spoke with Reese, who described her Velocity work as minimal and occasional and promised, at Cauchon's request, either to formally end her financial relationship with Velocity or to provide details of her work and payments in writing so HRO could determine whether a disclosable conflict existed. Cauchon forwarded the ensuing email exchange to Steward and HRO Administrator Katz. (Cauchon Decl. ¶ 35; Ex. 48 at 1–3, HRO_000245–246, REESE_000008.)

48. Despite Cauchon's written reminder, Reese never provided details of her Velocity work and never stated whether she would end her financial relationship with Velocity. (Cauchon Decl. ¶¶ 35, 37; Ex. 48 at 2–3, HRO_000246, REESE_000008; Ex. 49 at 1–3, REESE_000032–034.)

49. In late July and August 2024, Cauchon began research to determine whether (a) Reese had done work for Velocity on time she was being paid by HRO to work on the contract, and (b) Reese's naloxone ordering may have been influenced by her financial relationship with Kloxxado's lobbying firm. (Cauchon Decl. ¶ 37.)

50. On August 19, 2024, Cauchon wrote Steward that "[t]he ODH contract required us to submit a statement listing all people working on the contract for HRO who may have a conflict or possible conflict," and that "[w]e are required to report all conflict and possible conflicts when we learn of them." (Ex. 50, HRO_000320–321.)

51. Steward replied: "I don't think you should send ODH anything that would jeopardize the contract over an unproven conflict," wrote that disclosure "may put the agency's largest grant in jeopardy," and four minutes later forwarded the exchange to Turner-Bicknell and Golden, writing: "sending this to you two so there is full transparency in how I'm advising Dennis." (Ex. 50, HRO_000319–320.) The next morning, Steward texted Cauchon: "I agree that there needs to be disclosure." (Ex. 51, CAUCHON_002951.)

52. On August 21, 2024, HRO Administrator Cecile Katz emailed Cauchon that HRO's records showed Reese had taken no paid time off in 2024 except 32 hours for dental work. (Ex. 52, CAUCHON_002958.)

53. On August 21, 2024, Cauchon texted Steward that he had "found additional information that is concerning, including what I consider Hikma work and travel done on HRO time," that "[t]he first issue is she needs to disclose," and that "[a]n undisclosed financial relationship with the manufacture's [sic] lobbyist seems problematic to me." Steward replied that "a line should be drawn and there should be clear separation for external and internal work for all staff." (Ex. 53, CAUCHON_002952.)

54. On August 22, 2024, Cauchon sent a public records request to document naloxone orders made to the state pharmacy. The State acknowledged the request and produced the responsive records on September 16, 2024. (Ex. 54, CAUCHON_002953–957.)

55. On September 3, 2024, at 10:58 a.m., Cauchon sent Steward a draft of the Conflict Disclosure Notice he planned to provide ODH. At 11:47 a.m. — two minutes after the signed Notice was transmitted to ODH (¶ 86) — Steward replied: "I would suggest removing any language that says she refused to disclose. . . . [W]e don't have any definitive proof that she refused to disclose." The Notice as transmitted to ODH, and as attached to Cauchon's 1:57 p.m. email to the full Board (¶ 59), states: "AmandaLynn has declined to provide me details of her work for Velocity BioGroup." (Ex. 55, CAUCHON_003011, 000861; Ex. 56, HRO_000292; Ex. 57, CAUCHON_003001.)

56. On September 3, 2024, at 11:10 a.m., after calling Brittany Burns, HRO's contract manager at ODH, to tell her that HRO needed to disclose a potential conflict of interest under the contract, Cauchon emailed Burns a Conflict Disclosure Notice describing what he knew about Reese's role at Velocity. (Cauchon Decl. ¶ 37; Ex. 56, HRO_000292–296.)

57. The signed disclosure letter included this language: "Since December 2022, AmandaLynn, as Harm Reduction Ohio's representative, has ordered approximately 15,000 Kloxxado kits from the state. At present, I have no reason to believe that AmandaLynn's outside contract influenced her ordering decisions." (Ex. 56, HRO_000292–293.)

58. ODH acknowledged the disclosure: "Thank you for sending this to us and for your attention to this matter. Please keep us posted on the results of your internal investigation . . . ," and stated that it would pass the letter to "our funding partners . . . since the funding for this contract originates from them." (Ex. 56, HRO_000294.)

59. On September 3, 2024, at 1:57 p.m., Cauchon emailed the full HRO Board that the disclosure had been made, attached the Conflict Disclosure Notice, and reported that Reese had been placed on paid leave. (Ex. 57, CAUCHON_000202, 003001–005.)

60. On September 4, 2024, Cauchon circulated a proposed conflict-review schedule and proposed disclosure form for Reese to Steward, Katz and HRO attorney David Ball, who wrote, "I green light the form." (Ex. 58, CAUCHON_002926–930, 002939–940; principal messages also produced at HRO_000306–312.)

