**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DENNIS CAUCHON, | : | Case No. 2:25-cv-00075 |
| | : | |
| Plaintiff, | : | Judge Edmund A. Sargus, Jr. |
| | : | |
| v. | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| DWAYNE STEWARD, *et al.*, | : | |
| | : | |
| Defendants. | : | |

# PLAINTIFF'S SUMMARY-JUDGMENT EXHIBIT 6

## TURNER-BICKNELL RULE 30(b)(6) DEPOSITION — CERTIFIED EXCERPTS

**Certified transcript excerpts (deposition of July 30, 2026)**

Submitted in Support of Plaintiff's Motion for Partial Summary Judgment

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

---

DENNIS CAUCHON, et al.,

Plaintiff,

v.

Case No. 2:25-cv-0075

DWAYNE STEWARD, RAINA WILLIAM GOLDEN, TASHA TURNELL-BICKNELL, AND HARM REDUCTION OHIO,

Defendants.

---

DEPOSITION OF

TASHA TURNELL-BICKNELL,

AS 30(b)(6) CORPORATE REPRESENTATIVE FOR

HARM REDUCTION OHIO

DATE: Thursday, July 30, 2026

TIME: 10:07 a.m.

LOCATION: Reminger Co., LPA
955 Yard Street, Suite 330
Columbus, OH 43212

REPORTED BY: Kayleigh Kinnamon

Job No. CS8359309

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF DENNIS CAUCHON:

DENNIS CAUCHON, PRO SE
327 East Broadway
Granville, OH, 43023
denniscauchon@gmail.com
(740) 973-3814

ON BEHALF OF COUNTERCLAIM DEFENDANT DENNIS CAUCHON:

DAVID SHEARER, JR, ESQUIRE
Garvey Shearer & Nordstrom
2388 Grandview Drive
Fort Mitchell, KY 41017
dshearer@gsn-law.com
(859) 308-1490

ON BEHALF OF DEFENDANTS DWAYNE STEWARD, RAINA WILLIAM GOLDEN, and TASHA TURNELL-BICKNELL:

STEVEN CHANG, ESQUIRE
Reminger Co., LPA
955 Yard Street, Suite 330
Columbus, OH 43212
schang@reminger.com
(614) 232-2446

so let's do this. Back in September of 2024, Dennis Cauchon was the president of the organization, correct?

A Correct.

Q Okay. And there were eight board members at the time?

A I would have to look at it to be sure. Yeah. You would have to look --

MS. MOYO: What -- I'm sorry. I can't hear --

THE WITNESS: I don't have that in front of me.

BY MR. SHEARER:

Q Okay. Why don't you tell me who you know were the board members in September of '24?

A Sure. Anne Trinh, Colleen Garlock, Billy Golden, Dwayne Steward, Jamie Decker, Molly True, and myself.

Q So that's seven. Was Mr. Cauchon a board member?

A No.

Q Was Mr. Cauchon ever a board member?

A Not to my knowledge.

Q Okay. So Mr. Cauchon was never at any point did -- since -- that you're aware of, a board member

of Harm Reduction Ohio?
A Not to my knowledge.
Q Okay. And so tell me how that -- in September of 2024, Mr. Cauchon was the president of HRO; is that correct?
A Correct.
Q Okay. Who was the chairman of the board?
A Dwayne Steward.
Q Was there a vice chair?
A Yes. That was Billy Golden.
Q So from then, September of '24 until the present, August of '26, tell me how that leadership structure has changed. I understand that you are the interim executive director, but what other changes were made?
A What's the specific question?
Q Okay. How many board members are there currently?
A Current board members are Adriana Whelan, Mahjida Steffin, Billy Golden, Jamie Decker, Elizabeth -- I can't remember her last name off the top of my head. Molly True, Jamie Decker.
Q That is seven. Is that it?
A I believe so.
Q Okay. Is Billy Golden still a director?

was, in your opinion, terminated in -- on November the 4th of 2024?

A He had been insubordinate to the board.

Q Were there any other reasons?

A Not that I can think of at this time. There were lots of examples of insubordination --

Q Sure. And we'll talk --

A -- but they would all fall under, I believe, insubordination.

Q Got you. And we will talk about those. So I just wanted to make sure there was -- the only grounds that HRO was relying on is the insubordination.

MR. CHANG: Objection.

BY MR. SHEARER:

Q If there are other grounds, are there other grounds other than insubordination for Mr. Cauchon's termination in -- on November 4th of 24?

A He was terminated for insubordination.

Q Okay. So why don't you tell me what were the act -- what was the act or were the acts of insubordination which led to his termination?

A He did not comply with being placed on leave of absence. He continued to engage in work after we warned him several times in writing. He sent the

letter to the ODH without moving forward, as we had agreed, in consulting a lawyer and conducting an investigation.

He did not participate in the investigation. He continued to access bank accounts. He removed staff from accounts that needed to access them to do their work. He placed a lock on supplies in the office where employees could not access the supplies they needed for work. He continued to come into the office.

