**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DENNIS CAUCHON, | : | Case No. 2:25-cv-00075 |
| | : | |
| Plaintiff, | : | Judge Edmund A. Sargus, Jr. |
| | : | |
| v. | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| DWAYNE STEWARD, *et al.*, | : | |
| | : | |
| Defendants. | : | |

# PLAINTIFF'S SUMMARY-JUDGMENT EXHIBIT 7

## STEWARD DEPOSITION — CERTIFIED EXCERPTS

**Certified transcript excerpts (deposition of July 31, 2026)**

Submitted in Support of Plaintiff's Motion for Partial Summary Judgment

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

---

DENNIS CAUCHON, ET AL.,

Plaintiffs/Counterclaim Defendants,

v. Case No.:

DWAYNE STEWARD, RAINA WILLIAM 2:25-cv-0075

GOLDEN, TASHA TURNELL-BICKNELL

AND HARM REDUCTION OHIO,

Defendants/Counterclaim Plaintiffs.

---

DEPOSITION OF DWAYNE STEWARD

DATE: Friday, July 31, 2026

TIME: 10:05 a.m.

LOCATION: Remote Proceeding

Reminger Co., L.P.A.

955 Yard Street

Suite 330

Columbus, OH 43212

REPORTED BY: Kayleigh Kinnamon

JOB NO.: 8349311

A P P E A R A N C E S

ON BEHALF OF COUNTERCLAIM PLAINTIFF HARM REDUCTION OHIO:

ELIZABETH MOYO, ESQUIRE (by videoconference)
Porter Wright Morris & Arthur, LLP
41 South High Street
Columbus, OH 43215
emoyo@porterwright.com
(614) 227-2106

ON BEHALF OF PLAINTIFF DENNIS CAUCHON:

DENNIS CAUCHON, Pro Se (by videoconference)
327 East Broadway
Granville, OH 43023
denniscauchon@gmail.com
(740) 973-3814

ON BEHALF OF COUNTERCLAIM DEFENDANT DENNIS CAUCHON:

DAVID SHEARER, JR, ESQUIRE (by videoconference)
Garvey Shearer & Nordstrom
2388 Grandview Drive
Fort Mitchell, KY 41017
dshearer@gsn-law.com
(859) 308-1490

It varied.
Q So when there would be board meetings at HRO during your tenure as chair, who would run the meetings?
A My -- my recollection is, it was a joint facilitation between the chair and the executive director.
Q Okay. Was Mr. Cauchon on the board of -- was he a member of the board of directors of the organization?
A My recollection is, no.
Q Okay. Do you recall ever seeing any references to Mr. Cauchon being a member of the board of directors of HRO?
A I do not recall any references to Mr. Cauchon being a board member.
Q Did you ever have any discussions with Mr. Cauchon that you can recall as to whether or not he was a board member?
A I do not recall those conversations.
Q Okay. Do you recall any conversations with any other board member or staff member of HRO as to whether Mr. Cauchon was a board member? And that's at any time during your tenure as a board member.
MR. CHANG: I'm going to object and instruct the witness not to answer to the extent Counsel is

present for those conversations outside of the presence of Counsel.

Go ahead and answer.

THE WITNESS: So you said I'm not supposed to answer?

MR. CHANG: So I don't want you to reveal if you've discussed anything, you know, that subject where Liz, or myself, or another attorney has been present. I'll instruct you not to answer in -- with respect to those conversations.

THE WITNESS: I got you --

MR. CHANG: I do think his question is a little broader than that. To the extent you've had conversations about whether he is a board member or not outside the presence of Counsel, feel free to testify.

THE WITNESS: Thank you for the clarification.

From my recollection, I don't remember that becoming a conversation until after Mr. Cauchon was put on administrative leave. And so that's my recollection.

BY MR. SHEARER:

Q And what conversations do you recall occurring after he was placed on administrative leave?

A Again, I don't remember specific dates, or specific documents, or specific written communications. But I do remember that it was asserted at one point from

Mr. Cauchon that he was a -- was a board member, and the members of the board being generally confused by this assertion. And so that is when we had just started having discussions about whether or not that was the case.

Q And who were those conversations with? And again, I don't want to know anything about conversations with your counsel.

A Yeah. I have to admit, it's been two years. I don't remember every name of every member of the board. But the board of directors is the answer.

Q Okay. Would it be fair to say that generally, you recall conversations with the board members after he was placed on administrative leave as to whether or not he was a member of the board?

A The question came up from Mr. Cauchon. And so we began trying to understand why that was a -- a question. Because my -- again, my understanding was that he was not a board member.

Q So would the board, prior to Mr. Cauchon going on suspension or being -- or, I'm sorry, I keep saying that -- being placed on administrative leave, would the board, at meetings, vote on matters?

