IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

* * *

DENNIS CAUCHON,
Plaintiff,
vs. CASE NO. 2:25-cv-00075
DWAYNE STEWARD,
et al.,
Defendants.

* * *

Deposition of DENNIS CAUCHON, Plaintiff/Counterclaim Defendant herein, called by the Defendants Dwayne Steward, Raina (William) Golden, Tasha Turner-Bicknell, and Harm Reduction Ohio for cross-examination pursuant to the Rules of Civil Procedure, taken before me, Karen M. Rudd, a Notary Public in and for the State of Ohio, at the offices of Reminger Co., LPA, 955 Yard Street, Suite 330, Columbus, Ohio, on Wednesday, July 29, 2026, at 10:04 a.m.

* * *

I N D E X


EXAMINATION CONDUCTED PAGE
BY MR. CHANG:......................... 6


INDEX OF EXHIBITS


Exhibit 1, Bylaws of Harm Reduction Ohio (Cauchon 15-17)................. 20
Exhibit 2, Mission Statement (HRO 339-385)......................... 45
Exhibit 3, July 18, 2024, emails (HRO 242-243)......................... 67
Exhibit 4, emails (HRO 245-246)....... 76
Exhibit 5, August 8, 2024, email (Reese 9)............................ 81
Exhibit 6, emails (HRO 129-132)....... 85
Exhibit 7, emails (HRO 319-322)....... 97
Exhibit 8, August 26, 2024, emails (HRO 262-264)......................... 113
Exhibit 9, August 29, 2024, emails (HRO 133)............................ 118
Exhibit 10, August 29, 2024, emails (HRO 273-274)......................... 121
Exhibit 11, August 29, 2024, emails (271-272)............................ 125





Exhibit 12, August 29, 2024, emails (HRO 267-268)......................... 129
Exhibit 13, emails (Reese 37-39)...... 133
Exhibit 14, August 31, 2024, emails (Reese 41-42)......................... 136
Exhibit 15, report of Maritza Nelson (HRO 1398-1435)....................... 155
Exhibit 16, September 2, 2024, emails (HRO 288-289)................. 156
Exhibit 17, emails (HRO 269-270)...... 172
Exhibit 18, September 3, 2024, emails with attachment (HRO 290-292).. 177
Exhibit 19, September 3, 2024, email with attachment (HRO 136-138)......... 183
Exhibit 20, September 3, 2024, letter (Reese 47)..................... 199
Exhibit 21, emails (HRO 306-312)...... 207
Exhibit 22, September 5, 2024, email (HRO 148)............................ 215
Exhibit 23, September 5, 2024, email (HRO 149)............................ 224
Exhibit 24, September 5, 2024, email (HRO 150)............................ 231
Exhibit 25, September 5, 2024, emails (Cauchon 218)................. 235





Exhibit 26, text messages (Cauchon 1730-1736).................. 242
Exhibit 27, September 6, 2024, email (Cauchon 2853)........................ 257
Exhibit 28, September 6, 2024, emails (HRO 157-158).................. 262




APPEARANCES:

On behalf of the Plaintiff/Counterclaim Defendant Dennis Cauchon:


Garvey Shearer Nordstrom

By: David A. Shearer, Jr.
Attorney at Law
2388 Grandview Drive
Ft. Mitchell, Kentucky 41017
859 308-1490
dshearer@gsn-law.com


On behalf of the Defendants Dwayne Steward, Raina (William) Golden, Tasha Turner-Bicknell, and Harm Reduction Ohio:


Reminger

By: Steven A. Chang
Attorney at Law
955 Yard Street
Suite 330
Columbus, Ohio 43212
614 228-1311
schang@reminger.com


On behalf of the Counterclaim Plaintiff Harm Reduction Ohio:


Porter, Wright, Morris & Arthur

By: Elizabeth L. Moyo
Helen Sudhoff
Attorneys at Law
41 South High Street
Suites 2800-3200
Columbus, Ohio 43215
614 227-2000
emoyo@porterwright.com
hsudhoff@porterwright.com


* * *

Page 6

DENNIS CAUCHON
of lawful age, Plaintiff/Counterclaim Defendant herein, having been first duly cautioned and sworn, as hereinafter certified, was examined and said as follows:

CROSS-EXAMINATION
BY MR. CHANG:
Q. Can you please state your name for the record?
A. Dennis Cauchon, D E N N I S, C A U C H O N.
Q. Thank you, Mr. Cauchon. And we are here today for your deposition in the case Cauchon versus Steward currently pending in the Southern District of Ohio, Case Number 2:25-cv-00075.
To make today a little bit easier, I'm going to be using shortened terms to refer to certain individuals or entities, and I'll just go through them now. When I say the term HRO, I'm referring to Harm Reduction Ohio. Can we have that understanding?
A. The corporation?
Q. The non-profit entity, yes.
A. Okay.

Page 7

Q. When I refer to Hikma, I'm referring to the corporation Hikma Pharmaceuticals, Inc. Can we have that understanding?
A. Yes.
Q. When I refer to Velocity, I'm referring to Velocity BioGroup, Inc. Can we have that understanding?
A. Yes.
Q. Now, there may be numerous instances in which I refer to the board. Unless I'm more specific. When I say the board, I'm referring to the board of directors at Harm Reduction Ohio, HRO.
A. The corporate board? The full board including me?
Q. Well, in the context of the question --
A. Okay.
Q. -- if I say board, I'm referring to the full board. If I intend something else, I'll be more specific in the questions. Okay?
A. Okay.
Q. Have you ever had your deposition taken before?

Page 8

A. Yes.
Q. How many times?
A. One.
Q. Was that -- were you a party to that lawsuit or merely a witness?
A. Harm Reduction Ohio was a party to the lawsuit.
Q. So you are referring to the lawsuit that Harm Reduction Ohio was previously engaged in, correct?
A. Correct.
Q. Was Harm Reduction Ohio -- I'm just going to use HRO. Was HRO a defendant or a plaintiff in that action?
A. It was a plaintiff.
Q. And we're not going to go into much detail about it, but could you just generally describe what that lawsuit was about?
A. Harm Reduction Ohio sued the OneOhio opioid settlement board under open records. Yeah. So we sued them. They said their records were closed. We said they were open.
MR. CHANG: Can we just pause and go off the record one second?

Page 9

(Thereupon, an off-the-record discussion was held.)
BY MR. CHANG:
Q. You were deposed in that lawsuit in your individual capacity, or were you a corporate representative?
A. Corporate representative.
Q. So is this the first time you've been deposed in your individual capacity then?
A. Yes.
Q. Just to start, this deposition will be very similar when it comes to kind of the ground rules with how it will operate. In order to make the record clean, if you could just finish -- or wait for me to finish asking a question before you answer it, I will likewise provide you the same courtesy.
In order to record everything, I would ask that you don't do nonverbal head shakes or nods. Affirmatively state your answer yes, no, or audibly so that we can get it on the record. Can we have that understanding?
A. Yes.
Q. And we can take a break at any

point. I understand we started a little bit later this morning. You know, we do have seven hours. We may or may not use it all. But if -- at anytime if you need to take a break, just let me know, and we can. I would only ask if there's a question pending, you answer the question before we go on break. Okay?
A. Yes.
Q. Can you briefly just walk through for me your educational history beginning with post-primary education?
A. I have a bachelor's degree from the University of New Hampshire.
Q. And what was your specialty or major?
A. English and economics.
Q. If you could briefly, post-graduation, just kind of walk through your job history leading up to being the president of HRO.
A. I was a newspaper reporter for 30 plus years. I started at the Biloxi Sun-Herald, went to The Jackson Clarion-Ledger, and then went to USA Today newspaper in 1987, and worked there until 2013.



Q. In 2013 did you retire?
A. I took a buyout.
Q. And HRO was founded by you in or around 2018, correct?
A. 2017.
Q. 2017. Did you do anything between 2013 or 2017 in your professional career?
A. Yes.
Q. What were you doing in that time frame?
A. Consulting, writing, and working on criminal justice reform issues.
Q. Before we get more in detail, what did you do to prepare for today's deposition?
A. I talked to David a little bit.
Q. Okay. I don't want to know anything with your counsel, but thank you for saying that. Anything else?
A. No.
Q. Did you, in preparation for your deposition, reach out to any other non-parties, such as Mallory Bolen?
A. No. I did talk to my other attorney, David Martin, yesterday. He was my original attorney.



Q. Does he still represent you?
A. No.
Q. Did he represent you at the time that you spoke with him?
A. I'm not sure. You'd have to ask him. He represented me as a board member, and I wanted to -- you know, to make sure to ask him about waiving -- like what could I say without waiving attorney/client privilege. So I don't know if I'll be getting a bill, but he was speaking to me in his capacity as my lawyer.
Q. Okay. I don't need to know anything more about that. Thank you. Did you review any documents to prepare for today's deposition?
A. No, other than the ones I've been reviewing for --
Q. I see that you've brought some things with you today. Can you just identify for the record what you've brought?
A. My iPad and a notepad.
Q. And I see you've written notes on your note pad.
A. That's from yesterday's



deposition.
Q. Okay.
A. I just -- yep.
Q. Do you intend to utilize either of those in today's deposition?
A. No. Nope.
Q. So you were the founding member of Harm Reduction Ohio; is that fair to say?
A. I don't know about member, but I founded it.
Q. Founded it. Okay. Can you please -- what is HRO's mission, if you could describe it in your words?
A. Reduce overdose death. Make lives better for people who struggle with drugs.
Q. So to provide assistance with respect to drug addiction and to save lives; is that fair to say?
A. Yeah, that's a -- that's a general --
Q. In fact, you were kind enough to share your own experience with -- I believe when you and I met previously in person, your niece specifically was an individual who had either suffered from drug addiction or died of

Page 14

an overdose, correct?
A. My niece died of an overdose.
Q. I'm sorry for your loss. Needless to say, this is an issue that's very near and dear to your heart; is that fair to say?
A. Yes.
Q. And that's one of the reasons why you founded the organization, HRO, is to save lives, correct?
A. When I founded it, I did not know what I was going to do. I just, you know, saw like a gap in harm reduction. When I founded it, I did not know what naloxone was, I'm embarrassed to say.
Q. But you founded the organization because you wanted to prevent deaths from drug overdoses; is that fair to say?
A. Yes.
Q. When you founded the organization, did you have counsel to assist you in creating the company?
A. No.
Q. And I may -- if I refer to the words -- I'll try to be as specific as possible, but if I refer to the words the

Page 15

organization or the company, unless instructed otherwise, I'm referring to Harm Reduction Ohio. Okay?
A. Yes.
Q. So you were, in fact, the person who had invited others to join and become a board member for HRO back in 2017, correct?
A. 2018 is when I invited people to join the board.
Q. 2018. And one of the defendants in this case, Tasha Turner-Bicknell, was one of those individuals that you invited to be on the board?
A. Yes.
Q. All of the individuals that you invited to be on the board, did you inform them that these -- this would be a non-compensating role?
A. I don't remember.
Q. Do you recall as you sit here today whether all board members -- whether any board member ever received any compensation for their role acting as a board member at HRO?
A. At the time, nobody received any compensation.

Page 16

Q. Did that ever change from 2018 through 2024?
A. Did what ever change?
Q. The fact that no board members received compensation for performing their work as a board member at HRO.
A. Correct.
Q. So correct, it did not change during that time, correct?
A. Yeah, no board member received compensation for work as a board member.
Q. In fact, that's actually written into the bylaws of the organization, correct?
A. I don't know. I'd have to read what the language is.
Q. Do you have an understanding as to why no board members received compensation?
A. No.
Q. Did you create the bylaws?
A. I did.
Q. And you did not have an attorney assist you with the creation of the bylaws, correct?
A. Correct.
Q. When the company was founded, did

Page 17

you also procure the domain name for Harm Reduction Ohio?
A. Yes.
Q. Did you pay for that personally?
A. Yes.
Q. Did you ever reimburse yourself with HRO funds for that?
A. No.
Q. Did you license Harm Reduction Ohio to use that domain name in its operations?
A. No.
Q. Did you permit Harm Reduction Ohio to use that domain name in its operations?
A. We used it.
Q. Okay. Well, they would have had to use it with your permission, because you claim that you own it, correct?
A. Say that again.
Q. HRO would have had to use it with your permission, because you own it, correct?
A. Yeah, I think so.
Q. Okay. So for six years, you permitted Harm Reduction Ohio to use the domain name with no objection, fair?
A. Correct.

Page 18

Q. To your knowledge, does Harm Reduction Ohio --
A. Or, let's see, for -- yeah, seven -- seven -- seven years, yeah. I think I bought the domain name in 2017, maybe 2016. I bought many domain names, because I didn't know what I was going to do or what the name of the organization was going to be, so --
Q. How many, approximately, did you buy?
A. Ten.
Q. Why, after founding the organization and allowing it to use it for six years, did you not transfer ownership of the domain name to Harm Reduction Ohio?
A. I was planning to. I just never got around to it. I was going to donate it when I retired.
Q. Why would you wait until you retired to donate the domain name?
A. I was busy.
Q. What is your understanding of the process that it takes to transfer ownership of the domain name?
A. I don't know.

Page 19

Q. Are you still willing to transfer the domain name today?
A. No.
Q. Why not?
A. Because it's my possession, and I'm still a board member and president of Harm Reduction Ohio, so there's no need to transfer it.
Q. Well, whether or not you are or are not, you just testified that the reason why you never transferred it to HRO to begin with is simply because you never got around to it, correct?
A. I was planning on it, and now I do not plan on it until it's clear who has ownership or who has control of Harm Reduction Ohio.
Q. You don't want to transfer ownership because you were fired, correct, Mr. Cauchon?
A. I was not fired.
Q. I understand that you don't recognize the validity, but you did receive a notice of termination from the board of directors on November 4, 2024, correct?

Page 20

A. I did not.
Q. You did not receive it?
A. Not from the board of directors. I received a notice of termination, but not from the board of directors.
Q. Okay. So you received a notice of termination. Because you received a notice of termination, that's why you're refusing to transfer the domain name to Harm Reduction Ohio today, correct?
A. No.
Q. Do you have any other reason why you're not doing it?
A. There's no reason to.
Q. All right.
(Thereupon, Exhibit 1, Bylaws of Harm Reduction Ohio (Cauchon 15-17), was marked for purposes of identification.)
BY MR. CHANG:
Q. I understand that in prior depositions we might have agreed to continue the deposition numbering. For ease of today, we're going to start with a fresh list of exhibits.
So I'm handing you what's been

Page 21

marked as Cauchon Exhibit 1. Just take a look at that document and let me know when you're ready.
A. Yes.
Q. Do you recognize that document?
A. Yes.
Q. And it was produced by you or your counsel in this litigation, correct?
A. Yes.
Q. And this was a document that was created by you, correct?
A. Or by Carol, our office --
Q. Sorry, what did you say?
A. Or by -- I don't remember if I created it or Carol, our first office administrator, created it, but either me or her.
Q. And if you see at the top there, this says this was adopted on January 29, 2019?
A. Correct.
Q. And that comports with your understanding that the board made an affirmative vote to adopt these as the bylaws of Harm Reduction Ohio?
A. The board did. I would have to

like check the records on January 29th, but --
Q. Now, the copy that you produced is unexecuted, in other words, there's a line for your signature at the very end, but it's not filled in. Did you have in your possession at any point an executed version of this document?
A. I think so. Did I not produce it?
Q. Just do you have it or not?
A. I would have to check the files. It's on -- as I understand it, it's on HRO's Google drive.
Q. Other than the fact there's no signature on this document, though, is this a fair and accurate copy of the bylaws as they existed and were adopted on January 29, 2019?
A. Yes.
Q. And you would have reviewed -- well, when you say Carol created it, are you talking actually typed it up or had any type of substantive input to the content itself?
A. We had an intern do a design guide for Harm Reduction Ohio, like font and design, so this looks like it complies with that. So she may have just changed it to the format.
Q. With respect to the text on the



page as opposed to the format, you created the text that went into the bylaws, correct?
A. Correct.
Q. Let's go to article three, section one, and I'll read it into the record. The board is responsible for overall policy and direction of the organization and delegates responsibility of day-to-day operations to the staff and committees. The board -- we'll stop there. Did I read that correctly?
A. Could you read it again? I was looking at a different section.
Q. Sure. Section one, the board is responsible for overall policy and direction of the organization and delegates responsibility of day-to-day operations to the staff and committees. Do you see that?
A. Yes.
Q. Okay. And this is how -- you had actually drafted how the board of directors would operate at Harm Reduction Ohio, correct?
A. I would have -- I mean, I downloaded it from best practices from a -- from a non-profit association. So, yes, this is -- yep, this is -- this is the original.



Q. So you would agree that the board, as it states here, its role is to be responsible for the overall policy and direction of the organization?
A. Correct.
Q. And did that at any point change between the time that these bylaws were adopted through November 4th, 2024?
A. No.
Q. Was this the bylaws that went into effect as of November 4th, 2024?
A. Yes.
Q. In order to change the bylaws, it would have to have been an affirmative vote by the board, correct?
A. Correct.
Q. Section two states all board members shall serve two-year terms, but are eligible for re-election for up to five consecutive terms, correct?
A. Correct.
Q. And this is what the board of directors had approved and adopted as of January 29, 2019, correct?
A. Correct.



Q. Now let's go through all the board members that were on the board as of November 4th, 2024. The first one is Dwayne Steward. Was he voted in as a board member by an affirmative vote of the board?
A. Correct.
Q. Is the same true with Colleen Garlock?
A. Correct.
Q. Anne Trinh?
A. Yes. Correct.
Q. Billy Golden?
A. Correct.
Q. James Decker?
A. Correct.
Q. Molly True?
A. Correct.
Q. Tasha Turner-Bicknell?
A. Correct.
Q. Dennis Cauchon?
A. Correct.
Q. When were you allegedly voted in as a board member, Mr. Cauchon?
A. At the first -- at the first meeting. And Tasha, Anne, and I and one other

Page 26

board member were all original board members. I think Colleen. So we were all voted in at the same time and in the same way.
Q. Do you recall how many board members there were at that time?
A. I do not.
Q. Do you recall whether it was in or around the same time these bylaws were adopted on January 29, 2019?
A. Around the same time.
Q. And you would agree with me that if you were voted in as a board member, that should be reflected in the board minutes for that particular meeting?
A. The same way that Tasha and Anne, Colleen, and the other board members were reflected.
Q. Are you aware of any board meeting minutes that exist today that states that there was an affirmative vote for you to be a member?
A. Yes, I was elected chair of the board at the first meeting.
Q. And you produced that document in this litigation?
A. Yes.

Page 27

Q. Now, that would have been 2018 or 2019?
A. 2018.
Q. Were you ever re-elected onto the board?
A. We -- we didn't do re-elections. We just held over.
Q. What do you mean by that?
A. We didn't realize that -- that it required re-election every two years, so -- so we realized that I think in 2024 and re-elected three board members, but like the other four were -- their terms were not up, Tasha, me, and two others. So they were going to be re-elected at the September 15th, 2024, board meeting, if I understand it, or at least that was -- that was the talk.
Q. Did you send out an agenda for the September 15th, 2024, meeting?
A. No.
Q. Why not?
A. Because it was too far away. We sent out notice.
Q. Did you ever inform the board of directors that you were going to attempt to be

Page 28

re-elected to the board at the September 15th, 2024, meeting?
A. We talked at the previous meeting about starting the practice of formally re-electing.
Q. Is that reflected in the meeting minutes of that meeting?
A. I don't know.
Q. Who would have been responsible for recording those meeting minutes at the meeting that you're talking about?
A. Erin Pottenger.
Q. Do you recall the date of that meeting?
A. March 9, 2024, I believe.
Q. Do you recall who was in attendance at that meeting?
A. I'd have to check the minutes to see who was in attendance.
Q. You would agree with me, though, that both you, as the president, and the board did not re-elect board members pursuant to section -- article three, section two, of the bylaws at any point going up to September of 2024 then, correct?

Page 29

A. No. At the March 2024 meeting, we re-elected three board members.
Q. But you still considered all the actions that the board had taken up to that point to be effective, correct?
A. Up to March 9th, 2024, is that the question?
Q. We'll start there.
A. As far as I know, yeah, they were all valid.
Q. Okay. And up to August 31, 2024, all actions taken by the board were still valid?
A. The board didn't take any actions between -- after March 9th, still haven't taken any actions since March 9th.
Q. Understood. So despite the non-compliance with the bylaws, you agree with me, then, that you did not contest that the actions by the board that were taken were still valid and on behalf of HRO, fair?
A. The actions through March 9th --
Q. Correct.
A. -- 2024? Correct.
Q. If you'd go to section ten of the

Page 30

document that's in front of you, Mr. Cauchon. It states that special meetings of the board shall be called upon the request of the chair or one-third of the board. Notices of special meetings shall be sent out by the secretary to each board member at least two weeks in advance. Did I read that correctly?
A. Correct.
Q. Now, with respect to notice of board meetings, did you -- as president through March of 2024, would you be the person responsible for sending out those notices?
A. No.
Q. Who would be?
A. Our administrator usually sent them out.
Q. Did you instruct the administrator to send them out up to that date?
A. No, they organized the meetings.
Q. Who is they?
A. The administrators.
Q. Were you involved in the process of noticing the meetings?
A. Yes, to the extent that we needed a meeting, and I was a board member, and we

Page 31

were going to have a meeting.
Q. As president of HRO, as part of your responsibilities, did you include complying with bylaws as one of those responsibilities?
A. In -- for my job as president of Harm Reduction Ohio?
Q. Yeah. Was one of your roles to ensure that all meetings were properly noticed?
A. I don't know. I don't know if that was my responsibility.
Q. Well, whose would it have been?
A. I don't know.
Q. So you were a board member, and you were president of the company, and you have no idea whose responsibility it was to make sure that meetings were properly noticed; is that your testimony today?
A. I don't know. I would have to read the bylaws. The president has day-to-day responsibilities for the organization, including carrying out the organization's goals and policies. The president will attend all board meetings, report on the progress of the organization, answer questions of the board

Page 32

members, and carry out the duties described in the job description.
So I don't know if that would be the chair of the board who was responsible for it or the secretary.
Q. So as you sit here today, you have no recollection over those six years whether you took responsibility for sending out properly noticed board meetings -- notices for board meetings? Sorry.
A. I would work with the administrator, and she would send them out.
Q. Did you -- did the administrator report to you?
A. Yes.
Q. You were their boss, correct?
A. Correct.
Q. And don't you think it would be important for the president of the organization to ensure that the administrator is following the bylaws of the organization?
A. I'm not sure that the administrator saw the bylaws, but --
Q. Well, even more so then if you didn't know that the administrator saw the

Page 33

bylaws, then it would be important for you, as the president, to make sure that she is acting consistent with the bylaws and noticing meetings, fair?
A. Could you repeat the question?
Q. Regardless of whether the administrator did or did not know or have ever read the bylaws, you are her direct supervisor and boss, correct?
A. Yes.
Q. And it's important that -- as the president of the organization and as her supervisor and boss, it would be important to you that she complies with the bylaws when sending out notices for board meetings, correct?
A. Yes.
Q. Okay. Did you -- are you aware of any board meeting prior to March 9, 2024, that was ever sent out without two weeks' notice?
A. No.
Q. What is the purpose of the two weeks' notice requirement?
A. That all board members have two weeks' advance notice.

Q. Yes, that's what it says, but what's the purpose of it?
A. Do you want my opinion?
Q. Well, you wrote it, Mr. Cauchon. What was the purpose of having a 14-day time frame?
A. I didn't write it. I downloaded it, and this was what -- I looked at like five or six model bylaws, and then this was like common language in those bylaws, so that's where it came from. I didn't like write it from scratch.
But I would think that the purpose would be so that people would have time to get informed. Plus, people lived all over the state. So setting up a board meeting required a lot of work, you know, just people's schedules matching.
Q. You said the purpose was -- at least your understanding was so that the board members had time to get informed in order for them to attend, correct?
A. Among other reasons. I mean, it's -- I can't say that I thought what the purpose was. It was just sort of what other



bylaws used, so I just adopted it.
Q. Sure. You had many different choices to make, you made that one, and your understanding of the purpose is to give the board members sufficient time in order for them to be able to attend the meeting; is that fair?
A. Yeah.
Q. Is it your position that the board can never act on an emergency basis without a 14-day notice?
A. I would -- I believe not. I've seen -- and my lawyer, not David, my corporate lawyer, tells me no, that the bylaws are binding.
Q. Separate and aside from whatever advice your lawyer gave you, which, candidly, I don't want to know, unless you're agreeing to waive that -- are you agreeing to waive that attorney/client privilege today, Mr. Cauchon?
A. No.
Q. Okay.
A. But he said it in letters to the -- to the -- to Dwayne and to others, so you could just read it.
Q. Prior to consulting your lawyer on



that issue, did you believe that the board couldn't act without a 14-day notice in any circumstances?
A. Yes.
Q. So you believed that even if the entire board had agreed that there was an action that they needed to take, that they couldn't do something without a 14 -- they couldn't have a meeting without a 14-day notice?
A. As -- Harm Reduction Ohio's lawyer, Dave Ball, I was in his office when I got the notice that the board had met, and so he was there. So I asked him can the board meet without me, a board member, and he said no.
So I asked him well, can they take action without a board member. And he said you can only take action if all board members agree in writing to the action. So that was my understanding.
Q. Okay. Well, prior -- my question was prior to you engaging any type of counsel what your understanding was. Prior to that, did you believe that the board can set a



meeting without having 14 days' notice as long as everyone agreed?
A. I had no belief, because I didn't know what the law was.
Q. You had no belief and no understanding for six years before you retained an attorney about whether the board could or could not meet without 14 days' notice?
A. Correct, I didn't know.
Q. And as you sit here today, are you aware of any -- I don't know what you're referring to, any statute or provision that says 14 days must be adhered to for non-profit organizations under Ohio law?
A. A statute?
Q. A statute, a regulation, anything, Mr. Cauchon.
A. I don't know any statute.
Q. As you sit here today, you can't identify one, correct?
A. I can't identify one. I don't know if there is one.
Q. Are you aware of whether or not -- or the board itself could affirmatively vote to change the bylaws, correct?

A. I don't know. Probably, but I would have to -- these bylaws may be amended when necessary by two-thirds majority of the board of directors. Proposed amendments must be submitted to the secretary to be sent out with regular board announcements.
Q. Yes, that's what it says. So you would agree with me that the board can, at its leisure, amend the bylaws, correct?
A. Can, yep, if it follows those procedures.
Q. So the board had the power to be able to change any of the bylaws that it had voluntarily agreed to on behalf of the organization, fair?
A. Correct.
Q. Let's go through the individual board members. Mr. Steward. Did you invite Mr. Steward to be a board member?
A. Yes.
Q. Why did you invite him?
A. I thought he had relevant experience.
Q. What experience?
A. He worked in -- at Equitas Health



overseeing -- overseeing their programs that included their syringe service program in Columbus.
Q. To your knowledge, did he also have experience with running non-profit organizations or non-profit organization governance?
A. Not to my knowledge.
Q. Was Mr. Steward ever hired as a consultant by the board or by you?
A. Yes.
Q. When was that?
A. 2024. I don't remember the exact month.
Q. Do you recall what consulting services he was hired for?
A. Management consulting services.
Q. So you would agree that both you and the board recognized his expertise in management consulting services so much that you officially contracted with him to get his advice on that subject, correct?
A. Yes, he had -- after he left Equitas Health, he started his own little -- his own consulting business, so --



Q. Let's talk about Colleen Garlock. Did you invite her to be a board member?
A. Yes.
Q. Why?
A. Because harm reduction was almost unknown in Ohio, so I did a Google search on harm reduction, and any -- I told her anyone who came up in the Google search as saying harm reduction, I was going to ask them to be on the board. So she was quoted somewhere on harm reduction, and she -- her son had struggled with drugs, and she was a counselor, so -- so that's why I asked her.
Q. So she brought a different type of experience to the board; is that fair?
A. Correct.
Q. What about Anne Trinh, did you invite her to be on the board?
A. Yes.
Q. What expertise or lived experience did she bring to the board?
A. She was -- she had worked at Franklin County Public Health, and she had just taken a job at Ohio State working in like opioid grants.



Q. So, again, another experience and expertise that was beneficial for Harm Reduction Ohio, correct?
A. In one slice, correct.
Q. Billy Golden. Did you invite Billy Golden to be on the board?
A. Yes.
Q. What expertise or lived experience did Mr. Golden bring to the board?
A. He ran the syringe service program in Cincinnati in like 2017, 2018.
Q. And that was valuable to have someone with that expertise and experience on the board, fair?
A. Yes.
Q. What about James Decker, did you invite him to be on the board?
A. Yes.
Q. And what expertise or lived experience did he bring to the board?
A. He struggled with opioids and was in recovery and was -- was articulate. And I met him in his hometown. It's not Mansfield, but -- so, yeah, so I met him at a meeting with the public health department in his home

Page 42

county, and he attended. So I talked to him after, and he was very knowledgeable on harm reduction.
Q. And I used the term lived experience. Is that a terminology that you're familiar with?
A. Yes.
Q. And the reason why you invited Mr. Decker is he is an individual who would have lived experience with respect to opiate addiction, fair?
A. Among other reasons.
Q. And that was valuable for the board to have, correct?
A. Correct.
Q. And certainly Harm Reduction Ohio wouldn't hold that against him having that lived experience, correct?
A. No.
Q. No, they would not hold it against him, right?
A. Correct.
Q. Let's talk about Molly True. What expertise or lived experience did she bring to the board?

Page 43

A. I know that she had been addicted to opioids, and she was -- she had done some journalism, and she reached out to me for, you know, like help on various issues related to methadone, so that's how I knew her.
Q. How long did you know her before you invited her to be a board member?
A. I didn't know her very well. Maybe a year. I think she had also been featured in the Cincinnati Enquirer story that won the Pulitzer Prize of people struggling with everyday -- with drug addiction in their everyday lives. I know her least well of the various board members.
Q. Understood. Finally, Tasha Turner-Bicknell, did you invite her to be on the board?
A. Yes.
Q. In fact, she was one of the original people who you invited to be on the board, correct?
A. Yes.
Q. What expertise or lived experience did you find valuable or what expertise or lived experience did she bring to the board?

Page 44

A. I don't know if she has lived experience with opioids. I mean, she has lived experience with other drugs she told me, but her -- she is a professor of clinical nursing at the University of Cincinnati, so she -- she was knowledgeable in the pharmacology and on the medical side.
Q. Is it fair to say that the members that you invited to be on the board, it was important to you to kind of diversify their expertise or lived experience because you thought that would be beneficial for the operations of Harm Reduction Ohio, fair?
A. Correct.
Q. Prior to March of 2024, did you ever take issue with any of the board members with respect to you believing they weren't fulfilling their duties as a board member at any point?
A. Only in minor ways. Like Molly True didn't show up for board meetings, but -- but, no, I thought we all got along very well.
Q. Okay. And did they all express to you their belief in HRO's mission in saving lives?

Page 45

A. Yes.
Q. And that was important to them, they expressed to you?
A. I don't know if they expressed it directly, but implicitly I'm sure they had the same commitment.
Q. And at any point prior to March of 2024 did you ever doubt their commitment to that objective of HRO?
A. No.
Q. At some point did HRO -- did the HRO board adopt an employee handbook to your knowledge?
A. Yes.
Q. Do you recall when that occurred?
A. 2022 is my guess, but it's in the meeting minutes, so -- for the specific date. But off the top of my head --
MR. CHANG: That's fine. It's not a memory test. I have it in front of us. I'm just orienting. I'm giving the witness what is being marked as Deposition Exhibit 2.
(Thereupon, Exhibit 2, Mission Statement (HRO 339-385), was marked for purposes of identification.)

Page 46

BY MR. CHANG:
Q. Just take a moment. I'll direct you to the specific pages I have questions on, but if you can generally look through it, my question will be do you recognize this as the September 2022 HRO employee handbook. But please take a moment.
A. I do.
Q. And is this a fair and accurate depiction of what the HRO handbook was effective September 2022?
A. Yes, I believe so.
Q. Did you create this document?
A. I did -- did I -- no, I did not.
Q. When I say create the document, I mean did you have a role in actually creating the substantive -- the substance of the document, not the creation of it as a Word document or something.
A. No. We -- to get the ODH contract, we had to have an independent audit, which we did. And the independent auditor told us that we needed this document with the various policies. So I asked Linda Smolak, a volunteer, and AmandaLynn Reese if they could

Page 47

develop the handbook, and they took the lead and worked with others and developed it.
Q. You said Linda Smolak?
A. Yeah, Linda S M O L A K.
Q. At the time that you asked them to do this, what was Ms. Reese's role, job title, at HRO?
A. I think she was director of outreach. I'm not sure in 2022 what her job title was.
Q. What about Linda Smolak?
A. She was a volunteer.
Q. As a volunteer, what -- did she hold any type of title?
A. No.
Q. What type of experience did she bring to Harm Reduction Ohio?
A. She was a retired administrator at Kenyon, and she had managed -- I think she had been project manager on a couple of small grants we had in Cincinnati, at least one. So she was skilled sort of in HR type of issues.
Q. Did you have an opportunity to review the substance of what they created before presenting the handbook to the board?

Page 48

A. Yes.
Q. So it's fair to say that you would have reviewed and made any revisions as president of HRO that you found necessary, correct?
A. I didn't make any revisions, but I did review it. I mean, we were -- we were getting independently audited, and that was consuming all my time, so -- so I wanted to make sure that this satisfied what was needed in an audit.
Q. And did the auditor tell you that it did?
A. Yes.
Q. Okay. So you didn't make any substantive revisions, but you did read it page to page, correct?
A. I probably did not read it page to page.
Q. Why not?
A. Because I was extremely busy.
Q. At any point prior to March of 2024 did you go back and read the handbook page to page?
A. Page to page. I wanted -- it's 40

Page 49

pages, and like I wanted to cut it to 20, because it's got a lot of verbiage, but -- so I certainly skimmed it and probably pretty thoroughly. Whether I read it page to page -- like a couple issues came up like on days off and part-time employees. You know, it -- the first version like this, it can't really handle all the eventualities, what do people get paid, time off, you know, so --
Q. Understood. You wanted to fine tune it at some point to take care of some of those redundancies, fair to say?
A. Yeah.
Q. Okay. And you presented the HRO employee handbook to the board for approval?
A. Correct.
Q. And they approved it?
A. Correct.
Q. By a unanimous vote?
A. Correct.
Q. If you can direct your attention to page five under the subtitle of retaliation. I'm not going to read the entire thing into the record, but if you go under the subpart that talks about complaint procedure, it reads an

individual who feels harassed, discriminated, or retaliated against should initiate a complaint process by filing a complaint in writing with their immediate supervisor, the director of operations, or the president. If the president is the perpetrator, the complaint should be directed to the director of operations or chairperson of the board of directors.

So, Mr. Cauchon, it's fair to say, then, that if there was a claim of either harassment, discrimination, or retaliation that would be asserted against you, it would be proper for that individual to take that complaint to the board of directors and not present it to you, fair?

A. To the chairperson.

Q. To the chairperson, fair. And this was HRO's policy as of October 2024, correct?

A. Yes.

Q. If you go on to the next page, it's the third paragraph in, the sentence beginning with within five business days. Do you see that?



A. Yes.

Q. It says within five business days of receiving complaint, the director of operations will notify the person who is charged, quote, respondent, end quote, of the complaint and initiate an investigation to determine whether there is a reasonable basis for believing that an alleged violation of the policy occurred. Did I read that correctly?

A. Correct.

Q. So you would agree with me that upon being informed of a complaint, it was, in fact, the obligation of the organization to perform an investigation, fair?

A. Can you say that again?

Q. Upon receiving a complaint, would you agree with me pursuant to the handbook it would have been the obligation of the board to perform an investigation, correct?

A. Correct.

Q. And I don't see anything here that requires the person receiving the complaint to disclose the contents of the complaint to the person that was being complained of, do you?

A. You're saying about something that



you think is not in here?

Q. I don't see -- are you aware of whether there is any obligation under the handbook to disclose the substance of those allegations to the person that was complained of?

A. I don't know, but do you want me to read the handbook?

Q. No. I'm just asking if you're aware of any.

A. I don't know.

Q. If you'd turn to the page -- the bottom right-hand corner is what we call a Bates stamp. If you would turn to the page Bates stamp ending in 378.

Just to orient ourselves, the title of this first section is actually on the prior page and begins with conflict of interest. Do you see that?

A. Correct, on 377 is conflict of interest.

Q. Now, the first paragraph, the last sentence there appears to be a definition of what a potential or actual conflict of interest is, and I'll read it into the record. It



states a potential or actual conflict of interest occurs whenever an employee is able to influence a decision that may result in a personal gain for the employee or an immediate family member, then it puts in parentheses i.e., spouse or significant other, children, parents, siblings, end parentheses, as a result of the agency's business dealings.

Now, as of July of 2024, was this the official definition of what HRO considered to be a conflict of interest at that time?

A. Yes.

Q. Now, I know that you didn't --

A. Exclusive of the contract. The contract had a separate definition, but this was HRO's handbook's definition.

Q. What contract are you talking about?

A. The ODH contract.

Q. But for all intents and purposes with respect to the conflict of interest policies of the organization, this was the official definition for HRO, correct?

A. Correct.

Q. And when it says may result in a

Page 54

personal gain for the employee, what did you understand that to mean?
A. That it could benefit the employee.
Q. Monetarily?
A. Monetarily, yep.
Q. And if it didn't result in a personal gain for an employee under this definition, then it would not be a conflict of interest at least under HRO's policy, correct?
A. Are you saying that monetarily?
Q. No, I'm just saying if -- if there was not a personal gain for a particular course of action, then you would agree with me that the definition at least of a conflict of interest -- then it would not be a conflict of interest under HRO's definition?
A. I would say it slightly more broadly, because it says may result in a personal gain. So it's not will result, may, but -- but, yeah, if it could not result in a personal gain for the employee or the immediate family member, then it would not be a conflict under the policy.
Q. Now, the next section following

Page 55

this is HRO's policies with respect to outside employment, correct?
A. Correct.
Q. And this is the policy that would have been effective as of July of 2024, correct?
A. Yes.
Q. And feel free to read this. It's not very long. But, generally speaking, HRO did not prohibit its volunteers or employees from having jobs with other companies, correct?
A. According to this, like unrelated to HRO business.
Q. Right. There was no blanket prohibition for them having outside work, fair?
A. There was no blanket prohibition.
Q. And it lists three categories of things that would violate or where there are exceptions to that rule, if you follow along with me in the first bullet point, unless it prevented the employee from fully performing work for which they are employed at HRO, including overtime assignments.
So that's one exception to that general allowance of them having outside work,

Page 56

correct?
A. Correct.
Q. And then the second one here is if it involved organizations that are doing or seeking to do business with HRO, including actual or potential vendors or customers. So that's the second exception, correct?
A. Correct.
Q. And the third one is violates provisions of the law or HRO's policies or rules. Do you see that on the next page?
A. Correct.
Q. And in determining whether there was a violation of a provision of the law, you would agree with me it would be prudent for either you or the board of directors to get an opinion from a lawyer to determine whether there was a violation of law; is that fair?
A. It would depend on the situation.
Q. Well, you're not a lawyer, correct?
A. No.
Q. And are you aware of whether any board members at any point have ever held a law degree?

Page 57

A. Not that I know of.
Q. So there were no lawyers on the board, fair to say --
A. Correct.
Q. -- as of 2024?
A. Correct.
Q. So is it your testimony today that either you or the board would be determining whether something was a violation of law without seeking advice of counsel?
A. It would depend what the provision of law was. If an employee, while working, got a ticket for speeding, that's a violation of the law, but we don't need a lawyer to handle that. So it would be fact and case specific on what we would do.
Q. Okay. In the case where an employee hasn't been charged or indicted or convicted, you would agree with me that it would be prudent for HRO, either you or the board of directors, to consult legal advice if there's been none of that as to whether something violates the law, fair?
A. It could be. It depends on -- it depends on the circumstances, what the

Page 58

privilege -- what the policy is, et cetera. It's a judgment call.
Q. And who would be making that judgment call, Mr. Cauchon?
A. It would be me in consultation with the board.
Q. And you would agree with me that if the board disagreed with your decision not to seek legal advice, it would be their prerogative to do that, correct?
A. I would say at a -- yes, at a properly noticed meeting. But if I can give you a real world example --
Q. I'm not asking for an example, Mr. Cauchon. I just want you to answer the question.
And you would agree with me that if the board disagreed with you, they had the authority to -- their decision controls at the end of the day with a properly noticed board meeting a decision, fair?
A. No.
Q. You believe you have more authority than the board even if the entire board voted against you as president; that's

Page 59

your testimony today?
A. I believe the bylaws say the board can vote at a properly noticed meeting to fire me, but I have operational control, as well as staff, of like day -- I think day-to-day operations, as well as the ODH contract.
I was the contract signature -- signatory and was given specific duties according to that contract. The duties were not given to the board. So there would be -- there would have to be an interplay between various duties and obligations.
Q. The bylaw says that it was delegated to you. Do you have an understanding of the word delegated?
A. Yes.
Q. That means that they have it, but they're giving it to you for a limited purpose, correct?
A. What does it say? Policy and direction.
Q. It says delegated, Mr. Cauchon. I'm asking your understanding of the word delegated.
A. Could I look up -- I'm not sure.

Page 60

I think I know what delegate means, but I don't really know.
Q. Okay. Put that down. I'm asking you what your understanding of the word delegated means.
A. I think delegate means delegated or handed or signed to a different entity.
Q. They have the power, and they gave it to you for the purpose to -- they gave it to you effectively, fair?
A. Yes.
Q. And you would agree with me if they disagreed with the way that you were using it, they did have the ultimate authority to be able to terminate you if they desired, correct?
A. At a properly noticed meeting, yes, for any reason.
Q. You can set that aside. When is the first time that you learned that Ms. Reese had outside employment with Velocity?
A. July 15, 2024.
Q. What occurred on July 15th of 2024?
A. I was on Facebook at about at night, and I saw like a Facebook post from a

Page 61

new harm reduction group I had never heard of. So I went to their website -- went to their about page, and I saw that AmandaLynn was on their board, which I didn't know about, and that one of the jobs she listed herself as having is director of government advocacy for Velocity BioGroup.
Q. Had you ever requested a resume from Ms. Reese prior to July 2024?
A. I don't think so. When I hired her, maybe she provided one, but I do not recall.
Q. What about when you were filling out the ODH application, did you collect the resumes of your employees -- of HRO's employees?
A. I didn't collect them, but the ODH application had work experience, and she filled out that form.
Q. You didn't collect them. Could her supervisor have collected them?
A. No. No, I was her supervisor.
Q. Ms. Reese wasn't your direct report back in 2022, correct?
A. Not in 2022.

Page 62

Q. What about 2023?
A. In 2023, she became my direct report I think, yeah.
Q. Prior to that, her direct report would have been Mallory Bolen, correct?
A. Correct.
Q. And Mallory Bolen was her direct supervisor, correct?
A. Correct.
Q. And Mallory Bolen reported to you?
A. Yes.
Q. And what was Mallory Bolin's title before she left the organization?
A. Director of operations.
Q. All right. So you read on Facebook on July 15, 2024, that Ms. Reese is employed at Velocity. What did you do next?
A. I Googled Velocity BioGroup.
Q. And what did you find?
A. That they represented the Kloxxado brand of naloxone.
Q. And what were you looking at when you said they represented that?
A. Various websites, news articles and such, and press releases that had been put

Page 63

out by Hikma. I can't remember all the contents. But Velocity BioGroup is kind of an unusual name, so -- so the things -- so it's easy to find stuff on them.
Q. All right. When did you first address your findings with Ms. Reese?
A. July 17th.
Q. And what happened on July 17th?
A. Well, I sent an email and addressed it with Dwayne Steward the day before July 16 to talk about it, and then July 16 I asked her if she had time to talk.
Q. Okay. Let's start with July 16. You said one of the first things you did was send an email to Dwayne Steward, correct?
A. Correct.
Q. Were you sending that email to him as a board member or as a consultant for the organization?
A. Just for advice. In both capacities, I would say.
Q. And what do you recall being the substance of that conversation?
A. Well, it was about the email, and -- you know, and we were in agreement at

Page 64

the time about, you know, the various issues that had to be resolved and -- yeah. So it was similar to the email. We were in accord at the time, or so I thought.
Q. I'm not asking you to speculate as to Mr. Steward's state of mind, but your understanding at least at that time is that you were in agreement is your testimony?
A. Yes.
Q. You were in agreement with what?
A. That -- that we had to -- HRO had to learn more about her outside employment.
Q. Okay. So at that point in time, the only agreement that you had or understanding that you had with the agreement with Mr. Steward was you needed more information, fair?
A. You can see in the email, but I think like one thing is he said it would be a problem if she was doing this work on HRO time, and I agreed, and that's one thing I should check out, and he gave me some like dos and don'ts on language to use.
Q. Do you recall any of those dos and don'ts as you sit here today?

Page 65

A. It's in -- I think it's reflected in the email.
Q. I'm just asking if you recall any of the dos and don'ts as you sit here today, Mr. Cauchon.
A. I don't. Only generally.
Q. Suffice to say, though, you were in agreement that you needed more information from Ms. Reese before deciding what to do, correct?
A. Correct.
Q. And did you, in fact, attempt to get more information from Ms. Reese?
A. Yes.
Q. How did you do that?
A. We had a Zoom call on July 17th in which I asked her about her Velocity BioGroup employment and asked her if she could like provide the details, such as like her invoices and stuff on the work that she had done.
Q. Invoices. What are you referring to?
A. I thought at the time that -- or that she might be like a part-time worker, and she would -- I didn't know what she did, and

Page 66

when I asked her, she was very vague about what she actually did.
Q. So I asked you to state for the record what she said as opposed to characterizing what she said. What did she tell you about what she did; do you recall?
A. She told me her first commitment was to HRO, she would provide me all the information that I need, and that she didn't think she did anything that was related to what HRO does.
Q. She used those words, she didn't think that she did anything related to what HRO does?
A. I can't say for sure if it was those words.
Q. But that was the import, what you got from that conversation, fair?
A. Correct. And she also told me that she did very little work for them. I think minimal was the word she used, but I can't say for sure.
Q. Did you ask her what it meant -- what her job responsibilities were as the director of government advocacy?

Page 67

A. I don't remember. I probably did, but I don't remember.
Q. Did you ask to see her contract with Velocity?
A. No, because I didn't think she had a contract or -- I may have. I asked to see her invoices. I don't remember if I asked to see her contract.
MR. CHANG: It's okay if you don't recall. I would really prefer that you not speculate.
(Thereupon, Exhibit 3, July 18, 2024, emails (HRO 242-243), was marked for purposes of identification.)
MR. CHANG: I'm handing the witness what's been marked as Cauchon Deposition Exhibit 3. Sorry. I'm giving it to your lawyer first. It's proper procedure.
BY MR. CHANG:
Q. You can take a moment to look at it, but my questions are going to start in chronological order, which in this case is actually the last page first. And just look at it and let me know when you're ready.
A. HRO 243?

Page 68

Q. Correct.
A. Okay.
Q. All right. This appears to be an email from you dated July 18, 2024, at 10:72 [sic] a.m. Do you see that?
A. Yes.
Q. And you were sending this email to Cecile Katz, correct?
A. Correct.
Q. And you recognize this email?
A. Correct.
Q. And Ms. Katz, at this time, what is her position?
A. Administrator.
Q. She reported directly to you?
A. Yes.
Q. And you say we talked for a little over an hour today, and I think things went well. When you say we, you're referring to Ms. Reese, correct?
A. Correct.
Q. And you're referring to the conversation that we just talked about where you asked her about her role at Velocity, fair?
A. Correct.

Page 69

Q. You say I think she understands the conflict issues, and I acknowledged HRO needs a more formal policy and a reporting form.
What did you mean by the second part, that you acknowledged that HRO needs a more formal policy and reporting form?
A. I think at the time, I forgot that the handbook contained a conflict of interest policy. And also on a reporting form, at the time, we didn't have like an annual form. We were just -- it was based on trust that people would disclose the conflict. So we needed like a formal process.
Q. There was no formal process or formal requirement for employees of HRO to submit all of their outside employment to anyone at HRO as of July 18, 2024, correct?
A. It was based on trust.
Q. So that's correct, there was no policy, right?
A. Other than what's in the handbook, it says shall disclose. But we didn't have a form for them to disclose, but it was -- I believe it's a shall disclose requirement.

Q. The third paragraph in the email says we agreed for her to think about things and for us to talk on Monday. And you say I think she will formally step down from these groups, but want to make sure that's of her own volition. Did I read that correctly?
A. Correct.
Q. So you didn't want to force her hand. You wanted her to resign from Velocity; is that a fair characterization?
A. Correct.
Q. Why?
A. Because Velocity was a lobbyist for Kloxxado, and we, and her in particular, ordered thousands of kits of Kloxxado from the government.
Q. Bad question. Why did you want her to resign of her own volition as opposed to you forcing her hand?
A. Because if she wanted to stay with Velocity, or keep her consulting business, I wanted to respect that.
Q. What is the next thing that you recall occurred? The email states that you were going to meet with her on Monday. So just



to guide you through, did you, in fact, meet with her the following Monday to your knowledge?
A. She was supposed to send her disclosure information, and then we would regroup on Monday. She did not send that information. I think on Tuesday I reminded her, and she said oh, I haven't forgotten, and then there's email language on that.
Q. You are using a term or phrase disclosure information. What are you referring to?
A. She had promised to like disclose the invoices, what she had been paid and what for, from Velocity.
Q. Let's go through a list of what you requested. You keep saying invoices. What invoices were you expecting to receive?
A. That she would invoice Velocity for work that she had done.
Q. So help me understand this. You thought she was some type of consultant who would invoice her services on an hourly basis to Velocity? Is that why you kept asking for invoices?



A. Yeah. I don't know if it was an hourly basis, but she would invoice her services.
Q. Did she tell you there was no invoice?
A. No.
Q. Did she tell you that she was on salary?
A. No.
Q. Okay. So you're requesting the invoices. What else did you request specifically as part of the quote, unquote, disclosure information?
A. Essentially what she was paid, what she was paid for, and what she did.
Q. So you wanted to know how much she was paid?
A. Yes.
Q. Why were you interested in knowing that?
A. Because she indicated to me that she wasn't paid much, like, you know, maybe 100 or $200. I don't think she mentioned those numbers, but she made it seem like there was a very minimal relationship. So I just wanted to



test that with what the actual facts were.
Q. Well, HRO's conflict of interest policy was that any personal gain would be presenting that conflict of interest, correct?
A. Yes.
Q. So why -- why was the amount of her compensation -- why were you interested in even knowing that if it didn't matter?
A. Because there's a difference between being paid $1 and being paid 100,000.
Q. So you believed that there's a difference in being paid $1 versus 100,000 under the definition of a conflict of interest that HRO had adopted?
A. The details -- yeah, the details matter.
Q. For example, you think $1 wouldn't be a personal gain, but $100,000 might be?
A. It would depend on what she did. If you want to -- like I can -- she had earlier -- yeah.
Q. Mr. Cauchon, it didn't matter how much she made. If she received any type of personal gain, under HRO's conflict policy, you would agree that would be a conflict of

Page 74

interest under the definition that you reviewed and the board adopted, correct?
A. But it's a gray area. What if she got paid for speaking on a panel, you know. But if she got paid 100,000 for speaking on a panel versus $100 for speaking on a panel, you know, it's a judgment call.
Q. But the judgment call would be the nature of her work, not how much she is being compensated for it, correct?
A. No, it matters what she is being compensated, how much she is being compensated.
Q. And were you intending to create some type of distinction, some threshold, dollar threshold, as what is a personal gain and what is not?
A. I wanted to see what the facts were. I didn't have any opinion at the time.
Q. You just wanted to know how much she made, correct?
A. I wanted to know how much she made, what she did, and -- yeah, so -- I wanted the facts.
Q. When you say what she did, did you ask for any specific documentation?

Page 75

A. Yeah, the invoices.
Q. Okay. Beyond invoices?
A. I don't recall.
Q. Anything else that you would have asked of her to provide you as part of the, quote, disclosure information, end quote?
A. I was expecting her to use her good judgment to provide me the information that would decide whether her work with Velocity conflicted with her job and the function of Harm Reduction Ohio.
Q. So was that a no, you did not specifically ask for anything else?
A. I don't recall what I specifically asked for other than I remember invoices and -- but I thought I was leaving it to her discretion to provide the meaningful information.
Q. At that time, had you made the decision -- when I say at that time, in around -- after you had the conversation with her, was the decision made by you to update the conflict of interest policy and disclosure forms for HRO?
A. At that time, no.

Page 76

Q. When was --
A. Maybe a short time later. Like I think I talked with Cecile and Dwayne and others, and I'm not sure if they brought it up, like we thought we should get an annual form to distribute, or something like that.
Q. Was it within the next week after your initial conversation with Ms. Reese?
A. Probably close to it.
(Thereupon, Exhibit 4, emails (HRO 245-246), was marked for purposes of identification.)
BY MR. CHANG:
Q. I'm going to give you what is being marked as Cauchon Exhibit 4. Again, this goes chronologically from the end to the start, so we're going to begin at the end of the document, Bates stamp ending in 246.
Do you recognize this email? It appears to be dated July 23rd, 2024, at from you. It looks like it's directed to Ms. Reese.
A. Correct. On the back, on 246, yeah.
Q. Do you recall sending her an email

Page 77

in or around this date and time saying don't forget to let me know what you decided, period. Thanks, period?
A. Correct. I think this was Tuesday. When she didn't provide the documents on Monday, I wanted to prompt her.
Q. When you say don't forget to let me know what you decide, what are you talking about?
A. Is if she wants to stay with Velocity.
Q. Did you give her an ultimatum that she couldn't stay at HRO if she stayed at Velocity?
A. That it was probably a problematic conflict and it was her decision. It was her decision whether she wanted to stay with Velocity or HRO after we saw what her employment actually was.
Q. Did you say you would fire her if she didn't resign from Velocity?
A. No.
Q. And why are you asking her to let you know what she decided? It sounds like you were giving her option A and option B. What

were her options A and B?
A. It was her decision on what she wanted -- what she wanted to do and what she wanted to provide.
Q. Is it fair to say that the options that you provided her is that either, one, she could resign with HRO or, two, she could resign with Velocity BioGroup?
A. No, she could have done other things at HRO that didn't involve ordering Kloxxado, for example. It didn't occur to me that the conflict was as serious as it turned out to be.
Q. Did you express to her that you were willing to let her stay on at HRO, just not in the role of being a -- she was a program director at that time, right? What was her --
A. Director of outreach. I'm not sure what her official title was.
Q. Either way, did you express to her at that time that she could stay at HRO, but she couldn't oversee the naloxone procurement distribution program?
A. I don't remember.
Q. All right. Well, she responds to



you, if you go to the front page, saying Dennis, I apologize for any confusion. I have not forgotten our discussion. Based on our conversation, I was expecting to review a conflict of interest form or policy before finalizing anything, but, as I shared previously, my prior commitment remains to the people we serve at Harm Reduction Ohio. Do you recall receiving that email?
A. Yes.
Q. Okay. And so is it fair to say at this point, you had communicated at least to her that there would be revisions with respect to HRO's conflict of interest policy and the disclosure form, correct?
A. I don't think I communicated that with her. It's possible that -- that Dwayne or Cecile did.
Q. Either way, the decision was made, at least as of the date of this email on July 24th, that those policies and that form would be updated, fair?
A. I'm not sure.
Q. Well, do you have any reason to doubt the accuracy of her email saying that she



had expected a conflict of interest form or policy?
A. She said it like -- I'm not sure what information it was based on. It's all in email -- emails, so we can just check the timeline.
Q. Well, we're looking at the email. So I'm just asking you whether you remember by this point whether the decision was made to update those policies?
A. I don't recall.
Q. Okay. And you forwarded it to Dwayne. Why?
A. Because at the time, I thought he was concerned about the conflict of interest too. And to respect her privacy, I also decided to talk with only one board member rather than -- like I talked with no one else other than Cecile, who handled HR, and Dwayne, the single board member.
Q. Was Dwayne chair of the board at that time?
A. No.
Q. Was he vice chair?
A. He was vice chair.



Q. Billy Golden was the chair, right?
A. We had no chair, because Billy had resigned.
Q. Understood. Did you select Dwayne because he was the vice chair?
A. And because we were having regular meetings on him helping us prepare a strategic plan, and he also, I think, at Equitas had experience in HR.
Q. So you consulted Dwayne because you valued his expertise in these types of issues; is that fair to say?
A. I valued his opinion and insight, yes.
MR. CHANG: You can set that aside. I'm handing the witness what is being marked as Cauchon Exhibit 5.
(Thereupon, Exhibit 5, August 8, 2024, email (Reese 9), was marked for purposes of identification.)
BY MR. CHANG:
Q. This email, Mr. Cauchon, is just to refresh your recollection effectively of the time frame here. It appears to be an email from Ms. Katz to HRO staff dated August 8th of

Page 82

2024 at 2:52 p.m. Have you seen this email before?
A. Yes.
Q. Does the date reflected here, August 8, 2024, refresh your recollection of when a new conflict of interest disclosure form was circulated to HRO staff?
A. Not on the specific date. Well, this is when a revised form was -- that wasn't your earlier question.
Q. No, I understand that. It's a new question though.
A. Yeah, August 8th is when it was distributed.
Q. And the August 23rd deadline, was this a deadline that you had articulated to Ms. Katz to send to the staff?
A. I'm not sure if it was me or Cecile. I think probably it was Cecile.
Q. Needless to say, though, the decision was made to give staff a period of time, approximately two weeks, in order to fill out and return the form, correct?
A. Correct.
Q. And what was your -- were they to

Page 83

return the form to Ms. Katz or to you?
A. To Cecile Katz.
Q. And your intent was to review those forms once they were received?
A. Probably, but I hadn't really -- I hadn't really thought about it. But Cecile was going to get them, and then her and I would probably go over them after we had them all. But we hadn't worked out what would happen next.
Q. Would you agree that changing HRO's policy with respect to how conflicts of interest are reported is something that the board -- is required to be approved by the board?
A. No.
Q. You recall in reading the bylaws with me that the board is responsible for the overall direction of polices of the organization, correct?
A. Correct.
Q. But at least at this time, you didn't feel that board approval was required to change the way the conflicts of interest were reported; is that fair?

Page 84

A. We had the conflict of interest policy and like how the reporting was done. It was within -- it was within my authority and Cecile's authority.
Q. Were you also looking at changing the substance of the conflict of interest policy itself?
A. Not at this time. I don't -- I mean, we might have been looking at changing some languages, but --
Q. So is that you weren't, or is that I don't remember?
A. I don't remember.
Q. Okay. At some point did the board become aware that you had circulated this form and asked you to wait for board input before requiring all employees to fill it out?
A. No.
Q. You don't recall that happening?
A. The board never did, because the board hasn't met since March 9, 2024.
Q. Do you recall any members of the board having reached out to you saying they wanted to have a meeting to discuss the disclosure form?

Page 85

A. Yes.
Q. Do you recall who had reached out to you with concerns regarding the conflict of interest form that you had circulated or that Ms. Katz had circulated?
A. Tasha Turner-Bicknell.
Q. Anyone else?
A. Billy and Dwayne. I'm not sure if it was all at the same time, but those three.
Q. And they requested a meeting of the board to discuss the disclosure form, correct?
A. Yes, in an October 16th email, Tasha suggested getting the board together.
Q. Do you recall Dwayne ever informing you of his opinion that the conflict of interest policy, even if it's the same, if there's a change in implementation, that changes -- that implementation changes needed to be discussed and approved by the board?
A. I don't remember that.
(Thereupon, Exhibit 6, emails (HRO 129-132), was marked for purposes of identification.)
MR. CHANG: I'm handing the witness

what's been marked as Cauchon Exhibit 6.
BY MR. CHANG:
Q. This is a long email chain, Mr. Cauchon. I'll direct your attention to the specific emails that I have questions about, but you can orient yourself just by looking at it and just let me know when you're ready.
A. I'm ready.
Q. Okay. Going from the first email, it looks like it's from Turner-Bicknell -- or Tasha Turner-Bicknell August 16, 2024. This is on a page Bates stamped 131 at the very bottom. She says hello, Dennis and fellow board members. I hope everyone is doing well. I wanted to reach out to see if we could make time to get the board together next week.
So as of August 16, 2024, you received an email from a board member requesting that there be a board meeting to discuss the conflict of interest form that was circulated, fair?
A. Let's see. Yes.
Q. And at this point, you had not shared the conflict of interest form with the board, correct?



A. August 16th. I didn't. I'm not sure what Cecile did or -- yeah, I don't recall.
Q. Understood. The next email I want to direct your attention to is the one from Dwayne to you -- or on this thread to you and everyone else on the thread, HRO000130, the email dated August 19th, 2024. Are you there?
A. Yes, 8:37 a.m.
Q. Now, Mr. Steward says hello, Tasha. I agree that the board getting a look at this would be a good idea. The COI policy is the same, but the way it's being implemented is changing, and policy implementation changes like this should be discussed by the board. Do you see that?
A. Yes.
Q. Do you agree with Mr. Steward's advice here that when there's a change in policy implementation, it should be discussed by the board?
A. I do not.
Q. You said you do not agree or you don't recall him saying that?
A. Well, I can see that he sent it to



me, and I don't agree that that needed to be discussed by the board.
Q. Well, he said should. You don't agree that it should be discussed by the board?
A. Oh, should. Yeah, I was happy to discuss it with the board, but I wasn't -- it wasn't satisfactory to delay it or to turn over a policy to board members who appeared to be working with AmandaLynn.
Q. Sorry. You said appear to be working with AmandaLynn. As of August 19, 2024, you had the impression that the board members were already working with AmandaLynn?
A. August 16, because when I got the email from Tasha, I hadn't told Tasha. I hadn't told Billy. So that's when I knew that the three -- that AmandaLynn had been talking with the board members.
Q. You didn't know anything, Mr. Cauchon. You're speculating that Ms. Reese was communicating separate and aside from you, correct?
A. Correct.
Q. Did you ever ask Tasha Turner-Bicknell how she became aware there was



a conflict of interest form?
A. No. Well, we had a meeting. I'm not sure if I asked it at the meeting.
Q. You don't recall as you sit here today how she learned that information, fair?
A. I don't recall.
Q. The next paragraph of Dwayne's email states Dennis, have you been able to consult with an employee law attorney like we discussed.
Did Mr. Steward advise you of his recommendation to consult with an employee law attorney prior to revising the conflict of interest disclosure form?
A. What page is that?
Q. It's the very next paragraph in the email we're reading.
A. Yes, and I was -- and I was trying to hire a lawyer, and I eventually did. It took a little while.
Q. But you didn't hire a lawyer before the conflict of interest form was revised. You just revised it and instructed to have it sent out, correct?
A. We didn't need a lawyer for the

Page 90

conflict of interest form, but if we were going to look at the overall conflict of interest policy, I thought, you know, it helped to have a lawyer.
Q. Okay. So you agreed with his recommendation that it would be prudent to hire a lawyer to review any changes to the actual conflict of interest policy itself, fair?
A. With -- as I understood, hiring a lawyer would help us -- let's see. Do you -- so repeat it to me again so I make sure --
Q. Well, this is his email. I'm asking --
A. So --
Q. -- for your understanding.
A. So tell me which one you're referring to.
Q. You can put that down and just listen to my question. Did you agree with Mr. Steward's advice that HRO should hire an employee law attorney before revising the official conflict of interest policy of the organization?
A. No, I didn't think it was necessary, but I was trying to help everyone

Page 91

get along, so I thought it couldn't hurt, but I didn't think it was necessary.
Q. Why didn't you think it was necessary?
A. Because our conflict of interest form was -- our conflict of interest policy was satisfactory, and, you know, the ODH contract had its own terms. But getting an extra opinion and extra expert advice wouldn't have hurt, but it wasn't necessary.
Q. Even if you disagreed with whether it was necessary or not, you did agree to hire an employee law attorney to look at it, fair?
A. I don't think I hired one to look at the form.
Q. I'm not talking about the form. I'm talking about changes to the conflict of interest policy itself.
A. Yeah. Yeah.
Q. You agreed to hire a lawyer and consult with a lawyer prior to making any changes to the actual conflict of interest policy of HRO, correct?
A. No, he was going to review whether we needed to make any changes. We hadn't

Page 92

decided whether any changes should be made.
Q. Correct. That's why you were consulting him, and that's why you hired him on behalf of the organization, correct?
A. Correct.
Q. And that was David Ball, the first lawyer you hired, correct?
A. Correct.
Q. The very next sentence here -- now we're going back to the email, Mr. Cauchon, and, again, this is on page HRO000130, the second paragraph on the August 19, 2024, email at 8:37 a.m.
The next sentence after he talks about the lawyer, he says as I've mentioned before, I think we should hold off on acting on anything received from staff in the COI form until after we have consulted with the attorney and once the board has provided their input to make sure we're mitigating any risks. Did I read that correctly?
A. Yes.
Q. Did you agree with his recommendation?
A. Absolutely not.

Page 93

Q. Why not?
A. Because I realized they were trying to stall the reporting to the Ohio Department of Health on the conflict, and that's where my concern level became very high.
Q. So as of August 19, 2024, you have a belief that Ms. Reese is already conspiring with the board to not disclose the conflict to the ODH; is that your testimony today?
A. I don't know about Ms. Reese, but the board is trying to block disclosing -- is trying to throw procedural hurdles into -- into reporting the conflict of interest and learning about it.
Q. So you believe that recommending to hire an attorney is a procedural hurdle that the board was trying to put in front of you from reporting a conflict to the ODH?
A. Yes.
Q. And what is the basis for your belief?
A. Because we already knew she was director of government advocacy for Kloxxado lobbyists, and we knew that she was ordering Kloxxado, and we knew from the contract

Page 94

language that we needed to disclose that to the Ohio Department of Health.

Q. This isn't even about Ms. Reese, Mr. Cauchon. This is about changing the conflict of interest policy of the organization. How does advice of retaining an attorney to change that policy all of a sudden become a procedural hurdle, in your words, to presenting this to the ODH? I'm not understanding the connect. Can you help me understand that?

A. And ultimately it didn't, because I wouldn't not report to the ODH.

Q. I'm trying to understand how you came to the conclusion that they're attempting to put procedural hurdles in front of you. What's the basis for that assumption that you had as of August 19th?

A. It was my concern that they were -- they were trying to -- like they wanted to review the conflict form. They wanted to hire an attorney, that they were trying to put procedural hurdles in, and I think the subsequent emails sort of confirm that.

Q. I'm not asking you to characterize

Page 95

something that's not in front of you. I'm asking for the basis as of the date of that email.

You're speculating -- as of August 19, you're speculating that the board somehow has conspired to put procedural hurdles in front of you to submit a conflict to the ODH, aren't you?

A. Only one person had a conflict of interest. People there were mostly minimum wage workers. All of this was about AmandaLynn and her outside employment.

Q. The only thing that you could point to as a basis for your belief that somehow the board is attempting to block a conflict of interest disclosure is the fact that, one, they wanted you to hire an attorney, and, two, they wanted to review the conflict of interest form, correct? Anything else?

A. Let's look at Tasha's --

Q. Don't look at the email. I'm asking your recollection. Is there anything else that substantiates your belief that they were attempting to block your disclosure to the ODH other than the fact that, one, they

Page 96

recommended the hiring of an attorney, or, two, they wanted to look at the policy changes before they were implemented?

A. Yes, there were conversations in emails about not reporting to the Ohio Department of Health.

Q. Prior to August 19, 2024?

A. Correct.

Q. And what emails are you referring to?

A. I don't have them with me.

Q. So you're saying -- you're testifying today that there's some email that we haven't looked at where Dwayne has informed you not to report to the ODH; is that what you're saying?

A. I'm not sure if it was the -- I'm not sure. I would have to check the email of the date. But the point of the conversation was clear, and it was made clear in subsequent emails that he didn't think I should report to the ODH, because he thought it would endanger our founding.

Q. I'm not asking you about subsequent emails. We're on August 19th. Are

Page 97

you aware of any written communication that was presented to you by any board member informing you not to report something to the ODH as of that date as you sit here today?

A. I don't remember the specific dates of the emails --

Q. All right.

A. -- or of the conversations, but if I reviewed the text and everything, I could -- that could refresh my memory.

MR. CHANG: You answered the question. Thank you. We're going to take a brief break, about a five-minute break. Okay?

(Recess taken.)

BY MR. CHANG:

Q. When we left off, we were on the email chain discussion between you and the board regarding the conflict of interest policy. I'm going to hand you what's been -- what's being marked as Cauchon Exhibit 7.

(Thereupon, Exhibit 7, emails (HRO 319-322), was marked for purposes of identification.)

BY MR. CHANG:

Q. I'll give you a moment to look at

Page 98

it, but this appears to be an email chain ultimately forwarded to Ms. Nelson. I don't have any questions about the top email, but it's forwarding on an email chain between you and Mr. Steward that occurred between August 19th through August 20th.

If you go to the very end, which is actually the first email, my question is simply do you recognize this email that you sent to Dwayne as of August 19, 2024?

A. The one at HRO 319?

Q. 321, at the very end of the document. Technically the first email that was sent. That's why we're going backwards.

This is an email that you sent to Dwayne separate from the board thread on August 19, 2024, at around 4:01 p.m., correct?

A. Correct.

Q. And you inform or you state to Mr. Steward the conflict forms are due Friday. And when you say due Friday, that's the internal deadline that either you or Ms. Katz had set for submission by HRO staff, correct?

A. August 23rd.

Q. You're not referring to any type

Page 99

of deadline with the ODH, correct?

A. Correct.

Q. And you say we cannot delay this. The ODH contract required us to submit a statement listing all people working on the contract for HRO who may have a conflict or a possible conflict.

Now, when you say conflict or possible conflict here, are you -- what are you referring to? Are you referring to -- for example, are you making a legal determination? Are you referring to a conflict of interest definition that's in the ODH application, or are you referring to how HRO has defined a conflict of interest?

A. I would be referring to the ODH requirement.

Q. And what is your recollection as of the date of this email as to what the ODH requirement is?

A. That we had to disclose anything that has the potential or the possible appearance of being a conflict.

Q. And is there a definition for conflict that you can recall from the ODH

Page 100

application?

A. I would refer to the application.

Q. Do you recall there being a definition?

A. Yeah.

Q. Do you recall what the definition was?

A. No.

Q. Do you have a general understanding of -- what is your general understanding of what constituted a conflict of interest?

A. That we had to disclose anything that could potentially or have the possible appearance of being a conflict of interest.

Q. So we're going in circles. You keep saying the definition of conflict of interest is the definition of conflict of interest. I'm asking you what is your understanding of what was a conflict of interest under the ODH contract as of the time you sent this email?

A. I would refer to the contract itself.

Q. So you don't have an understanding

Page 101

as you sit here today about what you meant was a conflict of interest under the ODH policy?

A. I do understand it generally, but specifically I would refer to the specific language.

Q. Okay. Then what is your general understanding of what's a conflict of interest under the policy?

A. That we had to disclose whatever was a potential or possible appearance of a conflict of interest.

Q. So, again, we're around that circle again. Your definition of conflict of interest and understanding is just conflict of interest. I'm asking what is your understanding of what a conflict of interest was under the ODH contract?

A. As I explained.

Q. So you have no other definition other than whatever you thought was a conflict of interest?

A. Whenever I would say that, I would look at the actual definition.

MR. SHEARER: If you're asking him about what the ODH definition is, it's only fair

Page 102

that he be entitled to look at the ODH definition.
MR. CHANG: No speaking objections, please. I'm asking for his understanding of what it was.
BY MR. CHANG:
Q. As you sit here today, do you have any other understanding as to what it was when you sent this email?
A. I have stated what -- I've answered the question.
Q. You don't know without looking at the ODH contract, fair?
A. I haven't got it memorized. Correct.
Q. Now, Mr. Steward sends you an email in response at 11:30 p.m. We're now going to document ending in 320, Bates stamp. The very front -- not the very front. It's the second page.
Mr. Steward sends you this email. In the very first sentence, he says I appreciate you sending over the documentation, but I think you're misinterpreting what they're saying. I don't think you should send ODH anything that would jeopardize the contract

Page 103

over an unproven conflict. Did I read that correctly?
A. Yes.
Q. And does that fairly and accurately describe your understanding of what Mr. Steward had as the reason why Mr. Steward did not want at this point to disclose this potential conflict of interest to the ODH in your words?
A. Correct, he did not want to jeopardize the contract.
Q. Well, the second part of it, right, he didn't want to -- he didn't want to jeopardize the contract, because it was an unproven conflict, correct?
A. Yeah, I would disagree. Yes, that may have been what he was saying, but I think it was proven that there was appearance of a conflict.
Q. So he did not tell you that we shouldn't report this to the ODH. What he told you is that we need to know whether it was proven or unproven before disclosing it, fair?
A. I'll let that speak for itself.
Q. Well, what was your understanding?

Page 104

Did he ever instruct you never to tell -- never to disclose to the ODH under any circumstances?
A. My understanding was that he didn't want me to tell ODH.
Q. Your understanding is he didn't want to tell the ODH before an investigation occurred, correct?
A. Do I get to say what my understanding was?
Q. Absolutely.
A. My understanding is that he didn't want me to tell ODH.
Q. And what is the basis for that understanding?
A. What is his basis?
Q. What is your basis?
A. Because -- because they had -- him and the other directors had been trying to stop me from reporting it and to finding out additional information, that is the basis.
Q. Okay. So it's your testimony today that you believed as of the date of this email that he didn't want you to disclose anything about Ms. Reese to ODH at all?
A. Correct.

Page 105

Q. Ever, correct?
A. I can't speak for him, but at this time, he didn't -- yeah, he did not want me to disclose information.
Q. If you go to the second paragraph here, he informs you all of this could also lead to a claim of targeted discrimination given that the referenced employee is a protected class, a female over the age of 40, and the fact that there is language in writing and verbal that points towards focusing a COI submission to the state on one employee, as opposed to all employees.
So as of this date, Mr. Steward is expressing to you his concerns about the risk to the organization of a potential claim if you were to proceed with the course of action that you're proposing, fair?
A. That was a long sentence. Can you ask me again? I mean, this is what he's -- I will agree that this is what he's stating.
Q. Did you not have similar concerns as the president of the organization that having this targeted submission could potentially lead to a targeted -- to a

discrimination claim from that individual?
A. I did not have that concern.
Q. Did you consult a lawyer about that?
A. No.
Q. Why not?
A. Because there was -- I didn't know she was over 40. I wasn't targeting her for anything. It was just a professional seeking of information on outside employment she had that looked like a conflict.
Q. Now, the third paragraph begins with also as the COI policy becomes this strict, the agency is going to lose employees. Do you see that?
A. Correct.
Q. Did you share any concern that having a strict COI policy would result in higher -- or less employee retention?
A. No.
Q. Why not?
A. Because all of our employees were committed. We had extremely low turnover in the entire time I was there.
Q. It goes on to say in most cases,



working at a nonprofit in America means accepting low wages in order to commit to an agency's mission. Would you agree with that?
A. I agree that it was said here.
Q. No. Do you agree with that statement that he made?
A. No, I don't have any opinion on it. Many of the people we hired had struggled with drugs and struggled with holding any employment, so we would go out of our way to let them miss days because of problems or mental health issues.
So this didn't really -- to me, it didn't apply. It's not like we were -- we had Ph.D.'s who were holding minimum wage jobs. We had beautiful people who were struggling to function.
Q. So you had no concerns that having a strict conflict of interest policy that would prohibit a lot of outside work would adversely affect your employees --
A. No.
Q. -- the employees of HRO?
A. No.
Q. Let's go to your response email,



which is the first page, HRO000319. I'm not going to go through the entire email, but after you respond to Mr. Steward with your opinion, the fourth paragraph down says we need facts before we make a decision. Do you see that?
A. Yes.
Q. So as of August 20, 2024, you're communicating to Mr. Steward that at least you were in agreement that HRO needed more information before making a decision, correct?
A. More information, no. We needed information, but if we got no more information, we were still required to disclose to ODH.
Q. You say here we need facts before we make a decision. What facts are you referring to?
A. The facts that we didn't get. What her -- what she was paid for what she did for the lobbyists for the naloxone brand that she ordered.
Q. So when you say we need facts, you're referring to we need to give her -- her to give us the, quote, invoices and a better description of what she does, correct?
A. Yeah, as many facts as you can get



related to it.
Q. And how much she makes, did you include that as the needed facts that you needed in order to make a decision?
A. I don't know. I'd have to read it to see what I say.
Q. I'm asking you your understanding of what you wrote here. Are the facts that you needed also her actual salary?
A. I didn't know she was salaried at the time, so it wouldn't be on salary, but I did want to know what she did and what she was paid for.
Q. How much she was paid then? You needed to know how much she was paid, correct?
A. I think that was valuable information.
Q. Did you need to know?
A. What do you mean need to know?
Q. You say we need facts.
A. Yeah.
Q. Is how much she was compensated for the facts that you needed in order to make a decision?
A. Yeah. We needed facts, yep.

Q. And, in fact, you make a suggestion here in the very next sentence. You say I suggest we have Attorney Ball, rather than me, do the fact finding and provide a report. Did I read that correctly?
A. Correct.
Q. And why did you recommend that Mr. Ball be the person to do that?
A. Because I thought that it might assuage the -- like the opposition I was getting to reporting the conflict on AmandaLynn's outside employment.
Q. Did Mr. Steward have any objection to Mr. Ball doing the fact finding and providing a report?
A. I don't know.
Q. You don't recall?
A. I don't recall.
Q. But at least as of August 20th, you had submitted a specific recommendation that not -- that you weren't going to do the fact finding, but to have the attorney do it and provide a report before you would make a decision as to Ms. Reese, correct?
A. I don't know if I submitted a



recommendation, but I said that in an email.
Q. Are you testifying today that that wasn't your recommendation?
A. It was a suggestion, yeah.
Q. It was a suggestion. As a result of the concerns voiced by the board and your back and forth with Mr. Steward, did you make the decision to place the August 23rd deadline on hold?
A. The board -- the board has had no contact, so if you could rephrase the question. You talked about the board taking action, but the board did not take action or offer an opinion.
Q. The August -- I was asking you, but I'll restate the question. There was an August 23rd deadline for all HRO staff to submit a conflict of interest form, correct?
A. Correct.
Q. August 23, 2024. At some point that deadline was suspended, correct?
A. Correct.
Q. Did you make the decision to suspend that deadline?
A. I don't know if I made the



decision or it was just made as like a group decision, but ultimately I think I would have made the decision, yeah.
Q. You agreed with the decision at least to suspend the deadline, correct?
A. I didn't agree with it, but I was trying to keep everyone happy and make sure everyone felt involved, because there was nothing wrong with the form --
Q. In other words --
A. -- or the deadline.
Q. -- you didn't believe you needed to, but you still nonetheless at the end of the day did agree to suspend it?
A. Correct.
Q. All right. And why did you agree ultimately to suspend that deadline?
A. Trying to keep everyone happy.
Q. What do you mean by everyone?
A. Dwayne and like the people who were like throwing process concerns.
Q. So for everyone, you're talking about the board of directors, and are you also talking about the staff?
A. No, I hadn't heard anything from



the staff, and I'm not talking about the board of directors. The only ones I had heard from would be Dwayne and Tasha. I don't even think I heard from Billy, but maybe I had.
Q. I'm just trying to understand who we are. So we have Dwayne. We have Tasha. Anyone else you were trying to keep happy --
A. Them.
Q. -- by suspending the deadline?
A. Yeah, them.
Q. After you suspended the deadline, do you recall that HRO had officially retained Attorney Ball?
A. I remember the second half of the sentence. I remember that we retained Ball. I don't remember whether it was after or before.
(Thereupon, Exhibit 8, August 26, 2024, emails (HRO 262-264), was marked for purposes of identification.)
BY MR. CHANG:
Q. I'm handing you what's been marked as Cauchon Exhibit 8. You get the official one. I'll give your attorney the non-official one. I'll represent to you that this is an email chain that appears to be between you and

Page 114

Mr. Ball, copying Ms. Katz. And similar to the other exhibits, we're going to go from the end of the document first, but just give me -- or I'll give you a moment and let me know when you're ready.

I'll direct your attention to the specific portions I have questions on, but my first question is going to be whether the email dated August 26, 2024, to you at noon refreshes your recollection as to when Mr. Ball was retained by you?

A. Yes.

Q. Okay. And he was retained in or around August 26, fair --

A. Yes.

Q. -- approximately three days after the conflict of interest form submission deadline was placed on hold, correct?

A. August 26, yes.

Q. August 26. All right. And here -- I'm going to go to the request of you paragraph. That's the one I have questions on. You send to him a request of you. We need is -- for a lawyer, i.e., you, to look over new employee handbook and conflict of interest -- I

Page 115

think you mean policy, but it says police, and form to make sure it complies with the law and good practice.

Is that a fair characterization of what you told him despite the typos?

A. Yes.

Q. Okay. And then you attach for his review pdf's, a Word version of the handbook and pdf, plus links to the following conflict forms. You provide him the employee handbook, you provide him the conflict policy, and you provide him the conflict reporting form, correct?

A. Correct.

Q. Now, the handbook -- we haven't marked as an exhibit the reporting form, and I'm not going to, but the employee handbook you're referring to here is the September 2022 one that we looked at earlier?

A. Correct.

Q. And the conflict policy, this is a new document that you're sending to him, a new proposed document?

A. Yes, a draft. Yep.

Q. That's what I just wanted to

Page 116

confirm since it's a Google link that's no longer active.

You put in parentheses it's in the employee handbook too. This form is to sign to acknowledge policies. So what you're actually sending him is an acknowledgment of the conflict of interest policy; is that fair? Or it's okay if you don't recall. You can just say you don't recall.

A. I don't recall.

Q. So it's fair to say that you had engaged Mr. Ball's firm in order to provide legal advice with respect to revisions to the handbook, one, revisions to the conflict of interest policy, two, and to provide input with respect to the conflict reporting form, three, fair?

A. Yes.

Q. Now, you also engaged him, if you go toward the very end -- or let me ask you -- strike that.

At the very end of the email, you say on Tuesday, I will send a brief summary on the particular conflict issue we're working on now. Did I read that correctly?

Page 117

A. Correct.

Q. And the particular conflict issue -- the particular conflict issue that you're referring to here is the situation with Mr. Reese, fair?

A. Yes.

Q. And did you, in fact, engage Mr. Ball to provide legal services with respect to that particular conflict issue?

A. I don't recall. This is what we engaged him for.

Q. Right. So I'm asking -- so you don't recall whether you specifically engaged him to provide legal advice with respect to Ms. Reese as you sit here today then, correct?

A. Correct. But if you asked me like a specific question, I may recall. But that general statement, I -- I don't recall the specifics.

Q. Do you ever recall having asked Mr. Ball what, if anything, you should report to the ODH with respect to Ms. Reese?

A. I didn't ask him that question exactly, but he stated that he is not an expert in federal contracting law, so he didn't

consider himself appropriate to handle the report on the issue.
Q. If I understand you correctly, reading the past email, you did ask him to do the factual investigation and provide a report on Ms. Reese, and he said no, because he's not an expert? I'm just trying to understand your statement.
A. We had a verbal conversation, and he said that he is not an expert in federal contracting law and federal appearances, so he didn't think that was his niche. He was an expert in like non-profit and HR law.
Q. Okay. So HRO did not engage him to do an investigation and a report as to Ms. Reese's alleged conflict of interest then, fair?
A. To do the report, no, we did not.
Q. Did he provide you any recommendations as to any other counsel who might be able to assist with that request?
A. No.
Q. Did you ask for it?
A. No.
(Thereupon, Exhibit 9, August 29,



2024, emails (HRO 133), was marked for purposes of identification.)
BY MR. CHANG:
Q. Handing you what's been marked as Plaintiff's Exhibit 9. This appears to be an email from you to the board relating to the next board meeting, with the subject line also including employee handbook -- sorry, employee handbook and conflict form. And you see the date of this email is August 29, 2024, at 10:47 a.m., correct?
A. Correct.
Q. Do you recall this email?
A. Yes.
Q. And in this email, you're effectively notifying the board that HRO -- that you have, as president, have hired David Ball, who specializes in employment law and non-profits, and that he is going to review HRO's employee handbook, conflict policy, and conflict form, correct?
A. Correct.
Q. And so this is your understanding of what the formal engagement with Mr. Ball was to do, which you notified the board as of



August 29th, correct?
A. Correct.
Q. And the very end of this email states that your intention at this point was to schedule a meeting with the board to discuss the employee handbook and conflict policy after Mr. Ball completes his review, correct?
A. Correct.
Q. And the reason for that is you wanted -- you had agreed at least for the board to provide -- to be able to have the opportunity to provide any input as to the changes to the handbook and conflict policy, correct?
A. I think that the board needed to approve the policy if there was a revision to approve a new policy.
Q. So it was required for the board to review in order to approve the policy then?
A. To approve, yes.
Q. Do you recall when -- during this time frame on August 29th, HRO had already submitted an application to renew its policy [sic] with the ODH, correct?
A. No.



Q. So your testimony is you don't recall or --
A. There was no application to renew. It was conversations between me and ODH. There was no need for an application and there was no application.
Q. Fair. So there were ongoing communications with you and the ODH for the purpose of renewing the existing contract, correct?
A. Correct.
Q. And did you -- do you recall when you procured that renewal?
A. There were different stages. I can't recall exactly the date of the final approval, like -- I can't recall the exact date, but it's all in the emails.
(Thereupon, Exhibit 10, August 29, 2024, emails (HRO 273-274), was marked for purposes of identification.)
BY MR. CHANG:
Q. I'm handing you what's marked as Plaintiff's Exhibit 10. This email is just to orient you, to refresh your memory, as to that date just so we can move it along here.

Again, starting from the end, which is the first email, I'll just represent to you, and you can read it here, that this is an email that you sent on August 29, 2024, at 4:16 p.m. informing the board that the HRO's contract renewal with the state was finalized this afternoon. You can read that in the very first sentence of this email.

Does this refresh your recollection as to the date and time of when that renewal was procured by HRO?

A. Correct, August 29th.

Q. All right. Now, at this point, no decision had been made by you and the board as to Ms. Reese, correct?

A. The board had no role in the decision. I was still contemplating what to do.

Q. So you still had not made a decision, correct?

A. Correct.

Q. Do you recall having an in-person meeting with Ms. Reese in or around August 29th?

A. Around that time. I don't



remember the date. That might be correct.

Q. Do you recall the same day, on August 29th, that you sent an email recommending that at least for now, everyone should maintain the status quo with respect to Ms. Reese?

A. I'm not sure. If you have the email, if you could show it to me.

Q. You don't recall any recollections -- any conversations that your recommendation around this time was to maintain the status quo?

A. When we met with -- Cecile and I met with AmandaLynn, and we did agree to maintain the status quo.

Q. Do you have a recording of that meeting?

A. No.

Q. Do you have a recording of any of your communications with any board members that have not been committed to writing about that?

A. No.

Q. And what did you understand to mean -- what was maintaining the status quo in your opinion?



A. I don't know. Just what it says, maintaining the status quo. We were going to -- we were going to like figure out what to do.

Q. Let me help you out.

A. If you give me the email, I can tell you.

Q. It's not in the email. I'm asking you your understanding of what it was to maintain the status quo. So maintaining the status quo could mean that Ms. Reese would continue her day-to-day responsibilities, correct?

A. Yes.

Q. Ms. Reese was not going to be placed on administrative leave, at least as of that time, correct?

A. I'm not sure, but, yes, I would say, yes, correct.

Q. That would be maintaining the status quo, correct?

A. Yeah.

Q. Ms. Reese would continue to be on staff and paid, correct?

A. Correct.

Q. Suffice to say, no operational



changes or changes to Ms. Reese's responsibility was to maintain the status quo, correct?

A. Correct.

Q. And did -- who did you communicate to in or around August 29 and August 30 that you had made the decision to maintain the status quo with respect to Ms. Reese?

A. Cecile, and I don't remember who else.

Q. Dwayne?

A. I don't recall. Possibly. But Cecile was at the meeting, so --

Q. Were you communicating with Mr. Steward before and after the meeting regarding the results --

A. I was, but I don't remember like what the communications exactly were. I think there's email and text on that.

(Thereupon, Exhibit 11, August 29, 2024, emails (271-272), was marked for purposes of identification.)

BY MR. CHANG:

Q. Handing you what's been marked as Cauchon Exhibit 11. As with all the other

emails, we're going to go from the bottom up. There's not much on the back.
The first email is sent by you August 29, 2024, at 2:34 p.m., and you state that I think we need an interim plan for what we'll do while we wait for the conflict issue to be resolved, correct?
A. Yes.
Q. Does this email fairly and accurately depict the interim plan that you had proposed at that time?
A. Yes.
Q. And one of those recommendations, if you go to the last bullet point star, is that I recommend Cecile and I talk to AL -- AL refers to AmandaLynn, correct?
A. Correct.
Q. I recommend Cecile and I talk to AL next week and apprise her of this: Specifically the status quo will hold until the handbook and conflict of review -- and conflict review is completed, correct?
A. Correct.
Q. And that is what you informed Ms. Reese would occur, correct?



A. I think I informed Dwayne.
Q. Did you ever inform Ms. Reese of that?
A. Effectively, yeah, in the verbal meeting, although this one is -- who is this? Who --
Q. It's a little hard to tell. This is what was produced. But it appears to be an email from you to Dwayne. Do you have any reason to doubt that?
A. Probably not.
Q. Do you see his response there, this is --
A. Yeah.
Q. -- sounds good to me?
A. Okay, sounds good.
Q. So you can agree with me that this is an email kind of summarizing your proposal to Dwayne --
A. Yes.
Q. -- copying Ms. Katz, correct?
A. Yeah.
Q. And he agrees with your recommendation, correct?
A. Correct. Yeah.



Q. And he says give me a call when you can. I want to talk to you about the board. Do you see that?
A. Yes.
Q. Do you recall ever giving him a call after this?
A. I don't recall one way or another.
Q. During the time frame that you were reviewing the handbook and conflict of interest policy, do you recall either Dwayne or yourself kind of circulating with Mr. Ball examples of policies from other organizations, such as Remedy Alliance?
A. Yes.
Q. So there was an active dialogue that was occurring between you, Steward, and David Ball regarding input as to what the new policy should be; is that fair?
A. We were -- I was providing information that I had collected and sending it to various parties. I don't know if it was a dialogue, but we were giving like what other harm reduction groups had in their policies to David.
Q. Was Remedy Alliance a more



established non-profit organization in your opinion?
A. I think they were about the same length as us. They were national. They did -- they were a national organization doing similar to what we did throughout Ohio.
(Thereupon, Exhibit 12, August 29, 2024, emails (HRO 267-268), was marked for purposes of identification.)
BY MR. CHANG:
Q. I'm handing you what's been marked as Exhibit 12. I'll represent to you that this is an email chain on the same day, August 29, that was produced in this litigation. You can take a moment, but my question is only with respect to Dwayne's email to you copying David Ball and Ms. Katz.
The email below contains -- you can see you reference Remedy Alliance. And this is one of the emails that we were -- or that you testified about having kind of recommendations and looking at what other entities were doing with respect to conflicts of interest, fair?
A. Not recommendations. I was just

providing information.
Q. Providing information, correct? You were sending this to provide more information to the attorney as part of his review, fair?
A. Yes.
Q. Now, Mr. Steward sends you this email saying he likes this language a lot. I like how it includes definitions. Then he says I think we should take some time with the staff to do a training on how to complete conflict of interest forms, as well, since it's new for the agency.
Did you agree with his recommendation about having training for the staff as to how to complete conflict of interest forms?
A. I don't think I agreed or didn't agree.
Q. You didn't have any opinion on it?
A. I didn't. I don't remember offering any opinion on it.
Q. Now, he states that I know a lawyer who specifically has expertise in non-profit infrastructure who can do the



training. He mentions the name Maritza Nelson. Is this the first time you've heard of this attorney?
A. No, he had, earlier on, I think on August 19, suggested hiring her to do diversity training. So when we talked about it, he said I had a friend -- I have a friend who handles -- like is an expert in non-profits and suggested that we hire her for diversity training. So this would, I think, be the second.
Q. Can you just briefly describe what diversity training is to your understanding?
A. Just treating all social groups, you know, with respect.
Q. Like sensitivity training in other words?
A. I'm not sure. I don't do those trainings.
Q. What happened with that recommendation? Did you agree with the recommendation to hire Ms. Nelson to do diversity training?
A. No. Well, we didn't have any -- we didn't have any need to -- maybe later, but



there was -- you know, I didn't agree or disagree. It wasn't on the forum of what we were doing at the time.
Q. So just fair to say no action was taken with respect to --
A. No action was taken.
Q. -- hiring a lawyer to do diversity training, correct?
A. No action was taken to hire anyone to do diversity training.
Q. I know as the day goes on, you're going to anticipate my question, but, please, just to make it a little easier for her --
A. Okay.
Q. -- let me finish asking it before you respond. Okay?
The end of this email states I know Dave said he wasn't an expert in COIs for staff. Do you see that?
A. Yes.
Q. And this comports with your understanding and testimony today that Dave did say that he did not have that expertise, correct?
A. Correct.



Q. Do you recall having an in-person meeting with Amanda Reese in or around August 30th, 2024?
A. Is that different from the August 29 -- I only remember one meeting with Cecile. I don't know whether it was August 29th or August 30th.
Q. That answers my question. So there was only one meeting that occurred in or around August 29 and/or August 30, not multiple meetings, correct?
A. Only one that I remember.
Q. Okay. And do you recall what was discussed at the meeting?
A. Yeah, there's a memo describing what was discussed.
Q. Generally speaking, though, at the meeting, you communicated to Ms. Reese your decision that everything would be status quo until David Ball's review and the revisions to the conflict of interest policy were finalized; is that fair?
A. Correct.
(Thereupon, Exhibit 13, emails (Reese 37-39), was marked for purposes of

Page 134

identification.)

BY MR. CHANG:

Q. I'm handing you what has been marked as Exhibit 13. Now, you referenced there's a summary that was provided regarding what occurred at the meeting, and my question is just going to be is this summary that we see here in the email from Ms. Katz to Ms. Reese, copying you, is this what you were referring to?

A. Yes.

Q. And does this fairly and accurately describe what was conveyed to Ms. Reese during the meeting?

A. I think so, yes.

Q. And she even emphasizes, underlining it at the very bottom there, in the meantime, all your duties stay the same as they have been. For the record, the only part that's underlined is all your duties stay the same, correct?

A. Correct.

Q. That was a decision that you, as the president of HRO, had made, correct?

A. Correct.

Page 135

Q. Bullet point number four states that HRO will follow the process approved by the board to assess any potential conflict of interest. Did I read that correct?

A. Correct.

Q. So as of August 30th, 2024, at 11:51 a.m., you had agreed, as the president of HRO, that you would follow the process approved by the board to assess whether Ms. Reese had any potential conflict of interest, correct?

A. Correct.

Q. Now, Ms. Katz asked her if she has any questions. Do you know whether or not Ms. Reese had any questions in response to the email or not?

A. I do not know.

Q. Did she ever reach out to you regarding the summary after this?

A. Cecile or AmandaLynn?

Q. Ms. Reese. Thank you for clarifying.

A. No.

Q. Did you communicate with Mr. Steward regarding the results of the meeting?

A. I do not recall.

Page 136

(Thereupon, Exhibit 14, August 31, 2024, emails (Reese 41-42), was marked for purposes of identification.)

BY MR. CHANG:

Q. I'm handing you what's been marked as Plaintiff's Exhibit 14. The only email I have a question about is the second one on the first page, the first page being Reese00041. I'll represent to you that this was an email that was produced in response to the subpoena that was issued to Ms. Reese.

This email is from you to Dwayne Steward copying Cecile on August 31, 2024, at 11:15 a.m. Do you see that?

A. Yes.

Q. And the subject being AmandaLynn meeting. Do you see that?

A. Yes.

Q. And you state the meeting went okay, in all caps. I think we all understand things are status quo until the lawyer finishes his review. Did I read that correctly?

A. Correct.

Q. Okay. Again, when you say I think we all understand things are status quo, you

Page 137

are referring to the -- in substance to the same summary that Ms. Katz provided to Ms. Reese that we just saw in the last exhibit, fair?

A. Correct.

Q. The next sentence says AmandaLynn said she had fully disclosed all -- I think you mean potential conflicts to you. What did Ms. Reese specifically tell you at that meeting regarding that point?

A. That she disclosed her conflicts to Dwayne.

Q. Did she say anything more than that?

A. Not that I recall. I mean, she might have, but I don't recall.

Q. Understood. You state she seems surprised that I had not seen this disclosure material. During the meeting, did you address that at all with her, why she seemed surprised?

A. I believe I asked her whether -- why she hadn't shared it with me or with Cecile.

Q. What did she say?

A. I do not recall, but this is --

Page 138

she seemed surprised that I hadn't seen it. So I think she thought -- or she said -- she implied that Dwayne had provided it.
Q. Rather than kind of characterizing her surprise, can you describe for the record what you saw that gave you the belief that she was surprised?
A. She thought that I already had her disclosure.
Q. Did she tell you that?
A. Yeah. Yep.
Q. During the meeting, did you discuss at all Mallory Bolen, about whether she had disclosed her --
A. No.
Q. Just let me finish asking the question.
A. Sorry.
Q. During the August 30th meeting, did you discuss Mallory Bolen at all?
A. No.
Q. During the August 30th meeting, did you ask her whether she had informed any other board member or employee at HRO about her Velocity employment?

Page 139

A. Other than Dwayne?
Q. Anyone.
A. No.
Q. Why didn't you ask her whether she had disclosed that prior employment to other people?
A. I don't know why I didn't ask.
Q. Don't you think that was important to know?
A. Well, I already asked her. I had asked her a month ago. And this meeting wasn't about that. I think she raised the issue that she had disclosed. I didn't raise it. And she -- and she was surprised that I hadn't already seen it, so --
Q. Mr. Cauchon, what, if anything, did Ms. Reese do between the date of this email and September 3rd at 1:30 p.m. that required her to be placed on administrative leave?
A. There's nothing I know that she did.
Q. She didn't do anything, right --
A. No.
Q. -- to your knowledge?
A. Not that -- not to my knowledge.

Page 140

Q. In fact, she continued to perform her job duties as normal until you placed her on administrative leave on September 3rd, 2024, correct?
A. Correct.
MR. CHANG: So I've been notified by my secretary that food is here. We're going to go ahead and go off the record. So now is a good time to take a break.
(Recess taken.)
BY MR. CHANG:
Q. Good afternoon, Mr. Cauchon. We're going to move forward in our timeline. The very last question I asked you before we went on break is whether Ms. Reese had done anything between August 31st and September 3rd at 1:30 p.m. that would have required her to be placed on administrative leave, and your response was no. Do you recall that?
A. Yes.
Q. Okay. What occurred during that time frame in which you had made the decision that she needed to be placed on administrative leave?
A. ODH set up a meeting for Tuesday,

Page 141

the day after Labor Day, September 3rd, I think it is, and I thought it had to do with a single audit, which is -- at the time any organization receiving more than $750,000 in federal funds had to get a single audit, which is an elevated level of audit from the regular independent audit, which would cost us a lot of money and put a lot of strain on us.
So I called our project -- contract manager, Brittany Burns, and I asked her is this about the single audit? Are we going to be forced to do it this year? And she said no, it's not about the single audit. It's about the next year of the contract. That is the meeting in September.
So that caused me to like not worry about the single audit, but to worry about like this meeting. So if you want me to go on, I can. On Saturday --
Q. Let me just --
A. Okay.
Q. Let's orient ourselves a little bit. So between August 31st and September 3rd, the way I'm understanding it is that there was an actual call between you and Ms. Burns?

Page 142

A. I think it was -- it might have been August 30th, but I'm not sure. I can't recall the exact date, but it was right around that time.
Q. Was it before or after your meeting with Ms. Reese?
A. I don't remember.
Q. Was it before or after the email that we saw that you sent to Dwayne summarizing the meeting?
A. I don't remember.
Q. All you can recall is it's in or around August 30th?
A. Around that time period. I don't remember the exact date.
Q. It was a telephone call?
A. I believe so, yes.
Q. Do you keep your call records from that far back?
A. Yes, and I can go ahead and check if you want.
Q. Can you do that right now?
MR. SHEARER: We'll look at them and we'll -- we can produce it.
MR. CHANG: We can go off the record

Page 143

and take a minute. I think it's important for purposes to get this time line right. Let's go off the record for a minute.
(Thereupon, an off-the-record discussion was held.)
BY MR. CHANG:
Q. Mr. Cauchon, you've had an opportunity to review your phone. I'm not going to ask you to identify anything as an exhibit, but in reviewing it, were you able to refresh your recollection as to when the call with Ms. Burns occurred?
A. No.
Q. So as of right now, you just recall it was in or around August 30, that general time frame?
A. Around that general time frame. It's possible it's an email. I can check. She called me like -- I don't really remember how. And it's not -- yeah.
MR. SHEARER: We just looked. His calls go back to 10-5-24.
MR. CHANG: I figured it was about to cut off. Understood.
BY MR. CHANG:

Page 144

Q. To try to orient ourselves, though, it would have been after the renewal of the ODH contract?
A. I'm not sure exactly. The renewal was August 29th. We knew we were getting the renewal. That's when it was finalized, because the Department of Administrative Services did it. So ODH, you know, didn't have direct control, yeah. So about that time. It all happened very fast. I don't remember.
Q. You said she said it was about the, quote, next year of the contract?
A. Correct.
Q. Did she elaborate as to what she meant by that?
A. No.
Q. I guess what I'm trying to understand is the purpose of the call in determining whether ODH would renew the contract or --
A. No, it wasn't about that. We knew we were going to get renewed.
Q. So it was already known, even if it wasn't official, that the contract would be renewed, fair?

Page 145

A. Correct.
Q. And your understanding of the call is that she wanted to speak about the next year of the contract pursuant to that renewal, fair?
A. No, I called her because I wanted to know -- because I had been talking with our auditor about how much a single audit would cost, what we would have to do. So I wanted to alert her it's going to be a lot of struggle for us to get the single audit. But then she told me that the meeting wasn't about the single audit, so that moved that off the table.
Q. So let me just make sure I have this correct. You get notified that ODH wants to have a meeting, step one?
A. Correct.
Q. Step two, you give her a call about what that meeting is going to be about, correct?
A. Correct.
Q. How long in between those two steps would you say there was?
A. I don't remember.
Q. More than a day?
A. Could have been. Could have been

Page 146

a few days.
Q. More than a week?
A. Probably not more than a week.
Q. And, again, using August 30th, not more or less than a week from August 30th? We're still in that same general time frame?
A. Right, it would have been -- yeah, correct, that week.
Q. Okay. Was it a cold call or was it an arranged call? Did you let her know in advance?
A. I think -- I don't remember. But it wasn't a cold call, because I emailed them about the single audit issue.
Q. Tell me what happened on the call.
A. So I asked her about the -- is the meeting about the single audit, and these are our challenges to complete it, and she said oh, it's not about the single audit.
Q. And she said it was about the next year of the contract?
A. Yeah, it's about the next year's work plan in the contract. So I asked her well, who is going to be at the meeting, and she told me Sierra Dantzler, who runs the

Page 147

project, and others.
Q. Who were the others?
A. Devin, her.
Q. Anyone she requested from HRO other than you to be at this meeting?
A. I don't think she -- yeah, she didn't make a request.
Q. Is this the meeting that you are referring to -- is this the meeting that occurred on September 3rd?
A. Correct.
Q. Was Ms. Reese invited to that meeting?
A. Yes.
Q. At the time that you had a call with ODH at that time, was any potential or actual conflict of interest issues discussed?
A. No.
Q. Did she mention anything about HRO's submissions on any conflict of interest?
A. No.
Q. And she didn't elaborate any further about what she meant about the next year of the contract on that call?
A. She said it was about the work

Page 148

plan, what work we were going to do in the following year.
Q. Okay. Do you recall on September 3rd what time that meeting with the ODH occurred?
A. Not off the top of my head. I think it was -- it's in my calendar. 1:00, or something like that. I can check that.
Q. That's fine. All right. So between August 31st and August -- and September 3rd, was there anything that you did which effectively changed your mind as to whether you should disclose to the ODH anything regarding an alleged conflict of interest with respect to Ms. Reese?
A. Yes.
Q. What did you do?
A. On that Saturday and Sunday, I went to Michigan for a football game with my son, and a baseball game, and my stomach was just churning. I was not engaged. Because when I knew that Sierra Dantzler, who worked with me for years on getting the contract, was going to be at the meeting, that it was about what we were going to do the next year, it just

Page 149

didn't sit right with me not to be forthright.
So I determined on my way home that I was going to go and see what the actual requirements were for reporting a conflict. So I went in Labor Day about 5 a.m. There's emails to Dwayne where I asked to talk to him, but he was busy. And I read over the Federal Acquisition Regulations, Uniform Guidance, CFR 200, various law review articles, the NOFO for SAMHSA, which is where the federal money flowed through, the contract itself, and the RFP, and all of them zeroed in on the same language. They sort of all flow from the same conflict of interest disclosure. And I included some of these in my discovery, the handwritten notes I took of the FAR.
And the language was all the same, conflicts must be disclosed promptly as soon as identified, real or apparent. Each has different language, and even in the uniform code. At the time --
Q. Suffice -- you told me what documents you referenced. We can look at those documents if I find it necessary.
But suffice to say, you listed a

Page 150

number of things that you reviewed, including law review, some RFP language, other documents you referenced. You haven't mentioned -- did you consult ChatGPT on that day?
A. I don't think so. I might have. I don't remember what day. It might -- it might show in that. I don't remember what day that was. I think it could have been, but I don't remember whether it was September 2nd or September 3rd. I think it was probably September 2nd, but that's a guess.
Q. Did you consult ChatGPT before or after you reviewed all these other materials that you're referencing?
A. I don't remember.
Q. Why did you consult ChatGPT?
A. Because I'm a reporter, and I was trying to get all the information in and perspectives that I could obtain.
Q. What information was it that you were looking for from ChatGPT?
A. What our requirements were for reporting potential conflicts.
Q. Anything else?
A. That was the key thing that day,

Page 151

what we were supposed to do.
Q. Are you aware that ChatGPT is not a device -- or at least contains a disclosure should not be used for procurement of legal advice?
A. I didn't use it for legal advice.
Q. I'm asking whether you're aware of a disclosure that cautions from using ChatGPT as a source for legal advice?
A. No.
Q. You're not aware of that disclosure?
A. I am now, because you put it in the -- because you --
Q. Were you aware at the time that you were consulting ChatGPT that there was a disclosure cautioning you not to use ChatGPT for legal advice?
A. I was not.
Q. But you don't consider yourself as consulting ChatGPT for legal advice?
A. Correct.
Q. You would want to consult a lawyer for legal advice, correct?
A. I didn't think we -- I don't believe we needed legal advice.

Page 152

Q. Well, generally speaking, as the president of HRO, you would agree with me that it would be prudent if you actually felt the need for legal advice, you would consult a lawyer, correct?
A. If everything involved the law required consulting a lawyer, then we would just have ten lawyers on staff, but --
Q. That's not my question. I said if you had made the determination that you needed legal advice, you would consult a lawyer, correct?
A. No.
Q. So you, as the president of HRO, you make a determination I need legal advice, and your testimony today is that you wouldn't go seek a lawyer's advice?
A. I did not consider legal advice, so there was no reason to seek a lawyer's advice. We already had David Ball involved, and there's email exchanges with David on relevant issues.
Q. So you didn't feel the need to seek legal counsel as to whether there was or not even a potential conflict of interest for

Page 153

this particular issue, correct?
A. It wasn't about a conflict. It was disclosure that I was researching, when we had to disclose.
Q. So you're consulting all these materials to answer the question of what does the law require with respect to disclosure of HRO to the ODH, fair?
A. Correct, in regulations and the contract.
Q. And you made the unilateral determination as the president of HRO that the answer to that question did not require you to consult an attorney, correct?
A. Correct.
Q. And you didn't consult an attorney on that point as of September 2nd, 2024, did you?
A. We consulted David.
Q. You consulted David? When?
A. In the whole process leading up to it. But I made the decision to make the disclosure --
Q. I'm not talking about the whole process, Mr. Cauchon. I'm talking about the

Page 154

time period between the time that you consulted these materials on the weekend you described, consulted ChatGPT, and then placed AmandaLynn on administrative leave, that time period. Did you ever consult Mr. Ball between those two points?
A. I would have to check the emails to see whether there are any emails. I don't remember.
Q. So as you sit here today, you don't recall any conversations you had with Mr. Ball between that time period, correct?
A. I can't identify the specific time periods when we talked or emailed without looking at the documents.
Q. Do you recall having forwarded on the results of ChatGPT to Ms. Katz at any point?
A. Yes.
Q. Did you forward the results of ChatGPT on to any other person?
A. I think I may have sent it to Dwayne, but I don't remember without looking at the documents.
Q. Do you recall having ever sent the

Page 155

ChatGPT queries and responses to Mr. Ball?
A. I don't recall. It's possible I did.
Q. Anyone else that you believe it was possible that you could have sent the ChatGPT inquiries to between the time frame of August 31st, 2024, through September 3, 2024?
A. Not that I remember.
(Thereupon, Exhibit 15, report of Maritza Nelson (HRO 1398-1435), was marked for purposes of identification.)
BY MR. CHANG:
Q. I'm handing you what is being marked as Plaintiff's Exhibit 15. I only have questions regarding an attachment, so I'll direct your attention to that part. There's no need to fully review it.
For the record, this is the report that was produced by defense counsel that was redacted, pursuant to the Court's orders, of Maritza Nelson. My questions only relate to the attachment to the report that begins at the very end, HRO 1431. Let me know when you're ready.
A. Got it. Is there a date on this?

Page 156

Because I think ChatGPT has dates. Maybe it's at the end.
Q. You are being provided the document exactly as it was produced.
A. Okay.
Q. My question to you, Mr. Cauchon, is the inputs and responses that are seen here on pages 1431, on the bottom right-hand corner, all the way through the last page of this document, 1435, do you recognize these as the submissions that you input into ChatGPT as part of your investigation during the weekend that you described?
A. Yes.
Q. And is this a true and accurate copy of your submissions and the responses that ChatGPT responded with?
A. Yes, I believe it is.
Q. And so looking at -- we'll come back to this. I'm going to give you another exhibit.
(Thereupon, Exhibit 16, September 2, 2024, emails (HRO 288-289), was marked for purposes of identification.)
BY MR. CHANG:

Page 157

Q. For now, you can set that aside, but you can leave it on that page. I'm handing to you what's been marked as Plaintiff's Exhibit 16. Go ahead and take a moment and let me know when you're ready.
A. Yes, I'm ready.
Q. Again, going with the very first email, which is at the end of the document, if you turn it over, Bates stamp ending 289, this is an email from you to Ms. Katz on September 2nd, 2024, at 7:01 a.m. The subject is conflict of interest advice from ChatGPT. Do you recall sending this email?
A. Yes.
Q. Does this refresh your recollection of in or around when you consulted ChatGPT specifically?
A. Yes. And I would say that's at 7:01, so it was relatively early in my research.
Q. Was it that morning or the prior day?
A. No, it was that day, 7 a.m.
Q. And you say this was early in your research. What do you mean?

Page 158

A. I got there at 5 a.m., and I left at like 6:30, and this email was at 7:01.
Q. All right. So September 2nd, 2024, early in the morning, you state -- where are you at at this point?
A. In my office.
Q. In Granville?
A. Yeah. Yes.
Q. And you said you stayed in the office doing your research, for lack of a better word, until what time?
A. 6:30. About 6:30 p.m.
Q. Eastern?
A. Yes.
Q. So 11 to 12 hours, thereabouts?
A. Correct.
Q. Now, you state I think this is sound advice, immediate disclosure/create mitigation plan. Now, the reason why I marked the last exhibit is I wanted to confirm that these queries are what you provided to Ms. Katz.
A. I believe so.
Q. Okay. And her response to you approximately two hours later is this: Hi,

Page 159

Dennis. I think we need to tread carefully here -- well, she said thread carefully here -- especially as we just had a conversation with AL saying that everything is on status quo until the policy and disclosure process is reviewed by the lawyer. I also do understand the commitment we made to the state and that we need -- we may need to disclose sooner rather than later to protect the contract and consequently the organization and everyone's livelihood. Because the board apparently knows the details of the conflict, maybe you could explain your concerns to them about the potential conflict we may have with the state regarding our main source of funding, and that you and/or the board need to share the details about the conflict to the state. Did I read that correctly?
A. Yes.
Q. Okay. And did you accept her recommendation to share with the board this additional information that you had received from ChatGPT at this point?
A. I respected it and took it into account.

Page 160

Q. But you didn't follow it, did you?
A. I didn't share it to the board. I think I may -- I think I sent it to Dwayne, but I could be wrong on that.
Q. But you never formally presented to the board the additional information that you found so critical to place Ms. Reese on administrative leave, correct?
A. This is not what caused her to be placed on administrative leave.
Q. Well, you never disclosed to the board any of this information prior to disclosing the alleged conflict to the ODH, correct?
A. The ChatGPT information?
Q. Correct.
A. I did not.
Q. Okay. So you respected her opinion, but disagreed with it and disregarded it, correct?
A. Yeah. And this wasn't a major -- this wasn't a big factor. This was sort of like pro forma advice on what to do, immediate disclosure.
Q. Why wouldn't you bring this

Page 161

additional information to the board?
A. Are you asking about this in particular?
Q. Well, we can start with that.
A. Well --
MS. MOYO: Can we clarify on the record what we're talking about here? You're talking about the ChatGPT in Exhibit 15?
THE WITNESS: Correct.
BY MR. CHANG:
Q. When I say this information for purposes of this question, why did you not provide the queries and responses that you received from ChatGPT to the board prior to either disclosing it to ODH -- disclosing the alleged conflict to ODH or putting Ms. Reese on administrative leave?
A. Because I reviewed hundreds, if not thousands, of pages of documents, and this was -- this was just like some early stage general advice. It wasn't important enough. But I shared it to, you know, her early in the morning, you know, to get Cecile's thoughts. But like you're going under the assumption that this was sort of dispositive, and it just

Page 162

wasn't.
Q. I'm asking you. Did you share any other information -- any of the other sources that you referenced that day, did you share any of that with the board prior to September 3?
A. Yeah, I shared with Dwayne.
Q. Anyone else?
A. No. At least -- not that I recall. I had been talking to the board members earlier. But on September 2, it was Labor Day, so, no, I did not call them.
Q. We'll get to Dwayne in a second, but he's the only one you can recall potentially sending either the ChatGPT inquiries and/or the other information you referenced on that day too, correct?
A. Correct.
Q. All right. Going to the next sentence in the email, it reads or the details could be shared with D. Ball, and he could advise what we need to do in regard to the state's contract, i.e., should we disclose to the state what we know now even if it's not complete and we are in the middle of reviewing our COI policy/disclosure process, question

Page 163

mark.
Did you accept her recommendation to share it with David Ball to get his legal advice as to whether you should immediately disclose or not?
A. I didn't consider it a recommendation, but if you want to characterize it that way, then I would say no, I didn't accept it.
Q. Why not?
A. Because it was Labor Day, and I didn't want to bother David Ball on Labor Day, especially not regarding ChatGPT. That was just like a --
Q. Is September 3 Labor Day?
A. Oh, on September 3. Oh. No, I -- you've got the emails. I showed it to -- I sent it to David after that.
Q. When did you send it to Dave?
A. I'd have to look at the emails.
Q. Did you send it to Dave before or after you placed Ms. Reese on administrative leave?
A. I do not remember.
Q. Did you send it to Dave before or

Page 164

after you wrote a letter to the ODH claiming that Ms. Reese had a conflict of interest?
A. I do not remember, but the facts are all in the email.
Q. You can stop referring to the documents. I'm just asking what your recollection is here today.
A. I don't remember.
Q. Certainly if you had forwarded it to Mr. Ball, there would be an email representing that, correct?
A. Yes. If I emailed them, yes.
Q. And I only asked that to confirm you did not physically walk into his office --
A. Correct.
Q. -- and provide these materials, correct?
A. Correct.
Q. So if you did, in fact, inform Mr. Ball of this, we should have an email that would represent that?
A. Correct.
Q. And would you have produced that email in response to discovery in this litigation?

Page 165

A. Correct.
Q. Is it your understanding that you did produce it?
A. I don't remember. I produced a few thousand pages. I produced what I had.
Q. But as you sit here today, you don't recall whether you asked him or sought his legal advice before or after you disclosed to the ODH, fair?
A. I do not.
Q. Just to make the record clear, you went through a list of additional items that you reviewed on September 2nd, and I just want to make the record clear. You referenced law review articles?
A. The FAR, Federal Acquisition Regulation --
Q. We'll take them one at a time. Sorry. Law review articles?
A. Yeah.
Q. What law review articles?
A. I don't recall.
Q. Did you keep a copy of them?
A. I don't believe so. I just would have read them. Whatever is available online.

Q. Next what did you review? Not chronologically. I'm trying to make a list here.
A. Federal Acquisition Regulations.
Q. Let's stop there. Federal Acquisition Regulations. Do you recall what you did with respect to that FAR?
A. Read them, printed them out, made notes.
Q. Which regulations?
A. FAR.
Q. The entire thing?
A. Not the entire thing. Everything that I produced in discovery related to conflicts.
Q. How did you determine what to reference in FAR?
A. Google and research.
Q. What did you submit in your Google searches?
A. I don't recall.
Q. All right. We've got law review articles, FAR. What else?
A. Articles by law firms who specialize in these disclosures. There's quite



a lot of good stuff out there.
Q. Let's stop there.
A. Okay.
Q. Articles by law firms. Any law firms that you can recall specifically?
A. I don't recall.
Q. Did you produce those articles as part of this litigation?
A. No.
Q. Do you recall the titles of any of those articles?
A. No.
Q. When you say articles, are you referring to online postings, or are you referring to print articles, like physical print?
A. They may have been physical print, but I read them online. They would be mostly articles by law firms who work in the field.
Q. All right. Next. What else did you consult?
A. The Uniform Code of Federal Regulations, also called Uniform Guidance, CFR 200.
Q. Do you recall the specific



provisions of that code that you looked at?
A. The ones related to conflict and disclosure.
Q. You don't remember any specific subsection titles or numbers?
A. CFR 200 is the Uniform Guidance, but I don't remember the subsections.
Q. So as you sit here today, you cannot reference any specific subsection that you read as part of your research, fair?
A. Yeah. No, I would just Google and see which ones applied to conflict and disclosure.
Q. Did you print out and save a copy of the ones you reviewed?
A. If I did, I would have supplied it in production.
Q. As you sit here today, you can't recall whether you did or didn't though, right?
A. I can't, but I kept it all --
Q. What else --
A. -- in a folder and produced it all in discovery.
Q. What else did you review that day?
A. Let's see. Probably a couple



lawsuits. Whatever is available online. Disclosure letters, like how you write a disclosure letter, what's in it. A disclosure notice is what I think it's called rather than a letter, but what's the proper way to disclose.
Q. So you said you looked at lawsuits. Anything specific that you can recall about the lawsuits?
A. Other than they were related to disclosing conflicts.
Q. You don't have any names or numbers, jurisdictions --
A. No.
Q. -- nothing else to provide?
A. No.
Q. Disclosure letters. Did you Google how to write a disclosure letter? Is that what you're referring to?
A. I don't remember exactly what I Googled, but I would have Googled around that subject matter.
Q. Did you find disclosure letters or examples through Google?
A. I don't recall.

Page 170

Q. What about disclosure notices?
A. I don't recall.
Q. Anything else that you reviewed that day?
A. I'm sure there's a lot of other stuff that I just don't remember.
Q. As you sit here today, though, this is what you recall is --
A. Oh.
Q. Sorry. Go ahead.
A. The contract and the RFP and the -- yeah, and the actual award. The November 15th 2024, award I would have like reviewed.
Q. You're referring to ODH's contract -- or HRO's contract with the ODH?
A. Correct.
Q. The RFP related to HRO's contract with ODH also?
A. The RFP is incorporated by reference into the contract.
Q. Anything else?
A. That's all that I recall. There is probably one other subset. Like at the time, SAMHSA was covered by CFR 45 rather than CFR 200, so I would have read that. Because

Page 171

the money flows from the federal government, SAMHSA, Ohio Department of Mental Health and Addiction Services to ODH and then to us. So it's a complicated legal question on -- like all of them essentially come to the same language, but I tried to review everything.
So I would have reviewed -- I think it's 45 -- maybe it's 75 CFR. But I would have reviewed the ones that applied to SAMHSA. It wasn't clear to me at the time whether it would be the Uniform Guidance or --
Q. Do you know what the acronym SAMHSA stands for?
A. What -- SAMHSA? Substance Abuse Mental Health Services Administration.
Q. So you reviewed what you believe to be the Code of Federal Regulations related to that acronym?
A. And another one that I mentioned, but I didn't do on this list, is the SAMHSA NOFO, N O F O, notice of funding opportunity. And then SAMHSA also has like a 17-page list of requirements. I reviewed that too. In the notice of funding opportunity is described the state opioid response funding --

Page 172

Q. You don't have to -- don't feel the need to characterize the documents. I just want a list of what you reviewed though.
Before I move on, it seems like you are recalling more as you think about it. Is there anything else that you can recall that you reviewed.
A. Not that I recall.
(Thereupon, Exhibit 17, emails (HRO 269-270), was marked for purposes of identification.)
BY MR. CHANG:
Q. All right. Mr. Cauchon, what I just marked as Deposition Exhibit 17 appears to be an email chain. At least the top email here is between you, Mr. Ball, copying Mr. Steward and Ms. Katz. Do you see that?
A. Yes.
Q. And the date of this email and time is September 3rd at 10:12 a.m., correct?
A. The one on the first page, correct.
Q. Now, at this point, your research that you were describing that occurred the day before had been complete, correct?

Page 173

A. Correct. It was never complete. I'm still doing it today. But, yeah, for the purposes of sending the conflict disclosure letter.
Q. Okay. This email is from Mr. Ball to you, Dwayne, and Cecile, and he is essentially giving feedback with respect to the Remedy Alliance exemplar and their conflict of interest policy; is that fair?
A. Correct.
Q. And he's telling you he'll give it a careful review and let you know if I would suggest any tweaks for HRO, correct?
A. Correct.
Q. Would you agree with me there's no reference here to having received any additional materials either from you or any other board member or anyone at HRO related to the research you did the day before, correct?
A. Correct.
Q. So is it fair to say that you had not shared this information with Mr. Ball as of the date that this email was sent?
A. I would think that's accurate, because this is on a different topic.

Page 174

Q. So you, to the best of your knowledge, had not yet shared that information with Mr. Ball as of September 3, 2024, at 10:12 a.m., correct?
A. Correct.
Q. Did you have any other communications with Mr. Ball on that day to your knowledge?
A. I don't recall. I would look at the emails to tell you.
Q. Did you ask Ms. Reese to attend the ODH meeting that was going to occur that day?
A. The previous week -- I wouldn't have asked her. She would have been included on the calendar that Cecile or ODH sent out.
Q. Did she actually attend the meeting?
A. She did.
Q. At any point during that meeting was the alleged conflict of interest discussed?
A. Yes.
Q. Tell me what happened at that meeting.
A. We had the meeting on the plans for the next -- for what's coming up in the

Page 175

following year, and Sierra Dantzler, who runs Project DAWN, asked me if I could stay on the line with her after the meeting, and I did.
Q. So you have an initial portion of the meeting, which included individuals such as Ms. Burns, correct?
A. Correct.
Q. Ms. Reese, you, and --
A. I think a fellow named Devin Quinn.
Q. Devin? That first portion of the meeting when everyone is still on the call, was anything about the alleged conflict of interest discussed at that point?
A. No.
Q. Then at some point everyone else leaves the call except for you and -- what is her name?
A. Sierra Dantzler. S I E R R A, Dantzler, D A N T Z L E R.
Q. Did you tell everyone else in the meeting why you and Ms. Dantzler were staying on the call?
A. No, because it was Sierra who said she wanted to talk to me by myself.

Page 176

Q. All right. So tell me what was said during that call.
A. Sierra thanked me for sending the conflict disclosure. She said she appreciated it. She considers it like a serious conflict. We talked about the conflict mitigation plan, which is also in the documents, of putting AmandaLynn on administrative leave, removing her from any procurement authority.
And she said she liked that conflict mitigation plan, and then she called -- if you give me the letter, she called attention to one sentence in my letter.
Q. So you sent the letter --
A. Cecile --
Q. -- prior to the conference that you had with ODH?
A. Correct. Cecile sent it.
Q. Cecile sent it.
A. We sent it in a Word document, and they said please send it as a pdf. So she pdf'ed it, and we sent it as a pdf.
Q. If you had planned to place AmandaLynn on administrative leave, why did you have her still attend that call?

Page 177

A. Because I wanted to -- we scheduled the call with her after the meeting, because I wanted to talk with ODH, if they wanted to talk to me, just get their feedback, as well as talk with Cecile.
(Thereupon, Exhibit 18, September 3, 2024, emails with attachment (HRO 290-292), was marked for purposes of identification.)
BY MR. CHANG:
Q. I'm giving you what's been marked as Plaintiff's Exhibit 18. And my question is is this the email chain that you are referring to where you initially sent -- or Ms. Katz initially sent the conflict letter, they asked for a pdf, and then Ms. Katz followed up with a signed pdf at 11:45?
A. I think this is her sending the pdf. It doesn't have the DO -- the Word version, as far as I can tell, but that's effectively it.
Q. That's correct. If you look at the attachment, the attachment is a fair and accurate copy of the executed letter that was requested by the ODH, correct?
A. Not requested by -- oh, the pdf

version, yes.
Q. Yeah, I understand the letter wasn't requested, but they requested a pdf, and this is what you sent in response, correct?
A. Correct.
Q. And you had directed Ms. Katz to send this, correct?
A. Correct.
Q. Looking at the contents of this document, you begin the letter by saying Harm Reduction Ohio recently learned that our chief program officer, AmandaLynn Reese, has a conflict of interest that we believe should have been reported in our original contract application and our request for contract renewal.
When you say we, who are you referring to?
A. Harm Reduction Ohio, the corporate entity.
Q. Did anyone else at the organization express to you that this needed to be disclosed other than that?
A. Yes, Cecile.
Q. Anyone else?



A. I don't think I spoke with anyone else at the organization other than the directors, one off. And Molly True, the board member, said she thought it should be disclosed, but -- but I don't remember.
Q. Let's take them one at a time. You mentioned Cecile. You mentioned Molly. Anyone else?
A. No, not that I recall.
Q. So it's your testimony today that Cecile had since changed her mind since sending you the email the day before, and now, rather than saying we should talk with counsel, she agreed with your recommendation of just going straight to the ODH; is that your testimony today?
A. No.
Q. Then what are you saying she agreed with you on?
A. She agreed it needed to be disclosed. She may have disagreed or had a different view on timing, but like your characterization strings together a bunch of suppositions that are not accurate.
Q. When did you have this



conversation with Ms. Katz where she purportedly agreed with what you were about to do?
A. That morning.
Q. What time?
A. 9.
Q. You decided not to document it in any way?
A. No. And what she agreed with is that it needed to be disclosed.
Q. Did she agree with your letter?
A. Yes, she thought it was a good letter, or she thought it was a well done letter. She actually edited it, made a few minor edits.
Q. Now, you mentioned Molly. When did you speak with Molly about whether it should be or should not be disclosed?
A. Over the previous week, I called all the board members -- the previous ten days, I called all the board members, and she referred -- oh, her husband works for Coca-Cola, and they are very strict about conflicts, and this is what they do, and if it's got to be reported, it's got to be



reported.
Q. You spoke with Molly prior to the meeting with Ms. Reese where you advised Ms. Reese that you were going to maintain the status quo, correct?
A. Correct. I spoke with all the directors to update them on -- like after I found out -- I was trying to keep it just like quiet out of respect for her, but after AmandaLynn and the directors started talking, I wanted to make sure all the directors were equally informed.
Q. So I want to know every single person that you talked to from the time of September 2nd at 7 a.m. until 11:10 a.m. Right now all I have is Cecile; is that accurate?
A. It would have been me and Cecile.
Q. That's it?
A. All that I recall. I mean, I may have -- about this conflict, it would have been me, Cecile, and I emailed a copy of the letter to Dwayne.
Q. Before or after you sent it to the ODH?
A. Before. Before.

Page 182

Q. So you're saying there is an email that exists where you sent a copy of this before -- to Dwayne Steward before you released it to the ODH?
A. Correct.
Q. And you produced that email as part of this litigation?
A. You actually have it. And in the email, he says that he asked me to take out that she hasn't been disclosed, and that I declined to do so. You have the email. I think you actually produced it.
Q. When did that occur?
A. September 3, I think.
Q. Before 11:10 a.m.?
A. Yes.
Q. And you're saying he actually made edits to this letter?
A. He made a suggestion that I take out that she hasn't disclosed. There's an email from him saying that. I think it's in your disclosure.
Q. You can stop characterizing documents that aren't in front of you. I'm just asking you -- there's no question pending.

Page 183

Anyone else?
A. Not that I recall.
MR. CHANG: Let's take a brief break, about five minutes, and then we'll come back on the record.
(Recess taken.)
(Thereupon, Exhibit 19, September 3, 2024, email with attachment (HRO 136-138), was marked for purposes of identification.)
BY MR. CHANG:
Q. Mr. Cauchon, I'm handing you what's been marked as Exhibit 19. I'm just trying to clear up any confusion, to the extent it exists, with respect to the timing of communications with Mr. Steward.
This is an email communication that you sent to what appears to be the entire board dated September 3, 2024, at 1:57 p.m. Do you see that?
A. Yes. Yes.
Q. Do you recognize this email?
A. Yes, I do.
Q. And if you look at this and the attachment, this is a fair and accurate depiction of your notification to the board of

Page 184

the letter that you had forwarded on to the ODH, fair?
A. Yes.
Q. Now, just so I can understand your testimony today absolutely clear, it is your testimony today that prior to sending this email, there is an additional email communication between you and Mr. Steward which contains a draft of this attachment that was unexecuted. Did I understand you correctly?
A. I believe so, yes.
Q. I'll represent to you that we cannot locate that in the production. So would you, on the next break, locate that and be willing to produce that?
A. I don't -- I may be remembering it wrong. I just remember that he said -- maybe it was verbal. When I get back to my office, I'll get you --
Q. I'm not asking about back to your office. As you sit here today, it seems like you have now changed your position. You cannot recall whether or not you actually sent a draft of this letter to Mr. Steward as you sit here today; is that fair?

Page 185

A. I think that I did.
Q. But you cannot be certain one way or the other?
A. I cannot be certain without looking.
Q. And you believe that you could locate this email if you go back to your Granville office?
A. Correct.
Q. Do you agree to produce that to us at the moment that you locate it --
A. Yes.
Q. -- and/or confirm that it doesn't exist?
A. Okay. Yes.
Q. Thank you.
A. It's possible that it was verbal. Well, but he asked me to make a change in the letter, so -- so -- so that's the thing that's tying me to think that he had a version.
Q. Do you recall what -- the changes that he requested?
A. Yes. He requested that I take out that she declined to disclose details on her outside employment.
Q. Did he have any other comment to

Page 186

your recollection?
A. That's the only one I remember.
Q. Did he ever say no, don't send this, or anything to that effect?
A. I don't -- I don't remember one way or another. He didn't want me to send it. There's emails with --
Q. I'm not asking you to speculate as to what his internal thought processes were. You've answered the question. Thank you.
A. I'm just telling you what the answer is to your question.
Q. There's no question pending, Mr. Cauchon.
A. Okay.
Q. Let's go back to Exhibit 18. It's the same letter, but let's go back to the previous exhibit, the letter that you provided to the ODH.
A. Exhibit 18.
Q. Exhibit 18, the attachment where Ms. Katz is providing a signed pdf to the ODH. I just have some questions about the substance of the letter itself. The letter believes -- or states Harm Reduction Ohio recently learned

Page 187

that our chief program officer, AmandaLynn Reese, has a conflict of interest that we believe should have been reported in our original contract application and our request for contract renewal.
Now, at this point, Mr. Cauchon, when you say that there's been -- you affirmatively state here that there actually is a conflict of interest, correct, not just a potential conflict of interest?
A. Right, in that sentence, I do state conflict.
Q. And so you're informing the ODH that there has already been a determination made by HRO that Ms. Reese had a conflict of interest, correct?
A. Correct.
Q. Who made that determination?
A. I did.
Q. Unilaterally on your own?
A. Yes. Well, with consulting other people, yes.
Q. We've already gone through this.
A. Correct.
Q. Cecile was one of those individuals?

Page 188

A. She thought it was a conflict. She disagreed.
Q. Cecile, Molly, and then Dwayne, those are the people. And we've already discussed all those communications, correct?
A. Correct, but I -- yeah. And the other board -- board members, and none of them opposed or disagreed with the idea that it was a conflict other than Tasha, Billy, and Dwayne.
Q. Well, you recall the email that I put in front of you where Dwayne specifically said that we should not be sending something on a, quote, unproven conflict, end quote, correct?
A. Correct, that was his belief.
Q. Are you testifying that at some point between the sending of that email and this letter, that Dwayne now thought there actually was and communicated to you that there was a conflict of interest?
A. No. Dwayne, Tasha and Billy thought that there was no conflict or -- or thought there was no conflict.
Q. Thought there was no conflict or wanted an investigation?

Page 189

A. Thought there was no conflict.
Q. And your evidence for that is what? I haven't seen that in an email today. Is there an email today where you can say that either one of those three members said there was no conflict of interest?
A. No, that belief was stated in the August 16th or August 22nd -- like the phone call that we had with the three of them. They affirmatively stated that there was no conflict, and she had a right to do whatever work -- outside work that she wanted to do, and that we -- it was no different than working at Target, and that we had no legal authority to challenge even a potential conflict. That's what their views were in that -- in that conversation.
Q. So now there's a phone call on August 22nd that occurs? That's your testimony?
A. Or the 16th. It's on the calendar.
MS. MOYO: It's on what?
THE WITNESS: It's in there. It's -- I think August 16th she asked.

August 22nd is when, I think, it occurred.
BY MR. CHANG:
Q. Ms. Tasha Turner-Bicknell sends you her concerns with a conflict of interest form on August 16th, 2024. You recall that, right?
A. Yeah, we scheduled the meeting.
Q. And then we looked at an email chain date range August 16 through August 19. Do you recall that?
A. Yes.
Q. Okay. Now, my question to you is you are now referencing a phone call you said on August 22. Was there a phone call anytime between August 16 through August 22 on that issue?
A. Yes. Yeah.
Q. When?
A. Let me check, see if it's on my phone. Dwayne set up the meeting, so it's -- or like he did the Google Meets for it, I believe.
Q. I just ask that you provide more specifics, if you have it, the next time we go on break. You don't have to sit here and do it



unless you can find it in the next ten seconds.
A. I can find it quickly. Let me see. So it's not on my phone. It was either the 21st or the 22nd.
Q. Did you have a second phone around that time?
A. No, but it would have been set up on my work computer, and it doesn't always synchronize.
Q. So it wasn't a phone call, it might have been a Zoom call, is that what you're trying to say?
A. It was a Google Meets call, or -- your client set it up, so you can ask him.
Q. All right. Regardless, that was before the agreement that was reached by everyone at HRO, the board of directors, you, that there would be -- everything would be the status quo, correct, on August 31st?
A. I don't agree with your premise reached by everyone.
Q. That phone call occurred prior to August 31st; can we at least agree on that?
A. Correct.
Q. Was there any discussion between



you and any of the other board members that you just referenced, Tasha, Dwayne, Billy, where they affirmatively stated that there was no conflict of interest after August 31st?
A. I'm a little confused by that dating. So you want to know after did they state it?
Q. I'll clarify it. So between the time frame of August 31st and September 4th, did you have any other discussions, other than what we've already mentioned, regarding whether any board member believed there affirmatively was or was not a conflict of interest with respect to Ms. Reese?
A. I believe Molly True and I exchanged emails, and -- yeah, there's a couple emails.
Q. So now we have more than a couple emails that we haven't looked at today?
A. But you're talking about post August 31, right?
Q. Correct.
A. Yeah.
Q. So now you're claiming that there's an email between you and Molly True



between the time frame of August 31st and September 4th on Ms. Reese's conflict of interest?
A. Or September -- through September 5th. I don't remember the exact dates.
Q. Mr. Cauchon, to make today easier, I just ask that you stop speculating as to what may or may not exist.
A. Then I don't know.
Q. If you don't recall, just state you don't recall, fair?
A. I don't recall.
Q. Going back to the letter that you sent to the ODH. I'm looking at the one attached to Exhibit 18. I don't think they're different, but just to give you reference.
The second sentence reads the full details of the conflict or potential are not clear, because AmandaLynn has declined to disclose details on her outside employment.
Now, at the time that you sent this email, had you asked Mallory Bolen whether Ms. Reese had provided any details regarding her work at Velocity at that point?

Page 194

A. No.
Q. Why not?
A. I had no idea that any alleged disclosure had been made to Mallory. I had no reason to think there had been. AmandaLynn never mentioned, Dwayne never mentioned, no one ever mentioned it.
Q. Isn't this the part that Mr. Steward allegedly asked you to revise?
A. No.
Q. What part of the letter did he ask you to revise?
A. No, because he was talking about he thought disclosure to him was disclosure, at least that's how I understood it. I'm not -- but he didn't mention Mallory, and AmandaLynn never mentioned Mallory. I didn't find out until discovery -- until you produced in discovery the Mallory letter. I never heard of it before.
Q. At this point, you had already agreed that while everything was on status quo, there was going to be an investigation into that question with Ms. Reese, correct?
A. On what day? Yeah, I mean, I said

Page 195

it was at status quo, and then I changed my mind, correct.
Q. And Ms. Reese didn't express at any point a refusal to cooperate with that investigation, did she?
A. She did. She never -- she never produced any documents even when I asked her to and prompted her.
Q. Mr. Cauchon, you specifically recommended that you were not the person who was going to do the fact investigation. My question is whether Ms. Reese stated that she would refuse to cooperate with an investigation on that issue separate and aside from your previous request for information? Did she ever tell you that?
A. She didn't tell me that.
Q. Are you aware whether she ever told anyone else that?
A. I am not.
Q. So as of the date you sent this letter, Ms. Reese has not expressed to you or to your knowledge anyone else that she was going to refuse to cooperate with the investigation that was going to occur, fair?

Page 196

A. There was no investigation that was going to occur.
Q. Well, that's because you had made the decision that there would be no investigation to occur, correct?
A. I think that's fair to say.
Q. Okay. And why -- and the reasons why no further investigation needed to occur we've already discussed, because of your research from September 2nd, correct?
A. Correct, we needed to disclose.
Q. And before making that decision, you did not consult with counsel, correct?
A. I didn't talk to David Ball, no.
Q. Did you talk with any other attorney?
A. No.
Q. So you made that decision without consulting counsel, correct?
A. Correct.
Q. If you go to the third paragraph of the letter, the last sentence of the third paragraph reads at present, I have no reason to believe that AmandaLynn's outside contract influenced her ordering decisions. Did I read

Page 197

that correct?
A. Correct.
Q. So the information that was available to you, at least at this time, led you to the conclusion that as far as you knew, nothing about her outside contract had changed the way that she was conducting ordering and fulfillment at HRO, correct?
A. I was concerned. And on August 19, I filed a public records request with the State of Ohio to determine the ordering patterns. That request was not fulfilled until, I think, September 16th.
Q. Okay. I didn't ask you about what information you received after the time. As of September 3rd, though, you had no information in your possession to suggest that Ms. Reese's outside contract had influenced her ordering decisions, correct?
A. That sentence is correct, although later on September 3rd --
Q. I'm not asking about later. We'll talk about that.
A. I thought you said on September 3rd, but, okay, fair enough.

Page 198

Q. How did you inform Ms. Reese that she was being placed on administrative leave?
A. Cecile and I gave her a call and followed sort of a script that David Ball had given us to the best of my recollection.
Q. So between 11:41 a.m. on September 3rd and 1:30 p.m. on September 3rd, you're now saying that you procured legal advice from Mr. Ball as to what you should say to Ms. Reese?
A. I believe so, but I'm not sure about the timing of it. Cecile might have a better timing memory.
Q. You were provided a script?
A. Not a script. Not a written script, but he advised us on how to say things.
Q. Was this a phone call?
A. I don't remember if it was a phone call. I don't remember.
Q. Do you recall, what was the substance of that script?
A. No, I don't, other than just to like state the facts.
Q. Okay.
A. But I don't recall.

Page 199

(Thereupon, Exhibit 20, September 3, 2024, letter (Reese 47), was marked for purposes of identification.)
BY MR. CHANG:
Q. I'm providing you what is marked as Exhibit 20. Is this a fair and accurate depiction of a letter that you sent to Ms. Reese summarizing the details presented at your meeting that you had with her at 1:30 p.m. September 3rd?
A. Yes.
Q. And you state here I wanted to formalize the details presented at the meeting today. And then you have two bullet points here. Harm Reduction Ohio is placing you on paid leave effective immediately while a review is conducted of a potential conflict caused by your outside employment, and, two, the second bullet point, suspending your Harm Reduction Ohio email account and access to HRO's shared Google Drive while the review is underway.
Were these two bullet points part of the script that Mr. Ball provided to you?
A. I don't recall, but I think it's

Page 200

likely they were consistent.
Q. Do you recall anything else other than these two bullet points being discussed by Ms. Reese at this meeting?
A. I do not recall.
Q. Did Ms. Reese say anything at this meeting?
A. I think she did, but I don't recall what was said.
Q. Did you inform her why you had changed your mind regarding the status quo?
A. No.
Q. Did you inform her about the additional information that you reviewed on September 2nd?
A. No.
Q. Go back to Exhibit 19. It's the email dated September 3rd at 1:57 p.m. to the board. I have a few questions about this.
I think the only question I have that hasn't truly been covered from this email is you quote language here at the bottom of the first paragraph that Harm Reduction Ohio has an ongoing duty to disclosure all conflicts and potential conflicts, real or perceived, and

Page 201

then you quote as soon as identified, end quote. What are you quoting?
A. I believe that's from the FAR, Federal Acquisition Regulations, but --
Q. Do you recall what specific regulation?
A. FAR. I don't remember the provision number.
Q. Then you go on to say after receiving the disclosure letter, Project DAWN administrator, Sierra Dantzler, initiated a conversation with me in which she described the conflict as an actual and significant conflict that needed to be addressed.
The conversation you're referring to is when you stayed on the call after the ODH meeting, correct?
A. Correct.
Q. And you've already testified as to everything that you can recall with respect to that call with Ms. Dantzler?
A. Everything that you asked.
Q. Is there anything else that I haven't asked that you can recall about that phone call then?

Page 202

A. Yes.
Q. Okay. What else happened on that call?
A. On that call, she pointed to the last sentence in paragraph three, at present, I have no reason to believe that AmandaLynn's outside conflict will influence her ordering decisions, and Sierra said I wouldn't be so sure of that.
Q. Did you ask why?
A. I did not. I should have.
Q. Anything else that you can recall that she said?
A. Yes. I said that some board members didn't want me to report the conflict, and I might get fired on September 15th. And she said no way. It's an obvious conflict. And then she said you are Harm Reduction Ohio. And I said I don't think I will, but September 15th we'll know.
Q. Anything else?
A. Not that I recall right now.
Q. Why did you think that you were going to be fired?
A. Because I knew that Dwayne and

Page 203

Tasha and Billy, you know, were trying to stop me from disclosing. We had a September 15th board meeting scheduled, so that was going to be one of the topics in the board meeting. I didn't think I was going to be fired. I thought I might get fired September 15th.
Q. We haven't talked about Billy much. When did Billy inform you that he didn't believe any conflict of interest should be disclosed prior to a full investigation?
A. At the meeting following the September request -- I'm sorry, the August 16th request.
Q. And what they communicated was you shouldn't disclose, or did they communicate there should be an investigation before disclosure?
A. No, they said she had no conflict and it should not be reported, and that pretty much settled it. Because they believed -- all three of them believed she had a legal right to do whatever -- whatever she did. They used the term it was like working at Target, which I said well, it matters what she did and if she was paid $1 or $100,000. And they said no, it

Page 204

doesn't matter. It's just like working at Target.
So then after we got off that call, like I checked to see if that's what the law is, that you can enforce conflict provisions, and it was -- it was not inconsistent -- not consistent.
Q. This call that you claim happened --
A. Yeah.
Q. -- occurred prior to August 31st, correct?
A. Correct, on August 21st or 22nd. Your client set it up, and we were all on the call, so --
Q. Right. So after that call, we can all agree, then, that the decision that was ultimately reached is that there would be an investigation, and that we would wait for the advice of counsel before doing anything, correct?
A. No, there was no decision reached. I suggested that we could have the outside -- David Ball do it. He said it wasn't really appropriate for him. Then the issue on how to

Page 205

handle it sort of just floundered. Then we agreed to the status quo. Then I went and reviewed what the actual requirements were -- on our disclosure what our requirements were, and then I reported it.
Q. There was an agreement to maintain the status quo at least, correct?
A. Yes.
Q. And it's your testimony today that they -- these three individuals did not agree to a private investigation or that there should be a private investigation?
A. No, I can't say what they wanted. They wanted to make the decision. Yeah, I can't recall the nuance of what -- of what they wanted. It was their belief that the board --
Q. I'm not asking you to speculate as to what they believed or did not believe, Mr. Cauchon. I just want to know what they told you. Let's go ahead and move on.
After you had informed the board that you had placed AmandaLynn on administrative leave, do you recall that you, yourself, created a review schedule, for lack of a better word, to have this further

Page 206

investigation into whether she did or did not have a conflict?
A. Yeah, I created a schedule and proposed disclosure to send to AmandaLynn that I sent to Dwayne and David Ball.
Q. And do you recall that you had requested an expedited quote, unquote, investigation?
A. I don't remember what he said, but it should be in the email.
Q. Do you recall that you, yourself, wanted to be involved as part of the fact investigation process?
A. Correct. It was my responsibility to report conflicts and investigate conflicts. That was my job.
Q. Why did you change your opinion previously where you said you should not be the fact investigator and all of a sudden you want to be involved?
A. Because I thought if David Ball could do it promptly, then that might like calm everyone's nerves and satisfy everyone.
Q. I asked why you changed your decision that you shouldn't be involved and now

Page 207

you wanted to be involved.
A. Oh, I always thought I should be involved. I was the contract signatory, and I was in charge of compliance, and I signed the no conflict letter, so --
(Thereupon, Exhibit 21, emails (HRO 306-312), was marked for purposes of identification.)
BY MR. CHANG:
Q. Handing you what's been marked as Exhibit 21. We can quickly go through this, but starting at the email at the very end, this is September 4, 2024. You're sending this to Dwayne and Dave at 11:37 a.m. Do you see that?
A. Yes.
Q. Okay. You were essentially proposing that you, Cecile, Dwayne, and Dave be involved in this investigation into Ms. Reese?
A. Let's see what I say. Yep, there's different -- like Dwayne reviewed stuff. Yep, this is the proposal.
Q. And the purpose -- you state here in this email, the very last sentence of the third paragraph, the conflict should be resolved before the application is made.

Page 208

A. Correct.
Q. So at this point, you had already concluded there was a conflict, correct?
A. Yes.
Q. Okay. And so the purpose of your proposed investigation was not to determine whether or not a conflict of interest existed, but what HRO was going to do about it; is that fair?
A. Based on the information we knew, that she was director of government advocacy for Velocity BioGroup, the lobbyist, and that she ordered, that in and of itself is a conflict.
Q. Okay. That didn't really answer my question. My question was the purpose of the review was not to determine whether there was or was not a conflict. The purpose of the review was to determine what HRO was going to do about it, correct?
A. Correct.
Q. Because you had already concluded on your own accord that there was a conflict, fair?
A. Correct, there was a conflict.

Page 209

Q. No. You made that conclusion, which is why it was not part of the investigation, correct?
A. It was part of the investigation. I did the investigation.
Q. It was not going to be a part of this proposed investigation, correct?
A. This was a review schedule of asking her to disclose --
Q. I'm not asking that. I'm asking whether the question about whether there was a conflict of interest or not was not part of your proposal, because you had already concluded that there was, fair?
A. I believed that there was, yes.
Q. If you go to Mr. Ball's email, it begins on page 309 and continues on to page 310 using the Bates stamp, the first thing it says is he thinks the form is fine. Then he says he has a concern, and he expresses that concern.
But my question is with respect to what he writes on the next page, the sentence beginning until now. Do you see that?
A. Can you give me the Bates number?
Q. That's on page 310.

Page 210

A. Okay, in the middle of the first paragraph.
Q. He states until now, it has seemed to me there was a desire to use the conflict reporting form mechanism for consistency among employees and to avoid a negative impact on employee morale, but now that it has reached this point, I think the importance of repairing HRO's relationship with ODH is the top priority.
Is it true what he's saying here that at least prior to you sending the schedule, it was agreed that HRO would use the conflict reporting form mechanism as opposed to this investigation that you are proposing here in this email?
A. It's not my understanding, but I think it's a reasonable understanding on his part.
Q. I want to direct your attention to another portion of this email thread. This is going to be on page HRO00037. Chronologically speaking, this is after the email we just read, I'm just not reviewing everything in between.
The two emails I have questions

Page 211

about kind of respond to one another. I want to begin with David Ball's email on page 308 first, and then we're going to move to 307. So Mr. Ball writes to you at 3:37 p.m. Are you with me?
A. Yes.
Q. Good question. I generally advise that the interview be conducted by an outside investigator, such as myself, when there is a risk of litigation and the risk of accusations of bias on the part of the in-house interviewers, parentheses, typically HR and a supervisor.
So Mr. Ball is providing legal advice to you and HRO that any investigation should be done from an outside investigator, not from anyone who is an HRO employee, fair?
A. Or an interview. An interview be conducted by an outside investigator.
Q. Correct, the interview be conducted by an outside investigator. He's proposing an outside investigator, correct?
A. He's proposing an interview, yeah, be done by an outsider --
Q. By an outside investigator?

Page 212

A. Correct.
Q. Did you agree with his recommendation?
A. No.
Q. So you rejected the advice of HRO's counsel?
A. I did not reject it. It was a discussion. And it goes on to -- I made the point that this is all about like documents. It's not like a car crash interview.
Q. You respond to this email, if you go to the next email in the thread, on page 307. You state the truth -- whenever you're ready -- the truth is the information known now from public information is more than enough for ODH to believe she can't be involved in the naloxone contract or program. So we don't really need more information. The contract with the Kloxxado lobbying firm plus her position ordering Kloxxado is in itself a prohibited conflict that cannot be cured. The risk for us is slow action.
So you've affirmatively stated at this point that investigation is not necessary for a determination of Ms. Reese's conflict of

Page 213

interest, correct?
A. Correct.
Q. And you don't even need any more information to determine that according to this email, correct?
A. Correct.
Q. And you still hold that belief today?
A. Yeah. You can't work for Kloxxado's lobbyist and procure millions of dollars of Kloxxado, correct. That's a prohibited conflict.
Q. If that's the case, why were you still needing to know how much she made or all this other additional information that you've requested in this litigation?
A. Because I wanted to be able to disclose the details of the conflict, and I was still like researching how it had affected her -- if at all, her procurement patterns.
Q. If you go to the very top of the email chain, it's an email from Mr. Steward on September 5th at 9:30 a.m. This is page HRO 306. It's the very beginning of the document.

Page 214

Mr. Steward advises -- or sends you an email saying I think asking for the contracts and the amount of money is egregious. I also think there is a kinder approach that we should be taking to all of this. I don't think that AmandaLynn or any of the staff is expendable. I think there is a way we could have gone about this that didn't lead to losing staff, but we may be beyond that at this point. Our mission is to create more compassion in the world for people affected by drugs. I'm not sure why we're not extending the same compassion to our staff. It seems like we're currently not operating within our mission.

Would you agree with him that the mission of HRO was to create more compassion in the world for people affected by drugs?

A. Yes.

Q. Okay. Do you agree that that mission also extends to showing compassion for HRO's staff?

A. Correct.

Q. Did you have any worries on the last sentence there, the effects of all of this is going to have long-term consequences for the

Page 215

agency that I don't think we're considering? Did you consider that at all, Mr. Cauchon?

A. I considered it, but -- but I was not worried about it.

Q. Why not?

A. Because I knew our staff, and I built HRO from nothing, and I knew what we did, how we did it, and I knew that we would continue operating without difficulty.

Q. At this point, had you already made a decision to fire Ms. Reese?

A. No, but I thought it was definitely a possibility, but I was still hopeful that she would provide documentation on how the conflict was not really her being director of government advocacy for Velocity and ordering Kloxxado.

Q. Do you recall advising the ODH that part of your mitigation plan was to fire Ms. Reese?

A. No, I think it was just to put her on administrative leave and remove her from duties related to Kloxxado procurement.

(Thereupon, Exhibit 22, September 5, 2024, email (HRO 148), was marked for purposes of

Page 216

identification.)

BY MR. CHANG:

Q. All right. Showing you what is being marked as Exhibit 22. We're now on September 5th, which is the same day, at 12:31 p.m. Do you see that at the top, Mr. Cauchon?

A. Yes.

Q. And this is an email that you sent it looks like to the board, copying Ms. Katz, correct?

A. Yes.

Q. And this is -- you're intending to provide an update on the naloxone program and kind of a summary of what is going to happen now that Ms. Reese is on administrative leave?

A. Yes.

Q. Is that fair?

A. Yes.

Q. The first thing you did was you promoted Patrick Bourland, correct?

A. Correct.

Q. Okay. The second thing you advised them is our conflict issue has been sent to legal counsel's office of ODH, correct?

Page 217

A. Correct.

Q. Now, the third here I have questions about. I have verbally presented the outline of a conflict mitigation plan to ODH. Stop there. When did you present the conflict mitigation plan to the ODH?

A. To Sierra Dantzler on September 3rd.

Q. And is this a fair and accurate summary of the mitigation plan that you presented to her on that phone call?

A. I think it would be. And I stand corrected on the first bullet point.

Q. Ah. So you now recall that you had already made the decision to end employment of Ms. Reese, correct?

A. What I remember now is that I was going to remove her from it, but what it says here is probably more contemporaneously, and I would say that is likely accurate.

Q. So as you sit here today, you had made the decision to end the employment with Ms. Reese as of this date, correct?

A. I would think so, yes.

Q. And you didn't need an investigation to come to that decision, correct?

Page 218

A. We had the investigation.
Q. You didn't need another investigation other than the research you did on September 2nd in your mind, correct?
A. Well, the research was July 15th through September 5th -- or September 3rd, correct.
Q. Under the bullet points, it says Project DAWN program manager responded favorably to the outline; however, ultimately the decision will be made by the legal department at ODH/OMHAS. Do you see that?
A. Yes.
Q. Did you have subsequent communications with Ms. Dantzler, I believe is her name --
A. No.
Q. -- regarding this?
A. I think I talked to her maybe once or twice.
Q. Did she ever inform you what their legal department ultimately concluded regarding your proposed mitigation plan?
A. No, and I didn't ask, and we never actually formally got to submit it. That was

Page 219

just a verbal what the plans were, but -- but they were able to stop before the mitigation plan was put into effect.
Q. Why did you promote Patrick Bourland over his immediate supervisor to that position?
A. I didn't. Who was his immediate supervisor?
Q. Well, you tell me. Do you recall who his immediate supervisor was?
A. AmandaLynn was his immediate supervisor.
Q. Why did you pick Mr. Bourland?
A. Because he was 39, mature, chill, and he just had like the work experience to do it. He was -- he was the most qualified. I talked with Cecile, and then we talked with him and gave him a day to think about it.
Q. The first thing you mentioned is he was 39. What does his age have to do with his qualifications for that position?
A. Because he had a lot of work -- he had a lot of work experience. He had a college education. He was -- just had the right temperament for a management position.

Page 220

MR. CHANG: We've been going for a while now. We'll take a short break, try not to drag on the deposition too long.
(Recess taken.)
BY MR. CHANG:
Q. Mr. Cauchon, when we went off the record, you had noted that you found something on your phone which confirmed the date and time of the meeting that we were previously discussing on the record that occurred on August 22nd. Can you just state for the record the information that you found?
A. Yeah. It wasn't on my phone, but it was on my iPad. A Thursday August 22nd meeting at 2:00, from 2 to 3 p.m. The meeting was called HRO COI check-in, and it was Google Meets set up by Dwayne Steward. And the participants in the meeting were Dwayne Steward, Tasha Turner-Bicknell, Billy Golden, and me, Dennis Cauchon.
Q. And the testimony that you gave earlier, you had stated Dwayne and Tasha and Billy had expressed their opinions on the conflict of interest issue --
A. Yes.

Page 221

Q. -- those opinions were what was expressed at this meeting?
A. Yes.
Q. Was there a reason why the other board members weren't invited or weren't at the meeting?
A. Well, one, because a full board meeting required two weeks' written notice, but also because it was Tasha, Billy, and Dwayne who set it up.
Q. Were the other board members invited?
A. I don't know. I don't think so, but it wasn't -- I didn't set it up. It was set up by Dwayne and Tasha.
Q. When we left off, we were looking at Exhibit 22. And my question -- we'll move on from this, but my question to you is if you had already made the decision to terminate the employment of Ms. Reese and communicated that to the ODH, why didn't you fire her at that time?
A. Because I wanted to give her a chance to further disclose. You can always get like evidence or information that causes you to

Page 222

change your mind, as well as I wanted to be able to tell everyone, including -- especially ODH, on what her role was with Kloxxado with her outside employment, because it's ultimately for them to determine if it would affect our contract status. It wasn't up to us.

So I wanted to be -- as I put in the conflict disclosure notice, be forthcoming and forthright. So that was my goal.

Q. All right. So you didn't want to fire her, because you wanted more information from her, correct?

A. No. I think that she likely needed to be terminated because of the relationship and declining to disclose; however, you have to remain open. If it turns out that like director of government advocacy was just a fancy name that did nothing, then, you know, you just have to -- you just have to keep an open mind. But ultimately it's like sort of a cooperative agreement between what ODH thinks and what HRO thinks.

Q. So if the director of government advocacy was just a fancy name that didn't do anything, nothing, you were open to changing

Page 223

your conclusion that she had a conflict of interest?

A. Well, because early on I thought that her conflict of interest is like she got paid to speak on a panel or something, and that's what she sort of led me to think it was. But after she -- and then she promised to disclose. But when she didn't disclose, then my reporter weary -- I got weary. And the fact that she never would disclose, it caused my concern to realize that she really was director of government advocacy.

Plus, I did further research, found that she had attended conferences in San Diego while she was supposed to be working for HRO on the ODH contract, and she wasn't. You know, we had no business there, so -- then I discovered her -- or I also discovered her Maryland testimony.

So just on the internet things turned up that showed that her work was substantive, and she had been traveling without -- I'm her immediate supervisor, so I should have been told that I'm going to San Diego for a few days to go to a conference.

Page 224

Q. So in other words, you had already concluded that her title wasn't just a fancy name that did nothing, correct?

A. That's what it seemed to me, yeah.

Q. And you still just chose to keep her on because you wanted her to provide more information in order for you to assess that further, fair?

A. Yeah, and just to be thorough and go through the whole process. I didn't want to act on a whim. I wanted to act, you know, based on good information and professionally.

Q. But you had -- all right. Strike that.

All right. Mr. Cauchon, you recall that later that same day on September 5th you were advised by Mr. Steward that you were being placed on administrative leave at HRO, correct?

A. Yes.

Q. And you recall having received that communication via email, correct?

A. Yes.

(Thereupon, Exhibit 23, September 5, 2024, email (HRO 149), was marked for purposes of

Page 225

identification.)

BY MR. CHANG:

Q. Let me see that again. I need to remark it as Exhibit 23. I have provided you what's been marked as Exhibit 23. It's an email from Mr. Steward to you, copying Billy Golden, dated September 5th at 2024 at p.m. Do you see that?

A. Yes.

Q. And is this the first communication that you received in which you learned that you were being placed on administrative leave?

A. Oh, I didn't learn that, because Dwayne had no authority to put me on administrative leave, and this --

Q. We're not going to go through the next three to four hours with you --

A. Actually, he didn't put me on administrative leave. That wasn't --

Q. So let me make this a little simpler. We're not going to go through the next three or four hours where you have to qualify every single statement about they didn't actually do this, they didn't actually

Page 226

fire me. I understand that you have objections as to the authority of the board to do this, so we'll put a standing objection for you so that you don't have to keep qualifying your answer.
A. Well, I'm not going to accept as facts any claims that I think are false.
Q. Well, this is an email to you --
A. Correct.
Q. -- specifically advising you that the HRO board is placing you on administrative leave, correct?
A. No, that's the second email. That's not this email. This is a cease and desist to stop working on --
Q. Two minutes after this email, you received another email advising you that you're being placed on administrative leave.
A. Not two minutes, an hour and a half after.
Q. Approximately an hour and a half after, then, you were advised you were being placed on administrative leave?
A. Can you ask me a question and give me the --
Q. That was a question.

Page 227

A. -- email that you're referring to?
Q. No. I'm asking you, your recollection is an hour and a half later is when you were officially notified that they were placing you on administrative leave, correct?
A. I was not officially notified, no.
Q. You received an email saying that they were placing you on administrative leave?
A. They, no. If you want to say that Dwayne sent an email saying --
Q. You don't have to tell me what to say. There's no question pending.
Looking at the email in front of you, this states Mr. Dennis, Billy Golden and I are sending you this message as the acting board chair and board vice chair. The HRO board of directors has received complaints from staff alleging a hostile work environment. I'm going to stop there.
Is this the first time that you've become aware that someone has asserted a hostile work environment claim against you?
A. Yes.
Q. They next state that we must take

Page 228

these complaints seriously, and we are legally required to launch an official third-party investigation. Do you see that?
A. Yes.
Q. Now, you and I read the bylaws that you had helped create earlier, and in those bylaws it does state that when a hostile work environment complaint is filed, there is a requirement for an investigation, correct?
A. No, I think you're referring to the handbook.
Q. Okay, the handbook. You're right.
A. Do you want to ask the question?
Q. Do you recall that being in the handbook?
A. I do not. I'd have to reread the handbook.
Q. So you forgot from a couple hours ago whether it was in the handbook or not?
A. I don't think I -- the handbook is right here. I'm willing to read it.
Q. Was it your understanding at the time you received this email that it was required under HRO's policy to do an investigation when a hostile work environment

Page 229

complaint was received?
A. I don't know.
Q. Would you agree that the complaint of hostile work environment is serious and should be investigated by the board?
A. I don't know without seeing the hostile work environment if it is serious.
Q. The email goes on to read you are directed by the board of directors to cease and desist all activities related to conflict of interest matters, including, but not limited to, communications with funders, staff, and community partners. Did I read that correctly?
A. Yes.
Q. You didn't do that, did you?
A. What do you mean?
Q. You did not cease all of your communications with HRO's funders, staff, and community partners after you received this email, yes or no?
A. That's kind of rude, but the answer is no.
Q. Thank you. No staff decisions should be made until the board officially contacts you with further directions in the

next 24 hours. You continued to contact the ODH even after receiving this email, correct?
A. Correct.
Q. Why?
A. Because it was my job.
Q. So you openly admit on the record today that you completely disregarded the board's direction with respect to cease and desist those activities?
A. I received no direction from the board of directors.
Q. And you disregarded it because you believed that they didn't have the authority to put you on administrative leave?
A. I'm not put on administrative leave in this email.
Q. Why did you disregard the direction to cease and desist those communications?
A. Because I was HRO president and contract signatory, and this email has no authority.
Q. Do you believe that today?
A. Yes.
Q. You're still president of HRO



today?
A. Absolutely.
Q. And you've continued even to today even with communicating with funders, staff, and community partners of HRO representing that you were president, haven't you?
A. Correct.
(Thereupon, Exhibit 24, September 5, 2024, email (HRO 150), was marked for purposes of identification.)
BY MR. CHANG:
Q. Handing you what's been marked as Plaintiff's Exhibit 24. Do you recognize this document?
A. Yes.
Q. Now, this is the first communication you received where you have been advised that the board of directors met and had decided to place you on administrative leave, correct?
A. No, I was never advised. Oh, this email says that I was, but it's not accurate.
Q. Right. I understand you object to the authority of the board, but my question is more this is the first time that you were



advised that the board had met --
A. No.
Q. -- and they made that decision, correct?
A. I object to your claim that I object to authority. I respect the authority of the board.
Q. We're not playing around. Just answer the question, Mr. Cauchon.
A. Well, I answered it. I respect the authority of the board.
Q. Were you notified prior to this that you were -- they intended to place you on administrative leave? That's the question.
A. No. And by they, who do you mean, they?
Q. The board of directors.
A. No, the board of directors did not. Dwayne wrote an email saying that, but he didn't have the power to act as the board of directors.
Q. I didn't ask you whether he had the power to act. I asked whether this is the first time that you were notified that the board of directors was intending to place you



on administrative leave, yes or no? It's a straightforward question.
A. I would say yes, Dwayne notified me.
Q. Thank you.
A. The board did not.
Q. What did you do in the next ten minutes after you received this email?
A. I was in David Ball's office at the time working on the conflicts and working on what to do, and I showed him this email. And I asked him does the board of directors have the power to meet in an emergency meeting. And he said what is the notice requirement. And I said I'm not sure what the bylaws are, but I'm a member of the board of directors.
So I said to him can the board of directors meet without me. And David Ball said not if you're a director. No, they can't. They can't take valid action without you, and they can only act in an unnoticed meeting if all directors agree in writing.
Q. Did he ever put that in writing to you?
A. No.

Page 234

Q. Did you ever ask him to put that in writing to you?
A. No.
Q. So all we have is your testimony today that you were convening inside an attorney's office who told you all of these things?
A. You can ask him. He works for HRO.
Q. That's what you're testifying today, correct?
A. Correct, because it's true. Yep.
Q. Were you asking him for personal legal advice on these issues, or were you asking him as the president of HRO?
A. I was asking him as president and board member of HRO.
Q. Did you ask him for any legal advice as to whether you were a board member or not?
A. No.
Q. And you understand that he's not your personal attorney, correct?
A. Correct.
Q. And you understand the distinction

Page 235

between counsel being -- representing the entity as opposed to you personally, correct?
A. I think so.
Q. What else did you do in the next ten minutes?
A. Talked to -- I think I would have spent the next ten minutes in David's office.
Q. Do you recall having communicated to the ODH anything?
A. It's possible. I don't remember in the next ten minutes.
Q. Okay. What about the next 30 minutes?
A. I don't remember like five minutes, 30, you know. If you show me something, then that might help refresh my memory.
Q. Do you recall -- do you recall advising the ODH that there was a coup attempt at HRO?
A. Yes.
Q. What is your understanding of the word coup?
A. Takeover from lawful authority.
(Thereupon, Exhibit 25, September 5,

Page 236

2024, emails (Cauchon 218), was marked for purposes of identification.)
BY MR. CHANG:
Q. I'm giving you what has been marked as Exhibit 25. 11 minutes after you received the email from Mr. Steward, you forward the email on to Ms. Dantzler. Do you see that here?
A. Correct.
Q. And you go FYI, AmandaLynn-led coup attempt underway?
A. Correct.
Q. And what information do you have at this time, other than the fact that you were placed on administrative leave, that there was a, quote, AmandaLynn-led coup underway?
A. From the many conversations and their efforts to try to protect AmandaLynn and to cover up her outside employment.
Q. I'm not asking for your characterization. I'm asking what specifically did you know, other than pure speculation, that the reason why you were placed on administrative leave was some type of coup attempt?

Page 237

A. Because they were -- the board members who really had like no day-to-day involvement were repeating statements that AmandaLynn was saying, and it really tipped me off when Dwayne was so obsessed with like trying to prevent me from asking for the documents that would have showed her conflict of interest. Because to me and to David, David Ball, to others it seemed like you have to look at the documents to know. So that was really a tip-off. Plus, AmandaLynn is close friends with them. She lives in Cincinnati with Tasha, and they're all -- they're just close. So that was my surmise, and it turned out I was correct.
MR. CHANG: I object to your characterization for the record.
BY MR. CHANG:
Q. Other than your speculation and fantasy, is there anything that you can direct us to which you believe that AmandaLynn was in a conspiracy with the entire board to take over the agency?
A. Not the entire board, with the three members of the board. And, yes, the

Page 238

email from Dwayne on September 3rd saying it's egregious to ask her for documentation of her outside employment.
Q. So three board members out of seven you believe is somehow a coup attempt to take over the agency?
A. Three out of eight.
Q. Three out of eight, because you believe that you were, correct, that you're the eighth one you're adding in there?
A. Yes. Correct.
Q. And you didn't even ask for more information. You just forwarded on an email to the ODH 11 minutes later advising them there is some type of coup, correct?
A. A coup, I think it's an accurate description --
Q. Really?
A. -- but I accept some type of coup.
Q. Do you understand the word coup is often used to describe violent overtakings of political governments?
A. Yes.
Q. And that's the picture that you're trying to present to a state agency about HRO's

Page 239

operations?
A. No, I was -- there are bloodless coups, as well. But I do think that this was a coup. It's unlawful authority trying to displace lawful authority to protect.
Q. You realize you don't own HRO. You realize that, right?
A. Correct.
Q. Okay. And so -- and you testified earlier that the board could fire the president, had the authority to fire the president?
A. Correct.
Q. So if the board made the decision to fire the president, how is that in your characterization a coup?
A. Well, they didn't make a decision, because under the HRO bylaws and Ohio law, an official meeting cannot happen without two weeks' written notice to each board member, and that did not occur.
Q. Ah. So you believe that the only way that the board could have fired you is by having a meeting?
A. I believe so, yes.

Page 240

Q. After you were placed on administrative leave, do you recall that you had a conversation with Mallory Bolen regarding whether AmandaLynn had disclosed her work at Velocity to her?
A. I was never placed on administrative leave.
Q. After September 3rd, when you received the email about the board placing you on administrative leave, regardless of whether you believe it was valid or not, did you have a conversation with Ms. Bolen?
A. I had -- yes, I had a conversation with Mallory.
Q. Was it just via text or was there a voice -- or telephone?
A. We talked by phone. We talked twice by phone.
Q. Can you recall the dates of those conversations?
A. I cannot.
Q. Was it after September --
A. Yes, it was --
Q. Sorry. Let me finish asking the question. Was it after September -- excuse me.

Page 241

Was it after September 6th?
A. Yes.
Q. What did you discuss?
A. Mallory's new job and her new life in San Diego, among other things, and -- in the first conversation what did we discuss or the second conversation?
Q. The second conversation.
A. So the second conversation we discussed whether -- the details that she knew about AmandaLynn's conflict.
Q. And what did she say?
A. Like I asked her several of the things that were mentioned in the complaint about AmandaLynn having full-time employment, et cetera. I stuck closely to the script of what's in the second amended complaint and avoided the other protected stuff and asked her whether she knew that it was that extensive.
I also asked her -- and this is the first time I had seen that supposedly there had been a disclosure to her. And she said yes, there had been a disclosure to me. And I asked her what was disclosed, and she said just that AmandaLynn was working for Velocity



Veritext Legal Solutions
www.veritext.com 888-391-3376

BioGroup. And I said did you know this, and then I read her the details from the redacted version of the second amended complaint, and she expressed that she was not familiar with that.

Q. So the conversation you're describing obviously was after the second amended complaint. So we're talking like 2025 or later?

A. Correct. It was probably -- yeah, probably.

Q. Do you recall having a conversation with Ms. Bolen in or around September 2024 related to the conflict of interest issue?

A. No. We talked twice. I think the second one came a few months after, but I don't remember for sure. But if you want, I can look on my phone and see if hers are still in there. Do you want me to check?

Q. No, we're done.

(Thereupon, Exhibit 26, text messages (Cauchon 1730-1736), was marked for purposes of identification.)

THE WITNESS: But, in short, I don't



remember the date of the first conversation.

BY MR. CHANG:

Q. That's fine. I'm handing you something that you produced, which is a text message thread I believe between you and Mallory Bolen, if you just want to take a look at it.

A. Yes.

Q. Okay. And we don't have the year here, but I believe this is a conversation that occurred in 2025, beginning at July 22 at the top here.

MS. MOYO: 2024.

THE WITNESS: I think it's 2025.

BY MR. CHANG:

Q. Is it 2024 or '25? I guess that's the question.

A. It's '25.

MS. MOYO: It's '24. Why don't you take a minute to review it.

BY MR. CHANG:

Q. Go ahead and read it. We just don't have the year, so I want you to read it and let me know affirmatively when that conversation took place.



A. It's '25, because it would say -- if it was a year old, it would say '24, but I did these printouts in '25.

BY MR. CHANG:

Q. I'm not trying to ask a trick question. Just go to Cauchon 1731 just to orient you. The fourth bubble says we reported the conflict Tuesday. AmandaLynn has launched effort to have board fire me.

Can we agree this is a text message from 2024 and not 2025?

A. Which page is this?

Q. The page ending -- if you look at the Bates number -- Cauchon 001731. It's the second page there.

A. 1731. Okay.

Q. The fourth bubble down is what I'm reading.

A. Okay.

Q. Does this refresh your recollection that you had a conversation with her shortly after you were notified in the email that the board was attempting to place you on administrative leave?

A. Yes. So it may be 2024. Let me



-- but there's no dates there, are there? So, Steven, you can go ahead and ask me the question.

Q. I first want to confirm, this refreshes your recollection that you had a conversation in September of 2024 with Mallory Bolen? So that's the first question.

A. I don't see it. Is there a date on it?

Q. Mr. Cauchon, we're using our deductive reasoning here. The fourth bullet down says we reported the conflict Tuesday. AmandaLynn has launched effort to have board fire me. Obviously that's September of 2024, correct?

A. Yeah, I would say that's it. I agree.

Q. All right. And if you read on -- you recall there was a subsequent phone call, but did you have any phone call that you can recall with Mallory Bolen in September of 2024 regarding the conflict of interest issue?

A. We had two phone calls. I would have to check my phone records to see when they were.

Page 246

Q. And Ms. Bolen informs you here that, in fact, Ms. Reese had informed her she was working for Velocity BioGroup, correct?
A. No. Well, I don't see where she says Velocity, but if you point out to it --
Q. Well, she gives you -- let's go from the bubble where we reported the conflict Tuesday. She gives you her email. Do you see that?
A. Yeah.
Q. Then she says I thought you knew about her other job for a while now. Did something about it change. Did I say that correctly?
A. Yes.
Q. Then you respond had no idea until I saw it a month ago in a bio of another group she posted online. Did she disclose that to you? In writing? Are you following with me?
A. Correct.
Q. Okay. She informs you she told me and Linda about it. Who is Linda?
A. Linda Smolak, S M O L A K, was a volunteer.
Q. I was about to ask what is her

Page 247

position. You said she was a volunteer?
A. Correct.
Q. Did Linda have any type of supervisory capacity over Ms. Reese at any point?
A. No. We described it earlier. She did run a small grant in Cincinnati that AmandaLynn and others would have worked on. I think you would call her a grant manager.
Q. I'm not going to go through this entire thread with you, but I do have a question about one of the bubbles which appears on the next page beginning with AL has declined to disclose any details to me. That's you speaking, correct?
A. Yes.
Q. The conflict problem is factual: She had a financial interest and she was responsible for ordering Kloxxado.
Can you please explain what you mean by she was responsible for ordering Kloxxado?
A. She ordered Kloxxado. So when we needed naloxone and Kloxxado, she would contact the Ohio Department of Health, and then it

Page 248

would get delivered to us.
Q. Can you explain generally for the record your understanding of how naloxone and/or Kloxxado is distributed by HRO?
A. Yes. What would you like to know?
Q. Tell me how it happens.
A. We -- how it gets distributed or how we get it from the state?
Q. Both. Just walk me through chronologically how that works.
A. So we get it from the state. I ordered it for the first four or five years, and then Mallory took over. When Mallory left, then AmandaLynn took over the ordering in July of 2023.
And the way it first happened when I ordered is like I would have to hustle and see what they could get. There was not a formal process. But then as time went along and funding expanded, we would email our -- Mallory or I would email the project manager and say oh, we want a thousand kits of Narcan or 500 kits of generic. And then they would place the order with the state pharmacy, which is run by the Ohio Department of Health and

Page 249

Administrative Services. Then a truck would come within the next three days and deliver it to our office.
Q. Okay. So that's the description of how HRO receives the product. Now please describe how is it determined where the product is distributed?
A. Well, it changed in July 2023. They went to a red cap system, and this is the system that AmandaLynn operated under, in which there was a form that was automated and they would go through it. So she would put like how many kits of Kloxxado she wanted, how many of Narcan, and she would click it, and then that would trigger the process of delivery.
Q. Okay. So the form of transmission of the order, in your words, to the ODH changed, but the general process is a request is submitted by HRO to the ODH, and then the product is sent to ODH, if I'm understanding you correctly?
A. No, it's sent to HRO from --
Q. Thank you. Yes, it's sent from ODH to HRO.
A. No, it's sent from the Ohio

Page 250

Department of Mental Health and Addiction Services, which is now Ohio Department of Behavioral Health.
Q. Once -- describe to me how the product is distributed.
A. We have an online service, a statewide online service, and we have a network of lay distributors across the state who would distribute it in their local areas.
Q. Does a request have to be made to HRO for something to be distributed?
A. Well, the -- the online orders would come in. They would say Joe Smith from Dayton, and I ordered this. And then we would ship it out the same day. And that order is processed by a NEXT Distro partner out of New York.
And then on the bulk orders, what we called them, from the online distributors, they would say I'd like 144 kits, or I'd like 50 kits, or whatever, and we would pack them up and mail them to those distributors.
Q. Okay. So HRO would receive orders either through online orders or you described them as bulk orders, and then would fill those

Page 251

orders effectively?
A. Correct.
Q. What in your -- did the chief program officer have any type of discretion as to what product to place into those orders?
A. Yes, total discretion, just like I had total discretion and Mallory. We had discretion.
Q. So they are ordering -- let's say they're ordering 100 kits of naloxone. It's your testimony today that AmandaLynn had unilateral power to give them 100 kits of Kloxxado?
A. From the distributors?
Q. From the individuals or entities who were requesting the product from HRO.
A. They often wouldn't specify, or sometimes they would specify, and it would depend on what we had in inventory.
Q. Is there any situation where one of those individuals submitting these orders requested, say, 100 kits of naloxone, but instead of naloxone, they'd give them 100 kits of Kloxxado even if they had naloxone in stock?
A. Kloxxado is naloxone, so -- so

Page 252

yes. But I think it is -- like they could ask for Narcan -- they would ask, and then depending on what we had in stock. And they generally wouldn't ask for Kloxxado, because people know Narcan is like the Kleenex.
Q. I'm not asking you what other people know, nor am I asking you to speculate. I'm just trying to understand how the ordering process goes.
If they ask for a specific product from HRO and you have that product in stock, you fulfill the order, correct?
A. Generally, yes.
Q. Is there any discretion to not fulfill the order if you have that in stock?
A. Yes.
Q. Have you ever -- do you know of any single instance in which that actually occurred as you sit here today?
A. Yes. We would prefer sending people generic, because it's cheaper than like Narcan. In addition, because Kloxxado is controversial, and some people think it's more dangerous, and it's more expensive, we have like a special training requirement to -- you

Page 253

know, to inform them better of the risks.
Q. In all the research that you did, were you able to identify any specific order that Ms. Reese received where they requested something other than Kloxxado, HRO had it in stock, and Ms. Reese decided to give them Kloxxado anyway?
A. I don't have access to any of that information.
Q. Well, when you did have access to it, did you find any of that?
A. I didn't look.
Q. You didn't look?
A. No.
Q. So you're investigating a conflict of interest of Ms. Reese and trying to decide whether she's influencing order decisions, and you didn't even bother to look to see whether she was fulfilling the orders that were received properly?
A. I didn't look, because it's not --
Q. That's fine. I didn't ask you why.
A. It's not kept in the form that is easily --

Q. Sorry.
A. If you could just go ahead --
Q. There's no question pending, sir.
MR. SHEARER: He's allowed to explain his answer.
MR. CHANG: Yeah. I will ask the question though. I'm trying to make this clean.
THE WITNESS: But then you asked --
BY MR. CHANG:
Q. Can you please let me ask the question. Why did you not look? Go ahead.
A. Because the data is not kept in the form that that's easily distinguishable in.
Q. How is the data kept?
A. It's kept -- the data that I would see is kept in like a Google database with thousands of orders and -- and it's not clear. It shows what we shipped out. It doesn't show what people ordered. And then it's also interrelated with online orders, which is -- so it's just -- it's not -- I mean, if I spent days doing an analysis on it, then I might have been able to figure it out, but -- but we just didn't have our system kept in that type of -- that type of manner.



Q. Mr. Cauchon, you just testified that you didn't even look. You're not changing that testimony, right? You didn't even try to look, correct?
A. Because I knew what the data -- I knew what data options were there. I like my data.
Q. So you didn't look, because you thought it would be too difficult to discern that information, fair?
A. The information wasn't there.
Q. Now you're testifying the information wouldn't be there, it's not just too difficult to locate?
A. It would take -- yeah, it would take days, and it would just be --
Q. I didn't ask you how long it would take. Is the information there or is it not, Mr. Cauchon?
A. Tell me what I would be seeking to obtain.
Q. Is the information that -- strike that.
A. If you'd go ahead and ask me what information you think I should have queried,



then I can tell you whether it was there.
Q. I'll just withdraw the question. You never even attempted to discern whether there was an order that was submitted where HRO had what was requested, and instead Ms. Reese decided to fulfill it with Kloxxado, true?
A. The order is not -- there's -- the data is not collected in that manner.
Q. Did you ever ask Ms. Reese?
A. No, because at the time, I had no thought that she would have done heavy ordering. It was shocking to me when I got the public records request and called it up that she had made those orders.
Q. So if I'm understanding you correctly, you're testifying under oath that you had absolutely no way to be able to determine whether Ms. Reese was fulfilling orders with Kloxxado when it could have been fulfilled with another product; am I hearing you correctly?
A. The only -- the thing that I had is like how much Kloxxado she was ordering.
Q. That's all the information you had. That's all you could determine is how



much she was ordering, correct?
A. Correct. And I -- that's what I asked from the state. And she would have -- there's no data that documented what people asked, what people were shipped. So if there is, then I think you should go ahead and produce it if you can.
Q. Well, in all this searching that you did, you never found a single instance where you could show that she had shown a preference to Kloxxado instead of anything else, other than looking at how much was ordered, fair?
A. Right. And I -- yeah, that's correct, and I was seeking that information. My concern --
MR. CHANG: That's fine. There's no question pending.
(Thereupon, Exhibit 27, September 6, 2024, email (Cauchon 2853), was marked for purposes of identification.)
BY MR. CHANG:
Q. Handing you what has been marked Exhibit 27. It's a very short email. It appears to be from you to Ms. Katz dated

Page 258

September 6, 2024, at 10:29 a.m. Do you see that?
A. Yes.
Q. You state -- the subject line is Dennis' credit and debit card. Do you see that?
A. Yes.
Q. And I believe you mean to say I put them in an envelope in your purse for the first sentence?
A. Yes.
Q. When you say them, what are you referring to?
A. I believe my HRO credit and debit card.
Q. And why were you putting them in Ms. Katz's purse?
A. Because I wanted it to be clear that I wasn't -- that I wasn't going to be doing any -- any spending.
Q. Well, if you didn't think that the board had authority to put you on administrative leave, why are you putting your credit card and debit card into Ms. Katz's purse the very next day?

Page 259

A. I was trying to be cooperative, and I also wanted to confirm the accuracy of what David said and what I understood.
Q. You say I still had access to the bank account as of yesterday. That should probably be ended, correct? Did you at any point between sending this email on September 6th, 2024, at 10:29 a.m., through November 4th, access HRO's credit or -- credit accounts or bank accounts?
A. Not as far as I know.
Q. Never?
A. I don't believe so.
Q. Did you also provide Ms. Katz with the log-in information and password to be able to access those accounts online?
A. I did not. I think she already had them.
Q. Do you recall there ever being a request in that time period when you were on administrative leave for that information?
A. No.
Q. Do you recall when you were on administrative leave ever asking either First Federal Bank or Chase to deny access of any

Page 260

financial account to the HRO board of directors?
A. No, I never asked them to deny it to the board of directors. I asked them to deny it to unauthorized parties.
Q. Did that include the board of directors?
A. It would -- no, it wouldn't include the board of directors, but it would include some members of the board of directors.
Q. And you're unilaterally making this determination of who you think should be authorized and not authorized to access the accounts?
A. It was clear who was authorized to have access to the accounts and --
Q. Okay. Which board members in your position would be authorized to access HRO accounts --
A. Only me.
Q. -- from the time period of September 6th, 2024 --
A. Only me.
Q. -- through November 4th, 2024?
A. Only me, and Cecile and staff

Page 261

would have.
Q. You said board members plural, so now you're just saying board member, only you?
A. Correct, and that would be in my capacity as HRO president.
Q. So your position is that the entire board of directors, other than you, should not have access to HRO's financial accounts --
A. To --
Q. -- if they requested it?
A. To the money? Correct.
Q. Why not?
A. Basic security reasons. We had hundreds of thousands of dollars in there, and they had no -- being a board member doesn't give you access to -- to get the bank accounts of the organization.
Q. In or around September 6th, 2024, did you change the password to HRO's website?
A. No.
Q. Have you ever changed the password to HRO's website?
A. I don't believe so.
Q. Were you ever asked to provide the

password to HRO's website between September 6th, 2024, through November 4th, 2024?
A. I may have been, but I can't say for sure.
Q. Would you have denied giving that information to the board of directors if you were asked for it?
A. I was never asked by the board of directors.
Q. Would you have denied giving them that information?
A. I would have had to consider the request if the board made that request.
(Thereupon, Exhibit 28, September 6, 2024, emails (HRO 157-158), was marked for purposes of identification.)
BY MR. CHANG:
Q. Handing you what has been marked Exhibit 28. Walking through this, the bottom email, you send an email, it appears, to Mr. Steward and the other members of the board requesting additional information about the allegations that had been alleged against you with respect to hostile work environment. Is this a fair characterization of that email?



A. Correct.
Q. Why were you looking for that information?
A. Because I wanted to know what the allegations against me were.
Q. Did you believe there was any obligation under either the bylaws or handbook for the board to provide you with that information while the investigation was pending?
A. I did not know what the law was. I mean, I thought that I should have the right to it, but --
Q. I didn't ask what the law was. I asked whether there was anything in the handbook or the bylaws that you could point to that required the board to disclose that information to you while an investigation is pending.
A. I didn't consult the handbook or the bylaws on the issue.
Q. What did you plan to do with that information?
A. To learn what the allegations against me were.



Q. And then what?
A. I hadn't decided until I saw what they were, then I would decide.
Q. Mr. Steward responds to you on September 6th, 2024, at 7:48 p.m. He notifies you that they are in the process of procuring a firm to manage the investigation, and that the firm will provide instructions directly to you and all parties involved regarding next steps by the end of the week.
At some point did a law firm reach out to you to provide you instructions with respect to the investigation of the hostile work environment claims?
A. At some point I was contacted by Maritza Nelson, the lawyer.
Q. The third paragraph -- the fourth full paragraph of this email, beginning with please collect, it says please collect whatever materials you will need from your office for the next two to four weeks, and please do not return to the premises until further notice.
So at this point, you've been directed by Mr. Steward not to return to the premises, the premises being the HRO office in



Granville; is that your understanding?
A. Yes.
Q. And you didn't comply with that directive, correct?
A. I think I complied with this directive, yes. I didn't go in my office for two to four weeks until -- I went into my office later, I think. I didn't go into it until November 4th or until November --
Q. Were you physically in the HRO office at any point between September 6th, 2024, and November 4th, 2024?
A. I don't recall, but if I was, it was infrequently.
Q. He also reminds you again, please refrain from communicating with staff, funders, community partners, or constituents during this time. You didn't abide by that directive, did you?
A. It was not a directive.
Q. You didn't abide by his request, did you?
A. I did not abide by Dwayne's request.
Q. At any point did you agree to sit

Page 266

down for an in-person interview with Ms. Nelson?
A. No.
Q. Why not?
A. Because my lawyer, David Martin, said that I shouldn't.
MR. SHEARER: Don't tell him what your lawyer told you.
THE WITNESS: I did not. I did not want to legitimize the investigation, because I knew that the board had not hired Maritza, had not taken any official action to conduct the investigation, so I didn't want to give it the appearance of legitimacy.
BY MR. CHANG:
Q. You said the board had not hired Maritza Nelson. What's the basis for that statement?
A. The board had not met, and, in addition, in the meeting minutes that the purported board has, there's no reference to hiring Maritza Nelson.
Q. How do you know whether the board did or did not meet when you were on administrative leave?

Page 267

A. Well, they were provided.
Q. What is the basis for your statement that the board had not met to hire Ms. Nelson?
A. They were -- the board meeting minutes were provided to my lawyer, David Martin.
Q. Were there any circumstances where you would have sat down for an interview with Ms. Nelson?
A. If she had been lawfully hired by the board, if she had disclosed her conflict, et cetera. I would have sat down if things had been done properly.
Q. So if you had a properly noticed meeting, 14 days, and the board had voted to hire Ms. Nelson, but you weren't there, would you contend that that meeting wasn't properly noticed and executed?
A. Correct.
Q. Incorrect or correct?
A. Correct. Since I was a director, me not being noticed for a meeting, then there could be no -- there could be no valid meeting.
Q. So it's your understanding that

Page 268

even if the sole purpose of the meeting is to address complaints against you, you were entitled to be there simply because you were a board member?
A. Correct.
Q. Other than the advice of counsel, where do you get that understanding? I don't want to know what your lawyer told you. If you can't answer it, you can't answer it.
A. So I heard it from my lawyer and then --
Q. That's okay.
A. But I also -- I also looked up cases myself on -- to see what the law said, like -- so -- and it's pretty consistent, but -- I looked up the Ohio Revised Code 1702 doing my own analysis, and it seemed pretty clear that the corporate bylaws are binding and controlling, so --
Q. And you're not a lawyer, right?
A. Correct.
Q. You're not licensed to practice law, correct?
A. Correct.
Q. You never went to law school,

Page 269

correct?
A. Correct.
Q. But you're relying on your own review of legal statutes to come to a conclusion --
A. Correct.
Q. -- regarding the effectiveness of board meetings?
A. Correct.
Q. Prior to founding HRO, had you ever been on a board of directors for a non-profit organization?
A. No.
Q. At some point you decided to change your signature line when communicating via email to add that you were a board member. Do you recall that?
A. Yes.
Q. When did you do that?
A. I don't remember. I would have just done it ad hoc, and I was trying to make a point. But I didn't do it -- yeah, I just put it in sometimes when I thought it was relevant.
Q. Is it fair to say, at least in all the emails that we've seen today leading up to

September 6th, 2024, you had never done that before, correct?
A. Probably not.
Q. And why were you just now adding it now -- or, sorry, why did you decide to add that into your signature block?
A. Because -- because it was relevant. It was relevant.
Q. Relevant to what?
A. To the dispute that was going on at HRO. I also like sometimes put founder in, but I didn't often put that. Sometimes I wouldn't even -- I wouldn't even put my title, depending on what I was doing. But I added board of directors intentionally to make the point that I was a member of the board of directors.
Q. Through the founding of the organization through March of 2024, when there was ever a vote by the board of directors, did you include yourself in every single vote at every single meeting?
A. In every single vote at every single meeting? I think almost, or perhaps if my salary was voted on, I wouldn't have



participated in that. But other than that, I would have participated in every vote.
Q. Why didn't you participate in the vote for your own salary?
A. Just because I wanted to step back and let them decide what to do on my salary.
Q. But you would have a conflict of interest voting on your own salary, wouldn't you?
A. Yeah.
Q. So that's why you would abstain from that, correct?
A. I think I would have an interest. I don't know if it's a conflict, but I definitely would have an interest.
Q. Do you think that you would have a conflict of interest on voting on your own termination?
A. I would have an interest in it. Whether it's a conflict, I don't know. But I think I should have had a voice and participated in deliberations, as well as the vote.
Q. You believe you should have an affirmative vote to fire yourself or to not



fire yourself in a non-profit organization?
A. I would have to ask what the law is. I don't -- I don't know what the law is.
Q. You would have to consult an attorney to answer that question, right?
A. I would ask David.
Q. Likewise, if there's a hostile work environment complaint filed against you, do you believe that you were entitled to a vote as to whether an investigation should be opened against you?
A. I don't know about a vote, but I do know I was entitled to be there.
Q. I'm asking about a vote. So you don't know one way or the other whether you would be entitled to a vote as a board member?
A. There was no vote as far as I know.
Q. I'm not asking you that. I'm asking whether you believe you would be entitled to vote on whether to launch a hostile work environment investigation?
A. It's a good question. I don't know the answer.
Q. Because you're not a lawyer,



correct?
A. Correct.
Q. That's why you don't know.
A. But if I was legally entitled, I would vote.
Q. Well, would you have a conflict of interest in voting on whether or not there should be a hostile work environment --
A. Yes.
Q. Let me finish asking the question. Would you have had a conflict of interest in voting whether or not a hostile work environment complaint should be lodged against you?
A. Correct, but it's a -- the question is is it a permissible conflict of interest, and does Ohio law and the bylaws prohibit, you know. I would have been one of eight votes, so it's also an interest. I'm not sure. It's an interesting question on how democracy --
Q. You don't know because you're not a lawyer, right?
A. Yeah, but I could research and find out.

Q. But as you sit here today, you don't know the answer to that question, correct?
A. I don't know. I do know, however, that I would be entitled to participate in deliberations.
Q. So your testimony is you believe you would be entitled to participate in deliberations as to whether the board should terminate you or not, just so I can understand you correctly?
A. Correct.
Q. And the basis for your statement of that is what?
A. Can I say what my attorney told me?
MR. SHEARER: No.
THE WITNESS: Then I won't.
BY MR. CHANG:
Q. Other than --
A. Then I won't.
Q. -- advice of counsel --
MS. MOYO: Can we go off the record for a second?
MR. CHANG: We will go off the



record.
(Thereupon, an off-the-record discussion was held.)
BY MR. CHANG:
Q. So I don't want to get into the substance of communications that you had with David Martin, who you hired separate and apart. He was your personal attorney, correct?
A. Correct.
Q. When I'm asking these questions, did you procure any legal advice from Mr. Ball as to whether you would be entitled to vote on things such as your own termination or your suspension?
A. Only what I told you about like no meeting could be held without all the directors being noticed.
Q. Was there any conversation -- I believe you said that conversation occurred on September 6th, right?
A. Yes.
Q. Was there any conversation about this topics after that date?
A. No.
Q. We already discussed everything



that was discussed during those conversations, correct?
A. Everything I remember, correct.
MR. CHANG: Okay. Off the record.
THE WITNESS: We would have discussed other things, because I was there to work on like the conflict before this arrived. But after this arrived, that was what was discussed.
MR. CHANG: Off the record.
(Thereupon, an off-the-record discussion was held.)
(Thereupon, the deposition was adjourned at 5:04 p.m.)



STATE OF OHIO )
COUNTY OF MONTGOMERY ) SS: CERTIFICATE

I, Karen M. Rudd, a Notary Public within and for the State of Ohio, duly commissioned and qualified,

DO HEREBY CERTIFY that the above-named DENNIS CAUCHON, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth.

Said testimony was reduced to writing by me stenographically in the presence of the witness and thereafter reduced to typewriting.

I FURTHER CERTIFY that I am not a relative or Attorney of either party, in any manner interested in the event of this action, nor am I, or the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office at Dayton, Ohio, on this 10th day of August, 2026.

Karen M. Rudd

KAREN M. RUDD
NOTARY PUBLIC, STATE OF OHIO
My commission expires 5-21-2027

**&**

**&** 5:16

**0**

**00075** 1:7 6:16
**001731** 244:14

**1**

**1** 2:6 20:16 21:1 73:10,12 73:17 203:25
**10** 2:21 121:18 121:23
**10-5-24** 143:22
**100** 72:22 74:6 251:10,12,22 251:23
**100,000** 73:10 73:12,18 74:5 203:25
**10:04** 1:22
**10:12** 172:20 174:4
**10:29** 258:1 259:8
**10:47** 119:11
**10:72** 68:4
**10th** 278:3
**11** 2:23 125:20 125:25 158:15 236:5 238:14
**113** 2:18
**118** 2:20
**11:10** 181:15 182:15
**11:15** 136:14
**11:30** 102:16
**11:37** 207:14
**11:41** 198:6
**11:45** 177:16
**11:51** 135:7
**12** 3:1 129:7,12 158:15
**121** 2:22
**125** 2:24
**129** 3:2
**129-132** 2:15 85:23
**12:31** 216:6
**13** 3:3 133:24 134:4
**131** 86:12
**133** 2:20 3:3 119:1
**136** 3:5
**136-138** 3:14 183:8
**1398-1435** 3:7 155:10
**14** 3:4 34:5 35:10 36:2,8,9 37:1,8,13 136:1,6 267:16
**1431** 155:23 156:8
**1435** 156:10
**144** 250:20
**148** 3:19 215:25
**149** 3:21 224:25
**15** 3:6 60:21 62:16 155:9,14 161:8
**15-17** 2:7 20:17
**150** 3:23 231:9
**155** 3:7
**156** 3:9
**157-158** 4:6 262:15
**15th** 27:15,19 28:1 60:22 170:13 202:16 202:20 203:2,6 218:5
**16** 3:8 63:11,11 63:13 86:11,17 88:14 156:22 157:4 190:9,15
**16th** 85:13 87:1 189:8,21,25 190:5 197:13 203:12
**17** 3:10 171:22 172:9,14
**1702** 268:16
**172** 3:10
**1730-1736** 4:2 242:23
**1731** 244:6,16
**177** 3:12
**17th** 63:7,8 65:16
**18** 2:10 3:11 67:12 68:4 69:18 177:6,11 186:16,20,21 193:16
**183** 3:14
**19** 3:13 88:11 92:12 93:6 95:5 96:7 98:10,17 131:5 183:7,12 190:9 197:10 200:17
**1987** 10:24
**199** 3:16
**19th** 87:8 94:18 96:25 98:6
**1:00** 148:7
**1:30** 139:18 140:17 198:7 199:9
**1:57** 183:18 200:18

**2**

**2** 2:8 3:8 45:22 45:23 156:22 162:10 220:15
**20** 2:7 3:15 49:1 108:7 199:1,6

**200** 72:23 149:9 167:24 168:6 170:25
**2013** 10:25 11:1,7
**2016** 18:5
**2017** 11:5,6,7 15:7 18:5 41:11
**2018** 11:4 15:8 15:10 16:1 27:1,3 41:11
**2019** 21:19 22:15 24:24 26:9 27:2
**2022** 45:16 46:6,11 47:9 61:24,25 115:18
**2023** 62:1,2 248:15 249:8
**2024** 2:10,13,17 2:19,21,23 3:1 3:4,8,11,13,15 3:18,20,22,24 4:3,5 16:2 19:25 24:8,11 25:3 27:11,15 27:19 28:2,15 28:25 29:1,6 29:11,24 30:11 33:19 39:13 44:15 45:8 48:23 50:19 53:9 55:5 57:5 60:21,23 61:9 62:16 67:12 68:4 69:18 76:20 81:19 82:1,5 84:21 86:11,17 87:8 88:12 92:12 93:6 96:7 98:10,17 108:7 111:20 113:18 114:9 119:1,10 121:19 122:4 125:21 126:4 129:8 133:3 135:6 136:2,13 140:3 153:17 155:7,7 156:23 157:11 158:4 170:13 174:3 177:7 183:8,18 190:5 199:2 207:13 215:25 224:25 225:7 231:9 236:1 242:14 243:13 243:16 244:11 244:25 245:6 245:14,21 257:20 258:1 259:8 260:22 260:24 261:19 262:2,2,15 264:5 265:12 265:12 270:1 270:19
**2025** 242:8 243:11,14 244:11
**2026** 1:21 278:3
**207** 3:17
**20th** 98:6 110:19
**21** 3:17 207:6 207:11
**215** 3:19
**218** 3:25 236:1
**21st** 191:4 204:13
**22** 3:18 190:14 190:15 215:24 216:4 221:17 243:11
**22261** 278:6
**224** 3:21
**227-2000** 5:20
**228-1311** 5:13
**22nd** 189:8,19 190:1 191:4 204:13 220:11 220:14
**23** 3:20 111:20 224:24 225:4,5
**231** 3:23
**235** 3:25
**2388** 5:5
**23rd** 76:20 82:15 98:24 111:8,17
**24** 3:22 230:1 231:8,13 243:19 244:2
**242** 4:2
**242-243** 2:11 67:13
**243** 67:25
**245-246** 2:12 76:11
**246** 76:18,23
**24th** 79:21
**25** 3:24 235:25 236:5 243:16 243:18 244:1,3
**257** 4:4
**26** 2:17 4:1 113:17 114:9 114:14,19,20 242:22
**262** 4:6
**262-264** 2:18 113:18
**267-268** 3:2 129:8
**269-270** 3:10 172:10
**27** 4:3 257:19 257:24
**271-272** 2:24 125:21

**273-274** 2:22 121:19
**28** 4:5 262:14 262:19 277:19
**2800-3200** 5:19
**2853** 4:4 257:20
**288-289** 3:9 156:23
**289** 157:9
**29** 1:21 2:19,21 2:23 3:1 21:19 22:15 24:24 26:9 118:25 119:10 121:18 122:4 125:6,20 126:4 129:7,13 133:5,10
**290-292** 3:12 177:7
**29th** 22:1 120:1 120:22 122:12 122:24 123:3 133:7 144:5
**2:00** 220:15
**2:25** 1:7 6:16
**2:34** 126:4
**2:52** 82:1
**2nd** 150:9,11 153:17 157:11 158:3 165:13 181:15 196:10 200:15 218:4

**3**

**3** 2:10 3:11,13 3:15 67:12,17 155:7 162:5 163:15,16 174:3 177:6 182:14 183:7 183:18 199:1 220:15
**30** 10:21 125:6 133:10 143:15 235:12,15
**306** 213:24
**306-312** 3:17 207:7
**307** 211:3 212:13
**308** 211:2
**308-1490** 5:6
**309** 209:17
**30th** 133:3,7 135:6 138:19 138:22 142:2 142:13 146:4,5
**31** 3:4 29:11 136:1,13 192:21
**310** 209:17,25
**319** 98:11
**319-322** 2:16 97:22
**31st** 140:16 141:23 148:10 155:7 191:19 191:23 192:4,9 193:1 204:11
**320** 102:17
**321** 98:12
**330** 1:20 5:12
**339-385** 2:9 45:24
**37-39** 3:3 133:25
**377** 52:20
**378** 52:15
**39** 219:14,20
**3:37** 211:4
**3rd** 139:18 140:3,16 141:1 141:23 147:10 148:4,11 150:10 172:20 197:16,21,24 198:7,7 199:10 200:18 217:7 218:6 238:1 240:8

**4**

**4** 2:12 19:25 76:10,15 207:13
**40** 48:25 105:9 106:8
**41** 5:19
**41-42** 3:5 136:2
**41017** 5:6
**43212** 5:13
**43215** 5:20
**45** 2:9 170:24 171:8
**47** 3:16 199:2
**4:01** 98:17
**4:16** 122:5
**4th** 24:8,11 25:3 192:9 193:2 259:9 260:24 262:2 265:9,12

**5**

**5** 2:13 3:18,20 3:22,24 81:17 81:18 149:5 158:1 215:24 224:24 231:8 235:25
**5-21-2027** 278:8
**50** 250:21
**500** 248:23
**5:04** 276:13
**5th** 193:5 213:23 216:5 218:6 224:17 225:7

**6**

**6** 2:3,15 4:3,5 85:22 86:1 257:19 258:1

262:14
**614** 5:13,20
**67** 2:11
**6:30** 158:2,12 158:12
**6th** 241:1 259:8 260:22 261:19 262:2 264:5 265:11 270:1 275:20

**7**

**7** 2:16 97:20,21 157:23 181:15
**75** 171:8
**750,000** 141:4
**76** 2:12
**7:01** 157:11,19 158:2
**7:48** 264:5

**8**

**8** 2:13,17 81:18 82:5 113:17,22
**81** 2:14
**85** 2:15
**859** 5:6
**8:37** 87:9 92:13
**8th** 81:25 82:13

**9**

**9** 2:14,19 28:15 33:19 81:19 84:21 118:25 119:5 180:6
**955** 1:20 5:12
**97** 2:16
**9:30** 213:23
**9th** 29:6,15,16 29:22

**a**

**a.m.** 1:22 68:5 87:9 92:13 119:11 135:7 136:14 149:5 157:11,23 158:1 172:20 174:4 181:15 181:15 182:15 198:6 207:14 213:23 258:1 259:8
**abide** 265:18 265:21,23
**able** 35:6 38:13 53:2 60:15 89:8 118:21 120:11 143:10 213:17 219:2 222:2 253:3 254:23 256:17 259:15
**above** 277:7
**absolutely** 92:25 104:10 184:5 231:2 256:17
**abstain** 271:11
**abuse** 171:14
**accept** 159:20 163:2,9 226:5 238:19
**accepting** 107:2
**access** 199:20 253:8,10 259:4 259:9,16,25 260:13,16,18 261:8,17
**accord** 64:3 208:23
**account** 159:25 199:20 259:5 260:1
**accounts** 259:10,10,16 260:14,16,19 261:9,17
**accuracy** 79:25 259:2
**accurate** 22:14 46:9 156:15 173:25 177:23 179:24 181:16 183:24 199:6 217:8,19 231:22 238:16
**accurately** 103:5 126:10 134:13
**accusations** 211:10
**acknowledge** 116:5
**acknowledged** 69:2,6
**acknowledg...** 116:6
**acquisition** 149:8 165:16 166:4,6 201:4
**acronym** 171:12,18
**act** 35:9 36:2 224:11,11 232:20,23 233:21
**acting** 15:23 33:2 92:16 227:16
**action** 8:14 36:7,18,19,20 54:14 105:17 111:12,13 132:4,6,9 212:22 233:20 266:12 277:16
**actions** 29:4,12 29:14,16,20,22
**active** 116:2 128:15
**activities** 229:10 230:9

**actual** 52:24 53:1 56:6 73:1 90:7 91:22 101:23 109:9 141:25 147:17 149:3 170:12 201:13 205:3
**actually** 16:12 22:19 23:20 46:16 52:17 66:2 67:23 77:19 98:8 116:5 152:3 174:16 180:14 182:8,12,17 184:23 187:8 188:19 218:25 225:19,25,25 252:18
**ad** 269:21
**add** 269:16 270:5
**added** 270:14
**addicted** 43:1
**addiction** 13:17 13:25 42:11 43:12 171:3 250:1
**adding** 238:10 270:4
**addition** 252:22 266:20
**additional** 104:20 159:22 160:6 161:1 165:12 173:17 184:7 200:14 213:15 262:22
**address** 63:6 137:19 268:2
**addressed** 63:10 201:14
**adhered** 37:13
**adjourned** 276:13
**administration** 171:15
**administrative** 124:15 139:19 140:3,18,23 144:7 154:4 160:8,10 161:17 163:22 176:8,24 198:2 205:23 215:22 216:16 224:18 225:13,16,20 226:10,17,22 227:5,9 230:14 230:15 231:19 232:14 233:1 236:15,24 240:2,7,10 244:24 249:1 258:23 259:21 259:24 266:25
**administrator** 21:16 30:15,17 32:12,13,20,23 32:25 33:7 47:18 68:14 201:11
**administrators** 30:21
**admit** 230:6
**adopt** 21:23 45:12
**adopted** 21:19 22:15 24:7,23 26:8 35:1 73:14 74:2
**advance** 30:7 33:25 146:11
**adversely** 107:20
**advice** 35:16 39:22 57:10,21 58:9 63:20 87:19 90:20 91:9 94:6 116:13 117:14 151:5,6,9,17,20 151:23,25 152:4,11,15,17 152:18,20 157:12 158:18 160:23 161:21 163:4 165:8 198:9 204:20 211:15 212:5 234:14,19 268:6 274:22 275:11
**advise** 89:11 162:21 211:7
**advised** 181:3 198:16 216:24 224:17 226:21 231:18,21 232:1
**advises** 214:1
**advising** 215:18 226:9 226:16 235:19 238:14
**advocacy** 61:6 66:25 93:23 208:11 215:16 222:17,24 223:12
**affect** 107:21 222:5
**affected** 213:19 214:11,17
**affiliated** 277:18
**affirmative** 21:23 24:14 25:5 26:20 271:25
**affirmatively** 9:20 37:24 187:8 189:10 192:3,12 212:23 243:24

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-1 Filed: 08/31/26 Page: 77 of 297 PAGEID #: 1979



**afternoon** 122:7 140:12
**age** 6:2 105:9 219:20
**agency** 106:14 130:13 215:1 237:23 238:6 238:25
**agency's** 53:8 107:3
**agenda** 27:18
**ago** 139:11 228:19 246:17
**agree** 24:1 26:11 28:20 29:18 36:19 38:8 39:18 51:11,17 54:14 56:15 57:19 58:7,17 60:12 73:25 83:11 87:11,18,23 88:1,4 90:19 91:12 92:23 105:21 107:3,4 107:5 112:6,14 112:16 123:14 127:17 130:14 130:19 131:21 132:1 152:2 173:15 180:11 185:9 191:20 191:23 204:17 205:10 212:2 214:15,19 229:3 233:22 244:10 245:17 265:25
**agreed** 20:21 36:6 37:2 38:14 64:21 70:2 90:5 91:20 112:4 120:10 130:18 135:7 179:14 179:19,20 180:2,9 194:22 205:2 210:13
**agreeing** 35:17 35:18
**agreement** 63:25 64:8,10 64:14,15 65:8 108:9 191:16 205:6 222:21
**agrees** 127:23
**ah** 217:13 239:22
**ahead** 140:8 142:20 157:4 170:10 205:20 243:22 245:2 254:2,11 255:24 257:6
**al** 1:9 126:15 126:15,19 159:4 247:13
**alert** 145:9
**allegations** 52:5 262:23 263:5,24
**alleged** 51:8 118:16 148:14 160:13 161:16 174:20 175:13 194:3 262:23
**allegedly** 25:22 194:9
**alleging** 227:19
**alliance** 128:13 128:25 129:19 173:8
**allowance** 55:25
**allowed** 254:4
**allowing** 18:13
**amanda** 133:2
**amandalynn** 46:25 61:3 88:9,11,13,17 95:11 123:14 126:16 135:19 136:16 137:6 154:3 176:8,24 178:12 181:10 187:1 193:20 194:5,17 205:22 206:4 214:6 219:11 236:10,16,18 237:4,11,21 240:4 241:15 241:25 244:8 245:13 247:8 248:14 249:10 251:11
**amandalynn's** 110:12 196:24 202:6 241:11
**amend** 38:9
**amended** 38:2 241:17 242:3,8
**amendments** 38:4
**america** 107:1
**amount** 73:6 214:3
**analysis** 254:22 268:17
**anne** 25:10,25 26:15 40:17
**announcements** 38:6
**annual** 69:11 76:5
**answer** 9:16,21 10:6 31:25 58:15 153:6,13 186:12 208:15 226:4 229:22 232:9 254:5 268:9,9 272:5 272:24 274:2
**answered** 97:11 102:10

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-1 Filed: 08/31/26 Page: 78 of 297 PAGEID #: 1980



186:10 232:10
**answers** 133:8
**anticipate** 132:12
**anytime** 10:4 190:14
**anyway** 253:7
**apart** 275:7
**apologize** 79:2
**apparent** 149:19
**apparently** 159:11
**appear** 88:10
**appearance** 99:23 100:15 101:10 103:18 266:14
**appearances** 5:1 118:11
**appeared** 88:8
**appears** 52:23 68:3 76:20 81:24 98:1 113:25 119:5 127:8 172:14 183:17 247:12 257:25 262:20
**application** 61:14,18 99:13 100:1,2 120:23 121:3,5,6 178:15 187:4 207:25
**applied** 168:12 171:9
**apply** 107:14
**appreciate** 102:22
**appreciated** 176:4
**apprise** 126:19
**approach** 214:4
**appropriate** 118:1 204:25
**approval** 49:15 83:23 121:16
**approve** 120:16 120:17,19,20
**approved** 24:23 49:17 83:14 85:20 135:2,8
**approximately** 18:9 82:22 114:16 158:25 226:20
**area** 74:3
**areas** 250:9
**arranged** 146:10
**arrived** 276:7,8
**arthur** 5:16
**article** 23:4 28:23
**articles** 62:24 149:9 165:15 165:19,21 166:23,24 167:4,7,11,13 167:15,19
**articulate** 41:22
**articulated** 82:16
**aside** 35:15 60:18 81:15 88:21 157:1 195:14
**asked** 36:14,17 40:13 46:24 47:5 63:12 65:17,18 66:1 66:3 67:6,7 68:24 75:5,15 84:16 89:3 117:16,20 135:12 137:21 139:10,11 140:14 141:10 146:16,23 149:6 164:13 165:7 174:14 175:2 177:14 182:9 185:17 189:25 193:23 194:9 195:7 201:22,24 206:24 232:23 233:12 241:13 241:18,20,24 254:8 257:3,5 260:3,4 261:25 262:7,8 263:15
**asking** 9:15 52:9 58:14 59:23 60:3 64:5 65:3 71:24 77:23 80:8 90:13 94:25 95:2,22 96:24 100:19 101:15,24 102:3 109:7 111:15 117:12 124:7 132:15 138:16 151:7 161:2 162:2 164:6 182:25 184:20 186:8 197:22 205:17 209:9,10,10 214:2 227:2 234:13,15,16 236:20,21 237:6 240:24 252:6,7 259:24 272:14,19,20 273:10 275:10
**asserted** 50:13 227:22
**assess** 135:3,9 224:7
**assignments** 55:23

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-1 Filed: 08/31/26 Page: 79 of 297 PAGEID #: 1981



**assist** 14:20 16:22 118:21
**assistance** 13:16
**association** 23:24
**assuage** 110:10
**assumption** 94:17 161:24
**attach** 115:7
**attached** 193:16
**attachment** 3:12,14 155:15 155:22 177:7 177:22,22 183:8,24 184:9 186:21
**attempt** 27:25 65:12 235:19 236:11,25 238:5
**attempted** 256:3
**attempting** 94:15 95:15,24 244:23
**attend** 31:23 34:22 35:6 174:10,16 176:25
**attendance** 28:17,19
**attended** 42:1 223:14
**attention** 49:21 86:4 87:5 114:6 155:16 176:13 210:20
**attorney** 5:5,11 11:24,25 12:9 16:21 35:19 37:7 89:9,13 90:21 91:13 92:18 93:16 94:7,22 95:17 96:1 110:3,22 113:13,23 130:4 131:3 153:14,16 196:16 234:23 272:5 274:15 275:8 277:15
**attorney's** 234:6
**attorneys** 5:18
**audibly** 9:21
**audit** 46:21 48:11 141:3,5 141:6,7,11,13 141:17 145:7 145:10,12 146:14,17,19
**audited** 48:8
**auditor** 46:22 48:12 145:7
**august** 2:13,17 2:19,21,23 3:1 3:4 29:11 81:18,25 82:5 82:13,15 86:11 86:17 87:1,8 88:11,14 92:12 93:6 94:18 95:5 96:7,25 98:5,6,10,17,24 108:7 110:19 111:8,15,17,20 113:17 114:9 114:14,19,20 118:25 119:10 120:1,22 121:18 122:4 122:12,23 123:3 125:6,6 125:20 126:4 129:7,13 131:5 133:3,5,6,7,10 133:10 135:6 136:1,13 138:19,22 140:16 141:23 142:2,13 143:15 144:5 146:4,5 148:10 148:10 155:7 189:8,8,19,25 190:1,5,9,9,14 190:15,15 191:19,23 192:4,9,21 193:1 197:9 203:12 204:11 204:13 220:11 220:14 278:3
**authority** 58:19 58:24 60:14 84:3,4 176:9 189:14 225:15 226:2 230:13 230:22 231:24 232:6,6,11 235:24 239:4,5 239:11 258:22
**authorized** 260:13,13,15 260:18
**automated** 249:11
**available** 165:25 169:1 197:4
**avoid** 210:6
**avoided** 241:18
**award** 170:12 170:13
**aware** 26:18 33:18 37:11,23 52:2,10 56:23 84:15 88:25 97:1 151:2,7 151:11,14 195:18 227:22

**b**

**b** 77:25 78:1
**bachelor's** 10:12
**back** 15:7 48:23 61:24 76:23 92:10 111:7 126:2 142:19 143:22 156:20 183:4 184:18,20 185:6 186:16 186:17 193:14 200:17 271:5
**backwards** 98:14
**bad** 70:17
**ball** 36:12 92:6 110:3,8,14 113:13,15 114:1,10 117:8 117:21 119:18 119:24 120:7 128:11,17 129:17 152:20 154:5,12 155:1 162:20 163:3 163:12 164:10 164:20 172:16 173:5,22 174:3 174:7 196:14 198:4,9 199:24 204:24 206:5 206:21 211:4 211:14 233:18 237:9 275:11
**ball's** 116:12 133:20 209:16 211:2 233:9
**bank** 259:5,10 259:25 261:17
**baseball** 148:20
**based** 69:12,19 79:3 80:4 208:10 224:12
**basic** 261:14
**basis** 35:9 51:7 71:23 72:2 93:20 94:17 95:2,14 104:13 104:15,16,20 266:17 267:2 274:13
**bates** 52:14,15 76:18 86:12 102:17 157:9 209:18,24 244:14
**beautiful** 107:16
**beginning** 10:10 50:24 209:23 213:24 243:11 247:13 264:18
**begins** 52:18 106:12 155:22 209:17
**behalf** 5:2,8,15 29:21 38:14 92:4
**behavioral** 250:3
**belief** 37:3,5 44:24 93:7,21 95:14,23 138:6 188:15 189:7 205:16 213:7
**believe** 13:22 28:15 35:11 36:1,25 46:12 58:23 59:2 69:25 93:15 112:12 137:21 142:17 151:25 155:4 156:18 158:23 165:24 171:16 178:13 184:11 185:5 187:3 190:22 192:15 196:24 198:11 201:3 202:6 203:9 205:18 212:16 218:15 230:23 237:21 238:5,9 239:22,25 240:11 243:5 243:10 258:8 258:14 259:13 261:24 263:6 271:24 272:9 272:20 274:7 275:19
**believed** 36:5 73:11 104:22 192:12 203:20 203:21 205:18 209:15 230:13
**believes** 186:24
**believing** 44:17 51:8
**beneficial** 41:2 44:12
**benefit** 54:3
**best** 23:23 174:1 198:5
**better** 13:15 108:23 158:11 198:13 205:25 253:1
**beyond** 75:2 214:9
**bias** 211:11
**bicknell** 1:15 5:9 15:11 25:18 43:16 85:6 86:10,11 88:25 190:3 220:19
**big** 160:22
**bill** 12:10
**billy** 25:12 41:5 41:6 81:1,2 85:8 88:16

113:4 188:9,21 192:2 203:1,7 203:8 220:19 220:23 221:9 225:6 227:15
**biloxi** 10:22
**binding** 35:14 268:18
**bio** 246:17
**biogroup** 7:7 61:7 62:18 63:2 65:17 78:8 208:12 242:1 246:3
**bit** 6:17 10:1 11:15 141:23
**blanket** 55:14 55:16
**block** 93:11 95:15,24 270:6
**bloodless** 239:2
**board** 7:11,13 7:13,15,16,20 7:21 8:20 12:6 15:7,9,13,16,21 15:22,23 16:4 16:6,10,11,17 19:6,24 20:3,5 21:22,25 23:6 23:9,13,20 24:1,15,17,22 25:1,2,4,5,23 26:1,1,4,12,13 26:16,18,22 27:5,12,15,24 28:1,21,22 29:2,4,12,14,20 30:2,4,6,10,25 31:14,24,25 32:4,9,10 33:15,19,24 34:16,20 35:5 35:8 36:1,6,13 36:14,15,18,19 36:25 37:7,24 38:4,6,8,12,18 38:19 39:10,19 40:2,10,15,18 40:21 41:6,9 41:14,17,20 42:14,25 43:7 43:14,17,21,25 44:9,16,18,21 45:12 47:25 49:15 50:8,15 51:18 56:16,24 57:3,8,21 58:6 58:8,18,20,24 58:25 59:2,10 61:4 63:18 74:2 80:17,20 80:21 83:14,15 83:18,23 84:14 84:16,20,21,23 85:11,14,20 86:13,16,18,19 86:25 87:11,15 87:21 88:2,4,6 88:8,12,18 92:19 93:8,11 93:17 95:5,15 97:2,18 98:16 111:6,10,10,12 111:13 112:23 113:1 119:6,7 119:16,25 120:5,10,15,18 122:5,14,16 123:20 128:3 135:3,9 138:24 159:11,16,21 160:2,6,12 161:1,14 162:5 162:9 173:18 179:3 180:20 180:21 183:18 183:25 188:7,7 191:17 192:1 192:12 200:19 202:14 203:3,4 205:16,21 216:10 221:5,7 221:11 226:2 226:10 227:17 227:17,18 229:5,9,24 230:11 231:18 231:24 232:1,7 232:11,17,18 232:20,25 233:6,12,16,17 234:17,19 237:1,22,24,25 238:4 239:10 239:14,20,23 240:9 244:9,23 245:13 258:22 260:1,4,6,9,10 260:17 261:2,3 261:7,16 262:6 262:8,13,21 263:8,17 266:11,16,19 266:21,23 267:3,5,12,16 268:4 269:8,11 269:16 270:15 270:16,20 272:16 274:9
**board's** 230:8
**bolen** 11:22 62:5,7,10 138:13,20 193:23 240:3 240:12 242:13 243:6 245:7,21 246:1
**bolin's** 62:12
**boss** 32:16 33:9 33:13
**bother** 163:12 253:18
**bottom** 52:13 86:12 126:1 134:17 156:8 200:22 262:19

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-1 Filed: 08/31/26 Page: 82 of 297 PAGEID #: 1984



**bought** 18:5,6
**bourland** 216:21 219:5 219:13
**brand** 62:21 108:19
**break** 9:25 10:4 10:7 97:13,13 140:9,15 183:3 184:14 190:25 220:2
**brief** 97:12 116:23 183:3
**briefly** 10:9,17 131:12
**bring** 40:21 41:9,20 42:24 43:25 47:17 160:25
**brittany** 141:10
**broadly** 54:19
**brought** 12:19 12:21 40:14 76:4
**bubble** 244:7 244:17 246:7
**bubbles** 247:12
**built** 215:7
**bulk** 250:18,25
**bullet** 55:20 126:14 135:1 199:14,19,23 200:3 217:12 218:8 245:11
**bunch** 179:23
**burns** 141:10 141:25 143:12 175:6
**business** 39:25 50:24 51:2 53:8 55:13 56:5 70:21 223:17
**busy** 18:21 48:21 149:7
**buy** 18:10
**buyout** 11:2
**bylaw** 59:13
**bylaws** 2:6 16:13,19,22 20:16 21:23 22:14 23:2 24:7,10,13 26:8 28:24 29:18 31:4,20 32:21,23 33:1 33:3,8,14 34:9 34:10 35:1,13 37:25 38:2,9 38:13 59:2 83:17 228:5,7 233:15 239:18 263:7,16,21 268:18 273:17

**c**

**c** 6:11,11
**calendar** 148:7 174:15 189:22
**call** 52:13 58:2 58:4 65:16 74:7,8 128:1,6 141:25 142:16 142:18 143:11 144:18 145:2 145:17 146:9 146:10,13,15 147:15,24 162:11 175:12 175:17,23 176:2,25 177:2 189:9,18 190:13,14 191:10,11,13 191:22 198:3 198:17,19 201:16,21,25 202:3,4 204:4 204:8,15,16 217:10 245:19 245:20 247:9
**called** 1:13 30:3 141:9 143:19 145:5 167:23 169:4 176:12 176:12 180:19 180:21 220:16 250:19 256:13
**calls** 143:22 245:23
**calm** 206:22
**candidly** 35:16
**cap** 249:9
**capacities** 63:21
**capacity** 9:5,9 12:11 247:4 261:5
**caps** 136:20
**car** 212:10
**card** 258:5,15 258:24,24
**care** 49:11
**career** 11:7
**careful** 173:12
**carefully** 159:1 159:2
**carol** 21:12,15 22:18
**carry** 32:1
**carrying** 31:22
**case** 1:7 6:13 6:15 15:11 57:15,17 67:22 213:13
**cases** 106:25 268:14
**categories** 55:17
**cauchon** 1:5,12 2:7 3:25 4:2,4 5:2 6:1,10,12 6:14 19:20 20:17 21:1

25:20,23 30:1 34:4 35:19 37:17 50:10 58:4,15 59:22 65:5 67:16 73:22 76:15 81:17,22 86:1 86:4 88:20 92:10 94:4 97:20 113:22 125:25 139:16 140:12 143:7 153:25 156:6 172:13 183:11 186:14 187:6 193:7 195:9 205:19 215:2 216:7 220:6,20 224:15 232:9 236:1 242:23 244:6,14 245:10 255:1 255:19 257:20 277:7

**caused** 141:16 160:9 199:18 223:10

**causes** 221:25

**cautioned** 6:3

**cautioning** 151:16

**cautions** 151:8

**cease** 226:13 229:9,17 230:8 230:18

**cecile** 68:8 76:3 79:18 80:19 82:19,19 83:2 83:6 87:2 123:13 125:9 125:13 126:15 126:18 133:6 135:19 136:13 137:23 173:6 174:15 176:15 176:18,19 177:5 178:24 179:7,11 181:16,17,21 187:25 188:3 198:3,12 207:17 219:17 260:25

**cecile's** 84:4 161:23

**certain** 6:19 185:2,4

**certainly** 42:16 49:3 164:9

**certificate** 277:2

**certified** 6:4

**certify** 277:6,14

**cetera** 58:1 241:16 267:13

**cfr** 149:9 167:24 168:6 170:24,25 171:8

**chain** 86:3 97:17 98:1,4 113:25 129:13 172:15 177:12 190:9 213:22

**chair** 26:21 30:3 32:4 80:21,24,25 81:1,2,5 227:17,17

**chairperson** 50:8,17,18

**challenge** 189:15

**challenges** 146:18

**chance** 221:24

**chang** 2:3 5:11 6:7 8:24 9:3 20:19 45:19 46:1 67:9,15 67:19 76:13 81:15,21 85:25 86:2 97:11,15 97:24 102:2,5 113:20 119:3 121:21 125:23 129:10 134:2 136:4 140:6,11 142:25 143:6 143:23,25 155:12 156:25 161:10 172:12 177:9 183:3,10 190:2 199:4 207:9 216:2 220:1,5 225:2 231:11 236:3 237:16,18 243:2,15,21 244:4 254:6,9 257:17,22 262:17 266:15 274:19,25 275:4 276:4,9

**change** 16:1,3,8 24:6,13 37:25 38:13 83:24 85:18 87:19 94:7 185:17 206:17 222:1 246:13 261:20 269:15

**changed** 22:24 148:12 179:11 184:22 195:1 197:6 200:11 206:24 249:8 249:18 261:22

**changes** 85:19 85:19 87:14 90:7 91:17,22 91:25 92:1 96:2 120:13 125:1,1 185:20

**changing** 83:11 84:5,9 87:14

94:4 222:25 255:2
**characterizati...** 70:10 115:4 179:23 236:21 237:17 239:16 262:25
**characterize** 94:25 163:7 172:2
**characterizing** 66:4 138:4 182:23
**charge** 207:4
**charged** 51:5 57:18
**chase** 259:25
**chatgpt** 150:4 150:12,16,21 151:2,8,15,16 151:20 154:3 154:17,21 155:1,6 156:1 156:11,17 157:12,17 159:23 160:15 161:8,14 162:14 163:13
**cheaper** 252:21
**check** 22:1,9 28:18 64:22 80:5 96:18 142:20 143:18 148:8 154:7 190:19 220:16 242:20 245:24
**checked** 204:4
**chief** 178:11 187:1 251:3
**children** 53:6
**chill** 219:14
**choices** 35:3
**chose** 224:5
**chronological** 67:22
**chronologica...** 76:16 166:2 210:22 248:10
**churning** 148:21
**cincinnati** 41:11 43:10 44:5 47:21 237:12 247:7
**circle** 101:13
**circles** 100:16
**circulated** 82:7 84:15 85:4,5 86:21
**circulating** 128:11
**circumstances** 36:3 57:25 104:2 267:8
**civil** 1:17 277:19
**claim** 17:17 50:11 105:7,16 106:1 204:8 227:23 232:5
**claiming** 164:1 192:24
**claims** 226:6 264:14
**clarify** 161:6 192:8
**clarifying** 135:21
**clarion** 10:23
**class** 105:9
**clean** 9:14 254:7
**clear** 19:15 96:20,20 165:11,14 171:10 183:13 184:5 193:20 254:17 258:18 260:15 268:18
**click** 249:14
**client** 12:9 35:19 191:14 204:14
**clinical** 44:4
**close** 76:9 237:11,13
**closed** 8:22
**closely** 241:16
**coca** 180:23
**code** 149:21 167:22 168:1 171:17 268:16
**coi** 87:12 92:17 105:11 106:13 106:18 162:25 220:16
**cois** 132:18
**cola** 180:23
**cold** 146:9,13
**collect** 61:14,17 61:20 264:19 264:19
**collected** 61:21 128:20 256:8
**colleen** 25:7 26:2,16 40:1
**college** 219:23
**columbus** 1:21 5:13,20 39:3
**come** 156:19 171:5 183:4 217:25 249:2 250:13 269:4
**comes** 9:12
**coming** 174:25
**comment** 185:25
**commission** 278:8
**commissioned** 277:5
**commit** 107:2
**commitment** 45:6,8 66:7 79:7 159:7

**committed** 106:23 123:21
**committees** 23:9,17
**common** 34:10
**communicate** 125:5 135:23 203:15
**communicated** 79:12,16 133:18 188:19 203:14 221:20 235:8
**communicating** 88:21 108:8 125:14 231:4 265:16 269:15
**communication** 97:1 183:16 184:7 224:22 225:11 231:17
**communicati...** 121:8 123:20 125:18 174:6 183:15 188:5 218:15 229:12 229:18 230:19 275:6
**community** 229:13,19 231:5 265:17
**companies** 55:11
**company** 14:21 15:1 16:25 31:15
**compassion** 214:10,13,16 214:20
**compensated** 74:10,12,12 109:22
**compensating** 15:17
**compensation** 15:22,25 16:5 16:11,17 73:7
**complained** 51:24 52:5
**complaint** 49:25 50:3,3,6 50:15 51:3,6 51:12,16,22,23 228:8 229:1,3 241:14,17 242:3,8 272:8 273:13
**complaints** 227:18 228:1 268:2
**complete** 130:11,16 146:18 162:24 172:25 173:1
**completed** 126:22
**completely** 230:7
**completes** 120:7
**compliance** 29:18 207:4
**complicated** 171:4
**complied** 265:5
**complies** 22:23 33:14 115:2
**comply** 265:3
**complying** 31:4
**comports** 21:21 132:21
**computer** 191:8
**concern** 93:5 94:19 106:2,17 209:20,20 223:11 257:16
**concerned** 80:15 197:9
**concerns** 85:3 105:15,22 107:18 111:6 112:21 159:13 190:4
**concluded** 208:3,22 209:14 218:22 224:2
**conclusion** 94:15 197:5 209:1 223:1 269:5
**conduct** 266:12
**conducted** 2:2 199:17 211:8 211:19,21
**conducting** 197:7
**conference** 176:16 223:25
**conferences** 223:14
**confirm** 94:24 116:1 158:20 164:13 185:12 245:4 259:2
**confirmed** 220:8
**conflict** 52:18 52:20,24 53:1 53:11,21 54:9 54:15,16,23 69:2,9,13 73:2 73:4,13,24,25 75:23 77:16 78:12 79:5,14 80:1,15 82:6 84:1,6 85:3,16 86:20,24 89:1 89:13,22 90:1 90:2,8,22 91:5 91:6,17,22 93:4,8,13,18 94:5,21 95:7,9

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-1 Filed: 08/31/26 Page: 86 of 297 PAGEID #: 1988



95:16,18 97:18 98:20 99:6,7,8 99:9,12,15,23 99:25 100:11 100:15,17,18 100:20 101:2,7 101:11,13,14 101:16,20 103:1,8,15,19 106:11 107:19 110:11 111:18 114:17,25 115:9,11,12,21 116:7,14,16,24 117:2,3,9 118:16 119:9 119:20,21 120:6,13 126:6 126:21,21 128:9 130:11 130:16 133:21 135:3,10 147:17,20 148:14 149:4 149:14 152:25 153:2 157:12 159:12,14,17 160:13 161:16 164:2 168:2,12 173:3,8 174:20 175:13 176:4,5 176:6,11 177:14 178:13 181:20 187:2,9 187:10,12,15 188:1,9,13,20 188:22,23,24 189:1,6,11,15 190:4 192:4,13 193:2,19 199:17 201:13 201:13 202:7 202:15,17 203:9,18 204:5 206:2 207:5,24 208:3,7,14,18 208:23,25 209:12 210:4 210:14 212:21 212:25 213:12 213:18 215:15 216:24 217:4,5 220:24 222:8 223:1,4 229:10 237:7 241:11 242:14 244:8 245:12,22 246:7 247:17 253:15 267:12 271:7,14,17,20 273:6,11,16 276:7

**conflicted** 75:10

**conflicts** 83:12 83:24 129:23 137:8,11 149:18 150:23 166:15 169:11 180:24 200:24 200:25 206:15 206:15 233:10

**confused** 192:5

**confusion** 79:2 183:13

**connect** 94:10

**consecutive** 24:20

**consequences** 214:25

**consequently** 159:10

**consider** 118:1 151:19 152:18 163:6 215:2 262:12

**considered** 29:3 53:10 215:3

**considering** 215:1

**considers** 176:5

**consistency** 210:5

**consistent** 33:3 200:1 204:7 268:15

**conspiracy** 237:22

**conspired** 95:6

**conspiring** 93:7

**constituents** 265:17

**constituted** 100:11

**consult** 57:21 89:9,12 91:21 106:3 150:4,12 150:16 151:22 152:4,11 153:14,16 154:5 167:21 196:13 263:20 272:4

**consultant** 39:10 63:18 71:22

**consultation** 58:5

**consulted** 81:10 92:18 153:19,20 154:1,3 157:16

**consulting** 11:11 35:25 39:15,17,20,25 70:21 92:3 151:15,20 152:7 153:5 187:21 196:19

**consuming** 48:9

**contact** 111:11 230:1 247:24

**contacted** 264:15
**contacts** 229:25
**contained** 69:9
**contains** 129:18 151:3 184:8
**contemplating** 122:17
**contemporan...** 217:18
**contend** 267:18
**content** 22:20
**contents** 51:23 63:2 178:9
**contest** 29:19
**context** 7:17
**continue** 20:21 124:11,22 215:9
**continued** 140:1 230:1 231:3
**continues** 209:17
**contract** 46:21 53:14,15,17,19 59:6,7,9 67:3,6 67:8 91:7 93:25 99:4,6 100:21,23 101:17 102:12 102:25 103:11 103:14 121:9 122:6 141:10 141:14 144:3 144:12,20,24 145:4 146:21 146:23 147:24 148:23 149:11 153:10 159:9 162:22 170:11 170:15,15,17 170:20 178:14 178:15 187:4,5 196:24 197:6 197:18 207:3 212:17,18 222:6 223:16 230:21 277:18
**contracted** 39:21
**contracting** 117:25 118:11
**contracts** 214:3
**control** 19:16 59:4 144:9
**controlling** 268:19
**controls** 58:19
**controversial** 252:23
**convening** 234:5
**conversation** 63:23 66:18 68:23 75:21 76:8 79:4 96:19 118:9 159:3 180:1 189:17 201:12 201:15 240:3 240:12,13 241:6,7,8,9 242:6,13 243:1 243:10,25 244:21 245:6 275:18,19,22
**conversations** 96:4 97:8 121:4 123:10 154:11 236:17 240:20 276:1
**conveyed** 134:13
**convicted** 57:19
**cooperate** 195:4,13,24
**cooperative** 222:21 259:1
**copy** 22:2,14 156:16 165:23 168:14 177:23 181:21 182:2
**copying** 114:1 127:21 129:16 134:9 136:13 172:16 216:10 225:6
**corner** 52:13 156:8
**corporate** 7:15 9:6,7 35:12 178:19 268:18
**corporation** 6:23 7:2
**correct** 8:10,11 11:4 14:1,9 15:7 16:7,8,9 16:13,23,24 17:17,20,25 19:13,19,25 20:10 21:8,11 21:20 23:2,3 23:21 24:5,15 24:16,20,21,24 24:25 25:6,9 25:11,13,15,17 25:19,21 28:25 29:5,23,24 30:8 32:16,17 33:9,16 34:22 37:9,20,25 38:9,16 39:22 40:16 41:3,4 42:14,15,18,22 43:21 44:14 48:5,17 49:16 49:18,20 50:20 51:10,19,20 52:20 53:23,24 54:10 55:2,3,6 55:11 56:1,2,7 56:8,12,21 57:4,6 58:10

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-1 Filed: 08/31/26 Page: 88 of 297 PAGEID #: 1990



59:19 60:15 61:24 62:5,6,8 62:9 63:15,16 65:10,11 66:19 68:1,8,9,11,20 68:21,25 69:18 69:20 70:7,11 73:4 74:2,10 74:20 76:23 77:4 79:15 82:23,24 83:20 83:21 85:12 86:25 88:22,23 89:24 91:23 92:2,4,5,7,8 95:19 96:8 98:17,18,23 99:1,2 102:14 103:10,15 104:7,25 105:1 106:16 108:10 108:24 109:15 110:6,24 111:18,19,21 111:22 112:5 112:15 114:18 115:13,14,20 117:1,15,16 119:11,12,21 119:22 120:1,2 120:7,8,14,24 121:10,11 122:12,15,20 122:21 123:1 124:12,16,18 124:20,23,24 125:3,4 126:7 126:16,17,22 126:23,25 127:21,24,25 130:2 132:8,24 132:25 133:11 133:23 134:21 134:22,24,25 135:4,5,10,11 136:23 137:5 140:4,5 144:13 145:1,14,16,19 145:20 146:8 147:11 151:21 151:23 152:5 152:12 153:1,9 153:14,15 154:12 158:16 160:8,14,16,20 161:9 162:16 162:17 164:11 164:15,17,18 164:22 165:1 170:16 172:20 172:22,25 173:1,10,13,14 173:19,20 174:4,5 175:6 175:7 176:18 177:21,24 178:4,5,7,8 181:5,6 182:5 185:8 187:9,16 187:17,24 188:5,6,14,15 191:19,24 192:22 194:24 195:2 196:5,10 196:11,13,19 196:20 197:1,2 197:8,19,20 201:17,18 204:12,13,21 205:7 206:14 208:1,3,20,21 208:25 209:3,7 211:20,22 212:1 213:1,2 213:5,6,11 214:22 216:11 216:21,22,25 217:1,15,22,25 218:4,7 222:12 224:3,19,22 226:8,11 227:6 228:9 230:2,3 231:7,20 232:4 234:11,12,23 234:24 235:2 236:9,12 237:15 238:9 238:11,15 239:8,13 242:10 245:15 246:3,20 247:2 247:15 251:2 252:12 255:4 257:1,2,15 259:6 261:4,12 263:1 265:4 267:20,21,22 268:5,21,23,24 269:1,2,6,9 270:2 271:12 273:1,2,15 274:3,12 275:8 275:9 276:2,3

**corrected** 217:12

**correctly** 23:10 30:7 51:9 70:6 92:21 103:2 110:5 116:25 118:3 136:22 159:18 184:10 229:13 246:14 249:21 256:16 256:21 274:11

**cost** 141:7 145:8

**counsel** 11:17 14:20 21:8 36:23 57:10 118:20 152:24 155:19 179:13 196:13,19 204:20 212:6 235:1 268:6 274:22

**counsel's** 216:25
**counselor** 40:12
**counterclaim** 1:13 5:2,15 6:2
**county** 40:23 42:1 277:2
**coup** 235:19,23 236:11,16,24 238:5,15,16,19 238:20 239:4 239:16
**couple** 47:20 49:5 168:25 192:16,18 228:18
**coups** 239:3
**course** 54:13 105:17
**court** 1:1 277:17
**court's** 155:20
**courtesy** 9:17
**cover** 236:19
**covered** 170:24 200:21
**crash** 212:10
**create** 16:19 46:13,15 74:13 158:18 214:10 214:16 228:6
**created** 21:11 21:15,16 22:18 23:1 47:24 205:24 206:3
**creating** 14:20 46:16
**creation** 16:22 46:18
**credit** 258:5,14 258:24 259:9,9
**criminal** 11:12
**critical** 160:7
**cross** 1:16 6:6
**cured** 212:21
**currently** 6:14 214:14
**customers** 56:6
**cut** 49:1 143:24
**cv** 1:7 6:16

**d**

**d** 2:1 6:10 162:20 175:20 277:19
**dangerous** 252:24
**dantzler** 146:25 148:22 175:1,19,20,22 201:11,21 217:7 218:15 236:7
**data** 254:12,14 254:15 255:5,6 255:7 256:8 257:4
**database** 254:16
**date** 28:13 30:18 45:17 77:1 79:20 82:4,8 95:2 96:19 97:4 99:19 104:22 105:14 119:10 121:15,17,25 122:10 123:1 139:17 142:3 142:15 155:25 172:19 173:23 190:9 195:21 217:22 220:8 243:1 245:8 275:23
**dated** 68:4 76:20 81:25 87:8 114:9 183:18 200:18 225:7 257:25
**dates** 97:6 156:1 193:6 240:19 245:1
**dating** 192:6
**dave** 36:12 132:18,22 163:19,21,25 207:14,17
**david** 5:4 11:15 11:24 35:12 92:6 119:17 128:17,24 129:16 133:20 152:20,21 153:19,20 163:3,12,18 196:14 198:4 204:24 206:5 206:21 211:2 233:9,18 237:8 237:8 259:3 266:5 267:6 272:6 275:7
**david's** 235:7
**dawn** 175:2 201:10 218:9
**day** 23:8,8,16 23:16 31:20,20 34:5 35:10 36:2,9 58:20 59:5,5,5 63:10 112:14 123:2 124:11,11 129:13 132:11 141:1,1 145:24 149:5 150:4,6 150:7,25 157:22,23 162:4,11,16 163:11,12,15 168:24 170:4 172:24 173:19 174:7,12 179:12 194:25 216:5 219:18

224:16 237:2,2 250:15 258:25 278:3
**days** 37:1,8,13 49:5 50:24 51:2 107:11 114:16 146:1 180:20 223:25 249:2 254:22 255:16 267:16
**dayton** 250:14 278:2
**deadline** 82:15 82:16 98:22 99:1 111:8,17 111:21,24 112:5,11,17 113:9,11 114:18
**dealings** 53:8
**dear** 14:5
**death** 13:14
**deaths** 14:16
**debit** 258:5,14 258:24
**decide** 75:9 77:8 253:16 264:3 270:5 271:6
**decided** 77:2,24 80:17 92:1 180:7 231:19 253:6 256:6 264:2 269:14
**deciding** 65:9
**decision** 53:3 58:8,19,21 75:20,22 77:16 77:17 78:2 79:19 80:9 82:21 108:5,10 108:15 109:4 109:24 110:24 111:8,23 112:1 112:2,3,4 122:14,17,20 125:7 133:19 134:23 140:22 153:22 196:4 196:12,18 204:17,22 205:14 206:25 215:11 217:14 217:21,25 218:11 221:19 232:3 239:14 239:17
**decisions** 196:25 197:19 202:8 229:23 253:17
**decker** 25:14 41:16 42:9
**declined** 182:11 185:23 193:20 247:13
**declining** 222:15
**deductive** 245:11
**defendant** 1:13 5:2 6:2 8:13
**defendants** 1:10,14 5:8 15:10
**defense** 155:19
**defined** 99:14 277:18
**definitely** 215:13 271:15
**definition** 52:23 53:10,15 53:16,23 54:9 54:15,17 73:13 74:1 99:13,24 100:4,6,17,18 101:13,19,23 101:25 102:1
**definitions** 130:9
**degree** 10:12 56:25
**delay** 88:7 99:3
**delegate** 60:1,6
**delegated** 59:14,15,22,24 60:5,6
**delegates** 23:7 23:15
**deliberations** 271:22 274:6,9
**deliver** 249:2
**delivered** 248:1
**delivery** 249:15
**democracy** 273:21
**denied** 262:5 262:10
**dennis** 1:5,12 5:2 6:1,10 25:20 79:2 86:13 89:8 159:1 220:20 227:15 258:5 277:7
**deny** 259:25 260:3,5
**department** 41:25 93:4 94:2 96:6 144:7 171:2 218:12,22 247:25 248:25 250:1,2
**depend** 56:19 57:11 73:19 251:19
**depending** 252:3 270:14
**depends** 57:24 57:25
**depict** 126:10
**depiction** 46:10 183:25 199:7

**deposed** 9:4,9
**deposition** 1:12 6:13 7:24 9:11 11:14,21 12:16 13:1,5 20:22 45:22 67:16 172:14 220:3 276:12
**depositions** 20:21
**describe** 8:18 13:13 103:5 131:12 134:13 138:5 238:21 249:6 250:4
**described** 32:1 154:2 156:13 171:24 201:12 247:6 250:24
**describing** 133:15 172:24 242:7
**description** 32:2 108:24 238:17 249:4
**design** 22:21,22
**desire** 210:4
**desired** 60:15
**desist** 226:14 229:10 230:9 230:18
**despite** 29:17 115:5
**detail** 8:17 11:13
**details** 65:19 73:15,15 159:12,16 162:19 185:23 193:19,21,24 199:8,13 213:18 241:10 242:2 247:14
**determination** 99:11 152:10 152:15 153:12 187:14,18 212:25 260:12
**determine** 51:7 56:17 166:16 197:11 208:6 208:17,19 213:4 222:5 256:18,25
**determined** 149:2 249:6
**determining** 56:13 57:8 144:19
**develop** 47:1
**developed** 47:2
**device** 151:3
**devin** 147:3 175:9,11
**dialogue** 128:15,22
**died** 13:25 14:2
**diego** 223:15 223:25 241:5
**difference** 73:9 73:12
**different** 23:12 35:2 40:14 60:7 121:14 133:4 149:20 173:25 179:22 189:13 193:17 207:20
**difficult** 255:9 255:14
**difficulty** 215:9
**direct** 33:8 46:2 49:21 61:23 62:2,4,7 86:4 87:5 114:6 144:8 155:16 210:20 237:20
**directed** 50:7 76:21 178:6 229:9 264:24
**direction** 23:7 23:14 24:4 59:21 83:19 230:8,10,18
**directions** 229:25
**directive** 265:4 265:6,18,20
**directly** 45:5 68:15 264:8
**director** 47:8 50:5,7 51:3 61:6 62:14 66:25 78:17,18 93:23 208:11 215:16 222:17 222:23 223:11 233:19 267:22
**directors** 7:13 19:25 20:3,5 23:20 24:23 27:25 38:4 50:9,15 56:16 57:21 104:18 112:23 113:2 179:3 181:7,10 181:11 191:17 227:18 229:9 230:11 231:18 232:17,18,21 232:25 233:12 233:16,18,22 260:2,4,7,9,10 261:7 262:6,9 269:11 270:15 270:17,20 275:16
**disagree** 103:16 132:2
**disagreed** 58:8 58:18 60:13 91:11 160:19 179:21 188:2,8

**discern** 255:9 256:3
**disclose** 51:23 52:4 69:13,23 69:24,25 71:13 93:8 94:1 99:21 100:13 101:9 103:7 104:2,23 105:4 108:13 148:13 153:4 159:8 162:22 163:5 169:6 185:23 193:21 196:11 203:15 209:9 213:18 221:24 222:15 223:8,8 223:10 246:18 247:14 263:17
**disclosed** 137:7 137:11 138:14 139:5,13 149:18 160:11 165:8 178:23 179:5,21 180:10,18 182:10,20 203:10 240:4 241:24 267:12
**disclosing** 93:11 103:23 160:13 161:15 161:15 169:11 203:2
**disclosure** 71:5 71:11 72:13 75:6,23 79:15 82:6 84:25 85:11 89:14 95:16,24 137:18 138:9 149:14 151:3,8 151:11,16 153:3,7,23 158:18 159:5 160:24 162:25 168:3,13 169:2 169:3,3,17,18 169:23 170:1 173:3 176:4 182:22 194:4 194:14,15 200:24 201:10 203:17 205:4 206:4 222:8 241:22,23
**disclosures** 166:25
**discovered** 223:18,18
**discovery** 149:15 164:24 166:14 168:23 194:18,19
**discretion** 75:17 251:4,6 251:7,8 252:14
**discriminated** 50:1
**discrimination** 50:12 105:7 106:1
**discuss** 84:24 85:11 86:20 88:6 120:5 138:13,20 241:3,6
**discussed** 85:20 87:15,20 88:2 88:4 89:10 133:14,16 147:17 174:20 175:14 188:5 196:9 200:3 241:10 275:25 276:1,5,8
**discussing** 220:10
**discussion** 9:2 79:3 97:17 143:5 191:25 212:8 275:3 276:11
**discussions** 192:10
**displace** 239:5
**dispositive** 161:25
**dispute** 270:10
**disregard** 230:17
**disregarded** 160:19 230:7 230:12
**distinction** 74:14 234:25
**distinguishable** 254:13
**distribute** 76:6 250:9
**distributed** 82:14 248:4,7 249:7 250:5,11
**distribution** 78:23
**distributors** 250:8,19,22 251:14
**district** 1:1,2 6:15
**distro** 250:16
**diversify** 44:10
**diversity** 131:5 131:9,13,23 132:7,10
**division** 1:3
**document** 21:2 21:5,10 22:6 22:13 26:23 30:1 46:13,15 46:18,19,23 76:18 98:13 102:17 114:3 115:22,23 156:4,10 157:8

176:20 178:10 180:7 213:25 231:14
**documentation** 74:25 102:22 215:14 238:2
**documented** 257:4
**documents** 12:15 77:5 149:23,24 150:2 154:15 154:24 161:19 164:6 172:2 176:7 182:24 195:7 212:9 237:7,10
**doing** 11:9 20:13 56:4 64:20 86:14 110:14 129:5 129:23 132:3 158:10 173:2 204:20 254:22 258:20 268:17 270:14
**dollar** 74:15
**dollars** 213:11 261:15
**domain** 17:1,10 17:13,23 18:5 18:6,15,20,24 19:2 20:9
**don'ts** 64:23,25 65:4
**donate** 18:17 18:20
**dos** 64:22,24 65:4
**doubt** 45:8 79:25 127:10
**downloaded** 23:23 34:7
**draft** 115:24 184:9,23
**drafted** 23:20
**drag** 220:3
**drive** 5:5 22:11 199:21
**drug** 13:17,25 14:16 43:12
**drugs** 13:15 40:12 44:3 107:9 214:11 214:17
**dshearer** 5:7
**due** 98:20,21
**duly** 6:3 277:4 277:7
**duties** 32:1 44:18 59:8,9 59:12 134:18 134:20 140:2 215:23
**duty** 200:24
**dwayne** 1:8,14 5:8 25:3 35:23 63:10,15 76:3 79:17 80:13,19 80:21 81:4,10 85:8,15 87:6 96:14 98:10,16 112:20 113:3,6 125:11 127:1,9 127:19 128:10 136:12 137:12 138:3 139:1 142:9 149:6 154:23 160:3 162:6,12 173:6 181:22 182:3 188:3,9,11,18 188:21 190:20 192:2 194:6 202:25 206:5 207:14,17,20 220:17,18,22 221:9,15 225:15 227:11 232:19 233:3 237:5 238:1
**dwayne's** 89:7 129:16 265:23

**e**

**e** 2:1 6:10 175:19,20
**earlier** 73:21 82:10 115:19 131:4 162:10 220:22 228:6 239:10 247:6
**early** 157:19,24 158:4 161:20 161:22 223:3
**ease** 20:22
**easier** 6:17 132:13 193:7
**easily** 253:25 254:13
**eastern** 1:3 158:13
**easy** 63:4
**economics** 10:16
**edited** 180:14
**edits** 180:15 182:18
**education** 10:11 219:24
**educational** 10:10
**effect** 24:11 186:4 219:3
**effective** 29:5 46:11 55:5 199:16
**effectively** 60:10 81:23 119:16 127:4 148:12 177:20 251:1
**effectiveness** 269:7

**effects** 214:24
**effort** 244:9 245:13
**efforts** 236:18
**egregious** 214:3 238:2
**eight** 238:7,8 273:19
**eighth** 238:10
**either** 13:4,25 21:16 50:11 56:16 57:8,20 78:6,20 79:19 98:22 128:10 161:15 162:14 173:17 189:5 191:3 250:24 259:24 263:7 277:15
**elaborate** 144:14 147:22
**elect** 28:22
**elected** 26:21 27:4,11,15 28:1 29:2
**electing** 28:5
**election** 24:19 27:10
**elections** 27:6
**elevated** 141:5
**eligible** 24:19
**elizabeth** 5:17
**email** 2:13 3:13 3:18,20,22 4:3 63:9,15,17,24 64:3,18 65:2 68:4,7,10 70:1 70:24 71:9 76:19,25 79:9 79:20,25 80:5 80:7 81:19,22 81:24 82:1 85:13 86:3,9 86:18 87:4,8 88:15 89:8,17 90:12 92:10,12 95:3,21 96:13 96:18 97:17 98:1,3,4,8,9,13 98:15 99:19 100:22 102:8 102:16,20 104:23 107:25 108:2 111:1 113:25 114:8 116:22 118:4 119:6,10,13,15 120:3 121:23 122:2,4,8 123:3,8 124:5 124:7 125:19 126:3,9 127:9 127:18 129:13 129:16,18 130:8 132:17 134:8 135:15 136:6,9,12 139:17 142:8 143:18 152:21 157:8,10,13 158:2 162:19 164:4,10,20,24 172:15,15,19 173:5,23 177:12 179:12 182:1,6,9,11,21 183:8,16,21 184:7,7 185:6 188:10,17 189:3,4 190:8 192:25 193:23 199:20 200:18 200:21 206:10 207:12,23 209:16 210:16 210:21,23 211:2 212:11 212:12 213:5 213:22,22 214:2 215:25 216:9 224:22 224:25 225:6 226:7,12,13,15 226:16 227:1,8 227:11,14 228:23 229:8 229:20 230:2 230:16,21 231:9,22 232:19 233:8 233:11 236:6,7 238:1,13 240:9 244:23 246:8 248:20,21 257:20,24 259:7 262:20 262:20,25 264:18 269:16
**emailed** 146:13 154:14 164:12 181:21
**emails** 2:10,12 2:15,16,17,19 2:21,23 3:1,3,4 3:9,10,12,17,25 4:6 67:13 76:10 80:5 85:22 86:5 94:24 96:5,9 96:21,25 97:6 97:21 113:18 119:1 121:17 121:19 125:21 126:1 129:8,20 133:24 136:2 149:6 154:7,8 156:23 163:17 163:20 172:9 174:9 177:7 186:7 192:16 192:17,19 207:6 210:25 236:1 262:15 269:25
**embarrassed** 14:14

**emergency** 35:9 233:13
**emoyo** 5:21
**emphasizes** 134:16
**employed** 55:22 62:17
**employee** 45:12 46:6 49:15 53:2,4 54:1,4,8 54:22 55:21 57:12,18 89:9 89:12 90:21 91:13 105:8,12 106:19 114:25 115:10,17 116:4 119:8,8 119:20 120:6 138:24 210:7 211:17
**employees** 49:6 55:10 61:15,16 69:16 84:17 105:13 106:14 106:22 107:21 107:23 210:6
**employment** 55:2 60:20 64:12 65:18 69:17 77:19 95:12 106:10 107:10 110:12 119:18 138:25 139:5 185:24 193:21 199:18 217:14,21 221:20 222:4 236:19 238:3 241:15
**endanger** 96:22
**ended** 259:6
**enforce** 204:5
**engage** 117:7 118:14
**engaged** 8:10 116:12,19 117:11,13 148:21
**engagement** 119:24
**engaging** 36:23
**english** 10:16
**enquirer** 43:10
**ensure** 31:9 32:20
**entire** 36:6 49:23 58:24 106:24 108:2 166:12,13 183:17 237:22 237:24 247:11 261:7
**entities** 6:19 129:23 251:15
**entitled** 102:1 268:3 272:9,13 272:16,21 273:4 274:5,8 275:12
**entity** 6:24 60:7 178:20 235:2
**envelope** 258:9
**environment** 227:19,23 228:8,25 229:4 229:7 262:24 264:14 272:8 272:22 273:8 273:13
**equally** 181:12
**equitas** 38:25 39:24 81:8
**erin** 28:12
**especially** 159:3 163:13 222:2
**essentially** 72:14 171:5 173:7 207:16
**established** 129:1
**et** 1:9 58:1 241:16 267:13
**event** 277:16
**eventualities** 49:8
**eventually** 89:19
**everyday** 43:12 43:13
**everyone's** 159:10 206:23
**evidence** 189:2 221:25
**exact** 39:13 121:16 142:3 142:15 193:5
**exactly** 117:24 121:15 125:18 144:4 156:4 169:20
**examination** 1:16 2:2 6:6
**examined** 6:4
**example** 58:13 58:14 73:17 78:11 99:11
**examples** 128:12 169:24
**except** 175:17
**exception** 55:24 56:7
**exceptions** 55:19
**exchanged** 192:16
**exchanges** 152:21
**exclusive** 53:14
**excuse** 240:25
**executed** 22:6 177:23 267:19
**exemplar** 173:8
**exhibit** 2:6,8,10 2:12,13,15,16 2:17,19,21,23

3:1,3,4,6,8,10 3:11,13,15,17 3:18,20,22,24 4:1,3,5 20:16 21:1 45:22,23 67:12,17 76:10 76:15 81:17,18 85:22 86:1 97:20,21 113:17,22 115:16 118:25 119:5 121:18 121:23 125:20 125:25 129:7 129:12 133:24 134:4 136:1,6 137:3 143:10 155:9,14 156:21,22 157:4 158:20 161:8 172:9,14 177:6,11 183:7 183:12 186:16 186:18,20,21 193:16 199:1,6 200:17 207:6 207:11 215:24 216:4 221:17 224:24 225:4,5 231:8,13 235:25 236:5 242:22 257:19 257:24 262:14 262:19

**exhibits** 2:5 20:24 114:2

**exist** 26:19 185:13 193:9

**existed** 22:15 208:7

**existing** 121:9

**exists** 182:2 183:14

**expanded** 248:20

**expected** 80:1

**expecting** 71:18 75:7 79:4

**expedited** 206:7

**expendable** 214:7

**expensive** 252:24

**experience** 13:22 38:23,24 39:5 40:15,20 41:1,8,13,20 42:5,10,18,24 43:23,25 44:2 44:3,11 47:16 61:18 81:9 219:15,23

**expert** 91:9 117:24 118:7 118:10,13 131:8 132:18

**expertise** 39:19 40:20 41:2,8 41:13,19 42:24 43:23,24 44:11 81:11 130:24 132:23

**expires** 278:8

**explain** 159:13 247:20 248:2 254:4

**explained** 101:18

**express** 44:23 78:14,20 178:22 195:3

**expressed** 45:3 45:4 195:22 220:23 221:2 242:4

**expresses** 209:20

**expressing** 105:15

**extending** 214:12

**extends** 214:20

**extensive** 241:19

**extent** 30:24 183:13

**extra** 91:8,9

**extremely** 48:21 106:23

**f**

**f** 171:21

**facebook** 60:24 60:25 62:16

**fact** 13:21 15:5 16:4,12 22:12 43:19 51:13 57:15 65:12 71:1 95:16,25 105:10 110:1,4 110:14,22 117:7 140:1 164:19 195:11 206:12,19 223:9 236:14 246:2

**factor** 160:22

**facts** 73:1 74:17,23 108:4 108:14,15,17 108:21,25 109:3,8,20,23 109:25 164:3 198:23 226:6

**factual** 118:5 247:17

**fair** 13:8,18 14:5,17 17:24 22:14 29:21 33:4 35:6 38:15 40:15 41:14 42:11 44:8,13 46:9

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-1 Filed: 08/31/26 Page: 97 of 297 PAGEID #: 1999



48:2 49:12 50:10,16,18 51:14 55:15 56:18 57:3,23 58:21 60:10 64:17 66:18 68:24 70:10 78:5 79:11,22 81:12 83:25 86:21 89:5 90:8 91:13 101:25 102:12 103:23 105:18 114:14 115:4 116:7,11,17 117:5 118:17 121:7 128:18 129:24 130:5 132:4 133:22 137:4 144:25 145:4 153:8 165:9 168:10 173:9,21 177:22 183:24 184:2,25 193:12 195:25 196:6 197:25 199:6 208:9,24 209:14 211:17 216:18 217:8 224:8 255:10 257:13 262:25 269:24
**fairly** 103:4 126:9 134:12
**false** 226:6
**familiar** 42:6 242:4
**family** 53:5 54:23
**fancy** 222:18 222:24 224:2
**fantasy** 237:20
**far** 27:22 29:9 142:19 149:16 165:16 166:7 166:11,17,23 177:19 197:5 201:3,7 259:11 272:17
**fast** 144:10
**favorably** 218:10
**featured** 43:10
**federal** 117:25 118:10,11 141:4 149:7,10 165:16 166:4,5 167:22 171:1 171:17 201:4 259:25
**feedback** 173:7 177:4
**feel** 55:8 83:23 152:23 172:1
**feels** 50:1
**fellow** 86:13 175:9
**felt** 112:8 152:3
**female** 105:9
**field** 167:19
**figure** 124:3 254:23
**figured** 143:23
**filed** 197:10 228:8 272:8
**files** 22:9
**filing** 50:3
**fill** 82:22 84:17 250:25
**filled** 22:5 61:18
**filling** 61:13
**final** 121:15
**finalized** 122:6 133:21 144:6
**finalizing** 79:6
**finally** 43:15
**financial** 247:18 260:1 261:8
**find** 43:24 62:19 63:4 149:24 169:23 191:1,2 194:18 253:11 273:25
**finding** 104:19 110:4,14,22
**findings** 63:6
**fine** 45:19 49:10 148:9 209:19 243:3 253:22 257:17
**finish** 9:15,15 132:15 138:16 240:24 273:10
**finishes** 136:21
**fire** 59:3 77:20 215:11,19 221:21 222:11 226:1 239:10 239:11,15 244:9 245:14 271:25 272:1
**fired** 19:19,21 202:16,24 203:5,6 239:23
**firm** 116:12 212:19 264:7,8 264:11 277:17
**firms** 166:24 167:4,5,19
**first** 6:3 9:8 21:15 25:3,24 25:24 26:22 49:7 52:17,22 55:20 60:19 63:5,14 66:7 67:18,23 86:9 92:6 98:8,13 102:21 108:1 114:3,8 122:2 122:8 126:3

131:2 136:8,8 157:7 172:21 175:11 200:23 209:18 210:1 211:3 216:20 217:12 219:19 225:10 227:21 231:16,25 232:24 241:6 241:21 243:1 245:4,7 248:12 248:16 258:10 259:24 277:7
**five** 24:19 34:8 49:22 50:24 51:2 97:13 183:4 235:14 248:12
**floundered** 205:1
**flow** 149:13
**flowed** 149:11
**flows** 171:1
**focusing** 105:11
**folder** 168:22
**follow** 55:19 135:2,8 160:1
**followed** 177:15 198:4
**following** 32:20 54:25 71:2 115:9 148:2 175:1 203:11 246:19
**follows** 6:5 38:10
**font** 22:22
**food** 140:7
**football** 148:19
**force** 70:8
**forced** 141:12
**forcing** 70:19
**forget** 77:2,7
**forgot** 69:8 228:18
**forgotten** 71:8 79:3
**form** 61:19 69:4,7,10,11,24 76:5 79:5,15 79:21 80:1 82:6,9,23 83:1 84:15,25 85:4 85:11 86:20,24 89:1,14,22 90:1 91:6,15 91:16 92:17 94:21 95:19 111:18 112:9 114:17 115:2 115:12,16 116:4,16 119:9 119:21 190:5 209:19 210:5 210:14 249:11 249:16 253:24 254:13
**forma** 160:23
**formal** 69:3,7 69:14,15,16 119:24 248:19
**formalize** 199:13
**formally** 28:4 70:4 160:5 218:25
**format** 22:24 23:1
**forms** 75:24 83:4 98:20 115:10 130:12 130:17
**forth** 111:7
**forthcoming** 222:8
**forthright** 149:1 222:9
**forum** 132:2
**forward** 140:13 154:20 236:7
**forwarded** 80:12 98:2 154:16 164:9 184:1 238:13
**forwarding** 98:4
**found** 48:4 160:7 181:8 220:7,12 223:14 257:9
**founded** 11:3 13:10,11 14:8 14:10,12,15,19 16:25
**founder** 270:11
**founding** 13:7 18:12 96:23 269:10 270:18
**four** 27:12 135:1 225:18 225:23 248:12 264:21 265:7
**fourth** 108:4 244:7,17 245:11 264:17
**frame** 11:10 34:6 81:24 120:22 128:8 140:22 143:16 143:17 146:6 155:6 192:9 193:1
**franklin** 40:23
**free** 55:8
**fresh** 20:23
**friday** 98:20,21
**friend** 131:7,7
**friends** 237:11
**front** 30:1 45:20 79:1 93:17 94:16 95:1,7 102:18 102:18 182:24 188:11 227:14

**ft** 5:6
**fulfill** 252:12 252:15 256:6
**fulfilled** 197:12 256:20
**fulfilling** 44:18 253:19 256:18
**fulfillment** 197:8
**full** 7:15,21 193:18 203:10 221:7 241:15 264:18
**fully** 55:21 137:7 155:17
**function** 75:11 107:17
**funders** 229:12 229:18 231:4 265:16
**funding** 159:15 171:21,24,25 248:20
**funds** 17:7 141:4
**further** 147:23 196:8 205:25 221:24 223:13 224:8 229:25 264:22 277:14
**fyi** 236:10

**g**

**gain** 53:4 54:1 54:8,13,20,22 73:3,18,24 74:15
**game** 148:19,20
**gap** 14:12
**garlock** 25:8 40:1
**garvey** 5:3
**general** 13:20 55:25 100:9,10 101:6 117:18 143:16,17 146:6 161:21 249:18
**generally** 8:18 46:4 55:9 65:6 101:3 133:17 152:1 211:7 248:2 252:4,13
**generic** 248:23 252:21
**getting** 12:10 48:8 85:14 87:11 91:8 110:11 144:5 148:23
**give** 35:4 58:12 76:14 77:12 82:21 97:25 108:22,23 113:23 114:3,4 124:5 128:1 145:17 156:20 173:11 176:12 193:17 209:24 221:23 226:23 251:12,23 253:6 261:17 266:13
**given** 59:8,10 105:8 198:5
**gives** 246:6,8
**giving** 45:21 59:18 67:17 77:25 128:5,22 173:7 177:10 236:4 262:5,10
**go** 6:20 8:16,24 10:7 23:4 25:1 29:25 38:17 48:23 49:24 50:22 71:16 79:1 83:8 98:7 105:5 107:10 107:25 108:2 114:2,21 116:20 126:1 126:14 140:7,8 141:19 142:20 142:25 143:2 143:22 149:3 152:17 157:4 170:10 185:6 186:16,17 190:24 196:21 200:17 201:9 205:20 207:11 209:16 212:12 213:21 223:25 224:10 225:17 225:22 236:10 243:22 244:6 245:2 246:6 247:10 249:12 254:2,11 255:24 257:6 265:6,8 274:23 274:25
**goal** 222:9
**goals** 31:22
**goes** 76:16 106:25 132:11 212:8 229:8 252:9
**going** 6:18 8:13 8:16 14:11 18:7,8,17 20:23 27:14,25 28:24 31:1 40:9 49:23 67:21 70:25 76:14,17 83:7 86:9 90:1 91:24 92:10 97:12,19 98:14 100:16 102:17 106:14 108:2 110:21 114:2,8 114:21 115:17

119:19 124:2,3 124:14 126:1 132:12 134:7 140:7,13 141:12 143:9 144:22 145:9 145:18 146:24 148:1,24,25 149:3 156:20 157:7 161:24 162:18 174:11 179:14 181:4 193:14 194:23 195:11,24,25 196:2 202:24 203:3,5 208:8 208:19 209:6 210:22 211:3 214:25 216:15 217:17 220:1 223:24 225:17 225:22 226:5 227:20 247:10 258:19 270:10
**golden** 1:15 5:8 25:12 41:5,6,9 81:1 220:19 225:7 227:15
**good** 75:8 87:12 115:3 127:15,16 140:8,12 167:1 180:12 211:7 224:12 272:23
**google** 22:11 40:6,8 116:1 166:18,19 168:11 169:18 169:24 190:21 191:13 199:21 220:16 254:16
**googled** 62:18 169:21,21
**governance** 39:7
**government** 61:6 66:25 70:16 93:23 171:1 208:11 215:16 222:17 222:23 223:12
**governments** 238:22
**graduation** 10:18
**grandview** 5:5
**grant** 247:7,9
**grants** 40:25 47:21
**granville** 158:7 185:7 265:1
**gray** 74:3
**ground** 9:13
**group** 61:1 112:1 246:17
**groups** 70:5 128:23 131:14
**gsn** 5:7
**guess** 45:16 144:17 150:11 243:16
**guidance** 149:8 167:23 168:6 171:11
**guide** 22:21 71:1

**h**

**h** 6:11
**half** 113:14 226:19,20 227:3
**hampshire** 10:13
**hand** 52:13 70:9,19 97:19 156:8 278:2
**handbook** 45:12 46:6,10 47:1,25 48:23 49:15 51:17 52:4,8 69:9,22 114:25 115:8 115:10,15,17 116:4,14 119:8 119:9,20 120:6 120:13 126:21 128:9 228:11 228:12,15,17 228:19,20 263:7,16,20
**handbook's** 53:16
**handed** 60:7
**handing** 20:25 67:15 81:16 85:25 113:21 119:4 121:22 125:24 129:11 134:3 136:5 155:13 157:2 183:11 207:10 231:12 243:3 257:23 262:18
**handle** 49:7 57:14 118:1 205:1
**handled** 80:19
**handles** 131:8
**handwritten** 149:16
**happen** 83:9 216:15 239:19
**happened** 63:8 131:20 144:10 146:15 174:22 202:2 204:9 248:16
**happening** 84:19
**happens** 248:6
**happy** 88:5 112:7,18 113:7
**harassed** 50:1

**harassment** 50:12
**hard** 127:7
**harm** 1:16 2:6 5:9,15 6:21 7:14 8:6,9,12 8:19 13:8 14:12 15:2 17:1,9,12,23 18:1,15 19:6 19:16 20:9,16 21:24 22:22 23:21 31:7 36:11 40:5,7,8 40:10 41:2 42:2,16 44:13 47:17 61:1 75:11 79:8 128:23 178:10 178:19 186:25 199:15,19 200:23 202:18
**he'll** 173:11
**head** 9:19 45:18 148:6
**health** 38:25 39:24 40:23 41:25 93:4 94:2 96:6 107:12 171:2 171:15 247:25 248:25 250:1,3
**heard** 61:1 112:25 113:2,4 131:2 194:20 268:10
**hearing** 256:20
**heart** 14:5
**heavy** 256:11
**held** 9:2 27:7 56:24 143:5 275:3,16 276:11
**helen** 5:18
**hello** 86:13 87:10
**help** 43:4 71:21 90:10,25 94:10 124:4 235:16
**helped** 90:3 228:6
**helping** 81:7
**herald** 10:23
**hereinafter** 6:4
**hereunto** 278:1
**hi** 158:25
**high** 5:19 93:5
**higher** 106:19
**hikma** 7:1,2 63:1
**hire** 89:19,21 90:6,20 91:12 91:20 93:16 94:22 95:17 131:9,22 132:9 267:3,17
**hired** 39:9,16 61:10 91:14 92:3,7 107:8 119:17 266:11 266:16 267:11 275:7
**hiring** 90:9 96:1 131:5 132:7 266:22
**history** 10:10 10:19
**hoc** 269:21
**hold** 42:17,20 47:14 92:16 111:9 114:18 126:20 213:7
**holding** 107:9 107:15
**home** 41:25 149:2
**hometown** 41:23
**hope** 86:14
**hopeful** 215:14
**hostile** 227:19 227:23 228:7 228:25 229:4,7 262:24 264:13 272:7,21 273:8 273:12
**hour** 68:18 226:18,20 227:3
**hourly** 71:23 72:2
**hours** 10:3 158:15,25 225:18,23 228:18 230:1
**house** 211:11
**hr** 47:22 80:19 81:9 118:13 211:12
**hro** 2:9,11,12 2:15,16,18,20 2:22 3:2,7,9,10 3:12,14,17,19 3:21,23 4:6 6:21 7:14 8:13 8:13 10:20 11:3 14:8 15:7 15:23 16:6 17:7,19 19:11 29:21 31:2 45:9,11,12,24 46:6,10 47:7 48:4 49:14 53:10,23 55:9 55:13,22 56:5 57:20 64:11,20 66:8,11,13 67:13,25 69:2 69:6,16,18 73:14 75:24 76:11 77:13,18 78:7,10,15,21 81:25 82:7 85:22 90:20 91:23 97:21

98:11,23 99:6 99:14 107:23 108:9 111:17 113:12,18 118:14 119:1 119:16 120:22 121:19 122:11 129:8 134:24 135:2,8 138:24 147:4 152:2,14 153:8,12 155:10,23 156:23 172:10 173:13,18 177:7 183:8 187:15 191:17 197:8 207:7 208:8,19 210:13 211:15 211:17 213:24 214:16 215:7 215:25 220:16 222:22 223:16 224:19,25 226:10 227:17 230:20,25 231:5,9 234:9 234:15,17 235:20 239:6 239:18 248:4 249:5,19,22,24 250:11,23 251:16 252:11 253:5 256:4 258:14 260:1 260:18 261:5 262:15 264:25 265:10 269:10 270:11

**hro's** 13:12 22:10 44:24 50:19 53:16 54:10,17 55:1 56:10 61:15 73:2,24 79:14 83:12 119:20 122:5 147:20 170:15,17 199:21 210:9 212:6 214:21 228:24 229:18 238:25 259:9 261:8,20,23 262:1

**hro000130** 87:7 92:11

**hro000319** 108:1

**hro00037** 210:22

**hsudhoff** 5:21

**hundreds** 161:18 261:15

**hurdle** 93:16 94:8

**hurdles** 93:12 94:16,23 95:6

**hurt** 91:1,10

**husband** 180:22

**hustle** 248:17

**i**

**i.e.** 53:6 114:24 162:22

**idea** 31:16 87:12 188:8 194:3 246:16

**identification** 20:18 45:25 67:14 76:12 81:20 85:24 97:23 113:19 119:2 121:20 125:22 129:9 134:1 136:3 155:11 156:24 172:11 177:8 183:9 199:3 207:8 216:1 225:1 231:10 236:2 242:24 257:21 262:16

**identified** 149:19 201:1

**identify** 12:20 37:20,21 143:9 154:13 253:3

**immediate** 50:4 53:4 54:22 158:18 160:23 219:5,7,10,11 223:23

**immediately** 163:4 199:16

**impact** 210:6

**implementati...** 85:18,19 87:14 87:20

**implemented** 87:13 96:3

**implicitly** 45:5

**implied** 138:3

**import** 66:17

**importance** 210:8

**important** 32:19 33:1,11 33:13 44:10 45:2 139:8 143:1 161:21

**impression** 88:12

**include** 31:3 109:3 260:6,9 260:10 270:21

**included** 39:2 149:15 174:14 175:5

**includes** 130:9

**including** 7:16 31:22 55:23 56:5 119:8 150:1 222:2 229:11

**inconsistent** 204:7
**incorporated** 170:19
**incorrect** 267:21
**independent** 46:21,22 141:6
**independently** 48:8
**index** 2:5
**indicated** 72:21
**indicted** 57:18
**individual** 9:5 9:9 13:24 38:17 42:9 50:1,14 106:1
**individuals** 6:19 15:12,15 175:5 187:25 205:10 251:15 251:21
**influence** 53:3 202:7
**influenced** 196:25 197:18
**influencing** 253:17
**inform** 15:16 27:24 98:19 127:2 164:19 198:1 200:10 200:13 203:8 218:21 253:1
**information** 64:17 65:8,13 66:9 71:5,7,11 72:13 75:6,8 75:18 80:4 89:5 104:20 105:4 106:10 108:10,11,12 108:12 109:17 128:20 130:1,2 130:4 150:18 150:20 159:22 160:6,12,15 161:1,11 162:3 162:15 173:22 174:2 195:15 197:3,15,16 200:14 208:10 212:14,15,18 213:4,15 220:12 221:25 222:11 224:7 224:12 236:13 238:13 253:9 255:10,11,13 255:18,22,25 256:24 257:15 259:15,21 262:6,11,22 263:3,9,18,23
**informed** 34:15 34:21 51:12 96:14 126:24 127:1 138:23 181:12 205:21 246:2
**informing** 85:16 97:2 122:5 187:13
**informs** 105:6 246:1,21
**infrastructure** 130:25
**infrequently** 265:14
**initial** 76:8 175:4
**initially** 177:13 177:14
**initiate** 50:2 51:6
**initiated** 201:11
**input** 22:20 84:16 92:19 116:15 120:12 128:17 156:11
**inputs** 156:7
**inquiries** 155:6 162:15
**inside** 234:5
**insight** 81:13
**instance** 252:18 257:9
**instances** 7:11
**instruct** 30:17 104:1
**instructed** 15:1 89:23
**instructions** 264:8,12
**intend** 7:21 13:4
**intended** 232:13
**intending** 74:13 216:13 232:25
**intent** 83:3
**intention** 120:4
**intentionally** 270:15
**intents** 53:20
**interest** 52:19 52:21,24 53:2 53:11,21 54:10 54:16,17 69:9 73:2,4,13 74:1 75:23 79:5,14 80:1,15 82:6 83:13,24 84:1 84:6 85:4,17 86:20,24 89:1 89:14,22 90:1 90:2,8,22 91:5 91:6,18,22 93:13 94:5 95:10,16,19 97:18 99:12,15 100:12,15,18 100:19,21

101:2,7,11,14 101:15,16,21 103:8 107:19 111:18 114:17 114:25 116:7 116:15 118:16 128:10 129:24 130:12,17 133:21 135:4 135:10 147:17 147:20 148:14 149:14 152:25 157:12 164:2 173:9 174:20 175:13 178:13 187:2,9,10,16 188:20 189:6 190:4 192:4,13 193:3 203:9 208:7 209:12 213:1 220:24 223:2,4 229:11 237:8 242:15 245:22 247:18 253:16 271:8 271:13,15,17 271:19 273:7 273:11,17,19

**interested** 72:19 73:7 277:16

**interesting** 273:20

**interim** 126:5 126:10

**intern** 22:21

**internal** 98:22 186:9

**internet** 223:20

**interplay** 59:11

**interrelated** 254:20

**interview** 211:8 211:18,18,20 211:23 212:10 266:1 267:9

**interviewers** 211:12

**inventory** 251:19

**investigate** 206:15

**investigated** 229:5

**investigating** 253:15

**investigation** 51:6,14,19 104:6 118:5,15 156:12 188:25 194:23 195:5 195:11,13,25 196:1,4,8 203:10,16 204:19 205:11 205:12 206:1,8 206:13 207:18 208:6 209:2,4 209:5,7 210:15 211:15 212:24 217:24 218:1,3 228:3,9,25 263:9,18 264:7 264:13 266:10 266:13 272:10 272:22

**investigator** 206:19 211:9 211:16,19,21 211:22,25

**invite** 38:18,21 40:2,18 41:5 41:17 43:16

**invited** 15:6,8 15:12,16 42:8 43:7,20 44:9 147:12 221:5 221:12

**invoice** 71:19 71:23 72:2,5

**invoices** 65:19 65:21 67:7 71:14,17,18,25 72:11 75:1,2 75:15 108:23

**involve** 78:10

**involved** 30:22 56:4 112:8 152:6,20 206:12,20,25 207:1,3,18 212:16 264:9

**involvement** 237:3

**ipad** 12:22 220:14

**issue** 14:4 36:1 44:16 116:24 117:3,3,9 118:2 126:6 139:12 146:14 153:1 190:16 195:14 204:25 216:24 220:24 242:15 245:22 263:21

**issued** 136:11

**issues** 11:12 43:4 47:22 49:5 64:1 69:2 81:12 107:12 147:17 152:22 234:14

**items** 165:12

**j**

**jackson** 10:23

**james** 25:14 41:16

**january** 21:19 22:1,15 24:24 26:9

**jeopardize** 102:25 103:11 103:14

**job** 10:19 31:6 32:2 40:24 47:6,9 66:24 75:10 140:2 206:16 230:5 241:4 246:12
**jobs** 55:11 61:5 107:15
**joe** 250:13
**join** 15:6,9
**journalism** 43:3
**jr** 5:4
**judgment** 58:2 58:4 74:7,8 75:8
**july** 1:21 2:10 53:9 55:5 60:21,22 61:9 62:16 63:7,8 63:11,11,13 65:16 67:12 68:4 69:18 76:20 79:21 218:5 243:11 248:14 249:8
**jurisdictions** 169:13
**justice** 11:12

**k**

**k** 47:4 246:23
**karen** 1:18 277:3 278:7
**katz** 68:8,12 81:25 82:17 83:1,2 85:5 98:22 114:1 127:21 129:17 134:8 135:12 137:2 154:17 157:10 158:22 172:17 177:13 177:15 178:6 180:1 186:22 216:10 257:25 259:14
**katz's** 258:17 258:24
**keep** 70:21 71:17 100:17 112:7,18 113:7 142:18 165:23 181:8 222:20 224:5 226:4
**kentucky** 5:6
**kenyon** 47:19
**kept** 71:24 168:20 253:24 254:12,14,15 254:16,24
**key** 150:25
**kind** 9:12 10:18 13:21 44:10 63:2 127:18 128:11 129:21 138:4 211:1 216:15 229:21
**kinder** 214:4
**kits** 70:15 248:22,23 249:13 250:20 250:21 251:10 251:12,22,23
**kleenex** 252:5
**kloxxado** 62:20 70:14,15 78:11 93:23,25 212:19,20 213:11 215:17 215:23 222:3 247:19,22,23 247:24 248:4 249:13 251:13 251:24,25 252:4,22 253:5 253:7 256:6,19 256:23 257:11
**kloxxado's** 213:10
**knew** 43:5 88:16 93:22,24 93:25 144:5,21 148:22 197:5 202:25 208:10 215:6,7,8 241:10,19 246:11 255:5,6 266:11
**know** 10:2,5 11:16 12:7,10 12:13 13:9 14:10,11,13 16:14 18:6,25 21:2 28:8 29:9 31:10,10,13,19 32:3,25 33:7 34:17 35:17 37:4,9,11,18,22 38:1 43:1,4,6,8 43:13 44:1 45:4 49:6,9 52:7,11 53:13 57:1 60:1,2 61:4 63:25 64:1 65:25 67:24 72:1,16 72:22 74:4,7 74:19,21 77:2 77:8,24 86:7 88:19 90:3 91:7 93:10 102:11 103:22 106:7 109:5,10 109:12,15,18 109:19 110:16 110:25 111:25 114:4 124:1 128:21 130:23 131:15 132:1 132:11,18 133:6 135:13 135:16 139:7,9 139:20 144:8 145:6 146:10 155:23 157:5

161:22,23 162:23 171:12 173:12 181:13 192:6 193:10 202:20 203:1 205:19 213:14 221:13 222:19 223:17 224:11 229:2,6 235:15 236:22 237:10 242:1 243:24 248:5 252:5,7 252:17 253:1 259:11 263:4 263:11 266:23 268:8 271:14 271:20 272:3 272:12,13,15 272:18,24 273:3,18,22 274:2,4,4
**knowing** 72:19 73:8
**knowledge** 18:1 39:4,8 45:13 71:3 139:24,25 174:2,7 195:23
**knowledgeable** 42:2 44:6
**known** 144:23 212:14
**knows** 159:11

**l**

**l** 5:17 47:4 175:20 246:23
**labor** 141:1 149:5 162:11 163:11,12,15
**lack** 158:10 205:24
**language** 16:15 34:10 64:23 71:9 94:1 101:5 105:10 130:8 149:13 149:17,20 150:2 171:6 200:22
**languages** 84:10
**launch** 228:2 272:21
**launched** 244:8 245:13
**law** 5:5,11,18 37:4,14 56:10 56:14,18,24 57:9,12,14,23 89:9,12 90:21 91:13 115:2 117:25 118:11 118:13 119:18 149:9 150:2 152:6 153:7 165:14,19,21 166:22,24 167:4,4,19 204:5 239:18 263:11,14 264:11 268:14 268:23,25 272:2,3 273:17
**law.com** 5:7
**lawful** 6:2 235:24 239:5
**lawfully** 267:11
**lawsuit** 8:5,7,9 8:18 9:4
**lawsuits** 169:1 169:8,9
**lawyer** 12:12 35:12,13,16,25 36:12 56:17,20 57:14 67:17 89:19,21,25 90:4,7,10 91:20,21 92:7 92:15 106:3 114:24 130:24 132:7 136:21 151:22 152:5,7 152:11 159:6 264:16 266:5,8 267:6 268:8,10 268:20 272:25 273:23
**lawyer's** 152:17,19
**lawyers** 57:2 152:8
**lay** 250:8
**lead** 47:1 105:7 105:25 214:8
**leading** 10:19 153:21 269:25
**learn** 64:12 225:14 263:24
**learned** 60:19 89:5 178:11 186:25 225:12
**learning** 93:13
**leave** 124:15 139:19 140:3 140:18,24 154:4 157:2 160:8,10 161:17 163:23 176:8,24 198:2 199:16 205:23 215:22 216:16 224:18 225:13 225:16,20 226:11,17,22 227:5,9 230:14 230:16 231:19 232:14 233:1 236:15,24 240:2,7,10 244:24 258:23 259:21,24 266:25

**leaves** 175:17
**leaving** 75:16
**led** 197:4 223:6 236:10,16
**ledger** 10:23
**left** 39:23 62:13 97:16 158:1 221:16 248:13
**legal** 57:21 58:9 99:11 116:13 117:8 117:14 151:4,6 151:9,17,20,23 151:25 152:4 152:11,15,18 152:24 163:3 165:8 171:4 189:14 198:8 203:21 211:14 216:25 218:11 218:22 234:14 234:18 269:4 275:11
**legally** 228:1 273:4
**legitimacy** 266:14
**legitimize** 266:10
**leisure** 38:9
**length** 129:4
**letter** 3:16 164:1 169:3,5 169:18 173:4 176:12,13,14 177:14,23 178:2,10 180:11,13,14 181:21 182:18 184:1,24 185:18 186:17 186:18,24,24 188:18 193:14 194:11,19 195:22 196:22 199:2,7 201:10 207:5
**letters** 35:22 169:2,17,23
**level** 93:5 141:6
**license** 17:9
**licensed** 268:22
**life** 241:4
**liked** 176:10
**likely** 200:1 217:19 222:13
**likes** 130:8
**likewise** 9:17 272:7
**limited** 59:18 229:11
**linda** 46:24 47:3,4,11 246:22,22,23 247:3
**line** 22:3 119:7 143:2 175:3 258:4 269:15
**link** 116:1
**links** 115:9
**list** 20:23 71:16 165:12 166:2 171:20,22 172:3
**listed** 61:5 149:25
**listen** 90:19
**listing** 99:5
**lists** 55:17
**litigation** 21:8 26:24 129:14 164:25 167:8 182:7 211:10 213:16
**little** 6:17 10:1 11:15 39:24 66:20 68:17 89:20 127:7 132:13 141:22 192:5 225:21
**lived** 34:15 40:20 41:8,19 42:4,10,18,24 43:23,25 44:1 44:2,11
**livelihood** 159:11
**lives** 13:14,17 14:9 43:13 44:25 237:12
**lobbying** 212:19
**lobbyist** 70:13 208:12 213:10
**lobbyists** 93:24 108:19
**local** 250:9
**locate** 184:13 184:14 185:6 185:10 255:14
**lodged** 273:13
**log** 259:15
**long** 37:1 43:6 55:9 86:3 105:19 145:21 214:25 220:3 255:17
**longer** 116:2
**look** 21:1 46:4 59:25 67:20,23 87:11 90:2 91:13,14 95:20 95:21 96:2 97:25 101:23 102:1 114:24 142:23 149:23 163:20 174:8 177:21 183:23 237:9 242:18 243:6 244:13 253:12,13,18 253:21 254:11 255:2,4,8
**looked** 34:8 96:14 106:11 115:19 143:21

168:1 169:7 190:8 192:19 268:13,16
**looking** 23:12 62:22 80:7 84:5,9 86:6 102:11 129:22 150:21 154:15 154:23 156:19 178:9 185:4 193:15 221:16 227:14 257:12 263:2
**looks** 22:23 76:21 86:10 216:10
**lose** 106:14
**losing** 214:8
**loss** 14:3
**lot** 34:17 49:2 107:20 130:8 141:7,8 145:9 167:1 170:5 219:22,23
**low** 106:23 107:2
**lpa** 1:20

**m**

**m** 1:18 47:4 246:23 277:3 278:7
**made** 21:22 35:3 48:3 72:24 73:23 74:20,22 75:19 75:22 79:19 80:9 82:21 92:1 96:20 107:6 111:25 112:1,3 122:14 122:19 125:7 134:24 140:22 152:10 153:11 153:22 159:7 166:8 180:14 182:17,19 187:15,18 194:4 196:3,18 207:25 209:1 212:8 213:14 215:11 217:14 217:21 218:11 221:19 229:24 232:3 239:14 250:10 256:14 262:13
**mail** 250:22
**main** 159:15
**maintain** 123:5 123:11,15 124:9 125:2,7 181:4 205:6
**maintaining** 123:24 124:2,9 124:19
**major** 10:15 160:21
**majority** 38:3
**make** 6:17 9:14 12:7 13:14 31:16 33:2 35:3 48:6,10 48:15 70:5 86:15 90:11 91:25 92:20 108:5,15 109:4 109:23 110:1 110:23 111:7 111:23 112:7 115:2 132:13 145:13 147:7 152:15 153:22 165:11,14 166:2 181:11 185:17 193:7 205:14 225:21 239:17 254:7 269:21 270:15
**makes** 109:2
**making** 58:3 91:21 99:11 108:10 196:12 260:11
**mallory** 11:22 62:5,7,10,12 138:13,20 193:23 194:4 194:16,17,19 240:3,14 243:6 245:6,21 248:13,13,21 251:7
**mallory's** 241:4
**manage** 264:7
**managed** 47:19
**management** 39:17,20 219:25
**manager** 47:20 141:10 218:9 247:9 248:21
**manner** 254:25 256:8 277:16
**mansfield** 41:23
**march** 28:15 29:1,6,15,16,22 30:11 33:19 44:15 45:7 48:22 84:21 270:19
**maritza** 3:6 131:1 155:10 155:21 264:16 266:11,17,22
**mark** 163:1
**marked** 20:17 21:1 45:22,24 67:13,16 76:11 76:15 81:16,19 85:23 86:1 97:20,22 113:18,21 115:16 119:1,4 121:19,22

125:21,24 129:8,11 133:25 134:4 136:2,5 155:10 155:14 156:23 157:3 158:19 172:10,14 177:8,10 183:9 183:12 199:2,5 207:7,10 215:25 216:4 224:25 225:5 231:9,12 236:1 236:5 242:23 257:20,23 262:15,18
**martin** 11:24 266:5 267:7 275:7
**maryland** 223:19
**matching** 34:18
**material** 137:19
**materials** 150:13 153:6 154:2 164:16 173:17 264:20
**matter** 73:8,16 73:22 169:22 204:1
**matters** 74:11 203:24 229:11
**mature** 219:14
**mean** 23:22 27:8 34:23 44:2 46:16 48:7 54:2 69:5 84:9 105:20 109:19 112:19 115:1 123:24 124:10 137:8 137:15 157:25 181:19 194:25 229:16 232:15 247:21 254:21 258:8 263:12
**meaningful** 75:17
**means** 59:17 60:1,5,6 107:1
**meant** 66:23 101:1 144:15 147:23
**mechanism** 210:5,14
**medical** 44:7
**meet** 36:15 37:8 70:25 71:1 233:13,18 266:24
**meeting** 25:25 26:14,18,22 27:16,19 28:2 28:3,6,7,10,11 28:14,17 29:1 30:25 31:1 33:19 34:16 35:6 36:9 37:1 41:24 45:17 58:12,21 59:3 60:16 84:24 85:10 86:19 89:2,3 119:7 120:5 122:23 123:17 125:13 125:15 127:5 133:2,5,9,14,18 134:6,14 135:24 136:17 136:19 137:9 137:19 138:12 138:19,22 139:11 140:25 141:15,18 142:6,10 145:11,15,18 146:17,24 147:5,8,9,13 148:4,24 174:11,17,19 174:23,24 175:3,5,12,22 177:2 181:3 190:7,20 199:9 199:14 200:4,7 201:17 203:3,4 203:11 220:9 220:15,15,18 221:2,6,8 233:13,21 239:19,24 266:20 267:5 267:16,18,23 267:24 268:1 270:22,24 275:16
**meetings** 30:2,5 30:10,19,23 31:9,17,24 32:9,10 33:4 33:15 44:21 81:7 133:11 269:8
**meets** 190:21 191:13 220:17
**member** 12:6 13:7,9 15:7,22 15:23 16:6,10 16:11 19:6 25:4,23 26:1 26:12,20 30:6 30:25 31:14 36:15,18 38:19 40:2 43:7 44:18 53:5 54:23 63:18 80:17,20 86:18 97:2 138:24 173:18 179:4 192:12 233:16 234:17,19 239:20 261:3 261:16 268:4 269:16 270:16

272:16
**members** 15:21 16:4,17 24:18 25:2 26:1,5,16 27:12 28:22 29:2 32:1 33:24 34:21 35:5 36:19 38:18 43:14 44:8,16 56:24 84:22 86:14 88:8,13,18 123:20 162:10 180:20,21 188:7 189:5 192:1 202:15 221:5,11 237:2 237:25 238:4 260:10,17 261:2 262:21
**memo** 133:15
**memorized** 102:13
**memory** 45:20 97:10 121:24 198:13 235:17
**mental** 107:12 171:2,15 250:1
**mention** 147:19 194:16
**mentioned** 72:23 92:15 150:3 171:19 179:7,7 180:16 192:11 194:6,6 194:7,17 219:19 241:14
**mentions** 131:1
**merely** 8:5
**message** 227:16 243:5 244:11
**messages** 4:1 242:22
**met** 13:23 36:13 41:23,24 84:21 123:13 123:14 231:18 232:1 266:19 267:3
**methadone** 43:5
**michigan** 148:19
**middle** 162:24 210:1
**millions** 213:10
**mind** 64:6 148:12 179:11 195:2 200:11 218:4 222:1,20
**minimal** 66:21 72:25
**minimum** 95:10 107:15
**minor** 44:20 180:15
**minute** 97:13 143:1,3 243:20
**minutes** 26:13 26:19 28:7,10 28:18 45:17 183:4 226:15 226:18 233:8 235:5,7,11,13 235:15 236:5 238:14 266:20 267:6
**misinterpreting** 102:23
**mission** 2:8 13:12 44:24 45:23 107:3 214:10,14,16 214:20
**mitchell** 5:6
**mitigating** 92:20
**mitigation** 158:19 176:6 176:11 215:19 217:4,6,9 218:23 219:2
**model** 34:9
**molly** 25:16 42:23 44:20 179:3,7 180:16 180:17 181:2 188:3 192:15 192:25
**moment** 46:2,7 67:20 97:25 114:4 129:15 157:4 185:10
**monday** 70:3 70:25 71:2,6 77:6
**monetarily** 54:5,6,11
**money** 141:7 149:10 171:1 214:3 261:12
**montgomery** 277:2
**month** 39:14 139:11 246:17
**months** 242:17
**morale** 210:7
**morning** 10:2 157:21 158:4 161:23 180:4
**morris** 5:16
**move** 121:25 140:13 172:4 205:20 211:3 221:17
**moved** 145:12
**moyo** 5:17 161:6 189:23 243:13,19 274:23
**multiple** 133:10

**n**

**n** 2:1 6:10,10 6:11 171:21

175:20
**naloxone** 14:13 62:21 78:22 108:19 212:17 216:14 247:24 248:3 251:10 251:22,23,24 251:25
**name** 6:8 17:1 17:10,13,24 18:5,7,15,20,24 19:2 20:9 63:3 131:1 175:18 218:16 222:18 222:24 224:3
**named** 175:9 277:7
**names** 18:6 169:12
**narcan** 248:22 249:14 252:2,5 252:22
**national** 129:4 129:5
**nature** 74:9
**near** 14:4
**necessary** 38:3 48:4 90:25 91:2,4,10,12 149:24 212:24
**need** 10:4 12:13 19:7 57:14 66:9 89:25 103:22 108:4 108:14,21,22 109:18,19,20 114:23 121:5 126:5 131:25 152:4,15,23 155:17 159:1,8 159:8,16 162:21 172:2 212:18 213:3 217:24 218:2 225:3 264:20
**needed** 30:24 36:7 46:23 48:10 64:16 65:8 69:13 85:19 88:1 91:25 94:1 108:9,11 109:3 109:4,9,15,23 109:25 112:12 120:15 140:23 151:25 152:10 178:22 179:20 180:10 196:8 196:11 201:14 222:14 247:24
**needing** 213:14
**needless** 14:3 82:20
**needs** 69:3,6
**negative** 210:6
**nelson** 3:6 98:2 131:1,22 155:10,21 264:16 266:2 266:17,22 267:4,10,17
**nerves** 206:23
**network** 250:7
**never** 18:16 19:11,12 35:9 61:1 84:20 104:1,1 160:5 160:11 173:1 194:6,6,17,20 195:6,6 218:24 223:10 231:21 240:6 256:3 257:9 259:12 260:3 262:8 268:25 270:1
**new** 10:13 61:1 82:6,11 114:24 115:22,22 120:17 128:17 130:12 241:4,4 250:17
**news** 62:24
**newspaper** 10:21,24
**niche** 118:12
**niece** 13:24 14:2
**night** 60:25
**nods** 9:20
**nofo** 149:9 171:21
**non** 6:24 11:21 15:17 23:24 29:18 37:13 39:5,6 113:23 118:13 119:19 129:1 130:25 131:8 269:12 272:1
**nonprofit** 107:1
**nonverbal** 9:19
**noon** 114:9
**nope** 13:6
**nordstrom** 5:3
**normal** 140:2
**notary** 1:18 277:3 278:8
**note** 12:24
**noted** 220:7
**notepad** 12:22
**notes** 12:23 149:16 166:9
**notice** 19:24 20:4,6,7 27:23 30:9 33:20,23 33:25 35:10 36:2,10,13 37:1,8 169:4 171:21,24 221:8 222:8 233:14 239:20 264:22
**noticed** 31:9,17 32:9 58:12,20

59:3 60:16 267:15,19,23 275:17
**notices** 30:4,12 32:9 33:15 170:1
**noticing** 30:23 33:3
**notification** 183:25
**notified** 119:25 140:6 145:14 227:4,7 232:12 232:24 233:3 244:22
**notifies** 264:5
**notify** 51:4
**notifying** 119:16
**november** 19:25 24:8,11 25:3 170:12 259:9 260:24 262:2 265:9,9 265:12
**nuance** 205:15
**number** 6:15 135:1 150:1 201:8 209:24 244:14
**numbering** 20:22
**numbers** 72:24 168:5 169:13
**numerous** 7:10
**nursing** 44:4

**o**

**o** 6:11 47:4 171:21,21 246:23
**oath** 256:16
**object** 231:23 232:5,6 237:16
**objection** 17:24 110:13 226:3
**objections** 102:2 226:1
**objective** 45:9
**obligation** 51:13,18 52:3 263:7
**obligations** 59:12
**obsessed** 237:5
**obtain** 150:19 255:21
**obvious** 202:17
**obviously** 242:7 245:14
**occur** 78:11 126:25 174:11 182:13 195:25 196:2,5,8 239:21
**occurred** 45:15 51:9 60:22 70:24 98:5 104:7 133:9 134:6 140:21 143:12 147:10 148:5 172:24 190:1 191:22 204:11 220:10 243:11 252:19 275:19
**occurring** 128:16
**occurs** 53:2 189:19
**october** 50:19 85:13
**odh** 46:20 53:19 59:6 61:14,17 91:7 93:9,18 94:9 94:13 95:8,25 96:15,22 97:3 99:1,4,13,16,19 99:25 100:21 101:2,17,25 102:1,12,24 103:8,21 104:2 104:4,6,12,24 108:13 117:22 120:24 121:4,8 140:25 144:3,8 144:19 145:14 147:16 148:4 148:13 153:8 160:13 161:15 161:16 164:1 165:9 170:15 170:18 171:3 174:11,15 176:17 177:3 177:24 179:15 181:24 182:4 184:2 186:19 186:22 187:13 193:15 201:16 210:9 212:16 215:18 216:25 217:4,6 218:12 221:21 222:3 222:22 223:16 230:2 235:9,19 238:14 249:17 249:19,20,24
**odh's** 170:14
**offer** 111:13
**offering** 130:22
**office** 21:12,15 36:12 158:6,10 164:14 184:18 184:21 185:7 216:25 233:9 234:6 235:7 249:3 264:20 264:25 265:6,8 265:11 278:2
**officer** 178:12 187:1 251:4
**offices** 1:19
**official** 53:10 53:23 78:19

90:22 113:22 113:23 144:24 228:2 239:19 266:12
**officially** 39:21 113:12 227:4,7 229:24
**oh** 71:8 88:5 146:18 163:16 163:16 170:9 177:25 180:22 207:2 225:14 231:21 248:22
**ohio** 1:2,16,19 1:21 2:7 5:9,13 5:15,20 6:15 6:21 7:14 8:6,9 8:12,19 13:8 15:3 17:2,10 17:12,23 18:2 18:15 19:7,17 20:9,17 21:24 22:22 23:21 31:7 37:14 40:6,24 41:3 42:16 44:13 47:17 75:11 79:8 93:3 94:2 96:5 129:6 171:2 178:11 178:19 186:25 197:11 199:15 199:20 200:23 202:18 239:18 247:25 248:25 249:25 250:2 268:16 273:17 277:1,4 278:2 278:8
**ohio's** 36:11
**okay** 6:25 7:19 7:22,23 10:7 11:16 12:13 13:2,11 15:3 17:15,22 20:6 23:19 29:11 33:18 35:21 36:22 44:23 48:15 49:14 57:17 60:3 63:13 64:13 67:9 68:2 72:10 75:2 79:11 80:12 84:14 86:9 90:5 97:13 101:6 104:21 114:13 115:7 116:8 118:14 127:16 132:14 132:16 133:13 136:20,24 140:21 141:21 146:9 148:3 156:5 158:24 159:20 160:18 167:3 173:5 185:14 186:15 190:12 196:7 197:14,25 198:24 202:2 207:16 208:5 208:15 210:1 214:19 216:23 228:12 235:12 239:9 243:9 244:16,19 246:21 249:4 249:16 250:23 260:17 268:12 276:4
**old** 244:2
**omhas** 218:12
**once** 83:4 92:19 218:19 250:4
**oneohio** 8:20
**ones** 12:17 113:2 168:2,12 168:15 171:9
**ongoing** 121:7 200:24
**online** 165:25 167:14,18 169:1 246:18 250:6,7,12,19 250:24 254:20 259:16
**open** 8:20,23 222:16,20,25
**opened** 272:10
**openly** 230:6
**operate** 9:13 23:21
**operated** 249:10
**operating** 214:14 215:9
**operational** 59:4 124:25
**operations** 17:10,13 23:8 23:16 44:13 50:5,8 51:4 59:6 62:14 239:1
**opiate** 42:10
**opinion** 34:3 56:17 74:18 81:13 85:16 91:9 107:7 108:3 111:14 123:25 129:2 130:20,22 160:19 206:17
**opinions** 220:23 221:1
**opioid** 8:20 40:25 171:25
**opioids** 41:21 43:2 44:2
**opportunity** 47:23 120:12 143:8 171:21 171:24

**opposed** 23:1 66:4 70:18 105:13 188:8 210:14 235:2
**opposition** 110:10
**option** 77:25,25
**options** 78:1,5 255:6
**order** 9:14,18 24:13 34:21 35:5 67:22 82:22 107:2 109:4,23 116:12 120:19 224:7 248:24 249:17 250:15 252:12,15 253:3,17 256:4 256:7
**ordered** 70:15 108:20 208:13 247:23 248:12 248:17 250:14 254:19 257:13
**ordering** 78:10 93:24 196:25 197:7,11,18 202:7 212:20 215:17 247:19 247:21 248:14 251:9,10 252:8 256:12,23 257:1
**orders** 155:20 250:12,18,23 250:24,25 251:1,5,21 253:19 254:17 254:20 256:14 256:19
**organization** 14:8,15,19 15:1 16:13 18:8,13 23:7 23:15 24:4 31:21,25 32:19 32:21 33:12 38:15 39:6 51:13 53:22 62:13 63:19 83:19 90:23 92:4 94:6 105:16,23 129:1,5 141:3 159:10 178:22 179:2 261:18 269:12 270:19 272:1
**organization's** 31:22
**organizations** 37:14 39:6 56:4 128:12
**organized** 30:19
**orient** 52:16 86:6 121:24 141:22 144:1 244:7
**orienting** 45:21
**original** 11:25 23:25 26:1 43:20 178:14 187:4
**outline** 217:4 218:10
**outreach** 47:9 78:18
**outside** 55:1,15 55:25 60:20 64:12 69:17 95:12 106:10 107:20 110:12 185:24 189:12 193:21 196:24 197:6,18 199:18 202:7 204:23 211:8 211:16,19,21 211:22,25 222:4 236:19 238:3
**outsider** 211:24
**overall** 23:6,14 24:3 83:19 90:2
**overdose** 13:14 14:1,2
**overdoses** 14:17
**oversee** 78:22
**overseeing** 39:1 39:1
**overtakings** 238:21
**overtime** 55:23
**own** 13:22 17:17,20 39:24 39:25 70:5,18 91:8 187:20 208:23 239:6 268:17 269:3 271:4,8,17 275:13
**ownership** 18:14,23 19:16 19:19

**p**

**p.m.** 82:1 98:17 102:16 122:5 126:4 139:18 140:17 158:12 183:18 198:7 199:9 200:18 211:4 216:6 220:15 225:8 264:5 276:13
**pack** 250:21
**pad** 12:24
**page** 2:2 23:1 48:16,17,18,19 48:23,24,25,25 49:4,4,22

50:22 52:12,14 52:18 56:11 61:3 67:23 79:1 86:12 89:15 92:11 102:19 108:1 136:8,8 156:9 157:2 171:22 172:21 209:17 209:17,22,25 210:22 211:2 212:12 213:23 244:12,13,15 247:13
**pages** 46:3 49:1 156:8 161:19 165:5
**paid** 49:8 71:14 72:14,15,17,22 73:10,10,12 74:4,5 108:18 109:13,14,15 124:23 199:16 203:25 223:5
**panel** 74:4,6,6 223:5
**paragraph** 50:23 52:22 70:1 89:7,16 92:12 105:5 106:12 108:4 114:22 196:21 196:23 200:23 202:5 207:24 210:2 264:17 264:18
**parentheses** 53:5,7 116:3 211:12
**parents** 53:7
**part** 31:2 49:6 65:24 69:6 72:12 75:5 103:12 130:4 134:19 155:16 156:11 167:8 168:10 182:7 194:8,11 199:23 206:12 209:2,4,6,12 210:19 211:11 215:19
**participants** 220:18
**participate** 271:3 274:5,8
**participated** 271:1,2,22
**particular** 26:14 54:13 70:14 116:24 117:2,3,9 153:1 161:3
**parties** 11:21 128:21 260:5 264:9
**partner** 250:16
**partners** 229:13,19 231:5 265:17
**party** 8:4,6 228:2 277:15
**password** 259:15 261:20 261:22 262:1
**past** 118:4
**patrick** 216:21 219:4
**patterns** 197:12 213:20
**pause** 8:24
**pay** 17:4
**pdf** 115:9 176:21,22 177:15,16,18 177:25 178:3 186:22
**pdf'ed** 176:22
**pdf's** 115:8
**pending** 6:14 10:6 182:25 186:13 227:13 254:3 257:18 263:10,19
**people** 13:15 15:8 34:14,15 43:11,20 49:8 69:12 79:8 95:10 99:5 107:8,16 112:20 139:6 187:22 188:4 214:11,17 252:5,7,21,23 254:19 257:4,5
**people's** 34:17
**perceived** 200:25
**perform** 51:14 51:19 140:1
**performing** 16:5 55:21
**period** 77:2,3 82:21 142:14 154:1,4,12 259:20 260:21
**periods** 154:14
**permissible** 273:16
**permission** 17:16,20
**permit** 17:12
**permitted** 17:23
**perpetrator** 50:6
**person** 13:23 15:5 30:11 51:4,22,24 52:5 95:9 110:8 122:22 133:1 154:21 181:14 195:10 266:1

**personal** 53:4 54:1,8,13,20,22 73:3,18,24 74:15 234:13 234:23 275:8
**personally** 17:4 235:2
**perspectives** 150:19
**ph.d.'s** 107:15
**pharmaceutic...** 7:3
**pharmacology** 44:6
**pharmacy** 248:24
**phone** 143:8 189:8,18 190:13,14,20 191:3,5,10,22 198:17,18 201:25 217:10 220:8,13 240:17,18 242:19 245:19 245:20,23,24
**phrase** 71:10
**physical** 167:15 167:17
**physically** 164:14 265:10
**pick** 219:13
**picture** 238:24
**place** 111:8 160:7 176:23 231:19 232:13 232:25 243:25 244:23 248:24 251:5
**placed** 114:18 124:15 139:19 140:2,18,23 154:3 160:10 163:22 198:2 205:22 224:18 225:12 226:17 226:22 236:15 236:23 240:1,6
**placing** 199:15 226:10 227:5,9 240:9
**plaintiff** 1:6,13 5:2,15 6:2 8:14 8:15
**plaintiff's** 119:5 121:23 136:6 155:14 157:3 177:11 231:13
**plan** 19:15 81:8 126:5,10 146:23 148:1 158:19 176:6 176:11 215:19 217:4,6,9 218:23 219:3 263:22
**planned** 176:23
**planning** 18:16 19:14
**plans** 174:24 219:1
**playing** 232:8
**please** 6:8 13:12 46:7 102:3 132:12 176:21 247:20 249:5 254:10 264:19,19,21 265:15
**plural** 261:2
**plus** 10:22 34:15 115:9 212:19 223:13 237:11
**point** 10:1 22:6 24:6 28:24 29:5 44:19 45:7,11 48:22 49:11 55:20 56:24 64:13 79:12 80:9 84:14 86:23 95:14 96:19 103:7 111:20 120:4 122:13 126:14 135:1 137:10 153:17 154:18 158:5 159:23 172:23 174:19 175:14 175:16 187:6 188:17 193:25 194:21 195:4 199:19 208:2 210:8 212:9,24 214:9 215:10 217:12 246:5 247:5 259:7 263:16 264:11 264:15,23 265:11,25 269:14,22 270:16
**pointed** 202:4
**points** 105:11 154:6 199:15 199:23 200:3 218:8
**police** 115:1
**polices** 83:19
**policies** 31:23 46:24 53:22 55:1 56:10 79:21 80:10 116:5 128:12 128:23
**policy** 23:6,14 24:3 50:19 51:9 54:10,24 55:4 58:1 59:20 69:3,7 69:10,21 73:3 73:24 75:23 79:5,14 80:2

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-1 Filed: 08/31/26 Page: 117 of 297 PAGEID #: 2019



83:12 84:2,7 85:17 87:12,14 87:20 88:8 90:3,8,22 91:6 91:18,23 94:5 94:7 96:2 97:19 101:2,8 106:13,18 107:19 115:1 115:11,21 116:7,15 119:20 120:6 120:13,16,17 120:19,23 128:10,18 133:21 159:5 162:25 173:9 228:24
**political** 238:22
**porter** 5:16
**porterwright....** 5:21,21
**portion** 175:4 175:11 210:21
**portions** 114:7
**position** 35:8 68:13 184:22 212:20 219:6 219:21,25 247:1 260:18 261:6
**possession** 19:5 22:5 197:17
**possibility** 215:13
**possible** 14:25 79:17 99:7,9 99:22 100:14 101:10 143:18 155:2,5 185:16 235:10
**possibly** 125:12
**post** 10:11,18 60:25 192:20
**posted** 246:18
**postings** 167:14
**potential** 52:24 53:1 56:6 99:22 101:10 103:8 105:16 135:3,10 137:8 147:16 150:23 152:25 159:14 187:10 189:15 193:19 199:17 200:25
**potentially** 100:14 105:25 162:14
**pottenger** 28:12
**power** 38:12 60:8 232:20,23 233:13 251:12
**practice** 28:4 115:3 268:22
**practices** 23:23
**prefer** 67:10 252:20
**preference** 257:11
**premise** 191:20
**premises** 264:22,25,25
**preparation** 11:20
**prepare** 11:14 12:15 81:7
**prerogative** 58:10
**presence** 277:11
**present** 50:16 196:23 202:5 217:5 238:25
**presented** 49:14 97:2 160:5 199:8,13 217:3,10
**presenting** 47:25 73:4 94:9
**president** 10:19 19:6 28:21 30:10 31:2,6 31:15,20,23 32:19 33:2,12 48:4 50:5,6 58:25 105:23 119:17 134:24 135:7 152:2,14 153:12 230:20 230:25 231:6 234:15,16 239:11,12,15 261:5
**press** 62:25
**pretty** 49:3 203:19 268:15 268:17
**prevent** 14:16 237:6
**prevented** 55:21
**previous** 28:3 174:13 180:19 180:20 186:18 195:15
**previously** 8:9 13:23 79:7 206:18 220:9
**primary** 10:11
**print** 167:15,16 167:17 168:14
**printed** 166:8
**printouts** 244:3
**prior** 20:20 33:19 35:25 36:22,23,24 44:15 45:7 48:22 52:18 61:9 62:4 79:7 89:13 91:21 96:7 139:5

157:21 160:12 161:14 162:5 176:16 181:2 184:6 191:22 203:10 204:11 210:12 232:12 269:10
**priority** 210:10
**privacy** 80:16
**private** 205:11 205:12
**privilege** 12:9 35:19 58:1
**prize** 43:11
**pro** 160:23
**probably** 38:1 48:18 49:3 67:1 76:9 77:15 82:19 83:5,8 127:11 146:3 150:10 168:25 170:23 217:18 242:10 242:11 259:6 270:3
**problem** 64:20 247:17
**problematic** 77:15
**problems** 107:11
**procedural** 93:12,16 94:8 94:16,23 95:6
**procedure** 1:17 49:25 67:18
**procedures** 38:11
**proceed** 105:17
**process** 18:23 30:22 50:3 69:14,15 112:21 135:2,8 153:21,25 159:5 162:25 206:13 224:10 248:19 249:15 249:18 252:9 264:6
**processed** 250:16
**processes** 186:9
**procure** 17:1 213:10 275:11
**procured** 121:13 122:11 198:8
**procurement** 78:22 151:4 176:9 213:20 215:23
**procuring** 264:6
**produce** 22:7 142:24 165:3 167:7 184:15 185:9 257:7
**produced** 21:7 22:2 26:23 127:8 129:14 136:10 155:19 156:4 164:23 165:4,5 166:14 168:22 182:6 182:12 194:19 195:7 243:4
**product** 249:5 249:6,20 250:5 251:5,16 252:10,11 256:20
**production** 168:17 184:13
**professional** 11:7 106:9
**professionally** 224:12
**professor** 44:4
**profit** 6:24 23:24 37:13 39:5,6 118:13 129:1 130:25 269:12 272:1
**profits** 119:19 131:8
**program** 39:2 41:10 78:16,23 178:12 187:1 212:17 216:14 218:9 251:4
**programs** 39:1
**progress** 31:24
**prohibit** 55:10 107:20 273:18
**prohibited** 212:21 213:12
**prohibition** 55:15,16
**project** 47:20 141:9 147:1 175:2 201:10 218:9 248:21
**promised** 71:13 223:7
**promote** 219:4
**promoted** 216:21
**prompt** 77:6
**prompted** 195:8
**promptly** 149:18 206:22
**proper** 50:14 67:18 169:5
**properly** 31:9 31:17 32:9 58:12,20 59:3 60:16 253:20 267:14,15,18
**proposal** 127:18 207:21 209:13
**proposed** 38:4 115:23 126:11

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-1 Filed: 08/31/26 Page: 119 of 297 PAGEID #: 2021



206:4 208:6 209:7 218:23
**proposing** 105:18 207:17 210:15 211:22 211:23
**protect** 159:9 236:18 239:5
**protected** 105:9 241:18
**proven** 103:18 103:23
**provide** 9:17 13:16 65:19 66:8 75:5,8,17 77:5 78:4 110:4,23 115:10,11,12 116:12,15 117:8,14 118:5 118:19 120:11 120:12 130:3 161:13 164:16 169:15 190:23 215:14 216:14 224:6 259:14 261:25 263:8 264:8,12
**provided** 61:11 78:6 92:19 134:5 137:2 138:3 156:3 158:21 186:18 193:24 198:14 199:24 225:4 267:1,6
**providing** 110:15 128:19 130:1,2 186:22 199:5 211:14
**provision** 37:12 56:14 57:11 201:8
**provisions** 56:10 168:1 204:6
**prudent** 56:15 57:20 90:6 152:3
**public** 1:18 40:23 41:25 197:10 212:15 256:13 277:4 278:8
**pulitzer** 43:11
**pure** 236:22
**purported** 266:21
**purportedly** 180:2
**purpose** 33:22 34:2,5,13,19,25 35:4 59:18 60:9 121:9 144:18 207:22 208:5,16,18 268:1
**purposes** 20:18 45:24 53:20 67:13 76:11 81:19 85:23 97:22 113:19 119:1 121:20 125:21 129:9 133:25 136:3 143:2 155:11 156:24 161:12 172:10 173:3 177:8 183:9 199:2 207:7 215:25 224:25 231:9 236:2 242:23 257:21 262:16
**purse** 258:9,17 258:25
**pursuant** 1:17 28:22 51:17 145:4 155:20
**put** 60:3 62:25 90:18 93:17 94:16,22 95:6 116:3 141:8 151:12 188:11 215:21 219:3 222:7 225:15 225:19 226:3 230:14,15 233:23 234:1 249:12 258:9 258:22 269:22 270:11,12,13
**puts** 53:5
**putting** 161:16 176:7 258:16 258:23

**q**

**qualifications** 219:21
**qualified** 219:16 277:5
**qualify** 225:24
**qualifying** 226:4
**queried** 255:25
**queries** 155:1 158:21 161:13
**question** 7:18 9:16 10:6,7 29:7 33:5 36:22 46:5 58:16 70:17 82:10,12 90:19 97:12 98:8 102:10 111:11 111:16 114:8 117:17,23 129:15 132:12 133:8 134:6 136:7 138:17 140:14 152:9 153:6,13 156:6 161:12 162:25 171:4 177:11

182:25 186:10 186:12,13 190:12 194:24 195:12 200:20 208:16,16 209:11,21 211:7 221:17 221:18 226:23 226:25 227:13 228:13 231:24 232:9,14 233:2 240:25 243:17 244:6 245:3,7 247:12 254:3,7 254:11 256:2 257:18 272:5 272:23 273:10 273:16,20 274:2
**questions** 7:22 31:25 46:3 67:21 86:5 98:3 114:7,22 135:13,14 155:15,21 186:23 200:19 210:25 217:3 275:10
**quickly** 191:2 207:11
**quiet** 181:9
**quinn** 175:10
**quite** 166:25
**quo** 123:5,12 123:15,24 124:2,9,10,20 125:2,8 126:20 133:19 136:21 136:25 159:4 181:5 191:19 194:22 195:1 200:11 205:2,7
**quote** 51:5,5 72:12 75:6,6 108:23 144:12 188:13,13 200:22 201:1,2 206:7 236:16
**quoted** 40:10
**quoting** 201:2

**r**

**r** 175:19,19,20
**raina** 1:14 5:8
**raise** 139:13
**raised** 139:12
**ran** 41:10
**range** 190:9
**rather** 80:18 110:3 138:4 159:8 169:4 170:24 179:12
**reach** 11:21 86:15 135:17 264:11
**reached** 43:3 84:23 85:2
191:16,21 204:18,22 210:7
**read** 16:14 23:5 23:10,11 30:7 31:20 33:8 35:24 48:16,18 48:23 49:4,23 51:9 52:8,25 55:8 62:15 70:6 92:21 103:1 109:5 110:5 116:25 122:3,7 135:4 136:22 149:7 159:17 165:25 166:8 167:18 168:10 170:25 196:25 210:23 228:5,21 229:8 229:13 242:2 243:22,23 245:18
**reading** 83:17 89:17 118:4 244:18
**reads** 49:25 162:19 193:18 196:23
**ready** 21:3 67:24 86:7,8 114:5 155:24 157:5,6 212:14
**real** 58:13 149:19 200:25
**realize** 27:9 223:11 239:6,7
**realized** 27:11 93:2
**really** 49:7 60:2 67:10 83:5,6 107:13 143:19 204:24 208:15 212:18 215:15 223:11 237:2,4 237:10 238:18
**reason** 19:10 20:12,14 42:8 60:17 79:24 103:6 120:9 127:10 152:19 158:19 194:5 196:23 202:6 221:4 236:23
**reasonable** 51:7 210:18
**reasoning** 245:11
**reasons** 14:7 34:23 42:12 196:7 261:14
**recall** 15:20 26:4,7 28:13 28:16 39:15 45:15 61:12 63:22 64:24 65:3 66:6

67:10 70:24 75:3,14 76:25 79:9 80:11 83:17 84:19,22 85:2,15 87:3 87:24 89:4,6 99:25 100:3,6 110:17,18 113:12 116:8,9 116:10 117:10 117:13,17,18 117:20 119:13 120:21 121:2 121:12,15,16 122:22 123:2,9 125:12 128:5,7 128:10 133:1 133:13 135:25 137:15,16,25 140:19 142:3 142:12 143:15 148:3 154:11 154:16,25 155:2 157:13 162:9,13 165:7 165:22 166:6 166:21 167:5,6 167:10,25 168:19 169:9 169:25 170:2,8 170:22 172:6,8 174:8 179:9 181:19 183:2 184:23 185:20 188:10 190:5 190:10 193:11 193:12,13 198:20,25 199:25 200:2,5 200:9 201:5,20 201:24 202:12 202:22 205:15 205:23 206:6 206:11 215:18 217:13 219:9 224:16,21 228:14 235:8 235:18,18 240:2,19 242:12 245:19 245:21 259:19 259:23 265:13 269:17

**recalling** 172:5

**receive** 19:23 20:2 71:18 250:23

**received** 15:22 15:24 16:5,10 16:17 20:4,6,7 73:23 83:4 86:18 92:17 159:22 161:14 173:16 197:15 224:21 225:11 226:16 227:8 227:18 228:23 229:1,19 230:10 231:17 233:8 236:6 240:9 253:4,20

**receives** 249:5

**receiving** 51:3 51:16,22 79:9 141:4 201:10 230:2

**recently** 178:11 186:25

**recess** 97:14 140:10 183:6 220:4

**recognize** 19:23 21:5 46:5 68:10 76:19 98:9 156:10 183:21 231:13

**recognized** 39:19

**recollection** 32:7 81:23 82:5 95:22 99:18 114:10 122:10 143:11 157:16 164:7 186:1 198:5 227:3 244:21 245:5

**recollections** 123:9

**recommend** 110:7 126:15 126:18

**recommendat...** 89:12 90:6 92:24 110:20 111:1,3 123:10 127:24 130:15 131:21,22 159:21 163:2,7 179:14 212:3

**recommendat...** 118:20 126:13 129:22,25

**recommended** 96:1 195:10

**recommending** 93:15 123:4

**record** 6:9 8:25 9:1,14,18,22 12:21 23:5 49:24 52:25 66:4 134:19 138:5 140:8 142:25 143:3,4 155:18 161:7 165:11,14 183:5 220:7,10 220:11 230:6 237:17 248:3 274:23 275:1,2 276:4,9,10

**recording** 28:10 123:16 123:19

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-1 Filed: 08/31/26 Page: 122 of 297 PAGEID #: 2024



**records** 8:21,22 22:1 142:18 197:10 245:24 256:13
**recovery** 41:22
**red** 249:9
**redacted** 155:20 242:2
**reduce** 13:14
**reduced** 277:10 277:12
**reduction** 1:16 2:6 5:9,15 6:21 7:14 8:6,9,12 8:19 13:8 14:12 15:2 17:2,9,12,23 18:2,15 19:7 19:16 20:9,17 21:24 22:22 23:21 31:7 36:11 40:5,7,9 40:11 41:3 42:3,16 44:13 47:17 61:1 75:11 79:8 128:23 178:11 178:19 186:25 199:15,20 200:23 202:18
**redundancies** 49:12
**reese** 2:14 3:3,5 3:16 46:25 60:19 61:9,23 62:16 63:6 65:9,13 68:20 76:8,22 81:19 88:20 93:7,10 94:3 104:24 110:24 117:5 117:15,22 118:6 122:15 122:23 123:6 124:10,14,22 125:8 126:25 127:2 133:2,18 133:24 134:8 134:14 135:9 135:14,20 136:2,11 137:3 137:9 139:17 140:15 142:6 147:12 148:15 160:7 161:16 163:22 164:2 174:10 175:8 178:12 181:3,4 187:2,15 192:14 193:24 194:24 195:3 195:12,22 198:1,10 199:2 199:8 200:4,6 207:18 215:11 215:20 216:16 217:15,22 221:20 246:2 247:4 253:4,6 253:16 256:5,9 256:18
**reese's** 47:6 118:16 125:1 193:2 197:17 212:25
**reese00041** 136:8
**refer** 6:18 7:1,6 7:11 14:23,25 100:2,23 101:4
**reference** 129:19 166:17 168:9 170:20 173:16 193:17 266:21
**referenced** 105:8 134:4 149:23 150:3 162:4,16 165:14 192:2
**referencing** 150:14 190:13
**referred** 180:22
**referring** 6:21 7:2,7,13,20 8:8 15:2 37:12 65:21 68:19,22 71:11 90:17 96:9 98:25 99:10,10,12,14 99:16 108:16 108:22 115:18 117:4 134:9 137:1 147:9 164:5 167:14 167:15 169:19 170:14 177:12 178:18 201:15 227:1 228:10 258:13
**refers** 126:16
**reflected** 26:13 26:17 28:6 65:1 82:4
**reform** 11:12
**refrain** 265:16
**refresh** 81:23 82:5 97:10 121:24 122:9 143:11 157:15 235:16 244:20
**refreshes** 114:9 245:5
**refusal** 195:4
**refuse** 195:13 195:24
**refusing** 20:8
**regard** 162:21
**regarding** 85:3 97:18 125:16 128:17 134:5 135:18,24 137:10 148:14 155:15 159:15 163:13 192:11 193:24 200:11

218:18,22 240:3 245:22 264:9 269:7
**regardless** 33:6 191:15 240:10
**regroup** 71:6
**regular** 38:6 81:6 141:6
**regulation** 37:16 165:17 201:6
**regulations** 149:8 153:9 166:4,6,10 167:23 171:17 201:4
**reimburse** 17:6
**reject** 212:7
**rejected** 212:5
**relate** 155:21
**related** 43:4 66:10,13 109:1 166:14 168:2 169:10 170:17 171:17 173:18 215:23 229:10 242:14
**relating** 119:6
**relationship** 72:25 210:9 222:15
**relative** 277:15
**relatively** 157:19
**released** 182:3
**releases** 62:25
**relevant** 38:22 152:22 269:23 270:8,8,9
**relying** 269:3
**remain** 222:16
**remains** 79:7
**remark** 225:4
**remedy** 128:13 128:25 129:19 173:8
**remember** 15:19 21:14 39:13 63:1 67:1,2,7 75:15 78:24 80:8 84:12,13 85:21 97:5 113:14,15 113:16 123:1 125:9,17 130:21 133:5 133:12 142:7 142:11,15 143:19 144:10 145:23 146:12 150:6,7,9,15 154:9,23 155:8 163:24 164:3,8 165:4 168:4,7 169:20 170:6 179:5 184:17 186:2,5 193:5 198:18,19 201:7 206:9 217:16 235:10 235:14 242:18 243:1 269:20 276:3
**remembering** 184:16
**reminded** 71:7
**reminds** 265:15
**reminger** 1:20 5:10
**reminger.com** 5:14
**remove** 215:22 217:17
**removing** 176:8
**renew** 120:23 121:3 144:19
**renewal** 121:13 122:6,11 144:2 144:4,6 145:4 178:16 187:5
**renewed** 144:22,25
**renewing** 121:9
**repairing** 210:8
**repeat** 33:5 90:11
**repeating** 237:3
**rephrase** 111:11
**report** 3:6 31:24 32:14 61:24 62:3,4 94:13 96:15,21 97:3 103:21 110:5,15,23 117:21 118:2,5 118:15,18 155:9,18,22 202:15 206:15
**reported** 62:10 68:15 83:13,25 178:14 180:25 181:1 187:3 203:19 205:5 244:7 245:12 246:7
**reporter** 10:21 150:17 223:9
**reporting** 69:3 69:7,10 84:2 93:3,13,18 96:5 104:19 110:11 115:12 115:16 116:16 149:4 150:23 210:5,14 277:17
**represent** 12:1 12:3 113:24 122:2 129:12 136:9 164:21 184:12

**representative** 9:6,7
**represented** 12:6 62:20,23
**representing** 164:11 231:5 235:1
**request** 30:3 72:11 114:21 114:23 118:21 147:7 178:15 187:4 195:15 197:10,12 203:12,13 249:18 250:10 256:13 259:20 262:13,13 265:21,24
**requested** 61:8 71:17 85:10 147:4 177:24 177:25 178:3,3 185:21,22 206:7 213:16 251:22 253:4 256:5 261:11
**requesting** 72:10 86:19 251:16 262:22
**require** 153:7 153:13
**required** 27:10 34:16 83:14,23 99:4 108:13 120:18 139:18 140:17 152:7 221:8 228:2,24 263:17
**requirement** 33:23 69:16,25 99:17,20 228:9 233:14 252:25
**requirements** 149:4 150:22 171:23 205:3,4
**requires** 51:22
**requiring** 84:17
**reread** 228:16
**research** 157:20,25 158:10 166:18 168:10 172:23 173:19 196:10 218:3,5 223:13 253:2 273:24
**researching** 153:3 213:19
**resign** 70:9,18 77:21 78:7,7
**resigned** 81:3
**resolved** 64:2 126:7 207:25
**respect** 13:17 22:25 30:9 42:10 44:17 53:21 55:1 70:22 79:13 80:16 83:12 116:13,16 117:8,14,22 123:5 125:8 129:16,23 131:15 132:5 148:15 153:7 166:7 173:7 181:9 183:14 192:14 201:20 209:21 230:8 232:6,10 262:24 264:13
**respected** 159:24 160:18
**respond** 108:3 132:16 211:1 212:11 246:16
**responded** 156:17 218:9
**respondent** 51:5
**responds** 78:25 264:4
**response** 102:16 107:25 127:12 135:14 136:10 140:19 158:24 164:24 171:25 178:4
**responses** 155:1 156:7,16 161:13
**responsibilities** 31:3,5,21 66:24 124:11
**responsibility** 23:8,15 31:11 31:16 32:8 125:2 206:14
**responsible** 23:6,14 24:3 28:9 30:12 32:4 83:18 247:19,21
**restate** 111:16
**result** 53:3,7,25 54:7,19,20,21 106:18 111:5
**results** 125:16 135:24 154:17 154:20
**resume** 61:8
**resumes** 61:15
**retained** 37:6 113:12,15 114:11,13
**retaining** 94:6
**retaliated** 50:2
**retaliation** 49:22 50:12
**retention** 106:19
**retire** 11:1
**retired** 18:18 18:20 47:18

**return** 82:23 83:1 264:22,24
**review** 12:15 47:24 48:7 79:4 83:3 90:7 91:24 94:21 95:18 115:8 119:19 120:7 120:19 126:21 126:22 130:5 133:20 136:22 143:8 149:9 150:2 155:17 165:15,19,21 166:1,22 168:24 171:6 173:12 199:17 199:21 205:24 208:17,19 209:8 243:20 269:4
**reviewed** 22:17 48:3 74:1 97:9 150:1,13 159:6 161:18 165:13 168:15 170:3 170:13 171:7,9 171:16,23 172:3,7 200:14 205:3 207:20
**reviewing** 12:18 128:9 143:10 162:24 210:24
**revise** 194:9,12
**revised** 82:9 89:23,23 268:16
**revising** 89:13 90:21
**revision** 120:16
**revisions** 48:3,6 48:16 79:13 116:13,14 133:20
**rfp** 149:12 150:2 170:11 170:17,19
**right** 20:15 42:21 52:13 55:14 62:15 63:5 68:3 69:21 78:17,25 81:1 97:7 103:13 112:16 114:20 117:12 122:13 139:22 142:3,22 143:2 143:14 146:7 148:9 149:1 156:8 158:3 162:18 166:22 167:20 168:19 172:13 176:1 181:15 187:11 189:11 190:6 191:15 192:21 202:22 203:21 204:16 216:3 219:24 222:10 224:13,15 228:12,21 231:23 239:7 245:18 255:3 257:14 263:12 268:20 272:5 273:23 275:20
**risk** 105:15 211:10,10 212:22
**risks** 92:20 253:1
**role** 15:18,23 24:2 46:16 47:6 68:24 78:16 122:16 222:3
**roles** 31:8
**rudd** 1:18 277:3 278:7
**rude** 229:21
**rule** 55:19 277:19
**rules** 1:17 9:13 56:11
**run** 247:7 248:25
**running** 39:5
**runs** 146:25 175:1

**s**

**s** 6:10 47:4 175:19 246:23
**salaried** 109:10
**salary** 72:8 109:9,11 270:25 271:4,6 271:8
**samhsa** 149:10 170:24 171:2 171:10,13,14 171:20,22
**san** 223:14,25 241:5
**sat** 267:9,13
**satisfactory** 88:7 91:7
**satisfied** 48:10
**satisfy** 206:23
**saturday** 141:19 148:18
**save** 13:17 14:8 168:14
**saving** 44:24
**saw** 14:11 32:23,25 60:25 61:3 77:18 137:3 138:6 142:9 246:17 264:2
**saying** 11:18 40:8 51:25 54:11,12 71:17

77:1 79:1,25 84:23 87:24 96:12,16 100:17 102:24 103:17 130:8 159:4 178:10 179:13,18 182:1,17,21 198:8 210:11 214:2 227:8,11 232:19 237:4 238:1 261:3
**says** 21:19 34:1 37:13 38:7 51:2 53:25 54:19 59:13,22 69:23 70:2 86:13 87:10 92:15 102:21 108:4 115:1 124:1 128:1 130:9 137:6 182:9 209:18 209:19 217:17 218:8 231:22 244:7 245:12 246:5,11 264:19
**schang** 5:14
**schedule** 120:5 205:24 206:3 209:8 210:13
**scheduled** 177:2 190:7 203:3
**schedules** 34:18
**school** 268:25
**scratch** 34:12
**script** 198:4,14 198:15,16,21 199:24 241:16
**seal** 278:2
**search** 40:6,8
**searches** 166:20
**searching** 257:8
**second** 8:25 56:3,7 69:5 92:12 102:19 103:12 105:5 113:14 131:11 136:7 162:12 191:5 193:18 199:19 216:23 226:12 241:7,8 241:9,17 242:3 242:7,17 244:15 274:24
**seconds** 191:1
**secretary** 30:5 32:5 38:5 140:7
**section** 23:4,12 23:13 24:17 28:23,23 29:25 52:17 54:25
**security** 261:14
**see** 12:19,23 18:3 21:18 23:17 28:19 50:25 51:21 52:2,19 56:11 64:18 67:3,6,8 68:5 74:17 86:15,22 87:16 87:25 90:10 106:15 108:5 109:6 119:9 127:12 128:3 129:19 132:19 134:7 136:14 136:17 149:3 154:8 168:12 168:25 172:17 183:19 190:19 191:3 204:4 207:14,19 209:23 216:6 218:12 225:3,8 228:3 236:8 242:19 245:8 245:24 246:4,8 248:18 253:18 254:16 258:1,5 268:14
**seeing** 229:6
**seek** 58:9 152:17,19,24
**seeking** 56:5 57:10 106:9 255:20 257:15
**seem** 72:24
**seemed** 137:20 138:1 210:3 224:4 237:9 268:17
**seems** 137:17 172:4 184:21 214:13
**seen** 35:12 82:1 137:18 138:1 139:15 156:7 189:3 241:21 269:25
**select** 81:4
**send** 27:18 30:18 32:12 63:15 71:4,6 82:17 102:24 114:23 116:23 163:19,21,25 176:21 178:7 186:3,6 206:4 262:20
**sending** 30:12 32:8 33:15 63:17 68:7 76:25 102:22 115:22 116:6 128:20 130:3 157:13 162:14 173:3 176:3 177:17 179:11 184:6 188:12

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-1 Filed: 08/31/26 Page: 127 of 297 PAGEID #: 2029



188:17 207:13 210:12 227:16 252:20 259:7
**sends** 102:15 102:20 130:7 190:3 214:1
**sensitivity** 131:16
**sent** 27:23 30:5 30:15 33:20 38:5 63:9 87:25 89:24 98:10,14,15 100:22 102:8 122:4 123:3 126:3 142:9 154:22,25 155:5 160:3 163:18 173:23 174:15 176:14 176:18,19,20 176:22 177:13 177:14 178:4 181:23 182:2 183:17 184:23 193:15,22 195:21 199:7 206:5 216:9,25 227:11 249:20 249:22,23,25
**sentence** 50:23 52:23 92:9,14 102:21 105:19 110:2 113:15 122:8 137:6 162:19 176:13 187:11 193:18 196:22 197:20 202:5 207:23 209:22 214:24 258:10
**separate** 35:15 53:15 88:21 98:16 195:14 275:7
**september** 3:8 3:11,13,15,18 3:20,22,24 4:3 4:5 27:15,19 28:1,24 46:6 46:11 115:18 139:18 140:3 140:16 141:1 141:15,23 147:10 148:4 148:11 150:9 150:10,11 153:17 155:7 156:22 157:11 158:3 162:5,10 163:15,16 165:13 172:20 174:3 177:6 181:15 182:14 183:7,18 192:9 193:2,4,5 196:10 197:13 197:16,21,24 198:7,7 199:1 199:10 200:15 200:18 202:16 202:19 203:2,6 203:12 207:13 213:23 215:24 216:5 217:7 218:4,6,6 224:16,24 225:7 231:8 235:25 238:1 240:8,22,25 241:1 242:14 245:6,14,21 257:19 258:1 259:8 260:22 261:19 262:1 262:14 264:5 265:11 270:1 275:20
**serious** 78:12 176:5 229:4,7
**seriously** 228:1
**serve** 24:18 79:8
**service** 39:2 41:10 250:6,7
**services** 39:16 39:17,20 71:23 72:3 117:8 144:7 171:3,15 249:1 250:2
**set** 36:25 60:18 81:15 98:23 140:25 157:1 190:20 191:7 191:14 204:14 220:17 221:10 221:14,15 278:1
**setting** 34:16
**settled** 203:20
**settlement** 8:20
**seven** 10:2 18:4 18:4,4 238:5
**several** 241:13
**shakes** 9:20
**share** 13:22 106:17 159:16 159:21 160:2 162:2,4 163:3
**shared** 79:6 86:24 137:22 161:22 162:6 162:20 173:22 174:2 199:21
**shearer** 5:3,4 101:24 142:23 143:21 254:4 266:7 274:17
**ship** 250:15
**shipped** 254:18 257:5
**shocking** 256:12
**short** 76:2 220:2 242:25 257:24

**shortened** 6:18
**shortly** 244:22
**show** 44:21 123:8 150:7 235:15 254:18 257:10
**showed** 163:17 223:21 233:11 237:7
**showing** 214:20 216:3
**shown** 257:10
**shows** 254:18
**siblings** 53:7
**sic** 68:4 120:24
**side** 44:7
**sierra** 146:25 148:22 175:1 175:19,24 176:3 201:11 202:8 217:7
**sign** 116:4
**signatory** 59:8 207:3 230:21
**signature** 22:4 22:13 59:7 269:15 270:6 278:6
**signed** 60:7 177:16 186:22 207:4
**significant** 53:6 201:13
**similar** 9:12 64:3 105:22 114:1 129:5
**simpler** 225:22
**simply** 19:12 98:9 268:3
**single** 80:20 141:2,5,11,13 141:17 145:7 145:10,12 146:14,17,19 181:13 225:24 252:18 257:9 270:21,22,23 270:24
**sir** 254:3
**sit** 15:20 32:6 37:10,19 64:25 65:4 89:4 97:4 101:1 102:6 117:15 149:1 154:10 165:6 168:8,18 170:7 184:21,24 190:25 217:20 252:19 265:25 274:1
**situation** 56:19 117:4 251:20
**six** 17:22 18:13 32:7 34:9 37:6
**skilled** 47:22
**skimmed** 49:3
**slice** 41:4
**slightly** 54:18
**slow** 212:22
**small** 47:20 247:7
**smith** 250:13
**smolak** 46:24 47:3,11 246:23
**social** 131:14
**sole** 268:1
**son** 40:11 148:20
**soon** 149:18 201:1
**sooner** 159:8
**sorry** 14:3 21:13 32:10 67:17 88:10 119:8 138:18 165:19 170:10 203:12 240:24 254:1 270:5
**sort** 34:25 47:22 94:24 149:13 160:22 161:25 198:4 205:1 222:21 223:6
**sought** 165:7
**sound** 158:18
**sounds** 77:24 127:15,16
**source** 151:9 159:15
**sources** 162:3
**south** 5:19
**southern** 1:2 6:15
**speak** 103:24 105:2 145:3 180:17 223:5
**speaking** 12:11 55:9 74:4,5,6 102:2 133:17 152:1 210:23 247:15
**special** 30:2,4 252:25
**specialize** 166:25
**specializes** 119:18
**specialty** 10:14
**specific** 7:12,22 14:24 45:17 46:3 57:15 59:8 74:25 82:8 86:5 97:5 101:4 110:20 114:7 117:17 154:13 167:25 168:4,9 169:8 201:5 252:10 253:3
**specifically** 13:24 72:12 75:13,14 101:4 117:13 126:20

130:24 137:9 157:17 167:5 188:11 195:9 226:9 236:21
**specifics** 117:19 190:24
**specify** 251:17 251:18
**speculate** 64:5 67:11 186:8 205:17 252:7
**speculating** 88:20 95:4,5 193:8
**speculation** 236:22 237:19
**speeding** 57:13
**spending** 258:20
**spent** 235:7 254:21
**spoke** 12:4 179:1 181:2,6
**spouse** 53:6
**ss** 277:2
**staff** 23:9,16 59:5 81:25 82:7,17,21 92:17 98:23 111:17 112:24 113:1 124:23 130:10,16 132:19 152:8 214:6,9,13,21 215:6 227:19 229:12,18,23 231:4 260:25 265:16
**stage** 161:20
**stages** 121:14
**stall** 93:3
**stamp** 52:14,15 76:18 102:17 157:9 209:18
**stamped** 86:12
**stand** 217:11
**standing** 226:3
**stands** 171:13
**star** 126:14
**start** 9:11 20:23 29:8 63:13 67:21 76:16 161:4
**started** 10:1,22 39:24 181:10
**starting** 28:4 122:1 207:12
**state** 1:19 6:8 9:20 34:16 40:24 64:6 66:3 98:19 105:12 122:6 126:4 136:19 137:17 158:4 158:17 159:7 159:14,17 162:23 171:25 187:8,12 192:7 193:11 197:11 198:23 199:12 207:22 212:13 220:11 227:25 228:7 238:25 248:8,11,24 250:8 257:3 258:4 277:1,4 278:8
**state's** 162:22
**stated** 102:9 117:24 189:7 189:10 192:3 195:12 212:23 220:22
**statement** 2:8 45:24 99:5 107:6 117:18 118:8 225:24 266:18 267:3 274:13
**statements** 237:3
**states** 1:1 24:2 24:17 26:19 30:2 53:1 70:24 89:8 120:4 130:23 132:17 135:1 186:25 210:3 227:15
**statewide** 250:7
**stating** 105:21
**status** 123:5,11 123:15,24 124:2,9,10,20 125:2,8 126:20 133:19 136:21 136:25 159:4 181:5 191:19 194:22 195:1 200:11 205:2,7 222:6
**statute** 37:12 37:15,16,18
**statutes** 269:4
**stay** 70:20 77:10,13,17 78:15,21 134:18,20 175:2
**stayed** 77:13 158:9 201:16
**staying** 175:22
**stenographic...** 277:11
**step** 70:4 145:15,17 271:5
**steps** 145:22 264:9
**steven** 5:11 245:2
**steward** 1:8,14 5:8 6:14 25:4 38:18,19 39:9 63:10,15 64:16

87:10 89:11 98:5,20 102:15 102:20 103:6,6 105:14 108:3,8 110:13 111:7 125:15 128:16 130:7 135:23 136:13 172:16 182:3 183:15 184:8,24 194:9 213:22 214:1 220:17,19 224:17 225:6 236:6 262:21 264:4,24
**steward's** 64:6 87:18 90:20
**stock** 251:24 252:3,11,15 253:6
**stomach** 148:20
**stop** 23:9 104:18 164:5 166:5 167:2 182:23 193:8 203:1 217:5 219:2 226:14 227:20
**story** 43:10
**straight** 179:15
**straightforward** 233:2
**strain** 141:8
**strategic** 81:7
**street** 1:20 5:12 5:19
**strict** 106:14,18 107:19 180:23
**strike** 116:21 224:13 255:22
**strings** 179:23
**struggle** 13:15 145:9
**struggled** 40:11 41:21 107:8,9
**struggling** 43:11 107:16
**stuck** 241:16
**stuff** 63:4 65:20 167:1 170:6 207:21 241:18
**subject** 39:22 119:7 136:16 157:11 169:22 258:4
**submission** 98:23 105:12 105:24 114:17
**submissions** 147:20 156:11 156:16
**submit** 69:17 95:7 99:4 111:18 166:19 218:25
**submitted** 38:5 110:20,25 120:23 249:19 256:4
**submitting** 251:21
**subpart** 49:24
**subpoena** 136:10
**subsection** 168:5,9
**subsections** 168:7
**subsequent** 94:24 96:20,25 218:14 245:19
**subset** 170:23
**substance** 46:17 47:24 52:4 63:23 84:6 137:1 171:14 186:23 198:21 275:6
**substantiates** 95:23
**substantive** 22:20 46:17 48:16 223:22
**subtitle** 49:22
**sudden** 94:7 206:19
**sudhoff** 5:18
**sued** 8:19,21
**suffered** 13:25
**suffice** 65:7 124:25 149:22 149:25
**sufficient** 35:5
**suggest** 110:3 173:13 197:17
**suggested** 85:14 131:5,9 204:23
**suggestion** 110:2 111:4,5 182:19
**suite** 1:20 5:12
**suites** 5:19
**summarizing** 127:18 142:9 199:8
**summary** 116:23 134:5,7 135:18 137:2 216:15 217:9
**sun** 10:23
**sunday** 148:18
**supervisor** 33:8 33:13 50:4 61:21,22 62:8 211:13 219:5,8 219:10,12 223:23
**supervisory** 247:4
**supplied** 168:16

**supposed** 71:4 151:1 223:15
**supposedly** 241:21
**suppositions** 179:24
**sure** 12:5,7 23:13 31:17 32:22 33:2 35:2 45:5 47:9 48:10 59:25 66:15,22 70:5 76:4 78:19 79:23 80:3 82:18 85:8 87:2 89:3 90:11 92:20 96:17,18 112:7 115:2 123:7 124:17 131:18 142:2 144:4 145:13 170:5 181:11 198:11 202:9 214:12 233:15 242:18 262:4 273:20
**surmise** 237:14
**surprise** 138:5
**surprised** 137:18,20 138:1,7 139:14
**suspend** 111:24 112:5,14,17
**suspended** 111:21 113:11
**suspending** 113:9 199:19
**suspension** 275:14
**sworn** 6:4 277:8
**synchronize** 191:9
**syringe** 39:2 41:10
**system** 249:9 249:10 254:24

**t**

**t** 175:20
**table** 145:12
**take** 9:25 10:4 21:1 29:14 36:7,17,19 44:16 46:2,7 49:11 50:14 67:20 97:12 111:13 129:15 130:10 140:9 143:1 157:4 165:18 179:6 182:9,19 183:3 185:22 220:2 227:25 233:20 237:22 238:6 243:6,20 255:15,16,18
**taken** 1:17 7:25 29:4,12,15,20 40:24 97:14 132:5,6,9 140:10 183:6 220:4 266:12
**takeover** 235:24
**takes** 18:23
**talk** 11:23 27:17 40:1 42:23 63:11,12 70:3 80:17 126:15,18 128:2 149:6 175:25 177:3,4 177:5 179:13 196:14,15 197:23
**talked** 11:15 28:3 42:1 68:17,23 76:3 80:18 111:12 131:6 154:14 176:6 181:14 203:7 218:19 219:17,17 235:6 240:17 240:17 242:16
**talking** 22:19 28:11 53:17 77:8 88:17 91:16,17 112:22,24 113:1 145:6 153:24,25 161:7,8 162:9 181:10 192:20 194:13 242:8
**talks** 49:25 92:14
**target** 189:14 203:23 204:2
**targeted** 105:7 105:24,25
**targeting** 106:8
**tasha** 1:15 5:8 15:11 25:18,25 26:15 27:13 43:15 85:6,14 86:11 87:11 88:15,15,24 113:3,6 188:9 188:21 190:3 192:2 203:1 220:19,22 221:9,15 237:12
**tasha's** 95:20
**technically** 98:13
**telephone** 142:16 240:16
**tell** 48:12 66:5 72:4,7 90:16 103:20 104:1,4 104:6,12 124:6 127:7 137:9

138:10 146:15 174:9,22 175:21 176:1 177:19 195:16 195:17 219:9 222:2 227:12 248:6 255:20 256:1 266:7
**telling** 173:11 186:11
**tells** 35:13
**temperament** 219:25
**ten** 18:11 29:25 152:8 180:20 191:1 233:7 235:5,7,11
**term** 6:20 42:4 71:10 203:23 214:25
**terminate** 60:15 221:19 274:10
**terminated** 222:14
**termination** 19:24 20:4,7,8 271:18 275:13
**terminology** 42:5
**terms** 6:18 24:18,20 27:13 91:8
**test** 45:20 73:1
**testified** 19:10 129:21 201:19 239:9 255:1
**testify** 277:8
**testifying** 96:13 111:2 188:16 234:10 255:12 256:16
**testimony** 31:18 57:7 59:1 64:8 93:9 104:21 121:1 132:22 152:16 179:10,15 184:5,6 189:20 205:9 220:21 223:19 234:4 251:11 255:3 274:7 277:10
**text** 4:1 22:25 23:2 97:9 125:19 240:15 242:22 243:4 244:10
**thank** 6:12 11:17 12:14 97:12 135:20 185:15 186:10 229:23 233:5 249:23
**thanked** 176:3
**thanks** 77:3
**thereabouts** 158:15
**thing** 49:23 64:19,21 70:23 95:13 150:25 166:12,13 185:18 209:18 216:20,23 219:19 256:22
**things** 12:20 55:18 63:3,14 68:18 70:2 78:10 136:21 136:25 150:1 198:16 223:20 234:7 241:5,14 267:13 275:13 276:6
**think** 17:21 18:4 22:7 26:2 27:11 32:18 34:13 43:9 47:8,19 52:1 59:5 60:1,6 61:10 62:3 64:19 65:1 66:10,13,21 67:5 68:18 69:1,8 70:2,4 71:7 72:23 73:17 76:3 77:4 79:16 81:8 82:19 90:24 91:2,3 91:14 92:16 94:23 96:21 102:23,24 103:17 109:16 112:2 113:3 115:1 118:12 120:15 125:18 126:5 127:1 129:3 130:10 130:18 131:4 131:10 134:15 136:20,24 137:7 138:2 139:8,12 141:1 142:1 143:1 146:12 147:6 148:7 150:5,8 150:10 151:24 154:22 156:1 158:17 159:1 160:3,3 169:4 171:8 172:5 173:24 175:9 177:17 179:1 182:12,14,21 185:1,19 189:25 190:1 193:16 194:5 196:6 197:13 199:25 200:8 200:20 202:19 202:23 203:5 210:8,18 214:2 214:4,5,7

215:1,21 217:11,23 218:19 219:18 221:13 222:13 223:6 226:6 228:10,20 235:3,6 238:16 239:3 242:16 243:14 247:9 252:1,23 255:25 257:6 258:21 259:17 260:12 265:5,8 270:24 271:13 271:16,21
**thinks** 209:19 222:22,22
**third** 30:4 50:23 56:9 70:1 106:12 196:21,22 207:24 217:2 228:2 264:17
**thirds** 38:3
**thorough** 224:9
**thoroughly** 49:4
**thought** 34:24 38:22 44:12,22 64:4 65:23 71:22 75:16 76:5 80:14 83:6 90:3 91:1 96:22 101:20 110:9 138:2,8 141:2 179:4 180:12,13 186:9 188:1,18 188:22,23,24 189:1 194:14 197:24 203:6 206:21 207:2 215:12 223:3 246:11 255:9 256:11 263:12 269:23
**thoughts** 161:23
**thousand** 165:5 248:22
**thousands** 70:15 161:19 254:17 261:15
**thread** 87:6,7 98:16 159:2 210:21 212:12 243:5 247:11
**three** 23:4 27:12 28:23 29:2 55:17 85:9 88:17 114:16 116:16 189:5,9 202:5 203:21 205:10 225:18,23 237:25 238:4,7 238:8 249:2
**threshold** 74:14,15
**throw** 93:12
**throwing** 112:21
**thursday** 220:14
**ticket** 57:13
**time** 9:8 11:9 12:3 15:24 16:9 24:7 26:3 26:5,8,10 34:5 34:14,21 35:5 47:5 48:9 49:6 49:9 53:11 60:19 63:12 64:1,4,7,13,20 65:23,24 68:12 69:8,11 74:18 75:19,20,25 76:2 77:1 78:17,21 80:14 80:22 81:24 82:22 83:22 84:8 85:9 86:16 100:21 105:3 106:24 109:11 120:22 122:10,25 123:11 124:16 126:11 128:8 130:10 131:2 132:3 140:9,22 141:3 142:4,14 143:2,16,17 144:9 146:6 147:15,16 148:4 149:21 151:14 154:1,1 154:4,12,13 155:6 158:11 165:18 170:24 171:10 172:20 179:6 180:5 181:14 190:24 191:6 192:9 193:1,22 197:4 197:15 220:8 221:22 227:21 228:23 231:25 232:24 233:10 236:14 241:15 241:21 248:19 256:10 259:20 260:21 265:18
**timeline** 80:6 140:13
**times** 8:2
**timing** 179:22 183:14 198:12 198:13
**tip** 237:11
**tipped** 237:4
**title** 47:6,10,14 52:17 62:12 78:19 224:2 270:13

**titles** 167:10 168:5
**today** 6:13,17 10:24 12:20 15:21 19:2 20:10,22 26:19 31:18 32:6 35:19 37:10,19 57:7 59:1 64:25 65:4 68:18 89:5 93:9 96:13 97:4 101:1 102:6 104:22 111:2 117:15 132:22 152:16 154:10 164:7 165:6 168:8,18 170:7 173:2 179:10,16 184:5,6,21,25 189:3,4 192:19 193:7 199:14 205:9 213:8 217:20 230:7 230:23 231:1,3 234:5,11 251:11 252:19 269:25 274:1
**today's** 11:14 12:15 13:5
**together** 85:14 86:16 179:23
**told** 40:7 44:3 46:22 66:7,19 88:15,16 103:21 115:5 145:11 146:25 149:22 195:19 205:20 223:24 234:6 246:21 266:8 268:8 274:15 275:15
**took** 11:2 32:8 47:1 89:20 149:16 159:24 243:25 248:13 248:14
**top** 21:18 45:18 98:3 148:6 172:15 210:9 213:21 216:6 243:12
**topic** 173:25
**topics** 203:4 275:23
**total** 251:6,7
**toward** 116:20
**towards** 105:11
**training** 130:11 130:15 131:1,6 131:10,13,16 131:23 132:8 132:10 252:25
**trainings** 131:19
**transfer** 18:14 18:23 19:1,7 19:18 20:9
**transferred** 19:11
**transmission** 249:16
**traveling** 223:22
**tread** 159:1
**treating** 131:14
**trick** 244:5
**tried** 171:6
**trigger** 249:15
**trinh** 25:10 40:17
**truck** 249:1
**true** 25:7,16 42:23 44:21 156:15 179:3 192:15,25 210:11 234:12 256:6
**truly** 200:21
**trust** 69:12,19
**truth** 212:13,14 277:8,8,9
**try** 14:24 144:1 220:2 236:18 255:3
**trying** 89:18 90:25 93:3,11 93:12,17 94:14 94:20,22 104:18 112:7 112:18 113:5,7 118:7 144:17 150:18 166:2 181:8 183:13 191:12 203:1 237:6 238:25 239:4 244:5 252:8 253:16 254:7 259:1 269:21
**tuesday** 71:7 77:5 116:23 140:25 244:8 245:12 246:8
**tune** 49:11
**turn** 52:12,14 88:7 157:9
**turned** 78:12 223:21 237:14
**turner** 1:15 5:9 15:11 25:18 43:16 85:6 86:10,11 88:25 190:3 220:19
**turnover** 106:23
**turns** 222:16
**tweaks** 173:13
**twice** 218:20 240:18 242:16
**two** 24:17,18 27:10,14 28:23 30:6 33:20,22

33:24 38:3 78:7 82:22 95:18 96:1 116:15 145:17 145:21 154:5 158:25 199:14 199:18,23 200:3 210:25 221:8 226:15 226:18 239:19 245:23 264:21 265:7
**tying** 185:19
**type** 22:19 36:23 40:14 47:14,16,22 71:22 73:23 74:14 98:25 236:24 238:15 238:19 247:3 251:4 254:24 254:25
**typed** 22:19
**types** 81:11
**typewriting** 277:13
**typically** 211:12
**typos** 115:5

**u**

**u** 6:11
**ultimate** 60:14
**ultimately** 94:12 98:2 112:2,17 204:18 218:10 218:22 222:4 222:20
**ultimatum** 77:12
**unanimous** 49:19
**unauthorized** 260:5
**under** 8:20 37:14 49:22,24 52:3 54:8,10 54:17,24 73:13 73:24 74:1 100:21 101:2,8 101:17 104:2 161:24 218:8 228:24 239:18 249:10 256:16 263:7 277:18
**underlined** 134:20
**underlining** 134:17
**understand** 10:1 19:22 20:20 22:10 27:16 54:2 71:21 82:11 94:11,14 101:3 113:5 118:3,7 123:23 136:20 136:25 144:18 159:6 178:2 184:4,10 226:1 231:23 234:22 234:25 238:20 252:8 274:10
**understanding** 6:22 7:4,8 9:23 16:16 18:22 21:22 34:20 35:4 36:21,24 37:6 59:14,23 60:4 64:7,15 90:15 94:10 100:10,11,20 100:25 101:7 101:14,16 102:3,7 103:5 103:25 104:3,5 104:9,11,14 109:7 119:23 124:8 131:13 132:22 141:24 145:2 165:2 210:17,18 228:22 235:22 248:3 249:20 256:15 265:1 267:25 268:7
**understands** 69:1
**understood** 29:17 43:15 49:10 81:4 87:4 90:9 137:17 143:24 194:15 259:3
**underway** 199:22 236:11 236:16
**unexecuted** 22:3 184:9
**uniform** 149:8 149:20 167:22 167:23 168:6 171:11
**unilateral** 153:11 251:12
**unilaterally** 187:20 260:11
**united** 1:1
**university** 10:13 44:5
**unknown** 40:6
**unlawful** 239:4
**unnoticed** 233:21
**unproven** 103:1,15,23 188:13
**unquote** 72:12 206:7
**unrelated** 55:12
**unusual** 63:3
**update** 75:22 80:10 181:7

216:14
**updated** 79:22
**usa** 10:24
**use** 8:13 10:3 17:10,13,16,19 17:23 18:13 64:23 75:7 151:6,16 210:4 210:13
**used** 17:14 35:1 42:4 66:12,21 151:4 203:22 238:21
**using** 6:18 60:13 71:10 146:4 151:8 209:18 245:10
**usually** 30:15
**utilize** 13:4

**v**

**vague** 66:1
**valid** 29:10,13 29:21 233:20 240:11 267:24
**validity** 19:23
**valuable** 41:12 42:13 43:24 109:16
**valued** 81:11 81:13
**various** 43:4,14 46:24 59:12 62:24 64:1 128:21 149:9
**velocity** 7:6,7 60:20 61:7 62:17,18 63:2 65:17 67:4 68:24 70:9,13 70:21 71:15,19 71:24 75:10 77:11,14,18,21 78:8 138:25 193:25 208:12 215:16 240:5 241:25 246:3,5
**vendors** 56:6
**verbal** 105:11 118:9 127:4 184:18 185:16 219:1
**verbally** 217:3
**verbiage** 49:2
**version** 22:6 49:7 115:8 177:19 178:1 185:19 242:3
**versus** 6:14 73:12 74:6
**vice** 80:24,25 81:5 227:17
**view** 179:22
**views** 189:16
**violate** 55:18
**violates** 56:9 57:23
**violation** 51:8 56:14,18 57:9 57:13
**violent** 238:21
**voice** 240:16 271:21
**voiced** 111:6
**volition** 70:6,18
**voluntarily** 38:14
**volunteer** 46:25 47:12,13 246:24 247:1
**volunteers** 55:10
**vote** 21:23 24:14 25:5 26:20 37:24 49:19 59:3 270:20,21,23 271:2,4,23,25 272:9,12,14,16 272:17,21 273:5 275:12
**voted** 25:4,22 26:2,12 58:25 267:16 270:25
**votes** 273:19
**voting** 271:8,17 273:7,12
**vs** 1:7

**w**

**wage** 95:11 107:15
**wages** 107:2
**wait** 9:15 18:19 84:16 126:6 204:19
**waive** 35:18,18
**waiving** 12:8,9
**walk** 10:9,18 164:14 248:9
**walking** 262:19
**want** 11:16 19:18 34:3 35:17 52:7 58:15 70:5,8 70:17 73:20 87:4 103:7,10 103:13,13 104:4,6,12,23 105:3 109:12 128:2 141:18 142:21 151:22 163:7,12 165:13 172:3 181:13 186:6 192:6 202:15 205:19 206:19 210:20 211:1 222:10 224:10 227:10 228:13 242:18,20 243:6,23 245:4

248:22 266:10 266:13 268:8 275:5
**wanted** 12:7 14:16 48:9,25 49:1,10 70:9 70:20,22 72:16 72:25 74:17,19 74:21,22 77:6 77:17 78:3,3,4 84:24 86:15 94:20,21 95:17 95:18 96:2 115:25 120:10 145:3,5,8 158:20 175:25 177:1,3,4 181:11 188:25 189:12 199:12 205:13,14,16 206:12 207:1 213:17 221:23 222:1,7,11 224:6,11 249:13 258:18 259:2 263:4 271:5
**wants** 77:10 145:14
**way** 26:3,15 60:13 78:20 79:19 83:24 87:13 107:10 128:7 141:24 149:2 156:9 163:8 169:5 180:8 185:2 186:6 197:7 202:17 214:7 239:23 248:16 256:17 272:15
**ways** 44:20
**we've** 166:22 187:23 188:4 192:11 196:9 220:1 269:25
**weary** 223:9,9
**website** 61:2 261:20,23 262:1
**websites** 62:24
**wednesday** 1:21
**week** 76:7 86:16 126:19 146:2,3,5,8 174:13 180:19 264:10
**weekend** 154:2 156:12
**weeks** 30:6 33:20,23,25 82:22 221:8 239:20 264:21 265:7
**went** 10:23,24 23:2 24:10 61:2,2 68:18 136:19 140:15 148:19 149:5 165:12 205:2 220:6 248:19 249:9 265:7 268:25
**whereof** 278:1
**whim** 224:11
**william** 1:15 5:8
**willing** 19:1 78:15 184:15 228:21
**withdraw** 256:2
**witness** 8:5 45:21 67:15 81:16 85:25 161:9 189:24 242:25 243:14 254:8 266:9 274:18 276:5 277:12 278:1
**won** 43:11
**word** 46:18 59:15,23 60:4 66:21 115:8 158:11 176:20 177:18 205:25 235:23 238:20
**words** 13:13 14:24,25 22:3 66:12,16 94:8 103:9 112:10 131:17 224:1 249:17
**work** 16:5,11 32:11 34:17 55:15,22,25 61:18 64:20 65:20 66:20 71:20 74:9 75:9 107:20 146:23 147:25 148:1 167:19 189:12,12 191:8 193:25 213:9 219:15 219:22,23 223:21 227:19 227:23 228:8 228:25 229:4,7 240:4 262:24 264:14 272:8 272:22 273:8 273:12 276:6
**worked** 10:25 38:25 40:22 47:2 83:9 148:22 247:8
**worker** 65:24
**workers** 95:11
**working** 11:11 40:24 57:12 88:9,11,13 99:5 107:1 116:24 189:13 203:23 204:1

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-1 Filed: 08/31/26 Page: 138 of 297 PAGEID #: 2040



223:15 226:14 233:10,10 241:25 246:3
**works** 180:22 234:8 248:10
**world** 58:13 214:11,17
**worried** 215:4
**worries** 214:23
**worry** 141:17 141:17
**wright** 5:16
**write** 34:7,11 169:2,18
**writes** 209:22 211:4
**writing** 11:11 36:20 50:4 105:10 123:21 233:22,23 234:2 246:19 277:11
**written** 12:23 16:12 97:1 198:15 221:8 239:20
**wrong** 112:9 160:4 184:17
**wrote** 34:4 109:8 164:1 232:19

**x**

**x** 2:1

**y**

**yard** 1:20 5:12
**yeah** 8:21 13:19 16:10 17:21 18:3,4 29:9 31:8 35:7 41:24 47:4 49:13 54:21 62:3 64:2 72:1 73:15,21 74:22 75:1 76:24 82:13 87:2 88:5 91:19,19 100:5 103:16 105:3 108:25 109:21,25 111:4 112:3 113:10 124:21 127:4,14,22,25 133:15 138:11 143:20 144:9 146:7,22 147:6 158:8 160:21 162:6 165:20 168:11 170:12 173:2 178:2 188:6 190:7,17 192:16,23 194:25 204:10 205:14 206:3 211:23 213:9 220:13 224:4,9 242:10 245:16 246:10 254:6 255:15 257:14 269:22 271:10 273:24
**year** 24:18 43:9 141:12,14 144:12 145:3 146:21 147:24 148:2,25 175:1 243:9,23 244:2
**year's** 146:22
**years** 10:22 17:22 18:4,14 27:10 32:7 37:6 148:23 248:12
**yep** 13:3 23:25 38:10 54:6 109:25 115:24 138:11 207:19 207:21 234:12
**yesterday** 11:24 259:5
**yesterday's** 12:25
**york** 250:17

**z**

**z** 175:20
**zeroed** 149:12
**zoom** 65:16 191:11

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

HEALTH SCIENCE COMPASSION HUMAN RIGHTS
HARM REDUCTION OHIO

# BYLAWS OF HARM REDUCTION OHIO

Adopted: January 29, 2019

---

## ARTICLE I — NAME AND PURPOSE

*Section 1* — The name of the organization shall be Harm Reduction Ohio. It shall be a nonprofit organization incorporated under the laws of the State of Ohio.

*Section 2* —Harm Reduction Ohio is organized exclusively for charitable, scientific and education purposes. The purpose of this corporation is:

- To support and conduct research, education, and informational activities to increase awareness of drug policy guided by science, health, compassion and human rights.
- To combat overdose death and other harms caused by drug use and policies.
- To promote health-centered drug policies.
- To reduce the role of criminalization in drug policies.
- To reduce stigma and bias in drug policies.

## ARTICLE II — MEMBERSHIP

*Section 1* — Membership shall consist of the board of directors.

## ARTICLE III — BOARD OF DIRECTORS

*Section 1* — The board is responsible for overall policy and direction of the organization and delegates responsibility of day-to-day operations to the staff and committees. The board shall have up to ten, but not fewer than three members. The board receives no compensation other than reasonable expenses.

*Section 2* — All board members shall serve two-year terms, but are eligible for re-election for up to five consecutive terms.

*Section 3* — The board shall meet at least quarterly, at an agreed upon time and place. An official board meeting requires that each board member have written notice at least two weeks in advance.

*Section 4* — During the last quarter of each fiscal year of the corporation, the board of directors shall elect Directors to replace those whose terms will expire at the end of the fiscal year. This election shall take place during a regular meeting of the directors, called in accordance with the provisions of these bylaws.



EXHIBIT
tabbies
Cauchon
1
7-29-26 KR

*Section 5* — New directors shall be elected by a majority of directors present at such a meeting, provided there is a quorum present. Directors so elected shall serve a term beginning on the first day of the next fiscal year.

*Section 6* — A quorum must be attended by at least forty percent of board members for business transactions to take place and motions to pass.

*Section 7* — There shall be four officers of the board, consisting of a chair, vice-chair, secretary and treasurer. Their duties are as follows:

*The chair* shall convene regularly scheduled board meetings, shall preside or arrange for other members of the Executive Committee to preside at each meeting in the following order: vice-chair, secretary, treasurer.

*The vice-chair* shall chair committees on special subjects as designated by the board or appoint another director to chair a special subject committee.

*The secretary* shall be responsible for keeping records of board actions, including overseeing the taking of minutes at all board meetings, sending out meeting announcements, distributing copies of minutes and the agenda to each board member, and assuring that corporate records are maintained.

*The treasurer* shall make a report at each board meeting. The treasurer shall chair the finance committee, assist in the preparation of the budget, help develop fundraising plans, and make financial information available to board members and the public.

*Section 8* — When a vacancy on the board exists mid-term, the secretary must receive nominations for new members from present board members two weeks in advance of a board meeting. These nominations shall be sent out to board members with the regular board meeting announcement, to be voted upon at the next board meeting. These vacancies will be filled only to the end of the particular board member's term.

*Section 9* — Resignation from the board must be in writing and received by the secretary. A board member shall be terminated from the board due to excess absences, more than two unexcused absences from board meetings in a year. A board member may be removed for other reasons by a three-fourths vote of the remaining directors.

*Section 10* — Special meetings of the board shall be called upon the request of the chair, or one-third of the board. Notices of special meetings shall be sent out by the secretary to each board member at least two weeks in advance.

## ARTICLE IV — COMMITTEES

*Section 1* — The board may create committees as needed, such as fundraising, public relations, data collection, etc. The board Chair appoints all committee chairs.

*Section 2* — The four officers serve as the members of the Executive Committee. Except for the power to amend the articles of incorporation and bylaws, the Executive

Committee shall have all the powers and authority of the board of directors in the intervals between meetings of the board of directors, and is subject to the direction and control of the full board.

*Section 3* — The treasurer is the chair of the Finance Committee, which includes three other board members. The Finance Committee is responsible for developing and reviewing fiscal procedures, fundraising plan, and annual budget with staff and other board members. The board must approve the budget and all expenditures must be within budget. Any major change in the budget must be approved by the board or the Executive Committee. The fiscal year shall be the calendar year. Annual reports are required to be submitted to the board showing income, expenditures, and pending income. The financial records shall be made available to board members. IRS Form 990 is public information and shall be made available to board members and the public.

**ARTICLE V — DIRECTOR AND STAFF**

*Section 1* — The president of the organization is hired by the board. The president has day-to-day responsibilities for the organization, including carrying out the organization's goals and policies. The president will attend all board meetings, report on the progress of the organization, answer questions of the board members and carry out the duties described in the job description. The board can designate other duties as necessary.

**ARTICLE VI — AMENDMENTS**

*Section 1* — These bylaws may be amended when necessary by two-thirds majority of the board of directors. Proposed amendments must be submitted to the secretary to be sent out with regular board announcements.

**CERTIFICATION**

These bylaws were approved at a meeting of the board of directors by a two-thirds majority vote on September 14, 2018.

President Date

# WELCOME TO HARM REDUCTION OHIO

## Mission Statement

Harm Reduction Ohio (HRO)

Harm Reduction Ohio is a 501(c)3 non-profit organization dedicated to enhancing the health, safety, and acceptance of people who use drugs. Our commitment is rooted in:

- Basing drug policies on science, health, compassion, and human rights.
- Being the largest distributor of naloxone in Ohio.

HRO Aims To:

- Reduce harms linked with drug use and drug policies.
- Empower those who use drugs to prioritize their well-being.
- Advocate for health equity by offering compassionate, nonjudgmental medical services.
- Educate various stakeholders including the public, healthcare providers, and policymakers, to approach individuals who use drugs with respect and devoid of stigma.
- Work towards ending the criminalization of individuals who use drugs.

## Principles of Harm Reduction

Harm reduction refers to practical strategies designed to diminish the negative impacts of drug use. This includes a range of tactics from safer use, managed use, to even abstinence. These strategies are tailored to meet drug users "where they're at", focusing both on the conditions and the act of drug use itself.

While there's no one-size-fits-all definition or implementation method for harm

EXHIBIT
2
7-29-26 KR

reduction, Harm Reduction Ohio believes the following principles are essential:

1. Acceptance: Recognize that both legal and illegal drug use is a part of our society, focusing on mitigating its harmful effects rather than merely ignoring or condemning it.

2. Complexity: See drug use as a multi-dimensional phenomenon that spans from Substance Use Disorder (SUD) to functional use and complete abstinence, understanding that some drug use methods are safer than others.

3. Quality of Life: Prioritize the quality of life and well-being of individuals and communities over the mere cessation of drug use when gauging the success of interventions and policies.

4. Provision of Services: Offer non-judgmental, non-coercive services and resources to drug users and their communities to aid in harm reduction.

5. Inclusion: Ensure drug users and those with a history of drug use actively participate in shaping programs and policies intended for their benefit.

6. Empowerment: Position drug users as the main force in minimizing the harms of their drug use, empowering them to exchange information and provide mutual support.

7. Social Realities: Acknowledge that factors like poverty, class, racism, past traumas, gender-based discrimination, and other social disparities influence an individual's vulnerability to and capability of handling drug-related harms.

8. Recognition: Without undermining or overlooking the genuine and tragic harms linked with drug use, work towards understanding and addressing them.

# EMPLOYMENT POLICIES

## Equal Employment Opportunity Policy Statement

Harm Reduction Ohio (HRO) is committed to Equal Employment Opportunity as a foundational principle. At HRO, employment decisions are based on personal capabilities and qualifications without discrimination due to:

- Race, color, history of drug use, history of incarceration, religion, sex, gender, gender identity, sexual orientation, age, national origin, disability, housing history, medical history, or any other legally protected characteristic.

This policy encompasses all aspects of employment, including:

- Recruitment and hiring
- Compensation and benefits
- Termination and other employment terms.

The Director of Operations is responsible for enforcing this policy. Employees with concerns should direct them to the Director of Operations. Any intentional breach of this policy may result in disciplinary actions.

## Individuals with Disabilities

HRO adheres to the Americans with Disabilities Act and other relevant laws to prevent discrimination against qualified individuals with disabilities. We also provide reasonable accommodations consistent with these laws. This includes allowing trained service dogs.

Any accommodation requests should be addressed to the Director of Operations. Accommodations aim to enable employees to perform their roles effectively, not to exempt them from job responsibilities. The Director of Operations will engage in a dialogue with the requesting individual to

determine suitable accommodations.

## At-Will Employment

HRO practices at-will employment. Unless there's a written agreement signed by both the employee and the President, the employment relationship is at-will. Only the President can modify this arrangement. This means either party, HRO or the employee, can end the employment at any point for any reason, unless otherwise required by law.

## Non-Discrimination & Anti-Harassment Policy

HRO is devoted to maintaining a professional environment where all individuals are respected. We champion equal opportunities and prohibit discrimination and harassment. Breaching this policy can lead to disciplinary measures.

### Definitions of Harassment

Harassment is any adverse behavior towards someone based on their identity or lived experiences. This may encompass common categories like race, religion, or sexuality, but HRO extends this definition to all forms of lived experience.

Harassing behavior can be derogatory, threatening, or demeaning and often includes negative stereotyping, intimidation, hostile acts, or inappropriate jokes. This might also encompass the circulation of offensive material, including digital content.

Sexual harassment varies in its manifestations and can involve individuals of any gender. It ranges from unsolicited advances, verbal or physical misconduct, to other inappropriate behaviors of a sexual nature.

### Coverage

This policy applies to everyone involved with HRO, including applicants, employees, volunteers, vendors, contractors, and clients. Discrimination, harassment, and retaliation are prohibited regardless of the perpetrator's relationship to HRO.

**Retaliation**

HRO strictly prohibits retaliation against individuals who report any form of discrimination or harassment or participate in related investigations. Such retaliation is a severe breach of this policy and is subject to disciplinary action.

### Complaint Procedure: Reporting an Incident of Harassment, Discrimination or Retaliation

An individual who feels harassed, discriminated, or retaliated against should initiate a complaint process by filing a complaint in writing with their immediate supervisor, the Director of Operations, or the President. If the President is the perpetrator, the complaint should be directed to the Director of Operations or Chairperson of the Board of Directors. HRO strongly urges the reporting of all incidents of discrimination, harassment ,or retaliation, regardless of the offender's identity or position. If possible, HRO urges staff to report behavior prior to the conduct becoming severe or pervasive.

HRO understands that the process of formally acknowledging harassment by filing a complaint may be an intimidating process. We also recognize that harassment for many may fall into a 'gray area' at first. In all situations whether or not an individual decides to submit a complaint, HRO urges them to gather information, document what happened, and talk to trusted friends or colleagues who can provide support. We encourage anyone encountering a problematic behavior to write it down, keep all emails and texts, and document all occurrences. Harassment can build up and escalate over time.

For formal action to be taken, HRO requires a written, dated, and signed complaint containing enough details to determine if the Non-Discrimination and Anti-Harassment Policy has been violated. If any other staff member becomes aware that harassment or discrimination is occurring, either from personal observation or because of an employee coming forward, the staff should follow the same procedure in reporting the incident after informing the employee who was the subject of the harassment or discrimination.

Upon receiving a complaint that a violation of HRO's Non-Discrimination and Anti-Harassment Policy may be occurring, the Director of Operations will notify the President.

Within 5 business days of receiving the complaint, the Director of Operations will notify the person(s) charged "(respondent(s)") of a complaint and initiate an investigation to determine whether there is a reasonable basis for believing that the alleged violation of this policy occurred. During this investigation, the Director of Operations, together with the legal counsel, if one is engaged, and other management employees, will interview the complainant, the respondent, and any witnesses separately. The investigation will normally be concluded and the recommendation for discipline, if any, made within 30 calendar days of the receipt of the written complaint. The investigator will keep the complainant and the respondent informed of any process delays

If it is determined that harassment or discrimination in violation of this policy has occurred, the Director of Operations along with the leadership team, will recommend appropriate disciplinary action. The appropriate action will depend on the following factors: a) the severity, frequency, and pervasiveness of the conduct; b) prior complaints made by the complainant about the respondent; c) prior complaints made against the respondent; and d) the quality of the evidence (e.g., first-hand knowledge, corroboration). If the investigation is inconclusive or if it is determined that there has been no violation of policy, but potentially problematic conduct may have occurred, the Director of Operations may recommend appropriate preventative action. Within five days after the

investigation is concluded, the Director of Operations will meet with the complainant and the respondent separately, notify them of the findings of the investigation, and inform them of the action being recommended.

Disciplinary action, up to and including discharge from employment, may be taken against any individual who violates HRO's Non-Discrimination and Anti-Harassment Policy. Disciplinary action, up to and including discharge from employment, may also be taken against any others that condone such conduct.

## Harm Reduction Ohio Confidentiality Policy

1. General Confidentiality

- Purpose: Harm Reduction Ohio (HRO) is committed to maintaining the confidentiality of our clients, volunteers, interns, and employees. All non-public information is considered privileged and must not be disclosed.

- Scope: This includes but isn't limited to:
  - Personal details: HIV-related information, medical conditions, financial status, living situations, employment, histories of drug use, and incarceration.
  - Organizational details: Salaries, evaluation materials, budget details, meeting minutes, etc.

- Unauthorized Disclosure: Breaching these confidentiality rules can lead to disciplinary action, including termination. Such a breach may also violate federal law, which could result in a fine, jail sentence, or both.

2. Handling Requests

- Requests for information about an employee, whether electronically, by phone, or

in person, should be directed to the Director of Operations or the President.

3. Confidential Nature of Work

- All HRO-related information is strictly confidential. Unauthorized removal or sharing of such information, including electronically, is prohibited.

- Uncertain employees must seek clarity and approval from their supervisor before disclosing any information.

4. Confidentiality Concerning Employee Information

- The organization doesn't typically inquire about employees' or volunteers' HIV status or other infections. Any such information is treated as confidential, and individuals with HIV are protected under the ADA.

5. Federal Regulations and Confidentiality

- HRO adheres to Part 2 of Title 42 of the Code of Federal Regulations (42 CFR Part 2) regarding the confidentiality of alcohol and drug abuse clients.

- Before working with HRO, all personnel, including employees, contractors, and volunteers, must familiarize themselves with this regulation.

6. Incidental Release

- Accidental disclosure of confidential information (like leaving documents in fax machines or printers, or leaving unlocked file cabinets) is a breach of this policy.

7. Access to Confidential Information

- No details that are not public knowledge should be disclosed.

- Special care should be taken not to discuss sensitive information in public places.

- No information about donors or grantors may be sold by any affiliated person of HRO.

- Grant announcements or mentions of donations in public media must have the donor's or grantor's approval.

8. Donor & Grantor Confidentiality

- Information about donors and grantors is strictly confidential. This includes addresses, contact details, and donation or grant amounts.

By implementing this organized structure, it is easier to understand the key elements of the confidentiality policy.

## HOW WE WORK

### Organizational Culture & Values

#### Radical Candor

Radical candor is a communication style that emphasizes caring personally and challenging directly. This means we care about the people we're communicating with and we are candid, direct, and timely in our communication. Radical candor involves telling people in caring, non-judgmental language when their work is falling short. Radical candor is the antithesis of ruinous empathy, obnoxious aggression, and manipulative insincerity, and it facilitates deep and meaningful professional relationships.

#### Transparency

Transparency is an authentic sharing of information that honors and encourages engagement across all levels of stakeholders. Transparency is also the organization being upfront and visible about the actions it takes, and whether those actions are consistent with its values.

#### Accountability

Organizational accountability exists when all members of the workforce individually and collectively act to promote the timely accomplishment of the organization's mission and stated goals. No one can be accountable for accomplishing an undetermined goal because there is no basis against which to measure their accomplishments. Likewise, a goal that is not bound by time can never be incomplete or show insufficient progress because the individual or group working toward such a goal has an infinite amount of time to reach it.

### The People That Support Our Mission

### Employees

Employees are in HRO positions that either receive renewed funding each year or are hired for a specific project or duration of time. Employees may be on payroll or be contract workers (1099 employees). They may be full-time or part-time.

### Volunteers

These are unpaid positions for individuals seeking to advance the organization's work and/or their own personal and professional development.

### Interns

These positions are applied to individuals who work on special projects. HRO interns are typically student interns. Appointment to these positions is limited to a specific period of time, which is generally a designated number of weeks. Interns are assigned to a specific project or task.

### Independent Contractors

These individuals are employed by an outside firm, are self-employed, or are a group of individuals established as a business to provide expertise and services in a specialized field. An independent contractor must satisfy IRS regulations defining independent contractor status.

## Project Management

Project management is the process by which you move a project or campaign through its life cycle. From conception to implementation, Harm Reduction Ohio recognizes the importance of project management agreements and tools to allow staff to succeed – especially when staff have to wear multiple hats.

In order to support project management, Harm Reduction Ohio provides the tools to navigate the necessary steps. HRO provides all staff with a Microsoft account to encourage project team collaboration and overall project success.

Categorically, there are five stages of project management:

Project Initiation

This first stage officially starts the project once your team has the green light from the necessary stakeholders. In this stage, you determine what you need to make the project work, including resources - both human and financial. This will include identifying possible sources It may include securing outside funding such as grants or donations.

At this stage in the project, the team should identify a project lead who is responsible for seeing the project from start to completion. This person is not responsible for all the work but instead responsible for making sure the project is moving forward at a good rate and that team members are collaborating and receiving guidance and feedback, as needed.

Project Planning

In the second phase, you create the actual project management plan. Here you may plan the specifics of the project or campaign including the duration of the project, how much it will cost, what exactly you plan to do, and who's in charge of what.

When talking with your team, you can develop a schedule, outline milestones, and establish deadlines for key deliverables. If you have grant or other funding, this schedule should reflect any timetable submitted to or required by the funders.

Here, you should also plan for the worst case scenario, because things do go wrong, and you should always have a contingency plan in place. Among other things, someone in addition to the project manager should be aware of the major components of the projects including funding, goals, and staffing.

Project Execution

In this phase, the project comes to life. You will also monitor the execution so that you can gather project results and troubleshoot accordingly. This is where extensive user testing, project updates, status meetings, and reports are performed to keep everyone abreast of how the project is progressing.

During this stage, team members should not be afraid to contribute ideas and make suggestions for project changes along the way. This is how we ensure creativity and strong solutions.

Project Monitoring and Control

Here you'll get the key metrics and key performance indicators of your project to see how they fall in line with your original goals and objectives. Did you go over budget because of unforeseen costs? Was there a production delay because you were waiting on key assets? Whatever the case is, you'll make sure that the project metrics land right where you expect them to be or exceed expectations in this ongoing stage.

At this point, team members should reflect on the project planning phase and ensure the use of a Continuous Quality Improvement (CQI) plan. What's going according to plan? What can be done better? Is there a process we should streamline? Use data to identify and detail problems and strengths. All stakeholders should be empowered to identify problems and opportunities for improvement, and to develop and present solutions.

Project Closure

All good things come to an end, and your project is no different. In this stage, you'll make sure that all outstanding tasks are completed so that you can close out the project. It is especially crucial to future funding to submit a thorough final report, including the final budget. It is also a given that this is where your team conducts a project re-cap and evaluation to learn what went well and what could have been better and celebrates another success.

While the project life cycle will vary greatly by campaign and project, in general the same steps should be taken.

## CONDUCT AND APPEARANCE

### Hospitality Statement

It is our ambition as individuals and as an agency to treat all who enter our doors with compassion, dignity and respect, and without judgment or bias. If we notice anyone in distress, we will offer aid and comfort.

### Conduct While at HRO

HRO is a safe and secure workplace. We are united in ensuring that all employees, volunteers, interns, and guests are treated in a respectful and fair manner.

It is expected that all members of our team and visitors will respect one another. We will not allow for any kind of discriminatory behavior, harassment, or victimization. It is not possible for HRO to list all behaviors considered unacceptable however, we underscore the following behaviors that will not be tolerated under any circumstance:

- Harassment, slurs, derogatory gestures
- Verbal, written, or visual displays of items understood to have a negative racial, religious, or cultural significance
- Intimidating, demeaning, or hostile behavior, threatening violence
- Theft or inappropriate removal or possession of HRO's or other people's personal property
- The use, sale, or attempted purchase of illegal substances, weapons, or other items.

Breaches of the workplace code of conduct should be reported using the same structure as workplace harassment.

## Dress Code

Generally, HRC's dress code is casual. We trust that staff will understand what situations require dress that is casual, business-casual, or formal. Team members are encouraged to ask their supervisors when they're unsure. Regardless of style, we expect employees to make conscious choices about their work clothes and act in the best interest of HRO when doing so. Limiting or eliminating natural or artificial scents that could be distracting, annoying, or sickening to others, is also important.

If a team member's dress or poor hygiene is an issue, the supervisor will discuss the issue with the team member in private and should a) name the issue, b) give an example, c) describe it objectively, d) clarify why it's important, d) emphasize that you want to resolve it, e) invite the person to respond. If the problem persists, supervisors should utilize the Performance Improvement Plan to support the staff member in improving the matter. If there is no improvement, the other options in the disciplinary policies may be used.

## Attendance, Punctuality, & Dependability

Dependability, attendance, punctuality, and a commitment to do the job right are always essential . As such, employees are expected at work on all scheduled work days and during all scheduled work hours and to report to work on time. Moreover, an employee must notify their supervisor or the Director of Operations as far in advance as possible, but not later than one hour before their scheduled starting time if they expect to be late or absent. This policy applies for each day of their absence. An employee who fails to contact their immediate supervisor or the Office Manager may be considered as having voluntarily resigned. A careful record of absenteeism and lateness is kept by the employee's supervisor and becomes part of the personnel record. To the extent permitted by law, absenteeism and lateness lessen an employee's chances for advancement and may result in dismissal.

## Drug & Alcohol Use

HRO makes no judgment on the use of alcohol or drugs by any employee outside of the work environment. In keeping with HRO's values, we recognize the competencies, skills, and unique qualities of those who use drugs and alcohol and will offer non-judgmental assistance and support to any employee who discloses a need to address personal issues related to drugs or alcohol. HRO makes employment decisions based on job availability, qualifications, and performance. If personal drug use interferes with job performance, it will be treated as other job performance issues are treated.

**Based on the requirements of the Drug Free Workplace Act, HRO is required by law to state the following:**

Harm Reduction Ohio complies with the Drug-Free Workplace Act (41 U.S.C. § 701). The manufacture, distribution, dispensation, possession, or use of any illegal drug, alcohol, or controlled substance while on HRO premises is strictly prohibited. These activities constitute violations of HRO rules, jeopardize the agency, and can create situations that are unsafe or that substantially interfere with job performance. Employees in violation of the policy are subject to appropriate disciplinary action, up to and including dismissal.

Prohibited behaviors under this policy include, but are not limited to:

- Using an illicit substance in the workplace or at a work event
- Buying or selling illicit substances at the workplace or at a work event
- Asking other employees to procure drugs while at work or at a work event

It is a specific condition of employment with HRO that all employees agree to abide by the terms of the Drug-Free Workplace Act. As such, any employee who has had a criminal drug statute conviction for a violation occurring in the workplace must notify the Deputy Director no later than 5 days after such conviction.

In compliance with the Drug-Free Workplace Act, within 30 days of receiving notice of conviction, HRO will either take appropriate personnel action up to, and including termination, consistent with the requirements of the Rehabilitation Act of 1973, as amended; and/or may require that the employee satisfactorily participate in a drug use assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other agency as condition of continued employment with HRO.

HRO expects that all employees who consume alcohol at any event or activity that is either sponsored by HRO or at which they are representing HRO in an official capacity will do so in a manner that neither endangers nor reflects poorly on HRO, any of its programs, its Board of Directors, etc. Failure to comply with this policy may result in disciplinary action up to and including termination.

## EMPLOYMENT

### Work Schedule

Harm Reduction Ohio considers those working at least 32 hours per week to be full-time employees. HRO supports flexible work hours, but all full-time office-based employees are expected to be at work no later than 10 a.m. Monday – Friday unless they have received approval from their supervisor. Specific schedules for all full-time and part-time employees will be determined by the employee's supervisor, in a manner consistent with the employee's job description. To work fewer or more hours than scheduled, the employee must submit a written request to their supervisor and receive written approval. An employee will not be paid for hours beyond their scheduled time without such approval.

The standard work week notwithstanding, salaried employees know their responsibilities, and are expected to work the hours needed to fulfill these responsibilities. For some salaried employees there will be an inevitability of

working on some weekends or holidays. It is part of their employment and is not compensated on top of salary.

HRO staff are sometimes required to travel for work and for those employees this is a condition of employment. Salaries and other benefits were developed with consideration for this expectation.

### Time Records

Our attendance records are agency records, and care must be exercised in recording the hours worked, overtime hours, and absences. All employees must accurately track their work hours. Each employee is responsible only for their own recordkeeping. Hours are submitted biweekly to the Operations Director. The hours must reflect the number of hours the employee worked each day of the pay period. Employees should track their time to the nearest quarter hour on a daily basis. Please contact your supervisor if you have questions about your timesheet.

Employees must calculate their overtime on a weekly basis (see overtime section for further explanation). An employee's supervisor must approve each overtime entry; employees with overtime entries that do not have prior approval will not be paid for those hours and will be subject to disciplinary action.

### Offices

Harm Reduction Ohio  has one main office in Granville OH. HRO also has remote working capabilities for some positions and responsibilities. HRO's office address is:

935 River Road, Suite G
Granville OH 43023

### Working Remotely

Put simply, working remotely means working off one's computer and/or cell

phone outside of the office environment. In general, working remotely may be granted on an individual basis and if an employee's job responsibilities are suited to such an arrangement. Employees who wish to work remotely must meet the criteria below and are subject to specific standards of conduct. Note that working remotely is appropriate for some employees and some jobs; it is not a fit for an office manager, for instance, who is expected to meet visitors to the office as they enter and maintain the physical office space.

Working remotely is a means to achieve the following:

- Create a flexible workplace that considers diverse workstyles
- Create an environment for employees that increases productivity and job satisfaction
- Support employees in achieving optimal work/life balance
- Improve the organization's ability to recruit and retain well-qualified employees
- Broaden the organization's geographic reach in locations where a physical office does not exist
- Assist disabled workers, those returning to work after job injury, and other employee-specific situations
- Fulfill certain HRO goals, such as outreach to communities of people who use drugs.

Criteria

- Employees will be considered for remote work only if their job duties permit it. This is ultimately decided upon by the employee's supervisor.
- Individuals are asked to email their supervisors a formal request to work remotely. Supervisors have the right to disapprove such requests if it does not seem like a good fit.
- The employee must have access to an appropriate work environment outside of the office; they must also have the appropriate hardware and

software to complete job duties. Harm Reduction Ohio is not responsible for costs associated with setup or maintenance of the employee's home office, with a few exceptions when setting up a remote office in an alternate city.

Procedure

- Either an employee or a supervisor can suggest remote work as a possible arrangement.
- Before working remotely, the employee and supervisor will evaluate the suitability of such an arrangement, paying attention to the criteria above.
- An arrangement to work remotely will be on a trial basis for one month and may be discontinued at any time at the request of either the employee or the supervisor.
- The employee and supervisor will agree on the number of days of remote work allowed each week, the work schedule the employee will customarily maintain, and the manner and frequency of communication. Should additional remote work days be required, we ask that a formal request be emailed to the employee's supervisor.

Conduct

- An environment of teamwork, camaraderie, and integrity is essential to the culture of Harm Reduction Ohio. The utilization of technology to assist in maintaining this environment is expected.
- Employees who are working remotely are expected to be available via telephone, email, or Microsoft Teams during their work hours and will respond promptly to all correspondence, unless there are in pre-scheduled meetings, which are visible in their Outlook or Google Calendars.
- All employees, including those working remotely, are expected to ensure the protection of passwords and proprietary company information. Steps include regular password maintenance, secure document storage, and any other steps appropriate to your position and the environment where you are

working.

- Remote work cannot inconvenience other staff members. For example, staff should only be asked to scan workplace documents to a remote colleague in rare situations.

### Evaluation

Regardless of an employee's location, it is expected that the work that is required of their position is done in a timely, thorough, and thoughtful manner. The performance of an employee's remote work will be evaluated annually or as needed just as their work within the office will be. If it is found that an employee is not getting their work done while working remotely, their supervisor has the right to rescind this benefit and require an employee to work on site at the office during normal working hours.

### Distribution Events and Trainings

Organizing and attending events and the training of lay distributors are important components of HRO's distribution of naloxone and other harm reduction resources. Since much of this work is funded by grants, it is crucial to keep careful records about the time and location of events as well as a list of distributed materials. Therefore, no staff member is to participate in an event as a representative of HRO or conduct training for HRO without written approval from the Director of Programming. In addition, the employee and the Director of Programming will consult to determine how the employee is paid for this work. It may be part of the employee's normal weekly hours or the employee may accumulate paid time off for these hours. The employee may not work extra hours (overtime) in order to staff events or trainings.

### Employee Evaluation System

The contributions of our team members are vital to the integrity of our mission.

The purpose of employee evaluation is to ensure that staff activities are aligned with supporting the organization in fulfilling its mission, and that HRO supports staff in striving to expand our impact.

### 90-day Performance Review

The first 90 days of employment are considered a "trial period" during which the employee is given consistent feedback and coaching to have the chance to learn their new job and ensure the position is suitable. During the first few days of employment, the supervisor and new employee will complete the Introduction to 90-day Review Period which will include discussing responsibilities outlined on the job description and choosing up to seven job responsibilities to focus on during the performance review period. Together, the supervisor and employee will develop performance milestones that will be monitored through the review period and are expected to be completed at the end of the term. Under appropriate circumstances, such as a significant illness on the part of employee or supervisor, or if there is a change in the position, the 90-day review period may be extended.

### Annual Evaluation

The annual evaluation will take place during the month of the anniversary of the employee's hire date or other month established by the supervisor . Annual evaluations include three sections: milestones and new goals related to the job description, collaborative feedback, and a score card related to general employee responsibilities. New milestones for the following quarter are also developed during the annual evaluation.

### Performance Improvement Plan

The performance improvement plan is an opportunity for an employee to remedy insufficient performance or another issue related to their employment, when those issues have put the employee at risk for termination. During the performance improvement plan period, the supervisor will provide clear written communication of expectations and measures of improvement that the employee must reach if

they are to be considered for further employment. The duration of the performance improvement plan period is set by the supervisor and communicated in writing to the employee.

## COMPENSATION

### Paychecks

Paychecks will be issued to employees every two (2) weeks, generally as a direct deposit to your designated bank account. All employees must submit a complete and accurate timesheet to the Director of Operations by the close of business every other Friday. Accurate timesheets are crucial not only for correct pay but also for calculating paid time off and eligibility for other benefits. They are also important in HRO's budgeting process.

Paychecks will be processed once per pay cycle. Failure to turn in a completed, signed timesheet promptly may result in a paycheck not being issued until the following pay period. Employees do not risk losing pay for time worked in the event of a late timesheet, but they do risk not being paid until the following pay cycle. Failure to turn in timesheets will also inhibit any payment for earned unused paid time off should an employee leave the organization. It is the responsibility of an employee to turn in their timesheet accordingly. All employees are encouraged to enroll in HRO's free direct deposit service for payroll. It is HRO's policy that employee paychecks will only be given personally to that employee. All other arrangements for mailing or pick-up must be made in advance and in writing with the Director of Operations. In the event of a lost or missing paycheck, the Director of Operations must be notified in writing as soon as possible before a replacement check can be issued. In the event the lost paycheck is recovered, and the agency identifies the endorsement as that of the employee, the employee must remit the amount of the replacement check to HRO within 24 hours of the time it is demanded.

Except for extreme emergencies, no salary advances will be made. Employees should submit any such request to the Director of Operations in writing.

## Employee Categories

Based on the conditions of employment, employees of HRO fall into the following categories:

### Full-Time

HRO considers employees who are hired to work at least 32 hours a week to be full-time.

### Part-Time

Part-time employees are hired to work less than 32 hours per week.

### Temporary Employees

A temporary employee is hired for a specified project or time frame. Temporary employees are not eligible for any additional compensation or benefits provided by the agency.

## Overtime Pay Policy

HRO employees may not work more than their scheduled hours without written approval from their supervisor (see Work Schedule policy). Employees will not be paid for hours worked beyond those scheduled without such approval. Hours spent at Distribution Events and Trainings outside of normal business hours are not considered to be overtime (see Distribution Events and Trainings policy).

## Personnel Files

Each employee will have a personnel file maintained by the Director of Operations. Copies of performance evaluations and any resulting plans of action (see

Disciplinary and Employee Evaluation Policies) will be kept in these files, along with W-4s, approved paid time off requests, and other appropriate documentation. Employees may make an appointment to review their file, in the presence of the Director of Operations or the President, at any time. Personnel files are the property of HRO. HRO respects the confidentiality of employees' personnel files. To keep necessary agency records up to date, it is extremely important that you notify the Director of Operations of any changes in:

- Name and/or marital status
- Address and/or telephone number
- # of eligible dependents
- W-4 deductions
- Changes in residency status
- Person to contact in case of emergency

## EMPLOYEE BENEFITS

### Disclaimer

HRO has established a variety of employee benefit programs designed to assist you and your eligible dependents in meeting the financial burdens that can result from illness and to help you plan for retirement. This portion of the Employee Guidebook contains a very general description of the benefits to which you may be entitled as an employee of the Agency. Please understand that this general explanation is not intended to, and does not, provide you with all the details of these benefits. Therefore, this Handbook does not change or otherwise interpret the terms of the official plan documents. Your rights can be determined only by referring to the full text of the official plan documents, which are available for your

examination from the Director of Operations. To the extent that any of the information contained in this Handbook is inconsistent with the official plan documents, the provisions of the official documents will govern in all cases.

Please note that nothing contained in the benefit plans described herein shall be held or construed to create a promise of employment or future benefits, or a binding contract between the agency and its employees, retirees, or their dependents for benefits or for any other purpose. All employees shall remain subject to discharge or discipline to the same extent as if these plans had not been put into effect.

HRO reserves the right, in its sole and absolute discretion, to amend, modify or terminate, in whole or in part, any or all the provisions of the benefit plans described herein, including any health benefits that may be extended to retirees and their dependents. Further, HRO reserves the exclusive right, power, and authority, in its sole and absolute discretion, to administer, apply, and interpret the benefit plans described herein, and to decide all matters arising in connection with the operation or administration of such plans.

For more complete information regarding any of our benefit programs, please refer to the Summary Plan Descriptions, which were provided to you separately or contact the Director of Operations. If you lost or misplaced those descriptions, please contact the Director of Operations for another copy.

### Health Benefit

HRO does not provide health insurance. HRO does provide a health benefit that reimburses employees for their qualifying medical expenses. The benefit is an ICHRA (Individual Health Care Reimbursement Arrangement). HRO currently offers regular full-time and regular part-time employees who work more than 20 hours per week and have been employed by HRC for 30 days ICHRA coverage. You must have private health insurance in order to participate in the ICHRA. The program is administered by Take Command Health.

The Director of Operations will assist you in making the necessary arrangements for enrollment. A complete description of the plan is provided to each employee .

### Workers' Compensation Benefits

HRO is covered under state Workers' Compensation Laws. Should you sustain a work-related injury, you must immediately notify your supervisor and the Director of Operations. To file a claim, visit the Ohio Bureau of Workers Compensation at https://info.bwc.ohio.gov/for-workers/claims/filing-a-claim.

## RETIREMENT

HRO offers a SIMPLE IRA as a retirement benefit (Savings Incentive Match Plan for Employees Individual Retirement Account). HRO will match up to 3% of your salary dollar-for-dollar when you contribute to the SIMPLE IRA. So if you direct 3% of your salary into the IRA, HRO will match that. The contributions to the IRA are not taxed until you withdraw the money. There are tax penalties for withdrawal prior to retirement age.Contact the Director of Operations to enroll.

## TIME OFF & VACATION

### Paid Time Off

All employees who have worked at HRO for more than 30 days are eligible for paid time off (PTO). PTO is calculated as 5% of worked hours in a pay period. For example, 20 hours worked will earn 1 hour PTO. PTO hours accumulate and do not expire.

PTO may be used for any reason, including, but not limited to family leave, illness, bereavement, and vacation. The Director of Operations maintains the PTO records and should be contacted with any questions about an individual employee's available PTO. Aside from HRO designated paid holidays, employees will only be paid for hours they work and for hours covered by PTO. The employee must submit a request to use PTO for vacation as part of their timesheet. The Director of

Operations must be notified of the intention to use PTO in other situations such as illness or bereavement as soon as possible.

### Scheduling Time Off

When time off can be scheduled in advance, as is the case for vacations and personal days, the employee must submit the request to their supervisor for approval at least 1 week prior. Vacations and personal days can only be scheduled in consultation with the employee's supervisor. This is to insure adequate coverage for essential tasks at Harm Reduction Ohio. Once approved, employees must notify the Director of Operations of their intent to use paid time off.

### Holidays

All full-time employees are eligible for the paid holidays established by the federal government.

As of 2022, the 11 federal holidays are:

- New Year's Day
- Birthday of Martin Luther King, Jr.
- Washington's Birthday
- Memorial Day
- Juneteenth National Independence Day
- Independence Day
- Labor Day
- Columbus Day
- Veterans Day
- Thanksgiving Day
- Christmas Day

Part-time employees scheduled to work on an agency holiday will be compensated as if they had worked the day. Part-time employees without regular schedules will be compensated for the holiday so that their total work-week

compensation is at their normal level. Where a holiday falls on a weekend, it will be observed on either the preceding Friday or following Monday.

### Time Off to Vote

All employees are encouraged to vote. For any employee taking the opportunity to vote, adequate time will be granted at the beginning or end of the workday. No employee will be penalized or retaliated against for requesting time off to vote.

## ON THE JOB

### Nursing & Lactation Policy

Harm Reduction Ohio provides accommodations to employees who pump during work hours.

Before an employee returns from parental leave, Harm Reduction Ohio will seek to discuss with the employee whether the employee needs a reasonable accommodation to express breast milk at work.

Harm Reduction Ohion will not tolerate discrimination or harassment against any employee based on the request for or usage of lactation accommodations. Any discrimination, harassment, or other violations of this policy can be reported to the Director of Operations.

Multi-Purpose Space Available for Use for Lactation

HRO will designate private rooms as lactation rooms when employees are using the room to express breast milk. HRO will notify other employees that the room will be prioritized as a lactation room and may only be used for expressing breast milk during the time[s] when employees need the space and will post proper signage to ensure that it is free from intrusion and shielded from view of others while being used as a lactation room.

The employees who need the room for pumping will be given priority use of the room and their pumping needs will determine the availability of the room for other purposes.

HRO will ensure that the multi-purpose room can be locked from the inside so that the employee pumping can do so without intrusion.

HRO will ensure that the multi-purpose room is clean, free from intrusion, and meets as many of the following requirements as possible: contains at least one electrical outlet, a surface to place a pump and other personal items, and a chair; and is near running water and a refrigerator to store breast milk.

Lactation Accommodation Request Process
Before an employee returns from parental leave, HRO will resend this policy to the employee in writing (electronically or by mail) and request information from the employee regarding the need for a reasonable accommodation to express breast milk at work. Employees may also independently request a lactation accommodation by contacting the Director of Operations. A request may be made in writing to the Director of Operations and should indicate that the employee will need accommodations for expressing breast milk at work.

Employees may request changes to their existing lactation accommodation at any point.

E- Mail Policy
Every employee is responsible for using the electronic mail (email) system properly and in accordance with this policy. Any questions about this policy should be directed to your supervisor.

The email system is the property of Harm Reduction Ohio. It has been provided for our use in conducting business. All communication and information

transmitted by, received from, or stored in this system are agency records and is our property. Abuse of the email system for personal purposes or retrieving information from pornographic sites for your own personal use is prohibited.

Employees should conduct all email transactions for client communications and other agency or business-related communications through HRO's central email system. Using HRO's Internet access for personal communications is permitted but should be kept to a minimum during work hours.

Our equal employment opportunity policy and our policies against sexual or other harassment apply fully to the email system, and any violation of those policies will serve as grounds for discipline, up to and including dismissal. Therefore, no email messages should be created, sent, or received if they contain intimidating, hostile,
or offensive material concerning sex, race, color, national origin, religion, sexual orientation, age, marital status, disability or any other classification protected by law.

The email system may not be used for religious or political solicitation, commercial enterprises, other non-job-related solicitations, or in any other way that violates our policy.

The email system shall not be used to send or receive copyrighted materials, trade secrets, proprietary financial information, or similar materials without prior authorization from management. Employees, if uncertain about whether certain information is copyrighted, proprietary, or otherwise inappropriate for transfer should consult with their supervisor.

Users should routinely delete outdated or otherwise unnecessary email and computer files. These deletions will help keep the system running smoothly and effectively, as well as minimize maintenance costs.

Employees are reminded to be courteous to other users of the system and always to conduct themselves in a professional manner.

Because email records and computer files may be subject to discovery in litigation, our employees are expected to avoid making statements that, if disclosed in email or computer files, would not reflect favorably on HRO, any employee, our customers, or any of our services.

Violations of our email policy may result in disciplinary action up to and including dismissal.

### Internet Policy

Employees are provided with access to the Internet to assist them in performing their jobs. Internet access is primarily for staff. Staff accessing the Internet during work hours for other than job related needs should limit doing so. It is not intended for providing recreational activities or for a means for you to conduct your personal business.

## WORK TRAVEL

HRO employees may sometimes travel, particularly in Ohio, for work related reasons including but not limited to delivering and picking up supplies, meeting with partners, conducting trainings, and attending events. If you are traveling for HRO business, you should discuss travel expenses with your supervisor prior to traveling. HRO will not reimburse expenses that were not approved by an employee's supervisor. Traveling to and from approved events will be reimbursed for gas mileage. Check with the Director of Operations for HRO's mileage rate.

Travel that is not approved in advance will not be reimbursed. Reimbursement claims are submitted to the Director of Operations with the employee's hours and should include dates, destinations, and distance of travel.

## LEAVING HARM REDUCTION OHIO

### Resignation

When an employee decides to leave for any reason, their supervisor and the Director of Operations would like the opportunity to discuss the resignation before final action is taken. HRO often finds during this conversation that another alternative may be better. If, however, after full consideration the employee decides to leave, it is requested that the employee provide the agency with a written two- week advance notice period. HRO will only compensate employees for unused Paid Time Off (PTO) when the employee works throughout the notice period, and is not terminated for gross misconduct or cause; otherwise, PTO will be forfeited. If, as sometimes happens, the employee's supervisor wishes for the employee to leave prior to the end of the employee's two-week's notice, the employees may be paid for the remainder of that period.

### Lay-Offs

In the event of a funding shortage or funding cut, HRO may be in the unfortunate situation of having to lay off employees. HRO will provide laid off employees with any rights and benefits as required by local, state, and federal laws.

### Dismissals

Every HRO employee has the status of "employee-at-will," meaning that no one has a contractual right, expressed or implied, to remain in HRO's employment. HRO may terminate an employee's employment, or an employee may terminate their employment, without cause, and with or without notice, at any time for any reason. No supervisor or other representative of HRO (except the President) has the authority to enter into any agreement for employment for any specified period of time, or to make

any agreement contrary to the above. Any such agreement will only be binding if it is in writing and signed by the President and the employee.

**Immediate Dismissals/Misconduct**

Every organization must have some rules and regulations in order to function efficiently. It is our policy to prohibit employees from engaging in disruptive activities. In all activities and related personal interactions, employees are expected to conduct themselves appropriately (see Discrimination & Harrasment Policy; Conduct & Appearance Policy). We believe that our code can be best defined by describing the activities for which employees may be discharged or disciplined. The list below is not exhaustive, but describes the type of conduct, which is intolerable.

· Falsify any HRO records or timesheets.

· Have another employee falsify your timesheet.

· Be absent without reasonable cause.

· Report late for work without supervisory notification and approval.

· Be absent for two (2) working days without proper notification.

· Leave your department or the facility during working hours without notifying your supervisor.

· Distract the attention of another or cause confusion by unnecessary shouting or creating a demonstration in the facility.

· Create or contribute to unsanitary conditions.

· Be in possession of firearms or any other weapons on HRO premises at any time.

· Refuse to follow your supervisor's orders/instructions.

· Operate machines, tools, or other equipment without authorization.

· Engage in horseplay, scuffling, running or throwing things.

· Misuse or remove from the premises employees' personal information, HRO records or confidential information of any nature.

· Gamble, or engage in any illegal game of chance on HRO premises at any time.

· Make or publish false, vicious or malicious statements concerning any employee, supervisor, the agency or its clients. This includes on social media.

· Use abusive language to any employee, supervisor of HRO or its clients.

· Disregard safety rules or common safety practices.

· Create, engage or participate in actual or verbal harassment (sexual or discriminatory or otherwise) of any employee.

· Disregard security rules and practices

· Engage in any other illegal, immoral ,or indecent conduct on the premises.

**Disciplinary Action**

If an employee violates HRO's policy or rule or is not meeting performance requirements, has been insubordinate, or has engaged in conduct negatively affecting the workplace and/or other employees, a supervisor may take disciplinary action. When taking such action, a supervisor must consider the nature and seriousness of the infraction, all relevant facts and information, and any mitigating circumstances. Generally, there are three levels of discipline which may be applied, at the discretion of a supervisor. Not all performance or conduct problems lend themselves to progressive discipline. There are times when immediate and serious

disciplinary action, including termination, is warranted.

Action taken will depend upon the nature and severity of the problem. Any of the disciplinary actions below may be taken, with or without regard to prior problems or prior disciplinary action, at the discretion of management.

Warning

An oral or written warning may be given in cases where a problem occurs, meriting corrective action. This is considered a supervisory issue that will be addressed through ongoing supervision and monitoring. This action, therefore, is not subject to the formal complaint procedure.

Written Reprimand

A written reprimand is a formal statement which becomes part of an employee's permanent personnel file. Examples of problems which may result in a written reprimand include but are not limited to disruptions in the workplace, failure to follow proper work procedure or business practice, or situations in which problems could lead to dismissal if repeated.

Termination

Termination may be imposed when the problem is so serious that no other course of action is appropriate. Termination may also be imposed after all other courses of action have been attempted, or there is no expectation of future improvement. However, it should be noted that dismissal may occur for reasons not related to disciplinary action as Ohio is an employment-at-will state.

**Post Resignation/Termination Procedures**

Exit Interview

The Director of Operations is responsible for scheduling an exit interview with a terminated employee on the employee's last day of employment and for arranging

the return of Agency property including:

· Office keys

· Agency-issued credit cards

- Agency manuals

· Any additional Agency-owned or issued property

Benefits

Benefits (ICHRAI) end on your last day of the final month of employment.

Final Paycheck

Employees leaving the agency must return office keys, business debit or credit cards, HRO property such as laptop computers, etc., before their final paycheck can be issued. This final paycheck will be mailed or direct deposited during the next normal pay period or as required by state law. If there are unpaid obligations to the Agency, the final paycheck will reflect the appropriate deductions.

Severance Pay

The Board of Directors may approve severance pay in case of involuntary layoff or other situations determined by the board to be worthy of severance. An employee who has been employed by HRO for three or more years and not employed for a specific project that was known to end at a particular time may receive compensation equal to up to one week of average pay per full year of service and not less than two weeks of average weekly pay, based on HRO's ability to provide such a payment. The maximum severance pay is one month of average pay.

## FRAUD, CONFLICT OF INTEREST, AND OUTSIDE EMPLOYMENT STATEMENT

Fraud

Management is responsible for the detection and prevention of fraud, misappropriations, and other irregularities. Fraud is defined as the intentional, false representation or concealment of a material fact for the purpose of inducing another to act upon it to their injury. Examples of fraud include but are not limited to: misappropriation of funds, supplies, or assets; forgery or alteration of documents; embezzlement; using HRO debit cards for unauthorized purchase; forging receipts; forging documents concerning qualifications, work completed, evaluations, or number of hours worked.

Each member of the management team will be familiar with the types of improprieties that might occur within their area of responsibility, and be alert for any indication of irregularity. Any irregularity that is detected or suspected must be reported immediately to the Director of Operations or President, who leads the investigation in coordination with the Board of Directors.

Violation of this policy may result in disciplinary action, up to and including immediate dismissal. Violations may also be referred to law enforcement when appropriate.

Protections

To protect against fraud and conflict of interest, HRO has instituted the following rules:

- A log of donation checks will be kept by a person other than the person who deposits the checks;
- For any HRO check exceeding $1000, two signatures are required;
- Employees will only be reimbursed for expenses approved in writing by their supervisors or by the Director of Operations. Cash withdrawals using HRO debit cards must also be approved in writing by the supervisor or Director of Operations. Failure to do so may result in the employee being required to repay the cash or other disciplinary action.;
- For salaried employees, initial remuneration as well as changes in salary must be reviewed and approved by the Board of Directors;
- The Board of Directors must review the complete list of vendors receiving checks or payments from HRO no less than every 6 months. An independent audit must be conducted no less frequently than every 2 years.
- Any employee hired to handle money must undergo a background check focusing on criminal history related to fraudulent behavior. Previous employers may also be contacted.
- Harm Reduction Ohio does not maintain a petty cash fund.

Conflict of Interest -

HRO expects our employees to conduct business according to the highest ethical standards. HRO recognizes the right of employees to engage in activities outside of their employment which are of a private nature and unrelated to our business. However, the employee must disclose any possible conflicts so that HRO may assess and prevent potential conflicts of interest from arising. A potential or actual conflict of interest occurs whenever an employee is able to influence a decision that may result in a personal gain for the employee or an immediate family member (i.e., spouse or significant other, children, parents, siblings) as a result of the agency's business dealings.

A violation of this policy will result in immediate and appropriate discipline, up to and including immediate termination.

### Outside Employment -

HRO does not limit an employee's activities during non-working hours unless those activities interfere with or are in conflict with the performance of their job, or create a conflict of interest. In general, outside activities are not allowed when they:

- Prevent the employee from fully performing work for which they are employed at HRO, including overtime assignments
- Involve organizations that are doing or seek to do business with HRO, including actual or potential vendors or customers

· Violate provisions of law or HRO's policies or rules

HRO employees are required to work beyond their normally scheduled hours when work necessitates.

### Financial Interest in Other Business

An employee and their immediate family may not own or hold any significant interest in a supplier, customer or competitor of HRO, except where such ownership or interest consists of securities in a publicly owned agency and that securities are regularly traded on the open market.

### Acceptance of Gifts

No employee may solicit or accept gifts of significant value (i.e., in excess of $250), lavish entertainment or other benefits from potential and actual customers, suppliers, or competitors. Special care must be taken to avoid even the impression of a conflict of interest.

### Work Product Ownership

All HRO employees must be aware that HRO retains legal ownership of the product of their work. No work product created while employed by HRO can be claimed, construed, or presented as property of the individual, even after employment by HRO has been terminated or the relevant project completed. This includes written and electronic documents, audio and video recordings, system code, and also any concepts, ideas, or other intellectual property developed for HRO, regardless of whether the intellectual property

is actually used by HRO. Although it is acceptable for an employee to display and/or discuss a portion or the whole of certain work product as an example in certain situations (e.g., on a resume, in a freelancer's meeting with a prospective client), one must bear in mind that information classified as confidential must remain so even after the end of employment, and that supplying certain other entities with certain types of information may constitute a conflict of interest. In any event, it must always be made clear that work product is the sole and exclusive property of HRO. Freelancers and temporary employees must be particularly careful in the course of any work they discuss doing, or actually do, for a competitor of HRO.

Additional protections

The last person to leave each office for the day, for lunch, or for any other period of time shall:

- Log out of their computer
- Lock up any confidential paper files/logs they have used
- Lock the office door
- Check that other office doors are locked.

## Whistle blower policy

Harm Reduction Ohio requires directors, officers, employees, and volunteers to observe high standards of business and personal ethics in the conduct of their duties and responsibilities. As employees and representatives of the

HRO, we must practice honesty and integrity in fulfilling our responsibilities and comply with all applicable laws and regulations.

Reporting Responsibility

This Whistleblower Policy is intended to encourage and enable employees and others to raise serious concerns internally so that HRO can address and correct inappropriate conduct and actions. It is the responsibility of all board members, officers, employees and volunteers to report concerns about violations of HRO's code of ethics or suspected violations of law or regulations that govern HRO's operations.

No Retaliation

It is contrary to the values of HRO for anyone to retaliate against any board member, officer, employee, or volunteer who in good faith reports an ethics violation, or a suspected violation of law, such as a complaint of discrimination, or suspected fraud, or suspected violation of any regulation governing the operations of HRO. An employee who retaliates against someone who has reported a violation in good faith is subject to discipline up to and including termination of employment.

Reporting Procedure

HRO has an open door policy and suggests that employees share their questions, concerns, suggestions or complaints with their supervisor. If you are not comfortable speaking with your supervisor or you are not satisfied with your supervisor's response, you are encouraged to speak with the

Director of Operations or the President. Supervisors and managers are required to report complaints or concerns about suspected ethical and legal violations in writing to the HRO's Director of Operations, who has the responsibility to investigate all reported complaints. Employees with concerns or complaints may also submit their concerns in writing directly to their supervisor or the Director of Operations.

Compliance Officer

HRO's Director of Operations is responsible for ensuring that all complaints about unethical or illegal conduct are investigated and resolved. The Director of Operations will advise the President and/or the Board of Directors of all complaints and their resolution and will report at least annually to the Board of Directors on compliance activity relating to accounting or alleged financial improprieties.

Accounting and Auditing Matters

HRO's Director of Operations shall immediately notify the Board of Directors' Audit Committee/Finance Committee of any concerns or complaints regarding corporate accounting practices, internal controls, or auditing and shall work with the committee until the matter is resolved.

Acting in Good Faith

Anyone filing a written complaint concerning a violation or suspected violation must be acting in good faith and have reasonable grounds for believing the information disclosed indicates a violation. Any allegations

that prove not to be substantiated and which prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense.

Confidentiality

Violations or suspected violations may be submitted on a confidential basis to the Director of Operations, or the President . Reports of violations or suspected violations will be kept confidential to the extent possible, consistent with the need to conduct an adequate investigation. The Director of Operations will conduct the investigation or, if they cannot, the President will conduct the investigation.

Handling of Reported Violations

The Director of Operations will notify the person who submitted a complaint and acknowledge receipt of the reported violation or suspected violation. All reports will be promptly investigated and appropriate corrective action will be taken if warranted by the investigation.

Grievance policy

A grievance is defined as an act, omission, or occurrence in which an employee feels an injustice that can be established using factual information. It may include but is not limited to, compensation, working hours, working conditions, regulation, or disagreement. It does not include performance improvement plans or dismissals.

Harm Reduction Ohio's grievance process establishes procedures for the

fair, orderly, and timely resolution of problems or complaints using a thorough review process. The following principles will serve as the foundation for Harm Reduction Ohio's grievance process:

Harm Reduction Ohio's Director of Operations will deal with grievances expeditiously and fairly.

- Grievances and the proceedings under this policy will be treated with the greatest degree of confidentiality possible. However, limitations on confidentiality may include Harm Reduction Ohio's obligations to investigate grievance allegations, provide individuals accused of misconduct an opportunity to respond, inform appropriate individuals of the imposition of corrective action, or to fulfill duties imposed by law.
- The Director of Operations is protected from discrimination and retaliation in connection with exercising responsibilitiess under this grievance policy.

To file a grievance, email or hand deliver a signed and dated letter to the Director of Operations with the following information:

- Name and job title
- Date and time (if applicable) of event(s) leading to the grievance
- Date you became aware of event (if different than above)

· Detailed description of grievance including names of other persons involved, if any

· If grievance is related to discrimination, ensure this is clearly stated and explained

· Proposed solution to grievance

Every effort will be made to resolve the grievance by informal discussion within 10 working days following the submission of the grievance letter. If informal discussion is not possible or does not resolve the grievance, the grievant or the agency may choose to request a resolution conference. A resolution conference is a meeting between the parties for the opportunity of the grievance issue to be discussed and for possible solutions to be considered. A resolution conference will be scheduled within 20 business days of the submission of the grievance letter.

If neither an informal discussion nor resolutions conference resolves the grievance, the Director of Operations and the President will review the complaint, investigation materials, and attempted resolutions. They will then determine the resolution of the complaint.

Outlook

## Re: AmandaLynn and conflict policy

**From** Cecile Katz <cecile@harmreductionohio.org>
**Date** Thu 7/18/2024 11:02 AM
**To** Dennis Cauchon <Dennis@harmreductionohio.org>

Thanks for the update, I am glad things went well. I think this is a difficult situation but needs to be addressed moving forward for all employees, as suggested by the addition of a conflict of interest form, etc.

Amandalynn is certainly an important and trusted voice in the field of harm reduction/community building/organizing and it makes sense that she will be approached by other stakeholders for her expertise. Maybe Dwayne has good ideas/recommendations on how you/HRO can help employees develop and promote their expertise/skills outside of HRO, but in a way that stays aligned with HRO's mission and values.

Regarding forms, here is what I propose:

1. General conflict of interest policy form signed and dated at the time of hiring
   a. The conflict of interest issue will thus be emphasized and salient to employees, in addition to what is written in the employee handbook
   b. I'll update the form based on your feedback.

2. A Google form that can be used by employees when they need to report potential conflict of interest. Responses to the form will go to you and me and you can then make a decision.
   a. I'll update the employee handbook to include the fact that employee must fill out a written form when potential conflict of interest arise.

I am currently editing the employee handbook, and once it's done and I go over it with you about a few things, we should submit the revised version to all employees. At the same time we can have the new general conflict of interest form signed by all.

Let me know what you think. Thanks!

**Cecile Katz**
Administrator, Harm Reduction Ohio
935 River Road, Suite G

EXHIBIT
3
7-29-26 KR

HRO_000242

Granville, Ohio 43023

cecile@harmreductionohio.org

---

**From:** Dennis Cauchon
**Sent:** Thursday, July 18, 2024 10:27 AM
**To:** Cecile Katz
**Subject:** AmandaLynn and conflict policy

We talked for a little over an hour yesterday and I think things went well. I think she understands the conflict issues and I acknowledged HRO needs a more formal policy and a reporting form.

She's going to Pittsburgh today with Kyle for a conference, paid for by Gilead and blurring a little her role with Velocity Biogroup. I asked her to send in the reimbursement amounts and, just for clarity, I'd like for HRO to give a similar amount to a related harm reduction group.

We agreed for her to think about things and for us to talk on Monday. I think she will formally step down from these groups but want to make sure that's of her volition.

I made some suggestions to the proposed conflict policy. A different part for us is in addition to financial conflicts, we need to have a policy of alignment conflicts, particularly areas in which HRO's reputation and efforts may conflict with the financial interests of policies of others.

We also need to have a simple form for people to report potential conflicts annually or when they arise (and I place to certify no conflicts).

HRO_000243

Outlook

**Fwd: Conflict issues**

**From** Dennis Cauchon <denniscauchon@gmail.com>
**Date** Wed 7/24/2024 11:16 AM
**To** Dwayne Steward <dwayne@makeitbetterconsulting.com>
**Cc** Cecile Katz <cecile@harmreductionohio.org>

FYI...

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

Begin forwarded message:

**From:** Amanda Reese <amandalynn@harmreductionohio.org>
**Subject: Re: Conflict issues**
**Date:** July 24, 2024 at 10:51:18 AM EDT
**To:** Dennis Cauchon <dennis@harmreductionohio.org>

EXHIBIT 4 7-29-26 KR

Dennis,

I apologize for any confusion. I have not forgotten our discussion. Based on our conversation, I was expecting to review a conflict of interest form or policy before finalizing anything but as I shared previously my priority commitment remains to the people we serve at Harm Reduction Ohio.

HRO_000245

Thank you for your support as I navigate this new professional learning opportunity.

AmandaLynn Reese
513-833-1675
Note: I travel frequently for outreach and may be delayed in responding to emails.

On Tue, Jul 23, 2024, 2:09 PM Dennis Cauchon <dennis@harmreductionohio.org> wrote:

Don't forget to let me know what you decided. Thanks.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

HRO_000246

# 2024 Conflict(s) of Interest Disclosure Form

2 messages

**Cecile Katz** <cecile@harmreductionohio.org> Thu, Aug 8, 2024 at 2:52 PM
To: HRO Staff <hrostaff@harmreductionohio.org>

Hi everyone,

Please fill out the "**2024 Conflict(s) of Interest Disclosure**" form below. This form needs to be filled out even if you do not have any real or potential conflict(s) to disclose at the moment (there are boxes to check for this situation). If you can fill it out by August 23rd, that would be great!

HRO will require all employees to fill out this form once a year. If you are ever unsure whether your other job(s)/volunteering may be considered a conflict of interest, please request the form from me and fill it out again. (it can be filled out as many times as needed).
If you have potential conflict(s) to disclose, you can do so on the form and/or upload a document to the form with any relevant information.

Thank you so much in advance for your cooperation with this. As always, let me know if you have any questions.

https://forms.gle/q9UtRtzxgHkgSnXC8

**Cecile Katz**
Administrator, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023

cecile@harmreductionohio.org

---

**Amanda Reese** <amandalynn.a.reese@gmail.com> Wed, Aug 21, 2024 at 4:51 PM
To: billy Golden <bgoldenhr@gmail.com>

AmandaLynn Reese
Chief Program Officer
Harm Reduction Ohio
513-833-1675
Note: I travel frequently for outreach and may be delayed in responding to emails.
[Quoted text hidden]

EXHIBIT
5
7-25-26 KR

**From:** Dennis Cauchon <dennis@harmreductionohio.org>
**Sent time:** 08/19/2024 03:42:08 PM
**To:** Dwayne Steward <dwayneasteward@gmail.com>
**Cc:** Billy Golden <bgolden@nastad.org>; Tasha Turner-Bicknell (turnerta) <turnerta@ucmail.uc.edu>, Anne C. Trinh <trinh.89@osu.edu>; Colleen Garlock <colleengarlock@gmail.com>; James Decker <jamesdecker68@gmail.com>; mollybtrue <mollybtrue@yahoo.com>
**Subject:** Re: Board Discussion - concerns and questions
**Attachments:** smime.p7s

Yes, that is the form. Cecile developed it with small revisions from me.

Thanks for sending out, Dwayne.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

On Aug 19, 2024, at 12:31 PM, Dwayne Steward <dwayneasteward@gmail.com> wrote:

Dennis will have more information, but here is what I have received. Attached is the COI policy (pulled from the employee handbook), I also included the full employee handbook, and the form staff have been asked to complete is linked below. I definitely think an attorney needs to review all of these before there is any further action.

https://docs.google.com/forms/d/e/1FAIpQLSeh5Vbget64iDx8Xy6rUObmszgpC8IhzM0sYjqDggtJTqOvnw/view-form

Dwayne Steward, MPA
Writer. Speaker. Activist.
makeitbetterconsulting.com
614-859-9627

On Mon, Aug 19, 2024 at 9:40 AM Billy Golden <bgolden@nastad.org> wrote:
Hi everyone,

I am available to meet this week or hold off until September. I found the doodle poll for a September buried in my email so will fill that out as well.
May we all please have access to the conflict of interest form?

Thanks

Billy Golden

Manager, Drug User Health

Pronouns: He/Him/His

202.897.0079 | bgolden@NASTAD.org

Connect with us: LinkedIn | Facebook | Twitter | YouTube | Instagram
NASTAD | 444 North Capitol Street NW, Suite 339 | Washington, DC 20001| NASTAD.org

EXHIBIT C 7-29-26 KR

This email and any files transmitted with it are confidential and intended solely for the use of the entity to whom they are addressed. If you received this email in error please notify the sender.

**From:** Dennis Cauchon
**Sent:** Monday, August 19, 2024 8:45 AM
**To:** Dwayne Steward
**Cc:** Tasha Turner-Bicknell (turnerta); Billy Golden; Anne C. Trinh; Colleen Garlock; James Decker; mollybtrue
**Subject:** Re: Board Discussion - concerns and questions

I talked to employment attorney David Ball last week about representing us. Was hoping to meet with him this week. I;l try to make it today.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

On Aug 19, 2024, at 8:37 AM, Dwayne Steward <dwayneasteward@gmail.com> wrote:

Hello Tasha, I agree that the board getting a look a this would be a good idea. The COI policy is the same but the way it's being implemented is changing and policy implementation changes like this should be discussed by the board. Cecile sent out a doodle poll to set up a board meeting in September. Have folks seen this and been able to respond? I suggest a subcommittee of us get together to discuss the COI in advance of the meeting and then present the details to the larger group for discussion in September.

Dennis, have you been able to consult with the employee law attorney like we discussed? As I've mentioned before, I think we should hold off on acting on anything received from staff in the COI form until after we've consulted with the attorney and once the board has provided their input to make sure we're mitigating any risk.

Looking forward to further discussions.

Sincerely,
Dwayne

Dwayne Steward, MPA
Writer. Speaker. Activist.
makeitbetterconsulting.com
614-859-9627

On Mon, Aug 19, 2024 at 8:09 AM Turner-Bicknell, Tasha (turnerta) <turnerta@ucmail.uc.edu> wrote:

Hi Dennis,

I received your voicemail this morning. I'm in meetings all day today but I wanted to follow-up. I understand that HRO has had a conflict of interest policy for employees in place but I do still have some concerns and questions about the form that employees are required to sign now. It sounds like this

is a form that you just recently developed. I think it would be a good idea for the board to take a look at it and discuss it's implications.

I will send a doodle poll this afternoon to see when we can get together. ***Dennis, can you please share the document with the board?***

Talk soon,

Tasha

Tasha Turner-Bicknell, DNP, RN, CPH

Associate Professor

Director Advanced Public Health Nursing DNP and Certificate Programs

University of Cincinnati College of Nursing

turnerta@ucmail.uc.edu

(513) 558-5433

*Prefer a phone appointment? Reply with your availability.*

**From:** Turner-Bicknell, Tasha (turnerta) <turnerta@ucmail.uc.edu>
**Date:** Friday, August 16, 2024 at 12:54 PM
**To:** Dennis Cauchon <Dennis@harmreductionohio.org>, Billy Golden <bgolden@nastad.org>, Dwayne Steward <dwayneasteward@gmail.com>, Anne C. Trinh <trinh.89@osu.edu>, Colleen M. Garlock <colleengarlock@gmail.com>, Jamie Decker <jamesdecker68@gmail.com>, mollybtrue <mollybtrue@yahoo.com>
**Subject:** Board Discussion - concerns and questions

Hello Dennis and fellow board members,

I hope everyone is doing well. I wanted to reach out to see if we could make time to get the board together next week. I know several of you are aware of a Conflict of Interest Form that HRO is now requiring all employees to sign, but I don't think we have had the opportunity to discuss the document and its implications as a board. I would like the opportunity to review the document and learn more about how it was created and how it will be used moving forward. For example, would this apply to board members? Could this become a barrier to employment for some? Is the language too subjective?

I know everyone is extremely busy, including me, but I think this is important. I would be happy to send a doodle poll to identify a good time.

Dennis, could you please share the Conflict of Interest Form with the board so we can review in advance of our meeting?

Tasha

Tasha Turner-Bicknell, DNP, RN, CPH

Associate Professor

Director Advanced Public Health Nursing DNP and Certificate Programs

University of Cincinnati College of Nursing

turnerta@ucmail.uc.edu

(513) 558-5433

*Prefer a phone appointment? Reply with your availability.*

Gmail

# Fwd: Conflict of interest form

**Dwayne Steward** <dwayneasteward@gmail.com> Tue, Sep 10, 2024 at 1:40 PM
To: "Maritza "Shay" S. Nelson" <mnelson@msnlawoffice.com>

[redacted]

Forwarded message ---------
From: **Dennis Cauchon** <dennis@harmreductionohio.org>
Date: Tue, Aug 20, 2024 at 8:58 AM
Subject: Re: Conflict of interest form
To: Dwayne Steward <dwayne@makeitbetterconsulting.com>

I appreciate your knowledge and perspective.

The issue here is whether a conflict exist. We do not know because AmandaLynn has declined to provide details on her arrangement as Director of Government Advocacy for a lobbying company that represents Hikma, the pharmaceutical company that makes Kloxxado. We need to know the details of this arrangement before we can make a decision. It is worrisome that AmandaLynn has declined to disclose details of her work and may have enlisted Tasha to try to get the board to stop fact-gathering (i.e., asking AmandaLynn to complete a simple, disclosure routine form.)

The issue is not targeting someone for outside work. AmandaLynn has run a daycare center out of her house for years. No conflict. Being employed by a pharmaceutical company's lobbying firm for a brand of naloxone that is opposed by most national harm reductionist but distributed by HRO and not disclosing, despite HRO's policy, the work done, the terms of the agreement, etc. is a potential serious conflict. A Google search finds further facts on her undisclosed work, such as testifying before the Maryland legislature on pro-Kloxxado legislation.

We need facts before we make a decision.

I suggest we have attorney David Ball, rather than me, do the fact-finding and provide a report. I called him again this morning and hope to hear back today. If he is not available, I suggest asking an employment lawyer at Faruki Law Firm (Dayton-Cincinnati) to do the fact-finding. John Greiner of Faruki represented us in the public records case. I would ask him for the name of someone at his firm who does employment law.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

---------- Forwarded message ---------
From: **Dwayne Steward** <dwayneasteward@gmail.com>
Date: Mon, Aug 19, 2024 at 11:34 PM
Subject: Fwd: Conflict of interest form

EXHIBIT
7
7-29-26 KR

To: Turner-Bicknell, Tasha (turnerta) <turnerta@ucmail.uc.edu>, Billy Golden <bgolden@nastad.org>

Hello, sending this to you two so there is full transparency in how I'm advising Dennis...

---------- Forwarded message ---------
From: **Dwayne Steward**
Date: Mon, Aug 19, 2024 at 11:30 PM
Subject: Re: Conflict of interest form
To: Dennis Cauchon <dennis@harmreductionohio.org>

Hello Dennis,

I appreciate you sending over the documentation but I think you are misinterpreting what they're saying. I don't think you should send ODH anything that would jeopardize the contract over an unproven conflict. The documentation does not require reporting of perceived conflicts. In my 15 years managing federal, state and local grants, I have only reported an official conflict of interest once, and that was when I hired an employee that formerly worked at the health department and her former role worked directly on a grant of which we were an awardee. The law required that the former government employee to not work on that specific grant until the statute of limitations expired regarding a direct COI related to government employees, which in that case was 12 months. Following the 12 months, the COI was null and void. I provide this example, because our funders were very aware of our staff working at other agencies and being activists in the community for many causes, even some that protested the agencies that funded us. And yet there was never an COI issue. I don't think the ODH language calls for such a specific COI update. Especially given that it may put the agency's largest grant in jeopardy. Internal COI policies can be more comprehensive, but the state isn't requiring the level of oversight that you're suggesting.

All of this could also lead to a claim of targeted discrimination, given that the referenced employee is a protected class (a female over the age of 40) and the fact that there is language in writing and verbal that points towards focusing a COI submission to the state on one employee, as opposed to all employees. If this is truly an issue, then EVERY employee that has a second job, has served on a board, or crossed paths in any way with a company that distributes naloxone would need to also be reported. Given there aren't any clear stipulations or a clear algorithm to determine a policy breach, this could become a serious slippery slope that could put this grant and other grants in jeopardy if the agency miss-interprets the COI definitions as defined by the state. This is also why an employee law attorney really needs to take a look at this first.

Also if the COI policy becomes this strict, the agency is going to loose employees. In most cases, working at a nonprofit in America means accepting low wages in order to commit to a agency's mission. And many nonprofit employees must work second jobs in order to make ends meet. If HRO continues down this path, they could alienate current and potential staff for having a reputation of blocking the earning potential of it's staff when they can't afford to make up the gap.

Personally, I believe that we should be supporting any employee that chooses to bring their work with a nonprofit into their personal advocacy and board work. It shows that the agency produces industry experts that are sought after and it elevates the impact and credibility of the agency. I think the good far outweighs any concerns in these situations. I'm not saying we should ignore COI's, the law clearly says otherwise, but I'm just saying we should be taking a more people-first approach in how we define and police them.

As I keep saying, I really think we need to tread lightly here Dennis. Let me know if you want to schedule some one on one time to talk through this more.

Dwayne Steward, MPA
Founder and CEO
Make It Better Consulting

make it better
CONSULTING
makeitbetterconsulting.com
dwayne@makeitbetterconsulting.com
(614) 859-9627

On Mon, Aug 19, 2024 at 4:01 PM Dennis Cauchon <dennis@harmreductionohio.org> wrote:

The conflict forms are due Friday. We cannot delay this. The ODH contract required us to submit a statement listing all people working on the contract for HRO who may have a conflict or possible conflict. I do not know when AmandaLynn started working on this arrangement. But we did provide a statement in the July 2023 application that stated we had no conflicts or possible conflict.

I do not think it's likely this conflict or possible conflict would affect the ODH contract, but that's not our decision. We are required to report all conflict and possible conflicts when we learn of them. AL's paid work for the advocacy firm is clearly a possible conflict.We have currently submitted all documents for a two-year contract renewal. We need to disclose conflicts promptly as part of this renewal.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

makeitbetterconsulting.com

makeitbetterconsulting.com

**2 attachments**

**Doc - Aug 19 2024 - 3-54 PM.pdf**
204K

**Doc - Aug 19 2024 - 3-48 PM.pdf**

778K

Outlook

## Re: Harm Reduction Ohio -- thanks for representing us

**From** David Ball <dball@rosenbergball.com>
**Date** Mon 8/26/2024 12:48 PM
**To** Dennis Cauchon <Dennis@harmreductionohio.org>
**Cc** Cecile Katz <cecile@harmreductionohio.org>

1 attachments (3 KB)
clip_image001.png;

Thanks Dennis. I have offered this type of assistance to small employers numerous times. I'll get started looking at what you've sent.
Best,
Dave

**David T. Ball** ▫ Partner
Rosenberg & Ball Co., LPA
205 South Prospect Street
Granville, Ohio 43023
t (614) 316-8222
dball@rosenbergball.com ▫ www.rosenbergball.com

RATED BY Super Lawyers

EXHIBIT 9
7-29-26 KR

***Top Lawyers 2024***, *Columbus CEO magazine; 2010 American Bar Association Outstanding Young Nonprofit Attorney; Certified Arbitrator, American Arbitration Association ; Co-Host of the "Two Balls, One Court" podcast*

Confidentiality Notice

This e-mail message is intended for use only by the individual or entity to which it is addressed. This message may contain information that is privileged or confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee (or a person authorized to receive and deliver it to the named addressee). If you have received this transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail. Thank you.

On Mon, Aug 26, 2024 at 12:08 PM Dennis Cauchon <dennis@harmreductionohio.org> wrote:

Dave,

Thanks for representing us on employment issues for $250 per hour. We have some general needs — policies, handbooks, forms — and some specific needs related related to potential conflicts of interest.

This year, we have received a large Ohio Department of Health (ODH) contract for $650,000 for naloxone distribution and a $400,000 grant for various harm reduction efforts. The ODH contract is expected to renew for the next two years at $850,000 a year. HRO's revenue will be about $1.4 million this year. Excluding interns (who are paid), we currently have 9 employees (7.5 FTEs). We likely will hire an additional two employees in next six months.

With this expansion, we are adding more formal processes and professionalism. Our Administrator Cecile Katz, who started at HRO at the end of April, essentially runs HRO and has done a great job professionalizing what we do.

**Request of you:** We need is for a lawyer (i.e., you:) to look over our new Employee Handbook and conflict of interest police and form to make sure it complies with the law and good practice. Attached for your review are pdfs, a Word version of handbook, and pdfs + links of the conflict forms.:

* **Employee Handbook.** the proposed new handbook.
* **Conflict Policy.** the proposed new conflict of interest policy. (Google Drive link.) (It's in the Employee Handbook, too. This form is to sign to acknowledge policy.)
* **Conflict Reporting Form.** the proposed conflict of interest reporting form. (Google Drive link.)

We can receive your suggestions in any way that works for you — on a cloud, in Word, or by email. Your choice!

Basic question: How do the new Employee Handbook and conflict of interest forms look?

**Existing Employee Handbook.** Lastly, I have attached at the bottom a pdf of the existing Employee Handbook, from 2022. This Employee Handbook - 2022 includes our existing conflict of interest policy (page 43). The existing policy does not have a conflict reporting form.

On Tuesday, I will send a brief summary on a particular conflict issue we're working on now.

Thanks!

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G

HRO_000263

Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

| | |
|---|---|
| **From:** | Dennis Cauchon <dennis@HarmReductionOhio.org> |
| **Sent time:** | 08/29/2024 10:47:22 AM |
| **To:** | Billy Golden <bgolden@nastad.org>; Dwayne Steward <dwayne@makeitbetterconsulting.com>; James Decker <jamesdecker68@gmail.com>; Tasha Turner-Bicknell <turnerta@ucmail.uc.edu>; Colleen Garlock <colleengarlock@gmail.com>; Anne C. Trinh <trinh.89@osu.edu>; mollybtrue <mollybtrue@yahoo.com>; Dennis Cauchon <dennis@HarmReductionOhio.org> |
| **Cc:** | Dball@rosenbergball.com; Cecile Katz <cecile@harmreductionohio.org> |
| **Subject:** | Next board meeting...employee handbook, conflict form |
| **Attachments:** | smime.p7s |

I wanted to let everyone know that HRO has hired David Ball, a lawyer who specializes in employment law and nonprofits. Dwayne, Cecile and I met with Dave yesterday. Dave is going to review HRO's employee handbook, conflict policy and conflict form. This will take at least 30 days, so his review will not be done in time for our scheduled Sept. 15 board meeting.

Rather than cancel this scheduled meeting, we will discuss other topics that deserve attention — HRO's budget, a large state option response grant application due Sept. 23, etc. We'll schedule a meeting to discuss the employee handbook and conflict policy after David completes his review.

Thanks.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

EXHIBIT 9 7-29-26 KR

Outlook

**Re: ODH naloxone contract renewal finalized today**

**From** Amanda Reese <amandalynn@harmreductionohio.org>
**Date** Thu 8/29/2024 4:21 PM
**To** Dennis Cauchon <Dennis@harmreductionohio.org>
**Cc** Cecile Katz <cecile@harmreductionohio.org>; Molly Fantini <molly@harmreductionohio.org>; Patrick Bourland <patrick@harmreductionohio.org>; Kyle Johnston <kyle@harmreductionohio.org>; Kelsey Bates <Kelsey@harmreductionohio.org>; Abby Spears <abby@harmreductionohio.org>; Jennifer Phillips <jen@harmreductionohio.org>

Best News. Best job. Best team. Best people.

Dennis huge thank you for Captaining the ship that got HRO here, the seas haven't always been calm and that doesn't go without saying.

You are all amazing

EXHIBIT 16 7-29-26 KO

AmandaLynn Reese
Chief Program Officer
Harm Reduction Ohio
513-833-1675
Note: I travel frequently for outreach and may be delayed in responding to emails.

On Thu, Aug 29, 2024, 4:16 PM Dennis Cauchon <dennis@harmreductionohio.org> wrote:

I wanted to let everyone know that HRO's contract renewal with the state was finalized this afternoon. We signed the agreement letter this afternoon and emailed it to back to the state, thereby finalizing the agreement.

**Details.** The contract renewal is for up to $850,000 per year for two years starting October 1, 2024. Our existing contract is for up to $650,000 over 10.5 months, ending Sept. 30, 2024. The terms of the contract renewal are similar to the existing contract. The most important difference is we will be reimbursed for shipping up to 50,000 kits per year, up from the current 32,500.

The Ohio Department not Health will oversee continue to oversee the contract to support HRO:

HRO_000273

* operating a statewide online and layperson naloxone distribution program.
* targeting underserved geographic areas and populations in Ohio for increased naloxone access and distribution.
* maintaining a robust volunteer layperson network to distribute naloxone, especially in areas of great need.

**Thanks — and congratulations.** A big thank you to ever staff member for making our naloxone program the best of its kind in the country — large, efficient, caring, growing and getting better every day. Every one of you makes HRO special and creates a living, breathing organization of people who give a shit. We save lives every day. We make the world a better place in a concrete way that is largely invisible to the outside world but meaningful in homes, apartments and street corners across Ohio.

This contract renewal gives HRO's naloxone program — and your jobs — a strong level of security through Sept. 30, 2026 — and we hope beyond.

Thank you for working here. I feel very lucky.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

Outlook

**Re: Interim plan...tomorrow's 11 am meeting**

**From** Dwayne Steward <dwayne@makeitbetterconsulting.com>
**Date** Thu 8/29/2024 5:00 PM
**To** Dennis Cauchon <Dennis@harmreductionohio.org>
**Cc** Cecile Katz <cecile@harmreductionohio.org>

This is sounds good to me. Give me a call when you can Dennis. I want to talk to you about the board.

Dwayne Steward, MPA
Founder and CEO
Make It Better Consulting

make it better
CONSULTING
makeitbetterconsulting.com
dwayne@makeitbetterconsulting.com
(614) 859-9627

EXHIBIT 11 7-29-26 KD

On Thu, Aug 29, 2024 at 2:34 PM Dennis Cauchon <dennis@harmreductionohio.org> wrote:

I think we need an interim plan for what we'll do while we wait the conflict issue to be resolved. We have several important deadlines that need a plan. What I recommend:

* Postpone the employee staff retreat to discuss OKRs until it's clearer what future roles will be. Cecile and I agree it makes sense to delay.
* HRO plans to apply for a large amount of funds from the SOS 4.0 grant. The grant application deadline is Sept. 23. The handbook and conflict issue is unlikely to be resolved by then. I suggest we prepare the grant application assuming the status quo, i.e., existing employees in existing roles.
* The ODH contract is nearing renewal. There is nothing directly involving specific staff or policies in the renewal. However, to the extent that it may be an issue, I recommend we proceed with the status quo.
* I recommend Cecile and I talk to AL next week and apprise her of this: specifically, the status quo will hold until the handbook and conflict review is completed.

Other details may be worth discussing, but I think it's important to create a clear interim policy and the status quo seems the best option.

HRO_000271

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

Outlook

## Re: Remedy Alliance conflict policy and conflict form

**From** Dwayne Steward <dwayne@makeitbetterconsulting.com>
**Date** Thu 8/29/2024 5:12 PM
**To** Dennis Cauchon <Dennis@harmreductionohio.org>
**Cc** Dball@rosenbergball.com <Dball@rosenbergball.com>; Cecile Katz <cecile@harmreductionohio.org>

I like this language a lot and I like how it includes definitions. I think we should take some time with the staff to do a training on how to complete conflict of interest forms as well, since it's new for the agency. I know a lawyer that specifically has expertise in nonprofit infrastructure that can do the training. (Maritza Nelson: https://msnlawoffice.com/) We could possibly do this during the rescheduled retreat. Just a thought. I know Dave said he wasn't an expert in COIs for staff.

Dwayne Steward, MPA
Founder and CEO
Make It Better Consulting

make it better
CONSULTING
makeitbetterconsulting.com
dwayne@makeitbetterconsulting.com
(614) 859-9627

EXHIBIT 12 7-29-26 KR

On Thu, Aug 29, 2024 at 1:23 PM Dennis Cauchon <dennis@harmreductionohio.org> wrote:

Roxanne Saucier, who has been HRO's Open Society Foundation grant manager and is a board member of Remedy Alliance, sent me copies of Remedy's conflict policy and conflict form.

Remedy Alliance is the largest national distributor of naloxone and other harm reduction supplies. They've been around in one form or another since 2012 and distribute several million naloxone kits every year to harm reduction organizations nationwide. They are the harm reduction organization that most closely resembles HRO, albeit on a nationwide rather than statewide basis.

Thanks.

HRO_000267

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

# Quick recap of today's meeting

4 messages

**Cecile Katz** <cecile@harmreductionohio.org> Fri, Aug 30, 2024 at 11:51 AM
To: AmandaLynn Reese <AmandaLynn@harmreductionohio.org>
Cc: Dennis Cauchon <Dennis@harmreductionohio.org>

Hi AmandaLynn,

Great talking to you, just wanted to send a quick written recap of what was said regarding how HRO is moving forward:

1. Lawyer is looking into the new HRO's employee handbook:
    a. Lawyer will make edits and make sure that it is in compliance with employment law(s).
    b. HRO's Board will review/edit and then approve.
2. Lawyer is looking into HRO's conflict of interest policy and process, as well as the conflict of interest disclosure form:
    a. Lawyer will make edits and make sure that it is in compliance with employment law(s) and best practice(s).
    b. HRO's Board will review/edit and then approve.
3. Once these documents are ready, all employees will be given the documents to read, fill out/sign.
4. HRO will follow the process approved by the Board to assess any potential conflict of interest.

In the meantime, <u>all your duties stay the same</u> as they have been.

Let me know if you have any questions. Thanks!

**Cecile Katz**
Administrator, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023

cecile@harmreductionohio.org

EXHIBIT 13
tabbies
7-29-26 KR

**Amanda Reese** <amandalynn@harmreductionohio.org> Fri, Aug 30, 2024 at 12:01 PM
To: Cecile Katz <cecile@harmreductionohio.org>
Cc: Dennis Cauchon <Dennis@harmreductionohio.org>

Thank you for this information. Regarding that portion of the meeting.

Regarding the remainder of the meeting
1. Molly or Dennis will email me the job description/duties to adjust as appropriate prior to the upcoming interview with Carsyn.
2. Dennis is meeting with potential partners about SOS 4.0 funding opportunities and we will support them with data/research as needed as those opportunities develop.
3. Dennis is going to contact hourly employees about $1.00 per hour raises as appropriate. YAY!!!

4. I will forward the text from Linda at SOAR about her request regarding Bad Batch Alerts for your reference.


Follow up questions I of course forgot during the meeting when we discussed nuances of federal and state funding requirements -
Regarding Personnel -
Do we need to schedule a review for Kelsey? I am not sure if we have ever done one.
Hiring for NWO - are we considering bringing someone on even part-time? I want to communicate to Alyx who has inquired about the opportunity.

*At some point I want to follow up with Mahj and Lucas county about her subcontract proposal but she's been crazy busy so it's been hard to connect.

Thanks!
[Quoted text hidden]
--

AmandaLynn Reese
She/her/hers
Chief Program Officer
Harm Reduction Ohio
935 River Rd Suite G
Granville Ohio
513-833-1675

---

**Cecile Katz** <cecile@harmreductionohio.org> Fri, Aug 30, 2024 at 12:38 PM
To: AmandaLynn Reese <AmandaLynn@harmreductionohio.org>
Cc: Dennis Cauchon <Dennis@harmreductionohio.org>

Thanks for summarizing the rest!

Thanks for bringing up the performance review process. And you are absolutely correct, we need to get one scheduled for Kelsey, thanks for the reminder. She was hired at the end of August 2021, so we are due for an annual review any day. Do you have time the week of September 9-13?

In addition, Kyle and Patrick's 90 days performance reviews (who had been pushed to 90 days after they became full-time employees) will need to happen the first week of October. If you have availabilities that first week of October, let me know and I will schedule with them accordingly.

Thanks!

**Cecile Katz**
Administrator, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023

cecile@harmreductionohio.org

---

**From:** Amanda Reese <amandalynn@harmreductionohio.org>
**Sent:** Friday, August 30, 2024 12:01 PM

**To:** Cecile Katz <cecile@harmreductionohio.org>
**Cc:** Dennis Cauchon <Dennis@harmreductionohio.org>
**Subject:** Re: Quick recap of today's meeting

[Quoted text hidden]

---

**Amanda Reese** <amandalynn@harmreductionohio.org> Sat, Aug 31, 2024 at 12:44 PM
To: Dwayne Steward <dwayne@makeitbetterconsulting.com>

AmandaLynn Reese
Chief Program Officer
Harm Reduction Ohio
513-833-1675
Note: I travel frequently for outreach and may be delayed in responding to emails.
[Quoted text hidden]

# Fwd: AmandaLynn meeting

3 messages

**Dwayne Steward** <dwayne@makeitbetterconsulting.com> Sat, Aug 31, 2024 at 12:32 PM
To: AmandaLynn Reese <amandalynn@harmreductionohio.org>

Are you comfortable with this? I wanted to check in before I sent Dennis anything you sent me.

Dwayne Steward, MPA
Founder and CEO
Make It Better Consulting

make it better
CONSULTING
makeitbetterconsulting.com
dwayne@makeitbetterconsulting.com
(614) 859-9627

---------- Forwarded message ---------
From: **Dennis Cauchon** <dennis@harmreductionohio.org>
Date: Sat, Aug 31, 2024 at 11:15 AM
Subject: AmandaLynn meeting
To: Dwayne Steward <dwayne@makeitbetterconsulting.com>
Cc: Cecile Katz <cecile@harmreductionohio.org>

The meeting went OK. I think we all understand things are status quo until the lawyer finishes his review.

AmandaLynn said she had fully disclosed allpotetial conflicts to you. She seemed surprise that I had not seen this disclosure material. If this is so, I think it makes sense to forward the material to me, Cecile and Dave Ball.

Thanks.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

EXHIBIT
14
7-29-26 KR

**Amanda Reese** <amandalynn@harmreductionohio.org> Sat, Aug 31, 2024 at 12:41 PM
To: Dwayne Steward <dwayne@makeitbetterconsulting.com>, Amanda Reese <amandalynn.a.reese@gmail.com>

REESE_000041

I think you should hear the context of the meeting and decide. I trust your judgement.

I was definitely manipulated being told that the meeting was about grants and personnel. And then they brought up conflict of interest out of nowhere. Told me not to speak to anybody about it I asked if there was a gag order and he said no but that I shouldn't talk about it. He insinuated that I refused to disclose which is not true. I recorded the meeting. And will continue to record all interactions with Dennis moving forward due to his faulty and sometimes contrary recollection of events. Following the meeting they wrote me a summary of the meeting and only included details from the conflict of interest conversation. I replied to that email saying here is a summary of the rest of the meeting which was the majority of the content of the meeting. So it just was a guise to have a COI conversation with me. It's very disappointing.

If I trust my gut on the issue, I don't know if it's appropriate to share with him at this time. I will engage with the document as the board approves it. If it made sense to send to him I would have, I do not trust him. If everybody else's submissions were deleted as Cecile said in her email to staff (I will forward that to you) then mine should be deleted too. I don't know if this is me being petty or not. But this is very disheartening.

AmandaLynn Reese
Chief Program Officer
Harm Reduction Ohio
513-833-1675
Note: I travel frequently for outreach and may be delayed in responding to emails.
[Quoted text hidden]

---

**Dwayne Steward** <dwayne@makeitbetterconsulting.com> Sat, Aug 31, 2024 at 12:57 PM
To: Amanda Reese <amandalynn@harmreductionohio.org>

Thanks for this recap. This is helpful. I will hold off on sending for now. Let's touch base next week.

Dwayne Steward, MPA
Founder and CEO
Make It Better Consulting

make it better
CONSULTING
makeitbetterconsulting.com
dwayne@makeitbetterconsulting.com
(614) 859-9627

[Quoted text hidden]

MSN | LAW OFFICE OF MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

EXHIBIT
15
7-29-26 KR

**Privileged and Confidential**
**Attorney-Client Privilege**
**Attorney Work Product**

To: Board of Directors of Harm Reduction Ohio ("**HRO**")
From: Maritza S. Nelson, Law Office of Maritza S. Nelson, LLC
Date: October 9, 2024
Re: HRO's internal investigation of alleged conflicts of interest, hostile work environment and retaliation claims

---

## Table of Contents

***I. BACKGROUND*** ........ ***2***

***II. INVESTIGATIVE ACTIVITIES*** ........ ***2***

*A. Scope of Investigation* ........ *2*

*B. Witnesses Interviewed* ........ *3*

*C. Materials Reviewed* ........ *4*

***III. FACTUAL FINDINGS*** ........ ***6***

*A. Timeline* ........ *6*

*B. Amanda Lynn's Alleged Conflict of Interest* ........ *10*

*C. Dennis' Retaliation Claim* ........ *17*

[redacted]

***IV. LEGAL CONCLUSIONS*** ........ ***26***

*A. AmandaLynn's Alleged Conflict of Interest* ........ *26*

[redacted]



Sophisticated Legal Counsel for Serious Entrepreneurs
www.msnlawoffice.com

MSN LAW OFFICE OF MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

*E. Retaliation* ........ *30*

***V. RECOMMENDATIONS*** ........ ***32***

[redacted]

*B. Personnel Recommendations* ........ *33*

[redacted]

## I. BACKGROUND

HRO retained the Law Office of Maritza S. Nelson, LLC ("**MSN Law Office**") to conduct an internal investigation of:

- a potential conflict of interest accusation made by HRO's Founder and Executive Director, Dennis Cauchon[1], against AmandaLynn Reese, HRO's Chief Program Officer;
- [redacted]
- [redacted]

The purpose of the internal investigation is to provide legal advice to HRO. HRO initiated the investigation because Dennis reported the alleged conflict of interest to the Ohio Department of Health ("**ODH**"), a major funder of HRO, without conducting a formal investigation and against the Board's advice and guidance. Following Dennis' report to ODH, Dennis unilaterally placed AmandaLynn on administrative leave. AmandaLynn then submitted her formal grievance to the Board, and similar complaints soon followed from Kelsey, Molly and Shae. HRO anticipated litigation at the time it retained counsel.

## II. INVESTIGATIVE ACTIVITIES

### A. Scope of Investigation

On or about September 13, 2024, HRO retained MSN Law Office to conduct this internal investigation. No representative of HRO reviewed or edited this report. The report represents the independent opinions of Maritza S. Nelson, Esq. and their colleagues. In addition to Maritza S.

---

[1] Because everyone within the organization operates on a first name basis, we will refer to HRO employees and board members by their first names throughout this report to avoid any confusion.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

Nelson, Esq., the MSN Law Office team included James Douglas.[2] The MSN Law Office team spent approximately 95 hours conducting the investigation and preparing this report.

Counsel reached the conclusions set out herein at the end of an extensive and thorough investigation, and based them on the totality of the evidence collected and reviewed. Counsel investigated all matters they believe were relevant to reaching their conclusions.

HRO did not impose any constraints on the investigation and provided its full cooperation. HRO provided access to all relevant materials counsel requested. HRO implemented a litigation hold on or about September 17, 2024. The litigation hold applied to all board members and employees who might have information relevant to the investigation, including any emails, records of phone calls or text messages, HR policies, personnel files, and agreements. Counsel was able to request to interview any relevant individual for any amount of time.

**B. Witnesses Interviewed**

We interviewed the following individuals:

| No. | Name | Date of Interview | Title |
|---|---|---|---|
| 1. | Kelsey Caitlin (Bates) | 9/18/24 | Regional Coordinator / Black Community Strategy Director |
| 2. | Patrick Bourland | 9/19/24 | Regional Coordination / Interim Operations Manager |
| 3. | Molly Fantini | 9/20/24 | Naloxone Distribution and Social Media Manager |
| 4. | Abby Spears | 9/23/24 | Southeast Regional Coordinator |
| 5. | Kyle Johnston | 9/23/24 | Regional Distributor / Black Community Strategy Specialist |
| 6. | Cecile Katz | 9/25/24 | Administrator |
| 7. | Jen Phillips | 9/25/24 | Financial Manager |
| 8. | Chris Hawkins | 9/26/24 | Former Volunteer |

[2] Mr. Douglas is an unlicensed-JD working under the supervision of Maritza S. Nelson, Esq. while awaiting the results of the July 2024 Ohio bar exam.

MSN
LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

| | | | |
|---|---|---|---|
| 9. | AmandaLynn Reese | 10/2/24 | Chief Program Officer / Director of Programming |

On September 17, 2024, MSN Law Office requested to interview former employee Shae Dalrymple about her complaint, but to-date, she has not responded. Similarly, on September 20, 2024, MSN Law Office requested Dennis Cauchon to schedule an interview about his complaint and the allegations against him, but to-date, he has not responded or otherwise scheduled an interview. On September 24, 2024, MSN Law Office received a letter from David Martin, an attorney representing Dennis with respect to his alleged membership on the Board. While Attorney Martin did not indicate that he was also representing Dennis with respect to this employment investigation, ethically, we have not made any further attempts to secure Dennis' cooperation.

**C. Materials Reviewed**

Counsel collected and reviewed a broad range of materials during the course of the investigation, including the following:

- July 25, 2023 HRO application for the ODH Naloxone distribution contract
- October 27, 2023 Mandatory Use Contract For: Statewide Naloxone Mail Order & Lay Distributor Network
- July 18, 2024 emails between Dennis and Cecile re AmandaLynn and conflict policy
- July 23-24, 2024 emails between Dennis and AmandaLynn
- July 30, 2024 emails between Dennis and Cecile regarding changes to the employee handbook
- July 31, 2024 Memorandum of Agreement between HRO and the Ohio Department of Administrative Services regarding renewal of the ODH naloxone distribution contract
- August 8, 2024 emails from Cecile to the HRO staff sending them the "updated (and shortened) version of the HRO Employee Handbook" and asking staff to read and sign the new conflict of interest policy (sharing the Google form link) and fill out the new conflict of interest disclosure form (also via Google forms)
- August 15-16, 2024 emails between Dennis and Cecile re "A few Friday things"
- August 16, 2024 email from Tasha Turner-Bicknell (a Board member) to Dennis and the HRO Board re "Board Discussion – concerns and questions"
- August 19-20, 2024 emails between Dennis and Dwayne Steward (acting Board chair) re Conflict of interest form
- August 20, 2024 email from Tasha to Dennis and the HRO Board expressing concerns with only one person (presumably Dennis) deciding whether a conflict of interest exists rather than the Board making the decision

MSN
LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

- August 22, 2024 email from Cecile to HRO staff (cc'ing Dwayne) instructing the staff to disregard the August 23 deadline to complete the conflict of interest disclosure form.
- August 22-30, 2024 emails between AmandaLynn and Brittany Burns at ODH re a large naloxone order in advance of Save a Life Day. On August 30, Dennis forwarded these emails to Dwayne "To keep you up to date on AmandaLynn's role in ordering Kloxxado."
- August 26, 2024 emails between Dennis and David Ball re "Harm Reduction Ohio – thanks for representing us"
- August 29, 2024 emails between Dennis and the Board re "Next board meeting . . . employee handbook, conflict form"
- August 29, 2024 email from Dennis to Dwayne proposing that HRO maintain the status quo while the ODH contract is "nearing renewal"
- August 29, 2024 emails between Dennis and the staff announcing the renewal of the ODH contract
- August 29, 2024 letter from DAS to Dennis regarding the renewal of the naloxone distribution contract
- August 30, 2024 emails between AmandaLynn and Cecile (with Dennis cc'd) recapping a meeting
- August 31, 2024 emails between Dennis and Dwayne re AmandaLynn meeting
- September 2, 2024 emails between Dennis and Cecile re "Conflict of interest advice from Chat GPT" with "chat" attached
- September 3, 2024 letter from Dennis to ODH and related emails Dennis sent to the Board
- September 3, 2024 emails between Dennis, Cecile and ODH employees re Dennis' conflict disclosure letter
- September 3, 2024 letter from Dennis to AmandaLynn (sent via email from Cecile) to "formalize" the decision to place AmandaLynn on leave, along with subsequent emails between Cecile and AmandaLynn
- September 4, 2024 Grievance Formal Complaint Regarding Retaliation and Hostile Work Environment (email from AmandaLynn to board members Billy Golden and Dwayne Steward, including a statement from Mallory Bolen, AmandaLynn's former supervisor)
- September 4, 2024 email from Dennis to Dwayne, Attorney Ball, and Cecile asking everyone to review a proposed disclosure request that Dennis wanted to send to Amanda Lynn the next day.
- September 5, 2024 Letter of Concern Regarding the Behavior and Actions of the President of Harm Reduction Ohio (email from Kelsey to Dwayne and Billy) and attached letter
- September 5, 2024 Email from Dwayne to Dennis (cc'ing Billy) re Cease and Desist

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

- September 5-6, 2024 Emails re Update Regarding Harm Reduction Ohio Leadership between the Board and HRO Staff
- September 6, 2024 Email complaint from former employee Shae re Dennis and HRO
- September 6, 2024 Emails between the Board and Dennis re "Formal request for details on allegations made against me" and re "Contractual obligation to inform ODH you took the web site [*sic*] down"
- September 9, 2024 Emails between Anne Trinh (Board member) and Juan Devis (web developer)
- September 10, 2024 Email from volunteer Christopher Hawkins
- September 10, 2024 Email from the Board to Kelsey and Molly letting them know the Board decided to honor Patrick's interim promotion
- September 11, 2024 emails from the Board to HRO staff
- Undated Conflict of Interest statement submitted to ODH certifying no HRO staff had a conflict of interest with respect to the naloxone distribution project
- Portions of the 2022 HRO Employee Handbook (the most recent version that was actually approved by the Board and acknowledged by staff) and available job descriptions
- AmandaLynn's resume
- AmandaLynn's written testimony to the Maryland legislature
- AmandaLynn's draft conflict disclosure response

Counsel did not receive, and was therefore unable to review:

- Abby's recording of the September 5 staff meeting at which Dennis announced AmandaLynn's leave. Abby has offered to provide the recording, but to date, she has not done so. Nevertheless, everyone's account of that staff meeting has been fairly consistent.

## III. FACTUAL FINDINGS

### A. Timeline

October 27, 2023

- HRO was initially awarded a contract by the state to setup a Naloxone mail order and distribution network.

July 17, 2024

- Dennis had a conversation with AmandaLynn about her work for Velocity and the potential conflict of interest.

July 23, 2024

- Dennis emailed AmandaLynn: "Don't forget to let me know what you decided."

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

August 8, 2024

- Cecile sent emails to the HRO staff with a new HRO employee handbook and asking them to sign a new conflict of interest policy and fill out the new conflict of interest disclosure form, both via Google forms, by August 23.

August 16, 2024

- Tasha Turner-Bicknell emailed Dennis and the Board requesting that a Board meeting take place the following week to discuss the conflict of interest form Dennis had created. All employees were being asked to sign the form, but the Board had neither seen it nor approved it.

August 22, 2024

- Cecile sent the HRO staff an email instructing them to disregard the August 23 deadline to complete the new conflict of interest disclosure form so that "HRO and its Board of Directors" could "update the form."

August 26, 2024

- Dennis sent an email to Attorney David Ball confirming his representation of HRO. Specifically, Dennis asked Attorney Ball to review HRO's new employee handbook, conflict of interest policy, and conflict reporting form.

August 29, 2024

- Dennis sent an email to the Board confirming HRO's hiring of Attorney Ball. He also stated that Attorney Ball's review would take at least 30 days.
- In a separate email to Dwayne and Cecile (2:34pm), Dennis proposed that HRO maintain the status quo while HRO pursued funding from the SOS 4.0 grant and renewal of the ODH contract. "The handbook and conflict issue is unlikely to be resolved" before HRO applies for the SOS 4.0 grant funds. "I suggest we prepare the grant application assuming the status quo, i.e., existing employees in existing roles." Regarding the renewal of the ODH contract, "There is nothing directly involving specific staff or policies in the renewal. However, to the extent it may be an issue, I recommend we proceed with the status quo." He also suggested that he and Cecile speak with AmandaLynn the following week "and apprise her of this: specifically, the status quo will hold until the handbook and conflict review is completed."
- Later that day (4:16pm), Dennis sent an email letting everyone know that HRO's contract renewal with the state was finalized that afternoon. "This contract renewal gives HRO's naloxone program – and your jobs – a strong level of security through September 30, 2026 – and we hope beyond."

August 30, 2024

- Cecile sent AmandaLynn an email to "send a quick written recap of what was said regarding how HRO is moving forward." Cecile confirmed that a lawyer was reviewing

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

HRO's new employee handbook along with the new conflict of interest policy and disclosure form and that the Board would review and edit the documents and then approve. Following Board approval, employees would be given the documents to read, fill out and sign and then HRO would follow a process approved by the Board to assess any potential conflicts. "In the meantime, all your duties stay the same as they have been" (emphasis in original).

August 31, 2024

- Dennis sent an email to Dwayne (cc'ing Cecile) with the subject line "AmandaLynn meeting." Dennis stated, "The meeting went OK. I think we all understand things are status quo until the lawyer finishes his review."

September 2, 2024

- Dennis sought legal advice from Chat GPT regarding AmandaLynn's alleged conflict.

September 3, 2024

- Dennis, acting on his own and without Board approval, sent a letter to ODH alleging that AmandaLynn had a significant conflict of interest with respect to the naloxone distribution contract with ODH.
- Dennis notified the Board that he had made this report to ODH and briefly reported on his subsequent conversations with ODH.
- Dennis met with Molly and Patrick and informed them of his decision to place AmandaLynn on leave.
- Dennis (through Cecile) sent a letter to AmandaLynn to "formalize" the decision to place her on paid leave "while a review is conducted of a potential conflict caused by your outside employment."

September 4, 2024

- AmandaLynn sent the Board an email "Grievance Formal Complaint Regarding Retaliation and Hostile Work Environment." AmandaLynn's complaint also included a statement from Mallory Bolen regarding AmandaLynn's role at Velocity BioGroup ("**Velocity**").
- Dennis sent an email to Dwayne, Attorney Ball, and Cecile asking everyone to review a proposed disclosure request that Dennis wanted to send to Amanda Lynn the next day. The draft disclosure request instructed AmandaLynn to provide detailed information related to "potential conflicts of interest you may have or have had regarding your outside employment" by no later than 5pm on September 9. The letter also instructed her to "prioritize full disclosure related to your work as Director of Government Advocacy for Velocity BioGroup." In a subsequent email, Dennis proposed a timeline for reviewing any information received from AmandaLynn. According to his proposed timeline, Dennis would make a decision on AmandaLynn's conflict by September 13 and inform

MSN
LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

AmandaLynn and the Board. Then, on September 15, the Board could meet to discuss the conflict report and Dennis' decision.

- Attorney Ball responded with the suggestion that AmandaLynn should be interviewed instead of being sent a disclosure form. His concern was that the form's request for documentation and other detailed questions might be more than AmandaLynn was willing to comply with. And if she resigned rather than providing details, HRO would be left "in a difficult situation . . . [o]ne in which HRO knows generally about a conflict but very little detail. The lack of detail might bother HRO's funders." He also explained that an interview is the more typical approach when investigating potential employee misconduct. In response, Dennis asked if the interview should be conducted by Attorney Ball.
- When Attorney Ball responded with suggestions for who might conduct the interview, suggesting that perhaps it should not be Denis if there is "tension" between Dennis and AmandaLynn, Dennis responded that an interview was no longer necessary: "The truth is the information known now from public information is more than enough for ODH to believe [AmandaLynn] can't be involved in the naloxone contract or program. So we don't really need more information. The contract with the Kloxxado lobbying firm + her position ordering Kloxxado is in itself a prohibited conflict that cannot be cured."
- In another email response, Dennis insisted that the "conflict itself is determining, not whether it affected decision-making." Further, "The conflict has gone through the first four staff layers of review. All consider it a serious and prohibited conflict."[3] And Dennis pressed for a "quick resolution . . . because we are applying for $500,000+ from the same funders on Sept. 23 and a closed conflict case/with mitigation plan in place is better than an open case."

September 4 or 5, 2024

- Dennis met with the HRO staff to explain his decision to put AmandaLynn on leave and his decision to notify ODH. Dennis also promoted Patrick to Naloxone Distribution Manager, a position already held by Molly. Patrick's promotion included a raise from $21 to $28 per hour, which was more than Molly was earning ($23/hr) in the same position.

September 5, 2024

- Kelsey emailed Dwayne and Billy "Letter of Concern Regarding the Behavior and Actions of the President of Harm Reduction Ohio" attaching her own statement about Dennis' behavior at HRO. Kelsey also expressed interest in "any guidance or advice on forming a union," as well as her plans to reach out to a state representative and the staff.
- The Board held an emergency meeting and voted to place Dennis on administrative leave. Among other reasons, the Board determined that Dennis' letter to ODH included lies and inaccuracies that placed nearly $1 million in funding in jeopardy.

---

[3] We have not been able to determine what Dennis meant by "four staff layers of review" or who considered AmandaLynn's work a serious conflict other than Dennis himself.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

- Dwayne sent Dennis a cease-and-desist email letting Dennis know that the Board had received several staff complaints and instructing Dennis to stop communicating with funders, staff and community partners.
- The Board sent an email to the HRO staff informing them that Dennis had been placed on administrative leave.

September 6, 2024

- Shae sent an email complaint to the Board regarding her experiences with Dennis.
- Molly replied to the Board's September 5 email "to let you know what I've experienced and observed in the past week."
- On or around this date, the HRO website went down, briefly preventing the organization from taking any naloxone orders.[4]
- Dennis changed Patrick's new title from Naloxone Distribution Manager to Interim Operations Manager.

**B. Amanda Lynn's Alleged Conflict of Interest**

HRO's 2022 employee handbook includes a conflict of interest policy requiring employees "to conduct business according to the highest ethical standards." The policy requires the disclose of possible conflicts and defines a "potential or actual conflict" as a situation in which "an employee is able to influence a decision that may result in a personal gain for the employee or an immediate family member . . . as a result of the agency's business dealings."

HRO's policy goes on to permit outside employment and other activities outside of working hours as long as such activities do not "interfere with" the employee's job performance or "create a conflict of interest." Most relevant to this situation, the policy prohibits outside activities that:

- Involve organizations that are doing or seek to do business with HRO, including actual or potential vendors or customers
- Violate provisions of law or HRO's policies or rules

Despite this, Patrick told us that he did not think HRO ever had a concrete or "appropriately shared" conflict of interest policy or any procedures for responding to allegations that a conflict of interest existed. Molly stated that she was not aware HRO had any kind of conflict of interest policy until August of this year when the staff received an email saying they needed to disclose any potential conflicts. (Cecile subsequently told the staff to disregard this email.) Kye also told

[4] Juan Devis, the website developer who had been working with Dennis, determined that the HRO website was "redirected" when the domain, which is owned by Dennis, was pointed to servers at Bluehost (where Dennis has his account) rather than SiteGround (where HRO has a website hosting account). Mr. Devis blamed the failure on Dennis "adding domain privacy protection" which can "sometimes . . . cause the domain registrar to automatically switch the DNS settings to their own hosting service." Mr. Devis was adamant that this was not a "malicious" action, "but rather a mistake on the part of the domain provider (Bluehost)."

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

us that he was unaware of any official HRO policies regarding outside employment and that HRO has never defined the term "conflict of interest." Cecile also stated that HRO's policy on conflicts of interest was vague. Jen recalled signing the conflict form that was sent out but was not aware of any policies against having a second job. Similarly, AmandaLynn told us that HRO did not have a conflict of interest policy until Dennis created one after their July conversation.

In applying for the ODH naloxone distribution contract, HRO was required to "include a statement indicating whether [HRO] or any people that work on the Project through [HRO] have a possible conflict of interest (e.g., employed by the State, etc.) and, if so, the nature of that conflict. The State has the right to reject a Proposal in which a conflict of interest is disclosed or cancel the Contract if any interest is later discovered that could give the appearance of a conflict." We did not find anything else in the documents related to the naloxone distribution contract that otherwise defined "conflict of interest."

Dennis told Cecile that he learned about AmandaLynn's alleged conflict from her social media posts and that he investigated further on his own. (AmandaLynn confirmed that this is what Dennis told her as well.) He told her that he was worried that AmandaLynn's consulting decisions would influence her ordering decisions for HRO and that AmandaLynn's "lobbying" work would hurt HRO's reputation within the broader harm reduction community.

On or around July 17, Dennis had a conversation with AmandaLynn about her work for Velocity and the potential conflict of interest. According to Cecile, Dennis told AmandaLynn that her work for Velocity would be "water under the bridge" so long as AmandaLynn resigned from her consulting position. AmandaLynn described this and her subsequent interactions with Dennis as hostile, unprofessional and intimidating. According to AmandaLynn, Dennis was agitated and emotional from the very beginning of their conversation, immediately demanding that she answer for her work with Velocity and an unrelated nonprofit organization, On the Front Lines. AmandaLynn did not feel like Dennis was giving her a chance to participate in the conversation or explain her role at Velocity. Throughout the conversation, Dennis described feeling betrayed and hurt. At the end of the conversation, Dennis gave AmandaLynn a short deadline to "make a decision."

Following Dennis' conversation with AmandaLynn, he told Cecile that he was expecting AmandaLynn to step down from the other groups she was involved with, but he "wanted to make sure that's of her own volition." He also told Cecile that he made some suggested changes to the proposed conflict policy. In addition to potential financial conflicts, he wanted to address "alignment conflicts, particularly areas in which HRO's reputation and efforts may conflict with the financial interests of [*sic*] policies of others." He concluded his email to Cecile by telling her that HRO needed to have a simple form for reporting potential conflicts annually or when they arise. Cecile suggested using a Google form that would go to her and Dennis and then Dennis could make a decision about what was reported. Around this same time, Cecile, who told us that she had no background in HR and had been learning as she goes, was revising the employee handbook for Dennis. In response, Dennis took a template from Jotform and then adjusted it

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

(https://form.jotform.com/241995895490173).[5] Here, Dennis defined a conflict as any situation in which "a person or close relative . . . is involved in an organization, transaction, event or relationship that may be relevant to an employees' duties or the mission of Harm Reduction Ohio."[6]

On July 23, Dennis emailed AmandaLynn: "Don't forget to let me know what you decided."

In his August 19 email to Dwayne, Dennis insisted that the HRO staff needed to submit conflict forms by Friday, August 23. Dennis wrote:

We cannot delay this. The ODH contract required us to submit a statement listing all people working on the contract for HRO who may have a conflict or possible conflict . . . . I do not think it's likely this conflict or possible conflict would affect the ODH contract, but that's not our decision. We are required to report all conflict and possible conflicts when we learn of them. [AmandaLynn's] paid work for the advocacy firm is clearly a possible conflict . . . . We need to disclose conflicts promptly as part of this renewal.

In response, Dwayne argued that HRO should not send ODH "anything that would jeopardize the contract over an unproven conflict." Dwayne also stated that the ODH documentation did not require reporting "perceived conflicts."[7] Dwayne also expressed concern that the conflict of interest form Dennis created was targeted at AmandaLynn ("a female over the age of 40") rather than aimed at all employees. "If this is truly an issue, then EVERY employee that has a second job, has served on a board, or crossed paths in any way with a company that distributed naloxone would need to also be reported." Because of this, "an employee law attorney really needs to take a look at this first."

Dennis wrote back, acknowledging that HRO needed "to know the details" surrounding AmandaLynn's work for Velocity "before we can make a decision." However, Dennis was worried that AmandaLynn had "declined to disclose details of her work." Dennis then reiterated, "We need facts before we make a decision" and suggested that attorney David Ball "do the fact-finding and provide a report." He also suggested additional attorneys if Attorney Ball was not available.

Cecile confirmed that after consulting an attorney, Dennis was satisfied that everything should remain status quo until an internal investigation was conduct. In his emails, Dennis repeatedly stated that everything should remain "status quo" until Attorney Ball finished reviewing the updated employee handbook, conflict of interest policy, and conflict disclosure form. His emails indicated that it was especially important to maintain the status quo and keep all employees

---

[5] The form was later moved to Google docs but remained substantially the same (https://docs.google.com/forms/d/e/1FAIpQLSeh5Vbget64iDx8Xy6rUObmszgpC8lhzM0sYjqDggtJTqQvnw/viewform). We could not determine what specific form Dennis used because JotForm provides several conflict of interest templates.

[6] By this definition, nearly everyone involved with HRO has a conflict because nearly everyone at HRO is involved in another organization that might be relevant to their duties or the mission of HRO.

[7] The language in the contract documents did require reporting any "possible conflict."

MSN
LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

in their current positions while HRO applied for additional funding and sought renewal of the ODH contract. And on Saturday, August 31, he confirmed that "we all understand things are status quo until the lawyer finishes his review." AmandaLynn confirmed that she met with Dennis on Friday, August 30, and Dennis told her that HRO was maintaining the status quo while HRO's lawyer investigated the potential conflict.

Rather than maintaining the status quo, on September 2, 2024, Dennis sought legal advice from Chat GPT. Chat GPT's terms of service are clear: "Output may not always be accurate. You should not rely on Output from our Services as a sole source of truth or factual information, or as a substitute for professional advice." And "You must not use any Output relating to a person for any purpose that could have a legal or material impact on that person, such as making credit, educational, employment, housing, insurance, legal, medical, or other important decisions about them."

In his discussion with Chat GPT, Dennis posed his questions regarding AmandaLynn's potential conflict three different times, receiving a slightly different answer each time. The full conversation is attached, but in Dennis' presentation to Chat GPT, he claimed that AmandaLynn "had an undisclosed financial contract" with a manufacturer of naloxone.[8] Chat GPT responded be recommending immediate disclosure to the Board, conducting an internal review, consulting with legal counsel and *then* notifying the state, along with an action plan for remedying the situation and preventing a reoccurrence.

Dennis then suggested to Chat GPT that AmandaLynn "handles all ordering of the medicine under the grant." HRO orders three different medicines, two that cost about $35 and one that cost about $50. He then explained that AmandaLynn "oversees the program and ordering product" and "has a financial relationship to advocate for the pharmaceutical company making the $50 product." Chat GPT then responded that AmandaLynn's "relationship with the pharmaceutical company could influence [her] to favor the more expensive product." Chat GPT also changed its recommendations. Now, it suggested that step 1 was notifying the state government.

Dennis followed up a third time to inform Chat GPT about the Conflict of Interest Statement HRO submitted in response to the state's Request for Proposal. Again, Chat GPT highlighted AmandaLynn's alleged "financial relationship to the pharmaceutical company," noting this was "precisely the type of issue that should have been disclosed under the RFP requirements." Chat GPT then recommended immediate disclosure to the state.

Regardless, Dennis wrote to Cecile (and not the Board or Attorney Ball), "I think this is sound advice: immediate disclosure/create mitigation plan." In response, Cecile reminded Dennis that "we need to tread carefully here, especially as we just had a conversation with [AmandaLynn] saying that everything is on status quo until the policy and disclosure process is reviewed by the lawyer." She also suggested that Dennis explain his concerns to the Board or that the details could be shared with Attorney Ball "and he could advise what we need to do in regard to the State's contract . . . ."

---

[8] AmandaLynn confirmed that she does not have any direct relationships with pharmaceutical manufacturers, let alone a "financial contract" with Hikma or any other pharmaceutical company.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

Despite: (i) not having all of the information, (ii) not seeking legal advice from legal counsel, (ii) not sharing his concerns with the Board (and acting against the Board's advice and instructions to the contrary), Dennis decided to notify ODH of the existence of the alleged conflict on the basis of *legal advice from Chat GPT*.

In his September 3 letter to ODH, Dennis asserted that AmandaLynn "has a conflict of interest" that "should have been reported in [HRO's] original contract application and our request for contract renewal. He went on to admit that he did not have "full details of the conflict or potential" but blamed this on AmandaLynn allegedly declining to disclose details about her outside employment. His letter connected AmandaLynn's advocacy work for Velocity to the fact that, among other things, Velocity is a lobbyist for Hikma, the pharmaceutical company that manufactures Kloxxado, a naloxone nasal spray. Based on this series of connections and the fact that AmandaLynn oversees HRO's naloxone program, including ordering naloxone from the state pharmacy, Dennis concluded that there was a conflict or potential conflict of interest. And according to Molly, Dennis told her and Patrick that "AmandaLynn was put on paid leave because he thought she worked for a company that lobbied for Hikma and that we could lose our contract if she weren't immediately put on paid leave." According to Kelsey, Dennis stated that AmandaLynn was a sales representative for Velocity, which is false.

In reality, as Director of Government Advocacy for Velocity, AmandaLynn researches the efficacy of various forms of naloxone, educates Velocity about communities' needs and preferences related to naloxone, and advises Velocity on how to communicate with different communities about naloxone products. In this educational and communications capacity, AmandaLynn sometimes testifies before state legislatures, and in some states, this has meant she was required to register as a lobbyist. However, she was adamant that she does not promote any specific company or product. Rather, she advocates for expanding access to naloxone and harm reductions services generally. This is consistent with what we found in her Maryland testimony, discussed below.

We asked AmandaLynn directly about the relationship between herself, Hikma and Velocity. She confirmed that Velocity represents Hikma, but stated that she has no direct relationship with Hikma. She does not receive any compensation from Hikma. Velocity pays her a retainer and an hourly rate, and her Velocity compensation is not in any way tied to sales or distribution of Kloxxado. In fact, Velocity has a firewall between the advocacy division she works in and their sales teams.

We also asked AmandaLynn why she did not give Dennis this information. She replied that the conflict of interest policy and disclosure form Dennis asked her to submit appeared to be "targeted" at her, and she did not trust that he was creating a fair process. Despite this, she did complete the form and send it to the Board, not Dennis or Cecile, along with her concerns about the process. According to AmandaLynn, the Board instructed her to effectively ignore it until HRO could implement a proper disclosure and investigation process.

In his letter to ODH, Dennis also acknowledged that he had "no reason to believe that AmandaLynn's outside contract influenced her ordering decisions" for HRO. Molly confirmed that she had never seen AmandaLynn "show any preference for Kloxxado over other forms of

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

naloxone." In fact, (according to Molly) AmandaLynn has always been adamant that clients get the form of naloxone that they ask for, regardless of what AmandaLynn might prefer or think is best. According to Shae's complaint, Shae was the one who initially argued for HRO to carry Kloxxado because people were asking for it; AmandaLynn initially actually argued against it "recognizing that a higher dose could mean more intense precipitated withdrawal for our participants." After further discussions, including two separate assessments of the community's demand for Kloxxado, "AmandaLynn was adamant that [HRO] had to make sure we properly educated participants of the risks if we carried it. She made sure that happened."[9] And according to AmandaLynn, HRO distributes less Kloxxado than other forms of Naloxone. AmandaLynn also confirmed that she has ordered naloxone products from the state pharmacy for HRO, but what products are ordered and in what amounts are not in her discretion. Orders are placed based on what clients are requesting, inventory use, and external metrics and reporting.

Dennis' letter went on to assert that while working for Velocity, AmandaLynn submitted testimony to the Maryland legislature in support of a bill that would "require the Maryland Department of Health ("**MDH**") to provide Kloxxado access," a position opposed by the MDH. This statement gave the appearance that AmandaLynn goes around the country lobbying for Kloxxado to boost Hikma's sales even where health departments oppose the use of Kloxxado. In reality, AmandaLynn's testimony supported expanding access to all forms of naloxone and promoting "autonomy of choice." She cited HRO's own surveys that showed ¼ of respondents and 1/3 of HRO community distribution respondents reported using 3 or more doses of naloxone, leading to some requesting the higher dose form provided in Kloxxado. She also pointed to the fact that since Ohio expanded access to all forms of naloxone, the cost of 4mg naloxone had been cut nearly in half. Her conclusion was that "widespread distribution of and training about naloxone **of any form** at a lower cost is an important tool in reducing deaths from accidental drug overdoses" (emphasis in original).

AmandaLynn was not alone in her testimony in support of the proposed legislation. Statements in support were also submitted by:

- Johns Hopkins University ("This bill allows providers that receive naloxone from the [MDH] to choose the formulation or dosage of the drug");
- BrightView Health in Cincinnati ("We strongly support increasing accessibility to all forms of FDA approved opioid overdose reversal medications");[10]
- the Maryland Chiefs of Police Association and Maryland Sheriffs' Association ("This bill requires the [MDH] to provide choice in the selection of formulation or dosage of opioid overdose reversal drugs approved by the [FDA]"); and

[9] Here, AmandaLynn's account different from Shae's email complaint. Unlike Shae, AmandaLynn told us that she had no part in HRO's decision to begin distributing Kloxxado; the decision was made entirely based on clients' requests.

[10] Ironically, HRO's application for the ODH contract included a letter of support from BrightView Health.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

- the Maryland Association of Counties ("This bill would require the [MDH] to authorize local programs to treat and reverse overdoses to choose their preferred formulation of medication for these purposes").

The MDH did oppose the legislation, not because of some philosophical opposition to Kloxxado, which MDH was already providing to its Overdose Response Programs ("**ORPs**"), but because MDH felt the bill would require it to "honor ORP requests for higher priced naloxone formulations." MDH went on to state that it did not want to be forced to purchase naloxone without consideration of cost because of the unknown fiscal impact on MDH.

Dennis' letter to ODH then asserted his belief that HRO should have reported AmandaLynn's alleged conflict of interest when HRO first applied for the naloxone distribution contract with ODH (July 2023) and when applying for the contract extension in July of 2024. In her interview, Kelsey stated that as part of the process for applying for the ODH contract, ODH requested information about HRO employees and their outside employment. Kelsey helped to format resumes that were submitted to ODH, and AmandaLynn's resume does in fact include her role as Director of Government Advocacy for Velocity BioGroup (December 2022 – Present).[11] To Kelsey's knowledge, ODH did not ask any follow-up questions about anyone's outside employment.

Finally, Dennis claimed that he did not know about the alleged conflict when HRO applied for the contract or the contract extension and that, as far as he knew, no one else at HRO other than AmandaLynn knew of the alleged conflict. This was blatantly untrue—the alleged conflict had been discussed among Dennis, AmandaLynn and the Board as early as July 17, 2024, before the ODH contract was renewed on August 29. Dennis knew about the alleged conflict; he just chose not to disclose it to ODH until after ODH renewed the contract with HRO.

Further, in Mallory's September 4 statement, she stated that AmandaLynn had disclosed her role at Velocity to Mallory while Mallory was the Director of Operations at HRO. Not only was Mallory aware of AmandaLynn's outside employment while HRO was finalizing its proposal for the ODH contract, but Mallory "conducted a thorough review and engaged in discussions with a representative from Velocity." From those discussions, Mallory learned that "AmandaLynn's role involved harm reduction outreach and did not encompass any pharmaceutical sales activities." Further, HRO was already distributing Kloxxado before Velocity hired AmandaLynn.

Kelsey's interview also confirmed that "everyone" at HRO, including Dennis, knew about AmandaLynn's work for Velocity.[12] Velocity began pursuing AmandaLynn for a consulting position after AmandaLynn presented at a harm reduction conference in Puerto Rico. According

[11] We could not determine whether the resumes were actually submitted to ODH. They are not included in HRO's 128-page application for the contract dated July 25, 2023. There is an education and training summary (AmandaLynn's summary is page 79 of the application) and a "candidate experience requirement" (AmandaLynn's is on page 91), but neither mentions AmandaLynn's work with Velocity.

[12] Kyle, Abby and Chris all confirmed that everyone, not just at HRO, but in the broader harm reduction community as well, knew AmandaLynn worked as a consultant for another organization. AmandaLynn never treated her position at Velocity as a secret.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

to Kelsey, AmandaLynn told Dennis "all about" the interview and the work she would be doing for Velocity. AmandaLynn also discussed the role with various HRO Board members and sought their advice and guidance. And AmandaLynn discussed her work with Velocity openly with HRO staff and included travel for her Velocity work on the shared calendar. Kelsey also vaguely recalled Dennis asking about and commenting on AmandaLynn's work with Velocity, but she could not recall any specifics.

Patrick told us that it was possible AmandaLynn had told Dennis about her work with Velocity and Dennis had either forgotten or not paid any attention. (Kyle also mentioned the possibility that Dennis had simply forgotten about AmandaLynn's consulting work.) Patrick went on to explain that Dennis tends to focus intensely on his own work and interests, but he does not always seem aware of what is happening around him or at HRO. Patrick did not seem convinced that the first time Dennis learned about AmandaLynn's work for Velocity was in the summer of 2024.

After sending his letter to ODH, Dennis sent an email to the Board informing the Board that he had reported the alleged conflict to ODH. According to his email, he then had a conversation with the Project DAWN administrator, Sierra Dantzler, "in which she described the conflict as an actual and significant conflict that needed to be addressed. She agreed that then [*sic*] employee could no longer be involved with our naloxone program or contract in any way."

When Dennis met with members of the HRO staff on or around September 5, he stated that he had placed AmandaLynn on leave and notified ODH because of AmandaLynn's "factual conflict of interest." However, Kelsey told us that Dennis blamed the decision to put AmandaLynn on leave on ODH, telling the staff that ODH made the decision. According to Patrick, Dennis said there was nothing to do after notifying ODH except to place AmandaLynn on leave. ODH required it as part of their investigation, and Dennis simply had no choice in the matter. According to Molly, Dennis told everyone that AmandaLynn was placed on leave because she was lobbying and doing sales for Hikma, which he said jeopardized the ODH contract. Abby also confirmed that Dennis told the staff he was forced to place AmandaLynn on leave as part of ODH's investigation, and he implied that AmandaLynn's administrative leave would be permanent.

Dennis' efforts to blame ODH for AmandaLynn being placed on leave are not consistent with the emails from ODH employees. On September 3, 2024, Jennifer Voit at ODH emailed Dennis: "Please keep us posted on the results of your internal investigation and [AmandaLynn's] employment status."[13]

On September 9, Cecile wrote in an email to AmandaLynn that "the decisions that were taken were shortsighted, in my opinion. For what is [*sic*] worth, I was made aware of Dennis' decision at the last minute and I will forever regret that I was able to delay it or stop it."

**C. Dennis' Retaliation Claim**

The 2022 HRO employee handbook also includes a whistleblower policy requiring all directors, officers, employees and volunteers to "practice honesty and integrity in fulfilling our

[13] Dennis forwarded Ms. Voit's email to Cecile, noting that Ms. Voit was Ms. Dantzler's boss.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

responsibilities" and to "comply with all applicable laws and regulations." The policy encourages everyone affiliated with HRO "to raise serious concerns internally so that HRO can address and correct inappropriate conduct and actions." The policy expressly forbids anyone from retaliating "against any board member, officer, employee, or volunteer who *in good faith* reports an ethics violation, or a suspected violation of law . . . or suspected violation of any regulation governing the operations of HRO" (emphasis added). Furthermore, "Anyone filing a written complaint concerning a violation or suspected violation must be acting in good faith *and have reasonable grounds for believing the information disclosed indicates a violation.* Any allegations that prove not to be substantiated and which prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense" (emphasis added). Finally, the policy tasks the Director of Operations with investigating and resolving all complaints about unethical or illegal conduct and advising the President and/or the Board.

In response to Dennis' September 3 letter to ODH, Dwayne and Billy, in their capacity as acting Board Chair and Board Vice Chair respectively, sent Dennis a cease-and-desist email. The email informed Dennis that the Board had "received several complaints from staff alleging a hostile work environment" and that the Board had an obligation to take those complaints seriously and launch an investigation. The Board further instructed Dennis to "cease and desist all activities related to conflict of interest matters, including but not limited to communications with funders, staff, and community partners. No staff decisions should be made until the [B]oard officially contacts you with further directions . . ."

The day after Dennis was placed on leave, he went to the HRO office. Patrick asked him what he was doing there, and Dennis stated that the Board was retaliating against him for going to ODH against their advice. Dennis also stated that he (Dennis) was a member of the Board and that the Board acted wrongfully by failing to consult with him about the decision to place him on administrative leave. Dennis also acknowledged that employees would accuse him of creating a hostile work environment, but he was confident they could not satisfy the legal elements. Dennis then bragged about being "11 and 1" in court cases, indicating that he expected to win any case brought against him.

[redacted]

[redacted]

---

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]



Sophisticated Legal Counsel for Serious Entrepreneurs
www.msnlawoffice.com

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

MSN
LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

## IV. LEGAL CONCLUSIONS

[redacted]

### A. AmandaLynn's Alleged Conflict of Interest

AmandaLynn's work for Velocity does not present a conflict of interest with HRO's work on naloxone distribution. It is understandable how her work with Velocity might be perceived as a "possible conflict" if the only known facts were that she had a government advocacy position with Velocity, a known lobbyist for Hikma Pharmaceuticals, the manufacturer of Kloxxado. But a simple, professional conversation with AmandaLynn and Mallory would have quickly cleared up any lingering doubts or suspicions about AmandaLynn's role with Velocity.

It is difficult to reach any conclusion regarding what initially made Dennis so upset in July when he claims that he first learned AmandaLynn had a position with Velocity, a claim we find highly unlikely. But consistent with the employees' statements, it seems likely that Dennis simply dug his heels in. He had already taken the position that he was right and AmandaLynn was wrong, and there could be no backing him down from that position. From July to his report to ODH in September, Dennis' position progressively escalated:

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

On August 23, Dennis wrote: I do not think it's likely this conflict or possible conflict would affect the ODH contract." Dennis initially agreed that HRO needed to "know the details" before making a decision, and even agreed to Attorney Ball should investigate and prepare a report. Dennis repeatedly acknowledged the need to maintain the status quo until Attorney Ball could advise HRO.

But suddenly and inexplicably over Labor Day Weekend, Dennis decided that he could no longer wait for the details or Attorney Ball's advice. Instead, he painted a one-sided and false picture for Chat GPT, a service widely known for sometimes presenting unreliable and inaccurate information. Dennis made his requests to Chat GPT three times, subtly changing the facts each time, in an apparent attempt to manipulate the chat bot into providing his preferred conclusion.

- Dennis had already acknowledged that he did not have all of the facts, but he (falsely) told Chat GPT that AmandaLynn had a financial contract with Hikma.
- After Chat GPT recommended several steps *before* contacting the state, Dennis (falsely) told Chat GPT that AmandaLynn had a financial relationship to advocate for Hikma, which makes the more expensive form of naloxone as compared to other naloxone forms purchased by HRO.
- Dennis then effectively told Chat GPT that HRO had failed to disclose AmandaLynn's alleged financial relationship to Hikma.

After getting his preferred conclusion from Chat GPT (immediately disclosure to the state), Dennis told the state that AmandaLynn definitively had a conflict (or at least a potential conflict) of interest. Throughout his letter to the state and his subsequent conversations with HRO staff, he implied that AmandaLynn was effectively paid to promote Kloxxado on behalf of Hikma. He also falsely represented AmandaLynn's testimony before the Maryland legislature and even the MDH's position on the bill.

On several occasions in his letter, Dennis blatantly lied to ODH—He told ODH that that he was not aware of the alleged conflict when HRO applied for the contract extension. In reality, he wanted to "maintain the status quo" right up until the time that the contract extension was awarded. His statement that no one else knew about AmandaLynn's consulting work was also false. Apparently "everyone" at HRO knew, and most seem to have suspected that Dennis had simply buried his head in the sand. Dennis either outright lied or greatly exaggerated his claims that ODH forced him to place AmandaLynn on leave. It is not clear from the few available emails from ODH whether ODH made any determinations, and the last email from ODH on the matter implied that ODH was waiting for HRO to conduct an investigation.

After AmandaLynn was placed on leave, Dennis quickly became resistant to idea of any investigation or further fact-finding regarding AmandaLynn's actual work at Velocity. He insisted that having someone interview AmandaLynn was no longer necessary. "We don't really need more information." And he argued that it didn't matter whether AmandaLynn's work actually impacted her naloxone orders at HRO (which it did not). As far as Dennis was concerned, the mere fact that she worked for Velocity, which did work for Hikma, was the end of the story.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

While no one at HRO seems to have been aware of what was in the 2022 employee handbook, it is equally clear that with regard to AmandaLynn's non-existent conflict of interest, Dennis did not "conduct [HRO's] business according to the highest ethical standards."

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

MSN
LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

______________________________

[redacted]

[redacted]

[redacted]

[redacted]

MSN
LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**E. Retaliation**

Retaliation, in the legal context, occurs when an employer harasses, discriminates against, or otherwise punishes an employee for engaging in a *protected* activity. Simply complaining about an employer's decision or general behavior is not, in and of itself, a protected activity that can give rise to a retaliation claim. Instead, protected activity, for the purposes of a retaliation claim, is expressly defined by various statutes. In general, federal statutes protect employees who report an employer's criminal activity to authorities.[31] Title VII further states that it is unlawful for an employer to take an adverse employment action against an employee because they made a complaint under Title VII or supported or assisted in an investigation related to such a complaint.[32] Title VII retaliation claims require proof that the alleged unlawful retaliation would not have occurred in the absence of the alleged wrongful action of the employer.[33]

---

[redacted]

[31] See https://www.whistleblowers.gov/sites/wb/files/2024-09/Whistleblower-Statutes-Summary-Chart.pdf for a comprehensive summary of federal whistleblower statutes.

[32] 42 U.S.C. § 2000e-3(a).

[33] *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

MSN
LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

Under Ohio's whistleblower statute, an employer cannot take disciplinary action against an employee for reporting criminal activity of the employer or a fellow employee.[34] Ohio's law is further limited—not only is an employee only protected as a whistleblower when they report violations of specific statutes, but they must also follow a very specific reporting procedure. The law also explicitly denies whistleblower protections to employees who fail to "make a reasonable and good faith effort to determine the accuracy of any information reported…"[35]

[redacted]

Dennis has alleged that HRO engaged in retaliation by placing him on administrative leave in response to his act of reporting a suspected conflict of interest to ODH. His claim must be viewed in the larger context of the law on wrongful termination.

Generally, Ohio law recognizes the at-will employment doctrine and grants employers the freedom to terminate employment relationships for any or no reason. However, the Ohio Supreme Court also recognizes an exception to the doctrine when an at-will employee is fired for a reason that is against clear public policy.[36] At least one Ohio court has acknowledged that an employee may be protected when they are fulfilling their fiduciary or ethical duties by raising concerns to the company.[37] However, that court also declined to protect an employee who repeatedly raised such claims after the company and its attorney determined that they were without merit.[38]

While Dennis did not technically comply with the Ohio whistleblower statute when he wrote the letter to ODH (and he was not engaging in any federally protected activities at the time), an Ohio court is likely to at least consider the argument that an employee's act of reporting a suspected conflict of interest should be treated as a protected activity. Dennis could make the argument that he was trying to fulfil his ethical and fiduciary duties. He tried to report his concerns to the Board, but that the Board would not take action. However, his argument would be undermined by the fact that the Board had engaged Attorney Ball on Dennis' own recommendation and the fact that Dennis ignored Attorney Ball's advice on the matter and turned to Chat GPT instead.

---

[34] O.R.C. § 4113.52

[35] O.R.C. § 4112.52(C)

[36] *Greenley v. Miami Valley Maintenance Contrs., Inc.*, 49 Ohio St.3d 228 (1990).

[37] *See, e.g., Urda v. Buckingham, Doolittle, & Burroughs*, 2006-Ohio-6915, P30.

[38] *Id.*

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

In determining whether an employee has been wrongfully terminated, Ohio courts consider:

1. Whether a clear public policy exists and is manifested in Ohio's laws, constitution, or common law;
2. Whether dismissing the employee under the circumstances would jeopardize the public policy;
3. Whether the employee's dismissal was motivated by conduct related to the public policy; and
4. Whether the employer lacked an overriding legitimate business justification for dismissing the employee.

Even if a court decides that encouraging directors and employees of a nonprofit organization to make conflict of interest reports is a cognizable public policy, HRO could still argue that it had an overriding legitimate business justification for placing Dennis on leave. HRO's 2022 employee handbook requires all HRO directors and employees to "practice honesty and integrity." HRO's whistleblower policy further required that all reports be made *in good faith* and based on *reasonable grounds*. Not only was Dennis' letter to ODH wildly inaccurate, but it is simply impossible to believe that he was acting in good faith when he chose to rely on Chat GPT over HRO's actual attorney. And when he sent the letter to ODH, Dennis did so despite knowing that HRO needed "to know the details . . . before we can make a decision." Per HRO's whistleblower policy, "Any allegations that prove not to be substantiated and which prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense."

**V. RECOMMENDATIONS**

[redacted]

[redacted]

[redacted]

[redacted]

MSN | LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

**B. Personnel Recommendations**

Dennis Cauchon should be terminated and removed from the Board. Dennis' behavior clearly warrants termination. We do not see any viable path forward that would create a serious change in Dennis' behavior and attitudes and allow Dennis to remain at HRO in any capacity. Nevertheless, se suspect that he will not go quietly and without threatening or pursuing legal action. While we believe HRO can defend itself against any claims of retaliation or wrongful termination that Dennis might attempt to bring it, the Board must also consider the fact that litigation is incredibly time consuming and expensive. And given Dennis' background in journalism, he would almost certainly endeavor to present his case in the media just as much as he would try to make his case in court.

It is also rather unusual for a nonprofit's executive director to also having a voting role on the board of directors. Here, there has been quite a bit of confusion and conflicting information about whether Dennis actually has a vote on the HRO Board. Regardless, as a compensated employee, he cannot serve as an independent voting member of the Board when it comes to decisions about his employment. To the extent that Dennis is a voting member outside of his capacity as an employee/President, then the Board should consider voting to remove him as a director pursuant to Article III, Section 9: After providing two weeks' notice of a regular or special board meeting, "a board member may be removed for reasons other than excessive absences "by a three-fourths vote of the remaining directors."

AmandaLynn should be reinstated as soon as possible. Given that AmandaLynn does not actually have a conflict of interest, she should be reinstated. However, in order to do so, the Board will need to share some of the findings from this investigation with ODH. In order to preserve attorney-client privilege with respect to the other matters in this report, please do not share the entire report with ODH. The Board may cut out portions relevant to the conflict of interest portion of the investigation to present to the ODH. Better still, we can "ghost write" a letter for the Board to send to ODH explaining the relevant findings.

[redacted]

[redacted]

**You said:**

Our nonprofit organization has a large contract from the state government to distribute a medicine made by a variety of providers. We largely let our customers decide which brand of product to choose. Recently, we discovered the employee overseeing this program had an undisclosed financial contract with one of the medicine's manufacturer. To get the contract, we signed a form saying our organizations and its employees had no conflicts or potential conflicts. How should we handle this issue?

**ChatGPT said:**

ChatGPT
Handling this situation requires careful attention to both ethical and legal considerations. Here's a step-by-step approach:

### 1. Immediate Disclosure and Internal Review

- **Disclosure:** Immediately disclose the conflict of interest to your board of directors or governing body. Transparency is key in addressing the situation.
- **Internal Review:** Conduct a thorough internal review to assess the extent of the conflict and any impact it may have had on your operations, particularly the state contract.

### 2. Consult Legal Counsel

- Given the legal implications, particularly regarding the form signed stating there were no conflicts, consult with your legal counsel to understand the potential consequences and to guide your actions.

### 3. Communicate with the State Government

- **Notification:** Inform the relevant state government department or contract manager about the situation. It's essential to do this proactively to demonstrate good faith and maintain trust.
- **Action Plan:** Present a clear plan on how you are addressing the issue, including any steps to remedy the situation and prevent future occurrences.

### 4. Assess and Mitigate Damage

- **Evaluate Impact:** Determine whether the conflict of interest affected any decisions or operations, such as influencing the choice of medicine provided to customers.
- **Corrective Actions:** If any decisions were improperly influenced, consider steps to correct these, such as revisiting past procurement decisions or offering customers an opportunity to change their selection.

### 5. Disciplinary Action and Policy Review

- **Disciplinary Action:** Based on your internal policies and the findings of your review, consider appropriate disciplinary action against the employee involved. This could range from a warning to termination, depending on the severity of the breach.
- **Policy Review:** Review and update your conflict of interest policies to ensure they are robust and that all employees are aware of their responsibilities. Consider implementing regular training on conflicts of interest.

### 6. Documentation

- **Record-Keeping:** Document all actions taken, including internal discussions, legal advice, communications with the state, and any corrective measures. This documentation may be important for legal or audit purposes.

### 7. Long-Term Prevention

- **Strengthen Controls:** Implement stronger internal controls, such as regular audits of employee relationships with vendors, to prevent similar issues in the future.
- **Continuous Monitoring:** Establish ongoing monitoring of conflicts of interest as part of your organization's compliance and ethics programs.

### 8. Evaluate Impact on Funding and Compliance

- **Audit Implications:** Consider how this incident may impact your upcoming "single audit" and ensure that all necessary disclosures are made during the audit process.
- **Funding Compliance:** Review any other funding agreements to ensure that this issue does not create compliance problems elsewhere.

Taking these steps will help address the immediate problem while also reinforcing your organization's commitment to ethical conduct and compliance with all contractual obligations.

4o

**You said:**

The employee with the conflict handles all ordering of the medicine under the grant. The way it works is we ask the state government to purchase specific amounts of three or four similar medical products. Then, the state buys the products and delivers them to us. We do not purchase the products directly ourselves. Rather, we tell the state what we need and the state purchases the products and delivers them to us. We receive three medicines that are similar. Two cost about $35. The other costs about $50. Overall, the state buys about $2.2 million a year in products for us to distribute to people who need it. The employee who oversees the program and ordering product has a financial relationship to advocate for the pharmaceutical company making the $50 product. What should we know about the importance of this conflict? And what should the organization do about the conflict?

**ChatGPT said:**

ChatGPT
Memory updated

### Importance of the Conflict

The conflict of interest in this situation is significant due to the following reasons:

1. **Financial Impact:** The employee's relationship with the pharmaceutical company could influence them to favor the more expensive product, leading to higher overall costs for the state government and potentially reducing the number of people your organization can serve with the available funds.
2. **Ethical Concerns:** The undisclosed financial relationship raises serious ethical issues. The integrity of your organization could be questioned if it appears that decisions were made based on personal gain rather than the best interest of the people you serve.
3. **Compliance and Legal Risks:** Since your organization signed a form declaring no conflicts of interest, this undisclosed relationship could put you at risk of violating the terms of your contract with the state. This could lead to legal consequences, including the potential for the state to seek damages, cancel the contract, or take other punitive actions.
4. **Reputation Risk:** If this conflict becomes public, it could damage your organization's reputation, potentially leading to loss of trust from stakeholders, donors, and the communities you serve.

### What the Organization Should Do

1. **Immediate Disclosure and Remediation:**
   - **Notify the State Government:** Inform the state government immediately about the conflict of interest, disclosing all relevant details about the employee's financial relationship with the pharmaceutical company.
   - **Cease Involvement:** Remove the employee from any decision-making or oversight roles related to the ordering or management of these products until the matter is fully resolved.
2. **Internal Investigation:**
   - **Conduct a Review:** Perform an internal investigation to determine the extent of the influence this employee may have had on product ordering decisions. Assess whether the more expensive product was recommended more frequently than necessary due to the employee's conflict.
   - **Evaluate Past Orders:** Review past orders to see if the conflict may have led to an over-purchase of the more expensive product, and calculate any financial impact.
3. **Rectify Potential Bias:**

   - **Rebalance Orders:** If bias is found in past orders, work with the state to rebalance future orders to ensure that purchasing decisions are made purely on the basis of cost-effectiveness and patient needs, rather than personal financial gain.
   - **Seek Advice:** Consult with your legal counsel on how to address any financial discrepancies or potential overpayment issues with the state government.
4. **Implement Corrective Actions:**
   - **Disciplinary Action:** Based on the findings of your internal investigation, take appropriate disciplinary action against the employee. This could include termination if the breach is deemed severe.
   - **Strengthen Policies:** Update your conflict of interest policies and ensure all employees understand and comply with them. This may include requiring regular disclosures and implementing a more rigorous review process for those involved in procurement or other sensitive roles.
5. **Strengthen Oversight and Controls:**
   - **Independent Oversight:** Consider involving an independent committee or external auditor to oversee product ordering decisions to prevent future conflicts.
   - **Training:** Provide ongoing ethics and compliance training to all employees to reinforce the importance of transparency and integrity in all operations.
6. **Monitor and Report:**
   - **Ongoing Monitoring:** Establish a system for ongoing monitoring of employee relationships with vendors to detect and address potential conflicts early.
   - **Reporting Mechanism:** Implement a clear mechanism for employees to report potential conflicts of interest in a confidential manner.

By addressing this conflict swiftly and transparently, your organization can mitigate potential damage and demonstrate a strong commitment to ethical operations and compliance with your obligations.

When our organization received the state contract, the contract Request for Proposal said the following about conflicts of interest: "Conflict of Interest Statement. Each Proposal must include a statement indicating whether the Offeror or any people that may work on the Project through the Offeror have a possible conflict of interest (e.g., employed by the State, etc.) and, if so, the nature of that conflict. The State has the right to reject a Proposal in which a conflict is disclosed or cancel the Contract if any interest is later discovered that could give the appearance of a conflict." In our successful application, we said our organization had no conflicts. How would the situation described earlier in this conversation related to the conflict language in the contract Request for Proposal?

**ChatGPT said:**

ChatGPT

The situation you described earlier is directly related to the conflict of interest language in the contract's Request for Proposal (RFP). Here's how:

## 1. Conflict of Interest Disclosure Requirement

- **RFP Language:** The RFP explicitly required that each proposal include a statement indicating whether there is a possible conflict of interest involving the offeror or anyone who may work on the project.
- **Your Organization's Statement:** In your successful application, you stated that your organization had no conflicts of interest. This was a crucial part of your proposal, as the RFP language gives the state the right to reject a proposal or cancel the contract if a conflict of interest is discovered.

## 2. Relevance of the Undisclosed Conflict

- **Nature of the Conflict:** The conflict of interest involving the employee with a financial relationship to the pharmaceutical company is precisely the type of issue that should have been disclosed under the RFP requirements. This relationship could influence purchasing decisions, leading to higher costs for the state and potentially impacting the fairness and integrity of the procurement process.
- **Breach of Contract Terms:** By not disclosing this conflict, your organization inadvertently breached the terms of the RFP and the resulting contract. The state could view this as a material omission, particularly since the conflict involves a financial relationship that could be seen as compromising the objectivity of decisions related to state-funded purchases.

## 3. Potential Consequences

- **Contract Cancellation:** The state has the right, as outlined in the RFP, to cancel the contract if a conflict of interest that could give the appearance of impropriety is later discovered. This means the current contract could be at risk.
- **Reputational Damage:** Beyond the potential for contract cancellation, the failure to disclose the conflict could harm your organization's reputation with the state and other stakeholders, affecting future contract opportunities and relationships.

## 4. Recommended Actions

- **Immediate Disclosure:** As mentioned previously, it's critical to immediately disclose the conflict of interest to the state, explaining the situation fully and transparently.
- **Corrective Measures:** Outline the steps your organization is taking to address the conflict, such as removing the employee from the relevant role, conducting an internal investigation, and implementing stronger conflict of interest policies.
- **Seek State Guidance:** Engage with the state to understand their concerns and work collaboratively to resolve the issue. This could include revisiting past orders and potentially adjusting future procurement processes to ensure fairness.
- **Legal Consultation:** Consult with legal counsel to navigate the potential legal implications and to prepare for any possible actions the state might take, including negotiating any remedies or adjustments to the contract.

Addressing this issue promptly and openly with the state will be essential to maintaining your organization's credibility and ensuring compliance with the terms of the contract.

Outlook

## Re: Conflict of interest advice from Chat GPT

**From** Cecile Katz <cecile@harmreductionohio.org>
**Date** Mon 9/2/2024 9:14 AM
**To** Dennis Cauchon <Dennis@harmreductionohio.org>

Hi Dennis,

I think we need to thread carefully here, especially as we just had a conversation with AL saying that everything is on status quo until the policy and disclosure process is reviewed by the lawyer. I also do understand the commitment we made to the State and that we may need to disclose sooner rather than later to protect the contract and consequently the organization and everyone's livelihood. Because the Board apparently knows the details of the conflict, maybe you could explain your concerns to them about the potential conflict we may have with the State regarding our main source of funding and that you and/or the Board need to share the details about the conflict to the State.
Or the details could be shared with the D. Ball and he could advise what we need to do in regard to the State's contract (i.e. should we disclose to the State what we know now even if it's not complete and we are in the middle of reviewing our COI policy/disclosure process?)

I agree that this situation is embedded in so many aspects of the organization and needs to be addressed sooner than later, but I am not sure how to best address this without creating more (potential legal) issues. Sorry I cannot be much more help.

**Cecile Katz**
Administrator, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023

cecile@harmreductionohio.org

tabbies EXHIBIT 16 7-24-26 KR

HRO_000288

**From:** Dennis Cauchon
**Sent:** Monday, September 2, 2024 7:01 AM
**To:** Cecile Katz
**Subject:** Conflict of interest advice from Chat GPT

I think this is sound advice: immediate disclosure/create mitigation plan.

Outlook

**Re: Remedy Alliance conflict policy and conflict form**

**From** David Ball <dball@rosenbergball.com>
**Date** Tue 9/3/2024 10:12 AM
**To** Dennis Cauchon <Dennis@harmreductionohio.org>
**Cc** Dwayne Steward <dwayne@makeitbetterconsulting.com>; Cecile Katz <cecile@harmreductionohio.org>

1 attachments (3 KB)
clip_image001.png;

Dennis, Dwayne and Cecile,
These look excellent. I can see that Remedy Alliance has done is take the IRS conflict of interest policy that I shared with you and modified it, so that among a few others things it covers employees and volunteers in addition to board members. I will give it a careful review and let you know if I would suggest any tweaks for HRO.
Best,
Dave

**David T. Ball** Partner
Rosenberg & Ball Co., LPA
205 South Prospect Street
Granville, Ohio 43023
t (614) 316-8222
dball@rosenbergball.com www.rosenbergball.com

RATED BY Super Lawyers

EXHIBIT 17 7-29-26 KC

***Top Lawyers 2024***, *Columbus CEO magazine; 2010 American Bar Association Outstanding Young Nonprofit Attorney; Certified Arbitrator, American Arbitration Association ; Co-Host of the "Two Balls, One Court" podcast*

Confidentiality Notice

This e-mail message is intended for use only by the individual or entity to which it is addressed. This message may contain information that is privileged or confidential. It is not intended for transmission to, or receipt by, anyone other than the named

HRO_000269

addressee (or a person authorized to receive and deliver it to the named addressee). If you have received this transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail. Thank you.

On Thu, Aug 29, 2024 at 1:23 PM Dennis Cauchon <dennis@harmreductionohio.org> wrote:

Roxanne Saucier, who has been HRO's Open Society Foundation grant manager and is a board member of Remedy Alliance, sent me copies of Remedy's conflict policy and conflict form.

Remedy Alliance is the largest national distributor of naloxone and other harm reduction supplies. They've been around in one form or another since 2012 and distribute several million naloxone kits every year to harm reduction organizations nationwide. They are the harm reduction organization that most closely resembles HRO, albeit on a nationwide rather than statewide basis.

Thanks.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

HRO_000270

Outlook

**Re: Harm Reduction Ohio conflict disclosure letter**

**From** Cecile Katz <cecile@harmreductionohio.org>
**Date** Tue 9/3/2024 11:45 AM
**To** Brittany.Burns@odh.ohio.gov <Brittany.Burns@odh.ohio.gov>; Dennis Cauchon <Dennis@harmreductionohio.org>

1 attachments (149 KB)
HRO Conflict notice letter to ODH 9-3-24 .pdf;

Hi Brittany,

Please find the signed PDF attached. Let us know if you need anything else.

Thanks,

**Cecile Katz**
Administrator, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023

cecile@harmreductionohio.org

---

**From:** Brittany.Burns@odh.ohio.gov <Brittany.Burns@odh.ohio.gov>
**Sent:** Tuesday, September 3, 2024 11:39 AM
**To:** Dennis Cauchon <Dennis@harmreductionohio.org>
**Cc:** Cecile Katz <cecile@harmreductionohio.org>
**Subject:** RE: Harm Reduction Ohio conflict disclosure letter

Hello Dennis,

EXHIBIT 18 7-29-26 KR

HRO_000290

For this to be a formal notice to ODH, could you please sign it and send it back via PDF?

Kindly,

**Brittany Burns**
**Public Health Consultant**
**Community Harm Reduction**
**Bureau of Health Improvement and Wellness**
246 North High St.
Columbus, OH 43215
P: 614.466.7739
Brittany.Burns@odh.ohio.gov

Ohio Department of Health

The State of Ohio is an Equal Opportunity Employer and Provider of ADA Services.

This e-mail is intended for the sole use of the intended recipient and may contain privileged, sensitive, or protected health information. If you are not the intended recipient, be advised that the unauthorized use, disclosure, copying, distribution, or action taken in reliance on the contents of this communication is prohibited. If you have received this e-mail in error, please notify the sender via telephone or return e-mail and immediately delete this e-mail.

**From:** Dennis Cauchon <dennis@HarmReductionOhio.org>
**Sent:** Tuesday, September 3, 2024 11:10 AM
**To:** Burns, Brittany <Brittany.Burns@odh.ohio.gov>
**Cc:** Cecile Katz <cecile@harmreductionohio.org>
**Subject:** Harm Reduction Ohio conflict disclosure letter

HRO_000291

# HARM REDUCTION OHIO

Health. Science · Compassion · Human Rights

September 3, 2024

To Ohio Department of Health:

Harm Reduction Ohio recently learned that our chief program officer AmandaLynn Reese has a conflict of interest that we believe should have been reported in our original contract application and our request for contract renewal. The full details of the conflict or potential are not clear because AmandaLynn has declined to disclose details on her outside employment. However, publicly available information makes it clear that AmandaLynn has had and may continue to have a contract to do government advocacy for a lobbying firm representing Hikma, the pharmaceutical company that makes Kloxxado naloxone nasal spray.

AmandaLynn's contract is with Velocity BioGroup, a registered lobbyist for Hikma in Ohio, West Virginia and other states. AmandaLynn's title at Velocity BioGroup is Director of Government Advocacy, according to a biography she posted online in July 2024. AmandaLynn's Linkedin profile shows she had a contract to work as Director of Government Advocacy from December 2022 through December 2023. It seems likely from the social media post and a conversation with AmandaLynn that she retained this position after December 2023 and does so today. However, I cannot say for sure.

AmandaLynn tasks at Harm Reduction Ohio includes overseeing our naloxone program, ordering naloxone from the state pharmacy and providing information on naloxone volume used in monthly contract invoices. Since December 2022, AmandaLynn, as Harm Reduction Ohio's representative, has ordered approximately 15,000 Kloxxado kits from the state. At present, I have no reason to believe that AmandaLynn's outside contract influenced her ordering decisions.

AmandaLynn has declined to provide me details of her work for Velocity BioGroup. However, from the internet, it can be seen that AmandaLynn submitted testimony in the Maryland legislature in May 2023 in support of SB954, a bill to require the Maryland Department of Health to provide Kloxxado access. The Maryland Department of Health opposed the bill, which did not pass.

It is my understanding that Harm Reduction Ohio should have reported this conflict of interest in our July 2023 application for the naloxone distribution contract and in advance of the request for a contract extension. I signed the contract application and did not report the

conflict because I did not know it existed. As far as I know, nobody else at Harm Reduction Ohio, other than AmandaLynn Reese, knew of the conflict.

Harm Reduction Ohio plans to take action today to remove AmandaLynn Reese from any role in our naloxone distribution program, including ordering naloxone. Specifically, I plan to place AmandaLynn Reese on paid leave today while we review this matter.

Harm Reduction Ohio will continue to seek all information related this conflict and promises to be forthright and forthcoming in promptly reporting what we learn to the Ohio Department of Health.

I believe Harm Reduction Ohio has talented staff, partners and volunteer distributors that ensure we can continue to execute the ODH naloxone contract at a high level and with impartiality. Harm Reduction Ohio seeks ODH guidance in how we should proceed to mitigate all issues caused by this conflict.

Sincerely,

Dennis Cauchon

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, OH 43023
(740) 973-3814
dennis@harmreductionohio.org

| | |
|---|---|
| **From:** | Dennis Cauchon <dennis@HarmReductionOhio.org> |
| **Sent time:** | 09/03/2024 01:57:07 PM |
| **To:** | Dwayne Steward <dwayne@makeitbetterconsulting.com>; Billy Golden <bgolden@nastad.org>; Anne C. Trinh <trinh.89@osu.edu>; Tasha Turner-Bicknell <turnerta@ucmail.uc.edu>; James Decker <jamesdecker68@gmail.com>; Colleen Garlock <colleengarlock@gmail.com>; mollybtrue <mollybtrue@yahoo.com>; Dennis Cauchon <dennis@HarmReductionOhio.org> |
| **Cc:** | Cecile Katz <cecile@harmreductionohio.org> |
| **Subject:** | Conflict of interest disclosure made to Ohio Department of Health...HRO staffer placed on paid leave |
| **Attachments:** | HRO Conflict notice letter to ODH 9-3-24 .pdf smime.p7s |

To the HRO Board:

I reported to the Ohio Department of Health today that a Harm Reduction Ohio employee had a conflict of interest that should have been disclosed in our July 2023 application for a statewide naloxone distribution contract and in our paperwork for a two-year contract extension, awarded last week. As a state contractor receiving federal funds, Harm Reduction Ohio has an ongoing duty to disclose all conflicts and potential conflicts, real or perceived, "as soon as identified." The disclosure letter to ODH is attached and includes details.

After receiving the disclosure letter, Project DAWN administrator Sierra Dantzler initiated a conversation with me in which she described the conflict as an actual and significant conflict that needed to be addressed. She agreed that then employee could no longer be involved with our naloxone program or contract in any way.

Undisclosed conflicts can result in the termination of our federally funded contract. I am optimistic that by being forthright and forthcoming with ODH that we can resolve this issue in way that protects our organization, staff, volunteers and the people we serve.

We have a board meeting scheduled for September 15. If you have questions, please contact me or Cecile. Otherwise, the issue will be on the September 15 board meeting agenda.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

EXHIBIT
tabbies
7-29-26 KR

HRO Conflict notice letter to ODH 9-3-24 .pdf

# HARM REDUCTION OHIO

Health · Science · Compassion · Human Rights

September 3, 2024

To Ohio Department of Health:

Harm Reduction Ohio recently learned that our chief program officer AmandaLynn Reese has a conflict of interest that we believe should have been reported in our original contract application and our request for contract renewal. The full details of the conflict or potential are not clear because AmandaLynn has declined to disclose details on her outside employment. However, publicly available information makes it clear that AmandaLynn has had and may continue to have a contract to do government advocacy for a lobbying firm representing Hikma, the pharmaceutical company that makes Kloxxado naloxone nasal spray.

AmandaLynn's contract is with Velocity BioGroup, a registered lobbyist for Hikma in Ohio, West Virginia and other states. AmandaLynn's title at Velocity BioGroup is Director of Government Advocacy, according to a biography she posted online in July 2024. AmandaLynn's Linkedin profile shows she had a contract to work as Director of Government Advocacy from December 2022 through December 2023. It seems likely from the social media post and a conversation with AmandaLynn that she retained this position after December 2023 and does so today. However, I cannot say for sure.

AmandaLynn tasks at Harm Reduction Ohio includes overseeing our naloxone program, ordering naloxone from the state pharmacy and providing information on naloxone volume used in monthly contract invoices. Since December 2022, AmandaLynn, as Harm Reduction Ohio's representative, has ordered approximately 15,000 Kloxxado kits from the state. At present, I have no reason to believe that AmandaLynn's outside contract influenced her ordering decisions.

AmandaLynn has declined to provide me details of her work for Velocity BioGroup. However, from the internet, it can be seen that AmandaLynn submitted testimony in the Maryland legislature in May 2023 in support of SB954, a bill to require the Maryland Department of Health to provide Kloxxado access. The Maryland Department of Health opposed the bill, which did not pass.

It is my understanding that Harm Reduction Ohio should have reported this conflict of interest in our July 2023 application for the naloxone distribution contract and in advance of the request for a contract extension. I signed the contract application and did not report the

conflict because I did not know it existed. As far as I know, nobody else at Harm Reduction Ohio, other than AmandaLynn Reese, knew of the conflict.

Harm Reduction Ohio plans to take action today to remove AmandaLynn Reese from any role in our naloxone distribution program, including ordering naloxone. Specifically, I plan to place AmandaLynn Reese on paid leave today while we review this matter.

Harm Reduction Ohio will continue to seek all information related this conflict and promises to be forthright and forthcoming in promptly reporting what we learn to the Ohio Department of Health.

I believe Harm Reduction Ohio has talented staff, partners and volunteer distributors that ensure we can continue to execute the ODH naloxone contract at a high level and with impartiality. Harm Reduction Ohio seeks ODH guidance in how we should proceed to mitigate all issues caused by this conflict.

Sincerely,

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, OH 43023
(740) 973-3814
dennis@harmreductionohio.org

# HARM REDUCTION OHIO

Health. Science · Compassion · Human Rights

September 3, 2024

Dear AmandaLynn,

I wanted to formalize the details presented at our 1:30 p.m. meeting today.

Harm Reduction Ohio is:

- placing you on paid leave, effective immediately, while a review is conducted of a potential conflict caused by your outside employment.
- suspending your Harm Reduction Ohio email account and access to HRO's shared Google Drive while the review is underway.

Harm Reduction Ohio reported the potential conflict of interest today to the Ohio Department of Health. As part of the conflict review, HRO may request additional information from you or ask to speak with you directly.

If you have questions, please contact Cecile at cecile@harmreductionohio.org

Sincerely,

Dennis Cauchon

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, OH 43023
(740) 973-3814
dennis@harmreductionohio.org

EXHIBIT 20
7-29-26 KC

Outlook

## Re: Proposed HRO conflict review schedule

**From** Dwayne Steward <dwayne@makeitbetterconsulting.com>
**Date** Thu 9/5/2024 9:30 AM
**To** Dennis Cauchon <Dennis@harmreductionohio.org>
**Cc** David Ball <dball@rosenbergball.com>; Cecile Katz <cecile@harmreductionohio.org>

I think asking for the contracts and the amounts of money is egregious.I also think there is a kinder approach we should be taking to all of this. I don't think that AL or any of the staff is expendable. I believe there is a way we could have gone about this that didn't lead to losing staff, but we may be beyond that at this point. Our mission is to create more compassion in the world for people affected by drugs. I'm not sure why we're not extending this same compassion to our staff. It seems like we're currently not operating within our mission. The effects of all this is going to have long term consequences for the agency that I don't think we're considering.

Dwayne Steward, MPA
Founder and CEO
Make It Better Consulting

make it better
CONSULTING
makeitbetterconsulting.com
dwayne@makeitbetterconsulting.com
(614) 859-9627

EXHIBIT 21
7-29-26 KR

On Wed, Sep 4, 2024 at 4:25 PM Dennis Cauchon <dennis@harmreductionohio.org> wrote:
Will wait to hear from Dwayne.

To make point another way: This is a fact-based inquiry, not one based on a view of what the facts mean. The conflict itself is determining, not whether it affected decision-making. Also, the definitions of conflict and required disclosure — actual and potential, real or perceived — is so broad that, even interpretation, gives limited protection.

While I'm interested in interpretation and nuance, ODH first narrow concern relates to AmandaLynn directing the state to purchase 15,000 Kloxxado kits while having a contract with Kloxxado's lobbying firm.

HRO_000306

The conflict has gone through the first four staff layers of review. All consider it a serious and prohibited conflict. It is now in the legal counsel office of ODH (which administers then control) and the legal counsel of the Ohio Department of Mental Health (which funds the contract). AL's only real hope is those legal counsel offices OK override the staff's view.

As a practical matter, a quick resolution is important for us because we are applying for $500,000+ from the same funders on Sept. 23 and a closed conflict case/with mitigation plan in place is better than an open case.

On Sep 4, 2024, at 4:02 PM, David Ball <dball@rosenbergball.com> wrote:

Makes sense. I green light the form.

**David T. Ball** ▫ Partner
Rosenberg & Ball Co., LPA
205 South Prospect Street
Granville, Ohio 43023
t (614) 316-8222
dball@rosenbergball.com ▫ www.rosenbergball.com

Rated by Super Lawyers

***Top Lawyers 2024***, *Columbus CEO magazine; 2010 American Bar Association Outstanding Young Nonprofit Attorney; Certified Arbitrator, American Arbitration Association ; Co-Host of the "Two Balls, One Court" podcast*

Confidentiality Notice

This e-mail message is intended for use only by the individual or entity to which it is addressed. This message may contain information that is privileged or confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee (or a person authorized to receive and deliver it to the named addressee). If you have received this transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail. Thank you.

On Wed, Sep 4, 2024 at 4:00 PM Dennis Cauchon <dennis@harmreductionohio.org> wrote:

> The truth is the information known now from public information is more than enough for ODH to believe she can't be involved in the naloxone contract or program. So we don't really need more information. The contract with the Kloxxado lobbying firm + her position ordering Kloxxado is in itself a prohibited conflict that cannot be cured. The risk for us is slow action. ODH wants us to keep them up to date on how we are mitigating the conflict, including the status of the employee.

The disclosure effort is an opportunity for AmandaLynn to provide exculpatory information or her side of the story. If she decides to resign, that might be the best outcome for all.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

On Sep 4, 2024, at 3:37 PM, David Ball <dball@rosenbergball.com> wrote:

Good question. I generally advise that the interview be conducted by an outside investigator, such as myself, when there is the risk of litigation and the risk of accusations of bias on the part of the in-house interviewers (typically HR and a supervisor).

I don't see the risk of litigation here, and my concern is that bringing me in would raise her defenses. She might clam up and not give much information if an outside law firm gets involved.

If there is tension between Dennis and AmandaLynn, but less tension between her and Cecile, maybe the interview could be done by Cecile and Dwayne? Or Cecile and a member of the board's personnel committee (or the equivalent)?

Again, as I see the priority here is to strategize to get the most information from her before she might run off.

Dave

**David T. Ball** ▫ Partner
Rosenberg & Ball Co., LPA
205 South Prospect Street
Granville, Ohio 43023
t (614) 316-8222
dball@rosenbergball.com ▫ www.rosenbergball.com

HRO_000308

Rated by Super Lawyers

***Top Lawyers 2024***, *Columbus CEO magazine; 2010 American Bar Association Outstanding Young Nonprofit Attorney; Certified Arbitrator, American Arbitration Association ; Co-Host of the "Two Balls, One Court" podcast*

Confidentiality Notice

This e-mail message is intended for use only by the individual or entity to which it is addressed. This message may contain information that is privileged or confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee (or a person authorized to receive and deliver it to the named addressee). If you have received this transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail. Thank you.

On Wed, Sep 4, 2024 at 3:26 PM Dennis Cauchon <dennis@harmreductionohio.org> wrote:

Good points. Would it make sense for you to do the interview?

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

On Sep 4, 2024, at 3:24 PM, David Ball <dball@rosenbergball.com> wrote:

All:

I think the form itself is fine. But I do have a concern. I'm concerned that the request for documentation, especially, along with the other questions may be more than she is willing to comply with, which could lead her to simply resign rather than provide the information requested. That would leave HRO in a difficult situation, as I see it. One in which HRO knows generally about a conflict but very little detail. The lack of detail might bother HRO's funders.

HRO_000309

So I have a question/suggestion: why not just interview AmandaLynn? That's the more typical approach, in my experience, for an investigation of potential employee misconduct. Until now, it has seemed to me, there was the desire to use the conflict reporting form mechanism for consistency among employees and to avoid a negative impact on employee morale. But now that it's reached this point, I think the importance of repairing HRO's relationship with ODH is the top priority.

The advantage of the interview approach is that HRO would obtain at least some, hopefully most, of the information that it seeks. I'm concerned that if the disclosure form approach is used she might just quit and never provide any of the information.

If the interview approach is chosen, it should be Dennis with Cecile, so there is a witness.

I hope this concern makes sense. But I may be missing something(s).

Best,
Dave

**David T. Ball** ▫ Partner
Rosenberg & Ball Co., LPA
205 South Prospect Street
Granville, Ohio 43023
t (614) 316-8222
dball@rosenbergball.com ▫ www.rosenbergball.com

Rated by Super Lawyers

*__Top Lawyers 2024__, Columbus CEO magazine; 2010 American Bar Association Outstanding Young Nonprofit Attorney; Certified Arbitrator, American Arbitration Association ; Co-Host of the "Two Balls, One Court" podcast*

Confidentiality Notice

This e-mail message is intended for use only by the individual or entity to which it is addressed. This message may contain information that is privileged or confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee (or a person authorized to receive and deliver it to the named addressee). If you have received this transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply e-mail. Thank you.

On Wed, Sep 4, 2024 at 11:37 AM Dennis Cauchon <dennis@harmreductionohio.org> wrote:

Dwayne and Dave,

I think we should do the expeditiously to be fair to ODH and AmandaLynn. ODH's priority for us is status of conflicted employee.

Also, HRO plans to apply for $500,000 to $750,000 in Ohio Department of Mental Health and Addiction Services (OHMAS) SOS 4.0 grant money with a Sept. 23 application deadline. This conflict must be disclosed in the application. ODH has already reported conflict to OMHAS, which funds our existing contract through SOS 4.0 funds. The conflict should be resolved before the application is made if possible.

In following: DC is Dennis; CK is Cecile, DS is Dwayne, DC is Dave.

**Suggested review schedule:**

* Thursday, September 5 - Send disclosure request to AmandaLynn. (Created by DC, CK. Reviewed by DS, DB.)
* Monday, September 9 — 5 p.m. deadline for disclosure.
* September 10 or 11 — Discuss information gathered so far, including disclosure. Send further requests if needed. (DC, CK, DS, DB)
* Friday, September 13 — Meeting to discuss facts and options. (DC, CK, DS, DB.)
* Friday, September 13 — DC makes decision, informs AL and HTO board.
* Sunday, September 15 — HRO board meets to discuss conflict report and decision.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

HRO_000311

<clip_image001.png>

<clip_image001.png>

<clip_image001.png>

| | |
|---|---|
| **From:** | Dennis Cauchon <dennis@HarmReductionOhio.org> |
| **Sent time:** | 09/05/2024 12:31:18 PM |
| **To:** | Dwayne Steward <dwayne@makeitbetterconsulting.com>; Billy Golden <bgolden@nastad.org>; Colleen Garlock <colleengarlock@gmail.com>; James Decker <jamesdecker68@gmail.com>; Tasha Turner-Bicknell <turnerta@ucmail.uc.edu>; Anne C. Trinh <trinh.89@osu.edu>; mollybtrue <mollybtrue@yahoo.com>; Dennis Cauchon <dennis@HarmReductionOhio.org> |
| **Cc:** | Cecile Katz <cecile@harmreductionohio.org> |
| **Subject:** | Update on naloxone program |
| **Attachments:** | smime.p7s |

I want to update everyone on then status of our naloxone program and contract.

1) We promoted Patrick Bourland today to the position of interim naloxone program manager. Patrick had previous worked a Region 1 naloxone manager and naloxone distribution specialist. Cecile and I believe he has the right management skills and personal attributes (including an exceptional ability to communicate with others) to take over this role at a difficult time.

2) Our conflict issue has been sent to the legal counsel's office of ODH (which administers the contract) and OMHAS (which funds the contract). Ultimately, this office will decide what, if any penalties, are applied (based on the facts, then contract, our conflict mitigation plan, etc.) ODH has asked that we keep them updated but has not made a specific information request. Refresher: A $650,000 ODH contract ends September 30 and a two-year contract extension is scheduled to start October 1. I think our immediate risk is that the contract extension be put on hold if ODH wants to conduct its own review. But nobody at ODH has indicated this might be the case.

3) I have verballly presented the outline of a conflict mitigation plan to ODH. The plan has three parts:
 * End employment of conflicted employee.
 * Review and strengthen out conflict andn outside employment policy andn reporting forms.
 * End purchase of Kloxxado for at least 12 months while we review our ordering policies.
Project DAWN program manager responded favorably to this outline. However, ultimately, the decision will be made by the legal departments at ODH/OMHAS.

4) I met with HRO's naloxone staff and regional coordinators for one hour this morning. I introduced Patrick's new position, explained the conflict issue and the risk to our contract (probably safe but not for sure) and answered all questions. The staff, which is heartbroken about AmandaLynn's departure, expressed a desire to stay with the program and work with Patrick to continue its success. However, I believe all staffers will need time to digest the change so decisions may change.

If you have any other questions, please let me know. Thanks.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

EXHIBIT
tabbies
21
7-29-26 KR

| | |
|---|---|
| **From:** | Dwayne Steward <dwayneasteward@gmail.com> |
| **Sent time:** | 09/05/2024 01:02:42 PM |
| **To:** | Dennis Cauchon <dennis@harmreductionohio.org> |
| **Cc:** | Billy Golden <bgolden@nastad.org> |
| **Subject:** | Cease and Desist |

Hello Dennis,

Billy Golden and I are sending this message to you as the acting Board Chair and Board Vice Chair. The HRO Board of Directors has received several complaints from staff alleging a hostile work environment. We must take these complaints seriously and we are legally required to launch an official third party investigation in order to alleviate further risk to the agency. I will be in touch with ODH to explain the situation. You are directed by the board of directors to cease and desist all activities related to conflict of interest matters, including but not limited to communications with funders, staff, and community partners. No staff decisions should be made until the board officially contacts you with further directions in the next 24 hours.

Pursuant to Ohio Revised Code a 501c3 board of directors has purview and governance over the agency and any complaints alleged against the Executive Director/CEO and can intervene when the ED is under investigation.

Please reply in the affirmative the you have received this information and understand the contents therein.

Sincerely,
Dwayne Steward

Dwayne Steward, MPA
Writer. Speaker. Activist.
makeitbetterconsulting.com
614-859-9627

EXHIBIT 23
7-29-26

**Turner-Bicknell, Tasha (turnerta)**

**Subject:** Administrative Leave
**Date:** Thursday, September 5, 2024 at 2:24:29 PM Eastern Daylight Time
**From:** Dwayne Steward
**To:** Dennis Cauchon
**CC:** Billy Golden, Trinh, Anne, Colleen M. Garlock, James Decker, Turner-Bicknell, Tasha (turnerta), mollybtrue

External Email- Use Caution

Hello Dennis,

As mentioned in previous communications, there have been written and verbal staff complaints that have been received by the board regarding your role in creating a hostile work environment at Harm Reduction Ohio. **All members of the HRO Board of Directors met today during an emergency meeting where it was unanimously decided to place you on paid admin leave until the completion of an investigation. Please plan to end your work day immediately.**

Access to your email will be terminated during the duration of the investigation. Please provide a personal email in order for us to communicate with you during the period.

The board plans to bring in a third party to investigate the complaints and also investigate the conflict of interest that is under review. We have decided on an attorney and will be bringing them on contract with HRO in the coming days to begin the investigation. (The attorney that you have contracted with currently will remain on contract and his scope will be tailored to the completion of the Handbook and the Conflict of Interest policy and disclosure form.)

The board will be stepping in momentarily to lead the agency and will work with the current staff to move forward the logistics of the investigation. We will also be bringing in a consultant to manage the agency in the interim so that operations are not affected.

Thank you for your cooperation with the investigation. We understand this news may be difficult but the Board of Directors believes the end result of this professional process will strengthen Harm Reduction and its mission for many years to come.

Sincerely,
Dwayne Steward
Board of Directors, Chair
Harm Reduction Ohio

EXHIBIT 24
7-29-26 KP

**From:** **Dennis Cauchon** denniscauchon@gmail.com
**Subject:** Fwd: Administrative Leave
**Date:** September 5, 2024 at 2:35 PM
**To:** Sierra Dantzler Sierra.Dantzler@odh.ohio.gov

DC

FYI…AmandaLynn-led coup attempt underway.

The full board did not meet today. I was not notified or at the meeting.

> Begin forwarded message:
>
> **From:** Dwayne Steward <dwayneasteward@gmail.com>
> **Subject:** **Administrative Leave**
> **Date:** September 5, 2024 at 2:24:14 PM EDT
> **To:** Dennis Cauchon <dennis@harmreductionohio.org>
> **Cc:** Billy Golden <bgolden@nastad.org>, "Trinh, Anne" <trinh.89@osu.edu>, "Colleen M. Garlock" <colleengarlock@gmail.com>, James Decker <jamesdecker68@gmail.com>, "Turner-Bicknell, Tasha (turnerta)" <turnerta@ucmail.uc.edu>, mollybtrue <mollybtrue@yahoo.com>
>
> Hello Dennis.
>
> As mentioned in previous communications. there have been written and verbal staff complaints that have been received by the board regarding your role in creating a hostile work environment at Harm Reduction Ohio. **All members of the HRO Board of Directors met today during an emergency meeting where it was unanimously decided to place you on paid admin leave until the completion of an investigation. Please plan to end your work day immediately.**
>
> Access to your email will be terminated during the duration of the investigation. Please provide a personal email in order for us to communicate with you during the period.
>
> The board plans to bring in a third party to investigate the complaints and also investigate the conflict of interest that is under review. We have decided on an attorney and will be bringing them on contract with HRO in the coming days to begin the investigation. (The attorney that you have contracted with currently will remain on contract and his scope will be tailored to the completion of the Handbook and the Conflict of Interest policy and disclosure form.)
>
> The board will be stepping in momentarily to lead the agency and will work with the current staff to move forward the logistics of the investigation. We will also be bringing in a consultant to manage the agency in the interim so that operations are not affected.
>
> Thank you for your cooperation with the investigation. We understand this news may be difficult but the Board of Directors believes the end result of this professional process will strengthen Harm Reduction and its mission for many years to come.
>
> Sincerely.
> Dwayne Steward
> Board of Directors. Chair
> Harm Reduction Ohio

EXHIBIT
tabbies
25
7-29-26 KR

Mon, Jul 22 at 6:27 PM

Thanks. 67 years old. ODH is renewing contract for 2 years at $850,000 per year. We are financially stable and hiring.

Tue, Jul 23 at 11:34 AM

That's awesome! Love to hear that

Come visit if you're ever back in Ohio.

I will! I was supposed to be back this week but I was a victim of the global tech outage

Fri, Jul 26 at 10:33 AM

What is your current email? Vanguard shifted our IRA account to a new company, Ascensus. I want to send you an email to make sure you can access your money in the account. Easy for this relatively small amount to get lost over the years.

Mbolen12@gmail.com

Tue, Aug 27 at 7:39 PM

And yet another question...

When we did the employee handbook in 2002, did employees sign acknowledging getting it?

I believe so

Which was why we could enforced it

EXHIBIT 26 7-29-26 KR

We should talk later this week.

Ok sounds good



Thursday 2:43 PM

Did I tel you about AmandaLynn's work for Kloxxado?

What's going on with that

I know she works for a bio consulting firm that does work for hikma

I spoke to them before about what she was doing to make sure it wasn't pharmaceutical sales related

We reported the conflict Tuesday. AmandaLynn has launched effort to have board fire me. Board trying to put me on administrative leave. However, full board is needed to act between meetings and I'm on board. I will email you the emails. Where to?

Mbolen12@gmail.com

Oh man sounds like a mess

I thought you knew about her other job for a while now. Did something about it change?

Had no idea until I saw it a month ago in a bio of another group she posted online. Did she disclose it to you? In writing?

Oohhhh

She told me and Linda about it. I'm not sure if it was in writing

Do you recall what she said?

As far as I know she's just a harm reduction advocate

That's what she said and she told me they approached her to be a harm reduction advocate

Do you know about when?

Uhhhhhhhhh

Some time after the conference I believe

But I spoke to them bc of our COI statement in the

handbook. They told me she was just going to different conferences/events and introducing people/educating about Harm Reduction

She has been a Kloxxado advocate, including testifying in the Maryland legislature for a bill to compel Maryland Department of health to provide Kloxxado. The Maryland Department of health opposed. Law did not pass.

Did she use the HRO research to do that? Or funded by this org?

AL has declined to disclose any details to me. The conflict problem is factual: she had a financial interest and she was responsible for ordering Kloxxado.

She identified herself as representing Harm Reduction and her testimony including HRO distribution numbers that were identified as HRO distribution numbers.

What actions have you taken

I reported the conflict. What's your email to send letter?

Mbolen12@gmail.com

sent it

What did ODH say? Does it influence the contract?

Contract at risk

Just fyi she reached out to me to write a statement that I knew about her role. I wrote it saying that I knew about her role as a Harm Reduction Advocate and that, to my knowledge, this didn't impact our kloxxado ordering. Which reflects what you said to ODH (about it not impacting ordering).

Oh what??? They said that??!!

I understand, though, if it's a COI with a pharmaceutical company why they would say that

CAUCHON_001732

Despite repeating chances, she wouldn't disclose any

details to me, not even that she talked to you and Linda.

Have you met with the board?

They apparently met without me

Did they send you minutes? Or something to indicate what they spoke about?

No. I'll email you what they sent

Does the board have written guidelines?

Ok

So you and amandalynn are now both on leave?

That's so much money to bring in a lawyer and a consulting firm oh my

Is Kelsey running things? Do others know how to order through ODH, etc.?

I'm concerned about the org operations haha and of course you and AmandaLynn. I'm hoping that this works out in both of your favors, if that's even possible

Once this is all figured out, do you even see a way for the two of you to move forward?

We promoted Patrick to interim naloxone manager and had all his emails transferred to him. So he'll keep things going.

Dod AL tell you the consulting contract involved Kloxxado?

Her contract for her other job?

yes

I knew that the company had something to do with Hikma and I knew Hikma from when they were introducing us to Kloxxado, so I knew there was a connection of some kind. That's why I asked them what she was doing and that was when I was told it was introducing folks to harm reduction, not selling/pushing specific drugs. I don't have that in writing, though

Got it. Did we ever discuss? I do not remember doing so and I regret not following up with her. I never even asked for the company's name.

I'm not 100% sure. I thought you knew she had another job, but I'm not sure what was said about it. At first I didn't know what it was until I started asking more questions.

Ask I remember is her at the end of a meeting saying a consulting firm asked her to tell them what harm reduction needs were, such as serving on focus group. I said that sounded fine.

It sounds like she told us separately.

Yes

And I knew it included her traveling

I did not know that. Where did she go?

You had to know that - there were stretches where she was out of town, she would include it in emails to us detailing her availability, and I think she had an OOO on. She went to Montana and Arizona at one point I think.

Never on HRO funds and she didn't take HRO money for the time she was there, of course.

I remember the traveling was to meet and help/understand the needs of smaller, grassroots orgs

I thought she was traveling on her own.

I asked her to share her testimony in Maryland with me


Overdose Response Program – Opioid Overdose Reversal Drugs
of Formulation and Dosage



CAUCHON_001734


Thank you

She said this is what she said in March 2023

I remember her doing some very quick trips to San Diego for example, which I thought was odd. I also remember her going to Texas. I didn't remember her saying a consulting firm was saying, much less one working for Kloxxado. I thought it expensive but didn't want to pry.

Yes, that's the testimony I reference. Me, her and Kelsey had luck that day in Cincinnati. You'd think she would have mentioned it.

Also, notice that day that no harm reductionists from Maryland testified.

I am assuming that they paid, but she could have paid on her own. I just know that HRO didn't pay it.

Did she take PTO while on the trips?

I didn't look too deeply into the rest of the testimonies I just wanted to see what she said

No

We also had cut hours at that time bc we didn't have a contract so this wasn't effecting HRO financials in any way

As in we didn't pay for trips, didn't pay PTO, and we weren't missing out on any of her labor time due to her traveling

What trips do you remember? Am I correct on San Diego and Texas?

I'm not 100% and I don't have access to my HRO email

btw...did we have any hostile work environment complaints while you were here, against me or others? ii don't remember any

I don't remember any

Unless you consider Sydney's complaint against Shea to be one?

that's the only thing i remember. And that was related to gender, race, etc. It was related to personality! I also think we handled it well.

I think Sydney did about Chris too

Yes. How did we — i.e., you — handle that. I think you advised me to talk to Chris and I did and it was resolved, mostly with Chris not coming in much after.

Friday 1:02 PM

Yep that's what happened with Chris

Shae - AL and I dealt with that

We thought you spoke with her but you didn't and she and I ended up having a call with her to suspend her

Did Shae actually get suspended?

You and AL did well.

Delivered

Yes we put her on a two week leave I believe

**From:** **Dennis Cauchon** dennis@HarmReductionOhio.org
**Subject:** Dennis' credit and debit card
**Date:** September 6, 2024 at 10:29 AM
**To:** Cecile Katz cecile@harmreductionohio.org

DC

I out them in an envelope in your purse. A lot of recurring payments are tied to the 3581 credit card. And a lot of one time purchases are made on this card as well.

I still had access to the bank account as of yesterday. That should probably be ended.

Thanks.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

EXHIBIT 24
tabbies
7-29-26 KR

**Turner-Bicknell, Tasha (turnerta)**

**Subject:** Re: Formal request for details on allegations made against me
**Date:** Friday, September 6, 2024 at 7:48:30 PM Eastern Daylight Time
**From:** Dwayne Steward
**To:** Dennis Cauchon
**CC:** Billy Golden, mollybtrue, James Decker, Colleen M. Garlock, Trinh, Anne, Turner-Bicknell, Tasha (turnerta)

External Email: Use Caution

Hello Dennis,

The board is in the process of procuring a firm to manage the investigation. The firm will provide instructions directly to you and all parties involved regarding next steps, by the end of next week.

The information you have requested, if provided, will undermine the integrity of the investigation and would be a breach of confidentiality for the complainants. In order for this process to be fair and balanced it is important for no one internally to manage this process, including members of the board.

Please collect whatever materials you will need from your office for the next 2 to 4 weeks, and please do not return to the premises until further notice. Please refrain from communicating with staff, funders, community partners or constituents during this time. We are making arrangements to do the same with AmandaLynn.

Please honor the agency you built and the communities that it serves by complying with this process so that we ensure the agency continues to operate for many years to come.

If it is discovered that you interfered or disrupted agency operations in any way, the board will be forced to take further action. We are trying to avoid this at all costs.

Thank you for your continued cooperation.

Sincerely,
Dwayne Steward
Board of Directors, Interim Chair
Harm Reduction Ohio

On Fri, Sep 6, 2024 at 7:15 PM Dennis Cauchon <denniscauchon@gmail.com> wrote:

On September 5, 2024, I was informed that the Board of Directors has received several complaints from staff alleging a hostile work environment. Based on these unspecified allegations, the Board placed me on administrative leave.

As you know, these are very serious allegations. The action taken by the Board impacts me personally, impacts the organization's ability to interact properly and effectively with government officials and, most importantly, impacts the people HRO serves. As such, I respectfully request any information that the Board relied upon to take its recent action to suspend me. This would include any written communications with the Board regarding the hostile work environment allegation. The response also should include any oral allegations, in which case I would need to know who made these allegations, to whom on the Board the allegations were made, and a summary of what was alleged.

Sincerely,

Dennis Cauchon

EXHIBIT 78
7-29-26 KR

935 River Road, Suite G
Granville, OH 43023
1(740) 973-3814
denniscauchon@gmail.com