UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

______________________________

DENNIS CAUCHON, et al.,
Plaintiff,
v. Case No.
2:25-cv-0075
DWAYNE STEWARD, RAINA WILLIAM GOLDEN, TASHA TURNELL-BICKNELL, AND HARM REDUCTION OHIO,
Defendants.

______________________________

DEPOSITION OF
DENNIS CAUCHON
VOLUME II

DATE: Thursday, July 30, 2026
TIME: 3:26 p.m.
LOCATION: Reminger Co., LPA
955 Yard Street, Suite 330
Columbus, OH 43212
REPORTED BY: Kayleigh Kinnamon

Job No. CS8359309

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF DENNIS CAUCHON:

DENNIS CAUCHON, PRO SE
327 East Broadway
Granville, OH, 43023
denniscauchon@gmail.com
(740) 973-3814

ON BEHALF OF COUNTERCLAIM DEFENDANT DENNIS CAUCHON:

DAVID SHEARER, JR., ESQUIRE
Garvey Shearer & Nordstrom
2388 Grandview Drive
Fort Mitchell, KY 41017
dshearer@gsn-law.com
(859) 308-1490

ON BEHALF OF DEFENDANTS DWAYNE STEWARD, RAINA WILLIAM GOLDEN, and TASHA TURNELL-BICKNELL:

STEVEN CHANG, ESQUIRE
Reminger Co., LPA
955 Yard Street, Suite 330
Columbus, OH 43212
schang@reminger.com
(614) 232-2446



A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANT AND COUNTERCLAIM PLAINTIFF HARM REDUCTION OHIO:

ELIZABETH MOYO, ESQUIRE
Porter Wright Morris & Arthur, LLP
41 South High Street
Columbus, OH 43215
emoyo@porterwright.com
(614) 227-2106

ALSO PRESENT:

Tasha Turner-Bicknell, Harm Reduction Ohio
Executive Director



I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Chang | 7 |
| By Ms. Moyo | 46 |
| By Mr. Chang | 140 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 29 | First Federal Savings Bank Letter - November 1, 2024 | 28 |
| Exhibit 30 | Email | 30 |
| Exhibit 31 | E-mail With Letter Of Termination - November 4, 2024 | 31 |
| Exhibit 32 | Chase Statement for Credit Card Account | 64 |
| Exhibit 33 | Cease and Desist Letter March 28, 2025 | 67 |
| Exhibit 34 | Password List | 73 |
| Exhibit 35 | Screen Shot of Text Messages | 77 |
| Exhibit 36 | E-mail String | 84 |
| Exhibit 37 | Lease Signed November 27, 2024 | 85 |
| Exhibit 38 | Chase Statement - January 2025 | 91 |
| Exhibit 39 | Chase Statement - February 2025 | 94 |
| Exhibit 40 | Chase Statement - March 2025 | 97 |




E X H I B I T S (Cont'd)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 41 | E-mail With Attachment Letter from Dennis Cauchon - April 2, 2025 | 111 |
| Exhibit 42 | Attachment - April 7, 2025 | 119 |
| Exhibit 43 | Application Submitted to ODH | 140 |

Page 6

P R O C E E D I N G S

THE REPORTER: We are now on record. Time is 3:26 p.m. My name is Kayleigh Kinnamon, I am a notary authorized to take acknowledgements and administer oaths in Ohio.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
- shall constitute written stipulation of such.

We are here for Part 2 of the deposition of Dennis Cauchon, on July 30, 2026.

At this time, will everyone in attendance please identify yourself for the record, beginning from my right?

MR. CHANG: Oh, right this time? Okay. Steven Chang, from Reminger, representing the defendants.

Page 7

MS. MOYO: Elizabeth Moyo, from Porter Wright, representing Counterclaim Plaintiff, HRO.

MS. TURNER-BICKNELL: Tasha Turner-Bicknell from HRO.

MR. SHEARER: David Shearer, representing Mr. Cauchon on the counterclaims.

MR. CAUCHON: Dennis Cauchon.

THE REPORTER: Thank you. And hearing no objection, I will now swear in the witness.

If you'll raise your right hand?

WHEREUPON,

DENNIS CAUCHON,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you.

EXAMINATION

BY MR. CHANG:

Q Okay. Thank you, Mr. Cauchon, for coming back today.

Just for clarity of the record, Counsel have talked, and we have agreed to go approximately one hour or less for my examination and then approximately two hours for Ms. Moyo's examination here today. We're going to try to streamline some of the questions

Page 8

for you today to try to get through it faster.

First, can you please turn to what's previously been marked as Exhibit 23 on the list in front of you there? Actually, Exhibit 24.

And you should have in front of you, and just confirm, this is the e-mail dated September 5, 2024, at 2:42 p.m. Eastern from Mr. Steward to you, correct?

A 2:24, correct.

Q 2:24. For purposes of streamlining today, rather than argue about whether administrative leave was effective or not, I'm simply going to refer to this as the September 5th letter. Can we have that understanding?

A Correct.

Q Okay. Now, I understand that you did not accept or comply with the demands of Mr. Steward in this letter, stating that you were on administrative leave, because you did not think this was legally effective to place you on administrative leave; is that fair?

A Correct.

Q Okay. And I want to walk through just a series of things to see whether you dispute it or not. That way we can kind of streamline today.

Page 9

Do you dispute that after you received the September 5th letter and prior to November of 2024, you continued to go into HRO's Grandview [sic] office?

A I did not.

Q You didn't?

A I -- I went in, like, at -- on September 5th and -- but from September 6th through, I think, November 1, I did not go into the office.

Q Okay. So the time frame I provided to you was through November 4th. So you did go into the office at least on November 1st?

A Correct. Approximately November 1st.

Q Okay. And do you dispute that informing HRO staff that you intended to return in the office -- return to the office in or around that time?

A I did not inform them.

Q So you came to the office unannounced on November 1st. Is that your testimony?

A Yeah. Let's -- what day is -- is November 1? Is -- what day of the week?

Q I'm just asking for your recollection.

A I -- I -- I saw Cecile on a walk and I told her that I was going to be going in on the date that -- that I went in, but I didn't inform staff as a whole.

Page 10

Q Understood. So at least on November 1st, you did physically go into the Granville -- on November 1, 2024, you did physically go into the Granville office, as you had informed?
A Approximately. Yeah.
Q Okay. Any other times between the dates of September 5, 2024, and November 4, 2024?
A September 4th. Well, I went in on September 5th because it was a workday and it was before the September 5th e-mail. So I think what you're referring to is September 6th.
Q Sure. So at any time after September 5th, but yeah. Is there any other time between September 6th then and November --
A Not -- not that I recall.
Q Okay. And I know -- the same rules still apply from yesterday. I know we're trying to get through things a little quicker today, but to make it easier on her, just make sure to let me finish asking.
A Okay.
Q And then I'll have you answer the question, okay?
Mr. Cauchon, do you dispute that between the dates of September 6, 2024, and November 4th of 2024, you continued to send emails to staff from your HRO

Page 11

account?
A No. I -- I did not. I didn't have access to my HRO account.
Q Did you send -- do you dispute that you continued to send e-mail communications from another e-mail account purporting to still -- or sorry.
Do you dispute that you continued to send emails from another e-mail account with a signature block stating, "President of HRO"?
A I do not recall. I'd have to look at the emails.
Q Do you dispute that you continued to send communications to the ODH between the date, September 6, 2024, and November 4, 2024, regarding HRO business?
A I don't recall. I'd have to look at the emails with the dates.
Q So as you sit here today, you have no recollection of any communications with the ODH during that time period?
A I don't -- I don't recall. It's -- it's possible, but I'd have to actually look at the emails. The time periods, like, blur together.
Q Well, yesterday we looked at at least one e-mail, which was sent about 11 minutes after, where you referred to a coup attempt. Do you remember that?

Page 12

A Yeah. Wasn't that September 5th, though?
Q That's fine. But it's -- correct, September 5th. So do you recall any other e-mail communications to the recipients of that e-mail from the time period of September 6th through November 4th of 2024?
A To ODH?
Q To ODH, correct.
A I don't recall, but there -- there could have been. I'd -- I'd check the e-mail records to see.
Q Well, what about calls? Did you make any calls as the president of HRO during that same time period?
A To -- to ODH?
Q To anyone at ODH, correct.
A Not that I recall. I may have spoken -- I spoke by phone, I don't know the period, with Socrates Tuch, who's the -- the lawyer at ODH on public records. I don't remember the specific date. So I would have to check the records to know when the -- when those calls were.
THE REPORTER: Can you spell that name? I apologize.
THE WITNESS: Socrates and Tuch is T-U-C-H.

Page 13

BY MR. CHANG:
Q Do you dispute that Ms. Nelson requested to have an interview with you in 2024?
A She requested an interview, yes.
Q And you don't dispute that ultimately, that interview never took place, correct?
A Correct.
Q Do you dispute that you continued to do work for HRO during the time period after you received the September 5th letter through November 4th of 2024?
A I would say that's correct. I was still president, so I was still, you know, trying to prevent the coup, as we called it, like, the -- the take. So I -- I would've still been doing HRO work, yes.
Q Okay. Without accepting your characterization, I understand, I'm just trying to confirm that, you know, you didn't consider that September 5th letter to be effective. So you continued to do operations as your belief of being president, correct, and your responsibilities?
A Correct.
Q Did you at any point between September 5, 2024 -- or sorry, let me strike that.
Do you dispute that between September 5th in 2024 and November 4th of 2024, you changed the locks

Page 14

on one or more of the doors at the Granville office of HRO?
A Can you give me the dates again?
Q From September 5, 2024, through November 4, 2024, do you dispute that you changed the locks on one or more doors of the HRO Granville office?
A Yes. I did not do that.
Q Do you dispute that the locks were changed?
A No. I -- I do not dispute that.
Q Okay. So just to confirm, are you aware that the locks were changed?
A Yes.
Q Did you yourself change the locks?
A No.
Q Did you direct someone to change the locks?
A Yes.
Q Who did you direct to change the locks?
A A locksmith. I don't remember the name.
Q Why did you do that?
A Because I was trying to protect the assets of Harm Reduction Ohio from being taken by unauthorized people and moved to another location.
Q Okay. So it's fair to say that you do not dispute that at your direction, the locks were changed to HRO's office from -- sometime between September 5,

Page 15

2024, and November 4, 2024?
A I do. It happened after November 4th.
Q You said it happened after November 4th?
A Correct. Is the best of my recollection.
Q Okay. At any point between September 5th of 2024 and November 4th of 2024, did you remove any staff member or board member from HRO's QuickBooks?
A Not that I know of.
Q Okay. What about any logins or passwords to HRO's website? Did you change the password during that time frame?
A Which accounts are you referring to?
Q I'm referring to the website.
A No, I did not.
Q Do you recall having ever received a request for that password and denying -- or -- and declining to give that information to anyone at HRO or the board at HRO?
A I don't recall specifically, but I may have, and I would've denied it.
Q Okay. You definitely would have denied access to the website, correct?
A Correct.
Q Why not --
A It -- well, it depends who it would've been

Page 16

from, but if it was from a board member, I would've denied it.
Q Okay. So if it was from a board member, you would've denied it why?
A Correct. Because they had no lawful authority.
Q You believe the entire board of HRO would not have any lawful authority to access the website of HRO?
A Individual board members would not. The board had taken no action, so it wasn't an issue whether the board had lawful authority. So I didn't need to consider that.
Q So it's your belief that the board would have to take an action and then actually make a vote before you would turn over any of the logins and passwords to them?
A I don't know the answer to that question.
Q Well, you just testified that you wouldn't give it to them without lawful access. What are you talking about then?
A I wouldn't give it to individual board members, just like I wouldn't give them access to the bank account.
Q And I'm asking you what would have been

Page 17

required for you to release that information to an individual board member?
A I don't know. I'd have to think about that.
Q Well, I'm asking you right now. So think about it.
A I --
Q And do -- can you think of anything right now?
A I don't know the answer. No, I don't. I -- I don't because it never came up, so I don't -- hadn't really thought about it.
Q Okay. If the board had noticed a meeting with at least 14 days notice and taken an affirmative vote directing you to turn over the login credentials, would you have done it?
A I might have. I might have. Like, I can't say because I'd never thought about it before. So you're asking me to say something with no research and not -- not talking to anyone. So I'm not really in a position to answer.
But I think if the board had lawfully done so and taken a vote and asked me to turn over the credentials, then I think that's a plausible argument that I should turn over the credentials.
Q Well, I'm not asking if it's a plausible

Page 18

argument. You're the one who keeps using the term "lawful." I'm trying to understand whether that would've been sufficient for you to turn over the password or not.
A I don't know. I'd have to do more research.
Q Okay. Do you dispute that you communicated with one or more representatives at Chase Bank instructing them not to change any of the authorized signers on HRO's financial accounts?
A The authorized signers? No, I don't -- I don't think the authorized signer. I communicated with Cathy X. Daniels to tell her that there was a dispute over who had lawful authority over the accounts. And I believe I did, and that other people were going to try to get access to the accounts.
Q And you specifically instructed her not to provide access to the accounts to any other individual other than you, correct?
A I don't recall. I did send a letter from my lawyer, which you -- which I think you have on November 6th, that sort of summarized my position, is that it's -- that there's a dispute going on.
Q Okay. Just to be clear, I'm not talking about anything that occurred after November 4th. I'm talking about between the time period of -- or of

Page 19

September 5th through November 4th.
Did you ever have a communication with Ms. Daniels instructing her that no one but you or Cecile could access the Chase accounts?
A I don't -- I don't recall the day I talked to her.
Q What about First Federal Bank? Did you ever communicate with anyone at First Federal Bank between September 4, 2024, and November 4 of 2024, instructing them not to give anyone else access to those accounts other than you?
A I don't recall the date, but I did make a similar request to them at some time. I don't remember if it was before or after November 4th.
Q Fair. Why did you do that?
A Because I was trying to protect Harm Reduction Ohio's assets, the funds in particular.
Q And why did you believe that the assets of HRO were threatened in some way?
A Because people were trying to unlawfully access the money at Harm Reduction, specifically a handful of individual board members.
Q Can you state those -- their names?
A Tasha Turner-Bicknell, Billy Golden, and Billy -- and maybe Dwayne Steward. I'm not sure how

Page 20

they -- how it all worked out.
Q And what is it -- what information did you receive that made you come to the belief that they were attempting to unlawfully access that account?
A They sent an e-mail to my landlord, and they sent -- and they told Cathy Daniels of Chase. And when I went in to give the lawyer's letter to -- to First Federal, they said, yeah, people had been coming by here trying to get access to the accounts.
Q You referred to someone as your landlord. Who is that?
A Borough Company.
Q Okay. So it's your contention that the lease for the office space was a personal lease of you and not of HRO?
A No. It was -- I was a guarantor, but it was a Harm Reduction Ohio lease.
Q Ah, I see. So you're referring to him as your landlord because you're a guarantor on that lease; is that correct?
A I'm referring to in the colloquial for you. I represent Harm Reduction Ohio. So we, you. I think we can stipulate from my perspective, that's all the same.
Q You attended a board meeting on October 27,

Page 21

2024, where you were removed or voted off as a purported director of HRO. Do you recall that?
A I did not attend a board meeting.
Q You weren't physically present during a board meeting on October 27, 2024?
A There was no board meeting on October 27, 2024.
Q Were you present during a meeting where all of the directors of HRO were present on October 27, 2024?
A No.
Q Really? What were all the -- who were all the board members on October 27, 2024?
A Molly True wasn't in attendance.
Q Okay. So you attended a meeting excluding Molly True on October 27, 2024?
A Right. It wasn't a board meeting, but it was a gathering, I think they're sometimes called.
Q We're going to call it a meeting. So you attended a meeting. I'm not going to call it a board meeting. We'll just call it a meeting. Okay.
A Not a board meeting. Okay. So we'll stipulate it's not a board meeting.
Q No, we're not stipulating that it's not a board meeting. It's just I don't want to keep arguing

Page 22

with you. So we're going to refer to that just as a meeting for purposes of ease of questioning, okay?
A Okay.
Q All right. You attended a meeting in which all of the board members, which you would include as yourself, except Molly True, was present, correct?
A I was on a call.
Q You were on a call.
A I was on -- I was on that call.
Q And you are aware today that that call was recorded, correct?
A Correct.
Q It was actually a Zoom conference call, correct?
A Correct.
Q So it was a video call; fair to say?
A Correct.
Q And in fact, you had requested that meeting, correct?
A I had requested a -- a board meeting. I didn't request that meeting.
Q Okay. You requested a board meeting. And as part of that request, you showed up to the Zoom call. Is that fair to say?
A Yes.

Page 23

Q Okay. Now, you agree that all board members except Molly attended the meeting, correct?
A The -- yes. Attended the -- the non-board meeting, yes.
Q And you agree that you had an opportunity to speak at that meeting, correct?
A I spoke to expressly say that I was not waiving my right to proper notice.
Q Okay. You had an opportunity to say more than that at the meeting, correct?
A Yes. I asked that they do not record me as participating because I am not participating. So do not record me as -- as abstaining. Yes. I -- I followed the -- the script that my attorney had told me was -- was beneficial.
Q Okay. So you agree with me that you did have an opportunity to speak, and you did in fact speak, correct?
A I spoke to expressly not waive my right to a notice. So I spoke at the -- on the call for -- for that -- for the purpose that I just described to you.
Q And what is the basis for your belief that this was not a valid board meeting, or legally effective board meeting, to use your words?
A Because it did not have the required 14 days

Page 24

written notice after a notice provided by the secretary if it's a special meeting. And that's why I sent in writing that I did not waive my right to properly notice a meeting, and then expressed it again verbally at the start of the call.
Q Okay. Did you have any other basis for contesting the legal effectiveness of the meeting other than the 14-day notice requirement?
A I can't recall right now. I'd have to check with David if there were others, but that was the main one.
Q When you say David, you're talking about Mr. Martin, correct?
A Correct.
Q Okay. So as you sit here today, though, your main objection, at least as you sit here today, is that there wasn't 14 days from the time that you were notified of the meeting from the time that the meeting took place, fair?
A Correct. And I also think that it -- I can't remember if the secretary noticed it as required by special meetings. In -- in addition, I was not provided the proper -- I was provided redacted minutes while the other board members were provided unredacted minutes to the previous meeting. I was not provided

Page 25

an agenda. An agenda was worked out in board text ahead of time.
So really, the board met ahead of time to script this seven-minute meeting. So I would, like, challenge that I was given the right to equal access to board materials.
Q Okay. I'm not telling -- I'm not asking about what you believe or don't believe is your right for equal access right now. I just want to focus on your objections to the meeting as being legally effective as a board meeting.
And so far, you've mentioned the reason why you objected is because there wasn't 14 days of notice and you couldn't recall anything else. Is that fair at this time?
A No. The -- the lack of notice by the secretary, I believe, and the fact that all board members are required to the various duties of candor, et cetera, and right to access to get similar board documents. So that would've been my objection, even if it was properly noticed.
Q Okay. I'm not asking about your objections, even if it was properly noticed. Right now, we're looking solely on the effectiveness notice.
When you say -- what information are you

Page 26

referring to though, in that statement? What is information that was denied to you, to be more specific?

A Board meeting minutes from the previous meeting, which were distributed with the agenda. It was a redact -- it was a -- it was not -- not the real agenda. The -- the -- the agenda that was worked out in the text by the board members were that I was going to get kicked off the board, and the agenda had just said general matters or something like that. You've got the agenda. So it was not an accurate reflection of the true purpose of the meeting.

Q Okay. Any other reasons why you don't believe that that was a valid board meeting?

A Not that I can think of right now.

Q Okay. Do you recall in around November 1, 2024, you had mentioned you physically saw Cecile on that date, correct?

A Around then. I don't remember what specific day it was. We were taking a walk. I was taking a walk, she was taking a walk, and we met each other on a walk.

Q Did you recall informing her that you intended to assert your power as president?

A No. But I might have said that I still

Page 27

think I have authority and I plan to exercise my authority, but it's unlikely I would've used the word "power."

Q Did you -- in that conversation, did you go through a list of all the things that you believed that you controlled on -- of HRO?

A It couldn't have been a complete list because I believe I controlled everything that the president controlled, but I -- I might have given her a summary of -- of -- you know, of things that were relevant to -- to our positions.

Q And did you convey to her that you intended to keep that away from HRO, or not relinquish control of that to HRO's board at that time?

A Well, I never relinquished control.

Q Well, did you tell her that you had no intention of relinquishing control at that time?

A I could very well have, because I told the board members and other people as well.

Q Okay.

A And I've said it in court for two years, so...

Q Mr. Cauchon, if you could look at the last exhibit.

I believe we ended on Exhibit 28 or 27,

Page 28

correct? No, that's fine. I'm handing you what's being marked as Exhibit 28. We'll fix the numbers later if it's not right.

A Yeah. Okay. This is different than my Exhibit 28.

Q No, that's fine. This is a new exhibit. All right.

MR. SHEARER: So we marked the last one as --

MR. CHANG: Oh, is that 28?

MR. SHEARER: -- 28. Yeah.

THE WITNESS: So this would be 29?

MR. CHANG: Yeah. We'll mark it as -- we'll reference this as Exhibit 29. We'll re-mark it as Exhibit 29.

(Exhibit 29 was marked for identification.)

BY MR. CHANG:

Q This appears to be a letter that's dated November 1, 2024, directed to First Federal Savings Bank of Newark. Do you see that?

A Yes.

Q Are you the author of this letter?

A Yes.

Q Did you send this in or around the time

Page 29

frame listed there, November 1, 2024, to First Federal Savings Bank at that address?

A I brought it over.

Q Physically brought it over?

A Physically brought it over.

Q Okay. Do you recall who you handed it to?

A I do. I recall the person, but I don't recall her name off the top of my head. It -- it -- I -- I don't recall.

Q Okay. Just one final question. If you go to the signature block at the very end, I note now that you're not listing yourself as a board member. Why didn't you list yourself as a board member there?

A Because it wasn't relevant.

Q Okay. You can set that aside.

From September 5, 2024, through November 4, 2024, did you have access to any of HRO's e-mail accounts? Not just your own, but any other HRO e-mail account at all?

A Can you give me the dates again?

Q Yeah. September 5, 2020 -- sorry. We'll do September 6, 2024 through November 4th of 2024.

A Not that I know of, no.

Q I'm handing you what's been marked as Exhibit 30. There's a large portion that's been

Page 30

redacted, but my questions are going to be directed toward the end of the e-mail.

(Exhibit 30 was marked for identification.)

So if you go to the end of the document, there appears to be an e-mail from Cathy X. Daniels at -- it looks like she's from Chase, to you at dennis@harmreductionohio.org.

And Ms. Daniels is an individual at Chase that you had previously communicated with as president of HRO, correct?

A Yes.

Q Okay. Now, the e-mail states, "Okay. I will get it sent down. Do you want me only speaking to you on anything?" You see that?

A Yes.

Q Did you ever direct Ms. Daniels that she could only speak to you about HRO's bank accounts?

A Or to -- to Cecile. I don't remember exactly, but it would've been speak only to me or to Cecile.

Q And to your best of your knowledge, did she follow your direction?

A I -- to the best of my knowledge, but I don't know otherwise.

Page 31

Q Did you ever communicate with Ms. Daniels after this e-mail was sent regarding HRO attempting to gain access -- the HRO -- any individual HRO board members attempting to get access to Chase's accounts?

A Yes.

Q Okay. When was the next time you spoke with her?

A I don't recall, but I do remember that I emailed her David Martin's letter, which I believe is November 6th, or I -- I could have the date wrong, but -- and there may have been other occasions that I don't specifically remember.

Q Okay. You can go ahead and set that aside.

Mr. Cauchon, I'm handing you what's been marked as Cauchon Exhibit 31. If you can just take a look at that and let me know when you're ready to answer questions.

(Exhibit 31 was marked for identification.)

A Yes. I -- I'm ready to answer questions.

Q My first question is simply, did you receive this in or around November 4, 2024?

A I did.

Q Okay. Mr. Cauchon, I believe your position in this lawsuit is that this letter itself or the

Page 32

attachment to this e-mail is not effective to remove you as president of HRO; is that fair?

A That is correct.

Q Can you please state for the record what is the basis for your opinion that this letter was not effective to remove you?

A Because the board has held no lawful meeting since March 9, 2024.

Q Anything else?

A Such as?

Q Well, I'm asking you. You're the one who brought the lawsuit. Is there any other basis --

A The -- the -- the --

Q -- for you challenging the authority of the board to terminate you via this letter?

A This letter wasn't from the board. This letter was from certain board members, but not from the board.

Q Okay. So you -- so the second one is -- you believed that it wasn't from the board?

A Correct.

Q And what's the basis for your belief that it wasn't from the board?

A Because I'm not listed as a board member.

Q Do you believe that you would've had to sign

Page 33

your own termination letter in order for the board to unanimously terminate you with an action not in writing?

A I don't know. Not necessarily. But for the written action, it would have required all -- not at a -- a noticed board meeting. It would have required all directors.

Q Bad question. I'll actually withdraw that question.

Do you believe that you would have had to sign your own termination letter, in order for the board to terminate you without a meeting?

A I don't know.

Q So if I'm understanding you correctly, the basis for challenging this is you didn't sign it, but you don't know whether you were legally required to sign it for it to be effective, correct?

A No. My basis is that there's no -- this doesn't reflect board action.

Q And it doesn't reflect board action because you didn't sign it?

A And it's not clear to me that the -- the board fulfilled the requirement of the all members going without written notice, because you haven't produced in discovery the -- the emails between the

Page 34

board -- the other board members. So -- so it would be uncertain. It's possible that the other board members complied. But -- but there's been no evidence submitted in this lawsuit yet.
Q What exactly are you referring to as what you think needs to be complied with in order for this letter to be effective?
A As -- as I understand it, for boards to take action at non -- at non-scheduled meeting, all boards must agree in writing to take action and expressly say that they do not waive their right for a board meeting, and so on. But I would have to go back and -- and look at the law, and look at how David Ball and -- and David Martin explained it to me.
Q Well, you're representing yourself pro se in this litigation. So as you sit here today, not having access to that, do you have any other basis for challenging the legal effectiveness of this letter?
A I think my statement summarized my --
Q We covered it all?
A Yes.
Q Okay. So Mr. Cauchon, you have, if you recall, through your prior counsel, asserted three separate claims in the second amended complaint, which was sealed. Do you recall that?

Page 35

A In the second amended complaint? Yes. There were three counts.
Q Okay. And the first -- and I'm doing this just to -- for ease of questioning. Just referencing what claims are remaining. One of those claims was dismissed by the Court. Do you recall that?
A Count III.
Q Right. It was the derivative claim. Do you remember that?
A Correct.
Q Okay. So the remaining claims that we have left are the FCA retaliation claim, correct?
A Count I.
Q Okay. And then the declaratory judgment claim, correct?
A Correct. Count II.
Q Okay. Now, for the FCA retaliation claim, you're contending, as part of this lawsuit, that the board had retaliated against you for reporting what you believed to be a conflict of interest at ODH. Is that a fair description of your position?
A Correct.
Q Okay. Do you contend that you believe that there was a violation of federal law occurring?
A Ask that again.

Page 36

Q Do you believe, at the time that you reported that alleged conflict of interest to the ODH, that there was a violation of federal law occurring?
A That AmandaLynn was violating federal law?
Q Just that a violation of federal law was occurring at HRO?
A A violation of the contract. That we were not in compliance with the contract. I would have to, like, do further research to know if that's a violation of law. It was a violation of our -- of our contract.
Q So at the time that you sent the letter to the ODH, your concern was that there was a violation of the ODH contract, fair?
A Correct.
Q And you can't state, as you sit here today, your belief of whether or not it was or was not a violation of federal law, fair?
MR. SHEARER: I'll object to the question. It requires him to reach a legal conclusion, which is a -- you know, that's a legal issue for the judge, and possibly some factual issues with direct, as to -- go ahead.
BY MR. CHANG:
Q Go ahead and answer.

Page 37

A Yeah. So I would have to -- you know, I'd have to think about, like, violating a regulation is the same thing as violating a law. It sounds like it -- it likely is. It's not -- whether it's a criminal law, I -- I would have to check.
Q Well, without being a lawyer, my question is simply did you believe that a violation of federal law was occurring, or did you not know one way or the other?
A I believe that a violation of the contract was occurring and of federal regulations were occurring.
Q Okay. But you didn't know or have a belief as to whether that was a violation of federal law at that time?
A I -- I would say I thought it was a violation -- that violating regulations is a violation of the law. But are -- are you asking, like, a criminal law?
Q No. I'm asking your belief of whether you thought it was a violation of any federal law?
A Yes. Yes.
Q All right.
A I would say.
Q And at that time, what laws did you believe

Page 38

were being violated?
A The laws -- the contracting laws regarding reporting conflict of interest. Really the -- the contract was being violated.
Q You recognize that the contract -- just for clarify of the record, the contract that you're referring to is a contract between ODH and HRO, correct?
A Correct. Made up 100 percent of federal funds.
Q To your knowledge, was any federal agency a signatory to that contract?
A To that contract? No.
Q What federal law do you contend was -- did you have concerns about being violated at the time that you sent that letter to the ODH on September 3, 2024?
A Federal contracting law.
Q But you can't identify it for us today, correct?
A No. I -- no.
Q Okay. Anything else, other than federal contracting law, as you sit here today?
A Whatever laws would apply to -- to contract violations.

Page 39

Q So you don't know whether that would be state or federal law that applies to contract violations?
A Well, it could be both. Because state law applies to it, but federal -- but I do -- I did know it was federal money, and I made that point to the board, that it was all federal funds, in the notification that I sent them. But if you're asking me to, like, specify what code I assert was violated, I -- I had not researched it at the time.
Q Okay. And what was the basis for your belief that you believed that a violation of federal law was occurring?
A Because we failed to report a -- a contract -- or a -- a potential conflict of interest on a federally funded contract.
Q All right. So you said your belief that HRO failed to report a potential conflict of interest on a federally funded contract. So that's one. Is there anything else?
A Ask me the question again, so I make sure I'm --
Q Is there anything else on the answer that you gave right before that? Is there --
A Anything else to what? State the -- the

Page 40

premise again.
Q Anything else that supports your belief that a violation of federal law was occurring?
A I thought there was a potential violation of procurement issues. I was concerned that we had -- that something may have happened with -- with ordering Kloxxado. I didn't have the documentation at the time.
I made a public records' request on August 19th, to get that information, but that information was not provided until September. So I was concerned about procurement irregularities. But I did not yet have the -- the -- the particular facts and evidence.
Q So at the time you sent the September 3 letter though, you recall having told ODH, via the letter, that at the time you didn't have any reason to believe that this alleged conflict had influenced Ms. Reese's ordering decisions. Do you recall that?
A Correct. At the time. I was concerned that it had, but it took me a few -- it took me a month or so to -- to get the data.
Q Okay. So all you had at that time was a concern, but you needed more information to determine whether that was a valid concern, correct?
A Correct. I just wanted to state factually

Page 41

what was known at the time.
Q Anything else that we haven't discussed that you believe forms the basis for your FCA retaliation claim?
A That I was retaliated against. That the timing was one, two, three. It's mentioned in the termination letter. I mean, I think there's -- there's multiple instances that connect the -- my conflict report and the various adverse actions.
My suspension, administrative leave, a cease-and-desist order. My termination. The removal of my access to my Harm Reduction e-mail. Locking me out of the office. I mean, there's a series of adverse actions. And there's many emails that connect them. So that would be the basis of my FCA retaliation claim. And a lot of it's outlined in the second amended complaint.
Q So I think what -- you began that whole monologue with just basically saying that it was the timing of the actions that occurred, which formed the basis of the complaint.
A That's one.
Q Okay.
A I mean, you asked me for --
Q No. That's fair. I'm just trying to --

Page 42

A For all -- all of mine. I gave them to you, and then you say I'm doing a monologue, so --
Q Is there anything else, other than what you've already testified to today, that serves as the basis for the FCA retaliation claim?
A Well, what we have in the second amended complaint would also serve as the basis. But yeah, that's essentially the -- the basis.
Q Now, you worked very hard to obtain a copy of Ms. Nelson's report, haven't you?
A Yes. Well --
Q I mean --
A -- I -- I didn't work hard. I mean, I just went through the -- the channels. I didn't consider it hard work.
Q And you ultimately received at least a partially redacted version of that report, correct?
A Correct.
Q Even after having -- did you read and review that report?
A I did.
Q Even after reading and reviewing that report, do you still maintain the belief today that the board terminated you in retaliation for reporting a conflict of interest to the ODH?

Page 43

A Yes.
Q Okay. Do you -- is it your position that the board of directors of HRO should have ignored the advice of its counsel, Ms. Nelson, when she -- when her recommendation was to terminate you?
A Ask me the question again.
Q Yes. Is it your position that the board of HRO, upon receiving that report, which included a recommendation to terminate you, they should have ignored it?
A They should have done -- done otherwise. They should have done their own research, and they should have hired an independent attorney, an independent fact-finder. They should have done all those things that quality boards do, but they didn't. So yes, I -- I say they should not have terminated me.
Q So in sum, it's your position that the HRO board of directors should have rejected the recommendation of Ms. Nelson to fire you, correct?
MR. SHEARER: Objection to form.
THE WITNESS: Correct. They should have rejected it. It should have been -- they should have done an independent report. Correct. So they shouldn't have just -- yeah. The -- the report was not valid grounds to fire me.

Page 44

BY MR. CHANG:
Q Okay. Let's talk about your declaratory judgment claim. So my understanding is that -- and we've already discussed this. I just want to see if there's anything else.
Through the declaratory judgment claim, you're contesting the validity of the actions purportedly taken on -- by HRO at the October 27, 2024, meeting. I understand you contest whether it was a board meeting or not. We're just referring to a meeting.
But that's the first part of your declaratory judgment claim, correct? You want the board to declare that that meeting was not legally effective, fair?
A Do you have the -- the --
Q No. I'm asking your understanding of the claims that are here.
A I would have to go back and -- and -- and review the document.
Q So as you sit here today, you don't know whether you're challenging the effectiveness of the October 27, 2024, meeting?
A I mean, I challenge the effectiveness of all the meetings post-March 9, 2024. So I would be

Page 45

challenging that as well.
Q Okay. That's fine. And I just want to walk through all the basis for the reasons why you're challenging it. One that we've already covered is any meeting that didn't have a 14 days' notice, right?
A Correct.
Q Let me ask this. Is there anything that -- just to speed it up. Is there anything that we haven't discussed regarding those meetings, that you believe serves as the basis for your claim that they were not legally effective?
A I think that we've -- we've basically discussed all the -- the key points.
MR. CHANG: Okay. All right. I'll go ahead -- we'll take a brief break, if we need it. With that -- I don't -- how much -- we can go off the record.
THE REPORTER: Going off. The time is --
(Off the record.)
THE REPORTER: We are back on record. The time is 4:20 p.m.
//
//
//

Page 46

EXAMINATION
BY MS. MOYO:
Q Mr. Cauchon, we're back on the record. My name is Liz Moyo. I've introduced myself to you before. I have a few follow-up questions for you.
Would you please pull out that termination letter again, that was previously marked as Exhibit 31?
A I have it.
Q Please turn to Page 2, which is Bates numbered HRO_000191.
A Okay. I have it.
Q And at the second to last full paragraph, the -- this letter instructs you to return all Harm Reduction Ohio property. Do you see what I'm referring to?
A Yes.
Q After you received this letter, did you return any Harm Reduction Ohio property?
A I kept it with Harm Reduction Ohio. I did not -- I did not provide it to the -- the board members who wanted it. I kept it in Ohio -- Harm Reduction Ohio's possession.
Q And when you say you kept it in Harm Reduction Ohio's possession, do you mean you kept it

Page 47

in your possession?
A Or in the office of corporate Harm Reduction Ohio.
Q In that -- in the Granville office?
A Correct.
Q And at any time, you -- after the Granville office was closed, did you return any of this property?
A Return it where? It was already where it was supposed to be.
Q Well, let's talk about it then in a little bit more detail.
A Okay.
Q When this letter was sent on November 4, 2024 -- and just to clarify, you don't contest that you received this letter on November 4, 2024, correct?
A Correct. I received it on that day.
Q Okay. On November 4, 2024, did you have in your possession any identification cards or badges?
A No.
Q Did you have in your possession any access codes or devices?
A What do you mean by access codes? Like a password or --
Q Sure. Did you have any passwords to HRO

Page 48

accounts or any access codes that were used in the office?
A I did -- I did have passwords. And I did have -- I don't know what you mean by devices. I used my own computer. But -- but, like, keys would be a device, or --
Q I'm sorry. What?
A If keys are a device, you know, and there was a printer in the other room. That's a device. So I did have access to them, but -- even if I didn't use the printer. Keys is listed here.
Q So there were keys, there was a printer. And anything else that was on your possession in the office, at the Granville office?
Is it -- well, let's -- let me ask it this way. There was personal property in the Granville office that was personal property of HRO, correct?
A Corporate property? You mean corporate property of HRO?
Q Yes.
A Yes. There was HRO property there.
Q Yes. And did you, because you were still in the HRO office after November 4, 2024, did you maintain some control over that corporate property?
A Yes.

Page 49

Q Okay. And did you, between November 4, 2024, and August -- no. I'm sorry. April 8, 2025, did you ever relinquish control of that HRO corporate property?
A I'm not sure about the April 8th date. But if -- if that's the date that they came and picked it up, then I would say I did not relinquish control during that time period.
Q Was there any HRO, as you describe, "corporate property," that was in the Granville office, that you did not allow to be removed on April 8, 2025?
A No. I gave them access to everything.
Q Okay. So at that time, any laptops, computers, telephones, mobile phones, handheld electronic devices were returned on April 8, 2025?
A Is -- is that April 8th the date that they came over? Yeah.
Q Yes.
A Yeah. I gave them access to -- to everything.
Q Okay. What about HRO credit cards? When did you return HRO credit cards?
A On September 6th, I gave -- or September 5th, and this was testimony yesterday, I -- I gave my

Page 50

credit card and debit card to Cecile. And I -- I never got it back.
Q And which -- were those both a Chase credit card and a Chase debit card?
A Correct.
Q Any other credit cards that you returned to HRO?
A No.
Q To your knowledge, did HRO have any other credit cards as of November 4, 2024?
A A few of the employees had a debit card or a credit card. I didn't have any other.
Q And just based on your last answer, I want to make sure I understand correctly. You said that "you did not have any other." I want to make sure we're clear. Were there any other HRO credit cards that remained in your possession on November -- in your personal possession on November 4, 2024?
A No.
Q And then aside from the ones that the employees have, were there any other credit cards in the HRO office on November 4, 2024, other than the one that we talked about that you returned on September 5th of 2024?
A September 5th -- yeah. Not -- not as far as

Page 51

I know. I don't know if an employee had left a credit card in their desk in the other room. But as far as I know, the answer is no.
Q Okay. On November 4, 2024, did you leave or return any electronically stored -- well, that's a bad question. I apologize.
On November 4, 2024, through April 8, 2025, you continued to access the electronically stored documents or files of HRO, correct?
A Which files are you referring to?
Q I'm --
A Like the Google Drive?
Q I'm referring to any electronically stored documents or files of HRO. Is it fair to say that you continued to access electronically stored documents or files of HRO between November 4, 2024, and April 8, 2025?
A Yes. I would say that that's accurate.
Q Okay. And did -- after April 8, 2025, did you continue to access any HRO electronically stored documents or files?
A I'm not sure. Which ones are you referring to?
Q Well, let me ask you this. When -- did you keep any electronically stored documents or files of

Page 52

HRO after April 8, 2025?
A I have a whole bunch on my computer from, like, the application, and, like, seven years worth of work. But if you're referring to, like, the Chase bank account -- is that what you're referring to, or --
Q No.
A Okay.
Q I'm actually not referring to accounts. I'm just referring to --
A Files.
Q -- documents or files.
A Sure. And I produced a lot of them in discovery. Like, I had the board meeting minutes going back to the original board meeting. I have a whole bunch of HRO documents in my possession.
Q Okay. And did you return those, or make sure that HRO had all of those documents that you had, after April 8, 2025?
A I don't think I was asked for those files. But if Cecile had asked and they needed it, I would have provided it to them. But I don't specifically remember being asked for a file.
Q Will you -- would you agree with me that you were asked for those files in this November 4, 2024,

Page 53

letter?
A Stored -- yeah. Well, I -- I didn't transfer stuff from my personal computer back to them. Correct.
Q Okay. Did you -- well, let me start again. Did you continue to access the physical files of HRO between November 4, 2024, and April 8, 2025?
A And by -- what do you mean by physical files? Like, in filing cabinets and stuff?
Q Yes.
A I don't remember accessing -- I don't remember having a need. They're -- everything was on my computer, as far as I know. I mean, there might have been a piece of paper, but I don't recall accessing any physical files.
Q After April 8, 2025, did you return any physical files of HRO to HRO?
A I gave them access to everything they wanted. I think they took some of the files. They didn't -- like the naloxone distribution files and stuff, for some reason they didn't take them all and -- so -- but -- but they had access to -- to all HRO physical files.
Q Okay. And what about passwords and login information? You continued to maintain passwords and

Page 54

login information for HRO from November 4, 2024, to April 8, 2025?
A To the extent that I could, I tried to -- to maintain and protect them.
Q And did you return any -- did you return the passwords and login information to anyone at HRO after April 8, 2025?
A What do you mean returned? It was on Google Drive. So they had our password, password manager. So -- but did I return it to them specifically? Not anything that -- that was in -- in addition to -- to the -- to the main spreadsheet.
Q Where was the password list maintained on Google Drive?
A On the HRO Google Drive. I don't remember what the folder is.
Q Did anyone else at HRO know where that password list was?
A Yes.
Q Who?
A Cecile, and really all the employees. Katie Huang, one of our former employees, put it together. And, like, a couple years, or, like, a year or so before. And so it was just, like, a universal password, and we'd encouraged other employees to add

Page 55

their passwords. Like AmandaLynn used her Adobe Acrobat account, so her password was in there. So it was sort of, like, a -- a general staff.
Q At any time did you restrict access to that -- at any time after November 4, 2024, did you restrict access to that password list on Google Drive?
A No. But I think some passwords weren't on there. Like the financial bank accounts' passwords were not on there, for example. Because we didn't want them to be given to, you know, all employees.
Q What other passwords were not on there?
A I'd have to take a look. I think just the financial accounts. I can't remember if, like, our IRA accounts, where we made deposits -- I think that was probably on there for Vanguard, but I could be wrong.
And Katie Huang, which I mentioned, is H-U-A-N-G. And Katie, K-A-T-I-E.
Q When did Katie Huang leave HRO?
A Late 2023 or early 2024, I think. She created it, and then other people updated it as it went along.
Q When you were -- when -- after this November 4, 2024, letter was sent to you, did you remind anyone at HRO about the password list on the Google Drive?

Page 56

A Not that I recall.
Q Other than Cecile, was there anyone else who was working at HRO at the time, on November 4, 2024, who you know knew about the password list on the Google Drive?
A As far as I know, everyone knew because it -- I think it even had the passwords for, like, the naloxone program, for the Adobe Acrobat account. So as far as I know, everyone -- everyone knew, but --
Q Mr. Cauchon, you produced in discovery a redacted password list. Did that come from the Google Drive that you're talking about?
A Yes.
Q And you produced that in May of 2025; do you remember that?
A Yes.
Q And you instructed me not to provide the unredacted list to HRO; do you remember that?
A Correct. Because I was concerned that a lot of those passwords were, like, my personal password that I use on a bunch of accounts. So I didn't want those to -- to get further distributed.
Q But it's your contention now that those passwords were always available to HRO on the Google Drive?

Page 57

A Correct.
Q And with respect to the bank account passwords, the Chase bank account passwords, where were those stored?
A The way Chase does it, as I recall, is HRO didn't have a password. I had a password. Cecile had a password. You would -- then you would log on to Chase. And so everyone had their own password, even though it was the same organization.
Q Did anyone besides you and Cecile have passwords for Chase?
A Our bookkeeper, and our auditor may have when they were doing the -- the audit. But I think, in this time period, it would have been me and Cecile. I can't remember if Jen had them at one time. We did go to the bank one time to add her. And I'm not sure how that -- that -- I think that worked out, but Cecile would know.
Q Do you know whether Cecile had the same level of access as you to the Chase Bank account?
A She had the same access, but I was the primary signature, so -- and she would have been, like, at a -- a different -- we may have had the same access, but she would have been, like, at a different level of rights and authority.

Page 58

Q And is it fair to say that you did not transfer your authority as the primary signator on the account after November 4, 2024?
A That's correct.
Q Is it fair to say that you continued to access the Chase primary checking account of HRO after November 4, 2024?
A Yes.
Q Is it fair to say that you continued to -- actually, scratch that.
Is it fair to say that you continued to access the Chase credit card account after November 4, 2024?
A We didn't have one -- we had multiple credit cards. So there wasn't a credit card -- there -- there wasn't a credit card account, so to speak. So --
Q Well --
A So if you could rephrase the question --
Q Sure. Sure. Were -- you talked before about a Chase credit card that you returned to HRO in September of 2024, and then you talked about other employees had Chase credit -- were they Chase credit cards?
A Yes.

Page 59

Q Okay. And were all those credit cards attached to the same credit account; is that what you're saying?
A The same checking account, yes. They're the same HRO account. We also had a CD.
Q Well, there's a -- there's a checking account as one thing, and then there's a credit account, right?
A Or credit cards. It was all one account. One Harm Reduction Ohio account.
Q Right. But that's separate from the checking account, right?
A Yeah. It -- it -- it was all on the same portal and it was the -- it was connected. Yeah.
Q But there's -- there -- you would agree with me that there's a checking account that HRO had with Chase, correct?
A Correct.
Q And there's also a credit account that HRO had with Chase, correct?
A Credit cards, yes.
Q Okay. And I just want to be clear that you continued after November 4, 2024, to access that credit card account as well?
A And by access, you mean to look at it?

Page 60

Q Yes.
A Yes. And also, I may have, additionally -- there may have been some credit cards and debit cards used in -- on autopay for various services. Those could have gone through. I don't specifically recall. But -- but yeah, those would have remained functioning as far as I know.
Q And after you were terminated -- or I'm sorry, let's just stick to this. After November 4, 2024, you accessed the Chase debit and credit accounts daily, correct?
A I -- I reviewed, like, the -- all -- all the accounts. Yep. The -- the spending -- our accounts on a daily basis.
Q And you told the staff that you were going to review them on a daily basis, correct?
A I don't know if I -- I told the staff. I didn't -- I don't think I told -- I told Cecile and I was going to send her daily updates and -- yeah.
Q Well, Cecile is staff, correct?
A Correct.
Q Yeah.
A But if you mean staff, plural.
Q Okay. Anyone besides Cecile who you told you were going to continue to access HRO's accounts daily?

Page 61

A Not that I know of.
Q Okay. And you mentioned -- out of the Chase primary account for checking, did you make any payments from that account after November 4, 2024?
A Yes.
Q What payments did you make out of the primary checking account at Chase after November 4, 2024?
A If you look at the accounts, you can see them. We had various bills to pay, including the lease and, you know, like, our Microsoft Word -- Microsoft accounts. And so whatever bills in the ordinary course of business would have come up would have been paid, because that was our only account.
Q Okay. So you paid for the lease?
A Yes.
Q And what else did you pay for besides the lease after November 4, 2024? You said Microsoft?
A I can't -- that's an example. I would have to look at the accounts because a lot of them -- like, even the lease was on autopay. And so -- so if any bills -- like, money was flowing in and was flowing out. So I was just making sure that we got -- we've been -- had scam charges before. So when a charge

Page 62

would come in that wasn't clear what it is, I would verify that that was a legit charge.
Q But did you, from that account, did you write any checks after November 4, 2024?
A No.
Q Did you electronically wire any money from that account after November 4, 2024?
A Me, personally? I think, if you're referring to the lease, the way that worked on autopay is it would be programmed and then Chase would send a check to Borough Company. So that's why I sort of auto -- at the previous deposition, there was confusion about, is it autopay or is it a check? And it was both.
Q So it's your contention -- what -- when was the autopay for the lease in 2025 set up?
A It would have been a continuation for -- for, like, a few years before. So we -- if the rent changed, which I don't think it did, we would have changed the amount. So --
Q So what were the autopay dates then?
A I don't -- I don't recall, but it would have been, like -- I don't recall the specific date.
Q So you're -- are you telling me that after November -- that on or after November 4, 2024, you did

Page 63

not change the autopayments to Borough Company? Is that your testimony here today?
A Not the autopayments. Or I can't remember if I changed, like, the dates or the amount, but I was responsible for the autopay. And earlier, I -- when I was concerned about losing access to the account, is I sent three months -- I used the autopay function to send three months forward. They didn't end up cashing that check, and the regular autopay continued through May. So that might be something that -- that you're referring to.
Q The autopay continued through May after HRO vacated the Chase account?
A No. I don't know when they vacated it. I -- I lost access to it, but before May. I -- I -- I don't -- do you know when -- when it was -- when it was vacated? I don't know when it was vacated.
Q Okay. Well, I just asked you because you said that the autopayments that you had set up on the HRO account continued after -- you said they continued into May. And so that's why I was trying to clarify.
A Actually, May's rent. It was an April payment for -- for May's rent is when they ended.
MS. MOYO: What exhibit number are we up to?

Page 64

THE REPORTER: Next would be 32.
MR. CHANG: 32?
THE REPORTER: Yeah. Next would be 32.
BY MS. MOYO:
Q Mr. Cauchon, I'm handing you what's been marked as Exhibit 32.
(Exhibit 32 was marked for identification.)
What is this document, Mr. Cauchon?
A It's a Chase statement.
Q Is this for the credit card account?
A I don't know. Can you tell me what -- I -- I thought that the credit card -- I -- I didn't think that the credit card had a separate statement, but I - - I could be wrong. Can you tell me what this is?
Q Well, let's take a look at the third page of Exhibit 32. Bates number at the bottom is Cauchon 000489. This is a document that you produced, correct?
A Yep.
Q Okay. Do you recognize the payments on this account statement?
A I do. I -- I -- I know what most of them are for, maybe all of them.
Q Okay. Does it refresh your recollection

Page 65

whether this is the credit card account -- the credit account, or the checking account?
A It says "card member service," so it's likely a -- a card. But does it say explicitly what it is? No. So I'm guessing that it's a credit card.
Q And did you said you recognized some of these payments. Did you direct these payments to be made?
A No. They would've been all auto -- every one I see is in autopay. For example, Microsoft and Pirate Ship was our mail program. Gannett is like a newspaper subscription. Google One is sort of like the -- the Google Drive.
Q Okay. And you see in the middle of -- sort of the lower middle of that page, it says, "Dennis Cauchon transactions this cycle, card 3581"?
A Yes.
Q $2,647.36?
A Yes.
Q And your contention is those $2,647.36 worth of payments, none of those were payments that you personally used this account to make?
A Correct. These must have been autopays like Zoom. There were autopays on -- on my card.
Q And at any time, did you communicate to HRO

about these -- after November 4, 2024, about these automatic payments that were being made from this credit account?

A Well, I was president of HRO, so I didn't need to communicate. I can't remember what I -- what I updated Cecile on, but she would've been able to see the same thing. And -- and if it was relevant, like, if there were unusual charges, I'm sure we would've communicated about it.

Q At any time after November 4, 2024, did you stop these automatic payments that were being made from this credit account?

A I don't recall. Do you have a -- a -- like, a specific reference to Pirate Ship or Zoom or I -- I don't -- I don't remember.

Q I'm just asking for what you know of, Mr. Cauchon.

A Okay. Yeah. I -- I don't remember stopping any.

Q Okay. And did you -- were you -- after November 4, 2024, were you paying off this credit account with HRO funds?

A Yes.

Q All right. You can set that document aside. Thank you.



MS. MOYO: We're up to 33?

THE REPORTER: 33 is next.

BY MS. MOYO:

Q All right. Mr. Cauchon, I've handed you what's been marked as Exhibit 33. Take a minute to look at that document.

(Exhibit 33 was marked for identification.)

Do you recognize this document, Mr. Cauchon?

A Yes.

Q Did you receive a copy of it on or about March 28, 2025?

A Yes.

Q And I just have some questions about the first page, the first bullet. "Mr. Cauchon has sent unauthorized emails from the harmreductionohio.org domain purporting to represent HRO." Is it fair to say that between November 4, 2024 and March 28, 2025, that you sent emails from the harmreductionohio.org domain on behalf of HRO?

A I sent them all from my Gmail address. From what I've seen, three went out through the Harm Reduction Ohio. I -- I don't know why, because my access had been cut off. But -- like, there was the one to Chase that I saw, one to Dr. Mark Hurst, and



there was a third one I don't remember.

But it wasn't anything that I did, at least not -- not intentionally. I was sending them with my Gmail. And for some reason, they got funneled through the -- the HRO address. I think there were three.

Q And you were sending those from the office -- the Granville office?

A I was sending them either from my phone or from my personal computer at the office. So I have a theory on what happened, but I don't know for sure.

Q What's your theory?

A Is when you use the Apple program, it sort of, like, defaults on what it think you're sending for -- from. So sometimes it would default to my Harm Reduction Ohio address, which is the one I had used 90 percent of the time. But then it would say, doesn't function, and I would switch it back to Gmail. So my theory is that I don't know why these three would not have been blocked because they'd -- they'd blocked my e-mail, but I don't know why those particular ones weren't.

Q And even when you sent Gmail emails, you were purporting to represent HRO as its president, correct?

A Correct.



Q And that continued after March 28, 2025, correct?

A On occasion. I didn't have that many emails to -- to send, but -- but when I sent them and they were relevant, I would include my position as president.

Q Okay. Is the answer to my question yes?

A Ask your question again.

Q Will you please ask my question again?

THE REPORTER: Absolutely.

(The reporter repeated the record as requested.)

THE WITNESS: Not -- not -- not most. I mean, my Gmail account.

BY MS. MOYO:

Q But when you were sending emails to ODH or other business associates of HRO after March 28, 2025, you indicated that you were still the president of HRO, correct?

A To ODH. And usually -- or I might have on the others. Like, sometimes I -- I might not have, depending on the -- the nature of the e-mail.

Q Okay. And with respect to the second bullet on this first page of this letter, at -- on March 28, 2025, you continued to have access to the HRO website

Page 70

and you had not relinquished control of the HRO website, correct?
A I'm not sure if I still had access, but continuing that is I didn't make -- I didn't remove pages to identify HRO board members and staff.
Q You did not do that between November 4, 2024, and March 28, 2025?
A No.
Q And after March 28, 2025, I believe you indicated yesterday that you continued to exercise control and ownership over the domain name, correct?
A Yes. It's -- I own the domain name.
Q And you have not returned that domain name to HRO?
A I wouldn't return it. I own it. I've owned it from the beginning. I -- I -- as I said yesterday, I thought -- I planned to donate it, but -- but I didn't have to return it to -- to anyone because I was the owner.
Q With respect to the third bullet, Mr. -- on this Exhibit 33, first page, since November 4, 2024, have you refused to relinquish full access of the HRO Facebook page?
A To who?
Q To HRO?

Page 71

A No, I have not.
Q Okay. And did you ever provide -- you were provided with instructions on how to change the primary administration of the Facebook account by your Counsel -- your previous Counsel, correct?
A I think so, but I -- I know how to -- to change it. I knew -- I knew how to change it already.
Q And you did not do that, correct?
A Correct. I -- I would not turn it over to people who had no lawful right to it. Correct.
Q So you maintain primary authority over the HRO Facebook page even today, correct?
A I'm the administrator is what Facebook call -- Facebook owns it, but yes, I have administrator authority.
Q Okay. And sitting here today, you continue to refuse to relinquish that administrative control, correct?
A Correct.
Q Okay. We've already talked about access to the Chase Bank accounts. And sitting here today, did you ever transfer your primary authority on the Chase Bank account back to HRO? Did you -- let me ask it a different way. I apologize.
Did you ever relinquish your primary

Page 72

authority over the Chase Bank account?
A To who? Relinquish it to who?
Q I just -- did you relinquish it --
A No.
Q -- to anyone?
A No. No, because it was HRO's bank account. I was president of HRO, and I was the -- so no, I did not transfer it to anyone else.
Q Okay. On Page 2, the next bullet, "Mr. Cauchon has wrongfully accessed HRO's QuickBooks account and contacted HRO's bookkeepers in an attempt to gain information about HRO." Did you, after November 4, 2024, continue to access HRO's QuickBooks account, and did you contact HRO bookkeepers?
A After November 4th, I looked at the QuickBooks account, yes. And I don't recall if I contacted the bookkeepers, but I might very well have been. Because I saw that it was not being updated like it -- it should have been. So that would've been a concern. But I don't remember specifically what I talked with them about.
Q What about after March 28, 2025? Did you continue to access HRO's QuickBooks account?
A I don't believe so. It's possible, but I -- I -- I don't believe so.

Page 73

Q And did you ever relinquish all of the QuickBooks passwords and credentials?
A Did I transfer them to?
Q To anyone else?
A Other people had them, but I didn't transfer my credentials.
Q Who else had them?
A I believe Cecile. I could be wrong on that. The bookkeepers had them.
Q Okay. All right. We've already talked about the next bullet. Would you please turn to Page 4 of this letter, Mr. Cauchon? I'm sorry. I don't have any further questions on this exhibit. You can set it aside.
MS. MOYO: What exhibit number are we on?
THE REPORTER: 34.
BY MS. MOYO:
Q Mr. Cauchon, I've handed you what's been marked as Exhibit 34.
(Exhibit 34 was marked for identification.)
In your testimony earlier today, you referred to a password list on the Google Drive of HRO. On November 4, 2024, to your knowledge, was this the

password list that was on the Google Drive?
A Yes.
Q Okay. And you stated that you did not provide this redacted password list in this case until May of 2025, correct?
A I think that's when I provided it, yes.
Q And I think you said that one of your concerns was that it had -- was it that it had your personal account information on here, or was that one of your concerns?
A It had mostly -- I used the same password as were on many of these accounts as I use on, like, a whole bunch of accounts.
Q Okay. And there are about 53 accounts on here by my count. Does that seem right to you?
A Sure. Yes.
Q And all of these accounts on here were used to conduct HRO business, correct?
A Yes.
Q But this is not a complete list of all of the HRO accounts that had passwords as of November 4, 2024, correct?
A There were others. As I said, like, the Chase account is not on here. First -- I think First Federal is on here, which it -- it shouldn't be. See



a Vanguard's on here. But it's not -- it's not complete. No.
Q Anything else besides Chase, First Federal, Vanguard, that you weren't sure -- looking at this here today, any other accounts of HRO that are password protected that you do not see on this list?
A Not that -- not that I can tell from just looking at the list. I can't tell what, if anything, is missing.
Q Okay. Is it fair to say that after November 4, 2024 -- actually, you can scratch that.
Mr. Cauchon, you still continue to have this password list in your control, and you've never relinquished your access, correct?
A I still have the password list, yes.
Q And have you ever -- have you continued to this day to access some of these accounts?
A I see my desktop password is on here. So every morning when I go in and log in, I do access that. But, like, Dennis's computer, you see it there. But let me take a look at these other ones. No, I'm -- I'm not accessing any of the other ones.
Q And when did you stop accessing these accounts?
A The handful that I used, eventually they



just stopped working, presumably because the board faction was able to disable them. So it would've been different for different ones. But effectively, when they stopped working, then -- then I didn't do anything to -- to get them back.
Q But you continued to use them after November 4, 2024, up until the time your access was terminated?
A Until it stopped. Yeah. I don't know if it was terminated, but it -- it stopped.
Q Okay. Mr. Cauchon, you did not -- in response to that March 28, 2025, cease and desist letter that we marked as Exhibit 33, you did not provide this redacted account information marked as Exhibit 34, correct?
A I did not.
Q Okay. And I want to change gears to talk a little bit about the lease with Borough Company.
MR. CHANG: Can we take about five minutes break --
MS. MOYO: Yeah. Yep. Let's take five minutes.
THE REPORTER: All right. Off record. Time is 5:14.
(Off the record.)
THE REPORTER: We are back on record.



Time is 5:21.
BY MS. MOYO:
Q Okay. Mr. Cauchon, we're back on the record. I'm going to hand you Exhibit 35.
(Exhibit 35 was marked for identification.)
Exhibit 35 is two pages Bates labeled Cauchon 274 to 275; is that correct?
A Yes.
Q And can you tell me what this is, Mr. Cauchon?
A It's an e-mail between me and Bill Wernet, who represents Borough Company.
Q Is it an e-mail, or is it a text?
A It's a text. It's a text.
Q Okay. And this text string starts on November 5, 2024, correct?
A Correct.
Q And continues through November 15, 2024?
A Correct.
Q Okay. And you just said Mr. Wernet, who represented Borough Company. Who -- what's your understanding of what Mr. Wernet's role is with respect to Borough Company?
A He handles leases.

Page 78

Q Okay. As their lawyer, as their property manager?
A They testified to it on Wednesday that, effectively, as their -- their lawyer, and he has some property management duties, is what the testimony of Borough Company. The -- the owner, Mike Thornborough, that's his testimony.
Q And what was your understanding back in -- on November 5, 2024, as to Mr. Wernet's role with respect to the Borough Company?
A It was the same, that he handled the -- the leases.
Q Okay. Did you have any relationship with Mr. Wernet outside of the lease?
A Other than, like, we're -- we're friends, but -- but -- but no, like, we didn't -- we don't visit each other at our house or -- or anything like that. He's just -- like, he has the office -- he's had the office below HRO for the 20-plus years I've been there. And there's a coffee shop there. So we just have sort of, like, that casual friendship, but I would consider him to be a friend.
Q Okay.
A But -- but I -- I'll also add, like, I rarely see him. He's rarely -- he's rarely in the

Page 79

office, so -- so I don't think it's a close friendship, but we're -- we're friendly.
Q Okay. And in this text message that you send to Mr. Wernet, you say, "FYI, I think the coup plotters may contact you trying to seek control of our offices." Did I read that correctly?
A Yes.
Q And who are the "coup plotters"?
A Tasha and the -- the other -- the other board members and -- and -- and AmandaLynn would be the -- the key coup plotters.
Q All of the other board members?
A In a -- in a general sense, yeah. I mean, I -- I don't -- it's -- it's just a metaphor.
Q All of the board members who signed the November 4, 2024, letter?
A No. No. I think the -- the key plotters are the -- the named defendants, Dwayne, Billy, and -- and Tasha.
Q And AmandaLynn?
A Amanda -- AmandaLynn is, like, a behind the scenes, but I don't know. I hadn't thought of, like, defining who they are, but I would say the three named defendants are the key people I would be referring to here, because AmandaLynn wouldn't be involved in the

Page 80

lease or anything like that.
Q Do you know what that PDF is in the text string? It says, "AL e-mail about locks." What is that?
A I don't know for sure. Did I not provide it? I'm not really -- I'm not sure what it is.
Q Okay. And then, in the November 6, 2024, the blue box, almost halfway down the page, says -- I believe this is you saying, "Sorry. I was talking to my lawyer. I sent the coup leader an e-mail saying that the office is open." Who were you referring to as the coup leader?
A My guess is that, if I check the e-mail, I think it was probably Dwayne.
Q Okay.
A Or -- or I -- I could -- I'm not sure who I -- but you could -- we could cross-reference it with the e-mail.
Q Okay. And then the last sentence says, "We're hoping they initiate an action, but who knows?" What did you mean by that, "We're hoping that they initiate an action"?
A Because in the meeting minutes, they had talked about they were going to sue me and try to assert legal control. So I was hoping that they would

Page 81

get to court so that we could resolve the issue quickly.
Q Were you trying to get them to sue you?
A No. I just saw that they were threatening and they wanted to, and they talked to lawyers, but it -- but it didn't happen. But I thought that would've been a -- an effective way to -- to have it settled quickly.
Q I thought you said that the board didn't provide you with the minutes?
A They did. They provided my attorney, David Martin, with a redacted version of the minutes sometime in October, I -- I think it was. I think they've been provided in discovery, but they provided him as a courtesy.
Q Okay. Well, I would like to try to be as accurate as possible. If you don't know, you can tell me that you don't know. But on November 6, 2024, you said, "We're hoping they initiate an action." And you just described that as you were hoping that HRO or the board sued you, correct?
A Or sued -- sued for control of HRO, whatever would resolve who was lawfully in charge.
Q Okay. And what claims did you hope they were going to bring against you?

Page 82

A Well, I hoped it would ultimately resolve the issue of who was in charge.
Q Okay. And you said that you thought this was going to happen because you saw some minutes. Did you see minutes from the board meetings before November 6, 2024?
A Yes.
Q Okay. And was your intent in sending this text message to Mr. Wernet to prevent all board members from accessing HRO's Granville office?
A No. They were welcome to the office. The staff was welcome to the office. That's why I sent emails. The office is open for business. So no, but I didn't want them to have control of the finances of the lease. Those were, in my view, not proper for board members to -- to control.
Q Okay. Anyone other than you -- was it proper for anyone other than you to have control over those things, in your opinion, as of November 5, 2024?
A Yes. Other members of the staff. And, you know, I -- I wanted them to continue to work as normal, yeah.
Q So long as they were reporting to you, correct?
A Well, they reported to me de facto because I

Page 83

-- I was the president and the boss. But -- but no, I just wanted them to come in and ship -- ship the naloxone.
Q So they were permitted to come in and ship the naloxone so long as they were reporting to you, correct?
A No. They -- they didn't need to report to me. The -- the -- the doors were open every day. And as I told Cecile, we're -- we're open for business. The coup plotters, so to speak, or the other members, told them not to come in and -- and do their -- do their duties. So that was unfortunate, but that's where we were.
Q And you were not going to allow them to do their duties anywhere else other than the Granville office, correct?
A Correct, because that was Harm Reduction Ohio's office. That's where our equipment was. It's where we had operated for eight years. Had a very efficient system going.
Q All right. You can set Exhibit 35 to the side.
Mr. Cauchon, I've handed you what's been marked as Exhibit 36. It's Bates-numbered HRO208 through HRO210.

Page 84

(Exhibit 36 was marked for identification.)
A Yes.
Q Do you recognize this e-mail string?
A I do.
Q Okay. And I'm going to direct your attention to -- on the first page, to about the middle of the page.
On November 26, 2024, at 1:43 p.m., Anne Trinh wrote to you, "Hi, Dennis. Thanks for sending updates to Cecile." Do you see that?
A Yes.
Q And then she says, "As for the six-month renewal, we are not needing this and do not want the extension." Did I read that correctly?
A Yes.
Q And did you understand this to mean that the board did not want to renew the HRO lease?
A No.
Q Okay. What did you understand it to mean?
A Well, the -- the board hadn't met, so the board, as a collective body, could not take any action. So that's what I understood it to mean is that Anne was -- and the coup plotters, so to speak, didn't want to extend the lease, but it was not the

Page 85

board.
Q Was Anne a coup plotter?
A I don't think so. But -- but -- but I'd have to -- I haven't talked to her since, so --
Q And -- but she's the one who told you that the HRO did not want to renew the lease, correct?
A Correct. But no individual board member had authority. That -- that was operational duties that the -- the president had authority over. Yeah.
Q And you chose to renew the lease after receiving this e-mail from Anne, correct?
A Correct.
Q Okay. Were any staff working in the Granville office when you decided to renew the lease?
A When I decided to renew the lease? I was.
Q Anyone else?
A Naloxone shipping wasn't happening from there. I think Cecile might have come by now and then to get something out of her office. But basically, it was me and occasionally Cecile.
Q You can set that exhibit to the side.
Mr. Cauchon, I've just handed you what's been marked as Exhibit 37.
(Exhibit 37 was marked for identification.)

After you've had a chance to review this document, can you tell me what it is?

A It looks like the -- the lease signed on November 27, 2024.

Q And this is the lease for the Granville office?

A Correct.

Q And you signed this lease on November 27, 2024. That's your signature at the bottom of the first page?

A Oh, the first page? Yes. It's an electronic signature, but that is my signature.

Q That -- and that's the Agency Disclosure Statement, that first page. If you go to the end of the lease, it says, Page 10, "Lessee." It says, "Dennis Cauchon, President." Is that your E-signature there as well?

A It is.

Q And that was on November 27, 2024?

A Correct.

Q And you signed it as the president?

A Correct.

Q So if you turn to Page 1 of the lease agreement, which is actually Page 3 of this exhibit, right after the Agency Disclosure Statement. In the -



- under "B: term, rent and payment, renewal, and holdover tenancy," the original term, it says, "The term of the lease shall be one year beginning January 1, 2025, and ending December 31, 2025."

A Correct.

Q When you had emailed with Anne, you had suggested that the landlord would renew -- was willing to renew the lease for six months, correct?

A Correct.

Q And then why did you decide to renew this lease for a year?

A David Martin told me that -- that -- like, I offered the six-month lease to try to -- like, to limit every --

MR. SHEARER: Dennis, I don't know that you should be talking about --

THE WITNESS: Okay. Oh, got it.

MR. SHEARER: -- conversations with your personal attorney at the time.

THE WITNESS: So I can say, on the advice of Counsel, though?

MR. SHEARER: Yes.

THE WITNESS: So on the advice of Counsel, he recommended that we continue the same lease as -- as had been done in the previous years to



keep consistency going forward, so that's why I went from six months to do the same 12-month lease as we'd been having in previous years.

BY MS. MOYO:

Q Was it your intent to remain in control and possession of the Granville office for all of 2025?

A Yes.

Q You can set that exhibit to the side.

MS. MOYO: Can we go off the record for a second?

THE REPORTER: Yep.

(Off the record.)

THE REPORTER: We are back on record. Time is 5:47.

MS. MOYO: David, is your client relying on the advice of Counsel as a defense to entering into this lease?

MR. SHEARER: Let me talk to him real quickly and --

MS. MOYO: Okay.

THE REPORTER: Going off record.

(Off the record.)

THE REPORTER: We are back on record. Time is 5:49.

MR. SHEARER: Mr. Cauchon is not



relying on the advice of Counsel with regard to his decision to renew the lease.

MS. MOYO: Okay.

BY MS. MOYO:

Q Then I want to ask you again, Mr. Cauchon, why did you enter into a one-year lease on November 27, 2024?

A The 12-month lease rather than the six-month, or why did I enter a lease at all?

Q Well, let's start with why 12 months instead of six months?

A I wanted to keep it consistent with the previous years.

Q And you wanted to be in control of that lease for another year, correct?

A Well, I wanted HRO to continue the lease.

Q And you wanted to be in control of the lease as the president of HRO for another year, correct?

A Well, if I died of a heart attack, I wanted HRO to continue the -- the lease.

Q Let me ask my question one more time. Did you want to remain in control of HRO's office in Granville for one more year in 2025?

A I mean, I had authority over Harm --

Q Mr. Cauchon, please answer my question.

Page 90

A Well, we -- I'm not --
Q Did you want to remain in control of HRO's Granville office for one more year in 2025? Yes or no?
A No. Control didn't matter to me.
Q Okay. But you wanted HRO to remain at the Granville location for another year in 2025?
A Correct.
Q And then why did you decide on the 12-month lease instead of the six-month lease that you had offered to Anne?
A Because I thought it would be better to stick with the continuing pattern of leases that we'd had for previous years.
Q Why did you even offer the six-month lease to Anne?
A Because I was trying to be cooperative and work and reduce everyone's risk. But when she didn't want -- when her choice was, like, no lease, then I thought we should go back to the default.
Q Okay.
THE REPORTER: 38?
MS. MOYO: Thank you.
BY MS. MOYO:
Q Mr. Cauchon, I have handed you what's been

Page 91

marked as Exhibit 38, HRO 1531 through 1534. This is the January 2025 bank statement of Harm Reduction Ohio.
(Exhibit 38 was marked for identification.)
And you are familiar with this bank account. We talked about it earlier during this deposition, and you were still reviewing the activity of this account in January of 2025, correct?
A Yes.
Q Okay. And I want to draw your attention, in the January 2025 account statement, to Page 2, HRO 1532?
A Yes.
Q Okay. And at the bottom of the page, "Electronic Withdrawals 01/08: Online payment to Borough Company." You see that in the amount of 1750?
A Yes.
Q And you made this payment from this account, correct?
A I would have been responsible for making the payment, yes.
Q Okay. And is it fair to say, Mr. Cauchon, that before January 2025, you also directed payments from this account on the -- to the Borough Company for

Page 92

the 2025 lease, correct?
A In 2024, before 2025?
Q Yes.
A Yes.
Q Okay.
A I mean, I might not have done it myself, but yes, that's how it was done.
Q Is it your contention that before 2020 -- that in -- before 2025, someone other than yourself directed payment to the 2025 lease with Borough Company?
A Yes. I think the administrator or office manager probably did that, or autopay. I can't remember specifically how the payment got made.
Q So either -- Cecile is the office administrator who you're talking about?
A Or Erin Pottiger before that. Yeah.
Q Or Erin Pottiger made -- directed from this account a payment to the 2025 lease with Borough?
A No. That would have been the 2024 lease I thought we were --
Q Okay. No.
A -- referring to before, but yes.
Q I'm referring to the 2025 lease.
A For this -- yeah.

Page 93

Q And this -- see how this first -- the -- this January 8th payment, it's January 8th, right? And the lease begins -- is effective January 1, 2025, right?
A Correct.
Q So what my question is, is that -- is whether you made any payments from this account on the 2025 lease before January 8, 2025?
A Did I make any, like, in 2024?
Q Uh-huh.
A Yes. And, like, I don't know how many or who actually made them, but I would have, like, in 2020, 2021, I would have been overseeing.
Q I'm sorry. I think we're misunderstanding each other.
A Okay.
Q I'm just talking about the 2025 lease that you signed as president of HRO.
A Yeah.
Q You signed that on November 27, 2025. Remember we looked at that?
A Yes.
Q And so my question is, did you direct any payments -- for that lease, for 2025, did you direct any payments from this account to be for that lease

before this January 8, 2025?
A I don't -- I don't recall. I do know from Mike Thornborough's testimony that we had paid 1750 for every month. So I'm not quite sure when they -- like, what the timing was. Whether it's possible that this was for January's rent and the other is for February. But -- but we only paid 1750 per month, is ultimately how it washed out.
Q Okay. But as we sit here today, you're confident that you directed that payment on January 8, 2025, of 1750 to that lease?
A Yes. I would have been responsible for it. Yes.
Q Mr. Cauchon, I've handed you what's been marked as Exhibit 39.
(Exhibit 39 was marked for identification.)
This is a Harm Reduction Ohio Chase Bank statement from February of 2025. Take a minute to look through this.
A Okay.
Q I don't see any payments to Borough on this statement, do you?
A I do not.
Q Okay. Do you know whether you made any



payments to Borough in February of 2025 for the 2025 lease?
A I think that we did from yesterday's testimony. Borough Company supplied their month when it arrived. So I'm not sure if the two payments in January resulted in no payment in February, but if you compare it to what Borough Company supplied on Wednesday, it -- it would all -- it should all match up.
Q Okay. You're confident that you made at least six months worth of payments from HRO's account to Borough Company?
A Five, through May.
Q Through May? Even though Borough's records reflected six payments?
A I -- I don't think -- oh, I don't think they did. Or did they -- so if you show me their records, I think that maybe we had -- we were behind on December's payment, but we -- we only rented it through -- through May, and we only made one payment per month. So if there were six in the time period, it would have been for the -- the previous month.
Q Well, I don't have Borough's records in front of me, but if their records reflect that you paid six months worth of rent for 2025, do you have



any reason to dispute that?
A I think so, because I was there at his testimony, and he said that we rented it through May. And I remember their records, the last payment was in April. So I can't say without looking if there were, like, two payments in them, but it was only through May and then they -- it went to a -- a new tenant. That's just from my recollection of the testimony.
Q And again, if the testimony reflects something different, would you disagree?
A I would think the Borough Company's records are -- are accurate.
Q Okay. So if Borough Company's records reflect six payments received on the 2025 lease, you would agree that you directed those six payments to be made to the Borough Company, correct?
A If there was -- but they -- they weren't -- I mean, I -- I saw their records. If there were six payments in 2025, the sixth was likely for December 2024.
Q Okay. So you admit that the five -- there were at least five payments in 2025 that you directed to be paid from HRO's Chase account to Borough for the 2025 lease, correct?
A Yes. Five payments, January through May.



Q Okay. All right. Mr. Cauchon, I've handed you what's been marked as Exhibit 40.
(Exhibit 40 was marked for identification.)
This is an HRO Bank statement from March 2025. I'm going to direct your attention to Page 2 of this statement. And it -- towards the bottom of that page, it says, "Electronic Withdrawals"?
A Yes.
Q And it says it reflects three payments made from this account on March 4th, March 19th, March 26th, and you made each of these payments from this account, correct?
A I believe so, yes.
Q All right. Mr. Cauchon, you can set that aside.
Mr. Cauchon, I have some questions about some of the answers that you gave to Mr. Chang. You mentioned that you changed the locks at the Granville office after November 4, 2024, correct?
A Correct.
Q And when did you do that?
A I'm not sure the exact day, but in -- it looks like it's early November.
Q Okay. And can you tell me, which locks did

Page 98

you change?
A We had one, two, three, four -- we had five offices, and I changed the locks on all five offices.
Q And why did you change those locks?
A Because I was worried that the -- that people who didn't have lawful authority to the assets of Harm Reduction Ohio were going to come and take them.
And specifically, Patrick Bourland had told me that they were planning to come take them this weekend, so I didn't want that to happen. So -- so I changed the locks to -- to protect the assets and operations.
Q Who did Patrick Bourland tell you was going to come and take the assets of HRO?
A I don't know if he told me in person, or -- or what people it was, but it would have been the people who were trying to get those assets and -- and move them.
Q Well, Mr. Cauchon, I think that's a little bit important here. Did Patrick Bourland tell you who was coming to get the property?
A I don't remember which specific names he would -- he would have said. I -- I don't remember the names.

Page 99

Q And so you changed the locks to prevent those unknown people from retrieving the property at HRO, correct?
A Yes. Although I wouldn't say they were unknown. I just can't cite, like, specifically who -- who he said, but -- but yes, that's correct.
Q So it could have been all of the board members. If all of the board members came to retrieve the property, you were changing the locks so that they did not have access, correct?
A Well, if it had been all of the board members, it would have included me, so then they would have had legitimate authority to move it. But it was not all of the board members.
In fact, I don't think it was any of the board members, or one at most. It was likely, like, staff who were instructed to do such. But -- but I can't remember specifically who he told me was going to come.
Q Okay. And did you then provide access -- or let me ask you this.
When you changed those locks, were they key locks?
A Yes.
Q Okay. Did you give any keys to anyone else

Page 100

for those new locks?
A The -- the landlord and -- and myself.
Q Okay. Anyone else?
A No.
Q Did you give anyone else a key before April 8, 2025?
A Of -- of the -- the --
Q Other than the landlord.
A Of the new -- of the new ones?
Q Yes.
A No.
Q Okay.
A I will add, though, that the doors were open 9:00 to 5:00 five days a week. So -- so there was no need for anyone to unlock an operation or to unlock something, but --
Q And when the doors were unlocked, were you there?
A Usually. Yep.
Q You didn't just leave the doors unlocked?
A Sometimes I did.
Q And then you would leave?
A Yeah.
Q With no one else there at the Granville office?

Page 101

A Well, if I'm going to the coffee shop or -- yeah.
Q But you were there every day --
A Correct.
Q -- that the office was unlocked, fair?
A Yep. Correct.
Q Okay. All right. I also had a follow-up question about -- you said something yesterday and --
MS. MOYO: I'm sorry. Can we go off for one second?
THE REPORTER: Yeah. Going off record.
(Off the record.)
THE REPORTER: We are back on record. Time is 6:10.
MS. MOYO: Back on the record.
BY MS. MOYO:
Q Mr. Cauchon, you said something yesterday about Ms. Nelson is having a conflict. I think you were saying she had a conflict of interest with respect to the investigation; is that correct?
A Yes, because she is a -- a friend of Dwayne.
Q Is there any reason, other than the fact that she was a friend of Dwayne, that you thought Ms. Nelson had a conflict of interest with respect to the investigation that she did?

Page 102

A No.

Q Okay. Did you at any time investigate Ms. Nelson's credentials or experience to conduct that investigation?

A No. I mean, I looked up and checked that she had a law license and she went to the University of Texas. But no, I -- I didn't do any investigation.

Q Okay. Do you believe that you had a conflict of interest when it came to the board considering whether or not you should still remain as president of HRO?

A Did I have a conflict? I think you could argue that, yes, I did have a conflict. It would be similar to Dwayne and Tasha, who were the subject of the investigation as well. They didn't recuse themselves.

So contextually, I would think I should -- the same standard should -- should apply to me. But I think there's an argument to be made that we all should have recused ourselves, all the subjects of the investigation, but it didn't happen.

Q What about with respect to your continued employment as the president of HRO? Is it fair to say that you had a conflict of interest in evaluating whether or not you should continue to be the president

Page 103

of HRO?

A No, I don't think so. Because it's very common among nonprofits for the chief executive to serve on the board. Eight out of the ten largest nonprofits in Ohio, their chief executives on the board, the American Red Cross, the second largest, Thrive Peer Support, which is the second largest harm reduction, is on the board. So I think in the thinking of that -- in, like -- in -- in private corporations --

Q Mr. Cauchon, I'm going to interrupt you.

MR. SHEARER: Let him finish his answer.

BY MS. MOYO:

Q Oh, I'm going to interrupt you because I don't think you're answering my question.

A Okay.

Q Let me ask it again.

MR. CHANG: I'm also going to object and move to strike.

MS. MOYO: Yeah.

BY MS. MOYO:

Q My question was: You started talking about you being a board member, right?

A Yes.

Page 104

Q Okay. My question was more specific.

A Okay.

Q My question was: Do you view it as a conflict of interest for you to be involved in evaluating whether you should have continued as president of HRO?

A I should have been involved, yes.

Q Okay. My question was not whether you thought you should have been involved. Is it fair to say then that you did not view your -- you as having a conflict of interest in evaluating whether you should continue to be the president of HRO?

A Ask me the question one more time, please.

Q Okay. Is it your position that if the board was going to vote on whether or not you should continue to be president of HRO, that you were entitled to vote?

A I believe I should have had a vote as one of eight board members.

Q And do you view that as presenting a conflict of interest?

A I think there would be a conflict, but it would be mitigated by the fact that there are eight board members. I'm only one of eight.

Q So you would agree that you had a conflict

Page 105

of interest with respect to voting on your termination, correct?

A No. I would agree that we all had, like, different perspectives. You know, like, Tasha was friends with AmandaLynn. So we all had various overlapping -- but I -- there was nothing disqualifying about me deciding who was president of Harm Reduction Ohio. It was just a factor.

Q So your position is that you were entitled to vote on whether you should continue to be the president of HRO?

A Not entitled in the sense of entitlement, but, like, under the law, under Ohio Revised Code 1702, you can disagree. There's nothing disqualifying me from -- from having a vote on who should be president of HRO.

Q Okay. Including a conflict of interest? There was no -- your view is a conflict of interest did not disqualify you from voting on whether you should continue to be the president of HRO, correct?

A Correct.

Q Okay. And your conflict of interest should not have prevented you from signing off on that November 4, 2024, termination letter. That's your position, correct?

Page 106

A Oh, and then it is -- well, I wasn't asked to sign off. But I -- I -- I would not have signed off if asked.
Q No. I -- no. My question is: Is it your position that no conflict of interest should have prevented you from signing that letter?
A Correct.
Q Well, actually, let's try it this way.
A Yeah.
Q Let me back up.
Is it your position that, in order for that letter to be effective, you had to sign it?
A I believe so. Yes.
Q Okay. And is it your position that a conflict of interest did not negate you from having to sign that letter?
A If something in the bylaws said, if X conflict exists, he could not sign, then there might be an argument. But I was a director and I had the -- the right to make the decision, as the other directors.
Q All right. I want to change gears a little bit to some of the post-termination statements that you've made to third parties, so post-November 4, 2024.

Page 107

A Yes.
Q Was it your contention that AmandaLynn was a lobbyist for Kloxxado?
A No.
Q Was it your contention that Velocity BioGroup was a lobbyist for Kloxxado?
A Yes.
Q Were they a registered lobbyist for Kloxxado?
A Yes.
Q Really? They were a registered lobbyist for Kloxxado?
A Yes. They registered for Hikma. Different states have different lobbyist reporting requirements. And in various states, it has to report what they're lobbying for, like -- I think in New York, et cetera. And they would specify that they were lobbying ex- officials on behalf of Kloxxado. Yes. So --
Q On behalf of Kloxxado, not on behalf of Hikma. That's your testimony here today is that Velocity BioGroup was --
A They were lobbying for Hikma on behalf of Kloxxado.
Q I'm asking you what they were registered to lobby for. Was -- Velocity BioGroup, was it

Page 108

registered to lobby for Hikma, or was it registered to lobby for Kloxxado?
A For Hikma. And then in various states, they specified what the Hikma lobbyist was doing, and it was lobbying for their product, Kloxxado. Ohio does not have that specific reporting requirement, but other states do.
Q So in Ohio, was Velocity BioGroup registered as a lobbyist for Hikma or Kloxxado?
A For Hikma.
Q Okay. And when did you make the determination that Velocity BioGroup was a registered lobbyist for Hikma?
A When I discovered the -- the conflict on July 15th. I had never heard of Velocity BioGroup, so I quickly Googled them. And with my reporting experience, I could see that they were representing them.
Within the next ten days, I searched various lobbyist records in Ohio and a few other states and saw that they were in West Virginia -- in -- in all of Ohio and all the bordering states, they are -- they're registered lobbyists for Hikma.
Q And you -- which states were they registered to lobbyists -- to -- as a lobbyist? In which states

Page 109

was Velocity BioGroup registered, not just as a lobbyist for Hikma, but specifically for Kloxxado?
A I would have to go and -- and check my records. I -- I stopped at 20-plus states where they were registered for -- as lobbyists for Hikma. And then there's various states that have different reporting requirements that specify Kloxxado.
But we know from the -- the contract that -- that it was -- yeah. So -- so I -- I can't remember off the top of my head which -- which states require you to specify what product you're -- what you're doing for that company.
Q Do you have any evidence that AmandaLynn was lobbying for Kloxxado?
A The Nelson report seems to indicate that's - - I haven't found that AmandaLynn was a lobbyist in any state. However, the Nelson report indicates that she was a registered lobbyist. It doesn't specify which states it was for, and it doesn't give the details on it. So no, I -- I haven't found -- I personally have not found evidence that she was registered as a lobbyist.
Q No. My question is --
MR. CHANG: Objection. Move to strike his characterization of Ms. Nelson's report.

You can continue.
MS. MOYO: Okay.
BY MS. MOYO:
Q My question was: What evidence do you have, if any, that Ms. Reese lobbied for Kloxxado?
A I don't assert she lobbied for Kloxxado.
Q You do --
MS. MOYO: I'm sorry. Can you read back my question and his answer?
THE REPORTER: Absolutely.
(The reporter repeated the record as requested.)
BY MS. MOYO:
Q We marked an exhibit earlier during HRO's deposition. It was HRO Exhibit 6. Do you still have that? Only because --
A I -- I think it's here in the stack.
MS. MOYO: Actually, I can mark a new one.
MR. SHEARER: They're all there. He can just --
MS. MOYO: Okay. I was going to say because I gave away my copy.
MR. SHEARER: No, that's not 6.
THE WITNESS: Oh, different. Okay.



Got it.
MR. SHEARER: The other 6.
THE WITNESS: Okay.
BY MS. MOYO:
Q And actually, before we get to that, this is Exhibit 41. I can give you that one.
(Exhibit 41 was marked for identification.)
Mr. Cauchon, I've handed you what's been marked as Exhibit 41. Mr. Cauchon, Exhibit 41 is an e-mail that you produced with an attachment that is an April 2, 2025, letter from you to Jennifer Voit, the bureau chief, Health Improvement and Wellness of the Ohio Department of Health, correct?
A Correct.
Q Okay. And you sent this e-mail and this attachment, correct?
A Yes. Is the attachment with it? Yes.
Q Okay. And in this e-mail, you asked the Ohio Department of Health to make a determination on whether a disclosable conflict existed. To your knowledge, has a -- has the Ohio Department of Health done that?
A No, not to my knowledge.
Q And you asked for this over a year ago,



correct?
A April 2025. Yes.
Q And in the attachment on the first page of the letter, that third bullet. It said, "Details of Kloxxado orders that Ms. Reese placed with the State pharmacy while she was simultaneously employed by Kloxxado's lobbyist."
This is what -- you're complaining to the ODH about the information that Mr. Steward provided on October 23, 2024, in the board letter to ODH, correct?
A This is a response to that October 23 letter. Yes.
Q Okay. And you're pointing out that the letter does not contain details of Kloxxado orders that Ms. Reese placed to the State pharmacy while she was simultaneously employed by Kloxxado's lobbyists, correct?
A Correct.
Q And what did you mean by that?
A Is that -- the letter didn't refer to the orders that AmandaLynn had placed for Kloxxado.
Q Okay. And why did you think that that needed to be included?
A When you do an investigation on whether a person's outside employment with Hikma, Kloxxado's



lobbyist, affected their role as procuring that product, you would want to look at the factual basis of the orders that occurred during the period of the overlapping employment. That seems like basic investigative work to me.
Q Did ODH ask you for this information?
A No.
Q Did ODH ask HRO for this information?
A I don't know.
Q And the -- at this point, April 2, 2025, are you trying to persuade the Ohio Department of Health that Ms. Reese has a conflict of interest?
A I'm trying to persuade them to make the determination, which they are supposed to do.
Q And it's your position that they needed to make that determination, correct?
A Yes.
Q And they needed to make that determination and act accordingly to implement repercussions to HRO, correct?
A No.
Q No?
A It -- it's a direct reference to the conflict language that says the Government shall determine and then they shall -- there's specific

legal language on it -- is -- whether it's in the public interest, if a conflict exists, whether -- what action should be taken. So that's what the reference is to.

Q Well, what was your expectation? One, you expected ODH to determine that there was a conflict of interest, correct?

A Whether or not there was a conflict of interest, yes. I -- I think that they -- I would argue that they had that responsibility.

Q Well, your purpose in sending this letter was to point out why you believed there was a conflict of interest, correct?

A Yes. I believed there was a conflict of interest.

Q And you were trying to persuade the Ohio Department of Health that there was a conflict of interest, correct?

A I was trying to persuade them to make a determination.

Q You believe there was a conflict of interest, but you were not trying to persuade them by sending this information that there was a conflict of interest?

A Well, I would want them to review additional



facts that I didn't have. So their responsibility isn't to agree or disagree with me. I think they have an obligation to make a determination, and I would've respected that.

My opinion doesn't matter. Tasha's opinion doesn't matter. Ultimately, it's the -- it's the Government's responsibility to make a determination, and -- and -- and they did not do so. So I was encouraging them to adhere to the "shall" language.

Q But were you trying to persuade ODH that there was a conflict of interest?

A If they had asked me for my opinion, I would've said, yes, I believe there's a conflict of interest for these reasons. But -- but the purpose of this letter is to show them, like, why there's good reason to consider it.

The purpose of this letter is to get them to make a determination. The purpose of all the letters -- because, like I say, it's not -- it's not -- I have my opinion that she had a conflict. Tasha thinks she didn't have a conflict. The opinion that matters is the funder.

Q And you wanted the Ohio Department of Health to investigate the conflict of interest, correct?

A Correct.



Q Okay. And you knew that the Ohio Department of Health investigating the conflict of interest would require HRO to respond, correct?

A Yes. HRO, including the people that I claim are not HRO, would require them to respond. The Ohio Department of Health would get to -- yeah. They would get to solicit the information they thought was needed.

Q And what was your expectation if you persuaded the Ohio Department of Health that HRO had a conflict of interest?

A It's a good question, but I don't know what they would have done, because all of these situations are different. In fact, intensive. In my original letter, I promised to be forthright -- HRO would be forthright and forthcoming. And I thought that that would result -- even if there was a conflict, that things would go on because we mitigated it as we were supposed to.

So you're moving into a different place where the -- the conflict, if it existed, was not mitigated. And they were -- so -- so I think -- I would hope that they would be reluctant to terminate the contract. It's within their rights, but there's a lot of different options within that.



Q So that was one expectation that you had was that they could terminate the contract, correct?

A No. I was trying to prevent it from being terminated.

Q But you knew that that was a possibility, correct?

A It says so in -- in the contract.

Q And was it your -- was it also a possibility that the Ohio Department of Health could require HRO to return funds?

A I -- I don't know all the options, but I would think that could be an option. It's really a -- a very fact-specific case and -- and I don't really know what the --

Q Okay. And you knew at the time that you sent that April 2nd letter to the Ohio Department of Health that HRO had the Nelson investigation complete, correct?

A I believe so. Yes.

Q Okay.

A I believe it said so in the November 4th letter.

Q Okay.

A But -- but I could be wrong. I -- I -- I hadn't received the Nelson report, so I'm just -- I

think you and your defendants may have asserted it was complete, but I didn't have firsthand knowledge.

Q Are you claiming that November -- or April 2, 2025, after you filed your complaint, are you claiming that you did not know that Ms. Nelson had completed her investigation of the conflict of interest?

A I think I -- I would have known it was complete. I hadn't seen it. So I'm trying to think, like, when I would've learned that it was complete. Somewhere between November and the filing and -- and us -- filing of the counterclaims.

Q I think it's fair to say that you knew by April 2, 2025, that Ms. Nelson had completed her investigation and determined that --

A Oh, it --

Q -- there was no conflict of interest, correct?

A Oh, I knew that she had completed her investigation. I would have to look at the documents to see when it was told to me that -- that she determined there was no conflict. It might be --

Q Well, you --

A -- in the termination letter.

Q You were responding to Mr. Steward's letter



to ODH, right?

A Correct.

Q And it said that in his letter, correct?

A Correct. So -- so the -- so that October 23 letter, when I got that letter, that might have been. But it's -- I think it may be in the termination letter. You're asking me for a date on when I learned something, and it would -- it's easily identifiable in the documents.

MS. MOYO: This is Exhibit 42; is that right?

THE REPORTER: Uh-huh.

BY MS. MOYO:

Q Actually, I'm going to -- sorry. Let me use an extra second. Mr. Cauchon, I've handed you what's been marked as Exhibit 42.

(Exhibit 42 was marked for identification.)

A Yes.

Q Can you tell me what this document is?

A I believe that this is the -- the attachment to the April 2nd e-mail. Am I correct on that?

Q Actually, there's an April 7th e-mail. If you want it, I can get that to you.

A Okay. So -- so it would be an attachment to



the April 7th e-mail.

Q Okay. Here, if this refreshes your recollection. Did you send this Exhibit 42 to the Ohio Department of Health on April 7, 2025?

A I did.

Q Okay. And you sent it to Jennifer Voit, Sierra Dantzler, Brittany Burns, Socrates Tuch, Richard Massatti, and Tia Marcel, correct?

A Massatti. Yes.

Q Oh, Massatti. Okay. It looks like there's some people in addition to ODH on this e-mail. Can you tell me who those other people are? Like, Richard Massatti, is that someone at the Ohio Department of Health, or who's that?

A He's at the Ohio Department of Mental Health and Addiction Services, now the Ohio Department of Behavioral Health. And he's the one who the state opioid response money flowed to, and so he would've been in charge of, like, moving it -- moving the money. There's a $100 million opioid grant, and, like, 10 million of it went --

Q Okay.

A -- to naloxone.

Q I'm sorry to cut you off.

A I'm sorry.



Q But just to be efficient, I'm just trying to --

A Yeah.

Q -- understand where he was. So the mha.ohio.gov, those folks are at the Mental Health Association of Ohio?

A Correct. Or no, the -- the government. Yeah.

Q Okay. And aimeeshadwick@governor.ohio.gov. Who's Aimee Shadwick?

A She was head of his -- of the governor's drug policy or, like, the little task force that he -- or the task force that he had formed.

Q Okay. And you sent this Supplemental Conflict of Interest Disclosure Notice that we've marked as Exhibit 42 to all of those folks, correct?

A Correct.

Q Okay. And what was the purpose of sending this to all of those folks?

A To let the people responsible for opioid drug policy in Ohio know about the -- the -- the issue related to the Kloxxado ordering in -- in HRO.

Q Did -- was one of the reasons for sending this to these folks was to persuade them that HRO had a conflict of interest?

Page 122

A Let's see. What I wanted was a determination, but -- but I do think -- let's see if I -- let's see what I -- I said was my purpose. Yeah, I -- I asked the department to make a conflict of interest determination.
Q Okay. And it was your position that there was a conflict of interest?
A Yes.
Q And you sent them all of this information that supported your position that there was a conflict of interest in your mind, correct?
A Correct.
Q Okay. And did any of these folks on this e-mail -- did they respond letting you know that they agreed with you that there was a conflict of interest?
A They did not respond letting know -- they responded letting me know they had referred it to the Office of the Inspector General.
Q Was that in response to this April 7th e-mail or was that in response to your August 12th e-mail?
A Oh, it would've been in response to August -- August 12th. Yeah, you're correct.
Q Okay. So in response to this April 7th supplemental disclosure that you sent, did any of the

Page 123

folks who you sent this to respond letting you know that they agreed that there was a conflict of interest?
A I didn't get any response that I recall.
Q Okay. And then now let's look at that August 12, 2025, communication that you had with the Ohio Department of Health that's previously been marked as HRO Exhibit 6.
Okay. All right. And you -- I'm going to draw your attention to the paragraph that's halfway -- that starts, "Documents recently obtained in discovery in a False Claims Act case." Do you see that paragraph?
A Yes.
Q Okay. You were talking about this case, right?
A Yes.
Q So you collected documents in this case in discovery to provide to the Ohio Department of Health, correct?
A Correct.
Q Okay.
A No. No. We got them in discovery for the case, and then I thought they would be relevant, and then I -- I sent them to the Ohio Department -- but it

Page 124

-- it -- we didn't get it for them.
Q Okay. But you used documents obtained through discovery in this case to report to ODH; is that fair?
A Correct.
Q You used documents from this case to try to persuade the Ohio Department of Health that Ms. Reese and HRO had a conflict of interest, correct?
A I think I'm still trying to get a determination, but I thought this was important further evidence that expanded on the April letter. We didn't have the information in April that we had in -- in August.
Q So you thought these newly obtained records, including Ms. Reese's Velocity Employment Agreement, W-2 tax statements, travel records, and reimbursed business expenses supported your position that Ms. Reese had a conflict of interest; is that your --
A Yes, or at least a possible conflict of interest. Yes.
Q Okay. What -- in this letter, sorry, I'm trying to find where it is, you describe that Ms. Reese's employment as Director of Government Advocacy for Velocity BioGroup was undisclosed. Was that your position at the time? Is that what you communicated

Page 125

to ODH?
A It still is my position that it had not been disclosed to me or ODH.
Q But why in August 12th of 2025 were you still claiming that it was undisclosed after you disclosed it?
A Well, you -- you make a good point about timing, but it wasn't disclosed at the time that we received the contract. We were supposed to disclose it in the contract application, and it was not disclosed. If you point me to the language, I'll see if I -- if I got my tenses wrong, but -- but that's -- that's the key time period.
Q Well, that's the -- no. I mean, my question was, why did you claim in this letter that her employment was undisclosed?
A Because it -- we didn't disclose it to the Ohio Department of Health in the contract.
Q With the original application?
A Correct.
Q But by August 12, 2025, you had disclosed her employment as the director of government advocacy?
A Correct. There was other new information that came from the documents, but yeah, the disclosure came September 3, 2024.

Q Okay. And before -- and at that time, in 2023, HRO did not have a form for employees to complete related to their outside employment, correct?
A Correct.
Q Okay. And in August of 2024, HRO still did not have a form for employees to complete regarding their outside employment, correct?
A Correct. Well, we developed one, but we didn't need a form. There was an obligation, but it could have just been done in an e-mail. We created a form, and then we said we were going to revise it more.
Q Did you call and -- did you consult with anyone in August 2024 about what you could or could not ask employees to disclose about their outside employment?
A Yes. I mean, I talked with Dave Ball about it, but mostly I just did my own research and looked at -- like, we had to -- in my previous employment at USA Today, we had to sign a conflict of interest application and -- or conflict of interest form. So I just did, like, general knowledge, talked to Dave Ball a little bit, and --
Q Did Mr. Ball advise you that you were entitled to a copy of Ms. Reese's employment agreement



in 2024?
A I didn't ask him that specific question, but I gave the list of things I wanted to ask for, and he green -- that was on the list, and I don't know if I asked for the contract with the invoices, and he green-lighted it. It was his word, "green light."
Q Okay.
A And if you want others, like, I talked to Molly True, the board member, and she said it was proper. Her husband worked for Coca-Cola, and they had all of these requirements, et cetera. So that is another person I talked with about, but --
Q Did -- still on this first page of HRO Exhibit 6, Ms. Reese's W-2 tax statements, they confirmed that she was paid by Velocity, correct?
A Correct.
Q She was not paid by Hikma, correct?
A Correct.
Q And her W-2s confirmed that?
A Correct.
Q Do you agree that there is nothing in Ms. Reese's employment agreement that ties her salary to sales of Kloxxado?
A You mean, like, on a commission basis?
Q On any --



A On a commission basis, there's nothing. But her job was to work with government purchasers to increase purchases of 8 milligram, which is Kloxxado.
Q I'm not -- no. I want to know, do you agree that there is nothing in her employment agreement that ties her salary to sales of Kloxxado?
A Directly or indirectly?
Q Directly.
A Nothing directly.
Q Okay. And do you agree that she does not get paid more money for more sales of Kloxxado in Ohio?
A I don't know.
Q Do you agree that Ms. Reese did not get to choose which form of naloxone to order on behalf of HRO?
A I disagree.
Q And why is that?
A Because she had ordering authority from July 23 through September. She had total authority in the way it was done. It was at the discretion. For the first four years, it was me, for a year and a half, it was Mallory, and then it was AmandaLynn. And we just exercised our good judgment on what we ordered.
Q Okay. And you heard Ms. Turner-Bicknell



explain earlier about how orders were made based on the previous quarter -- previous year's quarter and based on current demand. Do you agree that's how the orders were placed?
A No. And certainly not up until September 24, orders were not made that way.
Q And how do you believe that the orders were made?
A They were made on our good judgment based on all of the -- the factors, our inventory, what people are asking for. It was one person's good judgment, originally me, then Mallory, then AmandaLynn.
Q And so your position is that AmandaLynn was using her good judgment to make orders of Kloxxado, Narcan, and anything else? Any other forms of naloxone?
A We did three Narcan, generic Narcan, and -- and four intramuscular and Kloxxado.
Q And is it your position that while you were at HRO, AmandaLynn was using her good judgment to place those orders?
A Yes. Whether the high volume of Kloxxado that she placed, I cannot prove the connection, but I can prove that during this period, there was a sixfold increase in Kloxxado orders, and there was no obvious

Page 130

reason. But -- but I would want to do further research before I made the claim that she actually -- so that's why I put in this letter it was anomalous, if that's the right word.
Q So let's take a look at, in that letter, Page 9, Harm Reduction Ohio, Kloxxado shipments from state pharmacy. Do you see --
A Yes.
Q -- do you see that table?
A On Page 9? Yes. This is -- table is actually from the second amended complaint.
Q And you created this table, correct?
A I did.
Q Okay. And underneath this table, it says, "Source: Ohio Department of Mental Health and Addiction Services Pharmacy." What information did you obtain from the Ohio Department of Mental Health and Addiction Services Pharmacy?
A I obtained all of their naloxone shipments statewide to all providers over -- over an eight-year period.
Q So this number of kits, does it reflect all the naloxone or just Kloxxado?
A Just Kloxxado.
Q Okay. So you did not include the amount of

Page 131

Narcan that was ordered during this time period?
A In this chart, no.
Q And you did not include the amount of IM -- or I'm sorry, IM naloxone that was purchased during this time period?
A From the pharmacy, it would've been generic. We didn't get IM from them. So generic and Narcan is not included in here.
Q Okay. Did you compare those numbers to see if they increased similarly to the Kloxxado orders here?
A I did.
Q And what did you find?
A They did not.
Q Okay. And what -- did you consider other reasons why these numbers increased?
A I did, and I could not think of any reason why this increase existed.
Q What other reasons did you consider?
A Any request. I saw if Kloxxado orders were going up statewide. And in fact, what it showed is Kloxxado orders were falling statewide, except for two requesters. HRO was accounting for 25 percent of orders.
Q Okay. I'm -- I'm sorry to interrupt you

Page 132

again, but I do think that we're talking past each other, that maybe you misunderstood my question. My question --
MR. CHANG: I'm so sorry. I move to strike his characterization of evidence on the record.
Go ahead. Go.
MS. MOYO: Yeah.
BY MS. MOYO:
Q My question was not about statewide orders. My question was about HRO's orders, okay? So why didn't you include -- in this chart, why didn't you include HRO's orders of Narcan?
A Just for simplicity reasons.
Q Okay.
A But to get back to your question, if HRO orders had gone up for Kloxxado 50 percent, and statewide they went up 50 percent, that would explain why HRO orders were going up. And you asked me, did I search for other explanations?
Q No. And that's why I think -- that's why I thought you misunderstood my question.
A Okay.
Q And you did. My question was not with respect to whether it -- whether the Kloxxado went up by the same percentage as the state Kloxxado. My

Page 133

question was, did you consider how much Narcan had -- orders by HRO had gone up during this same time frame?
A Yes.
Q Okay. And why didn't you include those numbers in this chart?
A They were far lower, and it was just for simplicity reasons. If -- if I'd had, like, another 40-page report, I would've been happy to do five charts. But it just -- just for -- you know, I just didn't want to throw too much weeds at people.
Q Have you provided that information to us in discovery?
A I can send you the -- the -- the pharmacy spreadsheet. I don't --
Q Yes. I would like that information --
A You got it. So --
Q That you relied on in preparing this chart.
A Yeah. So I'd have to send it in an Excel file because printing it out makes it useless. So can I just send it in Excel?
Q That's fine.
A And should I just send you the raw stuff? What -- what they --
Q I -- yeah. You coordinate with your Counsel.

Page 134

A All righty. Okay. All right.
Q Yes. Okay. Is it fair -- when in 2023 was ODH -- or when did ODH in 2023 award the contract to HRO?
A We officially got the award November 15, 2023.
Q Is that one reason why the orders of Kloxxado increased between -- during this time period?
A No.
Q Okay. So it's your position that between August 17, 2023, and February 2, 2024, and ODH awarding that contract in between that time, that that's not a reason why the orders of Kloxxado would've increased?
A No, it's not a reason.
Q Why not?
A There's -- we're giving out the -- roughly the same amount of Kloxxado. NEXT Distro, our online provider, refused to put it on the website. There's just no reason that the contract would've affected that.
Q But wasn't one of the purposes of that ODH contract to distribute more naloxone in Ohio?
A Yes, but we were already distributing it. We just weren't being paid for it. So this contract,

Page 135

it's possible in the last year, but in those -- but in the first year, the volume remained the same. We just weren't losing hundreds of thousand of dollars a year distributing it.
Q Okay. What do you mean you weren't losing hundreds of thousands of dollars distributing it?
A We were distributing 40,000 kits a year, and we were hemorrhaging money because we didn't have -- so that's what this contract -- that's what -- I worked on the contract for two years. So -- so this contract allowed us to have funding to distribute naloxone.
Before, we were -- I was paying out of my salary -- or not out of my salary, out of my savings, and other funders were subsidizing the program. We also had to -- like, before we got the contract, we had to put people on furlough. We had to, like, restrict how much we were giving out because we just had -- we had no money.
Q What other reasons besides AmandaLynn Reese did you consider about why the Kloxxado orders increased during this time frame?
A I stretched my mind to think of any reason that this increase would exist, and I have come up with none to this day.

Page 136

Q You came up with no other reasons?
A I can't think of any reason. Do you -- if you suggest one, I'm happy to hear it.
Q You could not come up with one other reason?
A No.
Q Okay. Not a single one?
A No.
Q Okay.
A I thought about them. I -- I -- I went down the list.
Q Well, that's what I'm asking. Like, what other reasons did you consider?
A Well, the ones I told you, Kloxxado's popularity had gone up statewide or this and that, but -- and I checked them out, and there was -- there's no reason to this day that -- that -- that I have found that explains this increase.
Q So it's your position that during this time period from August 2023 to June 2024, Kloxxado's popularity had not gone up statewide?
A Correct.
Q And I believe you testified yesterday that you had no way of verifying what your distributors were ordering during this time frame to verify whether or not they wanted Kloxxado or not; is that right?

Page 137

A No. Our data wasn't organized in a way that easily let us determine that. If we had dedicated ourselves to it, like paper forms, we could have, but our data was not organized in a way that easily answered that question.
Q Did the public -- did the people who were ordering naloxone through HRO, did they indicate whether they wanted Kloxxado or Narcan or IM naloxone?
A Sometimes yes, sometimes no.
Q Okay. More often than not, did they indicate which of those they wanted?
A I don't know.
Q Okay.
MR. SHEARER: Hey, Liz?
MS. MOYO: Yeah?
MR. SHEARER: We are now about 30 minutes over the two hours.
MS. MOYO: Okay. I apologize. Can I ask about one more document and then we can be done?
MR. SHEARER: Sure.
MS. MOYO: Okay. It's just the one that we --
Sorry. Off the record for a second.
THE REPORTER: Going off. Time is --
(Off the record.)

THE REPORTER: Back on. 7:06.
BY MS. MOYO:
Q Mr. Cauchon, the court reporter has handed you what's been -- what was marked as HRO Exhibit 5. It's a February 11, 2025, e-mail from you to some folks at NEXT Distro, correct?
A Yes.
Q Okay. What did you mean by, I've -- "I apologize for the stress we've caused by pushing Kloxxado?"
A NEXT Distro is very opposed to Kloxxado, and we thought or we -- that the -- that the ODH contract might require us to put Kloxxado on our online offering sheet. And NEXT Distro ran that operation. They'd been with us since the beginning. And -- and we had numerous, very tense conversations about it.
And then ultimately, I think in November, they sent us a letter and said, for moral reasons, they cannot put Kloxxado on there. And AmandaLynn had participated in those conversations along with me. And this was me apologizing for -- for us pushing these wonderful people at NEXT Distro to -- to list Kloxxado.
Q And you're saying that this was in November of 2024 that NEXT Distro said that they were no longer



going to put --
A I think it would've been November 2020 -- or it's -- no, it would've been earlier. It was around the time of the -- the -- the contract award, I believe, in probably November 2023.
Q Oh, okay. In November 2023, NEXT Distro no longer wanted to --
A They -- they never did. They refused. We were asking them to put Kloxxado on the online options of naloxone you could order. And they had -- and they refused for moral reasons from their perspective.
Q And what about our folks? Did they -- could you indicate you wanted Kloxxado from HRO if you were seeking?
A Online? No.
Q No. Not in November of --
A Never.
Q -- 2023? Never?
A Never. They -- they will refuse to put Kloxxado as an online option.
Q I'm -- I --
A I'm sorry for talking over.
Q Sorry. I -- again, I just -- I -- did HRO have an online form where people could order Kloxxado, Narcan, or IM naloxone?



A We had lay distributors. So we had two services, lay distributors, who would be, like, a community person who would hand it out in their community. If they were specially trained for Kloxxado, they could order it.
The online orders could not -- individuals could not order it. And originally, it was, like, a paper form. I'm sure it moved online at some point. I don't know -- know when, but it's different than the -- so those are the -- the two flows of naloxone.
Q Okay. And then you also say, "I had no idea at the time that we had an employee being paid by Kloxxado's lobbyist." And in this statement, Kloxxado's lobbyist, you're referring to Velocity BioGroup; is that correct?
A Correct.
MS. MOYO: Okay.
EXAMINATION
BY MR. CHANG:
Q MR. CHANG: All right. Mr. Cauchon, we're almost wrapping up here -- or we are wrapping up here. I'm just handing you what's being marked as Cauchon Exhibit 43.
(Exhibit 43 was marked for identification.)



And my question is just: We've been talking about the application HRO submitted to the ODH. I just wanted you to authenticate for the record that this is the application the HRO submitted to the ODH.
A Correct. This is the application. There was an additional, like, five-page addendum with the budget that we proposed that -- that's not in this. It was a separate document.
Q Okay. So after Page 128, which is the end, there's a five-page addendum, you're saying?
A It would've been a separate document.
Q Understood. And did you review this application before it was submitted to the ODH?
A I did.
MR. CHANG: Okay. That's all.
THE REPORTER: Did we want to -- do we have anything else?
MS. MOYO: That's it for today.
THE REPORTER: Okay. Did we want to advise on signature?
MR. SHEARER: We did yesterday. We waived, so.
THE REPORTER: Waived?
MR. SHEARER: Yeah.
THE REPORTER: Perfect. Did we want to

order?

MS. MOYO: You ordered yesterday?

MR. SHEARER: I think you ordered yesterday. So I --

MS. MOYO: Does that include the whole thing?

MR. CHANG: That will include -- yeah.

MR. SHEARER: And then I'll have a copy.

THE REPORTER: Okay.

MR. CHANG: Did --

THE REPORTER: Going off record.

(Signature waived.)

(Whereupon, at 7:11 p.m., the proceeding was concluded.)



CERTIFICATE OF DEPOSITION OFFICER

I, KAYLEIGH KINNAMON, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of t

KAYLEIGH KINNAMON
Notary Public in and for the
State of Ohio

**&**

**&** 2:11 3:5

**0**

**000191** 46:11
**000489** 64:18
**0075** 1:8
**01/08** 91:16

**1**

**1** 4:10 9:8,20 10:3 26:16 28:20 29:1 86:23 87:4 93:3
**10** 86:15 120:21
**100** 38:9 120:20
**11** 11:24 138:5
**111** 5:3
**119** 5:6
**12** 88:2 89:8,10 90:9 123:6 125:21
**128** 141:9
**12th** 122:20,23 125:4
**14** 17:13 23:25 24:8,17 25:13 45:5
**140** 4:5 5:7
**15** 77:19 134:5
**1531** 91:1
**1532** 91:13
**1534** 91:1
**15th** 108:15
**17** 134:11
**1702** 105:14
**1750** 91:17 94:3,7,11
**19th** 40:10 97:11
**1:43** 84:9
**1st** 9:11,12,18 10:1

**2**

**2** 5:5 6:18 46:10 72:9 91:12 97:6 111:12 113:10 118:4,14 124:16 127:14 134:11
**2,647.36** 65:18 65:20
**20** 78:19 109:4
**2020** 29:21 92:8 93:13 139:2
**2021** 93:13
**2023** 55:20 126:2 134:2,3 134:6,11 136:19 139:5,6 139:18
**2024** 4:10,13,21 8:7 9:2 10:3,7 10:7,24,24 11:14,14 12:5 13:3,10,23,25 13:25 14:4,5 15:1,1,6,6 19:9 19:9 21:1,5,7 21:10,13,16 26:17 28:20 29:1,16,17,22 29:22 31:22 32:8 38:17 44:9,23,25 47:15,16,18 48:23 49:2 50:10,18,22,24 51:4,7,16 52:25 53:7 54:1 55:5,20 55:24 56:3 58:3,7,13,22 59:23 60:10 61:5,9,19 62:4 62:7,25 66:1 66:10,21 67:18 70:7,21 72:13 73:25 74:22 75:11 76:7 77:17,19 78:9 79:16 80:7 81:18 82:6,19 84:9 86:4,9,19 89:7 92:2,20 93:9 96:20 97:20 105:24 106:25 112:10 125:25 126:5 126:14 127:1 134:11 136:19 138:25
**2025** 4:17,22,23 4:24 5:5,6 49:2 49:12,16 51:7 51:17,19 52:1 52:19 53:7,16 54:2,7 56:14 62:16 67:12,18 69:1,17,25 70:7,9 72:22 74:5 76:11 87:4,4 88:6 89:23 90:3,7 91:2,9,12,24 92:1,2,9,10,19 92:24 93:3,8,8 93:17,20,24 94:1,11,19 95:1,1,25 96:14,19,22,24 97:6 100:6 111:12 112:2 113:10 118:4 118:14 120:4 123:6 125:4,21 138:5
**2026** 1:17 6:19

**227-2106** 3:9
**23** 8:3 112:10 112:11 119:4 128:20
**232-2446** 2:24
**2388** 2:12
**24** 8:4 129:6
**25** 131:23
**26** 84:9
**26th** 97:12
**27** 4:21 20:25 21:5,6,9,13,16 27:25 44:8,23 86:4,8,19 89:7 93:20
**274** 77:8
**275** 77:8
**28** 4:9,17 27:25 28:2,5,10,11 67:12,18 69:1 69:17,24 70:7 70:9 72:22 76:11
**29** 4:9 28:12,14 28:15,16
**2:24** 8:9,10
**2:25** 1:8
**2:42** 8:7
**2nd** 117:16 119:22
**2s** 127:19

**3**

**3** 38:16 40:14 86:24 125:25
**30** 1:17 4:11,11 6:19 29:25 30:3 137:16
**308-1490** 2:15
**31** 4:12,12 31:15,18 46:8 87:4
**32** 4:14 64:1,2 64:3,6,7,17
**327** 2:4
**33** 4:16 67:1,2 67:5,7 70:21 76:12
**330** 1:20 2:21
**34** 4:18 73:17 73:20,21 76:14
**35** 4:19 77:4,5 77:7 83:21
**3581** 65:16
**36** 4:20 83:24 84:1
**36234** 143:18
**37** 4:21 85:23 85:24
**38** 4:22 90:22 91:1,4
**39** 4:23 94:15 94:16
**3:26** 1:18 6:3

**4**

**4** 4:13 10:7 11:14 14:4 15:1 19:9,9 29:16 31:22 47:14,16,18 48:23 49:1 50:10,18,22 51:4,7,16 52:25 53:7 54:1 55:5,24 56:3 58:3,7,12 59:23 60:9 61:5,8,19 62:4 62:7,25 66:1 66:10,21 67:18 70:6,21 72:13 73:12,25 74:21 75:11 76:7 79:16 97:20 105:24 106:24
**40** 4:24 97:2,3 133:8
**40,000** 135:7
**41** 3:6 5:3 111:6,7,10,10
**41017** 2:13
**42** 5:6 119:10 119:16,17 120:3 121:16
**43** 5:7 140:23 140:24
**43023** 2:5
**43212** 1:21 2:22
**43215** 3:7
**46** 4:4
**4:20** 45:22
**4th** 9:10 10:8 10:24 12:5 13:10,25 15:2 15:3,6 18:24 19:1,14 29:22 72:15 97:11 117:21

**5**

**5** 8:6 10:7 13:22 14:4,25 29:16,21 77:17 78:9 82:19 138:4
**50** 132:16,17
**53** 74:14
**5:00** 100:14
**5:14** 76:23
**5:21** 77:1
**5:47** 88:14
**5:49** 88:24
**5th** 8:13 9:2,6 10:9,10,12 12:1,3 13:10 13:18,24 15:5 19:1 49:25 50:24,25

**6**

**6** 10:24 11:14 29:22 80:7 81:18 82:6 110:15,24 111:2 123:8 127:14
**614** 2:24 3:9
**64** 4:14
**67** 4:16
**6:10** 101:14
**6th** 9:7 10:11 10:14 12:5 18:21 31:10 49:24

**7**

**7** 4:3 5:6 120:4
**73** 4:18
**740** 2:7
**77** 4:19
**7:06** 138:1
**7:11** 142:14
**7th** 119:23 120:1 122:19 122:24

**8**

**8** 49:2,12,16 51:7,16,19 52:1,19 53:7 53:16 54:2,7 93:8 94:1,10 100:6 128:3
**84** 4:20
**85** 4:21
**859** 2:15
**8th** 49:5,17 93:2,2

**9**

**9** 32:8 44:25 130:6,10
**90** 68:15
**91** 4:22
**94** 4:23
**955** 1:20 2:21
**97** 4:24
**973-3814** 2:7
**9:00** 100:14

**a**

**ability** 143:10
**able** 66:6 76:2
**absent** 6:6
**absolutely** 69:10 110:10
**abstaining** 23:13
**accept** 8:17
**accepting** 13:15
**access** 11:2 15:22 16:8,20 16:23 18:15,17 19:4,10,21 20:4,9 25:5,9 25:19 29:17 31:3,4 34:17 41:12 47:21,23 48:1,10 49:13 49:20 51:8,15 51:20 53:6,18 53:22 55:4,6 57:20,21,24 58:6,12 59:23 59:25 60:25 63:6,15 67:24 69:25 70:3,22 71:20 72:13,23 75:14,17,19 76:7 99:10,20
**accessed** 60:10 72:10
**accessing** 53:11 53:15 75:22,23 82:10
**account** 4:15 11:1,3,6,8 16:24 20:4 29:19 52:5 55:2 56:8 57:2 57:3,20 58:3,6 58:12,16 59:2 59:4,5,7,8,9,10 59:12,16,19,24 61:4,5,8,15 62:3,7 63:6,13 63:20 64:11,22 65:1,2,2,22 66:3,12,22 69:14 71:4,23 72:1,6,11,14,16 72:23 74:9,24 76:13 91:6,8 91:12,19,25 92:19 93:7,25 95:11 96:23 97:11,13
**accounting** 131:23
**accounts** 15:12 18:9,14,15,17 19:4,10 20:9 29:18 30:18 31:4 48:1 52:9 55:8,13,14 56:21 60:10,13 60:13,25 61:10 61:13,21 71:21 74:12,13,14,17 74:21 75:5,17 75:24
**accurate** 26:11 51:18 81:17 96:12 143:9
**acknowledge...** 6:4
**acrobat** 55:2 56:8
**act** 113:19 123:12
**action** 16:11,15 33:2,5,19,20 34:9,10 80:20 80:22 81:19 84:23 114:3

143:12,16
**actions** 41:9,14 41:20 44:7
**activity** 91:8
**actually** 8:4 11:21 16:15 22:13 33:8 52:9 58:10 63:22 75:11 86:24 93:12 106:8 110:18 111:5 119:14 119:23 130:2 130:11
**add** 54:25 57:16 78:24 100:13
**addendum** 141:6,10
**addiction** 120:16 130:16 130:18
**addition** 24:22 54:11 120:11
**additional** 114:25 141:6
**additionally** 6:6 60:2
**address** 29:2 67:21 68:5,15
**adhere** 115:9
**administer** 6:5
**administration** 71:4
**administrative** 8:11,18,20 41:10 71:17
**administrator** 71:13,14 92:12 92:16
**admit** 96:21
**adobe** 55:1 56:8
**adverse** 41:9,13
**advice** 43:4 87:21,23 88:16 89:1
**advise** 126:24 141:20
**advocacy** 124:23 125:22
**affected** 113:1 134:20
**affirmative** 17:13
**agency** 38:11 86:13,25
**agenda** 25:1,1 26:5,7,7,9,11
**ago** 111:25
**agree** 6:8 23:1 23:5,16 34:10 52:24 59:15 96:15 104:25 105:3 115:2 127:21 128:4 128:10,14 129:3
**agreed** 7:22 122:15 123:2
**agreement** 86:24 124:15 126:25 127:22 128:5
**ah** 20:18
**ahead** 25:2,3 31:13 36:23,25 45:15 132:6
**aimee** 121:10
**aimeeshadwick** 121:9
**al** 1:5 80:3
**alleged** 36:2 40:17
**allow** 49:11 83:14
**allowed** 135:11
**amanda** 79:21
**amandalynn** 36:4 55:1 79:10,20,21,25 105:5 107:2 109:13,16 112:21 128:23 129:12,13,20 135:20 138:19
**amended** 34:24 35:1 41:17 42:6 130:11
**american** 103:6
**amount** 62:20 63:4 91:17
130:25 131:3 134:18
**anne** 84:9,24 85:2,11 87:6 90:11,16
**anomalous** 130:3
**answer** 10:21 16:18 17:9,20 31:16,20 36:25 39:23 50:13 51:3 69:7 89:25 103:13 110:9
**answered** 137:5
**answering** 103:16
**answers** 97:18
**apologize** 12:23 51:6 71:24 137:18 138:9
**apologizing** 138:21
**appears** 28:19 30:6
**apple** 68:12
**applicable** 6:12
**application** 5:7 52:3 125:10,19 126:21 141:2,4 141:5,13
**applies** 39:2,5

**apply** 10:17 38:24 102:18
**approximately** 7:22,23 9:12 10:5
**april** 5:5,6 49:2 49:5,11,16,17 51:7,16,19 52:1,19 53:7 53:16 54:2,7 63:22 96:5 100:5 111:12 112:2 113:10 117:16 118:3 118:14 119:22 119:23 120:1,4 122:19,24 124:11,12
**argue** 8:11 102:13 114:10
**arguing** 21:25
**argument** 17:23 18:1 102:19 106:19
**arrived** 95:5
**arthur** 3:5
**aside** 29:15 31:13 50:20 66:24 73:14 97:16
**asked** 17:22 23:11 41:24 52:20,21,23,25 63:18 106:1,3 111:19,25 115:12 122:4 127:5 132:18
**asking** 9:21 10:19 16:25 17:4,18,25 25:7,22 32:11 37:18,20 39:8 44:17 66:16 107:24 119:7 129:11 136:11 139:9
**assert** 26:24 39:9 80:25 110:6
**asserted** 34:23 118:1
**assets** 14:20 19:17,18 98:6 98:12,15,18
**associates** 69:17
**association** 121:6
**attached** 59:2
**attachment** 5:3 5:6 32:1 111:11,17,18 112:3 119:21 119:25
**attack** 89:19
**attempt** 11:25 72:11
**attempting** 20:4 31:2,4
**attend** 21:3
**attendance** 6:21 21:14
**attended** 20:25 21:15,20 22:4 23:2,3
**attention** 84:7 91:11 97:6 123:10
**attorney** 23:14 43:13 81:11 87:19 143:14
**audio** 143:8
**audit** 57:13
**auditor** 57:12
**august** 40:9 49:2 122:20,22 122:23 123:6 124:13 125:4 125:21 126:5 126:14 134:11 136:19
**authenticate** 141:3
**author** 28:23
**authority** 16:6 16:8,12 18:13 27:1,2 32:14 57:25 58:2 71:11,15,22 72:1 85:8,9 89:24 98:6 99:13 128:19 128:20
**authorized** 6:4 18:8,10,11
**auto** 62:12 65:9
**automatic** 66:2 66:11
**autopay** 60:4 61:22 62:9,13 62:16,21 63:5 63:7,9,12 65:10 92:13
**autopayments** 63:1,3,19
**autopays** 65:23 65:24
**available** 56:24
**award** 134:3,5 139:4
**awarding** 134:12
**aware** 14:10 22:10

**b**

**b** 4:7 5:1 87:1
**back** 7:20 34:12 44:19 45:21 46:3 50:2 52:15 53:3 68:17 71:23 76:5,25 77:3 78:8 88:13,23 90:20

101:13,15 106:10 110:9 132:15 138:1
**bad** 33:8 51:5
**badges** 47:19
**ball** 34:13 126:17,22,24
**bank** 4:9 16:24 18:7 19:7,8 28:21 29:2 30:18 52:5 55:8 57:2,3,16 57:20 71:21,23 72:1,6 91:2,6 94:18 97:5
**based** 50:13 129:1,3,9
**basic** 113:4
**basically** 41:19 45:12 85:19
**basis** 23:22 24:6 32:5,12 32:22 33:15,18 34:17 39:11 41:3,15,21 42:5,7,8 45:3 45:10 60:14,16 113:2 127:24 128:1
**bates** 46:10 64:17 77:7 83:24
**began** 41:18
**beginning** 6:22 70:16 87:3 138:15
**begins** 93:3
**behalf** 2:2,9,17 3:2 67:20 107:18,19,19 107:22 128:15
**behavioral** 120:17
**belief** 13:19 16:14 20:3 23:22 32:22 36:17 37:13,20 39:12,17 40:2 42:23
**believe** 16:7 18:14 19:18 25:8,8,17 26:14 27:8,25 31:9,24 32:25 33:10 35:23 36:1 37:7,10 37:25 40:17 41:3 45:10 70:9 72:24,25 73:8 80:9 97:14 102:8 104:18 106:13 114:21 115:13 117:19,21 119:21 129:7 136:22 139:5
**believed** 27:5 32:20 35:20 39:12 114:12 114:14
**beneficial** 23:15
**best** 15:4 30:22 30:24 143:10
**better** 90:12
**bicknell** 1:10 2:18 3:12 7:3,4 19:24 128:25
**bill** 77:12
**bills** 61:11,13 61:23
**billy** 19:24,25 79:18
**biogroup** 107:6 107:21,25 108:8,12,15 109:1 124:24 140:15
**bit** 47:12 76:17 98:21 106:23 126:23
**block** 11:9 29:11
**blocked** 68:19 68:19
**blue** 80:8
**blur** 11:22
**board** 15:7,17 16:1,3,7,10,11 16:12,14,22 17:2,12,21 19:22 20:25 21:3,5,6,13,17 21:20,22,23,25 22:5,20,22 23:1,3,23,24 24:24 25:1,3,6 25:11,17,19 26:4,8,9,14 27:14,19 29:12 29:13 31:3 32:7,15,16,17 32:18,20,23,24 33:1,6,12,19,20 33:23 34:1,1,2 34:11 35:19 39:7 42:24 43:3,7,18 44:10,14 46:21 52:14,15 70:5 76:1 79:10,12 79:15 81:9,21 82:5,9,16 84:18,21,22 85:1,7 99:7,8 99:11,14,16 102:9 103:4,6 103:8,24 104:14,19,24 112:10 127:9
**boards** 34:8,9 43:15
**body** 84:22

**bookkeeper** 57:12
**bookkeepers** 72:11,14,17 73:9
**bordering** 108:22
**borough** 20:12 62:11 63:1 76:17 77:13,22 77:24 78:6,10 91:17,25 92:10 92:19 94:22 95:1,4,7,12 96:11,13,16,23
**borough's** 95:14,23
**boss** 83:1
**bottom** 64:17 86:9 91:15 97:7
**bourland** 98:9 98:14,21
**box** 80:8
**break** 45:15 76:19
**brief** 45:15
**bring** 81:25
**brittany** 120:7
**broadway** 2:4
**brought** 29:3,4 29:5 32:12
**budget** 141:7
**bullet** 67:15 69:23 70:20 72:9 73:11 112:4
**bunch** 52:2,16 56:21 74:13
**bureau** 111:13
**burns** 120:7
**business** 11:14 61:14 69:17 74:18 82:13 83:9 124:17
**bylaws** 106:17

**c**

**c** 2:1 3:1 6:1 12:25
**cabinets** 53:9
**call** 21:19,20,21 22:7,8,9,10,13 22:16,24 23:20 24:5 71:13 126:13
**called** 7:13 13:13 21:18
**calls** 12:11,12 12:21
**candor** 25:18
**card** 4:15 50:1 50:1,4,4,11,12 51:2 58:12,15 58:16,21 59:24 64:11,13,14 65:1,3,4,5,16 65:24
**cards** 47:19 49:22,23 50:6 50:10,16,21 58:15,24 59:1 59:9,21 60:3,3
**case** 1:7 74:4 117:13 123:12 123:15,18,24 124:3,6
**cashing** 63:8
**casual** 78:21
**cathy** 18:12 20:6 30:6
**cauchon** 1:5,15 2:2,3,9 5:4 6:19 7:6,7,7,12 7:19 10:23 27:23 31:14,15 31:24 34:22 46:3 56:10 64:5,9,17 65:16 66:17 67:4,9,15 72:10 73:12,19 75:12 76:10 77:3,8,11 83:23 85:22 86:16 88:25 89:5,25 90:25 91:23 94:14 97:1,15,17 98:20 101:17 103:11 111:9 111:10 119:15 138:3 140:21 140:23
**caused** 138:9
**cd** 59:5
**cease** 4:16 41:10 76:11
**cecile** 9:22 19:3 26:17 30:19,21 50:1 52:21 54:21 56:2 57:6,10,14,18 57:19 60:18,20 60:24 66:6 73:8 83:9 84:11 85:18,20 92:15
**certain** 32:17
**certainly** 129:5
**certificate** 143:1
**certified** 6:9
**certify** 143:4
**cetera** 25:19 107:16 127:11
**challenge** 25:5 44:24
**challenging** 32:14 33:15 34:18 44:22 45:1,4
**chance** 86:1
**chang** 2:19 4:3 4:5 6:23,24

7:18 13:1 28:10,13,18 36:24 44:1 45:14 64:2 76:18 97:18 103:19 109:24 132:4 140:19 140:20 141:15 142:7,11
**change** 14:13 14:15,17 15:10 18:8 63:1 71:3 71:7,7 76:16 98:1,4 106:22
**changed** 13:25 14:5,8,11,24 62:19,20 63:4 97:19 98:3,12 99:1,22
**changing** 99:9
**channels** 42:14
**characterizati...** 13:16 109:25 132:5
**charge** 61:25 62:2 81:23 82:2 120:19
**charges** 61:25 66:8
**chart** 131:2 132:11 133:5 133:17
**charts** 133:9
**chase** 4:14,22 4:23,24 18:7 19:4 20:6 30:7 30:9 50:3,4 52:4 57:3,5,8 57:11,20 58:6 58:12,21,23,23 59:17,20 60:10 61:3,8 62:10 63:13 64:10 67:25 71:21,22 72:1 74:24 75:3 94:18 96:23
**chase's** 31:4
**check** 12:9,20 24:9 37:5 62:11,13 63:9 80:13 109:3
**checked** 102:5 136:15
**checking** 58:6 59:4,6,12,16 61:4,8 65:2
**checks** 62:4
**chief** 103:3,5 111:13
**choice** 90:19
**choose** 128:15
**chose** 85:10
**cite** 99:5
**claim** 35:8,12 35:15,17 41:4 41:16 42:5
44:3,6,13 45:10 116:4 125:15 130:2
**claiming** 118:3 118:5 125:5
**claims** 34:24 35:5,5,11 44:18 81:24 123:12
**clarify** 38:6 47:15 63:21
**clarity** 7:21
**clear** 18:23 33:22 50:16 59:22 62:1
**client** 88:15
**close** 79:1
**closed** 47:7
**coca** 127:10
**code** 39:9 105:13
**codes** 47:22,23 48:1
**coffee** 78:20 101:1
**cola** 127:10
**collected** 123:18
**collective** 84:22
**colloquial** 20:21
**columbus** 1:21 2:22 3:7
**come** 20:3 56:11 61:14 62:1 83:2,4,11 85:18 98:7,10 98:15 99:19 135:24 136:4
**coming** 7:19 20:8 98:22
**commission** 127:24 128:1
**common** 103:3
**communicate** 19:8 31:1 65:25 66:5
**communicated** 18:6,11 30:10 66:9 124:25
**communication** 19:2 123:6
**communicati...** 11:5,13,18 12:3
**community** 140:3,4
**company** 20:12 62:11 63:1 76:17 77:13,22 77:24 78:6,10 91:17,25 92:11 95:4,7,12 96:16 109:12
**company's** 96:11,13

**compare** 95:7 131:9
**complaining** 112:8
**complaint** 34:24 35:1 41:17,21 42:7 118:4 130:11
**complete** 27:7 74:20 75:2 117:17 118:2,9 118:10 126:3,6
**completed** 118:6,14,19
**compliance** 36:8
**complied** 34:3 34:6
**comply** 8:17
**computer** 48:5 52:2 53:3,13 68:9 75:20
**computers** 49:15
**concern** 36:13 40:23,24 72:20
**concerned** 40:5 40:11,19 56:19 63:6
**concerns** 38:15 74:8,10
**concluded** 142:15
**conclusion** 36:21
**conduct** 74:18 102:3
**conference** 22:13
**confident** 94:10 95:10
**confirm** 8:6 13:17 14:10
**confirmed** 127:15,19
**conflict** 35:20 36:2 38:3 39:15,18 40:17 41:9 42:25 101:18,19,24 102:9,12,13,24 104:4,11,21,22 104:25 105:17 105:18,22 106:5,15,18 108:14 111:21 113:12,24 114:2,6,8,12,14 114:17,21,23 115:11,13,20 115:21,24 116:2,11,17,21 118:6,17,22 121:15,25 122:4,7,10,15 123:2 124:8,18 124:19 126:20 126:21
**confusion** 62:13
**connect** 41:8,14
**connected** 59:14
**connection** 129:23
**consider** 13:17 16:13 42:14 78:22 115:16 131:15,19 133:1 135:21 136:12
**considering** 102:10
**consistency** 88:1
**consistent** 89:12
**constitute** 6:16
**consult** 126:13
**cont'd** 3:1 5:1
**contact** 72:14 79:5
**contacted** 72:11,17
**contain** 112:14
**contend** 35:23 38:14
**contending** 35:18
**contention** 20:13 56:23 62:15 65:20 92:8 107:2,5
**contest** 44:9 47:15
**contesting** 24:7 44:7
**contextually** 102:17
**continuation** 62:17
**continue** 51:20 53:6 60:25 71:16 72:13,23 75:12 82:21 87:24 89:16,20 102:25 104:12 104:16 105:10 105:20 110:1
**continued** 9:3 10:25 11:5,7 11:12 13:8,19 51:8,15 53:25 58:5,9,11 59:23 63:9,12 63:20,20 69:1 69:25 70:10 75:16 76:6 102:22 104:5
**continues** 77:19
**continuing** 70:4 90:13
**contract** 36:7,8 36:11,14 37:10

38:4,5,6,7,12 38:13,24 39:2 39:14,16,19 109:8 116:24 117:2,7 125:9 125:10,18 127:5 134:3,12 134:20,23,25 135:9,10,11,16 138:12 139:4
**contracting** 38:2,18,23
**control** 27:13 27:15,17 48:24 49:3,7 70:1,11 71:17 75:13 79:5 80:25 81:22 82:14,16 82:18 88:5 89:14,17,22 90:2,5
**controlled** 27:6 27:8,9
**conversation** 27:4
**conversations** 87:18 138:16 138:20
**convey** 27:12
**cooperative** 90:17
**coordinate** 133:24
**copy** 42:9 67:11 110:23 126:25 142:9
**corporate** 47:2 48:18,18,24 49:3,10
**corporations** 103:10
**correct** 8:8,9,15 8:22 9:12 12:2 12:7,15 13:6,7 13:11,20,21 15:4,22,23 16:5 18:18 20:20 22:6,11 22:12,14,15,17 22:19 23:2,6 23:10,18 24:13 24:14,20 26:18 28:1 30:11 32:3,21 33:17 35:10,12,15,16 35:22 36:15 38:8,9,20 40:19,24,25 42:17,18 43:19 43:21,23 44:13 45:6 47:5,16 47:17 48:17 50:5 51:9 53:4 56:19 57:1 58:4 59:17,18 59:20 60:11,16 60:20,21 64:19 65:23 68:24,25 69:2,19 70:2 70:11 71:5,8,9 71:10,12,18,19 74:5,18,22 75:14 76:14 77:8,17,18,20 81:21 82:24 83:6,16,17 85:6,7,11,12 86:7,20,22 87:5,8,9 89:15 89:18 90:8 91:9,20 92:1 93:5 96:16,24 97:13,20,21 99:3,6,10 101:4,6,20 105:2,20,21,25 106:7 111:14 111:15,17 112:1,10,17,18 113:16,20 114:7,13,18 115:24,25 116:3 117:2,6 117:18 118:18 119:2,3,4,22 120:8 121:7,16 121:17 122:11 122:12,23 123:20,21 124:5,8 125:20 125:23 126:3,4 126:7,8 127:15 127:16,17,18 127:20 130:12 136:21 138:6 140:15,16 141:5
**correctly** 33:14 50:14 79:6 84:15
**counsel** 7:21 34:23 43:4 71:5,5 87:21 87:24 88:16 89:1 133:25 143:11,14
**count** 35:7,13 35:16 74:15
**counterclaim** 2:9 3:2 7:2
**counterclaims** 7:6 118:12
**counts** 35:2
**coup** 11:25 13:13 79:4,8 79:11 80:10,12 83:10 84:24 85:2
**couple** 54:23
**course** 61:14
**court** 1:1 27:21 35:6 81:1 138:3
**courtesy** 81:15

**covered** 34:20 45:4
**created** 55:21 126:10 130:12
**credentials** 17:14,23,24 73:2,6 102:3
**credit** 4:15 49:22,23 50:1 50:3,6,10,12,16 50:21 51:1 58:12,14,15,16 58:21,23,23 59:1,2,7,9,19 59:21,24 60:3 60:10 64:11,13 64:14 65:1,1,5 66:3,12,21
**criminal** 37:4 37:19
**cross** 80:17 103:6
**cs8359309** 1:25
**current** 129:3
**cut** 67:24 120:24
**cv** 1:8
**cycle** 65:16

**d**

**d** 4:1 6:1
**daily** 60:11,14 60:16,19 61:1
**daniels** 18:12 19:3 20:6 30:6 30:9,17 31:1
**dantzler** 120:7
**data** 40:21 137:1,4
**date** 1:17 9:23 11:13 12:19 19:12 26:18 31:10 49:5,6 49:17 62:23 119:7
**dated** 8:6 28:19
**dates** 10:6,24 11:16 14:3 29:20 62:21 63:4
**dave** 126:17,22
**david** 2:10 7:5 24:10,12 31:9 34:13,14 81:11 87:12 88:15
**day** 9:19,20 19:5 24:8 26:20 47:17 75:17 83:8 97:23 101:3 135:25 136:16
**days** 17:13 23:25 24:17 25:13 45:5 100:14 108:19
**de** 82:25
**debit** 50:1,4,11 60:3,10
**december** 87:4 96:19
**december's** 95:19
**decide** 87:10 90:9
**decided** 85:14 85:15
**deciding** 105:7
**decision** 89:2 106:20
**decisions** 40:18
**declaratory** 35:14 44:2,6 44:13
**declare** 44:14
**declining** 15:16
**dedicated** 137:2
**default** 68:14 90:20
**defaults** 68:13
**defendant** 2:9 3:2
**defendants** 1:12 2:17 6:25 79:18,24 118:1
**defense** 88:16
**defining** 79:23
**definitely** 15:21
**demand** 129:3
**demands** 8:17
**denied** 15:20 15:21 16:2,4 26:2
**dennis** 1:5,15 2:2,3,9 5:4 6:19 7:7,12 30:8 65:15 84:10 86:16 87:15
**dennis's** 75:20
**denniscauchon** 2:6
**denying** 15:16
**department** 111:14,20,22 113:11 114:17 115:23 116:1,6 116:10 117:9 117:16 120:4 120:13,15,16 122:4 123:7,19 123:25 124:7 125:18 130:15 130:17
**depending** 69:22
**depends** 15:25
**deposition** 1:14 6:14,19 62:12 91:7 110:15 143:1
**deposits** 55:14

**derivative** 35:8
**describe** 49:9 124:22
**described** 23:21 81:20
**description** 4:8 5:2 35:21
**desist** 4:16 41:11 76:11
**desk** 51:2
**desktop** 75:18
**detail** 47:12
**details** 109:20 112:4,14
**determination** 108:12 111:20 113:14,16,18 114:20 115:3,7 115:18 122:2,5 124:10
**determine** 40:23 113:25 114:6 137:2
**determined** 118:15,22
**developed** 126:8
**device** 48:6,8,9
**devices** 47:22 48:4 49:16
**died** 89:19
**different** 28:4 57:23,24 71:24 76:3,3 96:10 105:4 107:13 107:14 109:6 110:25 116:14 116:20,25 140:9
**digital** 143:8
**direct** 14:15,17 30:17 36:23 65:7 84:6 93:23,24 97:6 113:23
**directed** 28:20 30:1 91:24 92:10,18 94:10 96:15,22
**directing** 17:14
**direction** 14:24 30:23
**directly** 128:7,8 128:9
**director** 3:13 21:2 106:19 124:23 125:22
**directors** 21:9 33:7 43:3,18 106:21
**disable** 76:2
**disagree** 96:10 105:14 115:2 128:17
**disclosable** 111:21
**disclose** 125:9 125:17 126:15
**disclosed** 125:3 125:6,8,11,21
**disclosure** 86:13,25 121:15 122:25 125:24
**discovered** 108:14
**discovery** 33:25 52:14 56:10 81:14 123:11,19,23 124:3 133:12
**discretion** 128:21
**discussed** 41:2 44:4 45:9,13
**dismissed** 35:6
**dispute** 8:24 9:1,13 10:23 11:4,7,12 13:2 13:5,8,24 14:5 14:8,9,24 18:6 18:13,22 96:1
**disqualify** 105:19
**disqualifying** 105:7,14
**distribute** 134:23 135:11
**distributed** 26:5 56:22
**distributing** 134:24 135:4,6 135:7
**distribution** 53:20
**distributors** 136:23 140:1,2
**district** 1:1,2
**distro** 134:18 138:6,11,14,22 138:25 139:6
**division** 1:3
**document** 30:5 44:20 64:9,18 66:24 67:6,9 86:2 119:20 137:19 141:8 141:11
**documentation** 40:7
**documents** 25:20 51:9,14 51:15,21,25 52:12,16,18 118:20 119:9 123:11,18 124:2,6 125:24
**doing** 13:14 35:3 42:2 57:13 108:4 109:12
**dollars** 135:3,6
**domain** 67:17 67:20 70:11,12 70:13

**donate** 70:17
**doors** 14:1,6 83:8 100:13,17 100:20
**dr** 67:25
**draw** 91:11 123:10
**drive** 2:12 51:12 54:9,14 54:15 55:6,25 56:5,12,25 65:13 73:24 74:1
**drug** 121:12,21
**dshearer** 2:14
**duly** 7:13 143:5
**duties** 25:18 78:5 83:12,15 85:8
**dwayne** 1:9 2:17 19:25 79:18 80:14 101:21,23 102:14

**e**

**e** 2:1,1 3:1,1 4:1 4:7,12,20 5:1,3 6:1,1 8:6 10:10 11:5,6,8,23 12:3,4,9 20:5 29:17,18 30:2 30:6,13 31:2 32:1 41:12 55:18 68:20 69:22 77:12,14 80:3,10,13,18 84:4 85:11 86:16 111:11 111:16,19 119:22,23 120:1,11 122:13,19,20 126:10 138:5
**earlier** 63:5 73:23 91:7 110:14 129:1 139:3
**early** 55:20 97:24
**ease** 22:2 35:4
**easier** 10:19
**easily** 119:8 137:2,4
**east** 2:4
**eastern** 1:3 8:7
**effective** 8:12 8:20 13:18 23:24 25:11 32:1,6 33:17 34:7 44:15 45:11 81:7 93:3 106:12
**effectively** 76:3 78:4
**effectiveness** 24:7 25:24 34:18 44:22,24
**efficient** 83:20 121:1
**eight** 83:19 103:4 104:19 104:23,24 130:20
**either** 68:8 92:15
**electronic** 49:16 86:12 91:16 97:8
**electronically** 51:5,8,13,15,20 51:25 62:6
**elizabeth** 3:4 7:1
**email** 4:11
**emailed** 31:9 87:6
**emails** 10:25 11:8,11,16,21 33:25 41:14 67:16,19 68:22 69:3,16 82:13
**emoyo** 3:8
**employed** 112:6,16 143:11,14
**employee** 51:1 140:12 143:13
**employees** 50:11,21 54:21 54:22,25 55:10 58:23 126:2,6 126:15
**employment** 102:23 112:25 113:4 124:15 124:23 125:16 125:22 126:3,7 126:16,19,25 127:22 128:5
**encouraged** 54:25
**encouraging** 115:9
**ended** 27:25 63:23
**enter** 89:6,9
**entering** 88:17
**entire** 16:7
**entitled** 104:17 105:9,12 126:25
**entitlement** 105:12
**equal** 25:5,9
**equipment** 83:18
**erin** 92:17,18
**es** 143:4
**esquire** 2:10,19 3:4
**essentially** 42:8
**et** 1:5 25:19 107:16 127:11
**evaluating** 102:24 104:5

104:11
**eventually** 75:25
**everyone's** 90:18
**evidence** 34:3 40:13 109:13 109:21 110:4 124:11 132:5
**evidentiary** 6:13
**ex** 107:17
**exact** 97:23
**exactly** 30:20 34:5
**examination** 4:2 7:17,23,24 46:1 140:18
**examined** 7:15
**example** 55:9 61:20 65:10
**excel** 133:18,20
**except** 22:6 23:2 131:22
**excluding** 21:15
**executive** 3:13 103:3
**executives** 103:5
**exercise** 27:1 70:10
**exercised** 128:24
**exhibit** 4:9,11 4:12,14,16,18 4:19,20,21,22 4:23,24 5:3,6,7 8:3,4 27:24,25 28:2,5,6,14,15 28:16 29:25 30:3 31:15,18 46:7 63:24 64:6,7,17 67:5 67:7 70:21 73:13,15,20,21 76:12,14 77:4 77:5,7 83:21 83:24 84:1 85:21,23,24 86:24 88:8 91:1,4 94:15 94:16 97:2,3 110:14,15 111:6,7,10,10 119:10,16,17 120:3 121:16 123:8 127:14 138:4 140:23 140:24
**exist** 135:24
**existed** 111:21 116:21 131:18
**exists** 106:18 114:2
**expanded** 124:11
**expectation** 114:5 116:9 117:1
**expected** 114:6
**expenses** 124:17
**experience** 102:3 108:17
**explain** 129:1 132:17
**explained** 34:14
**explains** 136:17
**explanations** 132:19
**explicitly** 65:4
**expressed** 24:4
**expressly** 23:7 23:19 34:10
**extend** 84:25
**extension** 84:15
**extent** 54:3
**extra** 119:15

**f**

**facebook** 70:23 71:4,12,13,14
**fact** 22:18 23:17 25:17 43:14 99:15 101:22 104:23 116:14 117:13 131:21
**faction** 76:2
**facto** 82:25
**factor** 105:8
**factors** 129:10
**facts** 40:13 115:1
**factual** 36:22 113:2
**factually** 40:25
**failed** 39:14,18
**fair** 8:21 14:23 19:15 22:16,24 24:19 25:14 32:2 35:21 36:14,18 41:25 44:15 51:14 58:1,5,9,11 67:17 75:10 91:23 101:5 102:23 104:9 118:13 124:4 134:2
**falling** 131:22
**false** 123:12
**familiar** 91:6
**far** 25:12 50:25 51:2 53:13 56:6,9 60:7 133:6
**faster** 8:1
**fca** 35:12,17 41:3,15 42:5
**february** 4:23 94:7,19 95:1,6

134:11 138:5
**federal** 4:9 19:7 19:8 20:8 28:20 29:1 35:24 36:3,4,5 36:18 37:7,11 37:14,21 38:9 38:11,14,18,22 39:2,5,6,7,12 40:3 74:25 75:3
**federally** 39:16 39:19
**file** 52:23 133:19
**filed** 118:4
**files** 51:9,10,14 51:16,21,25 52:11,12,20,25 53:6,9,15,17,19 53:20,23
**filing** 53:9 118:11,12
**final** 29:10
**finances** 82:14
**financial** 18:9 55:8,13
**financially** 143:15
**find** 124:22 131:13
**finder** 43:14
**fine** 12:2 28:1,6 45:2 133:21
**finish** 10:19 103:12
**fire** 43:19,25
**first** 4:9 7:13 8:2 19:7,8 20:8 28:20 29:1 31:21 35:3 44:12 67:15,15 69:24 70:21 74:24,24 75:3 84:7 86:10,11 86:14 93:1 112:3 127:13 128:22 135:2
**firsthand** 118:2
**five** 76:18,20 95:13 96:21,22 96:25 98:2,3 100:14 133:8 141:6,10
**fix** 28:2
**flowed** 120:18
**flowing** 61:23 61:23
**flows** 140:10
**focus** 25:9
**folder** 54:16
**folks** 121:5,16 121:19,24 122:13 123:1 138:6 139:12
**follow** 30:23 46:5 101:7
**followed** 23:14
**follows** 7:15
**force** 121:12,13
**foregoing** 143:3,4
**form** 43:20 126:2,6,9,11,21 128:15 139:24 140:8
**formed** 41:20 121:13
**former** 54:22
**forms** 41:3 129:15 137:3
**fort** 2:13
**forthcoming** 116:16
**forthright** 116:15,16
**forward** 63:8 88:1
**found** 109:16 109:20,21 136:16
**four** 98:2 128:22 129:18
**frame** 9:9 15:11 29:1 133:2 135:22 136:24
**friend** 78:22 101:21,23
**friendly** 79:2
**friends** 78:15 105:5
**friendship** 78:21 79:2
**front** 8:4,5 95:24
**fulfilled** 33:23
**full** 46:13 70:22
**function** 63:7 68:17
**functioning** 60:6
**funded** 39:16 39:19
**funder** 115:22
**funders** 135:15
**funding** 135:11
**funds** 19:17 38:10 39:7 66:22 117:10
**funneled** 68:4
**furlough** 135:17
**further** 36:9 56:22 73:13 124:11 130:1 143:13
**fyi** 79:4

**g**

**g** 6:1 55:18
**gain** 31:3 72:12
**gannett** 65:11

**garvey** 2:11
**gathering** 21:18
**gears** 76:16 106:22
**general** 26:10 55:3 79:13 122:18 126:22
**generic** 129:17 131:6,7
**give** 14:3 15:17 16:20,22,23 19:10 20:7 29:20 99:25 100:5 109:19 111:6
**given** 25:5 27:9 55:10
**giving** 134:17 135:18
**gmail** 67:21 68:4,17,22 69:14
**gmail.com** 2:6
**go** 7:22 9:3,8 9:10 10:2,3 27:4 29:10 30:5 31:13 34:12 36:23,25 44:19 45:14,16 57:16 75:19 86:14 88:9 90:20 101:9 109:3 116:18 132:6,6
**going** 7:25 8:12 9:23,23 18:15 18:22 21:19,20 22:1 26:8 30:1 33:24 45:18 52:15 60:15,19 60:25 77:4 80:24 81:25 82:4 83:14,20 84:6 88:1,21 97:6 98:7,14 99:18 101:1,11 103:11,15,19 104:15 110:22 119:14 123:9 126:11 131:21 132:18 137:24 139:1 142:12
**golden** 1:10 2:18 19:24
**good** 115:15 116:12 125:7 128:24 129:9 129:11,14,20
**google** 51:12 54:8,14,15 55:6,25 56:5 56:11,24 65:12 65:13 73:24 74:1
**googled** 108:16
**government** 113:24 121:7 124:23 125:22 128:2
**government's** 115:7
**governor's** 121:11
**governor.ohi...** 121:9
**grandview** 2:12 9:3
**grant** 120:20
**granville** 2:5 10:2,4 14:1,6 47:4,6 48:14 48:16 49:10 68:7 82:10 83:15 85:14 86:5 88:6 89:23 90:3,7 97:19 100:24
**green** 127:4,6,6
**grounds** 43:25
**gsn** 2:14
**guarantor** 20:16,19
**guess** 80:13
**guessing** 65:5

**h**

**h** 4:7 5:1 12:25 55:17
**half** 128:22
**halfway** 80:8 123:10
**hand** 7:10 77:4 140:3
**handed** 29:6 67:4 73:19 83:23 85:22 90:25 94:14 97:1 111:9 119:15 138:3
**handful** 19:22 75:25
**handheld** 49:15
**handing** 28:1 29:24 31:14 64:5 140:22
**handled** 78:11
**handles** 77:25
**happen** 81:6 82:4 98:11 102:21
**happened** 15:2 15:3 40:6 68:10
**happening** 85:17
**happy** 133:8 136:3
**hard** 42:9,13 42:15
**harm** 1:11 3:2 3:12 14:21 19:16,21 20:17 20:22 41:12 46:14,19,20,22 46:24 47:2

59:10 67:22 68:14 83:17 89:24 91:2 94:18 98:7 103:7 105:8 130:6
**harmreductio...** 67:16,19
**harmreductio...** 30:8
**head** 29:8 109:10 121:11
**health** 111:13 111:14,20,22 113:11 114:17 115:23 116:2,6 116:10 117:9 117:17 120:4 120:14,15,17 121:5 123:7,19 124:7 125:18 130:15,17
**hear** 136:3
**heard** 108:15 128:25
**hearing** 7:8
**heart** 89:19
**held** 32:7
**hemorrhaging** 135:8
**hereto** 143:15
**hey** 137:14
**hi** 84:10
**high** 3:6 129:22
**hikma** 107:13 107:20,22 108:1,3,4,9,10 108:13,23 109:2,5 112:25 127:17
**hired** 43:13
**holdover** 87:2
**hope** 81:24 116:23
**hoped** 82:1
**hoping** 80:20 80:21,25 81:19 81:20
**hour** 7:23
**hours** 7:24 137:17
**house** 78:17
**hro** 7:2,4 9:13 10:25 11:3,9 11:14 12:12 13:9,14 14:2,6 15:17,18 16:7 16:9 19:19 20:15 21:2,9 27:6,13 29:18 30:11 31:2,3,3 32:2 36:6 38:7 39:17 43:3,8 43:17 44:8 46:11 47:25 48:17,19,21,23 49:3,9,22,23 50:7,9,16,22 51:9,14,16,20 52:1,16,18 53:6,17,17,22 54:1,6,15,17 55:19,25 56:3 56:18,24 57:5 58:6,21 59:5 59:16,19 63:12 63:20 65:25 66:4,22 67:17 67:20 68:5,23 69:17,19,25 70:1,5,14,22,25 71:12,23 72:7 72:12,14 73:24 74:18,21 75:5 78:19 81:20,22 84:18 85:6 89:16,18,20 90:6 91:1,12 93:18 97:5 98:15 99:3 102:11,23 103:1 104:6,12 104:16 105:11 105:16,20 110:15 113:8 113:19 116:3,4 116:5,10,15 117:9,17 121:22,24 123:8 124:8 126:2,5 127:13 128:16 129:20 131:23 132:15 132:18 133:2 134:4 137:7 138:4 139:13 139:23 141:2,4
**hro's** 9:3 14:25 15:7,10 18:9 27:14 29:17 30:18 60:25 72:6,10,11,13 72:23 82:10 89:22 90:2 95:11 96:23 110:14 132:10 132:12
**hro208** 83:24
**hro210** 83:25
**huang** 54:22 55:17,19
**huh** 93:10 119:12
**hundreds** 135:3,6
**hurst** 67:25
**husband** 127:10

**i**

**idea** 140:11
**identifiable** 119:8
**identification** 28:17 30:4

31:19 47:19 64:8 67:8 73:22 77:6 84:2 85:25 91:5 94:17 97:4 111:8 119:18 140:25
**identify** 6:21 38:19 70:5
**ignored** 43:3,10
**ii** 1:16 35:16
**iii** 35:7
**implement** 113:19
**important** 98:21 124:10
**improvement** 111:13
**include** 22:5 69:5 130:25 131:3 132:11 132:12 133:4 142:5,7
**included** 43:8 99:12 112:23 131:8
**including** 61:11 105:17 116:4 124:15
**increase** 128:3 129:25 131:18 135:24 136:17
**increased** 131:10,16
134:8,14 135:22
**independent** 43:13,14,23
**indicate** 109:15 137:7,11 139:13
**indicated** 69:18 70:10
**indicates** 109:17
**indirectly** 128:7
**individual** 16:10,22 17:2 18:17 19:22 30:9 31:3 85:7
**individuals** 140:6
**influenced** 40:17
**inform** 9:16,24
**information** 15:17 17:1 20:2 25:25 26:2 40:10,10 40:23 53:25 54:1,6 72:12 74:9 76:13 112:9 113:6,8 114:23 116:7 122:9 124:12 125:23 130:16 133:11,15
**informed** 10:4
**informing** 9:13 26:23
**initiate** 80:20 80:22 81:19
**inspector** 122:18
**instances** 41:8
**instructed** 18:16 56:17 99:17
**instructing** 18:8 19:3,9
**instructions** 71:3
**instructs** 46:14
**intended** 6:11 9:14 26:24 27:12
**intensive** 116:14
**intent** 82:8 88:5
**intention** 27:17
**intentionally** 68:3
**interest** 35:20 36:2 38:3 39:15,18 42:25 101:19,24 102:9,24 104:4 104:11,21 105:1,17,18,22 106:5,15
113:12 114:2,7 114:9,13,15,18 114:22,24 115:11,14,24 116:2,11 118:7 118:17 121:15 121:25 122:5,7 122:11,15 123:3 124:8,18 124:20 126:20 126:21
**interested** 143:15
**interrupt** 103:11,15 131:25
**interview** 13:3 13:4,6
**intramuscular** 129:18
**introduced** 46:4
**inventory** 129:10
**investigate** 102:2 115:24
**investigating** 116:2
**investigation** 101:20,25 102:4,7,15,21 112:24 117:17 118:6,15,20

**investigative** 113:5
**invoices** 127:5
**involved** 79:25 104:4,7,9
**ira** 55:14
**irregularities** 40:12
**issue** 16:11 36:22 81:1 82:2 121:21
**issues** 36:22 40:5

**j**

**january** 4:22 87:3 91:2,9,12 91:24 93:2,2,3 93:8 94:1,10 95:6 96:25
**january's** 94:6
**jen** 57:15
**jennifer** 111:12 120:6
**job** 1:25 128:2
**jr** 2:10
**judge** 36:22
**judgment** 35:14 44:3,6 44:13 128:24 129:9,11,14,20
**july** 1:17 6:19 108:15 128:19
**june** 136:19

**k**

**k** 55:18
**katie** 54:21 55:17,18,19
**kayleigh** 1:22 6:3 143:2,19
**keep** 21:25 27:13 51:25 88:1 89:12
**keeps** 18:1
**kept** 46:20,22 46:24,25
**key** 45:13 79:11 79:17,24 99:22 100:5 125:13
**keys** 48:5,8,11 48:12 99:25
**kicked** 26:9
**kind** 8:25
**kinnamon** 1:22 6:3 143:2,19
**kits** 130:22 135:7
**kloxxado** 40:7 107:3,6,9,12,18 107:19,23 108:2,5,9 109:2,7,14 110:5,6 112:5 112:14,21 121:22 127:23 128:3,6,11 129:14,18,22 129:25 130:6 130:23,24 131:10,20,22 132:16,24,25 134:8,13,18 135:21 136:25 137:8 138:10 138:11,13,19 138:23 139:9 139:13,20,24 140:5
**kloxxado's** 112:7,16,25 136:13,19 140:13,14
**knew** 56:4,6,9 71:7,7 116:1 117:5,15 118:13,19
**know** 10:16,17 12:17,20 13:12 13:17 15:8 16:18 17:3,9 18:5 27:10 29:23 30:25 31:16 33:4,13 33:16 36:9,21 37:1,8,13 39:1 39:5 44:21 48:4,8 51:1,1,3 53:13 54:17 55:10 56:4,6,9 57:18,19 60:7 60:17 61:2,12 63:14,16,17 64:12,23 66:16 67:23 68:10,18 68:20 71:6 76:8 79:22 80:2,5 81:17 81:18 82:21 87:15 93:11 94:2,25 98:16 105:4 109:8 113:9 116:12 117:11,14 118:5 121:21 122:14,16,17 123:1 127:4 128:4,13 133:9 137:12 140:9,9
**knowledge** 30:22,24 38:11 50:9 73:25 111:22,24 118:2 126:22 143:10
**known** 41:1 118:8
**knows** 80:20
**ky** 2:13

**l**

**labeled** 77:7
**lack** 25:16
**landlord** 20:5 20:10,19 87:7

100:2,8
**language** 113:24 114:1 115:9 125:11
**laptops** 49:14
**large** 29:25
**largest** 103:4,6 103:7
**late** 55:20
**law** 34:13 35:24 36:3,4,5 36:10,18 37:3 37:5,7,14,18,19 37:21 38:14,18 38:23 39:2,4 39:13 40:3 102:6 105:13
**law.com** 2:14
**lawful** 16:5,8 16:12,20 18:2 18:13 32:7 71:10 98:6
**lawfully** 17:21 81:23
**laws** 6:13 37:25 38:2,2,24
**lawsuit** 31:25 32:12 34:4 35:18
**lawyer** 12:18 18:20 37:6 78:1,4 80:10
**lawyer's** 20:7
**lawyers** 81:5
**lay** 140:1,2
**leader** 80:10,12
**learned** 118:10 119:7
**lease** 4:21 20:14,14,17,20 61:12,16,19,22 62:9,16 76:17 78:14 80:1 82:15 84:18,25 85:6,10,14,15 86:3,5,8,15,23 87:3,8,11,13,25 88:2,17 89:2,6 89:8,9,15,16,17 89:20 90:10,10 90:15,19 92:1 92:10,19,20,24 93:3,8,17,24,25 94:11 95:2 96:14,24
**leases** 77:25 78:12 90:13
**leave** 8:11,19 8:20 41:10 51:4 55:19 100:20,22
**left** 35:12 51:1
**legal** 24:7 34:18 36:20,21 80:25 114:1
**legally** 8:19 23:23 25:10 33:16 44:14 45:11
**legit** 62:2
**legitimate** 99:13
**lessee** 86:15
**letter** 4:10,12 4:16 5:4 8:13 8:18 9:2 13:10 13:18 18:19 20:7 28:19,23 31:9,25 32:5 32:15,16,17 33:1,11 34:7 34:18 36:12 38:16 40:15,16 41:7 46:7,14 46:18 47:14,16 53:1 55:24 69:24 73:12 76:12 79:16 105:24 106:6 106:12,16 111:12 112:4 112:10,12,14 112:20 114:11 115:15,17 116:15 117:16 117:22 118:24 118:25 119:3,5 119:5,7 124:11 124:21 125:15 130:3,5 138:18
**letters** 115:18
**letting** 122:14 122:16,17 123:1
**level** 57:20,25
**license** 102:6
**light** 127:6
**lighted** 127:6
**likely** 37:4 65:4 96:19 99:16
**limit** 87:14
**list** 4:18 8:3 27:5,7 29:13 54:13,18 55:6 55:25 56:4,11 56:18 73:24 74:1,4,20 75:6 75:8,13,15 127:3,4 136:10 138:22
**listed** 29:1 32:24 48:11
**listing** 29:12
**litigation** 34:16
**little** 10:18 47:11 76:17 98:20 106:22 121:12 126:23
**liz** 46:4 137:14
**llp** 3:5
**lobbied** 110:5,6
**lobby** 107:25 108:1,2

**lobbying** 107:16,17,22 108:5 109:14
**lobbyist** 107:3 107:6,8,11,14 108:4,9,13,20 108:25 109:2 109:16,18,22 112:7 113:1 140:13,14
**lobbyists** 108:23,25 109:5 112:16
**location** 1:19 14:22 90:7
**locking** 41:12
**locks** 13:25 14:5,8,11,13,15 14:17,24 80:3 97:19,25 98:3 98:4,12 99:1,9 99:22,23 100:1
**locksmith** 14:18
**log** 57:7 75:19
**login** 17:14 53:24 54:1,6
**logins** 15:9 16:16
**long** 82:23 83:5
**longer** 138:25 139:7
**look** 11:10,15 11:21 27:23 31:15 34:13,13 55:12 59:25 61:10,21 64:16 67:6 75:21 94:20 113:2 118:20 123:5 130:5
**looked** 11:23 72:15 93:21 102:5 126:18
**looking** 25:24 75:4,8 96:5
**looks** 30:7 86:3 97:24 120:10
**losing** 63:6 135:3,5
**lost** 63:15
**lot** 41:16 52:13 56:19 61:21 116:25
**lower** 65:15 133:6
**lpa** 1:19 2:20

**m**

**made** 20:3 38:9 39:6 40:9 55:14 65:8 66:2,11 91:19 92:14,18 93:7 93:12 94:25 95:10,20 96:16 97:10,12 102:19 106:24 129:1,6,8,9 130:2
**mail** 4:12,20 5:3 8:6 10:10 11:5,6,8,24 12:3,4,9 20:5 29:17,18 30:2 30:6,13 31:2 32:1 41:12 65:11 68:20 69:22 77:12,14 80:3,10,13,18 84:4 85:11 111:11,16,19 119:22,23 120:1,11 122:14,20,21 126:10 138:5
**main** 24:10,16 54:12
**maintain** 42:23 48:24 53:25 54:4 71:11
**maintained** 54:13
**make** 10:18,19 12:11 16:15 19:12 39:21 50:14,15 52:17 61:4,7 65:22 70:4 93:9 106:20 108:11 111:20 113:13 113:16,18 114:19 115:3,7 115:18 122:4 125:7 129:14
**makes** 133:19
**making** 61:24 91:21
**mallory** 128:23 129:12
**management** 78:5
**manager** 54:9 78:2 92:13
**manner** 6:14
**marcel** 120:8
**march** 4:17,24 32:8 44:25 67:12,18 69:1 69:17,24 70:7 70:9 72:22 76:11 97:5,11 97:11,11
**mark** 28:13,14 67:25 110:18
**marked** 8:3 28:2,8,16 29:24 30:3 31:14,18 46:7 64:6,7 67:5,7 73:20,21 76:12 76:13 77:5 83:24 84:1 85:23,24 91:1 91:4 94:15,16 97:2,3 110:14

111:7,10 119:16,17 121:16 123:8 138:4 140:23 140:24
**martin** 24:13 34:14 81:12 87:12
**martin's** 31:9
**massatti** 120:8 120:9,10,13
**match** 95:8
**materials** 25:6
**matter** 90:5 115:5,6
**matters** 26:10 115:21
**may's** 63:22,23
**mean** 41:7,13 41:24 42:12,13 44:24 46:25 47:23 48:4,18 53:8,13 54:8 59:25 60:23 69:14 79:13 80:21 84:17,20 84:23 89:24 92:6 96:18 102:5 112:19 125:14 126:17 127:24 135:5 138:8
**means** 6:15
**meeting** 17:12 20:25 21:3,5,6 21:8,15,17,19 21:20,21,21,22 21:23,25 22:2 22:4,18,20,21 22:22 23:2,4,6 23:10,23,24 24:2,4,7,18,19 24:25 25:4,10 25:11 26:4,5 26:12,14 32:7 33:6,12 34:9 34:12 44:9,10 44:11,14,23 45:5 52:14,15 80:23
**meetings** 24:22 44:25 45:9 82:5
**member** 15:7,7 16:1,3 17:2 29:12,13 32:24 65:3 85:7 103:24 127:9
**members** 16:10 16:23 19:22 21:13 22:5 23:1 24:24 25:18 26:8 27:19 31:4 32:17 33:23 34:1,3 46:22 70:5 79:10,12 79:15 82:10,16 82:20 83:10 99:8,8,12,14,16 104:19,24
**mental** 120:15 121:5 130:15 130:17
**mentioned** 25:12 26:17 41:6 55:17 61:3 97:19
**message** 79:3 82:9
**messages** 4:19
**met** 25:3 26:21 84:21
**metaphor** 79:14
**mha.ohio.gov** 121:5
**microsoft** 61:12,13,19 65:10
**middle** 65:14 65:15 84:7
**mike** 78:6 94:3
**milligram** 128:3
**million** 120:20 120:21
**mind** 122:11 135:23
**mine** 42:1
**minute** 25:4 67:5 94:19
**minutes** 11:24 24:23,25 26:4 52:14 76:19,21 80:23 81:10,12 82:4,5 137:17
**missing** 75:9
**misunderstan...** 93:14
**misunderstood** 132:2,21
**mitchell** 2:13
**mitigated** 104:23 116:18 116:22
**mobile** 49:15
**molly** 21:14,16 22:6 23:2 127:9
**money** 19:21 39:6 61:23 62:6 120:18,20 128:11 135:8 135:19
**monologue** 41:19 42:2
**month** 40:20 84:13 87:13 88:2 89:8,9 90:9,10,15 94:4,7 95:4,21 95:22

**months** 63:7,8 87:8 88:2 89:10,11 95:11 95:25
**moral** 138:18 139:11
**morning** 75:19
**morris** 3:5
**move** 98:19 99:13 103:20 109:24 132:4
**moved** 14:22 140:8
**moving** 116:20 120:19,19
**moyo** 3:4 4:4 7:1,1 46:2,4 63:24 64:4 67:1,3 69:15 73:15,18 76:20 77:2 88:4,9,15 88:20 89:3,4 90:23,24 101:9 101:15,16 103:14,21,22 110:2,3,8,13,18 110:22 111:4 119:10,13 132:7,8 137:15 137:18,21 138:2 140:17 141:18 142:2,5
**moyo's** 7:24
**multiple** 41:8 58:14

**n**

**n** 2:1 3:1 4:1 6:1 55:18
**naloxone** 53:20 56:8 83:3,5 85:17 120:23 128:15 129:16 130:19,23 131:4 134:23 135:12 137:7,8 139:10,25 140:10
**name** 6:3 12:22 14:18 29:8 46:4 70:11,12 70:13
**named** 79:18 79:23
**names** 19:23 98:23,25
**narcan** 129:15 129:17,17 131:1,7 132:12 133:1 137:8 139:25
**nature** 69:22
**necessarily** 33:4
**need** 16:13 45:15 53:12 66:5 83:7 100:15 126:9
**needed** 40:23 52:21 112:23 113:15,18 116:8
**needing** 84:14
**needs** 34:6
**negate** 106:15
**neither** 143:11
**nelson** 13:2 43:4,19 101:18 101:24 109:15 109:17 117:17 117:25 118:5 118:14
**nelson's** 42:10 102:3 109:25
**never** 13:6 17:10,17 27:15 50:2 75:13 108:15 139:8 139:17,18,19
**new** 28:6 96:7 100:1,9,9 107:16 110:18 125:23
**newark** 28:21
**newly** 124:14
**newspaper** 65:12
**non** 23:3 34:9,9
**nonprofits** 103:3,5
**nordstrom** 2:11
**normal** 82:22
**notary** 6:4 143:20
**note** 29:11
**notice** 17:13 23:8,20 24:1,1 24:4,8 25:13 25:16,24 33:24 45:5 121:15
**noticed** 17:12 24:21 25:21,23 33:6
**notification** 39:8
**notified** 24:18
**november** 4:10 4:13,21 9:2,8 9:10,11,12,18 9:19 10:1,3,7 10:14,24 11:14 12:5 13:10,25 14:4 15:1,2,3,6 18:21,24 19:1 19:9,14 26:16 28:20 29:1,16 29:22 31:10,22 47:14,16,18 48:23 49:1 50:10,17,18,22 51:4,7,16 52:25 53:7 54:1 55:5,23

Case: 2:25-cv-00075-EAS-CMV Doc #: 102-2 Filed: 08/31/26 Page: 61 of 300 PAGEID #: 2260



56:3 58:3,7,12 59:23 60:9 61:5,8,19 62:4 62:7,25,25 66:1,10,21 67:18 70:6,21 72:13,15 73:25 74:21 75:10 76:6 77:17,19 78:9 79:16 80:7 81:18 82:6,19 84:9 86:4,8,19 89:6 93:20 97:20,24 105:24 106:24 117:21 118:3 118:11 134:5 138:17,24 139:2,5,6,16
**number** 63:24 64:17 73:15 130:22
**numbered** 46:11 83:24
**numbers** 28:2 131:9,16 133:5
**numerous** 138:16

**o**

**o** 6:1
**oaths** 6:5
**object** 36:19 103:19
**objected** 25:13
**objection** 6:6 7:9 24:16 25:20 43:20 109:24
**objections** 25:10,22
**obligation** 115:3 126:9
**obtain** 42:9 130:17
**obtained** 123:11 124:2 124:14 130:19
**obvious** 129:25
**occasion** 69:3
**occasionally** 85:20
**occasions** 31:11
**occurred** 18:24 41:20 113:3
**occurring** 35:24 36:3,6 37:8,11,12 39:13 40:3
**october** 20:25 21:5,6,9,13,16 44:8,23 81:13 112:10,11 119:4
**odh** 5:7 11:13 11:18 12:6,7 12:14,15,18 35:20 36:2,13 36:14 38:7,16 40:15 42:25 69:16,20 112:9 112:10 113:6,8 114:6 115:10 119:1 120:11 124:3 125:1,3 134:3,3,11,22 138:12 141:2,4 141:13
**offer** 90:15
**offered** 87:13 90:11
**offering** 138:14
**office** 9:3,8,11 9:14,15,17 10:4 14:1,6,25 20:14 41:13 47:2,4,7 48:2 48:14,14,17,23 49:11 50:22 68:6,7,9 78:18 78:19 79:1 80:11 82:10,11 82:12,13 83:16 83:18 85:14,19 86:6 88:6 89:22 90:3 92:12,15 97:20 100:25 101:5 122:18
**officer** 143:1,2
**offices** 79:6 98:3,3
**officially** 134:5
**officials** 107:18
**oh** 1:21 2:5,22 3:7 6:23 28:10 86:11 87:17 95:16 103:15 106:1 110:25 118:16,19 120:10 122:22 139:6
**ohio** 1:2,11 3:3 3:12 6:5 14:21 20:17,22 46:15 46:19,20,22 47:3 59:10 67:23 68:15 91:3 94:18 98:7 103:5 105:8,13 108:5 108:8,20,22 111:14,20,22 113:11 114:16 115:23 116:1,5 116:10 117:9 117:16 120:4 120:13,15,16 121:6,21 123:7 123:19,25 124:7 125:18 128:12 130:6 130:15,17 134:23 143:21
**ohio's** 19:17 46:23,25 83:18

**okay** 6:23 7:19 8:16,23 9:9,13 10:6,16,20,22 13:15 14:10,23 15:5,9,21 16:3 17:12 18:6,23 20:13 21:15,21 21:22 22:2,3 22:22 23:1,9 23:16 24:6,15 25:7,22 26:13 26:16 27:20 28:4 29:6,10 29:15 30:13,13 31:6,13,24 32:19 34:22 35:3,11,14,17 35:23 37:13 38:22 39:11 40:22 41:23 43:2 44:2 45:2 45:14 46:12 47:13,18 49:1 49:14,22 51:4 51:19 52:8,17 53:5,24 59:1 59:22 60:24 61:3,16 63:18 64:21,25 65:14 66:18,20 69:7 69:23 71:2,16 71:20 72:9 73:10 74:3,14 75:10 76:10,16 77:3,16,21 78:1,13,23 79:3 80:7,15 80:19 81:16,24 82:3,8,17 84:6 84:20 85:13 87:17 88:20 89:3 90:6,21 91:11,15,23 92:5,22 93:16 94:9,21,25 95:10 96:13,21 97:1,25 99:20 99:25 100:3,12 101:7 102:2,8 103:17 104:1,2 104:8,14 105:17,22 106:14 108:11 110:2,22,25 111:3,16,19 112:13,22 116:1 117:15 117:20,23 119:25 120:2,6 120:10,22 121:9,14,18 122:6,13,24 123:5,9,15,22 124:2,21 126:1 126:5 127:7 128:10,25 130:14,25 131:9,15,25 132:10,14,22 133:4 134:1,2 134:10 135:5 136:6,8 137:10 137:13,18,21 138:8 139:6 140:11,17 141:9,15,19 142:10

**ones** 50:20 51:22 68:20 75:21,22 76:3 100:9 136:13

**online** 91:16 134:18 138:13 139:9,15,20,24 140:6,8

**open** 80:11 82:13 83:8,9 100:13

**operated** 83:19

**operation** 100:15 138:14

**operational** 85:8

**operations** 13:19 98:13

**opinion** 32:5 82:19 115:5,5 115:12,20,21

**opioid** 120:18 120:20 121:20

**opportunity** 23:5,9,17

**opposed** 138:11

**option** 117:12 139:20

**options** 116:25 117:11 139:9

**order** 33:1,11 34:6 41:11 106:11 128:15 139:10,24 140:5,7 142:1

**ordered** 128:24 131:1 142:2,3

**ordering** 40:6 40:18 121:22 128:19 136:24 137:7

**orders** 112:5,14 112:21 113:3 129:1,4,6,7,14 129:21,25 131:10,20,22 131:24 132:9 132:10,12,16 132:18 133:2 134:7,13 135:21 140:6

**ordinary** 61:14

**organization** 57:9

**organized** 137:1,4

**original** 52:15 87:2 116:14 125:19

**originally** 129:12 140:7
**outcome** 143:16
**outlined** 41:16
**outside** 78:14 112:25 126:3,7 126:15
**overlapping** 105:6 113:4
**overseeing** 93:13
**own** 29:18 33:1 33:11 43:12 48:5 57:8 70:12,15 126:18
**owned** 70:15
**owner** 70:19 78:6
**ownership** 70:11
**owns** 71:14

**p**

**p** 2:1,1 3:1,1 6:1
**p.m.** 1:18 6:3 8:7 45:22 84:9 142:14
**page** 4:2,8 5:2 46:10 64:16 65:15 67:15 69:24 70:21,23 71:12 72:9 73:11 80:8 84:7,8 86:10 86:11,14,15,23 86:24 91:12,15 97:6,8 112:3 127:13 130:6 130:10 133:8 141:6,9,10
**pages** 70:5 77:7
**paid** 61:15,16 94:3,7 95:25 96:23 127:15 127:17 128:11 134:25 140:12
**paper** 53:14 137:3 140:8
**paragraph** 46:13 123:10 123:13
**part** 6:18 22:23 35:18 44:12
**partially** 42:17
**participated** 138:20
**participating** 23:12,12
**particular** 19:17 40:13 68:20
**parties** 6:7 106:24 143:12 143:14
**password** 4:18 15:10,16 18:4 47:24 54:9,9 54:13,18,25 55:2,6,25 56:4 56:11,20 57:6 57:6,7,8 73:24 74:1,4,11 75:6 75:13,15,18
**passwords** 15:9 16:17 47:25 48:3 53:24,25 54:6 55:1,7,8 55:11 56:7,20 56:24 57:3,3 57:11 73:2 74:21
**past** 132:1
**patrick** 98:9,14 98:21
**pattern** 90:13
**pay** 61:11,18
**paying** 66:21 135:13
**payment** 63:23 87:1 91:16,19 91:22 92:10,14 92:19 93:2 94:10 95:6,19 95:20 96:4
**payments** 61:5 61:7 64:21 65:7,7,21,21 66:2,11 91:24 93:7,24,25 94:22 95:1,5 95:11,15 96:6 96:14,15,19,22 96:25 97:10,12
**pdf** 80:2
**peer** 103:7
**people** 14:22 18:14 19:20 20:8 27:19 55:21 71:10 73:5 79:24 98:6,17,18 99:2 116:4 120:11,12 121:20 129:10 133:10 135:17 137:6 138:22 139:24
**percent** 38:9 68:16 131:23 132:16,17
**percentage** 132:25
**perfect** 141:25
**period** 11:19 12:4,13,17 13:9 18:25 49:8 57:14 95:21 113:3 125:13 129:24 130:21 131:1,5 134:8 136:19

**periods** 11:22
**permitted** 6:11 83:4
**person** 29:7 98:16 127:12 140:3
**person's** 112:25 129:11
**personal** 20:14 48:16,17 50:18 53:3 56:20 68:9 74:9 87:19
**personally** 62:8 65:22 109:21
**perspective** 20:23 139:11
**perspectives** 105:4
**persuade** 113:11,13 114:16,19,22 115:10 121:24 124:7
**persuaded** 116:10
**pharmacy** 112:6,15 130:7 130:16,18 131:6 133:13
**phone** 12:17 68:8
**phones** 49:15
**physical** 53:6,8 53:15,17,23
**physically** 10:2 10:3 21:4 26:17 29:4,5
**picked** 49:6
**piece** 53:14
**pirate** 65:11 66:14
**place** 8:20 13:6 24:19 116:20 129:21
**placed** 112:5,15 112:21 129:4 129:23
**plaintiff** 1:6 2:2 3:2 7:2
**plan** 27:1
**planned** 70:17
**planning** 98:10
**plausible** 17:23 17:25
**please** 6:21 8:2 32:4 46:6,10 69:9 73:11 89:25 104:13
**plotter** 85:2
**plotters** 79:5,8 79:11,17 83:10 84:24
**plural** 60:23
**plus** 78:19 109:4
**point** 13:22 15:5 39:6 113:10 114:12 125:7,11 140:8
**pointing** 112:13
**points** 45:13
**policy** 121:12 121:21
**popularity** 136:14,20
**portal** 59:14
**porter** 3:5 7:1
**porterwright....** 3:8
**portion** 29:25
**position** 17:20 18:21 31:24 35:21 43:2,7 43:17 69:5 104:14 105:9 105:25 106:5 106:11,14 113:15 122:6 122:10 124:17 124:25 125:2 129:13,19 134:10 136:18
**positions** 27:11
**possession** 46:23,25 47:1 47:19,21 48:13 50:17,18 52:16 88:6
**possibility** 117:5,8
**possible** 11:21 34:2 72:24 81:17 94:5 124:19 135:1
**possibly** 36:22
**post** 44:25 106:23,24
**potential** 39:15 39:18 40:4
**pottiger** 92:17 92:18
**power** 26:24 27:3
**premise** 40:1
**preparing** 133:17
**present** 3:11 21:4,8,9 22:6
**presenting** 104:20
**president** 11:9 12:12 13:12,20 26:24 27:9 30:10 32:2 66:4 68:23 69:6,18 72:7 83:1 85:9 86:16,21 89:18 93:18 102:11 102:23,25 104:6,12,16 105:7,11,16,20

**presumably** 76:1
**prevent** 13:12 82:9 99:1 117:3
**prevented** 105:23 106:6
**previous** 24:25 26:4 62:12 71:5 87:25 88:3 89:13 90:14 95:22 126:19 129:2,2
**previously** 8:3 30:10 46:7 123:7
**primary** 57:22 58:2,6 61:4,8 71:4,11,22,25
**printer** 48:9,11 48:12
**printing** 133:19
**prior** 9:2 34:23 143:5
**private** 103:9
**pro** 2:3 34:15
**probably** 55:15 80:14 92:13 139:5
**procedural** 6:12
**proceeding** 6:10 142:15
**proceedings** 143:3,5,6,9
**procurement** 40:5,12
**procuring** 113:1
**produced** 6:9 33:25 52:13 56:10,14 64:18 111:11
**product** 108:5 109:11 113:2
**program** 56:8 65:11 68:12 135:15
**programmed** 62:10
**promised** 116:15
**proper** 23:8 24:23 82:15,18 127:10
**properly** 24:4 25:21,23
**property** 46:15 46:19 47:8 48:16,17,18,19 48:21,24 49:4 49:10 78:1,5 98:22 99:2,9
**proposed** 141:7
**protect** 14:20 19:16 54:4 98:12
**protected** 75:6
**prove** 129:23 129:24
**provide** 18:17 46:21 56:17 71:2 74:4 76:13 80:5 81:10 99:20 123:19
**provided** 9:9 24:1,23,23,24 24:25 40:11 52:22 71:3 74:6 81:11,14 81:14 112:9 133:11
**provider** 134:19
**providers** 130:20
**public** 12:18 40:9 114:2 137:6 143:20
**pull** 46:6
**purchased** 131:4
**purchasers** 128:2
**purchases** 128:3
**purported** 21:2
**purportedly** 44:8
**purporting** 11:6 67:17 68:23
**purpose** 23:21 26:12 114:11 115:14,17,18 121:18 122:3
**purposes** 8:10 22:2 134:22
**pushing** 138:9 138:21
**put** 54:22 130:3 134:19 135:17 138:13,19 139:1,9,19

**q**

**qualified** 143:7
**quality** 43:15
**quarter** 129:2,2
**question** 10:21 16:18 29:10 31:21 33:8,9 36:20 37:6 39:21 43:6 51:6 58:19 69:7,8,9 89:21 89:25 93:6,23 101:8 103:16 103:23 104:1,3 104:8,13 106:4 109:23 110:4,9 116:12 125:14 127:2 132:2,3

132:9,10,15,21 132:23 133:1 137:5 141:1
**questioning** 22:2 35:4
**questions** 7:25 30:1 31:17,20 46:5 67:14 73:13 97:17
**quickbooks** 15:7 72:10,13 72:16,23 73:2
**quicker** 10:18
**quickly** 81:2,8 88:19 108:16
**quite** 94:4

**r**

**r** 2:1 3:1 6:1
**raina** 1:9 2:17
**raise** 7:10
**ran** 138:14
**rarely** 78:25,25 78:25
**rather** 8:11 89:8
**raw** 133:22
**reach** 36:20
**read** 42:19 79:6 84:15 110:8
**reading** 42:22
**ready** 31:16,20
**real** 26:6 88:18
**really** 17:11,19 21:12 25:3 38:3 54:21 80:6 107:11 117:12,13
**reason** 25:12 40:16 53:21 68:4 96:1 101:22 115:16 130:1 131:17 134:7,13,15,20 135:23 136:2,4 136:16
**reasons** 26:13 45:3 115:14 121:23 131:16 131:19 132:13 133:7 135:20 136:1,12 138:18 139:11
**recall** 10:15 11:10,15,20 12:3,8,16 15:15,19 18:19 19:5,12 21:2 24:9 25:14 26:16,23 29:6 29:7,8,9 31:8 34:23,25 35:6 40:15,18 53:14 56:1 57:5 60:5 62:22,23 66:13 72:16 94:2 123:4
**receive** 20:3 31:21 67:11
**received** 9:1 13:9 15:15 42:16 46:18 47:16,17 96:14 117:25 125:9
**receiving** 43:8 85:11
**recently** 123:11
**recipients** 12:4
**recognize** 38:5 64:21 67:9 84:4
**recognized** 65:6
**recollection** 9:21 11:18 15:4 64:25 96:8 120:3
**recommendat...** 43:5,9,19
**recommended** 87:24
**record** 6:2,7,21 7:21 23:11,13 32:4 38:6 45:17,20,21 46:3 69:11 76:22,24,25 77:4 88:9,12 88:13,21,22,23 101:11,12,13 101:15 110:11 132:5 137:23 137:25 141:3 142:12 143:9
**recorded** 6:14 22:11 143:6
**recording** 6:9 143:8
**records** 12:9,19 12:20 40:9 95:14,17,23,24 96:4,11,13,18 108:20 109:4 124:14,16
**recuse** 102:15
**recused** 102:20
**red** 103:6
**redact** 26:6
**redacted** 24:23 30:1 42:17 56:11 74:4 76:13 81:12
**reduce** 90:18
**reduced** 143:7
**reduction** 1:11 3:3,12 14:21 19:17,21 20:17 20:22 41:12 46:15,19,20,23 46:25 47:2 59:10 67:23 68:15 83:17 91:2 94:18 98:7 103:8 105:8 130:6

**reese** 110:5 112:5,15 113:12 124:7 124:18 128:14 135:20
**reese's** 40:18 124:15,23 126:25 127:14 127:22
**refer** 8:12 22:1 112:20
**reference** 28:14 66:14 80:17 113:23 114:3
**referencing** 35:4
**referred** 11:25 20:10 73:23 122:17
**referring** 10:11 15:12,13 20:18 20:21 26:1 34:5 38:7 44:10 46:16 51:10,13,22 52:4,5,9,10 62:9 63:11 79:24 80:11 92:23,24 140:14
**reflect** 33:19,20 95:24 96:14 130:22
**reflected** 95:15
**reflection** 26:11
**reflects** 96:9 97:10
**refresh** 64:25
**refreshes** 120:2
**refuse** 71:17 139:19
**refused** 70:22 134:19 139:8 139:11
**regard** 89:1
**regarding** 11:14 31:2 38:2 45:9 126:6
**registered** 107:8,11,13,24 108:1,1,8,12,23 108:24 109:1,5 109:18,22
**regular** 63:9
**regulation** 37:2
**regulations** 37:11,17
**reimbursed** 124:16
**rejected** 43:18 43:22
**related** 121:22 126:3 143:11
**relationship** 78:13
**relative** 143:13
**release** 17:1
**relevant** 27:11 29:14 66:7 69:5 123:24
**relied** 133:17
**relinquish** 27:13 49:3,7 70:22 71:17,25 72:2,3 73:1
**relinquished** 27:15 70:1 75:14
**relinquishing** 27:17
**reluctant** 116:23
**relying** 88:16 89:1
**remain** 88:5 89:22 90:2,6 102:10
**remained** 50:17 60:6 135:2
**remaining** 35:5 35:11
**remember** 11:25 12:19 14:18 19:14 24:21 26:19 30:19 31:8,12 35:9 52:23 53:11,12 54:15 55:13 56:15,18 57:15 63:3 66:5,15,18 68:1 72:20 92:14 93:21 96:4 98:23,24 99:18 109:9
**remind** 55:24
**reminger** 1:19 2:20 6:24
**reminger.com** 2:23
**removal** 41:11
**remove** 15:6 32:1,6 70:4
**removed** 21:1 49:11
**renew** 84:18 85:6,10,14,15 87:7,8,10 89:2
**renewal** 84:14 87:1
**rent** 62:18 63:22,23 87:1 94:6 95:25
**rented** 95:19 96:3
**repeated** 69:11 110:11
**repercussions** 113:19
**rephrase** 58:19
**report** 39:14,18 41:9 42:10,17 42:20,23 43:8

43:23,24 83:7 107:15 109:15 109:17,25 117:25 124:3 133:8
**reported** 1:22 36:2 82:25
**reporter** 6:2 7:8,16 12:22 45:18,21 64:1 64:3 67:2 69:10,11 73:17 76:22,25 88:11 88:13,21,23 90:22 101:11 101:13 110:10 110:11 119:12 137:24 138:1,3 141:16,19,23 141:25 142:10 142:12
**reporting** 35:19 38:3 42:24 82:23 83:5 107:14 108:6,16 109:7
**represent** 20:22 67:17 68:23
**representatives** 18:7
**represented** 77:22
**representing** 6:24 7:2,6 34:15 108:17
**represents** 77:13
**request** 15:15 19:13 22:21,23 40:9 131:20
**requested** 13:2 13:4 22:18,20 22:22 69:12 110:12
**requesters** 131:23
**require** 109:10 116:3,5 117:9 138:13
**required** 17:1 23:25 24:21 25:18 33:5,6 33:16
**requirement** 24:8 33:23 108:6
**requirements** 107:14 109:7 127:11
**requires** 36:20
**research** 17:18 18:5 36:9 43:12 126:18 130:2
**researched** 39:10
**resolve** 81:1,23 82:1
**respect** 57:2 69:23 70:20 77:24 78:10 101:20,24 102:22 105:1 132:24
**respected** 115:4
**respond** 116:3 116:5 122:14 122:16 123:1
**responded** 122:17
**responding** 118:25
**response** 76:11 112:11 120:18 122:19,20,22 122:24 123:4
**responsibilities** 13:20
**responsibility** 114:10 115:1,7
**responsible** 63:5 91:21 94:12 121:20
**restrict** 55:4,6 135:18
**result** 116:17
**resulted** 95:6
**retaliated** 35:19 41:5
**retaliation** 35:12,17 41:3 41:15 42:5,24
**retrieve** 99:8
**retrieving** 99:2
**return** 9:14,15 46:14,19 47:7 47:9 49:23 51:5 52:17 53:16 54:5,5 54:10 70:15,18 117:10
**returned** 49:16 50:6,23 54:8 58:21 70:13
**review** 42:19 44:20 60:16 86:1 114:25 141:12
**reviewed** 60:12
**reviewing** 42:22 91:8
**revise** 126:11
**revised** 105:13
**richard** 120:8 120:12
**right** 6:22,23 7:10 17:4,7 21:17 22:4 23:8,19 24:3,9 25:5,8,9,19,23 26:15 28:3,7 34:11 35:8 37:23 39:17,24

45:5,14 59:8 59:11,12 66:24 67:4 71:10 73:10 74:15 76:22 83:21 86:25 93:2,4 97:1,15 101:7 103:24 106:20 106:22 119:1 119:11 123:9 123:16 130:4 134:1 136:25 140:20
**rights** 57:25 116:24
**righty** 134:1
**risk** 90:18
**role** 77:23 78:9 113:1
**room** 48:9 51:2
**roughly** 134:17
**rules** 6:13 10:16

**s**

**s** 2:1 3:1 4:7 5:1 6:1
**salary** 127:22 128:6 135:14 135:14
**sales** 127:23 128:6,11
**savings** 4:9 28:20 29:2
135:14
**saw** 9:22 26:17 67:25 72:18 81:4 82:4 96:18 108:21 131:20
**saying** 41:19 59:3 80:9,10 101:19 138:24 141:10
**says** 65:3,15 80:3,8,19 84:13 86:15,15 87:2 97:8,10 113:24 117:7 130:14
**scam** 61:25
**scenes** 79:22
**schang** 2:23
**scheduled** 34:9
**scratch** 58:10 75:11
**screen** 4:19
**script** 23:14 25:4
**se** 2:3 34:15
**sealed** 34:25
**search** 132:19
**searched** 108:19
**second** 32:19 34:24 35:1 41:16 42:6 46:13 69:23
88:10 101:10 103:6,7 119:15 130:11 137:23
**secretary** 24:2 24:21 25:17
**see** 8:24 12:10 20:18 28:21 30:15 44:4 46:15 61:10 65:10,14 66:6 74:25 75:6,18 75:20 78:25 82:5 84:11 91:17 93:1 94:22 108:17 118:21 122:1,2 122:3 123:12 125:11 130:7,9 131:9
**seek** 79:5
**seeking** 139:14
**seem** 74:15
**seems** 109:15 113:4
**seen** 67:22 118:9
**send** 10:25 11:4 11:5,7,12 18:19 28:25 60:19 62:10 63:8 69:4 79:4 120:3 133:13 133:18,20,22
**sending** 68:3,6 68:8,13 69:16 82:8 84:10 114:11,23 121:18,23
**sense** 79:13 105:12
**sent** 11:24 20:5 20:6 24:3 30:14 31:2 36:12 38:16 39:8 40:14 47:14 55:24 63:7 67:15,19 67:21 68:22 69:4 80:10 82:12 111:16 117:16 120:6 121:14 122:9 122:25 123:1 123:25 138:18
**sentence** 80:19
**separate** 34:24 59:11 64:14 141:8,11
**september** 8:6 8:13 9:2,6,7 10:7,8,8,10,11 10:12,13,24 11:13 12:1,2,5 13:10,18,22,24 14:4,25 15:5 19:1,9 29:16 29:21,22 38:16

40:11,14 49:24 49:24 50:23,25 58:22 125:25 128:20 129:5
**series** 8:24 41:13
**serve** 42:7 103:4
**serves** 42:4 45:10
**service** 65:3
**services** 60:4 120:16 130:16 130:18 140:2
**set** 29:15 31:13 62:16 63:19 66:24 73:14 83:21 85:21 88:8 97:15
**settled** 81:7
**seven** 25:4 52:3
**shadwick** 121:10
**shearer** 2:10,11 7:5,5 28:8,11 36:19 43:20 87:15,18,22 88:18,25 103:12 110:20 110:24 111:2 137:14,16,20 141:21,24 142:3,8
**sheet** 138:14
**ship** 65:11 66:14 83:2,2,4
**shipments** 130:6,19
**shipping** 85:17
**shop** 78:20 101:1
**shot** 4:19
**show** 95:17 115:15
**showed** 22:23 131:21
**sic** 9:3
**side** 83:22 85:21 88:8
**sierra** 120:7
**sign** 32:25 33:11,15,17,21 106:2,12,16,18 126:20
**signator** 58:2
**signatory** 38:12
**signature** 11:8 29:11 57:22 86:9,12,12,16 141:20 142:13 143:18
**signed** 4:21 79:15 86:3,8 86:21 93:18,20 106:2
**signer** 18:11
**signers** 18:9,10
**signing** 105:23 106:6
**similar** 19:13 25:19 102:14
**similarly** 131:10
**simplicity** 132:13 133:7
**simply** 8:12 31:21 37:7
**simultaneously** 112:6,16
**single** 136:6
**sit** 11:17 24:15 24:16 34:16 36:16 38:23 44:21 94:9
**sitting** 71:16,21
**situations** 116:13
**six** 84:13 87:8 87:13 88:2 89:8,11 90:10 90:15 95:11,15 95:21,25 96:14 96:15,18
**sixfold** 129:24
**sixth** 96:19
**skills** 143:10
**socrates** 12:17 12:24 120:7
**solely** 25:24
**solicit** 116:7
**sorry** 11:6 13:23 29:21 48:7 49:2 60:9 73:12 80:9 93:14 101:9 110:8 119:14 120:24,25 124:21 131:4 131:25 132:4 137:23 139:22 139:23
**sort** 18:21 55:3 62:11 65:12,14 68:12 78:21
**sounds** 37:3
**source** 130:15
**south** 3:6
**southern** 1:2
**space** 20:14
**speak** 23:6,17 23:18 30:18,20 58:16 83:10 84:24
**speaking** 30:14
**special** 24:2,22
**specially** 140:4
**specific** 12:19 26:3,19 62:23 66:14 98:23 104:1 108:6 113:25 117:13 127:2

**specifically** 15:19 18:16 19:21 31:12 52:22 54:10 60:5 72:20 92:14 98:9 99:5,18 109:2
**specified** 108:4
**specify** 39:9 107:17 109:7 109:11,18
**speed** 45:8
**spell** 12:22
**spending** 60:13
**spoke** 12:17 23:7,19,20 31:6
**spoken** 12:16
**spreadsheet** 54:12 133:14
**stack** 110:17
**staff** 9:14,24 10:25 15:7 55:3 60:15,17 60:20,23 70:5 82:12,20 85:13 99:17
**standard** 102:18
**start** 24:5 53:5 89:10
**started** 103:23
**starts** 77:16 123:11
**state** 19:23 32:4 36:16 39:2,4,25 40:25 109:17 112:5,15 120:17 130:7 132:25 143:21
**stated** 74:3
**statement** 4:14 4:22,23,24 26:1 34:19 64:10,14,22 86:14,25 91:2 91:12 94:19,23 97:5,7 140:13
**statements** 106:23 124:16 127:14
**states** 1:1 30:13 107:14,15 108:3,7,20,22 108:24,25 109:4,6,10,19
**statewide** 130:20 131:21 131:22 132:9 132:17 136:14 136:20
**stating** 8:18 11:9
**stenographic** 6:15
**steven** 2:19 6:24
**steward** 1:9 2:17 8:7,17 19:25 112:9
**steward's** 118:25
**stick** 60:9 90:13
**stipulate** 20:23 21:23
**stipulating** 21:24
**stipulation** 6:16
**stop** 66:11 75:23
**stopped** 76:1,4 76:8,9 109:4
**stopping** 66:18
**stored** 51:5,8 51:13,15,20,25 53:2 57:4
**streamline** 7:25 8:25
**streamlining** 8:10
**street** 1:20 2:21 3:6
**stress** 138:9
**stretched** 135:23
**strike** 13:23 103:20 109:24 132:5
**string** 4:20 77:16 80:3 84:4
**stuff** 53:3,9,21 133:22
**subject** 102:14
**subjects** 102:20
**submitted** 5:7 34:4 141:2,4 141:13
**subscription** 65:12
**subsidizing** 135:15
**sue** 80:24 81:3
**sued** 81:21,22 81:22
**sufficient** 18:3
**suggest** 136:3
**suggested** 87:7
**suite** 1:20 2:21
**sum** 43:17
**summarized** 18:21 34:19
**summary** 27:10
**supplemental** 121:14 122:25
**supplied** 95:4,7
**support** 103:7
**supported** 122:10 124:17
**supports** 40:2
**supposed** 47:10 113:14 116:19 125:9

**sure** 10:12,19 19:25 39:21 47:25 49:5 50:14,15 51:22 52:13,18 57:16 58:20,20 61:24 66:8 68:10 70:3 74:16 75:4 80:5,6,16 94:4 95:5 97:23 137:20 140:8
**suspension** 41:10
**swear** 7:9
**switch** 68:17
**sworn** 6:7 7:13 143:5
**system** 83:20

**t**

**t** 4:7 5:1 12:24 55:18
**table** 130:9,10 130:12,14
**take** 6:4 13:13 16:15 31:15 34:8,10 45:15 53:21 55:12 64:16 67:5 75:21 76:18,20 84:22 94:19 98:7,10,15 130:5
**taken** 14:21 16:11 17:13,22 44:8 114:3 143:3,12
**talk** 44:2 47:11 76:16 88:18
**talked** 7:22 19:5 50:23 58:20,22 71:20 72:21 73:10 80:24 81:5 85:4 91:7 126:17,22 127:8,12
**talking** 16:21 17:19 18:23,25 24:12 56:12 80:9 87:16 92:16 93:17 103:23 123:15 132:1 139:22 141:1
**tasha** 1:10 2:18 3:12 7:3 19:24 79:9,19 102:14 105:4 115:20
**tasha's** 115:5
**task** 121:12,13
**tax** 124:16 127:14
**telephones** 49:15
**tell** 7:14 18:12 27:16 64:12,15 75:7,8 77:10 81:17 86:2 97:25 98:14,21 119:20 120:12
**telling** 25:7 62:24
**ten** 103:4 108:19
**tenancy** 87:2
**tenant** 96:7
**tense** 138:16
**tenses** 125:12
**term** 18:1 87:1 87:2,3
**terminate** 32:15 33:2,12 43:5,9 116:23 117:2
**terminated** 42:24 43:16 60:8 76:7,9 117:4
**termination** 4:13 33:1,11 41:7,11 46:6 105:2,24 106:23 118:24 119:6
**testified** 7:15 16:19 42:4 78:3 136:22
**testifying** 143:5
**testimony** 9:18 49:25 63:2 73:23 78:5,7 94:3 95:4 96:3 96:8,9 107:20
**texas** 102:7
**text** 4:19 25:1 26:8 77:14,15 77:15,16 79:3 80:2 82:9
**thank** 7:8,16,19 66:25 90:23
**thanks** 84:10
**theory** 68:10,11 68:18
**thing** 37:3 59:7 66:7 142:6
**things** 8:24 10:18 27:5,10 43:15 82:19 116:18 127:3
**think** 8:19 9:7 10:10 17:3,4,7 17:21,23 18:11 18:20 20:22 21:18 24:20 26:15 27:1 34:6,19 37:2 41:7,18 45:12 52:20 53:19 55:7,12,14,20 56:7 57:13,17 60:18 62:8,19 64:13 68:5,13 71:6 74:6,7,24 79:1,4,17

80:14 81:13,13 85:3,18 92:12 93:14 95:3,16 95:16,18 96:2 96:11 98:20 99:15 101:18 102:12,17,19 103:2,8,16 104:22 107:16 110:17 112:22 114:9 115:2 116:22 117:12 118:1,8,9,13 119:6 122:2 124:9 131:17 132:1,20 135:23 136:2 138:17 139:2 142:3
**thinking** 103:9
**thinks** 115:20
**third** 64:16 68:1 70:20 106:24 112:4
**thornborough** 78:6
**thornborough's** 94:3
**thought** 17:11 17:17 37:16,21 40:4 64:13 70:17 79:22 81:6,9 82:3 90:12,20 92:21 101:23 104:9 116:7,16 123:24 124:10 124:14 132:21 136:9 138:12
**thousand** 135:3
**thousands** 135:6
**threatened** 19:19
**threatening** 81:4
**three** 34:23 35:2 41:6 63:7 63:8 67:22 68:5,18 79:23 97:10 98:2 129:17
**thrive** 103:7
**throw** 133:10
**thursday** 1:17
**tia** 120:8
**ties** 127:22 128:6
**time** 1:18 6:3 6:20,23 9:9,15 10:12,13 11:19 11:22 12:4,12 13:9 15:11 18:25 19:13 24:17,18 25:2 25:3,15 27:14 27:17 28:25 31:6 36:1,12 37:15,25 38:15 39:10 40:8,14 40:16,19,22 41:1 45:18,22 47:6 49:8,14 55:4,5 56:3 57:14,15,16 65:25 66:10 68:16 76:7,23 77:1 87:19 88:14,24 89:21 95:21 101:14 102:2 104:13 117:15 124:25 125:8,13 126:1 131:1,5 133:2 134:8,12 135:22 136:18 136:24 137:24 139:4 140:12
**times** 10:6
**timing** 41:6,20 94:5 125:8
**today** 7:20,24 8:1,10,25 10:18 11:17 22:10 24:15,16 34:16 36:16 38:19,23 42:4 42:23 44:21 63:2 71:12,16 71:21 73:23 75:5 94:9 107:20 126:20 141:18
**together** 11:22 54:22
**told** 9:22 20:6 23:14 27:18 40:15 60:15,17 60:18,18,24 83:9,11 85:5 87:12 98:9,16 99:18 118:21 136:13
**took** 13:6 24:19 40:20,20 53:19
**top** 29:8 109:10
**total** 128:20
**toward** 30:2
**towards** 97:7
**trained** 140:4
**transactions** 65:16
**transcript** 6:9
**transcriptionist** 143:8
**transfer** 53:3 58:2 71:22 72:8 73:3,5
**travel** 124:16
**tried** 54:3
**trinh** 84:10
**true** 21:14,16 22:6 26:12 127:9 143:9
**truth** 7:14,14 7:15

**try** 7:25 8:1 18:15 80:24 81:16 87:13 106:8 124:6
**trying** 10:17 13:12,16 14:20 18:2 19:16,20 20:9 41:25 63:21 79:5 81:3 90:17 98:18 113:11 113:13 114:16 114:19,22 115:10 117:3 118:9 121:1 124:9,22
**tuch** 12:18,24 120:7
**turn** 8:2 16:16 17:14,22,24 18:3 46:10 71:9 73:11 86:23
**turnell** 1:10 2:18
**turner** 3:12 7:3 7:3 19:24 128:25
**two** 7:24 27:21 41:6 77:7 95:5 96:6 98:2 131:22 135:10 137:17 140:1 140:10
**typewriting** 143:7

**u**

**u** 12:24 55:17
**uh** 93:10 119:12
**ultimately** 13:5 42:16 82:1 94:8 115:6 138:17
**unanimously** 33:2
**unannounced** 9:17
**unauthorized** 14:22 67:16
**uncertain** 34:2
**under** 6:12 87:1 105:13,13
**underneath** 130:14
**understand** 6:8 8:16 13:16 18:2 34:8 44:9 50:14 84:17,20 121:4
**understanding** 8:14 33:14 44:3,17 77:23 78:8
**understood** 10:1 84:23 141:12
**undisclosed** 124:24 125:5 125:16
**unfortunate** 83:12
**united** 1:1
**universal** 54:24
**university** 102:6
**unknown** 99:2 99:5
**unlawfully** 19:20 20:4
**unlock** 100:15 100:15
**unlocked** 100:17,20 101:5
**unredacted** 24:24 56:18
**unusual** 66:8
**updated** 55:21 66:6 72:18
**updates** 60:19 84:11
**usa** 126:20
**use** 23:24 48:10 56:21 68:12 74:12 76:6 119:14
**used** 27:2 48:1 48:4 55:1 60:4 63:7 65:22 68:15 74:11,17 75:25 124:2,6
**useless** 133:19
**uses** 6:11
**using** 18:1 129:14,20
**usually** 69:20 100:19

**v**

**v** 1:7
**vacated** 63:13 63:14,17,17
**valid** 23:23 26:14 40:24 43:25
**validity** 44:7
**vanguard** 55:15 75:4
**vanguard's** 75:1
**various** 25:18 41:9 60:4 61:11 105:5 107:15 108:3 108:19 109:6
**velocity** 107:5 107:21,25 108:8,12,15 109:1 124:15 124:24 127:15 140:14
**verbally** 24:5
**verify** 62:2 136:24

**verifying** 136:23
**version** 42:17 81:12
**video** 22:16
**view** 82:15 104:3,10,20 105:18
**violated** 38:1,4 38:15 39:9
**violating** 36:4 37:2,3,17
**violation** 35:24 36:3,5,7,10,10 36:13,18 37:7 37:10,14,17,17 37:21 39:12 40:3,4
**violations** 38:25 39:3
**virginia** 108:21
**visit** 78:17
**voit** 111:12 120:6
**volume** 1:16 129:22 135:2
**vote** 16:15 17:14,22 104:15,17,18 105:10,15
**voted** 21:1
**voting** 105:1,19

**w**

**w** 124:16 127:14,19
**waive** 23:19 24:3 34:11
**waived** 141:22 141:23 142:13
**waiving** 23:8
**walk** 8:23 9:22 26:20,21,21,22 45:2
**want** 8:23 21:25 25:9 30:14 44:4,13 45:2 50:13,15 55:10 56:21 59:22 76:16 82:14 84:14,18 84:25 85:6 89:5,22 90:2 90:19 91:11 98:11 106:22 113:2 114:25 119:24 127:8 128:4 130:1 133:10 141:16 141:19,25
**wanted** 40:25 46:22 53:19 81:5 82:21 83:2 89:12,14 89:16,17,19 90:6 115:23 122:1 127:3 136:25 137:8 137:11 139:7 139:13 141:3
**washed** 94:8
**way** 8:25 19:19 37:8 48:16 57:5 62:9 71:24 81:7 106:8 128:21 129:6 136:23 137:1,4
**we've** 44:4 45:4 45:12,12 61:24 71:20 73:10 121:15 138:9 141:1
**website** 15:10 15:13,22 16:8 69:25 70:2 134:19
**wednesday** 78:3 95:8
**weeds** 133:10
**week** 9:20 100:14
**weekend** 98:11
**welcome** 82:11 82:12
**wellness** 111:13
**went** 9:6,24 10:8 20:7 42:14 55:22 67:22 88:1 96:7 102:6 120:21 132:17 132:24 136:9
**wernet** 77:12 77:21 78:14 79:4 82:9
**wernet's** 77:23 78:9
**west** 108:21
**william** 1:9 2:17
**willing** 87:7
**wire** 62:6
**withdraw** 33:8
**withdrawals** 91:16 97:8
**witness** 6:7,8 7:9,13 12:24 28:12 43:21 69:13 87:17,20 87:23 110:25 111:3 143:4
**wonderful** 138:22
**word** 27:2 61:12 127:6 130:4
**words** 23:24
**work** 13:8,14 42:13,15 52:4 82:21 90:18 113:5 128:2
**workday** 10:9

**worked** 20:1 25:1 26:7 42:9 57:17 62:9 127:10 135:10
**working** 56:3 76:1,4 85:13
**worried** 98:5
**worth** 52:3 65:20 95:11,25
**would've** 13:14 15:20,25 16:1 16:4 18:3 25:20 27:2 30:20 32:25 65:9 66:6,8 72:19 76:2 81:6 115:3,13 118:10 120:18 122:22 131:6 133:8 134:14 134:20 139:2,3 141:11
**wrapping** 140:21,22
**wright** 3:5 7:2
**write** 62:4
**writing** 24:3 33:3 34:10
**written** 6:16 24:1 33:5,24
**wrong** 31:10 55:16 64:15 73:8 117:24 125:12
**wrongfully** 72:10
**wrote** 84:10

**x**

**x** 4:1,7 5:1 18:12 30:6 106:17

**y**

**yard** 1:20 2:21
**yeah** 9:19 10:5 10:13 12:1 20:8 28:4,11 28:13 29:21 37:1 42:7 43:24 49:18,20 50:25 53:2 59:13,14 60:6 60:19,22 64:3 66:18 76:8,20 79:13 82:22 85:9 92:17,25 93:19 100:23 101:2,11 103:21 106:9 109:9 116:6 121:3,8 122:3 122:23 125:24 132:7 133:18 133:24 137:15 141:24 142:7
**year** 54:23 87:3 87:11 89:6,15 89:18,23 90:3 90:7 111:25 128:22 130:20 135:1,2,3,7
**year's** 129:2
**years** 27:21 52:3 54:23 62:18 78:19 83:19 87:25 88:3 89:13 90:14 128:22 135:10
**yep** 60:13 64:20 76:20 88:11 100:19 101:6
**yesterday** 10:17 11:23 49:25 70:10,16 101:8,17 136:22 141:21 142:2,4
**yesterday's** 95:3
**york** 107:16

**z**

**zoom** 22:13,23 65:24 66:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# HARM REDUCTION OHIO

Health. Science · Compassion · Human Rights

November 1, 2024

First Federal Savings Bank of Newark
126 N. Prospect Street
Granville OH 43023

Re: Protecting control of HRO business bank account

To Whom It May Concern:

Harm Reduction Ohio has a bank account at First Federal Savings Bank. The account number is 82069800. The beneficial owner is Dennis Cauchon, president of Harm Reduction Ohio. I, Dennis Cauchon, am the Authorized Signer and Authorized Administrator on the account. This role also may be called Primary Account Holder or Authorized Representative.

The account has a balance of $461,625.57 on November 1, 2024, and includes:

- Savings account x7334
- CD x7342
- CD x7350
- CD x9984
- CD x9800
- CD x8365

**Security request:** I have reason to believe that someone may try to change control of Harm Reduction Ohio bank account at First Federal Savings Bank to themselves. This request seeks to block an unauthorized change of control on this account.

I do not authorize any changes to signers, account control, or other account privileges without my direct approval. If an attempt to change account control or authority occurs, I ask that I be contacted promptly and that no changes be made until the legitimacy and legality of such requests is established.

EXHIBIT
tabbies
29

Sincerely,

Dennis Cauchon
President and Founder
Harm Reduction Ohio
935 River Road, Suite G
Granville, OH 43023
denniscauchon@gmail.com
(740) 973-3814

EXHIBIT 30

**Turner-Bicknell, Tasha (turnerta)**

**Subject:** Re: Fw: [EXTERNAL]Protecting control f HRO bank accounts
**Date:** Saturday, November 2, 2024 at 3:20:06 PM Eastern Daylight Time
**From:** Dwayne Steward
**To:** Maritza Nelson
**CC:** Board Members, mollybtrue@yahoo.com, Turner-Bicknell, Tasha (turnerta), Trinh, Anne, jamesdecker68@gmail.com, colleengarlock@gmail.com, Billy Golden, jdouglas@msnlawoffice.com

[redacted]

On Sat, Nov 2, 2024 at 1:14 PM Maritza Nelson <mnelson@msnlawoffice.com> wrote:

[redacted]

On Fri, Nov 1, 2024 at 8:23 PM Board Members <board@harmreductionohio.org> wrote:

After getting those communications from Cecile, I started looking through the board email to see if we got anything from Dennis' attorney. And I found this. I think Dennis is messing with the accounts. The below came through the board email this week.

Board, we need to start checking this email inbox more often. Let's talk about how we can divvy

this up among the group.

I'm going to connect with Cecile, Jen and AmandaLynn to see if they know anything about any recent activity regarding our accounts.

---

**From:** Daniels, Cathy X <cathy.x.daniels@chase.com>
**Sent:** Wednesday, October 30, 2024 2:02 PM
**To:** Dennis Cauchon <Dennis@harmreductionohio.org>
**Subject:** RE: [EXTERNAL]Protecting control f HRO bank accounts

Ok.. I will get it sent down.
Do you want me only speaking to you on anything?

Cathy Daniels | Business Relationship Manager | Chase Business Banking
50 W Wilson Bridge Rd, Worthington, OH 43085 | o: 614.310.5161 | **Cathy.X.Daniels@chase.com**
For excellent service log on to **www.chase.com**, or call our Business Platinum Support Line: 877.425.8100

We work very hard trying to deliver an exceptional experience to our clients. We'd love to hear from you about how well we're doing. Please respond to an email survey from us with the subject line "Chase for Business requests your feedback about your experience with us. Your Opinion Matters." If you are not 100% satisfied with your experience at any time, please let me or my manager know right away. Thank you for choosing Chase.

Manager Janice Tedesco | Area Manager | Janice.l.tedesco@jpmorgan.com

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

**Turner-Bicknell, Tasha (turnerta)**

**Subject:** Official Notice of Termination
**Date:** Monday, November 4, 2024 at 4:53:12 PM Eastern Standard Time
**From:** Board Members
**To:** Dennis Cauchon
**CC:** mollybtrue@yahoo.com, Trinh, Anne, Turner-Bicknell, Tasha (turnerta), dwayneasteward@gmail.com, jamesdecker68@gmail.com, Billy Golden, colleengarlock@gmail.com
**Attachments:** DCauchon Termination Letter- Signed.pdf

External Email: Use Caution

Hello Dennis,

The HRO Board of Directors have voted unanimously to terminate your employment at Harm Reduction Ohio, effective immediately. After an extensive investigation, consistent complaints from staff regarding inappropriate behavior, and consistent insubordination we have no choice but to terminate in order to protect the agency from further damage.

See official termination letter attached. Please sign the document to confirm receipt and send this back to this email asap. Please collect your belongings from the HRO offices, return control of all systems to HRO staff, and return all HRO equipment by Tuesday, Nov. 5 at 5 pm. There have been reports that you have changed the locks at the HRO office, if you have done this, please return the locs to the original state. If these requests are not completed by the deadline we will be forced to take legal action.

Sincerely,
HRO Board of Directors

EXHIBIT 31

HARM REDUCTION OHIO

November 4, 2024

Dennis Cauchon
327 E. Broadway
Granville, Ohio 43023

Dear Dennis Cauchon,

Your employment with Harm Reduction Ohio, an Ohio nonprofit corporation ("HRO"), has been terminated effective immediately (the "Effective Date"). We engaged legal counsel to conduct an outside investigation of your conflict of interest allegation against AmandaLynn Reese, as well as her retaliation and hostile work environment allegations against you, and several complaints from current and former HRO employees that soon followed. The investigation determined that AmandaLynn does not have a conflict of interest with respect to the Ohio Department of Health ("ODH") contract. Your September 3 letter to ODH claiming that a conflict of interest existed and should have been reported by HRO was based on and contained numerous inaccurate and misleading statements.

The outside investigation also considered your retaliation claim. As you know, our employee handbook includes a whistleblower policy that requires all directors, officers, employees and volunteers to "practice honesty and integrity in fulfilling our responsibilities" and to "comply with all applicable laws and regulations." The policy encourages everyone affiliated with HRO "to raise serious concerns internally so that HRO can address and correct inappropriate conduct and actions." The policy expressly forbids anyone from retaliating "against any board member, officer, employee, or volunteer who *in good faith* reports an ethics violation, or a suspected violation of law . . . or suspected violation of any regulation governing the operations of HRO" (emphasis added). Furthermore, "Anyone filing a written complaint concerning a violation or suspected violation must be acting in good faith *and have reasonable grounds for believing the information disclosed indicates a violation.* Any allegations that prove not to be substantiated and which prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense" (emphasis added).

Your September 3 report to ODH violated this policy. Prior to sending your letter to ODH, you stated that AmandaLynn's work for Velocity BioGroup was not likely a conflict that would affect the ODH contract, and you acknowledged that HRO needed to "know the details" before making any decisions. You agreed that legal counsel should conduct an investigation and prepare a report. You repeatedly acknowledged that HRO needed to maintain the status quo until legal counsel could advise the organization. Despite these statements, you chose to send your letter to ODH, potentially jeopardizing significant funding, prior to an investigation begin completed, without having all of the facts, and while disregarding advice from our legal counsel. Instead of listening to our legal counsel, you chose to rely on advice from Chat GPT (in direct contravention of the

terms of service for Chat GPT). We do not consider this an act of good faith or reasonable grounds for your report to ODH.

You then placed the organization in further jeopardy with your sudden and inexplicable decision to promote Patrick Bourland and give him a significant raise, potentially in violation of equal pay laws.

Finally, your insubordination throughout this entire investigative process, including failing to participate in the investigation, failing to recognize the authority of the board of directors, threatening to return to the office despite being placed on administrative leave so that you can "assert your power" are all grounds for termination of your employment.

Except as set forth in this letter, the Effective Date will be your employment termination date for all purposes, meaning you will no longer be entitled to any further compensation, monies, or other benefits from Harm Reduction Ohio, including coverage under any benefits plans or programs sponsored by Harm Reduction Ohio.

Your final paycheck, subject to all withholdings and deductions as required by law, through November 4, 2024 will be paid in accordance with our standard payroll procedures.

You must immediately return all Harm Reduction Ohio property, including identification cards or badges, access codes or devices, keys, laptops, computers, telephones, mobile phones, hand-held electronic devices, credit cards, electronically stored documents or files, physical files, passwords and login information, and any other Harm Reduction Ohio property and information in your possession.

Please acknowledge below your receipt of this letter and return a copy of the letter back to Harm Reduction Ohio at board@harmreductionohio.org.

Yours sincerely,

Harm Reduction Ohio, Board of Directors

Dwayne Steward, Director

James Decker, Director

Colleen Garlock, Director

Molly True, Director

Anne Trinh, Director

Tasha Turner-Bicknell, Director

Billy Golden, Director

Acknowledged:

.....................................................
Dennis Cauchon
Date .......................................................

ink.

www.chase.com/cardhelp | 1-800-945-2028 | Chase Mobile® app today

| December 2024 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |

New Balance
**$258.75**
Minimum Payment Due
**$40.00**
Payment Due Date
**12/23/24**

**Late Payment Warning:** If we do not receive your minimum payment by the due date, you may have to pay a late fee, and existing and new balances may become subject to the Default APR.

**Minimum Payment Warning:** Enroll in Auto-Pay and avoid missing a payment. To enroll, go to www.chase.com

## CHASE ULTIMATE REWARDS® SUMMARY

| | |
|---|---|
| Previous points balance | 28,868 |
| + 1.5% (1.5 Pts)/$1 earned on all purchases | 4,997 |
| - Points redeemed this statement period | 28,868 |
| **Total points available for redemption** | **4,997** |

Redeem for cash back- any amount, anytime. Log on to chase.com/ultimaterewards to explore all your reward options.

You earn unlimited 1.5% cash back on all purchases- it's automatic! Redeem for cash with no minimum, and your Cash Back rewards do not expire as long as your account is open.

## ACCOUNT SUMMARY

**Account Number: XXXX XXXX XXXX 3581**

| | |
|---|---|
| Previous Balance | $1,661.76 |
| Payment, Credits | -$4,734.06 |
| Purchases | +$3,331.05 |
| Cash Advances | $0.00 |
| Balance Transfers | $0.00 |
| Fees Charged | $0.00 |
| Interest Charged | $0.00 |
| **New Balance** | **$258.75** |
| Opening/Closing Date | 11/02/24 - 12/01/24 |
| Revolving Credit Amount | $20,500 |
| Available Credit | $20,241 |
| Cash Access Line | $1,025 |
| Available for Cash | $1,025 |
| **Past Due Amount** | **$0.00** |
| **Balance over the Credit Access Line** | **$0.00** |

## YOUR ACCOUNT MESSAGES

Your next AutoPay payment for $40.00 will be deducted from your Pay From account and credited on your due date. If your due date falls on a Saturday, we'll credit your payment the Friday before.

0000001 FIS33339 C 1 0516 N Z 01 24/12/01 Page 1 of 3 05630 MA DA 71588 33610000010007158801

**This Statement is a Facsimile - Not an original**

ink.

42463154003935810000400000025875000000001

P.O. BOX 15123
WILMINGTON, DE 19850-5123
For Undeliverable Mail Only

**AUTOPAY IS ON**
See Your Account Messages for details.

| | |
|---|---|
| **Payment Due Date:** | **12/23/24** |
| **New Balance:** | **$258.75** |
| **Minimum Payment Due:** | **$40.00** |

**Account number: XXXX XXXX XXXX 3581**

$ ________ . ____ Amount Enclosed
Make/Mail to Chase Card Services at the address below:

71588 BEX Z 33624 C
DENNIS CAUCHON
HARM REDUCTION OHIO
935 RIVER RD STE G
GRANVILLE OH 43023-9538

CARDMEMBER SERVICE
PO BOX 6294
CAROL STREAM IL 60197-6294

⑆5000160 28⑆1595400393581 5⑈

EXHIBIT
tabbies
32

CAUCHON_000487

**To contact us regarding your account:**

| Call Customer Service: | Send Inquiries to: | Mail Payments to: | Visit Our Website: |
|---|---|---|---|
| In U.S 1-800-945-2028<br>Spanish 1-888-793-0674<br>Pay by phone 1-800-436-7958<br>International 1-480-350-7099<br>We accept operator relay calls | P.O. Box 15298<br>Wilmington, DE 19850-5298 | P.O. Box 6294<br>Carol Stream, IL 60197-6294 | www.chase.com/cardhelp |

## Information About Your Account

**Making Your Payments:**
The amount of your payment should be at least your minimum payment due, payable in U.S. dollars and drawn on or payable through a U.S. financial institution or the U.S. branch of a foreign financial institution. You can pay down balances faster by paying more than the minimum payment or the total unpaid balance on your account.

You may make payments electronically through our website or by one of our customer service phone numbers above. In using any of these channels, you are authorizing us to withdraw funds as a one-time electronic funds transfer from your bank account. In our automated phone system, this authorization is provided via entry of a personal identification number. You may revoke this authorization by cancelling your payment through our website or customer service telephone numbers prior to the payment processing. If we receive your completed payment request through one of these channels by 11:59 p.m. Eastern Time, we will credit your payment as of that day. If we receive your request after 11:59 p.m. Eastern Time, we will credit your payment as of the next calendar day. If you specify a future date in your request we will credit your payment as of that day.

If you pay by regular U.S. mail to the Payments address shown on this statement, write your account number on your check or money order and include the payment coupon in the envelope. Do not send more than one payment or coupon per envelope. Do not staple, clip or tape the documents. Do not include correspondence. Do not send cash. If we receive your properly prepared payment on any day by 5 p.m. local time at our Payments address on this statement, we will credit to your account that day. If your payment is received after 5 p.m. local time at our Payments address on this statement, we will credit it to your account as of the next calendar day.

For all other payments or for any payment type above for which you do not follow our payment instructions, crediting of your payments may be delayed for up to 5 days.

**Account Information Reported To Credit Bureau**
We may report information about your Account to credit bureaus. Late payments, missed payments or other defaults on your Account may be reflected in your credit report. If you think we have reported inaccurate information to a credit bureau, please write to us at Chase Card Services P.O. Box 15369 Wilmington, DE 19850-5369.

**Authorization To Convert Your Check To An Electronic Transfer Debit:**
When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check. Your bank account may be debited as soon as the same day we receive your payment. You will not receive your check back from your institution.

**Conditional Payments:**
Any payment check or other form of payment that you send us for less than the full balance due that is marked "paid in full" or contains a similar notation, or that you otherwise tender in full satisfaction of a disputed amount, must be sent to Card Services, P.O. Box 15049, Wilmington, DE 19850-5049. We reserve all our rights regarding these payments (e.g., if it is determined there is no valid dispute or if any such check is received at any other address, we may accept the check and you still owe any remaining balance). We may refuse to accept any such payment by returning it to you, not cashing it or destroying it. All other payments that you make should be sent to the regular Payment address shown on this statement.

**Annual Renewal Notice:**
If your Account Agreement has an annual membership fee, you are responsible for it every year your Account is open. We will add your annual membership fee to your monthly billing statement once a year, whether or not you use your account. Your annual membership fee will be added to your purchase balance and may incur interest. The annual membership fee is non-refundable unless you notify us that you wish to close your account within 30 days or one billing cycle (whichever is less) after we provide the statement on which the annual membership fee is billed. Your payment of the annual membership fee does not affect our rights to close your Account and to limit your right to make transactions on your Account. If your Account is closed by you or us, the annual membership fee will no longer be billed to your Account.

**Calculation Of Balance Subject To Interest Rate:**
Daily Interest Rates and Annual Percentage Rates may be found on the Rates and Fees Table. Periodic Interest Charge Calculation - Daily balance method (including new transactions): We calculate a daily balance for each type of transaction and use the daily balances to determine your interest charges. We figure the "daily balance" for each transaction type as follows:

- We take the beginning balance for each day and add any interest charge from the prior day (known as compounding of interest) and any new transactions or other debits (including Annual Membership Fees, transaction fees, Penalty Fees, any other fees and unpaid interest charges).
- We subtract payments or credits and treat any net credit balance as a zero balance.

The result is the daily balance for each type of transaction. We figure the interest charges on your account as follows:

- To get the daily interest rate for each type of transaction we divide the APR by 365. We may combine different transaction types that have the same daily interest rates.
- We multiply the daily interest rate by the daily balance for each transaction type for each day in the billing cycle.
- We add together the interest charges for each day in the billing cycle for each transaction type.
- If any interest charge is due, we will charge you at least the minimum interest charge shown on the Rates and Fees Table. We add transactions and fees to your daily balance no earlier than:
  - For new purchases (including Chase Pay Over Time plans created at checkout with select merchants), balance transfers, cash advances, or My Chase Loans - the date of the transaction.
  - For new cash advance checks or balance transfer checks - the date the payee deposits the check.
  - Fees - either on the date of a related transaction, the date they are posted to your account, or the last day of the billing cycle, whichever we may choose.

The Balances Subject to Interest Rate for each type of transaction shown on your billing statement is the sum of the daily balances for that type of transaction divided by the number of days in the billing cycle. We may use mathematical formulas that produce equivalent results to calculate the Balance Subject to Interest Rate, interest charges and related amounts. Credit Limit: If you want to inquire about your options to help prevent your account from exceeding your credit limit, please call the number on the back of your card.

DA04012024

To manage your account, including card payments, alerts, and change of address, visit **www.chase.com/cardhelp** or call the customer service number which appears on your account statement.

## YOUR ACCOUNT MESSAGES (CONTINUED)

Your AutoPay amount will be reduced by any payments that post to your account before we process your AutoPay payment. If the total of these payments and merchant credits is more than your statement balance, your AutoPay payment for that month will be zero.

## ACCOUNT ACTIVITY

| Date of Transaction | Merchant Name or Transaction Description | $ Amount |
|---|---|---|
| 11/06 | Payment Thank You - Web | -2,226.14 |
| 11/06 | Statement Credit Adjustment | -288.68 |
| 11/12 | Payment Thank You - Web | -400.70 |
| 11/15 | Payment Thank You - Web | -141.07 |
| 11/17 | Payment Thank You - Web | -173.64 |
| 11/18 | Payment Thank You - Web | -232.57 |
| 11/20 | Payment Thank You - Web | -325.02 |
| 11/21 | Payment Thank You - Web | -91.01 |
| 11/21 | Payment Thank You - Web | -225.32 |
| 11/26 | Payment Thank You - Web | -255.35 |
| 11/27 | Payment Thank You - Web | -275.27 |
| 11/28 | Payment Thank You - Web | -99.29 |
| 11/11 | MSFT * E0600U5QDX 800-6427676 WA | 51.75 |
| 11/13 | PIRATE SHIP * POSTAGE PRT.SH WY | 103.70 |
| 11/14 | GANNETT MEDIA CO 888-426-0491 VA | 17.79 |
| 11/14 | GANNETT MEDIA CO 888-426-0491 VA | 14.99 |
| 11/14 | PIRATE SHIP * POSTAGE PRT.SH WY | 173.64 |
| 11/16 | OAG CHAR LAW TRUST FEE 614-644-8681 OH | 100.00 |
| 11/15 | PIRATE SHIP * POSTAGE PRT.SH WY | 132.57 |
| 11/18 | PIRATE SHIP * POSTAGE PRT.SH WY | 262.09 |
| 11/18 | FACEBK *WUJUSECFU2 fb.me/ads CA | 25.18 |
| 11/19 | PIRATE SHIP * POSTAGE PRT.SH WY | 91.01 |
| 11/20 | PIRATE SHIP * POSTAGE PRT.SH WY | 129.13 |
| 11/21 | PIRATE SHIP * POSTAGE PRT.SH WY | 187.20 |
| 11/22 | GOOGLE *Google One 855-836-3987 CA | 3.20 |
| 11/22 | PIRATE SHIP * POSTAGE PRT.SH WY | 149.26 |
| 11/25 | PIRATE SHIP * POSTAGE PRT.SH WY | 11.88 |
| 11/25 | PIRATE SHIP * POSTAGE PRT.SH WY | 275.27 |
| 11/26 | PIRATE SHIP * POSTAGE PRT.SH WY | 99.29 |
| 11/27 | PIRATE SHIP * POSTAGE PRT.SH WY | 75.89 |
| 11/30 | ZOOM.US 888-799-9666 WWW.ZOOM.US CA | 31.98 |
| 11/29 | PIRATE SHIP * POSTAGE PRT.SH WY | 150.88 |
| | DENNIS CAUCHON<br>TRANSACTIONS THIS CYCLE (CARD 3581) $2647.36-<br>INCLUDING PAYMENTS RECEIVED | |
| 11/02 | PIRATE SHIP * POSTAGE PRT.SH WY | 137.66 |
| 11/01 | USPS PO 3831990523 GRANVILLE OH | 6.17 |
| 11/05 | PIRATE SHIP * POSTAGE PRT.SH WY | 420.55 |
| 11/05 | Spectrum 855-707-7328 MO | 79.97 |
| 11/06 | PIRATE SHIP * POSTAGE PRT.SH WY | 103.74 |
| 11/07 | PIRATE SHIP * POSTAGE PRT.SH WY | 99.25 |
| 11/09 | PIRATE SHIP * POSTAGE PRT.SH WY | 354.67 |
| 11/14 | PIRATE SHIP * POSTAGE PRT.SH WY | 4.59 |
| 11/17 | AMAZON MKTPL*CO7IN6QA3 Amzn.com/bill WA | 37.75 |
| | CECILE KATZ<br>TRANSACTIONS THIS CYCLE (CARD 7211) $1244.35 | |

| 2024 Totals Year-to-Date | |
|---|---|
| Total fees charged in 2024 | $0.00 |
| Total interest charged in 2024 | $230.00 |

Year-to-date totals do not reflect any fee or interest refunds you may have received.

## INTEREST CHARGES

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Balance Type | Annual Percentage Rate (APR) | Balance Subject To Interest Rate | Interest Charges |
|---|---|---|---|
| **PURCHASES** | | | |
| Purchases | 17.74%(v)(d) | - 0 - | - 0 - |
| **CASH ADVANCES** | | | |
| Cash Advances | 29.49%(v)(d) | - 0 - | - 0 - |
| **BALANCE TRANSFERS** | | | |
| Balance Transfers | 17.74%(v)(d) | - 0 - | - 0 - |

**30 Days in Billing Period**

(v) = Variable Rate
(d) = Daily Balance Method (including new transactions)
(a) = Average Daily Balance Method (including new transactions)
Please see Information About Your Account section for the Calculation of Balance Subject to Interest Rate, Annual Renewal Notice, How to Avoid Interest on Purchases, and other important information, as applicable.

REMINGER
RESULTS. PERIOD.

Steven A. Chang, Esq.
Direct Dial: (614) 232-2446
E-mail: schang@reminger.com

**NOTICE TO CEASE AND DESIST**

March 28, 2025

***VIA EMAIL ONLY:***

Christopher W. Tackett
Bailey Cavalieri LLC
10 West Broad St., Suite 2100
Columbus, OH 43215
ctackett@baileycav.com

Re: **Cease and Desist and Demand to Release Harm Reduction Ohio Property**
*Cauchon v. Steward, et al.*
United States District Court for the Southern District of Ohio (Case No. 2:25-cv-0075)
Franklin County Court of Common Pleas (Case No. 25 CV 1711)

Dear Mr. Tackett:

Please be advised that our office represents Harm Reduction Ohio ("HRO") and its Board of Directors. We are directing this letter to you, as you are counsel to Mr. Cauchon with respect to the above-referenced lawsuits. If we should direct this letter to Mr. Cauchon directly, or to another attorney, please let us know.

It has come to our attention that Mr. Cauchon—in violation of numerous state and federal laws—has continued to represent to others that he is still "President" of HRO and has taken, and continues to take, unauthorized actions purportedly on behalf of HRO. These unauthorized actions include, without limitation:

- Mr. Cauchon has sent unauthorized emails from the "harmreductionohio.org" domain, purporting to represent HRO.
- Mr. Cauchon has blocked HRO's access to, and continues to alter, the HRO website, including recently removing pages that identify the HRO board members and staff.
- Mr. Cauchon has blocked HRO's access to the HRO Facebook page.
- Mr. Cauchon has denied HRO access to its own Chase bank account and credit cards. He continues to wrongfully operate these accounts, without any authority to do so, in violation of state and federal law.

EXHIBIT
tabbies
Ex 33

- Mr. Cauchon has wrongfully accessed HRO's QuickBooks account and contacted HRO's bookkeepers in an attempt to gain information about HRO.
- Mr. Cauchon has denied HRO access to its property in the Granville office, including approximately 4,000 naloxone kits, 20,000 fentanyl strips, about $10,000 worth of printed materials, and other furniture and physical HRO property, paid for by the organization.[1]

Mr. Cauchon is hereby directed by HRO to **immediately cease and desist** all activities, without limitation, and immediately relinquish control of all tangible and intangible property back to HRO **no later than April 1, 2025**.

It is particularly telling how swiftly and definitively Judge Miller blocked Mr. Cauchon's request for immediate reinstatement. As you know, Judge Miller in his recent Order correctly noted that ***Mr. Cauchon's actions***—changing the locks on the Granville office building and interference with HRO bank accounts—have "significantly interfered with HRO's operations." (Mar. 25, 2025, Order at 3–4). And this was just the beginning.

A failure to comply will result in immediate action, including, but not limited to, the following.

**HRO's Claims Against Mr. Cauchon and Notice of Intent to File**

The Ohio Revised Code provides a private cause of action for criminal acts. R.C. 2307.60; *Jacobson v. Kaforey*, 2016-Ohio-8434, ¶ 10. No underlying criminal conviction is required to pursue a civil cause of action under the statute. *Buddenberg v. Weisdack*, 2020-Ohio-3832, ¶¶ 11–13. Mr. Cauchon's above actions are violative of multiple state and federal criminal statutes.

*First*, Mr. Cauchon's actions are a violation of R.C. 2913.04, which prohibits the unauthorized use of property, including computers and telecommunication services. Specifically, the statute provides that:

> No person, in any manner and by any means, including, but not limited to, computer hacking, shall knowingly gain access to, attempt to gain access to, or cause access to be gained to any computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service without the consent of, or beyond the scope of the express or implied consent of, the owner of the computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service or other person authorized to give consent.

R.C. 2913.04(B). Utilizing computers and email, beyond the scope of an employer's consent, is a violation of the statute. *See State v. Sherrills*, 2008-Ohio-1950 (8th Dist.). Here, Mr. Cauchon's

[1] We understand that Mr. Cauchon has recently offered to return the naloxone kits and fentanyl test strips to HRO. However, HRO also demands the return of its other physical property remaining at the Granville office, including its office furniture, computers, laptops, office supplies, shipping supplies, and other electronics.

continued use of his old HRO email address, "dennis@harmreductionohio.org," is unlawful. Despite HRO's termination of Mr. Cauchon and attempts to remove his access to his old HRO email account, Mr. Cauchon is still sending emails from that account. Indeed, Mr. Cauchon has sent emails from this address ***as recently as March 13, 2025***, continuing to sign off as "President" of HRO, despite his termination. While it should go without saying—because Mr. Cauchon was fired—HRO does not consent to Mr. Cauchon's continued use of his old HRO email address and to him sending emails from that address.

*Second*, Mr. Cauchon has acted in violation of R.C. 2913.21, which prohibits the misuse of credit cards. "No person, with purpose to defraud, shall . . . [o]btain property or services by the use of a credit card, in one or more transactions, knowing or having reasonable cause to believe that the card has expired or been revoked, or was obtained, is retained, or is being used in violation of law." R.C. 2913.21(B)(2). Further, "[n]o person, with purpose to violate this section, shall receive, possess, control, or dispose of a credit card." R.C. 2913.21(C). Mr. Cauchon has refused to relinquish HRO's credit cards and has continued to use HRO's credit cards, without authorization from HRO.

*Third*, Mr. Cauchon's unauthorized control of HRO's bank accounts with Chase Bank is a violation of 18 U.S.C. § 1030(a)(2)(A). It is a violation of the statute to:

> Intentionally access[] a computer without authorization or exceed[] authorized access, and thereby obtain[]—information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.).

18 U.S.C. § 1030(a)(2)(A). Mr. Cauchon has continued to access HRO's bank accounts, despite his termination from HRO. Mr. Cauchon, as a former employee, has no authority to access HRO's financial information. Indeed, Mr. Cauchon has made multiple payments to "Borough Company," since January 2025, including three payments of $1,750.00 *within March*. It is HRO's understanding that these payments are for the lease of the Granville office, **which Mr. Cauchon had no authority to enter after his termination**.

Beyond Mr. Cauchon's brazen conduct, HRO also has multiple claims to recover HRO's property that he is wrongfully holding, including conversion and an action for replevin. To establish conversion, a party must show (1) the party's ownership or right to possession of the property at the time of the conversion; (2) the opposing party's conversion by a wrongful act or disposition of the party's property rights; and (3) damages. *Francisco A. Mateo MD, Inc. v. Proia*, 2023-Ohio-3908, ¶ 68 (7th Dist.). Here, HRO meets every element. HRO—***not Mr. Cauchon***—is the rightful owner of the naloxone kits, fentanyl test strips, printed materials, and other physical items that Mr. Cauchon is holding in the Granville office. Yet, Mr. Cauchon has changed the locks and prevented HRO from accessing its own property. And HRO can easily prove damages, through the value of the property held and the cost it has been forced to expend to replace it. If HRO is forced to pursue legal action against Mr. Cauchon to recover its property, HRO will attempt to enforce its property rights via replevin. R.C. 2737.02.

Further, Mr. Cauchon's continued meddling with HRO's operations amount to tortious interference with business relationships. "The elements of tortious interference with a business relationship are (1) a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom." *Am. Chem. Soc'y v. Leadscope, Inc.*, 2010-Ohio-2725, ¶ 65 (10th Dist.) Mr. Cauchon has weaponized his connections within Chase bank, intentionally interfering with HRO's longstanding business relationship with the banking institution. Any continued attempts from Mr. Cauchon to access HRO's bank accounts and accounting information will not be tolerated. And any communications that Mr. Cauchon sends, purporting to represent HRO in an attempt to damage HRO's relationship and contracts with the Ohio Department of Health and any other entities will be subject to legal action as well.

**Demand**

Mr. Cauchon must:

1. Cease and desist all access and use of HRO's online presence, including but not limited to HRO's website, Facebook page, and use of his old HRO email address.

2. Cease and desist all access and attempts to access HRO's financial information, including any access to banking, credit, and accounting information.

3. Cease and desist all communications that purport to represent HRO.

4. Return any and all HRO property held in his personal possession or at the Granville office, including but not limited to, the naloxone kits, the fentanyl test strips, printed materials, furniture, and other physical items.

5. Turn over all passwords to any online account for which he still has access to HRO's Board of Directors.

These demands must be met on or before April 1, 2025, to prevent future legal action against Mr. Cauchon.

**Failure to Comply**

Should Mr. Cauchon fail to comply with the above demands, HRO intends to pursue all legal remedies against Mr. Cauchon and will be seeking punitive damages and attorneys' fees for his reprehensible conduct.

Sincerely,

**REMINGER CO., L.P.A.**

/s/ *Steven A. Chang*

Steven A. Chang

cc: Evan C. Ecos (eecos@baileycav.com)
Adrian Radilla (aradilla@baileycav.com)
Melvin Davis (mdavis@reminger.com)
Mrinali Sethi (msethi@reminger.com)

Password log sheet tracks all accounts and passwords including security questions, date of last password change and frequency of password change. The notes section can include who should maintain passwords, which employee last changed the password, or any additional information the organizations see fit. Below is an example, on the next page the template will be found.

## Password Log

| Account | Link | Email | Username | Password | Security Question #1 | Answer | Security Question #2 | Answer | Date of last password change | Frequency of password change | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4imprint | 4imprint.com | erin@harmreductionohio.org | erin@harmreductionohio.org | [REDACTED] | | | | | | when positions switch | last person to change passowrd was jane doe |
| adobe | | molly@harmreductionohio.org | | [REDACTED] | [REDACTED] | | | | | | |
| Amazon | Amazon.com | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | mm/dd/yyyy | | |
| Canva | canva.com | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | mm/dd/yyyy | | CDs |
| Cincinnati Enquirer | cincinnati.com | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| Cleveland Plain Dealer | cleveland.com | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| Columbus Dispatch | dispatch.com | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| Columbus Foundation | https://columbusfoundati | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| Dance Safe | dancesafe.org | amandalynn@harmreductionohio.org | amandalynn@harmreductionohio.org | [redacted] | | | | | | | |
| Dennis' Computer | | | dcauchon | [REDACTED] | | | | | mm/dd/yyyy | | |
| Doodle | www.doodle.com | AmandaLynn.a.reese@gmail.com | AmandaLynn.a.reese@gmail.com | [REDACTED] | | | | | | | |
| First Federal Savings of Ohio | https://secure.myvirtualbr | dennis@harmreductionohio.org | harmreductionohio1 | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | 03/20/2024 | | |
| Gongwer | https://www.gongwer-oh. | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| Google Workspace Administrative Console | https://admin.google.com | denniscauchon@gmail.com | dennis@www.harmreductionohio.org | [REDACTED] | [REDACTED] | | | | | | |
| Google Workspace Administrative Console | https://admin.google.com | denniscauchon@gmail.com | dennis@www.harmreductionohio.org | [REDACTED] | [REDACTED] | | | | | | |
| Harmreductionohio.org (HF | https://www.harmreducti | denniscauchon@gmail.com | denniscauchon@gmail.com | [REDACTED] | | | | | | | |
| hootsuite | hootsuite.com | info@harmreductionohio.org | info@harmreductionohio.org | [REDACTED] | | | | | | | |
| HRO Desktop | | | | [REDACTED] | | | | | mm/dd/yyyy | | |
| HRO Laptop | | | | [REDACTED] | | | | | 09/15/2021 | | |
| Instagram | | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| Jotform | jotform.com | | AmandaLynn_Reese | [REDACTED] | | | | | mm/dd/yyyy | | |
| Mailchimp | mailchimp.com | harmreductionohio | harmreductionohio | [REDACTED] | | | | | | | |
| Microsoft Business 365 | | dennis@harmreductionohio.org | dennis@harmreductionohio.org | | | | | | | | |
| Nonprofits Insurance Alliance | insurancefornonprofits.or | | Epottenger1 | [REDACTED] | | | | | | | |
| Otter.ai | https://otter.ai/ | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | [REDACTED] | | | | | | |
| PayPal - HRO | paypal.com | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| PirateShip | pirateship.com | carole@harmreductionohio.org | carole@harmreductionohio.org | [REDACTED] | | | | | | | |
| Printful | printful.com | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | mm/dd/yyyy | | |
| quickbooks | https://quickbooks.intuit.c | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| Shopify | shopify.com | info@harmreductionohio.org | info@harmreductionohio.org | [REDACTED] | | | | | mm/dd/yyyy | | |
| siteground (web host for h | siteground.com | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| Starboxes | starboxes.com | info@harmreductionohio.org | info@harmreductionohio.org | [REDACTED] | | | | | mm/dd/yyyy | | |

EXHIBIT 30 34

tabbies

CAUCHON_000381

Password log sheet tracks all accounts and passwords including security questions, date of last password change and frequency of password change. The notes section can include who should maintain passwords, which employee last changed the password, or any additional information the organizations see fit. Below is an example, on the next page the template will be found.

OHIO

## Password Log

| Account | Link | Email | Username | Password | Security Question #1 | Answer | Security Question #2 | Answer | Date of last password change | Frequency of password change | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Take Command Health Insurance | | dennis@harmreductionohio.org | dennis@harmreductionhio.org | [REDACTED] | | | | | | Dover Point Carwash | |
| Techsoup | https://www.techsoup.org | info@harmreductionohio.or | info@harmreductionohio.or | [REDACTED] | | | | | mm/dd/yyyy | | |
| Tik Tok | https://www.tiktok.com/@ | info@harmreductionohio.org | katie@harmreductionhio.org | [REDACTED] | | | | | mm/dd/yyyy | | |
| Toledo Blade | https://www.toledoblade. | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| Uline | uline.com | info@harmreductionohio.org | info@harmreductionohio.org | [REDACTED] | | | | | mm/dd/yyyy | | |
| UPaknShip | upaknship.com | info@harmreductionohio.org | info@harmreductionohio.org | [REDACTED] | | | | | mm/dd/yyyy | | |
| Uprinting | uprinting.com | info@harmreductionohio.org | info@harmreductionohio.org | [REDACTED] | | | | | mm/dd/yyyy | | |
| USPS | | dennis@harmreductionohio.org | Harmreductionohio123 | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | | | |
| valuemailers | valuemailers.com | | | | | | | | mm/dd/yyyy | | |
| Vanguard Simple IRA | https://smallbiz.vanguard. | dennis@harmreductionohio.org | denniscaucho | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | First Job | | |
| Vimeo | vimeo.com | info@harmreductionohio.org | info@harmreductionohio.org | [REDACTED] | | | | | mm/dd/yyyy | | |
| zoom | https://zoom.us/ | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| Chat GPT | | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| UPS | | molly@harmreductionohio.org | HROhio | [REDACTED] | | | | | | | |
| Stripe | | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | | | | | | | |
| DirectRelief | https://network.directreli | dennis@harmreductionohio.org | dennis@harmreductionohio.org | [REDACTED] | [REDACTED] | [REDACTED] | | | | | |
| Remedy Alliance for the People | https://remedyallianceftp. | AmandaLynn@harmreductionohio.org | AmandaLynn@harmreductionohio.org | [REDACTED] | | | | | | | |
| NEW SIMPLE IRA | https://www.sponsorinsig | dennis@harmreductionohio.org | HarmReductionOhio1 | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | | | |
| Ohio ID | https://ohid.ohio.gov/wps | | HROhio | [REDACTED] | | | | | | | |
| Ohio Buys | https://ohiobuys.ohio.gov | | HROhio | [REDACTED] | | | | | | | |
| Wordpress Login | http://dennisc22.sg-host. | dcauchon@harmreductionohio.org | dcauchon@harmreductionohio.org | [REDACTED] | | | | | | | |

Nov 5, 2024 at 10:23 AM

FYI...I think the coup plotters may contact you trying to seek control of our offices. They lack legal authority to do so, so it's reasonable for you to ask for proof of such authority. FYI...the sent me a termination letter yesterday. Also not valid because no properly noticed board meeting held since March 9.

Andn all this on election day. I voted this morning. Took only a few minutes. Pretty efficient.

PDF AL email about locks.pdf
PDF Document · 159 KB

Email by people seeking control about office

Nov 6, 2024 at 4:23 PM

Sorry. I was talking to my lawyer. I sent the coup leader an email saying that the office is open, bank accounts paying bills, etc. and if he has legal documentation supporting a change of control he should provide it. We're hoping they initiate an action...but who knows.

No prob. Thanks for the update.

Nov 8, 2024 at 9:41 AM

I emailed you a letter from my attorney. Thanks.

Nov 8, 2024 at 11:38 AM

Got it

Nov 15, 2024 at 1:52 PM

I got a call from a Billy Golden trying to gain access to the offices. I have texted him back. Here is a copy of that text:

Billy, I would recommend that you give Dennis Cauchon a call. He is in his office today at 935 River Road, Granville.

By the way, I have been provided a letter from an attorney. a David A. Martin with Bailey Cavalieri LLC in Columbus, who is apparently representing Mr. Cauchon in a dispute with some members of the Harm Reduction Ohio board. My understanding is that Mr. Cauchon is the President of Harm Reduction Ohio and is responsible for overseeing the operations of HRO and leasing related matters. I have been instructed by Mr. Cauchon to direct all requests for access to the leased premises to him as President of HRO.

If my understanding is incorrect, please contact Mr. Martin and perhaps Mr. Martin and your counsel can provide me with some direction in order to reach a resolution of this matter. The terms of the lease do not allow the landlord access or to provide access to others to the leased premises except for very limited purposes in our responsibilities as landlord.

Thanks for the update.

Here is a text I have received from Billy Golden as well as my reply text

Thank you Bill for getting back with us. Dennis has been terminated as President from Harm Reduction Ohio. We appreciate your situation having been provided a letter from his lawyer- please keep in mind that it is just a letter from his attorney- not a court order. We can provide the termination letter, board minutes of the vote to terminate, and the HRO bylaws stating the board has the right to replace the president. I would like to send these if you can provide an email address?
We will be in touch next week.

EXHIBIT
tabbies
35

To: Bill Wernet

my reply:

My email address is wernet@wernetlaw.com. Please feel free to send me what you would like. However, I have received from Mr. Cauchon's attorney notification of a legal dispute. Specifically that dispute is alleged to include, among other things, "efforts to terminate [Mr. Cauchon]."

While I am an attorney licensed to practice law in Ohio I cannot give you legal advice. On this, as well as on other matters, I do provide Borough Company, LLC, from time to time with both property management services (as Bill Wernet Realty, LLC) and legal counsel.

I would strongly recommend that you consult competent legal counsel of your own and have your counsel work out a proper resolution with Mr. Martin to what appears to be a legal dispute.

## Turner-Bicknell, Tasha (turnerta)

**Subject:** Re: Chase and office update
**Date:** Wednesday, November 27, 2024 at 10:47:23 AM Eastern Standard Time
**From:** Dennis Cauchon
**To:** Anne C. Trinh
**CC:** dmartin@baileycav.com, Turner-Bicknell, Tasha (turnerta), Dwayne Steward, Billy Golden, mollybtrue, Colleen Garlock, James Decker, Cecile Katz

External Email: Use Caution

Anne,

Thanks for your reply. I was simply wondering whether we as a board might wish to extend the lease for six months rather than undertaking our regular annual renewal. However, if you or other board members are not interested in entertaining that option or otherwise acting, I'll go ahead and renew the lease for one year as per usual. That will assure HRO continued access to the office space essential for HRO's operations at the below market rate of $1,750 a month.

Regarding naloxone kits, HRO has 1,000+ kits readily available in the office. While someone has apparently told the employees that they need not show up at the office, I, as a director and the President, expect business to be conducted as usual. That means our employees returning to the office and resuming standard operations. As long as our staff members are regularly in the office, they will also have ready access to the naloxone kits, scales and other resources needed to ship the kits in a timely and efficient manner.

Thanks,

Dennis

> On Nov 26, 2024, at 1:43 PM, Trinh, Anne <trinh.89@osu.edu> wrote:
>
> Hi, Dennis,
>
> Thanks for sending updates to Cecile.
>
> We are going to continue out of office shipping. Please let us know when and for how long we can have access to the supplies. We will try to get an HRO staff member there to pack and move supplies.
>
> As for the 6-month renewal, we are not needing this and do not want the extension.
>
> Hope you have a nice Thanksgiving,
>
> Anne
>
> **From:** Cecile Katz <cecile@harmreductionohio.org>
> **Date:** Tuesday, November 26, 2024 at 10:24 AM
> **To:** Board Members <board@harmreductionohio.org>, Turner-Bicknell, Tasha (turnerta) <turnerta@ucmail.uc.edu>, dwayneasteward@gmail.com <dwayneasteward@gmail.com>

EXHIBIT 36

**Cc:** AmandaLynn Reese <AmandaLynn@harmreductionohio.org>
**Subject:** Fw: Chase and office update

External Email: Use Caution

Please see note from Dennis below.

**Cecile Katz**
Administrator, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023

cecile@harmreductionohio.org

---

**From:** Dennis Cauchon <denniscauchon@gmail.com>
**Sent:** Tuesday, November 26, 2024 10:02 AM
**To:** Cecile Katz <cecile@harmreductionohio.org>
**Subject:** Chase and office update

A Gilead grant payment of $119,144 arrived today. That brings our checking account balance to $214,119.94.

The office is open and available for shipping. Note: There are 1,000+ naloxone skits on the shelves in your office, which you have access to at your convenience, if you desire to continue out-of-office shipping.

Our lease expires December 31, 2024. The landlord offered to provide a six-month extension (attached) rather than usual one-year extension to reflect the current competing claims over operational authority. Please send this to others. If I don't hear back by the end of the week, I will sign the six-month extension. The rent is unchanged.

Thanks.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814

<image001.jpg>
<image002.jpg>

<image003.jpg>

Ohio | Department of Commerce
Division of Real Estate & Professional Licensing

EQUAL HOUSING OPPORTUNITY

# AGENCY DISCLOSURE STATEMENT

**The real estate agent who is providing you with this form is required to do so by Ohio law. You will not be bound to pay the agent or the agent's brokerage by merely signing this form.** Instead, the purpose of this form is to confirm that you have been advised of the role of the agent(s) in the transaction proposed below. (For purposes of this form, the term "seller" includes a landlord and the term "buyer" includes a tenant.)

Property Address: 935 River Road, Suites C, D, E, F and G, Granville, Ohio 43023

Buyer(s): Harm Reduction Ohio, an Ohio nonprofit corporation, and, only as guarantor, Dennis Cauchon

Seller(s): Borough Company, LLC

## I. TRANSACTION INVOLVING TWO AGENTS IN TWO DIFFERENT BROKERAGES

The buyer will be represented by ______________ AGENT(S), and ______________ BROKERAGE.

The seller will be represented by ______________ AGENT(S), and ______________ BROKERAGE.

## II. TRANSACTION INVOLVING TWO AGENTS IN THE SAME BROKERAGE

If two agents in the real estate brokerage ______________
represent both the buyer and the seller, check the following relationship that will apply:

☐ Agent(s) ______________ work(s) for the buyer and Agent(s) ______________ work(s) for the seller. Unless personally involved in the transaction, the principal broker and managers will be "dual agents," which is further explained on the back of this form. As dual agents they will maintain a neutral position in the transaction and they will protect all parties' confidential information.

☐ Every agent in the brokerage represents every "client" of the brokerage. Therefore, agents ______________ and ______________ will be working for both the buyer and seller as "dual agents." Dual agency is explained on the back of this form. As dual agents they will maintain a neutral position in the transaction and they will protect all parties' confidential information. Unless indicated below, neither the agent(s) nor the brokerage acting as a dual agent in this transaction has a personal, family or business relationship with either the buyer or seller. *If such a relationship does exist, explain:* ______________.

## III. TRANSACTION INVOLVING ONLY ONE REAL ESTATE AGENT

Agent(s) Bill Wernet and real estate brokerage Bill Wernet Realty, LLC will

☐ be "dual agents" representing both parties in this transaction in a neutral capacity. Dual agency is further explained on the back of this form. As dual agents they will maintain a neutral position in the transaction and they will protect all parties' confidential information. Unless indicated below, neither the agent(s) nor the brokerage acting as a dual agent in this transaction has a personal, family or business relationship with either the buyer or seller. *If such a relationship does exist, explain:* ______________.

☒ represent only the (*check one*) ☒ **seller** or ☐ **buyer** in this transaction as a client. The other party is not represented and agrees to represent his/her own best interest. Any information provided the agent may be disclosed to the agent's client.

## CONSENT

I (we) consent to the above relationships as we enter into this real estate transaction. If there is a dual agency in this transaction, I (we) acknowledge reading the information regarding dual agency explained on the back of this form.

| | | | |
|---|---|---|---|
| *Dennis Cauchon, President* | 11/27/2024 | *Borough Company LLC by [signature]* | 11/27/2024 |
| BUYER/TENANT | DATE | SELLER/LANDLORD | DATE |
| | | | |
| BUYER/TENANT | DATE | SELLER/LANDLORD | DATE |



Effective 02/10/19

EXHIBIT
tabbies
37

Document ID: e1a559cc-934b-43f3-aa11-880c5ca3c916

# DUAL AGENCY

Ohio law permits a real estate agent and brokerage to represent both the seller and buyer in a real estate transaction as long as this is disclosed to both parties and they both agree. This is known as dual agency. As a dual agent, a real estate agent and brokerage represent two clients whose interests are, or at times could be, different or adverse. For this reason, the dual agent(s) may not be able to advocate on behalf of the client to the same extent the agent may have if the agent represented only one client.

**As a dual agent, the agent(s) and brokerage shall:**

- Treat both clients honestly;
- Disclose latent (not readily observable) material defects to the purchaser, if known by the agent(s) or brokerage;
- Provide information regarding lenders, inspectors and other professionals, if requested;
- Provide market information available from a property listing service or public records, if requested;
- Prepare and present all offers and counteroffers at the direction of the parties;
- Assist both parties in completing the steps necessary to fulfill the terms of any contract, if requested.

**As a dual agent, the agent(s) and brokerage shall not:**

- Disclose information that is confidential, or that would have an adverse effect on one party's position in the transaction, unless such disclosure is authorized by the client or required by law;
- Advocate or negotiate on behalf of either the buyer or seller;
- Suggest or recommend specific terms, including price, or disclose the terms or price a buyer is willing to offer or that a seller is willing to accept;
- Engage in conduct that is contrary to the instructions of either party and may not act in a biased manner on behalf of one party.

**Compensation:** Unless agreed otherwise, the brokerage will be compensated per the agency agreement.

**Management Level Licensees:** Generally, the principal broker and managers in a brokerage also represent the interests of any buyer or seller represented by an agent affiliated with that brokerage. Therefore, if both buyer and seller are represented by agents in the same brokerage, the principal broker and manager are dual agents. There are two exceptions to this. The first is where the principal broker or manager is personally representing one of the parties. The second is where the principal broker or manager is selling or buying his own real estate. These exceptions only apply if there is another principal broker or manager to supervise the other agent involved in the transaction.

**Responsibilities of the Parties:** The duties of the agent and brokerage in a real estate transaction do not relieve the buyer and seller from the responsibility to protect their own interests. The buyer and seller are advised to carefully read all agreements to assure that they adequately express their understanding of the transaction. The agent and brokerage are qualified to advise on real estate matters. IF LEGAL OR TAX ADVICE IS DESIRED, YOU SHOULD CONSULT THE APPROPRIATE PROFESSIONAL.

**Consent:** By signing on the reverse side, you acknowledge that you have read and understand this form and are giving your voluntary, informed consent to the agency relationship disclosed. If you do not agree to the agent(s) and/or brokerage acting as a dual agent, you are not required to consent to this agreement and you may either request a separate agent in the brokerage to be appointed to represent your interests or you may terminate your agency relationship and obtain representation from another brokerage.

Any questions regarding the role or responsibilities of the brokerage or its agents should be directed to: attorney or to:

Ohio Department of Commerce
Division of Real Estate & Professional Licensing
77 S. High Street, 20th Floor
Columbus, OH 43215-6133
(614) 466-4100

Ohio Department of Commerce
Division of Real Estate & Professional Licensing

EQUAL HOUSING OPPORTUNITY



Effective 02/10/19

Document ID: e1a559cc-934b-43f3-aa11-880c5ca3c916

# LEASE AGREEMENT

This lease agreement ("Lease") is made as of the date of last signing by and between Borough Company LLC, an Ohio limited liability company of 4470 Indianola Avenue, Columbus, Ohio, 43214, ("Lessor"), and Harm Reduction Ohio, an Ohio nonprofit corporation, and only as guarantor, Dennis Cauchon, 935 River Road, Suite C, Granville, Ohio, 43023 ("Lessee").

## A. Lease of Premises

In consideration of the payment of rent and the promises of Lessee, Lessor leases to Lessee the following premises in the Township of Granville, County of Licking and State of Ohio and being: 935 River Road, Suites C, D, E, F and G (the "Premises").

Together, where applicable, with the right to the non-exclusive use of the right of ingress and egress to the Premises by way of established drives and sidewalks, and in the case of shared use of a building without an entrance-way exclusively to the Premises, the non-exclusive use of such common areas and passageways to reach the Premises (collectively, "Access Rights").

The Premises are part of River Road Shops (the "Property").

## B. Term; Rent and Payment; Renewal and Holdover Tenancy

1. *Original term*

The term of the Lease shall be one year, beginning January 1, 2025, and ending December 31, 2025.

Possession of the Premises will be on the first day of this period.

2. *Rent*

The rent for the term shall be $20,700, payable in monthly installments of $1,725 during the term of this lease, each in advance to Lessor, with the first installment due and payable at the signing of this Lease, and subsequent installments due and payable on the twenty-fifth day of the preceding month.



Document ID: e1a559cc-934b-43f3-aa11-880c5ca3c916

3. *Payment of Rent; Lien for Security*

Lessee will pay the rent installments due to Lessor, for the term when due, at Lessor's address given above or at such other place as Lessor may designate in writing.

Should any rent installment not be paid in accord with the terms of this Lease, a late fee of $25.00 per day after the due date shall be due and payable by Lessee to Lessor. Additionally, should any check, money order or recognized form of payment be returned by Lessor's bank unpaid, a fee of $30.00, plus any fees charged by Lessor's bank due to such return shall be added to rent immediately due for such month.

As security for the rent to be paid and the covenants and representations of Lessee, a lien on the Premises and Access Rights and the Lessee's interest in the same is reserved in favor of Lessor and is prior and superior to all other liens on the Premises and Access Rights.

4. *Holdover Tenancy*

If Lessee remains in possession of any part of the Premises after expiration or termination of this Lease, absent negotiation for renewal as provided above or a new lease or other written agreement between the parties, Lessee will hold as a tenant from month to month only, at a monthly rental at 10% above the last month's installment rate while the original or any renewal term of the Lease was still in force, and shall remain subject to all other provisions of the Lease. The tenancy from month to month may be terminated by either party at the end of a rental month by giving the other party at least thirty day's prior written notice as specified by law.

**C. Use and occupancy**

1. *Manner and purpose*

The Premises will be used and occupied by Lessee in a careful, safe, and proper manner, solely for the purposes of distributing Narcan, a public interest organization, and media and public relations.

2. *Hazardous Activities*

Lessee shall not carry on or allow any activity or use of the Premises, or exercise of Access Rights, considered hazardous for insurance purposes, nor will Lessee do any act which will invalidate insurance coverage on the structure or premises or cause an increase in premiums. Lessee will observe all reasonable precautions for the prevention

of fire, explosion, or escape of fumes, and reasonable and necessary measures to protect the safety of persons and property. Without limiting the general nature of the above prohibitions, the burning of candles, oil lamps, or other flamed devices is prohibited, and Lessee shall not allow smoking on the Property.

3. *Obedience to Laws and Regulations*

Lessee will abide by all applicable federal, state, and local laws and regulations respecting the Premises and their occupancy and use and will not use the Premises or allow the same to be used for any unlawful purpose.

## D. Inspection of Premises by Lessee; No Warranty of Fitness

Lessee has inspected the Premises and acknowledges that Lessor has made no representation, and there is no express or implied warranty by Lessor with respect to the fitness of the Premises, any component of the Premises, or any common area, for any particular use or purpose.

## E. Utilities Charges; Maintenance

1. *Refuse; Water & Sewer Service; Snow Removal*

Lessor will provide refuse removal service; however, should any extra charge be levied for large amounts or heavy items left by Lessee, the cost shall be borne by Lessee. Lessee shall place any refuse in the Lessor provided refuse containers and shall reclose the lid. Under no circumstances shall Lessee place refuse on top of or outside the refuse containers and Lessee shall ensure that no contents of any trash bags are left on sidewalks, drives, or otherwise outside of the refuse containers. Lessor will provide water and sewer service and snow removal for the Premises. Lessor shall provide electricity, air conditioning and heat.

2. *Telecommunications and other Utilities*

Lessee shall promptly pay all costs of telecommunications and every other utility charge levied against the Premises except for those specified in E.1.

3. *Lessee's Expenses for Maintenance or Improvements*

Lessee will promptly pay all obligations incurred by Lessee in maintaining or improving the Premises, and will not allow any mechanic's or materialman's liens to be placed on

the Premises.

4. *Items to Be Maintained by Lessee*

Each of the following will be maintained at Lessee's expense by Lessee: interior paint, displays, and decorations; interior floor finish, commode and other exposed plumbing fixtures in the case of any within the exclusive space of Lessee; lighting bulbs. Further, Lessee agrees to keep drains which exclusively service Lessee's space free of obstructions. Lessee shall clean up any trash or other matter discarded on the Property by the Lessee or Lessee's agents, employees, or invitees. Lessee shall take care to ensure that its use of the Premises does not result in damage to other units or other tenant's property.

5. *Items to Be Maintained by Lessor*

Each of the following will be maintained at Lessor's expense by Lessor in good condition, repair, and working order: Roof, walls, common areas, structural portions of floors, windows, the exterior of entrance doors (not including signs or other displays of Lessee), exterior paint, lawn care, building grounds, all HVAC and other mechanical items serving the building (other than those as may be installed by Lessee) and the parking area. Lessor's duties do not include regular cleaning of any nature, including the exterior of windows.

6. *Lessor given Permission to obtain any Utility Consumption and Charge Information*

Lessee gives Lessor permission to obtain from relevant utility companies any information regarding electricity and natural gas utility consumption and charges incurred by Lessee related to the Premises. Lessee agrees to sign waivers or other paperwork, if any, required by the companies in order to give Lessor such information.

## F. Taxes and assessments

Lessor will promptly pay when due all taxes and special assessments levied against the Property of which the Premises are a part. Lessee will promptly pay when due all taxes and special assessments imposed upon them by law, or required to be collected by Lessee.

## G. Alterations

No alterations or additions to the Premises will be made by Lessee without the prior

written consent of Lessor. However, Lessor shall not unreasonably withhold approval of the same.

Should any alternations or additions be made, whether approved or not, at the termination of the lease the Lessor shall have the option, on each separate alteration and addition, to either have the Lessee return the Premises to the condition the Premises would be in had that specific alteration or addition not been made, or to leave that specific alteration or addition for the benefit of the Lessor without cost to Lessor.

## H. Signs, devices

1. *Signs Supplied by Lessor*

Subject to approval by Granville Township, there will be a sign on the outside of the Premises which conforms to the Lessor's system of signage at its properties. This sign shall be at Lessor's expense and Lessor shall have full power over the sign's design and color. If the Premises which is the subject of this Lease is one which has one or more entrances to an interior common space shared with other tenants, the same terms as set forth above, other than Township approval, shall apply.

2. *Other Sign Terms*

Before installing any sign, whether in interior common space, in interior private space with outside visibility, or outside the building, Lessee shall obtain Lessor's approval of the design, color, size, style, and material of the sign. Lessor reserves the right to remove without notice any unapproved sign at Lessee's expense. At Lease expiration or termination, Lessee at Lessee's expense shall remove all signs, advertisements, and notices installed by Lessee. In any event, neon signs and "sandwich board" style signs are not permitted.

## I. Waste

Lessee will not commit or allow any waste on the Premises, and the same shall be returned at the end of this tenancy in the condition provided, normal wear and tear excepted.

## J. Indemnification and insurance

1. *Indemnification*

Lessee will indemnify and save Lessor harmless against all loss, damage, expense, costs, and attorney fees incurred by Lessor in discharging any filed or inchoate mechanic's or materialman's liens arising from Lessee's maintenance or improvement of the Premises, or incurred by Lessor in defending or discharging claims for personal injuries or property damage asserted or perfected against Lessor and arising out of the use and occupancy of the Premises, or out of the exercise of Access Rights, by Lessee or Lessees agents, employees, or invitees.

2. *Liability insurance*

Lessee will obtain and maintain in force liability insurance in one or more companies satisfactory to Lessor, insuring against liability to third persons for personal injuries or property damage arising out of the use or occupancy of the Premises, and out of the exercise of Access Rights.

The insurance shall provide minimum general liability limits of $1,000,000.

Each policy shall name Lessor as an additional insured and shall provide that the insurer will give Lessor written notice at least twenty days prior to the effective date of cancellation. Lessee shall furnish appropriate certificates or other satisfactory proof of insurance to Lessor.

Lessee further agrees that Lessor shall not be liable for any injury, loss or damage to the person or property of Lessee or of employees, agents, guests or invitees by reason of any defect(s) in the Premises, Property, or appurtenances, whether latent or patent.

**K. Entry by Lessor**

Lessee will permit Lessor or Lessor's agents to enter the Premises at all reasonable times to examine the Premises, make corrections in the structure, or eliminate health and safety hazards as well as to gain access to the mechanical/HVAC systems, and, during the final ninety days of this Lease, to show the Premises to prospective tenants as well as posting "For Rent" or "For Sale" signs.

**L. Assignment and Subletting**

Lessee will not assign this Lease, or sublet any part of the Premises, without Lessor's express written consent.

**M. Covenants of Title and Quiet Enjoyment**

Lessor warrants that Lessor is the lawful owner of the Premises and has good right and power to make this Lease. If Lessee pays the rent as agreed, and fulfills all other conditions and obligations under this Lease, Lessee may quietly enjoy the Premises without hindrance by Lessor or any person lawfully claiming under Lessor.

**N. Subordination to Mortgages and Encumbrances**

This Lease is subject and subordinate to the lien and provisions of any mortgage or encumbrance now or subsequently imposed on the Premises or the Property of which the Premises are a part. Lessee will promptly execute and deliver to Lessor any instrument Lessor may reasonably request in order to subordinate this Lease to a mortgage or encumbrance.

**O. Responsibility for Personal Property**

Lessee is solely responsible for all tangible and intangible personal property, that belongs to Lessee or Lessee's agents, employees, licensees, or invitees.

**P. Damage to the Premises**

If any part of the building or Premises is damaged or destroyed without Lessee's fault, rendering the Premises more than fifty percent unfit for occupancy, Lessee may surrender possession of the Premises and thereby terminate the Lease with respect to all provisions, remaining liable only for accrued and unpaid rent and other financial obligations under the Lease.

**Q. Default by Lessee; Remedies of Lessor**

1. What constitutes default by Lessee

Lessee is in default under this Lease if: (a) any installment of rent is not paid when due, whether or not Lessor has given written notice of such failure to perform; (b) with respect to an obligation other than the obligation to pay rent, Lessee fails to perform any other provision or rectify any other deficiency under this Lease within five days after written notice to Lessee of the breach; (c) Lessee



Document ID: e1a559cc-934b-43f3-aa11-880c5ca3c916

vacates the Premises during the term; (d) Lessee makes an assignment for the benefit of creditors, or is subjected to receivership; (e) Lessee's interest in the premises is subjected to execution, attachment, or other legal process; or (f) Lessee is adjudicated bankrupt in a voluntary or involuntary proceeding.

2. Remedies of Lessor

If Lessee defaults, Lessor may enter and repossess the Premises as if this Lease had not been made, and the Lease will thereby terminate without prejudice to Lessor's rights of action for past due rent, breach of covenant, present and prospective damages, or other cost or expense resulting from Lessee's default. For purposes of this section, the commencement of an action in forcible entry and detainer, ejectment, or similar action following default by Lessee is equivalent to an actual entry of the premises by Lessor.

3. Non-waiver of Default

The failure to prosecute by Lessor of any default by Lessee, shall not constitute a waiver of the default or of any subsequent default of the same or similar kind.

**R. Notices**

All notices under this Lease shall be in writing. Unless the party concerned designates another address, notices to Lessor shall be mailed or delivered to the address designated for the payment of rent, and notices to Lessee shall be mailed or delivered to the Premises.

**S. General**

Upon the request of either party, the parties shall execute a memorandum of this Lease for recording, as provided in R.C. 5301.251.

This Lease and its provisions shall inure to the benefit of and bind the heirs, personal representatives, successors, and assigns of the Parties, except that no assignment of all or any part of this Lease by Lessee in violation of its terms shall vest any right, title, or interest in the purported assigns.

Should any provision of this Lease be declared invalid by any court of competent jurisdiction, the remaining provisions shall remain in full force and effect regardless of such declaration.

Failure by Lessor to insist upon strict performance of any terms and conditions of this Lease shall not be deemed a waiver of any rights or remedies Lessor may have and shall not be deemed a waiver of any subsequent breach or default on the part of Lessee.

The exclusive venue and place of jurisdiction for any litigation arising from or related to this Lease shall be the Court of Common Pleas for Licking County, Ohio, located in Newark, Ohio, or the United States District Court for the Southern District of Ohio, Eastern Division, located in Columbus, Ohio. This lease shall be governed by and construed in accordance with the laws of the State of Ohio, without reference to its conflicts of law rules.

This lease constitutes the entire agreement between Lessor and Lessee, and no representations, oral or written, not contained in this Lease shall bind either party. This agreement can be modified in writing only, and any oral agreements are not binding.

**Agreed,**

**Borough Company LLC, an Ohio limited liability company, LESSOR**

by: Borough Company LLC by Michael N. Thornborough President ______________________ 11/27/2024

Michael N. Thornborough, Managing Member Date

**LESSEE**

by: Dennis Cauchon, President ______________________ 11/27/2024

Dennis Cauchon, President Date

Harm Reduction Ohio, an Ohio nonprofit corporation

For value received, the undersigned unconditionally guarantees payment to Lessor of all rent and any other amounts or obligations owing by Lessee under this Lease

Dennis Cauchon, President ______________________ 11/27/2024

Dennis Cauchon, Guarantor Date



Document ID: e1a559cc-934b-43f3-aa11-880c5ca3c916

SignWell

Completed Document Audit Report

Completed with SignWell.com

## Title: 2025 Agency Disclosure Form

Document ID: e1a559cc-934b-43f3-aa11-880c5ca3c916

Time Zone: (GMT+00:00) Coordinated Universal Time

### Files

| | |
|---|---|
| 2025 Agency Disclosure Form.pdf - 2 pages | Nov 27, 2024 20:38:03 UTC |
| 2025 commercial lease harm reduction ohio nonprofi.pdf - 10 pages | Nov 27, 2024 20:38:07 UTC |

### Activity

| | | |
|---|---|---|
| **William R. Wernet**<br>IP: 2a09:bac2:bec5:1578::23d:2a | created the document (bill@billwernet.com) | Nov 27, 2024<br>20:38:57 UTC |
| **William R. Wernet** | sent the document to denniscauchon@gmail.com | Nov 27, 2024<br>20:41:48 UTC |
| **Harm Reduction Ohio, an Ohio nonprofit corporation, by Dennis Cauchon, President, and, only as Guarantor, Dennis Cauchon**<br>IP: 65.185.21.119 | first viewed document (denniscauchon@gmail.com) | Nov 27, 2024<br>20:45:33 UTC |
| **Harm Reduction Ohio, an Ohio nonprofit corporation, by Dennis Cauchon, President, and, only as Guarantor, Dennis Cauchon**<br>IP: 65.185.21.119 | signed the document (denniscauchon@gmail.com) | Nov 27, 2024<br>20:47:17 UTC |
| **William R. Wernet** | sent the document to mnt@ghminc.com | Nov 27, 2024<br>20:47:15 UTC |
| **Borough Company, LLC, by Michael N. Thornborough, President**<br>IP: [illegible] | first viewed document (mnt@ghminc.com) | [illegible]<br>[illegible] UTC |

| | | |
|---|---|---|
| ✓ Borough Company, LLC, by Michael N. Thornborough, President<br>IP: 2605:59c8:1437:1a00:f508:6271:2c26:2a23 | signed the document (mnt@ghminc.com) | Nov 23, 2024<br>02:31:08 UTC |

CHASE

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

January 01, 2025 through January 31, 2025
Account Number: [redacted]

**CUSTOMER SERVICE INFORMATION**

| | |
|---|---|
| Web site: | **www.Chase.com** |
| Service Center: | **1-877-425-8100** |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |
| We accept operator relay calls | |

00001529 DRE 001 212 03625 NNNNNNNNNNN 1 000000000 D2 0000
HARM REDUCTION OHIO
935 RIVER RD STE G
GRANVILLE OH 43023-9538

00015290201000000022

**To help protect you from fraud and scams, you'll no longer be able to send Zelle® payments to recipients originating from social media – such as social media marketplaces or messaging apps.**

Due to the significant rise in social media scams and to help protect your account, we'll be updating our policies on March 23, 2025, limiting your ability to send Zelle® payments identified as originating from contact through social media. As a result, we may:

- Request details about your payment's purpose and how you made contact with the recipient
- Block or decline payments identified as originating from contact through social media
- Decline payments, restrict your use of Zelle® through Chase or take other actions as described in your account agreement

The updates to the policy become effective March 23, 2025, and will be outlined in Section 2 of the Zelle® Service Agreement, which may appear as a separate agreement or as an Addendum to the Digital Services Agreement. You can review the new agreements beginning January 23, 2025. Here's how to access them:

- On **chase.com/business**, log in to your account, click the Main Menu, then select "Agreements & disclosures."
- On the Chase Mobile® app, go to "Legal information" in Profile & Settings or at the bottom of the home page, then "Legal agreements and disclosures."

If you have questions, please call the number on this statement.

## CHECKING SUMMARY

Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$150,045.99** |
| Deposits and Additions | 2 | 64.71 |
| ATM & Debit Card Withdrawals | 2 | -676.42 |
| Electronic Withdrawals | 17 | -139,629.11 |
| **Ending Balance** | **21** | **$9,805.17** |

EXHIBIT
tabbies
38

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account – please refer to your Deposit Account Agreement for more information.

CHASE

January 01, 2025 through January 31, 2025
Account Number: [redacted]

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01/15 | Orig CO Name:Stripe Orig ID:4270465600 Desc Date: CO Entry Descr:Transfer Sec:CCD Trace#:111000029735830 Eed:250115 Ind ID:St-V8N8C5O8X4I1 Ind Name:Harm Reduction Ohio Trn: 0149735830Tc | $39.71 |
| 01/27 | Orig CO Name:Paypal Orig ID:Paypalsd11 Desc Date:250127 CO Entry Descr:Transfer Sec:PPD Trace#:021000022373337 Eed:250127 Ind ID:1039887782169 Ind Name:Harm Reduction Ohio 250127Ppzw87 Trn: 0272373337Tc | 25.00 |
| | **Total Deposits and Additions** | **$64.71** |

## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01/06 | Recurring Card Purchase 01/04 Siteground Hosting Siteground.CO VA Card 5439 | $648.00 |
| 01/06 | Recurring Card Purchase 01/06 Mailchimp 678-9990141 GA Card 5439 | 28.42 |
| | **Total ATM & Debit Card Withdrawals** | **$676.42** |

## ATM & DEBIT CARD SUMMARY

Dennis G Cauchon Card 5439

| | |
|---|---|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $676.42 |
| Total Card Deposits & Credits | $0.00 |

ATM & Debit Card Totals

| | |
|---|---|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $676.42 |
| Total Card Deposits & Credits | $0.00 |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01/02 | Zelle Payment To Dennis C Jpm99Atxj27C | $300.00 |
| 01/02 | Zelle Payment To Amandalynn Reese Jpm99Atxvi3X | 200.00 |
| 01/02 | Orig CO Name:Amethyst Financi Orig ID:832459399 Desc Date:Jan 2 CO Entry Descr:Harm Reducsec:PPD Trace#:044015958906096 Eed:250102 Ind ID: Ind Name:Harm Reduction Trn: 3668906096Tc | 500.00 |
| 01/02 | 01/02 Online Payment 23252690422 To Amandalynn Reese | 432.91 |
| 01/02 | Orig CO Name:Intuit Payroll S Orig ID:1722616679 Desc Date:250102 CO Entry Descr:Quickbookssec:CCD Trace#:021000023735755 Eed:250102 Ind ID:825110907 Ind Name:Harm Reduction Ohio Ervices 825110907 Trn: 0023735755Tc | 8,456.01 |
| 01/02 | Orig CO Name:Alliance Member Orig ID:9000819718 Desc Date:010225 CO Entry Descr:To ACH Sec:Web Trace#:111924683735757 Eed:250102 Ind ID:037-0240802379 Ind Name:Chase Main Account 9164 Trn: 0023735757Tc | 1,529.07 |
| 01/03 | 01/03 Online Payment 23265999030 To Amandalynn Reese | 96.42 |
| 01/03 | 01/03 Online Payment 23266022477 To Amandalynn Reese | 96.42 |
| 01/03 | Orig CO Name:Irs Orig ID:3387702000 Desc Date:010325 CO Entry Descr:Usataxpymtsec:CCD Trace#:061036010273348 Eed:250103 Ind ID:220540315541536 Ind Name:Harm Reduction Ohio Trn: 0030273348Tc | 2,292.94 |
| 01/06 | 01/06 Online ACH Payment 11157614676 To Hro (_#######4325) | 100,000.00 |
| 01/07 | 01/07 Online ACH Payment 11157754453 To Hro (_#######4325) | 19,144.00 |
| 01/08 | 01/08 Online Payment 23319096488 To Borough Company | 1,750.00 |
| 01/08 | Zelle Payment To Patrick Bourland Jpm99Aud149M | 42.90 |



HRO-001532

CHASE

January 01, 2025 through January 31, 2025
Account Number: [redacted]

## ELECTRONIC WITHDRAWALS (continued)

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01/13 | 01/13 Online Payment 22938234012 To Borough Company | 1,750.00 |
| 01/23 | 01/23 Payment To Chase Card Ending IN 3581 | 2,805.36 |
| 01/30 | 01/30 Payment To Chase Card Ending IN 3581 | 3.20 |
| 01/31 | Orig CO Name:Irs Orig ID:3387702000 Desc Date:013125 CO Entry Descr:Usataxpymtsec:CCD Trace#:061036013501019 Eed:250131 Ind ID:220543121022842 Ind Name:Harm Reduction Ohio Trn: 0313501019Tc | 229.88 |
| | **Total Electronic Withdrawals** | **$139,629.11** |

10015290202000000062

## DAILY ENDING BALANCE

| DATE | AMOUNT | DATE | AMOUNT | DATE | AMOUNT |
|---|---|---|---|---|---|
| 01/02 | $138,628.00 | 01/08 | 14,528.90 | 01/27 | 10,038.25 |
| 01/03 | 136,142.22 | 01/13 | 12,778.90 | 01/30 | 10,035.05 |
| 01/06 | 35,465.80 | 01/15 | 12,818.61 | 01/31 | 9,805.17 |
| 01/07 | 16,321.80 | 01/23 | 10,013.25 | | |

## SERVICE CHARGE SUMMARY

| | | |
|---|---|---|
| Monthly Service Fee | $95.00 | |
| Other Service Charges | $2.50 | |
| **Total Service Charges** | **$97.50** | Will be assessed on 2/5/25 |

You were assessed a monthly service fee on your Chase Platinum Business Checking account because you did not maintain the required relationship balance.

## SERVICE CHARGE DETAIL

| DESCRIPTION | VOLUME | ALLOWED | CHARGED | PRICE/ UNIT | TOTAL |
|---|---|---|---|---|---|
| **Monthly Service Fee** | | | | | |
| Monthly Service Fee | 1 | | | $95.00 | $95.00 |
| **Other Service Charges:** | | | | | |
| **Electronic Credits** | | | | | |
| Electronic Credits | 2 | Unlimited | 0 | $0.40 | $0.00 |
| **Credits** | | | | | |
| Non-Electronic Transactions | 9 | 500 | 0 | $0.40 | $0.00 |
| **Cash Management Services** | | | | | |
| Standard ACH Pmnts Initial Fee | 1 | 0 | 1 | $2.50 | $2.50 |
| Debit Block Maintenance | 1 | 0 | 1 | $0.00 | $0.00 |
| ACH Debit Block - Authorized ID | 17 | 0 | 17 | $0.00 | $0.00 |
| Online - Check Monitoring | 1 | 0 | 1 | $0.00 | $0.00 |
| **Subtotal Other Service Charges (Will be assessed on 2/5/25)** | | | | | **$97.50** |

**ACCOUNT** 000000287632225

| DESCRIPTION | VOLUME |
|---|---|
| **Monthly Service Fee** | |
| Monthly Service Fee | 1 |
| **Other Service Charges:** | |
| **Electronic Credits** | |
| Electronic Credits | 2 |

CHASE

January 01, 2025 through January 31, 2025
Account Number: [redacted]

## SERVICE CHARGE DETAIL *(continued)*

| DESCRIPTION | VOLUME | ALLOWED | CHARGED | PRICE/ UNIT | TOTAL |
|---|---|---|---|---|---|
| **Credits** | | | | | |
| Non-Electronic Transactions | 9 | | | | |
| **Cash Management Services** | | | | | |
| Standard ACH Pmnts Initial Fee | 1 | | | | |
| Debit Block Maintenance | 1 | | | | |
| ACH Debit Block - Authorized ID | 17 | | | | |
| Online - Check Monitoring | 1 | | | | |

Reminder: Fees associated with ACH Payments, Real Time Payments, Same Day ACH, ACH Collections and Chase QuickDeposit[SM] are based on previous month activity.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**

Call us at 1-866-564-2262 or write us at the address on the front of this statement immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

**For personal accounts only:** We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:

- Your name and account number;
- A description of the error or the transaction you are unsure about, and why you think it is an error or want more information; and
- The amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**For business accounts**, see your deposit account agreement or other applicable agreements that govern your account for details.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC FUNDS TRANSFERS:** Contact us immediately if your statement is incorrect or if you need more information about any non-electronic funds transfers on this statement. For more details, see your deposit account agreement or other applicable agreements that govern your account.

**JPMorgan Chase Bank, N.A. Member FDIC**

CHASE

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

February 01, 2025 through February 28, 2025
Account Number: [redacted]

**CUSTOMER SERVICE INFORMATION**

| | |
|---|---|
| Web site: | **www.Chase.com** |
| Service Center: | **1-877-425-8100** |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |
| We accept operator relay calls | |

00001894 DRE 001 212 06425 NNNNNNNNNNN 1 000000000 D2 0000
HARM REDUCTION OHIO
935 RIVER RD STE G
GRANVILLE OH 43023-9538

00018940201000000022

## CHECKING SUMMARY

Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$9,805.17** |
| Deposits and Additions | 3 | 553.97 |
| ATM & Debit Card Withdrawals | 1 | -28.42 |
| Fees | 1 | -97.50 |
| **Ending Balance** | **5** | **$10,233.22** |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account – please refer to your Deposit Account Agreement for more information.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 02/10 | Orig CO Name:Stripe Orig ID:4270465600 Desc Date: CO Entry Descr:Transfer Sec:CCD Trace#:111000023852874 Eed:250210 Ind ID:St-N1Y2O0V3M5E7 Ind Name:Harm Reduction Ohio Trn: 0413852874Tc | $14.26 |
| 02/14 | Orig CO Name:Paypal Inc. Orig ID:463389051 Desc Date:250214 CO Entry Descr:Payment Sec:CCD Trace#:073972188626707 Eed:250214 Ind ID:000000849252389 Ind Name:Harm Reduction Ohio 250213210116 Trn: 0458626707Tc | 500.00 |
| 02/14 | Orig CO Name:Stripe Orig ID:4270465600 Desc Date: CO Entry Descr:Transfer Sec:CCD Trace#:111000024338055 Eed:250214 Ind ID:St-Q4N5O1H0S4S5 Ind Name:Harm Reduction Ohio Trn: 0444338055Tc | 39.71 |
| **Total Deposits and Additions** | | **$553.97** |

## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 02/06 | Recurring Card Purchase 02/06 Mailchimp 678-9990141 GA Card 5439 | $28.42 |
| **Total ATM & Debit Card Withdrawals** | | **$28.42** |

## ATM & DEBIT CARD SUMMARY

EXHIBIT 35
tabbies

CHASE

February 01, 2025 through February 28, 2025
Account Number: [redacted]

Dennis G Cauchon Card 5439

| | |
|---|---|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $28.42 |
| Total Card Deposits & Credits | $0.00 |

ATM & Debit Card Totals

| | |
|---|---|
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $28.42 |
| Total Card Deposits & Credits | $0.00 |

## FEES

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 02/05 | Service Charges For The Month of January | $97.50 |
| **Total Fees** | | **$97.50** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|---|---|
| 02/05 | $9,707.67 |
| 02/06 | 9,679.25 |
| 02/10 | 9,693.51 |
| 02/14 | 10,233.22 |

## SERVICE CHARGE SUMMARY

| | | |
|---|---|---|
| Monthly Service Fee | $95.00 | |
| Other Service Charges | $5.00 | |
| **Total Service Charges** | **$100.00** | Will be assessed on 3/5/25 |

You were assessed a monthly service fee on your Chase Platinum Business Checking account because you did not maintain the required relationship balance.

## SERVICE CHARGE DETAIL

| DESCRIPTION | VOLUME | ALLOWED | CHARGED | PRICE/ UNIT | TOTAL |
|---|---|---|---|---|---|
| **Monthly Service Fee** | | | | | |
| Monthly Service Fee | 1 | | | $95.00 | $95.00 |
| **Other Service Charges:** | | | | | |
| **Electronic Credits** | | | | | |
| Electronic Credits | 3 | Unlimited | 0 | $0.40 | $0.00 |
| **Credits** | | | | | |
| Non-Electronic Transactions | 1 | 500 | 0 | $0.40 | $0.00 |
| **Cash Management Services** | | | | | |
| Standard ACH Pmnts Initial Fee | 2 | 0 | 2 | $2.50 | $5.00 |
| Debit Block Maintenance | 1 | 0 | 1 | $0.00 | $0.00 |
| ACH Debit Block - Authorized ID | 17 | 0 | 17 | $0.00 | $0.00 |
| Online - Check Monitoring | 1 | 0 | 1 | $0.00 | $0.00 |
| **Subtotal Other Service Charges (Will be assessed on 3/5/25)** | | | | | **$100.00** |

**ACCOUNT** 000000287632225

| | |
|---|---|
| **Monthly Service Fee** | |
| Monthly Service Fee | 1 |
| **Other Service Charges:** | |
| **Electronic Credits** | |
| Electronic Credits | 3 |

CHASE

February 01, 2025 through February 28, 2025
Account Number: [redacted]

## SERVICE CHARGE DETAIL *(continued)*

| DESCRIPTION | VOLUME | ALLOWED | CHARGED | PRICE/ UNIT | TOTAL |
|---|---|---|---|---|---|
| **Credits** | | | | | |
| Non-Electronic Transactions | 1 | | | | |
| **Cash Management Services** | | | | | |
| Standard ACH Pmnts Initial Fee | 2 | | | | |
| Debit Block Maintenance | 1 | | | | |
| ACH Debit Block - Authorized ID | 17 | | | | |
| Online - Check Monitoring | 1 | | | | |

Reminder: Fees associated with ACH Payments, Real Time Payments, Same Day ACH, ACH Collections and Chase QuickDeposit[SM] are based on previous month activity.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**

Call us at 1-866-564-2262 or write us at the address on the front of this statement immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

**For personal accounts only:** We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:

- Your name and account number;
- A description of the error or the transaction you are unsure about, and why you think it is an error or want more information; and
- The amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**For business accounts**, see your deposit account agreement or other applicable agreements that govern your account for details.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC FUNDS TRANSFERS**: Contact us immediately if your statement is incorrect or if you need more information about any non-electronic funds transfers on this statement. For more details, see your deposit account agreement or other applicable agreements that govern your account.

**JPMorgan Chase Bank, N.A. Member FDIC**

10018940202000000062

CHASE

February 01, 2025 through February 28, 2025
Account Number: [redacted]

This Page Intentionally Left Blank

CHASE

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

March 01, 2025 through March 31, 2025
Account Number: [redacted]

**CUSTOMER SERVICE INFORMATION**

| | |
|---|---|
| Web site: | **www.Chase.com** |
| Service Center: | **1-877-425-8100** |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |
| We accept operator relay calls | |

00001517 DRE 001 212 09325 NNNNNNNNNNN 1 000000000 D2 0000
HARM REDUCTION OHIO
935 RIVER RD STE G
GRANVILLE OH 43023-9538

00015170201000000022

**Chase Business Complete Checking® and Chase Business Savings account customers: We're increasing the rush fee for replacement debit and ATM cards to $15.**

Starting June 22, 2025, there will be a $15 fee if you request express shipping on a replacement Chase debit or ATM card. Please know that you can still receive a replacement card at no cost through our regular mailing process.

Access your replacement card sooner by adding it to your digital wallet.

- When you add your card to your digital wallet, you'll typically be able to use your replacement card once it's issued
- For more information on how to add your card to your digital wallet, visit **chase.com/Digital-Payments**.

If you have any questions, please call the number on this statement. We're here to help.

**California privacy policy information for Chase business accounts**

If you are a California resident, you may have rights under the California Consumer Privacy Act ("CCPA") if personal information was collected as part of your business account. Learn more by reviewing our CCPA Disclosure and Notice at Collection, available at **chase.com/privacy** or in the Chase Mobile®,[1] app in the Security & Privacy Center. Please note that the CCPA does not apply to personal information collected subject to certain other laws, including the Gramm-Leach-Bliley Act and the Fair Credit Reporting Act. For example, the CCPA does not apply to personal information we collect when you obtain products or services primarily for personal, family or household use. If you have any questions, call the number on this statement.

[1] **Chase Mobile® app is available for select mobile devices. Message and data rates may apply.**

**CHECKING SUMMARY** Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$10,233.22** |
| Deposits and Additions | 2 | 5,317.57 |
| ATM & Debit Card Withdrawals | 1 | -59.88 |
| Electronic Withdrawals | 3 | -5,250.00 |
| Fees | 1 | -100.00 |
| **Ending Balance** | **7** | **$10,140.91** |

EXHIBIT
tabbies
40

CHASE

March 01, 2025 through March 31, 2025
Account Number: [redacted]

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account – please refer to your Deposit Account Agreement for more information.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 03/03 | Credit Return: Online Payment 22852963890 To Borough Company | $5,250.00 |
| 03/14 | Orig CO Name:Stripe Orig ID:4270465600 Desc Date: CO Entry Descr:Transfer Sec:CCD Trace#:111000022831834 Eed:250314 Ind ID:St-L2L9I5S0H9M7 Ind Name:Harm Reduction Ohio Trn: 0722831834Tc | 67.57 |
| **Total Deposits and Additions** | | **$5,317.57** |

## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 03/04 | Recurring Card Purchase 03/04 Siteground Hosting Siteground.CO VA Card 5439 | $59.88 |
| **Total ATM & Debit Card Withdrawals** | | **$59.88** |

## ATM & DEBIT CARD SUMMARY

| | |
|---|---|
| Dennis G Cauchon Card 5439 | |
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $59.88 |
| Total Card Deposits & Credits | $0.00 |
| ATM & Debit Card Totals | |
| Total ATM Withdrawals & Debits | $0.00 |
| Total Card Purchases | $59.88 |
| Total Card Deposits & Credits | $0.00 |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 03/04 | 03/04 Online Payment 23935657924 To Borough Company | $1,750.00 |
| 03/19 | 03/19 Online Payment 24108178173 To Borough Company | 1,750.00 |
| 03/26 | 03/26 Online Payment 24181721565 To Borough Company | 1,750.00 |
| **Total Electronic Withdrawals** | | **$5,250.00** |

## FEES

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 03/05 | Service Charges For The Month of February | $100.00 |
| **Total Fees** | | **$100.00** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|---|---|
| 03/03 | $15,483.22 |
| 03/04 | 13,673.34 |
| 03/05 | 13,573.34 |

CHASE

March 01, 2025 through March 31, 2025
Account Number: [redacted]

## DAILY ENDING BALANCE *(continued)*

| DATE | AMOUNT |
|---|---|
| 03/14 | 13,640.91 |
| 03/19 | 11,890.91 |
| 03/26 | 10,140.91 |

## SERVICE CHARGE SUMMARY

| | | |
|---|---|---|
| Monthly Service Fee | $95.00 | |
| Other Service Charges | $0.00 | |
| **Total Service Charges** | **$95.00** | Will be assessed on 4/3/25 |

You were assessed a monthly service fee on your Chase Platinum Business Checking account because you did not maintain the required relationship balance.

## SERVICE CHARGE DETAIL

| DESCRIPTION | VOLUME | ALLOWED | CHARGED | PRICE/ UNIT | TOTAL |
|---|---|---|---|---|---|
| **Monthly Service Fee** | | | | | |
| Monthly Service Fee | 1 | | | $95.00 | $95.00 |
| **Other Service Charges:** | | | | | |
| **Electronic Credits** | | | | | |
| Electronic Credits | 1 | Unlimited | 0 | $0.40 | $0.00 |
| **Credits** | | | | | |
| Non-Electronic Transactions | 1 | 500 | 0 | $0.40 | $0.00 |
| **Cash Management Services** | | | | | |
| Debit Block Maintenance | 1 | 0 | 1 | $0.00 | $0.00 |
| ACH Debit Block - Authorized ID | 17 | 0 | 17 | $0.00 | $0.00 |
| Online - Check Monitoring | 1 | 0 | 1 | $0.00 | $0.00 |
| **Subtotal Other Service Charges (Will be assessed on 4/3/25)** | | | | | **$95.00** |

**ACCOUNT** 000000287632225

| DESCRIPTION | VOLUME |
|---|---|
| **Monthly Service Fee** | |
| Monthly Service Fee | 1 |
| **Other Service Charges:** | |
| **Electronic Credits** | |
| Electronic Credits | 1 |
| **Credits** | |
| Non-Electronic Transactions | 1 |
| **Cash Management Services** | |
| Debit Block Maintenance | 1 |
| ACH Debit Block - Authorized ID | 17 |
| Online - Check Monitoring | 1 |

Reminder: Fees associated with ACH Payments, Real Time Payments, Same Day ACH, ACH Collections and Chase QuickDeposit[SM] are based on previous month activity.

10015170202000000062

CHASE

March 01, 2025 through March 31, 2025
Account Number: [redacted]

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**

Call us at 1-866-564-2262 or write us at the address on the front of this statement immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.

**For personal accounts only:** We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:

- Your name and account number;
- A description of the error or the transaction you are unsure about, and why you think it is an error or want more information; and
- The amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**For business accounts**, see your deposit account agreement or other applicable agreements that govern your account for details.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC FUNDS TRANSFERS**: Contact us immediately if your statement is incorrect or if you need more information about any non-electronic funds transfers on this statement. For more details, see your deposit account agreement or other applicable agreements that govern your account.

**JPMorgan Chase Bank, N.A. Member FDIC**

**Moyo, Elizabeth L.**

| | |
|---|---|
| **From:** | Dennis Cauchon <denniscauchon@gmail.com> |
| **Sent:** | Wednesday, April 2, 2025 12:05 PM |
| **To:** | Jennifer.Voit@odh.ohio.gov |
| **Cc:** | Sierra Dantzler; Brittany.Burns@odh.ohio.gov; Socrates.Tuch@odh.ohio.gov; Richard.Massatti@mha.ohio.gov; Jason.Boylan@mha.ohio.gov |
| **Subject:** | Harm Reduction Ohio naloxone contract - Conflict of interest determination request |
| **Attachments:** | HRO Cauchon letter to ODH conflict 3-31-25 .pdf; Untitled attachment 00008.htm |

Jennifer,

I recently =btained an October 23, 2024, letter to you from Harm Reduction Ohio =oard Vice Chair Dwayne Steward. The letter explains why HRO Chief =rogram Officer AmandaLynn Reese was reinstated to her position =verseeing the statewide naloxone distribution contract despite her =ndisclosed outside employment as Director of Government Advocacy for =elocity BioGroup, Kloxxado's lobbyist. Mr. Steward's letter =tates that I acted in bad faith in disclosing the potential =nbsp;conflict and that Ms. Reese's outside employment was =either a conflict, nor a possible conflict that should have been =isclosed to the funding agency (ODH/OMHAS). =nbsp;

Attached is my response to Mr. =teward's letter.

I ask that you and =he state's legal staff review my response and the conflict =ssue thoroughly. My letter provides an overview of errors and omissions =n Mr. Steward's letter and, most importantly, requests the =tate make a formal determination on whether a disclosable conflict =xisted on the federally funded contract. As stated in the contract, the =under, not the contractor, makes conflict =eterminations.

Thanks very much for your =onsideration. I am happy to answer any questions that you or the state =ay have.

Dennis Cauchon
President, Harm =eduction Ohio
935 River Road, Suite G
Granville, =hio 43023
(740) =73-3814
denniscauchon@gmail.com
<=div>

=

EXHIBIT 41

# HARM REDUCTION OHIO

Health. Science · Compassion · Human Rights

April 2, 2025

Jennifer Voit
Bureau Chief, Health Improvement and Wellness
Ohio Department of Health
246 N. High Street
Columbus, OH 43215

Re: Response – Steward Claims Kloxxado-related Outside Employment

Dear Jennifer,

Harm Reduction Ohio Vice Chair Dwayne Steward sent a letter to you on October 23, 2024, stating that an internal review had determined that HRO Chief Program Officer AmandaLynn Reese's outside employment as Director of Government Advocacy with Velocity BioGroup was not a disclosable conflict of interest under HRO's contract with the Ohio Department of Health.[1] This letter was recently made available to me for the first time through legal proceedings.

In this letter, I provide a high-level overview of documentation and credibility problems in Mr. Steward's letter. Later, in a separate document, I will detail the many specific errors and omissions in Mr. Steward's 18-paragraph, 2,200-word letter.

First, note what the letter does not contain:

- Any documentation supporting the letter's claims.
- A copy of the "independent review" that the letter relies on.
- Details of Kloxxado orders that Ms. Reese placed to the state pharmacy while she was simultaneously employed by Kloxxado's lobbyist.[2]
- Evidence that Ms. Reese disclosed her Velocity BioGroup employment to ODH or me (her immediate supervisor, contract compliance officer and president of HRO).
- The dollar amount of Ms. Reese's compensation and travel reimbursements from Velocity BioGroup.
- The dates of trips, work and other activities performed for Velocity BioGroup, and whether the outside work occurred on days HRO paid her with contract funds.
- Copies of Ms. Reese's employment contract, invoices or work product, or, alternatively, a list of payments, dates, hours worked, tasks completed, reimbursements or supervisors.

[1] Velocity BioGroup is a registered lobbyist for Hikma Pharmaceuticals in Ohio and more than 20 other states. Hikma manufactures the Kloxxado brand of naloxone.

[2] Ms. Reese ordered 11,500 Kloxxado kits from the state pharmacy in the 12 months after she assumed ordering authority. The Kloxxado kits cost the state approximately $600,000 in federal funds and accounted for more than half the naloxone kits that Ms. Reese ordered on HRO's behalf during this period.

In addition to lacking documentation and details, the letter also fails to note:

- Attorney Maritza Nelson, who conducted the "independent review," is a friend of Mr. Steward's, not an independent investigator.
- Ms. Nelson's employment was arranged by Mr. Steward, who had earlier requested that I hire Ms. Nelson for another job (diversity training).
- Mr. Steward was Ms. Nelson's primary contact and participated in all board activities related to Ms. Nelson's investigation.
- Ms. Nelson was tasked with investigating the retaliation claim against Mr. Steward but did not do so. When provided a three-page, single-spaced complaint detailing the retaliation, Ms. Nelson called the retaliation claim "rather outlandish" in an email to my attorney and did not inquire further, a violation of her duty as an impartial fact finder.[3]
- Ms. Nelson held conflicting legal roles, serving both as a "neutral investigator" and legal adviser to Mr. Steward and select board members in efforts to remove me from the HRO board for disclosing Ms. Reese's conflict. The dual legal roles undermined the integrity of her investigation.

**Written Report:** I have seen no evidence that Ms. Nelson produced a formal investigatory report. No written report has been provided at any point to ODH, to me, in legal proceedings, or placed in HRO Board meeting minutes. In his letter to ODH, Mr. Steward describes Ms. Nelson's work as a "review" that produced "determinations." He does not cite, mention, describe or quote from a written investigative report.

HRO paid approximately $35,000 for Ms. Nelson's investigation and legal work. It would be highly unusual for the investigation to not result in a written report. In conflict-of-interest investigations, standard practice is to produce a formal report that includes the scope of the investigation, how the investigation was conducted, a summary of facts and documentation, an analysis of relevant legal standards and conclusions. The basis of my purported termination on November 4, 2024, was that Ms. Nelson determined that Ms. Reese's outside employment should not have been disclosed to ODH and, in doing so, I acted in "bad faith."

It is inappropriate for Mr. Steward to make hearsay claims to ODH that "determinations" were made based on a secret "review" for which no documentation is provided. A written report may exist. If so, it should be produced. To that end, ODH should ask that Ms. Nelson's report be provided to the funding agency, with any redactions explained in a redaction log. If a written report does not exist, Mr. Steward should confirm that no report exists and explain why. ODH should rely on an actual report – not Mr. Steward's subjective description of his friend's review– as the basis for a decision on whether Ms. Reese's outside employment should have been disclosed to the funding agency and is permissible under the contract.

**Conflict of Interest Determination:** I request that the state make, as called for in the contract, a formal determination on Ms. Reese's alleged conflict of interest and its disclosure to the funding agency.[4] The contract's Request for Proposal, incorporated by reference into the contract, states:

> The Contractor **will disclose** to the State knowledge of any such person who acquires an incompatible or conflicting personal interest related to this Contract. The Contractor will take steps to ensure that such a person does not participate in any action affecting the work under this Contract. (Emphasis added.)

[3] The formal written complaint, filed October 22, 2024, is required by HRO's employee manual. Available upon request.

[4] The Ohio Department of Health funds the contract via an interagency agreement with the Ohio Department of Health and Addiction Services, which receives federal funds for contract under the State Opioid and Stimulant Response 4.0 Grant.

In my capacity as HRO President and contract Compliance Officer, I properly filed -- as the "will disclose" provision of the contract requires -- an accurate and timely Conflict Disclosure Notice on September 3, 2024. Under the contract, the conflict issue then proceeds to the state for a determination.

> This (conflict provision) will not apply **when the State has determined**, in light of the personal interest disclosed, that the person's participation in any such action would not be contrary to the public interest. (Emphasis added.)

I believe the state is required to make a formal determination on two issues:

1) Was Ms. Reese's outside employment as Director of Government Advocacy for Kloxxado's lobbyist a "possible conflict" that HRO was obligated to disclose to the state?
2) If so, in light of the disclosed conflict, was Ms. Reese naloxone ordering authority and supervision of the contract consistent with the public interest?

**Mootness.** The issue is not moot. Ms. Reese was reinstated on October 16, 2024, to her position of authority overseeing HRO's $850,000 federally funded contract and the organization's ordering of more than $1.5 million annually in federally funded naloxone from the state pharmacy.

Ms. Reese's current employment with Velocity BioGroup or other outside interests is unknown. As Mr. Steward's letter states, HRO's current management asserts that Ms. Reese's employment as Director of Government Advocacy for Kloxxado's lobbyist does not constitute a <u>possible</u> conflict that should be disclosed to the funding agency, nor an <u>actual</u> conflict that requires removing the conflicted employee from participation in the contract. I disagree. I believe the conflict should have been disclosed and the conflicted employee should not be involved in ordering federally funded naloxone from the state pharmacy. But our opinions do not matter. This is a funder decision, not a contractor decision.

**Conclusion:** As stated earlier, I will send a separate report that documents errors and omissions in Mr. Steward's tendentious letter of October 23, 2024. In addition, I will provide new information learned since the filing of the original Conflict Disclosure Notice on September 3, 2024. Most importantly, I will detail Ms. Reese's placement of large and anomalous Kloxxado orders from the state pharmacy from July 2023 through July 2024 (the period during which she controlled naloxone ordering authority at HRO and before I discovered her Kloxxado-related employment).[5]

In summary, this letter asks that:

1. ODH request the **<u>actual report</u>** used as the basis of all claims and conclusions used in Mr. Steward's October 23, 2024, letter, to support the reinstatement of Ms. Reese's naloxone ordering authority.
2. A **<u>formal determination</u>** from the funding agency (ODH/OMHAS) on whether Ms. Reese's outside employment with Velocity BioGroup constituted (a) a possible conflict that needed to be disclosed or (b) an actual conflict that required Ms. Reese to not participate in the state contract.

Thank you for consideration of this information.

---

[5] In a legal filing, Mr. Steward, current HRO executive director Tasha Turner-Bicknell and Director Billy Golden state they have no knowledge of Ms. Reese's anomalous Kloxxado ordering. This lack of knowledge of Ms. Reese's Kloxxado ordering illustrates that Ms. Nelson's report was not a serious effort to evaluate the true nature or extent of Ms. Reese's conflict of interest.

Sincerely,

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, OH 43023
(740) 973-3814
denniscauchon@gmail.com

**HARM REDUCTION OHIO**

Health. Science · Compassion · Human Rights

# Supplemental Conflict of Interest Disclosure Notice

Anomalous Kloxxado Ordering Activity

April 7, 2025

## 1. Executive Summary

This updated Conflict Disclosure Notice provides newly discovered evidence of disproportionate ordering of the Kloxxado brand of naloxone by a conflicted employee on a federally funded state contract. The original conflict notice was filed September 3, 2024. (Exhibit 1)

On September 3, 2024, I reported that the HRO employee responsible for ordering naloxone from the state pharmacy had undisclosed outside employment with a lobbying firm representing Kloxxado. In that disclosure, I stated that Harm Reduction Ohio (HRO) had no reason to believe her outside employment had influenced the naloxone products she selected. This statement was true at the time, but newly obtained state pharmacy shipment records strongly suggest the employee's outside employment may have affected naloxone ordering.

State pharmacy records show that during the 12-month period when the employee held sole authority over naloxone ordering—and before I discovered her outside employment—she ordered large volumes of Kloxxado. Specifically, between July 2023 and June 2024, she ordered 11,500 Kloxxado kits at an estimated cost of $600,000 in federal funds. This represented a sixfold increase in Kloxxado ordering compared to her predecessor. The heavy ordering ceased after July 17, 2024, when I asked the employee about her Kloxxado-related employment.

This newly discovered information raises concerns about procurement integrity, federal fund stewardship, and potential conflicts of interest. Accordingly, consistent with contract terms, I respectfully request that the state make a formal determination as to whether this outside employment constituted a disclosable conflict and whether the employee's continued participation in the contract is consistent with the public interest.

## 2. Original Disclosure and Information Available at the Time

On September 3, 2024, after consulting with legal counsel, I submitted a Conflict Disclosure Notice to the Ohio Department of Health (Exhibit 1). The notice reported that HRO Chief Program Officer AmandaLynn Reese — the employee responsible for ordering naloxone from



EXHIBIT
tabbies
42

the state pharmacy — had an outside employment contract to be Director of Government Advocacy at Velocity BioGroup, a lobbying firm representing the manufacturer of Kloxxado.

At the time of the disclosure, I had only publicly available information on Ms. Reese's apparent conflict. I promptly initiated an internal inquiry and requested documentation from Ms. Reese. However, Ms. Reese declined to provide me with details of her Velocity BioGroup employment, including the terms of her contract, compensation received, work performed, and travel dates and reimbursement provided.

Concerned by Ms. Reese's lack of cooperation and her communication with friendly board members who she wanted to block disclosure of her outside employment to ODH, I submitted a records request to the state pharmacy on August 23, 2024, to review her naloxone ordering patterns. The state pharmacy records were received on September 16, 2024 (after the disclosure had been submitted), analyzed in November 2024, and most recently updated last week.

The state pharmacy records — now extending through March 30, 2025 — give a fuller picture of a spike in Kloxxado orders that occurred after Ms. Reese assumed ordering authority in the summer of 2023. Specifically, Ms. Reese ordered 11,500 Kloxxado kits in a 12-month period, a rate far exceeding that of her predecessor. The sixfold increase in Kloxxado orders was not supported by a corresponding increase in HRO's total naloxone volume or discussed with me, her immediate supervisor. Ms. Reese stopped ordering Kloxxado immediately after she was asked about her employment with Kloxxado's lobbying firm.

This supplemental Conflict Disclosure Notice expands on the original statement and provides documentation that was not available at the time of the initial filing.

**3. Naloxone Ordering Patterns and Evidence of Anomalous Kloxxado Ordering**

Naloxone shipment records obtained from the state pharmacy show a dramatic and unprecedented shift in HRO's ordering behavior during the 12-month period in which Ms. Reese had sole authority over naloxone procurement. The spike in Kloxxado orders coincided with Ms. Reese's assumption of naloxone ordering authority and her simultaneously holding an employment contract with Kloxxado's lobbying firm. Ms. Reese's outside employment was undisclosed to me (her immediate supervisor and contract compliance officer) or ODH.

To examine whether Ms. Reese's outside employment was correlated to changes in HRO's naloxone ordering, I filed a public records request with the state pharmacy on August 23, 2024. The request sought an Excel file showing all state pharmacy naloxone shipments statewide since January 1, 2018. The records were provided on September 16, 2024, and two subsequent requests provided data through March 30, 2025.

State pharmacy records reveal an anomalous ordering pattern. Ms. Reese ordered large volumes of Kloxxado after assuming naloxone ordering authority at HRO in July 2023, a time when her position as Director of Government Advocacy for Velocity BioGroup was unknown to me or ODH. Ms. Reese immediately stopped ordering Kloxxado after I asked on July 17, 2024, about her employment with Velocity BioGroup.

Key findings from state pharmacy shipment data:

- Between July 2023 and June 2024, Ms. Reese ordered 11,500 Kloxxado kits.
- These kits accounted for 52.3% of her total naloxone orders of 22,000 kits during the 12-month period.
- The state spent approximately $600,000 in federal funds to procure these Kloxxado kits.
- In contrast, her predecessor, Mallory Bolen, ordered 3,446 Kloxxado kits out of 44,437 total kits over the 22 months preceding July 2023, or 7.8% of all naloxone kits ordered by HRO.
- From February through June 2024, Ms. Reese ordered only Kloxxado and no other brand of naloxone. Those orders totaled 9,500 kits at an estimated cost of $400,000 in federal funds.

The table below shows the history of state pharmacy Kloxxado shipments to HRO:

**Harm Reduction Ohio**

Kloxxado Shipments from State Pharmacy

| Order Number | Pharmacy Shipment Date | # of Kits | Orderer |
|---|---|---|---|
| 1 | 11/18/21 | 1,000 | Mallory Bolen |
| 2 | 05/17/22 | 200 | Mallory Bolen |
| 3 | 06/17/22 | 200 | Mallory Bolen |
| 4 | 09/09/22 | 700 | Mallory Bolen |
| 5 | 03/15/23 | 346 | Mallory Bolen |
| 6 | 04/12/23 | 500 | Mallory Bolen |
| 7 | 06/21/23 | 500 | Mallory Bolen |
| 8 | 08/15/23 | 500 | AmandaLynn Reese |
| 9 | 08/17/23 | 1,500 | AmandaLynn Reese |
| 10 | 02/02/24 | 2,500 | AmandaLynn Reese |
| 11 | 4/24/24 | 3,500 | AmandaLynn Reese |
| 12 | 06/14/24 | 3,500 | AmandaLynn Reese |

Source: Ohio Department of Mental Health and Addiction Services

**Naloxone Ordering Process.** The paperwork on one of Ms. Reese's Kloxxado orders is attached to illustrate the ordering process. (Exhibit 2.) In this order, Ms. Reese used the state's seven-page form to order 3,500 Kloxxado kits at 11:31 a.m. on Tuesday, April 23, 2024. State pharmacy records show the 3,500 Kloxxado kits were delivered the next day to HRO's Granville office.

**Kloxxado Price.** Kloxxado is the most expensive of the three intranasal naloxone formulations available through the state. During the period in question, a two-dose kit of Kloxxado cost approximately $50, compared to about $40 for Narcan and $30 for generic naloxone.

**Kloxxado Controversy.** Kloxxado has been the subject of substantial controversy among harm reduction providers concerned about its higher dose (8mg vs. 4mg for Narcan and generic naloxone) and aggressive marketing. Most harm reduction organizations decline to distribute Kloxxado. Thrive4Change, Ohio's second-largest harm reduction organization (after HRO), does not distribute Kloxxado. NEXT Distro, which operates HRO's online ordering platform, refuses to list Kloxxado as an option on HRO's online ordering page.

**Outside Employment.** Ms. Reese was hired as Director of Government Advocacy at Velocity BioGroup in December 2022, according to her since-deleted LinkedIn profile. (Exhibit 3) Ms. Reese continued in this position until at least July 2024, when I asked her about the employment. An HRO director reports that Ms. Reese says she received a monthly retainer from Velocity BioGroup and also was paid hourly for work done. The amount of her Velocity BioGroup compensation has not been disclosed to me, the contract's state funding agency or federal funder.

Velocity BioGroup is a registered lobbyist for Hikma Pharmaceuticals in Ohio and more than 20 other states. Ohio lobbying records show Velocity BioGroup interacted with ODH, OMHAS and other state agencies to increase Kloxxado's availability in Ohio.

Ms. Reese is not listed as a registered lobbyist in Ohio or other states reviewed.

**Scope.** HRO is ODH's largest Project DAWN program and receives more naloxone from the state than any other entity. Since 2020, HRO has received 9.1% of the 1.4 million naloxone kits the state pharmacy has distributed statewide to 500+ organizations (health departments, treatment providers, non-profits, etc.)

Ms. Reese's pattern of concentrated, high-volume Kloxxado ordering – followed by a cessation of orders after being asked about her outside employment -- suggests that procurement decisions may have been influenced by her employment with Kloxxado's lobbyist. At a minimum, the details of Ms. Reese's employment with Velocity BioGroup should have been timely and fully disclosed to state and federal funding agencies.

### 4. Applicable Conflict-of-Interest Standards

HRO applied for the Statewide Naloxone Mail Order & Lay Distributor Network Contract (SRC0000009421, DOH005) on July 25, 2023, and was awarded the contract on November 15, 2023. The contract is administered by the Ohio Department of Health (ODH) under an interagency agreement with the Ohio Department of Mental Health and Addiction Services (OMHAS). The Substance Abuse and Mental Health Services Administration (SAMHSA) provides contract funds to the State of Ohio through the federal State Opioid and Stimulant (SOS) Response grant program.

The contract paid HRO $650,000 in federal fiscal year 2024 and will pay $850,000 in federal fiscal year 2025. In addition to direct funding, the state provides HRO with 30,000 to 40,000 naloxone kits annually, also purchased with federal SOS funds. The dollar value of these naloxone kits, provided to HRO at no charge, exceeds the direct funding that HRO receives.

Under the contract's Staffing Plan, Ms. Reese is Project Manager, working full-time on the contract. (Exhibit 4) Her salary is paid entirely with contract funds. Her defined responsibilities include "management and execution of the contract's goals, objectives and deliverables." She oversees HRO's naloxone distribution network and places orders with the state pharmacy to procure naloxone for HRO's statewide network of volunteers to distribute in their communities.

As HRO President, I serve as the contract's Compliance Officer under the Staffing Plan.[1] I work half-time on the contract, with 50% of my salary paid from contract funds. My contract role includes responsibility for "Compliance and Governance," which is defined as ensuring HRO "operates in compliance with all relevant laws, regulations and ethical standards." (Exhibit 5)

#### A. Contractual Conflict-of-Interest Obligations

The contract incorporates conflict-of-interest language from the Request For Proposal (RFP) that requires contractors to identify, disclose, and mitigate personal interests that may interfere with contract duties:

> No personnel of the Contractor may voluntarily acquire any personal interest that conflicts with their responsibilities under this Contract.…**The Contractor will disclose to the State knowledge of any such person who acquires an incompatible or conflicting personal interest related to this Contract.** The Contractor will take steps to ensure that such a person does not participate in any action affecting the work under this Contract. (Emphasis Added.) (RFP, P. 45) (Exhibit 6)

---

[1] HRO Board members friendly to Ms. Reese claim I was terminated November 4, 2024, for disclosing Ms. Reese's outside employment to ODH. I assert the board has not acted or held at noticed meeting since March 9, 2024. I am also a board member. The issue is currently in court.

The provision includes a narrow exception:

> This will not when the State has determined, in light of the personal interest disclosed, that the person's participation in any such action would not be contrary to the public interest." (Exhibit 6)

This creates a two-part obligation:

1. The contractor must disclose any known or possible conflicts to the State.
2. The State — not the contractor — must determine whether participation in the contract is permissible in light of the disclosed interest.

**B. Disclosure Requirements at Time of Bidding**

The RFP required all applicants to submit a Conflict-of-Interest Statement disclosing any existing or potential conflicts involving employees or contractors. It further states: "The State has the right to reject a Proposal in which a conflict is disclosed or cancel the Contract if any interest is later discovered that could give the appearance of a conflict." (RFP, p. 25) (Exhibit 7)

In response, HRO submitted the following statement as part of its July 2023 application: "Harm Reduction Ohio confirms that no employee or contractors associated with the organization have a conflict of interest working on the statewide Naloxone project." (Exhibit 8) I now believe this statement to be inaccurate.

At the time this statement was submitted, Ms. Reese had already entered into an outside employment agreement with Velocity BioGroup, the lobbying firm representing the manufacturer of Kloxxado. This relationship should have been disclosed – but was not – in HRO's Conflict-of-Interest Statement in its July 25, 2023, contract application. Failing that, the Uniform Guidance (2 CFR Part 200) controlling the spending of federal funds requires that all possible conflicts be disclosed promptly to the funding agency.

**C. The Public Interest Determination**

The contract clearly states that once a potential conflict has been disclosed, the final determination of whether participation is permissible rests solely with the State. This process has not yet occurred. Despite receiving a disclosure on September 3, 2024, ODH has not issued a formal determination on whether Ms. Reese's outside employment disqualified her from participating in naloxone ordering or oversight activities under the contract.

Given the facts now available — including evidence of anomalous product ordering and the continued lack of transparency about her outside employment — HRO requests that the State make a formal conflict determination, as provided for under the contract.

**5. Request for Formal Determination and Next Steps**

This supplemental Conflict Disclosure Notice fulfills HRO's contractual duty to disclose knowledge of a conflicting personal interest involving a key employee. As Compliance Officer, I have provided all relevant information currently available to me, including ordering data, contract documentation, and the existence and timing of the undisclosed outside employment.

Pursuant to the contract's conflict-of-interest clause, I respectfully request that the Ohio Department of Health make a formal determination on two specific questions:

1. Did Ms. Reese's employment with Velocity BioGroup constitute a potential conflict of interest required to be disclosed under the contract?
2. If so, is her continued authority to order federally funded naloxone consistent with the public interest?

This determination is not moot. Ms. Reese currently remains in a position of authority under the contract, and her current outside employment status with Velocity BioGroup remains unknown. The contract requires that such determinations be made by the State, not the contractor.

In addition, I respectfully request the following:

1. That ODH request or compel production of any investigative report related to this matter that was relied upon by HRO Vice Chair Dwayne Steward in his claim that no conflict existed and no potential conflict should have been disclosed to ODH.
2. That ODH advise whether any further disclosures, documentation, or corrective actions are required from Harm Reduction Ohio.
3. That ODH provide guidance on any federal compliance implications, including procurement integrity, audit procedures, or funding continuity.

If ODH considers it appropriate, I support referring this matter to the Ohio Inspector General or other state or federal entity authorized to review potential conflicts of interest.

On behalf of Harm Reduction Ohio, I remain committed to compliance with all legal, contractual and ethical obligations and stand ready to support ODH in addressing and resolving this matter appropriately.

Sincerely,

Dennis Cauchon
President and Contract Compliance Officer
Harm Reduction Ohio
(740) 973-3814
denniscauchon@gmail.com

# Supplemental Conflict Disclosure Notice

## Exhibit List

Exhibit 1 – Conflict Disclosure Notice, September 3, 2024.
Exhibit 2 – Naloxone Order for 3,500 Kloxxado kits, April 23, 2024.
Exhibit 3 – AmandaLynn Reese, LinkedIn Profile, DATE (now deleted)
Exhibit 4 – AmandaLynn Reese, Project Manager, Contract Staffing Plan Description.
Exhibit 5 – Dennis Cauchon, President-Compliance Officer, Contract Staffing Plan Description.
Exhibit 6 – Contract Conflict of Interest Language, Page 45, Request for Proposal.
Exhibit 7 – Contract Conflict Language, State Determination Authority, Page 25, Request for Proposal.
Exhibit 8 – Harm Reduction Ohio Conflict of Interest Statement, Contract Application, July 25, 2023.

# Exhibit 1

Conflict Disclosure Notice, September 3, 2024

# HARM REDUCTION OHIO

Health. Science · Compassion · Human Rights

September 3, 2024

To Ohio Department of Health:

Harm Reduction Ohio recently learned that our chief program officer AmandaLynn Reese has a conflict of interest that we believe should have been reported in our original contract application and our request for contract renewal. The full details of the conflict or potential are not clear because AmandaLynn has declined to disclose details on her outside employment. However, publicly available information makes it clear that AmandaLynn has had and may continue to have a contract to do government advocacy for a lobbying firm representing Hikma, the pharmaceutical company that makes Kloxxado naloxone nasal spray.

AmandaLynn's contract is with Velocity BioGroup, a registered lobbyist for Hikma in Ohio, West Virginia and other states. AmandaLynn's title at Velocity BioGroup is Director of Government Advocacy, according to a biography she posted online in July 2024. AmandaLynn's Linkedin profile shows she had a contract to work as Director of Government Advocacy from December 2022 through December 2023. It seems likely from the social media post and a conversation with AmandaLynn that she retained this position after December 2023 and does so today. However, I cannot say for sure.

AmandaLynn tasks at Harm Reduction Ohio includes overseeing our naloxone program, ordering naloxone from the state pharmacy and providing information on naloxone volume used in monthly contract invoices. Since December 2022, AmandaLynn, as Harm Reduction Ohio's representative, has ordered approximately 15,000 Kloxxado kits from the state. At present, I have no reason to believe that AmandaLynn's outside contract influenced her ordering decisions.

AmandaLynn has declined to provide me details of her work for Velocity BioGroup. However, from the internet, it can be seen that AmandaLynn submitted testimony in the Maryland legislature in May 2023 in support of SB954, a bill to require the Maryland Department of Health to provide Kloxxado access. The Maryland Department of Health opposed the bill, which did not pass.

It is my understanding that Harm Reduction Ohio should have reported this conflict of interest in our July 2023 application for the naloxone distribution contract and in advance of the request for a contract extension. I signed the contract application and did not report the

conflict because I did not know it existed. As far as I know, nobody else at Harm Reduction Ohio, other than AmandaLynn Reese, knew of the conflict.

Harm Reduction Ohio plans to take action today to remove AmandaLynn Reese from any role in our naloxone distribution program, including ordering naloxone. Specifically, I plan to place AmandaLynn Reese on paid leave today while we review this matter.

Harm Reduction Ohio will continue to seek all information related this conflict and promises to be forthright and forthcoming in promptly reporting what we learn to the Ohio Department of Health.

I believe Harm Reduction Ohio has talented staff, partners and volunteer distributors that ensure we can continue to execute the ODH naloxone contract at a high level and with impartiality. Harm Reduction Ohio seeks ODH guidance in how we should proceed to mitigate all issues caused by this conflict.

Sincerely,

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, OH 43023
(740) 973-3814
dennis@harmreductionohio.org

# Exhibit 2

Project DAWN Naloxone Order Form
3,500 Kloxxado Kits
April 23, 2024

# Project DAWN Order Request

As Of July 26, 2023, the ODH Project DAWN team is no longer accepting order requests via email.Only lead agencies should complete this survey to order naloxone and fentanyl test strips.Note: programs no longer need to keep track of account balances and request additional funds.

DO NOT SUBMIT MULTIPLE REQUESTS AT ONE TIME. IF YOU SUBMITTED ONE IN ERROR AND NEED IT CORRECTED, PLEASE CONTACT YOUR CONSULTANT! OTHERWISE, YOUR ORDER WILL NOT BE FULFILLED.

PLEASE BE CONSIDERATE OF THE PHARMACY BY ORDERING WHAT YOU NEED FOR THREE MONTHS OR BASED ON YOUR CAPACITY FOR STORAGE!

For educational materials, please complete this survey.

Response was added on 04/23/2024 11:31am.

| | |
|---|---|
| Lead agency | ◯ Adams County Health Department ◯ AIDS Healthcare Foundation ◯ AIDS Taskforce of Greater Cleveland ◯ Akron Treatment Centers (Pinnacle Treatment Center) ◯ Allen County Public Health ◯ Alliance City Health Department ◯ Animal House Sober Club ◯ Applegate Recovery (Northeast Region) ◯ Applegate Recovery (Montgomery County) ◯ Ascend Counseling & Recovery Services ◯ Arcadia Healthcare: Cleveland Comprehensive Treatment Center ◯ Ashland County Health Department ◯ Ashtabula County Health Department ◯ Athens City-County Health Department ◯ Auglaize County Health Department ◯ AVO Behavioral Health and Recovery ◯ Ballville Volunteer Fire Department ◯ BCI - Ohio Bureau of Investigation ◯ Belmont County Health Department ◯ Birdielight ◯ Brown County Health Department ◯ Butler County General Health District ◯ Canton City Public Health ◯ Cedar Oaks Wellness Center ◯ Cedar Ridge Foundation ◯ Champaign Health District ◯ Cindel's Gift ◯ City of Franklin Division of Fire and EMS ◯ City of Hamilton Health Department ◯ Clark County Combined Health District ◯ Clermont County Mental Health & Recovery Board ◯ Clermont County Public Health ◯ Clermont Recovery Center ◯ Cleveland Clinic Akron General Medical Center ◯ Cleveland Treatment Center ◯ Cleveland UMADOP ◯ Clinton County Health District ◯ Coleman Crisis Services ◯ Columbiana County Health District ◯ Columbus Kappa Foundation ◯ Columbus Public Health ◯ CommQuest Services ◯ Community Action Against Addiction ◯ Community Action Committee of Pike County ◯ Community Action Pathways to Recovery ◯ CompDrug ◯ Coshocton Public Health District ◯ Crawford County Public Health ◯ Cuyahoga County Board of Health ◯ Darke County General Health District ◯ Darke County Recovery Services ◯ DeCoach Rehabilitation Centre ◯ Defiance County General Health District ◯ Delaware Public Health District ◯ Eagle Healthworks ◯ East Liverpool City Hospital ◯ Equitas Health ◯ Erie County Health Department ◯ Fairfield County Health Department ◯ Fairfield Medical Center ◯ Famicos Foundation ◯ Family Health Services of Darke County ◯ Family Recovery Center - Lisbon ◯ Family Recovery Center - Steubenville ◯ Fayette County Public Health ◯ Franklin County Office of Justice Policy & Programs (OJPP) ◯ Franklin County Public Health ◯ Fringe Public Health, Inc. ◯ Fringe Public Health ◯ Fulton County Health Department ◯ Gallia County Health Department ◯ Geauga Public Health |

○ Glenbeigh ○ Global Health Education and Development ○ Greene County Public Health ○ Guernsey County Sheriff's Office
○ Hamilton County Public Health
○ Hancock Public Health
⊗ Harm Reduction Ohio
○ Harness Health Pharmacy
○ Harrison County General Health District
○ Henry County Health Department
○ Health Partners of Western Ohio
○ Highland County Health Department
○ Highland County QRT
○ Hocking County Health Department
○ Holmes County General Health District
○ Homeless Hookup CLE
○ Hometown Pharmacy
○ Hope Spot ○ Hope Valley Recovery
○ House of Hope, Inc. ○ Huron County Public Health ○ Integrated Services for Behavioral Health ○ International Development Association Of Africa (IDAA)
○ Jackson County Health Department
○ Jefferson County Health Department
○ Kent City Health Department
○ Kenton-Hardin Health Department
○ Kicos Wellness Center
○ Knox County Health Department
○ Lake County ADAMH Board
○ Lake County General Health District
○ Lawrence County Health Department
○ Lead the Way Recovery
○ Let's Get Real, Inc. ○ Licking County Health Department ○ Logan County Health District ○ Lorain County Public Health
○ Lower Lights Christian Health Center
○ Madison County Public Health
○ Mahoning County District Board of Health
○ Mansfield UMADAOP
○ Marion Public Health
○ Maryhaven ○ Massillon City Health Department ○ Maumee Valley Guidance Center ○ McKinley Hall
○ Medina County Health Department
○ MedMark Treatment Center - Franklin
○ MedMark Treatment Center - Milford
○ MedMark Treatment Center- Montgomery
○ Meigs County Health Department
○ Mercer County Health District
○ Mercy Health Lorain Hospital
○ Miami County Public Health
○ Miami Valley Hospital - Premier Health
○ Michael's Lab at the Center for Injury Research ○ Modern Psychiatry & Wellness
○ Monroe County Health Department
○ Morgan County Health Department
○ Morrow County Health District
○ Mount Carmel Health System
○ Narcotics Awareness Program of Ohio
○ Neighborhood Pets ○ Noble County Health Department ○ Northern Ohio Recovery Association ○ Northwest Ohio Emergency Medical Services Consortium
○ ODOT - District 1 ○ ODOT - District 2
○ ODOT - District 3 ○ ODOT - District 4
○ ODOT - District 5 ○ ODOT - District 6
○ ODOT - District 7 ○ ODOT - District 8
○ ODOT - District 9 ○ ODOT - District 10
○ ODOT - District 11 ○ ODOT - District 12
○ Ohio Addiction Recovery Center
○ Ohio Department of Health
○ Ohio Domestic Violence Network (ODVN)

◯ Ohio For Humanity ◯ Ohio Northern University Healthwise & Pharmacy
◯ Ohio Recovery Alliance
◯ Ohio State Highway Patrol - Tailor Shop
◯ Ohio State University Wexner Medical Center ◯ OneFifteen
◯ Oriana House Inc. ◯ Ottawa County Health Department ◯ Out of Darkness, Columbus ◯ Paulding County Health Department ◯ Perry County Health Department ◯ Pickaway County General Health District ◯ Pike County General Health District ◯ Portage County Combined General Health District
◯ Portsmouth City Health Department
◯ Preble County General Health District
◯ ProMedica Health Systems
◯ Public Health Dayton & Montgomery County ◯ RI International
◯ Richland Public Health
◯ Ross County Health District
◯ RRS Ohio Drug & Alcohol Counseling LLC
◯ Safe Harbor Recovery
◯ Samaritan Behavioral Health, Inc.
◯ Sanctuary Night ◯ Sandusky County Public Health ◯ Save Our Families
◯ Scioto Connect ◯ Scioto Township Fire Department ◯ Seneca County General Health District ◯ Shawnee Family Health Center ◯ Sidney-Shelby County Health Department ◯ Signature Health
◯ Silver Maple Recovery
◯ SOAR Initiative ◯ Southeast Healthcare
◯ Southern Ohio Medical Center
◯ Southwest General Emergency Department
◯ Spero Health ◯ SpringVale Health Centers Pharmacy ◯ Starfish Project of Richland County ◯ Stark County Health Department
◯ Stark Recovery Associates
◯ Summa Health ◯ Summit County Public Health ◯ Sunrise Treatment Center
◯ Superior Behavioral Health
◯ Talbert House ◯ TCC Health, Inc. (The Counseling Center, Inc.)
◯ TEMS Joint Ambulance District
◯ The Centers (Circle Health)
◯ The MetroHealth System
◯ This Must Be The Place
◯ Thrive for Change ◯ Toledo-Lucas County Health Department ◯ Townhall II
◯ TriHealth ◯ Trumbull County Combined Health District ◯ Tuscarawas County Health Department ◯ UC Health - University of Cincinnati Medical Center
◯ Union County Health Department
◯ University Hospitals Cleveland Medical Center ◯ University of Cincinnati Early Intervention Program ◯ University of Toledo Medical Center ◯ University Settlement
◯ Van Wert County General Health District
◯ Vinton County Health Department
◯ Warren County Health District
◯ Washington County Health Department
◯ Wayne County Health Department
◯ Whole Truth Ministries
◯ Willard Fire & Rescue
◯ Williams County Health Department
◯ Wood County Health Department
◯ Wyandot County Public Health Department
◯ Zanesville-Muskingum County Health Department

(You may type the agency to return a result)

| | |
|---|---|
| Base County of Program | ◯ Adams County ◯ Allen County<br>◯ Ashland County ◯ Ashtabula County<br>◯ Athens County ◯ Auglaize County<br>◯ Belmont County ◯ Brown County<br>◯ Butler County ◯ Carroll County<br>◯ Champaign County ◯ Clark County<br>◯ Clermont County ◯ Clinton County<br>◯ Columbiana County ◯ Coshocton County<br>◯ Crawford County ◯ Cuyahoga County<br>◯ Darke County ◯ Defiance County<br>◯ Delaware County ◯ Erie County<br>◯ Fairfield County ◯ Fayette County<br>◯ Franklin County ◯ Fulton County<br>◯ Gallia County ◯ Geauga County<br>◯ Greene County ◯ Guernsey County<br>◯ Hamilton County ◯ Hancock County<br>◯ Hardin County ◯ Harrison County<br>◯ Henry County ◯ Highland County<br>◯ Hocking County ◯ Holmes County<br>◯ Huron County ◯ Jackson County<br>◯ Jefferson County ◯ Knox County<br>◯ Lake County ◯ Lawrence County<br>⊗ Licking County ◯ Logan County<br>◯ Lorain County ◯ Lucas County<br>◯ Madison County ◯ Mahoning County<br>◯ Marion County ◯ Medina County<br>◯ Meigs County ◯ Mercer County<br>◯ Miami County ◯ Monroe County<br>◯ Montgomery County<br>◯ Morgan County ◯ Morrow County<br>◯ Muskingum County ◯ Noble County<br>◯ Ottawa County ◯ Paulding County<br>◯ Perry County ◯ Pickaway County<br>◯ Pike County ◯ Portage County<br>◯ Preble County ◯ Putnam County<br>◯ Richland County ◯ Ross County<br>◯ Sandusky County ◯ Scioto County<br>◯ Seneca County ◯ Shelby County<br>◯ Stark County ◯ Summit County<br>◯ Trumbull County ◯ Tuscarawas County<br>◯ Union County ◯ Van Wert County<br>◯ Vinton County ◯ Warren County<br>◯ Washington County ◯ Wayne County<br>◯ Williams County ◯ Wood County<br>◯ Wyandot County ◯ N/A - Statewide/State Agency<br>(You may type the county to return a result) |
| Contact Name | Dennis Cauchon AmandaLynn Reese |
| Email | amandalynn@harmreductionohio.org |
| Note for ODH/Pharmacy | ______________________<br>(If applicable: Ward #, Location/Site, Pick-up) |

Items for Order
(Select all that apply)

☒ Naloxone
☐ Fentanyl test strips
☐ Individual items from naloxone kit

Choose Preferred Naloxone Formulation(s)

GENERIC and ZIMHI CURRENTLY NOT AVAILABLE

FULL KITS or FULL KITS w/MASK are on back order due to the pouches being ordered by the pharmacy. Medication-only boxes will arrive much quicker.
(Select up to three choices.)

☐ Generic naloxone (4mg)
☐ Narcan (4mg)
☐ ZIMHI (5mg)
☒ Kloxxado (8mg)
☐ 2-Pack IM Vials w/Atomizers (2mg) ---- FOR GROUP C/HEALTH DEPARTMENTS ONLY

---

Choose Kit Type and Amount - Kloxxado
*Project DAWN kits (not boxes) must be ordered in increments of 10.

☒ Medication only (boxes of two doses). 3500
☐ Project DAWN kit* (medication, gloves, face shield, carrying pouch) _____
☐ Project DAWN kit* + medical face mask _____

---

Agree to terms and conditions.

⊗ By clicking here, I state that I understand and will adhere to the Project DAWN reporting requirements for the material(s) requested in this survey. I also understand that my order request may be denied if there is a 90+ day lapse in reporting from my agency.

# Exhibit 3

AmandaLynn Reese, LinkedIn Profile
September 9, 2024
(Now Deleted)




## AmandaLynn (Anderson) Reese (She/Her) · 3rd

Meet People where they are at - and don't leave them there.

- Harm Reduction Ohio
- The Ohio State University

Cincinnati Metropolitan Area · **Contact info**

418 connections

Message **+ Follow** More

**Connect if you know each other** Connect

## Highlights

**AmandaLynn follows you**
AmandaLynn has been following you since May 2024

**You both work at Harm Reduction Ohio**
AmandaLynn started at Harm Reduction Ohio 2 years and 9 months after you did

Message

## About

As a dedicated advocate and experienced professional, I have spent my career working towards creating positive change in my community. My expertise in harm reduction, policy development, and program management has allowed me to make a tangible impact on the lives of individuals and families in need ...see more

## Activity

420 followers

Posts **Comments**

AmandaLynn Reese reposted this · 2w

Today we're sharing facts about cocaine. People need factual, non-stigmatizing drug information to be safer. Swipe to learn more.

34 3 comments · 10 reposts

AmandaLynn Reese reposted this • 2mo

"This is a moment...[to] collectively challenge the gross misuse of the criminal law system to surveill & lock up people bc of what they put into their ...show more

**Criminalizing Drugs—Including Misoprostol and Mifepristone—Is ...**
msmagazine.com

18 · 1 comment

AmandaLynn Reese reposted this • 3mo

We have to be careful on how and when we pathologize substance use. There is a risk of promoting even greater social injustice to drug users from an- ...show more

**Addiction as a brain disease revised: why it still matters, and the ...**
nature.com

14 · 3 comments

Show all posts →

## Experience

**Harm Reduction Ohio**
4 yrs 1 mo

**Chief Program Officer**
Contract
Jul 2023 - Present · 1 yr 2 mos
Remote

**Director of Programming**
Full-time
Jun 2022 - Sep 2023 · 1 yr 4 mos
Cincinnati, Ohio, United States

**Interpersonal Skills, Volunteering and +30 skills**

**Outreach Coordinator**
Full-time
Aug 2020 - Oct 2022 · 2 yrs 3 mos
Cincinnati, Ohio, United States

**Interpersonal Skills, Volunteering and +14 skills**

**Director**
Best Buddies Stay & Play · Full-time
Sep 2017 - Present · 7 yrs
United States

**Business Development, Interpersonal Skills and +20 skills**

**Director of Government Advocacy**
Velocity BioGroup, LLC · Contract
Dec 2022 - Dec 2023 · 1 yr 1 mo
Remote

**Interpersonal Skills, Program Development and +19 skills**

**Logisitics Account Executive**
Total Quality Logistics
Dec 2015 - Dec 2016 · 1 yr 1 mo
United States

**Interpersonal Skills, Communication and +7 skills**

**Executive Artistic Director**
Teaching Outreach through Theatre · Full-time
Sep 2007 - Aug 2016 · 9 yrs
Columbus Ohio · Hybrid

**Artistic Direction, Executive Team and +1 skill**

Show all 9 experiences →

## Education

**The Ohio State University**
Bachelor's degree, Theatre Literature, History and Criticism
2006 - 2010
Activities and societies: Alpha Psi Omega, 8th Floor Improv, BSTN, TOTTs, All State Choir

**Microsoft Excel**

## Skills

**Stage Direction**

Executive Artistic Director at Teaching Outreach through Theatre

**Artistic Direction**

Executive Artistic Director at Teaching Outreach through Theatre

Show all 46 skills →

## Languages

**American Sign Language**

**English**

Show all 3 languages →

## Interests

Top Voices | Companies | Groups | Newsletters | Schools



**Kelley Robinson** in · 3rd
President of the Human Rights Campaign
28,873 followers
+ Follow



**Brené Brown** in · 3rd
University of Houston + University of Texas at Austin | Researcher. Storyteller. Courage-builder.
4,488,834 followers
+ Follow

Show all Top Voices →

# Exhibit 4

AmandaLynn Reese, Project Manager
Contract Staffing Plan

## Project Manager (AmandaLynn Reese)

40 hours, 1.0 FTE
Reports to President

The Project Manager is responsible for management and execution of the contract's goals, objectives and deliverables. Key project responsibilities:

1. **Project Oversight:** Provide oversight for the statewide mail order and lay distributor naloxone contract, ensuring alignment with the contract's goals and objectives.
2. **Team Supervision:** Oversee and support the regional lay distributor coordinators and naloxone distribution staff, ensuring they have necessary resources and training.
3. **Hiring:** Work with President to hire required staff to fulfill the contract's goals and objectives.
4. **Budget Management:** Work with Grant Manager to ensure proper budgeting and compliance with grant guidelines.
5. **Reporting and Evaluation:** Oversee monitoring and evaluation of project activities to ensure progress and outcomes are tracked and documented.
6. **Stakeholder Engagement:** Build and maintain relationships with stakeholders, partners, and community members to foster support for the project.
7. **Communication and Outreach:** Develop and implement communication strategies, including holding regional and state lay distributor group meetings across the state.
8. **Program Expansion:** Explore opportunities for expanding project reach and impact.
9. **Training and Capacity Building:** Organize training sessions and capacity-building initiatives for lay distributors, team members and community partners.
10. **Coordination with Other Programs:** Ensure coordination and synergy with other Project DAWN programs.

# Exhibit 5

Dennis Cauchon, President-Compliance Officer
Contract Staffing Plan

## President (Dennis Cauchon)

20 hours, 0.5 FTE

Reports to Board of Directors

The President is responsible for strategic, financial and operational leadership. The President is also the primary link to the Board of Directors, policymakers and the media. Key project responsibilities:

1. **Vision and Mission:** Set overall pace and direction of the project.
2. **Research:** Identify demographic groups and geographic areas that are under-resourced with Project DAWN naloxone, as measured by overdose mortality and kits distributed.
3. **Hiring:** Work with Project Manager to hire additional qualified staff, with a preference for those with lived or shared opioid overdose experience.
4. **Financial Management:** Oversee organizational finances, budgeting and fundraising.
5. **Stakeholder Engagement:** Build and maintain relationships with key stakeholders, partners, donors and community members.
6. **Board Relations:** Provide Board of Directors with regular updates, seeking guidance and support as needed.
7. **Public Relations:** Represent HRO to the public, media, and policymakers.
8. **Compliance and Governance:** Ensure HRO operates in compliance with all relevant laws, regulations and ethical standards.
9. **Inter-Department Collaboration:** Coordinate staff, particularly Project Manager and Grant Manager, to ensure effective contract execution.

# Exhibit 6

Contract Conflict of Interest Language, P. 45
Request For Proposal

ATTACHMENT THREE: GENERAL TERMS AND CONDITIONS
PART SEVEN: LAW & COURTS

COMPLIANCE WITH LAW. The Contractor agrees to comply with all applicable federal, state, and local laws in the conduct of the Work.

DRUG-FREE WORKPLACE. The Contractor will comply with all applicable state and Federal laws regarding keeping a drug-free workplace. The Contractor will make a good faith effort to ensure that all the Contractor employees, while working on state property, will not have or be under the influence of illegal drugs or alcohol or abuse prescription drugs in any way.

CONFLICTS OF INTEREST. No Personnel of the Contractor may voluntarily acquire any personal interest that conflicts with their responsibilities under this Contract. Additionally, the Contractor will not knowingly permit any public official or public employee who has any responsibilities related to this Contract or the Project to acquire an interest in anything or any entity under the Contractor's control if such an interest would conflict with that official's or employee's duties. The Contractor will disclose to the State knowledge of any such person who acquires an incompatible or conflicting personal interest related to this Contract. The Contractor will take steps to ensure that such a person does not participate in any action affecting the work under this Contract. This will not apply when the State has determined, in light of the personal interest disclosed, that person's participation in any such action would not be contrary to the public interest.

OHIO ETHICS AND ELECTIONS LAW.

1. Ethics Law

   All Contractors who are actively doing business with the State of Ohio or who are seeking to do business with the State of Ohio are responsible to review and comply with all relevant provisions of O.R.C. Sections 102.01 to 102.09. Contractor certifies that it is currently in compliance and will continue to adhere to the requirements of Ohio ethics laws.

2. Political Contributions

   The Contractor affirms in its cover letter that, as applicable to the Contractor, all personal and business associates are in compliance with Chapter 3517 of the Revised Code regarding limitations on political contributions and will remain in compliance for the duration of the Contract and with all applicable provisions that extend beyond the expiration of the Contract.

EQUAL EMPLOYMENT OPPORTUNITY. The Contractor will comply with all state and federal laws regarding equal employment opportunity, including ORC §125.111 and all related Executive Orders.

Before a contract can be awarded or renewed, an Affirmative Action Program Verification Form must be completed using the Ohio Business Gateway Electronic Filing website http://gateway.ohio.gov. Contractor must verify compliance on an annual basis for the duration of any contract. Approved Affirmative Action Plans can be found by going to the Minority Business Development Division's website: https://eodreporting.oit.ohio.gov/affirmative-action.

INJUNCTIVE RELIEF. Nothing in this Contract is intended to limit the State's right to injunctive relief if such is necessary to protect its interests or to keep it whole.

ASSIGNMENT. The Contractor may not assign this Contract or any of its rights or obligations under this Contract without the prior, written consent of the State.

GOVERNING LAW. This Contract will be governed by the laws of Ohio, and venue for any disputes will lie exclusively with the appropriate court in Franklin County, Ohio.

ORC 9.76(B). Pursuant to ORC §9.76 (B) Contractor warrants that Contractor is not boycotting any jurisdiction with whom the State can enjoy open trade, including Israel, and will not do so during the Contract period.

LEGAL REPRESENTATION AND RIGHTS. The Ohio Attorney General is the chief law officer for the State, its agencies, boards and commissions, and only the Ohio Attorney General has the authority to appoint outside legal counsel to represent the State. Contractor agrees that any provisions in this Contract or any documents incorporated by reference that provide or allow for outside legal representation to defend or settle claims on behalf of the State or provide for a third party to have sole control of a defense or settlement of a claim do not meet the requirements of state law and are considered stricken. Contractor also agrees that, unless specifically agreed to in writing by the State, any provisions that require or provide for a waiver of any legal rights, remedies, or litigation defenses (i.e., waiver of a jury trial) do not meet the requirements of state law and are considered stricken.

STATUTE OF LIMITATIONS. Statutes of limitations generally do not apply to actions brought by the State and any such provisions in this Contract or in any documents incorporated by reference are considered stricken.

# Exhibit 7

Contract Conflict of Interest Language, P. 25
Request For Proposal

implementation and production of the Scope of Work. Provide a comprehensive Work Plan that gives ample description and detail as to how Offeror proposes to accomplish this Project and what resources are necessary to meet the Deliverables.

The State seeks insightful responses that describe proven state-of-the-art methods. Recommended solutions should demonstrate that the Offeror would be prepared to immediately undertake and successfully complete the required tasks. The Offeror's Work Plan should clearly and specifically identify key personnel assignments. (NOTE: The staffing plan should be consistent with the Work plans).

Additionally, the Offeror should address potential problem areas, recommended solutions to the problem areas, and any assumptions used in developing those solutions.

9. Support Requirements. The Offeror must describe the support it wants from the State other than what the State has offered in this RFP. Specifically, the Offeror should address the following:

   a. Nature and extent of State support required in terms of staff roles, percentage of time available, etc.;
   b. Assistance from State staff and the experience/qualification level required; and
   c. Other support requirements.

   The State may not be able or willing to provide the additional support the Offeror lists in this part of its Proposal. The Offeror must therefore indicate whether its request for additional support is a requirement for its performance. If any part of the list is a requirement, the State may reject the Offeror's Proposal if the State is unwilling or unable to meet the requirements.

10. Conflict of Interest Statement. Each Proposal must include a statement indicating whether the Offeror or any people that may work on the Project through the Offeror have a possible conflict of interest (e.g., employed by the State, etc.) and, if so, the nature of that conflict. The State has the right to reject a Proposal in which a conflict is disclosed or cancel the Contract if any interest is later discovered that could give the appearance of a conflict.

11. Assumptions. The Offeror must provide a comprehensive listing of any and all of the assumptions that were made in preparing the Proposal. If any assumption is unacceptable to the State, it may be cause for rejection of the Proposal. No assumptions shall be included regarding negotiation, terms and conditions, and requirements.

12. Proof of Insurance. In this section, the Offeror must provide the certificate of insurance required by the General Terms and Conditions, Attachment Three, Part Two. The policy may be written on an occurrence or claims made basis.

13. Payment Address. The Offeror must provide the address to which payments to the Offeror will be sent.

14. Contract Performance. The Offeror must complete Attachment Eight, Offeror Performance Form.

15. W-9 Form and Supplier Registration. The Offeror must complete Federal Form W-9, Request for Taxpayer Identification Number and Certification form. At least one (1) original (signed in blue ink) must be submitted in the "original" copy of the Proposal. All other copies of the Proposal may contain duplicates of this form. If a subsidiary company is involved, Offerors must have an original W-9 for both the parent and subsidiary companies. In addition, the Offeror must be registered as a supplier with the State through the Supplier Portal. Registration can be completed or confirmed at: https://supplier.ohio.gov

16. Affirmative Action. Before a contract can be awarded or renewed, an Affirmative Action Program Verification Form must be completed using:

    https://development.ohio.gov/business/construction-compliance/affirmative-action-program#AffirmativeActionProgramVerificationGoodsandServices

    Approved Affirmative Action Plans can be found by going to the Minority Business Development Division (MBDD) Web site:

    https://eodreporting.oit.ohio.gov/affirmative-action

    Copies of approved Affirmative Action plans shall be supplied by the Offeror as part of its Proposal or inclusion of an attestation to the fact that the Offeror has completed the process and is pending approval by the MBDD office.

17. Offshore Services. The Contractor must complete the Contractor/Subcontractor Affirmation and Disclosure form affirming the Contractor understands and will meet the requirements of the above prohibition. During the performance of this Contract, the Contractor can change the location(s) disclosed on the Affirmation and Disclosure Form, but a new Affirmation and Disclosure form must be completed. A duly signed waiver from the State is required if the initial or any subsequent form discloses a location to perform the services outside the United States.

# Exhibit 8

Harm Reduction Ohio – No Conflicts - Contract
Certification Statement
July 25, 2023

## 10. Conflict of Interest Statement

Harm Reduction Ohio confirms that no employees or contractors associated with the organization have a conflict of interest working on the statewide Naloxone project.

# Harm Reduction Ohio Application

## Statewide Naloxone Mail Order & Lay Distributor Network Contract

SRC0000009421, DOH005

Application Filed: July 25, 2023

EXHIBIT 43

# Table of Contents

1. Cover letter-Pages 3-4
2. Certification-Pages 5-6
3. Signed Contracts-Page 7
4. Offerer Profile and Prior Projects-Pages 8-22
5. Offerer Letters of Supports-Pages 23-61
6. Staffing Plan-Pages 62-73
7. Personnel Profile Summary-Pages 74-93
8. Work Plan- Pages 94-107
9. Support Requirements-Page 108
10. Conflict of Interest Statement-Page 109
11. Assumptions-Page 110
12. Proof of Insurance-Page 111
13. Payment Address-Page 120
14. Contract Performance-Page 121
15. W-9 Form and Supplier Registration-Page 122
16. Affirmative Action Plan-Page 123
17. Prohibition of the Expenditure of Public Funds for Offshore Services-Pages 124-125
18. Cost Summary Form (Not Included, Uploaded Separately)
19. Preference Certification Statements-Page 126
20. Minority Business Enterprise Plan-Not Applicable
21. Schedule S Response-Pages 127-128

# HARM REDUCTION OHIO

Health · Science · Compassion · Human Rights

July 24, 2023

Ohio Department of Health
Ohio Department of Administrative Services
30 E Broad St.
Columbus, OH 43215

Re: Application for Statewide Naloxone Mail Order and Lay Distributor Contract

To Whom It May Concern:

This is the cover letter required to apply for the Statewide Mail Order and Lay Distributor Network contract (RFP Number SRC0000009421, Index Number DOH005).

**Executive Summary:** Harm Reduction Ohio (HRO) currently operates a statewide online mail-order naloxone distribution service and a statewide network of volunteer lay distributors. The service is the largest Project DAWN program when measured by volume (42,077 kits in 2022). HRO's naloxone program has distributed naloxone in all 88 counties and has extensive experience increasing naloxone distribution to underserved populations and in counties. HRO's existing statewide network of 350 active volunteer lay distributors is the most extensive in Ohio. HRO's lay distributor network follows the five-region Project DAWN design required in the contract. HRO operates the lowest cost (per unit) naloxone program in the country. The organization has published research identifying specific populations and geographic areas receiving disproportionally low volumes of naloxone from Project DAWN. HRO has an unmatched ability to (a) deliver naloxone statewide on scale and at a low per unit cost and (b) implement strategies that increase naloxone volume in accurately identified populations and geographic areas that are currently underserved.

1a. Harm Reduction Ohio is a non-profit 501(c)(3) Ohio corporation. Its federal tax identification number is 82-5110907. Its principal place of business is 935 River Road, Granville, OH 43023.
1b. The individuals involved in preparing this application were:

- President Dennis Cauchon
- Project Manager AmandaLynn Reese
- Grant Manager Jen Phillips
- Administrator Erin Pottenger
- Operations Director Mallory Bolen
- Research Fellow Nick Maxwell

1c. The contact person for this application is HRO President Dennis Cauchon, 935 River Road, Suite G, Granville OH 43023. dennis@harmreductionohio.org. Phone: (740) 973-3814. The organization has no fax number. Cauchon is legally authorized to bind HRO to contract terms.

1d. HRO will employ subcontractor NEXT Distro to operate its online naloxone order-taking system.
1e. A signed letter is attached providing the required information. (Attached.)
1f. Harm Reduction Ohio's proposed solution to the Project meets all requirements of the RFP.
1g. Harm Reduction Ohio does not take exception to the General Terms and Conditions in the RFP or contract.
1h. Harm Reduction Ohio does not assume there will be an opportunity to negotiate any aspect of the Proposal.
1i. Harm Reduction Ohio will comply with all Federal and Ohio Laws and Rules of the Ohio Administrative Code as currently exist or may do so in the future.
1j. Harm Reduction Ohio will not substitute at Project start-up different personnel from those evaluated by the state except when a candidate's availability is no fault of the Contractor.
1k. Harm Reduction Ohio is not now and will not become subject to an unresolved finding for recovery under ORC 9.24.
1l. Harm Reduction Ohio personnel and business associates are in compliance with Chapter 3517 of the ORC regarding political contributions and will remain in compliance for the duration of the contract.
1m. Harm Reduction Ohio has an affirmative action program consistent with ORC122.71(E)(1) and described in attachments to this RFP.
1n. Harm Reduction Ohio is an Ohio corporation properly registered with the Ohio Secretary of State. Harm Reduction Ohio attests that it is registered with the Ohio Secretary of State. Its Chart Number is 4143099.

Sincerely,

Dennis Cauchon

Dennis Cauchon
President
Harm Reduction Ohio
935 River Road, Suite G
Granville, OH 43023
(740) 973-3814
dennis@harmreductionohio.org

**Signature:** Dennis Cauchon

**Email:** dennis@harmreductionohio.org

# HARM REDUCTION OHIO

Health. Science · Compassion · Human Rights

July 20, 2023

Certification

Harm Reduction Ohio is the prime Offerer.

Harm Reduction Ohio affirms it shall not and shall not allow others to perform work or take data outside the United States without express written authorization from DAS.

Harm Reduction Ohio affirms that all personnel provided for the Project, who are not United States citizens, will have executed a valid I-9 form and presented valid employment authorization documents.

Harm Reduction Ohio affirms that any small business program participants will provide necessary data to ensure program reporting and compliance.

Harm Reduction Ohio agrees that it is a separate and independent enterprise from the State of Ohio, the Agency, and the Department of Administrative Services. Harm Reduction Ohio has a full opportunity to find other business and has made an investment in its business. Moreover Harm Reduction Ohio will retain sole and absolute discretion in the judgment of the manner and means of carrying out its obligations and activities under the Contract. This Contract is not to be construed as creating any joint employment relationship between Harm Reduction Ohio or any of the personnel provided by Harm Reduction Ohio the Agency, or the Department of Administrative Services.

Harm Reduction Ohio affirms that the individuals supplied under the Contract are either: (1) employees of (Harm Reduction Ohio with Harm Reduction Ohio withholding all appropriate taxes, deductions, or contributions required under law; or (2) independent Contractors to Harm Reduction Ohio.

Harm Reduction Ohio affirms that it has obtained written acknowledgment from its independent Contractors that they are separate and independent enterprises from the State of Ohio and the Department of Administrative Services and the Agency for all purposes including the application of the Fair Labor Standards Act, Social Security Act, Federal Unemployment Tax Act, Federal Insurance Contributions Act, the provisions of the Internal Revenue Code, Ohio tax law, worker's compensation law, and unemployment insurance law.

Harm Reduction Ohio does not qualify as a Veteran Friendly Business Enterprise as defined by Ohio Revised Code 122.925.

Certified by

Signature:
Email:

Dennis Cauchon
President, Harm Reduction Ohio

**Subcontractor:** Next Harm Reduction, Inc.

**Legal status:** 501(c)3 not-for-profit corporation

**Tax ID Number:** 83-1333112

**Principal place of business address:** 22 West 27th Street, 5th Floor NY, NY 10001

***Please fill out the below with the authorized person that legally binds the contractor to contractual obligations.***

**Name:** Jamie Favaro, Executive Director

**Phone Number:** 917-828-0293

**Fax Number:**

**Email address:** jamie@nextdistro.org

**Mailing address:** 22 West 27th Street, 5th Floor NY, NY 10001

**Description of work NEXT Distro does for Harm Reduction Ohio.**
NEXT Distro processes Harm Reduction Ohio's online Naloxone orders.

**NEXT Distro commits to doing the work if Harm Reduction Ohio is awarded the Statewide Naloxone Grant.**

**NEXT Distro has read and understood the RFP and will comply with the requirements of the RFP.**

**NEXT Distro will maintain any permits, licenses, and certifications required to perform work.**

**NEXT Distro understands that they are a separate and independent enterprise from the State of Ohio and the Department of Administrative Services and the Agency for all purposes including the application of the Fair Labor Standards Act, Social Security Act, Federal Unemployment Tax Act, Federal Insurance Contributions Act, the provisions of the Internal Revenue Code, Ohio tax law, worker's compensation law, and unemployment insurance law.**

**Authorized Signature** | 7/19/23 **Date**

ATTACHMENT FOUR
CONTRACT

This Contract, which results from SRC0000009421, entitled Statewide Naloxone Mail Order & Lay Distributor Network is between the State, through DAS, on behalf of the Agency and

Harm Reduction Ohio
(the "Contractor").

If this RFP results in a Contract award, the Contract will consist of this RFP including all attachments, written amendments to this RFP, the Contractor's Proposal, and written, authorized amendments to the Contractor's Proposal. It will also include any materials incorporated by reference in the above documents and any purchase orders and change orders issued under the Contract. The form of the Contract is this one (1) page attachment to the RFP, which incorporates by reference all the documents identified above. The General Terms and Conditions for the Contract are contained in another attachment to the RFP. If there are conflicting provisions between the documents that make up the Contract, the order of precedence for the documents is as follows:

1. This RFP, as amended;
2. The documents and materials incorporated by reference in the RFP;
3. The Contractor's Proposal, as amended, clarified, and accepted by the State; and
4. The documents and materials incorporated by reference in the Contractor's Proposal.

Notwithstanding the order listed above, change orders and amendments issued after the Contract is executed may expressly change the provisions of the Contract. If they do so expressly, then the most recent of them will take precedence over anything else that is part of the Contract.

This Contract has an effective date of the later of September 01, 2023 or the occurrence of all conditions precedent specified in the General Terms and Conditions.

**IN WITNESS WHEREOF,** the parties have executed this Contract as of the dates below.

| | |
|---|---|
| Harm Reduction Ohio<br>(Contractor) | Department of Administrative Services<br>(State of Ohio Agency) |
| [signature]<br>(Signature) | (Signature) |
| Dennis Cauchon<br>(Printed Name) | Kathleen C. Madden<br>(Printed Name) |
| President<br>(Title) | Director, Department of Administrative Services<br>(Title) |
| 7/22/23<br>(Date) | (Date) |

# 4. Offeror Profile

Table of Contents

**OVERVIEW AND HISTORY** ..... 2
ORGANIZATIONAL HISTORY ..... 2
NALOXONE DISTRIBUTION CAPACITY: ONLINE MAIL ORDER ..... 2
NALOXONE DISTRIBUTION CAPACITY: LAY DISTRIBUTORS ..... 2
**PRIOR EXPERIENCE** ..... 4
PRIOR EXPERIENCE: STATEWIDE SCALE ..... 4
PRIOR EXPERIENCE: TARGETING UNDER-RESOURCED POPULATIONS ..... 4
PRIOR PROJECTS: THREE SUCCESS STORIES (CITED IN AMENDMENT 5) ..... 5
**CAPACITY AND CAPABILITY: STAFFING** ..... 6
STAFF OVERVIEW ..... 6
BOARD STRUCTURE AND OTHER POLICIES ..... 7
**CAPACITY AND CAPABILITY: OPERATIONS** ..... 8
DAILY SHIPPING ..... 8
PRODUCT COST SAVINGS ..... 8
FINANCIAL MANAGEMENT ..... 8
NALOXONE INTAKE FORM TRACKING SYSTEM ..... 9
REGIONAL LAY DISTRIBUTOR NETWORK: STRUCTURE ..... 9
SPANISH-LANGUAGE RESOURCES ..... 9
SOCIAL MEDIA ..... 10
**CAPACITY AND CAPABILITY: RESEARCH** ..... 11
HRO RESEARCH BACKGROUND ..... 11
DATA ANALYSIS: REGIONAL DISPARITIES ..... 11
DATA ANALYSIS: COUNTY-LEVEL DISPARITIES ..... 12
DATA ANALYSIS: RACIAL DISPARITIES ..... 13
**STRATEGY SUMMARY** ..... 14
ONLINE TARGETING/SOCIAL MEDIA ..... 14
EMAIL CAMPAIGN ..... 14
LAY DISTRIBUTION ..... 14

**Required information:** Legal name: Harm Reduction Ohio, 935 River Road, Suite G, Granville, OH 43023. Phone: 740-973-3814. Fax: None. Email: dennis@harmreductionohio.org. Home office: 935 River Road, Suite G, Granville, OH 43023. Established: 2017. Ownership: Non-profit 501(c)(3). Leadership: Dennis Cauchon, President. Employees: 7. Employees engaged in Project tasks: 6.

# Overview and History

## ORGANIZATIONAL HISTORY

Harm Reduction Ohio (HRO) was founded in February 2017 by Dennis Cauchon, a former national reporter and editor at USA Today newspaper. HRO incorporated as a non-profit with the Ohio Secretary of State on February 27, 2018. HRO received tax-exempt 501(c)(3) status from the Internal Revenue Service on April 13, 2018. Cauchon continues to serve as HRO's President.

## NALOXONE DISTRIBUTION CAPACITY: ONLINE MAIL ORDER

HRO gave away its first naloxone kit on July 13, 2018. HRO's then-outreach director Taylor Bennett, a person in recovery who had previously overdosed, conceived of and initiated the naloxone program. On December 13, 2018, HRO signed an agreement to be the Ohio naloxone distribution affiliate for NEXT Distro, a national harm reduction non-profit that provides a secure naloxone ordering system geared toward people at risk of overdose. NEXT has naloxone distribution affiliates in 43 states. HRO received its first online order on February 14, 2018, from Custar, Ohio, in Wood County. Since then, it has only continued to grow. In early 2020, HRO received funds from the State to support online ordering statewide during Covid's worst months; it has continued to serve as the only statewide distributor. To date, HRO has mailed more than 30,000 kits ordered online to Ohio residents in all 88 counties. A significant share of HRO's online orders is from rural counties with limited naloxone access. For context, HRO now provides more naloxone kits than any other affiliate in the NEXT system.

## NALOXONE DISTRIBUTION CAPACITY: LAY DISTRIBUTORS

Harm Reduction Ohio has used lay volunteers to distribute naloxone since its first kit was distributed in July 2018 (which was used to reverse an overdose in Columbus the next month). HRO's lay distributor network expanded quickly through word-of-mouth and social media networking. The lay distributor network adopted a formalized structure in October 2019 when HRO received an IN-naloxone distribution grant from the Ohio Department of Health. In November 2019, HRO held two half-day lay distributor training sessions in Columbus. More than 50 people attended from across Ohio, some driving more than two hours. Then-ODH Project DAWN coordinator Amy Holthusen gave welcoming remarks.

With the IN grant and help from ODH staff, HRO created policies, procedures and processes that supported the operation of a fast-growing, formalized statewide lay distributor program. Today, HRO's distributor program is the nation's largest. It is also the largest Project DAWN program and the only one to have provided naloxone in all of Ohio's 88 counties. The chart below shows HRO's naloxone volume since the program's inception.

| HARM REDUCTION OHIO Naloxone Distribution | |
|---|---|
| **Year** | **Kits** |
| *2023* | *17,460* |
| 2022 | 42,077 |
| 2021 | 32,297 |
| 2020 | 17,006 |
| 2019 | 2,484 |
| 2018 | 300 |
| **Total** | **111,624** |

*2023 volume through June 30.*

Of the 111,624 kits provided to Ohio residents, 33,242 (29.8%) were mailed in response to online orders, and 73,368 (70.2%) were provided to individuals by lay distributors, including HRO staff. Since its inception, HRO has supplied naloxone to more than 500 volunteer lay distributors in 72 counties across the state.[1]

Lay distributor retention is a challenge. Some move. Some die. Some don't return the required paperwork. Some drift away from harm reduction work. But HRO still maintains a large, robust lay distributor network that includes 351 lay distributors working in 43 counties.

[1] This count does not include nearly 50 "agencies" such homeless shelters, food pantries, treatment centers, churches, schools and bars. HRO-suppled agencies such as the Columbus METRO transit systems and concessionaires for the Cincinnati Reds' baseball stadium.

# Prior Experience

## PRIOR EXPERIENCE: STATEWIDE SCALE

As described above, Harm Reduction Ohio already operates a statewide mail order and lay distributor network. HRO's statewide naloxone service is the largest in the United States, not just Ohio. Other states have noted a desire to follow the "Ohio innovation" in grant applications for State Opioid Response funds.

Hard experience has taught HRO that scaling a naloxone distribution program from a local or regional level is a daunting task. The cost and logistics of distributing multiple versions of a regulated pharmaceutical product via different distribution mechanisms (online/lay distribution), into different settings (urban/rural) and across cultures is a profoundly complex and challenging task. HRO's naloxone distribution capability and capacity were hard-earned and cannot be readily or quickly matched.

## PRIOR EXPERIENCE: TARGETING UNDER-RESOURCED POPULATIONS

HRO has considerable experience targeting populations and geographic areas under resourced for naloxone. Three efforts are itemized in the section on Prior Projects. Put broadly, HRO has previously targeted underserved populations in foundation-funded local efforts. This contract would support a *systematic* effort to identify and prioritize areas of greatest need in Ohio, a categorical improvement from *ad hoc* efforts limited by the geographic scope and limited resources of individual foundations.

Although not used in this application as examples of Prior Projects, it should be noted that HRO's IN20-23 grants all included funded strategies for reaching prioritized populations. Examples of such outcomes included:

1. Increasing online orders in high mortality zip codes.
2. Increasing online orders in rural communities.
3. Increasing lay distribution to sex workers and victims of human trafficking.
4. Increasing lay distribution in rural communities and counties underserved by Project DAWN.
5. Increasing lay distribution to the unsheltered (homeless) population.
6. Recruiting lay distributors with lived and shared experience.
7. Increasing lay distribution partnerships with organizations that serve the LGBTQIA2+ communities.
8. Building new partnerships with treatment centers.
9. Increasing naloxone distribution "to highest-risk populations including 2% of Ohio residents living in highest overdose mortality zip codes and African Americans at risk of cocaine-fentanyl overdoses." (More detail below)

HRO's IN22 Grant's Targeted Evaluation Plan examined the cost-effectiveness of various strategies to increase naloxone volume in high-mortality zip codes. As part of its targeting work, HRO identified Ohio's highest overdose mortality zip codes (for all residents, Black residents, and for overdoses stemming from specific stimulant-fentanyl combinations) from January 2018 through

October 2020 in original research conducted with researcher Orman Hall, former drug policy adviser to Gov. John Kasich and a member of the RecoveryOhio board. If ODH is able to provide updated zip code-level mortality data to Hall, he has agreed to provide an updated report. (See letter of support.) ODH also may provide a zip code-level analysis using recent data. If this information is made available, HRO will prioritize work on this contract – both online and by lay distributors – to focus heavily on the 50 highest mortality zip codes among Ohio's 1,450 zip codes. (Additional details found later in Strategy Summary.)

## PRIOR PROJECTS: THREE SUCCESS STORIES (CITED IN AMENDMENT 5)

### Attachment 5A: "End Stigma, Save Lives"

This Ohio Department of Mental Health and Addiction Services grant provided $90,000 from 2021-2023 to combat stigma and provide harm reduction supplies, including naloxone, to people who use(d) drugs (PWUD) in underserved rural areas in Southwest Ohio. HRO conducted 86 events and distributed anti-stigma material to about 1,000 people. Separately, HRO created a Spanish-language anti-stigma program for the LatinX community. The effort included events and a radio/social media campaign to reach the at-risk LatinX population. The effort distributed 8,000 naloxone kits, 3,000 fentanyl test strips, 300 wound care kits and 500 dental care kits. From this project, HRO has a wide range of Spanish language material related to naloxone and harm reduction.

### Attachment 5B: Harm Reduction Grant

This Interact for Health Foundation grant provided $155,000 from 2020 to 2023 to bring naloxone distribution and harm reduction to at-risk populations in Hamilton, Clermont, Brown, Adams, Butler, Warren, Clinton and Highland counties. The effort distributed more than 17,312 kits over two years and dramatically expanded the number of lay distributors in the eight targeted counties. Funding also supported installing and maintaining naloxboxes in high-mortality areas.

### Attachment 5C: Leave Behind Naloxone Initiative

As part of its Medicaid contract, CareSource provided HRO $100,000 to install naloxboxes and harm reduction vending machines in under-resourced, high-mortality locations. HRO was given discretion to use its research and experience to determine the best locations in Ohio for these targeted interventions.

# Capacity and Capability: Staffing

Capacity refers to an ability that exists now. Capability refers to what more can be done under the right circumstances, such as receiving this contract. As described above, HRO has the **capacity** to operate a statewide mail order naloxone program and lay distributor network and to do so in a cost-effective manner consistent with state of Ohio contract requirements. In this section, we hope to confirm that HRO has the **capability** to expand previous *ad hoc* targeting efforts to a scaled, statewide program that prioritizes distribution to under-resourced areas and populations as defined on pages 16-17 of the contract Request for Proposal.[2]

## STAFF OVERVIEW

Harm Reduction Ohio has 6 Full-time Equivalent (FTE) employees, which include a total of 10 full and part-time staff based in Granville and Cincinnati. The majority of HRO staff has lived and/or shared experience. This background creates a personal commitment and strong work ethic tied to harm reduction and naloxone distribution. It also creates a personal understanding of the needs of the stigmatized and under-resourced population.

One example: HRO includes hand-written notes of encouragement in mail-order kits. To save money, HRO considered printing the notes in bulk. Shae Dalrymple, our primary naloxone shipper, forcefully and tearfully opposed the proposed change. Shae, who has been reversed twice with Project DAWN naloxone, said hand-written and tailored notes of love may be the most important thing in the package for people struggling with drugs. She was right. A naloxone recipient posted the photo below on social media thanking HRO (i.e., Shae) for the handwritten note of encouragement.




[2] The RFP defines "under resourced populations" as "populations disparately impacted by overdose fatalities" (1.1.6.5) and "under resourced areas" as "counties with low uptake of Project DAWN programs." (1.1.6.6.)

## BOARD STRUCTURE AND OTHER POLICIES

Harm Reduction Ohio has a demographically diverse board that has a range of skills and deep personal connections to opioid-related issues. Board members include an epidemiologist, a nursing professor, a human resources executive and a treatment professional. Those with lived and personal experience include a mother who lost a child to overdose and individuals who have personally used/are using opioids and other drugs. Board members with professional skills and related personal experience overlap. This provides HRO with a skilled and committed board of directors.

HRO has a 51-page Employee Handbook that covers policies and procedures related to conduct, confidentiality, discipline, benefits and other matters. Established policies and procedures support adding the staff needed to fulfill the contract.

# Capacity and Capability: Operations

## DAILY SHIPPING

HRO ships naloxone every weekday from a centralized shipping room located in Granville, Ohio. Per postal service policy, nearly all packages shipped from HRO's central Ohio location arrive the next day at all addresses in Ohio. Five staff members are trained to ship naloxone to ensure continuity in case of a staffer's absence or other problems, such as weather delays. Since HRO made its "ship-everyday" promise in 2019, it has not missed a single day of shipping.

The shipping operation uses professional strategies to maximize efficiency and reduce costs. For example, the PirateShip shipping program automates tracking shipments and ensures the lowest postal rate possible ($3.66 per single naloxone package). The use of QR codes, bulk material ordering and assembly line-style packaging gives HRO the lowest cost and most flexible naloxone packaging operation in the country. The existing system can be scaled for growth to any size.

## PRODUCT COST SAVINGS

Harm Reduction Ohio gets 20% of its naloxone at no cost from DirectRelief, the pharmaceutical industry's charity. HRO is Ohio's only approved recipient of DirectRelief-donated naloxone. HRO also received donated naloxone from health departments, prisons, and EMS providers; last year, HRO received 2,000 donated kits. While the State funds most HRO-distributed naloxone and will do so for the foreseeable future, the ability of HRO to obtain free naloxone from other sources saves the State money. HRO obtained naloxone for about 12,000 two-dose kits last year. This represents a cost-savings for the State of roughly $400,000.

## NON-PROJECT DAWN COUNTIES

Harm Reduction Ohio has provided 512 naloxone kits through its online ordering service to the nine counties that do not currently have a Project DAWN site. Those counties are Auglaize, Carroll, Harrison, Holmes, Monroe, Noble, Preble, Putnam and Williams. HRO also has existing lay distributors in four of these counties: Auglaize (1), Harrison (1), Holmes (1) and Preble (2). HRO is well-positioned to, as described in the Work Plan, double naloxone kit volume in non-Project DAWN counties and ensure all 88 counties have at least one active lay distributor.

## FINANCIAL MANAGEMENT

The proposed Administrator handles all human resources and administrative functions for HRO and the project. They oversee finance, accounting, personnel, insurance, payroll, taxes and physical assets such as office space. This includes managing the contractors providing support for these functions. These firms include:

1. **Bookkeeping:** Meghan Kizer, Courtney Satterfield of Amethyst Financial Services of Columbus, Ohio.
2. **Payroll:** Ray Barber, Barber and Chodak, Newark, Ohio.
3. **Independent Auditor:** Jean Kyle Calago, CPA, HWA Alliance of CPA Firms, Westerville, Ohio.

4. **Customer Relation Management Software.** Grant Gutwein, JotForm.
5. **Insurance:** Mike Birkmeyer, Madison-Collins-Stephens Agency, Newark, Ohio.

## NALOXONE INTAKE FORM TRACKING SYSTEM

The most challenging and expensive part of managing a statewide lay distributor network is collecting Naloxone Intake Forms, a single-page form that must be returned with each state-funded naloxone kit provided. HRO has implemented several NIF tracking programs over the years as our lay distributor network expanded. In April 2023, HRO implemented its most effective system ever. The change has greatly improved compliance and timeliness.[3] The system uses an encrypted JotForm online portal to automate and combine both NIF reporting and supply ordering for lay distributors. For a $4,000 annual licensing fee, the JotForm system can be made HIPAA-compliant. While harm reduction organizations are not covered by HIPAA, HRO would discuss with ODH whether this extra level of privacy protection is desirable for network lay distributors.

## REGIONAL LAY DISTRIBUTOR NETWORK: STRUCTURE

HRO's proposed Project Manager adjusted HRO's existing regional structure two years ago to match Project DAWN's five-region design. That five-region structure is used to recruit, organize and train lay distributors statewide. Thus, HRO's existing framework can be readily expanded and adjusted to successfully meet contract requirements for a statewide naloxone mail order and lay distributor network.

HRO has held quarterly regional meetings of lay distributors since early 2022. The meetings are hybrid (available both in-person and on Zoom). They have been held in three of the five Project DAWN regions. More than 30 lay distributors have attended these meetings. To complement these meetings, HRO has created an ongoing group chat for lay distributors to facilitate collaboration and communication. HRO has also previously held a statewide Zoom meeting for lay distributors, as well, and it is planning for another in-person meeting this November in Granville.

In sum, HRO already has an existing, statewide lay distributor network functioning in a way that aligns well with the contract requirements. This contract would help HRO formalize and strengthen this effort.

## SPANISH-LANGUAGE RESOURCES

As described in the "Prior Projects: Three Success Stories (cited in Amendment 5)" section on page five of this Offeror Profile and Prior Projects document, HRO has created an extensive portfolio of Spanish-language harm reduction-related material. This Spanish-language material includes naloxone

[3] "To ensure accuracy and compliance, NIFs will be collected through an online platform and cross-checked with an Excel report on JotForm 30 days after each order. Distributors submitting NIFs within the 30-day window will receive a thank-you letter and a refill order link. Delinquent NIFs trigger warning emails at 30 and 60 days, with HRO staff entering overdue NIFs. Distributors will discuss the NIF process with their HRO contact to resume their lay distributor status. These measures streamline NIF tracking and communication, enhancing overall network management." (HRO: NIF Distribution Plan).

training. The translation was funded by an Ohio Department of Mental Health and Addiction Services anti-stigma grant from 2021-2023.

## SOCIAL MEDIA

HRO has Ohio's largest social media presence related to overdose reduction and drug policy. HRO's Facebook page has nearly 10,000 followers. Social media is an excellent, low-cost way to narrowly target people at risk of overdose and underserved populations. HRO has successfully run social media campaigns to increase online naloxone orders from targeted populations. Social media also played a key role in the success of the projects listed in the "Prior Projects: Three Success Stories (cited in Amendment 5)" section on page five of this Offeror Profile and Prior Projects document.

# Capacity and Capability: Research

## HRO RESEARCH BACKGROUND

At Harm Reduction Ohio, President Dennis Cauchon and others have studied overdose death and naloxone distribution extensively. HRO board member Anne Trinh, an epidemiologist at HOPES at Ohio State University, provided a graduate student to research naloxone volume and overdose death. Findings from these efforts have been published on HRO's website and elsewhere.

For this application, HRO research fellow Nick Maxwell conducted a new analysis using the most current data. Nick, a Granville native, was an HRO intern in 2019, graduated from Harvard University in 2022 and will start graduate school this fall at the University of Oxford. He is a skilled researcher.

Here we present summary findings of under-resourced areas and populations. More detailed analysis will be used to inform implementation decisions for the project in the future.

## DATA ANALYSIS: REGIONAL DISPARITIES

In a data analysis for this application, HRO used Ohio Department of Health mortality and Project DAWN data to measure naloxone sourcing at the regional and county levels. Using the most basic measure – share of Project DAWN naloxone kits supplied vs. the share of Ohio overdose deaths – it is clear than Regions 2 (Northeast) and 3 (Southeast) are the most under resourced.

| Disparity Rank | Region | % Statewide Naloxone Provision | % Statewide Overdose Death | Ratio of Overdose Share to Naloxone Share | Status |
|---|---|---|---|---|---|
| 1 | 3 | 17.80% | 25.87% | 1.453 | Under Resourced |
| 2 | 2 | 28.42% | 35.56% | 1.251 | Under Resourced |
| 3 | 4 | 8.62% | 8.19% | 0.950 | Appropriately Resourced |
| 4 | 1 | 10.69% | 8.79% | 0.822 | Over Resourced |
| 5 | 5 | 34.40% | 21.60% | 0.628 | Over Resourced |

## DATA ANALYSIS: COUNTY-LEVEL DISPARITIES

A county-level analysis provides confirmation that Regions 2 and 3 should be prioritized in any effort to close gaps in naloxone uptake. Eleven of the twelve most under-resourced counties are located in these two regions.

| County | Region | % Statewide Overdose / % Statewide Naloxone Provision |
|---|---|---|
| **Washington** | **3** | **8.76** |
| **Preble** | **3** | **8.24** |
| **Clinton** | **3** | **5.62** |
| **Shelby** | **3** | **5.02** |
| **Wayne** | **2** | **4.96** |
| **Adams** | **3** | **4.78** |
| **Holmes** | **2** | **4.50** |
| Williams | 1 | 3.80 |
| **Darke** | **3** | **3.72** |
| **Warren** | **3** | **3.62** |
| **Mahoning** | **2** | **3.51** |
| **Richland** | **2** | **3.49** |

Harm Reduction Ohio has analyzed the data in other ways to include populations, demographics and various time periods. While the numbers vary slightly depending on the variables used, the message is the same: Regions 2 and 3 are the most under-resourced parts of the State. These regions, especially Region 3, include most of the counties in the State with high overdose death rates for meth-fentanyl.

## DATA ANALYSIS: RACIAL DISPARITIES

A demographic analysis adds an important wrinkle to the findings of the prioritization analysis. Black residents of Ohio are under-resourced compared to White residents.

| Race | % Statewide Overdose Death | % Statewide Naloxone Provision |
|---|---|---|
| White | 79.91% | 77.27% |
| **Black** | **19.52%** | **15.75%** |

This data analysis informs the targets and process by which HRO will prioritize its provision of naloxone. Lay volunteer recruitment in Regions Two and Three will be prioritized, as will the targeting of online advertisements for the counties listed above. Additionally, special attention will be paid and priority given to the disproportionate rates at which Black Ohioans fatally overdose. As statewide overdose and naloxone provision numbers continue to change, HRO will re-run this analysis and recalibrate accordingly.

# Strategy Summary

The Scope of Work in the contract includes first identifying underserved populations and areas, then implementing strategies to increase naloxone distribution to relevant populations. The last section focused on the former: identifying underserved populations and vulnerable areas. This section focuses on the latter: strategies that will be implemented to reach those currently under resourced.

## ONLINE TARGETING/SOCIAL MEDIA

Ohio has 88 counties and 1,450 zip codes. HRO will test the effectiveness of various campaigns and targeting strategies in October, November and December 2023. The results will be analyzed in January 2024. A large, targeted campaign will be conducted in February 2024, the highest overdose death rate month of the year, nationally. The campaigns can be extended as appropriate, including in the weeks surrounding Overdose Awareness Day on August 31.

Social media campaigns will be tested and used for the following audiences:

1. **At-risk locations, all drugs.** 100% of budget to 12 counties with the highest overdose death rates or, if available, the 50 zip codes with the highest overdose death rates.
2. **At-risk locations, cocaine-fentanyl.** 100% of budget to 6 counties with the highest overdose death rates or, if available, the 20 zip codes with the highest overdose death rates.
3. **At-risk locations, meth-fentanyl.** 100% of budget to 6 counties with the highest overdose death rates or, if available, the 20 zip codes with the highest overdose death rates.
4. **Black Ohio residents.** 25% of budget to targeted audience of Black residents statewide; 75% to six counties with highest Black resident overdose death rates or, if available, the 15 zip codes with highest Black overdose death rates.
5. **Non-Project DAWN counties.** 100% of budget to nine counties that do not have Project DAWN. Campaign shall spread budget evenly over time to generate continuous social media impressions for the demographic most likely to use naloxone.
6. **Under-resourced counties.** 100% of budget for any under-resourced counties not covered in campaigns listed above. (Under resourced measured by naloxone kits per capita and/or per overdose death.)

## EMAIL CAMPAIGN

Harm Reduction Ohio will send a naloxone offer email to previous orderers who have (a) opted-in to communication from HRO and (b) have met high-value criteria (personally overdosed, reversed overdose, etc.) Also considered: follow-up emails to previous orderers to targeted groups listed above for social media.

## LAY DISTRIBUTION

Harm Reduction Ohio will seek to (a) improve effectiveness and retention among existing HRO lay distributors and (b) recruit and train existing high-value lay distributors, especially in the key target groups listed in the social media section. This will be done through the following steps:

1. **Recruit new lay distributors.** Regional coordinators will personally recruit lay distributors with lived and/or shared experience and direct contact with at-risk populations. Existing lay distributors will be asked for recommendations for new lay distributors. Recruiting and educational events geared toward expanding the lay distributor network will be held. Other Project DAWN programs will be contacted for partnering opportunities. HRO's email list (see e-mail campaign above) will be sent to individuals who have ordered naloxone from HRO to gauge interest in becoming lay distributors.
2. **Target underserved counties.** To achieve the goal of having at least one lay distributor in all 88 Ohio counties, Project Manager and regional coordinators will emphasize recruiting in (a) nine counties that lack a Project DAWN program, (b) counties that lack an active lay distributor (but may have had one in the past), and (c) counties that have lay distributors but low distribution volume given the county's population and overdose death rate.
3. **Network cohesion.** Harm Reduction Ohio will hold quarterly meetings for lay distributors in all five Project DAWN regions and an annual statewide meeting. HRO began these meetings in 2022 but will expand regional meetings from its current capacity of five per year to 20 per year.

All strategies listed in this section will be subject to a data-driven evaluation and revised when appropriate.

# 5. Letters of Support

## Table of Contents

1. Talbert House, Cincinnati
2. The Centers, Cleveland
3. Hancock Public Health, Findlay
4. The Ohio Domestic Violence Network, Statewide
5. Hamilton County Addiction Response Coalition & Newtown Police Dept., Newtown
6. This Must Be the Place, Columbus
7. Butler County Public Health Dept., Butler Co.
8. Orman Hall, National Emerging Threats Initiative, Lancaster
9. Central Outreach, Cleveland Heights
10. Regional Harm Reduction Collaborative, Middletown
11. Jackson & Vinton County Health Dept. SEARCH Program, Hamden
12. The Recovery Center USA, Dayton
13. Hamilton County Health Dept., Cincinnati
14. Scioto Connect, Portsmouth
15. Young Democratic Socialists of America at Miami University, Oxford
16. The Ohio University, Athens
17. Amy Kasprzak, Lay Distributor, bereaved parent, Dayton
18. Newark Homeless Outreach, Newark
19. Caracole, Cincinnati
20. Coalition for Community Safety, Cincinnati
21. Integrated Services for Behavorial Health, Nelsonville
22. Interact for Health, Cincinnati
23. Brightview, Cincinnati
24. Willie Toles, Lay Distributor, Columbus

ATTACHMENT SIX
OFFEROR LETTERS OF SUPPORT

The Offeror must provide a minimum of three (3) letters of support from any community-partner or stakeholder. This can include other Project DAWN programs, local health departments, grassroots harm reduction programs, and organizations that are based in areas that do not have naloxone services (such as Project DAWN) established. The Offeror must complete all areas of Attachment Six for each of the three (3) letters of support provided. If fewer than three (3) letters of support are provided, the Offeror must include information as to why fewer than three (3) letters of support were provided.

| | |
|---|---|
| Company Name: Talbert House | Contact Name: Kamaria A. Tyehimba |
| Address: 2600 Victory Parkway<br>Cincinnati, OH 45206-1711 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br>Contact is the co-founder of the African American Engagement Workgroup which serves the SW region. AmandaLynn is a CORE member and Kelsey Bates is a member of their Stigma Free Outreach Team. HRO will continue to provide support and resources to the groups efforts to reduce overdose death in Black and Brown communities. HRO will continue to learn cultural competency skills and provide up to date harm reduction tools, training and resources to mutually benefit the reach and impact of both agencies. Share data and strategies to reach the at risk populations. Both agencies are project DAWN programs and will have multiple opportunities for collaboration. Contact also provides healthcare, linkage to care, and peer support resources that support PWUD which is in alignment with HRO's mission. | |

| | |
|---|---|
| Company Name: The Centers | Contact Name: Christina Jackson |
| Address: 12201 Euclid Ave<br>Cleveland, OH 44106 | Phone Number: [redacted]<br>E-Mail Address |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br>Will help Identify candidates for our regional Lay Distribution Program, Provide linkage to care and resources beyond naloxone. Will be a link to regional volunteers, clients and distributors. The Centers is a model Harm Reduction Program with multiple locations in the NW Region. As a program that empowers and uplifts Brown and Black staffers with lived experience HRO can learn how to support efforts to decrease Black over dose deaths in the NW region. | |

| | |
|---|---|
| Company Name: Hancock Public Health | Contact Name: Gary Bright |
| Address: 2225 Keith Parkway, Findlay, Ohio 45840 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br>As a distributor of naloxone the Hancock County, program depends on HRO's mail order program, with confidence, to reach residents who we cannot. HRO'S mail order is dependable, efficient, and allows HCPH avoid unnecessarily using it's limited resources to build it's own mail order program. HRO's ability to consistently supply residents who HCPH cannot reach with naloxone has been instrumental in the mutal ongoing efforts to combat the opioid crisis. HCPH will continue to collaborate with HRO and tell its community about its resources to fill gaps in its own programing. HCPH will also assit in identifing supports for lay distribution in the NE region | |

ATTACHMENT SIX
OFFEROR LETTERS OF SUPPORT

The Offeror must provide a minimum of three (3) letters of support from any community-partner or stakeholder. This can include other Project DAWN programs, local health departments, grassroots harm reduction programs, and organizations that are based in areas that do not have naloxone services (such as Project DAWN) established. The Offeror must complete all areas of Attachment Six for each of the three (3) letters of support provided. If fewer than three (3) letters of support are provided, the Offeror must include information as to why fewer than three (3) letters of support were provided.

| | |
|---|---|
| Company Name: The Ohio Domestic Violence Network | Contact Name: Cheryl Stahl |
| Address: 1855 E. Dublin-Granville Road, Suite 301 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br><br>Continue to expand a project to raise awareness about the specific needs of survivors of domestic violence who use substances and are seeking domestic violence services. The importance of naloxone distribution to prevent hypoxia in instances of overdose. SDV are at increased risk of TBI due to repeat exposure to strangulation, head injury and over dose only increases these risks. ODVN is a statewide partner and can add value and capacity to the lay distribution network. | |

| | |
|---|---|
| Company Name: Hamilton County Addiction Response Coalition & Newtown Police Department | Contact Name: Colonel Thomas W. Synan Jr Cheif of Police |
| Address: 3536 Church St.<br>Newtown, Ohio 45244 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br><br>Support efforts to build community relationships. Key partner in our effort to combat stigma and myths around naloxone, opioids and other drugs. | |

| | |
|---|---|
| Company Name: This Must Be the Place | Contact Name: William Perry |
| Address: 401 W. Town Street Suite 228<br>Columbus, OH 43215 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br><br>Sharing ideas, event coverage and lay distribution tactics to meet shared goals. Sharing improvments to distribution programs to better meet the needs of those we serve. Sharing training materials and other resources to stay consistant in messaging and reach. | |

## ATTACHMENT SIX
## OFFEROR LETTERS OF SUPPORT

The Offeror must provide a minimum of three (3) letters of support from any community-partner or stakeholder. This can include other Project DAWN programs, local health departments, grassroots harm reduction programs, and organizations that are based in areas that do not have naloxone services (such as Project DAWN) established. The Offeror must complete all areas of Attachment Six for each of the three (3) letters of support provided. If fewer than three (3) letters of support are provided, the Offeror must include information as to why fewer than three (3) letters of support were provided.

| | |
|---|---|
| Company Name: Butler County Public Health Department | Contact Name: Erik Balster<br>Jordan Meyer |
| Address: 301 S Third Street<br>Hamilton Ohio 45011 | Phone Number [redacted]<br>E-Mail Address |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br><br>Regional goal setting and data sharing to maxiumize reach and sustainability. Continued collaboration surrounding events, and lay distribution efforts. Working with QRT and others to improve overall outcomes when working with those who use drugs. | |

| | |
|---|---|
| Company Name: National Emerging Threats Initiative | Contact Name: Orman Hall |
| Address:<br>1435 Beverly Hills Drive Lancaster, Ohio 43130 | Phone Number [redacted]<br>E-Mail Address |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br><br>Will continue to support efforts of data review and analysis as a volunteer to improve overall outcomes for HRO programing and mission. | |

| | |
|---|---|
| Company Name: Central Outreach | Contact Name: Christina Gast |
| Address: 2323 Lee Road<br>Cleveland Heights, OH 44118 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br><br>Continued support in reaching most at risk for HCV and providing free services for testing and treatment. Supporting efforts in naloxone education distribution. Helping close the health gap in black and brown communities by offering addtional care and services. | |

ATTACHMENT SIX
OFFEROR LETTERS OF SUPPORT

The Offeror must provide a minimum of three (3) letters of support from any community-partner or stakeholder. This can include other Project DAWN programs, local health departments, grassroots harm reduction programs, and organizations that are based in areas that do not have naloxone services (such as Project DAWN) established. The Offeror must complete all areas of Attachment Six for each of the three (3) letters of support provided. If fewer than three (3) letters of support are provided, the Offeror must include information as to why fewer than three (3) letters of support were provided.

| | |
|---|---|
| Company Name: Regional Harm Reduction Collabortive | Contact Name: Tami Adams |
| Address: 4464 S. Dixie Highway Middletown, OH 45005 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br>Collaborative efforts will involve shared training sessions, joint community outreach programs, and coordinated distribution efforts to maximize impact. The shared goal is to reduce overdose rates, increase naloxone accessibility, and promote harm reduction education among high-risk populations. By working collaboratively with regional harm reduction groups, HRO aims to foster a more unified, effective response to the opioid crisis in the southwest Ohio region. HRO will also advocate for policies that support harm reduction efforts and reduce barriers to naloxone access, amplifying the voices of local harm reduction groups. This collaborative approach is fundamental to achieving the collective goal of saving lives and promoting health within communities affected by opioid use. | |

| | |
|---|---|
| Company Name: Jackson & Vinton County Health Department SEARCH Program | Contact Name: Rachel Stewart |
| Address: 35241 Benner Rd<br>Hamden, OH 45634 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br>Working to continue antistigma and overdose responder trainings for rural pubic health leaders. Recreating the efforts to reduce stigma in rural communities like was done in Jackson Co SSP. HRO was instrumental in creating literature, training and other resources to engage stakeholders and community members in support. Creating more community access points for distribution. | |

| | |
|---|---|
| Company Name: The Recovery Center USA | Contact Name: Tonja Catron |
| Address: 7345 Far Hills Lane<br>Dayton, OH 45459 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br>Having naloxone avalible to share with recovery community at events and at treatment centers is critical to reducing overdose death. Tonja is one of HROs first and most dedicated distributors of naloxone. | |

## ATTACHMENT SIX
## OFFEROR LETTERS OF SUPPORT

The Offeror must provide a minimum of three (3) letters of support from any community-partner or stakeholder. This can include other Project DAWN programs, local health departments, grassroots harm reduction programs, and organizations that are based in areas that do not have naloxone services (such as Project DAWN) established. The Offeror must complete all areas of Attachment Six for each of the three (3) letters of support provided. If fewer than three (3) letters of support are provided, the Offeror must include information as to why fewer than three (3) letters of support were provided.

| | |
|---|---|
| Company Name: Hamilton County Health Department | Contact Name: Greg Kesterman or Darci Smith |
| Address: 250 William Howard Taft Road<br>Cincinnati, OH 45219 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br>Hamilton County Public Health (HCPH) and Harm Reduction Ohio (HRO) collaborate strategically to enhance naloxone distribution across the region. They leverage each other's strengths - HCPH's extensive health networks and resources, and HRO's expertise in harm reduction and large-scale naloxone distribution - to extend the reach of this life-saving medication. Together, they co-host training sessions on naloxone use and overdose prevention, and utilize HCPH's communication channels to promote HRO's online naloxone mail-order service. Community outreach events, co-organized by HCPH and HRO, provide on-the-spot naloxone distribution and harm reduction education. HRO assists HCPH in advocating for policies that reduce barriers to naloxone access within the county, thus jointly strengthening the regional response to the opioid crisis. | |

| | |
|---|---|
| Company Name: Scioto Connect | Contact Name: Abby Spears |
| Address: 613 Chillicothe St. Portsmouth, Ohio 45662 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br>Harm Reduction Ohio (HRO) and Scioto County Connection (SCC) are collaborating to maximize naloxone distribution in Ohio, specifically focusing on underserved regions. SCC, with its deep-rooted connections in the local community, and HRO, with its experience in large-scale naloxone distribution, create a synergy that enhances access to this vital medication. Together, they conduct community outreach events and training sessions on naloxone use and overdose prevention. Their collaboration ensures the broader reach of HRO's online naloxone mail-order service, and they jointly advocate for policies promoting harm reduction and naloxone accessibility. | |

| | |
|---|---|
| Company Name: Young Democratic Socialists of America, Miami University | Contact Name: Dylan Halpin or Lizzy Childers |
| Address: 550 East Spring Street<br>Oxford, Ohio 45056 | Phone Number [redacted]<br>E-Mail Address |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br>The Young Democratic Socialists of America (YDSA) at Miami University are partnering with Harm Reduction Ohio (HRO) to extend naloxone accessibility on campus and beyond. YDSA, with its influential student network, and HRO, with its comprehensive naloxone distribution expertise, work in unison to provide the life-saving medication to those in need. Their collaborative efforts include hosting educational events on overdose prevention and harm reduction, and distributing naloxone kits procured from HRO, contributing to a safer and more informed community. | |

ATTACHMENT SIX
OFFEROR LETTERS OF SUPPORT

The Offeror must provide a minimum of three (3) letters of support from any community-partner or stakeholder. This can include other Project DAWN programs, local health departments, grassroots harm reduction programs, and organizations that are based in areas that do not have naloxone services (such as Project DAWN) established. The Offeror must complete all areas of Attachment Six for each of the three (3) letters of support provided. If fewer than three (3) letters of support are provided, the Offeror must include information as to why fewer than three (3) letters of support were provided.

| | |
|---|---|
| Company Name: The Ohio University | Contact Name: Nathaniel Berger |
| Address: Circle Drive, The Ridges<br>Athens, Ohio, 45701 | Phone Number: (740) 593-2438<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br>Harm Reduction Ohio (HRO) and the Inspire Lights program at Ohio University are collaborating to strengthen naloxone access and foster harm reduction practices within the university community and beyond. This includes their innovative work at The Ridges makerspaces, where they leverage the creative and collaborative environment to further disseminate naloxone kits supplied by HRO. This partnership amplifies the reach of naloxone into these unique spaces, thus enhancing community safety and further integrating harm reduction practices within diverse settings of the Ohio University.This work covers several counties in collaboration with Recovery Ecosystems (INSPIRE), an ARC initiative addressing Appalachia's substance use disorder crisis (SUD) through projects that create or expand a recovery ecosystem leading to workforce entry or re-entry. | |

| | |
|---|---|
| Company Name: Volunteer RN Bereaved Parent | Contact Name: Amy Kasprzak |
| Address: 1420 Passport Ln<br>Dayton Ohio 44903 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br>Volunteer lay distributors in Ohio, specifically in Montgomery and Miami counties, have found immense value in their collaboration with Harm Reduction Ohio (HRO). They've been equipped by HRO with naloxone supplies, enabling them to make a significant impact in their communities by saving multiple lives. These distributors actively urge the state to support HRO's efforts, emphasizing that in many parts of Ohio, HRO serves as the only provider of naloxone. | |

| | |
|---|---|
| Company Name: Newark Homeless Outreach | Contact Name: Patricia Perry |
| Address: 184 East Main Street,<br>Newark Ohio 43055 | Phone Number: [redacted]<br>E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project.<br>Harm Reduction Ohio (HRO) and Newark Homeless Outreach are partnering to deliver crucial naloxone supplies and harm reduction education to one of Ohio's most vulnerable populations. With HRO's provision of naloxone, Newark Homeless Outreach effectively dispenses these life-saving kits within their outreach services, targeting individuals who are experiencing homelessness. This critical alliance not only broadens the reach of naloxone into under-served communities, but also exemplifies the potential for collaboration between harm reduction initiatives and homeless outreach services to effectively respond to the opioid crisis. NHO is able to become a Project Dawn thanks to the help and support of HRO. | |

## ATTACHMENT SIX
## OFFEROR LETTERS OF SUPPORT

The Offeror must provide a minimum of three (3) letters of support from any community-partner or stakeholder. This can include other Project DAWN programs, local health departments, grassroots harm reduction programs, and organizations that are based in areas that do not have naloxone services (such as Project DAWN) established. The Offeror must complete all areas of Attachment Six for each of the three (3) letters of support provided. If fewer than three (3) letters of support are provided, the Offeror must include information as to why fewer than three (3) letters of support were provided.

| | |
|---|---|
| Company Name: Caracole | Contact Name: Rina Saperstein |
| Address: 4138 Hamilton Ave, Cincinnati, OH 45223 | Phone Number: [redacted]<br>E-Mail Address: |

Description of what role, if any, the community-partner or stakeholder will have in the project.

Harm Reduction Ohio (HRO) and Caracole are collaborating to increase the reach of naloxone and promote harm reduction initiatives in Ohio. Caracole, renowned for its work in the HIV/AIDS community, uses its established network to distribute naloxone kits supplied by HRO. This collaboration is especially vital in addressing the overlapping crises of HIV/AIDS and opioid overdose. Caracole's trusted presence in the community enables them to effectively disseminate naloxone and spread awareness about its importance in overdose prevention, demonstrating the power of community partnerships in public health endeavors.

| | |
|---|---|
| Company Name: Coalition for Community Safety | Contact Name: Noam Barnard |
| Address: 22 West Hollister Street<br>Cincinnati, Ohio 45219-1523 | Phone Number: [redacted]<br>E-Mail Address: |

Description of what role, if any, the community-partner or stakeholder will have in the project.
Harm Reduction Ohio (HRO) and the Coalition for Community Safety (CCS) partner strategically to optimize naloxone access and advance harm reduction principles across Ohio. Their collaboration is unique as CCS employs its far-reaching influence in music venues, bars, and its monthly free hot meal services to distribute naloxone kits supplied by HRO. These events are targeted within Hamilton and Clermont counties, notably in areas identified as the highest overdose zip codes. CCS's specific channels and community touchpoints allow them to effectively distribute HRO's naloxone in settings often overlooked, creating safer environments and extending lifesaving support where it is critically needed.

| | |
|---|---|
| Company Name: Intergrated Services for behavioral health | Contact Name: Natashia Rapp |
| Address: 1940 Mt. St. Mary Drive<br>Nelsonville, Ohio 45764 | Phone Number [redacted]<br>E-Mail Address |

Description of what role, if any, the community-partner or stakeholder will have in the project.
Harm Reduction Ohio (HRO) and Integrated Services for Behavioral Health (ISBH) work collaboratively to promote harm reduction and naloxone distribution in Ohio. HRO played a key role in aiding ISBH to become a Project DAWN (Deaths Avoided With Naloxone) site, further expanding access to this life-saving medication. Together, HRO and ISBH continue to support each other in regional initiatives to distribute naloxone and other harm reduction supplies, combining HRO's expertise in large-scale distribution with ISBH's strong local networks in the behavioral health community. This collaboration strengthens the overall regional response to the opioid crisis and underscores the importance of community partnership in public health initiatives.

## ATTACHMENT SIX
## OFFEROR LETTERS OF SUPPORT

The Offeror must provide a minimum of three (3) letters of support from any community-partner or stakeholder. This can include other Project DAWN programs, local health departments, grassroots harm reduction programs, and organizations that are based in areas that do not have naloxone services (such as Project DAWN) established. The Offeror must complete all areas of Attachment Six for each of the three (3) letters of support provided. If fewer than three (3) letters of support are provided, the Offeror must include information as to why fewer than three (3) letters of support were provided.

| | |
|---|---|
| Company Name: Interact for Health | Contact Name: Kate Schroder or Lisa Myers |
| Address: 8230 Montgomery Rd Ste 300, Cincinnati, OH 45236 | Phone Number: [redacted] E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project. Harm Reduction Ohio (HRO) and Interact for Health will continue to bolster the provision and utilization of naloxone throughout Southwest Ohio. Interact for Health, with its commitment to improving health through key community partnerships, works closely with HRO to extend the availability of naloxone to areas that need it most. This collaboration facilitates an increased reach of naloxone supplies, ensuring that a life-saving measure is accessible for those affected by opioid use, thereby strengthening the overall health and well-being of communities across 8 counties in Ohio. | |

| | |
|---|---|
| Company Name: BrightView | Contact Name: Emily Harsh, LPC, LICDC |
| Address: BrightView<br>446 Morgan St.<br>Cincinnati, OH 45206 | Phone Number: [redacted] E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project. Harm Reduction Ohio (HRO) and BrightView have collaborated on multiple fronts to combat the opioid crisis in Ohio. One significant partnership occurred when they jointly provided naloxone for 53 Overdose Awareness Day events across the state, demonstrating a large-scale commitment to public education and overdose prevention. Moreover, BrightView's outreach workers are regularly equipped with naloxone supplies from HRO, thereby enabling them to respond swiftly and effectively to overdose situations in their daily community interactions most notebly rural drug court outreach. This collaboration represents a powerful blend of treatment and harm reduction strategies, enhancing their collective capacity to save lives and promote recovery in Ohio. | |

| | |
|---|---|
| Company Name: Lay Distributor and Volunteer | Contact Name: Willie Toles |
| Address: 78 Hawkes Ave<br>Columbus Ohio 43222 | Phone Number: [redacted] E-Mail Address: |
| Description of what role, if any, the community-partner or stakeholder will have in the project. Will continue to reach black and brown community memebers through lay distribution and provide feedback to inform best practices and cultural sensitivity. | |

# Talbert House

Building a Stronger Community...
One Life at a Time.

EXECUTIVE OFFICES
2600 Victory Parkway
Cincinnati, OH
45206-1711
Phone: (513) 751-7747
www.talberthouse.org

BOARD OF TRUSTEES

Mark Addy
CHAIR

Denice Hertlein
VICE CHAIR/TREASURER

Laurence Jones
VICE CHAIR

Ann Marie Tracey, J.D.
SECRETARY

Stephanie P. Gaither
PAST CHAIR

Richard Bodner
David Hoguet
James C. Leonard, CPA
Alan Piker
Jennifer Sherwood
Sourushe Zandvakili, Ph.D.
EXECUTIVE COMMITTEE

Paul M. Brunner
Nan Kohnen Cahall
James J. Chalfie, Esq.
Cherryl Christensen, D.O.
Glenda Cousins
Cathy T. Crain, J.D.
Meredith Fossett
J.R. Foster
Carol B. Goodman
Barbara Gould
Michael J. Harmon, Esq.
Gina Hemenway
Gregory Hoernschemeyer
Margaret Hulbert
Fred Ioffe, Ph.D.
Robert Jones
Navdeep S. Kang, Psy.D
Thomas C. Kilcoyne, Esq.
Sarah Leyshock
Robert B. Meacham
Rev. Peterson Mingo
Candace Novak Sabers
Julie Shifman, Esq.
E.B Silberstein, M.D.
Marla Silliman
John I. Silverman
Nicholas M. Tepe
Christopher Thompson
Alex Triantafilou, Esq.
Mark A. Vander Laan, Esq.
Sarah Weiss
Joyanna Wesche Blake
Gwendolyn I. Wilder
Dennis Williams
Barry Willison

Josh Arnold
President/CEO

July 19, 2023

Dear Ohio Department of Health,

We are writing to express our enthusiastic support for Harm Reduction Ohio's application for funding from the Ohio Department of Health for their proposed statewide naloxone distribution program. As a coalition of community partners dedicated to improving public health and well-being, we have witnessed the tremendous impact of Harm Reduction Ohio's initiatives in our community.

Harm Reduction Ohio (HRO) is a leading 501(c)3 non-profit organization that has consistently demonstrated its commitment to providing essential harm reduction services to individuals affected by substance use. Their work as the largest distributor of naloxone in Ohio, delivering an impressive 42,000 naloxone kits in 2022 through the Ohio Department of Health's Project DAWN program, exemplifies their expertise and dedication to saving lives.

Our coalition, consisting of organizations working closely with individuals who use drugs and other key stakeholders, has had the privilege of collaborating with HRO. Through this partnership, we have experienced firsthand the invaluable support and resources provided by HRO. Their commitment to ensuring accessible naloxone distribution, combined with their compassionate and respectful approach towards individuals with lived and shared experiences, has made a significant difference in our community.

We firmly believe that expanding HRO's naloxone distribution efforts to underserved areas and populations in Ohio is crucial in addressing the opioid crisis. HRO's strategic approach to reaching marginalized communities aligns perfectly with our coalition's shared goal of reducing overdose-related deaths and promoting the overall well-being of our residents. By supporting HRO's statewide naloxone distribution program, the Ohio Department of Health would contribute substantially to these efforts.

In light of the urgent need for comprehensive harm reduction services, we wholeheartedly endorse Harm Reduction Ohio's application for funding. Their expertise, collaborative approach, and dedication to addressing the opioid crisis make them an invaluable partner in our community's collective efforts. We urge the Ohio Department of Health to prioritize HRO's proposal and provide the necessary support to expand naloxone distribution statewide.

Thank you for your consideration and commitment to improving public health in our state.

Sincerely,

Dr. Kamaria A. Tyehimba
Vice President

12201 Euclid Ave
Cleveland, OH 44106
Christina.jackson@thecentersohio.org
216-387-3432
7/21/2023

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I am honored to compose this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a commendable 501(c)3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. With great pride, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

Allow me to emphasize the profound impact HRO has had on our local community. We operate as the oldest syringe services program in the state, and their support, guidance and resources have been instrumental in our growth. Their ability to consistently supply our community with naloxone has been instrumental in our ongoing efforts to combat the opioid crisis. Moreover, HRO's approachability, professionalism, and empathetic treatment of individuals with lived and shared experiences truly set them apart. It is evident that HRO prioritizes kindness, respect, and a deep understanding of the challenges faced by those in need.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we wholeheartedly urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and populations within our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this life-saving medication.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Thank you for your time and consideration.

Sincerely,

Christina Jackson
Director of Integrated Harm Reduction and Linkage to Care Services
The Centers

**Hancock Public Health**

Your Recognized Leader in Population Health

*Karim Baroudi, MPH, Health Commissioner*

June 7, 2023

Ohio Department of Health
Columbus, OH

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I enthusiastically offer this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a commendable 501(c)3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. With great pride, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

Allow me to emphasize the profound impact HRO has had on our local community. As a distributor of naloxone in Hancock County, our program depends on HRO's mail order program, with confidence, to reach residents who we cannot. Their mail order is dependable, efficient, and allows us to avoid unnecessarily using our limited resources to build our own mail order program. Their ability to consistently supply residents who we cannot reach with naloxone has been instrumental in our ongoing efforts to combat the opioid crisis. Moreover, HRO's approachability, professionalism, and empathetic treatment of individuals with lived and shared experiences truly set them apart. It is evident that HRO prioritizes kindness, respect, and a deep understanding of the challenges faced by those in need.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we wholeheartedly urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and populations within our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this life-saving medication.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Hancock Public Health
Your Recognized Leader in Population Health
Karim Baroudi, MPH, Health Commissioner

Thank you for your time and consideration.

Sincerely,

Gary D. Bright, MPA, LSW
Injury Prevention Program Supervisor
Hancock Public Health

2225 Keith Parkway, Findlay, Ohio 45840 | Phone: 419-424-7105 | Fax: 419-424-7872 | www.HancockPH.com
An Equal Opportunity Employer and Provider Serving All of Hancock County and the City of Findlay

Ohio Domestic Violence Network
ODVN

1855 E. Dublin-Granville Road, Suite 301
Columbus, Ohio 43229
Phone: 614-781-9651
www.odvn.org

1855 E. Dublin-Granville Road, Suite 301

Columbus, Ohio 43229

cheryls@odvn.org

330-256-7091

7/10/23

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I am honored to compose this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a commendable 501(c)3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. With great pride, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

Allow me to emphasize the profound impact HRO has had on our local community. As a lay distributor of naloxone in eight Ohio counties, our program owes its existence and countless lives saved to the invaluable support of HRO. Their ability to consistently supply us with naloxone has been instrumental in our ongoing efforts to combat the opioid crisis. Moreover, HRO's approachability, professionalism, and empathetic treatment of individuals with lived and shared experiences truly set them apart. It is evident that HRO prioritizes kindness, respect, and a deep understanding of the challenges faced by those in need.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we wholeheartedly urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and populations within

our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this lifesaving medication.

I have personally worked with two staff members at Harm Reduction Ohio on a project to raise awareness about the specific needs of survivors of domestic violence who use substances and are seeking domestic violence services. The staff members with whom I worked were dedicated, professional, and passionate individuals and I consider myself very fortunate to have partnered with them in this work.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Thank you for your time and consideration.

Sincerely,

Cheryl Stahl, LPCC-S

Substance Use/Mental Health Program Director

Ohio Domestic Violence Network

Hamilton County Addiction Response Coalition

# NEWTOWN POLICE DEPARTMENT

*Colonel Thomas W. Synan Jr.*
*Chief of Police*

**3536 Church St.**
**Newtown, Ohio 45244**
513-561-7697 Main / 513-561-7506 Fax
tsynan@villageofnewtown.com

7/13/2023

RE; Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

As a Co-Chair for the Hamilton County Addiction Response Coalition, I have seen the work of Harm Reduction Ohio. As the addiction crisis continues, it is critical all partners have the funding, supplies and resources needed to ensure we are able to serve all of those in need. Organizations such as Harm Reduction Ohio are key members in building relationship and saving lives.

As a public safety official, my partnership with groups such as Harm Reduction Ohio, ensure I have the tools, knowledge and resources to help those I come into contact with. Resources like Harm Reduction Ohio help ease the burdens I may face of not having the right resources or the amount needed to improve the lives of individuals, families and our communities.

I hope you will continue to support the efforts of Harm Reduction Ohio so we can continue to strengthen our partnerships and collaborations ta save and improve many more lives of those struggling with substance use disorder.

Sincerely,

Col. Thomas W. Synan Jr.
Chief of Police
Newtown Police Department

Hamilton County Addiction Response Coalition
Steering Committee- Interdiction

HRO_000508

401 W. Town Street Suite 228
Columbus, OH 43215
Perry@betheplace.org
740.789.0906
Monday, July 10, 2023

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I am honored to compose this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a commendable 501(c)3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. With great pride, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

Allow me to emphasize the profound impact HRO has had on our local community. As a lay distributor of naloxone in Franklin County, our program owes its existence and countless lives saved to the invaluable support of HRO. Their ability to consistently supply us with naloxone has been instrumental in our ongoing efforts to combat the opioid crisis. Moreover, HRO's approachability, professionalism, and empathetic treatment of individuals with lived and shared experiences truly set them apart. It is evident that HRO prioritizes kindness, respect, and a deep understanding of the challenges faced by those in need.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we wholeheartedly urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and populations within our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this life-saving medication.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Thank you for your time and consideration.

Sincerely,

W. Perry

William Perry
Co-Founder, Executive Director
This Must Be The Place

**Public Health**
Prevent. Promote. Protect.

**Butler County**
**General Health District**

July 11, 2023

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I am pleased to compose this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a commendable 501 (c) 3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. With great pride, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

Allow me to emphasize the profound impact HRO has had on our local community. As a lay distributor of naloxone in Butler County, our program owes its existence and countless lives saved to the invaluable support of HRO. Their ability to consistently supply us with naloxone has been instrumental in our ongoing efforts to combat the opioid crisis. Moreover, HRO's approachability, professionalism, and empathetic treatment of individuals with lived and shared experiences truly set them apart. It is evident that HRO prioritizes kindness, respect, and a deep understanding of the challenges faced by those in need.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we wholeheartedly urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and populations within our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this life-saving medication.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Thank you for your time and consideration.

Sincerely,

Erik Balster
*Health Commissioner*
Butler County General Health District

# Orman Hall

1435 Beverly Hills Drive
Lancaster, Ohio 43130


July 24, 2023

Re: Zip Code-level Mortality Analysis to Better Target Naloxone Distribution

To Whom It May Concern:

My name is Orman Hall. I am a former ADAMH board director, and I served as Director of Alcohol and Drug Addiction Services for Governor John Kasich. Currently, I serve as senior analyst for the National Emerging Threats Initiative, and I am an executive in residence for the Ohio University College of Health Sciences and Professions. Over the past two years I have also provided volunteer analytic assistance to Harm Reduction Ohio.

In 2021, at the request of Harm Reduction Ohio, I analyzed Ohio individual mortality records for a multi-year period to calculate overdose death rates by zip codes in Ohio. Zip codes with the highest mortality among key demographic groups and by drugs involved in death records were identified. Harm Reduction Ohio used this information to target naloxone distribution in the zip codes with highest overdose mortality among Black residents and for cocaine-fentanyl and methamphetamine-fentanyl combinations.

While, I currently do not have access to mortality records that would allow me to update this analysis, it is my understanding that Harm Reduction Ohio will request these data. If their efforts are successful, I will replicate the previous analysis. Ohio Department of Health epidemiologists could also perform this analysis. Regardless of who reports updated high overdose mortality zip codes, this information would help Harm Reduction Ohio optimize the effectiveness of its naloxone distribution effort.

I will perform this analysis on a volunteer basis, at no cost. Harm Reduction Ohio is a leader in seeking to understand overdose death rates and applying that knowledge to real-world efforts to decrease overdose deaths and I am committed to supporting their efforts.

Sincerely,

O. Hall

Orman Hall

CENTRAL OUTREACH WELLNESS CENTER

# Central Outreach Wellness Center – Christina Gast, NP-C

| Pittsburgh - North Shore | Washington | Aliquippa | Erie | Ohio |
|---|---|---|---|---|
| 127 Anderson St. Suite 101 | 817 Jefferson Avenue | 2360 Hospital Drive | 3104 State St | 2323 Lee Road |
| Pittsburgh, PA 15212 | Washington PA 15301 | Aliquippa, PA 15001 | Erie, PA 16508 | Cleveland Heights, OH 44118 |
| 412-515-0000 | 724-249-2517 | 724-707-1155 | 814-619-4009 | 216-350-1000 |

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I am privileged to compose this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a praiseworthy 501(c)3 non-profit organization that exhibits a steadfast dedication to enriching the health and well-being of individuals who use drugs. With great pride, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

Allow me to emphasize the profound impact HRO has had on our local community. As a lay distributor of naloxone in the state of Ohio, our program owes its continuous expansion and countless lives saved to the invaluable support of HRO. Their ability to consistently supply us with naloxone has been instrumental in our ongoing efforts to combat the opioid crisis. Moreover, HRO's approachability, professionalism, and empathetic treatment of individuals with lived and shared experiences truly set them apart. It is evident that HRO prioritizes kindness, respect, and a deep understanding of the challenges faced by those in need.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we passionately urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and marginalized populations within our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this life-saving medication, providing faith in the system to so many disenfranchised people.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will produce substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Thank you for your time and consideration.

Sincerely,

*Christina Gast, NP-C*

Christina Gast, NP-C
Director of Ohio Mobile Team
Central Outreach Wellness Center

HRO_000512

REGIONAL
HARM REDUCTION
COLLABORATIVE

*Reducing Harm. Promoting Health. Creating Possibilities.*

4464 S. Dixie Highway
Middletown, OH 45005
Tadams@acscounseling.com
513-833-7859
July 16, 2023

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

It is my privilege to write this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

We have witnessed first hand that Harm Reduction Ohio (HRO) is a commendable 501(c)3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. To the benefit of all Ohioans, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

The Regional Harm Reduction Collaborative serves Brown, Butler, Clermont, Clinton and Warren counties in southwest Ohio and we have seen the significance of the support of HRO in our local communities. Their ability to supply naloxone has been instrumental in our ongoing efforts to combat the opioid crisis. The experience of our staff, in addition to feedback from participants, consistently describes the HRO's approachability, professionalism, and empathetic treatment of individuals with lived and shared experiences. This demonstrates the expectional impact of the HRO and speaks to their prioritization of kindness, respect, and a deep understanding of the challenges faced by those in need. They often serve as content experts supporting local programs and community leaders with education and information.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we wholeheartedly urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and populations within our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this life-saving medication.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Thank you for your time and consideration.

Sincerely,

Tamara Adams, MSN, RN

Tamara Adams, MSN, RN

Program Coordinator

Regional Harm Reduction Collaborative

35241 Benner Rd
Hamden, OH 45634
rstewart@jchd.us
740-583-0633
7/17/2023

SEARCH
SOUTHEAST APPALACHIAN REGIONAL COMMUNITY HEALTH

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I am honored to compose this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a commendable 501(c)3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's Project DAWN program.

HRO has a profound impact on our local community. As a lay distributor of naloxone in Vinton County, our program owes countless lives saved to the invaluable support of HRO. Their ability to consistently supply us with naloxone has been instrumental in our ongoing efforts to combat the opioid crisis. Moreover, HRO's approachability, professionalism, and empathetic treatment of individuals with lived and shared experiences truly set them apart. It is evident that HRO prioritizes kindness, respect, and a deep understanding of the challenges faced by those in need.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we wholeheartedly urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and populations within our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this life-saving medication.

I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Thank you for your time and consideration.

Sincerely,
Rachel Stewart
C-CHW
Jackson County Health Department SEARCH program

THE RECOVERY CENTER USA

Tonja Catron

The Recovery Center USA

7345 Far Hills Lane

Dayton, OH 45459

July 12, 2023

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health

I am writing to express my utmost support and appreciation for the invaluable work that Harm Reduction Ohio has been doing in our community, particularly in the field of harm reduction and saving lives.

Over the past five years, I have had the privilege of working closely with HRO, specifically around providing Narcan and harm reduction services to individuals who use drugs in the Miami Valley. I cannot stress enough the profound impact their efforts have had on countless lives, including my own.

The Narcan that Harm Reduction Ohio has consistently provided me with has been a literal lifeline in my work and has undoubtedly saved numerous lives. The regular supply of Narcan, delivered every two weeks without fail, has been instrumental in allowing me to serve and support individuals who use drugs in our community. This uninterrupted access to Narcan has not only empowered me to administer immediate assistance in overdose situations but has also given me the confidence and peace of mind needed to make a real difference.

The consistent support from Harm Reduction Ohio has been a game-changer, not only for me but for the individuals I serve. Their organization's dedication to ensuring access to life-saving tools like Narcan is commendable. The impact of their work cannot be overstated, as it extends far beyond the immediate crisis of an overdose. By providing individuals with the means to reverse an overdose, they are offering them a second chance at life and an opportunity to seek help, treatment, and recovery.

Furthermore, I deeply appreciate the holistic approach that Harm Reduction Ohio takes in its harm reduction efforts. HRO's commitment to providing comprehensive support services, advocating for policy change, and fostering community engagement has undoubtedly contributed to reducing the stigma surrounding substance use and improving the overall well-being of our community.

I am truly grateful to be affiliated with an organization like Harm Reduction Ohio and to have the opportunity to witness firsthand the positive impact it has on the lives of individuals who use drugs. Their dedication, compassion, and unwavering support have not only saved lives but have also instilled hope and a sense of belonging in those who often feel marginalized and forgotten.

I am honored to be a part of the Harm Reduction Ohio organization and will continue to support and advocate for their remarkable work.

With heartfelt gratitude,

THE RECOVERY CENTER USA

**Tonja Catron (She/Her/Hers)**
**SUD Counselor, The Recovery Center USA**

(833) 697-7900 | -937-830-2139
therecoverycenterusa.com/
tcatron@therecoverycenterusa.com

HAMILTON COUNTY
**PUBLIC HEALTH**

PREVENT. PROMOTE. PROTECT.

Greg Kesterman, *Health Commissioner*
250 William Howard Taft Road
Cincinnati, OH 45219
Phone: 513.946.7800 Fax: 513.946.7890
hcph.org

July 21, 2023

Dear Ohio Department of Health,

I am writing to express my support for Harm Reduction Ohio's application for funding from the Ohio Department of Health for their proposed statewide naloxone distribution program. As the Health Commissioner at Hamilton County Public Health, I have witnessed firsthand the impact of Harm Reduction Ohio's initiatives in improving the health and well-being of individuals who use drugs.

Harm Reduction Ohio (HRO) is a 501(c)3 non-profit organization that has demonstrated its commitment to providing essential services to individuals affected by substance use. I would like to emphasize the critical role HRO plays as the largest distributor of naloxone in Ohio. In the previous year alone, HRO distributed an impressive 42,000 naloxone kits through the Ohio Department of Health's Project DAWN program. This exemplary track record highlights their expertise and capacity to effectively manage statewide naloxone distribution efforts.

As a naloxone distribution site in Hamilton County, our agency has experienced the positive impact of HRO's support and collaboration. HRO's commitment to supplying naloxone and working collaboratively has made our program in Hamilton County more robust and has undoubtedly saved countless lives. Their dedication to providing accessible naloxone, coupled with their compassionate approach and respect for individuals with lived and shared experiences, distinguishes HRO as the premier provider of all forms of naloxone in our region.

It is with great conviction that I implore the Ohio Department of Health to support HRO's endeavors to expand naloxone distribution to underserved areas and populations across Ohio. HRO's commitment to reaching these marginalized communities is a testament to their understanding of the urgent need for naloxone and harm reduction services in these regions. By investing in HRO's statewide naloxone distribution program, the Ohio Department of Health will contribute significantly to the prevention of overdose-related deaths and promote the overall health and well-being of individuals throughout Ohio.

Thank you for your attention to this matter.

Sincerely,

Greg Kesterman
Health Commissioner
Hamilton County Public Health

SCIOTO CONNECT

740.981.7714 info@sciotoconnect.org www.sciotoconnect.org

07/18/2023

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I am thrilled to provide this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is an incredible 501(c)3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. With great pride, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

Allow me to emphasize the profound impact HRO has had on our local community. As a lay distributor of naloxone in Scioto County, our lay distribution program's existence and the countless lives saved in my community are due in large part to HRO. Their ability to consistently supply us with naloxone has been instrumental in our ongoing efforts to combat the opioid crisis. Moreover, HRO's approachability, professionalism, and empathetic treatment of individuals with lived and shared experiences truly set them apart. It is evident that HRO prioritizes kindness, respect, and a deep understanding of the challenges faced by those in need.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we wholeheartedly urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and populations within our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this life-saving medication.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. I would be happy to answer any questions that may arise or provide further information and can be reached at the below provided telephone number or email. .

Thank you for your time and consideration.

**Sincerely,**

Abby Spears

**Abby Spears, Executive Director**
**Scioto Connect**
**abby@sciotoconnect.org**
**740.357.9773**



**Scioto Connect**
613 Chillicothe St. Portsmouth, Ohio 45662

550 East Spring Street
Oxford, Ohio 45056
halpindt@miamioh.edu
614-783-7201
07/24/2023

A Letter of Support for Harm Reduction Ohio's Naloxone Distribution Application

Dear Ohio Department of Health,

I am honored to compose this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a commendable 501(c)3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. With great pride, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

I would like to emphasize that HRO has had a profound impact on our local community. Oxford, Ohio has a college problem as well as abundant opiate use. Visits from HRO have substantially increased community knowledge on drug safety as well as encouraged community interconnectedness. Their ability to consistently supply us with naloxone has also been instrumental in our ongoing efforts to combat the opioid crisis. There are many more humanitarian organizations that rely on HRO for necessary health support.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we wholeheartedly urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and populations within our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this life-saving medication.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Thank you for your time and consideration.

Sincerely,

Dylan Halpin, Lizzy Childers
Co-President(s)
Young Democratic Socialists of America, Miami University

OHIO UNIVERSITY | Voinovich School of Leadership and Public Service

Circle Drive, The Ridges
Athens, Ohio, 45701
bergern@ohio.edu
(740) 593-2438

7/10/2023

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I'm honored to support Harm Reduction Ohio's (HRO) application for Ohio Department of Health funding for a statewide naloxone distribution program. HRO is a commendable nonprofit committed to improving the health of individuals who use drugs. As the top naloxone distributor in Ohio, HRO distributed 42,000 kits through the esteemed Project DAWN program in 2022.

HRO has had a profound impact in our served impact region of Athens and Perry Counties. Their support and naloxone supply have been instrumental in our efforts to combat the opioid crisis. HRO's approachability, professionalism, compassion and empathy distinguish them among like organizations. They prioritize kindness, respect, and understanding for those in need, helping to reduce overdoses and fight stigma.

Given HRO's exceptional track record and their status as Ohio's primary naloxone provider, we wholeheartedly urge state support to expand distribution to underserved areas. HRO's established network and expertise will reach those lacking access to this life-saving medication.

Supporting Harm Reduction Ohio's funding application will yield substantial benefits for our communities today, and allow us to increase our impact in other counties tomorrow. Their commitment to harm reduction, empowerment, and saving lives makes them an exceptional candidate. Feel free to contact me for further information or inquiries.

Thank you for your time and consideration.

Sincerely,

Nathaniel Berger | Director
Impact Enterprise Team
OHIO UNIVERSITY
Voinovich School of Leadership & Public Service

Dear Ohio Department of Health,

I am pleased to write this letter of support for Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a 501(c)3 non-profit organization dedicated to improving the health and welfare of people who use drugs. HRO is the largest distributor of naloxone in Ohio, providing 42,000 naloxone kits in 2022 through the Ohio Department of Health's Project DAWN program.

I am a volunteer lay distributor of naloxone in Montgomery and Miami Counties. HRO's ability to supply me with naloxone has helped me save multiple lives.

I kindly request and urge the state to support HRO's effort to distribute naloxone statewide via lay distributors and its online service. In much of Ohio, HRO is the only provider of naloxone. It is certainly the easiest to work with and treats people with kindness and respect. My dear son, Michael, died from a fentanyl overdose. If he had access to naloxone, he would be alive today! It is very important to me that I can continue to access naloxone easily and consistently from an agency like HRO.

I wholeheartedly support HRO's effort to expand naloxone distribution to underserved areas and underserved populations in Ohio. Every Ohioan who suffers with an addiction (or is experimenting with drugs) deserves to be saved from the poisonous drugs infiltrating our State. My hope is you feel the same way!

Sincerely,

AMY S. KASPRZAK, R.N.
937-344-1609 : Cell
amykasprzak@gmail.com

OhioCAN
Newark Homeless Outreach
838 S 30th St 107
Heath Ohio 43056
740-405-5682
7/19/2023

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I am honored to compose this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a commendable 501(c)3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. With great pride, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

We are a lay distributor of Naloxone because in 2019 the local health department quit supplying us with narcan due to the CNN video we made about the folks in town. We distribute approx 200 kits per month between our Saturday outreach, our naloxbox on the property, pop up events and serving a couple of agencies. In the past two weeks we have supplied the salvation army with 36 kits, due to a rash of overdoses there. Multiple lives saved. We are told every week that lives were saved in the unsheltered population due to the naloxone we are able to get on the streets. When there is an overdose alert in. Our town. The health department reached out to us with a vicinity of hot spots and we are able to set up and get narcan in that area. Without Harm reduction Ohio, we would not be able to save the lives that we do.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Thank you for your time and consideration.

Sincerely,

Patricia Perry
Newark Homeless Outreach
OhioCAN

caracole
positively changing lives
in the fight against HIV/AIDS

4138 Hamilton Avenue
Cincinnati, OH 45223

513.761.1480
caracole.org

CEO
Linda Seiter

PRESIDENT
Lee Ann Conard, RPh, DO, MPH

VICE PRESIDENT
Chaim B. Weiss, PhD

SECRETARY
Don Clowe

TREASURER
Rick Kay, CPA

BOARD OF DIRECTORS
Darnell Pierre Benjamin
Lee Bower
Esly S. Caldwell, MD
Kevin T. Celarek
Erin Davis, MPA
Heric Flores
William P. Gallagher, Esq
Hall Greene
Mark Haggard
Manuel Hernandez, Esq
Corinne E. Lehmann, MD, MEd
Annie Lewis, MHA
Duane Lewis, DMD
Lydia J. Morgan
Anar Patel, MD, MS
Thorsten Schroeder
Ranisha Smith, MPS
Clara Matonhodze Strode
Tyrina R. Taylor, MPH
Chris Tinalgon
Rose Todd Stanford
Matthew R. Wenker, MD
Tammy Miller Wohl, BSN, RN, MHA

PAST PRESIDENTS
Melissa Lanier
Richard L. Buchanan
Ann Moore
Mary Ellen Heintz
Kathleen Byrne
Linda Seiter
John P. Gillespie
Kathleen E. [illegible]
James C. Jackson
Rick Kay
Bernard L. [illegible]
Stephen J. [illegible]
Jim Gates
Don Clowe

July 17, 2023 BY EMAIL

Ohio Department of Health

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I am honored to send this letter of support on behalf of Harm Reduction Ohio's application for funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) has emerged as a leading community distributor of naloxone within Ohio, demonstrating an unwavering commitment to improving the health and well-being of individuals who use drugs. In 2022, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the ODH Project DAWN program.

HRO's approachability, professionalism, and empathetic treatment of individuals who use drugs sets them apart. It is evident that HRO prioritizes kindness, respect, and a deep understanding of the challenges faced by those at risk for overdose.

As Greater Cincinnati's agency devoted to positively changing lives in the fight against HIV/AIDS, Caracole has adopted harm reduction as key in how we see and interact with our community. Harm Reduction Ohio has been a great partner to us, sharing resources, supplies, education and best practice ideas. We always learn a lot and improve services when working with them.

We wholeheartedly urge the state to support Harm Reduction Ohio's proposal to expand naloxone distribution within our state. HRO's exceptional track record and expertise and their commitment to empowering individuals assures that they will save lives and reach the most underserved individuals and communities in the state.

Thank you for your time and consideration.

*Rina Saperstein*

Rina Saperstein
Chief Administrative Officer
Caracole

(she/her) 513-948.2711 rsaperstein@caracole.org

FUNDED BY city of CINCINNATI · BBB ACCREDITED CHARITY · United Way AGENCY PARTNER

CCS
Coalition for community safety

**Noam Barnard**
Executive Director
Coalition for Community Safety
22 West Hollister Street
Cincinnati, Ohio 45219-1523

July 8, 2023

Ohio Department of Health
246 North High Street
Columbus, Ohio 43215

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I am honored to compose this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a commendable 501(c)3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. With great pride, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

Allow me to emphasize the profound impact HRO has had on our local community. As a lay distributor of naloxone in both Hamilton and Clermont County, our program owes its existence and countless lives saved to the invaluable support of HRO. Their ability to consistently supply us with naloxone has been instrumental in our ongoing efforts to combat the opioid crisis. Moreover, HRO's approachability, professionalism, and empathetic treatment of individuals with lived and shared experiences truly set them apart. It is evident that HRO prioritizes kindness, respect, and a deep understanding of the challenges faced by those in need.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we wholeheartedly urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and populations within our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this life-saving medication.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Thank you for your time and consideration.

**Noam Barnard**
Executive Director

**July 18, 2023**

1940 Mt. St. Mary Drive
Nelsonville, Ohio 45764

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I am honored to compose this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a commendable 501(c)3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. With great pride, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

Allow me to emphasize the profound impact HRO has had on our local community. As a lay distributor of naloxone in Ross, Vinton, Hocking, Morgan, Washington, Athens, Gallia, Meigs, Jackson, Pickaway, Pike, Franklin, Fairfield, Perry Fayette and Highland counties, our program owes its existence and countless lives saved to the invaluable support of HRO. Their ability to consistently supply us with naloxone has been instrumental in our ongoing efforts to combat the opioid crisis. Moreover, HRO's approachability, professionalism, and empathetic treatment of individuals with lived and shared experiences truly set them apart. It is evident that HRO prioritizes kindness, respect, and a deep understanding of the challenges faced by those in need.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we wholeheartedly urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and populations within our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this life-saving medication.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Thank you for your time and consideration.

*Natashia Rapp*

Natashia Rapp
Managing Director of Harm Reduction Programs
Integrated Services for Behavioral Health
740-248-8255
nrapp@isbh.org

July 25, 2023

Re: Letter of Support for Harm Reduction Ohio Naloxone Distribution Application

Dear Ohio Department of Health,

I am honored to compose this letter of support on behalf of Harm Reduction Ohio's application for Ohio Department of Health funding for a statewide naloxone distribution program.

Harm Reduction Ohio (HRO) is a commendable 501(c)3 non-profit organization that demonstrates an unwavering commitment to enhancing the health and well-being of individuals who use drugs. With great pride, HRO has emerged as the leading distributor of naloxone within Ohio. Notably, in 2022 alone, HRO facilitated the distribution of an impressive 42,000 naloxone kits through the Ohio Department of Health's esteemed Project DAWN program.

As a grantee of Interact for Health for the past three years, HRO has worked hard to expand the online distribution of naloxone. HRO developed community partnerships and a lay distribution network in the southwestern Ohio region. Its staff provided education and resources to the community to reduce the stigma of addiction and harm reduction services. HRO has emerged as a community thought-leader in the field of harm reduction.

Given HRO's exceptional track record and their status as the primary provider of naloxone across much of Ohio, we wholeheartedly urge the state to support their ambitious endeavor to expand naloxone distribution to underserved areas and populations within our state. By leveraging their established network and expertise, HRO will undoubtedly play a pivotal role in reaching those who are currently lacking access to this life-saving medication.

In closing, I am confident that supporting Harm Reduction Ohio's application for Ohio Department of Health funding will yield substantial benefits for our communities. Their commitment to harm reduction, dedication to empowering individuals, and their proven ability to save lives make them an exceptional candidate for this funding opportunity. Please do not hesitate to reach out to me if you require any further information or have additional inquiries.

Thank you for your time and consideration.

Sincerely,

*Ashlee Young*

Ashlee Young
Vice President, Policy and Engagement

HRO_000528

BrightView
PATIENT-FOCUSED ADDICTION TREATMENT

BrightView
446 Morgan St.
Cincinnati, OH 45206

**July 19, 2023**

**Dear Ohio Department of Health:**

I'm writing today to voice strong support for Harm Reduction Ohio and their application to recieve a statewide naloxone distribution contract on behalf of BrightView Health. BrightView is a new kind of addiction treatment center, founded on the philosophy of same day access to care for individuals experiencing substance use disorders. Since opening our doors in 2015, BrightView has served over 50,000 individuals experiencing substance use disorders across 85 centers in Ohio, Kentucky, Virginia, Delaware, Connecticut, Massachusetts, North Carolina, Arizona, and most recently, Maryland.

With our experience treating individuals with substance use disorders, we have worked with countless individuals who have achieved stability and remission from opioid use disorder following an overdose experience. To put it frankly, ***individuals cannot move on to a life after of addiction and recover from opioid use disorders if they do not survive the medical emergency of an opioid overdose - these medications must be widely available and accessible to all individuals.*** Access to all forms of FDA approved medications for opioid overdose and reversal should be a vital component of every communities strategy to providing individuals with the tools they need to survive an overdose experience and recover. Harm Reduction Ohio is one of the few programs where we can access all forms of naloxone to meet the variety of needs of our diverse clients.HRO continues to be a critical partner to reducing overdose death in our communities.

Sincerely,

Emily Harsh, LPC, LICDC

Director of Justice System Outreach

14th July 2023

Dear Ohio Department of Health,

Hi. I'm a 41 year old black male. I grew up on the streets of Columbus where I was involved in gangs and drugs. It was the environment and all I knew. As kids we would see the drug dealers and addicts hang out on 2nd Ave in Urbancrest I...it was glorified....it was everyday life. As I grew older I transitioned through the world of addiction. At 15 I was on the streets using cocaine with an older guy named [redacted] who I looked up too. He told me my mind was not strong enough so I looked at it as a challenge..my cousin [redacted] would use it and he would cry everytime he used. He eventually died from cancer but he was still an addict..at 18 I got my lady friend [redacted] pregnant and told myself that I wanted to be better for my son so I quit cold turkey . In 2016 I was with a friend who was an addict who got caught with drugs and ended up doing 2 yrs as we both got charged with it. While in prison 40 people I knew died from overdoses and after my release about another 20 more. I knew a woman named [redacted] who was the sweetest woman u could ever meet. She overdosed and died. I was speaking to [redacted] whose daughter died from an overdose and she told me about Narcan and also gave me a box ...walking around the narcan was gone quickly. So I needed more ...every time I heard about an overdose I felt like if I was there I could've saved them and I also started running into people who would tell me stories about the lives they saved. I ended up eventually hooking up with whom I call Narcan lady. She sends me about 100 boxes of Narcan which last me about a week. Narcan Lady at HRO does her best to send me what she can and to get me other resources when I need them. I take narcan very seriously and walk around on the front line passing out narcan and have run into many people in active overdose and was able to save them. One time there was a man passed out in a truck and the police busted the window and a straw fell off his lap. I had narcan they did not. We were able to save his life. I found a man on the side of the road a week ago and was able to narcan him and save his life. A McDonald's employee at both the McDonald's that I left narcan at were able to narcan customers they found overdosing in the bathroom. The stories are countless but the result is the same addiction and narcan saving them. It makes a difference in the world but there is never enough. I thank you for reading and also for the life saving narcan as I do what I can to save those around that are lost and battling addiction...Also [redacted] after all of these years finally decided that he wanted to be done and I was able to call the narcan lady after midnight on a

HRO_000530

weekend and she got him in rehab that day. Which is a blessing...we are out here changing lives, making a difference in the world and giving those who are hopeless another chance at life.Heck the Narcan lady even helped me find a library to write this important letter. Please fund the program that lets me help my neighborhood and give back.

Sincerely,

[redacted]

# 6. Staffing Plan

## Overview of Staffing: **8.0 FTE Total**

| Role | Reports to | Name(s) | FTE (each) |
|---|---|---|---|
| President (1) | Board of Directors | Dennis Cauchon | 0.5 |
| Project Manager (1) | President | AmandaLynn Reese | 1.0 |
| Grant Manager (1) | President | Jen Phillips | 0.5 |
| Regional Coordinator (5) | Project Manager | Kelsey Bates<br>Four to be hired | 0.5 |
| Black Community Outreach Coordinator (1) | Project Manager | Kelsey Bates | 0.5 |
| Naloxone Distribution Manager (1) | Project Manager | One to be hired | 0.8 |
| Naloxone Specialist (3) | Project Manager | Shae Dalrymple<br>Ella Clark<br>One to be hired | 0.5 |
| Administrator (1) | President | Erin Pottenger | 0.6 |
| Project Consultant (1) | Project Manager | Mallory Bolen | 0.1 |

**Contingency Planning and Ability to Provide Replacement Personnel**

While the staff defined in the table above represents the planned team to successfully execute all aspects of the Project, Harm Reduction Ohio can easily recruit qualified replacement personnel should it be needed. With connections to both practitioners in the harm reduction community and those with lived and shared experience (along with a large, already functioning lay distributor network), HRO has a deep talent pool of already-identified people who could fill in key roles. This holds true both in the case of an unexpected need for increased capacity or to replace a member of staff.

## President (Dennis Cauchon)

20 hours, 0.5 FTE

Reports to Board of Directors

The President is responsible for strategic, financial and operational leadership. The President is also the primary link to the Board of Directors, policymakers and the media. Key project responsibilities:

1. **Vision and Mission:** Set overall pace and direction of the project.
2. **Research:** Identify demographic groups and geographic areas that are under-resourced with Project DAWN naloxone, as measured by overdose mortality and kits distributed.
3. **Hiring:** Work with Project Manager to hire additional qualified staff, with a preference for those with lived or shared opioid overdose experience.
4. **Financial Management:** Oversee organizational finances, budgeting and fundraising.
5. **Stakeholder Engagement:** Build and maintain relationships with key stakeholders, partners, donors and community members.
6. **Board Relations:** Provide Board of Directors with regular updates, seeking guidance and support as needed.
7. **Public Relations:** Represent HRO to the public, media, and policymakers.
8. **Compliance and Governance:** Ensure HRO operates in compliance with all relevant laws, regulations and ethical standards.
9. **Inter-Department Collaboration:** Coordinate staff, particularly Project Manager and Grant Manager, to ensure effective contract execution.

## Project Manager (AmandaLynn Reese)

40 hours, 1.0 FTE

Reports to President

The Project Manager is responsible for management and execution of the contract's goals, objectives and deliverables. Key project responsibilities:

1. **Project Oversight:** Provide oversight for the statewide mail order and lay distributor naloxone contract, ensuring alignment with the contract's goals and objectives.
2. **Team Supervision:** Oversee and support the regional lay distributor coordinators and naloxone distribution staff, ensuring they have necessary resources and training.
3. **Hiring:** Work with President to hire required staff to fulfill the contract's goals and objectives.
4. **Budget Management:** Work with Grant Manager to ensure proper budgeting and compliance with grant guidelines.
5. **Reporting and Evaluation:** Oversee monitoring and evaluation of project activities to ensure progress and outcomes are tracked and documented.
6. **Stakeholder Engagement:** Build and maintain relationships with stakeholders, partners, and community members to foster support for the project.
7. **Communication and Outreach:** Develop and implement communication strategies, including holding regional and state lay distributor group meetings across the state.
8. **Program Expansion:** Explore opportunities for expanding project reach and impact.
9. **Training and Capacity Building:** Organize training sessions and capacity-building initiatives for lay distributors, team members and community partners.
10. **Coordination with Other Programs:** Ensure coordination and synergy with other Project DAWN programs.

## Grant Manager (Jen Phillips)

20 hours, 0.5 FTE
Reports to President

The Grant Manager is responsible for overseeing and coordinating tasks related to grant management and reporting. Key project responsibilities:

1. **Grant Management:** Ensure the effective administration of the contract and compliance with its terms.
2. **Grant Compliance:** Ensure that all activities and expenses comply with grant guidelines and regulations.
3. **Grant Reporting:** Ensure that Monthly Distribution Logs, Naloxone Intake Forms and Naloxone Evaluation Instruments are filed accurately within the required timeframe.
4. **Communication and Coordination:** Collaborate with Project Manager and President to provide regular updates on project status.
5. **Project Coordination:** Work closely with all team members to prevent redundant work and maximize synergy.
6. **Support and Resource Allocation:** Provide necessary support and resources for regional coordinators and naloxone distribution staff to facilitate work and project implementation.
7. **Documentation:** Maintain detailed records and documentation of project activities, expenses and outcomes for reporting and future reference.

## Regional Coordinator (5)

20 hours, 0.5 FTE each
Reports to Project Manager

**Region 1 Coordinator (Northwest):** Hired by 3/30/24
**Region 2 Coordinator (Northeast):** Hired by 12/31/23
**Region 3 Coordinator (Southeast):** Hired by 10/31/23
**Region 4 Coordinator (Southwest):** Kelsey Bates
**Region 5 Coordinator (Central):** Hired by 12/31/23

Regional Coordinators work and live in their regions. Preferred candidates shall have lived or shared experience, as well as a background in harm reduction. Regional Coordinators will expand the number of lay distributors in their regions and optimize naloxone delivery to under-resourced populations and in under-resourced areas. Regional Coordinators will onboard new lay distributors and provide professional and emotional support to them. Regional coordinators must be comfortable interacting with people who use drugs. Key project responsibilities:

1. **Outreach and Engagement:** Establish and maintain relationships with stakeholders, including volunteer lay distributors, community members, service providers and other relevant organizations within assigned region.
2. **Needs Assessment:** Conduct a needs assessment to identify gaps in naloxone access, harm reduction services and stigma-free services within assigned region.
3. **Lay Distributor Recruitment:** Work closely with Project Manager and other team members to expand the number of lay distributors in assigned region.
4. **Non-Project DAWN Counties.** Hold at least one naloxone distribution event in each non-Project DAWN county within assigned region. Recruit lay distributors in those counties.
5. **Training and Education:** Train and educate lay distributors and community members. Participate in at least one event in each county in assigned region.
6. **Data Collection and Reporting:** Collect data on naloxone distribution and project activities to track progress and outcomes. Provide regular reports by email and regular meetings to Project Manager and Grant Manager on regional developments and outcomes.
7. **Collaboration and Networking:** Collaborate with other Regional Coordinators, Project DAWN programs and partner organizations to share best practices, resources and experiences. Network with local health departments, clinics and social service agencies to strengthen linkages to care.
8. **Resource Management:** Manage inventory of harm reduction supplies in assigned region.
9. **Communication:** Participate in online, bi-weekly project staff meetings. Participate in ODH naloxone-related meetings when asked.
10. **Cultural Sensitivity:** Demonstrate cultural competence and sensitivity in interactions with community members, including people who use drugs, to ensure harm reduction services are inclusive and respectful of diverse backgrounds.

## Black Community Outreach Coordinator (Kelsey Bates)[1]

20 hours, 0.5 FTE

Reports to Project Manager

The Black Community Outreach Coordinator works to increase lay distributors and naloxone distributors in Ohio's Black communities statewide. Key project responsibilities:

1. **Organization:** Organize regional and state-level efforts to increase lay distribution of naloxone and the number of lay distributors in the Black community by 25%, prioritizing counties with high overdose rates.
2. **Recruitment:** Recruit and support lay distributors who live in predominantly Black neighborhoods to support the project's goal of increasing the number of Black lay distributors and the volume of naloxone provided to Black Ohioans by at least 25%.
3. **Community Outreach:** Work with Regional Coordinators, churches, businesses and other partners to support increased naloxone availability in predominantly Black neighborhoods.
4. **Stakeholder Engagement:** Seek opportunities to educate lay distributors and other relevant stakeholders about the disproportionately high rates of overdose death among Black Ohioans and how they can increase naloxone uptake in the Black community.
5. **Program evaluation:** Track changes in the number of Black lay distributors and the volume of naloxone kits received by Black residents, and deliver reports to Project Manager.

[1] Kelsey Bates will concurrently serve as the Regional Coordinator for Region 4

## Naloxone Distribution Manager[2]

32 hours, 0.8 FTE

Reports to Project Manager

The Naloxone Distribution Manager oversees and organizes HRO's statewide naloxone distribution program. Key project responsibilities:

1. **Naloxone Tracking and Inventory Management:** Track naloxone inventory, organize storage, and manage distribution logistics.
2. **Naloxone Order Management:** Order naloxone from ODH and other relevant manufacturers and suppliers.
3. **Order and Supply Forecasting:** Monitor naloxone usage patterns and trends to accurately forecast demand.
4. **Onboarding:** Work closely with Regional Coordinators and lay distributors to facilitate onboarding process for individuals interested in distributing naloxone within their communities.
5. **Training:** Schedule and organize training sessions for lay distributors and other relevant stakeholders on naloxone distribution, overdose response and harm reduction practices.
6. **Backup Shipper:** Act as "shipper of last resort" in case of unexpected delays in shipping.
7. **Distribution Planning:** Work with Regional Coordinators to assess naloxone distribution needs and tailor distribution plans based on each region's requirements.
8. **Data Collection and Reporting:** Collect data on naloxone distribution, usage, and impact. Prepare regular reports for HRO leadership.

---

2 The Naloxone Distribution Manager will be hired by January 31, 2024.

## Naloxone Specialist (3)

20 hours, 0.5 FTE each
Reports to Project Manager

Position 1: Shae Dalrymple (0.6 to 0.8 FTE)
Position 2: Ella Clark (0.2 to 0.4 FTE)
Position 3: To be hired (0.4 to 0.8 FTE)

Naloxone Specialists are the backbone of HRO's daily shipping operation. They pack and ship tens of thousands of naloxone kits every year. Among their many functions, they order and receive supplies, manage the PirateShip postal program, deliver packages to shippers and manage the NEXT online system. Naloxone Specialists often have lived experience with drug use and may be in active use while employed (although drug use on the HRO premises is not allowed). Their personal experience with addiction or recovery provides valuable perspectives on how to better serve the target population with empathy and understanding.

Naloxone Specialists are also cross-trained from the perspective of contingency planning. They are among the five staff members that trained to ship naloxone to ensure continuity in case of a staffer's absence or other problems, such as weather delays. HRO has not missed a day of shipping since beginning its ship-everyday promise in 2019.

Key project responsibilities:

1. **Order Fulfillment:** Fulfill all online orders and ensure that all naloxone kits are properly packaged, labeled and ready for distribution.
2. **Shipping and Logistics:** Ship all naloxone and anti-stigma materials. Maintain shipment records and monitor inventory.
3. **Outreach and Education:** Engage in community outreach efforts and educational sessions to increase awareness of harm reduction programs.
4. **Communications**: Manage social media and assist in other organizational communication efforts. This includes developing promotional materials (flyers, brochures, social media posts) to raise awareness of HRO.
5. **Support for Lay Distributors:** Offer training sessions for and address concerns raised by lay distributors.
6. **Record Keeping**: Maintain records of naloxone distribution activities, including the number of kits distributed, locations served and any feedback.
7. **Collaboration:** Collaborate with all team members to coordinate naloxone distribution.

## Administrator (Erin Pottenger)

24 hours, 0.6 FTE
Reports to President

The Administrator handles all human resources and administrative functions. They oversee finance, accounting, personnel, insurance, payroll, taxes and physical assets such as office space. This includes managing the contractors providing support for these functions. Key project responsibilities:

1. **Human Resources:** Fulfill all HR functions, including employee acquisition, monitoring employee compensation and compliance.
2. **Finance:** Oversee bookkeeping and auditing, ensuring that contract funds are properly segregated and tracked.
3. **Insurance:** Secure bids for the $8 million in liability insurance required for the contract. Along with the President, select an insurer and purchase required policies.
4. **Payroll:** Submit information on pay rates, hours worked and other required information to HRO's payroll contracting firm, Barber and Chodak.
5. **Physical Plan:** Purchase leased office space and all other assets needed to complete the project.
6. **Communication:** Work with Project Manager, Grant Manager and President to provide status updates on administrative functions, such as office lease, insurance, banking and payroll.

The Administrator will oversee and facilitate work done by the following firms and any successors:

1. **Bookkeeping:** Meghan Kizer, Courtney Satterfield of Amethyst Financial Services, Columbus, Ohio.
2. **Payroll:** Ray Barber, Barber and Chodak, Newark, Ohio.
3. **Independent Auditor:** Jean Kyle Calago, CPA, HWA Alliance of CPA Firms, Westerville, Ohio.
4. **Insurance Agent:** Mike Birkmeyer, Madison-Collins-Stephens Agency, Newark, Ohio.

## Project Consultant (Mallory Bolen)

4 hours, 0.1 FTE
Reports to Project Manager

The Project Consultant is the current HRO Operations Director. They are leaving their current full-time role on September 1, 2023. They will remain on contract through December 31, 2023, to assist with relevant tasks, particularly those related to the duties of the Grant Manager.

# 6a. Staffing Implementation Plan

For New Hires

**Phase 1: Recruitment** (1-3 months)

1. Identify roles and post job descriptions.
   a. Person(s) responsible: Project Manager.
   b. Job descriptions highlight preference for direct lived or shared experience with opioids and other drugs. Other qualities noted in Staffing Plan.
2. Review applications and conduct interviews.
   a. Persons(s) responsible: Project Manager, President.
3. Shortlist applications, follow-up interviews, reference checks, identify preferred candidate.
   a. Person(s) responsible: Project Manager.
4. Offer Job.
   a. Person(s) responsible: President.

**Phase 2: Onboarding** (1-2 months)

1. Conduct two-day orientation in Granville, Cincinnati or regional location to understand HRO's mission, services, culture, policies and procedures.
   a. Person(s) responsible: Project Manager, Naloxone Staff.
2. Schedule new hire meeting (lunch) in Granville. Pair new employee with mentors from existing staff.
   a. Person(s) responsible: Naloxone Staff, Administrator, President.
3. Familiarize with policies, procedures and ODH requirements.
   a. Person(s) responsible: Project Manager, Naloxone Staff.
   b. This will be tailored specifically to the role of the new employee.

**Phase 3: Initial Integration** (1-2 months)

1. Conduct scheduled check-ins with new hires in person or by Zoom.
   a. Person(s) responsible: Project Manager, Staff Mentor.
2. Conduct team-building activities to foster unity and cohesion within the naloxone team.
   a. Person(s) responsible: Project Manager, Naloxone Staff.
3. After two months, complete written progress report. Identify future goals.
   a. Person(s) responsible: Project Manager.

**Phase 4: Full Integration** (6 months)

1. Provide written evaluation and discuss possible raise based on performance.
   a. Person(s) responsible: Project Manager.
2. One-on-one conversation with President (in region, if employee is based outside main office).
   a. Person(s) responsible: President.

3. Expand responsibilities and revise job description, if appropriate.
    a. Person(s) responsible: Project Manager.
4. Continued Support and Development: Provide ongoing training for professional growth.
    a. Person(s) responsible: Project Manager, President.

**Phase 5: One-year Anniversary** (12 months)

1. Full 360 performance review.
    a. Person(s) responsible: Project Manager, President.
2. Adjust pay based on performance.
    a. Person(s) responsible: President.

ATTACHMENT SEVEN A
OFFEROR'S CANDIDATE REFERENCES

Candidate's Name: Dennis Cauchon

Candidate's Proposed Position: President, Harm Reduction Ohio

Three (3) professional references who have received services from the Candidate in the past three (3) years.

| | | |
|---|---|---|
| Company Name: Equitas Health | Contact Name: Rick Barclay, Harm Reduction Manager | |
| Address: 1105 Schrock Road, Columbus, OH 42339 | Phone Number: Phone: [redacted]<br>E-mail: Email: | |
| Project Name: Syringe service program conference | Beginning Date of Project: Month/Year 01/23 | Ending Date of Project: Month/Year 06/23 |
| Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project.<br>Held conference at the Ohio State University in May with Equitas Health/Safepoint. All Ohio syringe programs attended. | | |

| | | |
|---|---|---|
| Company Name: Ohio State University | Contact Name: Anne Trinh, Director of Programs, Center for HOPES, OSU | |
| Address: OSU, 381 Cunz Hall, 1841 Neil Ave, 43210 | Phone Number: [redacted]<br>E-mail: | |
| Project Name: Syringe program conference/CE credits/research | Beginning Date of Project: Month/Year 06/2019 | Ending Date of Project: Month/Year 07/23 |
| Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project.<br>Held syringe program conference at OSU in May. Worked with OSU-Center for HOPES graduate student to do naloxne research. | | |

| | | |
|---|---|---|
| Company Name: North Central Ohio Harm Reduction | Contact Name: Anne Joudrey | |
| Address: Mansfield, Ohio | Phone Number: Phone [redacted]<br>E-mail: Email: | |
| Project Name: Naloxone Distribution | Beginning Date of Project: Month/Year 01/20 | Ending Date of Project: Month/Year |
| Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project.<br>Helped Anne start he organization, which is an important harm reduction advocate and distributor of naloxone in Richland County. | | |

ATTACHMENT SEVEN A
OFFEROR'S CANDIDATE REFERENCES

Candidate's Name: AmandaLynn Reese

Candidate's Proposed Position: **Project Manager**

Three (3) professional references who have received services from the Candidate in the past three (3) years.

| | | |
|---|---|---|
| Company Name: Interact for Health | Contact Name: Michelle Lydenberg or Lisa Myer | |
| Address:8230 Montgomery Rd Ste 300, Cincinnati, Ohio 45236 | Phone [redacted]<br>E-mail: [redacted] | |
| Project Name: Online and Lay Distribution of Naloxone in Southwestern Ohio | Beginning Date of Project: Month/Year 05/2020 | Ending Date of Project: Month/Year 09/2021 |
| Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project.<br>Project originally proposed to distribute 600 naloxone kits across 7 counties. This would have represented a 13-fold increase in distribution. We actually distributed 4864 kits. We sent 1034 online and gave out 3830 via lay distribution and outreach exceeding our original goal in each channel. By the end of 2021, lay distribution was particularly successful as we added 26 new distributors and Covid vaccines enabled 55 events. These efforts may have affected overdose deaths. 2020 and 2021 set overdose death records but in 4 of the counties (Adams, Butler, Clinton, Warren), death rates decreased in 2021.We were successful in connecting with lay distributors. We added 26 lay distributors, at least one ineach county. Candidate also partnered with several organizations both to distribute naloxone. Candidate was able to increase monthly online orders in every county.Candidate was responsible for all grant deliverables. | | |
| Company Name: OHMAS | Contact Name: Linda Smolak Project Manager | |
| Address: | Phone Number: [redacted]<br>E-mail: | |
| Project Name: Stigma Reduction Expansion Initiative | Beginning Date of Project: Month/Year | Ending Date of Project: Month/Year |
| Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project.<br>Project is Statewide, special emphasis on Latinx communities in Hamilton & Butler counites Broad goals Anti-stigma focus but also distribute & educate re: harm reduction rescurces, including naloxone. Created Spanish self-stigma booklet; begin gathering information re: machismo & alcohol stigmas/issue; identify harm reduction resource needs in Latinx communities. Expand resource distribution, including linkage to care. Identify culturally sensitive/appropriate recovery options. Candidate responsible for managing staff, and meeting grant deliverables. | | |
| Company Name: Rocky Mtn Tribal Leaders Council | Contact Name: Cinda Ironmaker | |
| Address: 2929 3rd Avenue North, 3rd Floor Billings, MT 59101 | Phone [redacted]<br>E-mail: | |
| Project Name: TECPHI Project | Beginning Date of Project: Month/Year 12/2022 | Ending Date of Project: Month/Year 03/2023 |
| Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project.<br>The Rocky Mountain Tribal Leaders Council partnership with Velocity Bio Group and the Rocky Mountain High Intensity Drug Trafficking Area (HIDTA) was developed to address the disproportionate impact of fatal and non-fatal overdoses within Tribal communities in MT and WY.<br>With the active involvement of the Candidate, this initiative has seen the distribution of 2,000 boxes of Naloxone (4,000 doses), representing a substantial surge of naloxone within Tribal communities. Crucially, Candidate conducted comprehensive training for over 160 individuals from Tribes and Urban Indian Centers. These participants gained the ability to identify the signs of an opioid overdose and effectively administer naloxone. By emphasizing the use and destigmatization of naloxone and raising awareness about Good Samaritan Laws, Candidate's expertise has proven instrumental in enhancing the capacity of these communities to navigate the opioid crisis. | | |

ATTACHMENT SEVEN A
OFFEROR'S CANDIDATE REFERENCES

Candidate's Name: Mallory Bolen

Candidate's Proposed Position: Reporting Support

Three (3) professional references who have received services from the Candidate in the past three (3) years.

| | | |
|---|---|---|
| Company Name: MDRC | Contact Name: Vince Messina | |
| Address: 200 Vesey St, New York, NY 10281 | Phone Number: E-mail: [redacted] | |
| Project Name: MIHOPE | Beginning Date of Project: Month/Year 01/2017 | Ending Date of Project: Month/Year 12/2027 |

Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project.

This project is a mother-infant home visiting research project that evaluates the home visiting effects on impoverished families. This project is funded by the federal government (Department of Health and Human Services) and is a multi-million dollar project with different sub-projects, the current active projects being for $3 million dollars and for $27 million dollars. There are multiple contractors working on the project as well, because it is so large with many different data processing and reporting components. Mallory's role on the project is to manage the budget, all finances, staffing, progress reporting, and contract agreements. Each of these reports must be created and posted monthly with extreme attention to detail and accuracy or else the reporting will be rejected and the project will be off track.

| | | |
|---|---|---|
| Company Name: Special Olympics Ohio | Contact Name: Josh Messersmith | |
| Address: 3303 Winchester Pike, Columbus OH | Phone Number: E-mail: [redacted] | |
| Project Name: Athlete Health & Wellbeing | Beginning Date of Project: Month/Year 12/2019 | Ending Date of Project: Month/Year 12/2021 |

Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project.

The Ohio Department of Developmental Disabilities funding a $30,000 project focus on the health and wellbeing of people with intellectual disabilities in Ohio. With the onset of Covid-19, the project shifted to supporting this population and their mental health while they were unable to go to school, camps, and play sports (anything allowing them to socialize). Social media programs and virtual fitness groups were created to connect others. There was also a delivery of at-home sports/exercise and mental health focused materials for people to use in their home without needing to be in a large group. Mallory's role was to work as the point of contact with DODD, negotiate grant changes during Covid, report to DODD, and handle to logistics of the home deliveries.

| | | |
|---|---|---|
| Company Name: Make-A-Wish Ohio, Kentucky, Indiana | Contact Name: Avery Reinwald | |
| Address: 4345 Farmers Drive, Columbus OH | Phone Number: E-mail: [redacted] | |
| Project Name: State Budget Effort | Beginning Date of Project: Month/Year 10/1/18 | Ending Date of Project: Month/Year 3/1/19 |

Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project.

This project involved the executive team of Make-A-Wish to work in a lobby effort to get a line item in the Ohio state budget. The entire executive team worked to pull data and perform outreach. The project cost $50,000 to produce content and hire consultants. Mallory's role was to act as the project manager, ensuring that all deadlines were met and work was being produced at a high level. She also worked closely managing the law firm Make-A-Wish worked with and assisted where needed in their lobbying efforts. She also created reports and presented the project overview to leadership at Make-A-Wish America.

## ATTACHMENT SEVEN A
## OFFEROR'S CANDIDATE REFERENCES

Candidate's Name: Kelsey Bates

Candidate's Proposed Position: **Regional Coordinatior /Black Community Outreach Coordinator**

Three (3) professional references who have received services from the Candidate in the past three (3) years.

| | | |
|---|---|---|
| Company Name: African American Engagement Workgroup | Contact Name: Deztani Randle | |
| Address: 250 William Howard Taft Rd.2nd Floor Cincinnati, OH 45219 | Phone N[redacted] E-mail: [redacted] | |
| Project Name: A1 Stigma Free Coalition | Beginning Date of Project: Month/Year 03/2023 | Ending Date of Project: Month/Year Present |
| Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project. | | |
| Harm reduction outreach partner in a stigma reduction project. 11 primarily Black churches in the Cincinnati area that have joined a voluntary effort to ensure their members recognize that overdose deaths from fentanyl are a serious threat to their community and their families. Hamilton County coroner's records show a count of 47 overdose deaths of Black people here in 2016, compared to 135 in 2021 – a 187% jump. The team is working to end the disparity with face-to-face engagement with Black residents combined with apologies for past inequities. Expanding beyond Churches into the community in other ways is the next step of the coalition hosting a resource fair in August 2023 as well as regular community outreach. | | |

| | | |
|---|---|---|
| Company Name: Ohio Injury Research Network | Contact Name: Linda Smolak Project Manager | |
| Address: | Phone N[redacted] E-mail: [redacted] | |
| Project Name: Safe Supply and Stigma | Beginning Date of Project: Month/Year 02/2022 | Ending Date of Project: Month/Year 10/2022 |
| Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project. | | |
| This two-phase project first aims to gather qualitative data on the nature of drug-related stigma in the community and concurrently analyze existing services, such as the provision of safe snorting and smoking kits by local Syringe Service Programs (SSPs). The goal is to identify possible stigmas associated with accessing these services and determine if segregating them from syringe services could reduce stigma. The second phase of the project focuses on creating one or two anti-stigma print brochures, customized to the local culture, with a budget cap of $7,000. This foundational work will pave the way for more extensive funding and continued stigma-reduction efforts in the future. | | |

| | | |
|---|---|---|
| Company Name: Ohio Prevention Network | Contact Name: Linda Smolak Project Manager | |
| Address: | Phone [redacted] E-mail: [redacted] | |
| Project Name: 2022 Ohio OPN Pilot Project Guatemalan/Honduran Community | Beginning Date of Project: Month/Year 1/2022 | Ending Date of Project: Month/Year 9/202: |
| Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project. | | |

ATTACHMENT SEVEN B
OFFEROR'S CANDIDATE INFORMATION
EDUCATION AND TRAINING

Candidate's Name: Dennis Cauchon

Education and Training: This section must be completed to list the education and training of the proposed Candidate.

| Name and Address | Months/Years | Degree/Major |
|---|---|---|
| College<br>University Of New Hampshire<br>105 Main St, Durham, NH 03824 | Sept 1976-<br>May 1981 | Bachelors of Arts<br>-Major in English<br>-Minor in Economics |
| Technical School | | |
| Licenses | | |
| Certifications<br>The Knights Journalism Fellowship<br>University of Michigan Medical<br>School7300 Medical Science<br>Catherine St. Ann Arbor, MI 48109 | Aug 1996-<br>May 1997<br><br>2015 | Topic: "The History of False Ideas"<br><br>Certified Opioid Overdose Responder |

ATTACHMENT SEVEN B
OFFEROR'S CANDIDATE INFORMATION
EDUCATION AND TRAINING

Candidate's Name: AmandaLynn Reese

Education and Training: This section must be completed to list the education and training of the proposed Candidate.

| Name and Address | Months/Years | Degree/Major |
|---|---|---|
| College<br>The Ohio State University<br>281 W Lane Ave,<br>Columbus, OH 43210 | May 2011 | Bachelor of Art<br>-History Education major<br>-Theatre major |
| Technical School | | |
| Licenses | | |
| Certifications<br>-The National Harm Reduction Coalition Conference<br>Puerto, Rico<br>-Harm Reduction Ohio<br>935 River Rd Suite G, Granville, OH 43023 | -Oct 2022<br><br>-Sept 2020 | Certified in Anti-Stigma and Cultural Competency<br>Trained in the foundations of Harm Reduction<br>Certified Opioid Overdose Responder |

ATTACHMENT SEVEN B
OFFEROR'S CANDIDATE INFORMATION
EDUCATION AND TRAINING

Candidate's Name: Mallory Bolen

Education and Training: This section must be completed to list the education and training of the proposed Candidate.

| Name and Address | Months/Years | Degree/Major |
|---|---|---|
| College<br>The Ohio State University<br>281 W Lane Ave,<br>Columbus, OH 43210 | Class of 2017 | Bachelor of Arts<br>-International Relations and Diplomacy<br>Bachelor of Arts<br>-Italian Studies<br>Minor in Middle East Studies |
| Technical School | | |
| Licenses | | |
| Certifications<br>-Harm Reduction Ohio<br>935 River Rd Suite G, Granville, OH 43023<br>-The National Harm Reduction Coalition Conference Puerto Rico | -Mar 2021<br>-Oct 2022 | Foundations of Harm Reduction training<br>Certified Opioid Overdose Responder<br>Anti-Stigma training |

ATTACHMENT SEVEN B
OFFEROR'S CANDIDATE INFORMATION
EDUCATION AND TRAINING

Candidate's Name: Shae Dalrymple

Education and Training: This section must be completed to list the education and training of the proposed Candidate.

| Name and Address | Months/Years | Degree/Major |
|---|---|---|
| College<br>Ohio University<br>1 Ohio University Drive Athens, OH 45701 | Class of 2012 | Bachelors of Science<br>Major in Journalism |
| Technical School | | |
| Licenses | | |
| Certifications<br>-Harm Reduction Ohio<br>935 River Rd Suite G, Granville, OH 43023<br>-The National Harm Reduction Coalition Conference<br>Puerto Rico | -Nov 2019<br>-Oct 2022 | Foundations of Harm Reduction training<br>Certified Opioid Overdose Responder<br>Anti-Stigma training |

ATTACHMENT SEVEN B
OFFEROR'S CANDIDATE INFORMATION
EDUCATION AND TRAINING

Candidate's Name: Kelsey Bates

Education and Training: This section must be completed to list the education and training of the proposed Candidate.

| Name and Address | Months/Years | Degree/Major |
|---|---|---|
| College<br>The Ohio State University<br>281 W Lane Ave, Columbus, OH 43210 | Sept 2007-<br>May 2012 | Bachelors of Arts<br>-Major in Theatre |
| Technical School | | |
| Licenses | | |
| Certifications<br>-The National Harm Reduction Coalition Conference Puerto, Rico<br>-Harm Reduction Ohio<br>935 River Rd Suite G, Granville, OH 43023 | -Oct 2022<br><br>-Sept 2020 | Certified in Anti-Stigma and Cultural Competency<br>Trained in the foundations of Harm Reduction<br>Certified Opioid Overdose Responder |

ATTACHMENT SEVEN B
OFFEROR'S CANDIDATE INFORMATION
EDUCATION AND TRAINING

Candidate's Name: Jen Phillips

Education and Training: This section must be completed to list the education and training of the proposed Candidate.

| Name and Address | Months/Years | Degree/Major |
|---|---|---|
| College | | |
| Technical School | | |
| Licenses | | |
| Certifications<br>-Harm Reduction Ohio<br>935 River Rd Suite G, Granville, OH 43023 | May 2023 | Anti-Stigma training<br>Foundations of Harm Reduction training<br>Certified Opioid Overdose Responder |

ATTACHMENT SEVEN B
OFFEROR'S CANDIDATE INFORMATION
EDUCATION AND TRAINING

Candidate's Name: Erin Pottenger

Education and Training: This section must be completed to list the education and training of the proposed Candidate.

| Name and Address | Months/Years | Degree/Major |
|---|---|---|
| College<br>Miami University<br>501 E High St,<br>Oxford, OH 45056 | 2003 - 2007 | Bachelor's of Arts<br>Major in Psychology |
| Technical School | | |
| Licenses | | |
| Certifications<br>Harm Reduction Ohio<br>935 River Rd Suite G,<br>-Granville, OH 43023 | MAY 2023 | Anti-Stigma Competency<br>Trained in the foundations of Harm Reduction<br>Certified Opioid Overdose Responder |

ATTACHMENT SEVEN B
OFFEROR'S CANDIDATE INFORMATION
EDUCATION AND TRAINING

Candidate's Name: Ella Clark

Education and Training: This section must be completed to list the education and training of the proposed Candidate.

| Name and Address | Months/Years | Degree/Major |
|---|---|---|
| College<br>Ohio University<br>1 Ohio University Drive<br>Athens, OH 45701 | Expected<br>DEC 2024 | Bachelor of Sciences<br>Major in Psychology<br>Minor in Sociology |
| Technical School | | |
| Licenses | | |
| Certifications<br>-Harm Reduction Ohio<br>935 River Rd Suite G,<br>-Granville, OH 43023 | -MAY 2022 | Anti-Stigma Competency<br>Trained in the foundations of Harm Reduction<br>Certified Opioid Overdose Responder |

ATTACHMENT SEVEN C
OFFEROR'S CANDIDATE EXPERIENCE REQUIREMENT

Candidate's Name: Dennis Cauchon

Candidate's Proposed Position: Harm Reduction Ohio President

| | | |
|---|---|---|
| Client Company Name: Ohio University/ HIDTA | Client's Project Supervisor Contact Name: Orman Hall | |
| Address: 1435 Beverly Hills Dr<br>Lancaster Ohio 43130 | Phone [redacted]<br>E-Mail: [redacted] | |
| Project Name: Overdose Mortality Research | Beginning Date of Project: Month/Year JULY 2019 | Ending Date of Project: Month/Year PRESENT |
| Description of the related services provided:<br>Orman worked with Dennis Cauchon to identify the zip codes with the highest overdose mortality in Ohio | | |

| | | |
|---|---|---|
| Client Company Name: BirdieLight | Client's Project Supervisor Contact Name: Beth Weinstock, M.D. | |
| Address: 190 S. Drexel St<br>Columbus OH 43209 | Phone Number:<br>E-Mail: [redacted] | |
| Project Name: Distribute harm reduction supplies | Beginning Date of Project: Month/Year FEB 2020 | Ending Date of Project: Month/Year PRESENT |
| Description of the related services provided:<br>Harm Reduction Ohio and BirdieLight worked together to educate college and high school age students about fentanyl risk and to distribute supplies to remediate that risk. | | |

| | | |
|---|---|---|
| Client Company Name: NEXTDistro | Client's Project Supervisor Contact Name: Jamie Favaro | |
| Address: 22 W 27th St<br>New York, NY 10001 | Phone [redacted]<br>E-Mail: [redacted] | |
| Project Name: Online Naloxone Orders | Beginning Date of Project: Month/Year FEB 2019 | Ending Date of Project: Month/Year PRESENT |
| Description of the related services provided:<br>Harm Reduction Ohio and NEXTDistro work together to receive online orders for naloxone and distribute them through the mail. | | |

ATTACHMENT SEVEN C
OFFEROR'S CANDIDATE EXPERIENCE REQUIREMENT

Candidate's Name: Mallory Bolen

Candidate's Proposed Position: Project Consultant

| | |
|---|---|
| Client Company Name: MDRC | Client's Project Supervisor Contact Name: |
| Address: Remote | Phone [redacted] E-Mai |
| Project Name: Analyst II/Resource Manager | Beginning Date of Project: Month/Year MAR 2023 / Ending Date of Project: Month/Year Present |
| Description of the related services provided: -Managed a portfolio of projects, making ongoing updates/revisions to and monitoring of work plans, staffing, and expenditures. -Provided key management information related to budget variances, project staffing, and contract status to inform project decision-making. | -Collaborated with management from other organizations including project partners, funders, and program sites to meet project management needs related to fundraising, contract development, and financial reporting. |
| Client Company Name: Harm Reduction Ohio | Client's Project Supervisor Contact Name: Dennis Cauchon |
| Address: 935 River Road, Suite G Granville OH 43023 | Phone Number: [redacted] E-Mail: |
| Project Name: Director of Operations | Beginning Date of Project: Month/Year MAR 2021 / Ending Date of Project: Month/Year Present |
| Description of the related services provided: -Managed all financial aspects of the organization, including executing a financial audit, processing payroll, and producing monthly financial reports. Created project budgets for each program and grant in coordination with program directors and created quarterly projected budgets for the organization. | -Worked with project coordinators to develop key relationships with external organizations, including multiple State/governmental offices, to create proposals for large grants from these organizations and to develop project road maps detailing the timeline, staffing, and projected budgets for each grant. |
| Client Company Name: Special Olympics Ohio | Client's Project Supervisor Contact Name: Susan Somers Human Resources |
| Address: 921 Eastwind Dr Suite 120, Westerville, OH 43081 | Phone Number: [redacted] E-Mail: |
| Project Name: Special Projects Manager | Beginning Date of Project: Month/Year JUN 2019 / Ending Date of Project: Month/Year MAR 2021 |
| Description of the related services provided: -Prepared reports and briefings for senior leadership to evaluate current projects, share new project proposals, and approve projected budgets. Developed and maintained relationships with community organizations to increase giving and general support. | -Re-prioritized responsibilities from the financial project management to grant project management during the onset of COVID-19, using strategic writing skills to bring in over $100k in grants in Spring 2020 and to rewrite many grants with relevant funding requests. Worked cross-functionally to assist with the development and execution of new projects. |

HRO_000557

ATTACHMENT SEVEN C
OFFEROR'S CANDIDATE EXPERIENCE REQUIREMENT

Candidate's Name: Shae Dalrymple

**Candidate's Proposed Position:** Naloxone Specialist

| | | |
|---|---|---|
| Client Company Name: Harm Reduction Ohio | Client's Project Supervisor Contact Name: Dennis Cauchon | |
| Address: 935 River Rd Suite G, Granville, OH 43023 | Phone [redacted]<br>E-Mail: [redacted] | |
| Project Name: Naloxone Staffer and Communications | Beginning Date of Project: Month/Year NOV 2019 | Ending Date of Project: Month/Year PRESENT |
| Description of the related services provided: Handles Public Relations and some freelance writing This included workshopping press releases, developing media relations strategies and newsletter, and pitching stories. | Assisted with community outreach and harm reduction supply distribution throughout Ohio Including working with community members to educate them about harm reduction, distributing naloxone and other harm reduction supplies, providing support to people who use drugs from a place of lived experience, and has been an integral part to the success of HRO's mail order naloxone distribution. | |
| Client Company Name: Ohio Department of Health | Client's Project Supervisor Contact Name: Dennis Cauchon | |
| Address: 246 N High St, Columbus, OH 43215 | Phone [redacted]<br>E-Mail [redacted] | |
| Project Name: Integrated Naloxone Access and Infrastructure (IN22) | Beginning Date of Project: Month/Year SEPT 2020 | Ending Date of Project: Month/Year SEPT 2021 |
| Description of the related services provided: Helped to ensured the sustainability of the naloxone distribution program by training interns and student employees in online and bulk shipping of naloxone. | Pioneered the initiative to include personalized hand written notes in all mail order naloxone requests. Building trust and connection with people who use drugs and the people who love them. | |
| Client Company Name: Interact for Health | Client's Project Supervisor Contact Name: AmandaLynn Reese | |
| Address: 8230 Montgomery Rd Ste 300 Cincinnati, OH 45236 | Phone N[redacted]<br>E-Mail: [redacted] | |
| Project Name: Harm Reduction Grant | Beginning Date of Project: Month/Year 2020 | Ending Date of Project: Month/Year 2023 |
| Description of the related services provided: Played a central role in the development of anti-stigma content for people who use drugs. This work helped to break down the stigma associated with drug use and substance use disorder, which is essential to improving the lives of people who use drugs. | Processed a high volume of naloxone requests. Worked with a team of staff to ensure that all naloxone requests were met. | |

## ATTACHMENT SEVEN C
## OFFEROR'S CANDIDATE EXPERIENCE REQUIREMENT

Candidate's Name: Kelsey Bates

Candidate's Proposed Position: Regional Coordinator-Black Community Outreach Coordinator

| | | |
|---|---|---|
| Client Company Name: Ohio Department of Mental Health and Addiction Services | Client's Project Supervisor Contact Name: AmandaLynn Reese | |
| Address: 30 E Broad St, Columbus, OH 43215 | Phon[redacted] E-Ma[redacted] | |
| Project Name: End Stigma, Save Lives | Beginning Date of Project: Month/Year 2021 | Ending Date of Project: Month/Year 2023 |
| Description of the related services provided: Researched, designed, built, and distributed wound care, dental, and hygiene kits to people who use drugs. Provided training at events and canvassing across the state and personally trained or assisted in training over 500 people in opioid overdose response | | |

| | | |
|---|---|---|
| Client Company Name: Interact for Health | Client's Project Supervisor Contact Name: AmandaLynn Reese | |
| Address: 8230 Montgomery Rd Ste 300 Cincinnati, OH 45236 | Phone[redacted] E-Mail[redacted] | |
| Project Name: Harm Reduction Grant | Beginning Date of Project: Month/Year SEPT 2021 | Ending Date of Project: Month/Year MAR 2023 |
| Description of the related services provided: Installed Naloxboxes in small business in southwest Ohio, trained employees in opioid overdose response and anti-stigma. Many of these businesses are black owned, woman owned and/or employ people who use drugs. | | |

| | | |
|---|---|---|
| Client Company Name: Ohio Department of Health Violence and Injury Prevention Section | Client's Project Supervisor Contact Name: AmandaLynn Reese | |
| Address: 35 E. Chestnut Street, 5th Floor Columbus, OH 43215 | Phon[redacted] E-Ma[redacted] | |
| Project Name: IN23 - Integrated Naloxone Access and Infrastructure Grant | Beginning Date of Project: Month/Year SEPT 2021 | Ending Date of Project: Month/Year AUG 2022 |
| Description of the related services provided: Successfully increased Peer Lay Distribution Network to increase naloxone distribution to PWUD, high overdose counties, LGBTQIA2+ Communities, people of color and communities of the Global Majority, Human Trafficking Survivors, and other vulnerable populations. | | |

HRO_000559

ATTACHMENT SEVEN C

OFFEROR'S CANDIDATE EXPERIENCE REQUIREMENT

Candidate's Name: Jen Phillips

Candidate's Proposed Position: Grant Manager

| | |
|---|---|
| Client Company Name: The Callard Company | Client's Project Supervisor Contact Name: Robin Welch |
| Address: 811 Green Crest Dr, Westerville, OH 43081 | Phone [redacted] |
| | E-Mail [redacted] |
| Project Name: Program Manager | Beginning Date of Project: Month/Year AUG 2018 — Ending Date of Project: Month/Year AUG 2022 |
| Description of the related services provided: Online inventory management - Process implementation - Cost analysis - Website building via templates - Statistical reports Quarterly Business Reviews - Organize online data - Update online product specifications, i.e. descriptions, price etc. | |
| Client Company Name: The Callard Company | Client's Project Supervisor Contact Name: Robin Welch |
| Address: 811 Green Crest Dr, Westerville, OH 43081 | Phone [redacted] |
| | E-Mail [redacted] |
| Project Name: Account Manager | Beginning Date of Project: Month/Year JULY 2015 — Ending Date of Project: Month/Year AUG 2018 |
| Description of the related services provided: Customer relations<br>Presentations / Quotes to the potential customer<br>Organized records and project management | |
| Client Company Name: Advantage Sales & Marketing | Client's Project Supervisor Contact Name: Pamela Morris-Thornton |
| Address: 15310 Barranca Parkway, Suite 100 Irvine, CA 92618 | Phone Number: [redacted] |
| | E-Mail: |
| Project Name: OMS Analyst | Beginning Date of Project: Month/Year 2002 — Ending Date of Project: Month/Year JULY 2015 |
| Description of the related services provided:<br>-Responsible for the management of relational databases, including all maintenance and testing after upgrades.<br>-Run weekly/monthly reports for Business Managers using Crystal Reports.<br>-Served as the primary interface for database-related issues.<br>-Created training documentation to better our associate's knowledge of database functions. | |

ATTACHMENT SEVEN C
OFFEROR'S CANDIDATE EXPERIENCE REQUIREMENT

Candidate's Name: AmandaLynn Reese

Candidate's Proposed Position: Project Manager

| | | |
|---|---|---|
| Client Company Name: Harm Reduction Ohio | Client's Project Supervisor Contact Name: Dennis Cauchon | |
| Address: 935 River Rd Suite G, Granville, OH 43023 | Phone Number: 740-501-8457<br>E-Mail: Dennis@harmreductionohio.org | |
| Project Name: Outreach Coordinator | Beginning Date of Project: Month/Year AUG 2020 | Ending Date of Project: Month/Year AUG2021 |
| Description of the related services provided:<br>Designed ,implemented, and evaluated a program to reduce stigma against people who use drugs.<br>Recruited and created dynamic relationships with community members and stakeholders to identify needs, and make outreach efforts sustainable.<br>Coordinating volunteers, promoting community wellness, addressing public health concerns, delegating tasks to staff, managing finances, attracting outreach support, assessing program efficacy, and reporting to supervisors. | | |
| Client Company Name: Harm Reduction Ohio | Client's Project Supervisor Contact Name: Dennis Cauchon | |
| Address: 935 River Rd Suite G, Granville, OH 43023 | Phone Number: 740-501-8457<br>E-Mail: Dennis@harmreductionohio.org | |
| Project Name: Director of Outreach and Engagement | Beginning Date of Project: Month/Year AUG 2021 | Ending Date of Project: Month/Year JUNE 2022 |
| Description of the related services provided:<br>Managed distribution program of over 35k naloxone kits, harm reduction supplies and other direct services.<br>Organized staff, vendors, partners for over 150 events, and outreach services statewide during a global crisis that severely limited the function of these tasks.<br>Manages staff and volunteers to meet grant deliverables and organizational goals | | |
| Client Company Name: Harm Reduction Ohio | Client's Project Supervisor Contact Name: Dennis Cauchon | |
| Address: 935 River Rd Suite G, Granville, OH 43023 | Phone Number: 740-501-8457<br>E-Mail: Dennis@harmreductionohio.org | |
| Project Name: Director of Programming | Beginning Date of Project: Month/Year JUNE 2022 | Ending Date of Project: Month/Year PRESENT |
| Description of the related services provided:<br>Ensures seamless team management and development, program delivery, quality control and evaluation of projects and grants.<br>Overseas all direct service programs by researching, planning, and implementing outreach services that will ensure a successful outcome on behalf of partners and the organization.<br>Manages a network of 300+ volunteer distributors, staffers and partners to direct the states largest Naloxone distribution network<br>Assists with grant writing, reporting and other deliverables. | | |

ATTACHMENT SEVEN C
OFFEROR'S CANDIDATE EXPERIENCE REQUIREMENT

Candidate's Name: Erin Pottenger

Candidate's Proposed Position: Administrator

| | | |
|---|---|---|
| Client Company Name: Harm Reduction Ohio | Client's Project Supervisor Contact Name: Dennis Cauchon | |
| Address: 935 River Rd Suite G, Granville, OH 43023 | Phone Number: 740-501-8457<br>E-Mail: Dennis@harmreductionohio.org | |
| Project Name: Chief Operations Officer | Beginning Date of Project: Month/Year MAY 2023 | Ending Date of Project: Month/Year PRESENT |
| Description of the related services provided:<br>-Payroll and Financial Manager<br>-Sales Management<br>-Event Organizer<br>-Communication Manager | | |
| Client Company Name: Harm Reduction Ohio | Client's Project Supervisor Contact Name: Dennis Cauchon | |
| Address: 935 River Rd Suite G, Granville, OH 43023 | Phone Number: 740-501-8457<br>E-Mail: Dennis@harmreductionohio.org | |
| Project Name:Ohio Syringe Services Programs Conference Event Organizer | Beginning Date of Project: Month/Year MAY 2023 | Ending Date of Project: Month/Year MAY 2023 |
| Description of the related services provided:<br>Addressed unexpected problems with flexibility and grace.<br>Displayed strong organizational and time management skills, attention to detail, and the ability to work under pressure.<br>Assisted in managing logistics and event budget, distributed schedules and managing registration and scholarships. | | |
| Client Company Name: Dot Dot Smile, LLC | Client's Project Supervisor Contact Name: Nicole Thompson | |
| Address: 12000 Magnolia Ave, Suite 100 Riverside, CA 92503 | Phone Number: info@dotdotsmile.com<br>E-Mail: | |
| Project Name: Direct Sales and Inventory | Beginning Date of Project: Month/Year 2020 | Ending Date of Project: Month/Year PRESENT |
| Description of the related services provided:<br>-Customer Service<br>-Online and In-Person Events<br>-Ordering and Inventory Management<br>-Invoicing for purchases<br>-Packaging and Mailing purchases | | |

ATTACHMENT SEVEN C
OFFEROR'S CANDIDATE EXPERIENCE REQUIREMENT

Candidate's Name: Ella Clark

Candidate's Proposed Position: Naloxone Specialist

| | | |
|---|---|---|
| Client Company Name: Harm Reduction Ohio | Client's Project Supervisor Contact Name: Dennis Cauchon | |
| Address: 935 River Rd Suite G, Granville, OH 43023 | Phone Number: 740-501-8457<br>E-Mail: Dennis@harmreductionohio.org | |
| Project Name: Naloxone Distribution Intern | Beginning Date of Project: Month/Year MAY 2022 | Ending Date of Project: Month/Year PRESENT |
| Description of the related services provided:<br>Assembled and packaged naloxone nasal spray and intramuscular naloxone<br>Has consistently and accurately entered naloxone intake forms into the REDCap database, proficient in compliance policies for the Ohio Department of Health's ProjectDAWN<br>Data security competency | | |
| Client Company Name: Harm Reduction Ohio | Client's Project Supervisor Contact Name: Dennis Cauchon | |
| Address: 935 River Rd Suite G, Granville, OH 43023 | Phone Number: 740-501-8457<br>E-Mail: Dennis@harmreductionohio.org | |
| Project Name: Ohio State Fair 2022-Naloxone Distribution Intern | Beginning Date of Project: Month/Year JULY 2022 | Ending Date of Project: Month/Year AUG 2022 |
| Description of the related services provided:<br>Distributed naloxone and fentanyl test strips to the public, provided anti-stigma literature, informed people about the signs and symptoms of an opioid overdose and the importance of naloxone. | | |
| Client Company Name: Harm Reduction Ohio | Client's Project Supervisor Contact Name: Dennis Cauchon | |
| Address: 935 River Rd Suite G, Granville, OH 43023 | Phone Number: 740-501-8457<br>E-Mail: Dennis@harmreductionohio.org | |
| Project Name: Ohio's 2022 Recovery Celebration-Naloxone Distribution Intern | Beginning Date of Project: Month/Year JUNE 2022 | Ending Date of Project: Month/Year JUNE 2022 |
| Description of the related services provided:<br>Distributed naloxone and fentanyl test strips to the public, provided anti-stigma literature, informed people about the signs and symptoms of an opioid overdose and the importance of naloxone. | | |

# 8. Work Plan

## Table of Contents

TABLE OF CONTENTS ..... 1
PROJECT OVERVIEW: SCOPE OF PROJECT ..... 2
WORK PLAN BY TASK ..... 2
TASK 1: PROGRAM ADMINISTRATION: GENERAL REQUIREMENTS ..... 3
TASK 2: ONLINE MAIL ORDER SYSTEM ..... 5
TASK 3: NALOXONE DISTRIBUTION (VOLUME/REPORT FILING) ..... 7
TASK 4: LAY DISTRIBUTION NETWORK DEVELOPMENT & DISTRIBUTION ..... 8
SUBTASK 4A: REGIONAL CAPACITY EXPANSION SCHEDULE ..... 10
TASK 5: TARGETING UNDER-RESOURCED POPULATION ..... 11
APPENDIX A: STAFFING GANTT CHART ..... 13
APPENDIX B: DELIVERABLE GANTT CHART ..... 14

# Project Overview: Scope of Project

## SCOPE OF WORK/CAPACITY

Harm Reduction Ohio (HRO) will expand its existing mail order and lay distribution naloxone network to prioritize increasing naloxone delivery to under-resourced populations, as defined in the Request for Proposal (Attachment One: 1.1.6.5. and 1.1.6.6.). HRO's capacity, capability and experience to execute this Work Plan are detailed fully in 4. Offeror Profile and Prior Projects. Key aspects are highlighted in this Work Plan.

For this project, HRO will create a regional distribution structure that includes regional coordinators for each Project DAWN region. HRO will use existing staff, added staff and volunteer lay distributors to execute strategies described in this Work Plan to achieve the goals and objectives described below and outlined in this Request for Proposal (RFP).

## GOALS AND OBJECTIVES

During the term of this contract, Harm Reduction Ohio will complete the following:

- Expand its volunteer lay distributor network to have at least one lay distributor in all 88 Ohio counties;
- Increase by 25% the volume of naloxone in 5 counties with highest cocaine-fentanyl or methamphetamine-fentanyl overdose death rates;
- Increase by at least 25% the volume of naloxone distributed to Black Ohioans;
- Increase by at least 25% the number of lay distributors who work primarily with Black Ohioans and in 5 counties with highest overdose death rates for cocaine-fentanyl or methamphetamine-fentanyl;
- Increase by 100% naloxone volume in all nine non-Project DAWN counties.
- Distribute at least 40,000 naloxone kits statewide via online order fulfillment and an expanded network of volunteer lay distributors;
- Complete an evaluation report at contract-end that analyzes the effectiveness of distribution strategies used to improve naloxone availability among under resourced populations.

# Work Plan by Task

This Work Plan follows the "Project Requirements" listed in Attachment One of the RFP. Specifically, the Work Plan does the following:

a) Identifies in **bold** the part of the Work Plan that completes the eight deliverables listed in 1.7 – "Timeline of Events."
b) Names the personnel responsible for executing each Work Plan action step.
c) Provides a time -- deadline, duration or frequency -- for each activity.

# TASK 1: Program Administration: General Requirements

## SCOPE OF WORK/CAPACITY

*Harm Reduction Ohio currently employs 6 full-time equivalents (FTEs). HRO estimates adding 3 to 4 FTEs to fulfill this contract. When fully staffed, 6 of 9 FTEs will be working on the statewide naloxone program. The majority of HRO's demographically diverse staff has lived or shared experience with opioids and other drugs. Newly hired staff (i.e., regional coordinators, naloxone specialists) will be drawn from the population directly affected by opioids (i.e., lived experience).*

| ACTION STEPS | ANTICIPATED OUTPUTS | ANTICIPATED COMPLETION DATE(S) | PERSON RESPONSIBLE |
|---|---|---|---|
| 1. Assign existing staff to positions that align with staffing plan and the needs of the contract | Email sent, staff meeting held | Within 7 days | President |
| 2. Approve job description for new and revised positions | Revised job descriptions placed in google drive folder | Within 15 days | Project Manager |
| 3. Submit overdose education material, including Spanish language version, to ODH for approval | Submission emailed *(note: this material already exists.)* | Within 15 days | Project Manager |
| 4. Submit policies and procedures for naloxone program to ODH for approval | Submission emailed *(note: this material already exists.)* | Within 15 days | Project Manager |
| 5. Revise role transition and cross training plan to reflect contract job descriptions | Revised plan placed in google drive folder | Within 30 days | Project Manager |
| 6. Create a segregated bank account to receive Contract funds | Account established at Chase Bank | Within 7 days | Administrator |

HRO_000566

| | | | |
|---|---|---|---|
| 7. Establish project meeting schedule and requirements with ODH | Meeting held with ODH to establish meeting requirements, email to confirm | Within 30 days | Project Manager |
| 8. A) submit report to formalize structure of lay distributor network, b) list regional coordinators and regional lay leaders, c) provide policies and procedures, d) complete chart documenting network's organizational Structure and personnel **DELIVERABLE NO. 8** | Final report approved by ODH and placed in Google Drive folder | Within 180 days | President, Project Manager, Grant Manager |

# TASK 2: ONLINE MAIL ORDER SYSTEM

## SCOPE OF WORK/CAPACITY

*Harm Reduction Ohio has operated a statewide online mail order service since February 14, 2019. As of July 19, 2023, HRO had mailed 24,862 kits to all 88 counties, including more than 700 kits to non-Project DAWN counties. HRO ships every day, Monday through Friday. Orders ship within 24 hours. NEXT Distro, a national harm reduction non-profit, currently handles the online order system and will continue to do so. HRO's online orders have averaged 17.5 kits per day since June 1, a slight decline from 2022 because HRO stopped social media posts about the service to control costs. With funding, HRO has the capacity to dramatically increase online access for at-risk population, under-resourced populations. HRO has a large social media presence that generates many high-value orders when posts are targeted based on content and audience.*

| ACTION STEPS | ANTICIPATED OUTPUTS | ANTICIPATED COMPLETION DATE(S) | PERSON RESPONSIBLE |
|---|---|---|---|
| 1. Confirm existing ordering site remains operational **DELIVERABLE NO. 1** | Email confirmation sent to ODH | Completed | Grant Manager |
| 2. Join naloxone.ohio.gov website | Request emailed to ODH 7/6/2023 | Pending | President |
| 3. Advertise for and hire additional Naloxone Specialist (0.5 FTE) | Staffer hired | By 10/31/2023 | President, Project Manager |
| 4. Advertise for and hire Naloxone Distribution Manager (0.8 FTE) | Staffer hired | By 12/31/2023 | President, Project Manager |
| 5. Submit online ordering public interface to ODH for approval | Email sent to ODH | Within 15 days | Project Manager |
| 6. Review online ordering system for compliance with ADA, CLAS, Section 508 Accessibility Standards | Email sent to ODH confirming compliance | By 09/30/2023 | Naloxone Specialists |

HRO_000568

| | | | |
|---|---|---|---|
| 7. Document online naloxone shipping occurs within 24 hours | PirateShip receipt placed in Google Drive folder, Receipt supplied to ODH if requested | Ongoing | Naloxone Specialists |
| 8. Revise web site to allow ordering full Project DAWN kits and fentanyl test strips, in addition to naloxone only kits | Screenshot of change taken | By 9/30/2023 | Project Manager |
| 9. Create and distribute weekly inventory report | Report completed, Delivered every Friday | By 9/30/2023 | Naloxone Specialists |
| 10. Upload Monthly Distribution Log, NIF data and other required reports | Reports uploaded to GMIS or appropriate system | Monthly | Grant Manager |
| 11. Spend $500 per month in October, November, December to test various social media strategies to increase naloxone provided to Black Ohioans; in counties having the five highest overdose death rates for cocaine-fentanyl and meth; and to previous online orderers who report suffering or reversing an overdose. Analyze results in January, implement evidence-based campaign (dollar amount to be determined in january) in February, the month with highest overdose death rate | Complete report analyzing social media effectiveness | 10/01/23 – 02/29/24 | President |
| 12. Create policies and procedures for cyber security and data privacy; train staff | Staff training session held | 02/15/24 | Administrator |



HRO_000569

# TASK 3: NALOXONE DISTRIBUTION (VOLUME/REPORT FILING)

## SCOPE OF WORK/CAPACITY

*Harm Reduction Ohio has distributed 116,240 naloxone kits to Ohio residents since July 2018. As a recipient of two previous IN naloxone grants, HRO has the capability to fulfill all ODH reporting requirements related to monthly distribution logs, Naloxone Intake Forms and naloxone program evaluation reports. HRO Operations Director Mallory Bolen, who has handled ODH reporting since March 2021, has trained a newly hired grant manager, GRANT MANAGER, who started in April 2023, to take over reporting duties. Mallory will continue to provide support as a part-time consultant after she leaves HRO's staff on September 1 to move to California. The contract-end evaluation report will document effective strategies that other naloxone programs may use.*

| ACTION STEPS | ANTICIPATED OUTPUTS | ANTICIPATED COPMLETION DATE(S) | PERSON RESPONSIBLE |
|---|---|---|---|
| 1. File monthly distribution logs and naloxone intake form data<br>**DELIVERABLE NO. 5** | Data uploaded to GMIS or appropriate system | Monthly, by the 10th | Grant Manager |
| 2. File naloxone evaluation instrument and other required reports for year 1 and 2 benchmarks<br>**DELIVERABLES NO. 6, 7** | Reports uploaded to GMIS or appropriate system | 10/15/23<br>03/15/24<br>04/15/24<br>10/15/24 | Grant Manager |
| 3. Create and distribute detailed monthly volume report to staff, key lay distributors and ODH | Report emailed | Monthly, beginning 10/31/2023 | Project Manager, Black Community Outreach Coordinator, Naloxone Distribution Manager |
| 4. Order naloxone to maintain at least a two-week supply (est. 1,500 kits) based on monitoring weekly inventory/volume report | Orders placed | Ongoing, review weekly | Project Manager, Naloxone Distribution Manager |

HRO_000570

# TASK 4: LAY DISTRIBUTION NETWORK DEVELOPMENT & DISTRIBUTION

## SCOPE OF WORK/CAPACITY

*Harm Reduction Ohio has distributed naloxone via a network of more than 400 volunteer lay distributors in more than 70 counties since September 2018. Most lay distributors are women directly affected by opioid and overdose death. Managing the country's largest volunteer lay distributor network – one that, including lay distributors on staff, furnished 30,000 naloxone kits statewide in 2022 – is an enormous task that has, at times, overwhelmed HRO's. To control workload and expenses, HRO has automated processes to an enormous extent: training, lay distributor onboarding, NIF tracking, bulk shipping, etc. As a result, HRO operates the most cost-effective naloxone operation in the nation when measured on a per unit basis. This contract would allow HRO to dramatically expand volunteer lay distribution in Ohio, especially in underserved counties. A regional structure will support prioritizing reaching individuals and areas most in need of naloxone.*

| ACTION STEPS | ANTICIPATED OUTPUTS | ANTICIPATED COMPLETION DATE(S) | PERSON RESPONSIBLE |
|---|---|---|---|
| 1. Submit report to ODH assessing current lay distributor capacity at regional and county level, recommend strategies for closing capacity gaps **DELIVERABLE NO. 4** | Plan and recommendations submitted to ODH for review | Within 90 days | Project Manager, Black Community Outreach Coordinator |
| 2. Ensure HRO's existing five-region, project dawn-defined structure meets contract requirements for a statewide structure that supports capacity growth; submit policies and procedures consistent with structure **DELIVERABLE NO. 4** | Plan, supported by policies and procedures submitted to ODH | Within 90 days | Project Manager, President |
| 3. To HRO's existing schedule of monthly regional Zoom meetings, add voluntary quarterly in-person regional meetings of lay distributors | In-person meetings held for all five regions starting in Q1 2024 | By 12/31/2023 | Project Manager, Naloxone Distribution Manager |

| | | | |
|---|---|---|---|
| 4. Hold statewide lay distributor meeting, as scheduled, in Granville in November 2023 | >50 lay distributors attend meeting | On 11/04, 05, or 06/2023 | Project Manager, Administrator |
| 5. Provide list of regional coordinators and lead lay distributors to ODH for all regions and counties **DELIVERABLE NO. 2** | List of lay distributors submitted to ODH | Within 60 days, updated quarterly | Project Manager, Naloxone Distribution Manager |
| 6. Optional: if HIPAA compliance desired for lay distributor management, buy JotForm license. Cost: $4,000 annually. | Meeting with ODH | On 11/30/23 | President, Project Manager |

## SUBTASK 4A: REGIONAL CAPACITY EXPANSION SCHEDULE

| REGION, ACTION | ANTICIPATED OUTPUTS | ANTICIPATED COMPLETION DATE(S) | PERSON RESPONSIBLE |
|---|---|---|---|
| Region 1 – Northwest, Hire coordinator | Region 1 Coordinator position advertised, Region 1 Coordinator hired | By 03/30/2024 | Project Manager |
| Region 2 – Northeast, Hire coordinator | Region 2 Coordinator position advertised, Region 2 Coordinator hired | By 12/31/2023 | Project Manager |
| Region 3 – Southwest, Hire coordinator | Region 3 Coordinator position advertised, Region 3 Coordinator hired | By 10/31/2023 | Project Manager |
| Region 4 – Southeast, Kelsey Bates (HRO staffer) assumes Region 4 Coordinator role | Region 4 Coordinator contacts Region 4 lay distributors by email | Immediate | Project Manager |
| Region 5 – Central, Hire coordinator | Region 5 Coordinator position advertised, Region 5 Coordinator hired | By 12/31/2023 | Project Manager |

# TASK 5: TARGETING UNDER-RESOURCED POPULATION

## SCOPE OF WORK/CAPACITY

*Harm Reduction Ohio's President has experience analyzing overdose mortality, naloxone distribution and resource gaps in Ohio. Two former interns, including Sydney Tavens, MPH, now a Researcher 3 at ODH, also wrote reports on resource gaps to support HRO's IN naloxone grants which addressed some local gaps. Cauchon has worked with researcher Orman Hall (see letter of support) and former HRO Board Chair Anne Trinh, an epidemiologist at the Center for Health Outcomes and Policy Evaluation Studies, Ohio State University.*

| ACTION STEPS | ANTICIPATED OUTPUTS | ANTICIPATED COMPLETION DATE(S) | PERSON RESPONSIBLE |
|---|---|---|---|
| 1. Analyze ODH and Project DAWN data to find under-resourced counties and regions | Table showing under-resourced counties and regions based on ratio of overdose rates and naloxone sourcing rates | Completed<br>See "Capacity and Capability: Research" section of Offeror Profile and Prior Projects | President |
| 2. Analyze ODH and Project DAWN data to find disparately impacted and under-resourced racial groups | Table showing racial disparities in overdose rates relative to naloxone sourcing rates | Completed<br>See "Capacity and Capability: Research" section of Offeror Profile and Prior Projects | President |
| 3. Create detailed plan to identify populations and geographic areas to target and strategies, using mail order and lay distribution, to reach the under-resourced population<br>**DELIVERABLE NO. 3** | Plan and report submitted to ODH | Within 60 days | President,<br>Project Manager |

HRO_000574

| | | | |
|---|---|---|---|
| 4. Use online targeting and social media to test the effectiveness of targeting strategies in October, November, and December | Report on effectiveness of online targeting strategies sent to ODH | 01/01/2024 | President, Project Manager |
| 5. Conduct large, targeted social media campaign based on results of analysis in previous step during February, the month of the highest overdose rates<br>See "Strategy Summary" section of Offeror Profile and Prior Projects | Campaign conducted and report generated based on populations/areas targeted, report sent to ODH | 03/15/2024 | President, Project Manager, Naloxone Distribution Manager |
| 6. Improve lay distribution network, especially in key target regions/groups identified in data analysis<br>See "Strategy Summary" section of Offeror Profile and Prior Projects | Increase in raw numbers of lay distributors, have at least one lay distributor in each county, hold both quarterly meeting for each Project DAWN region and an annual statewide meeting for lay distributors | Ongoing, review monthly | President, Project Manager, Regional Coordinators |
| 7. Update approved plan on quarterly basis to reflect (a) trends in mortality and naloxone distribution, and (b) effectiveness of tested strategies to reach under-resourced Ohioans | Submit updated strategies to ODH and HRO staff | 03/30/2024<br>06/30/2024<br>09/29/2024 | President |

# Appendix A: Staffing Gantt Chart

## HRO Staffing Gantt Chart for Project Duration (09/01/2023 – 09/29/2024)




HRO_000576

# Appendix B: Deliverable Gantt Chart[1]

HRO Deliverable Gantt Chart (Anticipated Completion Dates)




[1] **The numbering of deliverables in the Gantt Chart mirrors the ordering of deliverables as listed on page 19 of the RFP. For convenience, that text is reproduced here:**
Deliverable 1: Contractor must provide a website and infrastructure established to obtain and process orders for naloxone as demonstrated by a listing of orders being fulfilled.
Deliverable 2: Contractor must provide a list and contact information for Lead Lay Distributors or Coordinators organized by Project DAWN regions/counties.
Deliverable 3: Contractor must submit a summary document that describes the process by which naloxone provided through mail orders and lay distributors are prioritized fot under resourced areas and populations.
Deliverable 4: Contractor must submit a workplan identifying strategies to formalize its Lay Distributor Network.
Deliverable 5: Contractor must distribute a minimum of 2,500 units per month.
Deliverable 6: Contractor must submit a completed Naloxone Evaluation Instrument (Supplement 2).
Deliverable 7: Contractor must submit a completed Naloxone Evaluation Instrument (Supplement2). Note: Deliverable 7 reads the same as Deliverable 6 but covers instead the reporting requirements for Year 2.
Deliverable 8: Contractor must demonstrate full implementation of Work Plan to formalize its Lay Distributor Network as evidenced by a final report.

## 9. Support Requirements

Harm Reduction Ohio has no support requirements other than those described in the contract Request for Proposal.

## 10. Conflict of Interest Statement

Harm Reduction Ohio confirms that no employees or contractors associated with the organization have a conflict of interest working on the statewide Naloxone project.

## 11. Assumptions

Harm Reduction Ohio uses the following assumptions in preparation of this grant: Naloxone supply:

· The Ohio Department of Health will have sufficient naloxone to support the volume of naloxone projected in this application.
· DirectRelief, the pharmaceutical industry charity, will continue to supply Harm Reduction Ohio with some amount of naloxone at no cost.
Shipping:
· Postage rates will not increase more than 30% in the next 13 months.
Online Order Processing:
· NEXT Distro will continue to process Harm Reduction Ohio's online orders.

ALLIANCE OF NONPROFITS FOR INSURANCE
*A Head for Insurance. A Heart for Nonprofits.*

# Nonprofits OWN NEW BUSINESS QUOTATION
## Q2-2023-79663

Applicant: (79663)
Harm Reduction Ohio
935 River Rd., Ste. G
Granville, OH 43023

Producer: (03268)
Kerber Agency LLC dba: Kerber Gost Ins. Agency
1754 Spyglass Circle
Vista, CA 92081

**Proposed Effective Date: 08/01/2023**

| | | |
|---|---|---|
| General Liability | $ | 4,456 |
| Liquor Liability | | Included |
| Social Service Professional Liability | $ | 1,838 |
| Improper Sexual Conduct Liability | $ | 4,091 |
| Business Auto Liability | $ | 3,100 |
| Terrorism Coverage (Certified Acts)** | $ | 80 |

**Annual Premium** with Terrorism coverage: $13,565

**Annual Premium** without Terrorism coverage: $13,485

## GENERAL CONDITIONS

- See the attached Index of Forms.
- For coverages not quoted, contact your Underwriter.
- Improper Sexual Conduct and Physical Abuse (ISC) coverage requires background checks for any employees and/or volunteers who have close, regular contact (physical or otherwise) with "high risk" clients (e.g., youth, the elderly, developmentally disabled of any age) in an unsupervised and/or "one-on-one" situation. Verification of compliance with requirements is required within 30 days of binding. ISC coverage is Event Trigger and defense costs are included within the ISC limit.
- We must write the General Liability in order to write any other line of business.
- The attached Terrorism Disclosure MUST be delivered to the nonprofit agency.
- We can only insure 501(c)(3) nonprofits.
- **ANI-RRG Broker Commission is 15.0%.**

## SPECIAL CONDITIONS

A signed and dated Nonprofits Select Application is required to bind coverage.
Quote is subject to favorable loss runs for prior 3 years or a signed no known incidents/losses letter if no prior insurance carried, for each line of coverage.

**THE COVERAGE OFFERED IN THIS QUOTATION MAY DIFFER FROM THAT REQUESTED IN THE APPLICATION. FAILURE TO PROVIDE THE REQUESTED COVERAGE SHALL IMPOSE NO LIABILITY ON ANI-RRG.**

** Terrorism premium may adjust slightly due to changing ISO rates.

**Underwriter: Desiree Reich**
Email: dreich@insurancefornonprofits.org
Direct Phone: (831) 621-6014, Direct Fax: (831) 621-6126
(800) 359-6422, Ext. 6014

**Underwriting Asst. : Nicole McNeil**
Email: nmcneil@insurancefornonprofits.org
Direct Phone: (831) 900-9429, Direct Fax: (831) 459-0853
(800) 359-6422, Ext. 9429

ALLIANCE OF NONPROFITS FOR INSURANCE

*A Head for Insurance. A Heart for Nonprofits.*

# LIABILITY QUOTATION SCHEDULE OF PROPOSED COVERAGES AND LIMITS

**Q2-2023-79663**

Control Number: 79663

Applicant: Harm Reduction Ohio

| | | Limits | | Limits |
|---|---|---|---|---|
| General Aggregate | $ | 2,000,000 | Liquor Liability Aggregate/Common Cause | $1,000,000/$1,000,000 |
| Products-Completed Operations Aggregate | $ | 2,000,000 | Social Service Professional Aggregate/Event | $2,000,000/$1,000,000 |
| Personal/Advertising Injury | $ | 1,000,000 | Improper Sexual Conduct Limits Aggregate/Occurrence | $2,000,000/$1,000,000 |
| Each Occurrence | $ | 1,000,000 | | |
| Damage to Premises Rented to You | $ | 500,000 | | |
| Medical Expense | $ | 20,000 | | |

| Loc # | Address | ClassCode(s) | Exposure | Premium |
|---|---|---|---|---|
| 1 | 935 River Rd Ste G<br>Granville, OH 43023 | 47366 | 232,000 (p) | $235 |
| | | 12362 & Products | 400,000 (s) | $4,162 |

ALLIANCE OF NONPROFITS FOR INSURANCE

*A Head for Insurance. A Heart for Nonprofits.*

# DIRECTORS & OFFICERS NEW BUSINESS QUOTATION

**Q1-2023-79663-DO**

| Applicant: (79663) | Producer: (03268) |
|---|---|
| **Harm Reduction Ohio**<br>**935 River Rd., Ste. G**<br>**Granville, OH 43023** | Kerber Agency LLC dba: Kerber Gost Ins. Agency<br>1754 Spyglass Circle<br>Vista, CA 92081 |
| **Proposed Effective Date: 08/01/2023** | **Employment Practices Liability Included** |

**LIMITS OF LIABILITY:** $ 1,000,000 Each Wrongful Act
$ 2,000,000 Annual Aggregate

**DEDUCTIBLE:** N/A

**(Defense Costs in addition to applicable limits of liability)**

| | |
|---|---|
| **Annual Premium** (with Terrorism coverage): | $2,138 |
| Terrorism Coverage (Certified Acts): | $19 |
| **Annual Premium** (without Terrorism coverage): | $2,119 |

## GENERAL CONDITIONS

- See the attached Index of Forms.
- Directors and Officers Liability policy is written on an event-trigger basis.
- A written request to bind coverage must be submitted to our office prior to the proposed effective date. Please use the bind order checklist located on the secure broker website to bind coverage.
- Monoline D&O coverage is not available. D&O coverage can only be written in conjunction with General Liability.
- The attached Terrorism Disclosure MUST be delivered to the nonprofit agency.
- **Broker Commission is 15.0%.**

## SPECIAL CONDITIONS

To add the Retro Date, a current copy of their Declarations Page reflecting the Retro Date and currently valued loss runs with a completed Confirmation of Reported Claims Letter is required. The premiums are subject to change upon receipt.

**THE COVERAGE OFFERED IN THIS QUOTATION MAY DIFFER FROM THAT REQUESTED IN THE APPLICATION. FAILURE TO PROVIDE THE REQUESTED COVERAGE SHALL IMPOSE NO LIABILITY ON ANI-RRG.**

**D&O Underwriter: Desiree Reich**
Email: dreich@insurancefornonprofits.org
Direct Phone: (831) 621-6014, Direct Fax: (831) 621-6126
(800) 359-6422, Ext. 6014

**Underwriting Asst. : Nicole McNeil**
Email: nmcneil@insurancefornonprofits.org
Direct Phone: (831) 900-9429, Direct Fax: (831) 459-0853
(800) 359-6422, Ext. 9429

# DIRECTORS & OFFICERS LIABILITY QUOTATION

**Q1-2023-79663-DO**

ALLIANCE OF NONPROFITS FOR INSURANCE
*A Head for Insurance. A Heart for Nonprofits.*

Control Number: 79663
Applicant: Harm Reduction Ohio

Our review of the materials you submitted is for the specific purpose of determining whether the proposed insured meets our criteria to be offered a quotation for D&O coverage. Our failure to comment on any of the material submitted with your application should not be construed to mean that it is in compliance with current law. We strongly recommend that the applicant have their personnel manual/handbook reviewed on a regular basis by an attorney or other personnel professional.

ALLIANCE OF NONPROFITS FOR INSURANCE

*A Head for Insurance. A Heart for Nonprofits.*

ALLIANCE OF NONPROFITS FOR INSURANCE RISK RETENTION GROUP (ANI)
www.insurancefornonprofits.org

# UMBRELLA NEW BUSINESS QUOTATION

**Q1-2023-79663-UMB**

Applicant: (79663)

**Harm Reduction Ohio**
**935 River Rd., Ste. G**
**Granville, OH 43023**

**Proposed Effective Date: 08/01/2023**

Producer: (03268)

**Kerber Agency LLC dba: Kerber Gost Ins. Agency**
**1754 Spyglass Circle**
**Vista, CA 92081**

| **Umbrella Premium per Line of Business** | **Limits** | **Premium** |
|---|---|---|
| General Liability | $1,000,000 | $1,103 |
| Social Service Professional Liability | $1,000,000 | Incl. |
| Improper Sexual Conduct | $1,000,000 | $1,143 |
| Directors & Officers | $1,000,000 | $534 |
| Terrorism coverage (Certified Acts) | | $139 |
| **Annual Premium** (with Terrorism coverage): | | $2,919 |
| **Annual Premium** (without Terrorism coverage): | | $2,780 |

**Exclusions**

Employers' Liability
Damages to Premises Rented to You
Liquor Liability
Uninsured / Underinsured Motorist

**Exclusions (cont.)**

**Follow Form**

Auto Liability
Directors & Officers

## GENERAL CONDITIONS

- See the attached Index of Forms.
- For coverages not quoted, contact your Underwriter.
- A written request to bind coverage must be submitted to our office prior to the proposed effective date. Please use the bind order checklist located on the secure broker website to bind coverage.
- Follow Form Uninsured/Underinsured Motorist is not available.
- The attached Terrorism Disclosure MUST be delivered to the nonprofit agency.
- **Broker Commission is 15.0%.**

## SPECIAL CONDITIONS

Please note that the Umbrella premiums will change upon amendment to the D&O to add the Retro Date.

**THE COVERAGE OFFERED IN THIS QUOTATION MAY DIFFER FROM THAT REQUESTED IN THE APPLICATION. FAILURE TO PROVIDE THE REQUESTED COVERAGE SHALL IMPOSE NO LIABILITY ON ANI-RRG.**

**Underwriter: Desiree Reich**
Email: dreich@insurancefornonprofits.org
Direct Phone: (831) 621-6014, Direct Fax: (831) 621-6126
(800) 359-6422, Ext. 6014

**Underwriting Asst. : Nicole McNeil**
Email: nmcneil@insurancefornonprofits.org
Direct Phone: (831) 900-9429, Direct Fax: (831) 459-0853
(800) 359-6422, Ext. 9429

ALLIANCE OF NONPROFITS FOR INSURANCE

*A Head for Insurance. A Heart for Nonprofits.*

ALLIANCE OF NONPROFITS FOR INSURANCE
RISK RETENTION GROUP (ANI)
www.insurancefornonprofits.org

# SCHEDULE OF PROPOSED UMBRELLA LIMITS

**Q1-2023-79663-UMB**

Control Number: 79663
Applicant: Harm Reduction Ohio

| Line of Business | Limits | | Additional Premium Per Layer |
|---|---|---|---|
| **Liability** | $ 1,000,000 | | $1,103 |
| | | **Subtotal:** | $1,103 |
| **Social Service Professional** | $ 1,000,000 | | Incl. |
| **Improper Sexual Conduct** | $ 1,000,000 | | $1,143 |
| | | **Subtotal:** | $1,143 |
| **Directors & Officers** | $ 1,000,000 | | $534 |
| | | **Subtotal:** | $534 |

# QBE INSURANCE CORPORATION

## ACCIDENT INSURANCE
## NEW BUSINESS
## QUOTATION

**Q1-2023-79663-ACC**

Applicant: (79663)
**Harm Reduction Ohio**
**935 River Rd., Ste. G**
**Granville, OH 43023**

**Proposed Effective Date: 08/01/2023**

Producer: (03268)
Kerber Agency LLC dba: Kerber Gost Ins. Agency
1754 Spyglass Circle
Vista, CA 92081

SUMMARY OF BENEFITS

PLAN B

| | |
|---|---|
| Accidental Death | $50,000 |
| Accidental Dismemberment Maximum | $50,000 |
| Accidental Paralysis | $25,000 |
| Aggregate Limit of Liability | $1,000,000 |
| Excess Accident Medical | $25,000 |
| Deductible | $0 |

COVERED PERSONS

Volunteers & Participants

OPTIONAL COVERED ACTIVITIES

None

**ANNUAL PREMIUM: $1,268**

**GENERAL CONDITIONS**

- A written request to bind coverage must be submitted to our office prior to the proposed effective date. Please use the bind order checklist located on the secure broker website to bind coverage.
- Monoline accident coverage is not available. Accident coverage can only be written in conjuction with General Liability.
- **Broker Commission is 15.0%.**

**SPECIAL CONDITIONS**

Refer to the Accident Insurance program brochure for information regarding these benefits, including exclusions and limitations.

**Desiree Reich**
Email: dreich@insurancefornonprofits.org
Direct Phone: 831-621-6014, Direct Fax: 831-621-6126
(800) 359-6422, Ext. 6014

**Nicole McNeil**
Email: nmcneil@insurancefornonprofits.org
Direct Phone: 831-900-9429, Direct Fax: 831-459-0853
(800) 359-6422, Ext. 9429

**www.insurancefornonprofits.org**

HRO_000587



Made possible
QBE

# Volunteer and Participant Accident Insurance Program

**QBE's Accident Insurance Program makes it possible for you to protect volunteers and participants in your care.**

- Up to $500,000 Accident Medical Expense benefits
- $50,000 Accidental Death benefit
- $50,000 Accidental Dismemberment benefit
- $25,000 Total Paralysis benefit

Protect your organization, your volunteers and your participants from the financial consequences of accidental injuries. This Volunteer and Participant Accident Insurance Program is designed to provide insurance protection for all your volunteers performing supervised and sponsored volunteer activities, on your premises or at another location. You can also select coverage for all participants engaged in supervised and sponsored activities.

### Protect your volunteers and participants

Just complete the Accident Insurance Questionnaire Form. If you have any questions, please contact your assigned underwriter or call toll-free at **800.359.6422**.

### Accident benefits for your volunteers and participants

Benefits are payable for injuries that result, directly and independently of all other causes, from a covered accident, while coverage is in effect, up to the maximum benefit selected.

### Accident Medical Expense Benefits

Accident Medical Expense Benefits include eligible medical expenses that are in excess of amounts paid by any other Health Care Plan, including individual, group medical or health benefit plans the covered volunteer or participant may have. In the event no other health plan or policy exists, benefits for these expenses will be payable like primary coverage, once the deductible is satisfied. The first eligible expense must be incurred within 26 weeks after the date of the covered accident. Eligible accident medical expenses must be incurred within one year of the covered accident.

### Covered expenses

Services and supplies payable when prescribed by a physician for injuries sustained in a covered accident include:

- Hospital bills, including room and board
- Emergency room and outpatient treatment
- Medical or surgical treatment by a licensed doctor
- Prescription drugs and medicines
- The services of a licensed or graduate nurse
- Ambulance expenses from the covered accident site to the hospital
- Dental care for injury to sound and natural teeth, up to $1,000, $300 per tooth

The benefit payment will be based on the usual and customary charges for medical services in your area.

NONPROFITS INSURANCE ALLIANCE GROUP

*A Head for Insurance. A Heart for Nonprofits.*

Proof of Insurance

**Including ALLIANCE OF NONPROFITS FOR INSURANCE (ANI) & NONPROFITS INSURANCE ALLIANCE OF CALIFORNIA (NIAC)**

**www.insurancefornonprofits.org**

VICTOR

## INDICATION OF TERMS

| | |
|---|---|
| REFERENCE NUMBER: | 3503530 |
| COMPANY NAME: | Harm Reduction Ohio |
| TOTAL PAYABLE: | USD2,400.00 |
| Broken down as follows: | |
| Premium: | USD2,400.00 |
| Policy Administration Fee: | USD0.00 |
| TRIA: | USD0.00 |
| BUSINESS ACTIVITIES: | Social Organisation |
| LEGAL ACTION: | Worldwide |
| TERRITORIAL SCOPE: | Worldwide |
| INDEMNITY PERIOD: | 6 months |
| WAITING PERIOD: | 8 hours |
| RETROACTIVE DATE: | Unlimited |
| WORDING: | Cyber, Private Enterprise (CFC-CY-0037 11 19) |
| ENDORSEMENTS: | Privacy Notice<br>Consequential Reputational Harm Extension Endorsement<br>Customer Payment Fraud Extension Endorsement<br>Incident Response Outside Of The Policy Limit Endorsement<br>System Damage And Rectification Costs Amendatory Endorsement<br>System Failure Extension Endorsement<br>Additional Insureds Condition Endorsement<br>Hardware Replacement Costs Extension Endorsement<br>Media Liability Amendatory Endorsement<br>Policyholder Disclosure Notice Of Terrorism Insurance Coverage<br>Schedule Of Information<br>Ohio Fraud Notice<br>War and Cyber War Exclusion Endorsement |
| SUBJECTIVITIES: | N/A |
| POLICY PERIOD: | 12 months |
| DATE OF ISSUE: | 17 Jul 2023 |
| OPTIONAL EXTENDED REPORTING PERIOD: | 12 months for 100%, 24 months for 150%, or 36 months for 200%, of applicable annualized premium |
| THE INSURER: | State National Insurance Company Inc. |
| QUOTE TYPE: | Admitted |

THIS QUOTATION IS ONLY VALID FOR 60 DAYS FROM THE DATE OF ISSUE

PLEASE REFER TO THE FOLLOWING PAGES FOR A FULL BREAKDOWN OF LIMITS, RETENTIONS AND APPLICABLE CLAUSES

# 13. Payment Address

Harm Reduction Ohio, 935 River Road, Suite G, Granville, OH 43023.

Harm Reduction Ohio's bank address: Chase Bank, 136 E. Broadway, Granville, OH 43023.

## ATTACHMENT EIGHT
## OFFEROR PERFORMANCE FORM

The Offeror must provide the following information for this section for the past seven (7) years. Please indicate yes or no in each column.

| Yes/No | Description |
|---|---|
| No | The Offeror has had a contract terminated for default or cause. If so, the Offeror must submit full details, including the other party's name, address, and telephone number. |
| No | The Offeror has been assessed any penalties in excess of five thousand dollars ($5,000), including liquidated damages, under any of its existing or past contracts with any organization (including any governmental entity). If so, the Offeror must provide complete details, including the name of the other organization, the reason for the penalty, and the penalty amount, and resolution for each incident. |
| No | The Offeror was the subject of any governmental action limiting the right of the Offeror to do business with that entity or any other governmental entity. |
| No | Has trading in the stock of the company ever been suspended? If so provide the date(s) and explanation(s). |
| No | The Offeror, any officer of the Offeror, or any owner of a twenty percent (20%) interest or greater in the Offeror has filed for bankruptcy, reorganization, a debt arrangement, moratorium, or any proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding. |
| No | The Offeror, any officer of the Offeror, or any owner with a twenty percent (20%) interest or greater in the Offeror has been convicted of a felony or is currently under indictment on any felony charge. |

If the answer to any item above is affirmative, the Offeror must provide complete details about the matter. While an affirmative answer to any of these items will not automatically disqualify an Offeror from consideration, at the sole discretion of the State, such an answer and a review of the background details may result in a rejection of the Offeror's Proposal. The State will make this decision based on its determination of the seriousness of the matter, the matter's possible impact on the Offeror's performance on the Project, and the best interests of the State.

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

Print or type. See Specific Instructions on page 3.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.
Dennis Cauchon

2 Business name/disregarded entity name, if different from above
Harm Reduction Ohio

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC ☑ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ ____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) ____

Exemption from FATCA reporting code (if any) ____

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.
935 River Road Suite G

Requester's name and address (optional)

6 City, state, and ZIP code
Granville, OH 43023

7 List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN,* later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**
___ – __ – ____

**or**

**Employer identification number**
[redacted]

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here** Signature of U.S. person ▶ Dennis Cauchon Date ▶ 7-19-23

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9.*

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)
- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

Department of Development

Development.Ohio.gov

Mike DeWine, *Governor* Jon Husted, *Lt. Governor* Lydia Mihalik, *Director*

July 24, 2023

Jennifer Phillips,
Grant Manager
Harm Reduction Ohio
935 River Road Suite G
Granville, OH 43023

SUBJECT: Affirmative Action Program Verification (AAPV)
**Effective Dates:** July 24, 2023 - July 24, 2024

Dear Jennifer Phillips:

A business desiring to participate in the State of Ohio procurement process must demonstrate to the Ohio Department of Development, Minority Business Development Division (MBDD) that the company has complied with all applicable federal and state affirmative action programs for at least the last year.

After careful review of the provided affirmative action documentation, MBDD has determined that Harm Reduction Ohio satisfactorily meets the requirements set forth in Section 125.111(B) of the Ohio Revised Code as is required for participation in the State of Ohio procurement process. This letter shall serve as the State's official certification.

Please note that the MBDD may conduct an audit of Harm Reduction Ohio affirmative action program to determine the company's continued compliance with Section 125.111 of the Ohio Revised Code.

As the Affirmative Action Program Verification indicates, the State of Ohio values diversity among its business partners and their employees and hopes to see them grow and prosper. Consequently, MBDD was delighted to be able to assist your company by approving your affirmative action program efforts. If you need any assistance or have questions about the Affirmative Action Program Verification, its objectives, or its operation, please contact the MBDD at 614.466.8380

Sincerely,

Monica L. Womack
Chief

HRO_000593

# AFFIRMATION AND DISCLOSURE FORM

Contractor affirms that Contractor has read and understands the applicable Executive Orders regarding the prohibitions of performance of offshore services, locating State data offshore in any way, or purchasing from Russian institutions or companies.

Contractor shall provide all the name(s) and location(s) where services under this Contract will be performed and where data is located in the spaces provided below or by attachment. Failure to provide this information may result in no award. If the Contractor will not be using subcontractors, indicate "Not Applicable" in the appropriate spaces.

1. Principal location of business of Contractor:

935 River Road, Suite G (Address)

Granville, OH 43023 (City, State, Zip)

Name/Principal location of business of subcontractor(s):

NEXT Harm Reduction Inc (Name)

22 West 27th Street, 5th Floor, NY,NY 10001 (Address, City, State, Zip)

(Name)

(Address, City, State, Zip)

2. Location where services will be performed by Contractor:

(Address)

(City, State, Zip)

Name/Location where services will be performed by subcontractor(s):

(Name)

(Address, City, State, Zip)

(Name)

(Address, City, State, Zip)

3. Location where state data will be located, by Contractor:

| | |
|---|---|
| (Address) | (City, State, Zip) |

Name/Location(s) where state data will be located by subcontractor(s):

| | |
|---|---|
| (Name) | (Address, City, State, Zip) |
| (Name) | (Address, City, State, Zip) |
| (Name) | (Address, City, State, Zip) |
| (Name) | (Address, City, State, Zip) |
| (Name) | (Address, City, State, Zip) |

Contractor affirms, understands, and agrees that Contractor and its subcontractors are under a duty to disclose to the State any change or shift in location of services performed by Contractor or its subcontractors before, during and after execution of any contract with the State. Contractor agrees it shall so notify the State immediately of any such change or shift in location of its services. The State has the right to immediately terminate the contract, unless a duly signed waiver from the State has been attained to perform the services outside the United States.

On behalf of the Contractor, I acknowledge that I am duly authorized to execute this Affirmation and Disclosure Form and have read and understand that this form is a part of any Contract that Contractor may enter into with the State and is incorporated therein.

By: [signature]
Contractor

Print Name: Dennis Cauchon

Title: President

Date: 7/25/23

# CERTIFICATION STATEMENTS O L L

*****SUPPLIERS MUST COMPLETE THE APPROPRIATE CERTIFICATION BELOW TO RECEIVE THE PREFERENCE.*****

**Any supplier who intentionally submits false or misleading information in an attempt to receive a scoring preference will be immediately disqualified and may be subject to administrative or legal action including debarment.** The State reserves the right to clarify any information during the evaluation process.

Does the cost of product(s) offered exceed 50% of the total offered cost for both products and services?
Yes (Go to A-1) No (Go to B-2)

## A. DOMESTIC PREFERENCE (BUY AMERICAN): Revised Code 125.11

**[Not applicable to "Excepted Products"]**

1. Where is each product being offered mined, raised, grown, produced or manufactured?
   United States: _______(State) Canada Mexico (Go to B-1)
   Other: (Specify Country)_______________________ (Go to A-2)
2. An end product is manufactured outside the United States but at least 50% of the cost of its components are produced, mined, raised, grown or manufactured within the United States. The cost of components may include transportation costs to the place of manufacture and, in the case of components of foreign origin, duty whether or not a duty free entry certificate is issued. Yes (Go to Section B-1) No (Go to Section A-3)
3. The Supplier hereby certifies that each end product, except the products listed below, is a domestic source end product as defined in the Buy American Act and that components of unknown origin have been considered to have been mined, produced, grown or manufactured outside the United States.

   ______________________(Item) ______________________(Country of Origin)
   ______________________(Item) ______________________(Country of Origin)

## B. OHIO PREFERENCE (BUY OHIO): Revised Code 125.09

1. The products being offered are raised, grown, produced, mined or manufactured in Ohio.
   Yes (Go to C) No (Go to B-2)
2. Supplier has **significant economic presence** within the State of Ohio:
   a) Supplier has paid the required taxes due to the State of Ohio Yes (Go to B-2b) No (Go to B-3)
   b) Supplier is registered with the Ohio Secretary of State
   Yes (Charter/Registration No.: ______________________) (Go to B-2c) No (Go to B-3)
   Questions regarding registration should be directed to (614) 466-3910 or visit the SOS website at: http://sos.state.oh.us/
   c) Supplier has ten or more employees based in Ohio. Yes (Go to C) No (Go to B-2d)
   d) Supplier has seventy-five percent or more employees based in Ohio. Yes (Go to C) No (Go to B-3)
3. **Border state supplier**: (Except products ***mined*** in Michigan)
   a) Supplier has paid the required taxes due to the border state Yes (Go to B-3b) No (Go to C)
   b) Supplier is registered with the applicable border state
   Yes (Registration No.: ______________________) (Go to B-3c) No (Go to C)
   c) Supplier has ten or more employees based in a border state. Yes (Go to B-3f) No (Go to B-3d)
   d) Supplier has seventy-five percent or more employees based in a border state.
   Yes (Go to B-3f) No (Go to B-3e)
   e) Is the supplier offering products that are raised, grown, produced, mined, or manufactured in a border state?
   Yes (Go to B-3d) No (Go to C)
   f) Specify which state: KY MI NY PA IN

## C. VETERANS PREFERENCE (BUY VETERAN): Revised Code 122.925 and Administrative Code 123:5-1-16

Is the supplier a certified Veteran Friendly Business Enterprise as defined in Administrative Code 123:5-1-01(OO)?
Yes No

**Supplement S Response: Information Security and Privacy**

IT Capacity. Harm Reduction Ohio (HRO) does not provide IT services to the state, nor does it have an IT department or a server. HRO uses Google and Microsoft cloud services and relies on those companies to provide systematic security for organizational information, such as Word documents, stored on the cloud services.

Organizational hardware. Harm Reduction Ohio owns two computers. No personal, medical or financial data are stored on these computers. The computers require different passwords to open and access Google and Microsoft cloud services or participate in a video call on Zoom or Microsoft Teams. No remote login to these computers is allowed.

Organizational software. Harm Reduction Ohio has accounts with national companies, including Google, Microsoft, Zoom, Adobe, PirateShip, Shopify, Canva, Intuit Quickbooks, PayPal, and Chase Bank. HRO data are stored on the servers of these companies. The data vary by service: Canva holds graphic designs, Quickbooks holds financial information, etc. No data are retained on HRO's two computers.

Naloxone orders. As a Project DAWN program, HRO receives online orders to mail naloxone to Ohio residents. About 20 online orders are placed per day. When the link is clicked on HRO's website, the person is directed to https://nextdistro.org/hro. New York City-based NEXT Distro processes orders on an encrypted system overseen by Program Director Dan Coello (dan@nextdistro.org) and Technical Program Manager Mohawke Greene (mohawk@nextdistro.org). ADD Sentence from DAN

HRO receives view-only access to a Google Sheets file that provides the information needed to mail naloxone kits: name, address, product requested, etc. A Memorandum of Understanding limits HRO's use of ordering information beyond what's needed for naloxone fulfillment. Specifically, the MOU prohibits:

· making this information public or disclosing it to a third party.

· copying it into a secondary dataset or email listserv.

· using it for promotional or solicitation purposes.

The MOU permits using "aggregate data to inform services, funder proposals, or for any other purpose." HRO uses aggregate data in this contract proposal.

HRO also distributes naloxone through volunteer lay distributors in Ohio. Information on lay distributors is maintained in a spreadsheet on Google's cloud service. Lay distributor information is not retained on HRO's computers.

Financial information. HRO keeps no financial information or tax information. Payroll is done by the Barber and Chodak accounting firm in Newark, Ohio. HRO and its payroll firm use Intuit's Quickbooks online system, which is connected to HRO's bank, Chase Bank. HRO's bookkeeping firm, Amethyst Financial Services of Columbus, Ohio, also uses the Quickbooks online system to code HRO transactions.

Risk assessment. HRO updates its computers to maintain the most current versions of security and other software. If problems arise, HRO calls consultant Joel Greff, owner of Share-a-tech in Bexley, Ohio, to solve problems. In January 2023, Mr. Greff (jgreff@shareatech.com) visited HRO's offices to harmonize our cloud services. While there, he conducted a brief security audit of court systems and reported that our computers and WiFi wireless router had good security.

Physical security. Harm Reduction Ohio operates from four offices above a coffee shop in Granville, Ohio. HRO's offices are locked when HRO personnel are not in the office. The exterior of the building has security cameras.

Disclosure of confidential information. HRO does not store or disclose confidential information, except as described above.

Theft of data. No data have been stolen from HRO, not from its cloud services or from the two computers the organization owns. HRO knows of no attempts to access or steal data.

Security incidents. HRO has never had a security incident related to physical or cyber property.