UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

________________________________

DENNIS CAUCHON, et al.,

Plaintiff,

v. Case No.

2:25-cv-0075

DWAYNE STEWARD, RAINA WILLIAM GOLDEN, TASHA TURNELL-BICKNELL, AND HARM REDUCTION OHIO,

Defendants.

________________________________

DEPOSITION OF

TASHA TURNELL-BICKNELL,

AS 30(b)(6) CORPORATE REPRESENTATIVE FOR

HARM REDUCTION OHIO

DATE: Thursday, July 30, 2026

TIME: 10:07 a.m.

LOCATION: Reminger Co., LPA

955 Yard Street, Suite 330

Columbus, OH 43212

REPORTED BY: Kayleigh Kinnamon

Job No. CS8359309

APPEARANCES

ON BEHALF OF PLAINTIFF DENNIS CAUCHON:
DENNIS CAUCHON, PRO SE
327 East Broadway
Granville, OH, 43023
denniscauchon@gmail.com
(740) 973-3814

ON BEHALF OF COUNTERCLAIM DEFENDANT DENNIS CAUCHON:
DAVID SHEARER, JR, ESQUIRE
Garvey Shearer & Nordstrom
2388 Grandview Drive
Fort Mitchell, KY 41017
dshearer@gsn-law.com
(859) 308-1490

ON BEHALF OF DEFENDANTS DWAYNE STEWARD, RAINA WILLIAM GOLDEN, and TASHA TURNELL-BICKNELL:
STEVEN CHANG, ESQUIRE
Reminger Co., LPA
955 Yard Street, Suite 330
Columbus, OH 43212
schang@reminger.com
(614) 232-2446



APPEARANCES (Cont'd)

ON BEHALF OF DEFENDANT AND COUNTERCLAIM PLAINTIFF HARM REDUCTION OHIO:
ELIZABETH MOYO, ESQUIRE
Porter Wright Morris & Arthur, LLP
41 South High Street
Columbus, OH 43215
emoyo@porterwright.com
(614) 227-2106



INDEX

| EXAMINATION: | PAGE |
|---|---|
| By Mr. Shearer | 7 |
| By Mr. Chang | 134 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 10 |
| Exhibit 2 | Termination Letter | 24 |
| Exhibit 3 | HRO Emergency Board Only Meeting - September 5, 2024 | 89 |
| Exhibit 4 | HRO Board Meeting Updated Meeting Link - September 15, 2024 | 93 |
| Exhibit 5 | Email from Dennis Cauchon - February 11, 2025 | 110 |
| Exhibit 6 | August Letter to ODH | 127 |



PROCEEDINGS

THE REPORTER: We are now on record. The time is 10:07 a.m. I am -- my name is Kayleigh Kinnamon. I'm the court reporter today assigned by Veritext to take the record of this proceeding.

This is the deposition of Tasha Turner-Bicknell, Harm Reduction Ohio, on -- taken on July 30, 2026, at Reminger Co., 955 Yard Street, Columbus, Ohio. I am a notary authorized to take acknowledgements and administer oaths in Ohio.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
- shall constitute written stipulation of such.

At this time, will everyone in attendance please identify yourself for the record, beginning from my left?

Page 6

MR. SHEARER: David Shearer, representing Dennis Cauchon, on the counterclaims against him.
MR. CAUCHON: Dennis Cauchon, Plaintiff and counterclaim Defendant.
MR. CHANG: Steven Chang from Reminger, representing all defendants.
MS. MOYO: Elizabeth Moyo from Porter Wright, representing counterclaim Plaintiff, Harm Reduction Ohio.
THE WITNESS: Tasha Turner-Bicknell.
THE REPORTER: Thank you.
And hearing no objection, I will now swear in the witness.
Will you raise your right hand?
WHEREUPON,
TASHA TURNELL-BICKNELL,
AS CORPORATE REPRESENTATIVE FOR
HARM REDUCTION OHIO,
called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:
THE REPORTER: All right. Thank you.

Page 7

EXAMINATION
BY MR. SHEARER:
Q Good morning. My name is David Shearer, and I just introduced myself. And I am going to be asking you a number of questions today. And we'll go through some ground rules first, but how would you like me to address you?
A My first name is fine.
Q Tasha is fine?
A Tasha.
Q Tasha? Tasha?
A Uh-huh.
Q Okay. That's -- I wanted to make sure I had it right. Okay. So we are here because you are -- you have been designated as a representative of HRO. And when I refer to HRO, are you fine if I say HRO as opposed to Harm Reduction Ohio?
A Uh-huh.
Q We both know what I'm talking about?
A Yes. Uh-huh.
Q Okay. So let me give you a few ground rules before I -- before we get started. One of them you already just violated. So there will be a number of questions today that you can answer yes or no to. Instead of the uh-huhs or uh-uhs, if you could

Page 8

verbally give us a yes or a no instead of, you know, shake -- nodding or shaking your head or the uh-huhs, uh-huhs.
Next, you may know what I'm asking, where I'm going with a question. If you could just let me spit the whole thing out before you start your answer. Likewise, I will try to let you get your entire answer out before I move on to my next question.
That will make it easier for us to talk, and more importantly, for her to take it down and for us to read it back later on. If there's any questions I ask you today that aren't clear or you don't understand, just let me know and I'll do what I can to straighten them out for you. That's not a problem.
And finally, we -- I don't know how long we'll be here today, but if, any point in time, you want to take a break, just let me know and we're able to do so. The only thing I would ask is that, if there's a question I've asked you, answer that question before we take our break. So with that, is there any other questions you have for us?
A No.
Q Okay. Just for the record, why don't you go ahead and give me your full name again, please?
A Tasha Turner-Bicknell.

Page 9

Q Okay. And can you tell me what your role is at HRO?
A I'm serving as the interim executive director.
Q Okay. And just by way of background, real briefly, how long have you been associated with HRO?
A I served as a board member from 2018 until November, when I stepped off the board to serve as the interim director.
Q Okay. November of '25 or November -- when you --
A November of 2024.
Q Okay. So November of 2024, you resigned as a director?
A Board member.
Q Oh, I'm sorry. Board member. And since have been the -- you've been the executive -- acting as the executive director since then?
A The interim executive director, yes.
Q Got you. Okay. So we have -- we are here today pursuant to a deposition notice, and that notice lists a number of topics that we were going to talk about today. Have you had an opportunity to review that notice?
A Yes.

Q Okay. So what I'm going to do is hand you a copy. We'll mark that as Defendant's 1. And do you guys -- there's a copy for you.

(Exhibit 1 was marked for identification.)

MR. SHEARER: You made these for me, Steve, but there's a copy for you.

MS. MOYO: Mr. Shearer, this one, I think, reflects an incorrect date.

MR. SHEARER: Okay.

MS. MOYO: So you know.

MR. SHEARER: So I'm sorry. I had -- let's go -- Steven just printed --

Let's go off the record.

MS. MOYO: Yeah.

MR. CHANG: Yeah. Let's go -- all right. So I --

THE REPORTER: All right. We're off. Time is 10:13.

(Off the record.)

THE REPORTER: We are back on record. Time is 10:18.

BY MR. SHEARER:

Q Okay. So we have Exhibit 1 in front of you. And so you have reviewed that?



A Yes.

Q Okay. And you are prepared to testify as to the topics contained therein subject to your counsel's objections?

MS. MOYO: Yes. And for the record, Counsel objects -- has provided an objection letter to Mr. Shearer. Ms. Turner-Bicknell will testify as a representative of HRO. Subject to those objections, she will not testify to Topics 5A and C -- 5C.

MR. SHEARER: 5A and C? Okay.

BY MR. SHEARER:

Q Okay. So probably the easiest way to do this is: Let's just start at the top with Topic 1A. So first topic is, "The organizational structure, operational control, and corporate governance of HRO during the transition of leadership from Dennis Cauchon to subsequent management."

So what may be easiest is -- I understand you are now the interim executive director. So why don't you tell me kind of what has happened with the leadership of HRO, starting since September of '24 until now?

And maybe if you just kind of want to give me a narrative and I'll probably have some actual questions for you. So if you want to tell me what --



so let's do this. Back in September of 2024, Dennis Cauchon was the president of the organization, correct?

A Correct.

Q Okay. And there were eight board members at the time?

A I would have to look at it to be sure. Yeah. You would have to look --

MS. MOYO: What -- I'm sorry. I can't hear --

THE WITNESS: I don't have that in front of me.

BY MR. SHEARER:

Q Okay. Why don't you tell me who you know were the board members in September of '24?

A Sure. Anne Trinh, Colleen Garlock, Billy Golden, Dwayne Steward, Jamie Decker, Molly True, and myself.

Q So that's seven. Was Mr. Cauchon a board member?

A No.

Q Was Mr. Cauchon ever a board member?

A Not to my knowledge.

Q Okay. So Mr. Cauchon was never at any point did -- since -- that you're aware of, a board member



of Harm Reduction Ohio?

A Not to my knowledge.

Q Okay. And so tell me how that -- in September of 2024, Mr. Cauchon was the president of HRO; is that correct?

A Correct.

Q Okay. Who was the chairman of the board?

A Dwayne Steward.

Q Was there a vice chair?

A Yes. That was Billy Golden.

Q So from then, September of '24 until the present, August of '26, tell me how that leadership structure has changed. I understand that you are the interim executive director, but what other changes were made?

A What's the specific question?

Q Okay. How many board members are there currently?

A Current board members are Adriana Whelan, Mahjida Steffin, Billy Golden, Jamie Decker, Elizabeth -- I can't remember her last name off the top of my head. Molly True, Jamie Decker.

Q That is seven. Is that it?

A I believe so.

Q Okay. Is Billy Golden still a director?

Page 14

A Billy Golden is the chair.
Q Okay. He's now chair. Dwayne Steward?
A Dwayne Steward is no longer on the board.
Q When did Dwayne Steward leave the board?
A I don't know the exact date.
Q Can you give me a rough time frame of when he left the board?
A I would have to look at it.
Q What would you have to look at for you to know that information?
A The calendar or the minutes. I just don't remember exactly when he left the board.
Q Can you give me a year?
A I -- I can't. I'm not sure if it was late 2025 or early 2026.
Q Okay. Does Dwayne currently hold any position with HRO?
A No.
Q Is James Decker still a board member?
A Yes.
Q Molly True?
A Yes.
Q Colleen?
A No.
Q When did Colleen leave?

Page 15

A Colleen left the board in 2026.
Q Okay. And then Anne?
A No. Anne is no longer serving on the board.
Q She what?
A No.
Q She's no longer a board member?
A Yes.
Q When did she leave the board?
A Anne left the board in 2025.
Q Okay.
A And I would have to check the exact date. I'm not sure.
Q When you say you would have to check the exact date, what documents would you refer to to check that exact date?
A The minutes from the board meetings.
Q Does the role of president still exist --
A No.
Q The position of president still exists?
A No.
Q When was that position eliminated?
A During the transitional time, we selected the title Executive Director. So that would've been in November of 2024.
Q Does the executive director have the same

Page 16

duties and responsibilities that the president formerly had?
A Yes.
Q Why did HRO make the decision to change the title?
A It was consistent with best practice in small nonprofits.
Q Since Dennis was, in your opinion, removed as president, has anyone else held the role of Executive Director, other than yourself?
A No.
Q As executive director, do you draw a salary?
A Yes.
Q And what is that salary?
A 89, 9, the same as the previous.
Q Okay. The -- so we have a board member -- or we have board of seven members. We have an executive director. What other positions/titles are there in HRO now?
A We have an administrator, Cecile Katz. We have a chief programs officer. We have a naloxone program manager. We have staffers. Their titles, some of them are what we call Regional Coordinators. We have staff that work in the office as part of the shipping team.

Page 17

Q Okay. So the first was the administrator. You mentioned that was Cecile.
A Cecile.
Q She was the administrator prior to September of '24?
A That's correct.
Q And then the next position you mentioned was the -- well, you mentioned the naloxone program manager. Who is the current naloxone program manager?
A Kelsey. Kelsey Bates.
Q I am going to show you what we previously marked in the deposition yesterday as Exhibit 1.
MR. SHEARER: How do you want to handle these for ease of -- I mean, it's just -- it's the bylaws that were Number 1 yesterday. So I don't know that we need to keep -- I mean, I don't --
MS. MOYO: Do you want to just call it Cauchon 1?
MR. SHEARER: Yeah. That's what I was saying. I don't think we need to keep reintroducing things and having multiple copies of the same thing with different numbers.
MS. MOYO: Let's refer to it as Cauchon Exhibit 1.
MR. SHEARER: Okay. That's fine.

Page 18

MS. MOYO: Is that okay?
MR. SHEARER: Yeah.
MR. CHANG: That's fine. I'm getting my copy. You guys can keep going.
BY MR. SHEARER:
Q I'm going to hand you what we have previously marked as Cauchon Exhibit 1.
MS. MOYO: And, David, I'm going to mark what she has as HRO 1.
MR. SHEARER: HRO 1, okay.
MS. MOYO: Is that okay?
MR. SHEARER: That's fine.
BY MR. SHEARER:
Q And if I could have you take a quick look at that document, please. And can you tell me what that is?
A Bylaws of Harm Reduction Ohio.
Q Okay. Are those the current bylaws?
A They are.
Q Okay. They have not been changed or amended since September of 2024?
A They have not.
Q Okay. Thank you. If I can have that back, please. So other than the change from eliminating a position of president and adding an executive

Page 19

director, have there been any other structural changes within the organization from September of '24 until now?
A What do you mean by structural changes?
Q I mean, do you know what, like, a flow chart is? Like, you have the president at the top. You'll have a vice president. You may have executive vice presidents. What I'm trying to get an idea of, we have -- you've told me the positions that exist.
We still have a board member or board. The board still -- the board currently consists of seven members. And have there been any other levels of either administration or management that have been added or eliminated?
A Other than?
Q Other than the position of president?
A And eliminated.
Q Or added?
A We added the naloxone -- the -- the shipping -- the shipping manager, Kelsey, running the naloxone shipping program.
Q Okay. And AmandaLynn Reese, what position does she hold with the organization currently?
A She is still the chief program officer.
Q Got you. Has anyone else served as the

Page 20

chief program officer, either on a permanent or interim basis, from September of 2024 until the present?
A Served in that role?
Q Yes.
A No, they did not have that title.
Q Okay. Did anyone fulfill the duties of the chief program officer without the title at any point in time from September of '24 until the present?
A Yes. While AmandaLynn was placed on administrative leave, we subsumed her -- people subsumed her duties for normal operations.
Q Got you. No one was brought in to do it. Just existing people took over those duties?
A Yes.
Q Got you. Okay. And when was AmandaLynn, what were the dates of her suspension?
A She was not suspended as far as I understand. She was placed on administrative leave.
Q Oh, okay. I'm sorry. That's -- yeah. I apologize. Administrative leave. So when were the -- what were the time periods for that?
A She was placed on administrative leave by Mr. Cauchon before he was placed on administrative leave. So that would've been September, early

Page 21

September.
Q Okay. And when was she, for lack of a better term, reinstated or removed from administrative leave?
A At the conclusion of the Independent Counsel's investigation.
Q Okay. Would that be the investigation by Ms. Nelson?
A Yes.
Q Okay. And do you know when that investigation was concluded?
A I don't know the exact date.
Q Okay. Do you know the month?
A October of 2024.
Q So let's move on to 1B, if we can.
A Back to this document?
Q Yes, please. So we're probably going to keep that in front of you today because I will have a number of -- we'll kind of, you know, run through it. I can read it. I can tell the topics, but it may be easier for you to have it in front of you as well.
The 1B is, "The complete factual basis and documentation for the unanimous board action on November 4, 2024, terminating Cauchon's employment as president." So why don't you tell me why Mr. Cauchon

Page 22

was, in your opinion, terminated in -- on November the 4th of 2024?
A He had been insubordinate to the board.
Q Were there any other reasons?
A Not that I can think of at this time. There were lots of examples of insubordination --
Q Sure. And we'll talk --
A -- but they would all fall under, I believe, insubordination.
Q Got you. And we will talk about those. So I just wanted to make sure there was -- the only grounds that HRO was relying on is the insubordination.
MR. CHANG: Objection.
BY MR. SHEARER:
Q If there are other grounds, are there other grounds other than insubordination for Mr. Cauchon's termination in -- on November 4th of 24?
A He was terminated for insubordination.
Q Okay. So why don't you tell me what were the act -- what was the act or were the acts of insubordination which led to his termination?
A He did not comply with being placed on leave of absence. He continued to engage in work after we warned him several times in writing. He sent the

Page 23

letter to the ODH without moving forward, as we had agreed, in consulting a lawyer and conducting an investigation.
He did not participate in the investigation. He continued to access bank accounts. He removed staff from accounts that needed to access them to do their work. He placed a lock on supplies in the office where employees could not access the supplies they needed for work. He continued to come into the office.
Q Is there anything else?
A I think, probably.
Q Okay. Then why don't you tell me what the other reasons are?
A No. I thought --
Q I'm talking about the other --
A -- these are examples of insubordination.
Q What other examples? And so what I want to know are the examples of insubordination which led to the November 4th termination letter.
A I -- I -- I think those -- those are -- that's a good summary.
Q Okay. If there are additional ones, I would like to know about them. Are you aware of any additional, I have --

Page 24

A Insubordination?
Q Yes.
A He verbally told employees that he did not plan to cooperate with his leave of absence or the investigation. And I can't think of any other at this time.
Q Okay. So why don't we -- why don't I hand you what we'll mark as Exhibit 2. And this is, oh, I can put a sticker on that real quick.
(Exhibit 2 was marked for identification.)
MS. MOYO: HRO Exhibit 2?
MR. SHEARER: HRO Exhibit 2.
BY MR. SHEARER:
Q I'm going to have you take a quick look at that and tell me if you're familiar with that document.
A Yes, I am.
Q Okay. And this is -- what -- well, you tell me. What is this document?
A This is the termination letter sent to Mr. Cauchon on November 4th.
Q Okay. Do you know who authored this letter?
A The board of directors with the advice of Counsel.

Page 25

Q Okay. And so I see, if I go to Page 2 of the document, that has the signatures of seven board members, it appears? Is that a yes?
A Is that a question?
Q Yes.
A What was the question?
Q Is that the signature of the board members?
A Yes.
Q And is that your signature above your name?
A Yes.
Q Okay. Did you all conduct a meeting in person to execute this? I -- how were the signatures obtained?
A Signatures were obtained electronically.
Q Okay. When was it decided to issue this letter to Mr. Cauchon?
A When was it decided to issue this letter?
Q Uh-huh.
A It was part of the decision-making. It's the part of the process of termination.
Q Okay.
A To send a termination letter.
Q Okay. So why don't you tell me how the process of termination played out with regard to Mr. Cauchon? And I can -- specifically, when was his

termination first contemplated by the board?
MR. CHANG: Objection. Form.
THE WITNESS: I can't speak to the contemplation of individual parties.
BY MR. SHEARER:
Q Okay. When did the board, as a whole, consider, first consider, first discuss the possibility of Mr. Cauchon's termination?
A Individual board members may have suggested that Mr. Cauchon be terminated anywhere from the time that he was placed on leave to when he -- the decision was formally made based on his actions. The formal discussion about where we held a vote to terminate him was in October.
Q Okay. Do you recall the date of the October -- well, let me just -- was there a formal meeting of the board to discuss his termination?
A His termination was discussed at a board meeting.
Q Okay.
A A formal board meeting.
Q How many board meetings was his potential termination discussed?
A I don't -- I -- I couldn't say. I'm not sure.



Q Okay. Would it be fair to say that ultimately at a board meeting though, the decision was made to terminate Mr. Cauchon?
A Yes.
Q Okay. And what was the date of that meeting?
A I believe it was October 14th.
Q So was that a formally noticed meeting of the board of directors?
A What do you mean by formally noticed?
Q Well, why don't you tell me how meetings are scheduled of the board -- for the board to meet?
A Typically, the board meetings are noticed at least two weeks in advance, and an agenda is then shared in documents, et cetera.
Q Okay.
A The reason why I said that is that during this period of time, there were some emergency meetings, but all board members were noticed.
Q Okay. Do you know the date of those emergency meetings? Dates.
A I couldn't come up with them. I couldn't come up with that without looking at the -- the dates of all the meetings.
Q Okay. And what documents would allow you to



know the dates of those meetings?
A The minutes.
Q The minutes of the meetings?
A Uh-huh.
Q Okay.
THE REPORTER: Is that a yes?
THE WITNESS: Yes.
BY MR. SHEARER:
Q And those minutes are maintained by HRO?
A Yes.
Q I assume stored electronically?
A Yes.
Q Okay. So if I could have you look at Cauchon Exhibit 1, and we'll look at on Page 2, Provision 10 or Section 10. It refers to "special meetings."
A Okay.
Q Is that -- you're using the phrase emergency meetings. Is that the same thing in your mind, or are those different types of meetings?
A Emergency meeting would be a meeting that would need to occur in less than two weeks.
Q Okay. Is there any provision in the bylaws for emergency meetings?
A I don't know that it's explicitly discussed



in these bylaws.
Q Okay. Do you know if there was any provision for emergency meetings in the procedure or -- well, let me say this. Do you know if there was any provision for emergency meetings in any HRO handbook, policies, procedures, any written -- any written procedure for emergency meetings?
A I don't know what documents you're referring to.
Q I'm asking -- well, I don't either. I'm asking you if --
A Okay.
Q You are here speaking on behalf --
A Okay.
Q -- of HRO. You are the corporate representative of HRO. So what I am asking is: Are there any documents that you're aware of that HRO has that speak to or address how emergency meetings may occur?
A Not that I'm aware of.
Q Okay. And by that, I mean notice, procedure, anything like that. You're not aware of anything?
MS. MOYO: Objection to form. You can answer.

THE WITNESS: Not that I'm aware of.
BY MR. SHEARER:
Q Okay. How does a special meeting differ from an emergency meeting?
A Emergency meeting, we had emergency issues to discuss. For example, when Mr. Cauchon was continuing to access our bank account, when Mr. Cauchon had locked the supplies and our staff could not access those materials. These were direct threats to daily operations, and the board needed to convene to discuss in crisis management.
Q Okay. Were there meetings or were there -- I'm sorry. Were there minutes kept at these meetings?
A Yes.
Q Okay. Were these meetings recorded?
A Not to my knowledge.
Q Okay. How many emergency meetings were there to discuss Mr. Cauchon's actions?
A I don't know off the top of my head. I'd have to count them.
Q Okay. What would you need to do -- what documents would you have to be able to refer to to tell me the number of meetings?
A The minutes, the records from the meeting.
Q All right. What is HRO's procedure for



recording meetings, be they special, regular, or emergency?
A I don't -- not -- I don't -- I don't know. That's not something that I'm aware of.
Q Okay.
A That we -- are you -- rephrase the -- ask me the question again.
Q Sure.
A I don't think I understood you.
Q Yes. Are board meetings, be they special meetings, emergency meetings, or just regular run-of-the-mill meetings, are those recorded in any fashion?
A I can't speak to whether they ever have been. I -- I'm not sure.
Q Okay. Are you aware of any meetings concerning Mr. Cauchon that were recorded?
A I don't know. I'd have to -- I don't know.
Q Okay. Okay. Can I have the exhibit back, please? Thank you. So if I could have you look at Section 3. Again, that's on Exhibit Cauchon 1.
MR. CHANG: Counsel, for clarity, can you state the article as well?
MR. SHEARER: Article 3, Number 3.
MR. CHANG: Thank you.



BY MR. SHEARER:
Q And that has the provision for regular meetings. Does that contain the provision for regular meetings of the board?
A Yes.
Q Okay. And it requires a two-week notice?
A What's the question there?
Q Does it require a two-week notice?
A At least two weeks in advance is what it says.
Q Okay. Is a meeting still a valid meeting if the requisite two-week notice is not provided?
A Yes.
Q And why is that?
A Because in an --
MS. MOYO: I'm going to object to the form, but you can answer.
THE WITNESS: When an emergency situation arises, a board must meet to discuss and make a plan to respond, to protect the organization.
BY MR. SHEARER:
Q And how does HRO define emergency?
A I don't know that there's a definition of emergency in the bylaws.
Q Who determines whether an emergency meeting



needs to be held?
A The board members.
Q Can any board member on his or her own call an emergency meeting?
A If they felt like there was an emergency, a board member could ask for an emergency meeting.
Q Who would that board member ask?
A All of the board.
Q Okay.
A Board members.
Q Okay. And then is there a specific number of board members that must agree that an emergency meeting should be held?
A I -- we -- I -- I think we've already stated that the emergency meetings aren't -- aren't discussed in this document, so I don't know what that question is.
Q Right. Well, so you are here on behalf of HRO.
A Right.
Q And you have told me that we have regular meetings, we have special meetings, and we have emergency meetings. So what I am asking you about is the process on how emergency meetings are scheduled. And so what you have told me is that any board member

Page 34

can request an emergency meeting; is that correct?
A I -- I -- I think so.
Q Okay.
A Okay.
Q And when a board member requests an emergency meeting, how is it determined whether or not the emergency meeting will in fact take place?
A I don't know. I don't -- because I don't really understand your question.
Q Okay.
A I only have the experience of going through an emergency with HRO.
Q Okay.
A And having those emergency meetings to respond to those specific emergencies.
Q Right. And we are here just solely talking about HRO. So at HRO, you've told me a board member can request an emergency meeting?
A That is evidenced by the emergency meetings that we had.
Q Okay. And so what I --
MR. CHANG: I'm going to have a standing objection to this line of questioning being outside the scope of the topics that have been so noticed. I'm not going to keep objecting, but you can

Page 35

continue.
MR. SHEARER: Okay.
BY MR. SHEARER:
Q So we have emergency meetings. You can -- okay. And a -- you've told me that a member can request an emergency meeting, or a board member, correct?
A I've said that we had emergency meetings and board members asked for those meetings.
Q Okay. Is there a formal policy or procedure in place at HRO that governs how emergency meetings are held or conducted?
A Not to my knowledge.
Q Okay. In your time -- well, has HRO ever conducted any emergency meetings other than meetings that concern Mr. Cauchon?
A The meetings -- the emergency meetings concerned more than Mr. Cauchon. They were about daily operations also. So I'm not sure exactly what that question is.
Q Okay. How many emergency meetings has HRO held?
A I don't know off the top of my head.
Q Okay. Are you aware or have there been any meetings -- any -- I'm sorry. Any emergency meetings

Page 36

that did not discuss Mr. Cauchon?
MS. MOYO: Objection. Asked and answered.
You can answer.
THE WITNESS: I -- I don't know.
BY MR. SHEARER:
Q Okay. Regular meetings require at least 14-day notice. And special meetings also on Article 10 require 14-day notice. What is the difference between a regular meeting and a special meeting?
A I -- so a special meeting could be something that maybe was at a time of year where there was not a plan for a board meeting, or a special meeting could be a meeting that was about a special topic or had maybe a special reason that we would be having it.
I mean, that's what I understand when I read this. I don't have special meetings that I'm thinking of as examples, but when I read that, that's what I -- that's how I interpreted it as a board member.
Q Okay. But you are here as the representative of HRO. So what -- my questions are, not you individually, but my questions are the corporate knowledge of HRO.
A Yeah. The -- my -- the --
MR. CHANG: Wait. I don't know for

Page 37

diverging context. Standing objections as to scope. There is no topic on the policy and procedure of notices, and you've strayed far beyond the topic of his termination. But standing objection so I don't have to keep objecting, but I thought it was something different.
MR. SHEARER: Okay.
MR. CHANG: Go ahead.
MR. SHEARER: I believe it was covered by 1A, but that's -- it's neither here nor there, so.
MR. CHANG: Go ahead.
THE WITNESS: What's the question?
BY MR. SHEARER:
Q The question --
MR. SHEARER: Can you read the question back, please?
THE REPORTER: Absolutely.
(The reporter repeated the record as requested.)
BY MR. SHEARER:
Q Okay. So what I was -- meant to ask, the difference between a special meeting and an emergency meeting. And --
A I -- I thought I -- I thought we already answered that.

Page 38

Q Okay. And.
A Well, is that -- what's the question?
MS. MOYO: She answered as the corporate representative of HRO.
MR. SHEARER: So -- yeah. She answered that. Right. And then I had a following question. And then that's when -- then my statement was --
BY MR. SHEARER:
Q Well, my question was, on behalf of HRO, as -- I understand what you interpreted as a board member, but speaking for HRO, do you have a different understanding other than what you just explained to me?
A That is how I've -- the organization understands it.
Q Okay. So I want to go back to Topic 1B real quick. And that's when you gave me the list of items of insubordination that Mr. Cauchon committed. And the very first one that you told me was the letter to ODH?
MS. MOYO: Objection. Form.
BY MR. SHEARER:
Q So what I will do, just so we're on the same page, is have you take a look at what had previously been marked as Cauchon 18. And I will have you look -

Page 39

- I'll let -- they get -- wait until -- I'll wait till they dig it down.
So I'll have you look at Page 2 of that document, and what I'm interested in is the letter. Is that the letter that you are referring to when you said -- when you testified that the letter to ODH was an act of insubordination?
A Yes.
Q And that is the letter attached to Cauchon 18?
A Yes.
Q Okay. If I could have that back, please. Were there any other communications with ODH that you're aware of that consisted of acts of insubordination other than this September 3, 2024, letter?
A After the time that he was placed on administrative leave, any communication where he would represent himself as representing HRO would be an act of insubordination.
Q Okay. Were there additional communications with ODH after the suspension from HRO and that's by Mr. Cauchon?
A I would have to look. I'm not sure. I know there are many communications, but as far as the

Page 40

timeline of if they were before -- if they were after he was terminated or after he was placed on administrative leave, I would have to look.
Q Okay. As we sit here today, you're not able to tell me of any specific communications after -- or other than this September 4, 2024 letter?
MS. MOYO: Objection to form.
You can answer.
THE WITNESS: After September? Yeah. I think he continued to contact them for a year afterwards. Maybe more.
BY MR. SHEARER:
Q Do you know the particulars of those communications, and that, by, I mean dates or topics?
A Well, we have -- there's -- I think they're all part of the -- the documents that have been produced.
Q Okay. You also testified that one of the acts of insubordination was that Mr. Cauchon did not participate in the investigation?
A That's correct.
Q Okay. What investigation are you referring to?
A The HRO conducted an investigation of the conflict of interest and the complaints that we

Page 41

received of the hostile work environment.
Q Okay. So the conflict of interest, would that be in reference to AmandaLynn Reese?
A That the -- yes. The questions that were brought forward about potential conflict of interest.
Q Okay. And he did not participate in that investigation?
MS. MOYO: Objection to form.
You can answer.
THE WITNESS: The investigation was also about hostile work environment, the complaints that we had received. And it is my understanding that he did not cooperate with that investigation and participate.
BY MR. SHEARER:
Q Okay. Were there two separate investigations, or was it one combined investigation?
A I don't really understand that question.
Q Okay. You said there was an investigation into hostile work environment and there's an investigation into the potential conflict of AmandaLynn Reese.
And so what I want to understand is his insubordination, is it not participating in one investigation? Is it not participating in two

Page 42

investigations? Or were those two investigations all one big investigation?
A The firm that conducted the investigation, it's my understanding that they contacted Mr. Cauchon and wanted to include him in their interviews and part -- as part of their investigation. It's my understanding that he did not participate.
Q Okay. And what firm was that?
A Maritza Nelson.
Q Okay. One of the acts of insubordination -- was one of the acts of insubordination continuing to access bank accounts?
A Yes.
Q Okay. Tell me what specifically Mr. Cauchon did to access bank accounts that was an act of insubordination?
A He sent emails to our administrator, Cecile Katz, and another employee, Jen, before she quit, letting them know that he was in control of the bank account and that if they needed to do anything for HRO business, they needed to go through him. In addition to that, he, per bank records, accessed the bank account consistently.
Q When you say "access," what do you mean by that?

