UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

---

DENNIS CAUCHON, ET AL.,

Plaintiffs/Counterclaim Defendants,

v. Case No.:

DWAYNE STEWARD, RAINA WILLIAM 2:25-cv-0075

GOLDEN, TASHA TURNELL-BICKNELL

AND HARM REDUCTION OHIO,

Defendants/Counterclaim Plaintiffs.

---

DEPOSITION OF DWAYNE STEWARD

DATE: Friday, July 31, 2026

TIME: 10:05 a.m.

LOCATION: Remote Proceeding

Reminger Co., L.P.A.

955 Yard Street

Suite 330

Columbus, OH 43212

REPORTED BY: Kayleigh Kinnamon

JOB NO.: 8349311

A P P E A R A N C E S

ON BEHALF OF COUNTERCLAIM PLAINTIFF HARM REDUCTION OHIO:

ELIZABETH MOYO, ESQUIRE (by videoconference)
Porter Wright Morris & Arthur, LLP
41 South High Street
Columbus, OH 43215
emoyo@porterwright.com
(614) 227-2106

ON BEHALF OF PLAINTIFF DENNIS CAUCHON:

DENNIS CAUCHON, Pro Se (by videoconference)
327 East Broadway
Granville, OH 43023
denniscauchon@gmail.com
(740) 973-3814

ON BEHALF OF COUNTERCLAIM DEFENDANT DENNIS CAUCHON:

DAVID SHEARER, JR, ESQUIRE (by videoconference)
Garvey Shearer & Nordstrom
2388 Grandview Drive
Fort Mitchell, KY 41017
dshearer@gsn-law.com
(859) 308-1490



A P P E A R A N C E S (cont d)

ON BEHALF OF DEFENDANTS/COUNTERCLAIM PLAINTIFFS DWAYNE STEWARD, RAINA WILLIAM GOLDEN, TASHA TURNELL-BICKNELL, HARM REDUCTION OHIO:

STEVEN CHANG, ESQUIRE (by videoconference)
Reminger Co., L.P.A.
955 Yard Street
Suite 330
Columbus, OH 43212
schang@reminger.com
(614) 232-2446



I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Shearer | 6 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Email From Dennis Cauchon Informing of AmandaLynn Reese Potential Conflict - July 16, 2024 | 22 |
| Exhibit 2 | Email Between Dennis Cauchon and Dwayne Steward - July 16, 2024 11:08 a.m. | 25 |
| Exhibit 3 | Invoice from Consulting Firm to Harm Reduction Ohio | 33 |
| Exhibit 4 | Email September 3, 2024 - Make It Better Consulting Contract Extension and Scope Expansion | 34 |
| Exhibit 5 | Screen Shot of Text Messages | 67 |
| Exhibit 6 | Email Scheduling Board Meeting for October 27 at 10:00 a.m. | 71 |
| Exhibit 7 | Board Minutes from October 27, 2024 Board Meeting | 74 |
| Exhibit 8 | October 23, 2024 Email With Mr. Cauchon's Letter | 78 |




P R O C D E E I N G S

THE REPORTER: Good morning. My name is Kayleigh Kinnamon. I am the reporter assigned by Veritext to take the record of this proceeding.

We are now on the record at 10:05 a.m. This is the deposition of Dwayne Steward taken on July 31, 2026. I am a notary authorized to take acknowledgements and administer oaths in Ohio.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
- shall constitute written stipulation of such.

At this time, will everyone in attendance please identify yourself for the record, beginning from my left?

MR. SHEARER: David Shearer, representing Mr. Cauchon on the counterclaims against him.

MR. CAUCHON: Dennis Cauchon, Plaintiff and

Counterclaim Defendant.
MS. MOYO: Elizabeth Moyo, counsel for Counterclaim Plaintiff Harm Reduction Ohio.
MR. CHANG: Steven Chang on behalf of all defendants.
THE WITNESS: Dwayne Steward.
THE REPORTER: Thank you. And hearing no objection, I will now swear in the witness.
If you'll raise your right hand.
WHEREUPON,
DWAYNE STEWARD,
called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:
THE REPORTER: You may begin.
EXAMINATION
BY MR. SHEARER:
Q Okay. Mr. Steward, as you just heard, my name is David Shearer, and I represent Mr. Cauchon in the claims that have been filed against him.
A Uh-huh.
Q So I am here to ask you some questions today about your role with Harm Reduction Ohio, Mr. Cauchon's role with Harm Reduction Ohio, and the events occurring in 2024 and '25. Have you ever had your deposition



taken before?
A No.
Q Okay. So let me give you -- I'm sure they -- your attorneys have told you how it works. But let me give you a few ground rules, if I can. First, there will be questions today that I could answer, that you can answer yes or no to. If you verbally give us a yes or no I'd appreciate it, instead of uh-huhs or uh-uhs. It obviously makes it easier for her to take it down, and for us to read it back later. Also, you may know where I'm going with a question, what I'm asking. If you could let me get my whole question out before you start your answer, I'd appreciate it. And likewise, I have a tendency of talking over people. I will try to let you get your whole answer out before I move on to my next question.
Also, we may be here a little while today. Whenever you would like to take a break, let me know, and we are certainly able to -- to do so. To get us started, why don't you give me your full name, please?
A Dwayne Steward. Do you want me to spell it?
Q Sure.
A D-W-A-Y-N-E, Steward is S-T-E-W-A-R-D.
Q Okay. And Mr. Steward, where are you currently employed?



A I'm currently employed at -- at Equality Ohio.
Q At Equality Ohio?
A Uh-huh.
THE REPORTER: Is that a yes?
THE WITNESS: Yes. I'm sorry. Yes.
BY MR. SHEARER:
Q We're two questions in. And what do you do at Equality Ohio?
A I'm the CEO and executive director.
Q Okay. How long have you been at Equality Ohio?
A It'll be two years in September. So almost two years.
Q Are you also on the board of directors of Equality?
A No.
Q Okay. The two years that you have been there, has your role been the CEO the entire -- your entire tenure?
A Yeah. Yes.
Q Okay. So that would take us back to -- we are now August of '26. So August of -- or July of -- when would you have started at Equality?
A No. It was September -- September 12, 2024. Yeah.
Q Okay. You are not -- when I say "HRO," can we



agree that I'm talking about Harm Reduction Ohio?
A Yes.
Q As opposed to me, you know, saying Harm Reduction Ohio?
A Yeah. Yes. Yes.
Q The -- you are not on the board. My understanding, you are no longer on the board at HRO?
A Correct.
Q Okay. And when I say "board," I mean board of directors?
A Uh-huh. Yes.
Q How long were you on the board of directors at HRO?
A It was approximately four years, I believe.
Q Okay. So when did it end? Or when did your role as a board of director end?
A Apologies. I don't remember the exact dates.
Q No. And let me interrupt you real quick. I'm not looking -- you know, if you don't know May 12, 2025 --
A Yeah.
Q -- just, I'm just trying to get a rough idea of the timeframes.
A It was within the last six months.
Q Okay. And why did you leave the board of

directors at HRO?
A Honestly, I took on this role at Equality Ohio, and it was a pretty big role. And so I was on the board of many entities and decided I needed to spend more time dedicated to being the CEO of this organization. So I left, actually, several boards at the time.
Q Okay. When you were on the board at HRO in 2024, what other board of -- boards were you a member of?
A The Marsha P. Johnson Institute, the LGBTQ+ Victory Fund. Those are the two that I can recall, currently.
Q Okay. When I have looked at your -- some of the emails that have been exchanged through discovery in this case, it looked like you also had a business called Make It Better Consulting?
A Yes. And I still have that.
Q Oh, okay. What is that? What is that business?
A Yeah. It is a consulting firm I started three years ago to support nonprofits' sustainability to help nonprofits with their administration and strategic planning.
Q Okay. And is that a paid -- I mean, you are paid for your services through that entity?



A Yes. Yes.
Q So in your role as a board member at HRO, did you ever have any other titles or roles?
A I think I started as just a regular board member. Then I became, I believe, vice president at one point, and then interim chair.
Q Okay. When you say, "vice president," do you mean vice chair or vice president?
A Vice chair. Yes.
Q I think that's probably correct, but I don't know for sure.
A I have to admit, you know, I don't -- I -- we -- I believe -- we use chair, from my understanding.
Q Okay. So you were vice chair for a period of time, and then you were chair for a period of time?
A Yes.
Q Or did you say, "interim chair"? I apologize.
A Interim. It was -- it was interim chair.
Q Okay. Can you recall the timeframes when you were vice chair?
A I believe it was about -- so 2024 is the year that I remember being chair. And I believe '22, '23 was the timing by which I was vice chair. Again, this is what I recall.
Q Absolutely. When you were chair in '24, who



was the vice chair?
A Billy Golden.
Q Okay. Was that consistent for the entire time that you were chair?
A That is what I recall. Yes.
Q Okay. Now, I understand that Mr. Cauchon was president of HRO, correct?
A My understanding is that he was executive director.
Q Executive director?
A Yes.
Q Okay. Where does that understanding come from?
A The -- the conversations that we had as a board, the information that was shared with me through our board conversations. It was -- that was my understanding within the board context.
Q Okay. I have seen correspondence from Mr. Cauchon where he referenced himself as president.
A Uh-huh.
Q Have you seen the same thing?
A I have seen that, yes.
Q Okay. And you would disagree with that characterization of his role?
A It depends on how Mr. Cauchon defines president.



Q Okay. Well, did the -- to your understanding -- and again, I can only ask you about what your knowledge is, what your understanding is. Is it your understanding that HRO did not have a position with the title of president?
MR. CHANG: Can you just clarify the time frame, Dave?
BY MR. SHEARER:
Q At any time frame while you were on the board of directors?
A I don't recall. I don't recall. I don't recall.
Q Okay. So as your role as chair on the -- chair of the board of directors, did that entail any -- well, let's back up a little bit. Within the organization, HRO, what was the role of the board of directors during your time on the board?
A From my understanding, we were an advisory to the executive director. I believe we operated as the supervisor of the executive director. And we met regularly to get updates from the executive director on the business of the organization. And just from my understanding around nonprofit best practice, you know, we had a fiduciary responsibility, as well as a responsibility to uphold the mission.

Page 14

Q Okay. So for example, let me give you some examples. And I'm trying to figure out what's within the board, you know, what's within the purview of the board, what's within the purview of the president/executive director, whatever term we want to use.
A Uh-huh.
Q So the first thing you said was, the board advises the president/executive director.
A Uh-huh.
Q What type of advice, what type of matters would the board advise the president/executive director on?
A I mean, I recall several conversations within the board context where the executive director would provide, you know, an update on the budget, the activities, and we would provide our feedback on how that -- how that was going, if we thought it was going well, if we thought there could be things that could go better, and, just, in general, be in conversation about how best to move the agency forward.
Q As far as access to financial accounts, like looking at bank balances or withdrawing money from the bank accounts, writing checks, financial matters, did the board have any involvement in those roles?
A Yes and no. So no, up -- up until Mr. Cauchon

Page 15

was put on administrative leave. Yeah. That's my answer.
Q Okay. And that changed after he was put -- placed on administrative leave?
A That is my recollection. Yes.
Q Okay. So prior to the -- prior to Mr. Cauchon being placed on administrative leave, did the board have any role in managing the finances of the organization?
A Yes.
Q Okay. Tell me what role that would be.
A So Mr. Cauchon and other members of staff had, you know, access to the bank accounts and would do the withdrawals. But the -- we would receive budget reports from the executive director that we would, again, provide our feedback and advisory on.
Q Got you. Was there, like, an annual budget prepared for the -- for HRO every year?
A We -- we received budget documents. I don't know if they were categorized as an annual budget, but we received budgeting information. Yes.
Q And that would be -- would that typically be at meetings, or would it be in advance of a pending meeting, or how would that work, exactly?
A I mean, it varied. So sometimes we would receive them during the meeting, sometimes in advance.

Page 16

It varied.
Q So when there would be board meetings at HRO during your tenure as chair, who would run the meetings?
A My -- my recollection is, it was a joint facilitation between the chair and the executive director.
Q Okay. Was Mr. Cauchon on the board of -- was he a member of the board of directors of the organization?
A My recollection is, no.
Q Okay. Do you recall ever seeing any references to Mr. Cauchon being a member of the board of directors of HRO?
A I do not recall any references to Mr. Cauchon being a board member.
Q Did you ever have any discussions with Mr. Cauchon that you can recall as to whether or not he was a board member?
A I do not recall those conversations.
Q Okay. Do you recall any conversations with any other board member or staff member of HRO as to whether Mr. Cauchon was a board member? And that's at any time during your tenure as a board member.
MR. CHANG: I'm going to object and instruct the witness not to answer to the extent Counsel is

Page 17

present for those conversations outside of the presence of Counsel.
Go ahead and answer.
THE WITNESS: So you said I'm not supposed to answer?
MR. CHANG: So I don't want you to reveal if you've discussed anything, you know, that subject where Liz, or myself, or another attorney has been present. I'll instruct you not to answer in -- with respect to those conversations.
THE WITNESS: I got you --
MR. CHANG: I do think his question is a little broader than that. To the extent you've had conversations about whether he is a board member or not outside the presence of Counsel, feel free to testify.
THE WITNESS: Thank you for the clarification.
From my recollection, I don't remember that becoming a conversation until after Mr. Cauchon was put on administrative leave. And so that's my recollection.
BY MR. SHEARER:
Q And what conversations do you recall occurring after he was placed on administrative leave?
A Again, I don't remember specific dates, or specific documents, or specific written communications. But I do remember that it was asserted at one point from

Mr. Cauchon that he was a -- was a board member, and the members of the board being generally confused by this assertion. And so that is when we had just started having discussions about whether or not that was the case.
Q And who were those conversations with? And again, I don't want to know anything about conversations with your counsel.
A Yeah. I have to admit, it's been two years. I don't remember every name of every member of the board. But the board of directors is the answer.
Q Okay. Would it be fair to say that generally, you recall conversations with the board members after he was placed on administrative leave as to whether or not he was a member of the board?
A The question came up from Mr. Cauchon. And so we began trying to understand why that was a -- a question. Because my -- again, my understanding was that he was not a board member.
Q So would the board, prior to Mr. Cauchon going on suspension or being -- or, I'm sorry, I keep saying that -- being placed on administrative leave, would the board, at meetings, vote on matters?
A Yes.
Q Okay. And during those prior -- those meetings



prior to Mr. Cauchon being placed on administrative leave, did he participate in those votes by the board?
A I do not recall that happening.
Q Have you reviewed any documents in preparation for your deposition today?
A Yes.
Q Okay. And can you tell me what you have reviewed?
A There was information, minutes, and investigation documents from the time I was -- during the time of the suspension and termination. So I've seen some of those documents, yes.
Q Okay. Specifically, what documents have you -- do you recall reviewing?
A I mean, there's a lot of documents in this case.
Q Sure. There are.
A So I don't remember reading every single -- or every --
Q I --
A I don't remember every word of every document that I reviewed. But for generally, my review, or -- was of meeting minutes and the investigation documents from the attorney.
Q Do you recall what meeting minutes you



reviewed?
A I cannot -- I don't recall specific dates.
Q Would these be meeting minutes after Mr. Cauchon was placed on administrative leave?
A Yes.
Q Okay. Did you review any meeting minutes from before Mr. Cauchon was placed on administrative leave?
A Yes.
Q Okay. Do you recall the subjects of the meeting -- the subjects discussed in the meeting minutes from the meetings prior to him being placed on administrative leave?
A Well, I mean, how far back?
Q Well, that's what I want to know, how far back you reviewed.
A I mean, I was -- again, there was a lot of documents. I was provided all the meeting minutes during my time on the board.
Q Okay. You were provided all of minutes of meetings from the board of directors during your entire tenure at HRO?
A Correct.
Q Okay. And you reviewed all of those in preparation for today's deposition?
A I -- I guess it would depend on what the



definition of -- of "reviewed" is. But I would say yes, I have seen them.
Q Okay. Okay. Then other than meeting minutes, I think you mentioned a -- what else did you mention? I'm sorry. Maybe an investigative report?
A Investigative documents from the attorney.
Q Okay. Would that be from Ms. Nelson?
A Correct.
Q And any other documents that you have reviewed?
A For the most part, those are the main ones. I mean, there were emails where these documents were a part of, but yes.
Q Sure. And we're going to talk about some of those. I -- we'll talk about some of those emails today. I'm just trying to get an idea of the general category of the documents that you have that you have reviewed.
A Yeah. There were emails and text messages. Yes.
Q Okay. Okay. And I'm sorry, when did you tell me you left the board of HRO? I apologize.
A Within the last six months. I apologize. I did not look up the exact date.
Q No, no, no. That's fine. I'll write it down so I don't forget it again. So part of the reason that

Page 22

we are here -- well, the reason we're here revolves around Mr. Cauchon's employment and termination thereof. But some of the events leading up to that concern a potential conflict with AmandaLynn Reese. Are you generally aware of that?

A I am aware, yes.

Q Okay. How did you first become aware that -- of the AmandaLynn Reese potential conflict issue?

MR. CHANG: Objection. Form.

You can answer.

THE WITNESS: I'm sorry. I didn't hear that.

MR. CHANG: So I -- from time to time, I may object. Unless I instruct you not to answer, it's only for the record.

THE WITNESS: Got you.

MR. CHANG: You can just answer his questions, unless I instruct you not to.

THE WITNESS: Thank you.

I was first informed during meetings with Mr. Cauchon and -- and AmandaLynn Reese.

MR. SHEARER: Okay. So I am going to hand you what we will mark as Steward 1.

(Exhibit 1 was marked for identification.)

MR. SHEARER: So it's an exhibit that I'm going

Page 23

to have you take a look at, and just have you take a moment and review. This is a, one, two, three-page document. And if I could just have you take a brief look at it.

MR. CHANG: Dave, this one isn't Bates stamped. Is there any clarity as to where the document came from? Was it our production? Or is this a new email from -- that wasn't produced?

MR. SHEARER: I do not know if it -- I obviously did not produce it. I do not know if it was produced prior to this or not, but you are correct. It does not have a Bates number.

MR. CAUCHON: It was produced in Cauchon, but I didn't have time to get the Bates version. So I'll get that for you after.

MR. CHANG: You can proceed.

THE WITNESS: All righty.

BY MR. SHEARER:

Q Do you recall receiving this email, or reviewing this email?

A Yes. I do remember during the time that there was communications from Mr. Cauchon about the situation.

Q Okay. Do you know -- it -- well, let's do this: This email purports to tell you about AmandaLynn having a position with Velocity BioGroup. Prior to

Page 24

receiving this email on July 16, 2024, were you aware that Ms. Reese had a role, or was employed by Velocity BioGroup?

A I do not believe so.

Q Okay. Prior to July 16 of 2024, did -- are you aware of whether HRO had a conflict disclosure policy?

A There was a policy, yes.

Q Okay. Were you aware of that policy prior to July 16th of 2024?

A I was aware that there was a policy. I will admit I had not reviewed it in full until after this.

Q Okay. After your receipt of this email on July 16, 2024, did you have any subsequent conversations with Mr. Cauchon?

A Yes.

Q Okay. And can you tell me what you can recall about those conversations?

A I recall this being brought up in conversation, that it -- that Mr. Cauchon was -- thought it was a potential conflict. And we had discussed investigating it and trying to figure out what was really going on here. So yes, I do remember those conversations.

Q Okay. Did you agree that it was a potential conflict?

A At the time, not knowing the details and on

Page 25

face value, yes.

Q Okay. You believed it was a potential conflict with the limited details that you had?

A Correct.

Q Okay. And did you have any recommendations as to what should be done once you were informed of the potential conflict?

A I believe my first recommendation was that we have a -- or that a conversation be had to get -- to understand the full situation with AmandaLynn Reese, specifically. And then, I believe, I also made a recommendation at the time to do a proper -- a full investigation into the matter.

Q Okay. Yeah. And we'll get through that. And ultimately that resulted in Ms. Nelson, and we can talk about all that -- about that later.

A Okay.

MR. SHEARER: So I'll hand you what we'll mark as Steward 2.

(Exhibit 2 was marked for identification.)

MR. SHEARER: And again, this does not have the Bates numbers on it, but we can certainly provide those to you.

MR. CAUCHON: And I'll provide you with the

Page 26

Bates numbers for it later.
BY MR. SHEARER:
Q And if you can take a moment to review that email, please.
A Do I get a copy, or no?
MR. SHEARER: Oh, I'm sorry. Lordy. Sorry about that. Let me put this --
MR. CAUCHON: Missing a copy for him?
MR. SHEARER: No, I've got it right. I've got it right here. I just put the sticker on the copy that I wrote on.
MR. CHANG: That's with another one.
MR. SHEARER: That's a -- yeah. So if you guys look, it's actually supposed to be -- my paperclips have -- and the -- it's only -- the exhibit is only the first two pages, not that, right?
BY MR. SHEARER:
Q And this looks like an email exchange that occurred between you and Mr. Cauchon later in that -- later on the 16th? His first email was sent to you at 11:08 a.m.?
A Correct.
Q Then there's a response by you at 11:56 p.m., which is at the bottom of the page?
A Uh-uh.