61. On September 5, 2024, at 9:30 a.m., Steward opposed Cauchon's draft disclosure request, emailing: "asking for the contracts and the amounts of money is egregious." (Ex. 58, CAUCHON_002947–948.)

62. On September 5, 2024 at 12:31 p.m., Cauchon emailed the Board that he had presented a conflict mitigation plan to ODH and appointed an interim program manager. (Ex. 59, HRO_000148.)

63. On September 5, 2024, at 1 p.m., Cauchon was at attorney Ball's office working on the conflict when he received Steward's cease-and-desist email quoted in ¶ 14. (Ex. 26; Cauchon Decl. ¶ 40.)

64. On September 6, 2024, at 9:16 a.m., Cauchon texted Steward: "To be clear, I consider this action to be retaliation for reporting the conflict." Steward responded, "I'm really sorry you feel that way," and forwarded the message to the Board. (Ex. 60 at 3, CAUCHON_000881; Ex. 60, HRO_000849–850.)

65. On October 22, 2024, Cauchon signed a formal employee complaint describing "actions by three board members to obstruct the legally required reporting of an apparent conflict of interest related to a federally funded state contract" and retaliation for that reporting, and stating: "The following complaints implicate various state and federal laws, including Uniform Guidance (2CFR 200), Federal Acquisition Regulations (FAR), the False Claims Act." On October 23, 2024, at 8:24 a.m., he transmitted the complaint by email to HRO administrator Katz

and Board Secretary Garlock, stating that it was "filed with you as required by our employee handbook." At 7:35 p.m., Garlock replied: "Thank you Dennis for filing your complaint. The board will review and investigate these claims and we will be in touch regarding next steps." (Ex. 61, CAUCHON_000882–885, 003006–007.)

66. HRO's later-hired investigator, Maritza S. Nelson, addressed her investigation report to HRO's Board of Directors. The report is dated October 9, 2024. (Ex. 31, HRO_001398.) The report states: "The language in the contract documents did require reporting any 'possible conflict.'" (Ex. 31, HRO_001409.)

67. The Nelson report also states: "It is understandable how [Reese's] work with Velocity might be perceived as a 'possible conflict' if the only known facts were that she had a government advocacy position with Velocity, a known lobbyist for Hikma Pharmaceuticals, the manufacturer of Kloxxado." (Ex. 31, HRO_001423.)

**(c) HRO's knowledge of the protected activity**

68. The seven directors who signed the November 4, 2024 termination letter (¶ 25) were Steward, Decker, Garlock, True, Trinh, Turner-Bicknell, and Golden. (Ex. 22, HRO_000191.)

69. Steward received Cauchon's written report of Reese's Velocity Biogroup employment on July 16, 2024 and responded the same day. (¶ 46; Ex. 47.)

70. On September 3 and 4, 2024, Steward, Golden, and Turner-Bicknell exchanged the text messages quoted in ¶ 17 concerning Cauchon's coming disclosure to ODH and a meeting "without him." (Ex. 29, HRO_001275, 001277–278.)

71. Cauchon's September 3, 2024, 1:57 p.m. email to the full Board (¶ 59) stated: "As a state contractor receiving federal funds, Harm Reduction Ohio has an ongoing duty to disclose

all conflicts and potential conflicts," and "[u]ndisclosed conflicts can result in the termination of our federally funded contract." (Ex. 57, CAUCHON_000202.)

72. On September 5, 2024, at 3:32 p.m., after the cease-and-desist directive (¶ 14) and the administrative-leave email (¶ 16), Steward wrote ODH, copying the six other directors, that the Board had "learned recently of a document that our Executive Director, Dennis Cauchon, sent to ODH with information regarding a conflict of interest" and had "officially placed Mr. Cauchon on administrative leave pending an investigation." (Ex. 62, HRO_000172.)

73. On October 4, 2024, Cauchon's written request to all seven other directors for a Board meeting listed, among the matters requiring Board action, "HRO compliance with federal and state contracting regulations and laws, including the False Claims Act." (Ex. 35.)

74. HRO's investigator reported to the Board that "HRO initiated the investigation because Dennis reported the alleged conflict of interest to the Ohio Department of Health ('ODH'), a major funder of HRO . . . ." (Ex. 31, HRO_001399.)

75. The investigator's report analyzed whether Cauchon's conduct was protected whistleblowing and recommended: "Dennis Cauchon should be terminated and removed from the Board." (Ex. 31, HRO_001427–428, 001430.)

76. The October 13, 2024 minutes record the vote to terminate Cauchon (¶ 19) as taken "based on the investigation . . . and the final report." (Ex. 21, HRO_000108.)

77. On October 23, 2024, Garlock forwarded Cauchon's formal complaint (¶ 65) to the other directors. In the directors' group text thread, Golden wrote, "Thanks Colleen. I just read it"; True wrote, "Yeah I read it too"; and Steward wrote: "He's likely going to sue. But this is also a ploy to keep us from terminating him." (Ex. 32, HRO_001022, 001024.)