Q Is there anything else?

A I think, probably.

Q Okay. Then why don't you tell me what the other reasons are?

A No. I thought --

Q I'm talking about the other --

A -- these are examples of insubordination.

Q What other examples? And so what I want to know are the examples of insubordination which led to the November 4th termination letter.

A I -- I -- I think those -- those are -- that's a good summary.

Q Okay. If there are additional ones, I would like to know about them. Are you aware of any additional, I have --

know the dates of those meetings?
A The minutes.
Q The minutes of the meetings?
A Uh-huh.
Q Okay.
THE REPORTER: Is that a yes?
THE WITNESS: Yes.
BY MR. SHEARER:
Q And those minutes are maintained by HRO?
A Yes.
Q I assume stored electronically?
A Yes.
Q Okay. So if I could have you look at Cauchon Exhibit 1, and we'll look at on Page 2, Provision 10 or Section 10. It refers to "special meetings."
A Okay.
Q Is that -- you're using the phrase emergency meetings. Is that the same thing in your mind, or are those different types of meetings?
A Emergency meeting would be a meeting that would need to occur in less than two weeks.
Q Okay. Is there any provision in the bylaws for emergency meetings?
A I don't know that it's explicitly discussed

in these bylaws.
Q Okay. Do you know if there was any provision for emergency meetings in the procedure or -- well, let me say this. Do you know if there was any provision for emergency meetings in any HRO handbook, policies, procedures, any written -- any written procedure for emergency meetings?
A I don't know what documents you're referring to.
Q I'm asking -- well, I don't either. I'm asking you if --
A Okay.
Q You are here speaking on behalf --
A Okay.
Q -- of HRO. You are the corporate representative of HRO. So what I am asking is: Are there any documents that you're aware of that HRO has that speak to or address how emergency meetings may occur?
A Not that I'm aware of.
Q Okay. And by that, I mean notice, procedure, anything like that. You're not aware of anything?
MS. MOYO: Objection to form. You can answer.

THE WITNESS: Not that I'm aware of.
BY MR. SHEARER:
Q Okay. How does a special meeting differ from an emergency meeting?
A Emergency meeting, we had emergency issues to discuss. For example, when Mr. Cauchon was continuing to access our bank account, when Mr. Cauchon had locked the supplies and our staff could not access those materials. These were direct threats to daily operations, and the board needed to convene to discuss in crisis management.
Q Okay. Were there meetings or were there -- I'm sorry. Were there minutes kept at these meetings?
A Yes.
Q Okay. Were these meetings recorded?
A Not to my knowledge.
Q Okay. How many emergency meetings were there to discuss Mr. Cauchon's actions?
A I don't know off the top of my head. I'd have to count them.
Q Okay. What would you need to do -- what documents would you have to be able to refer to to tell me the number of meetings?
A The minutes, the records from the meeting.
Q All right. What is HRO's procedure for

recording meetings, be they special, regular, or emergency?

A I don't -- not -- I don't -- I don't know. That's not something that I'm aware of.

Q Okay.

A That we -- are you -- rephrase the -- ask me the question again.

Q Sure.

A I don't think I understood you.

Q Yes. Are board meetings, be they special meetings, emergency meetings, or just regular run-of-the-mill meetings, are those recorded in any fashion?

A I can't speak to whether they ever have been. I -- I'm not sure.

Q Okay. Are you aware of any meetings concerning Mr. Cauchon that were recorded?

A I don't know. I'd have to -- I don't know.

Q Okay. Okay. Can I have the exhibit back, please? Thank you. So if I could have you look at Section 3. Again, that's on Exhibit Cauchon 1.

MR. CHANG: Counsel, for clarity, can you state the article as well?

MR. SHEARER: Article 3, Number 3.

MR. CHANG: Thank you.

BY MR. SHEARER:
Q And that has the provision for regular meetings. Does that contain the provision for regular meetings of the board?
A Yes.
Q Okay. And it requires a two-week notice?
A What's the question there?
Q Does it require a two-week notice?
A At least two weeks in advance is what it says.
Q Okay. Is a meeting still a valid meeting if the requisite two-week notice is not provided?
A Yes.
Q And why is that?
A Because in an --
MS. MOYO: I'm going to object to the form, but you can answer.
THE WITNESS: When an emergency situation arises, a board must meet to discuss and make a plan to respond, to protect the organization.
BY MR. SHEARER:
Q And how does HRO define emergency?
A I don't know that there's a definition of emergency in the bylaws.
Q Who determines whether an emergency meeting

continue.
MR. SHEARER: Okay.
BY MR. SHEARER:
Q So we have emergency meetings. You can -- okay. And a -- you've told me that a member can request an emergency meeting, or a board member, correct?
A I've said that we had emergency meetings and board members asked for those meetings.
Q Okay. Is there a formal policy or procedure in place at HRO that governs how emergency meetings are held or conducted?
A Not to my knowledge.
Q Okay. In your time -- well, has HRO ever conducted any emergency meetings other than meetings that concern Mr. Cauchon?
A The meetings -- the emergency meetings concerned more than Mr. Cauchon. They were about daily operations also. So I'm not sure exactly what that question is.
Q Okay. How many emergency meetings has HRO held?
A I don't know off the top of my head.
Q Okay. Are you aware or have there been any meetings -- any -- I'm sorry. Any emergency meetings