A Yes.

Q Okay. And during those prior -- those meetings

prior to Mr. Cauchon being placed on administrative leave, did he participate in those votes by the board?
A I do not recall that happening.
Q Have you reviewed any documents in preparation for your deposition today?
A Yes.
Q Okay. And can you tell me what you have reviewed?
A There was information, minutes, and investigation documents from the time I was -- during the time of the suspension and termination. So I've seen some of those documents, yes.
Q Okay. Specifically, what documents have you -- do you recall reviewing?
A I mean, there's a lot of documents in this case.
Q Sure. There are.
A So I don't remember reading every single -- or every --
Q I --
A I don't remember every word of every document that I reviewed. But for generally, my review, or -- was of meeting minutes and the investigation documents from the attorney.
Q Do you recall what meeting minutes you

reviewed?
A I cannot -- I don't recall specific dates.
Q Would these be meeting minutes after Mr. Cauchon was placed on administrative leave?
A Yes.
Q Okay. Did you review any meeting minutes from before Mr. Cauchon was placed on administrative leave?
A Yes.
Q Okay. Do you recall the subjects of the meeting -- the subjects discussed in the meeting minutes from the meetings prior to him being placed on administrative leave?
A Well, I mean, how far back?
Q Well, that's what I want to know, how far back you reviewed.
A I mean, I was -- again, there was a lot of documents. I was provided all the meeting minutes during my time on the board.
Q Okay. You were provided all of minutes of meetings from the board of directors during your entire tenure at HRO?
A Correct.
Q Okay. And you reviewed all of those in preparation for today's deposition?
A I -- I guess it would depend on what the

definition of -- of "reviewed" is. But I would say yes, I have seen them.

Q Okay. Okay. Then other than meeting minutes, I think you mentioned a -- what else did you mention? I'm sorry. Maybe an investigative report?

A Investigative documents from the attorney.

Q Okay. Would that be from Ms. Nelson?

A Correct.

Q And any other documents that you have reviewed?

A For the most part, those are the main ones. I mean, there were emails where these documents were a part of, but yes.

Q Sure. And we're going to talk about some of those. I -- we'll talk about some of those emails today. I'm just trying to get an idea of the general category of the documents that you have that you have reviewed.

A Yeah. There were emails and text messages. Yes.

Q Okay. Okay. And I'm sorry, when did you tell me you left the board of HRO? I apologize.

A Within the last six months. I apologize. I did not look up the exact date.

Q No, no, no. That's fine. I'll write it down so I don't forget it again. So part of the reason that

to have you take a look at, and just have you take a moment and review. This is a, one, two, three-page document. And if I could just have you take a brief look at it.

MR. CHANG: Dave, this one isn't Bates stamped. Is there any clarity as to where the document came from? Was it our production? Or is this a new email from -- that wasn't produced?

MR. SHEARER: I do not know if it -- I obviously did not produce it. I do not know if it was produced prior to this or not, but you are correct. It does not have a Bates number.

MR. CAUCHON: It was produced in Cauchon, but I didn't have time to get the Bates version. So I'll get that for you after.

MR. CHANG: You can proceed.

THE WITNESS: All righty.

BY MR. SHEARER:

Q Do you recall receiving this email, or reviewing this email?

A Yes. I do remember during the time that there was communications from Mr. Cauchon about the situation.

Q Okay. Do you know -- it -- well, let's do this: This email purports to tell you about AmandaLynn having a position with Velocity BioGroup. Prior to

receiving this email on July 16, 2024, were you aware that Ms. Reese had a role, or was employed by Velocity BioGroup?

A I do not believe so.

Q Okay. Prior to July 16 of 2024, did -- are you aware of whether HRO had a conflict disclosure policy?

A There was a policy, yes.

Q Okay. Were you aware of that policy prior to July 16th of 2024?

A I was aware that there was a policy. I will admit I had not reviewed it in full until after this.

Q Okay. After your receipt of this email on July 16, 2024, did you have any subsequent conversations with Mr. Cauchon?

A Yes.

Q Okay. And can you tell me what you can recall about those conversations?

A I recall this being brought up in conversation, that it -- that Mr. Cauchon was -- thought it was a potential conflict. And we had discussed investigating it and trying to figure out what was really going on here. So yes, I do remember those conversations.

Q Okay. Did you agree that it was a potential conflict?

A At the time, not knowing the details and on

face value, yes.

Q Okay. You believed it was a potential conflict with the limited details that you had?

A Correct.

Q Okay. And did you have any recommendations as to what should be done once you were informed of the potential conflict?