Page 43

A He continued to have access to the account to review it, monitor, and use the funds.
Q Okay. When you say "use the funds," do you mean spend the funds?
A He would communicate when -- with the administrator and -- and e-mail and say, I did X, Y, and Z, which demonstrated that he was accessing the -- the account.
Q Okay. No. I understand accessing. So accessing is -- why don't you tell me what you mean by accessing? I don't want to put words in your mouth.
A Continuing to be -- to gain access through either going into the bank in person or accessing it remotely through any means that one has to access bank accounts remotely, monitor the funds that are in there, and use those funds to pay -- conduct HRO business.
Q How long did Mr. Cauchon continue to access HRO -- the HRO account after his suspension?
A Until we vacated the account.
Q And when was that?
A I can't think of the exact date.
Q What bank was that account?
A The one that he was continuing to access?
Q Uh-huh.

Page 44

A Was the Chase account. That was the primary bank account for HRO.
Q Okay. And you testified that he continued to distribute or spend funds from that account?
A Yes.
Q When did that stop?
A We vacated the account, so he could still be using the account.
Q Okay. And what did he use the funds for?
A What time period are we referring to at this point?
Q At any point in time after his suspension until the account was vacated?
A He used the funds to sign a new lease for an office space and pay rent payments.
Q Is there anything else that you're aware of that Mr. Cauchon used HRO funds for from the Chase account?
A He -- he could have used it -- I mean, I -- I can't say for sure. I would have to have the accounts in front of me to be able to detail it.
Q Okay. As we sit here today, are you aware of any expenditures by Mr. Cauchon from that account other than to pay rent?
A I would have to review it. I can't say

Page 45

because he had control of the account. He removed other people from the accounts.
Q Whom did he remove from the account?
A Initially, from the -- he restricted access. A woman named Jen, who was working in QuickBooks, he restricted her access to QuickBooks. Cecile Katz continued to have access, but Dennis sent an e-mail to her letting her know that anything she needed to do needed to come through him first.
Q Anyone else?
A When the board of director -- when the chair of the board and the vice chair went to the bank in person, they were told that they had been instructed to not allow the board to access or have any information about the accounts.
Q Okay. Who were the signatories on the account prior to Mr. Cauchon's suspension?
A Mr. -- Mr. Cauchon and Cecile Katz.
Q Okay. And did that change at any point in time after his submission -- I'm sorry, after his suspension?
A After he was placed on administrative leave?
Q Correct.
A We were not able to -- to add anyone to the Chase account. They continued to -- we -- he blocked

Page 46

our access to that account.
Q Okay. Prior to Mr. Cauchon being placed on administrative leave, so he -- my understanding, he was a signatory?
A Uh-huh.
Q Cecile was a signatory. But who had access to log into the account and have access to it?
A It's my understanding that those two were the signatories on the account.
Q Okay. And by signatories, you're -- that's the same thing as having access to the account?
A Uh-huh.
Q That's a yes?
A I -- I don't -- I don't -- I would have to review the definition of a signatory.
Q Okay. Are you aware of anyone else who had access to the account prior to Mr. Cauchon being placed on administrative leave other than himself and Cecile?
A We had credit cards that people could use to buy shipping supplies and things for -- for work. But if you're talking about, you know, going into the bank and accessing the accounts --
Q Right.
A -- it -- to my knowledge, it was those two

Page 47

people.
Q Okay. And did Mr. Cauchon change that after being placed on administrative leave?
A He -- I -- I -- I don't know. He told Cecile that she had to come through him, but she was able to still access the account.
Q Okay. You mentioned Jen. What is Jen's last name?
A I would have to -- I would have to look.
Q Okay. You mentioned that he restricted her. You initially, I believe, testified that she was one of the people whose access to the account was changed, but it's --
A It's QuickBooks.
Q Right. So just when we were talking about Jen's access, that is to QuickBooks?
A Yes.
Q Jen did not have access to the bank account?
A I don't know.
Q Okay.
A Because Mr. Cauchon controlled it at that time.
Q Got you.
THE WITNESS: I think I'd like to take a break.

Page 48

MR. SHEARER: Yeah, absolutely. I'm sorry. Yep.
THE REPORTER: All right. Going off record. Time is 11:14.
(Off the record.)
THE REPORTER: We are now back on record. Time is 11:29.
BY MR. SHEARER:
Q Okay. We were talking about the acts of insubordination and specifically talking about the access to the bank accounts. Is the only bank account we are -- or that you are referring to, the Chase account, or was there more than one account?
A We had -- HRO had another -- had another account at First Federal.
Q Okay.
A But we were able to gain control. The board was able to gain control of that account.
Q Okay. How did it gain control of that account?
A We contacted the bank manager. The chair of the board and myself, serving as interim director, went to the bank. Actually, I would have to think of the date because I don't -- I can't remember. I was probably not the interim director at that time, but

Page 49

the chair and another board member went to the bank. We provided documents and followed their procedure for removing a former employee from the account.
Q Okay. Did HRO ever gain access to the Chase account prior to it being -- your term was vacated?
A Cecile had access, but we were not able -- at -- our attempts to communicate with the bank staff to tell them that Mr. Cauchon was no longer employed by HRO, they were not -- they didn't cooperate.
Q Okay. Okay. Another example of the insubordination that you gave me was the "removal of staff." What are -- what were you referring to with that?
A Restricting access to accounts. QuickBooks.
Q Okay. And that would be just Jen?
A I think there may have been -- I think Cecile's access may have been limited at one time as well.
Q To QuickBooks?
A Yes.
Q Anyone else?
A Not that I'm aware of.
Q Okay. I appreciate that answer, but I -- what I wrote down when you were giving me the examples of the insubordination before was the -- I thought you

Page 50

said, "removal of staff"?
A (No verbal response.).
Q Okay.
A I don't -- what do you mean by "removal of staff"?
Q I don't know. I wrote down what you said, so --
A Restricting access -- restricting HRO's access to our accounts.
Q Yeah. This is a separate -- so you gave me a number -- you listed a number of examples of insubordination --
A Uh-huh.
Q -- one of which was the banking activity. So I was moving on from the banking activity. And the next one that I wrote down, and maybe I wrote that wrong, was "removal of staff." And so by that, just I intuitively, in my head, thought, does that mean someone was fired or someone was demoted or --
A No.
Q I don't know.
A No. I -- I -- I don't think that's what I said. I don't think I said anybody was -- that -- that somebody was demoted.
Q Well, I didn't say demoted. I -- you just

Page 51

said removal. I wrote down, "removal of staff."
A Restricting -- what I meant by removal of staff is restricting our access, HRO's access to HRO's property.
Q Got you. Got you. Got you.
A The bank account, the QuickBooks. There was some restricting of access to the website briefly. So what I meant -- what I was referring to by removal, removing our access.
Q Got you.
A Restricting our access. At one point, you know, maybe a password was changed. A two-factor authentication was placed at -- giving him sole control.
Q Okay. You mentioned website access was restricted. Tell me about that. What do you -- what specifics do you have regarding that?
A When Mr. Cauchon was terminated, he did not cooperate with turning over any passwords, information, login information. As you can imagine, being the president for some years, he had a lot of information that belonged to HRO, a lot of passwords and logins. And the domain, for example, that is associated with the website, HRO did not receive any handover of any login passwords to -- to gain control

Page 52

of that.
Q Of the website?
A Uh-huh.
Q Okay. When you started to give your answer, it sounded like you were talking about maybe more than just the website. But was that intended to be the passwords, two-factor authentication?
A I was referring to his insubordination upon termination, where he did not return property of HRO. And among that property, I would include passwords, logins for -- and the website is one example.
Q Okay. What are the other passwords, logins, that he did not return or did not give to HRO?
A They are numerous. There's a -- a sheet, I believe, that was provided.
Q Okay. Let's limit it to the website right now. How was access to the website limited?
A He did not turn over the password to go into the -- to the account and be an administrator. Those were not -- it wasn't turned over to HRO.
Q Did HRO ultimately regain control of the website?
A Partially.
Q And what do you mean by partially?
A Mr. Cauchon still maintains control of the

Page 53

domain. I believe that the passwords were submitted at some point as part of this proceeding.
Q Okay. Does HRO own the domain?
A I don't know.
Q Does Mr. Cauchon own the domain?
A I don't know.
Q One of the examples of insubordination was -- that you mentioned was, "Placed lock on supplies"?
A Yes.
Q Okay. Can you describe that for me?
A We were notified by an employee that when they went into the office, there had been locks placed on the storage cabinet, I think, or wherever, that was kept in the office. And those supplies were locked. And -- and the employee told the board that they -- that Mr. Cauchon instructed them that they could get supplies. They just needed to go through him.
Q Okay. Who was the employee?
A Patrick Bollard [ph].
Q And what type of supplies are you referring to?
A Naloxone, fentanyl test strips, other types of outreach materials.
Q So did Mr. Cauchon deny or limit access to the naloxone?

A Yes.
Q Okay. The entire supply?
A To my knowledge. Some employees may have had some supply with them at the time that -- he restricted access to everything that was in the HRO office.
Q Is Naloxone stored anywhere other than the HRO office?
A During his tenure, I don't know. I can't speak for sure.
Q Okay. For what period of time did he deny access or did he place lock on -- place the lock on the supplies?
A He placed the lock, I believe, a few days before he was terminated.
Q Okay. And did HRO ever either replace the lock or gain access to the supplies that were locked up?
A Through work with Counsel, we obtained the supplies later.
Q Okay. So Patrick is the employee that you mentioned, and it sounded like it was -- he was given the supplies, but he simply -- but he had to go through Mr. Cauchon?
MS. MOYO: Objection to form.



You can answer.
THE WITNESS: I didn't say he was given supplies.
BY MR. SHEARER:
Q Okay. Sorry. I misunderstood. So Patrick was denied supplies?
A What I said was that Patrick reported to the board that when he arrived at the office, locks had been placed on the supplies and that Dennis told him that he could -- had to go through him if he wanted to get the supplies.
Q Okay. Can you describe for me -- I've not seen the office or what it looked like, so when we talk about the supplies in a lock, are they in a -- are they in a room? Are they in a cabinet? A series of cabinets?
A I -- all of the above. I think they're in a room. And I think that there was a variety of different ways they were stored in cabinets, shelves.
Q Were the naloxone supplies secured in some fashion prior to Mr. Cauchon's suspension and then ultimate removal?
A I think -- didn't I just answer that? Are you asking me if we regained control with our supplies?



Q No. No. Before -- no. Before all -- before his suspension. So I understand you testified that Naloxone is stored somewhere. Is it -- was it secured -- and this is prior to his suspension. Was it secured in some fashion?
A There was not locks on it. The -- the -- or employees were custom -- they would go in and get supplies as needed.
Q So if you had access -- if an employee had access to the office, they would also have access to the Naloxone. It wasn't a separate step?
A To my knowledge. To my knowledge, we were notified when the locks were placed. And that prior to that, Patrick could access the supplies.
Q Okay.
A And there was also e-mail communication.
Q Regarding?
A Telling everyone that they could get supplies if they wanted to go through Dennis.
Q The next topic that I wrote down, and hopefully I wrote it down correctly, was that he continued to come into the office?
A Yes.
Q Okay. And I assume we're talking -- did -- at that time, in September of '24, did HRO only have



the one physical location?
A Yes. We had a -- we -- we have another storage place in Cincinnati, but that was the office, you know, the office where people worked.
Q Okay. And who -- at the time of Mr. Cauchon's suspension, who reported to that office and worked in that office on a daily or regular basis?
A Cecile Katz.
Q Okay.
A Patrick, Molly.
MR. CHANG: Counsel --
THE WITNESS: There could be regional coordinators.
MR. CHANG: Counsel, just standing objection to the word "suspension." I'm not sure if you're --
MR. SHEARER: I'm sorry. I used suspension, administrative leave.
BY MR. SHEARER:
Q Cecile, Patrick, Molly?
A Uh-huh. And it was -- I mean, other people could come. Like, regional coordinators who worked remotely. It wouldn't be out of the question for someone else to come there that worked for us.
Q So after being placed on administrative

Page 58

leave, how long did Mr. Cauchon continue to come into the office?
A Consistently.
Q Okay. When did that stop?
A I don't know that it ever did. We vacated the office, HRO.
Q When did HRO vacate the office?
A Wow. I'd have to think the exact date. In early 2025, I believe.
Q Did HRO get a new office at a different location?
A Yes.
Q When was that?
A At the same time.
Q Sometime in early 2025?
A Yes.
Q Why did HRO not continue to use the original office?
A Because Mr. Cauchon continued to be there.
Q I'm assuming -- well, actually, I don't want to assume. At some point, did HRO remove its possessions, furniture, supplies from the original office?
A Through Counsel, we were able to do that.
Q Another item of insubordination that you

Page 59

mentioned was, "verbally told employees that he did not plan to cooperate." I'm assuming that sounds like it overlaps with the not participating in the investigation that we already discussed, or is that a separate --
A What's -- what's the question?
Q No. What I wrote down was the last item of insubordination that you mentioned was -- I wrote down, "verbally told employees that he did not plan to cooperate." And so when you say "cooperate," what are you referring to? Cooperate with what?
A With his administrative leave.
Q So let's go back to Exhibit 2, if we can, which was the termination letter. And so I want to go through -- you have mentioned the acts of insubordination that we've discussed. And so there were some other items in here that I wanted to go through in the letter.
If we go down to -- in the first paragraph, you say, "The investigation determined that AmandaLynn does not have a conflict of interest with respect to the Ohio Department of Health, ODH, contract." Do you see where I read that?
A Yes.
Q Okay. And would that have been the Nelson

Page 60

investigation?
A Yes.
Q Was there a separate -- any other separate investigation other than the Nelson investigation?
A No.
Q Okay. It mentions that your September 3rd letter to ODH claiming that a conflict of interest existed and should have been reported to HRO was based on and contained numerous inaccurate and misleading statements.
So what I would like to do is go back to Cauchon 18, which is the September 3rd letter to ODH. And it is HRO 292 and HRO 293 for Bates numbers. And if I could have you take all the time you need. And what I want to do is have you tell me what the numerous inaccurate and misleading statements are?
A Okay. Do we want to just go through it from the top or --
Q Yeah. If that's easiest for you. So that's probably the easiest.
A So the first -- the first one that I noticed, he says that AmandaLynn Reese has a conflict of interest.
Q Okay.
A Additionally, he states that AmandaLynn has

Page 61

declined to disclose details on her outside employment. That is also inaccurate.
Q Okay. So what is inaccurate about that?
A She disclosed her outside employment to her immediate supervisor.
Q And who was the immediate supervisor?
A Mallory Bolen.
Q Okay. And when was that disclosure made to Mallory?
A I don't know the exact date. I'd have to look. But before she accepted the position, they discussed it. Mallory Bolen also met with someone from Velocity Group and looked into it and told AmandaLynn that it was not a conflict of interest.
Q Okay. Do you know when Mallory met with someone from Velocity?
A I don't.
Q Do you know who Mallory met with from Velocity?
A I do not. That was during Dennis's tenure.
Q Okay.
A Are we -- are we continuing to go through the letter?
Q Yeah, that's fine. Yeah, please.
A Okay. "AmandaLynn has declined to provide

Page 62

details of her work for Velocity Group."
Q Okay. Let me interrupt you for a second. So did Ms. Reese provide details of her work for Velocity?
A To HRO, yes.
Q Okay. And when did she provide the details to HRO?
A I -- as I already stated, she discussed it with her immediate supervisor before accepting the position.
Q Okay. Okay. Is that the only disclosure of details that you are referring to, was the conversation with Mallory that we've already talked about?
A She's cooperated fully with -- it's my understanding that she cooperated fully with the investigation once the conflict of interest question was brought forward.
Q And when you say "the investigation," that's the Nelson investigation?
A Yes.
Q Do you know if she cooperated with Mr. Cauchon with regard to his requests for information about her work with Velocity?
A At what time?

Page 63

Q Any time from July of '24 through September of '24?
A It's my understanding that she did.
Q Okay. Do you have any information or do you know what information he requested and what information she provided?
A I have seen some of the e-mail communication. He -- before being placed on administrative leave, he asked her for a number of things that HRO did not feel we had a policy in place to ask of an employee.
Q Okay. And what were those items?
A I would have to look at the e-mail communication to say for sure.
Q And then you mentioned that HRO did not feel that the information that he was requesting was appropriate?
A That is my understanding. Dwayne was already working with Mr. Cauchon to strengthen HRO's policies and procedures.
Q Okay. You want to continue? And, again, we're -- you're reviewing the letter for purpose of giving me the inaccurate and misleading statements.
A As far as -- as far as I know, nobody else at Harm Reduction Ohio, other than AmandaLynn Reese,

Page 64

knew of the conflict.
Q And is that it, or are there more?
A Those are the ones that I see.
Q Okay. If I could have it back, please? Thank you. When you mentioned on there, the last one you read was the top of Page 293, where it says, "No one else other than AmandaLynn knew of the conflict." So what is inaccurate or misleading about that?
A HRO knew that she had the position.
Q Okay. And would that have been -- be through the conversations with Mallory, or did HRO have another source of knowledge other than the conversations with Mallory that you've already told me about?
A AmandaLynn discussed the position with her immediate supervisor, Mallory Bolen.
Q Okay.
A So HRO knew about it.
Q Yeah. Okay. And that's what I was asking. Was there any other than that conversation that you've already told me about with Mallory, was there any other source of HRO's knowledge about her work with Velocity?
A I don't think it was just one conversation with Mallory. I think Mallory knew --

Page 65

Q Okay.
A -- about the position, and HRO knew.
Q So let's go back to the November 24, 2024, letter, which we've marked as Exhibit 2. And it says, "The outside investigation also considered your retaliation claim." So what was the retaliation claim that you are referring to there?
A Mr. Cauchon had written some communication. I can't recall if it came from him or the attorney he was working with at the time. There was communication that he asserted the retaliation, that we -- that the board had retaliated against him.
Q Okay. What was the retaliation in response to?
MR. CHANG: Objection.
MS. MOYO: I'm going to join in the objection, but you can answer.
THE WITNESS: There was no retaliation, to my knowledge.
BY MR. SHEARER:
Q What is your understanding of why he was claiming he was retaliated against?
MR. CHANG: Objection. Calls for speculation.
THE WITNESS: I can't speculate.

BY MR. SHEARER:
Q Okay. So HRO does not know what his complaints were that gave rise to his retaliation claim?
MR. CHANG: Same objection.
THE WITNESS: What's that?
MS. MOYO: Objection. You can answer.
MR. CHANG: Sorry. You don't have to listen to that.
THE WITNESS: Okay.
MR. CHANG: I'm just objecting for the record. Just objection. You can answer.
THE WITNESS: If you're -- are you asking me what is being referred to in this paragraph?
BY MR. SHEARER:
Q Yes.
A I -- Mr. Cauchon and I believe Counsel that was working with him at the time had communicated to HRO that Mr. Cauchon believed that he had been -- that he was being retaliated against when he was placed on administrative leave for reporting, it says here, the -- referring to the whistleblower policy.
Q Okay. So the letter then goes on to cite the whistleblower policy?
A Yes.



Q And then about halfway down, there's a -- I mean, there's a sentence that says, "The policy expressly forbids anyone from retaliating against any board member, officer, employee, or volunteer who in good faith reports an ethics violation or a suspected violation of law." Is that what Mr. Cauchon did?
A What is the question? What do you mean by "did"?
Q Yes. Did he report an ethics violation, a suspected violation, or a suspected violation of law?
MR. CHANG: Objection.
THE WITNESS: At which stage in the process is this question referring to?
BY MR. SHEARER:
Q At any time prior to November 4, 2024.
A I think the question there is a -- is good faith in that sentence. And again, what are we referring to?
Q Well, so we're referring to his retaliation claim.
A Okay.
Q So in order to have a retaliation claim, would you agree with me you had -- there was an action taken by Mr. Cauchon, which he is claiming he was retaliated for?



A Okay.
Q Retaliated against. What was that action?
A According to the communication from Mr. Cauchon?
Q According to HRO's -- what is HRO's knowledge?
A My knowledge is that Mr. Cauchon, and I think I already said this, and an attorney that he was working with at the time, sent us written communication expressing that he believed that he was being retaliated against for bringing forward concerns about the conflict of interest.
Q The conflict of interest with AmandaLynn Reese?
A Yes.
Q Okay. Okay. Then a moment ago, you mentioned -- you referenced the "in good faith" portion of the paragraph. And when I look at that, the "in good faith" portion is in italics. Okay. So what is the significance of the "in good faith"?
A Well, according to our counsel, and they go on to say this, I believe, in this letter, that when he sent the letter to ODH, we did not feel that it was in good faith.
Q Okay. And why does HRO believe that it was



not sent in good faith?
A It was against the advice of the board of directors. We wanted to consult Counsel and conduct an investigation first.
Q And in reporting it -- well, when Mr. Cauchon reported this, it was prior to the investigation which was being contemplated or being recommended by the board?
A What do you mean by reporting it? Reporting it? Reporting what to where?
Q Reporting the conflict to ODH and then --
A Do you mean when he sent the letter?
Q Correct.
A So when -- go ahead. What's the question?
Q Okay. So he sent the letter and the lack of good faith was based on the fact that the board -- if I understand you, that the board wanted to conduct an investigation first?
MS. MOYO: Objection to form.
You can answer.
THE WITNESS: Yes.
BY MR. SHEARER:
Q Okay. But he went ahead and reported it to ODH prior to any investigation which was conducted or authorized by HRO?

A Is there a question in there?
Q Yes.
A Okay. What's the question?
Q Was his report to -- or his -- yeah. His letter --
A His --
Q His letter to HRO dated September 4, 2024, was that prior to HRO conducting or retaining someone to conduct an investigation?
A Yes.
Q Further down in the paragraph, it, again in italics, is, "And have -- anyone filing a written complaint concerning a violation or suspected violation must be acting in good faith," which we've already spoken about. And then we have the italics again, "and have reasonable grounds for believing the information disclosed indicates a violation." Do you know why that section was in italics or highlighted in the letter?
A I -- I -- I shouldn't -- am I -- I can't speculate.
MR. CHANG: I'm going to object as to -- I don't know if there's a communication between Counsel as to that point, but I'm going to object and allow you to answer to the extent HRO is aware outside



of communication from Counsel.
BY MR. SHEARER:
Q Okay. You can go ahead and answer.
A What was -- would you repeat the question?
Q Let's do this. Does HRO believe that Mr. Cauchon had reasonable grounds for believing the information regarding AmandaLynn Reese was a violation of HRO's policies and procedures?
A HRO had instructed Mr. Cauchon to pause and that we were going to engage a third party and conduct an investigation.
Q Okay. I understand that. Does HRO believe that Mr. Cauchon had reasonable grounds for believing there may be a conflict with AmandaLynn Reese's employment with Velocity?
MR. CHANG: Objection.
You can answer.
THE WITNESS: We took his complaint very seriously. We hired a third party to conduct an investigation.
BY MR. SHEARER:
Q Okay. Do you believe there was reasonable grounds -- does HRO believe there was reasonable grounds for conducting an investigation into the potential conflict of AmandaLynn Reese?



A For HRO, just bringing something like that forward seemed like reasonable grounds to look into it, so we conducted an investigation. I do want to point out, though, there's a lot of interpretation of the second paragraph here, and I want to be clear on what you're really asking me.
Q Well, if any of my questions --
A For example, does it refer to him bringing something forward to HRO or submitting a letter --
MS. MOYO: Ms. Turner-Bicknell, let him ask --
THE WITNESS: Okay.
MS. MOYO: -- the question.
THE WITNESS: Okay.
MS. MOYO: Just let him ask the question.
BY MR. SHEARER:
Q So, yes, if there is any confusion, I would appreciate it if we -- if you could clarify it for me, because this letter is written on behalf of and signed by the HRO board of directors.
MS. MOYO: And I think you answered the pending question.
THE WITNESS: Uh-huh.
MR. SHEARER: Yeah.



MS. MOYO: So let him ask his next question.
THE WITNESS: Okay.
BY MR. SHEARER:
Q The last sentence in that paragraph is, "Any allegations that prove not to be substantiated and which prove to have been maliciously or knowingly to be false will be viewed as a serious disciplinary offense." Can you tell me why that sentence was included in the letter?
MS. MOYO: Objection to form.
You can answer.
THE WITNESS: On the advice of Counsel.
BY MR. SHEARER:
Q Okay. Does HRO take the position that Mr. Cauchon's letter to the ODH and his raising of AmandaLynn's potential conflict were made maliciously?
MS. MOYO: Objection to form.
You can answer.
THE WITNESS: Can you read back that question again, please?
THE REPORTER: Yeah.
(The reporter repeated the record as requested.)
MS. MOYO: I don't understand the basis

Page 74

for this question. There's nothing in the record that -- HRO has not asserted anywhere.

MR. SHEARER: You -- that's fine. It's my question. It's my -- if you want to object.

MS. MOYO: Okay. Objection.

BY MR. SHEARER:

Q Let's do this. But go ahead and answer.

A No. Go ahead.

Q No. Go ahead and answer.

A To the question about malicious?

Q Yes.

MR. CHANG: Can the reporter -- since there's been a lot of backbar, can you just read the -- reread the question for her and she can answer?

MR. SHEARER: Sure.

(The reporter repeated the record as requested.)

THE WITNESS: We take the position that they were -- it was insubordination. We had agreed to do an investigation.

BY MR. SHEARER:

Q When Mr. Cauchon sent his September 4th letter to the ODH, is HRO taking a position that he knew it was false or the contents of the letter were false?

Page 75

A HRO viewed the action of sending the letter to ODH as insubordination. It -- acting in direct conflict with what the board had advised.

Q Absolutely. I 100 percent understand that. What I'm asking is a separate question. Was the letter to ODH of September 3, 2024, knowingly false?

A I believe we just answered a question where I pointed out the items that were false.

Q Okay.

A So there -- we do -- we do believe there were false statements made there.

Q Did Mr. Cauchon know they were false when he made them to the ODH?

MR. CHANG: Objection.

THE WITNESS: I can't speak to Mr. Cauchon's knowledge.

BY MR. SHEARER:

Q Okay. When the letter of September 3rd was sent to ODH, was Mr. Cauchon acting maliciously?

MR. CHANG: Objection.

MS. MOYO: Objection to form.

You can answer.

THE WITNESS: I don't know what his intentions were at that time.

Page 76

BY MR. SHEARER:

Q Okay. Let's go to the next paragraph of the termination letter. And I think we've already discussed the first sentence, "Your September 3rd report to ODH violated this policy." And that's the policy that we've just discussed that was -- that's contained in the handbook.

A Uh-huh.

Q That's a yes?

A Yes.

Q Okay. It says, "Prior to sending your letter to ODH, you stated that AmandaLynn's work for Velocity BioGroup was not likely a conflict that would affect the ODH contract." Can you tell me what you can about Mr. Cauchon's statement that it was not likely a conflict?

A I -- that's what he -- he said that it was not likely a conflict.

Q Okay. Who did he make that statement to?

A I can't speak to all of the people. I have knowledge that he sent that -- I think it's in an e-mail exchange with the board of directors, with the chair, and I don't know if there were others.

Q Okay. And then it says, "And you acknowledge that HRO needed to 'know the details,' before making any decisions." That's -- that quote of "know the details," to me implies that that came specifically from either a document or from a statement that he made. Do you know if that's referring to -- which of the two it's referring to?

Page 77

A I think it's in e-mail communication and it was also stated.

Q Okay. Do you know who it was stated to? Outside of the emails, which we have.

A Dwayne, Billy Golden, myself. Cecile Katz was also on -- in there.

Q Okay. So let's go to the next page, if we can. And we'll go to the first full paragraph. And it says, "You then placed the organization in further jeopardy with your sudden and inexplicable decision to promote Patrick Bourland and give him a significant raise, potentially in violation of equal pay laws." So what was Patrick Bourland promoted to?

A He was promoted to take the responsibilities -- my understanding is that he was promoted to take on the responsibilities in part of -- that AmandaLynn Reese's position had had. But I don't know that -- that -- I don't know that that was clear because others also were doing some of those responsibilities.

Q Okay. When Mr. Cauchon promoted Mr.

Page 78

Bourland, was he still -- had he been suspended -- or had he been placed on administrative leave at that point?
A I don't believe so.
Q Okay. What powers did Mr. Cauchon have as president of HRO to hire or promote employees?
A He had the ability to hire and promote employees.
Q Okay. Was board approval required before he could hire or demote employees?
A No.
Q The next part of the sentence says, "Give him a significant raise." Do you know what raise was given to Mr. Bourland?
A It's my understanding that it was a $9 an hour increase.
Q Okay. As president of HRO, did Mr. Cauchon have the power to give employees raises?
A He did.
Q Okay. Did he have to seek board approval prior to giving raises?
A No.
Q The last part of the sentence talks about potential violations of the equal pay laws. And what are you referring to? What potential violations are

Page 79

you referring to?
A The promotion of Patrick occurred in front of other staff members. He had not been there very long. And there was -- the board had questions about the appropriateness of promoting him before other people.
Q Okay. What other staff members were present when he was given his promotion?
A Kelsey Bates.
Q I'm sorry. I didn't hear you.
A Kelsey Bates.
Q Okay.
A Molly Fantini. And there may have been others there as well that I can't remember.
Q Okay. If we can go to the next paragraph. I believe we've already talked about those topics. The question I have is just in that last line, you have quotes around the, "assert your power." Why are quotes -- is that a -- why are quotes placed around that phrase?
A That was a statement that came from Mr. Cauchon.
Q Okay. And who did he make that statement to?
A To Cecile Katz.