Page 27

Q Okay.
A Yeah. I see that.
Q And so it seems to -- just in reading this, it seems that there may have been some -- a conversation or conversations in the interim?
A Yes.
Q Okay. So when I look at your 11:56 a.m. email, it says, "I was going to ask for this. Thanks for sending." And then when you say, "I was going to ask for this. Thanks for sending," would that be the two article -- what is that referring to?
A I have to admit, I don't 100 percent recall what was -- is the record of a document being sent to me?
Q So look at this. So go to the second page.
A Yeah.
Q And it says, "It's from our board-approved employee handbook."
A Okay.
Q Do you recall what that's referring to?
A I can make an assumption, but I don't fully recall.
Q Okay.
MR. CHANG: Don't speculate.
//

Page 28

BY MR. SHEARER:
Q What do you think it is?
MR. CHANG: Don't speculate.
THE WITNESS: So I will not speculate.
BY MR. SHEARER:
Q Okay.
A I don't recall.
Q Okay. Do you recall having a conversation with Mr. Cauchon between 11:08 on the 16th and 11:42?
A I'm sure we did. I have to admit, I don't remember the details of that conversation.
Q Okay.
A Because there were many conversations about this with Mr. Cauchon during that time.
Q Okay. Then the next email, you -- there's one from you at 11:56, which says, "I was going to ask for this."
A Uh-huh.
Q Again, do you know what that is referring to?
A At this time, I don't. I'm sorry.
Q Okay. Got you. So when it says, "Thanks for sending," and then, "Had a lawyer review this recently?" I'm assuming you still are not you still don't know what that's referring to?
A Again, I can speculate, which I've been told

Page 29

not to do.
Q Okay.
A But I don't remember exactly what was attached to this email that was sent to me on the -- was it -- 11:42.
Q The next sentence says, "There may be some language in here that is no longer allowed per employee law. There have been some changes recently. They're moving towards outlawing non-compete clauses, and I don't think required overtime is allowed anymore." Again, when it goes back, it says, "There might be some language in here that is no longer allowed per employee law." That does not -- you still don't know what document that's referring to?
A I -- no. I don't remember the -- I don't remember the document. I -- I don't remember the document.
Q Okay.
A Sorry.
Q Got you. Then we have another email from you dated July 16, 2024, at 2:07 p.m. "Just as a follow, the language is important to mitigate risk. See suggested language below."
A Uh-huh.
Q What language are you talking about -- are you

referring to?
A I -- during this time, I do remember a -- there was like a -- like I mentioned, my initial recommendation was that a conversation be had with --
Q Miss --
A -- AmandaLynn Reese --
Q Okay.
A -- to understand their perspective and to, you know, begin the fact-finding process. And so, again, I -- I was also, at the time, advising the -- the -- Mr. Cauchon and the agency. And so I wanted to make sure that, at the time, Mr. Cauchon and the agency were protected from any potential claims that could come from AmandaLynn Reese. And so I just was, again, wanting the process to -- to be within best practice at the time.
Q Okay. So what were you advising -- were you advising the organization outside of your role as a board member?
A Yes.
Q Okay. Tell me a little bit about that.
A I was -- as in -- in this email, it says this is coming from Make It Better Consulting. As we talked about my consulting firm already, I have been contracted at the request of the executive director to assist with just organizational development and helping update



policies and procedures at the agency. So yes.
Q Okay. So going down, it says, "Do say these activities are not allowed on company time, and company resources cannot be used for these activities." What activities are you referring to?
A Those referenced by Mr. Cauchon in the original email that I received. Again, at that point, we did not have information from AmandaLynn Reese, or I did not at that point. And so based off the facts that were put in front of me and based on non-profit best practice, if you have a second job, it is not -- it -- you're not supposed to be doing that job during company time. And so that was my recommendation, to stick to making sure that you're making it clear, basically, that anything you do on company time -- well, anything that you're doing related to this -- to this situation shouldn't be done on company time based on --
Q When you said "situation," you're referring to the work with Velocity BioGroup?
A Yes. Again, based on the -- the initial information I received.
Q Okay. Okay. So then you said -- went down there below and says, "Do say participating in these activities could reflect poorly on the agencies." And, again, these activities are the work with Velocity



BioGroup?
A Correct.
Q And do you recall if you and Mr. Cauchon had a follow-up conversation to this email on July 16th?
A I don't recall. I know there was -- I remember there was a follow-up conversation once he talked to AmandaLynn Reese.
Q Okay. When Mr. Cauchon -- do you know when Mr. Cauchon's initial call with Amanda -- or call with AmandaLynn Reese was to discuss this situation?
A I don't remember the exact date, but I know it was in this time -- within this time --
Q Okay.
A -- during this time frame in July.
Q Did you ever participate in any calls with Mr. Cauchon and AmandaLynn Reese regarding the issue of her employment with Velocity BioGroup?
A I recall having conversations with both of them. I don't remember if there were conversations with the three of us together, to be honest.
Q Okay. What conversations do you recall having with Ms. Reese on the issue of her employment with Velocity BioGroup?
A I remember it being brought to my attention after Mr. Cauchon brought it to my attention. At the



time, through Make It Better Consulting, I was meeting with all staff about how to better the agency. And I believe it -- during one of those consulting meetings with -- around the programs of the agency that AmandaLynn Reese led at the time, they brought this up, as this had been a -- this is -- was -- has become a conversation between her and Mr. Cauchon.
Q Okay. Okay. So as a board member at HRO, did you receive any compensation on an annual basis or semi-annual basis for that role?
A As a board member? No.
Q No. Okay. Did you receive compensation from HRO for your role as a consultant?
A Yes.
MR. SHEARER: Okay. So I'll hand you what we are going to mark as Steward 3, which was the second part of what I -- yeah.
(Exhibit 3 was marked for identification.)
MR. CHANG: Do you have that in front of you, Mr. Steward?
THE WITNESS: No.
MR. SHEARER: I'm handing him one right now.
MR. CHANG: Oh, okay.
//

Page 34

BY MR. SHEARER:
Q And just take a minute to look at that. That appears to be -- well, why don't you tell me what this document is?
A This is an invoice from my consulting firm to Harm Reduction Ohio --
Q Okay.
A -- for $2,040.
Q Okay. So what work did that -- what type of work was that for?
A Yeah. I mean, as it says here, this nonprofit infrastructure development and strategic planning, assisting with updating policies and procedures and their -- their objectives, key results are what people call KPIs, like goals for the agency, facilitation of stock receipts, assistance with grant implementation, those types of things. Nonprofit administrative assistance.
Q Got you.
MR. SHEARER: Okay. And then I'll hand you what we'll call -- identify as Steward 4.
(Exhibit 4 was marked for identification.)
THE WITNESS: Okay.
//

Page 35

BY MR. SHEARER:
Q And that's dated a little bit later. There's an email on the front page that is titled -- or is dated September 3rd of 2024. And the subject is Make It Better Consulting Contract Extension and Scope Expansion. If I could have you take a look at that real quick. If I go to the last page of the document, Page 7, it is dated September 3, 2024.
And there's a place for your signature, and then there's a place for -- well, there's a line for client signature. And it appears to be Mr. Cauchon's signature, and the other one appears to be your signature?
A Correct.
Q Okay. Is this the contract that -- or the consulting services agreement that your company entered into with HRO in September of 2024?
A That is my understanding, yes.
Q Okay. So let's talk generally about what happened after this September 16, 2024, email exchange between you and Mr. Cauchon regarding AmandaLynn Reese and her employment with Velocity BioGroup. Why don't you -- there are -- and I'll show you some emails. We can talk about those, but I want to get an idea of what your general recollection is of how the situation

Page 36

unfolded from September 16 -- or from July 16 on.
A Okay. July 16th. Okay.
MR. CHANG: You originally said September 3rd. So you're --
MR. SHEARER: Sorry. I apologize. July 16th.
THE WITNESS: Sorry, what's the question?
BY MR. SHEARER:
Q Yeah. So why don't you tell me generally how -- your recollection of how the events unfolded regarding the potential conflict that AmandaLynn Reese had with regard -- with her -- with regard to her employment with Velocity BioGroup?
MR. CHANG: I'm going to have a standing objection on the use of the word "potential conflict" without clarity of what you're referring to.
THE WITNESS: My understanding of the situation? As mentioned, I -- you know, I remember receiving communications and having conversations with Mr. Cauchon, as this was brought to my attention. I was, at the time, in -- with -- you know, I was at the time in contract -- my firm was in contract with the company, so it came out during these meeting -- our meetings, the consultation meetings. It -- I, as mentioned here, recommended there was a conversation with AmandaLynn Reese. And then the conflict of

Page 37

interest policy came into the conversation of potentially updating the policy because it didn't feel like it was in line with best practice. So, you know, we brought in an attorney to help look at that.
And then, you know, the board was also informed of this because there were policy changes at play, and it is best practice for a board to approve policy change of an agency. And then as far as this situation, I do remember at the time it was agreed upon that since the policy seemed out of compliance with -- with kind of current best practice, we would -- the executive director would work with the board and counsel to update the policy and then use the new understanding of the -- of our new policy to investigate the matter fully. And it was my understanding at the time that all parties, board, executive director, counsel agreed to that at the time.
BY MR. SHEARER:
Q Okay. So jumping ahead a little bit, and maybe we'll fill in some of the blanks, but I want to hand you what has previously been marked. And this was in Mr. Cauchon's deposition. It was Exhibit 25. And it is a -- have you take a look at that and tell me what is --
MR. CHANG: I may just look at it for a second here. Thanks.

Page 38

THE REPORTER: And I do have all the copies from yesterday --
MR. SHEARER: Okay.
BY MR. SHEARER:
Q Why don't we do that. So we'll have you look at the real --
A Okay.
Q -- copy.
MR. SHEARER: There's 25?
THE REPORTER: Just to confirm.
MR. SHEARER: Yes. Thank you.
BY MR. SHEARER:
Q Oh, okay. Okay. So what I'm referring to is the email portion dated September 5, 2024, at 2:24?
A Yes.
Q Let's see. I'm referring to there. And so that appears to be the email placing Mr. Cauchon on administrative leave?
A Yes.
Q Okay. So I want to ask you just a little bit about that. It said, "As mentioned in previous communications, there had been written and verbal staff complaints that had been received by the board regarding your role in creating a hostile work environment at Harm Reduction Ohio." Can you tell me what you recall about

Page 39

the written and verbal staff complaints?
A I recall receiving -- or the board and myself receiving an official complaint from AmandaLynn Reese, as well as verbal complaints at the time from at least two other staff members.
Q Okay. And who were those two other staff members?
A I have to admit, I don't remember one of their names because it's been two years, and I haven't talked to them since. One was -- name was Kelsey. I don't remember their last name. And then the other, I know their role was to manage the website and social media.
Q Okay. And what were those complaints?
A The AmandaLynn Reese complaint was generally hostile work environment, from my -- again, this is my recollection. And then the complaint from Kelsey was more around potential racial and gender discrimination. And then the -- the complaint from the social media website manager at the time was also potential gender discrimination.
Q Okay. So Kelsey and the -- and -- Kelsey is one person, and then the social media manager is the other person?
A Uh-huh.
Q Okay.

Page 40

THE REPORTER: Yes?
BY MR. SHEARER:
Q And so you believe Kelsey's complaints were of what?
THE WITNESS: Yes.
I'm sorry. Kelsey?
BY MR. SHEARER:
Q Uh-huh.
A Kelsey's -- from my recollection, Kelsey's verbal complaints were around racial discrimination and gender discrimination.
Q Okay. And I'm assuming that you took those complaints seriously?
A Yes.
Q Okay. What was done to investigate those complaints?
A So as it mentions in the email, we sought third-party investigation from a -- an attorney, and they began to interview staff in order to produce a -- a an investigative report.
Q Okay. Did Kelsey ever make a written complaint?
A I have to admit, I don't recall. I do know majority of staff were interviewed.
Q Okay. Do you recall how Kelsey's complaint was

Page 41

resolved?
MR. CHANG: I'm going to object.
I'll allow you to testify with respect to whether the board took any action. I'll instruct you not to answer to the extent it would divulge any communication from Counsel, specifically Ms. Nelson.
THE WITNESS: As far as Kelsey's situation specifically, I can't speak to that, but generally, once the investigation was complete, as the termination letter will reflect, we terminated Mr. Nelson -- Mr. Cauchon.
BY MR. SHEARER:
Q Okay. When you say, "the investigation," is that the investigation by Ms. Nelson?
A Correct.
Q And so the question was -- I'm sorry. I -- did you ever receive a written complaint from Kelsey? And you may have answered that, and I apologize.
A I don't recall. I don't recall. That is my answer. But I do recall a majority of the staff being interviewed during the investigation.
Q Okay. Prior to September the 5th of 2024, did you ever have any conversations with Kelsey regarding mister -- regarding these complaints against Mr. Cauchon?

Page 42

A I did not have a conversation with Kelsey. Because of the seriousness of the situation, we thought it fair that a third party should have those conversations.
Q Okay. My question was -- maybe I was -- I poorly worded the question. My question was: Did you have any conversations with Mr. Cauchon regarding Kelsey's complaints?
A Oh. Kind of the same answer. I did not. Because of the seriousness situation, we thought it fair a third party have that conversation as a part of the investigation with Mr. Cauchon.
Q Okay. Do you recall who Kelsey made her original complaints to?
A I do not recall. I do know the board received them.
Q Okay. How did the board receive them?
A I do not recall.
Q Okay. Would the board receive -- had received something in writing?
A It was verbal. I do remember it was verbal.
Q Okay. So when you say "the board," in my mind, that means all members of the board. Was this something that Kelsey presented to the board?
A My recollection was it was presented to a

Page 43

member of the board. I can't recall who, but there was a verbal --
Q Okay.
A It was verbally to the board --
Q Do you --
A -- a member of the board.
Q All right. Do you recall when this complaint was made?
A Based on the facts in front of me, it had to have been prior to September 5th. I don't remember the exact date, no.
Q Okay. So Kelsey made a discrimination complaint to a board member who you cannot recall. So you've said you thought that was a serious complaint, correct?
A Correct.
Q But can you give me any of the details of the complaint?
A Again, I -- all I recall is the -- that the -- if the complaint -- overall, the complaint was about racial discrimination, gender discrimination.
Q Do you recall any of the specifics about the complaint, whether Mr. Cauchon's alleged harassment was in writing, was verbal? Kind of do you recall any of the specifics of the complaint?

Page 44

A I do not recall any specifics of the complaint.
Q Okay. And you don't recall the board member who the complaint was made to?
A Correct.
Q Okay. Did you author any emails to the other board members, informing them of this complaint, which you have deemed for today very serious?
MR. CHANG: Objection.
You can answer.
THE WITNESS: I recall a conversation with board members about the complaint and that it was -- the proper next steps was for a third party to investigate.
BY MR. SHEARER:
Q What board members did you have those conversations with?
A We were -- those -- that conversation was with the entire board.
Q Back conversations. What do you mean by back conversations?
A No. I said "that." Sorry.
Q Oh, "that conversation"?
A That conversation was with the entire board.
Q Okay. So would that -- was that, like, a phone call, a Zoom call?
A Truthfully, I don't recall.

Page 45

Q Okay.
A There were, you know, board meetings during that time. My recollection is it happened at a board meeting.
Q Okay. So you believe that Kelsey's complaints were mentioned at a board meeting?
A Correct.
Q Okay. So somewhere prior to September 5th, it was discussed at a board meeting?
A That is --
MR. CHANG: Objection.
You can answer.
THE WITNESS: That is my understanding.
BY MR. SHEARER:
Q Okay. Well, you were present at the board meetings?
A Correct.
Q And I assume that would be present in the minutes of the board meetings?
A Correct.
Q Right. I mean, you -- you've -- do you -- I mean, do you believe this was a serious event?
MS. MOYO: Objection.
BY MR. SHEARER:
Q Do you believe this was a serious event?

Page 46

MR. CHANG: Objection.
Asked and answered.
BY MR. SHEARER:
Q You can answer.
A Correct.
Q Okay. And although -- and you believe it was discussed at a regular board meeting of the organization?
A I didn't say regular board meeting. I said, "a board meeting."
Q Okay. Was it -- what type of board meeting was it?
A I don't recall.
Q Okay. Why don't you tell me what types of board meetings there are?
A At the time of this situation, there were more -- there were -- because of the importance of the situation that we were dealing with, there were emergency board meetings. There were regular board meetings and -- that also took place during that time.
Q Okay. So -- and you believe there was an emergency board meeting that discussed Kelsey's complaints against Mr. Cauchon?
A Well, I don't recall if it was a regular board meeting or emergency board meeting. I just know it was

Page 47

during a board meeting.
Q A board meeting? Are minutes kept at board meetings?
A Correct.
Q Are all meetings -- minutes kept for all meetings?
A That was my understanding.
Q Okay. Well, you were chair of the board?
A Uh-huh.
Q Correct?
A Correct.
Q And did you call after the board member made you aware of Kelsey's complaints, do you recall calling an emergency board meeting?
A I don't recall if the board meeting was called specifically because of Kelsey's complaints, but I know it was during a board meeting that Kelsey's complaints were discussed.
Q Okay. Do you recall what month Kelsey made her complaints?
A Again, based off the information in front of me, it must have been September.
Q Okay. And if Kelsey's complaints were discussed at a board meeting, are you aware of any reason why they would not be included in the board

Page 48

meeting minutes?
MR. CHANG: Objection.
You can answer.
THE WITNESS: I don't recall. Again, I can only assume, and I don't want to do that.
BY MR. SHEARER:
Q You can only assume what?
MR. CHANG: Same objection.
THE WITNESS: Yeah. I don't want to assume that they were part of board meeting minutes if I don't recall.
BY MR. SHEARER:
Q Okay. But you do recall that Kelsey's complaints were discussed at a board meeting?
A Yes.
Q Okay. Was Mr. Cauchon present at that board meeting?
A I do not recall. I do not recall.
Q Who recorded the meetings of the board meeting minutes in 2024?
A It was the board secretary. I know that changed at one point, but my under -- I believe at that time it was Colleen.
Q As chairman of the board, did you ever inform Mr. Cauchon of these complaints at any time prior to

Page 49

September the 5, 2024?
MR. CHANG: Objection. When you say, "these complaints," can you just clarify, Counsel?
BY MR. SHEARER:
Q You can answer the question. Of Kelsey's complaints of discrimination?
A I don't recall. I don't recall.
Q You do not recall, as you sit here today, whether you informed Mr. Cauchon of the very serious complaints of racial harassment and discrimination by Kelsey; is that fair?
MR. CHANG: Objection. Asked and answered.
THE WITNESS: Right. I -- I do not recall myself informing Mr. Cauchon. I do recall him being informed.
BY MR. SHEARER:
Q Okay. How was he informed?
A Through Counsel.
Q Through Counsel? Which counsel are you referring to?
A No -- Attorney Nelson.
Q Okay. And how do you know that Attorney Nelson informed him of these complaints?
A That's what they told the board.
Q Who's "they"?

Page 50

A Attorney Nelson.
MR. CHANG: I'm going to object. I'm -- the Court has already ruled that the communication privileges with respect to this subject matter is still subject to attorney-client privilege. So if you have any further questions, I'm going to instruct him not to answer with respect to communications with Ms. Reese.
MR. SHEARER: Okay.
MR. CHANG: Or Ms. Nelson.
MR. SHEARER: Okay. Thank you. Okay.
MR. CHANG: And we've been going for about an hour and 15 minutes. Would you like a break?
THE WITNESS: Sure.
MR. SHEARER: Yep.
THE REPORTER: All right. Going off record --
(Off the record.)
THE REPORTER: We are back on record. The time is 11:32.
BY MR. SHEARER:
Q Okay. So Mr. Steward, we were talking about the complaint by Kelsey. Let's talk a little bit about the other complaint that you received. You do not recall the name of the person who made that complaint?
A I don't.
Q Okay. Do you recall what the complaint was

Page 51

about? I think -- did you mention racial or sexual discrimination?
A That second complaint was gender discrimination.
Q Gender?
A Yeah. The other complaint we're referencing.
Q The what?
A The complaint we're referencing, I -- I recall it was gender discrimination.
Q Okay. And do you not recall who made that complaint?
A I remember the title, but I don't remember their name.
Q Okay. And the title was what?
A Social Media and --
Q Social Media --
A -- Website Manager. That was the -- the work that they did.
Q Okay. Can you tell me any specifics about the complaint, other than it was gender-based?
A From my recollection, it was gender discrimination based off being -- not considered for -- being passed over for a promotion.
Q Do you recall what the promotion was?
A I don't recall the position, no.

Page 52

Q Okay. Do you recall the person who received the promotion instead of the unknown person who made the gender complaint?
A It was an individual named Patrick, from my recollection.
Q All right. Was this complaint made to you?
A I don't recall.
Q Okay. Did you ever communicate this complaint to Mr. Cauchon?
A I don't recall.
Q Was this complaint ever discussed at a board meeting?
A Yes.
Q Okay. And what board meeting would that have been?
A I would have to review the minutes. I don't recall.
Q Okay. But you believe that the complaint would be mentioned in the board minutes?
A Yes.
Q Okay. When we talk -- back -- going back to Exhibit 25, there have been written and verbal staff complaints of the hostile work environment. Were one of those complainants AmandaLynn Reese?
A Yes.

Page 53

Q And what do you recall about the nature of AmandaLynn's complaints?
A Generally, my understanding was hostile work environment.
Q What was the nature of that hostile work environment?
MR. CHANG: Objection.
THE WITNESS: Yeah. I don't recall the specifics.
BY MR. SHEARER:
Q Okay. Are those all of the written and verbal complaints that you can recall that led to Mr. Cauchon being placed on administrative leave?
A Those were all the complaints from staff that I remember receiving. Correct.
Q Okay. Were there complaints from people other than staff?
A Not that I recall.
Q Okay. So I go on, and it's bolded in your email. "All members of the HRO board of directors met today during an emergency meeting where it was unanimously decided to place you on paid admin leave until the completion of the investigation."
A Boom.
Q Okay. It references an emergency meeting.

What is an emergency meeting, to your understanding?
A An emergency meeting is a meeting that's called as soon as the board members are able to come together to address the situation.
Q Okay. The emergency meeting, do you recall when it was called?
A I do not recall.
Q Okay. Obviously, it appears from your email, that it occurred on September 5th?
A Correct.
Q Okay. Now, could we look at Cauchon Exhibit 1? And this is the bylaws.
THE WITNESS: Did you want to see this?
MR. CHANG: I have it.
THE WITNESS: Okay.
MR. CHANG: Thank you.
BY MR. SHEARER:
Q And if I could have you just take a moment to review those.
A All right.
Q If I have you look at, under Article 3, Section 3, on the first page.
A Uh-huh.
Q It refers to board meetings. And it says, "An official board meeting requires that each board member



have written notice at least two weeks in advance." Do you see that?
A I do.
Q Did -- when you were chairman of the board at HRO, did you always give the 14 days' notice?
A No.
Q Okay. Why not?
A In order to -- if -- if a board meeting was needed immediately, we would try to convene as soon as possible.
Q Okay. The -- under Article 3, Board of Directors, under Section 10, it references special meetings.
A Uh-huh.
Q Do you see that?
A Yeah.
Q Okay. And it says, "Notices of special meetings shall be sent out by the secretary to each board member at least two weeks in advance." Who was the secretary during your tenure as chairman of the board?
A My recollection is Colleen.
Q Okay. Do you have an understanding of what the difference is between a regularly scheduled board meeting, as referenced in Section 3, and a special



meeting, as referenced in Section 10?
A I'm sorry. Can you ask the question again?
Q Sure. Section 3 references board meetings.
A Uh-huh.
Q Section 10 references special meetings. Do you have an understanding what the difference is between a board meeting under Section 3 or a special meeting under Section 10?
A Yes.
Q And tell me what the difference is.
A Based on the -- the bylaws, a board meeting is the regularly scheduled meetings throughout the year. Those the quarterly. And then the special meetings are maybe meetings that may not happen within that regular time frame.
Q Do the bylaws contemplate emergency meetings?
A I do not see that here.
Q As chairman of the board of HRO, did you have a position on whether emergency meetings needed to be given or needed to be 14 days' notice?
A I do believe they were --
MR. CHANG: Objection to form. Sorry. I wasn't sure if you were done asking your question.
Go ahead and answer.
THE WITNESS: Sorry. I do believe they were



properly noticed.
BY MR. SHEARER:
Q That emergency meetings were properly noticed?
A Correct.
Q Okay. What does it take -- and what does it take to properly notice an emergency meeting?
MR. CHANG: Standing objection as to properly noticed.
You can answer.
THE WITNESS: That the board members are made aware and provided time to avail their schedule so they can attend.
BY MR. SHEARER:
Q Okay. But you do not believe there's any specific time frame that must be given in -- with regard to the notice?
MR. CHANG: Same objection. Vague.
THE WITNESS: I -- guys, I don't understand the question. I apologize.
BY MR. SHEARER:
Q Okay. Is there a specific -- so you would agree with me that regular meetings and special meetings require a 14-day notice period?
A According to this document.
Q Correct. Do emergency meetings require -- have

a -- do emergency meetings have a notice requirement?
A I mean, it's not in the bylaws. So I -- like I said, I do believe they were properly noticed. So that's my answer.
Q Okay. And my question is: What is the basis of your statement that they were properly noticed?
A The board was --
MR. CHANG: Objection. Asked and answered.
THE WITNESS: Oh. Sorry.
The board was informed in advance of the meeting to allow time for them to attend.
BY MR. SHEARER:
Q Okay. And so what I would like to hand you --
MR. SHEARER: And we are done with that.
MR. CHANG: Okay.
MR. SHEARER: And I think both of those. Yeah. If we could hand him HRO Exhibit 3, please.
MR. CHANG: Let me --
BY MR. SHEARER:
Q Have you seen that document before?
A It looks like it's from my calendar, so yes.
Q Okay. Is that the notice of the emergency meeting on -- that was held on September 5th?
MR. CHANG: Objection.
You can answer.