78. On November 2, 2024, Turner-Bicknell wrote in the directors' group text thread: "I know there are some questions about timing and his aqusations [sic]. I don't see any whistle blowing on his part- I think it is delusional." (Ex. 63, HRO_001072.)

79. On November 4, 2024, before the termination email was sent, Steward wrote in the directors' group text thread: "I still haven't sent the termination letter. Not sure what to do at this point." Garlock responded: "I think we still need to send the letter and terminate him. . . . The problem is he can say we terminated him in retaliation - although he was already told to cease and desist and put on leave." Turner-Bicknell responded: "We need to keep things as simple as possible- he is outside of cease & desist and admin leave. Now he will be terminated- there is no whistle blowing or retaliation here." (Ex. 63, HRO_001096–097.)

**(d) HRO's stated termination rationale**

80. The termination letter states that Cauchon's September 3 letter to ODH "was based on and contained numerous inaccurate and misleading statements," quotes HRO's whistleblower policy, and declares: "Your September 3 report to ODH violated this policy." It states: "We do not consider this an act of good faith or reasonable grounds for your report to ODH." And it identifies "insubordination throughout this entire investigative process," including "failing to participate in the investigation," among the "grounds for termination of your employment." (Ex. 22, HRO_000190–191.)

**(e) Deposition testimony of HRO's Rule 30(b)(6) representative, Steward, and Reese**

81. In its Rule 30(b)(6) deposition, HRO testified that Cauchon "was terminated for insubordination." Asked to identify "the acts of insubordination which led to his termination," HRO's representative answered: "He did not comply with being placed on leave of absence. He continued to engage in work after we warned him several times in writing. He sent the letter to

the ODH without moving forward, as we had agreed, in consulting a lawyer and conducting an investigation. He did not participate in the investigation. He continued to access bank accounts. . . ." She confirmed that the "letter to the ODH" was Cauchon's September 3, 2024 letter to ODH. (Turner-Bicknell 30(b)(6) Dep. 22:16–23:22, 38:16–39:16.)

82. Asked whether HRO believed Cauchon "had reasonable grounds for believing there may be a conflict with AmandaLynn Reese's employment with Velocity," HRO's Rule 30(b)(6) representative answered: "We took his complaint very seriously. We hired a third party to conduct an investigation." Asked whether HRO believed "there was reasonable grounds for conducting an investigation into the potential conflict of AmandaLynn Reese," she answered: "For HRO, just bringing something like that forward seemed like reasonable grounds to look into it, so we conducted an investigation." (Turner-Bicknell 30(b)(6) Dep. 71:12–72:3.)

83. HRO's Rule 30(b)(6) representative testified that HRO's knowledge was that Cauchon "and an attorney that he was working with at the time, sent us written communication expressing that he believed that he was being retaliated against for bringing forward concerns about the conflict of interest," and confirmed that this meant "[t]he conflict of interest with AmandaLynn Reese." (Turner-Bicknell 30(b)(6) Dep. 68:7–15.)

84. When Cauchon reported Reese's Velocity position to Steward on July 16, 2024 (¶ 46), the information was new to Steward: asked whether, before receiving Cauchon's email, he was aware that Reese "had a role, or was employed by Velocity BioGroup," he testified, "I do not believe so." Asked whether he agreed "that it was a potential conflict," Steward testified: "At the time, not knowing the details and on face value, yes," and answered "Correct" when asked whether he "believed it was a potential conflict with the limited details that [he] had." Steward testified that he recommended a conversation with Reese to understand the situation and "a

proper — a full investigation into the matter." He further testified that, on the facts initially provided and "based on non-profit best practice," an employee with a second job is "not supposed to be doing that job during company time," and confirmed that this referred to Reese's work for Velocity BioGroup. (Steward Dep. 23:23–25:13, 31:6–32:2.)

85. Reese testified that she is the only person listed at "1.0" FTE on the staffing plan in HRO's ODH contract application; that her understanding of that entry was "[t]hat of the allotment for the contract, I would be given full-time equivalent for work done under this contract"; and that "[i]n this application, that 40 hours is equivalent to one full FTE." Asked whether she considered "that [her] full-time employment at Velocity interfered with [her] full-time employment at HRO," Reese answered, "No, sir," and asked whether "having two full-time jobs did not cause either to interfere with the other," she answered: "No, sir. . . . Having two full-time jobs is the norm." (Ex. 64, Reese Dep. 103:17–105:2, 119:7–25.)