Q Okay. And.
A Well, is that -- what's the question?
MS. MOYO: She answered as the corporate representative of HRO.
MR. SHEARER: So -- yeah. She answered that. Right. And then I had a following question. And then that's when -- then my statement was --
BY MR. SHEARER:
Q Well, my question was, on behalf of HRO, as -- I understand what you interpreted as a board member, but speaking for HRO, do you have a different understanding other than what you just explained to me?
A That is how I've -- the organization understands it.
Q Okay. So I want to go back to Topic 1B real quick. And that's when you gave me the list of items of insubordination that Mr. Cauchon committed. And the very first one that you told me was the letter to ODH?
MS. MOYO: Objection. Form.
BY MR. SHEARER:
Q So what I will do, just so we're on the same page, is have you take a look at what had previously been marked as Cauchon 18. And I will have you look -

- I'll let -- they get -- wait until -- I'll wait till they dig it down.

So I'll have you look at Page 2 of that document, and what I'm interested in is the letter. Is that the letter that you are referring to when you said -- when you testified that the letter to ODH was an act of insubordination?

A Yes.

Q And that is the letter attached to Cauchon 18?

A Yes.

Q Okay. If I could have that back, please. Were there any other communications with ODH that you're aware of that consisted of acts of insubordination other than this September 3, 2024, letter?

A After the time that he was placed on administrative leave, any communication where he would represent himself as representing HRO would be an act of insubordination.

Q Okay. Were there additional communications with ODH after the suspension from HRO and that's by Mr. Cauchon?

A I would have to look. I'm not sure. I know there are many communications, but as far as the

A Okay.
Q Retaliated against. What was that action?
A According to the communication from Mr. Cauchon?
Q According to HRO's -- what is HRO's knowledge?
A My knowledge is that Mr. Cauchon, and I think I already said this, and an attorney that he was working with at the time, sent us written communication expressing that he believed that he was being retaliated against for bringing forward concerns about the conflict of interest.
Q The conflict of interest with AmandaLynn Reese?
A Yes.
Q Okay. Okay. Then a moment ago, you mentioned -- you referenced the "in good faith" portion of the paragraph. And when I look at that, the "in good faith" portion is in italics. Okay. So what is the significance of the "in good faith"?
A Well, according to our counsel, and they go on to say this, I believe, in this letter, that when he sent the letter to ODH, we did not feel that it was in good faith.
Q Okay. And why does HRO believe that it was

of communication from Counsel.
BY MR. SHEARER:
Q Okay. You can go ahead and answer.
A What was -- would you repeat the question?
Q Let's do this. Does HRO believe that Mr. Cauchon had reasonable grounds for believing the information regarding AmandaLynn Reese was a violation of HRO's policies and procedures?
A HRO had instructed Mr. Cauchon to pause and that we were going to engage a third party and conduct an investigation.
Q Okay. I understand that. Does HRO believe that Mr. Cauchon had reasonable grounds for believing there may be a conflict with AmandaLynn Reese's employment with Velocity?
MR. CHANG: Objection.
You can answer.
THE WITNESS: We took his complaint very seriously. We hired a third party to conduct an investigation.
BY MR. SHEARER:
Q Okay. Do you believe there was reasonable grounds -- does HRO believe there was reasonable grounds for conducting an investigation into the potential conflict of AmandaLynn Reese?

A For HRO, just bringing something like that forward seemed like reasonable grounds to look into it, so we conducted an investigation. I do want to point out, though, there's a lot of interpretation of the second paragraph here, and I want to be clear on what you're really asking me.

Q Well, if any of my questions --

A For example, does it refer to him bringing something forward to HRO or submitting a letter --

MS. MOYO: Ms. Turner-Bicknell, let him ask --

THE WITNESS: Okay.

MS. MOYO: -- the question.

THE WITNESS: Okay.

MS. MOYO: Just let him ask the question.

BY MR. SHEARER:

Q So, yes, if there is any confusion, I would appreciate it if we -- if you could clarify it for me, because this letter is written on behalf of and signed by the HRO board of directors.

MS. MOYO: And I think you answered the pending question.

THE WITNESS: Uh-huh.

MR. SHEARER: Yeah.

CERTIFICATE OF DEPOSITION OFFICER

I, KAYLEIGH KINNAMON, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

KAYLEIGH KINNAMON
Notary Public in and for the
State of Ohio

[X] Review of the transcript was requested.