A I believe my first recommendation was that we have a -- or that a conversation be had to get -- to understand the full situation with AmandaLynn Reese, specifically. And then, I believe, I also made a recommendation at the time to do a proper -- a full investigation into the matter.

Q Okay. Yeah. And we'll get through that. And ultimately that resulted in Ms. Nelson, and we can talk about all that -- about that later.

A Okay.

MR. SHEARER: So I'll hand you what we'll mark as Steward 2.

(Exhibit 2 was marked for identification.)

MR. SHEARER: And again, this does not have the Bates numbers on it, but we can certainly provide those to you.

MR. CAUCHON: And I'll provide you with the

policies and procedures at the agency. So yes.
Q Okay. So going down, it says, "Do say these activities are not allowed on company time, and company resources cannot be used for these activities." What activities are you referring to?
A Those referenced by Mr. Cauchon in the original email that I received. Again, at that point, we did not have information from AmandaLynn Reese, or I did not at that point. And so based off the facts that were put in front of me and based on non-profit best practice, if you have a second job, it is not -- it -- you're not supposed to be doing that job during company time. And so that was my recommendation, to stick to making sure that you're making it clear, basically, that anything you do on company time -- well, anything that you're doing related to this -- to this situation shouldn't be done on company time based on --
Q When you said "situation," you're referring to the work with Velocity BioGroup?
A Yes. Again, based on the -- the initial information I received.
Q Okay. Okay. So then you said -- went down there below and says, "Do say participating in these activities could reflect poorly on the agencies." And, again, these activities are the work with Velocity

BioGroup?

A Correct.

Q And do you recall if you and Mr. Cauchon had a follow-up conversation to this email on July 16th?

A I don't recall. I know there was -- I remember there was a follow-up conversation once he talked to AmandaLynn Reese.

Q Okay. When Mr. Cauchon -- do you know when Mr. Cauchon's initial call with Amanda -- or call with AmandaLynn Reese was to discuss this situation?

A I don't remember the exact date, but I know it was in this time -- within this time --

Q Okay.

A -- during this time frame in July.

Q Did you ever participate in any calls with Mr. Cauchon and AmandaLynn Reese regarding the issue of her employment with Velocity BioGroup?

A I recall having conversations with both of them. I don't remember if there were conversations with the three of us together, to be honest.

Q Okay. What conversations do you recall having with Ms. Reese on the issue of her employment with Velocity BioGroup?

A I remember it being brought to my attention after Mr. Cauchon brought it to my attention. At the

meeting, as referenced in Section 10?
A I'm sorry. Can you ask the question again?
Q Sure. Section 3 references board meetings.
A Uh-huh.
Q Section 10 references special meetings. Do you have an understanding what the difference is between a board meeting under Section 3 or a special meeting under Section 10?
A Yes.
Q And tell me what the difference is.
A Based on the -- the bylaws, a board meeting is the regularly scheduled meetings throughout the year. Those the quarterly. And then the special meetings are maybe meetings that may not happen within that regular time frame.
Q Do the bylaws contemplate emergency meetings?
A I do not see that here.
Q As chairman of the board of HRO, did you have a position on whether emergency meetings needed to be given or needed to be 14 days' notice?
A I do believe they were --
MR. CHANG: Objection to form. Sorry. I wasn't sure if you were done asking your question.
Go ahead and answer.
THE WITNESS: Sorry. I do believe they were

properly noticed.
BY MR. SHEARER:
Q That emergency meetings were properly noticed?
A Correct.
Q Okay. What does it take -- and what does it take to properly notice an emergency meeting?
MR. CHANG: Standing objection as to properly noticed.
You can answer.
THE WITNESS: That the board members are made aware and provided time to avail their schedule so they can attend.
BY MR. SHEARER:
Q Okay. But you do not believe there's any specific time frame that must be given in -- with regard to the notice?
MR. CHANG: Same objection. Vague.
THE WITNESS: I -- guys, I don't understand the question. I apologize.
BY MR. SHEARER:
Q Okay. Is there a specific -- so you would agree with me that regular meetings and special meetings require a 14-day notice period?
A According to this document.
Q Correct. Do emergency meetings require -- have

CERTIFICATE OF OATH

I, the undersigned, certify that the witness in the foregoing transcript personally appeared before me and was duly sworn.



KAYLEIGH KINNAMON
Reporter, Notary Public
State of Ohio
Commission Expires: 02/01/2029
Commission Number: 2024-RE-873296

C E R T I F I C A T E

I do hereby certify that the witness in the foregoing transcript was taken on the date and at the time and place set out on the Title page hereof, by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said Matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel and that I am in no way interested financially, directly or indirectly, in this action.

KAYLEIGH KINNAMON

Notary Public, in and for the

State of Ohio