Page 80

Q Okay. And do you know when that statement was made?
A Around the time that he was placed on administrative leave.
Q So let's go to the second to last paragraph. It says, "You must immediately return" to Harm Reduction -- "you must immediately return all Harm Reduction Ohio property." And then it has a list of other materials. Can you tell me, did he comply with that?
A No.
Q Let's maybe go through them, the topics, one by one, and you can tell me what you -- if he did return or didn't return the listed item. And the first one says, "Including identification cards." Did he have an --
A We did not receive an -- I -- I -- I'm not aware if he had any -- I don't know if he had any or not.
Q Okay. Does HRO issue identification cards to its employees or board members?
A Not board members. Employees, it -- it depends.
Q Okay. When you say, "identification cards," are you referring to, like, a business card or

Page 81

something other than a business card?
A I -- I think that identification cards could include any type of card with your identification on it that has the name of HRO.
Q Okay. So at the time of his termination, what identification cards with HRO's name on it did Mr. -- did Mr. Cauchon possess?
A I don't -- I can't speak to what he possessed at the time.
Q Okay. Do you know, did he return any identification cards?
A He did not.
Q All right.
A To my knowledge.
Q The next item is "badges." What badges did Mr. Cauchon have relating to HRO?
A I think identification cards or badges, I think, is one item there.
Q Okay.
A In that list.
Q You're not aware of any separate badges that he had regarding with the -- any way pertaining to HRO?
A It would -- it would -- again, like the identification cards or badges. Any -- any

identification card or badge.
Q Okay. The next item listed that he was requested to return are "access codes or devices." What is that referring to?
A Any access codes to access Harm Reduction Ohio property.
Q Okay. Now, is that like a -- are you referring to, like, a key code for a building, or are you referring to the code for website, bank information, et cetera?
A I think it's -- it's an exhaustive -- it's access codes. So any code that would provide one access to HRO property is how I understand that.
Q Okay. And what access codes or devices are you aware of that he did not return?
A We didn't receive any access codes, to my knowledge, from Mr. Cauchon. So QuickBooks, Facebook, the website.
Q QuickBooks, Facebook, website. Anything else?
A Not that I can think of right now.
Q Did anyone other than Mr. Cauchon have access to QuickBooks?
A At different times, yes.
Q At the time of his termination, who had



access to QuickBooks other than Mr. Cauchon?
A Cecile and our bookkeepers.
Q And who were the bookkeepers?
A Amethyst Bookkeeping.
Q Did Mr. Cauchon ever limit or change the password so that Cecile or the bookkeepers could not obtain access to QuickBooks?
A Yes.
Q Okay. When did that happen?
A I would have to look at the date to be certain.
Q And who -- did he limit both of their accesses to QuickBooks or one or the other?
A Both.
Q Did they regain access to QuickBooks?
A We did not.
Q Okay. Does Harm Reduction Ohio still use QuickBooks?
A Yes.
Q Okay. Did Harm Reduction Ohio start a new account, open a new account, or tell me what happened to --
A We started a new account.
Q Okay. The next topic is -- or next items -- the next two items are "laptops, computers." Did he



return -- did he have any laptops, computers that belonged to -- that were the property of HRO?
A I don't know.
Q Okay. Do you know if he returned any laptop or computers to HRO?
A Not that I'm aware of.
Q Okay. The next category is "telephones, mobile phones." Did Mr. Cauchon have any telephones or mobile phones that were the property of HRO at the time of his termination?
A I don't know.
Q Okay. The next category is "handheld electronic devices." Did he have, in his possession at the time of his termination, any handheld electronic devices that were the property of Harm Reduction Ohio?
A I don't know.
Q The next category is "credit cards." At the time of his termination, did Mr. Cauchon have in his possession any credit cards that belonged to or the property of HRO?
A Yes.
Q Or that were linked -- I'm sorry. That were linked -- or that were linked to HRO accounts?
A Yes.



Q And would that be for the Chase account?
A One of them was.
Q Okay. And what was the other one for? Well, I'm making assumptions. How many credit cards were there?
A I believe there were two. The other one was an American Express.
Q Okay. Were those cards returned?
A No.
Q Okay. After his termination, did Mr. Cauchon make any charges to either of those credit cards?
A Not that I'm aware of.
Q Okay. The next category is "electronically stored documents or files." When you refer to electronically stored documents or files, what is -- what are you referencing?
A Any -- any work for Harm Reduction Ohio. So it -- all electronic records would be -- that statement, I think, is intended to be all-inclusive.
Q Okay. So was it intended that he return the electronically stored documents and not retain a copy, or was it that he returned them and he was entitled to retain a copy?
A It was that he would -- it says,

Page 86

"Electronically stored documents or files." So I think that we're instructing him that since he's leaving, we would like him to return any electronic stored documents or files that belong to HRO.
Q Okay. And did he do so?
A Not to my knowledge.
Q Okay. What electronically stored documents or files were in his possession at the time of his termination?
A He was the president of HRO for a number of years, so I imagine -- or I -- I -- it's my understanding that there would be a lot of files.
Q Okay. Can you give me any specifics other than "a lot of files"?
A Mr. Cauchon did not return -- or did not return any files to us on his departure.
Q Okay. The next category is "physical files." What physical files did Mr. Cauchon have in his possession at the time of his termination?
A As president of HRO, he could have had a number of physical files.
Q Okay. What physical files does HRO know that he had in his possession at the time of his termination?
A I -- I couldn't list them. Again, I think

Page 87

it's intended to be inclusive, instructing the person to return property of HRO.
Q Okay. Did he return any physical files after November the 4th?
A Not that I'm aware of.
Q Okay. The next one is "passwords and login information." We've already discussed some of that. So what passwords and login information did he have in his possession at the time of his termination?
A It would be extensive. He would have a number for -- he -- he was the president of the organization. So QuickBooks, Facebook, login information for the bank, and the credit cards. Certain grant portals.
Q Anything else that comes to mind?
A The website, which we already mentioned --
Q Right.
A -- which included SiteGround and the domain.
Q Okay. Anything else?
A Not that I can think of right now.
Q Did he ever provide the login information for Facebook?
A As we stated, there was a list that was provided through Counsel.
Q Okay. Did anyone else -- at the time of Mr.

Page 88

Cauchon's termination, did anyone else at HRO have Facebook -- the Facebook login information?
A My understanding is that he is the only person that can access it.
Q Okay. Let's talk a little bit about the grant portals. Can you tell me what exactly you're referring to by that?
A Well, I can't be exhaustive, because during his time there, there could've been other grant portals that he -- that would've been the purpose of him turning everything over, but I can list, like, sams.gov as an example. When you apply for certain types of grants, you have to complete the application through a portal. That would be one example of an important organizational password that he did not turn over.
Q Stamps.com?
A Sams. Sams.
Q Oh, Sams. I'm sorry, it sounded like --
A Sams.gov.
Q -- you said stamps. I'm like, okay. No. I've got you now.
A Sams.gov.
Q Yeah. Okay. I want to talk a little bit, still on 1B, about the documentation for the

Page 89

termination. And so what I would like to hand you -- I think we're up to HRO 3.
(Exhibit 3 was marked for identification.)
And right -- oh, sorry. There you go. And could you tell me what it is we are looking at here, document -- Exhibit 3, which is Bates numbered HRO 1436?
A I -- I don't know what this document is.
Q Okay. HRO has produced that through the discovery process in this case.
A Okay.
Q You have never seen that document before?
A I just mean the way it's printed out, like, I don't know what I'm really looking at. That's -- that's what it --
Q Okay.
A So --
Q Okay. And that's why I'm asking you, as you are here as a representative of HRO --
A As a representative of HRO, it looks like a printout of a calendar.
Q Okay.
A Is that what this is?
Q I'm asking you. HRO produced --

A Okay.
Q -- this to us. You're here on behalf of HRO.
A Yeah.
Q This could -- so that's why I'm asking the question.
MR. CHANG: Object to have a standing objection. There's no topic that lists her to state - - to speak about any productions from HRO.
Also, I don't see how this relates to topic 1B, but she can answer.
Go ahead.
BY MR. SHEARER:
Q Okay. So let's talk about what this might be or what it is, or the information contained on it. The title is "HRO Emergency Board Only Meeting."
A Okay.
Q Do you see that?
A I do.
Q And it appears as if you are listed on there as a guest. Do you see on the right side, it has a list of e-mail addresses, and above that, it says "guests"?
A Yes.
Q Okay. And it has an e-mail address of



turnerta@ucmail.uc.edu. Do you see that?
A I do.
Q Is that your e-mail address?
A Yes.
Q Okay. Do you recall a emergency board only meeting on September the 5, 2024?
A I -- I would have to look at all of the meetings to see, like, what which one this one is referring to.
Q Okay. So this would've been on September 5th, which was the day after the letter was sent to ODH, the September 4th letter. Do you -- you did -- you know the September 4th letter I'm referring to?
A Yes.
Q Okay. And this was the day after that. Does that refresh your recollection as to what maybe this meeting may have been about?
A Yeah. It's an emergency board meeting.
Q Okay. And it lists emergency -- it says, "Emergency board only meeting." What's board -- what's the word "only"? What's the significance of that?
A I think it means that it will be only the board meeting.
Q Okay. Would there typically be -- at HRO



meetings, board meetings, regularly scheduled board meetings, would there typically be people at those meetings other than the board?
A It could be.
Q Okay. For example, like, who would attend meetings of the board that were not of -- who would attend meetings of the board of directors who were not on the board of directors?
A Well, the president would attend the meeting. They were not on the board of directors. If there was a relevant staff member that needed to be there for some sort of function.
Q Sure. Okay.
A So there could be.
Q Okay. And as you sit here, do you know what was discussed, or can you tell me what was discussed at that meeting on September the 5, 2024?
A I can -- based on the timeline, I would think that we were meeting to discuss how to proceed forward.
Q With regard to what?
A With regard to the moving forward with an investigation.
Q The investigation -- what investigation?
A The investigation of the potential conflict.



Q Okay.
MS. MOYO: Objection to form.
I'm sorry, you -- she's described the investigation to you before being conducted by Maritza Nelson as being both related to the alleged hostile work environment and the alleged conflict of interest.
MR. SHEARER: Okay.
BY MR. SHEARER:
Q The next document that I will give you is -- we'll mark that as HRO 4.
(Exhibit 4 was marked for identification.)
And I'll ask you, have you ever seen this document before?
A Not in this form.
Q Okay.
A Not --
Q This references a September 15, 2024, meeting. You see where I am reading from?
A Yes.
Q Okay. And when was that meeting first noticed?
A I would have to look at the records to say.
Q What records would tell you when the meeting was first noticed?

Page 94

A Communication from the board.
Q Okay. When a board meeting would be scheduled, again, probably prior to Mr. Cauchon's being placed on administrative leave, how was -- how were people notified? How were people given notice of the meeting?
A Communication. E-mail communication.
Q Who would typically send out the e-mail scheduling or noticing a regular board of directors meeting?
A It would depend. It was -- sometimes it was administrative staff. Sometimes it was the president.
Q Okay. And what was discussed at this meeting on Sunday, September 15th?
A I would have to look at the minutes to know for sure.
Q Okay. This indicates that it was a Zoom meeting. Do you know if that meeting would've been recorded?
A I don't.
Q Okay. And absent looking at the notes -- or I'm sorry, absent looking at the meeting minutes, you do not recall, or you cannot tell me what was discussed at their -- what topics were discussed at that meeting.

Page 95

MS. MOYO: Objection to form.
You can answer.
THE WITNESS: I -- I can't say for certain what was discussed, just looking at the date.
BY MR. SHEARER:
Q Okay.
MS. MOYO: David, let us know when you think is a good time to take a break for lunch.
MR. SHEARER: That's fine. We're not -- well, yeah, that's fine. Yeah.
MS. MOYO: Whenever you're --
MR. SHEARER: I -- that's fine with me. Yeah.
MS. MOYO: I'm not -- we're not -- okay.
MR. CHANG: I have not yet received an e-mail that lunch has arrived, but now might be --
MR. SHEARER: Yeah.
MS. MOYO: Off the record.
MR. SHEARER: I don't care. I mean --
THE REPORTER: Off the record. Time is 12:39.
(Off the record.)
THE REPORTER: We are back on record. Time is 1:35.

Page 96

BY MR. SHEARER:
Q Okay. We are ready to go, and we'll hopefully get you moving sooner rather than later. So we have pretty much talked about most of the topics that we have that I -- on my notice, with the exception of some of the tortious interference stuff, which we'll get to in a minute.
So let's go back to -- let's go to Topic Number 2. In those, we talked about the unauthorized access and control of the corporate credentials, and we did talk about the Facebook, the QuickBooks, everything else you told me about.
So what I would like to know is how that affected, or how that financially affected HRO, what additional expenses it incurred as a result of the alleged use of the -- or non-returning of passwords, account information.
A Okay. Well, we had to hire Counsel. We had to hire Porter Wright to work with us to communicate with the landlord, the bank, Facebook. We also spent a lot of time, employee time. Myself, I think in the -- a good average for the year following is about 30 percent of my time was spent trying to access things that we previously had, opening up new accounts, which also cost -- there was a financial cost to those as well.

Page 97

Q Okay. Can you quantify for me the financial cost to HRO as a result of the changing the passwords, the hiring the accountant, the payment -- the payments to Porter Wright?
A Hiring the Counsel? Is that what you meant?
Q All of the -- so what I wanted to do is talk about -- you told me generally what the expenses were. And what I would like to know is, to the extent you can tell me, what those amounts are.
A Okay. I don't have a list of specific totals.
Q Okay.
A We can --
MS. MOYO: If you know the amounts he's asking you right now based on your memory.
THE WITNESS: Okay. So if I can -- the -- the amount of my -- so if you estimate, you know, 30 percent of the -- my time as interim executive director, that would be 30 percent of $89,999. That would be -- I mean, I can't do that kind of math directly in my mind, but you know --
BY MR. SHEARER:
Q No, no, no. And I'm not --
A Yeah.

Page 98

Q Yeah. I'm actually more referring to the outside expenses. And so you told me about hiring of Porter Wright. And then there was the -- so what did you have to do to get control of the Facebook page back?
A We had to get the assistance of Counsel.
Q Okay.
A We were unable to access HRO's Facebook account.
Q That was, again -- okay. That was, again, the Porter Wright work.
A Uh-huh.
Q Got you. And then the issues with the landlord, I've seen, obviously, the correspondence that's gone back and forth, and we've talked about it here. Was that also Porter Wright as well?
A We spent -- we -- we worked with Counsel there, and then also our -- my time -- our time again. Like, I -- you know, I spent time trying to communicate with the landlord and working on that as well.
Q Okay. And when did you actually get access back to the property?
A We did not. We worked with Counsel to remove --

Page 99

Q To remove your stuff.
A Uh-huh.
Q Right. And then when we -- with regard to the lease, the lease was renewed after the November 4th correspondence to Mr. Cauchon. Were it not for him renewing the lease, would HRO have -- well, were it not for -- in the absence of Mr. Cauchon's November 4th, the letter to him removing him from his position, and then him staying, you could testify he continued to occupy the premises.
Would -- otherwise, would HRO have continued that property, or was there -- or was it looking for a different property otherwise? And that was very poorly worded. So --
A Okay. What's the question?
Q Yeah. So you had been in that space since 2018, correct?
A Correct.
Q Was the intention, absent the issues with Mr. Cauchon, his termination, your allegations that he continued to occupy the property, would the intention of HRO been to continue to occupy that property and rent that -- lease that -- lease those premises?
MS. MOYO: Objection to form.
You can answer.

Page 100

THE WITNESS: I think it's hard to say.
BY MR. SHEARER:
Q Okay.
A But I can say that prior to placing Mr. Cauchon on administrative leave, there wasn't a plan to change the office location.
Q And then the new office that you opened up, or that HRO opened, what's the address of that?
A It's in Grandview.
Q Okay. And what's the rent -- what was the rent for that when you leased it in 2025?
A For the new space?
Q Correct.
A I can't really say off the top of my head.
Q Okay. Okay. The rent for the Granville, the original Granville office, we talked to the representative of the landlord the other day, and it seems as if rent was paid through the end of May of 2025. Is that consistent with your understanding?
A HRO did not rent the property at that time.
Q Okay. Let me phrase it differently. There were payments made to the landlord in the amount of $1,750 per month. It is my understanding that those funds came out of the Chase account that was in HRO's name, correct?

Page 101

A Correct.
Q Okay. Was any portion of those payments -- were any portion of those payments ever refunded to HRO by the landlord?
A I can't say for sure. There was a lot of confusion about that.
Q Yeah. And so I think the landlord wasn't exactly clear either.
A I would have to look at the financial record to detail that.
Q Okay. Okay. So from my review of the records, the payments did come from the Chase account, the last payment being made in April of 2025. I did not see anything after May -- for example, May, June, anything throughout the remainder of 2024. Are you aware of any other payments made out of the Chase account to Borough & Company, the landlord on the Granville property, after April of 2025?
A 2025. I don't -- I -- I can't say for certain, without looking at the bank records, what the exact date was.
Q Okay. Earlier, you mentioned when the account was vacated. By vacated, do you mean closed or --
A We opened -- on the advice of Counsel, HRO

Page 102

opened a new account.
Q Correct. Okay. And that account was closed? You used the word "vacated." I'm just trying to figure out whether there's a difference in your mind between the phrase vacated versus closing an account.
A I say vacated because we couldn't close the account because we didn't have control of it. Mr. Cauchon maintained full control of that account.
Q Okay. At some time, though, you were able to remove the remaining funds from that account.
A Yes.
Q After Mr. Cauchon's termination, no additional funds were any additional funds deposited into that account?
A Yes.
Q Okay. Okay.
A Okay. I just want to make sure I understand the question here. Are you asking me if -- if funds were deposited into HRO's primary account?
Q At Chase.
A At Chase.
Q Correct.
A Leading up to the time that we transferred to another account.

Page 103

Q Yes.
A Yeah.
Q Yes. Okay. If HRO had expenses that needed to be paid during the period of time that Mr. Cauchon -- after November 4th and prior to the account being vacated, how were those expenses paid?
A Cecile Katz was able to -- to make payments.
Q So she still had access to the account.
A She did. It was -- she -- she expressed that it was restricted at one time, but then she was able to access --
Q To access it. Got you. Okay. Earlier, you mentioned that Mr. Cauchon had an American Express card. And I just want to make sure I am -- are you certain about that?
A I'm not without looking at the records. I - - I believe at one time, there was a question about whether or not HRO had an American Express card at one time.
Q Okay. We talked about the -- locks on the supply cabinets in the office and that for a period of time, that there was restricted access to the products in those cabinets, which consisted of, I believe you told me naloxone. What other supplies was access restricted to?

Page 104

A I can't say for certain what was in the cabinet when Mr. Cauchon locked it.
Q Okay. So for the materials that HRO did not have access to, did it obtain replacements for those supplies?
A We did in some cases.
Q Okay. And where were those replacement supplies obtained from?
A We received donations from partner organizations.
Q Okay. Donations specifically for the purpose of replacing items that were -- that there was restricted access to, or were these regular donations?
A My understanding is that staff had to spend some time. They had to work to obtain some items that we needed during the time that we could not access them.
Q Okay. So in the discovery, it looks like there were -- some of the supplies were naloxone, but also, there's some mention of some fentanyl testing strips. Does that refresh your recollection as to some of the supplies that may have been included in the -- or in the restricted area?
A I guess I'm just trying to -- to be clear if I'm being asked that -- I can't say for certain

Page 105

exactly what was in a cabinet on a certain day of the week --
Q Okay.
A -- when Mr. Cauchon took that action. I -- it would -- it is reasonable that we would have naloxone and fentanyl test strips. Those are two important pieces of the work we do.
Q Okay. As a result of the restricted access to these supplies, I think you already told me that ultimately, it was negotiated through Counsel, and you regained access. Do you know if any of the supplies that access was restricted to had expired or were no longer usable?
A I don't know for sure. I would have to look.
Q Okay. So after the November 4th -- well, I'll say -- backing up, after Mr. Cauchon was placed on administrative leave, he still had access to computers that -- correct, the -- HRO's computer and network?
A I'm not -- I'm not sure if he had a computer that was his personal computer that he used for HRO or if it was purchased by HRO. I'm -- I'm not certain.
Q Okay. There is -- in the counterclaim, the complaints that was filed against Mr. Cauchon, there's

Page 106

mention of having to spend, incur expenses with regard to remediating his access to protected computers. What can you tell me about that?
A I know that there was some concern that we -
- he was sending emails where it was saying that it was coming from his Harm Reduction Ohio account, but we had already restricted that. So our question then was: How is he doing that?
Q Okay.
A And that was -- and -- and I'm going to -- I don't really know all the IT piece of this.
Q Sure.
A There was also some concern that he was accessing HRO files in a shared drive, and we had to take another look at whether or not we had restricted his access.
Q Okay. So what expenses -- what outside expenses were incurred in that?
A Employee time. We consulted with Counsel as well, so there was that. We also worked with our IT folks that are not salaried, so there was an expense there as well.
Q Okay. For external -- besides your -- besides Porter Wright, can you give me the name of any outside entities that you consulted with, retained, or

Page 107

paid funds to as a result of that?
A It would be our -- we have two IT people that we work with. Juan and Joel would be their names.
Q And do they have -- they operate under a company, or is it a -- are they just individuals, or do you know?
A I don't know for certain without looking at -- looking at it.
Q Okay. So let's talk a little bit about the -- any communications made regarding Ms. Reese and her role at Velocity. So if I could have you look at the deposition notice again --
A I think -- I think that's what I have here.
Q Yep, you have. Go to 5, and I have questions -- so your counsel has objected to any questions regarding 5(a) and 5(c).
Let's look at 5(b), if we can, and what I want to talk about is Mr. Cauchon's statements regarding a "Kloxxado lobbyist." What is your understanding of the statements that he made regarding a Kloxxado lobbyist?
A Do we have the statement that I can look at to --
Q Well, what statement are you referring to?

Page 108

A I'm -- I'm asking -- I -- if you show me the specific communication. I'm just -- what am I referring to here?
Q Yeah. So here's what it is. So you've -- you -- there was a counterclaim filed for defamation, libel, and one of the allegations were -- the allegations in the counterclaim are that he knew or should've known that she was not a lobbyist, let alone a, "Kloxxado lobbyist." So I did not know when that counterclaim was filed. I want to know what statements that HRO is referring to.
A Okay. The letter that we looked at just a little bit ago.
Q Okay. The letter to ODH?
A Yes.
Q Okay. So that was Cauchon 18.
A There were also communications with NEXT Distro.
Q Right.
A NEXT Distro. And what is the question again?
Q Yeah. So what -- I want to know what -- so the claim -- one of the counts in the counterclaim is for defamation, libel, and it refers to quotes -- and this is in quotes, and I can show it to you if you

Page 109

would like. And this is -- we'll just look at the answer and counterclaim and have you look at -- starting on -- it's Paragraph 64.
A And what's the question?
Q The question is: It refers to statements made about a, quote, "Kloxxado lobbyist." And so you have told me that -- and that was my question, was: What statements --
A What statements --
Q -- either written, verbal, are you referring to about the Kloxxado lobbyist?
A In the communication to NEXT Distro, he references that we were pushing Kloxxado, which is false.
Q Okay.
A And there's a reference in that communication as well to "Kloxxado lobbyist."
Q Okay. And that's that e-mail to -- I believe his name is Jack --
MR. CAUCHON: Jamie Favaro.
BY MR. SHEARER:
Q Yeah, Jamie Favaro. Let me find that. I have that here in my stack.
MR. CHANG: Just -- can we reflect on the record, what is the document you handed to the

Page 110

witness?
MR. SHEARER: Oh, I'm sorry. It is the -- well, first of all, I handed her Exhibit 18, but the first document was the actual answer and counterclaim of HRO.
MR. CHANG: Okay. Thank you.
MR. SHEARER: So I will hand you -- we're up to number 5, I believe.
(Exhibit 5 was marked for identification.)
THE REPORTER: Yes.
BY MR. SHEARER:
Q I'm sorry. There you go. Is that the e-mail that you're referring to?
A Yes.
Q Okay.
A The other communication in the letter that he writes in August, I believe it is, to ODH --
Q August of '24 or '25?
A 2025. This is a later -- there's a -- there's a later letter to ODH and --
Q Okay. So let's talk about this one. This will probably be quicker. Let's talk about this one first, the -- what we've marked Exhibit 5, and it says, "I have attached a federal lawsuit I filed a

Page 111

couple of weeks ago related to HRO's conflict of interest with Kloxxado and the efforts to remove me for -- from HRH [sic] for disclosing the conflict to the Ohio Department of Health." Okay. Is there anything that you consider false about that statement?
A Yes.
Q Okay. And what would it be?
A He states that HRO has a conflict of interest.
Q Okay. It then -- the next paragraph starts with the, "I apologize for the stress we've caused by pushing Kloxxado." Okay. And do you consider that statement to be false?
A Yes.
Q Okay. And what is false about that statement?
A What -- "pushing Kloxxado."
Q Okay.
A HRO doesn't push Kloxxado.
Q Okay. What does HRO do with Kloxxado?
A At the time when it was being distributed, we were a distributor.
Q Okay. And at some point in time, you quit distributing Kloxxado; is that correct?
A The Ohio Department of Health stopped using

Page 112

Kloxxado.
Q Right. So -- and when they stopped using it, they then stopped supplying it to you?
A Uh-huh.
Q And do you know when that was?
A I can't say the date accurately off the top of my head.
Q Sometime in 2025?
A I -- I -- I really --
Q You think it's -- okay. That's fine. That's fine.
A -- wouldn't want to speculate.
Q So the remaining stock that you have of Kloxxado, I assume that HRO continued to distribute that until it was depleted?
A I'm not sure.
Q Okay. But any event, the portion of that sentence that you have the issue with is the pushing of Kloxxado?
A If you were asking me what in this statement is false --
Q Correct.
A -- that's something in this statement that I believe to be false.
Q Okay. Did HRO, prior to September of '24,

Page 113

have the ability to request different types of naloxone from the State?
A I -- our standard practice was to order naloxone, which includes Narcan and Kloxxado at that time when the state was using it. Our process is to look back at the previous quarter -- the previous year.
So this -- the quarter that you're projecting your inventory for, you would go back one year, and you would look at that quarter from last year, and you would use that information and current orders to estimate how much you needed to order for your next order. So we had a process that we used.
Q Okay. Based on -- largely based on past usage?
A Yes.
Q Is that fair? Okay.
A To some degree.
Q Okay.
A And then also the orders that were coming in.
Q So when HRO would request, say, Kloxxado or some other version, would you have absolute control over what was provided to you by the State?
A I -- I don't think we had absolute control.

Page 114

Q Okay.
A You know, the State only has what the State has.
Q Right.
A Right?
Q Okay. And prior to September of 2024, who was in charge of ordering the product from the State?
A Prior to September of 2024?
Q Correct.
A There had been a number of people. I -- I think AmandaLynn Reese and Kelsey Bates. I think Aaron ordered naloxone at some times. Dennis ordered Kloxxado -- or naloxone in general at times. That's my understanding.
Q Okay. Was there any one person who was -- you know, say, is in charge of ordering?
A I think there were. The -- those were the people that I listed. I think those were the people who ordered in the time leading up to that.
Q But there was not one person who had the title or served as the primary person ordering? It could be any of a number of people?
A It's my understanding at that time that a number of people placed orders.
Q Okay. The next sentence in there -- or in

Page 115

that e-mail, Exhibit 5, "I had no idea at the time that we had an employee being paid by Kloxxado's lobbyist." Is that a statement that you consider to be false?
A Yes.
Q Okay. And what about that statement is false?
A HRO did know that we had an employee who was working for Velocity Group.
Q Okay. And is it your understanding that the Velocity Group, maybe among other things, performs lobbying service for Kloxxado's manufacturer, Hikma?
A That's not my understanding.
Q Okay.
A I don't know.
Q What is your understanding of what Velocity's relationship is with Hikma?
A I don't really know a -- a whole lot about Velocity Group's relationship directly with Hikma. I'm not sure what the question is.
Q Okay. And if you don't know, that's fine. I was just asking you. You -- we -- you were aware that AmandaLynn was working for Velocity Group?
A HRO was aware, yes.
Q Yeah. Yeah. HRO was aware that AmandaLynn

Page 116

was working for Velocity Group, and my question is: What was HRO's understanding of what Velocity Group's relationship with Hikma, the manufacturer of Kloxxado, was?
A HRO's understanding was that AmandaLynn's role was advocacy and education. It's my understanding that Mallory identified that there was no connection to sales and that there was not a conflict of interest.
Q Okay.
A As far as HRO's understanding.
Q Sure.
A Yeah.
Q Sure. But what about what -- I'm sorry, what Velocity Group's relationship with Hikma was? Did HRO have an understanding of that relationship?
A I don't know for sure at that time. At that time, I'm not sure.
Q Prior to September 4th, was HRO aware that Ms. Reese had a contract with Velocity Group?
A Yes. It is my understanding that Mallory and AmandaLynn discussed that before she entered into it.
Q Okay. Did Mallory or anyone else at HRO ever review AmandaLynn Reese's contract with Velocity

Page 117

prior to September the 4, 2024?
A It's my understanding that that was not a part of our process.
Q Does HRO have an understanding -- or does HRO -- yeah. Does HRO have an understanding that Velocity Group provides lobbying services for Hikma, the manufacturer of Kluxxado?
A No.
Q No, there is no understanding, or no, it does not?
A What was your -- what -- what was the question?
Q Yeah. Does HRO have an understanding or have a belief that Velocity Group provides lobbying services for Hikma, the manufacturer of Kluxxado?
A I can't really speak to what -- what -- what you're asking about what Velocity Group does.
Q Okay. You do not have an understanding as to what services Velocity Group may or may not supply to Hikma, the manufacturer of Kloxxado?
A I -- what -- what -- what is the question again?
Q Does HRO have an understanding as to what services Velocity Group supplies or supplied to Hikma, the manufacturer of Kloxxado, in 2024?

Page 118

A So the question is, what services are provided by Velocity Group to someone that they're contracted with, which would be Hikma?
Q Correct.
A Okay. I -- I -- I would need to see that. I can't speak to -- to what that could entail.
Q Okay. So as we sit here today, you have no knowledge as to whether or not Velocity Group provide lobbying services for Hikma or not?
A I can't -- I -- I don't know for sure right now.
Q Okay.
A I can't -- I don't --
Q Did Mr. Cauchon have any conversations or any communications that you're aware of with the Ohio Board of Pharmacy regarding Ms. Reese's potential conflict of interest?
A I have heard that he did.
Q Okay. And can you tell me the information that you have heard?
A That he was contacting them, and just -- and saying that we had a conflict of interest.
Q What is the source of your knowledge?
A Cameron from the Ohio Board of Pharmacy shared it with me.

Page 119

Q And what is Cameron's last name?
A I would have to look it up to be sure to be accurate.
Q And what position does Cameron hold with the Ohio Board of Pharmacy?
A He's -- it's my understanding that he's on the board, the Ohio Board of Pharmacy.
Q And can you tell me everything that you recall about the statements he made to you or what information he provided to you regarding his communications with Mr. Cauchon regarding Ms. Reese in her work for Velocity Group?
A He stated that Mr. Cauchon was continuing to contact him.
Q Did he tell you what information that Mr. Cauchon had provided to him?
A We did not speak about the details.
Q So HRO was informed by Cameron that he was having communications with Mr. Cauchon, correct?
A Uh-huh.
Q It's a yes?
A What is the question? We were informed?
Q Yes. HRO was informed by Cameron -- currently, we don't know his last name -- that he was having ongoing communications with Mr. Cauchon?

Page 120

A He described it as that Mr. Cauchon was continuing to contact him.
Q Okay. And so my question was: Do you know what the -- what that contact was about, the subject of it?
A He -- I -- I did not ask -- I -- I -- I apologized that it was happening, and I did not ask the details.
Q Do you know when these communications took place?
A No.
Q Do you know if during these communications, did Mr. Cauchon represent himself as a representative of HRO?
A I -- I couldn't say for certain.
Q Now, we know that there was the investigation by Nelson Law Office. And we know that one of the topics of that conversation, or that investigation, was whether or not Ms. Reese had a conflict of interest, correct?
A Correct.
Q Did any portion of that investigation delve into the relationship between Velocity Group and Hikma?
MR. CHANG: Objection.