THE WITNESS: My understanding is this is one of the notices, correct.
BY MR. SHEARER:
Q Okay. Were there additional notices sent for that September the 5, 2024, emergency meeting?
A I don't recall.
MR. SHEARER: Could we hand him Cauchon Exhibit 21, please?
THE REPORTER: Are we done with --
MR. SHEARER: Yeah. We are done with that one.
THE REPORTER: Was it 21?
MR. SHEARER: 21.
THE REPORTER: Did not have --
MR. CHANG: Just give me one second, Counsel. If this is the official one, I'm going to mark it with an exhibit, but we'll double check letter to make sure this is Exhibit 21. It is. Yeah. So it is. Here you go. Is that the same thing?
THE REPORTER: It might be the same thing.
MR. CHANG: Is that the official one?
MR. SHEARER: Because I had it as 21. She had it in her stack at 21.
THE REPORTER: Do you want to go off record?
MR. SHEARER: Yeah. That's fine.
THE REPORTER: Okay. Off the record.



(Off the record.)
THE REPORTER: We are back on record --
BY MR. SHEARER:
Q All right. Okay. And Mr. Steward, I appreciate you reading it. My questions are really actually limited to -- or pretty simple. The very first -- or the last in time email, but at the top of the first page, is an email to you -- from you, to Mr. Cauchon, CCing David Ball and Cecile Katz.
A Uh-huh.
Q It indicates, "I think asking for the contracts, and the amount of money is egregious." You see where it's -- the first sentence I'm referring to?
A Uh-huh.
Q And am I correct --
MR. CHANG: Answer audibly. Sorry.
THE WITNESS: Yes. Yes. Yes.
BY MR. SHEARER:
Q Am I correct in saying when you -- referring to the contracts, you are referring to Ms. Reese's contracts with Velocity BioGroup?
A Correct.
Q Okay. "And the amounts of money is egregious." By that, are you -- I don't want to put words in your mouth, but are you referring to her salary from Velocity



BioGroup?
A Correct.
Q Okay. So as part of investigating any potential conflict, did you think it was not important to see her contract with Velocity BioGroup?
MR. CHANG: Objection. Foundation.
You can answer.
THE WITNESS: Can you ask the question again?
BY MR. SHEARER:
Q Yes. We've already talked about, you agreed or thought that an investigation needed to be taken into whether or not there was a conflict of interest that had been held by AmandaLynn Reese, correct?
A Correct.
Q Okay. And in this email exchange, Mr. Cauchon suggests reviewing her contracts, as well as her salary, with Velocity BioGroup?
A Correct.
Q Correct. And my question for you is: In evaluating the conflict, were you of the opinion that her contract with Velocity BioGroup, as well as her -- the amounts of money made from Velocity BioGroup, should not be reviewed?
MR. CHANG: Objection. Form. Foundation.
THE WITNESS: At the time that this email was

Page 62

sent, yes.
BY MR. SHEARER:
Q Okay. Did that opinion subsequently change?
MR. CHANG: Same objection.
THE WITNESS: I don't know if that completely characterizes the situation. The question is too simple.
MR. CHANG: Do you understand the question?
THE WITNESS: I don't think so.
BY MR. SHEARER:
Q If he doesn't understand it, he can tell me.
A I don't understand the question.
Q Okay. On September the 5, 2024, you indicated in your email that you did not think -- well, you state, "I think asking for the contracts and the amounts of money is egregious." Why did you believe that asking for the contracts and the amounts of money was egregious?
A Because at the time, I believed we should be keeping it focused on the process and -- and procedures related -- or keep it focused on updating processes and procedure that led to this problem. And so that's my response.
Q What do you mean by, "updating processes and procedures"?

Page 63

A Updating the out-of-compliance conflict of interest policy.
Q What was out of compliance about the contract the conflict of interest policy?
A Based on my experience, it felt like it was not aligned with best practice.
Q Okay. Did your -- let me ask you this: As part of the investigation into Ms. Reese's potential conflict, was her contract ever produced?
MR. CHANG: Objection. Vague. Foundation.
THE WITNESS: I don't recall.
BY MR. SHEARER:
Q Have you ever reviewed her contract?
THE WITNESS: Can I ask you a question?
MR. CHANG: No, not when a question is pending.
THE WITNESS: Okay.
MR. CHANG: Just answer the question.
THE WITNESS: Yes.
BY MR. SHEARER:
Q Okay. Do you recall when that was?
A I do not recall.
Q Okay. Do you recall how you came in -- to be in possession of the -- of AmandaLynn's contract?
A I do recall, yes.
MR. CHANG: So I was going to have an objection

Page 64

and instruct the witness not to answer to the extent he -- it would divulge any communications as between you and I. Perhaps you just want to clarify that, Dave. You -- keep asking. I'll -- I'm going to instruct the witness not to answer if you're going to start getting into his conversations with me. Just letting you know. So proceed.
BY MR. SHEARER:
Q Yeah. I'm not asking for any conversations with your counsel. As part of the investigation into AmandaLynn Reese's potential conflict, was her contract with Velocity BioGroup ever produced?
MR. CHANG: Objection. Foundation. Vagueness as to the investigation.
You can answer, if you understand.
THE WITNESS: My answer is I don't recall.
BY MR. SHEARER:
Q Okay. So I'd like to hand you what has been marked previously as Cauchon Exhibit 23. No. She'll -- I'm sorry. She'll hand it to you.
A Oh, okay.
Q I apologize.
A Let me just hand it to you anyway.
THE REPORTER: Are we done with 21?
MR. SHEARER: Yes.

Page 65

THE WITNESS: Oh. Yes. 23. Yes.
BY MR. SHEARER:
Q Okay. So the email wherein you indicated that -- referencing -- asking for the contracts, was at 9:30 a.m. on the 5th. This email to Mr. Cauchon with its subject as cease and desist was sent at 2:42 p.m.?
A Uh-huh.
Q Okay.
MR. CHANG: Answer audibly, please.
THE WITNESS: Yes. It was sent at -- I'm sorry. I'm just confirming. It was sent at 2:42 based off what's in front of me.
BY MR. SHEARER:
Q Okay. What led you to sending this email to him, the cease and desist email, in the afternoon of September 5th?
A Conversations with the board of directors.
Q Okay. Would these have been conversations of an informal nature? And by that, I mean, not a formal board meeting?
A I do not recall.
Q The direction from you to cease and desist, was that something that was voted on by the board or simply discussed with the board?
A I do not recall.

Page 66

Q Okay. I'm going to hand you --
MR. SHEARER: What number are we up to for Steward?
THE REPORTER: Are we done with 23?
MR. SHEARER: For right now, yes. Yes.
BY MR. SHEARER:
Q So I have a copy for you there. So I want to ask you a little bit about --
A Oh, I'm sorry. Oh, you got it? Okay.
Q Yeah. He's got it. So if I can, I'm sorry, direct your attention to the third page, which is Bates stamped HRO1277.
A Sorry. Say that again?
Q Yeah. The third page, which is HRO1277 on the bottom.
A Oh. Yes.
Q Okay. And I'm referring to the very last text. It says, "I think we should do an emergency meeting of the board without him after he sends the email."
A Okay.
MR. SHEARER: And if you want to look at the -- I was going to ask you what email you're referring to. And maybe if you want to look at the preceding text messages to clarify that, maybe that will help you.
//

Page 67

(Exhibit 5 was marked for identification.)
THE WITNESS: Sorry. Repeat the question.
BY MR. SHEARER:
Q Yes. It says, "We" -- "I think we should do an emergency meeting of the board without him after he sends the email."
A Yes. I see that.
Q And so what email are you referring to? And what I said is -- what I was suggesting is you may want to read the --
A Oh, okay.
Q -- prior -- yeah. Maybe that'll give you a little context.
A Based off what I'm reading, it is the email he sent to ODH.
Q Okay.
A Oh. To the -- I'm sorry. I -- I misspoke.
Q Could it -- let me ask you this. And I don't want to -- if we look at -- it may -- the very first text, at September 3rd at 10:49, refers to an email to the board, letting folks know he's disclosing the conflict with AmandaLynn to ODH, and he's putting AmandaLynn on paid admin leave.
A I -- I don't recall which email.

Page 68

Q Okay. Which email that's referring to?
A Yeah.
Q Got you. Okay. When it says, "We should do an emergency meeting of the board without him," after he sends the email, do you know why you included the "without him" portion?
A Due to nonprofit board best practice.
Q Can you explain that to me?
A It is, in my experience, best practice not to include a person who's being investigated in the meeting.
Q Okay. Then if we go onto the next page, and it's HRO1278 on the bottom, and there's a text from you, saying, "I agree he's being petty." Below that is a text that says, "I agree as well/punishment in emergency board meeting." Do you know who that text is from?
A I'm assuming, based off what is in front of me, it seems to be a conversation between myself and Tasha, but I do not know who that specific text is from.
Q Okay. Maybe Billy Golden, or you just don't know?
A I don't know.
Q Got you. If I look at the rest of the texts, anything from Tasha is in gray.
MS. MOYO: I'm going to object to your

Page 69

statement, Counselor.
MR. SHEARER: That it's gray?
MS. MOYO: Yeah. If you look at 1278, there is both Tasha and Dwayne that's gray, so I'm going to object to that representation.
MR. SHEARER: Right. Tasha and Dwayne are both gray.
MS. MOYO: Okay.
MR. SHEARER: So I asked him who the blue text -- if he knew who the blue text was from --
MS. MOYO: Okay.
MR. SHEARER: And he indicated that he thought it may be Tasha. And I simply pointed out that the rest of the emails from Tasha were in gray, or texts from Tasha were in gray.
MS. MOYO: Yeah. Thank you for the clarity. Go ahead.
THE WITNESS: Sorry. What is the question?
BY MR. SHEARER:
Q Now that we have looked and seen that the rest of the emails from Tasha are in gray, does that change your testimony that the blue is from Tasha?
A I don't know.
Q Okay. So if I look at Page 1279 at the very bottom --

A Okay. Yes.
Q -- there's an -- a text from you. It says -- it's partially cut off, but it says, "Billy, did you want to send an email?"
A I see that.
Q Okay. Then the next page, it says, "I am hitting the road for -- in a few minutes for some work. So if that is something you're able to do, that would be great."
A I'm sorry. What page are you on?
Q I'm sorry. I'm sorry. I skipped a page. It says, "Billy" -- I'm sorry. Let's go to 1280.
A Okay.
Q The bottom, you say, "Billy, did you want to send an email, or did you want me to?"
Then the response is, "Yes. I would very much like to meet, as well. And Dwayne, I was going to ask you the same."
A Okay.
Q So does that, maybe, seem like the blues are Billy?
A Based on what I see in front of me, yes.
MR. SHEARER: Okay. Okay. I want to jump ahead a little bit, if I can. And we'll hand you what we'll mark as Steward 6.



(Exhibit 6 was marked for identification.)
BY MR. SHEARER:
Q I'll have you take a minute and look at that.
A Okay.
Q Okay. And that's an email, scheduling a board meeting for October 27th at 10:00 a.m.; is that fair?
A Yes.
Q Okay. Was that a special board meeting, a regular meeting, or an emergency meeting?
A I don't recall the specific nature -- specific category.
Q Okay. Sure. What was the purpose, then, of scheduling that board meeting for October 27th?
A It was at the request of Cauchon.
Q Why was it -- if it was -- so your email went out on the 15th. Why was the date of October 27th picked? Was there any particular reason that you're aware of?
A I don't recall the specific reason.
Q Was Mr. Cauchon's potential termination one of the topics to be considered at that board meeting?
A I don't recall the agenda.
Q Ultimately, was that meeting held on the 27th?
A Yes.



Q Okay. And you were in attendance at that meeting?
A Yes.
Q Okay. Tell me what was discussed at that meeting?
MS. MOYO: Objection. You can answer.
THE WITNESS: From my recollection, it was an opportunity for Mr. Cauchon to address the board.
BY MR. SHEARER:
Q Regarding what?
A Whatever concerns he had at the time, which seemed to be outlined in his email here.
Q Do you recall if his termination was considered at that meeting?
A I don't recall.
Q Do you recall if his termination was voted on at that meeting?
MS. MOYO: Objection. Vague.
THE WITNESS: I would have to review the meeting minutes.
BY MR. SHEARER:
Q Okay. Would you agree with me that, ultimately, the decision was made to terminate Mr. Cauchon?
A Yes. The decision was made by the board to



terminate Mr. Cauchon.
Q Okay. When was that decision made by the board?
A I would have to review the meeting minutes to know exactly the date because I do not remember that at this time.
Q Other than this October 27, 2024, meeting, are you aware of any other meetings in either October or November to discuss Mr. Cauchon's potential termination?
A I don't recall specific dates, but if I had meeting minutes to review, I could answer properly.
Q So ultimately, on November the 4th of 2024, Mr. Cauchon was sent a letter terminating his employment?
A Correct.
Q Let me get the -- let me find that letter. I had it here a couple minutes ago. Let me find that and we'll go over it and hopefully speed this up.
MS. MOYO: Well, we've been going for about an hour, so now would be probably a good time for a break.
MR. SHEARER: That's fine.
MS. MOYO: And also, I know yesterday, he thought we wouldn't go --
MR. SHEARER: I apologize.
MS. MOYO: Should we also make plans for lunch?
THE REPORTER: Give me one second to get off

Page 74

record --
MS. MOYO: Off the record.
(Off the record.)
THE REPORTER: We are back on record. Time is 4:45.
MR. SHEARER: Okay. Mr. Steward, I apologize. I had some dates screwed up earlier. I want to hand you what we've marked as Steward Exhibit 7. And these are the board minutes from the October 27, 2024, meeting.
(Exhibit 7 was marked for identification.)
BY MR. SHEARER:
Q I -- when I was asking you before, I was -- had my dates mixed up, and I was referring to that as the meeting where Dennis' termination was discussed, but that is incorrect. So I've looked at the meeting minutes now, and I think I have my dates squared away. So if I can just have you take a quick moment and look at those for me, please?
A Okay. Okay. I read it.
Q Okay. Does reviewing these board minutes refresh your recollection of what the purpose of that October 27, 2024, board meeting was?
A Yes.
Q Okay. And what was the purpose of that

Page 75

meeting?
A The purpose of the meeting was to grant Cauchon space to speak, as they requested the meeting. During the meeting, it was decided upon that, based on the minutes, that Dennis be removed from the board.
Q Okay. So it looks like, as I read it, Anne -- who is Anne?
A Anne Trinh was a board member.
Q Right. And so she stated, "I'm putting forward a motion for Dennis to be removed as an official board member so that we're in compliance with the IRS and nonprofit best practices that state that members are not paid." Do you see where I'm referring to?
A Yes. Yes.
Q So that is in quotes. I'm assuming that means that that is a direct quote from Anne or --
A That's my understanding.
Q Okay. And then did you second to that motion?
A I --
Q You asked for a second.
A Right. I did not second. Colleen -- yeah.
Q Colleen seconded the motion. And then subsequently, there was a vote?
A Correct.
Q Okay. And six board members voted, aye. Then

Page 76

"(none)". Then "period". Was there a board member that was missing from that meeting, or was not present at that meeting?
A Based on the minutes, it says Molly was absent.
Q Oh, I see that. I'm sorry. Yep. You're correct. You're correct. Okay. That was all the questions I have for you about that. Finally, if we could have you look real quick -- or not finally, but close to finally, have you real quick look at what we have previously marked as HRO Exhibit 2, which is the November 4th termination letter. And I just have a couple of questions for you about that -- about the first page, but if you want to take a minute to review the whole thing, feel free.
A I've reviewed this.
Q Okay. Got you. If we look at the second page, it says, "We engaged legal counsel to conduct an outside investigation of your conflict of interest allegation against AmandaLynn Reese, as well as her retaliation and hostile work environment allegations against you."
Then the next part of it is what I want to just clarify and make sure I know what we're talking about. It says, "And several complaints from current and former HRO employees that soon followed." So you have told me about the complaints of Kelsey, correct?

Page 77

A Correct. Yes.
Q And you told me complaints about the -- from the social media director?
A Yes.
Q Okay. Are you referring to any other complaints in that portion of the letter?
MS. MOYO: I'm just going to object to the word "you".
But you can answer.
BY MR. SHEARER:
Q Well, I'm sorry. The board.
A I don't recall the -- the nature of all the complaints. I do recall that there were other complaints within the investigation -- that were brought forward in the investigation.
Q Okay. Do you recall the specifics of any of those complaints?
A I don't recall. I would have to have the investigation document in front of me.
Q Okay. And the investigation documents, you mean the Nelson investigation report?
A Correct.
Q Got you. Okay. How was Ms. Nelson retained to conduct her investigation? Was that a decision of the board, a decision of -- how did the decision come about,

Page 78

if you could tell me?
A Attorney Nelson was retained by the board. I made recommendation to the board. We were looking for a third party. I made a recommendation, based off my understanding of Attorney Nelson's experience, and they accepted that recommendation.
Q Okay. I saw that you had you previously worked with Ms. Nelson or knew Ms. Nelson somehow?
A Yeah. We had worked together and had known each other for some time, yes.
Q Okay. And you recommended her, and the board agreed, and she was retained?
A Yes.
Q Okay. Was that done at a meeting, or was that informally?
A My recollection was at a meeting.
MR. SHEARER: Okay. Now, the last thing -- well, one of the last things I want to ask you about is -- and we'll mark this Steward 8.
(Exhibit 8 was marked for identification.)
THE WITNESS: Oh, did you want this back? I reviewed it.
BY MR. SHEARER:
Q Okay.

Page 79

A I -- I -- yeah. Yeah.
Q And this email, on the cover page, on the first page, it is -- the email was not sent to you, but did you have an opportunity to receive and review this -- Mr. Cauchon's letter that is on the second three pages -- four pages of the document?
A I do remember receiving Cauchon's complaint.
Q Okay.
A Correct. Correct.
Q And was his complaint investigated?
A Yes.
Q Can you tell me how his complaint -- what was done to investigate his complaint?
MS. MOYO: I'm going to object and instruct the witness not to answer to the extent it could divulge any communications from Ms. Nelson.
I'll permit you to answer with respect to what the board did.
THE WITNESS: The board provided this information to Ms. Nelson to include in her investigation.
MR. SHEARER: This is dated October the 23rd of 2024. I had been provided with a redacted version of Ms. Nelson's report that is dated October 9, 2024. And I'm not sure, off the top of -- I think this was -- I

Page 80

can't read my own handwriting. May have been -- it is -- I have my -- it would have been in Mr. Cauchon's deposition, in maybe, like, number -- it would have been early on. Maybe, like, 11 or so. It's pretty thick.
MS. MOYO: Not to shortcut you.
MR. SHEARER: Yeah.
MS. MOYO: I'll allow him to testify to confirm the date the report received. I will not allow you to ask and for him to answer the contents of this -- of the report beyond what has been waived. So I'm just warning you now.
BY MR. SHEARER:
Q Okay. So I'm going to have you take a look at that report from Ms. Nelson. And it looks like that was -- the date on that is October the 9, 2024?
A Correct.
Q Okay. And if I look at Mr. Cauchon's complaint, it is dated October 22, 2024?
A Correct.
Q Okay. So when you mentioned that it was included in the Nelson report, was there a separate investigation conducted by Ms. Nelson into Mr. Cauchon's October 22, 2024, complaint?
MS. MOYO: Objection. You can answer.
THE WITNESS: What I recall is: When we

Page 81

received the complaint, we provided it to Counsel for a further investigation.
BY MR. SHEARER:
Q Okay. Other than providing it to Counsel, did the board take any other action with regard -- at any time with regard to Mr. Cauchon's October 22, 2024, complaint?
MS. MOYO: Objection.
You can answer.
THE WITNESS: I believe I answered that question. I -- we provided it to our counsel.
BY MR. SHEARER:
Q Correct.
A Yeah.
Q And then my question was: Other than providing it to your counsel, did the board ever take any other action with regard to Mr. Cauchon's October 22, 2024, complaint?
MS. MOYO: So I'm going to object again. Instruct you not to divulge any communications with Counsel. Outside of that, I'll allow you to answer if the board took any action, outside of anything that would reveal advice of Counsel. Go ahead.
THE WITNESS: What I recall is: The complaint was provided to Counsel. And unless I can see further

documentation, I can't recall what was done after that.
BY MR. SHEARER:
Q Okay. Do you recall if there was any communications ever provided to Mr. Cauchon regarding the topic of his October 22, 2024, complaint?
A I do not recall. Because communication with Mr. Cauchon was through Counsel.
Q Okay. Did the board make a determination as to whether Mr. Cauchon's October 22, 2024, complaint had any basis or was well-founded?
MS. MOYO: Objection. Again, I'll instruct him not to answer to the extent it would require divulging advice of Counsel.
MR. SHEARER: Well, I'm not asking him what Counsel told him. I'm asking him what the results -- was there an investigation in -- based on this letter and what the results of that investigation were?
MS. MOYO: Which would divulge --
I'm instructing you not to answer to the extent it would reveal communications with Ms. Nelson. So if you have anything else to answer that -- that don't reveal privileged communications, then you can say it.
THE WITNESS: Yeah. I -- I don't -- I don't recall.
//



BY MR. SHEARER:
Q Okay. Did the board -- other than the email, dated October the 23, 2024, to Mr. Cauchon from Colleen Garlock, was there any other correspondence sent from HRO, or any communications from HRO, to Mr. Cauchon regarding his October 22, 2024, complaint?
MS. MOYO: Standing objection. Relevance.
Go.
THE WITNESS: Yeah.
MS. MOYO: You can answer.
THE WITNESS: I -- I don't recall through which communication the complaint was received.
MR. SHEARER: Okay. Why don't you give us two minutes and we may be done?
THE REPORTER: All right --
(Off the record.)
THE REPORTER: Back on record.
BY MR. SHEARER:
Q Yeah. Mr. Steward, just a couple more questions for you. We discussed earlier that, at some point, you don't recall when, you did review Ms. Reese's contracts with Velocity BioGroup?
A Correct.
Q Okay. After reviewing those contracts, was any information, regarding the contents of the contracts or



the contracts themselves, supplied to ODH?
MS. MOYO: I'm going to object.
You can answer, if you know.
THE WITNESS: Yeah. I -- I don't recall. I do know if that is the -- it did not come from me.
BY MR. SHEARER:
Q It did not come from you?
A If it -- if it was given to ODH.
Q Okay. And by "you," do you mean as chairman of the board?
MS. MOYO: Objection.
THE WITNESS: All right. I don't recall because I don't -- I don't recall when. I don't recall when. So I don't know if it was before -- when I was on the board or when I was not.
BY MR. SHEARER:
Q Okay. You don't recall when what?
A The -- what you just -- your -- your question. When the contract was reviewed by myself.
Q Okay. Do you know when the contract was provided to the board of directors of HRO?
A I do not know the answer to that.
Q Okay. Okay. And you and your role as chairman of the board of directors, you're not aware or have any knowledge that the contracts or a summary of their



contents was provided to the ODH?
A No.
Q Okay.
A No.
MR. SHEARER: That's all the questions I have for you. Thank you.
MS. MOYO: No questions.
MR. SHEARER: We'll read.
THE REPORTER: Read. Okay. Did you want to order? Is that it?
MS. MOYO: It's his depo. I'll waive that. Are you ordering?
MR. SHEARER: Oh, yeah. I'll order. Yeah.
MS. MOYO: We'll take a copy.
THE REPORTER: Sounds good. Going off record. Time is 1:50 p.m.
(Signature reserved.)
(Whereupon, at 1:50 p.m., the proceeding was concluded.)