86. ODH staff circulated Cauchon's September 3, 2024 conflict disclosure internally within minutes of receiving it. At 11:45 a.m., HRO Administrator Cecile Katz emailed the signed disclosure letter to ODH Public Health Consultant Brittany Burns. At 11:50 a.m., Burns forwarded it to ODH staff members Sierra Dantzler and Devin Quinn. At 11:53 a.m., Dantzler forwarded it to Jennifer Voit, writing: "Please see Dennis' letter attached." (Ex. 56, HRO_000294.)

87. In his September 3, 2024, 1:57 p.m. email to the Board (¶ 59), Cauchon reported that "Project DAWN administrator Sierra Dantzler initiated a conversation with me in which she described the conflict as an actual and significant conflict that needed to be addressed," and that Dantzler "agreed that then employee [sic] could no longer be involved with our naloxone program or contract in any way." At 2:08 p.m. the same day, Cauchon wrote HRO's outside

counsel that Dantzler "expressed that she considered it a clear and unacceptable conflict of interest" and "said the issue will be sent to the ODH's legal counsel's office." (Ex. 57, CAUCHON_000202, 003002.)

## VI. ARGUMENT — COUNT ONE: THE FOUR FCA COMPONENTS PRESENTED ARE ESTABLISHED AS A MATTER OF LAW (DEFENDANT HRO ONLY)

Each determination below rests on documents — HRO's own pleadings and produced records, and public records — cited by paragraph number to the Statement of Additional Undisputed Facts in Part V.B.

### 1. Federal funds financed the statewide naloxone contract, and HRO requested payment under it.

The supporting facts are set out at SOF ¶¶ 31–40.

HRO's invoice to ODH is a "claim" under § 3729(b)(2)(A)(ii). A request to a state grantee is a claim when the money is to be spent "to advance a Government program or interest" and the United States "provides or has provided any portion" of it. 31 U.S.C. § 3729(b)(2)(A)(ii); *Wisconsin Bell, Inc. v. United States ex rel. Heath*, 604 U.S. 140, 149–50 (2025); *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544 (1943) (federal grant money in state hands remains "as much in need of protection from fraudulent claims as any other federal money").

HRO's own admissions and the State's records establish both conditions. HRO admits that it distributes naloxone as part of ODH's Project DAWN program, that it "receives some funding through federal grants," and that it completed the contract's first-year work plan and was paid $650,000. (SOF ¶¶ 31, 33, 40.) The State's records trace that money. The OMHAS–ODH Interagency Agreement applies the SAMHSA-funded SOS grant to naloxone distribution through Project DAWN and allocates $650,000 to the statewide mail-order contract. (SOF ¶ 38.) That is the exact amount HRO admits it was paid. (SOF ¶ 33.) HRO's August 5, 2024 invoice for $59,319.14 matches to the dollar the payment Ohio Checkbook records a week later under the

appropriation line "Federal Public Health Programs." (SOF ¶¶ 35–37.) And the State's Single Audit reports ODH's expenditures under the federal Opioid STR program. (SOF ¶ 39.)

The Court need not decide whether federal money covered the whole contract. Any portion is enough. *Wisconsin Bell*, 604 U.S. at 149–50. No genuine dispute exists that federal funds financed the contract and that HRO requested payment under it.

**2. Cauchon engaged in protected activity by investigating and reporting an undisclosed conflict that implicated HRO's contract representations and payment requests.**

The supporting facts are set out at SOF ¶¶ 14, 16, 25, 36–37, 41–67, 71–73, 82, 84–87.

The evidence known to Cauchon at the time went well beyond a mere suspicion of a possible conflict. As part of its contract application, HRO was required to submit a Conflict of Interest Statement and certified that "no employees or contractors associated with the organization have a conflict of interest working on the statewide Naloxone project." (SOF ¶ 41.) Cauchon had confirmed that HRO's full-time Project Manager simultaneously worked for the lobbying firm representing a naloxone manufacturer whose product she ordered for HRO. (SOF ¶¶ 43–45, 57, 85.) Cauchon maintains that these facts established an actual undisclosed conflict and made HRO's certification false or materially inaccurate while HRO continued to seek payment under the federally funded state contract.

The Court need not decide those ultimate merits questions to determine protected activity. The narrower question is whether Cauchon had a good-faith, objectively reasonable basis to investigate whether HRO's contract representations and requests for payment were false or fraudulent, and whether his investigation, disclosure, and remedial efforts were protected.

Section 3730(h)(1) protects acts taken in furtherance of an FCA action and "other efforts to stop 1 or more violations." 31 U.S.C. § 3730(h)(1). Cauchon's investigation, disclosure to ODH, and efforts to correct and mitigate the conflict fall within the second category. A retaliation

plaintiff need not prove that an FCA violation actually occurred. *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 416 & n.1 (2005). An employee need not understand the FCA's qui tam mechanism, *McKenzie*, 219 F.3d at 516, and need not have actual knowledge of the FCA at all. *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004). Nor must the employee finish investigating before protection attaches. *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 399 (6th Cir. 2015). Congress meant to protect employees "while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998), quoted in *Jones-McNamara*, 630 F. App'x at 399. The employee must act in good faith on a belief a reasonable employee in the same circumstances could hold. *Jones-McNamara*, 630 F. App'x at 399–401.