Page 121

Can we go off the record for a second before --
MR. SHEARER: Sure.
MR. CHANG: So I don't have to, like --
MR. SHEARER: Sure. Absolutely.
MR. CHANG: Go off the record for a second.
THE REPORTER: Going off. Time is 2:13.
(Off the record.)
THE REPORTER: We are back on. Time is 2:18.
BY MR. SHEARER:
Q Did HRO ever conduct a relationship into the relationship -- I'm sorry -- ever conduct an investigation into the relationship between Velocity Group and Hikma?
MR. CHANG: Objection. But I'm not instructing you not to answer. You can answer.
THE WITNESS: We conducted a full investigation.
BY MR. SHEARER:
Q And the full investigation was the Nelson investigation?
A Uh-huh.

Page 122

Q Got you. Okay. At this point, as we sit here now, in August of -- or I'm sorry, July of 2026, are you aware if Mr. Cauchon is still -- is representing himself as a representative or a member of HRO?
A I don't understand that question.
Q Okay. After he was placed on administrative leave and then after he was terminated in -- after he was issued the termination letter in November of 2024, he continued to occupy the Granville office. You've told me about that.
He continued to assert control over -- your testimony has been he attended -- and continued to assert control over HRO's -- what you've -- the website, the Facebook page, the bank accounts. And you've told me about, you know, numerous other things I don't intend upon going back and rehashing. Are any of those actions of that -- continuing to this day?
A I think that's a very broad question.
Q It is. It is. And --
A I can't say for certain. I can't say for certain.
Q Okay. And I did not want to go through -- what I was trying to do was hopefully get a short answer and move on and not go through.

Page 123

So would you agree with me that for a period of time after November 4, 2024, you have alleged that he continued to act as if he still had some role or some authority in the organization, HRO?
A I would not characterize it that way, so I don't know how to answer that question.
Q Okay. Okay. Got you.
A Okay.
Q So what I -- what -- maybe we can speed this up a little bit. So I'm looking at the answer and counterclaim. And if I could read Paragraph 73 to you, "Counterclaim Defendant's continued possession and assertion of ownership over one or more" -- I'm sorry.
A That's okay.
Q Why don't you read Paragraph 73?
A Okay.
Q Are those actions continuing to this day?
A I can't say for certain. Because I don't know of everything that he's doing.
Q Okay. Fair enough. But as we sit here today, do you know of anything that he is doing?
A So how long of a period back are you asking me for?
Q I'm asking right now.

Page 124

A Today? This week?
Q I'm asking you currently.
A I can't say for certain if he -- that he's not.
Q Okay.
MR. SHEARER: Go ahead.
MS. MOYO: He asked you earlier about the website, the Facebook account, all those things. And I believe what Mr. Shearer is asking you is -- because you described those earlier as accounts.
THE WITNESS: Uh-huh.
MS. MOYO: He's asking you, are there still possession and assertion of ownership over one or more of HRO's accounts?
I'm sorry, David. I didn't -- I'm not trying to --
MR. SHEARER: Oh, no, no, no. I'm just trying to get the answer.
MS. MOYO: I know.
THE WITNESS: I think -- I think what -- like, I -- I -- I didn't look at the Facebook account today, but I believe he still asserts control of the Facebook account and ownership of it.
BY MR. SHEARER:
Q Okay. How does he do that? I mean, what --

Page 125

let me strike that.
Why do you say that?
A We -- when you -- we -- we don't have access to it, as HRO. It wasn't turned over. And when we went through the process with Counsel to gain control of it, and Mr. Cauchon maintained control of it.
Q Okay. And that has not changed to the present?
A Correct.
Q Okay. Does HRO have a --
A To my knowledge.
Q Okay. Does HRO have a new Facebook account or a separate Facebook account that was created after November the 4th of 2024?
A We do not.
Q The next thing that you have -- we have in there, in the counterclaim, "Counterclaim Defendant," which is Mr. Cauchon, "has continued to interfere with and control one or more of HRO's accounts."
And so my question to you is, in July of 2025, is Mr. Cauchon continuing to interfere with and control one or more of HRO's accounts, other than what you just told me about the Facebook?
A There was the QuickBooks account that we vacated.

Q Right.
A I -- to my knowledge, I don't know if he's still using that or not. I can't access it.
Q Believe you told me HRO did -- so HRO opened up a new QuickBooks account?
A Yes.
MR. SHEARER: I think I may be about done.
Steve, could you do me a great favor and have those things printed?
MR. CHANG: Yes. I wanted to make sure that this is the Bates range that you're looking for. I'm pretty confident that it is.
MR. SHEARER: Yeah. 1494 to 1786.
MS. MOYO: Is this the same thing I have in front of me?
MR. SHEARER: It is. So there was a couple things in here that I wanted to ask about, but to give me -- I think I'm probably --
MS. MOYO: Do you want to go off the record?
MR. SHEARER: Yeah.
THE REPORTER: We are off. Time is 2:26.
(Off the record.)



THE REPORTER: We are back on record. Time is 2:44.
BY MR. SHEARER:
Q Okay. I actually have a few more questions for you. First, you mentioned the August -- you mentioned an August letter to the ODH. We talked about the September 4, 2024, letter, and you mentioned a second letter to ODH that you believe contained false information.
And so I just wanted to hand you that, have you confirm that that in fact is that letter. I don't have copies. I'm not going to ask any questions about it, but it is HRO 1712 through 1727. And just have you -- we'll mark that as Defendant's -- or HRO -- or, I'm sorry, HRO 6.
(Exhibit 6 was marked for identification.)
And just have you confirm that that is the letter that you were referring to when I asked you earlier about statements made that contained false information.
A Yeah.
Q Okay. That's the --
A The August 12, 2025 --
Q That's what -- okay. That's what you were



referring to earlier when you talked about an additional letter that contained false information?
A Yes.
Q Great. Okay. Next, in the interrogatory responses, those are the questions that I sent to your attorney that were answered. And there were a number of individuals and entities mentioned who you believed false statements were made towards. And we've talked about them all except for two. One of them is Signal News. And the individual looks like it was identified with Jake Zuckerman.
So I have some correspondence that's been produced from between Mr. Zuckerman and HRO. But my question to you generally is, do you know what statements -- can you tell me what statements were made to Signal made by Mr. Cauchon that were false?
A Do we have the --
Q If there's nothing other than what you've produced, we can -- I don't need to ask about it. I mean, we can -- if there's something that you are aware of other than what has been produced -- and when --
MR. SHEARER: I was trying to wrap this up and let you guys get started.



BY MR. SHEARER:
Q Do you know -- let me ask you this. Do you know what Signal is?
A Yes.
Q Okay. And what is Signal?
A It's a news outlet of some kind.
Q Okay. Did Signal, to your knowledge, publish any articles about HRO?
A I believe they did.
Q Okay. Have you reviewed those articles?
A I -- I don't know that they're -- I've seen more than one. I would have to look at it again.
Q Okay. You're just aware of the one article?
A I would have to look again.
Q Okay. Okay. The next -- well, we'll come back to that in a minute. The next is, there is reference to something called Cardinal News. Do you know what Cardinal News is?
A Cardinal News? I can't think of what that is at -- right off the top of my head.
Q A Douglas Pardue?
A Yes. Uh-huh.
Q Okay. Can you tell me who Douglas Pardue is?
A I don't know a lot about him. I believe he

Page 130

was contracted by HRO to write something for HRO.
Q Okay. And do you know what he was contracted to write for HRO?
A Reviewing the records, it looks like he was contracted to write a story about impacted children and families related to the overdose crisis.
Q Okay. And did he, in fact, write an article, to your knowledge?
A I don't know.
Q Okay. And so I assume you have no information that an article was ever published by Mr. Pardue or his organization, Cardinal News?
A I don't know.
Q Okay. Okay. Let's talk a little bit about how the statements that you have alleged are false, how those have affected HRO. So what you have in the counterclaim is that as a result of the defamatory publications, HRO suffered and continues to suffer reputational injury in HRO's professional communities. So what reputational injury has HRO suffered?
A I think that's really hard to quantify. Can you give me an example of what would quantify that?
Q No, I can't.
A Okay.
Q If I could, I would.

Page 131

A Okay.
Q That's why I'm asking you.
A Okay.
Q Because I'm reading from the complaint that was filed, and the complaint alleges reputational injury in HRO's professional communities. And so I'm really looking for you to clarify what you mean by that.
A Okay. I know when the -- when the Signal article was out, we had a number of people contact us and ask us about the information that was shared there. So we had to talk with them about it.
Q Can you tell me who those people were that contacted you?
A Contacted HRO?
Q Contacted HRO.
A Contacted HRO. It would be -- I would need to review it to -- to really provide an accurate list. I know that just in our immediate community, people from other organizations, such as S.O.A.R., Caracole -- I'm trying to summarize for HRO. I know that other individuals received -- you know, were contacted by people asking questions as well.
Q Who were those other individuals that were contacted at HRO?

Page 132

A I know a number of people contacted our staff, Kelsey -- Kelsey Bates, AmandaLynn Reese. I believe Dwayne had some people contact him about it as well.
Q Okay. Was HRO's reputation in the community impacted?
A I think it's too soon to say what that impact is.
Q Okay. Next, it says, "As a direct and proximate result of the defamatory publications, HRO suffered and continues to suffer," it says, "economic loss, including lost clients or business prospects, and damage to professional standing." What lost clients are you referring to? Who is HRO referring to?
A I think that the -- I don't know that I can say exactly.
Q Okay. Can you identify any lost clients?
A Let me think for a moment. Not that I can think of right now.
Q Okay. Can -- the next category was "damage to professional standing." Can you give me -- can you tell me how HRO was -- its professional standing was damaged?
A Well, if someone was to read that article

Page 133

and pursue and -- and assume that it was true, it would damage HRO's reputation.
Q Okay. Can you give me an examples of where you know that has happened or someone has relayed something to you, some specific information regarding damage to the professional standing?
A Not at this time.
Q Okay. Next, we have -- as a result of the defamatory publications, we have costs incurred in -- to mitigate the damage, including reputation management, legal fees, and communications with third parties. I believe we've already talked about a lot of those, have we not?
A That we've hired Counsel --
Q Correct.
A Counsel? Yeah.
Q Specifically, what I wanted to ask you about is, were there any costs incurred regarding reputation management?
A I would include the -- our working with our counsel with that.
Q That would be the Porter Wright?
A Yes.
Q Did HRO retain any outside, you know, publicists or PR firm?

A Not at this -- no. Not to my knowledge.
MR. SHEARER: Okay. I think that's all the questions I have for you.
THE WITNESS: Okay.
MR. SHEARER: Thank you very much.
THE WITNESS: I don't know where these go.
THE REPORTER: Do you want to advise on signature?
MR. CHANG: I actually just have -- I do have one question for her.
THE REPORTER: Okay.

EXAMINATION

BY MR. CHANG:
Q Ms. Turner-Bicknell, you were previously provided a document that was marked as Cauchon Exhibit 18, which is -- which attaches a letter to the ODH that you reviewed with Counsel. I'm not going to revisit the substance of the letter itself, but my only question is: As the basis for HRO's counterclaims in this lawsuit, is that letter part of a -- part of the claim for defamation that HRO is asserting?
A No.
MR. CHANG: Okay. Thank you.
THE REPORTER: Did we want to advise on



signature?
MS. MOYO: She'll read it.
THE REPORTER: She'll read?
MS. MOYO: Uh-huh.
THE REPORTER: Perfect.
And then, Mr. Shearer, did we want to order transcripts?
MR. SHEARER: Yeah.
THE REPORTER: Perfect.
Did we want to order?
MS. MOYO: Copy.
Are you ordering?
MR. CHANG: So I believe -- did -- are you ordering?
MR. SHEARER: Yes.
MR. CHANG: We'll get a copy.
THE REPORTER: Perfect. We are going off record. Time is 2:57 --
(Signature reserved.)
(Whereupon, at 2:57 p.m., the proceeding was concluded.)



CERTIFICATE OF DEPOSITION OFFICER

I, KAYLEIGH KINNAMON, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this actio



KAYLEIGH KINNAMON
Notary Public in and for the
State of Ohio

[X] Review of the transcript was requested.



STEVEN CHANG, ESQUIRE
schang@reminger.com

August 20, 2026

RE: Cauchon, Dennis, Et Al. v. Steward, Dwayne, Et Al.
7/30/2026, Tasha Turner-Bicknell (#8359309)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

Cauchon, Dennis, Et Al. v. Steward, Dwayne, Et Al.
Tasha Turner-Bicknell (#8359309)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________
________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
________________________________________________
REASON____________________________________________

________________________________ _______________
Tasha Turner-Bicknell Date



Cauchon, Dennis, Et Al. v. Steward, Dwayne, Et Al.
Tasha Turner-Bicknell (#8359309)

ACKNOWLEDGEMENT OF DEPONENT

I, Tasha Turner-Bicknell, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Tasha Turner-Bicknell Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

**&**

**&** 2:11 3:5 101:17

**0**

**0075** 1:7

**1**

**1** 4:8 6:1 7:1 10:2,4,24 17:12,15,18,24 18:7,9,10 28:14 31:1,20 32:1 75:1 76:1 128:1 129:1
**1,750** 100:23
**10** 4:8 6:10 7:10 28:15,15 31:10 32:10 36:8 75:10 76:10 128:10 129:10
**100** 75:4
**10:07** 1:18 5:3
**10:13** 10:19
**10:18** 10:22
**11** 4:16 6:11 7:11 31:11 32:11 75:11 76:11 128:11 129:11
**110** 4:15
**11:14** 48:4
**11:29** 48:7
**12** 6:12 7:12 31:12 32:12 75:12 76:12 127:24 128:12 129:12
**127** 4:17
**12:39** 95:22
**13** 6:13 7:13 31:13 32:13 75:13 76:13 128:13 129:13
**134** 4:4
**14** 6:14 7:14 31:14 32:14 36:7,9 75:14 76:14 128:14 129:14
**1436** 89:8
**1494** 126:14
**14th** 27:7
**15** 4:13 6:15 7:15 31:15 32:15 75:15 76:15 93:18 128:15 129:15
**15th** 94:14
**16** 6:16 7:16 31:16 32:16 75:16 76:16 128:16 129:16
**17** 6:17 7:17 31:17 32:17 75:17 76:17 128:17 129:17
**1712** 127:13
**1727** 127:13
**1786** 126:14
**18** 6:18 7:18 31:18 32:18 38:25 39:10 60:12 75:18 76:18 108:16 110:3 128:18 129:18 134:17
**19** 6:19 7:19 31:19 32:19 75:19 76:19 128:19 129:19
**1:35** 95:25
**1a** 11:13 37:10
**1b** 21:15,22 38:16 88:25 90:11

**2**

**2** 4:9 6:2 7:2 24:8,10,12,13 25:1 28:14 31:2 32:2 39:3 59:13 65:4 75:2 76:2 96:9 128:2 129:2
**20** 6:20 7:20 31:20 32:20 75:20 76:20 128:20 129:20 137:3 139:15
**2018** 9:7 99:17
**2024** 4:11,14 9:12,13 12:1 13:4 15:24 18:21 20:2 21:14,24 22:2 39:15 40:6 65:3 67:15 70:7 75:6 91:6 92:17 93:18 101:15 114:6,8 117:1,25 122:9 123:2 125:14 127:7
**2025** 4:16 14:15 15:9 58:9,15 100:11 100:19 101:13 101:18,19 110:20 112:8 125:21 127:24
**2026** 1:17 5:8 14:15 15:1 122:2 137:3
**21** 6:21 7:21 31:21 32:21 75:21 76:21 128:21 129:21
**22** 6:23 7:22 31:22 32:22 75:22 76:22 128:22 129:22
**227-2106** 3:9

**23** 6:25 7:23 31:23 32:23 75:23 76:23 128:23 129:23
**232-2446** 2:24
**2388** 2:12
**24** 4:9 7:24 11:21 12:15 13:11 17:5 19:2 20:9 22:18 31:25 32:24 56:25 63:1,2 65:3 75:25 76:24 110:19 112:25 128:25 129:24
**25** 7:25 9:10 32:25 76:25 110:19 129:25
**26** 13:12
**292** 60:13
**293** 60:13 64:6
**2:13** 121:9
**2:18** 121:12
**2:25** 1:7
**2:26** 126:24
**2:44** 127:2
**2:57** 135:18,20

**3**

**3** 4:10 6:3 7:3 31:3,20,23,23 32:3 39:15 75:3,6 76:3 89:2,3,7 128:3 129:3
**30** 1:15,17 5:7 96:22 97:19,20 137:16
**308-1490** 2:15
**327** 2:4
**330** 1:20 2:21
**36234** 136:18
**3rd** 60:6,12 75:18 76:4

**4**

**4** 4:12 6:4 7:4 21:24 31:4 32:4 40:6 67:15 70:7 75:4 76:4 93:10,11 117:1 123:2 127:7 128:4 129:4
**41** 3:6
**41017** 2:13
**43023** 2:5
**43212** 1:21 2:22
**43215** 3:7
**4th** 22:2,18 23:20 24:22 74:22 87:4 91:12,13 99:5 99:8 103:5 105:16 116:19 125:14

**5**

**5** 4:11,15 6:5 7:5 31:5 32:5 75:5 76:5 91:6 92:17 107:15 107:17,17,18 110:8,9,24 115:1 128:5 129:5
**5a** 11:9,10
**5c** 11:9
**5th** 91:11

**6**

**6** 1:15 4:17 6:6 7:6 31:6 32:6 75:6 76:6 127:15,16 128:6 129:6
**614** 2:24 3:9
**64** 109:3

**7**

**7** 4:3 6:7 7:7 31:7 32:7 75:7 76:7 128:7 129:7
**7/30/2026** 137:5
**73** 123:11,16
**740** 2:7

**8**

**8** 6:8 7:8 31:8 32:8 75:8 76:8 128:8 129:8
**8359309** 137:5 138:2 139:2
**859** 2:15
**89** 4:10 16:15
**89,999** 97:20

**9**

**9** 6:9 7:9 16:15 31:9 32:9 75:9 76:9 78:15 128:9 129:9
**93** 4:12
**955** 1:20 2:21 5:8
**973-3814** 2:7

**a**

**a.m.** 1:18 5:3
**aaron** 114:12
**ability** 78:7 113:1 136:10
**able** 8:17 30:22 40:4 44:21 45:24 47:6 48:17,18 49:6 58:24 102:10 103:7,11
**above** 25:9 55:17 90:22 137:6 139:7

**absence** 22:24 24:4 99:7
**absent** 5:11 94:21,22 99:19
**absolute** 113:23,25
**absolutely** 37:17 48:1 75:4 121:5
**accepted** 61:11
**accepting** 62:9
**access** 23:5,6,8 30:7,9 42:12 42:15,24 43:1 43:12,14,18,24 45:4,6,7,14 46:1,6,7,11,17 47:6,12,16,18 48:11 49:4,6 49:14,17 50:8 50:9 51:3,3,7,9 51:11,15 52:17 53:24 54:5,12 54:17 56:9,10 56:10,14 82:3 82:5,5,12,13,14 82:16,23 83:1 83:7,15 88:4 96:10,23 98:8 98:22 103:8,11 103:12,22,24 104:4,13,16 105:8,11,12,18 106:2,16 125:3 126:3
**accessed** 42:22
**accesses** 83:13
**accessing** 43:7 43:9,10,11,13 46:23 106:14
**account** 30:7 42:20,23 43:1 43:8,19,20,23 44:1,2,4,7,8,13 44:18,23 45:1 45:3,17,25 46:1,7,9,11,17 47:6,12,18 48:11,13,13,15 48:18,20 49:3 49:5 51:6 52:19 83:21,21 83:23 85:1 96:17 98:9 100:24 101:12 101:17,23 102:1,2,6,8,9 102:11,15,20 102:25 103:5,8 106:6 124:8,22 124:23 125:12 125:13,24 126:5
**accountant** 97:4
**accounts** 23:5,6 42:12,15 43:15 44:21 45:2,15 46:23 48:11 49:14 50:9 84:24 96:24 122:15 124:10 124:14 125:19 125:22
**accuracy** 137:9
**accurate** 119:3 131:18 136:9
**accurately** 112:6
**acknowledge** 76:25
**acknowledge...** 139:3
**acknowledge...** 5:10
**acknowledg...** 137:12
**act** 22:21,21 39:7,19 42:15 123:3
**acting** 9:17 70:14 75:2,19
**action** 21:23 67:23 68:2 75:1 105:4 136:12,16
**actions** 26:12 30:18 122:18 123:18
**activity** 50:14 50:15
**acts** 22:21 39:14 40:19 42:10,11 48:9 59:15
**actual** 11:24 110:4
**actually** 48:23 58:20 98:1,22 127:4 134:10
**add** 45:24
**added** 19:14,18 19:19
**adding** 18:25
**addition** 42:21
**additional** 23:23,25 39:21 96:15 102:14 102:14 128:2
**additionally** 5:11 60:25
**additions** 139:6
**address** 7:7 29:18 90:25 91:3 100:8
**addresses** 90:22
**administer** 5:10
**administration** 19:13
**administrative** 20:11,19,21,23 20:24 21:3 39:18 40:3

45:22 46:3,18 47:3 57:18,25 59:12 63:9 66:21 78:2 80:4 94:4,12 100:5 105:18 122:7
**administrator** 16:20 17:1,4 42:17 43:6 52:19
**adriana** 13:19
**advance** 27:14 32:9
**advice** 24:24 69:2 73:13 101:25
**advise** 134:8,25
**advised** 75:3
**advocacy** 116:6
**affect** 76:14
**affected** 96:14 96:14 130:16
**agenda** 27:14
**ago** 68:16 108:13 111:1
**agree** 5:13 33:12 67:23 123:1
**agreed** 23:2 74:19
**ahead** 8:24 37:8,11 69:14 69:23 71:3
74:7,8,9 90:12 124:6
**al** 1:4 137:4,4 138:1,1 139:1 139:1
**allegations** 73:6 99:20 108:6,7
**alleged** 93:5,6 96:16 123:2 130:15
**alleges** 131:5
**allotted** 137:19
**allow** 27:25 45:14 70:25
**amandalynn** 19:22 20:10,16 41:3,22 59:20 60:22,25 61:14 61:25 63:25 64:7,15 68:13 71:7,14,25 77:21 114:11 115:23,25 116:22,25 132:2
**amandalynn's** 73:17 76:12 116:5
**amended** 18:20
**american** 85:7 103:13,18
**amethyst** 83:4
**amount** 97:18 100:22
**amounts** 97:10 97:15
**anne** 12:16 15:2,3,9
**answer** 7:24 8:6,7,19 29:25 32:17 36:4 40:8 41:9 49:23 52:4 55:1,23 65:17 66:7,12 69:20 70:25 71:3,17 73:12,19 74:7 74:9,14 75:22 90:11 95:2 99:25 109:2 110:4 121:19 121:19 122:25 123:6,10 124:18
**answered** 36:3 37:25 38:3,5 72:22 75:7 128:6
**anybody** 50:23
**apologize** 20:21 111:11
**apologized** 120:7
**appears** 25:3 90:20
**appended** 139:7
**applicable** 5:17 137:8
**application** 88:13
**apply** 88:12
**appreciate** 49:23 72:19
**appropriate** 63:17
**appropriaten...** 79:5
**approval** 78:9 78:20
**april** 101:13,18
**area** 104:23
**arises** 32:19
**arrived** 55:8 95:17
**arthur** 3:5
**article** 31:22,23 36:8 129:13 130:8,11 131:10 132:25
**articles** 129:8 129:10
**asked** 8:19 35:9 36:2 63:9 104:25 124:7 127:19
**asking** 7:4 8:4 29:10,11,16 33:23 55:24

64:19 66:14 72:6 75:5 89:19,25 90:5 97:16 102:19 108:1 112:20 115:22 117:17 123:23,25 124:2,9,12 131:2,23
**assert** 79:18 122:12,14
**asserted** 65:11 74:2
**asserting** 134:22
**assertion** 123:13 124:13
**asserts** 124:22
**assigned** 5:4
**assistance** 98:6
**associated** 9:6 51:24
**assume** 28:11 56:24 58:21 112:14 130:10 133:1
**assuming** 58:20 59:2
**assumptions** 85:4
**attached** 39:9 110:25 137:11
**attaches** 134:17
**attempts** 49:7
**attend** 92:5,7,9
**attendance** 5:24
**attended** 122:13
**attorney** 65:9 68:8 128:6 136:14 137:13
**audio** 136:8
**august** 4:17 13:12 110:18 110:19 122:2 127:5,6,24 137:3
**authentication** 51:13 52:7
**authored** 24:23
**authority** 123:4
**authorized** 5:9 69:25
**available** 137:6
**average** 96:22
**aware** 12:25 23:24 29:17,20 29:22 30:1 31:4,15 35:24 39:14 44:16,22 46:16 49:22 70:25 80:18 81:21 82:15 84:6 85:13 87:5 101:16 115:22,24,25 116:19 118:15 122:3 128:21 129:13

**b**

**b** 1:15 4:6 107:18
**back** 8:11 10:21 12:1 18:23 21:16 31:18 37:16 38:16 39:12 48:6 59:13 60:11 64:4 65:3 73:20 95:24 96:8 98:5,15,23 113:6,9 121:11 122:17 123:23 127:1 129:16
**backbar** 74:13
**background** 9:5
**backing** 105:17
**badge** 82:1
**badges** 81:15 81:15,17,21,25
**bank** 23:5 30:7 42:12,15,19,22 42:22 43:13,14 43:23 44:2 45:12 46:22 47:18 48:11,11 48:21,23 49:1 49:7 51:6 82:9 87:13 96:20 101:20 122:15
**banking** 50:14 50:15
**based** 26:12 60:8 69:16 92:18 97:16 113:14,14
**basis** 20:2 21:22 57:7 73:25 134:20
**bates** 17:10 60:13 79:9,11 89:7 114:11 126:12 132:2
**beginning** 5:25
**behalf** 2:2,9,17 3:2 29:13 33:18 38:9 72:20 90:2
**belief** 117:14
**believe** 13:24 22:8 27:7 37:9 47:11 52:15 53:1 54:14 58:9 66:17 68:22,25 71:5 71:12,22,23 75:7,10 78:4 79:16 85:6 103:17,23 109:19 110:8 110:18 112:24

124:9,22 126:4 127:8 129:9,25 132:3 133:12 135:13
**believed** 66:19 68:10 128:7
**believing** 70:16 71:6,13
**belong** 86:4
**belonged** 51:22 84:2,20
**best** 16:6 136:10
**better** 21:3
**beyond** 37:3
**bicknell** 1:9,14 2:18 5:7 6:11 6:17 8:25 11:7 72:10 134:15 137:5 138:2,24 139:2,4,12
**big** 42:2
**billy** 12:16 13:10,20,25 14:1 77:10
**biogroup** 76:13
**bit** 88:5,24 107:10 108:13 123:10 130:14
**blocked** 45:25
**board** 4:10,12 9:7,8,15,16 12:5,15,19,22 12:25 13:7,17 13:19 14:3,4,7 14:12,19 15:1 15:3,6,8,9,16 16:16,17 19:10 19:10,11,11 21:23 22:3 24:24 25:2,7 26:1,6,9,17,18 26:21,22 27:2 27:9,12,12,13 27:19 30:10 31:10 32:4,19 33:2,3,6,7,8,10 33:12,25 34:5 34:17 35:6,9 36:13,19 38:10 45:11,12,14 48:17,22 49:1 53:15 55:8 65:12 67:4 69:2,8,16,17 72:21 75:3 76:22 78:9,20 79:4 80:21,22 90:16 91:5,18 91:20,20,24 92:1,1,3,6,7,8 92:10 94:1,2,9 118:16,24 119:5,7,7
**bolen** 61:7,12 64:16
**bollard** 53:19
**bookkeepers** 83:2,3,6
**bookkeeping** 83:4
**borough** 101:17
**bourland** 77:16 77:18 78:1,14
**break** 8:17,20 47:25 95:8
**briefly** 9:6 51:7
**bringing** 68:11 72:1,8
**broad** 122:19
**broadway** 2:4
**brought** 20:13 41:5 62:18
**building** 82:8
**business** 42:21 43:17 80:25 81:1 132:12
**buy** 46:21
**bylaws** 17:15 18:17,18 28:23 29:1 32:24

**c**

**c** 2:1 3:1 5:1 11:9,10 107:17
**cabinet** 53:13 55:15 104:2 105:1
**cabinets** 55:16 55:19 103:21 103:23
**calendar** 14:11 89:22
**call** 16:23 17:17 33:3
**called** 6:20 129:17
**calls** 65:23
**cameron** 118:24 119:4 119:18,23
**cameron's** 119:1
**caracole** 131:20
**card** 80:25 81:1 81:3 82:1 103:14,18
**cardinal** 129:17,18,19 130:12
**cards** 46:20 80:15,20,24 81:2,6,11,17,25 84:18,20 85:4 85:8,12 87:13
**care** 95:20
**case** 1:6 89:11
**cases** 104:6
**category** 84:7 84:12,18 85:14 86:17 132:21
**cauchon** 1:4 2:2,3,9 4:15

6:2,4,4 11:17 12:2,19,22,24 13:4 17:18,23 18:7 20:24 21:25 24:22 25:16,25 26:10 27:3 28:14 30:6,8 31:16 31:20 35:16,18 36:1 38:18,25 39:9,23 40:19 42:4,14 43:18 44:17,23 45:18 46:2,17 47:2 47:21 49:8 51:18 52:25 53:5,16,24 54:24 58:1,19 60:12 62:23 63:19 65:8 66:17,19 67:6 67:24 68:4,7 69:6 71:6,9,13 74:22 75:12,19 77:25 78:5,17 79:22 81:7,16 82:17,22 83:1 83:5 84:8,19 85:11 86:15,18 99:5,20 100:5 102:9 103:4,13 104:2 105:4,17 105:25 108:16 109:20 118:14 119:11,13,16 119:19,25 120:1,13 122:3 125:6,18,21 128:16 134:16 137:4 138:1 139:1

**cauchon's** 21:24 22:17 26:8 30:18 45:17 55:21 57:6 73:16 75:16 76:15 88:1 94:3 99:7 102:13 107:19

**caused** 111:11

**cecile** 16:20 17:2,3 42:17 45:6,18 46:6 46:19 47:5 49:6 57:8,20 77:10 79:25 83:2,6 103:7

**cecile's** 49:17

**certain** 83:11 87:14 88:12 95:4 101:20 103:15 104:1 104:25 105:1 105:23 107:8 120:15 122:21 122:22 123:19 124:3

**certificate** 136:1

**certified** 5:14

**certify** 136:4

**cetera** 27:15 82:10

**chair** 13:9 14:1 14:2 45:11,12 48:21 49:1 76:23

**chairman** 13:7

**chang** 2:19 4:4 6:6,6 10:16 18:3 22:14 26:2 31:21,25 34:22 36:25 37:8,11 57:11 57:14 65:15,23 66:5,8,11 67:11 70:22 71:16 74:12 75:14,20 90:7 95:16 109:24 110:6 120:25 121:4,6,18 126:11 134:10 134:14,24 135:13,16 137:1