Page 86

CERTIFICATE OF OATH

I, the undersigned, certify that the witness in the foregoing transcript personally appeared before me and was duly sworn.

KAYLEIGH KINNAMON
Reporter, Notary Public
State of Ohio
Commission Expires: 02/01/2029
Commission Number: 2024-RE-873296

Page 87

C E R T I F I C A T E

I do hereby certify that the witness in the foregoing transcript was taken on the date and at the time and place set out on the Title page hereof, by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said Matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel and that I am in no way interested financially, directly or indirectly, in this action.

KAYLEIGH KINNAMON
Notary Public, in and for the
State of Ohio

Page 88

Steven A. Chang
schang@reminger.com

August 18, 2026

RE: Cauchon, Dennis Et Al v. Steward, Dwayne Et Al
7/31/2026, Dwayne Steward (#8349311)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

Page 89

Cauchon, Dennis Et Al v. Steward, Dwayne Et Al
Dwayne Steward (#8349311)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE______________________
_____________________________________________
REASON______________________________________
PAGE_____ LINE_____ CHANGE______________________
_____________________________________________
REASON______________________________________
PAGE_____ LINE_____ CHANGE______________________
_____________________________________________
REASON______________________________________
PAGE_____ LINE_____ CHANGE______________________
_____________________________________________
REASON______________________________________
PAGE_____ LINE_____ CHANGE______________________
_____________________________________________
REASON______________________________________
PAGE_____ LINE_____ CHANGE______________________
_____________________________________________
REASON______________________________________

_____________________________ ______________
Dwayne Steward Date

Cauchon, Dennis Et Al v. Steward, Dwayne Et Al
Dwayne Steward (#8349311)

ACKNOWLEDGEMENT OF DEPONENT

I, Dwayne Steward, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Dwayne Steward Date
*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

**&**

**&** 2:4,19

**0**

**0075** 1:7
**02/01/2029** 86:14

**1**

**1** 4:7 22:22,23 54:11
**10** 55:12 56:1,5 56:8
**100** 27:12
**10:00** 4:20 71:7
**10:05** 1:14 5:5
**10:49** 67:21
**11** 80:4
**11:08** 4:12 26:21 28:9
**11:32** 50:18
**11:42** 28:9 29:5
**11:56** 26:23 27:7 28:16
**12** 8:23 9:19
**1278** 69:3
**1279** 69:24
**1280** 70:12
**14** 55:5 56:20 57:23
**15** 50:12
**15th** 71:17
**16** 4:9,11 24:1 24:5,13 29:21 35:20 36:1,1
**16th** 24:9 26:20 28:9 32:4 36:2 36:5
**18** 88:3
**1:50** 85:16,18

**2**

**2** 4:10 25:19,20 76:10
**2,040** 34:8
**20** 90:15
**2024** 4:9,11,15 4:22,23 6:25 8:23 10:8 11:21 24:1,5,9 24:13 29:21 35:4,8,17,20 38:14 41:22 48:20 49:1 59:5 62:13 73:7,12 74:9 74:23 79:23,24 80:15,18,23 81:6,17 82:5,9 83:3,6 86:15
**2025** 9:20
**2026** 1:13 5:6 88:3
**21** 59:8,11,12 59:17,21,22 64:24
**22** 4:7 11:22 80:18,23 81:6 81:17 82:5,9 83:6
**227-2106** 2:8
**23** 4:23 11:22 64:19 65:1 66:4 83:3
**232-2446** 3:11
**2388** 2:20
**23rd** 79:22
**24** 11:25
**25** 4:10 6:25 37:22 38:9 52:22
**26** 8:21
**27** 4:20,21 73:7 74:9,23
**27th** 71:7,14,17 71:24
**2:07** 29:21
**2:24** 38:14
**2:25** 1:7
**2:42** 65:6,11

**3**

**3** 4:13,15 33:16 33:18 35:8 54:21,22 55:11 55:25 56:3,7 58:17
**30** 88:16
**308-1490** 2:23
**31** 1:13 5:6
**327** 2:12
**33** 4:13
**330** 1:18 3:8
**34** 4:15
**36234** 86:10 87:18
**3rd** 35:4 36:3 67:21

**4**

**4** 4:15 34:21,22
**41** 2:5
**41017** 2:21
**43023** 2:13
**43212** 1:19 3:9
**43215** 2:6
**4:45** 74:5
**4th** 73:12 76:11

**5**

**5** 4:18 38:14 49:1 59:5 62:13 67:1
**5th** 41:22 43:10 45:8 54:9 58:23 65:5,16

**6**

**6** 4:3,19 70:25 71:1
**614** 2:8 3:11
**67** 4:18

**7**

**7** 4:21 35:8 74:8,10

**7/31/2026** 88:5
**71** 4:19
**74** 4:21
**740** 2:15
**78** 4:23

**8**

**8** 4:23 78:19,20
**8349311** 1:21 88:5 89:2 90:2
**859** 2:23
**873296** 86:15

**9**

**9** 79:24 80:15
**955** 1:17 3:7
**973-3814** 2:15
**9:30** 65:5

**a**

**a.m.** 1:14 4:12 4:20 5:5 26:21 27:7 65:5 71:7
**ability** 87:11
**able** 7:19 54:3 70:8
**above** 88:6 90:7
**absent** 5:9 76:4
**absolutely** 11:25
**accepted** 78:6
**access** 14:21 15:12
**accounts** 14:21 14:23 15:12
**accuracy** 88:9
**acknowledge...** 90:3
**acknowledge...** 5:7
**acknowledg...** 88:12
**action** 41:4 81:5,17,22 87:14
**activities** 14:16 31:3,4,5,24,25
**actually** 10:6 26:14 60:6
**additional** 59:4
**additionally** 5:9
**additions** 90:6
**address** 54:4 72:8
**admin** 53:22 67:24
**administer** 5:8
**administration** 10:22
**administrative** 15:1,4,7 17:19 17:22 18:14,22 19:1 20:4,7,12 34:17 38:18 53:13
**admit** 11:12 18:9 24:11 27:12 28:10 39:8 40:23
**advance** 15:22 15:25 55:1,19 58:10
**advice** 14:11 81:23 82:13
**advise** 14:12
**advises** 14:9
**advising** 30:10 30:16,17
**advisory** 13:18 15:15
**afternoon** 65:15
**agencies** 31:24
**agency** 14:20 30:11,12 31:1 33:2,4 34:15 37:8
**agenda** 71:23
**ago** 10:21 73:16
**agree** 5:11 9:1 24:23 57:22 68:14,15 72:22
**agreed** 37:9,16 61:10 78:12
**agreement** 35:16
**ahead** 17:3 37:19 56:24
69:17 70:24 81:23
**al** 1:4 88:4,4 89:1,1 90:1,1
**aligned** 63:6
**allegation** 76:18
**allegations** 76:20
**alleged** 43:23
**allotted** 88:19
**allow** 41:3 58:11 80:7,8 81:21
**allowed** 29:7 29:10,12 31:3
**amanda** 32:9
**amandalynn** 4:8 22:4,8,20 23:24 25:10 30:6,14 31:8 32:7,10,16 33:5 35:21 36:10,25 39:3 39:14 52:24 61:13 64:11 67:23,24 76:19
**amandalynn's** 53:2 63:23
**amount** 60:12
**amounts** 60:23 61:22 62:15,17
**anne** 75:6,7,8 75:16

Case: 2:25-cv-00075-EAS-CMV Doc #: 103-2 Filed: 08/31/26 Page: 27 of 86 PAGEID #: 2631



**annual** 15:16 15:19 33:9,10
**answer** 7:6,7 7:13,15 15:2 16:25 17:3,5,9 18:11 22:10,13 22:16 41:5,20 42:9 44:9 45:12 46:4 48:3 49:5 50:7 56:24 57:9 58:4,25 60:16 61:7 63:17 64:1,5,15,16 65:9 72:6 73:11 77:9 79:15,17 80:9 80:24 81:9,21 82:12,19,21 83:10 84:3,22
**answered** 41:18 46:2 49:12 58:8 81:10
**anymore** 29:10
**anyway** 64:23
**apologies** 9:17
**apologize** 11:17 21:21,22 36:5 41:18 57:19 64:22 73:23 74:6
**appeared** 86:4
**appears** 34:3 35:11,12 38:17 54:8
**appended** 90:7
**applicable** 5:14 88:8
**appreciate** 7:8 7:13 60:5
**approve** 37:7
**approved** 27:17
**approximately** 9:14
**arthur** 2:4
**article** 27:11 54:21 55:11
**asked** 46:2 49:12 58:8 69:9 75:20
**asking** 7:11 56:23 60:11 62:15,16 64:4 64:9 65:4 74:13 82:14,15
**asserted** 17:25
**assertion** 18:3
**assigned** 5:3
**assist** 30:24
**assistance** 34:16,18
**assisting** 34:13
**assume** 45:18 48:5,7,9
**assuming** 28:23 40:12 68:17 75:15
**assumption** 27:21
**attached** 29:3 88:11
**attend** 57:12 58:11
**attendance** 5:20 72:1
**attention** 32:24 32:25 36:19 66:11
**attorney** 17:8 19:24 21:6 37:4 40:18 49:21,22 50:1 50:5 78:2,5 88:13
**attorneys** 7:4
**audibly** 60:16 65:9
**august** 8:21,21 88:3
**author** 44:5
**authorized** 5:7
**avail** 57:11
**available** 88:6
**aware** 22:5,6,7 24:1,6,8,10 47:13,24 57:11 71:19 73:8 84:24
**aye** 75:25

**b**

**b** 4:5
**back** 7:10 8:20 13:15 20:13,14 29:11 44:18,18 50:17 52:21,21 60:2 74:4 78:22 83:17
**balances** 14:22
**ball** 60:9
**bank** 14:22,23 15:12
**based** 31:9,10 31:17,20 43:9 47:21 51:20,22 56:11 63:5 65:11 67:15 68:17 70:22 75:4 76:4 78:4 82:16
**basically** 31:14
**basis** 33:9,10 58:5 82:10
**bates** 23:5,12 23:14 25:23 26:1 66:11
**becoming** 17:18
**began** 18:17 40:19
**beginning** 5:21

Case: 2:25-cv-00075-EAS-CMV Doc #: 103-2 Filed: 08/31/26 Page: 28 of 86 PAGEID #: 2632



**behalf** 2:2,10 2:17 3:2 6:4
**believe** 9:14 11:5,13,21,22 13:19 24:4 25:8,11 33:3 40:3 45:5,22 45:25 46:6,21 48:22 52:18 56:21,25 57:14 58:3 62:16 81:10
**believed** 25:2 62:19
**best** 13:23 14:20 30:15 31:10 37:3,7 37:11 63:6 68:7,9 75:12 87:11
**better** 4:16 10:16 14:19 30:22 33:1,2 35:5
**beyond** 80:10
**bicknell** 1:8 3:3
**big** 10:3
**billy** 12:2 68:20 70:3,12,14,21
**biogroup** 23:25 24:3 31:19 32:1,17,23 35:22 36:12 60:21 61:1,5 61:17,21,22 64:12 83:22
**bit** 13:15 30:20 35:2 37:19 38:20 50:21 66:8 70:24
**blanks** 37:20
**blue** 69:9,10,22
**blues** 70:20
**board** 4:19,21 4:22 8:13 9:6,7 9:9,9,12,16,25 10:3,7,8 11:2,4 12:14,15,16 13:9,14,16,17 14:3,4,8,12,14 14:24 15:7 16:2,7,8,12,15 16:18,21,22,23 17:14 18:1,2 18:10,11,13,15 18:19,20,23 19:2 20:18,20 21:21 27:17 30:18 33:8,11 37:5,7,12,16 38:23 39:2 41:4 42:15,17 42:19,22,23,24 43:1,4,6,13 44:2,6,11,14,17 44:22 45:2,3,6 45:9,15,19 46:7,9,10,11,15 46:19,19,22,24 46:25 47:1,2,2 47:8,12,14,15 47:17,24,25 48:10,14,16,19 48:21,24 49:24 52:11,14,19 53:20 54:3,24 54:25,25 55:4 55:8,11,19,21 55:24 56:3,7 56:11,18 57:10 58:7,10 65:17 65:20,23,24 66:19 67:6,22 68:4,7,16 71:6 71:9,14,22 72:8,25 73:3 74:9,21,23 75:5,8,10,25 76:1 77:11,25 78:2,3,11 79:18,19 81:5 81:16,22 82:8 83:2 84:10,15 84:21,24
**boards** 10:6,8
**bolded** 53:19
**boom** 53:24
**bottom** 26:24 66:15 68:13 69:25 70:14
**break** 7:18 50:12 73:19
**brief** 23:3
**broader** 17:13
**broadway** 2:12
**brought** 24:18 32:24,25 33:5 36:19 37:4 77:14
**budget** 14:15 15:13,16,18,19
**budgeting** 15:20
**business** 10:15 10:19 13:22
**bylaws** 54:12 56:11,16 58:2

**c**

**c** 2:1 3:1 5:1 87:1,1
**calendar** 58:21
**call** 32:9,9 34:15,21 44:24 44:24 47:12
**called** 6:12 10:15 47:15 54:2,6
**calling** 47:13
**calls** 32:15
**case** 1:6 10:15 18:5 19:16
**categorized** 15:19
**category** 21:16 71:12

**cauchon** 1:4 2:10,11,17 4:7 4:10 5:24,25 5:25 6:19 12:6 12:18,24 14:25 15:6,11 16:7 16:12,14,17,22 17:18 18:1,16 18:20 19:1 20:4,7 22:20 23:13,13,22 24:14,19 25:25 26:8,19 28:9 28:14 30:11,12 31:6 32:3,8,16 32:25 33:7 35:21 36:19 38:17 41:11,25 42:7,12 46:23 48:16,25 49:9 49:14 52:9 53:12 54:11 59:7 60:9 61:15 64:19 65:5 71:15 72:8,24 73:1 73:13 75:2 82:4,7 83:3,5 88:4 89:1 90:1
**cauchon's** 4:24 6:23 22:2 32:9 35:11 37:22 43:23 71:21 73:9 79:5,7 80:2,17,22 81:6,17 82:9
**ccing** 60:9
**cease** 65:6,15 65:22
**cecile** 60:9
**ceo** 8:9,17 10:5
**certainly** 7:19 25:23
**certificate** 86:1
**certified** 5:11
**certify** 86:3 87:3,11
**chair** 11:6,8,9 11:13,14,15,17 11:18,20,22,23 11:25 12:1,4 13:13,13 16:3 16:5 47:8
**chairman** 48:24 55:4,20 56:18 84:9,23
**chang** 3:5 6:4,4 13:6 16:24 17:6,12 22:9 22:12,16 23:5 23:16 26:12 27:24 28:3 33:20,24 36:3 36:13 37:24 41:2 44:8 45:11 46:1 48:2,8 49:2,12 50:2,9,11 53:7 54:14,16 56:22 57:7,17 58:8 58:15,18,24 59:14,20 60:16 61:6,24 62:4,8 63:10,15,17,25 64:13 65:9 88:1
**change** 37:7 62:3 69:21 89:4,7,10,13,16 89:19
**changed** 15:3 48:22
**changes** 29:8 37:6 88:10 90:6
**characterizati...** 12:23
**characterizes** 62:6
**check** 59:16
**checks** 14:23
**claims** 6:20 30:13
**clarification** 17:16
**clarify** 13:6 49:3 64:3 66:24 76:22
**clarity** 23:6 36:15 69:16
**clauses** 29:9
**clear** 31:14
**client** 35:11 50:5
**close** 76:9
**colleen** 48:23 55:22 75:21,22 83:3
**columbus** 1:19 2:6 3:9
**come** 12:12 30:13 54:3 77:25 84:5,7
**coming** 30:22
**commission** 86:14,15
**communicate** 52:8
**communication** 41:6 50:3 82:6 83:12
**communicati...** 17:24 23:22 36:18 38:22 50:7 64:2 79:16 81:20 82:4,20,22 83:5
**company** 31:3 31:3,12,15,17 35:16 36:22
**compensation** 33:9,12
**compete** 29:9

**complainants** 52:24
**complaint** 39:3 39:14,16,18 40:22,25 41:17 43:7,13,14,18 43:20,20,23,25 44:1,3,6,11 50:21,22,23,25 51:3,6,8,11,20 52:3,6,8,11,18 79:7,10,12,13 80:18,23 81:1 81:7,18,24 82:5,9 83:6,12
**complaints** 38:23 39:1,4 39:13 40:3,10 40:13,16 41:24 42:8,14 45:5 46:23 47:13,16 47:17,20,23 48:14,25 49:3 49:6,10,23 52:23 53:2,12 53:14,16 76:23 76:25 77:2,6 77:13,14,17
**complete** 41:9 90:8
**completed** 88:16
**completely** 62:5
**completion** 53:23
**compliance** 37:10 63:1,3 75:11
**concern** 22:3
**concerns** 72:11
**concluded** 85:19
**conduct** 76:17 77:24
**conducted** 80:22
**confirm** 38:10 80:7
**confirming** 65:11
**conflict** 4:9 22:4,8 24:6,20 24:24 25:2,7 36:10,14,25 61:4,12,20 63:1,4,9 64:11 67:23 76:18
**confused** 18:2
**considered** 51:22 71:22 72:13
**consistent** 12:3
**constitute** 5:18
**constitutes** 87:10
**consultant** 33:13
**consultation** 36:23
**consulting** 4:13 4:16 10:16,20 30:22,23 33:1 33:3 34:5 35:5 35:16
**cont** 3:1
**contemplate** 56:16
**contents** 80:9 83:25 85:1
**context** 12:16 14:14 67:14
**contract** 4:16 35:5,15 36:21 36:21 61:5,21 63:3,9,13,23 64:11 84:19,20
**contracted** 30:23
**contracts** 60:12 60:20,21 61:16 62:15,17 65:4 83:22,24,25 84:1,25
**convene** 55:9
**conversation** 14:19 17:18 24:18 25:9 27:4 28:8,11 30:4 32:4,6 33:7 36:24 37:1 42:1,11 44:10,16,21,22 68:18
**conversations** 12:13,15 14:13 16:19,20 17:1 17:10,14,21 18:6,7,13 24:13,17,22 27:5 28:13 32:18,19,21 36:18 41:23 42:4,7 44:15 44:18,19 64:6 64:9 65:17,18
**copies** 38:1 88:14
**copy** 26:5,8,10 38:8 66:7 85:14
**correct** 9:8 11:10 12:7 20:22 21:8 23:11 25:4 26:22 32:2 35:14 41:15 43:15,16 44:4 45:7,17,20 46:5 47:4,10 47:11 53:15 54:10 57:4,25 59:2 60:15,19 60:22 61:2,13 61:14,18,19 73:14 75:24

76:6,6,25 77:1 77:22 79:9,9 80:16,19 81:13 83:23 90:8
**corrections** 90:6
**corresponden...** 12:17 83:4
**counsel** 6:2 16:25 17:2,15 18:8 37:12,16 41:6 49:3,18 49:19,19 59:14 64:10 76:17 81:1,4,11,16,21 81:23,25 82:7 82:13,15 87:12 88:14
**counselor** 69:1
**counterclaim** 1:5,10 2:2,17 3:2 6:1,3
**counterclaims** 5:24
**couple** 73:16 76:12 83:19
**court** 1:1 50:3
**cover** 79:2
**creating** 38:24
**cs** 88:15
**current** 37:11 76:23
**currently** 7:24 8:1 10:12
**cut** 70:3
**cv** 1:7

**d**

**d** 3:1 4:1 5:1 7:23,23
**date** 1:13 21:23 32:11 43:11 71:17 73:5 80:8,15 87:4 89:24 90:12
**dated** 29:21 35:2,3,8 38:14 79:22,24 80:18 83:3
**dates** 9:17 17:23 20:2 73:10 74:7,14 74:17
**dave** 13:7 23:5 64:3
**david** 2:18 5:23 6:19 60:9
**day** 57:23 90:15
**days** 55:5 56:20 88:16
**dealing** 46:18
**decided** 10:4 53:22 75:4
**decision** 72:23 72:25 73:2 77:24,25,25
**declare** 90:4
**dedicated** 10:5
**deemed** 44:7 90:6
**defendant** 2:17 6:1
**defendants** 1:5 1:10 3:2 6:5
**defines** 12:24
**definition** 21:1
**dennis** 1:4 2:10 2:11,17 4:7,10 5:25 74:15 75:5,10 88:4 89:1 90:1
**denniscauchon** 2:14
**depend** 20:25
**depends** 12:24
**depo** 85:11
**deponent** 88:13 90:3
**deposing** 88:13
**deposition** 1:12 5:6,16 6:25 19:5 20:24 37:22 80:3
**description** 4:6
**desist** 65:6,15 65:22
**details** 24:25 25:3 28:11 43:17
**determination** 82:8
**development** 30:25 34:12
**difference** 55:24 56:6,10
**digitally** 87:8
**direct** 66:11 75:16
**direction** 65:22 87:9
**directly** 87:13
**director** 8:9 9:16 12:9,10 13:19,20,21 14:5,9,12,14 15:14 16:6 30:24 37:12,16 77:3
**directors** 8:13 9:10,12 10:1 13:10,14,16 16:8,12 18:11 20:20 53:20 55:12 65:17 84:21,24
**disagree** 12:22
**disclosing** 67:22
**disclosure** 24:6
**discovery** 10:14
**discrimination** 39:17,20 40:10

Case: 2:25-cv-00075-EAS-CMV Doc #: 103-2 Filed: 08/31/26 Page: 32 of 86 PAGEID #: 2636



40:11 43:12,21 43:21 49:6,10 51:2,4,9,22
**discuss** 32:10 73:9
**discussed** 17:7 20:10 24:20 45:9 46:7,22 47:18,24 48:14 52:11 65:24 72:4 74:15 83:20
**discussions** 16:16 18:4
**district** 1:1,1
**division** 1:2
**divulge** 41:5 64:2 79:15 81:20 82:18
**divulging** 82:12
**document** 19:21 23:3,6 27:13 29:14,16 29:17 34:4 35:7 57:24 58:20 77:19 79:6
**documentation** 82:1
**documents** 15:18 17:24 19:4,10,12,13 19:15,23 20:17 21:6,9,11,16
77:20
**doing** 31:12,16
**double** 59:16
**drive** 2:20
**dshearer** 2:22
**due** 68:7
**duly** 6:12 86:5 87:6
**dwayne** 1:7,12 3:2 4:11 5:6 6:6,11 7:21 69:4,6 70:17 88:4,5 89:1,2 89:24 90:1,2,4 90:12