Cauchon's protected activity began with his investigation. On July 16, he reported to Steward that Reese was Director of Government Advocacy for Velocity BioGroup, the lobbying firm for Hikma Pharmaceuticals, maker of Kloxxado. (SOF ¶ 46.) He then asked Reese about her Velocity work and financial relationship. He checked HRO records to determine whether she performed Velocity work while committed to work full time on the contract. And he filed a public records request to determine whether her relationship with Hikma's lobbyist had affected her naloxone procurement from the state pharmacy. (SOF ¶¶ 47–50, 52–54.) These inquiries sought facts bearing directly on whether HRO's staffing and no-conflict representations remained accurate while HRO sought government payment. (SOF ¶¶ 36–37.)

On August 19, Cauchon told Steward the contract required disclosure of any conflict or possible conflict. (SOF ¶ 50.) Steward responded, "I don't think you should send ODH anything that would jeopardize the contract over an unproven conflict." The next morning, however, he

agreed: "I agree that there needs to be disclosure." (SOF ¶ 51.) Steward's contemporaneous agreement supports the reasonableness of Cauchon's belief that the matter required disclosure.

On September 3, Cauchon disclosed Reese's Velocity employment to ODH. (SOF ¶ 56.) He distinguished clearly what he had confirmed from what remained under investigation. After noting HRO had ordered approximately 15,000 Kloxxado kits, the disclosure stated: "At present, I have no reason to believe that AmandaLynn's outside contract influenced her ordering decisions." (SOF ¶ 57.) Cauchon's records request to the state was filed August 22 but not fulfilled until September 16, after his suspension and directive from Defendants that he "cease and desist" his investigation. (SOF ¶¶ 14, 16, 54.)

ODH acknowledged the disclosure and said it would pass the letter to "our funding partners . . . since the funding for this contract originates from them." (SOF ¶ 58.) Cauchon told the Board that HRO was a state contractor receiving federal funds, had an ongoing duty to disclose conflicts and potential conflicts, and that undisclosed conflicts could result in termination of the federally funded contract. (SOF ¶ 71.) He prepared and presented a conflict mitigation plan to ODH and reported the effort to the Board. (SOF ¶¶ 59–60, 62.) By then, HRO had already requested and received payment under the contract. (SOF ¶¶ 36–37.)

Two days later Steward himself wrote ODH that the Board had "learned recently of a document that our Executive Director, Dennis Cauchon, sent to ODH with information regarding a conflict of interest." (SOF ¶ 72.) The disclosure thus put the suspected problem before the agency being billed. *McKenzie*, 219 F.3d at 516; *United States ex rel. Crockett v. Complete Fitness Rehab., Inc.*, 721 F. App'x 451, 461–62 (6th Cir. 2018).

The protected activity continued after Cauchon's September 5 suspension. On October 4, he asked the full Board to address "HRO compliance with federal and state contracting

regulations and laws, including the False Claims Act." (SOF ¶ 73.) On October 22, he signed a formal complaint alleging obstruction of required reporting of an apparent conflict involving a federally funded state contract and retaliation for that reporting. The complaint again invoked the False Claims Act, along with other federal contracting requirements. It was submitted to HRO's administrator and Board Secretary. (SOF ¶ 65.) Thus, although FCA protection did not depend on naming the statute, *Fanslow*, 384 F.3d at 479, Cauchon expressly invoked it twice before his November 4 termination. (SOF ¶ 25.)

The record confirms both good faith and objective reasonableness. Cauchon sought information before reporting, distinguished confirmed facts from questions under investigation, and pursued mitigation. (SOF ¶¶ 47–48, 52–54, 57, 60, 62.) His declaration states his good-faith belief and purpose directly. (Cauchon Decl. ¶ 41.) Within hours of the disclosure he reported to both his Board and HRO's outside counsel that ODH's Project DAWN administrator had told him she regarded the conflict as actual and significant, and that ODH would refer the matter to its legal counsel. Those are two contemporaneous accounts of what he understood at the time. (SOF ¶ 87.) HRO's own witnesses corroborate the reasonableness of that belief. Steward testified that Reese's Velocity position appeared "on face value" to present a "potential conflict" and recommended "a full investigation." (SOF ¶ 84.) HRO's investigator acknowledged that the contract required reporting any "possible conflict" and that it was "understandable" how Reese's Velocity position could be perceived as one. (SOF ¶¶ 66–67.) HRO testified under Rule 30(b)(6) that bringing the concern forward provided "reasonable grounds to look into it." (SOF ¶ 82.) And Reese confirmed a central factual premise of the investigation: the contract's staffing plan committed her alone at 1.0 FTE, to 40 hours per week while she simultaneously held full-time employment with Velocity. (SOF ¶ 85.)