**change** 16:4 18:24 45:19 47:2 83:5 100:6 138:4,7 138:10,13,16 138:19

**changed** 13:13 18:20 47:12 51:12 125:7

**changes** 13:14 19:1,4 137:10 139:6

**changing** 97:3

**characterize** 123:5

**charge** 114:7 114:16

**charges** 85:11

**chart** 19:5

**chase** 44:1,17 45:25 48:12 49:4 85:1 100:24 101:12 101:16 102:21 102:22

**check** 15:11,13 15:14

**chief** 16:21 19:24 20:1,8

**children** 130:5

**cincinnati** 57:3

**cite** 66:23

**claim** 65:6,6 66:4 67:20,22 108:23 134:22

**claiming** 60:7 65:22 67:24

**clarify** 72:19 131:7

**clarity** 31:21
**clear** 8:12 72:5 77:23 101:8 104:24
**clients** 132:12 132:14,18
**close** 102:7
**closed** 101:23 102:3
**closing** 102:5
**code** 82:8,9,12
**codes** 82:3,5,12 82:14,16
**colleen** 12:16 14:23,25 15:1
**columbus** 1:21 2:22 3:7 5:8
**combined** 41:17
**come** 23:9 27:22,23 45:9 47:5 56:22 57:22,24 58:1 101:12 129:15
**comes** 87:15
**coming** 106:6 113:20
**committed** 38:18
**communicate** 43:5 49:7 96:19 98:20
**communicated** 66:18
**communication** 39:18 56:16 63:8,14 65:8 65:10 68:3,10 70:23 71:1 77:6 94:1,7,7 108:2 109:12 109:17 110:17
**communicati...** 39:13,21,25 40:5,14 107:11 108:17 118:15 119:11,19,25 120:9,12 133:11
**communities** 130:19 131:6
**community** 131:19 132:5
**company** 101:17 107:6
**complaint** 70:13 71:18 131:4,5
**complaints** 40:25 41:11 66:3 105:25
**complete** 21:22 88:13 139:8
**completed** 137:16
**comply** 22:23 80:9
**computer** 105:19,21,22
**computers** 83:25 84:1,5 105:19 106:2
**concern** 35:16 106:4,13
**concerned** 35:18
**concerning** 31:16 70:13
**concerns** 68:11
**concluded** 21:11 135:21
**conclusion** 21:5
**conduct** 25:11 43:16 69:3,17 70:9 71:10,19 121:14,15
**conducted** 35:12,15 40:24 42:3 69:24 72:3 93:4 121:20
**conducting** 23:2 70:8 71:24
**confident** 126:13
**confirm** 127:11 127:18
**conflict** 40:25 41:2,5,21 59:21 60:7,22 61:14 62:17 64:1,7 68:12 68:13 69:11 71:14,25 73:17 75:3 76:13,16 76:18 92:25 93:6 111:1,3,8 116:9 118:17 118:22 120:20
**confusion** 72:18 101:6
**connection** 116:8
**consider** 26:7,7 111:5,12 115:3
**considered** 65:5
**consisted** 39:14 103:23
**consistent** 16:6 100:19
**consistently** 42:23 58:3
**consists** 19:11
**constitute** 5:21
**consult** 69:3
**consulted** 106:19,25
**consulting** 23:2
**cont'd** 3:1
**contact** 40:10 119:14 120:2,4 131:10 132:3

**contacted** 42:4 48:21 131:14 131:15,16,17 131:22,25 132:1
**contacting** 118:21
**contain** 32:3
**contained** 11:3 60:9 76:7 90:15 127:8,20 128:2
**contemplated** 26:1 69:7
**contemplation** 26:4
**contents** 74:24
**context** 37:1
**continue** 35:1 43:18 58:1,17 63:21 99:22
**continued** 22:24 23:5,9 40:10 43:1 44:3 45:7,25 56:22 58:19 99:9,11,21 112:14 122:10 122:12,13 123:3,12 125:18
**continues** 130:18 132:11
**continuing** 30:7 42:11 43:12,24 61:22 119:13 120:2 122:18 123:18 125:21
**contract** 59:22 76:14 116:20 116:25
**contracted** 118:3 130:1,3 130:5
**control** 11:15 42:19 45:1 48:17,18,19 51:14,25 52:21 52:25 55:24 96:10 98:4 102:8,9 113:23 113:25 122:12 122:14 124:22 125:5,6,19,22
**controlled** 47:21
**convene** 30:10
**conversation** 62:13 64:20,24 120:18
**conversations** 64:11,13 118:14
**cooperate** 24:4 41:13 49:9 51:19 59:2,10 59:10,11
**cooperated** 62:15,16,22
**coordinators** 16:23 57:13,22
**copies** 17:21 127:12 137:14
**copy** 10:2,3,7 18:4 85:22,24 135:11,16
**corporate** 1:15 6:18 11:15 29:15 36:23 38:4 96:10
**correct** 12:3,4 13:5,6 17:6 34:1 35:7 40:21 45:23 69:13 99:17,18 100:13,25 101:1 102:2,23 105:19 111:24 112:22 114:9 118:4 119:19 120:20,21 125:9 133:15 139:8
**corrections** 139:6
**correctly** 56:21
**corresponden...** 98:14 99:5 128:12
**cost** 96:25,25 97:3
**costs** 133:9,18
**could've** 88:9
**counsel** 11:6 24:25 31:21 54:19 57:11,14 58:24 66:17 68:21 69:3 70:24 71:1 73:13 87:24 96:18 97:6 98:6,17,24 101:25 105:10 106:19 107:16 125:5 133:14 133:16,21 134:18 136:11 136:14 137:14
**counsel's** 11:3 21:6
**count** 30:20
**counterclaim** 2:9 3:2 6:5,9 105:24 108:5,7 108:10,23 109:2 110:5 123:11,12 125:17,17 130:17
**counterclaims** 6:2 134:20
**counts** 108:23

**couple** 111:1 126:18
**court** 1:1 5:4
**covered** 37:9
**created** 125:13
**credentials** 96:10
**credit** 46:20 84:18,20 85:4 85:11 87:13
**crisis** 30:11 130:6
**cs** 137:15
**cs8359309** 1:25
**current** 13:19 17:9 18:18 113:11
**currently** 13:18 14:16 19:11,23 119:24 124:2
**custom** 56:7
**cv** 1:7

**d**

**d** 4:1 5:1
**daily** 30:10 35:19 57:7
**damage** 132:13 132:21 133:2,6 133:10
**damaged** 132:24
**date** 1:17 10:9 14:5 15:11,14 15:15 21:12 26:15 27:5,20 43:22 48:24 58:8 61:10 83:10 95:4 101:21 112:6 138:24 139:12
**dated** 70:7
**dates** 20:17 27:21,23 28:1 40:14
**david** 2:10 6:1 7:3 18:8 95:7 124:15
**day** 36:8,9 91:11,15 100:17 105:1 122:18 123:18 139:15
**days** 54:14 137:16
**decided** 25:15 25:17
**decision** 16:4 25:19 26:11 27:2 77:15
**decisions** 77:1
**decker** 12:17 13:20,22 14:19
**declare** 139:4
**declined** 61:1 61:25
**deemed** 139:6
**defamation** 108:5,24 134:22
**defamatory** 130:17 132:10 133:9
**defendant** 2:9 3:2 6:5 125:17
**defendant's** 10:2 123:12 127:14
**defendants** 1:11 2:17 6:7
**define** 32:22
**definition** 32:23 46:15
**degree** 113:18
**delve** 120:22
**demonstrated** 43:7
**demote** 78:10
**demoted** 50:19 50:24,25
**denied** 55:6
**dennis** 1:4 2:2 2:3,9 4:15 6:2 6:4 11:16 12:1 16:8 45:7 55:9 56:19 114:12 137:4 138:1 139:1
**dennis's** 61:20
**denniscauchon** 2:6
**deny** 53:24 54:11
**department** 59:22 111:4,25
**departure** 86:16
**depend** 94:11
**depends** 80:23
**depleted** 112:15
**deponent** 137:13 139:3
**deposing** 137:13
**deposited** 102:14,20
**deposition** 1:13 4:8 5:6,19 9:21 17:12 107:13 136:1
**describe** 53:10 55:12
**described** 93:3 120:1 124:10
**description** 4:7
**designated** 7:15
**detail** 44:21 101:10
**details** 61:1 62:1,3,6,12 76:25 77:2 119:17 120:8

**determined** 34:6 59:20
**determines** 32:25
**devices** 82:3,14 84:13,15
**differ** 30:3
**difference** 36:9 37:22 102:4
**different** 17:22 28:20 37:6 38:11 55:19 58:10 82:24 99:13 113:1
**differently** 100:21
**dig** 39:2
**digital** 136:8
**direct** 30:9 75:2 132:9
**directly** 97:22 115:19
**director** 9:4,9 9:14,18,19 11:19 13:14,25 15:23,25 16:10 16:12,18 19:1 45:11 48:22,25 97:20
**directors** 24:24 27:9 69:3 72:21 76:22 92:7,8,10 94:9
**disciplinary** 73:8
**disclose** 61:1
**disclosed** 61:4 70:17
**disclosing** 111:3
**disclosure** 61:8 62:11
**discovery** 89:11 104:18
**discuss** 26:7,17 30:6,11,18 32:19 36:1 92:19
**discussed** 26:18 26:23 28:25 33:15 59:4,16 61:12 62:8 64:15 76:4,6 87:7 92:16,16 94:13,24,24 95:4 116:22
**discussion** 26:13
**distribute** 44:4 112:14
**distributed** 111:21
**distributing** 111:24
**distributor** 111:22
**district** 1:1,1
**distro** 108:18 108:20 109:12
**diverging** 37:1
**division** 1:2
**document** 18:15 21:16 24:17,20 25:2 33:16 39:4 77:3 89:7,9,13 93:9,14 109:25 110:4 134:16
**documentation** 21:23 88:25
**documents** 15:14 27:15,25 29:8,17 30:22 40:16 49:2 85:15,16,22 86:1,4,7
**doing** 77:24 106:8 123:20 123:22
**domain** 51:23 53:1,3,5 87:18
**donations** 104:9,11,13
**douglas** 129:21 129:23
**draw** 16:12
**drive** 2:12 106:14
**dshearer** 2:14
**duly** 6:20 136:5
**duties** 16:1 20:7,12,14
**dwayne** 1:8 2:17 12:17 13:8 14:2,3,4 14:16 63:18 77:10 132:3 137:4 138:1 139:1

**e**

**e** 2:1,1 3:1,1 4:1 4:6 5:1,1 43:6 45:7 56:16 63:7,13 76:21 77:6 90:22,25 91:3 94:7,8 95:17 109:18 110:13 115:1 138:3,3,3
**earlier** 101:22 103:12 124:7 124:10 127:20 128:1
**early** 14:15 20:25 58:9,15
**ease** 17:14
**easier** 8:9 21:21
**easiest** 11:12,18 60:19,20
**east** 2:4
**eastern** 1:2

**economic** 132:11
**education** 116:6
**efforts** 111:2
**eight** 12:5
**either** 19:13 20:1 29:10 43:13 54:16 77:3 85:11 101:8 109:10
**electronic** 84:13,15 85:19 86:3
**electronically** 25:14 28:11 85:14,16,22 86:1,7
**eliminated** 15:21 19:14,17
**eliminating** 18:24
**elizabeth** 3:4 6:8 13:20
**email** 4:15
**emails** 42:17 77:9 106:5
**emergencies** 34:15
**emergency** 4:10 27:18,21 28:18,21,24 29:3,5,7,18 30:4,5,5,17 31:2,11 32:18 32:22,24,25 33:4,5,6,12,15 33:23,24 34:1 34:6,7,12,14,18 34:19 35:4,6,8 35:11,15,17,21 35:25 37:22 90:16 91:5,18 91:19,20
**emoyo** 3:8
**employed** 49:8 136:11,14
**employee** 42:18 49:3 53:11,15 53:18 54:21 56:9 63:11 67:4 96:21 106:19 115:2,8 136:13
**employees** 23:8 24:3 54:3 56:7 59:1,9 78:6,8 78:10,18 80:21 80:22
**employment** 21:24 61:2,4 71:15
**engage** 22:24 71:10
**entail** 118:6
**entered** 116:22
**entire** 8:7 54:2
**entities** 106:25 128:7
**entitled** 85:23
**environment** 41:1,11,20 93:6
**equal** 77:17 78:24
**errata** 137:11 137:13,16
**erratas** 137:15
**es** 136:4
**esquire** 2:10,19 3:4 137:1
**estimate** 97:18 113:12
**et** 1:4 27:15 82:10 137:4,4 138:1,1 139:1 139:1
**ethics** 67:5,9
**event** 112:17
**evidenced** 34:19
**evidentiary** 5:18
**exact** 14:5 15:11,14,15 21:12 43:22 58:8 61:10 101:21
**exactly** 14:12 35:19 88:6 101:8 105:1 132:17
**examination** 4:2 7:1 134:13
**examined** 6:23
**example** 30:6 49:10 51:23 52:11 72:8 88:12,14 92:5 101:14 130:22
**examples** 22:6 23:17,18,19 36:18 49:24 50:11 53:7 133:3
**except** 128:9
**exception** 96:6
**exchange** 76:22
**execute** 25:12
**executive** 9:3 9:17,18,19 11:19 13:14 15:23,25 16:10 16:12,18 18:25 19:7 97:19
**exhaustive** 82:11 88:8
**exhibit** 4:8,9,10 4:12,15,17 10:4,24 17:12 17:24 18:7 24:8,10,12,13 28:14 31:18,20 59:13 65:4 89:3,7 93:11

110:3,9,24 115:1 127:16 134:16
**exist** 15:17 19:9
**existed** 60:8
**existing** 20:14
**exists** 15:19
**expenditures** 44:23
**expense** 106:21
**expenses** 96:15 97:8 98:2 103:3,6 106:1 106:17,18
**experience** 34:11
**expired** 105:12
**explained** 38:12
**explicitly** 28:25
**express** 85:7 103:13,18
**expressed** 103:9
**expressing** 68:10
**expressly** 67:3
**extensive** 87:10
**extent** 70:25 97:9
**external** 106:23

**f**

**facebook** 82:17 82:19 87:12,22 88:2,2 96:11 96:20 98:4,8 122:15 124:8 124:21,23 125:12,13,23
**fact** 34:7 69:16 127:11 130:7
**factor** 51:12 52:7
**factual** 21:22
**fails** 137:18
**fair** 27:1 113:17 123:21
**faith** 67:5,17 68:17,19,20,24 69:1,16 70:14
**fall** 22:8
**false** 73:8 74:24 74:25 75:6,8 75:11,12 109:14 111:5 111:13,15 112:21,24 115:4,7 127:9 127:20 128:2,8 128:16 130:15
**familiar** 24:16
**families** 130:6
**fantini** 79:13
**far** 20:18 37:3 39:25 63:24,24 116:11
**fashion** 31:12 55:21 56:5
**favaro** 109:20 109:22
**favor** 126:9
**february** 4:16
**federal** 48:15 110:25
**feel** 63:10,15 68:23
**fees** 133:11
**felt** 33:5
**fentanyl** 53:22 104:20 105:6
**figure** 102:4
**filed** 105:25 108:5,10 110:25 131:5
**files** 85:15,16 86:1,4,8,12,14 86:16,18,18,21 86:22 87:3 106:14
**filing** 70:12
**finally** 8:15
**financial** 96:25 97:2 101:9
**financially** 96:14 136:15
**find** 109:22
**fine** 7:8,9,16 17:25 18:3,12 61:24 74:3 95:9,10,12 112:10,11 115:21
**fired** 50:19
**firm** 42:3,8 133:25
**first** 6:20 7:6,8 11:14 17:1 26:1,7,7 38:19 45:9 48:15 59:19 60:21,21 69:4,18 76:4 77:13 80:15 93:21,25 110:3 110:4,24 127:5
**flow** 19:5
**folks** 106:21
**followed** 49:2
**following** 38:6 96:22
**follows** 6:23
**forbids** 67:3
**foregoing** 136:3,4 139:5
**form** 26:2 29:24 32:17 38:21 40:7 41:8 54:25 69:19 73:11,18 75:21 93:2,15 95:1 99:24

**formal** 26:12 26:16,21 35:10
**formally** 26:12 27:8,10
**former** 49:3
**formerly** 16:2
**fort** 2:13
**forth** 98:15
**forward** 23:1 41:5 62:18 68:11 72:2,9 92:20,22
**frame** 14:6
**front** 10:24 12:12 21:18,21 44:21 79:2 126:16
**fulfill** 20:7
**full** 8:24 77:13 102:9 121:20 121:23
**fully** 62:15,16
**function** 92:12
**funds** 43:2,3,4 43:15,16 44:4 44:9,14,17 100:24 102:11 102:14,14,19 107:1
**furniture** 58:22
**further** 70:11 77:14 136:13

**g**

**g** 5:1
**gain** 43:12 48:17,18,19 49:4 51:25 54:17 125:5
**garlock** 12:16
**garvey** 2:11
**general** 114:13
**generally** 97:8 128:14
**getting** 18:3
**give** 7:21 8:1,24 11:23 14:6,13 52:4,13 77:16 78:12,18 86:13 93:9 106:24 126:19 130:22 132:22 133:3
**given** 54:22 55:2 78:14 79:8 94:5 139:9
**giving** 49:24 51:13 63:23 78:21
**gmail.com** 2:6
**go** 7:5 8:23 10:13,14,16 25:1 37:8,11 38:16 42:21 52:18 53:17 54:23 55:10 56:7,19 59:13 59:14,17,19 60:11,17 61:22 65:3 68:21 69:14 71:3 74:7,8,9 76:2 77:12,13 79:15 80:5,12 89:5 90:12 96:2,8,8 107:15 110:13 113:9 121:1,6 122:23,25 124:6 126:20 134:7
**goes** 66:23
**going** 7:4 8:5 9:22 10:1 17:11 18:4,6,8 21:17 24:15 32:16 34:11,22 34:25 43:13 46:22 48:3 65:16 70:22,24 71:10 106:10 121:8 122:17 127:12 134:18 135:17
**golden** 1:9 2:18 12:17 13:10,20 13:25 14:1 77:10
**good** 7:3 23:22 67:5,16 68:17 68:19,20,24 69:1,16 70:14 95:8 96:22
**governance** 11:15
**governs** 35:11
**grandview** 2:12 100:9
**grant** 87:14 88:6,9
**grants** 88:13
**granville** 2:5 100:15,16 101:18 122:10
**great** 126:9 128:4
**ground** 7:6,21
**grounds** 22:12 22:16,17 70:16 71:6,13,23,24 72:2
**group** 61:13 62:1 115:9,11 115:23 116:1 116:20 117:6 117:14,17,19 117:24 118:2,8 119:12 120:23 121:17
**group's** 115:19 116:2,15
**gsn** 2:14
**guess** 104:24
**guest** 90:21

**guests** 90:23
**guys** 10:3 18:4 128:25

h

**h** 4:6 138:3
**halfway** 67:1
**hand** 6:15 10:1 18:6 24:7 89:1 110:7 127:10
**handbook** 29:5 76:7
**handed** 109:25 110:3
**handheld** 84:12 84:14
**handle** 17:13
**handover** 51:25
**happen** 83:9
**happened** 11:20 83:21 133:4
**happening** 120:7
**hard** 100:1 130:21
**harm** 1:10,16 3:2 5:7 6:9,19 7:17 13:1 18:17 63:25 80:6,7 82:5 83:17,20 84:15 85:18 106:6
**head** 8:2 13:22 30:19 35:23 50:18 100:14 112:7 129:20
**health** 59:22 111:4,25
**hear** 12:10 79:10
**heard** 118:18 118:20
**hearing** 6:13
**held** 16:9 26:13 33:1,13 35:12 35:22
**hereto** 136:15 139:7
**high** 3:6
**highlighted** 70:18
**hikma** 115:12 115:17,19 116:3,15 117:6 117:15,20,24 118:3,9 120:24 121:17
**hire** 78:6,7,10 96:18,19
**hired** 71:19 133:14
**hiring** 97:4,6 98:2
**hold** 14:16 19:23 119:4
**hopefully** 56:21 96:3 122:24
**hostile** 41:1,11 41:20 93:5
**hour** 78:16
**hrh** 111:3
**hro** 4:10,12 7:15,16,16 9:2 9:6 11:8,15,21 13:5 14:17 16:4,19 18:9 18:10 22:12 24:12,13 28:9 29:5,15,16,17 32:22 33:19 34:12,17,17 35:11,14,21 36:21,23 38:4 38:9,11 39:19 39:22 40:24 42:20 43:16,19 43:19 44:2,17 48:14 49:4,9 51:22,24 52:9 52:13,20,21 53:3 54:5,8,16 56:25 58:6,7 58:10,17,21 60:8,13,13 62:5,7 63:10 63:15 64:9,11 64:18 65:2 66:2,19 68:25 69:25 70:7,8 70:25 71:5,9 71:12,23 72:1 72:9,21 73:15 74:2,23 75:1 76:25 78:6,17 80:20 81:4,16 81:23 82:13 84:2,5,9,21,24 86:4,10,20,22 87:2 88:1 89:2 89:7,10,20,21 89:25 90:3,9 90:16 91:25 93:10 96:14 97:3 99:6,11 99:22 100:8,20 101:4,25 103:3 103:18 104:3 105:22,23 106:14 108:11 110:5 111:8,19 111:20 112:14 112:25 113:22 115:8,24,25 116:16,19,24 117:4,5,5,13,23 119:18,23 120:14 121:14 122:5 123:4 125:4,10,12 126:4,4 127:13 127:14,15 128:13 129:8 130:1,1,3,16,18

130:20 131:15 131:16,17,21 131:25 132:10 132:14,23 133:24 134:22
**hro's** 30:25 50:8 51:3,3 63:19 64:22 68:5,5 71:8 81:6 98:8 100:24 102:20 105:19 111:1 116:2,5,11 122:14 124:14 125:19,22 130:19 131:6 132:5 133:2 134:20
**huh** 7:12,18,20 25:18 28:4 43:25 46:5,12 50:13 52:3 57:21 72:24 76:8 98:12 99:2 112:4 119:20 121:25 124:11 129:22 135:4
**huhs** 7:25 8:3

**i**

**idea** 19:8 115:1
**identification** 10:5 24:11
80:15,20,24 81:2,3,6,11,17 81:25 82:1 89:4 93:12 110:10 127:17
**identified** 116:7 128:10
**identify** 5:24 132:18
**imagine** 51:20 86:11
**immediate** 61:5 61:6 62:9 64:16 131:19
**immediately** 80:6,7
**impact** 132:8
**impacted** 130:5 132:6
**implies** 77:2
**important** 88:15 105:7
**importantly** 8:10
**inaccurate** 60:9 60:16 61:2,3 63:23 64:8
**include** 42:5 52:10 81:3 133:20
**included** 73:10 87:18 104:22
**includes** 113:4
**including** 80:15 132:12 133:10
**inclusive** 85:20 87:1
**incorrect** 10:9
**increase** 78:16
**incur** 106:1
**incurred** 96:15 106:18 133:9 133:18
**independent** 21:5
**indicates** 70:17 94:17
**individual** 26:4 26:9 128:10
**individually** 36:22
**individuals** 107:6 128:7 131:22,24
**inexplicable** 77:15
**information** 14:10 45:15 51:20,20,22 62:23 63:4,5,6 63:16 70:17 71:7 82:10 87:7,8,13,21 88:2 90:15 96:17 113:11 118:19 119:10 119:15 127:9
127:21 128:2 130:11 131:11 133:5
**informed** 119:18,22,23
**initially** 45:4 47:11
**injury** 130:19 130:20 131:6
**instructed** 45:13 53:16 71:9
**instructing** 86:2 87:1 121:19
**insubordinate** 22:3
**insubordinati...** 22:6,9,13,17,19 22:22 23:17,19 24:1 38:18 39:7,15,20 40:19 41:24 42:10,11,16 48:10 49:11,25 50:12 52:8 53:7 58:25 59:8,16 74:19 75:2
**intend** 122:17
**intended** 5:16 52:6 85:20,21 87:1

**intention** 99:19 99:21
**intentions** 75:25
**interest** 40:25 41:2,5 59:21 60:7,23 61:14 62:17 68:12,13 93:6 111:2,9 116:9 118:17 118:22 120:20
**interested** 39:4 136:15
**interfere** 125:18,21
**interference** 96:6
**interim** 9:3,9 9:19 11:19 13:14 20:2 48:22,25 97:19
**interpretation** 72:4
**interpreted** 36:19 38:10
**interrogatory** 128:4
**interrupt** 62:2
**interviews** 42:5
**introduced** 7:4
**intuitively** 50:18
**inventory** 113:9
**investigation** 21:6,7,11 23:3 23:4 24:5 40:20,22,24 41:7,10,13,17 41:19,21,25 42:2,3,6 59:4 59:20 60:1,4,4 62:17,19,20 65:5 69:4,7,18 69:24 70:9 71:11,20,24 72:3 74:20 92:23,24,24,25 93:4 120:17,19 120:22 121:16 121:21,23,24
**investigations** 41:17 42:1,1
**issue** 25:15,17 80:20 112:18
**issued** 122:9
**issues** 30:5 98:13 99:19
**italics** 68:19 70:12,15,18
**item** 58:25 59:7 80:14 81:15,18 82:2
**items** 38:17 59:17 63:12 75:8 83:24,25 104:12,15

**j**

**jack** 109:19
**jake** 128:11
**james** 14:19
**jamie** 12:17 13:20,22 109:20,22
**jen** 42:18 45:5 47:7,18 49:15
**jen's** 47:7,16
**jeopardy** 77:15
**job** 1:25
**joel** 107:3
**join** 65:16
**jr** 2:10
**juan** 107:3
**july** 1:17 5:7 63:1 122:2 125:20
**june** 101:14

**k**

**katz** 16:20 42:18 45:6,18 57:8 77:10 79:25 103:7
**kayleigh** 1:22 5:3 136:2,19
**keep** 17:16,20 18:4 21:18 34:25 37:5
**kelsey** 17:10,10 19:20 79:9,11 114:11 132:2,2
**kept** 30:13 53:14
**key** 82:8
**kind** 11:20,23 21:19 97:21 129:6
**kinnamon** 1:22 5:4 136:2,19
**kloxxado** 107:20,22 108:9 109:6,11 109:13,17 111:2,12,17,19 111:20,24 112:1,14,19 113:4,22 114:13 116:3 117:20,25
**kloxxado's** 115:2,12
**kluxxado** 117:7 117:15
**knew** 64:1,7,9 64:18,25 65:2 74:24 108:7
**know** 7:19 8:1 8:4,13,15,17 10:11 12:14 14:5,10 17:15 19:5 21:10,12 21:13,19 23:19 23:24 24:23 27:20 28:1,25 29:2,4,8 30:19

31:3,17,17 32:23 33:16 34:8 35:23 36:5,25 39:24 40:13 42:19 45:8 46:22 47:4,19 50:6 50:21 51:12 53:4,6 54:9 57:4 58:5 61:10,15,18 62:22 63:5,24 66:2 70:18,23 75:12,23 76:23 76:25 77:2,4,8 77:22,23 78:13 80:1,18 81:10 84:3,4,11,17 86:22 89:9,15 91:13 92:15 94:15,18 95:7 96:13 97:9,15 97:18,22 98:19 105:11,14 106:4,11 107:7 107:8 108:9,10 108:22 112:5 114:2,16 115:8 115:15,18,21 116:17 118:10 119:24 120:3,9 120:12,16,17 122:16 123:6 123:20,22 124:19 126:2 128:14 129:2,3 129:11,18,25 130:2,9,13 131:9,19,21,22 132:1,16 133:4 133:24 134:6

**knowingly** 73:7 75:6

**knowledge** 12:23 13:2 30:16 35:13 36:23 46:25 54:3 56:12,12 64:12,22 65:19 68:6,7 75:16 76:21 81:14 82:17 86:6 118:8,23 125:11 126:2 129:7 130:8 134:1 136:10

**known** 108:8

**ky** 2:13

**l**

**lack** 21:2 69:15

**landlord** 96:20 98:14,20 100:17,22 101:4,7,17

**laptop** 84:4

**laptops** 83:25 84:1

**largely** 113:14

**late** 14:14

**law** 67:6,10 120:17

**law.com** 2:14

**laws** 5:18 77:17 78:24

**lawsuit** 110:25 134:21

**lawyer** 23:2

**leadership** 11:16,21 13:12

**leading** 102:24 114:19

**lease** 44:14 99:4,4,6,23,23

**leased** 100:11

**leave** 14:4,25 15:8 20:11,19 20:21,23,25 21:4 22:23 24:4 26:11 39:18 40:3 45:22 46:3,18 47:3 57:18 58:1 59:12 63:9 66:21 78:2 80:4 94:4 100:5 105:18 122:8

**leaving** 86:3

**led** 22:22 23:19

**left** 5:25 14:7 14:12 15:1,9

**legal** 133:11 137:23

**letter** 4:9,17 11:6 23:1,20 24:21,23 25:16 25:17,22 38:19 39:4,5,6,9,16 40:6 59:14,18 60:7,12 61:23 63:22 65:4 66:23 68:22,23 69:12,15 70:5 70:7,19 72:9 72:20 73:10,16 74:23,24 75:1 75:6,18 76:3 76:12 91:11,12 91:13 99:8 108:12,14 110:17,21 122:9 127:6,7 127:8,11,19 128:2 134:17 134:19,21

**letting** 42:19 45:8

**levels** 19:12

**libel** 108:6,24

**likely** 76:13,16 76:18

**likewise** 8:7

**limit** 52:16 53:24 83:5,12

**limited** 49:17 52:17
**line** 34:23 79:17 138:4,7 138:10,13,16 138:19
**link** 4:13
**linked** 84:23,24 84:24
**list** 38:17 80:8 81:20 86:25 87:23 88:11 90:22 97:11 131:18
**listed** 50:11 80:14 82:2 90:20 114:18
**listen** 66:9
**lists** 9:22 90:8 91:19
**little** 88:5,24 107:10 108:13 123:10 130:14
**llp** 3:5
**lobbying** 115:12 117:6 117:14 118:9
**lobbyist** 107:20 107:22 108:8,9 109:6,11,17 115:3
**location** 1:19 57:1 58:11 100:6
**lock** 23:7 53:8 54:12,12,14,17 55:14
**locked** 30:8 53:14 54:17 104:2
**locks** 53:12 55:8 56:6,13 103:20
**log** 46:7
**login** 51:20,25 87:6,8,12,21 88:2
**logins** 51:23 52:11,12
**long** 8:15 9:6 43:18 58:1 79:4 123:23
**longer** 14:3 15:3,6 49:8 105:13
**look** 12:7,8 14:8,9 18:14 24:15 28:13,14 31:19 38:24,25 39:3,24 40:3 47:9 61:11 63:13 68:18 72:2 83:10 91:7 93:23 94:15 101:9 105:15 106:15 107:12,18,23 109:1,2 113:6 113:10 119:2 124:21 129:12 129:14
**looked** 55:13 61:13 108:12
**looking** 27:23 89:6,15 94:21 94:22 95:4 99:12 101:20 103:16 107:8,9 123:10 126:12 131:7
**looks** 89:21 104:18 128:10 130:4
**loss** 132:12
**lost** 132:12,13 132:18
**lot** 51:21,22 72:4 74:13 86:12,14 96:21 101:5 115:18 129:25 133:12
**lots** 22:6
**lpa** 1:19 2:20
**lunch** 95:8,17