**e**

**e** 2:1,1 3:1,1 4:1 4:5 5:1,1 7:23 7:23 87:1,1 89:3,3,3
**earlier** 74:7 83:20
**early** 80:4
**easier** 7:9
**east** 2:12
**eastern** 1:2
**egregious** 60:12,23 62:16 62:18
**either** 73:8 87:12
**elizabeth** 2:3 6:2
**email** 4:7,10,15 4:19,23 23:7 23:19,20,24 24:1,12 26:4 26:18,20 27:7 28:15 29:4,20 30:21 31:7 32:4 35:3,20 38:14,17 40:17 53:20 54:8 60:7,8 61:15 61:25 62:14 65:3,5,14,15 66:19,22 67:7 67:9,15,21,25 68:1,5 70:4,15 71:6,16 72:12 79:2,3 83:2
**emails** 10:14 21:11,14,18 35:23 44:5 69:14,21
**emergency** 46:19,22,25 47:14 53:21,25 54:1,2,5 56:16 56:19 57:3,6 57:25 58:1,22 59:5 66:18 67:6 68:4,15 71:10
**emoyo** 2:7
**employed** 7:25 8:1 24:2
**employee** 27:18 29:7,12 87:12
**employees** 76:24
**employment** 22:2 32:17,22 35:22 36:12 73:13
**engaged** 76:17
**entail** 13:14
**entered** 35:16
**entire** 8:17,17 12:3 20:20 44:17,22
**entities** 10:4
**entity** 10:25
**environment** 38:24 39:15 52:23 53:4,6 76:20
**equality** 8:1,2,8 8:10,14,22 10:2
**errata** 88:11,13 88:16
**erratas** 88:15
**esquire** 2:3,18 3:5
**et** 1:4 88:4,4 89:1,1 90:1,1
**evaluating** 61:20
**event** 45:22,25

**events** 6:24 22:3 36:9
**evidentiary** 5:15
**exact** 9:17 21:23 32:11 43:11
**exactly** 15:23 29:3 73:5
**examination** 4:2 6:16
**examined** 6:14
**example** 14:1
**examples** 14:2
**exchange** 26:18 35:20 61:15
**exchanged** 10:14
**executive** 8:9 12:8,10 13:19 13:20,21 14:5 14:9,12,14 15:14 16:5 30:24 37:11,16
**exhibit** 4:7,10 4:13,15,18,19 4:21,23 22:23 22:25 25:20 26:15 33:18 34:22 37:22 52:22 54:11 58:17 59:7,16 59:17 64:19 67:1 71:1 74:8 74:10 76:10 78:20
**expansion** 4:17 35:6
**experience** 63:5 68:9 78:5
**expires** 86:14
**explain** 68:8
**extension** 4:17 35:5
**extent** 16:25 17:13 41:5 64:1 79:15 82:12,19

**f**

**f** 87:1
**face** 25:1
**facilitation** 16:5 34:15
**fact** 30:9
**facts** 31:9 43:9
**fails** 88:18
**fair** 18:12 42:3 42:10 49:11 71:7
**far** 14:21 20:13 20:14 37:8 41:7
**feedback** 14:16 15:15
**feel** 17:15 37:2 76:14
**felt** 63:5
**fiduciary** 13:24
**figure** 14:2 24:21
**filed** 6:20
**fill** 37:20
**finally** 76:7,8,9
**finances** 15:8
**financial** 14:21 14:23
**financially** 87:13
**find** 73:15,16
**finding** 30:9
**fine** 21:24 59:24 73:20
**firm** 4:13 10:20 30:23 34:5 36:21
**first** 6:12 7:5 14:8 22:7,19 25:8 26:16,20 54:22 60:7,8 60:13 67:20 76:13 79:2 87:6
**focused** 62:20 62:21
**folks** 67:22
**follow** 29:21 32:4,6
**followed** 76:24
**follows** 6:14
**foregoing** 86:4 87:4 90:5
**forget** 21:25
**form** 22:9 56:22 61:24 87:9
**formal** 65:19
**former** 76:23
**fort** 2:21
**forward** 14:20 75:9 77:15
**foundation** 61:6,24 63:10 64:13
**founded** 82:10
**four** 9:14 79:6
**frame** 13:7,9 32:14 56:15 57:15
**free** 17:15 76:14
**friday** 1:13
**front** 31:10 33:20 35:3 43:9 47:21 65:12 68:17 70:22 77:19
**full** 7:20 24:11 25:10,12
**fully** 27:21 37:14
**fund** 10:11
**further** 50:6 81:2,25

**g**

**g** 5:1
**garlock** 83:4
**garvey** 2:19
**gender** 39:17 39:19 40:11 43:21 51:3,5,9 51:20,21 52:3
**general** 14:19 21:15 35:25
**generally** 18:2 18:12 19:22 22:5 35:19 36:8 39:14 41:8 53:3
**getting** 64:5
**give** 7:3,5,7,20 14:1 43:17 55:5 59:14 67:13 73:25 83:13
**given** 56:20 57:15 84:8 90:9
**gmail.com** 2:14
**go** 14:18 17:3 27:15 35:7 53:19 56:24 59:18,23 68:12 69:17 70:12 73:17,22 81:23 83:8
**goals** 34:15
**goes** 29:11
**going** 7:11 14:17,17 16:24 18:20 21:13 22:21,25 24:21 27:8,9 28:16 31:2 33:16 36:13 41:2 50:2,6,11,15 52:21 59:15 63:25 64:4,5 66:1,22 68:25 69:4 70:17 73:18 77:7 79:14 80:13 81:19 84:2 85:15
**golden** 1:8 3:3 12:2 68:20
**good** 5:2 73:19 85:15
**grandview** 2:20
**grant** 34:16 75:2
**granville** 2:13
**gray** 68:24 69:2 69:4,7,14,15,21
**great** 70:9
**ground** 7:5
**gsn** 2:22
**guess** 20:25
**guys** 26:13 57:18

**h**

**h** 4:5 89:3
**hand** 6:9 22:21 25:18 33:15 34:20 37:20 58:13,17 59:7 64:18,20,23 66:1 70:24 74:7
**handbook** 27:18
**handing** 33:23
**handwriting** 80:1
**happen** 56:14
**happened** 35:20 45:3
**happening** 19:3
**harassment** 43:23 49:10
**harm** 1:9 2:2 3:4 4:14 6:3,23 6:24 9:1,3 34:6 38:24
**hear** 22:11
**heard** 6:18
**hearing** 6:7
**held** 58:23 61:13 71:24
**help** 10:21 37:4 66:24
**helping** 30:25
**hereof** 87:5
**hereto** 90:7
**high** 2:5
**hitting** 70:7
**honest** 32:20
**honestly** 10:2
**hopefully** 73:17
**hostile** 38:24 39:15 52:23 53:3,5 76:20
**hour** 50:12 73:19
**hro** 8:25 9:7,13 10:1,7 11:2 12:7 13:4,16 15:17 16:2,13 16:21 20:21 21:21 24:6 33:8,13 35:17 53:20 55:5 56:18 58:17 76:10,24 83:5 83:5 84:21
**hro1277** 66:12 66:14
**hro1278** 68:13
**huh** 6:21 8:3 9:11 12:19 14:7,10 28:18 29:24 39:24 40:8 47:9 54:23 55:14 56:4 60:10,14 65:7

**huhs** 7:8

**i**

**idea** 9:22 21:15 35:24
**identification** 22:24 25:21 33:19 34:23 67:2 71:2 74:11 78:21
**identify** 5:21 34:21
**immediately** 55:9
**implementati...** 34:16
**importance** 46:17
**important** 29:22 61:4
**include** 68:10 79:20
**included** 47:25 68:5 80:21
**incorrect** 74:16
**indicated** 62:13 65:3 69:12
**indicates** 60:11
**indirectly** 87:14
**individual** 52:4
**inform** 48:24
**informal** 65:19
**informally** 78:15
**information** 12:14 15:20 19:9 31:8,21 47:21 79:20 83:25
**informed** 22:19 25:6 37:5 49:9 49:15,17,23 58:10
**informing** 4:8 44:6 49:14
**infrastructure** 34:12
**initial** 30:3 31:20 32:9
**institute** 10:10
**instruct** 16:24 17:9 22:13,17 41:4 50:6 64:1 64:4 79:14 81:20 82:11
**instructing** 82:19
**intended** 5:13
**interest** 37:1 61:12 63:2,4 76:18
**interested** 87:13
**interim** 11:6,17 11:18,18 27:5
**interrupt** 9:18
**interview** 40:19
**interviewed** 40:24 41:21
**investigate** 37:14 40:15 44:12 79:13
**investigated** 68:10 79:10
**investigating** 24:20 61:3
**investigation** 19:10,23 25:13 40:18 41:9,13 41:14,21 42:12 53:23 61:11 63:8 64:10,14 76:18 77:14,15 77:19,20,21,24 79:21 80:22 81:2 82:16,17
**investigative** 21:5,6 40:20
**invoice** 4:13 34:5
**involvement** 14:24
**irs** 75:11
**issue** 22:8 32:16,22
**it'll** 8:11

**j**

**job** 1:21 31:11 31:12
**johnson** 10:10
**joint** 16:4
**jr** 2:18
**july** 1:13 4:9,11 5:6 8:21 24:1,5 24:9,12 29:21 32:4,14 36:1,2 36:5
**jump** 70:23
**jumping** 37:19

**k**

**katz** 60:9
**kayleigh** 1:20 5:3 86:11 87:19
**keep** 18:21 62:21 64:4
**keeping** 62:20
**kelsey** 39:10,16 39:21,21 40:6 40:21 41:17,23 42:1,13,24 43:12 47:19 49:11 50:21 76:25
**kelsey's** 40:3,9 40:9,25 41:7 42:8 45:5 46:22 47:13,16 47:17,23 48:13

49:5
**kept** 47:2,5
**key** 34:14
**kind** 37:10 42:9 43:24
**kinnamon** 1:20 5:3 86:11 87:19
**knew** 69:10 78:8
**know** 7:10,18 9:3,19,19 11:11,12 13:23 14:3,15 15:12 15:19 17:7 18:7 20:14 23:9,10,23 28:19,23 29:13 30:9 32:5,8,11 36:17,20 37:3 37:5 39:11 40:23 42:15 45:2 46:25 47:16 48:21 49:22 62:5 64:6 67:22 68:5,16,19,21 68:22 69:23 73:5,21 76:22 84:3,5,14,20,22
**knowing** 24:25
**knowledge** 13:3 84:25
**known** 78:9
**kpis** 34:15
**ky** 2:21

**l**

**l.p.a.** 1:16 3:6
**language** 29:7 29:12,22,23,25
**law** 29:8,13
**law.com** 2:22
**laws** 5:15
**lawyer** 28:22
**leading** 22:3
**leave** 9:25 15:1 15:4,7 17:19 17:22 18:14,22 19:2 20:4,7,12 38:18 53:13,22 67:24
**led** 33:5 53:12 62:22 65:14
**left** 5:22 10:6 21:21
**legal** 76:17 88:23
**letter** 4:24 41:10 59:16 73:13,15 76:11 77:6 79:5 82:16
**letting** 64:6 67:22
**lgbtq** 10:10
**likewise** 7:13
**limited** 25:3 60:6
**line** 35:10 37:3 89:4,7,10,13,16 89:19
**little** 7:17 13:15 17:12 30:20 35:2 37:19 38:20 50:21 66:8 67:14 70:24
**liz** 17:8
**llp** 2:4
**location** 1:15
**long** 8:10 9:12
**longer** 9:7 29:7 29:12
**look** 21:23 23:1 23:4 26:14 27:7,15 34:2 35:6 37:4,23 37:24 38:5 54:11,21 66:21 66:23 67:20 68:23 69:3,24 71:4 74:18 76:8,9,16 80:13,17
**looked** 10:13 10:15 69:20 74:16
**looking** 9:19 14:22 78:3
**looks** 26:18 58:21 75:6 80:14
**lordy** 26:6
**lot** 19:15 20:16
**lunch** 73:24

**m**

**made** 25:11 42:13 43:8,12 44:3 47:12,19 50:23 51:10 52:2,6 57:10 61:22 72:23,25 73:2 78:3,4 90:5
**main** 21:10
**majority** 40:24 41:20
**make** 4:15 10:16 27:21 30:11,22 33:1 35:4 40:21 59:16 73:24 76:22 82:8
**makes** 7:9
**making** 31:13 31:14
**manage** 39:12
**manager** 39:19 39:22 51:17
**managing** 15:8
**manner** 5:16

**mark** 22:22 25:18 33:16 59:15 70:25 78:19
**marked** 22:23 25:20 33:18 34:22 37:21 64:19 67:1 71:1 74:8,10 76:10 78:20
**marsha** 10:10
**matter** 25:13 37:14 50:4 87:8
**matters** 14:11 14:23 18:23
**mean** 9:9 10:24 11:8 14:13 15:24 19:15 20:13,16 21:11 34:11 44:18 45:21,22 58:2 62:24 65:19 77:21 84:9
**means** 5:17 42:23 75:15
**media** 39:12,18 39:22 51:15,16 77:3
**meet** 70:17
**meeting** 4:19 4:22 15:23,25 19:23,25 20:3 20:6,10,10,17 21:3 33:1 36:22 45:4,6,9 46:7,9,10,11,22 46:25,25 47:1 47:2,14,15,17 47:24 48:1,10 48:14,17,19 52:12,14 53:21 53:25 54:1,2,2 54:5,25 55:8 55:25 56:1,7,7 56:11 57:6 58:11,23 59:5 65:20 66:18 67:6 68:4,11 68:16 71:7,9 71:10,10,14,22 71:24 72:2,5 72:14,17,20 73:4,7,11 74:9 74:15,16,23 75:1,2,3,4 76:2 76:3 78:14,16
**meetings** 15:22 16:2,3 18:23 18:25 20:11,20 22:19 33:3 36:23,23 45:2 45:16,19 46:15 46:19,20 47:3 47:5,6 48:19 54:24 55:13,18 56:3,5,12,13,14 56:16,19 57:3 57:22,22,25 58:1 73:8
**member** 10:8 11:2,5 16:8,12 16:15,18,21,21 16:22,23 17:14 18:1,10,15,19 30:18 33:8,11 43:1,6,13 44:2 47:12 54:25 55:19 75:8,11 76:1
**members** 15:11 18:2,13 39:5,7 42:23 44:6,11 44:14 53:20 54:3 57:10 75:12,25
**mention** 21:4 51:1
**mentioned** 21:4 30:3 36:17,24 38:21 45:6 52:19 80:20
**mentions** 40:17
**messages** 4:18 21:18 66:24
**met** 13:20 53:20
**mind** 42:22
**minute** 34:2 71:4 76:13
**minutes** 4:21 19:9,23,25 20:3,6,10,17,19 21:3 45:19 47:2,5 48:1,10 48:20 50:12 52:16,19 70:7 72:20 73:4,11 73:16 74:9,17 74:21 75:5 76:4 83:14
**missing** 26:8 76:2
**mission** 13:25
**misspoke** 67:18
**mister** 41:24
**mitchell** 2:21
**mitigate** 29:22
**mixed** 74:14
**molly** 76:4
**moment** 23:2 26:3 54:18 74:18
**money** 14:22 60:12,23 61:22 62:16,17
**month** 47:19
**months** 9:24 21:22
**morning** 5:2
**morris** 2:4
**motion** 75:10 75:18,22
**mouth** 60:25
**move** 7:15 14:20

**moving** 29:9
**moyo** 2:3 6:2,2 45:23 68:25 69:3,8,11,16 72:6,18 73:18 73:21,24 74:2 77:7 79:14 80:5,7,24 81:8 81:19 82:11,18 83:7,10 84:2 84:11 85:7,11 85:14

**n**

**n** 2:1 3:1 4:1 5:1 7:23
**name** 5:2 6:18 7:20 18:10 39:10,11 50:23 51:13
**named** 52:4
**names** 39:9
**nature** 53:1,5 65:19 71:11 77:12
**necessary** 90:6
**needed** 10:4 55:9 56:19,20 61:11
**nelson** 21:7 25:15 41:6,10 41:14 49:21,22 50:1,9 77:21 77:23 78:2,8,8 79:16,20 80:14 80:21,22 82:20
**nelson's** 78:5 79:24
**new** 23:7 37:13 37:14
**non** 29:9 31:10
**nonprofit** 13:23 34:11,17 68:7 75:12
**nonprofits** 10:21,22
**nordstrom** 2:19
**notary** 5:7 86:12 87:20 90:13,19
**note** 88:10
**noted** 90:7
**notice** 55:1,5 56:20 57:6,16 57:23 58:1,22
**noticed** 57:1,3 57:8 58:3,6
**notices** 55:17 59:2,4
**november** 73:9 73:12 76:11
**number** 23:12 66:2 80:3 86:15
**numbers** 25:23 26:1

**o**

**o** 5:1
**oath** 86:1
**oaths** 5:8
**object** 16:24 22:13 41:2 50:2 68:25 69:5 77:7 79:14 81:19 84:2
**objection** 5:9 6:8 22:9 36:14 44:8 45:11,23 46:1 48:2,8 49:2,12 53:7 56:22 57:7,17 58:8,24 61:6 61:24 62:4 63:10,25 64:13 72:6,18 80:24 81:8 82:11 83:7 84:11
**objectives** 34:14
**obviously** 7:9 23:10 54:8
**occurred** 26:19 54:9
**occurring** 6:24 17:21
**october** 4:20,21 4:23 71:7,14 71:17 73:7,8 74:9,23 79:22 79:24 80:15,18 80:23 81:6,17 82:5,9 83:3,6
**odh** 67:16,23 84:1,8 85:1
**official** 39:3 54:25 59:15,20 75:10
**oh** 1:19 2:6,13 3:9 10:18 26:6 33:24 38:13 42:9 44:21 58:9 64:21 65:1 66:9,9,16 67:12,18 76:5 78:22 85:13
**ohio** 1:1,9 2:2 3:4 4:14 5:8 6:3,23,24 8:1,2 8:8,10 9:1,4 10:2 34:6 38:25 86:13 87:21
**okay** 6:18 7:3 7:24 8:10,16 8:20,25 9:9,15 9:25 10:7,13 10:18,24 11:7 11:14,19 12:3 12:6,12,17,22 13:1,13 14:1 15:3,6,10 16:7 16:11,20 18:12

18:25 19:7,13 20:6,9,19,23 21:3,3,7,20,20 22:7,21 23:23 24:5,8,12,16,23 25:2,5,14,17 27:1,7,19,23 28:6,8,12,15,21 29:2,18 30:7 30:16,20 31:2 31:22,22 32:8 32:13,21 33:8 33:8,12,15,24 34:7,9,20,24 35:15,19 36:2 36:2 37:19 38:3,7,13,13,20 39:6,13,21,25 40:12,15,21,25 41:13,22 42:5 42:13,17,19,22 43:3,12 44:2,5 44:23 45:1,5,8 45:15 46:6,11 46:14,21 47:8 47:19,23 48:13 48:16 49:17,22 50:8,10,10,20 50:25 51:10,14 51:19 52:1,8 52:14,18,21 53:11,16,19,25 54:5,8,11,15 55:7,11,17,23 57:5,14,21 58:5,13,15,22 59:4,25 60:4 60:23 61:3,15 62:3,13 63:7 63:16,20,22 64:18,21 65:3 65:8,14,18 66:1,9,17,20 67:12,17 68:1 68:3,12,20 69:8,11,24 70:1,6,13,19,23 70:23 71:5,6,9 71:13 72:1,4 72:22 73:2 74:6,20,20,21 74:25 75:6,18 75:25 76:6,16 77:5,16,20,23 78:7,11,14,17 78:25 79:8 80:13,17,20 81:4 82:3,8 83:2,13,24 84:9,17,20,23 84:23 85:3,9

**once** 25:6 32:6 41:8

**ones** 21:10

**operated** 13:19

**opinion** 61:20 62:3

**opportunity** 72:8 79:4

**opposed** 9:3

**order** 40:19 55:8 85:10,13

**ordering** 85:12

**organization** 10:5 13:15,22 15:8 16:9 30:17 46:8

**organizational** 30:25

**original** 31:6 42:14

**originally** 36:3

**outlawing** 29:9

**outlined** 72:12

**outside** 17:1,15 30:17 76:17 81:21,22

**overall** 43:20

**overtime** 29:10

**own** 80:1

**p**

**p** 2:1,1 3:1,1 5:1 10:10

**p.m.** 26:23 29:21 65:6 85:16,18

**page** 4:2,6 23:2 26:24 27:15 35:3,7,7 54:22 60:8 66:11,14 68:12 69:24 70:6,10,11 76:13,16 79:2 79:3 87:5 89:4 89:7,10,13,16 89:19

**pages** 26:16 79:6,6

**paid** 10:24,25 53:22 67:24 75:13

**paperclips** 26:14

**part** 21:10,12 21:25 33:17 42:11 48:10 61:3 63:7 64:10 76:21

**partially** 70:3

**participate** 19:2 32:15

**participating** 31:23

**particular** 71:18

**parties** 5:10 37:15

**party** 40:18 42:3,11 44:12 78:4

**passed** 51:23

**patrick** 52:4

**pending** 15:22 63:15

**people** 7:14 34:14 53:16
**percent** 27:12
**period** 11:14,15 57:23 76:1
**permit** 79:17
**permitted** 5:13
**person** 39:22 39:23 50:23 52:1,2 68:10
**personally** 86:4
**perspective** 30:8
**petty** 68:14
**phone** 44:23
**picked** 71:18
**place** 35:9,10 46:20 53:22 87:5
**placed** 15:4,7 17:22 18:14,22 19:1 20:4,7,11 53:13
**placing** 38:17
**plaintiff** 2:2,10 5:25 6:3
**plaintiffs** 1:5 1:10 3:2
**planning** 10:23 34:12
**plans** 73:24
**play** 37:6
**please** 5:21 7:20 26:4 58:17 59:8 65:9 74:19
**point** 11:6 17:25 31:7,9 48:22 83:21
**pointed** 69:13
**policies** 31:1 34:13
**policy** 24:6,7,8 24:10 37:1,2,6 37:7,10,13,14 63:2,4
**poorly** 31:24 42:6
**porter** 2:4
**porterwright....** 2:7
**portion** 38:14 68:6 77:6
**position** 13:4 23:25 51:25 56:19
**possession** 63:23
**possible** 55:10
**potential** 4:9 22:4,8 24:20 24:23 25:2,7 30:13 36:10,14 39:17,19 61:4 63:8 64:11 71:21 73:9
**potentially** 37:2
**practice** 13:23 30:15 31:10 37:3,7,11 63:6 68:7,9
**practices** 75:12
**preceding** 66:23
**preparation** 19:4 20:24
**prepared** 15:17
**presence** 17:1 17:15
**present** 17:1,8 45:15,18 48:16 76:2
**presented** 42:24,25
**president** 11:5 11:7,8 12:7,18 12:25 13:5 14:5,9,12
**pretty** 10:3 60:6 80:4
**previous** 38:21
**previously** 37:21 64:19 76:10 78:7
**prior** 15:6,6 18:20,25 19:1 20:11 23:11,25 24:5,8 41:22 43:10 45:8 48:25 67:13
**privilege** 50:5
**privileged** 82:22
**privileges** 50:4
**pro** 2:11
**probably** 11:10 73:19
**problem** 62:22
**procedural** 5:14
**procedure** 62:22
**procedures** 31:1 34:13 62:20,25
**proceed** 23:16 64:7
**proceeding** 1:15 5:4,12 85:19
**process** 30:9,15 62:20
**processes** 62:21 62:24
**produce** 23:10 40:19
**produced** 5:12 23:8,11,13 63:9 64:12
**production** 23:7
**profit** 31:10
**programs** 33:4