Taken together, this course of conduct falls within § 3730(h)(1). It began with Cauchon's investigation into whether HRO's contract representations and requests for payment were accurate and continued through his disclosure and mitigation efforts with ODH, his October 4 FCA notice, and his October 22 formal complaint. The Court need not decide whether the underlying conduct ultimately establishes an actual FCA violation. On the undisputed record, no reasonable jury could find that Cauchon's investigation, reporting, disclosure, and remedial efforts were outside § 3730(h)(1)'s protection.

**3. HRO knew of Cauchon's protected activity before the October 13 vote and received additional FCA-specific notice before the November 4 termination.**

The supporting facts are set out at SOF ¶¶ 14, 16, 19, 25, 46, 50–51, 55, 64–65, 68–79, 83.

An FCA retaliation plaintiff must show that the employer knew of the protected activity. *Vander Boegh v. EnergySolutions, Inc.*, 536 F. App'x 522, 530–31 (6th Cir. 2013). Internal notice suffices when the employee connects the challenged conduct to suspected fraud on the federal government. *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449–50 & n.5 (6th Cir. 2008). The relevant decisionmakers were seven HRO directors, all of whom signed the November 4 termination letter. (SOF ¶¶ 25, 68.) Their knowledge appears in their own contemporaneous writings.

Steward knew of Cauchon's investigation from the outset. He received Cauchon's July 16 written report and later forwarded the August 19 reporting-duty exchange to Turner-Bicknell and Golden. (SOF ¶¶ 46, 50–51, 69.) By September 3, the notice was organization-wide and expressly federal. Steward reviewed the disclosure before it went to ODH, and he, Golden, and Turner-Bicknell discussed the coming disclosure that day. (SOF ¶¶ 55, 70.) That afternoon, Cauchon sent every director the disclosure, warning that HRO was "a state contractor receiving

federal funds" and that "[u]ndisclosed conflicts can result in the termination of our federally funded contract." (SOF ¶ 71.)

HRO's actions immediately afterward confirm that it understood what Cauchon was doing. On September 5, Steward and Golden ordered him to cease conflict-related activities, including "communications with funders," placed him on administrative leave, and Steward wrote ODH about the disclosure. (SOF ¶¶ 14, 16, 72.) The next day, Cauchon told Steward in writing that he considered the action retaliation for reporting the conflict. Steward forwarded that notice to the Board. (SOF ¶ 64.) HRO later confirmed under Rule 30(b)(6) that it understood Cauchon believed he was being retaliated against for raising the Reese conflict. (SOF ¶ 83.)

The result is the same even under the heightened notice rule applied in *Yuhasz*. There, an employee acting within ordinary compliance duties had to make clear that his conduct went beyond routine job responsibilities. *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 567–68 (6th Cir. 2003). Cauchon did so. He reported directly to the funding agency, left the disclosure unchanged after Steward asked in writing that its language be softened, was ordered to stop communicating with funders, expressly characterized the response as retaliation, and on October 4 told every director that the Board had to address "HRO compliance with federal and state contracting regulations and laws, including the False Claims Act." (SOF ¶¶ 55, 64, 72–73.) Whatever ambiguity might have existed earlier was gone before the October 13 vote.

HRO's investigator then reported to the Board on the investigation arising from Cauchon's ODH disclosure and analyzed whether his conduct was protected whistleblowing. On October 13, the directors present voted to terminate him "based on the investigation . . . and the final report." (SOF ¶¶ 19, 74–76.)

HRO received still more explicit notice before November 4. On October 23, Cauchon's formal complaint invoking the False Claims Act reached Board Secretary Garlock, who forwarded it to the Board. Golden and True confirmed reading it. (SOF ¶¶ 65, 77.) In the days before the November 4 termination, directors' group texts expressly discussed whether Cauchon's conduct was whistleblowing and whether termination could be characterized as retaliation. (SOF ¶¶ 25, 78–79.) Whichever date HRO identifies as the decision date—the October 13 vote or the November 4 termination—HRO had explicit written notice of Cauchon's protected activity beforehand. No reasonable jury could find otherwise.

**4. HRO's termination letter and Rule 30(b)(6) testimony expressly link the September 3 report to the termination, establishing the prima facie causal connection.**

The supporting facts are set out at SOF ¶¶ 14, 16–17, 19, 25, 30, 65, 70, 72, 74–81.

HRO admits that it terminated Cauchon's employment on November 4, 2024. (SOF ¶¶ 25, 30.) The issue presented here is only the causal connection required at the prima facie stage. The third element requires that the employer discharged the employee "as a result of" protected activity. *McKenzie*, 219 F.3d at 514. Under the circumstantial framework, that showing establishes the prima facie case before the analysis turns to HRO's stated reasons and pretext. *Jones-McNamara*, 630 F. App'x at 397–98.