**m**

**made** 10:6 13:15 26:12 27:3 61:8 73:17 75:11,13 77:4 80:2 100:22 101:13 101:16 107:11 107:21 109:6 119:9 127:20 128:8,16,16 139:5
**mahjida** 13:20
**mail** 43:6 45:7 56:16 63:7,13 76:22 77:6 90:22,25 91:3 94:7,8 95:17 109:18 110:14 115:1
**maintained** 28:9 102:9 125:6
**maintains** 52:25
**make** 7:13 8:9 16:4 22:11 32:20 76:19 79:23 85:11 102:18 103:7 103:14 126:11
**making** 25:19 77:1 85:4
**malicious** 74:10
**maliciously** 73:7,17 75:19
**mallory** 61:7,9 61:12,15,18 62:13 64:11,13 64:16,21,25,25

Case: 2:25-cv-00075-EAS-CMV Doc #: 103-1 Filed: 08/31/26 Page: 56 of 103 PAGEID #: 2557



116:7,21,24
**management** 11:17 19:13 30:11 133:11 133:19
**manager** 16:22 17:9,9 19:20 48:21
**manner** 5:19
**manufacturer** 115:12 116:3 117:7,15,20,25
**maritza** 42:9 93:4
**mark** 10:2 18:9 24:8 93:10 127:14
**marked** 10:4 17:12 18:7 24:10 38:25 65:4 89:3 93:11 110:9,24 127:16 134:16
**materials** 30:9 53:23 80:9 104:3
**math** 97:21
**mean** 17:14,16 19:4,5 27:10 29:21 36:16 40:14 42:24 43:4,10 44:19 50:4,18 52:24 57:21 67:2,7 69:9,12 89:14 95:20 97:21 101:23 124:25 128:20 131:7
**means** 5:20 43:14 91:23
**meant** 37:21 51:2,8 97:6
**meet** 27:12 32:19
**meeting** 4:11 4:12,13 25:11 26:16,19,21 27:2,6,8 28:21 28:21 30:3,4,5 30:24 32:11,11 32:25 33:4,6 33:13 34:1,6,7 34:18 35:6 36:10,10,11,13 36:13,14 37:22 37:23 90:16 91:6,17,18,20 91:24 92:10,17 92:19 93:19,21 93:24 94:2,6 94:10,14,18,18 94:22,25
**meetings** 15:16 26:22 27:11,13 27:19,21,24 28:1,3,16,19,20 28:24 29:3,5,7 29:18 30:12,13 30:15,17,23 31:1,10,11,11 31:12,15 32:3 32:4 33:15,22 33:22,23,24 34:14,19 35:4 35:8,9,11,15,15 35:17,17,21,25 35:25 36:7,8 36:17 91:8 92:1,1,2,3,6,7
**member** 9:7,15 9:16 12:20,22 12:25 14:19 15:6 16:16 19:10 33:3,6,7 33:25 34:5,17 35:5,6 36:19 38:11 49:1 67:4 92:11 122:4
**members** 12:5 12:15 13:17,19 16:17 19:12 25:3,7 26:9 27:19 33:2,10 33:12 35:9 79:3,7 80:21 80:22
**memory** 97:16
**mention** 104:20 106:1
**mentioned** 17:2 17:7,8 47:7,10 51:15 53:8 54:22 59:1,8 59:15 63:15 64:5 68:17 87:16 101:22 103:13 127:5,6 127:7 128:7
**mentions** 60:6
**met** 61:12,15 61:18
**mill** 31:12
**mind** 28:19 87:15 97:22 102:5
**minute** 96:7 129:16
**minutes** 14:11 15:16 28:2,3,9 30:13,24 94:15 94:22
**misleading** 60:9,16 63:23 64:8
**misunderstood** 55:5
**mitchell** 2:13
**mitigate** 133:10
**mobile** 84:8,9
**molly** 12:17 13:22 14:21 57:10,20 79:13
**moment** 68:16 132:19

**monitor** 43:2 43:15
**month** 21:13 100:23
**morning** 7:3
**morris** 3:5
**mouth** 43:11
**move** 8:8 21:15 122:25
**moving** 23:1 50:15 92:22 96:3
**moyo** 3:4 6:8,8 10:8,11,15 11:5 12:9 17:17,23 18:1 18:8,11 24:12 29:24 32:16 36:2 38:3,21 40:7 41:8 54:25 65:16 66:7 69:19 72:10,13,15,22 73:1,11,18,25 74:5 75:21 93:2 95:1,7,11 95:14,19 97:15 99:24 124:7,12 124:19 126:15 126:20 135:2,4 135:11
**multiple** 17:21

**n**

**n** 2:1 3:1 4:1 5:1
**naloxone** 16:21 17:8,9 19:19 19:20 53:22,25 54:7 55:20 56:3,11 103:24 104:19 105:6 113:2,4 114:12 114:13
**name** 5:3 7:3,8 8:24 13:21 25:9 47:8 81:4 81:6 100:25 106:24 109:19 119:1,24
**named** 45:5
**names** 107:4
**narcan** 113:4
**narrative** 11:24
**necessary** 139:6
**need** 17:16,20 28:22 30:21 60:14 118:5 128:19 131:17
**needed** 23:6,9 30:10 42:20,21 45:8,9 53:17 56:8 76:25 92:11 103:3 104:16 113:12
**needs** 33:1
**negotiated** 105:10
**neither** 37:10 136:11
**nelson** 21:8 42:9 59:25 60:4 62:20 93:5 120:17 121:23
**network** 105:20
**never** 12:24 89:13
**new** 44:14 58:10 83:20,21 83:23 96:24 100:7,12 102:1 125:12 126:5
**news** 128:10 129:6,17,18,19 130:12
**nodding** 8:2
**non** 96:16
**nonprofits** 16:7
**nordstrom** 2:11
**normal** 20:12
**notary** 5:9 136:20 139:13 139:19
**note** 137:10
**noted** 139:7
**notes** 94:21
**notice** 4:8 9:21 9:21,24 29:21 32:6,8,12 36:8 36:9 94:5 96:5 107:13
**noticed** 27:8,10 27:13,19 34:25 60:22 93:22,25
**notices** 37:3
**noticing** 94:9
**notified** 53:11 56:13 94:5
**november** 9:8 9:10,10,12,13 15:24 21:24 22:1,18 23:20 24:22 65:3 67:15 87:4 99:4,7 103:5 105:16 122:9 123:2 125:14
**number** 7:5,23 9:22 17:15 21:19 30:23 31:23 33:11 50:11,11 63:9 86:10,21 87:11 96:9 110:8 114:10,22,24 128:6 131:10 132:1
**numbered** 89:7

**numbers** 17:22 60:13
**numerous** 52:14 60:9,16 122:16

**o**

**o** 5:1
**oaths** 5:10
**object** 32:16 70:22,24 74:4 90:7
**objected** 107:16
**objecting** 34:25 37:5 66:11
**objection** 5:11 6:13 11:6 22:14 26:2 29:24 34:23 36:2 37:4 38:21 40:7 41:8 54:25 57:15 65:15,17 65:23 66:5,7 66:12 67:11 69:19 71:16 73:11,18 74:5 75:14,20,21 90:8 93:2 95:1 99:24 120:25 121:18
**objections** 11:4 11:8 37:1
**objects** 11:6
**obtain** 83:7 104:4,15
**obtained** 25:13 25:14 54:19 104:8
**obviously** 98:14
**occupy** 99:10 99:21,22 122:10
**occur** 28:22 29:19
**occurred** 79:2
**october** 21:14 26:14,15 27:7
**odh** 4:17 23:1 38:20 39:6,13 39:22 59:22 60:7,12 68:23 69:11,24 73:16 74:23 75:2,6 75:13,19 76:5 76:12,14 91:12 108:14 110:18 110:21 127:6,8 134:17
**offense** 73:9
**office** 16:24 23:8,10 44:15 53:12,14 54:6 54:8 55:8,13 56:10,22 57:3 57:4,6,7 58:2,6 58:7,10,18,23 100:6,7,16 103:21 120:17 122:10
**officer** 16:21 19:24 20:1,8 67:4 136:1,2
**oh** 1:21 2:5,22 3:7 9:16 20:20 24:8 88:19 89:5 110:2 124:17
**ohio** 1:1,10,16 3:3 5:7,9,10 6:10,19 7:17 13:1 18:17 59:22 63:25 80:8 82:6 83:17,20 84:16 85:18 106:6 111:4,25 118:15,24 119:5,7 136:21
**okay** 7:13,14 7:21 8:23 9:1,5 9:10,13,20 10:1,10,24 11:2,10,12 12:5,14,24 13:3,7,17,25 14:2,16 15:2 15:10 16:16 17:1,25 18:1 18:10,11,18,20 18:23 19:22 20:7,16,20 21:2,7,10,13 22:20 23:13,23 24:7,19,23 25:1,11,15,21 25:23 26:6,15 26:20 27:1,5 27:16,20,25 28:5,13,17,23 29:2,12,14,21 30:3,12,15,17 30:21 31:5,15 31:18,18 32:6 32:11 33:9,11 34:3,4,10,13,21 35:2,5,10,14,21 35:24 36:7,20 37:7,21 38:1 38:16 39:12,21 40:4,18,22 41:2,6,16,19 42:8,10,14 43:3,9 44:3,9 44:22 45:16,19 46:2,10,16 47:2,7,10,20 48:9,16,19 49:4,10,10,15 49:23 50:3 51:15 52:4,12 52:16 53:3,10 53:18 54:2,11 54:16,21 55:5

55:12 56:15,24 57:5,9 58:4 59:25 60:6,17 60:24 61:3,8 61:15,21,25 62:2,6,11,11 63:4,12,21 64:4,10,17,19 65:1,13 66:2 66:10,23 67:21 68:1,16,16,19 68:25 69:15,23 70:3 71:3,12 71:22 72:12,14 73:3,15 74:5 75:9,18 76:2 76:11,19,24 77:8,12,25 78:5,9,17,20 79:7,12,15,23 80:1,20,24 81:5,10,19 82:2,7,14 83:9 83:17,20,24 84:4,7,12 85:3 85:8,10,14,21 86:5,7,13,17,22 87:3,6,19,25 88:5,21,24 89:10,12,17,19 89:23 90:1,14 90:17,25 91:5 91:10,15,19,25 92:5,13,15 93:1,7,16,21 94:2,13,17,21 95:6,15 96:2 96:18 97:2,11 97:13,17 98:7 98:10,22 99:15 100:3,10,15,15 100:21 101:2 101:11,11,22 102:2,10,17,17 102:18 103:3 103:12,20 104:3,7,11,18 105:3,8,16,24 106:9,17,23 107:10 108:12 108:14,16 109:15,18 110:6,16,22 111:4,7,10,12 111:15,18,20 111:23 112:10 112:17,25 113:14,17,19 114:1,6,15,25 115:6,10,14,21 116:10,24 117:18 118:5,7 118:12,19 120:3 122:1,7 122:23 123:7,7 123:8,15,17,21 124:5,25 125:7 125:10,12 127:4,23,25 128:4 129:5,7 129:10,13,15 129:15,23 130:2,7,10,14 130:14,24 131:1,3,9 132:5,9,18,21 133:3,8 134:2 134:4,12,24

**once** 62:17

**ones** 23:23 64:3

**ongoing** 119:25

**open** 83:21

**opened** 100:7,8 101:25 102:1 126:4

**opening** 96:24

**operate** 107:5

**operational** 11:15

**operations** 20:12 30:10 35:19

**opinion** 16:8 22:1

**opportunity** 9:23

**opposed** 7:17

**order** 67:22 113:3,12,13 135:7,10

**ordered** 114:12 114:12,19

**ordering** 114:7 114:16,21 135:12,14

**orders** 113:12 113:20 114:24

**organization** 12:2 19:2,23 32:20 38:14 77:14 87:12 123:4 130:12

**organizational** 11:14 88:15

**organizations** 104:10 131:20

**original** 58:17 58:22 100:16

**outcome** 136:16

**outlet** 129:6

**outreach** 53:23

**outside** 34:24 61:1,4 65:5 70:25 77:9 98:2 106:17,25 133:24

**overdose** 130:6

**overlaps** 59:3

**own** 33:3 53:3 53:5

**ownership** 123:13 124:13 124:23

**p**

**p** 2:1,1 3:1,1 5:1
**p.m.** 135:20
**page** 4:2,7 25:1 28:14 38:24 39:3 64:6 77:12 98:4 122:15 138:4,7 138:10,13,16 138:19
**paid** 100:18 103:4,6 107:1 115:2
**paragraph** 59:19 66:14 68:18 70:11 72:5 73:5 76:2 77:13 79:15 80:5 109:3 111:10 123:11 123:16
**pardue** 129:21 129:23 130:12
**part** 16:24 25:19,20 40:16 42:5,6 53:2 77:21 78:12,23 117:3 134:21 134:21
**partially** 52:23 52:24
**participate** 23:4 40:20 41:6,14 42:7
**participating** 41:24,25 59:3
**particulars** 40:13
**parties** 5:12 26:4 133:12 136:12,14
**partner** 104:9
**party** 71:10,19
**password** 51:12 52:18 83:6 88:15
**passwords** 51:19,22,25 52:7,10,12 53:1 87:6,8 96:16 97:3
**past** 113:14
**patrick** 53:19 54:21 55:5,7 56:14 57:10,20 77:16,18 79:2
**pause** 71:9
**pay** 43:16 44:15,24 77:17 78:24
**payment** 97:4 101:13
**payments** 44:15 97:4 100:22 101:2,3 101:12,16 103:7
**pending** 72:23
**people** 20:11,14 45:2 46:20 47:1,12 57:4 57:21 76:20 79:6 92:2 94:5 94:5 107:2 114:10,18,18 114:22,24 131:10,13,19 131:23 132:1,3
**percent** 75:4 96:23 97:19,20
**perfect** 135:5,9 135:17
**performs** 115:11
**period** 27:18 44:10 54:11 103:4,21 123:1 123:23
**periods** 20:22
**permanent** 20:1
**permitted** 5:16
**person** 25:12 43:13 45:13 87:1 88:4 114:15,20,21
**personal** 105:22
**pertaining** 81:22
**ph** 53:19
**pharmacy** 118:16,24 119:5,7
**phones** 84:8,9
**phrase** 28:18 79:20 100:21 102:5
**physical** 57:1 86:17,18,21,22 87:3
**piece** 106:11
**pieces** 105:7
**place** 34:7 35:11 54:12,12 57:3 63:10 120:10
**placed** 20:10,19 20:23,24 22:23 23:7 26:11 39:17 40:2 45:22 46:2,18 47:3 51:13 53:8,12 54:14 55:9 56:13 57:25 63:8 66:20 77:14 78:2 79:19 80:3 94:4 105:17 114:24 122:7

**placing** 100:4
**plaintiff** 1:5 2:2 3:2 6:4,9
**plan** 24:4 32:20 36:13 59:2,9 100:5
**played** 25:24
**please** 5:24 8:24 18:15,24 21:17 31:19 37:16 39:12 61:24 64:4 73:21
**point** 8:16 12:24 20:8 44:11,12 45:19 51:11 53:2 58:21 70:24 72:4 78:3 111:23 122:1
**pointed** 75:8
**policies** 29:6 63:20 71:8
**policy** 35:10 37:2 63:10 66:22,24 67:2 76:5,6
**poorly** 99:14
**portal** 88:14
**portals** 87:14 88:6,10
**porter** 3:5 6:8 96:19 97:5 98:3,11,16 106:24 133:22
**porterwright....** 3:8
**portion** 68:18 68:19 101:2,3 112:17 120:22
**position** 14:17 15:19,21 17:7 18:25 19:16,22 61:11 62:10 64:9,15 65:2 73:15 74:18,23 77:22 99:8 119:4
**positions** 16:18 19:9
**possess** 81:7
**possessed** 81:9
**possession** 84:13,20 86:8 86:19,23 87:9 123:12 124:13
**possessions** 58:22
**possibility** 26:8
**potential** 26:22 41:5,21 71:25 73:17 78:24,25 92:25 118:16
**potentially** 77:17
**power** 78:18 79:18
**powers** 78:5
**pr** 133:25
**practice** 16:6 113:3
**premises** 99:10 99:23
**prepared** 11:2
**present** 13:12 20:3,9 79:7 125:8
**president** 12:2 13:4 15:17,19 16:1,9 18:25 19:6,7,16 21:25 51:21 78:6,17 86:10 86:20 87:11 92:9 94:12
**presidents** 19:8
**pretty** 96:4 126:13
**previous** 16:15 113:6,6
**previously** 17:11 18:7 38:24 96:24 134:15
**primary** 44:1 102:20 114:21
**printed** 10:13 89:14 126:10
**printout** 89:22
**prior** 17:4 45:17 46:2,17 49:5 55:21 56:4,13 67:15 69:6,24 70:8 76:11 78:21 94:3 100:4 103:5 112:25 114:6,8 116:19 117:1 136:5
**pro** 2:3
**probably** 11:12 11:24 21:17 23:12 48:25 60:20 94:3 110:23 126:19
**problem** 8:14
**procedural** 5:17
**procedure** 29:3 29:7,22 30:25 35:10 37:2 49:2
**procedures** 29:6 63:20 71:8
**proceed** 92:19
**proceeding** 5:5 5:15 53:2 135:21
**proceedings** 136:3,5,6,9
**process** 25:20 25:24 33:24 67:13 89:11 113:5,13 117:3

125:5
**produced** 5:14 40:17 89:10,25 128:13,19,21
**product** 114:7
**productions** 90:9
**products** 103:22
**professional** 130:19 131:6 132:13,22,23 133:6
**program** 16:22 17:8,9 19:21 19:24 20:1,8
**programs** 16:21
**projecting** 113:9
**promote** 77:16 78:6,7
**promoted** 77:18,19,20,25
**promoting** 79:5
**promotion** 79:2 79:8
**property** 51:4 52:9,10 80:8 82:6,13 84:2,9 84:15,21 87:2 98:23 99:12,13 99:21,22 100:20 101:18 102:19 103:17 106:7 108:20 109:4,5,7 115:20 116:1 117:12,21 118:1 119:22 120:3 122:6,19 123:6 125:20 128:14 134:11 134:20
**prospects** 132:12
**protect** 32:20
**protected** 106:2
**prove** 73:6,7
**provide** 61:25 62:3,6 82:12 87:21 118:8 131:18
**provided** 11:6 32:12 49:2 52:15 63:6 87:24 113:24 118:2 119:10 119:16 134:16
**provides** 117:6 117:14
**provision** 28:15 28:23 29:3,5 32:2,3
**proximate** 132:10
**public** 136:20 139:19
**publications** 130:18 132:10 133:9
**publicists** 133:25
**publish** 129:8
**published** 130:11
**purchased** 105:23
**purpose** 63:22 88:10 104:12
**pursuant** 9:21
**pursue** 133:1
**push** 111:19
**pushing** 109:13 111:12,17 112:18
**put** 24:9 43:11

**q**

**qualified** 136:7
**quantify** 97:2 130:21,22
**quarter** 113:6,8 113:10
**question** 8:5,8 8:19,20 13:16 25:4,6 31:7 32:7 33:16 34:9 35:20 37:12,14,15 38:2,6,9 41:18 57:23 59:6 62:17 67:7,13 67:16 69:14 70:1,3 71:4 72:13,16,23 73:2,21 74:1,4 74:10,14 75:5 75:7 79:17 90:6 99:15
**questioning** 34:23
**questions** 7:5 7:24 8:11,21 11:25 36:21,22 41:4 72:7 79:4 107:16,17 127:4,12 128:5 131:23 134:3
**quick** 18:14 24:9,15 38:17
**quickbooks** 45:5,6 47:14 47:16 49:14,19 51:6 82:17,19 82:23 83:1,7 83:13,15,18 87:12 96:11 125:24 126:5
**quicker** 110:23
**quit** 42:18 111:23
**quote** 77:1 109:6

**quotes** 79:18 79:19,19 108:24,25

**r**

**r** 2:1 3:1 5:1 138:3,3
**raina** 1:8 2:17
**raise** 6:15 77:17 78:13,13
**raises** 78:18,21
**raising** 73:16
**range** 126:12
**rather** 96:3
**read** 8:11 21:20 36:16,18 37:15 59:23 64:6 73:20 74:13 123:11,16 132:25 135:2,3 137:9 139:5
**reading** 93:19 131:4
**ready** 96:2
**real** 9:5 24:9 38:16
**really** 34:9 41:18 72:6 89:15 100:14 106:11 112:9 115:18 117:16 130:21 131:7 131:18
**reason** 27:17 36:15 137:11 138:6,9,12,15 138:18,21
**reasonable** 70:16 71:6,13 71:22,23 72:2 105:5
**reasons** 22:4 23:14
**recall** 26:15 65:9 91:5 94:23 119:9
**receipt** 137:17
**receive** 51:24 80:17 82:16
**received** 41:1 41:12 95:16 104:9 131:22
**recollection** 91:16 104:21
**recommended** 69:8
**record** 5:2,5,12 5:24 8:23 10:14,20,21 11:5 37:18 48:4,5,7 66:12 73:23 74:1,16 95:19,21,23,24 101:9 109:25 121:1,6,10 126:21,25 127:1 135:18 136:9
**recorded** 5:19 30:15 31:12,16 94:19 136:6
**recording** 5:14 31:1 136:8
**records** 30:24 42:22 85:19 93:23,24 101:12,20 103:16 130:4
**reduced** 136:7
**reduction** 1:10 1:16 3:3 5:7 6:10,19 7:17 13:1 18:17 63:25 80:7,8 82:5 83:17,20 84:16 85:18 106:6
**reese** 19:22 41:3,22 60:22 62:3 63:25 68:14 71:7,25 107:11 114:11 116:20 119:11 120:19 132:2
**reese's** 71:14 77:22 116:25 118:16
**refer** 7:16 15:14 17:23 30:22 72:8 85:15
**reference** 41:3 109:16 129:17
**referenced** 68:17 137:6
**references** 93:18 109:13
**referencing** 85:17
**referred** 66:14
**referring** 29:8 39:5 40:22 44:10 48:12 49:12 51:8 52:8 53:20 59:11 62:12 65:7 66:22 67:13,18,19 77:5,5 78:25 79:1 80:25 82:4,8,9 88:7 91:9,13 98:1 107:25 108:3 108:11 109:10 110:14 127:19 128:1 132:14 132:14
**refers** 28:15 108:24 109:5
**reflect** 109:24
**reflects** 10:9
**refresh** 91:16 104:21
**refunded** 101:3

**regain** 52:21 83:15
**regained** 55:24 105:11
**regard** 25:24 62:23 92:21,22 99:3 106:1
**regarding** 51:17 56:17 71:7 81:22 107:11,17,20 107:21 118:16 119:10,11 133:5,18
**regional** 16:23 57:12,22
**regular** 31:1,11 32:2,3 33:21 36:7,10 57:7 94:9 104:13
**regularly** 92:1
**rehashing** 122:17
**reinstated** 21:3
**reintroducing** 17:20
**related** 93:5 111:1 130:6 136:11
**relates** 90:10
**relating** 81:16
**relationship** 115:17,19 116:3,15,16 120:23 121:14 121:15,16
**relative** 136:13
**relayed** 133:4
**relevant** 92:11
**relying** 22:12
**remainder** 101:15
**remaining** 102:11 112:13
**remediating** 106:2
**remember** 13:21 14:12 48:24 79:14
**reminger** 1:19 2:20 5:8 6:6
**reminger.com** 2:23 137:2
**remotely** 43:14 43:15 57:23
**removal** 49:11 50:1,4,17 51:1 51:1,2,8 55:22
**remove** 45:3 58:21 98:25 99:1 102:11 111:2
**removed** 16:8 21:3 23:5 45:1
**removing** 49:3 51:9 99:8
**renewed** 99:4
**renewing** 99:6
**rent** 44:15,24 99:23 100:10 100:11,15,18 100:20
**repeat** 71:4
**repeated** 37:18 73:23 74:16
**rephrase** 31:6
**replace** 54:16
**replacement** 104:7
**replacements** 104:4
**replacing** 104:12
**report** 67:9 70:4 76:5
**reported** 1:22 55:7 57:6 60:8 69:6,23
**reporter** 5:2,4 6:12,25 10:18 10:21 28:6 37:17,18 48:3 48:6 73:22,23 74:12,16 95:21 95:24 110:11 121:8,11 126:23 127:1 134:8,12,25 135:3,5,9,17
**reporting** 66:21 69:5,9,9 69:10,11
**reports** 67:5
**represent** 39:19 120:13
**representative** 1:15 6:18 7:15 11:8 29:16 36:21 38:4 89:20,21 100:17 120:13 122:4
**representing** 6:2,7,9 39:19 122:4
**reputation** 132:5 133:2,10 133:18
**reputational** 130:19,20 131:5
**request** 34:1,18 35:6 113:1,22
**requested** 37:19 63:5 73:24 74:17 82:3 136:23
**requesting** 63:16
**requests** 34:5 62:23
**require** 32:8 36:7,9
**required** 78:9 139:13

**requires** 32:6
**requisite** 32:12
**reread** 74:14
**reserved** 135:19
**resigned** 9:13
**respect** 59:21
**respond** 32:20 34:15
**response** 50:2 65:13
**responses** 128:5
**responsibilities** 16:1 77:19,21 77:24
**restricted** 45:4 45:6 47:10 51:16 54:5 103:10,22,25 104:13,23 105:8,12 106:7 106:15
**restricting** 49:14 50:8,8 51:2,3,7,11
**result** 96:15 97:3 105:8 107:1 130:17 132:10 133:8
**retain** 85:22,24 133:24
**retained** 106:25
**retaining** 70:8
**retaliated** 65:12,22 66:20 67:25 68:2,11
**retaliating** 67:3
**retaliation** 65:6 65:6,11,13,18 66:3 67:19,22
**return** 52:9,13 80:6,7,14,14 81:10 82:3,15 84:1 85:21 86:3,15,16 87:2,3 137:13 137:16
**returned** 84:4 85:8,23
**returning** 96:16
**review** 9:23 43:2 44:25 46:15 101:11 116:25 131:18 136:23 137:7
**reviewed** 10:25 129:10 134:18
**reviewing** 63:22 130:4
**revisit** 134:19
**right** 6:15,25 7:14 10:17,18 30:25 33:18,20 34:16 38:6 46:24 47:15 48:3 52:16 81:13 82:21 87:17,20 89:5 90:21 97:16 99:3 108:19 112:2 114:4,5 118:10 123:25 126:1 129:20 132:20
**rise** 66:3
**role** 9:1 15:17 16:9 20:4 107:12 116:6 123:3
**room** 55:15,18
**rough** 14:6
**rules** 5:18 7:6 7:21
**run** 21:19 31:11
**running** 19:20

**s**

**s** 2:1 3:1 4:6 5:1 138:3
**s.o.a.r.** 131:20
**salaried** 106:21
**salary** 16:12,14
**sales** 116:8
**sams** 88:18,18 88:19
**sams.gov** 88:12
**sams.gov.** 88:20,23
**saying** 17:20 106:5 118:22
**says** 32:10 60:22 64:6 65:4 66:21 67:2 76:11,24 77:14 78:12 80:6,15 85:25 90:22 91:19 110:25 132:9 132:11
**schang** 2:23 137:2
**scheduled** 27:12 33:24 92:1 94:3
**scheduling** 94:9
**scope** 34:24 37:1
**se** 2:3
**second** 62:2 72:5 80:5 121:1,7 127:8
**section** 28:15 31:20 70:18
**secured** 55:20 56:4,5
**see** 25:1 59:23 64:3 90:10,18 90:21 91:1,8 93:19 101:14 118:5

**seek** 78:20
**seemed** 72:2
**seems** 100:18
**seen** 55:13 63:7 89:13 93:13 98:14 129:11
**selected** 15:22
**send** 25:22 94:8
**sending** 75:1 76:11 106:5
**sent** 22:25 24:21 42:17 45:7 68:9,23 69:1,12,15 74:22 75:19 76:21 91:11 128:5 137:14
**sentence** 67:2 67:17 73:5,9 76:4 78:12,23 112:18 114:25
**separate** 41:16 50:10 56:11 59:5 60:3,3 75:5 81:21 125:13
**september** 4:11 4:13 11:21 12:1,15 13:4 13:11 17:4 18:21 19:2 20:2,9,25 21:1 39:15 40:6,9 56:25 60:6,12 63:1 70:7 74:22 75:6,18 76:4 91:6,10 91:12,13 92:17 93:18 94:14 112:25 114:6,8 116:19 117:1 127:7
**series** 55:15
**serious** 73:8
**seriously** 71:19
**serve** 9:8
**served** 9:7 19:25 20:4 114:21
**service** 115:12
**services** 117:6 117:15,19,24 118:1,9
**serving** 9:3 15:3 48:22
**seven** 12:19 13:23 16:17 19:11 25:2
**several** 22:25
**shake** 8:2
**shaking** 8:2
**shared** 27:15 106:14 118:25 131:11
**she'll** 135:2,3
**shearer** 2:10,11 4:3 6:1,1 7:2,3 10:6,8,10,12,23 11:7,10,11 12:13 17:13,19 17:25 18:2,5 18:10,12,13 22:15 24:13,14 26:5 28:8 30:2 31:23 32:1,21 35:2,3 36:6 37:7,9,13,15,20 38:5,8,22 40:12 41:15 48:1,8 55:4 57:17,19 65:20 66:1,15 67:14 69:22 71:2,21 72:17,25 73:4 73:14 74:3,6 74:15,21 75:17 76:1 90:13 93:7,8 95:5,9 95:12,18,20 96:1 97:23 100:2 109:21 110:2,7,12 121:3,5,13,22 124:6,9,17,24 126:7,14,17,22 127:3 128:23 129:1 134:2,5 135:6,8,15
**sheet** 52:14 137:11
**shelves** 55:19
**shipping** 16:25 19:19,20,21 46:21
**short** 122:24
**should've** 108:8
**show** 17:11 108:1,25
**sic** 111:3
**side** 90:21
**sign** 44:14 137:12
**signal** 128:9,16 129:3,5,7 131:9
**signatories** 45:16 46:9,10
**signatory** 46:4 46:6,15
**signature** 25:7 25:9 134:9 135:1,19 136:18
**signatures** 25:2 25:12,14
**signed** 72:20 137:19
**significance** 68:20 91:21
**significant** 77:16 78:13
**simply** 54:23
**sit** 40:4 44:22 92:15 118:7