**promotion** 51:23,24 52:2
**proper** 25:12 44:12
**properly** 57:1,3 57:6,7 58:3,6 73:11
**protected** 30:13
**provide** 14:15 14:16 15:15 25:23,25
**provided** 20:17 20:19 57:11 79:19,23 81:1 81:11,25 82:4 84:21 85:1
**providing** 81:4 81:15
**public** 86:12 87:20 90:19
**punishment** 68:15
**purports** 23:24
**purpose** 71:13 74:22,25 75:2
**purview** 14:3,4
**put** 15:1,3 17:18 26:7,10 31:9 60:24
**putting** 67:23 75:9

**q**

**quarterly** 56:13
**question** 7:11 7:12,16 17:12 18:16,18 36:6 41:16 42:5,6,6 49:5 56:2,23 57:19 58:5 61:8,19 62:6,8 62:12 63:14,15 63:17 67:3 69:18 81:11,15 84:18
**questions** 6:22 7:6 8:7 22:16 50:6 60:5 76:7 76:12 83:20 85:5,7
**quick** 9:18 35:7 74:18 76:8,9
**quote** 75:16
**quotes** 75:15

**r**

**r** 2:1 3:1 5:1 7:23 87:1 89:3 89:3
**racial** 39:17 40:10 43:21 49:10 51:1
**raina** 1:7 3:3
**raise** 6:9
**read** 7:10 67:11 74:20 75:6 80:1 85:8,9 88:9 90:5
**reading** 19:18 27:3 60:5 67:15
**real** 9:18 35:6 38:6 76:8,9
**really** 24:21 60:5
**reason** 21:25 22:1 47:25 71:18,20 88:11 89:6,9,12,15,18 89:21
**recall** 10:11 11:19,24 12:5 13:11,11,12 14:13 16:11,14 16:17,19,20 17:21 18:13 19:3,14,25 20:2,9 23:19 24:16,18 27:12 27:20,22 28:7 28:8 32:3,5,18 32:21 38:25 39:2 40:23,25 41:19,19,20 42:13,15,18 43:1,7,13,19,22 43:24 44:1,2 44:10,25 46:13 46:24 47:13,15 47:19 48:4,11 48:13,18,18 49:7,7,8,13,14 50:23,25 51:8 51:10,24,25 52:1,7,10,17 53:1,8,12,18 54:5,7 59:6 63:11,20,21,22 63:24 64:16 65:21,25 67:25 71:11,20,23 72:13,15,16 73:10 77:12,13 77:16,18 80:25 81:24 82:1,3,6 82:24 83:11,21 84:4,12,13,13 84:17
**receipt** 24:12 88:17
**receipts** 34:16
**receive** 15:13 15:25 33:9,12 41:17 42:17,19 79:4
**received** 15:18 15:20 31:7,21 38:23 42:15,19 50:22 52:1 80:8 81:1 83:12

**receiving** 23:19 24:1 36:18 39:2,3 53:15 79:7
**recently** 28:22 29:8
**recollection** 15:5 16:4,10 17:17,19 35:25 36:9 39:16 40:9 42:25 45:3 51:21 52:5 55:22 72:7 74:22 78:16
**recommendat...** 25:8,12 30:4 31:13 78:3,4,6
**recommendat...** 25:5
**recommended** 36:24 78:11
**record** 5:4,5,9 5:21 22:14 27:13 50:15,16 50:17 59:23,25 60:1,2 74:1,2,3 74:4 83:16,17 85:15 87:10
**recorded** 5:16 48:19 87:8
**recording** 5:12
**redacted** 79:23
**reduced** 87:9
**reduction** 1:9 2:2 3:4 4:14 6:3,23,24 9:1,4 34:6 38:25
**reese** 4:8 22:4,8 22:20 24:2 25:10 30:6,14 31:8 32:7,10 32:16,22 33:5 35:21 36:10,25 39:3,14 50:7 52:24 61:13 76:19
**reese's** 60:20 63:8 64:11 83:21
**referenced** 12:18 31:6 55:25 56:1 88:6
**references** 16:11,14 53:25 55:12 56:3,5
**referencing** 51:6,8 65:4
**referring** 27:11 27:20 28:19,24 29:14 30:1 31:5,18 36:15 38:13,16 49:20 60:13,19,20,25 66:17,22 67:9 68:1 74:14 75:13 77:5
**refers** 54:24 67:21
**reflect** 31:24 41:10
**refresh** 74:22
**regard** 36:11 36:11 57:15 81:5,6,17
**regarding** 32:16 35:21 36:10 38:23 41:23,24 42:7 72:10 82:4 83:6,25
**regular** 11:4 46:7,9,19,24 56:14 57:22 71:10
**regularly** 13:21 55:24 56:12
**related** 31:16 62:21
**relative** 87:12
**relevance** 83:7
**remember** 9:17 11:22 17:17,23 17:25 18:10 19:18,21 23:21 24:22 28:11 29:3,15,16,16 30:2 32:5,11 32:19,24 36:17 37:9 39:8,11 42:21 43:10 51:12,12 53:15 73:5 79:7
**reminger** 1:16 3:6
**reminger.com** 3:10 88:2
**remote** 1:15
**removed** 75:5 75:10
**repeat** 67:3
**report** 21:5 40:20 77:21 79:24 80:8,10 80:14,21
**reported** 1:20
**reporter** 5:2,3 6:7,15 8:4 38:1 38:10 40:1 50:15,17 59:9 59:11,13,19,23 59:25 60:2 64:24 66:4 73:25 74:4 83:15,17 85:9 85:15 86:12
**reports** 15:13
**represent** 6:19
**representation** 69:5
**representing** 5:23
**request** 30:24 71:15

**requested** 75:3
**require** 57:23 57:25 82:12
**required** 29:10 90:13
**requirement** 58:1
**requires** 54:25
**reserved** 85:17
**resolved** 41:1
**resources** 31:4
**respect** 17:9 41:3 50:4,7 79:17
**response** 26:23 62:23 70:16
**responsibility** 13:24,25
**rest** 68:23 69:13,20
**resulted** 25:15
**results** 34:14 82:15,17
**retained** 77:23 78:2,12
**retaliation** 76:19
**return** 88:13,16
**reveal** 17:6 81:23 82:20,22
**review** 19:22 20:6 23:2 26:3 28:22 52:16 54:19 72:19 73:4,11 76:13 79:4 83:21 88:7
**reviewed** 19:4 19:8,22 20:1 20:15,23 21:1 21:9,17 24:11 61:23 63:13 76:15 78:23 84:19
**reviewing** 19:14 23:20 61:16 74:21 83:24
**revolves** 22:1
**right** 6:9 26:9 26:10,16 33:23 43:7 45:21 49:13 50:15 52:6 54:20 60:4 66:5 69:6 75:9,21 83:15 84:12
**righty** 23:17
**risk** 29:22
**road** 70:7
**role** 6:23,24 8:17 9:16 10:2 10:3 11:2 12:23 13:13,16 15:8,10 24:2 30:17 33:10,13 38:24 39:12 84:23
**roles** 11:3 14:24
**rough** 9:22
**ruled** 50:3
**rules** 5:15 7:5
**run** 16:3

**s**

**s** 2:1 3:1 4:5 5:1 7:23 89:3
**salary** 60:25 61:16
**saw** 78:7
**saying** 9:3 18:21 60:19 68:14
**says** 27:8,17 28:16,21 29:6 29:11 30:21 31:2,23 34:11 54:24 55:17 66:18 67:5 68:3,15 70:2,3 70:6,12 76:4 76:17,23
**schang** 3:10 88:2
**schedule** 57:11
**scheduled** 55:24 56:12
**scheduling** 4:19 71:6,14
**scope** 4:17 35:5
**screen** 4:18
**screwed** 74:7
**se** 2:11
**second** 27:15 31:11 33:16 37:24 51:3 59:14 73:25 75:18,20,21 76:16 79:5
**seconded** 75:22
**secretary** 48:21 55:18,20
**section** 54:21 55:12,25 56:1 56:3,5,7,8
**see** 27:2 29:22 38:16 54:13 55:2,15 56:17 60:13 61:5 67:8 70:5,22 75:13 76:5 81:25
**seeing** 16:11
**seem** 70:20
**seemed** 37:10 72:12
**seems** 27:3,4 68:18
**seen** 12:17,20 12:21 19:12 21:2 58:20 69:20
**semi** 33:9

**send** 70:4,15
**sending** 27:9 27:10 28:22 65:14
**sends** 66:19 67:7 68:5
**sent** 26:20 27:13 29:4 55:18 59:4 62:1 65:6,10 65:11 67:16 73:13 79:3 83:4 88:14
**sentence** 29:6 60:13
**separate** 80:21
**september** 4:15 8:11,23,23 35:4,8,17,20 36:1,3 38:14 41:22 43:10 45:8 47:22 49:1 54:9 58:23 59:5 62:13 65:16 67:21
**serious** 43:14 44:7 45:22,25 49:9
**seriously** 40:13
**seriousness** 42:2,10
**services** 10:25 35:16
**set** 87:5
**several** 10:6 14:13 76:23
**sexual** 51:1
**shared** 12:14
**she'll** 64:19,20
**shearer** 2:18,19 4:3 5:23,23 6:17,19 8:6 13:8 17:20 22:21,25 23:9 23:18 25:18,22 26:2,6,9,13,17 28:1,5 33:15 33:23 34:1,20 35:1 36:5,7 37:18 38:3,4,9 38:11,12 40:2 40:7 41:12 44:13 45:14,24 46:3 48:6,12 49:4,16 50:8 50:10,14,19 53:10 54:17 57:2,13,20 58:12,14,16,19 59:3,7,10,12,21 59:24 60:3,18 61:9 62:2,10 63:12,19 64:8 64:17,25 65:2 65:13 66:2,5,6 66:21 67:4 69:2,6,9,12,19 70:23 71:3 72:9,21 73:20 73:23 74:6,12 77:10 78:17,24 79:22 80:6,12 81:3,12 82:2 82:14 83:1,13 83:18 84:6,16 85:5,8,13
**sheet** 88:11
**shortcut** 80:5
**shot** 4:18
**show** 35:23
**sign** 88:12
**signature** 35:9 35:11,12,13 85:17 86:10 87:18
**signed** 88:19
**simple** 60:6 62:7
**simply** 65:23 69:13
**single** 19:18
**sit** 49:8
**situation** 23:22 25:10 31:16,18 32:10 35:25 36:17 37:8 41:7 42:2,10 46:16,18 54:4 62:6
**six** 9:24 21:22 75:25
**skill** 87:11
**skipped** 70:11
**social** 39:12,18 39:22 51:15,16 77:3
**solutions** 88:23
**soon** 54:3 55:9 76:24
**sorry** 8:5 18:21 21:5,20 22:11 26:6,6 28:20 29:19 36:5,6 40:6 41:16 44:20 56:2,22 56:25 58:9 60:16 64:20 65:11 66:9,10 66:13 67:3,18 69:18 70:10,11 70:11,12 76:5 77:11
**sought** 40:17
**sounds** 85:15
**south** 2:5
**southern** 1:1
**space** 75:3
**speak** 41:8 75:3
**special** 55:12 55:17,25 56:5 56:7,13 57:22 71:9
**specific** 17:23 17:24,24 20:2 57:15,21 68:19

71:11,11,20 73:10
**specifically** 19:13 25:11 41:6,8 47:16
**specifics** 43:22 43:25 44:1 51:19 53:9 77:16
**speculate** 27:24 28:3,4,25
**speed** 73:17
**spell** 7:21
**spend** 10:4
**squared** 74:17
**stack** 59:22
**staff** 15:11 16:21 33:2 38:22 39:1,5,6 40:19,24 41:20 52:22 53:14,17
**stamped** 23:5 66:12
**standing** 36:13 57:7 83:7
**start** 7:13 64:5
**started** 7:20 8:22 10:20 11:4 18:3
**state** 62:14 75:12 86:13 87:21
**stated** 75:9
**statement** 58:6 69:1
**states** 1:1
**stenographic** 5:17
**steps** 44:12
**steven** 3:5 6:4 88:1
**steward** 1:7,12 3:3 4:11 5:6 6:6,11,18 7:21 7:23,24 22:22 25:19 33:16,21 34:21 50:20 60:4 66:3 70:25 74:6,8 78:19 83:19 88:4,5 89:1,2 89:24 90:1,2,4 90:12
**stick** 31:13
**sticker** 26:10
**stipulation** 5:18
**stock** 34:16
**strategic** 10:22 34:12
**street** 1:17 2:5 3:7
**subject** 17:7 35:4 50:4,5 65:6
**subjects** 20:9 20:10
**subscribed** 90:14
**subsequent** 24:13
**subsequently** 62:3 75:23
**suggested** 29:23
**suggesting** 67:10
**suggests** 61:16
**suite** 1:18 3:8
**summary** 84:25
**supervisor** 13:20
**supplied** 84:1
**support** 10:21
**supposed** 17:4 26:14 31:12
**sure** 7:3,22 11:11 19:17 21:13 28:10 30:11 31:13 50:13 56:3,23 59:16 71:13 76:22 79:25
**suspension** 18:21 19:11
**sustainability** 10:21
**swear** 6:8
**sworn** 5:10 6:12 86:5 87:6 90:14

**t**

**t** 4:5 7:23 87:1 87:1 89:3,3
**take** 5:4,7 7:9 7:18 8:20 23:1 23:1,3 26:3 34:2 35:6 37:23 54:18 57:5,6 71:4 74:18 76:13 80:13 81:5,16 85:14
**taken** 5:6 7:1 61:11 87:4,10
**talk** 21:13,14 25:15 35:19,24 50:21 52:21
**talked** 30:22 32:6 39:9 61:10
**talking** 7:14 9:1 29:25 50:20 76:22
**tasha** 1:8 3:3 68:18,24 69:4 69:6,13,14,15 69:21,22
**tell** 6:13 15:10 19:7 21:20 23:24 24:16 30:20 34:3 36:8 37:23 38:25 46:14

51:19 56:10 62:11 72:4 78:1 79:12
**tendency** 7:14
**tenure** 8:18 16:3,23 20:21 55:20
**term** 14:5
**terminate** 72:23 73:1
**terminated** 41:10
**terminating** 73:13
**termination** 19:11 22:2 41:9 71:21 72:13,16 73:9 74:15 76:11
**testified** 6:14
**testify** 17:15 41:3 80:7 87:6
**testimony** 69:22 88:9,17 90:8
**text** 4:18 21:18 66:17,23 67:21 68:13,15,16,19 69:10,10 70:2
**texts** 68:23 69:14
**thank** 6:7 17:16 22:18 38:11 50:10 54:16 69:16 85:6
**thanks** 27:8,10 28:21 37:25
**thereof** 22:2
**thick** 80:4
**thing** 12:20 14:8 59:18,19 76:14 78:17
**things** 14:18 34:17 78:18
**think** 11:4,10 17:12 21:4 28:2 29:10 51:1 58:16 60:11 61:4 62:9,14,15 66:18 67:5 74:17 79:25
**third** 40:18 42:3,11 44:12 66:11,14 78:4
**thought** 14:17 14:18 24:19 42:2,10 43:14 61:11 69:12 73:22
**three** 10:20 23:2 32:20 79:5
**time** 1:14 5:20 10:4,6 11:15 11:15 12:3 13:6,9,17 16:22 19:10,11 20:18 22:12,12 23:14,21 24:25 25:12 28:14,20 30:2,10,12,15 31:3,12,15,17 32:12,12,14 33:1,5 36:20 36:21 37:9,15 37:17 39:4,19 45:3 46:16,20 48:23,25 50:17 56:15 57:11,15 58:11 60:7 61:25 62:19 72:11 73:6,19 74:4 78:10 81:6 85:16 87:5 88:18
**timeframe** 88:8
**timeframes** 9:23 11:19
**timing** 11:23
**title** 13:5 51:12 51:14 87:5
**titled** 35:3
**titles** 11:3
**today** 6:22 7:6 7:17 19:5 21:15 44:7 49:8 53:21
**today's** 20:24
**together** 32:20 54:3 78:9
**told** 7:4 28:25 49:24 76:24 77:2 82:15
**took** 10:2 40:12 41:4 46:20 81:22
**top** 60:7 79:25
**topic** 82:5
**topics** 71:22
**towards** 29:9
**transcript** 5:11 86:4 87:4,10 88:6,19 90:5,8
**trinh** 75:8
**true** 87:10 90:8
**truth** 6:13,13 6:14 87:6,7,7
**truthfully** 44:25
**try** 7:14 55:9
**trying** 9:22 14:2 18:17 21:15 24:21
**turnell** 1:8 3:3
**two** 8:7,11,11 8:16 10:11 18:9 23:2 26:16 27:10 39:5,6,9 55:1 55:19 83:13
**type** 14:11,11 34:9 46:11
**types** 34:17 46:14

**typewritten** 87:9
**typically** 15:21

**u**

**uh** 6:21 7:8,8 8:3 9:11 12:19 14:7,10 26:25 26:25 28:18 29:24 39:24 40:8 47:9 54:23 55:14 56:4 60:10,14 65:7
**uhs** 7:8
**ultimately** 25:15 71:24 72:23 73:12
**unanimously** 53:22
**under** 5:14 48:22 54:21 55:11,12 56:7 56:7 87:9
**undersigned** 86:3
**understand** 5:11 12:6 18:17 25:10 30:8 57:18 62:8,11,12 64:15
**understanding** 9:7 11:13 12:8 12:12,16 13:2 13:3,4,18,23 18:18 35:18 36:16 37:13,15 45:13 47:7 53:3 54:1 55:23 56:6 59:1 75:17 78:5
**unfolded** 36:1 36:9
**united** 1:1
**unknown** 52:2
**update** 14:15 30:25 37:12
**updates** 13:21
**updating** 34:13 37:2 62:21,24 63:1
**uphold** 13:25
**use** 11:13 14:6 36:14 37:13
**used** 31:4 88:19
**uses** 5:13

**v**

**v** 1:6 88:4 89:1 90:1
**vague** 57:17 63:10 72:18
**vagueness** 64:13
**value** 25:1
**varied** 15:24 16:1
**velocity** 23:25 24:2 31:19,25 32:17,23 35:22 36:12 60:21,25 61:5,17,21,22 64:12 83:22
**verbal** 38:22 39:1,4 40:10 42:21,21 43:2 43:24 52:22 53:11
**verbally** 7:7 43:4
**verify** 88:9
**veritext** 5:4 88:14,23
**veritext.com.** 88:15
**version** 23:14 79:23
**vice** 11:5,7,8,8 11:9,14,20,23 12:1
**victory** 10:11
**videoconfere...** 2:3,11,18 3:5
**vote** 18:23 75:23
**voted** 65:23 72:16 75:25
**votes** 19:2

**w**

**w** 7:23,23
**waive** 85:11
**waived** 80:10
**want** 7:21 14:5 17:6 18:7 20:14 35:24 37:20 38:20 48:5,9 54:13 59:23 60:24 64:3 66:7,21 66:23 67:10,20 70:4,14,15,23 74:7 76:13,21 78:18,22 85:9
**wanted** 30:11
**wanting** 30:14
**warning** 80:10
**way** 87:13
**we've** 50:11 61:10 73:18 74:8
**website** 39:12 39:19 51:17
**weeks** 55:1,19
**went** 31:22 71:16
**william** 1:7 3:3
**withdrawals** 15:13
**withdrawing** 14:22

**witness** 5:10,10 6:6,8,12 8:5 16:25 17:4,11 17:16 22:11,15 22:18 23:17 28:4 33:22 34:24 36:6,16 40:5 41:7 44:10 45:13 48:4,9 49:13 50:13 53:8 54:13,15 56:25 57:10,18 58:9 59:1 60:17 61:8,25 62:5,9 63:11,14,16,18 64:1,5,16 65:1 65:10 67:3 69:18 72:7,19 78:22 79:15,19 80:25 81:10,24 82:23 83:9,11 84:4,12 86:3 87:3 88:8,10 88:12,18
**word** 19:21 36:14 77:7
**worded** 42:6
**words** 60:24
**work** 15:23 31:19,25 34:9 34:10 37:12 38:24 39:15 51:17 52:23 53:3,5 70:7 76:20
**worked** 78:7,9
**works** 7:4
**wright** 2:4
**write** 21:24
**writing** 14:23 42:20 43:24
**written** 5:18 17:24 38:22 39:1 40:21 41:17 52:22 53:11 55:1
**wrote** 26:11

**x**

**x** 4:1,5

**y**

**y** 7:23
**yard** 1:17 3:7
**yeah** 8:19,24 9:5,21 10:20 15:1 18:9 21:18 25:14 26:13 27:2,16 33:17 34:11 36:8 48:9 51:6 53:8 55:16 58:16 59:10,17 59:24 64:9 66:10,14 67:13 68:2 69:3,16 75:21 78:9 79:1,1 80:6 81:14 82:23 83:9,19 84:4 85:13,13
**year** 11:21 15:17 56:12
**years** 8:11,12 8:16 9:14 10:21 18:9 39:9
**yep** 50:14 76:5
**yesterday** 38:2 73:21

**z**

**zoom** 44:24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**From:** **Dennis Cauchon** dennis@HarmReductionOhio.org
**Subject:** AmandaLynn...potential conflicts and disclosure
**Date:** July 16, 2024 at 11:08 AM
**To:** Dwayne Steward dwayne@makeitbetterconsulting.com

I got a Facebook feed for a one-day peer specialist conference by a group I'd never heard of: On the Front Lines Community Alliance.

When I checked them out, I see that AmandaLynn is on its board and her biography also says she is Director of Government Advocacy with Velocity Biogroup, a Colorado company.

**Velocity Biogroup**'s web site is here. Velocity is a "solutions" business that does PR, advocacy, lobbying, contract negations, etc. in the substance use, pharma and federal government markets. From my research, they appear to have large contacts to promote Kloxxado and Zimhi (high dose naloxone), as well as some forms of MAT. Company refers to SUD contract

This is one description the company supplied to a business web site: "Velocity Biogroup is a strategic alliance of long-serving leaders from the pharmaceutical, biologics, medical device, and federal markets, with deep ties to the commercial and government payer worlds, as well as the public relations and advocacy groups. Their major goal is to assist the company in developing a compelling recipe for the success oftheir key items as they enter the market. The US Department of defense, US department of veteran affairs, US public health services, center for disease control, national, regional, and local private healthcare plans, center for medicare & Medicaid services, Ryan white care act and state ADAP programs, Indian health services, and the federal bureau of prisons are among their areas of expertise."