HRO's termination letter establishes the connection on its face. It states that Cauchon's September 3 report contained "inaccurate and misleading statements," reproduces HRO's whistleblower policy, and declares: "Your September 3 report to ODH violated this policy." It further states, "We do not consider this an act of good faith or reasonable grounds for your report to ODH," and lists "insubordination throughout this entire investigative process" among the "grounds for termination of your employment." (SOF ¶ 80.) HRO's attack on the report as inaccurate or made in bad faith does not sever the causal connection. Those assertions explain

why HRO says it acted because of the report; whether they are true is a separate issue reserved for trial. The connection therefore does not depend on temporal proximity. It appears in HRO's termination document itself.

HRO's sworn corporate testimony confirms the same point. Asked to identify "the acts of insubordination which led to his termination," HRO's Rule 30(b)(6) representative answered, among other things: "He sent the letter to the ODH without moving forward, as we had agreed, in consulting a lawyer and conducting an investigation." She confirmed that she meant the September 3 letter. (SOF ¶ 81.) HRO disputes how and when Cauchon reported to ODH, but its own testimony places the protected report among the acts that led to termination.

HRO's contemporaneous records reinforce that direct connection. On the morning of the September 3 disclosure, Steward proposed "an emergency meeting of the board without him after he sends the email." Golden responded: "I agree as well/ punishment and emergency board meeting." (SOF ¶¶ 17, 70.) Within forty-eight hours, Cauchon was directed to cease conflict-related activity and placed on administrative leave, and Steward wrote ODH about the disclosure. (SOF ¶¶ 14, 16, 72.) HRO's investigator later reported that "HRO initiated the investigation because Dennis reported the alleged conflict of interest" to ODH, analyzed whether Cauchon's conduct was protected whistleblowing, and recommended termination. The October 13 vote was taken "based on the investigation . . . and the final report." (SOF ¶¶ 19, 74–76.)

The connection continued through November 4. When Cauchon's formal FCA complaint reached the Board on October 23, Steward wrote: "He's likely going to sue. But this is also a ploy to keep us from terminating him." (SOF ¶¶ 65, 77.) In the hours before the termination letter issued, Garlock wrote that "he can say we terminated him in retaliation," while Turner-Bicknell responded that "there is no whistle blowing or retaliation here." (SOF ¶¶ 78–79.)

No reasonable jury could find the prima facie causal connection absent from this record. Together with HRO's admitted employment and termination and the determinations sought in Parts VII.B(2) and (3), this ruling establishes Plaintiff's prima facie case. It decides nothing more: HRO's stated reasons, pretext, ultimate causation, and damages remain for trial. (Part VII.C.)

## VII. RELIEF REQUESTED

### A. Count Two — partial summary judgment against all Defendants.

Plaintiff respectfully requests partial summary judgment on Count Two of the Second Amended Complaint (ECF No. 59, PageID 1128–29, ¶¶ 183–185) declaring that:

1. HRO's Bylaws (Ex. 2, CAUCHON_000015–017) required at least two weeks' advance written notice to each board member for any official meeting of the Board of Directors, and Ohio Rev. Code § 1702.31(C) makes that bylaw requirement controlling;

2. On September 5, October 13, and October 27, 2024, Plaintiff was a member of HRO's Board of Directors entitled to written notice of official board meetings;

3. Plaintiff did not waive notice, in writing or by attendance without timely protest under Ohio Rev. Code § 1702.19, for the September 5, October 13, or October 27, 2024 meetings;

4. The September 5, 2024 gathering of certain HRO directors was not a validly convened official board meeting, and the purported suspension of Plaintiff announced that day was not validly authorized;

5. The October 13, 2024 gathering of certain HRO directors was not a validly convened official board meeting for lack of timely notice to each director, and the

vote taken there to terminate Plaintiff as "Executive Director/President" was therefore not validly authorized board action;

6. The November 4, 2024 termination letter was not validly authorized, whether treated as implementation of the defective October 13 vote or as independent Board action taken without a meeting, because it lacked the unanimous written consent required by Ohio Rev. Code § 1702.25, and no waiver or subsequent valid board action authorized Plaintiff's termination; and

7. The October 27, 2024 gathering of certain HRO directors was not a validly convened official board meeting for want of the required two weeks' notice, and the vote taken there to remove Plaintiff from HRO's Board of Directors was therefore not validly authorized board action.