122:1 123:21
**siteground** 87:18
**situation** 32:19
**skills** 136:10
**small** 16:7
**sole** 51:13
**solely** 34:16
**solutions** 137:23
**somebody** 50:24
**soon** 132:7
**sooner** 96:3
**sorry** 9:16 10:12 12:9 20:20 30:13 35:25 45:20 48:2 55:5 57:17 66:8 79:10 84:23 88:19 89:5 93:3 94:22 110:2,13 116:14 121:15 122:2 123:14 124:15 127:15
**sort** 92:12
**sounded** 52:5 54:22 88:19
**sounds** 59:2
**source** 64:12,22 118:23
**south** 3:6
**southern** 1:1
**space** 44:15 99:16 100:12
**speak** 26:3 29:18 31:13 54:10 75:15 76:20 81:8 90:9 117:16 118:6 119:17
**speaking** 29:13 38:11
**special** 28:15 30:3 31:1,10 33:22 36:8,10 36:11,13,14,15 36:17 37:22
**specific** 13:16 33:11 34:15 40:5 97:11 108:2 133:5
**specifically** 25:25 42:14 48:10 77:3 104:11 133:17
**specifics** 51:17 86:13
**speculate** 65:25 70:21 112:12
**speculation** 65:24
**speed** 123:9
**spend** 43:4 44:4 104:14
106:1
**spent** 96:20,23 98:17,19
**spit** 8:6
**spoken** 70:15
**stack** 109:23
**staff** 16:24 23:6 30:8 49:7,12 50:1,5,17 51:1 51:3 79:3,7 92:11 94:12 104:14 132:2
**staffers** 16:22
**stage** 67:12
**stamps** 88:21
**stamps.com** 88:17
**standard** 113:3
**standing** 34:23 37:1,4 57:14 90:7 132:13,22 132:23 133:6
**start** 8:6 11:13 83:20
**started** 7:22 52:4 83:23 128:25
**starting** 11:21 109:3
**starts** 111:10
**state** 31:22 90:8 113:2,5 113:24 114:2,2 114:7 136:21
**stated** 33:14 62:8 76:12 77:7,8 87:23 119:13
**statement** 38:7 76:15,19 77:4 79:21,23 80:1 85:20 107:23 107:25 111:5 111:13,16 112:20,23 115:3,6
**statements** 60:10,16 63:23 75:11 107:19 107:21 108:11 109:5,8,9 119:9 127:20 128:8,15,15 130:15
**states** 1:1 60:25 111:8
**staying** 99:9
**steffin** 13:20
**stenographic** 5:20
**step** 56:11
**stepped** 9:8
**steve** 10:7 126:9
**steven** 2:19 6:6 10:13 137:1
**steward** 1:8 2:17 12:17

13:8 14:2,3,4 137:4 138:1 139:1
**sticker** 24:9
**stipulation** 5:21
**stock** 112:13
**stop** 44:6 58:4
**stopped** 111:25 112:2,3
**storage** 53:13 57:3
**stored** 28:11 54:7 55:19 56:3 85:15,16 85:22 86:1,4,7
**story** 130:5
**straighten** 8:14
**strayed** 37:3
**street** 1:20 2:21 3:6 5:8
**strengthen** 63:19
**stress** 111:11
**strike** 125:1
**strips** 53:22 104:21 105:6
**structural** 19:1 19:4
**structure** 11:14 13:13
**stuff** 96:6 99:1
**subject** 11:3,8 120:4
**submission** 45:20
**submitted** 53:1
**submitting** 72:9
**subscribed** 139:14
**subsequent** 11:17
**substance** 134:19
**substantiated** 73:6
**subsumed** 20:11,12
**sudden** 77:15
**suffer** 130:18 132:11
**suffered** 130:18 130:20 132:11
**suggested** 26:9
**suite** 1:20 2:21
**summarize** 131:21
**summary** 23:22
**sunday** 94:14
**supervisor** 61:5 61:6 62:9 64:16
**supplied** 117:24
**supplies** 23:7,8 30:8 46:21 53:8,14,17,20 54:13,17,20,23 55:3,6,9,11,14 55:20,25 56:8 56:14,19 58:22 103:24 104:5,8 104:19,22 105:9,11 117:24
**supply** 54:2,4 103:21 117:19
**supplying** 112:3
**sure** 7:13 12:7 12:16 14:14 15:12 22:7,11 26:25 31:8,14 35:19 39:24 44:20 54:10 57:15 63:14 74:15 92:13 94:16 101:5 102:18 103:14 105:14,21 106:12 112:16 115:20 116:12 116:14,17,18 118:10 119:2 121:3,5 126:11
**suspected** 67:5 67:10,10 70:13
**suspended** 20:18 78:1
**suspension** 20:17 39:22 43:19 44:12 45:17,21 55:21 56:2,4 57:6,15 57:18
**swear** 6:14
**sworn** 5:12 6:20 136:5 139:14

**t**

**t** 4:6 138:3,3
**take** 5:5,9 8:10 8:17,20 18:14 24:15 34:7 38:24 47:24 60:14 73:15 74:18 77:19,20 95:8 106:15
**taken** 5:7 67:24 136:3,12
**talk** 8:9 9:22 22:7,10 55:14 88:5,24 90:14 96:11 97:7 107:10,19 110:22,23 130:14 131:12
**talked** 62:13 79:16 96:4,9 98:15 100:16 103:20 127:6 128:1,8 133:12
**talking** 7:19 23:16 34:16

46:22 47:15 48:9,10 52:5 56:24
**talks** 78:23
**tasha** 1:9,14 2:18 5:6 6:11 6:17 7:9,10,11 7:11 8:25 137:5 138:2,24 139:2,4,12
**team** 16:25
**telephones** 84:7 84:8
**tell** 6:21 9:1 11:20,25 12:14 13:3,12 18:15 21:20,25 22:20 23:13 24:16,19 25:23 27:11 30:23 40:5 42:14 43:10 49:8 51:16 60:15 73:9 76:14 80:9,13 83:21 88:6 89:6 92:16 93:24 94:23 97:10 106:3 118:19 119:8 119:15 128:15 129:23 131:13 132:23
**telling** 56:18
**tenure** 54:9 61:20
**term** 21:3 49:5
**terminate** 26:13 27:3
**terminated** 22:1,19 26:10 40:2 51:18 54:15 122:8
**terminating** 21:24
**termination** 4:9 22:18,22 23:20 24:21 25:20,22,24 26:1,8,17,18,23 37:4 52:9 59:14 76:3 81:5 82:25 84:10,14,19 85:10 86:9,19 86:24 87:9 88:1 89:1 99:20 102:13 122:9
**test** 53:22 105:6
**testified** 6:23 39:6 40:18 44:3 47:11 56:2
**testify** 11:2,7,9 99:9
**testifying** 136:5
**testimony** 122:13 137:9 137:17 139:8
**testing** 104:20
**thank** 6:12,25 18:23 31:19,25 64:5 110:6 134:5,24
**thing** 8:6,18 17:21 28:19 46:11 125:16 126:15
**things** 17:21 46:21 63:10 96:23 115:11 122:16 124:8 126:10,18
**think** 10:9 17:20 22:5 23:12,21 24:5 31:9 33:14 34:2 40:10,15 43:22 47:24 48:23 49:16,16 50:22,23 53:13 55:17,18,23 58:8 64:24,25 67:16 68:8 72:22 76:3,21 77:6 81:2,17 81:18 82:11,21 85:20 86:2,25 87:20 89:2 91:23 92:19 95:8 96:21 100:1 101:7 105:9 107:14 107:14 112:10 113:25 114:11 114:11,17,18 122:19 124:20 124:20 126:7 126:19 129:19 130:21 132:7 132:16,19,20 134:2
**thinking** 36:17
**third** 71:10,19 133:11
**thought** 23:15 37:5,24,24 49:25 50:18
**threats** 30:9
**thursday** 1:17
**till** 39:1
**time** 1:18 5:3 5:23 8:16 10:19,22 12:6 14:6 15:22 20:9,22 22:5 24:6 26:10 27:18 35:14 36:12 39:17 44:10,12 45:20 47:22 48:4,7 48:25 49:17 54:4,11 56:25

57:5 58:14 60:14 62:25 63:1 65:10 66:18 67:15 68:9 75:25 80:3 81:5,9 82:25 84:10,14 84:19 86:8,19 86:23 87:9,25 88:9 95:8,21 95:25 96:21,21 96:23 97:19 98:18,18,19 100:20 102:10 102:24 103:4 103:10,17,19 103:22 104:15 104:16 106:19 111:21,23 113:5 114:19 114:23 115:1 116:17,18 121:8,11 123:2 126:23 127:2 133:7 135:18 137:18

**timeframe** 137:8

**timeline** 40:1 92:18

**times** 22:25 82:24 114:12 114:13

**title** 15:23 16:5 20:6,8 90:16 114:21

**titles** 16:18,22

**today** 5:4 7:5 7:24 8:12,16 9:21,23 21:18 40:4 44:22 118:7 123:22 124:1,22

**told** 19:9 24:3 33:21,25 34:17 35:5 38:19 45:13 47:4 53:15 55:9 59:1,9 61:13 64:13,21 96:12 97:8 98:2 103:24 105:9 109:7 122:11 122:16 125:23 126:4

**took** 20:14 71:18 105:4 120:9

**top** 11:13 13:21 19:6 30:19 35:23 60:18 64:6 100:14 112:6 129:20

**topic** 11:13,14 36:14 37:2,3 38:16 56:20 83:24 90:8,11 96:8

**topics** 9:22 11:3,9 21:20 34:24 40:14 79:16 80:12 94:24 96:4 120:18

**tortious** 96:6

**totals** 97:12

**towards** 128:8

**transcript** 5:14 136:23 137:6 137:19 139:5,8

**transcriptionist** 136:8

**transcripts** 135:7

**transferred** 102:24

**transition** 11:16

**transitional** 15:22

**trinh** 12:16

**true** 12:17 13:22 14:21 133:1 136:9 139:8

**truth** 6:21,21 6:23

**try** 8:7

**trying** 19:8 96:23 98:19 102:3 104:24 122:24 124:16 124:18 128:23 131:21

**turn** 52:18 88:15

**turned** 52:20 125:4

**turnell** 1:9,14 2:18 6:17

**turner** 5:6 6:11 8:25 11:7 72:10 134:15 137:5 138:2,24 139:2,4,12

**turnerta** 91:1

**turning** 51:19 88:11

**two** 27:14 28:22 32:6,8,9 32:12 41:16,25 42:1 46:8,25 51:12 52:7 77:5 83:25 85:6 105:6 107:2 128:9

**type** 53:20 81:3

**types** 28:20 53:22 88:13 113:1

**typewriting** 136:7

**typically** 27:13 91:25 92:2 94:8

**u**

**ucmail.uc.edu.** 91:1
**uh** 7:12,18,20 7:25,25 8:2,3 25:18 28:4 43:25 46:5,12 50:13 52:3 57:21 72:24 76:8 98:12 99:2 112:4 119:20 121:25 124:11 129:22 135:4
**uhs** 7:25 8:2
**ultimate** 55:22
**ultimately** 27:2 52:21 105:10
**unable** 98:8
**unanimous** 21:23
**unauthorized** 96:9
**under** 5:17 22:8 107:5
**understand** 5:13 8:13 11:18 13:13 20:19 34:9 36:16 38:10 41:18,23 43:9 56:2 69:17 71:12 73:25 75:4 82:13 102:18 122:6
**understanding** 38:12 41:12 42:4,7 46:3,8 62:16 63:3,18 65:21 77:20 78:15 86:12 88:3 100:19,23 104:14 107:21 114:14,23 115:10,13,16 116:2,5,7,11,16 116:21 117:2,4 117:5,9,13,18 117:23 119:6
**understands** 38:15
**understood** 31:9
**united** 1:1
**updated** 4:12
**usable** 105:13
**usage** 113:15
**use** 43:2,3,16 44:9 46:20 58:17 83:17 96:16 113:11
**used** 44:14,17 44:19 57:17 102:3 105:22 113:13 137:19
**uses** 5:16
**using** 28:18 44:8 111:25 112:2 113:5 126:3

**v**

**v** 1:6 137:4 138:1 139:1
**vacate** 58:7
**vacated** 43:20 44:7,13 49:5 58:5 101:23,23 102:3,5,7 103:6 125:25
**valid** 32:11
**variety** 55:18
**velocity** 61:13 61:16,19 62:1 62:4,24 64:23 71:15 76:13 107:12 115:9 115:11,19,23 116:1,2,15,20 116:25 117:6 117:14,17,19 117:24 118:2,8 119:12 120:23 121:16
**velocity's** 115:17
**verbal** 50:2 109:10
**verbally** 8:1 24:3 59:1,9
**verify** 137:9
**veritext** 5:5 137:14,23
**veritext.com** 137:15
**version** 113:23
**versus** 102:5
**vice** 13:9 19:7,7 45:12
**viewed** 73:8 75:1
**violated** 7:23 76:5
**violation** 67:5,6 67:9,10,10 70:13,14,17 71:7 77:17
**violations** 78:24,25
**volunteer** 67:4
**vote** 26:13

**w**

**wait** 36:25 39:1 39:1
**want** 8:17 11:23,25 17:13 17:17 23:18 38:16 41:23 43:11 58:20 59:14 60:15,17 63:21 72:3,5 74:4 88:24 102:18 103:14

107:19 108:10 108:22 112:12 122:23 126:20 134:8,25 135:6 135:10
**wanted** 7:13 22:11 42:5 55:10 56:19 59:17 69:3,17 97:7 126:11,18 127:10 133:17
**warned** 22:25
**way** 9:5 11:12 81:22 89:14 123:5
**ways** 55:19
**we've** 33:14 59:16 62:13 65:4 70:14 76:3,6 79:16 87:7 98:15 110:24 111:11 128:8 133:12 133:14
**website** 51:7,15 51:24 52:2,6 52:11,16,17,22 82:9,18,19 87:16 122:15 124:8
**week** 32:6,8,12 105:2 124:1
**weeks** 27:14 28:22 32:9 111:1
**went** 45:12 48:23 49:1 53:12 69:23 125:5
**whelan** 13:19
**whistleblower** 66:22,24
**william** 1:8 2:17
**witness** 5:12,13 6:11,14,20 12:11 26:3 28:7 30:1 32:18 36:5 37:12 40:9 41:10 47:24 55:2 57:12 65:18,25 66:6 66:10,13 67:12 69:21 71:18 72:12,14,24 73:3,13,20 74:18 75:15,23 95:3 97:17 100:1 110:1 121:20 124:11 124:20 134:4,6 136:4 137:8,10 137:12,18
**woman** 45:5
**word** 57:15 91:21 102:3
**worded** 99:14
**words** 43:11
**work** 16:24 22:24 23:7,9 41:1,11,20 46:21 54:19 62:1,3,24 64:22 76:12 85:18 93:6 96:19 98:11 104:15 105:7 107:3 119:12
**worked** 57:4,7 57:22,24 98:17 98:24 106:20
**working** 45:5 63:19 65:10 66:18 68:9 98:20 115:9,23 116:1 133:20
**would've** 15:23 20:25 88:10 91:10 94:18
**wow** 58:8
**wrap** 128:23
**wright** 3:5 6:9 96:19 97:5 98:3,11,16 106:24 133:22
**write** 130:1,3,5 130:7
**writes** 110:18
**writing** 22:25
**written** 5:21 29:6,6 65:8 68:9 70:12 72:20 109:10
**wrong** 50:17
**wrote** 49:24 50:6,16,16 51:1 56:20,21 59:7,8

**x**

**x** 4:1,6 43:6 136:23

**y**

**y** 43:6
**yard** 1:20 2:21 5:8
**yeah** 10:15,16 12:8 17:19 18:2 20:20 36:24 38:5 40:9 48:1 50:10 60:19 61:24,24 64:19 70:4 72:25 73:22 88:24 90:4 91:18 95:10,10,13,18 97:25 98:1 99:16 101:7 103:2 108:4,22 109:22 115:25 115:25 116:13 117:5,13

126:14,22 127:22 133:16 135:8
**year** 14:13 36:12 40:10 96:22 113:7,10 113:11
**years** 51:21 86:11
**yep** 48:2 107:15
**yesterday** 17:12,15

**z**

**z** 43:7
**zoom** 94:17
**zuckerman** 128:11,13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Case: 2:25-cv-00075-EAS-CMV Doc #: 99 Filed: 07/28/26 Page: 1 of 5 PAGEID #: 1435

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DENNIS CAUCHON, et al.** | : | **CASE NO. 2:25-cv-0075** |
| | : | |
| **Plaintiff,** | : | **JUDGE: Edmund A. Sargu** |
| | : | **Magistrate: Chelsey M. Vascura** |
| **v.** | : | |
| | : | **COUNTERCLAIM DEFENDANT** |
| **DWAYNE STEWARD, et al.** | : | **DENNIS CAUCHON'S AMENDED** |
| | : | **NOTICE OF FRCP 30(b)(6)** |
| **Defendants.** | : | **DEPOSITION TO COUNTERCLAIM** |
| | : | **PLAINTIFF HARM REDUCTION** |
| | : | **OHIO** |

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Counterclaim Defendant Dennis Cauchon, by and through counsel, will take the deposition upon oral examination of Counterclaim Plaintiff Harm Reduction Ohio ("HRO").

The deposition will commence on Thursday July 30, 2026, at10:00 a.m./p.m. EST at the offices of Reminger Co., L.P.A., 955 Yard Street, Suite 330, Columbus, OH 43212, or at another mutually agreeable location. The deposition will be taken before a notary public or other officer authorized by law to administer oaths and will be recorded by stenographic means and videotape.

Pursuant to FRCP 30(b)(6), HRO is required to designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf, and must set forth, for each person designated, the matters on which the person will testify. The designated person(s) must testify as to matters known or reasonably available to the organization regarding the topics described in the attached Addendum.



garvey | shearer | nordstrom

EXHIBIT
tabbies
HRO 1

Case: 2:25-cv-00075-EAS-CMV Doc #: 99 Filed: 07/28/26 Page: 2 of 5 PAGEID #: 1436

Respectfully submitted,

GARVEY | SHEARER | NORDSTROM. PSC

*/s/ David A. Shearer, Jr.*

David A. Shearer, Jr. (0070805)
2388 Grandview Dr.
Ft. Mitchell, KY 41017
t: 859.308.1490
f: 866.675.3676
dshearer@gsn-law.com
*Attorney for Plaintiff/Counterclaim Defendant Dennis Cauchon*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties of record through the Court's CM/ECF system. Parties may access this filing through the Court's CM/ECF system.

*/s/ David A. Shearer, Jr.*
David A. Shearer, Jr.

Case: 2:25-cv-00075-EAS-CMV Doc #: 99 Filed: 07/28/26 Page: 3 of 5 PAGEID #: 1437

## ADDENDUM

## DEFINITIONS

1. "**HRO**" or "**Counterclaim Plaintiff**" refers to Harm Reduction Ohio, its officers, directors, employees, agents, and attorneys.
2. "**Cauchon**" or "**Counterclaim Defendant**" refers to Dennis Cauchon.
3. "**HRO Accounts**" refers to any online, financial, communication, or data system used by HRO, including but not limited to its website (www.harmreductionohio.org), email system, Chase Bank, N.A. banking accounts, QuickBooks, and the "Harm Reduction Ohio" Facebook page.
4. The "**Granville Office**" refers to the former HRO office space located at 935 River Road, Suite G, Granville, Ohio 43023.

## MATTERS FOR EXAMINATION

1. Corporate Governance and Corporate Separation
   a. The organizational structure, operational control, and corporate governance of HRO during the transition of leadership from Dennis Cauchon to subsequent management.
   b. The complete factual basis and documentation for the unanimous board action on November 4, 2024, terminating Cauchon's employment as president.
   c. All corporate policies, bylaws, and board resolutions governing the authority of the president to execute leases and bind the organization financially prior to November 4, 2024.
   d. The nature and extent of losses or damages suffered by cross claimants as a result of Mr. Cauchon's actions.
2. Alleged Unauthorized Access and Control of Corporate Credentials
   a. The specific dates, times, IP addresses, and digital footprints supporting HRO's claims that Cauchon engaged in "unauthorized" access of HRO Accounts after November 4, 2024.
   b. HRO's administrative procedures for revoking digital access credentials, changing passwords, and updating contact info on the HRO Facebook page, website, and email domains following Cauchon's termination.
   c. The nature and transmission of the March 28, 2025 Notice to Cease and Desist, and any communications regarding login credentials.

d. The nature and extent of losses or damages suffered by cross claimants as a result of Mr. Cauchon's actions.

3. Financial Accounts and the Borough Company, LLC Lease

a. The complete factual background, negotiations, communications, and terms regarding the lease agreement for the Granville Office with Borough Company, LLC.

b. The specifics of the $7,000 transfer from HRO's Chase Bank account to Borough Company, LLC, including the operational purpose of the transfer and any baseline benefit HRO received from the Granville Office during that period.

c. All communications between HRO representatives and Chase Bank, N.A. concerning Cauchon's access, including the context of the correspondence attached as Exhibit 2 to the Counterclaim.

d. The nature and extent of losses or damages suffered by cross claimants as a result of Mr. Cauchon's actions.

4. Inventory, Storage, and Property Control at the Granville Office

a. The procurement, ownership, tracking, and operational utility of the approximately 4,000 naloxone kits and 20,000 fentanyl test strips stored at the Granville Office.

b. The factual circumstances surrounding the placement of locks on the Granville Office and any efforts made by HRO to access printed materials, furniture, and personal property between November 2024 and April 2025.

c. The logistics, coordination, and eventual retrieval of the naloxone kits, fentanyl test strips, and other personal property by HRO in April 2025.

d. The nature and extent of losses or damages suffered by cross claimants as a result of Mr. Cauchon's actions.

5. Independent Investigation and "Kloxxado" Conflict Allegations

a. The hiring, scope of work, retention agreement, billing, and ultimate findings of independent counsel Ms. Nelson regarding the internal investigation into Ms. Reese's retaliation and hostile work environment claims.

b. The factual basis for HRO's assertion that Cauchon's statements regarding a "Kloxxado lobbyist" or structural conflicts of interest were objectively false.

c. HRO's internal relationships, communication, or agreements with any entities or individuals involved in lobbying, marketing, or distributing Kloxxado.

d. The nature and extent of losses or damages suffered by cross claimants as a result of Mr. Cauchon's actions.

6. Tortious Interference and Alleged Reputational Damages

a. Any communication between HRO and third parties—including Next Distro, the State of Ohio Board of Pharmacy, and the Ohio Department of Health ("ODH")—regarding statements made by Cauchon.

b. The precise identification, itemization, and calculation of financial losses, lost clients, disrupted business expectancies, or altered grant allocations from ODH resulting from Cauchon's conduct.

c. Any documentation or metrics tracking harm to HRO's professional standing or operational capacity within its professional communities.

d. The nature and extent of losses or damages suffered by cross claimants as a result of Mr. Cauchon's actions.

7. CFAA Losses and System Security Costs

a. An itemized breakdown of all costs exceeding $5,000 that HRO claims it incurred within a one-year period to investigate, respond to, or remediate Cauchon's access to protected computers under 18 U.S.C. § 1030.

b. The retention of any cybersecurity, forensic, or IT professionals hired to audit, secure, or restore web and network systems connected to HRO Accounts.

c. The nature and extent of losses or damages suffered by cross claimants as a result of Mr. Cauchon's actions.

HARM REDUCTION OHIO

November 4, 2024

Dennis Cauchon
327 E. Broadway
Granville, Ohio 43023

Dear Dennis Cauchon,

Your employment with Harm Reduction Ohio, an Ohio nonprofit corporation ("HRO"), has been terminated effective immediately (the "Effective Date"). We engaged legal counsel to conduct an outside investigation of your conflict of interest allegation against AmandaLynn Reese, as well as her retaliation and hostile work environment allegations against you, and several complaints from current and former HRO employees that soon followed. The investigation determined that AmandaLynn does not have a conflict of interest with respect to the Ohio Department of Health ("ODH") contract. Your September 3 letter to ODH claiming that a conflict of interest existed and should have been reported by HRO was based on and contained numerous inaccurate and misleading statements.

The outside investigation also considered your retaliation claim. As you know, our employee handbook includes a whistleblower policy that requires all directors, officers, employees and volunteers to "practice honesty and integrity in fulfilling our responsibilities" and to "comply with all applicable laws and regulations." The policy encourages everyone affiliated with HRO "to raise serious concerns internally so that HRO can address and correct inappropriate conduct and actions." The policy expressly forbids anyone from retaliating "against any board member, officer, employee, or volunteer who *in good faith* reports an ethics violation, or a suspected violation of law . . . or suspected violation of any regulation governing the operations of HRO" (emphasis added). Furthermore, "Anyone filing a written complaint concerning a violation or suspected violation must be acting in good faith *and have reasonable grounds for believing the information disclosed indicates a violation*. Any allegations that prove not to be substantiated and which prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense" (emphasis added).

Your September 3 report to ODH violated this policy. Prior to sending your letter to ODH, you stated that AmandaLynn's work for Velocity BioGroup was not likely a conflict that would affect the ODH contract, and you acknowledged that HRO needed to "know the details" before making any decisions. You agreed that legal counsel should conduct an investigation and prepare a report. You repeatedly acknowledged that HRO needed to maintain the status quo until legal counsel could advise the organization. Despite these statements, you chose to send your letter to ODH, potentially jeopardizing significant funding, prior to an investigation begin completed, without having all of the facts, and while disregarding advice from our legal counsel. Instead of listening to our legal counsel, you chose to rely on advice from Chat GPT (in direct contravention of the

EXHIBIT
tabbies
HRO 2

terms of service for Chat GPT). We do not consider this an act of good faith or reasonable grounds for your report to ODH.

You then placed the organization in further jeopardy with your sudden and inexplicable decision to promote Patrick Bourland and give him a significant raise, potentially in violation of equal pay laws.

Finally, your insubordination throughout this entire investigative process, including failing to participate in the investigation, failing to recognize the authority of the board of directors, threatening to return to the office despite being placed on administrative leave so that you can "assert your power" are all grounds for termination of your employment.

Except as set forth in this letter, the Effective Date will be your employment termination date for all purposes, meaning you will no longer be entitled to any further compensation, monies, or other benefits from Harm Reduction Ohio, including coverage under any benefits plans or programs sponsored by Harm Reduction Ohio.

Your final paycheck, subject to all withholdings and deductions as required by law, through November 4, 2024 will be paid in accordance with our standard payroll procedures.

You must immediately return all Harm Reduction Ohio property, including identification cards or badges, access codes or devices, keys, laptops, computers, telephones, mobile phones, hand-held electronic devices, credit cards, electronically stored documents or files, physical files, passwords and login information, and any other Harm Reduction Ohio property and information in your possession.

Please acknowledge below your receipt of this letter and return a copy of the letter back to Harm Reduction Ohio at board@harmreductionohio.org.

Yours sincerely,

Harm Reduction Ohio, Board of Directors

Dwayne Steward, Director

James Decker, Director

Colleen M Garlock

Colleen Garlock, Director

M B True

Molly True, Director

Anne Trinh, Director

Tasha Turner-Bicknell

Tasha Turner-Bicknell, Director

Billy Golden

Billy Golden, Director

Acknowledged:

.....................................................

Dennis Cauchon

Date .......................................................

dwayneasteward@gmail.com

# HRO Emergency Board Only Meeting

Created by: Dwayne Steward · Your response: ✓Yes, I'm going

Time

1pm - 2pm (Eastern Time - New York)

Date

Thu Sep 5, 2024

Guests

- ✓ bgolden@nastad.org
- ✓ Dwayne Steward
- ✓ jamesdecker68@gmail.com
- ✓ mollybtrue@yahoo.com
- ✓ trinh.89@osu.edu
- ✓ turnerta@ucmail.uc.edu
- colleengarlock@gmail.com

My Notes

EXHIBIT
tabbies
HRO 3

dwayneasteward@gmail.com

# HRO Board Meeting updated meeting link

Created by: Dwayne Steward · Your response: ✓Yes, I'm going

Time
10am - 11am (Eastern Time - New York)

Date
Sun Sep 15, 2024

Guests
✓ bgolden@nastad.org
✓ Dwayne Steward
colleengarlock@gmail.com
dwayne@makeitbetterconsulting.com
jamesdecker68@gmail.com
mollybtrue@yahoo.com
trinh.89@osu.edu
turnerta@ucmail.uc.edu

Where
https://nastad.zoom.us/j/83369975436

Description
Hey all, updating the meeting link for our Sunday board meeting

Billy Golden (he/him/his) is inviting you to a scheduled Zoom meeting.

Join Zoom Meeting
https://nastad.zoom.us/j/83369975436

Meeting ID: 833 6997 5436

---

One tap mobile
+13017158592,,83369975436# US (Washington DC) 13052241968,, 83369975436#
+US

---

EXHIBIT
tabbies
HRO4

**From:** **Dennis Cauchon** dennis@HarmReductionOhio.org
**Subject:** HRO update...Kloxxado and lawsuit
**Date:** February 11, 2025 at 9:07 AM
**To:** Dan Coello dan@nextdistro.org, Sidney Lane sidney@nextdistro.org
**Cc:** Jamie Favaro jamie.favaro@gmail.com

I've attached a federal lawsuit I filed a couple of weeks ago related to HRO's conflict of interest with Kloxxado and the efforts to remove me from HRO for disclosing the conflict to the Ohio Department of Health. NEXT is mentioned a few times in the 46-page complaint but, as you know, much happened that is not detailed in the filing.

I apologize for the stress we've caused by pushing Kloxxado. I had no idea at the time that we had an employee being paid by Kloxxado's lobbyist.

Thanks for all you've done for HRO. Take care.

**Cauchon HRO Complaint from PACER 1-28-25.pdf**

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

EXHIBIT
5

August 12, 2025

Jennifer Voit
Bureau Chief, Health Improvement and Wellness
Ohio Department of Health
246 N. High Street
Columbus, OH 43215

**Subject:** Formal Notice: Documented Conflict of Interest on HRO Naloxone Contract

Dear Ms. Voit,

This letter formally notifies the Ohio Department of Health (ODH) that material assertions made in an October 23, 2024, letter to your office—submitted by Harm Reduction Ohio (HRO) Vice Chair Dwayne Steward—are now known to be false.

Mr. Steward's letter stated that no conflict of interest existed between AmandaLynn Reese's role as Project Manager of HRO's federally funded naloxone distribution contract and her undisclosed employment as Director of Government Advocacy with Velocity BioGroup (Velocity), lobbyist for Hikma Pharmaceuticals (Hikma) and its Kloxxado brand of naloxone.

Mr. Steward wrote in his October 23, 2024, letter: (Attachment 2, P. 1)

> Ms. Reese does not have a direct relationship with Hikma and does not receive any compensation from Hikma for this advocacy role. Her Velocity compensation (a retainer and an hourly rate) is not in any way tied to sales or distribution of Kloxxado.

Documents recently obtained in discovery in a False Claims Act case disprove these claims and establish that Ms. Reese's outside employment was related to and funded by Hikma and directly related to increasing Kloxxado purchases by government agencies. The newly obtained records include Ms. Reese's Velocity employment agreements, W-2 tax statements, travel records and reimbursed business expenses. The records cover the period of her full-time Velocity employment from December 2022 to at least December 2024 and as late as April 2025. The conflict was discovered July 15, 2024, and disclosed to ODH on September 3, 2024. (Attachment 2, P. 6)

The documents –filed under seal—are more fully described in two federal court filings filed on July 28, 2025. (Attachment 1) A redacted version of those filings is attached to this letter and are the basis for key information provided in this letter. I encourage you to read the full court filings or the attached excerpts related to Ms. Reese's conflict. (Attachment 2, P. 8)

In short, Ms. Reese lived a professional double-life for more than two years. She simultaneously held two full-time salaried positions at two different employers and often double-billed both employers for the same work time and travel expenses. Her two full-time jobs conflicted directly with each other: in her federally funded position as HRO's full-time Project Manager on the ODH contract, Ms. Reese ordered federally funded naloxone, including Kloxxado, from the state

EXHIBIT
6

pharmacy; in her job as Director of Government Advocacy at Kloxxado's lobbying firm, Ms. Reese's job responsibilities included working to increase Kloxxado purchases by government agencies.