The company appears to have many "directors of government advocacy." It's likely a paid, contract position, but I am not sure.

A couple of weeks ago, the big harm reduction list serve had comments criticizing Hikma, which makes 8mg Kloxxado (which we distribute even though harm reduction circles don't like high dose). AmandaLynn posted a brief defense of Hikma to the list serve, noting they do good such as hiring people with criminal records. All fine..but problematic if she has an undisclosed relationship with a firm promoting Hikma and Kloxxado.

**On the Front Lines Community Alliance** is new group that hopes to be a kind of trade group for peer specialists. It's run by a harm reduction specialist Hannah Schilling at Hamilton County Public Health. (I do not know Hannah.) It's a group that just go its 501c3 in February. Its first 990 reports $1,000 in annual revenue.

The idea of organizing peer specialists is good and important. I've talked about trying to do it with Jamie Decker and other peers. I have no problem with this effort. However, it is 100% funded by OMHAS and the treatment industry. OMHAS pushes out about $5-10 million a year to groups that claim to represent the impacted population. The Prevention Action Alliance (former Drug Free Ohio), Peer Recovery Organizations, Ohio Citizens Advocates for Addiction Recovery, etc. These groups are harm reduction friendly to varying degrees, from barely to a lot. Some good people in recovery work with them (although not in senior positions).

I have no problem with these groups and sometimes work with them a little. These groups have resources that peers can easily get. However, this structure of peer representation being funded and controlled by employers and OMHAS (which regulates peers) could be problematic long-term. The peers core gripes are pay, working conditions, advancement, etc.

The new group On the Front Lines is serving as the grassroots front person for a nine-month series of networking lunches for peers around the state and a Peer Summit in September at the Hamilton County Coroners Office/Crime Lab. The funding appears to be OMHAS to Peer Recovery Organizations to the Weitzman Institution (a big non-profit health care provider in Connecticut) to the new On the Front Lines as the upstart organizer.

To me, it's fine to work with these groups, serve on panels, etc. But I don't like HRO being a part of the governing board of an organization that is only partly aligned with our mission.

So that's the overview. Thanks for thinking about this.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

EXHIBIT
tabbies
Steward 1

**From:** **Dennis Cauchon** dennis@HarmReductionOhio.org
**Subject:** Fwd: AmandaLynn...potential conflicts and disclosure
**Date:** July 17, 2024 at 10:04 AM
**To:** Cecile Katz cecile@harmreductionohio.org

DC

This is what I wanted to talk about. AmandaLynn is doing some volunteer and paid(?) work that I was not told about that raises concerns about conflicts with HRO's work. I summarized at length in email to Dwayne.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

Begin forwarded message:

**From:** Dennis Cauchon <dennis@HarmReductionOhio.org>
**Subject:** **AmandaLynn...potential conflicts and disclosure**
**Date:** July 16, 2024 at 11:08:58 AM EDT
**To:** Dwayne Steward <dwayne@makeitbetterconsulting.com>

I got a Facebook feed for a one-day peer specialist conference by a group I'd never heard of: On the Front Lines Community Alliance.

When I checked them out, I see that AmandaLynn is on its board and her biography also says she is Director of Government Advocacy with Velocity Biogroup, a Colorado company.

**Velocity Biogroup**'s web site is here. Velocity is a "solutions" business that does PR, advocacy, lobbying, contract negations, etc. in the substance use, pharma and federal government markets. From my research, they appear to have large contacts to promote Kloxxado and Zimhi (high dose naloxone), as well as some forms of MAT. Company refers to SUD contract

This is one description the company supplied to a business web site: "Velocity Biogroup is a strategic alliance of long-serving leaders from the pharmaceutical, biologics, medical device, and federal markets, with deep ties to the commercial and government payer worlds, as well as the public relations and advocacy groups. Their major goal is to assist the company in developing a compelling recipe for the success oftheir key items as they enter the market. The US Department of defense, US department of veteran affairs, US public health services, center for disease control, national, regional, and local private healthcare plans, center for medicare & Medicaid services, Ryan white care act and state ADAP programs, Indian health services, and the federal bureau of prisons are among their areas of expertise."

The company appears to have many "directors of government advocacy." It's likely a paid, contract position, but I am not sure.

A couple of weeks ago, the big harm reduction list serve had comments criticizing Hikma, which makes 8mg Kloxxado (which we distribute even though harm reduction circles don't like high dose). AmandaLynn posted a brief defense of Hikma to the list serve, noting they do good such as hiring people with criminal records. All fine..but problematic if she has an undisclosed relationship with a firm promoting Hikma and Kloxxado.

**On the Front Lines Community Alliance** is new group that hopes to be a kind of trade group for peer specialists. It's run by a harm reduction specialist Hannah Schilling at Hamilton County Public Health. (I do not know Hannah.) It's a group that just go its 501c3 in February. Its first 990 reports $1,000 in annual revenue.

The idea of organizing peer specialists is good and important. I've talked about trying to do it with Jamie Decker and other peers. I have no problem with this effort. However, it is 100% funded by OMHAS and the treatment industry. OMHAS pushes out about $5-10 million a year to groups that claim to represent the impacted population. The Prevention Action Alliance (former Drug Free Ohio), Peer Recovery Organizations, Ohio Citizens Advocates for Addiction Recovery, etc. These groups are harm reduction friendly to varying degrees, from barely to a lot. Some good people in recovery work with them (although not in senior positions).

I have no problem with these groups and sometimes work with them a little. These groups have resources that peers can easily get. However, this structure of peer representation being funded and controlled by employers and OMHAS (which regulates peers) could be problematic long-term. The peers core gripes are pay, working conditions, advancement, etc.

The new group On the Front Lines is serving as the grassroots front person for a nine-month series of networking lunches for peers around the state and a Peer Summit in September at the Hamilton County Coroners Office/Crime Lab. The funding appears

to be OMHAS to Peer Recovery Organizations to the Weitzman Institution (a big non-profit health care provider in Connecticut) to the new On the Front Lines as the upstart organizer.

To me, it's fine to work with these groups, serve on panels, etc. But I don't like HRO being a part of the governing board of an organization that is only partly aligned with our mission.

So that's the overview. Thanks for thinking about this.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

**From:** **Dwayne Steward** dwayne@makeitbetterconsulting.com
**Subject:** Re: FYI...HRO's current conflict of interest policy
**Date:** July 16, 2024 at 2:07 PM
**To:** Dennis Cauchon dennis@harmreductionohio.org

DS

Just as a follow, the language is important to mitigate risk. See suggested language below.

Do say:

"These activities are not allowed on company time, and company resources cannot be used for these activities."

Don't say:

"You're not allowed to do these activities if you work at HRO."

Do say:

"Participating in these activities could reflect poorly on the agency, so it must be made clear that these activities are not done in association with your work at HRO. Please remove all mention of your employment with HRO when you are engaged in these activities."

Don't say:

"You are required to cease these activities to remain employed at HRO."

I hope this helps!

Dwayne Steward, MPA
Founder and CEO
Make It Better Consulting

make it better
CONSULTING
makeitbetterconsulting.com
dwayne@makeitbetterconsulting.com
(614) 859-9627

On Tue, Jul 16, 2024 at 11:56 AM Dwayne Steward <dwayne@makeitbetterconsulting.com> wrote:

> I was going to ask for this. Thanks for sending. Had a lawyer reviewed this recently? There might be some language in here that is no longer allowed per employee law. There have been some changes recently. They're moving towards outlawing non-compete clauses, and I don't think required overtime is allowed anymore.
>
> https://www.ftc.gov/news-events/news/press-releases/2024/04/ftc-announces-rule-banning-noncompetes
>
> https://joinhomebase.com/blog/is-mandatory-overtime-legal/
>
> I have a lot of thoughts about AmandaLynn's situation. You'll need to be delicate if you approach her. So you stay on the right side of employee law.
>
> Looking forward to chatting at 1:30.
>
> Sincerely,
> Dwayne
>
> Dwayne Steward, MPA
> Founder and CEO
> Make It Better Consulting
>
> make it better
> CONSULTING
> makeitbetterconsulting.com
> dwayne@makeitbetterconsulting.com
> (614) 859-9627

EXHIBIT
Steward 2

On Tue, Jul 16, 2024 at 11:42 AM Dennis Cauchon <dennis@harmreductionohio.org> wrote:
It's from our board-approved employee handbook.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

# INVOICE

**Make It Better Consulting, LLC**
1345 Hildreth Ave, Columbus, OH 43203,
UNITED STATES
Tax ID: 82-1975532
dwayne@makeitbetterconsulting.com; Website:
http://makeitbetterconsulting.com

**Invoice No#**: 0023
**Invoice Date**: Jul 16, 2024
**Due Date**: Aug 15, 2024

**$2,040.00**
**AMOUNT DUE**

**BILL TO**
Harm Reduction Ohio
Dennis Cauchon
935 River Rd., Suite G, Granville, OH 43023,
UNITED STATES
dennis@harmreductionohio.org
Phone: +1 740-973-3814

| # | ITEMS & DESCRIPTION | QTY/HRS | PRICE | AMOUNT($) |
|---|---|---|---|---|
| 1 | Non-Profit Infrastructure Development & Strategic Planning Consultation Fees<br>Monthly fee for consultation services that include but are not limited to: - Operations audit, policy review and OKR development - Workforce training and development of individual work plans - Staff Retreat Facilitation - Programs implementation and grants management strategic planning | 24 | $85.00 | $2,040.00 |
| 2 | Admin Fee<br>Only pay the admin fee if paying through the PayPal portal. | 1 | $81.60 | $81.60 |

| | |
|---|---|
| Subtotal | $2,121.60 |
| Other discount | -$81.60 |
| Shipping | $0.00 |
| **TOTAL** | **$2,040.00 USD** |

EXHIBIT
tabbies
Stewart 2

**NOTES TO CUSTOMER**
PAYMENT OPTIONS:

PayPal:
dwayne@makeitbetterconsulting.com
NOTE: 4% Admin Fee Assessed Per Invoice

-OR-

Direct Deposit (Wire Transfer):
Account Number: 01770419975
Routing Number: 044000024

-OR-

Zelle:
dwayne@makeitbetterconsulting.com

-OR-

Checks payable to "Make It Better Consulting, LLC"
Mail to: 1345 Hildreth Ave. Columbus, OH 43203

**TERMS AND CONDITIONS**

SCOPE OF WORK OUTLINED IN SERVICES AGREEMENT

INVOICE MUST BE PAID WITHIN 30 DAYS OF RECEIPT

**ATTACHMENTS**

MIBC-Services-Agreement_Harm Reduction Ohio 4.4.24.pdf

**From:** **Dennis Cauchon** dennis@HarmReductionOhio.org
**Subject:** Fwd: Make It Better Consulting Contract Extension and Scope Expansion
**Date:** September 3, 2024 at 10:01 AM
**To:** Cecile Katz cecile@harmreductionohio.org

DC

Extension of Dwayne's contract. Can you attach my signature and send back to me and Dwayne. Thanks.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

> Begin forwarded message:
>
> **From:** Dwayne Steward <dwayne@makeitbetterconsulting.com>
> **Subject:** **Make It Better Consulting Contract Extension and Scope Expansion**
> **Date:** September 3, 2024 at 8:00:00 AM EDT
> **To:** Dennis Cauchon <dennis@harmreductionohio.org>
>
> Hello Denis, see updated contract attached. It includes the board recruitment services and extends the contract through January to give us more time to finish the board work and OKR development.
>
> Please sign and return at your earliest convenience.
>
> Sincerely,
> Dwayne
>
> Dwayne Steward, MPA
> Founder and CEO
> Make It Better Consulting
>
> make it better
> CONSULTING
> makeitbetterconsulting.com
> dwayne@makeitbetterconsulting.com
> (614) 859-9627

**MIBC-Services-Agreement_Harm Reduction ...**
241 KB

EXHIBIT
tabbies
Steward 4

**From:** **Cecile Katz** cecile@harmreductionohio.org
**Subject:** Re: Make It Better Consulting Contract Extension and Scope Expansion
**Date:** September 3, 2024 at 11:04 AM
**To:** Dennis Cauchon Dennis@harmreductionohio.org, Dwayne Steward dwayne@makeitbetterconsulting.com

Hi Dwayne,
Please find attached the signed contract extension. Let me know if you need anything else, thanks!

**Cecile Katz**
Administrator, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023

cecile@harmreductionohio.org

---

**From:** Dennis Cauchon
**Sent:** Tuesday, September 3, 2024 10:01 AM
**To:** Cecile Katz
**Subject:** Fwd: Make It Better Consulting Contract Extension and Scope Expansion

Extension of Dwayne's contract. Can you attach my signature and send back to me and Dwayne. Thanks.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@HarmReductionOhio.org
www.harmreductionohio.org/
he/him/his

*"Let's save some lives today!"*

Begin forwarded message:

**From:** Dwayne Steward <dwayne@makeitbetterconsulting.com>
**Subject: Make It Better Consulting Contract Extension and Scope Expansion**
**Date:** September 3, 2024 at 8:00:00 AM EDT
**To:** Dennis Cauchon <dennis@harmreductionohio.org>

Hello Denis, see updated contract attached. It includes the board recruitment services and extends the contract through January to give us more time to finish the board work and OKR development.

Please sign and return at your earliest convenience.

Sincerely,

Dwayne

Dwayne Steward, MPA
Founder and CEO
Make It Better Consulting

make it better
CONSULTING
makeitbetterconsulting.com
dwayne@makeitbetterconsulting.com
(614) 859-9627

MIBC-Services-
Agreement_Harm Reduction...
209 KB

# CONSULTING SERVICES AGREEMENT

**I. The Parties**. This Consulting & Retainer Agreement ("Agreement") is made effective as of May 1 2024, by and between a business entity known as Make It Better Consulting, LLC with a mailing address of 1345 Hildreth Ave., Columbus, Ohio, 43203 ("Consultant") and a business entity known as Harm Reduction Ohio, located at 935 River Road, Suite G, Granville, Ohio 43023 ("Client").

**II. Services**. Consultant agrees to provide the following services ("Services"), including but not limited to:

- Operations
  - Conduct operations audit to review policies & procedures, strategic plan, and program implementation plans.
  - Provide recommendations for best practice
  - Develop OKRs based on strategic plan for operations and programs departments
- Workforce
  - Conduct staff needs assessment
  - Build individualized development plans for each full-time staff member based on their needs, OKRs, and agency mission
  - Facilitate staff retreat to review strategic plan, socialize new OKRs, and introduce updated work plans
- Programs
  - Provide grants management and grants implementation training for staff
  - Develop community engagement plan prioritizing black, indigenous, and people and color
- Board Development
  - Provide project management for board recruitment process

**III. Term**. The Services shall commence on the date of May 1, 2024, and end on the date of January 31, 2025. This Agreement can be renewed or terminated with 15 days' notice by either party.

**IV. Payment**. In consideration for the Services provided, the Consultant is to be paid the following:

- Nonprofit rate: $85/hour

**V. Payment Interval**. Consultant shall be paid, in accordance with Section IV, in the following manner:

- A down payment of $2,040 is due to begin service delivery.
- Make It Better Consulting will invoice Client on the first of each month for services to be rendered. (Approximately $2,040 monthly).
- A contract amendment can be submitted at any time during the contract period to increase or decrease hours of service, as agreed upon by both parties.
- Invoices must be paid within 30 days of receipt.

**VII. Retainer**. The Client is not required to pay a retainer as part of this Agreement.

**VIII. Expenses**. The Consultant shall be responsible for all expenses related to providing the Services under this Agreement. This includes, but is not limited to, supplies, equipment, operating costs, business costs, employment costs, taxes, Social Security contributions and/or payments, disability insurance, unemployment taxes, and any other cost that may or may not be in connection with the Services provided by the Consultant including out-of-pocket expenses.

**IX. Termination Clause**. The Consultant and Client may terminate this Agreement at any time with notice of at least 15 Day(s) notice.

**X. Return of Records**. Upon termination of this Agreement, the Consultant shall deliver all records, notes, and data of any nature that are in the Consultant's possession or under the Consultant's control and that are of the Client's property or relate to Client's business.

**XI. Disputes**. If any dispute arises under this Agreement, the Consultant and the Client shall negotiate in good faith to settle such dispute. If the parties cannot resolve such dispute themselves, then either party may submit the dispute to mediation by a mediator approved by both parties. If the parties cannot agree with any mediator or if either party does not wish to abide by any decision of the mediator, they shall submit the dispute to arbitration by any mutually acceptable arbitrator, or the American Arbitration Association (AAA). The costs of the arbitration proceeding shall be borne according to the decision of the arbitrator, who may apportion costs equally or in accordance with any finding of fault or lack of good faith of either party. If either party does not wish to abide by any decision of the arbitrator, they shall submit the dispute to litigation. The jurisdiction for any dispute shall be administered and decided upon the Client.

**XII. Liability Insurance**. The Consultant agrees to bear all responsibility for the actions related to themselves and their employees or personnel under this Agreement. In addition, the Consultant agrees to obtain comprehensive liability insurance coverage in case of bodily injury, personal injury, property damage, contractual liability, and cross-liability. The Consultant shall not be required to have liability insurance covering any potential liabilities they may possess with providing their Services to the Client.

**XIII. Legal Notice**. All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in-person or deposited in the United States Postal Service via Certified Mail with return receipt.

**XIV. Non-Compete**. During the term of this Agreement, and for the maximum term allowed under State and Federal laws following its termination, the Consultant shall not engage in any activity that would compete in any way whatsoever with the activities of the Client in which the Consultant was or is involved, or where the Consultant gained confidential or sensitive information of the Client, directly or indirectly through the delivery of the Services. For further clarity, this section is to be geographically limited to areas and locations that the Customer operates and conducts its business activity.

**XV. Non-Solicitation**. During the term of this Agreement, and for the maximum term allowed under State and Federal laws following its termination ("Solicitation Period"), the Consultant shall not, without the written consent of the Client, directly or indirectly, solicit or attempt to solicit any person who was:

(a) A customer of the Client as of the date of this Agreement was terminated;

(b) A customer of the Client at any time within the Solicitation Period immediately before the date of the termination of this Agreement;

(c) Solicited as a prospective customer by the Client at any time during the provision of Services under this Agreement, should the Consultant have had knowledge of this pursuit; or,

(d) An employee or contractor of the Client as of the date this Agreement was terminated or within the one-year period immediately before the date of the termination of this Agreement.

**XVI. Waiver of Contractual Right**. The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**XVII. Independent Contractor Status**. The Consultant, under the code of the Internal Revenue (IRS), is an independent contractor and neither the Consultant's employees or contract personnel are, or shall be deemed, the Client's employees. In its capacity as an independent contractor, the Consultant agrees and represents:

a.) Consultant has the right to perform Services for others during the term of this Agreement;

b.) Consultant has the sole right to control and direct the means, manner, and method by which the Services required under this Agreement will be performed; Consultant shall select the routes taken, starting and ending times, days of work, and order the work that performed;

c.) Consultant has the right to hire assistant(s) as subcontractors or to use employees to provide the Services under this Agreement.

d.) Neither Consultant nor the Consultant's employees or personnel shall be required to wear any uniforms provided by the Client;

e.) The Services required by this Agreement shall be performed by the Consultant, Consultant's employees or personnel, and the Client will not hire, supervise, or pay assistants to help the Consultant;

f.) Neither the Consultant nor the Consultant's employees or personnel shall receive any training from the Client for the professional skills necessary to perform the Services required by this Agreement; and

g.) Neither the Consultant nor Consultant's employees or personnel shall be required by the Client to devote full-time to the performance of the Services required by this Agreement.

**XVIII. State and Federal Licenses**. The Consultant represents and warrants that all employees and personnel associated shall comply with federal, state, and local laws requiring any required licenses, permits, and certificates necessary to perform the Services under this Agreement.

**XIX. Payment of Taxes**. Under this Agreement, the Client shall not be responsible for:

a.) Withholding FICA, Medicare, Social Security, or any other Federal or State withholding taxes from the Consultant's payments to employees or personnel or make payments on behalf of the Consultant;

b.) Making Federal and/or State unemployment compensation contributions on the Consultant's behalf; and

c.) Making payments of taxes incurred while performing the Services under this Agreement, including all applicable income taxes and, if the Consultant is not a business entity, all applicable self-employment taxes. Upon demand, the Consultant shall provide the Client with proof that such payments have been made.

**XX. Employees' Compensation**. The Consultant shall be solely responsible for the following:

a.) Employee Benefits. The Consultant understands and agrees that they are solely responsible and shall be liable to all benefits that are provided to their employees including, but not limited to, retirement plans, health insurance, vacation time-off, sick pay, personal leave, or any other benefit provided.

b.) Unemployment Compensation. The Consultant shall be solely responsible for the unemployment compensation payments on behalf of their employees and personnel. The Consultant themselves shall not be entitled to unemployment compensation with the Services performed under this Agreement.

c.) Workers' Compensation. The Consultant shall be responsible for providing all workers' compensation insurance on behalf of their employees. If the Consultant hires employees to perform any work under this Agreement, the Consultant agrees to grant workers' compensation coverage to the extent required by law. Upon request by the Client, the Consultant must provide certificates proving workers' compensation insurance at any time during the performance of the Services.

**XXI. Indemnity**. Consultant shall release, defend, indemnify, and hold harmless the Client and its officers, agents, and employees from all suits, actions, or claims of any character, name, or description including reasonable attorney fees, brought on account of any injuries or damage, or loss (real or alleged) received or sustained by any person, persons, or property, arising out of services provided under this Agreement or Consultant's failure to perform or comply with any requirements of this Agreement including, but not limited to any claims for personal injury, property damage, or infringement of copyright, patent, or other proprietary rights. Client reserves the right to retain whatever funds which would be due to the Consultant under this Agreement until such suits, action or actions, claim or claims for injuries or damages as aforesaid shall have been settled and satisfactory evidence to that effect furnished.

**XXII. Confidentiality & Proprietary Information**. The Consultant acknowledges that it will be necessary for the Client to disclose certain confidential and proprietary information to the Consultant in order for the Consultant to perform their duties under this Agreement. The Consultant acknowledges that disclosure to a third (3rd) party or misuse of this proprietary or confidential information would irreparably harm the Client. Accordingly, the Consultant will not disclose or use, either during or after the term of this Agreement, any proprietary or confidential information of the Client without the Client's prior written permission except to the extent necessary to perform the Services on the Client's behalf.

Proprietary or confidential information includes, but is not limited to:

a.) The written, printed, graphic, or electronically recorded materials furnished by Client for Consultant to use;

b.) Any written or tangible information stamped "confidential," "proprietary," or with a similar legend, or any information that Client makes reasonable efforts to maintain the secrecy of, business or marketing plans or strategies, customer lists, operating procedures, trade secrets, design formulas, know-how and processes, computer programs and inventories, discoveries and improvements of any kind, sales projections, and pricing information; and

c.) Information belonging to customers and suppliers of the Client about whom the Consultant gained knowledge as a result of the Consultant's Services to the Client.