**B. Count One — partial summary judgment against Defendant HRO.**

Plaintiff respectfully requests partial summary judgment on Count One of the Second Amended Complaint (ECF No. 59, PageID 1126–28, ¶¶ 173–182) against HRO, determining that:

1. HRO's requests for payment under the statewide naloxone contract were claims within 31 U.S.C. § 3729(b)(2)(A)(ii): the requested funds advanced a Government program or interest, and the United States provided a portion of the money requested;

2. Cauchon's course of investigation and reporting — beginning with his July 16, 2024 report to Steward and including the September 3, 2024 disclosure to ODH, the October 4, 2024 written request to the Board invoking the False Claims Act,

and the October 22, 2024 written complaint filed October 23 — was protected activity under § 3730(h)(1);

3. HRO knew of Cauchon's protected activity before the October 13, 2024 vote and received additional FCA-specific notice before the November 4, 2024 termination; and

4. The undisputed record establishes the causal connection between the protected activity and HRO's November 4, 2024 termination of Cauchon sufficient for his prima facie retaliation case under § 3730(h). Together with HRO's operative-pleading admissions concerning employment and termination, and the determinations in paragraphs 2 and 3, this establishes Cauchon's prima facie case.

**C. Matters reserved for trial.**

The motion does not present, and the Court need not decide, ultimate causation or pretext on Count One; the merits of HRO's asserted non-retaliatory reasons, including any honest-belief or advice-of-counsel argument; damages; the other adverse acts alleged in Count One (including the September 5, 2024 cease-and-desist directive and suspension); the October 27, 2024 Board removal as a Count One adverse action; or any other Count One issue not presented in this motion. The Count One determinations are sought against Defendant HRO only. Nor does Count Two ask the Court to determine who governs HRO today or to disturb any corporate act other than the three challenged actions. Cauchon's employment and his November 4, 2024 discharge are admitted in HRO's operative pleading and are treated as established background; no separate ruling is requested on them.

**D. In the alternative, an order under Rule 56(g).**

If the Court concludes that any portion of the requested judgment cannot be entered now, Plaintiff asks the Court to enter an order under Rule 56(g) stating that the following facts are not genuinely in dispute and are established in this action, identified by paragraph of the Statement of Undisputed Facts:

> *Count Two.* The operative Bylaws and their two-week written-notice rule (SOF ¶¶ 1–3); Cauchon's status as a director on each relevant date (SOF ¶¶ 4–10); HRO's operative pleading identifying the gatherings it claims were official Board meetings (SOF ¶ 11); Defendants' verified notice dates for the September 5, October 13, and October 27, 2024 meetings (SOF ¶ 13); the absence of any recorded suspension vote on September 5 (SOF ¶¶ 15–16); the October 13 termination vote and its execution by the November 4 letter without any November 4 meeting or unanimous written consent, and HRO's counterclaim describing that termination as unanimous board action (SOF ¶¶ 12, 18–19, 25–26, 28); the October 27 vote to remove Cauchon from the Board (SOF ¶ 24); Cauchon's written and on-the-record non-waiver (SOF ¶¶ 21, 22, 27); and the absence of any qualifying emergency or emergency-meeting procedure (SOF ¶ 29).
>
> *Count One.* HRO's employment of Cauchon and its November 4, 2024 termination of him, as admitted in its operative pleading and recorded in the termination email and letter (SOF ¶¶ 25, 30); the federal funding of the statewide naloxone contract and HRO's request for payment under it (SOF ¶¶ 31–40); Cauchon's investigation, reports, disclosure, and written complaint (SOF ¶¶ 41–

67, 82, 84–87); the directors' September 3–4, 2024 text messages planning an emergency meeting "without him" (SOF ¶ 17); HRO's receipt of each of Cauchon's reports before October 13 and November 4, 2024 (SOF ¶¶ 68–79, 83); the September 5, 2024 cease-and-desist directive, administrative-leave email, and Steward's same-day report to ODH (SOF ¶¶ 14, 16, 64, 72); the investigator's statement that HRO initiated the investigation because Cauchon reported the alleged conflict of interest to ODH (SOF ¶ 74); the investigator's recommendation (SOF ¶ 75); the October 13, 2024 vote recorded as taken "based on the investigation . . . and the final report" (SOF ¶¶ 19, 76); the directors' October 23 and November 2–4, 2024 text discussions (SOF ¶¶ 77–79); the termination letter's statements concerning the September 3, 2024 report (SOF ¶ 80); and HRO's Rule 30(b)(6) identification of the September 3 letter among the acts that led to the termination (SOF ¶ 81).

The Court should enter the declarations requested in Part VII.A and the determinations requested in Part VII.B or, in the alternative, the order under Rule 56(g) described in Part VII.D. The requested rulings would not determine who governs HRO today, would not decide pretext, ultimate causation, or damages, and would not disturb any corporate act other than the three challenged actions. They would resolve discrete documentary questions on Defendants' own records and materially narrow the case for trial.

Respectfully submitted,

/s/ Dennis Cauchon

Dennis Cauchon, *pro se*
327 East Broadway
Granville, Ohio 43023

(740) 973-3814
denniscauchon@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the date of its filing, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve notice of the filing on all counsel of record, including counsel for Defendants Dwayne Steward, Billy Golden, Tasha Turner-Bicknell, and Harm Reduction Ohio.

/s/ Dennis Cauchon
Dennis Cauchon