During her more than two years of dual employment, Ms. Reese participated in numerous internal and external discussions, decisions and funding applications related to the procurement of Kloxxado--a controversial, high-dose, high-cost product --without disclosing to colleagues, partners, funders, or the government that she was simultaneously employed full-time in an advocacy capacity by Kloxxado's lobbyist. In addition, public records show that Ms. Reese, in her capacity as Contract Project Manager, personally placed orders with the state pharmacy for more than 11,000 Kloxxado kits that cost the state pharmacy approximately $600,000 in federal funds. Ms. Reese's orders were a six-fold increase and began immediately after she assumed naloxone procurement authority at HRO in July 2023.

Documents obtained in Discovery, along with public records obtained from state agencies, establish that Ms. Reese's conflict of interest was egregious and impermissible under the terms of the ODH-HRO contract and government contracting regulations. The harm to taxpayers and the at-risk population served by the contract were significant and are described later in this letter.

This letter corrects the record, explains the nature and scope of the conflict, quantifies the financial cost to taxpayers, describes efforts to conceal the conflict from HRO's primary government funder, and identifies past and ongoing compliance violations.

I ask that ODH conduct an independent investigation into the conflict of interest arising from Ms. Reese's undisclosed overlapping full-time positions as Director of Government Advocacy at Velocity and as Project Manager on the federally funded ODH naloxone contract. This investigation is urgent, overdue, and required under federal rules. Ms. Reese was reinstated as Project Manager on October 16, 2024, after an "investigation" that concluded no conflict existed—without reviewing her employment agreements, compensation records, or Kloxxado procurement patterns. She continues to serve in a fiduciary role on the $850,000-a-year federally funded ODH contract, which distributes more than $1 million in naloxone annually.

Ms. Reese's conduct may constitute civil and criminal violations—including fraud, conversion, unjust enrichment, and breach of fiduciary duty—arising from her misrepresentations and double-billing of work hours and travel expenses. She may also face criminal liability if it is proven that she knowingly influenced procurement decisions or concealed her conflict of interest to benefit Velocity, Hikma, or herself.

### 1. Newly Obtained Evidence: Reese's Velocity Employment Documents

On June 24, 2025, Velocity produced Ms. Reese's employment agreements, W-2 tax statements, and employee handbook in response to a third-party subpoena in *Cauchon v. Steward et al.*, Case No. 2:25-cv-00075 (S.D. Ohio). On July 11, 2025, the company produced her travel and expense reimbursement records. It has committed to producing Ms. Reese's relevant emails but has not yet done so. Ms. Reese was subpoenaed to produce these same employment and compensation records on April 14, 2025. She refused to comply with the subpoena to produce these records.

Records produced by Velocity have been filed under seal pursuant to a court-issued protective order. As a result, specific details from those materials—such as salary figures, travel destinations, expense claims, and exact contractual language—cannot be publicly disclosed at this time. We intend to seek agreement from all parties to lift the protective order as it applies to Ms. Reese's employment documents and other materials relevant to HRO's compliance with its federally funded ODH contract.

That said, and in full compliance with the protective order, it can now be stated with certainty that numerous material statements made in Mr. Steward's October 23, 2024, letter to ODH—specifically concerning Ms. Reese's employment and the claim that no conflict of interest existed—are demonstrably false, based on evidence filed under seal and additional documents obtained through discovery and public records requests.

The protective order permits identifying the categories of documents produced, explain their relevance, and state conclusions those materials support. Publicly disclosable information is included in the redacted public version of case documents filed on July 29, 2025, namely a Motion for Leave to Amend and the attached Second Amended Complaint.

For brevity and clarity, the next section provides direct quotes from the two court filings—a 14-page Motion and a 65-page Amended Complaint—relevant to Ms. Reese's conflict of interest.

## 2. Court Filings: Reese's Conflict of Interest and Double-Billing

This section consists entirely of relevant quotations from court filings made July 29, 2025, that describe what may be publicly disclosed about the nature and scope of Ms. Reese's employment at Velocity and its conflict with her Project Manager role at HRO on the federally funded ODH contract. (An expanded listing of relevant quotes can be found in Attachment 2, P.8)

From the Motion:

> HRO's Director of Operations, AmandaLynn Reese, was secretly employed by a lobbying firm representing the manufacturer of a brand of naloxone, the same drug she was responsible for procuring at HRO under the federally funded Contract. (Motion, P.2)
>
> The documents confirm that Ms. Reese's employment with Velocity was not merely a "perceived" or "potential" conflict of interest; it was a blatant and egregious conflict, given Ms. Reese's direct role in procuring naloxone for HRO that the state purchased with federal State Opioid Response (SOR) Grant funds. From 2022 to 2024, Ms. Reese was employed full-time as Director of Government Advocacy at Velocity and received over in [redacted] annual salary plus health benefits, a 401(k) and a generous expense account. This compensation was more than double what she received for her full-time, federally funded job at HRO. (Motion, P. 4)
>
> Newly obtained expense reports from Velocity further show that Ms. Reese maintained a double professional life for over two years. She worked two full-time

jobs in direct conflict with each other, without HRO's knowledge or approval and in violation of HRO policies and federal grant requirements. The scale and duration of Ms. Reese's undisclosed dual employment underscore Defendants' failure to investigate and address the conflict in breach of their fiduciary duties to act in HRO's best interests. (Motion, P. 6)

The new evidence demonstrates that Ms. Reese double-billed her time, travel and business expenses to both HRO and Velocity and spent many weeks traveling on Velocity business while representing to HRO that she was working regular hours in her Cincinnati office. For example, on July 17, 2024, when Plaintiff Cauchon first asked Ms. Reese about her position at Velocity, Plaintiff was unaware—and Ms. Reese did not disclose—that she was calling from another state during a three-city, nine-day Velocity business trip. That is just one instance among a broader pattern of similar misconduct by Ms. Reese. (Motion, P. 6)

Documents produced by Velocity show that, while working on behalf of Velocity, Ms. Reese engaged in widespread fraud against HRO and the government by working full time for Velocity and at times submitting fraudulent expense requests to HRO's federally funded operations. (Motion, P. 10)

In sum, this is not a case of minor technical noncompliance or an ambiguous conflict. The new evidence reveals a pervasive scheme of concealment and double-dealing by Ms. Reese, made possible only by Defendants' breach of fiduciary duty and *ultra vires* conduct as board members. (Motion, P. 12)

From the complaint:

Over two years, Ms. Reese worked at least dozens--likely hundreds—of days for Velocity while claiming to work full-time to perform her regular HRO duties from her home office in Cincinnati. Expense records show she took numerous business trips to 14 states and Washington, D.C. from January 2023 through September 2024. She did not take time off from HRO to make these trips. Velocity reimbursed Ms. Reese for travel expenses. On at least five trips, Ms. Reese double-billed travel expenses to both HRO and Velocity, thus submitting false reimbursement claims to HRO to be reimbursed with federal funds. (P. 4, Par. 14)

Post-disclosure research has found Ms. Reese's conflict to be far more egregious than known at the time of the September 3, 2024, disclosure. In addition to her anomalous Kloxxado ordering, Ms. Reese was found to be a highly paid, full-time employee of Velocity and to have taken many out-of-state trips for Velocity BioGroup on days when she was paid by HRO for working on the Contract. She also had her own company email, amandalynnar@velocitybiogroup.com, that she used simultaneously with her HRO email. (P. 30, Par. 124)

### 3. False Statements in Steward Letter to ODH on October 23, 2024

This section identifies four consequential false statements made in Mr. Steward's October 23, 2024, letter to ODH in which Mr. Steward claimed, purportedly on HRO's behalf, that Ms. Reese's outside employment was not a conflict of interest.

**1. False Claim: Ms. Reese's Compensation**

"Her Velocity compensation (a retainer and an hourly rate) is not in any way tied to sales or distribution of Kloxxado."

**What the Evidence Shows:** This statement is false.

Documents obtained in discovery confirm that Ms. Reese's was always a full-time salaried employee—not a consultant or contractor—and was not compensated by retainer or hourly rate. Her role was a management-level position directly tied to advocacy efforts aimed at increasing government purchases of Kloxxado.

**2. False Claim: Ms. Reese's Job Duties**

"Ms. Reese does not promote any specific company or product, instead advocating for expanding access to naloxone and harm reduction services generally."

**What the Evidence Shows:** This statement is false.

Ms. Reese's employment contracts and related documents show that her role at Velocity was explicitly structured to promote Hikma's commercial interests, specifically, to increase state and local government purchases of its branded 8mg naloxone product, Kloxxado.

Documents provided recently in discovery confirm this conclusion. However, specific details and language related job duties are currently under seal and cannot be fully disclosed publicly. The following is a screenshot of a redacted version of P. 39 of the Amended Complaint, which describes Ms. Reese's employment obligations.

165. Under Ms. Reese's employment agreements with Velocity, she had an annual salary of over [redacted] and was required to act in "[redacted]," by, among other things, [redacted], [redacted] that she ordered through federally backed dollars at HRO. (Ex. 35 at 39.) Under the employee agreements, Ms. Reese's duties included:

- [redacted]." *Id.* at 40.
- Promoting Kloxxado [redacted] *Id.* at 43.
- [redacted]" *Id.* at 39.
- Understanding [redacted]" *Id.* at 41.
- "[redacted]" *Id.* at 40.
- [redacted] *Id.*

**3. False Claim: Ms. Reese's Conflict Disclosure**

"Mr. Cauchon's claim that Ms. Reese declined to provide details of her work with Velocity was a blatant misrepresentation."

**What the Evidence Shows:** This statement is false.

Ms. Reese refused to provide her employment agreements, compensation records, and related documentation when requested by her employer. She continued to withhold these records even when formally subpoenaed in litigation, despite a legal obligation to produce them. Her stated reason for noncompliance was that her Velocity documents were confidential and not relevant or proportional to the case.

The materials were ultimately obtained from Velocity, not from Ms. Reese. Documents filed under seal confirm that Mr. Steward failed to disclose or accurately describe critical aspects of

Ms. Reese's outside employment – job duties, pay, travel and work conducted on HRO time, etc. – in his October 23, 2024, letter to ODH stating that no conflict of interest existed.

**4. False Claim: Independent Investigation**

"HRO engaged the Law Office of Maritza S. Nelson, LLC, an outside law firm, to conduct an independent investigation of Ms. Reese's alleged conflict of interest. Legal counsel reviewed all available documents and correspondence related to Ms. Reese's alleged conflict of interest."

**What the Evidence Shows:** This statement is false.

The attorney retained by Mr. Steward and select board members was neither independent nor impartial. Ms. Nelson had a prior personal relationship with Mr. Steward, who was the subject of a formal written complaint (Attachment 2, P. 14) alleging that he helped Ms. Reese conceal her conflict of interest. In response to that complaint, Ms. Nelson emailed Mr. Cauchon's counsel, dismissing the allegation as "rather outrageous," and failed to investigate the credible claim.

While purporting to act as a neutral fact-finder, Ms. Nelson simultaneously represented Mr. Steward and other board members in matters adverse to Mr. Cauchon and protective of Ms. Reese. This dual representation created an irreconcilable conflict of interest that fatally compromised the credibility of her work.

Most importantly, Ms. Nelson did not review "all available documents and correspondence." She failed to request or examine critical evidence: Ms. Reese's active employment contracts and expense accounts at Velocity (available from Ms. Reese), as well as Ms. Reese's Kloxxado ordering history at HRO (available from both the state and HRO).

By disregarding key documents, Ms. Nelson engaged in willful blindness to facts central to determining (a) whether Ms. Reese's outside employment was a conflict of interest and (b) whether that employment influenced Kloxxado procurement and the use of federal funds. Her omissions ensured that pivotal evidence remained unexamined and produced an investigative outcome aligned with the narrative advanced by Ms. Reese and Mr. Steward. In short, the investigation was a sham.

The Amended Complaint makes this claim plainly on Page, 41, Paragraph 172

> Mr. Reese's verified conflict of interest also shows that Defendants' investigation (through attorney Maritza Nelson) concluding no conflict of interest by Ms. Reese was a complete sham, which was self-driven to justify Defendants' retaliation against Mr. Cauchon. Spending just five minutes looking at Ms. Reese's employment agreement with Velocity makes it clear that she had an irredeemable conflict. Yet, Defendants chose to be willfully blind to the conflict and succeeded in convincing Maritza Nelson to do the same.

## 4. Taxpayer Cost: Reese Double-Billing and Anomalous Ordering

Mr. Steward's October 23, 2024, letter to ODH—and the sham investigation on which it relies—failed to address the financial harm to taxpayers caused by Ms. Reese's impermissible conflict of interest. The significant harm can be measured by:

> (a) the number of workdays Ms. Reese spent on Velocity business over more than two years of employment while falsely claiming to be working full-time for HRO;
> (b) the federal funds HRO paid to Ms. Reese for work hours and travel expenses she double-billed to the ODH contract while conducting Velocity business; and
> (c) the value of the unusually large volume of Kloxxado she ordered for HRO while employed by Velocity to promote increased government purchasing of that same product.

**Overview of Taxpayer Harm:** Court filings outline the overlapping work time and double-billing referenced in (a) and (b) in general terms:

> The new evidence demonstrates that Ms. Reese double-billed her time, travel and business expenses to both HRO and Velocity and spent many weeks traveling on Velocity business while representing to HRO that she was working regular hours in her Cincinnati office. (Motion, P. 6)
>
> Over two years, Ms. Reese worked at least dozens--likely hundreds—of days for Velocity while claiming to work full-time to perform her regular HRO duties from her home office in Cincinnati. Expense records show she took numerous business trips to 14 states and Washington, D.C. from January 2023 through September 2024. She did not take time off from HRO to make these trips. Velocity reimbursed Ms. Reese for travel expenses. On at least five trips, Ms. Reese double-billed travel expenses to both HRO and Velocity, thus submitting false reimbursement claims to HRO to be reimbursed with federal funds. (Complaint, P. 4, Par. 14)

**Quantifying Taxpayer Loss:** ODH can quantify the cost of Ms. Reese's double-billing by comparing her Velocity and HRO work records—emails, texts, and calendars--to match travel and workdays against HRO timesheets and reimbursements. She had her own Velocity email, amandalynnar@velocitybiogroup.com, that she used concurrently with her HRO email, amandalynn@harmreductionohio.org. Ms. Reese used the same computer, cell phone, internet service, calendar and home office for both jobs. Metadata from devices and accounts—timestamps, IP addresses, and geolocation data—can corroborate work patterns and locations.

Kloxxado cost $10 more per kit than Narcan on average and $20 more per kit than generic naloxone during her period of dual employment. (Complaint, Figure 1, P. 9). Unnecessary spending on high-cost Kloxxado reduced SOR-grant money available to reduce overdose deaths in Ohio. To examine the potential cost of biased Kloxxado procurement, ODH can review its own ordering records and state pharmacy fulfillment data. These records, obtained through public-records requests and used in court filings, show that Ms. Reese, after assuming naloxone-ordering authority in July 2023, began ordering unusually large quantities of Kloxxado

and continued to do so until questioned about her Velocity employment in July 2024. (Complaint, PP. 10–12, ¶¶40–45)

> In the 12 months before her outside employment was discovered, Ms. Reese ordered 11,500 units of Kloxxado—the most expensive brand of naloxone—at an approximate cost of $600,000, paid with federal SOR funds through the state pharmacy. (Motion, P. 5)

This chart summarizes state pharmacy shipments of Kloxxado to HRO. (Complaint, Figure 2, P. 11)

**Harm Reduction Ohio**

Kloxxado Shipments from State Pharmacy

| Order Number | Pharmacy Shipment Date | # of Kits | Ordered By |
|---|---|---|---|
| 1 | 11/18/21 | 1,000 | Mallory Bolen |
| 2 | 05/17/22 | 200 | Mallory Bolen |
| 3 | 06/17/22 | 200 | Mallory Bolen |
| 4 | 09/09/22 | 700 | Mallory Bolen |
| 5 | 03/15/23 | 346 | Mallory Bolen |
| 6 | 04/12/23 | 500 | Mallory Bolen |
| 7 | 06/21/23 | 500 | Mallory Bolen |
| 8 | 08/15/23 | 500 | AmandaLynn Reese |
| 9 | 08/17/23 | 1,500 | AmandaLynn Reese |
| 10 | 02/02/24 | 2,500 | AmandaLynn Reese |
| 11 | 4/24/24 | 3,500 | AmandaLynn Reese |
| 12 | 06/14/24 | 3,500 | AmandaLynn Reese |

Source: Ohio Department of Mental Health and Addiction Services Pharmacy

### 5. Unlawful Board Actions to Conceal Reese Conflict of Interest

This section addresses actions by Mr. Steward and certain board members that exceeded the authority granted under HRO's bylaws, Ohio law, and government contracting rules. These actions—taken *ultra vires* (without legal authority) after Ms. Reese sought assistance in limiting disclosure of her outside employment—were integral to efforts to conceal her conflict of interest from government funders.

Under Ohio law and consistent court precedent, a nonprofit's corporate bylaws are considered binding contracts that govern its operations. HRO's bylaws assign the Board of Directors a single operational power: the appointment (or removal) of HRO's President. The board may

exercise this power only at a meeting convened and conducted in full accordance with the bylaws' notice and procedural requirements.

For nearly a year, Mr. Steward and allied board members have flagrantly ignored HRO's bylaws. (Attachment 2, P. 18) They have engaged in a systematic pattern of *ultra vires* conduct for the express purpose of concealing Ms. Reese's conflict of interest and retaliating against me, HRO President, for lawfully reporting it to HRO's government funders. As a matter of law, such *ultra vires* actions are legally void and represent a significant breach of the fiduciary duties of care, loyalty, and obedience required of non-profit directors under Ohio law. Mr. Steward and allied directors were timely informed that their actions lacked legal validity, yet they persisted even after they knew, or should have known, their actions were legally void.

Lacking any legal authority to block the disclosure of Ms. Reese's conflict, Mr. Steward organized an effort by select board members to seize control of HRO's day-to-day operations and personnel decisions, specifically those involving Ms. Reese and her conflict of interest.

On September 5, 2024, Mr. Steward, the board vice chair, sent an email ordering me to "cease and desist all activities related to conflict of interest matters, including but not limited to communications with funders, staff, and community partners." Neither HRO's bylaws nor Ohio law grants Mr. Steward authority to issue operational directives or restrict the duties of the President, whether as chief executive or as designated compliance officer on a federally funded contract.

Shortly thereafter, Mr. Steward convened a board meeting on less than 24 hours notice and instructed others that I, a voting director, not be notified of the meeting. This directly violated HRO's bylaws, which state: "Notices of special meetings shall be sent out by the secretary to each board member at least two weeks in advance." Text messages produced in the HRO case confirm that Mr. Steward and two other board members explicitly agreed to deny me notice and the right to attend this meeting. In the meeting minutes, I was listed as an "Absent" board member.

Intentional failure to provide notice to a voting director is a profound breach of the three core fiduciary duties required by Ohio law:

- **Duty of Obedience**, by disregarding the organization's binding bylaws.
- **Duty of Care**, by preventing the board from making fully informed decisions.
- **Duty of Loyalty**, because the exclusion was done to advance the interests of individuals over the interests of the corporation.

It also violates the embedded duty of candor, which requires directors to be truthful, transparent, and to disclose all material information to all board members.

Mr. Steward's pattern of misconduct continued with an October 27, 2024, board meeting—also invalid for failure to provide timely notice—which was convened solely to hold a scripted vote to remove me from the board. At that meeting, Mr. Steward acknowledged my status as a voting board member. He then stated the rationale for denying me notice to meetings, including an

October 16, 2024, meeting in which select board members agreed that Ms. Reese had no conflict of interest, voted to reinstate her, and terminated me. Mr. Steward explained: "During your administrative leave, the board felt it unethical for you to be a part of the investigation that was about you, which is why you weren't in attendance." (Attachment 2, P. 21) This justification is not recognized under Ohio law or HRO's bylaws as a lawful basis to deny meeting notice to a director.

This pattern of deliberate procedural violations confirms that the board's conduct was not an inadvertent oversight, but an unlawful campaign to conceal Ms. Reese's conflict of interest and silence the individual who reported it. Acting exclusively through *ultra vires* actions, Mr. Steward and allied board members succeeded in hiding Ms. Reese's conflict of interest without hearing from the one person obligated to report it: the organization's founder, President, board member, contract signatory and contract compliance officer. This is a textbook example of failed corporate governance, where those entrusted with ensuring transparency instead exceeded their legal authority in order to conceal a conflict of interest on a government contract.

### 6. Steward's Failure to Correct Errors in Record

Under 2 C.F.R. § 200.113 and the ODH Grants Administrative Policies and Procedures (OGAPP) Manual (Sections B1.6 and C2.2), subrecipients of federal funds are required to promptly disclose known conflicts of interest and correct material misstatements made to funding agencies. Yet despite receiving conclusive evidence on June 24 and July 11, 2025, that Mr. Steward's October 23, 2024, letter to ODH contained multiple material falsehoods, HRO leadership has neither corrected the record nor notified government funders—violating both regulatory mandates and fiduciary obligations.

For nearly a year, Ms. Reese and her board allies successfully concealed her Velocity employment contracts, compensation records and anomalous Kloxxado ordering. As of August 3, 2025—more than a month after receiving documents that sought to ignore—ODH reports Mr. Steward's October 23, 2024, letter remains unamended.

This ongoing refusal to correct the falsehoods constitutes a clear breach of fiduciary duty, a continuing violation of federal and state grant compliance requirements, and a direct threat to HRO's eligibility to participate in federally funded contracts administered by the State of Ohio.

### 7. Joint Defense: Conflicted Counsel and Compromised Oversight

It is significant that Ms. Reese, Mr. Steward and other board members are all represented by the same attorney, Steven A. Chang of the Reminger law firm. This joint representation creates an inherent conflict of interest and calls into question the board's independence and ability to exercise impartial oversight regarding Ms. Reese's conflict.

Mr. Chang is simultaneously defending Ms. Reese's efforts to withhold documents related to her Velocity employment and defending the directors accused of breaching their fiduciary duties by concealing her conflict. In this dual role, counsel cannot provide independent advice to board members about Ms. Reese's misconduct without compromising his duty to protect her as a client.

This arrangement has resulted in a unified legal strategy aimed not at ensuring transparency or regulatory compliance, but at resisting timely, accurate, and forthright disclosure of Ms. Reese's conflict of interest to the appropriate authorities. In response to a lawful subpoena to Ms. Reese, Mr. Chang refused to produce Reese's Velocity employment agreements, compensation records, travel reimbursements, and Velocity emails that Reese continues to withhold in violation of the subpoenaed issued to her. These key records were ultimately obtained only because Velocity complied with a separate subpoena.

Now that Steward and allied directors have clear proof of Ms. Reese's serious conflict in their hands, it is clear that their interests are not aligned with Ms. Reese – considering that Steward and two other directors are facing legal claims that they breached their fiduciary duties by failing to properly investigate and address Reese's conflict. Indeed, Steward and allied directors' legal interests are actively adverse to Reese's at this juncture. As a result, Chang and the Reminger firm may not ethically represent Reese with regard to the same case and same operative facts under governing rules of professional conduct for lawyers.

Joint legal representation between a conflicted employee—who exercised procurement authority under a federally funded state contract—and the board members charged with overseeing that employee and the contract presents an irreconcilable conflict of interest. Such representation is inconsistent with the fiduciary duties of care, loyalty, and obedience owed by nonprofit directors under Ohio law, as well as with the duty of independent judgment required for effective oversight. The presumption that the legal interests of Ms. Reese, the board, and Harm Reduction Ohio are aligned is unsupported by the facts and reflects a continuing bias that has undermined the commitment to full and accurate disclosure made in HRO's original Conflict Disclosure Notice on September 3, 2024.

These are not abstract concerns. The record reflects a clear and continuing pattern of delay in producing core documents—a legal strategy that appears designed to shield key individuals from scrutiny. The hiring of Mr. Steward's personal associate, Maritza Nelson, to conduct an "investigation" compromised both the independence and credibility of the inquiry. The continued failure to retain unconflicted counsel has hindered the organization's ability to assess its own compliance and has impaired the government's ability to ensure oversight and accountability.

ODH and other oversight authorities should carefully evaluate whether this shared-representation arrangement complies with ethical standards applicable to federally funded programs. In matters involving public funds, independent oversight and full cooperation are not discretionary. They are foundational to program eligibility, fiscal accountability, and public trust.

### 8. Dismissal of HRO's Independent Auditor

HRO has not submitted to ODH legally required independent audits for 2023 or 2024. This failure puts the organization in ongoing violation of Ohio law and ODH audit requirements for its $850,000-per-year, federally funded naloxone distribution contract.

Ohio Revised Code § 9.234 and Section B2.10 of OGAPP require all organizations receiving more than $500,000 a year in state-administered funds to undergo an independent financial audit

annually. Because HRO meets this threshold, it is subject to this mandatory requirement. These audits are critical for fiscal transparency, detecting conflicts of interest, and protecting the integrity of public funds. HRO's audit failures are relevant to its efforts to obstruct scrutiny of Ms. Reese's conflict of interest.

HWA Alliance of Independence, Ohio, completed independent financial audits of HRO in 2021 and 2022 while I was HRO President. In March 2024, the firm began its audit for 2023, the first year of HRO's ODH contract.

Under Generally Accepted Accounting Standards, auditors require board members, officers and key staff to disclose all potential conflicts of interest for disclosure in financial statements. In July 2024, I learned that Ms. Reese had outside employment with Velocity, Kloxxado's lobbyist. In August 2024, prior to learning Mr. Steward was working with Ms. Reese to conceal her Velocity employment, I emailed HRO's auditor to ask if Ms. Reese was required to complete and submit a Related Party Questionnaire (RPQ) to disclose potential conflicts of interest. The auditor confirmed that it was standard procedure for Ms. Reese to submit an RPQ.

On September 5, 2024, the board suspended me and ordered me to halt all work related to Ms. Reese's conflict. The audit process stalled. Later that year, HWA Alliance sought to resume the audit, including providing RPQs for Ms. Reese and others to complete. Ms. Reese did not provide an RPQ to the auditor, a material breach of audit protocol and grant compliance.

In early 2025, HRO leadership terminated HWA Alliance as HRO's auditor, leaving the 2023 audit incomplete and unsubmitted to ODH. To date, HRO is not known to have hired a new auditor. The required independent audit for 2023 is now long overdue and in violation of OGAPP's nine-month filing requirement. Under OGAPP, this failure places HRO in high-risk status, subject to sanctions including probation, suspension, or termination of funding.

The mid-audit dismissal of a financial auditor is unusual and raises serious questions about whether the decision was tied to efforts to suppress details of Ms. Reese's conflict.

### Requested ODH Actions: Investigate and Cure Compliance Violations

As set forth above, it is clear that Mr. Steward's October 23, 2024, letter to ODH contains material falsehoods and cannot be relied upon as a good-faith representation of fact or contract compliance. Court records establish that Ms. Reese had an impermissible conflict of interest through her work with Hikma's lobbyist. Public records show that she oversaw a six-fold increase in Kloxxado orders, which cost approximately $600,000 in federal funds in one year.

Despite the seriousness of this evidence, ODH has not conducted a formal review or provided a written response to HRO's September 3, 2024, Conflict Disclosure Notice or Mr. Steward's October 23, 2024, letter asserting no conflict existed. ODH's only formal response is an email acknowledging receipt of Mr. Steward's letter.

As a pass-through entity of federal State Opioid Response Grant funds, ODH is required by federal and state regulations to take prompt, effective remedial action in response to material noncompliance by a subrecipient. These obligations are mandatory, not discretionary.

Accordingly, I respectfully request that ODH:

1. **Formally Disregard the October 23, 2024, Letter**
   - Disregard and disavow Mr. Steward's October 23, 2024, letter and its conclusions, based on the evidence presented above demonstrating it is materially false and misleading.
2. **Initiate a Formal Compliance Review**
   - Conduct its own formal investigation of Ms. Reese's undisclosed outside employment, all related procurement activity, and HRO's failure to disclose and update conflicts of interest as required by federal and state grant conditions.
3. **Refer for State and Federal Audit and Enforcement**
   - Refer this matter—including the evidence of dual employment, procurement anomalies and lack of conflict disclosure—to appropriate state and federal auditing and enforcement authorities, including the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA), for further review under applicable grant and Single Audit compliance frameworks.
4. **Exercise All Remedies for Noncompliance**
   - Pursue all available remedial actions—including suspension or termination of HRO's funding—if HRO is found to have materially failed to comply with the terms of its federally funded contract.

In addition to the core corrective actions listed above, I also request the following targeted measures to secure evidence, evaluate the scope of misconduct, and determine the extent of its impact:

- Require HRO and Ms. Reese to promptly produce all HRO and Velocity emails, texts, expense accounts, and employment records related to Ms. Reese's dual employment.
- Assess the extent to which Ms. Reese double-billed work time and travel between HRO and Velocity and determine whether her surge in Kloxxado orders was influenced by her outside employment.
- Transmit any evidence indicating double-billing or improper procurement to the appropriate law enforcement authorities for analysis of whether it constitutes potential criminal activity.

**Legal and Regulatory Authority**

The actions referenced above are expressly required or authorized under:

- **2 CFR § 200.339:** Requires pass-through entities to take appropriate remedial action—including suspension or termination—when a subrecipient materially fails to comply.
- **2 CFR § 200.318(c)(1):** Prohibits participation in federally funded procurement where a real or apparent conflict of interest exists.

- **OGAPP Sections B1.6 and C2.2:** Mandate disclosure of conflicts of interest and prohibit conflicted individuals from involvement in grant administration.
- **Ohio Revised Code § 9.234 & OGAPP Section B2:** Require timely submission of independent financial audits by subrecipients.

## Conclusion

Timely and decisive action by ODH is essential to restore accountability, protect taxpayer funds, and uphold the transparency, compliance, and integrity required by law in Ohio's life-saving naloxone distribution system.

I remain committed to transparency and to protecting the integrity of public funds and Ohio's Project DAWN program. Please contact me if I can provide further documentation or assistance to support your review.

Sincerely,

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road
Granville, OH 43023
denniscauchon@gmail.com
(740) 973-3814

| Section | Title | Page |
|---|---|---|
| | Introduction | 1 |
| 1 | Newly Obtained Evidence: Reese's Velocity Employment Documents | 2 |
| 2 | Court Filings: Reese's Conflict of Interest and Double-Billing | 3 |
| 3 | False Statements in Steward Letter to ODH on October 24, 2024 | 5 |
| 4 | Taxpayer Cost: Reese's Double-Billing and Anomalous Ordering | 8 |
| 5 | Unlawful Board Actions to Conceal Reese Conflict of Interest | 10 |
| 6 | Steward's Failure to Correct Errors in Record | 11 |
| 7 | Joint Defense: Conflicted Counsel and Compromised Oversight | 11 |
| 8 | Dismissal of HRO's Independent Auditor | 12 |
| 9 | Requested ODH Actions: Curing Conflict and Compliance Violations | 13 |
| | Conclusion – Signature Page | 15 |
| | **Table of Contents** | **16** |