Upon termination of the Consultant's Services to the Client, or at the Client's request, the Consultant shall deliver all materials to the Client in the Consultant's possession relating to the Client's business. The Consultant acknowledges any breach or threatened breach of confidentiality under this Agreement will result in irreparable harm to the Client for which damages would be an inadequate remedy. Therefore, the Client shall be entitled to equitable relief, including an injunction, in the event of such breach or threatened breach of confidentiality. Such equitable relief shall be in addition to Client's rights and remedies otherwise available at law.

Furthermore, proprietary information, under this Agreement, shall include:

a.) The product of all work performed under this Agreement ("Work Product"), including without limitation all notes, reports, documentation, drawings, computer programs, inventions, creations, works, devices, models, works-in-progress and deliverables, will be the sole property of the Client, and Consultant hereby assigns to the Client all right, title, and interest therein, including, but not limited to, all audiovisual, literary, moral rights and other copyrights, patent rights, trade secret rights, and other proprietary rights therein. Consultant retains no right to use the Work Product and agrees not to challenge the validity of the Client's ownership in the Work Product;

b.) Consultant hereby assigns to the Client all right, title, and interest in any and all photographic images and videos or audio recordings made by the Client during Consultant's work for them, including, but not limited to, any royalties, proceeds, or other benefits derived from such photographs or recordings; and

c.) The Client will be entitled to use the Consultant's name and/or likeness in advertising and other materials.

**XXIII. Assignment and Delegation**. The Consultant may assign rights and may delegate duties under this Agreement to other individuals or entities acting as a subcontractor ("Subcontractor"). The Consultant recognizes that they shall be liable for all work performed by the Subcontractor and shall hold the Client harmless of any liability in connection with their performed work.

The Consultant shall be responsible for any confidential or proprietary information that is shared with the Subcontractor in accordance with this section. If any such information is shared by the Subcontractor to third (3rd) parties, the Consultant shall be made liable.

**XXIV. Governing Law**. This Agreement shall be governed under the laws in the State of Ohio.

**XXV. Severability**. This Agreement shall remain in effect in the event a section or provision is unenforceable or invalid. All remaining sections and provisions shall be deemed legally binding unless a court rules that any such provision or section is invalid or unenforceable, thus, limiting the effect of another provision or section. In such case, the affected provision or section shall be enforced as so limited.

**XXVI. Entire Agreement**. This Agreement, along with any attachments or addendums, represents the entire agreement between the parties. Therefore, this Agreement supersedes any prior agreements, promises, conditions, or understandings between the Client and Consultant. This Agreement may be modified or amended if the amendment is made in writing and is signed by both parties.

**Consultant's Signature** [signature] Date 9-3-2024

Print Name Dwayne Steward

**Client's Signature** [signature] Date 09/03/2024

Print Name Dennis Cauchon

3:49 LTE

New iMessage Cancel

To: Tasha Turner-Bicknell, Dwayne Steward

iMessage
Tue, Sep 3 at 10:49 AM

Dwayne Steward

Just fyi, Dennis is going to be sending an email to the board letting folks know that he's disclosing the conflict with AmandaLynn to ODH. And he's putting AmandaLynn on paid admin leave.

Tasha Turner-Bicknell

Was this the recommendation of the attorney?

Dwayne Steward

No

So Dennis just decided this was what he wanted to do? How can we respond to this? Suggestions? Because I am not feeling very diplomatic right now

Dwayne Steward

He just told me he expects to

Subject

iMessage

EXHIBIT
Starme 5

3:49 LTE

New iMessage Cancel

To: Tasha Turner-Bicknell, Dwayne Steward

He just told me he expects to terminate after the paid leave period

Tasha Turner-Bicknell

What in the world? I don't understand - I guess he wasn't open to anything we had to say last week

He told us that the board would decide if it was a conflict. Can he be reminded of that?

Tasha Turner-Bicknell

I don't see how there are grounds for termination? We rolled back the COI document deadline - what is his cause?

Dwayne Steward

He's decided that she's been lying to him for a year and has put the agency at risk. He said it's a personnel issue and it's outside the purview of the board. He

Subject

iMessage

3:49 LTE

New iMessage Cancel

To: Tasha Turner-Bicknell, Dwayne Steward

personnel issue and it's outside the purview of the board. He talked to some friend in California who does regulatory work and they told him he needs to disclose to ODH immediately. He's written a letter to AmandaLynn that he ran by the hired lawyer (who said during the meeting that his expertise is with nonprofit boards and he doesn't have a lot of experience with nonprofit employees) but it seems like the lawyer he hired is just doing what he says

Edited

He flippantly said "the board can find me in the wrong and do a vote of no confidence if they like, but this is not in the boards purview"

I think we should do an emergency meeting of the board without him after he sends the email

Tasha Turner-Bicknell

Subject

iMessage

3:49 LTE

New iMessage Cancel

To: Tasha Turner-Bicknell, Dwayne Steward

Tasha Turner-Bicknell

I feel like he punishing her for getting us involved. This is a worse outcome than the COI form.

I agree.

Dwayne Steward

I agree he's being petty

Edited

I agree as well/ punishment and emergency board meeting

Dwayne Steward

I told him this is going to wreak havoc on staff morale and it will cause folks to leave, he said he doesn't think that will happen

He's gone too far. I can say that I wont be sticking around if he proceeds in firing her

Dwayne Steward

I don't think any of us will stick around

Subject

iMessage

3:49

New iMessage Cancel

To: Tasha Turner-Bicknell, Dwayne Steward

Dwayne Steward

I don't think any of us will stick around

Edited

I cant imagine.

Wed, Sep 4 at 9:53 AM

Dwayne Steward

Let me know if you still want to bring the board together. He's got ODH on his side now because the letter he sent was extremely inflammatory and overstated and makes claims that haven't been proven. I told him to make changes to the letter before he sent it and he didn't

Tasha Turner-Bicknell

I would like to. I don't think the board is aware of the details.

1 Reply

Dwayne Steward

Billy did you want to send an email

Subject

iMessage

3:49 SOS

New iMessage Cancel

To: Tasha Turner-Bicknell, Dwayne Steward

Wed, Sep 4 at 9:53 AM

Dwayne Steward

Let me know if you still want to bring the board together. He's got ODH on his side now because the letter he sent was extremely inflammatory and overstated and makes claims that haven't been proven. I told him to make changes to the letter before he sent it and he didn't

Tasha Turner-Bicknell

I would like to. I don't think the board is aware of the details.

1 Reply

Dwayne Steward

Billy did you want to send an email or did you want me to?

Yes, I would very much like to meet as well. And Dwayne, I was going to ask you the same.

Subject

iMessage

3:50 LTE

New iMessage Cancel

To: Tasha Turner-Bicknell, Dwayne Steward

I am hitting the road for in a few minutes for some work so if it is something you're able to do that would be great.

I would like to. I don't think the board is aware of the details.

Agreed.

Dwayne Steward

I can send it. No worries

Many thanks!
I should be pretty available for the next few days during the days and evenings.

Wed, Sep 4 at 12:48 PM

Dwayne Steward

Email sent. If you have phone numbers of folks on the board

Subject

iMessage

3:50 LTE

New iMessage Cancel

To: Tasha Turner-Bicknell, Dwayne Steward

please contact them and urge them to complete the doodle poll today. I just texted Anne Trinh

I don't have anyone else's number

I have Colleen's number and Molly's. I will text them. I don't have Jamies number. but if no one else on the board has it, I can probably get it from one of my teammates

Wed, Sep 4 at 1:56 PM

Tasha Turner-Bicknell

I can reach out to Jamie

Dwayne Steward

Jamie, Anne and Molly have filled out the doodle poll

It's looking like tomorrow at 1 or 2 is the best time for everyone. Can

Subject

iMessage

3:50 LTE

New iMessage Cancel

To: Tasha Turner-Bicknell, Dwayne Steward

is the best time for everyone. Can you make that work billy?

Edited

Hey there. I could make either work. 1 o'clock will probably be easier though. If 2 o'clock is the preferred time I'll probably just have to hop off a bit early.

Dwayne Steward

1 pm works for everyone. So that fine. Can you check in with Colleen? I'll send an agenda and video invite

Wed, Sep 4 at 3:24 PM

Will do

Wed, Sep 4 at 4:31 PM

Colleen is good for 1 o'clock tomorrow as well.

Subject

iMessage

3:50 LTE

New iMessage Cancel

To: Tasha Turner-Bicknell, Dwayne Steward

Also, AmandalLynn filed a formal grievance against Dennis to the board. She emailed it to me today, I believe she thought I was still board chair until our board meeting on the 15th.
I'd like to go ahead and forward it to you both ahead of our meeting tomorrow.

Tasha Turner-Bicknell

I think dwayne sent it to all

Dwayne Steward

Yes I saw that and sent it to everyone. It should definitely be a topic tomorrow

Oh perfect! I think for some reason I thought I just got it! Agree, it should be something we talk about tomorrow for sure

Thu, Sep 5 at 3:03 PM

Dwayne Steward

Can you send me Colleen, Molly, &

Subject

iMessage

**Turner-Bicknell, Tasha (turnerta)**

**Subject:** Re: New request for HRO board meeting
**Date:** Tuesday, October 15, 2024 at 11:39:31 AM Eastern Daylight Time
**From:** Dwayne Steward
**To:** Dennis Cauchon
**CC:** Colleen Garlock, Anne C. Trinh, Billy Golden, James Decker, Turner-Bicknell, Tasha (turnerta), mollybtrue

External Email: Use Caution

Hello Dennis, that board is available on Oct. 27 at 10 am. You have been sent an invite with the Zoom link. An agenda is forthcoming. We look forward to you joining us.

On Tue, Oct 15, 2024 at 9:46 AM Dennis Cauchon <dennisuchon@gmail.com> wrote:
Thanks, Dwayne. This is a step forward. I assume I am being included as a board member.

On Oct 14, 2024, at 4:58 PM, Dwayne Steward <dwayneasteward@gmail.com> wrote:

Hello Dennis,

The Harm Reduction Ohio Board of Directors agrees that there are several key issues facing the agency that need to be addressed. We do not think it is appropriate for staff to be engaged in board logistics, especially given recent complaints, so we will work amongst ourselves to find a time that works for folks in the near future to convene. We will be in touch soon with a date, time, and a link to the video call.

Sincerely,
Dwayne Steward

On Mon, Oct 14, 2024 at 2:19 PM Dennis Cauchon <denniscauchon@gmail.com> wrote:
Dear Fellow Directors,

I've always taken my responsibilities to HRO very seriously and I trust that you do too. Currently our HRO board has before it several very important matters that relate to HRO's legal obligations to the State of Ohio and the federal government under the current contract. My understanding is that we, as directors, are legally obligated to carefully oversee these matters and could potentially be personally liable if we fail to do so. I have the added burden of being the signatory and point of contact on the contract with the State of Ohio.

I have important concerns related to this contract that we as a board need to discuss. I have been trying in vain to get us as a board to meet and address these issues. I've reached out to you and attorney Maritza Nelson and am being told that I have no right, apparently either as a director or the president of HRO, to meet with the board to discuss these issues. I have notified Maritza of my concern that recent board meetings have not been held in compliance with the HRO bylaws and Ohio law. I do not want us to be in a position where decisions about the well-being of HRO are made without considering available information or made outside of the requirements of law. To that end, I am again asking that the board formally meet to thoroughly discuss the issues befo[re the] board and then make reasoned decisions based upon that information. I think the board needs [to] consider and discuss what I have to say and then formally vote on the issues.

In the past, we have always treated each other with trust and respect. That tradition is worth honoring now more than ever. I, again, propose that we schedule a meeting as soon as possib[le to] have a frank, informed and open discussion. (I suggest asking Cecile to send a Doodle poll.) If

EXHIBIT
tabbies
Steward 6

# HARM REDUCTION OHIO
# BOARD MINUTES

| | | | |
|---|---|---|---|
| **Date of Meeting:** | 10/27/2024 | **Start time:** | 10:05 AM |
| **Location:** | Zoom | **End time:** | 10:13 AM |

## Meeting Agenda

- Call to order
- Approval of agenda
- Approval of minutes
- Executive Director statement and updates
- Additional comments
- Motions and votes
- Adjourn meeting

## Attendance

| **Board members:** | | | **Absent** |
|---|---|---|---|
| Dwayne | Anne | Tasha | Molly |
| Colleen | Billy | Jamie | |
| Dennis | | | |

## Notes

**Topic, Discussions, Issues, Decisions**

- Dwyane called to order meeting at 10:05AM
- Dwayne reminded Dennis that he was voted in as chair when Billy Golden strpped down from the position
- Dwayne also informed Dennis of the reason why Dennis was not given access to other board meetings due to the investigation, and the ethics of not having Dennis be part of those meetings due to him being the subject of the investigation. He reminded Dennis that Dennis asked for today's meeting and this is why we are having this meeting today
- Dennis stated he requested a properly noticed board meeting and stated "this is not a properly noticed board meeting, and I object to this beiing called a board meeting".
- Dwayne acknowledged Dennis' statement and informed him it is in the record.
- Dwayne reqested that we approve last board minutes and asked for a motion to do so
- Anne made a motion to approve the minutes
- Tasha seconded and minutes were approved
- Dennis refused to vote and wanted it noted "Please record me as not participating" and was not abstaining
- Dwayne noted that the motion carried by majority
- Dwayne asked Dennis for his statement
- Dennis stated "on the agenda it stated HRO has an executive director, and HRO does not have an executive director, it has a president. I am speaking in my capacity as a board member. I am asking again that we properly convene a board meeting, that requires providing all directors with due advance notice and directors with information provided to all board members.

EXHIBIT
tabbies

This will allow us to start discussing and acting on important issues that needto be addressed.We have not had a board meeting since March 9 (2024). The board has taken no valid actions. I have not been placed on leave, AmandayLynn has not been reinstated. An investigator has not been hired, to review or report on issues including AmandaLynn's apparent conflict of interest. The efforts of 3 directors to block the legally the prior disclosure of that conflict to the Ohio Dept. of Health. The retalitory measures taken by the 3 board members against me for making the legally required disclosure. Claims that I created a hostile work environment. Nothing since AmandaLynn's conflict was discussed or has been presented to the full board. Thank you".

- Dwayne thanked Dennis for his statement
- Dwayne asked for any comments from other board members. None were made
- Dwayne stated "I am a little confused because Dennis, you asked for this meeting". Dennis stated that he asked for a 'properly noticed meeting'. Dwayne stated there must be a different definition of a properly noticed meeting, as everyone was noticed the same way about the meeting. Dwayne then noted there are 6 who voted noting that this is a properly noticed meeting and one that is not.
- Dwayne stated "We have been informed by our attorney to move forward in the following way, so I request a motion for dismissal".
- Anne stated "I am putting forward a motion for Dennis to be removed as an offical board member so that we're in compliance with the IRS and nonprofit best practices that state thatmembers are not paid"
- Dwayne asked for a second to the motion
- Colleen seconded
- Dwayne asked all those in favor say aye
- Dennis stated "Point of order, under Roberts Rules of Order, removing a director requires due process that includes advance notice of intent to remove, written charges, notice to the accused member, and a fair and impartial trial".
- Dwayne thanked Dennis and informed him he would be provided with those details.
- Dwayne asked again for those in favor to say 'aye'
- 6 board members stated "aye" (not Dennis). There were none opposed, and no abstentions. The motion carried
- Dwayne informed Dennis "according to our records, as an employee, since you are continuing to be paid, you are still the ED, Executive Director of HRO, we will moved forward with you as an Executive Director but not a board member".
- Dwayne thanked all for attending and adjourned the meeting
- Meeting adjourned at 10:13AM

**Action Items**

| Action | Responsible | Due Date |
|---|---|---|
| Next steps TBD | Dwayne/Board | TBD |

**Next Meeting**

| Date: | TBD | Time: | TBD | Location: | TBD |
|---|---|---|---|---|---|

**From:** **Colleen M. Garlock** colleengarlock@gmail.com
**Subject:** Re: Cauchon - HRO employee complaint - signed, dated
**Date:** October 23, 2024 at 7:35 PM
**To:** Dennis Cauchon dennisCauchon@gmail.com
**Cc:** Cecile Katz cecile.katz@gmail.com, Cecile Katz cecile@harmreductionohio.org

Thank you Dennis for filing your complaint.

The board will review and investigate these claims and we will be in touch regarding next steps. We are looking forward to you joining the board meeting on Sunday.

Thanks,
Colleen

On Wed, Oct 23, 2024 at 8:24 AM Dennis Cauchon <denniscauchon@gmail.com> wrote:

Cecile,

Attached is a signed and dated employee complaint, filed with you as required by our employee handbook. HRO currently has no board chair, so I have also cced Colleen, board secretary, on this complaint. It is not appropriate for me to send this directly to Vice Chair Steward, a subject of the complaint.

If you have questions, please don't hesitate to call.

Thanks very much.

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
denniscauchon@gmail.com
HarmReductionOhio.org

--
Colleen M. Garlock, MSW, LISW
She/Her/Hers

EXHIBIT
Steward 8

October 22, 2024

Cecile Katz, Administrator
Colleen Garlock, Board Secretary
Harm Reduction Ohio
935 River Road
Granville, Ohio 43023

To Whom It May Concern,

On September 3, 2024, I reported to the Ohio Department of Health an apparent conflict of interest arising out of a financial relationship between Chief Program Officer AmandaLynn Reese, a Harm Reduction Ohio (HRO) employee, and Velocity Biogroup, a lobbying firm representing Hikma Pharmaceuticals, maker of the Kloxxado brand of naloxone. My understanding was that I was required by law to promptly report any potential conflict to the Ohio Department of Health.

Subsequently, on September 5, 2024, at 1:03 p.m., HRO Board Vice Chair Dwayne Steward emailed me, instructing me to "cease and desist all activities related to conflict of interest matters, including but not limited to communications with funders, staff, and community partners." At 2:24 p.m. that same day, Mr. Steward told me that I was being placed on administrative leave, my email access had been revoked, and that I was barred from using my office until a third-party investigation was completed. I also was informed by Mr. Steward that I was the target of complaints concerning a hostile work environment. On September 6, 2024, at 9:16 a.m., I texted Mr. Steward, stating: "To be clear, I consider this action to be retaliation for reporting the conflict." Despite this, Mr. Steward continued his course of action.

Despite Mr. Steward's purportedly official actions on behalf of HRO, to my knowledge the board of directors of HRO has never officially met to consider and decide upon any course of action with respect to the Reese conflict-of-interest issue, the required reporting of same to the State of Ohio, the suspension of the HRO President or the hostile work environment claims asserted, despite my best efforts to call for formal board consideration and action on these matters. Additionally, an investigation of the conflict-of-interest issue and the hostile workplace environment complaint has apparently been conducted at the direction of Mr. Steward, despite no formal inquiry or decision by the HRO board in support of such action and despite my having never even been interviewed with respect to these matters, about which I have material knowledge, for which I have official

responsibility, and which directly affect my employment by HRO and my personal and professional reputation.

---

**Formal Employment Complaint**

This letter is a more detailed complaint regarding (a) actions by three board members to obstruct the legally required reporting of an apparent conflict of interest related to a federally funded state contract, and (b) retaliation against me in my roles as an employee, officer and board member for fulfilling my legal obligations.

**Complaint Subjects (the "Three"):**

- Dwayne Steward (Vice Chair)
- Tasha Turner-Bicknell
- Billy Golden

The following complaints implicate various state and federal laws, including Uniform Guidance (2 CFR 200), Federal Acquisition Regulations (FAR), the False Claims Act, ORC 4113, and Ohio's public policy exception to the at-will employment doctrine.

**Complaint 1: Obstructing the Reporting of a Conflict of Interest**

From July 16, 2024, to the present, the Three took actions to obstruct me, as HRO President and contract signatory, from obtaining information on an apparent employee conflict of interest. AmandaLynn Reese is Chief Program Officer, a full-time salaried employee at Harm Reduction Ohio who reports to the President of HRO. Her duties include overseeing much of the state contract and procuring federally funded naloxone, including Kloxxado, from Ohio's state government pharmacy. Concurrently and unbeknown to HRO's President to whom she directly reports, Ms. Reese was employed as Director of Government Advocacy for Velocity Biogroup, a lobbyist for Hikma Pharmaceuticals, the manufacturer of the Kloxxado brand of naloxone. I learned of the outside employment via social media on July 16, 2024, and sought additional information from Ms. Reese the next day.

In a July 17, 2024, meeting with me, Ms. Reese promised to cooperate in the review of the apparent conflict and disclose relevant information. However, despite this promise, Ms. Reese did not cooperate on this matter with me as President of HRO . Instead, in violation of HRO bylaws and

board-approved personnel policies, Ms. Reese worked exclusively with the Three on "conflict of interest matters." On August 22, 2024, Mr. Steward, Ms. Turner-Bicknell and Mr. Golden met with me to seek to halt or at least delay my efforts at gathering pertinent information on the apparent conflict. They told me that neither the nature of the work done, nor the amount of compensation received by Ms. Reese, mattered when considering how to handle a conflict. Instead, they indicated that their primary concern was the negative financial effect the (mandatory) reporting of the apparent conflict could have on Ms. Reese and her family.

Mr. Steward withheld from me as President documents that Ms. Reese had provided him ostensibly to explain the apparent conflict. Ms. Reese stated that providing information to Mr. Steward proved that she had, in fact, disclosed the conflict. Mr. Steward refused to share Ms. Reese's information, knowing that Ms. Reese had already refused my request to her to provide me those documents. The withholding of these documents by both Ms. Reese and Mr. Steward impeded my efforts as President, on behalf of HRO, to make a full, forthright and accurate conflict disclosure to an Ohio state agency on a federally funded contract. On September 3, 2024, lacking cooperation by Mr. Steward or Ms. Reese, I provided a conflict disclosure letter to the Ohio Department of Health, using information obtained via other legally available public sources. On September 5, 2024, Mr. Steward ordered me to cease and desist communicating with the Ohio Department of Health concerning the conflict and notified me that I was being placed on leave pursuant to a supposedly unanimous HRO board vote in favor of such action.

**Complaint 2: Retaliation for Reporting a Conflict of Interest**

The Three retaliated against me for reporting to a state government agency a conflict of interest affecting a $2.4 million contract awarded to HRO that consisted entirely of federal funds. Beginning on or before September 4, 2024, these board members took adverse actions against me, including suspending my duties as President of HRO, placing me on leave, cutting off my email, denying me access to my office of 20 years, and thus damaging my personal and professional reputation. Mr. Steward and Mr. Golden exceeded their authority in imposing these adverse employment actions and may have intentionally or unintentionally misled the board about material issues related to these actions. These and other adverse actions effectively punished me for complying with the mandatory reporting of an apparent conflict of interest involving Ms. Reese and her outside employment as Director of Government Advocacy for Velocity Biogroup, a lobbyist for a company that makes a product that HRO obtains and distributes under a federally funded state contract.

I urge and will cooperate with an impartial investigation of all matters that warrant review.

Sincerely,

Dennis Cauchon
President, Harm Reduction Ohio
935 River Road, Suite G
Granville, Ohio 43023
(740) 973-3814
dennis@harmreductionohio.org

*"Let's save some lives today."*