UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

________________________________

DENNIS CAUCHON, et al.,
Plaintiff,
v. Case No.
DWAYNE STEWARD; RAINA WILLIAM 2:25-cv-0075
GOLDEN; TASHA TURNER-BICKNELL;
and HARM REDUCTION OHIO,
Defendants.

________________________________

DEPOSITION OF AMANDALYNN ANDERSON REESE

DATE: Friday, July 24, 2026
TIME: 9:57 a.m.
LOCATION: Reminger Co., LPA
955 Yard Street, Suite 330
Columbus, OH 41017
REPORTED BY: Asia Mays

PAGES 37-96, 169-170 ARE CONFIDENTIAL

Job No. CS8349307

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF DENNIS CAUCHON:

DAVID SHEARER JR., ESQUIRE
Garvey Shearer & Nordstrom
2388 Grandview Drive
Fort Mitchell, KY 41017
dshearer@gsn-law.com
(859) 308-1490

ON BEHALF OF DEFENDANTS DWAYNE STEWARD, RAINA WILLIAM GOLDEN, TASHA TURNER-BICKNELL, AND HARM REDUCTION OHIO:

MRINALI SETHI, ESQUIRE
Reminger Co.
955 Yard Street, Suite 330
Columbus, OH 43212
msethi@reminger.com
(614) 232-2440

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANT HARM REDUCTION OHIO:
HELEN K. SUDHOFF, ESQUIRE
Porter Wright Morris & Arthur LLP
41 South High Street, Suites 2800-3200
Columbus, OH 43215
hsudhoff@porterwright.com
(614) 227-1915

ALSO PRESENT:
Stephanie Bradley, Veritext Observer
Dennis Cauchon, Plaintiff

# I N D E X


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Shearer | 7 |
| By Ms. Sudhoff | 167 |
| By Ms. Sethi | 168 |


## E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Employment Agreement 1 | 38 |
| Exhibit 2 | Employment Agreement 2 | 72 |
| Exhibit 3 | Expense Report Analysis | 79 |
| Exhibit 4 | Staffing Plan, etc. | 100 |
| Exhibit 5 | Email Correspondence Begin Date 09/15/22 | 107 |
| Exhibit 6 | Harm Reduction Ohio Handbook | 111 |
| Exhibit 7 | Email Correspondence Begin Date: 07/23/23 | 123 |
| Exhibit 8 | Project DAWN Order Request | 132 |
| Exhibit 9 | ODH HRO Naloxone Orders - Combined Worksheet Grid | 136 |
| Exhibit 10 | Draft Disclosure | 139 |
| Exhibit 11 | Email Correspondence Begin Date: 09/04/24 | 155 |

P R O C E E D I N G S

THE REPORTER: Good morning. My name is Asia Mays. I am the reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 9:57 a.m.

This is the deposition of Amanda Reese taken in the matter of Dennis Cauchon, et al., vs. Dwayne Steward, et al., on Friday, July 24, 2026, at Reminger Co., LPA, 955 Yard Street, Suite 330, Columbus, Ohio 43212.

I am a notary authorized to take acknowledgments and administer oaths in Ohio.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
- shall constitute written stipulation of such.

At this time, will everyone in

attendance please identify yourself for the record, and we'll begin with my taking attorney.

MR. SHEARER: My name is David Shearer, and I'm representing the plaintiff on counterclaims against him.

MR. CAUCHON: And I'm Dennis Cauchon, C-A-U-C-H-O-N, and I'm the plaintiff and counterclaim defendant.

MS. SUDHOFF: Helen Sudhoff, attorney for Harm Reduction Ohio as to the counterclaims.

MS. SETHI: Mrinali Sethi here on behalf of non-party Amandalynn Reese, as well as Defendants Dwayne Steward, Billy Golden, Tasha Turner-Bicknell, and Harm Reduction Ohio on the claims against Harm Reduction Ohio.

MS. REESE: I'm Amandalynn Reese. I'm non-party.

THE REPORTER: Thank you.

Hearing no objection, I will now swear in the witness.

WHEREUPON,

AMANDALYNN ANDERSON REESE,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you.
Counsel, you may proceed.

EXAMINATION

BY MR. SHEARER:

Q Ms. Reese, to get us started, why don't you give me your full name please?
A Amandalynn Anderson Reese.
Q Okay. And "Amandalynn" is one word?
A Yes, sir.
Q Okay. And I'm sorry, middle name is Anderson?
A Last name Anderson Reese.
Q Anderson --
A Reese.
Q Dash?
A No dash. No, sir.
Q Just Anderson Reese?
A Yes, sir.
Q Your last name is Anderson Reese?
A Uh-huh.
Q Got it. Okay. And, Ms. Reese, why don't you -- how do you go by? Is it Amandalynn, do you want me to call you "Ms. Reese," or how --
A I always say anything but late for dinner. "Amanda" is fine.

Q So why don't you tell me where you are currently living?
A I live in Cincinnati, Ohio.
Q Okay. Where?
A Winton Road. 8931 Winton Road.
Q And where are you currently employed?
A At Best Buddies Stay and Play and at Harm Reduction Ohio.
Q And what is Best Buddies Stay and Play?
A It is a daycare.
Q And do you work there, or do you own it, manage it? What exactly is --
A I own and manage and do the administrative work for it.
Q Okay. But you are the owner of Best Buddies?
A Yes.
Q Okay. Before we get started, let me give you just a few ground rules. I know the court reporter's already given you some of them.
I don't know how long we'll be here, but it'll probably be a little while. So at any point in time you want to take a break, let me know. We are able to take a break whenever you want as long as there's just not a question that's hanging out there.

If there are any questions that I ask you that aren't clear, you don't understand, let me know and I'll do what I can to straighten them out for you. Otherwise, I'm going to assume you understand what I'm asking you.

You are probably going to answer "yes" or "no" to a number of the questions. Again, nodding your head, shaking your head, if you could try to avoid that and give us the "yes" or "no" or the "uh-huhs" or the "uh-uhs" so it makes it easier for us to read it back later on.

And finally, I have a really annoying habit of talking fast and talking over people. I will do my best to try to let you get your whole answer out before I move on to my next question.

And likewise, if you could do the same for me. You may know where I'm going with a question, what I'm asking you. If you can let me spit the whole thing out before you start your answer, and then, again, it'll flow smoother. Easier for her to take us down, and easier for us to read back later on.

A All right. No problem.

MR. SHEARER: Okay. So you are representing her for purposes of the deposition?

MS. SETHI: Correct.

BY MR. SHEARER:
Q Okay. So, Ms. Reese, I don't want to know about any conversations that you've had with your counsel. But other than that, let's talk a little bit about what you did to prepare for today's deposition.
A I asked questions about what a deposition is, what my role would be, and just to kind of understand the workflow, for lack of a better word, for how it would go.
Q And --
MS. SETHI: Just a reminder, I would -- we don't want you to --
MR. SHEARER: Yeah.
MS. SETHI: -- give anything that we talked about or that -- for here. So --
MR. SHEARER: Yeah.
THE WITNESS: No problem.
BY MR. SHEARER:
Q The subject or topics of what you talked about with your counsel is -- yeah, we can't -- that's not for me.
Other than your counsel, who else have you talked to about your deposition here today?
A I've told my husband I'll be here, folks that would need to know about my absence that I had

this planned.
Q Have you spoken at anyone at Harm Reduction Ohio about your deposition today?
A That I would be having a deposition. Yes.
Q Okay. But other than simply having a deposition, did you talk with anyone about what you may be asked about, the topics of the deposition, or what you anticipated the topics of the deposition be?
A No. Just my general feelings.
Q Okay. And your general feelings are?
A This is new.
Q Okay.
A So I have lots of --
Q Okay. So you have never been deposed before?
A Correct.
Q To prepare for your deposition today, have you reviewed any documents?
A Yes.
Q Okay. And why don't you tell me what you can recall reviewing?
A I reviewed my calendar. I reviewed my notes. That's basically it.
Q Okay. When you say your calendar, for what period of time are we talking about?

A The last six years.
Q Okay. And is this a paper calendar, or is this a computer calendar?
A Both.
Q Okay. And what was the purpose of reviewing your calendar? What kind of information were you hoping to elicit from that's with regard to the deposition today?
A Just so I could be as factual and truthful as possible.
Q And then you said "notes." What notes did you review?
A Notes about things on my calendar, responsibilities, things like that. The tasks that were in notes on my calendar.
Q Tasks relating to your work? Or tasks relating to --
A Everything lives on my calendar that -- you know, I use it.
Q Okay. Did you review any documents generated by Harm Reduction Ohio? Any, like, memos, emails between you and other of your coworkers?
A I did look at some documents that were attached to my calendar, things like that. If there was an attachment, like, to calendar dates, things of

that nature. But nothing, you know, specific.
Q Did you review any documents with regard to your employment at Velocity?
A Yes. That were -- when it was on my calendar, if there were things like that. Yes.
Q Okay. And what documents regarding your employment at Velocity can you recall reviewing?
A Appointments about, you know, first day, those sorts of things.
Q Did you review your employment agreement with Velocity?
A Not at length.
Q But casually or personally?
A That -- that it was sent or that it was due, things like that.
Q Okay. So let's talk a little bit about your work, current work, and work history. How long have you owned Best Buddies?
A We started in 2017.
Q Are you the sole owner, or is there a -- someone else that owns it with you?
A I'm the sole owner.
Q And the reason why I asked that, you said "we" started it in '17. So --
A My husband and I. I -- when I think of

things that belong to me in that respect, I think of my -- my marital.

Q Got you. Got you. Is Best Buddies a corporation?

A It's a nonprofit.

Q It's a nonprofit?.

A Mm-hmm.

THE REPORTER: That was a yes?

THE WITNESS: Yes.

BY MR. SHEARER:

Q That was a yes?

A Yes. Well -- yes. Nonprofit corporation. Yes.

Q Yep. Got it.

A Thank you.

MS. SETHI: She's just meaning that the "mm-hmms" and the --

MR. SHEARER: Yeah. She just follows the --

THE WITNESS: Oh, okay.

MR. SHEARER: Yeah.

THE WITNESS: Sorry. Thank you.

MS. SETHI: We'll prompt you from time to time, and everyone does it. So we're not trying to be mean. We're just trying to make sure the record is

clean.

THE WITNESS: No, it's helpful. Thank you.

BY MR. SHEARER:

Q And do you draw a salary from Best Buddies?

A No, I do not.

Q Okay. Are you compensated in any way for your work or ownership at Best Buddies?

A No, I'm not.

Q Have you ever been received any financial compensation from Best Buddies?

A Yes.

Q And when would that have been?

A 2017 through 2022.

Q Okay. And why did that stop in 2022?

A Financially, a lot of it had to go back into the business. My husband started working there full-time a little before that, and so it was mostly just paying back things.

Q Got you. So you all still own it together? Like, he draws a salary; you do not draw a salary?

A He gets paid an hourly wage. Yeah.

Q Okay. Got you. Harm Reduction Ohio, when did you start working at Harm Reduction Ohio?

A Late summer of 2020.

Q And how did you come to work for -- when I say -- can we call it "HRO"?
A Yeah. That's fine.
Q How did you come to work for HRO?
A I came to work for HRO under a grant that I saw posted was hiring.
Q Okay. When you first began at HRO, what was your job title?
A When I began working at HRO?
Q Uh-huh.
A My title was outreach coordinator.
Q And can you tell me what you did as outreach coordinator?
A At that time, I tabled at events, did education and awareness. I worked in seven southwest Ohio counties. Specifically, I would help people obtain naloxone and other educational materials.
I did a lot of anti-stigma training and creation of literature. I helped give feedback to the team about what the area was seeing. I did a lot of learning to improve systems for our outreach. Those sorts of activities.
Q Okay. I should have asked you this before. Let's jump back a little bit. Tell me about your educational background.

A I have most of my degree from OSU. I have, like, one class to pay for before I get my actual diploma. But I have a bachelor's in theater, minors in history and music.
Q Okay. Let's go back even further. High school, where'd you go to high school?
A I went to Amelia High School.
Q Okay. And what year did you graduate?
A 2006.
Q Then after that, did you go directly to college?
A Yes.
Q Okay. And where did you go to college?
A Ohio State University.
Q And you said that you have a bachelor's in?
A Theater.
Q Okay. And when did you get that degree?
A I finished college in 2011.
Q And then you mentioned some other -- another degree that maybe you're a little short of?
A Oh, no. So that -- all of that is within Ohio State University. So I had some minors, I switched my major, and I was on financial aid. All this to say, that's all the same at OSU. So that BA with theater.

Q Okay. So you're -- you do have a degree in theater?

A I have what is called a completion of education. I owe them money. So to get my actual diploma, I have to pay that last course. But it was federal financial aid.

Q Got you. Got you. Okay. Besides OSU, do you have any other formal education?

A No, sir.

Q Okay. And tell me a little bit about your work history from high school up until HRO, then we'll -- just kind of give me a little background.

A Okay.

Q Like, what you did before going to HRO.

A I've had numerous jobs. I've worked in food service. I worked in childcare. I have worked in landscaping and gardening. I had worked in Ticketmaster. I've worked at the Ohio State Fair. I worked work study jobs at the Ohio State University. I worked in parking enforcement at OSU.

I've had jobs in healthcare, employment services, lots of nonprofit work where I help people with developmental disabilities and other barriers to employment, obtain employment. I've worked at COSI. I usually hold three jobs at a time.

I also worked for Total Quality Logistics; that's how I got back to Cincinnati. I think up -- up to college, you're saying? Like, high school to college, through college?
Q Okay.
A Yeah.
Q So a little of everything?
A Yeah.
Q And so kind of the reason why I was asking that was, your job at at Harm Reduction Ohio, had you ever done anything similar to that prior to beginning at HRO?
A Yes.
Q Okay. And where would that -- can you tell me a little bit about that?
A When I worked at Goodwill Industries, I did a lot of barriers to employment, a lot of outreach, a lot of education. I did a lot of direct community service work.
Also, when I took surveys for a company that would check on people who did, like, home healthcare and had Medicaid and finding out -- it was part of their regulatory process. I would go and help folks with that in outreach, doing direct service work.
I did a lot of volunteer work. But actual

paid work, those would be the relevant.
Q Okay. Got you. And since you began with HRO -- so you said late summer of '22?
A 2020.
Q 2020. I'm sorry.
A Yes, sir.
Q Since you have started at HRO in 2020, and I know about Best Buddies, what other employment have you had?
A I also worked for Velocity Bio Group.
Q Okay. And what were the dates of your work for Velocity?
A December of '22 through fall of 2025, I believe.
Q Okay. And why did you leave Velocity in the fall of 2025?
A The consulting work that I was doing ended under a -- a employment status.
Q Were you under, like, a contract?
A Multiple. Yes.
Q And we'll probably look at your contract a little bit later on. But why don't you kind of tell me what you did for for Velocity?
A I was a consultant. I provided expert education and advocacy around any of their substance

use disorder products and clients.
Q Okay. Were you a full-time employee of Velocity at any time?
A I did full-time work for Velocity.
Q Okay. So just by the way you answered -- I said, "Were you a full-time employee?"
And you said, "I did full-time work." Is there a distinction in your mind? I'm trying to figure out --
A Yes.
Q Just because the way -- yeah. What's the distinction, in your mind?
A It wasn't a shift job.
Q Oh. Right. It was a salaried --
A Right.
Q I assume it was --
A More like -- yeah. More like a retainer, monthly salary.
Q Okay. So when you were paid by Velocity, was that -- did you receive W-2 income?
A For a part of my tenure. That was December or so 2022 until the late summer, fall of 2025. But I -- yes, that was W-2 work.
Q Okay. Was there ever a time that your work at Velocity was not W-2, it was -- that was, like,

1099 or something else?

A Yes, sir.

Q Okay. When was that?

MS. SETHI: Just make sure you're letting him finish the question before you answer.

THE WITNESS: Thank you.

BY MR. SHEARER:

Q Okay. When was that?

A Until present.

Q Oh. So you're still doing work for Velocity?

A I still do 1099 independent contracting. Yes, sir.

Q Okay. Okay. So what type of work are you doing for Velocity now?

A Currently there are some SUD products that they ask my guidance on, ask questions about. They have a nutraceutical they're trying to use. That kind of thing, just more expert consulting.

Q Okay. And what is your area of expertise that -- when you say you do expert consulting, what area -- what's your area of expertise that you are consulting on?

A Usually substance use disorder. But there has been a few other things. Dysregulated eating; you

know, geographical expertise, certain communities.

Q Okay. When you -- that you have expertise in substance abuse, what is the basis of that expertise?

A My expertise in substance use disorder?

Q Your expertise in substance abuse -- correct. Here's what I'm trying to get -- you say you're doing expert work for Velocity with regard to substance -- did you say substance abuse disorder?

A Substance use.

Q Oh, substance use. Right. Substance use. Okay. So my question to you was, what is the -- what there is -- what is there in your background that makes you an expert in substance use?

MS. SETHI: Objection.

THE WITNESS: I am from Appalachia. I come from a long line of people who use maladaptive coping mechanisms and other reasons to engage in substances. I am a person with lived experience when it comes to substance use, and I am an expert in that area.

BY MR. SHEARER:

Q Okay. By virtue of your life experiences?

A Yes.

Q And that's one of the reason why I was asking about your education. And you said you're a theater major.

So there's, like, no -- so I sort of -- your expertise is based on what you have lived through, what you have done through, et cetera, et cetera. Not any -- not, like, an educational program?

A I did not -- I do not have a degree, as defined by formal education. But I have taken years of courses, technical assistance, and other things to inform and validate my lived and living experience.

Q Yep. Got you. Got you. Okay. And so currently, since late '25, like, how much of your professional time are you dedicating to Velocity?

A No less than five hours a month. But up to, you know, about 120 hours, I would say, in the last quarter.

Q Okay. Substantial but not full-time?

A Oh, not full-time. No, sir.

Q Okay. Got you. Got you. The full-time, or at least the salaried portion, that ended late '25?

A Yeah. Fall '25, I believe.

Q Fall '25.

A Late summer, fall '25. I don't know the exact date.

Q Okay. And that was because your contract expired?
A One of -- yeah. All of my contracts had expired at that point. Yes, sir.
Q Okay. So at Velocity, what was your actual job title when you began there?
A When I began, it was director of government advocacy.
Q Okay. And did that change throughout your tenure?
A Yes, it did.
Q Okay. And what did it change to and when?
A It was sometime in 2024 that it changed to director of public health outreach and education, I believe. I might be getting those out of order, but those words.
Q Director of public --
A Public health and outreach and education. Yeah.
Q Okay. Public health, outreach, education. So did your besides your job title changing in -- sometime in -- let me interrupt real quick.
When I'm asking for dates, I don't -- I mean, if you remember the exact dates, that's great. I'm actually just trying to get a general time frame.

I mean, so, you know, if you knew it was January 21st, you know, 2024, that's great.

But if you can -- you know, I'm not holding you to exact dates. I'm just trying to get rough time frames.

A Thank you. I understand.

Q So did your -- when your job title changed, did your job duties change along with that?

A No. I gained a few extra responsibilities, but otherwise not in earnest.

Q Okay. You had the duties of your original job, just additional duties were added. And then so when you added, that resulted in a changed title?

A Yes, sir.

Q Got it. So let's go back and talk a little bit about your work at HRO.

A Yes, sir.

Q So when you started, your title was -- and I apologize. All these words all kind of -- they all are very similar to me and run together. So your initial --

A Outreach coordinator.

Q Outreach coordinator. Okay. And how long were you outreach coordinator?

A I believe until 2022.

Q Okay. And then in 2022, what changed?
A I became director of outreach and engagement.
Q Okay. And --
A And then sometime that year to -- to early 2023, I was director of programming. It was a better fit for the -- my -- my job responsibilities.
Q And that also started in 2022?
A Or 2023. There -- it's a -- it was a little nebulous there.
Q Okay. Director of programming?
A Yes. I've had business cards with all three of these titles. So yes.
Q So is your title still "director of programming"?
A No. In the spring or summer of '23, we changed my title to "chief program officer."
Q And are you still chief program officer?
A I am.
Q Got you. So you have had four different titles while at HRO?
A Correct.
Q Okay. So why don't you tell me what you did as outreach coordinator at HRO?
A As we discussed previously, I did outreach,

education, direct service work, creating materials, creating feedback loops, and creating systems. I answered deliverables as according to the grants as they were assigned, and other duties as assigned.

Q Okay. Now, I am not familiar with all the lingo and/or jobs that are involved in the -- you know, in this area, in, you know, the nonprofit area.

So when you say outreach -- you know, you're doing outreach, what do you mean? Like, what does "outreach" mean to you?

A Okay. It can mean calling community partners, finding community access points relevant to the deliverable. It can mean meeting with individuals in the community. It can mean tabling at events.

It can mean knocking on doors. It can mean making phone calls. It can mean circulating flyers and educational materials. It can mean attending coalition meetings. It can mean meeting with stakeholders.

It can mean, you know, having conversations. It can mean a very great number of things, but that's how I would define it.

Q Okay. Then in 2022, you changed to director of outreach and engagement. So what changed from outreach coordinator when you assumed the new title?

A More responsibilities. So all of the responsibilities I already had; and then also training other staffers and volunteers that may be doing outreach coordinating themselves; seeing more geographical region, managing outreach for more than one grant; and, you know, maybe supervising interns that were doing outreach; onboarding other staff.

You know, just an expansion of those duties and responsibilities.

Q And then sometime in '22 or '23, you went to director of programming?

A Yes, sir.

Q So what did director of programming include?

A All of the responsibilities I've already mentioned; overseeing staff; helping create systems to make the organization sustainable with the level of growth we were experiencing; identifying other funding streams, other grant opportunities; creating more relationships in the community.

All the programs that HRO was utilizing, not just the ones relevant to certain counties like I was in the beginning. A lot of working with staff; doing more hands-on work with the actual grants and funders, more work with leadership; lots of meetings, a lot more Zoom meetings; a lot more administrative work.

But in earnest, I was still doing the day-to-day duties that I had been assigned since my beginning of work at Harm Reduction Ohio in many respects.

Q Got you. Okay.

A We're a small organization.

Q Then in '23, chief programming officer?

A Yes, sir.

Q Okay. So what additional -- I assume, based on your prior title, this just was a advancement or promotion and additional duties?

A As it was explained to me by leadership; in an effort to create the value associated with the level of work I was doing, the expert delivery of that work, and to, you know, present to funders and other stakeholders as more professional, more tenured, that was the suggestion of that title. But the responsibilities did not change.

Q Okay. It was more of a recognition of the extent of the work that you were performing?

A Correct. Especially -- yes. Correct.

Q Okay. When you started as outreach coordinator -- well, let me ask you this. You are currently full-time with HRO?

A Correct. I am a salaried employee.

Q Okay. Has that been constant since 2020?
A Full-time?
Q Yes.
A No, sir.
Q Okay. When did you become a full-time employee?
A I did full-time work my whole tenure. I was compensated as a full-time employee depending on the grant we had and the funding streams at that time. And so there were times I was and there was times I wasn't throughout my tenure.
Q Okay. So as far as -- let me make sure I'm saying this right. So as far as the time goes, you were -- from the beginning until current, you were working full-time?
A I have done full-time hours. I was not compensated full-time even prior to my actual hiring at HRO. Yes.
Q Okay. So how were you -- why don't you explain that to me? Tell me how you were -- tell me -- why don't you tell me how you were compensated?
A I was compensated hourly in the beginning, part-time. In certain counties, when you are a nonprofit organization and you have grants, only certain FTEs are afforded to certain deliverables.

And I was always paid based on that in the -- especially in the beginning years. And so I was paid an hourly wage, a biweekly paycheck, from the organization.

Q Okay. And then at some point did you become salaried?

A Yes, sir.

Q And when was that?

A I believe '23.

Q And have you remained salaried from '23 until the present?

A Yes, sir.

Q And what is your current salary?

A I believe 72.5 before taxes.

Q Okay. That's $72,500?

A Yes, sir.

Q Just so we're clear.

A Yes, sir.

Q Okay. And in '23, when you first became salaried, do you recall what your annual salary was?

A 62,500, I believe, once I was -- actual salary when we were fully funded. Yes, sir.

Q Got you.

A It may have been less, but I believe that's what was discussed.

Q That's what it was?
A I believe so. It definitely wasn't more.
Q Got you. So did you ever have any type of -- well, throughout your employ at HRO, have you ever had any type of employment agreement?
A An employee handbook.
Q Okay. And was that something that's, like, provided to you when you began with the company?
A No, sir.
Q Okay. When did an employee handbook -- when were you first made aware that there was an employee handbook?
A One was created -- I think one already existed when I was hired, but it wasn't presented to me in, like, an onboarding packet. But when one was created in '22, that was -- you know, I understood that one clearly.
Q Okay. And that was something -- I assume when you say "an employee handbook," it has policies and procedures of HRO?
A Yes, sir.
Q Okay. But did it have -- did -- was there anything in there -- and maybe I can try to find it and we can look at it later.
Was there anything -- like, typically, when

I think of a handbook, I think all employees get the exact same handbook.
A Yes, sir.
Q "Here's our vacation policy. Here's how" -- you know, that kind of thing. "Here's the holidays every year," et cetera, et cetera.
Did you have anything through your employment at HRO that was separate from just, like, a general handbook given to all employees?
A At times there may have been the idea of a job description, but that was not provided to me at the time of hire.
Q Okay. Were you later provided with job descriptions for your different positions?
A We later created them for funding. Like, when you do a funding, you know, application, we would -- we'd have to create one.
Q But you would've helped create the job description?
A They would ask what I did, and we would work together to create that.
Q And then you put -- and then that goes into the grant? And then --
A Or -- sorry. I'll let you finish.
Q No. You tell me.

A Typically it was used by leadership for whatever their purposes were.

Q Okay. I think what I would like to do now is talk a little bit about your employment at Velocity. And so why don't you tell me what -- I think I've got an idea, but what exactly is Velocity?

A Velocity Bio Group is a consulting firm.

Q Okay. And who does it -- what types of businesses does it consult with?

A As I understand -- and this is not the full breadth. I'm not -- there is contracts with DOD, the VA. They have multiple clients in healthcare, multiple clients in pharmaceuticals, and more -- much more beyond that. It's above my purview.

Q Okay. What was your -- there's area -- I mean, did you work with the Department of Defense?

A I did give expert consulting on multiple contracts to Velocity Bio Group.

Q Okay. What was your area of expertise within Velocity?

A Substance use disorder. And like I said, also, you know, disordered eating and geographical, you know, understandings.

Q So why don't I hand you what we will mark as Defendant's Exhibit Number 1?

MS. SETHI: Then if you're going to show her her contract, we should designate this portion of the transcript confidential.

MR. SHEARER: Yeah. Sure. That's fine.

(Nonconfidential portion of transcript ends.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

(Confidential portion of transcript begins.)

MR. CAUCHON: Do you get the -- the copies? Or --

MR. SHEARER: I have --

MS. SETHI: If you have copies, I would like one. Yes please.

MR. SHEARER: No, no. I'll get -- I thought I had -- so hold on. I have -- I thought I had four. I only have two. So if you have the other ones -- so I'll hand you --

MS. SETHI: Thank you. And you're marking this Defendant's Exhibit 1?

MR. SHEARER: I'm sorry.

MS. SETHI: I shouldn't have to realize that.

MR. SHEARER: Right. I'm just using --

MS. SETHI: Do you -- I -- do we want to do a --

MR. SHEARER: Let's go off record real quick.

MS. SETHI: Yeah. Can we --

MR. CAUCHON: Actually, I'm thinking differently. Because these are both the contracts --

MS. SETHI: One moment.

MR. SHEARER: Wait a minute. Hold on. Let's just leave --

THE REPORTER: The time is 10:36 a.m. We're now off the record.

(Off the record.)

THE REPORTER: We are back on the record. The time is 10:39 a.m.

BY MR. SHEARER:

Q Okay. So what we have is what we have agreed to mark as Exhibit 1. If I could have you just take a look at that, review it real quick. And this has been -- my -- this is my understanding, that this is your original contract with Velocity.

(Exhibit 1 was marked for identification.)

I just want you to take a second, look through it, and make sure that you are, in fact, comfortable that that is the complete, entire contract.

A To the best of my understanding and recollection.

Q Okay. You just looked a little confused for a second. So if there's -- if you think there's something different, missing, or wrong, let us know.

A I don't have my original in front of me, so

it's challenging to answer that question. There are some things that stand out to me, like the absence of my address. My original definitely had that.

And there's a couple of points that I believe -- in my discussion that I don't see, but I -- this might be the original as they presented it to me. I just don't have it in front of me to be sure. But --

Q Okay. Do you believe that there is a different version of this that would have -- other than your address, do you believe that there is a different version of this?

A I would really need to look at my original to know for sure, but it is possible. But I would have to look at my original to be sure.

Q Okay. This was provided to us by Velocity through a subpoena.

A Okay.

Q So as we are going through it -- why don't we go to the last page, which is titled Velocity 38. Is that your signature?

A On the last page? Yes, it is my signature.

Q Okay. Okay. Where it says "December" -- the date on there is December 1, 2022?

A Correct.

Q Got you. Okay. Okay.
A But out of context, one page -- you know, but that is my signature. Yes, sir.
Q Okay. So when I look at the agreement, the first -- not the first paragraph, but the first titled paragraph is "Background." And it talks about -- there's a description of Hikma. And -- am I pronouncing that right?
A Correct.
Q Hikma. Okay. And it talks about -- if you see the third paragraph under "Background," it talks about Hikma's introduction of an 8-milligram naloxone nasal spray?
A Yes.
Q Okay. Was the development or distribution of that naloxone, the 8-milligram naloxone spray, the -- kind of the impetus for you going to work for Velocity?
A I'm not sure why Velocity hired me.
Q Okay. Why do you -- well, why do you think Velocity hired -- what -- let's say this. What did you bring to Velocity, if you don't know why they hired you?
A My expertise in substance use disorder.
Q Okay.

A Among my other skill sets as a person and professional.

Q Okay. So under "Employee Duties" --

A Yes, sir.

Q That's paragraph 1, and the heading is "Employee Duties." Could you just take a moment and read that?

A Okay.

Q Okay. Do you believe that is accurate, and do you have any reason to believe that's different than what you think -- the other version that may exist with your address on it?

A No, sir.

Q Okay. And I would ask you, when we're going through this, if you could tell me if you think there's something that may exist in a different form, some different description, some different wording. If you -- if something jumps out to you that you think is not in a different version that you signed?

A Yes, sir.

Q Okay. So under "Employee Duties," under 1, it kind of has a -- that's kind of a general description of of what you're going to do.

Then we go under the next heading, which is "Services and Deliverables."

A Okay.
Q Do you see where I am?
A Yes, sir.
Q Okay. And then it says "The employee shall be given the job title of director of government advocacy, with the following requirements below."
A Yes, sir.
Q And then we go to the next page, and there are seven separate categories. And what I'd like to do is go through those one by one, if we could, and talk about what you did or didn't do.
So I understand -- like, you have a job, a job may have a description, but you may do some of it and you may not do some of it.
So what I want to do is run through the -- what they have as the -- you know, the elements of the job, and you tell me which ones you did or or did not do.
A Okay.
Q Is that fair?
A Yes, sir.
Q Okay. The first one says "Learn and communicate the clinical and economic benefits of Hikma's products with key audiences, along with the policy and positioning of the product across the U.S."

Did you do that?
A Yes. I did learn and communicate clinical benefits of their SUD portfolio.
Q Okay. And when you say you learned -- obviously, there was some sort of company education that they gave you to teach you about the product?
A In addition to learning their whole portfolio of SUD, you know, work. Yes. It's mainly the clinical side. Yes.
Q Okay. So it's my understanding that Velocity does work for a number of different clients.
A Correct.
Q Okay. This agreement between you and Velocity seems to focus on Hikma? Their client, Hikma?
A Correct.
Q Okay. Did you do work with any other Velocity clients, or was it just related to Hikma?
A Multiple clients.
Q Okay. Did you have a separate employment agreement that talked about your work with other clients other than Hikma?
A Yes.
Q Okay. So there would be different

employment agreements?

A Yes.

Q Okay. Not all -- so how many different employment agreements do you believe that you had with Velocity?

A At least three.

Q Okay. Can you tell me what the names of those other entities were that -- other than Hikma?

A Not without reviewing the contracts to know what I'm allowed to disclose. Because those clients have, you know, confidentiality agreements sometimes in those contracts, and I would have to have those in front of me.

Q Okay. And are those contracts that you do, in fact, maintain and have?

A Most contracts have a term of years that maybe there is -- and I'd have to look at those to review what I'm saying.

Q No, no. I'm saying -- you say you need to review them. My question was, and I apologize, are those agreements in your possession?

A I have some agreements in my possession. Yes.

Q Okay. And the other entities, were any of them involved in the pharmaceutical realm or

pharmaceutical field?
A Yes.
Q Okay. But as we sit here, you're not willing to tell me what those other -- the names of those other entities?
A I'm not at liberty to say.
Q Okay. So I'm going to jump ahead real quick.
A Okay.
Q And we'll come back to the duties. But if I could direct you to Velocity page 35.
A Yes, sir.
Q And I'm under "Employment Period." And number 2, it talks about compensation.
A Okay.
Q And that has compensation of $10,416 per month?
A Yes, sir.
Q Okay. The other contracts that you had, without you disclosing the identity of the entity, did they have a separate compensation package?
A Some. Yes.
Q Okay. So while, for example, say, this contract was effective in 2022, you were being paid $10,416 by Velocity per month for your work for Hikma.

You may have been paid -- you had another contract that may have paid you X amount for your work during the same period of time with the other entity?

A There was some -- yes. Yes.

Q Okay. This equals an annual salary of about, what, $130,000 or so?

A A little less. Yes, sir.

Q A little less. Okay. Can you tell me what the amounts of those other contracts were? Again, without telling me the identity of the -- you know, of the entity?

A I was compensated monthly like a retainer. So I made about 11,000 to 12,000 a month from Velocity.

Q Okay. So the majority of it, then, if you made 11,000 to 12,000 a month, this is 10,400 dollars. So it'd be 1,000 to 1,500 dollars per month for the other entities -- from the other entities?

A At the time of this contract?

Q Yes.

A In 2022?

Q Yes.

A Yes.

Q Okay. Did that change through the fall of 2025?

A Yes.
Q Okay. How did that change?
A There were different contracts with different salaries.
Q Okay.
A But I -- I -- yes.
Q So -- well, we'll get to those other ones later. But so we'll say, at least upon the -- this initial contract from 2022, 10,400 dollars was from Hikma, and you believe it was approximately 1,000 to 1,500 dollars from maybe other contracts that Velocity had?
MS. SETHI: Objection.
THE WITNESS: Correct. But also in '22, I was -- it was less in the beginning, and then it was raised. So as you can see here, there was prorated month.
BY MR. SHEARER:
Q Oh, right.
A Right.
Q Right. But I'm saying the monthly rate --
A Yes.
Q -- was the 10,416?
A Yes, sir.
Q Got you. Got you. Okay. So let's go back

to Velocity 32. When we say "communicate the clinical and economic benefits," who were you communicating that information to?

A So clinical was more my realm. Economic would've been more that it was just a generics manufacturer. That's the extent there.

But stakeholders, you know, parties in the community, I did outreach and conversation with. Folks seeking donations. It could have been anyone I engaged in my time there.

Q Okay. And that's what I want to ask you about. You're giving me, like, kind of generalities. Let's talk about -- can you give me any specific entities?

A Several tribal nations, hospital systems, nonprofits, treatment centers, doctors, advocacy groups, policymakers in some places. Yep.

Q Okay. What entities can you specifically recall communicating the clinical and economic benefits to in -- here in Ohio?

A Oh, I did not do that.

Q Okay. You did no work in Ohio?

A Correct.

Q At any point in time at your -- through your work with Velocity, did you communicate or speak with

any entities based in Ohio?
A Entities or -- yes. Actually, yes. Yes.
Q Like -- and who would those have been?
A If somebody received a donation, I might ask them for their tax paperwork for purposes of processing that donation. There may have been people who were a part of a national organization that lived in Ohio. But other than that, not really anyone.
Q Number 3 refers to "expert consulting"?
A Yes.
Q "Within the advocacy and policy arena"?
A Mm-hmm.
Q Tell me what that included. What did that include for you?
A Understanding how naloxone is used in a community. Understanding, you know, the evidence-based best practices around naloxone dissemination and use; education on overdose reversal; community health education and understanding.
Understanding, you know, municipalities versus, you know, community ability to obtain naloxone. Just my understanding of naloxone saturation and evidence-based best practices surrounding the medication.
Q Okay. If I look under 3(a), it says

"director of of governmental advocacy," and
that's -- that was you?
A Mm-hmm.
Q "Shall allocate no less than full time." So
that was a full-time position for you?
A Yes.
Q Okay. "To achieve Hikma business
objectives."
When we say -- what were the business
objectives that you were trying to achieve per your
job description?
A In my role under the clinical director and
on the advocacy team; to provide donations, to provide
education awareness, train the trainer programs, and
to get feedback from communities about their products.
Q And then it says "manage accounts." What
accounts did you manage?
A If people received donations and then
advocacy partners, we gave out micro and mini grants
to some advocacy organizations and partners. And so
just knowing who the -- they were, making sure we had
their 513 documentation, that I knew who those people
were and I understood their stories.
Q So there would be a grant. You would help
use that money or -- to purchase Hikma products?

A No. You could not use the money to purchase Hikma products.
Q Okay. So then I'm just -- this is just my ignorance of how this works. So when you say -- so what -- how would you manage accounts? What would --
A The account was an individual or organization that received a donation or a micro grant to continue their advocacy efforts in the community relating to SUD.
Q Okay. Let's jump a little bit ahead to the end of that sentence. And it says "and support the lobbyist team"?
A Mm-hmm.
Q Okay. What was the lobbyist team?
A My understanding of the lobbyist team was there was a government affairs team within Velocity that worked with hired lobbyists or partner lobbyists. And that -- that's my understanding.
Q Okay. The lobbyist team are employees of -- when we say "lobbyist team," that's the Velocity lobbyist team?
A I don't believe Velocity had lobbyists. They had a government affairs team, and they worked with outside lobbyist partners, from my understanding. I was not on that side of the work. I was on the

advocacy and clinical side.
Q So it's your belief that Velocity -- that part of Velocity's business is not providing lobbying services?
A I don't have an understanding of lobbying services, so I can't best answer that question.
Q You do not know what "lobbying services" means?
A I understand the definition of a lobbyist. I don't understand all of their services.
Q Okay. So what is your understanding of the definition of a lobbyist?
A An individual that provides support for legislation. And that could be different in every municipality throughout the nation. Our -- our justice system is large and robust.
Q Okay. So when you say "support the lobbyist team," you didn't really understand what that meant?
A Yes.
Q Yes, you did understand?
A I -- I understood -- I'm explaining to you what I understood it to mean.
Q Okay. Okay. So you knew there was a lobbyist team?
A Correct. I knew that there was a government

affairs team, and that they worked with lobbyists in some form.
Q And you knew that part of your job description was to support the lobbyist team?
A With education and feedback around evidence-based practices and things like that in the scope of my work. Yes. That was my assumption and understanding.
Q Right. So as -- so let's read that. "As director of governmental advocacy, shall allocate no less than full-time to achieve Hikma business objectives, manage accounts, develop advocacy, and support the lobbyist team."
But yet what you told me a moment ago is you did not know if Hikma had any lobbyists or employed any lobbyists?
A I told you I understood that they had a government affairs team that worked with lobbyists.
Q Correct.
A I don't understand that direct relationship, as I was not a member of that team and it was above my purview. I was on a different team.
Q Okay. Did you ever ask anyone what you were -- how you could support the lobbyist team, or did anyone explain to you how you could support the

lobbyist team?
A No, sir.
Q So let's go under 3(a), sub 3. See the -- where I'm referring to?
A Yes, sir.
Q It says "Create synergistic relationships with influential policy organizations, community coalitions, and harm reduction groups whose focus includes strategies to increase the state use and funding of naloxone or block access to 8-milligram naloxone."
So tell me what part of -- how did that -- what did you do with that part of your job description?
A I would work with the folks that we gave grants to, the folks that we gave donations to. Understand the feedback from the products, all funding of naloxone. Hikma had a large portfolio of naloxone products.
I was to advocate in my work to the understanding of the best use of naloxone in the best community, understanding how organizations felt about the medications in the Hikma portfolio, and do my best to communicate that between those community groups. Yeah.

Q So Hikma is trying to promote the alternative of the 8-milligram naloxone?

MS. SETHI: Objection.

Go ahead.

THE WITNESS: Hikma had a large naloxone portfolio. The 8-milligram naloxone was the addition to that portfolio, but they had a large portfolio of naloxone.

BY MR. SHEARER:

Q And the reason why I'm asking is when I look at the background on page 1, it specifically refers to their product of the 8-milligram naloxone nasal spray?

A Correct.

Q Okay. And it refers to how -- if you read down, it says "2-milligram or 4-milligram naloxone doses are often inadequate for effective revival."

Do you see where I read -- did I read that correctly?

A Yes.

Q Okay. So to my reading of this, Hikma developed and introduced an 8-milligram naloxone product?

A Correct.

Q That they believed was superior to a 2-milligram or 4-milligram?

MS. SETHI: Objection.
THE WITNESS: I can't speak to what they believe.
BY MR. SHEARER:
Q Okay. What was your understanding of the emphasis or your role in promoting the 8-milligram product?
A I promoted no individual product.
Q Okay. I don't see -- when I'm looking through your business or through your job description, the seven topics, the only specific product I see referenced is the 8-milligram naloxone. Do you see any other ones? And take your time.
A They mention naloxone product often, and they had a wide portfolio of naloxone. I understood that to mean all naloxone products, by direction and understanding of this document; and "all SUD products" as their broad portfolio of SUD products, as my contract states on the first page.
Q Okay. Under 3(a), sub 3, the paragraph we were just talking about. "Creates synergistic relationships with influential policy organizations, community coalitions, and harm reduction groups whose focus includes strategies to increase the state use and funding of naloxone, or block access to

8-milligram naloxone."
So what type of work did you do with organizations that were attempting to block access to 8-milligram naloxone?
A    Listen, understand, have communications around why and what their preferences were. Understanding how, you know, things could be improved, what their reservations were.  Basic pharmacovigilance.  Many -- yeah, that's enough.
Q    Okay.  Under 4, and it says "Team Communication."  And under 4(d), it references "Conduct discussions with lobbyist team members as requested."
You see what I'm referring to?
A    I see that, sir.
Q    Okay.  Tell me about discussions that you had with the lobbyist team members.
A    They didn't always understand what a standing order was.  They didn't understand differences in naloxone.  They didn't understand who was using naloxone.
They didn't often understand, as you yourself have said in this deposition, the lingo or the ecosystem.  And I tried to best share with them, you know, what that was.

Q Then if I could drop down to (f) underneath the -- it's at 4(f), the top of page 33. It says "When attending conference presentations."
What type -- can you tell me the conferences that you would've attended on behalf of Velocity and its client Hikma?
A Yes. I went to lots of substance use conferences, pharmaceutical conferences, community conferences, healthcare system conferences, EMS and law enforcement conferences. Clinical, harm reduction, any great number of conferences as relating to substance use disorder, mainly.
Q So were these, like, local in Ohio conferences, or were these conferences -- I know you said that none of your work -- most of your work was not really directed to Ohio. Would any of these conferences have been outside Ohio?
A National. Yes. There were -- there was very few instances of attending things within Ohio.
Q Okay. So during your work with -- work for Velocity, can you give me a rough idea of how many conferences outside of Ohio that you would've attended?
A Over a dozen.
Q So if I look under your job description

under number 5, and then we can go to 5(b). "The director of government advocacy must train to understand the following components."

And 4 underneath that is "Key influencers in purchasing decisions who sway the use of specific forms, doses, products, and naloxone allocation of government grants"?

A Yes.

Q What was the purpose of you doing that, do you know?

A I was firewalled from knowing prices, sales, procurement in my role. And so I had to understand all the things I was not allowed to be involved with. I had to understand all of the, you know, legal roadblocks to my work.

Q Well, actually what it says -- I appreciate that. It says that you must be trained to understand "the following components." And one of the following components is the "key influencers"?

A Yes.

Q Why did you need to know about the key influencers?

A My understanding is so that I could avoid any issues with the firewalls in my work.

Q Did you have -- so you would've

had -- through your work for Velocity, you would be having contact with these key influencers?
A I would not have contact with key influencers unless the advocacy groups or things like that where I was doing the grants and the donations. I think that's a pretty broad term.
But yeah, I wasn't I wasn't talking to the person at any time who does purchasing. If that makes sense.
Q Okay, then. Let's go down to number 6 then, if we can.
A Mm-hmm.
Q "In conjunction with the director of strategic alliances, identify the major national and needed state players in advocacy from a Hikma Kloxxado opportunity perspective and assess their willingness to partner with Hikma."
So part of your job, it sounds like, was identifying people who may need or could use Hikma or Kloxxado; correct? Is that --
A Yeah. I'm interested in the word "director of strategic alliances" because I couldn't tell you who that was.
Q Okay.
A But I think that's funny.

Q Well, we can just take that as --
A Well, I'm just thinking it's funny.
Q Yeah.
A But yes. "Needed for state players in advocacy -- perspective and assess their willingness to partner."
Yeah. Identifying people who wanted to apply for these grants, who would be interested in donations. Yeah. That -- that makes sense.
Q Yeah. "From a Hikma Kloxxado opportunity perspective and assess their willingness to partner with Hikma"?
A Yes. Yes.
Q So what --
MS. SETHI: Let him ask the question.
BY MR. SHEARER:
Q "And assess their willingness to partner with Hikma." So tell me; like, who were some of the people that you assessed their willingness to -- some of the entities that you assessed their willingness to partner with Hikma?
A Groups that might distribute naloxone that might want to distribute multiple forms or receive a donation.
Folks that might want to participate in our

advocacy summit, folks that might want to learn more about the products, folks that might want to do research regarding pharmacovigilance in the products and learn from them.

Q But that would include -- you didn't mention people that would want to purchase Hikma products.

A Correct.

Q Okay. So none of the goals of your job were to increase Hikma's sales?

A Correct.

Q Why would Hikma care if someone was going to partner with them if they're not going to use their products?

MS. SETHI: Objection.

THE WITNESS: To understand the community willingness and readiness for their portfolio of SUD products.

BY MR. SHEARER:

Q And hopefully those products are compatible, and they would use those products?

MS. SETHI: Objection.

THE WITNESS: I can't speak for Hikma Pharmaceuticals.

BY MR. SHEARER:

Q Okay. But are you telling me that your

understanding is that no part of your job with Velocity on behalf of Hikma was to help Hikma or assist Hikma with the marketing of their products?

MS. SETHI: Objection.

Go ahead.

THE WITNESS: Could you ask the question in a different way?

BY MR. SHEARER:

Q No. I could ask it the same way.

A Would you -- would you repeat it for me?

MR. SHEARER: Could you read the question back please?

THE REPORTER: One moment.

(The reporter repeated the record as requested.)

THE WITNESS: No. I don't believe my role was marketing.

BY MR. SHEARER:

Q What is your understanding of why you would assess a entity's willingness to partner with Hikma?

A Someone has to do it.

Q Has to do what?

A Find out if somebody was willing to partner, if they're going to accept a grant or a donation or are interested in their portfolio of products. That

was just part of my role.

Q What does "partner with Hikma" mean to you?

A Well, if they're going to receive a donation or a grant, they would give data and information about how they used that money or how they used the product. They would give feedback. They would talk about its efficacy, about its how it was used, their opinions of it. Yeah.

Q But just so I'm clear; your understanding of "partner," the phrase "partner with Hikma," in no way means using Hikma products?

MS. SETHI: Objection.

THE WITNESS: As I just said, feedback about the products that they may have received in a donation, or the communities they engage with when receiving a grant, or the data they're collecting or the education.

BY MR. SHEARER:

Q Okay. But my question is, is it your understanding that any part of the phrase "partner with Hikma" includes using or purchasing Hikma products?

A Not purchasing.

Q Using Hikma products?

A It depended on the partner. But if a

partner received a donation of Hikma products, they would be interested in how those were used.

MS. SETHI: Now, David, I know I want to let you kind of finish your topic, but we've been going for a little over an hour.

MR. SHEARER: Yeah.

MS. SETHI: So if you're moving to a new section --

MR. SHEARER: I was hoping to get done with the agreement first, but we'll come -- yeah. We'll take a break

MS. SETHI: Yeah. If it's a good stopping point.

MR. SHEARER: No, no. Absolutely it is.

MS. SETHI: All right. Let's take a five-minute break or so?

THE WITNESS: Yeah. Sounds good.

THE REPORTER: All right. One moment.

The time is 11:16 a.m. We're now off the record.

(Off the record.)

THE REPORTER: We are back on the record. The time is 11:27 a.m.

//

BY MR. SHEARER:

Q Okay, Ms. Reese, just a few more questions about this agreement and then hopefully we can move on. But I do want to direct you back to the very first page, if I could.

The second paragraph says "Under this agreement, you are employed by VBG on behalf of Hikma Pharmaceuticals to provide services as described below."

Is that consistent with your understanding, that while you were employed by VBG, it was on behalf of Hikma?

MS. SETHI: Objection.

THE WITNESS: My understanding was that I was an employee of VBG, and Hikma was a client of VBG.

BY MR. SHEARER:

Q Okay. Okay. So do you believe that sentence that says "you are employed by VBG on behalf of Hikma Pharmaceuticals," do you disagree with that?

A I stand by what I just stated. I understood that Hikma was a client of VBG, and I was a VBG employee.

Q Okay. But you don't really have an understanding or a -- well, you don't agree or

disagree with the phrase "employed by VBG on behalf of Hikma Pharmaceuticals"?

MS. SETHI: Objection.

THE WITNESS: If that is legalese, it is beyond my understanding other than what I have stated.

BY MR. SHEARER:

Q Got you. Okay. Let's go back to page 33 of the agreement, if we could, and go under the very bottom of the page. It says "Summary of Velocity Bio Group Promotional Policies." Do you see where I am?

A Yes, sir.

Q Okay. The sentence says "This employment agreement outlines several VBG policies that will apply to how the director of government advocacy promotes our client's products on behalf of Hikma."

So you were the director of government advocacy; correct?

A Correct.

Q And as the director of government advocacy, you were to "promote our client's products on behalf of Hikma." Do you agree with that?

A The statement is "how," to apply "how" the director of government advocacy promotes our client's products on behalf of Hikma.

Q Correct. Correct. Do you agree that it was part of your job duties to "promote our client's products on behalf of Hikma"?
A I understood that I would follow the policies relating to that.
Q As director of government advocacy, did you ever promote your client's products on behalf of Hikma?
A I spoke to the relevance and necessity for naloxone and other SUD products that Hikma owned. Absolutely.
Q Okay. And then consistent with that, let's go to page 34, the next page, and go into that (a). And it says "Director of government advocacy will promote Hikma products only in accordance with the approved label."
See where I'm referring to?
A Yes, sir.
Q Okay. And did you promote the Hikma products only in accordance with the approved label?
A My understanding is that I would never promise a medicine did something it didn't do in its prescribing or other labels. I wouldn't promise that if you use naloxone, you could fly to the moon.
Q Oh, sure. I appreciate that. But my

question actually was, did you promote Hikma products in accordance with the approved label?
A I agreed that I would only, you know, talk to the products, speak about the products in accordance with their approved label.
Q Okay. And you did so?
A I would say, "This is how you use naloxone. This is its expiration." Yes.
Q Okay. When the agreement uses the word "promote," you seem to maybe have some disagreement with the word "promote." Do you disagree or -- strike that.
Do you feel like you ever promoted Hikma products while you were working for Velocity?
MS. SETHI: Objection.
THE WITNESS: I promote personally, at all times, access to naloxone and lifesaving opioid reversal medications. Yes, sir.
BY MR. SHEARER:
Q And that's very noble of you. But my question was, did you or have you promoted Hikma products?
A Hikma has a wide portfolio of those types of products.
Q Have you promoted Hikma --

A Yes.
Q -- products?
A Of naloxone.
MS. SETHI: Let him finish the question.
THE WITNESS: I'm sorry. It's just the same question.
BY MR. SHEARER:
Q Have you promoted Hikma products?
A I have promoted naloxone; Hikma makes naloxone. Yes.
Q Okay. So the answer -- so would you agree -- you would agree with me that you have promoted Hikma products?
A I believe so.
Q Who did you directly -- who have you directly reported to during your work at Velocity?
A Desiree Crevecoeur-McPhail.
Q I'm sorry. What was that name?
A Desiree Crevecoeur-McPhail.
Q Okay. Anyone else?
A Pat Trifunov.
Q Okay. Anyone else?
A No, sir.
Q Do you know what their titles are?

A I believe Desiree's is the senior director of government advocacy and the clinical or medical director, and Pat is the CEO of Velocity Bio Group.
Q Let's go to page 37 of the agreement, if we could. You see the heading that says "Non-Compete"?
A Yes.
Q Okay. Under "competitors," do you see that? Under -- is that (b)?
A Yes.
Q It says you're required "to withhold from working directly for the following competitors." And then it just describes companies selling opioid reversal drugs. You see where I'm referring to?
A Yes, sir.
Q What are the other companies that you're aware of that sell opioid reversal drugs?
A BioEmergent Solution [sic], Amphastar, Teva, Padagis, Amneal, Pfizer, and I'm sure there's a great many more.
Q Okay. There's a bunch of them?
A Yeah.
Q Okay. Why don't we just -- so we are -- so this was your first contract with Velocity. We have the second contract. Why don't we all get a copy of that?

(Exhibit 2 was marked for
identification.)

Let me have you take a look at this and tell me if this is the second. Take all the time you want. This is Bates numbers Velocity 39 through Velocity 48. Just have you look and tell me if you believe that's the contract, the second contract.

A To the best of my understanding and recollection. Yes.

Q Okay. And if you take a look at the last page, Velocity 48?

A Yes.

Q Is that your signature?

A Yes, sir.

Q Okay. And that date on that is February the 8th of 2024?

A Yes, sir.

Q Okay. Have you had any other -- we already talked about other contracts, but have you had any other contracts with Velocity pertaining to Hikma other than these two?

A I don't believe so.

THE REPORTER: And then just for clarification purposes, Counsel, were you marking that as an exhibit?

MR. SHEARER: Oh, I'm sorry. This will be number 2 please. I'm sorry.
THE REPORTER: Yes, sir. No problem.
MR. SHEARER: I couldn't remember if I said it or not.
THE REPORTER: Thank you.
BY MR. SHEARER:
Q So if I look at -- if we can jump to page -- towards the end, hold on. Forty-five of the document, under "pay."
A Yes, sir.
Q Okay. This -- you have an increase in your monthly compensation to $11,250?
A Yes, sir.
Q Okay. And again, it looks like that was probably W-2 income?
A Yes, sir.
Q The other work that you did for the other entities that you are not at liberty to tell me about, was that also -- would that have also been W-2 income?
A Some. Not all.
Q Okay. Do you --
A To my understanding.
Q You think some of it may have been 1099?
A Yes, sir.

Q And would that 1099 have been issued by -- would've been issued to you by Velocity?
A Correct.
Q Okay. So the -- under your pay, under the employee benefits, looks like you're also eligible for medical and health insurance?
A Yes, sir.
Q And eligible to participate in their 401k?
A Yes, sir.
Q Did you do both of those?
A Yes, sir.
Q Did HRO offer you any medical benefits?
A No, sir.
Q They're not available?
A Correct.
Q What about any type of retirement plan? Did HRO have any type of retirement plan in place?
A I believe at different points there was, but I was never given it. I never received it from the organization.
Q Okay. And if I can direct you back to the second page of the agreement. And again, under "Employee Responsibilities," under number 3, I believe this is the same language as the first contract.
But under 3(a), it says "Director of

government advocacy shall allocate no less than full time to achieve Hikma business objectives."

You see where I read that?

A Yes, sir.

Q Okay. So again, this was a full-time position?

A Yes, sir.

Q Okay. When -- what does "full-time" mean to you?

A I was assigned certain tasks and deliverables, and I would complete those in the time it took to complete them.

Q Was there ever any expectation provided to you by Velocity that they expected you to spend a certain number of hours per week, per month, per year?

A No, sir.

Q I think that's probably all the questions I have for Exhibit 2.

I want to talk a little bit about your work. You talked about meetings. We just briefly touched on meetings that you attended while on behalf of Velocity, and you said that "most" of those were not in Ohio. Were some of them in Ohio?

A There were -- Hikma has a plant in Ohio, and there was a time I traveled there. But I worked

remote, so I was in Ohio physically.
Q Sure.
A Yeah. Just trying to answer it the best -- earnestly.
Q Yeah. But I was talking about, like, the conferences -- you know, the conferences that you attended on behalf of Velocity. You mentioned that a lot of those were out of state.
And we'll maybe talk about that in a little bit, but were any of those conferences in Ohio and involving -- you know, involving Ohio organizations?
A I believe there may have been two that I can think of off the top of my head. It was a national conference, but it was held in Ohio, which was the OD2A Deflection Conference.
Q OD2A. What is that?
A Yes. Some sort of deflection and -- I don't know what it stands for, if I'm being honest.
Q What's the "O" stand for?
A I don't know.
Q And what was the purpose of you attending that conference?
A It was in Cincinnati. To gain knowledge and understanding, to attend sessions.
Q Okay. Did you mention another one? You

said maybe there were two?
A Yeah. I'm trying to remember. To the best of my recollection, there might have been -- I wish I could remember the name of it, but there's, like, a -- is it Opioid and Other Drugs Conference? It might have another name.
But there is another conference I attended, I believe, in Ohio. But I -- I don't know the name. I don't recall.
Q Okay. Now, we've already gone through your job description with the part about the promoting of products. Did any of the meetings that you have attended, either in Ohio or out of Ohio, involve promoting Hikma products to Ohio entities?
A No, sir.
MR. SHEARER: Do you have -- copies of this?
MR. CAUCHON: I have copies of the original, the -- the expense accounts.
MR. SHEARER: Okay. So --
MR. CAUCHON: That's just my summary. But -- but I do have a few copies to give. But this is all from -- these are the -- account.
MR. SHEARER: So hold on.
MR. CAUCHON: All right.

MR. SHEARER: All right. All right. We'll just sit here for second please. Give me a second.

MR. CAUCHON: Yep.

MR. SHEARER: These are all --

MR. CAUCHON: These are the Hikma expense accounts, and this is an easily readable version of those.

MR. SHEARER: What's an easily readable version of it?

MR. CAUCHON: This is -- it's just in bigger. That's, like, a 7-point font.

MR. SHEARER: And what's this? This is --

MR. CAUCHON: That's fine.

MR. SHEARER: Let me step out for a second.

THE WITNESS: No problem.

MS. SETHI: Yeah. Take -- we can go off the record for a minute.

THE REPORTER: All right. One moment.

The time is 11:46 a.m. We're now off the record.

(Off the record.)

THE REPORTER: We are back on the

record. The time is 11:50 a.m.
BY MR. SHEARER:
Q Okay. So, Ms. Reese, what I have handed you, we're marking as Exhibit 3. And that is titled "Amandalynn Reese Expense Report Analysis."
(Exhibit 3 was marked for identification.)
A Okay.
Q Start date 12/1/22 to present. And I'll represent to you that this was produced from Velocity pursuant to subpoena.
Have you had a chance to review this document before?
A No, sir.
Q Okay. Do you understand what this document is?
A I think so.
Q Okay. And what is your understanding of what it would be?
A It looks like a spreadsheet of expenses that I may have been reimbursed for.
Q Right. Okay. Throughout your travels or for whatever, if you incurred expenses on your own personal credit card on behalf of the -- Velocity, you could submit those for reimbursement?

A Correct.
Q Okay. And so it does give us a little bit of insight to some of your travels. For example, if I go down to -- I know this is a very small type, and I apologize.
If I go down to about two-thirds of the way down the first page, there's an entry for July 11, 2024, that says "Delta Airlines"?
A July 11, 2024. Yes.
Q Okay. And it says "Flight to Pennsylvania for Viral Hepatitis Summit from Native American Conference"?
A Correct.
Q Okay. So that probably gives you -- that, I assume, would help remind you that, "Hey, that's one of the conferences that you attended"? It was in Pennsylvania, and it was a Native American Conference?
A No. The Viral Hepatitis Summit was in Pennsylvania; the Native American Conference is where I was flying from.
Q Got you. Okay. Okay. But any event, that kind of helps refresh your recollection as to maybe some of the trips that you would have taken?
A Sure.
Q So let's go to, say for -- on page -- one

second. I apologize for this. Let's go to November 14th of 2023.

MS. SETHI: Which page are you on, David?

MR. SHEARER: I'm just -- it is --

MS. SETHI: The Bates number on it?

MR. SHEARER: Yeah. I'm sorry. That is Bates number 54.

MS. SETHI: Thank you.

THE WITNESS: Can you repeat the date please?

BY MR. SHEARER:

Q Yeah. I'm sorry. November 14th of 2023?

A Okay.

Q And so it looks like I've got a charge on there for Shell?

A Mm-hmm.

Q One for Waffle House?

A Mm-hmm.

MS. SETHI: Make sure you're using "yes" and "no."

THE WITNESS: Oh. Yes.

BY MR. SHEARER:

Q And then I have November 14 of '23, REVERB by Hard Rock, for lodging.

A    Yes.
Q    And that says "Hotel parking and meals for APHA conference"?
A    Yes.
Q    Okay.  What was the APHA conference?
A    I believe that stands for Association of Public Health.  I -- it's something Public Health.
Q    Okay.  And do you remember any of the entities that you may have met with at that APAH [sic] conference?
A    I do not, sir.
Q    So you do not recall having a meeting with the Franklin County public health department?
A    They may have attended and I saw them there. But not, like, an official meeting.  No, sir.
Q    Okay.  And the same would go for the COTA, the COTA bus system?
A    COHR?  Is that what you're talking about, Columbus health department?
Q    We -- yeah.  That's fine.
A    That's not the Franklin County health department.
Q    Okay.  Actually, I'm still talking about -- where are you referring to right now?  I'm sorry.

A I -- I don't know. You said COTA bus and public health --
Q Yes. That was -- those were -- I'm just -- yeah. I'm just asking if you recalled -- you're looking at a different entry.
A Oh.
Q I'm just asking if you recalled meeting with the COTA bus system at that November 14, 2023, conference.
A No, I did not meet with them at the conference.
Q Did you meet with them separately, outside of the conference?
A I believe so.
Q Okay. Do you recall when that would've been?
A No, sir.
Q Okay. Do you recall, well, the purpose of that meeting?
A I believe to discuss if they carried naloxone and training for naloxone.
Q Okay. Was that meeting on behalf of your work with Velocity or on behalf of your work for HRO?
A I believe Velocity, if I billed them. But there were, you know -- I don't recall.

Q Okay. Do you recall a meeting in November 14th of 2023, meeting with a central Ohio harm reduction group?
A Yes.
Q And tell me about that meeting.
A We discussed how things were going.
Q How things were going with what?
A Outreach, activities, personal pursuits.
Q Was your attendance at that meeting on behalf of Velocity or Harm Reduction Ohio?
A I don't recall.
Q Okay. Could have been on behalf of Velocity or could have been on behalf of HRO?
A I don't believe it was -- I don't -- I don't recall.
Q Okay.
A It's -- it's been three years.
Q Sure. Let me ask you a question. Let's go to November 3rd of 2023. Do you see that "272.62 miles"?
A November 3rd. Yes, sir.
Q Okay. You submitted an expense to Velocity for $170.39?
A Yes, sir.
Q Okay. And then the charge above that is you

charged Velocity for staying at the Granville Inn. You see that? November 4, 2023?
A Yes, sir.
Q Do you recall that trip and that conference?
A I recall the conference.
Q What?
A I recall the conference. Yes, sir.
Q Okay. And you recall attending it?
A Yes, sir.
Q And you recall sending -- having Velocity reimburse you for your hotel and for your travel?
A No, sir.
Q Okay. You recall submitting your hotel bill but not the travel?
A I would need to see the bill. I remember attending and traveling to the conference, but I would need to see the bill.
Q Okay. But you will agree that this document, which is your expense report analysis, is for the expenses you submitted to Velocity?
A Correct.
Q Okay. And then when I look at the -- so whether you recall it or not recall it, from your expense report, it appears as if Velocity paid you for traveling to and from Granville, Ohio, and staying at

the Granville Inn on November the 3rd, 2023?
A Yes, it appears I was reimbursed for charges related to that. Absolutely.
Q What is the HRO conference?
A I believe at that time -- I can't remember if that was our SSP conference or what it was, but there was an HRO conference.
Q When we say "HRO," we're referring to Harm Reduction Ohio?
A Yes, sir.
Q Who was your employer?
A Yes, sir.
Q And so your employer held a conference?
A Yes, sir.
Q And were you required as part of your employment at HRO to attend that conference?
A Yes, sir.
Q But yet you billed your other employer, Velocity, for attending that conference?
A Yes, sir. I would have to see the bill to see if I billed for myself or for another reason, which would happen sometimes. So I would have to see the bill to talk specifics, but that's what this says.
Q Okay. Just so I'm clear, your employment at HRO -- which you described as full-time; is that

correct?
A Yes, sir.
Q And your employment at Velocity, you've described that as full-time?
A Yes, sir.
Q So you held two full-time jobs?
A Yes, sir.
Q And you were required by HRO to travel to and attend this conference?
A Correct.
Q Were you required by Velocity to travel to and attend that conference?
A No, sir.
Q Then why would you have -- but you did attend, and you did charge Velocity for your attendance at the conference?
MS. SETHI: Objection.
THE WITNESS: As I said, I would have to actually see the bill to see what I -- what I actually charged.
BY MR. SHEARER:
Q Sure. Whether -- whatever the nature of the charge is, we can agree that this expense report reflects that you submitted reimbursement for mileage and for some charge at the Granville Inn for that

conference?

A Yes, sir.

Q Okay. The APAH [sic] conference that we previously talked about under November the 14th of 2023, your stay was at REVERB by Hard Rock?

A Yes, sir.

Q And where is that?

A Atlanta.

Q Atlanta. Let's go up to the line above that.

A Okay.

Q November 29th of 2023.

A Okay.

Q "Travel to and from meeting in Columbus, Ohio, with COTA and FCPH"?

A Yes, sir.

Q And what is COTA?

A It is -- I think it's Columbus Ohio Transit Authority.

Q Okay. And what is FCPH?

A I believe Franklin County Public Health.

Q Okay. And that was on behalf of Velocity?

A I believe so.

Q Okay. And what was the purpose of your meeting with COTA and FCPH on November the 29th of

2023?

A The best of my recollection was there was a training related to a donation, I believe, and education around naloxone.

Q Did you -- since you billed Velocity for attendance at this, I assume that you were performing work on behalf of Velocity?

A There were allowables for travel. I would have to look.

Q Well, in any event --

A I think that's fair.

Q Okay. So you do not recall if you performed any work on behalf of Velocity at that conference?

A That was not a conference.

Q At that -- at those -- at that meetings. I'm sorry. I misspoke.

A I do not recall.

Q Okay. Would you expect Velocity to reimburse you for trips that you were not performing work for them?

MS. SETHI: Objection.

Go ahead.

THE WITNESS: I would follow the policies and procedures as outlined.

//

BY MR. SHEARER:
     Q    And what were -- what are the policies and procedures with regard to reimbursement for travel?
     A    I would have to consult my employee handbook, which I don't have in front of me.
     Q    But in general, would you agree that -- this is maybe the policy, and if we can get the policy, maybe we can see what it says.
          But you would agree with me that typically when you ask for reimbursement for something, it is work-related?
     A    Typically.
     Q    For example, you wouldn't go on vacation to Hawaii and ask Velocity to reimburse you for that?
     A    No, I would not.
     Q    So would it be safe to assume that that meeting was -- you were performing work in your role as a full-time employee of Velocity?
     A    I don't want to make assumptions.
     Q    Can you think of any other rational explanation as to why you would have submitted expenses to your employer for meeting with a potential contact if it was not for purposes of work?
     A    I asked, and they said it was okay.
     Q    During your work through your work at

Velocity, have you ever asked them to pay for trips that are unrelated to your work for Velocity?
A Yes.
Q Okay. Give me an example of that.
A Traveling to a conference and traveling home from the area. That -- but maybe I built in time for personal time in between.
Q Okay. But the -- it would all be part of attendance at a conference?
A The -- the -- like, where I -- the destination would be in accordance with the conference. But yes, I have.
Q Got you. Got you. Let's look at -- let's see. I have -- the very last entry is December 31st of 2022, and we're on page 56.
A Is that '22 or '23? I can barely tell.
Q It's December 31st of 2022.
A Okay. Yes, sir.
Q And then we can look right above that. There's an entry for flight insurance?
A Yes, sir.
Q And then looks like on January 31st we have a charge of $12. Also on January 31st we have a trip to the Alamo?
A Yes, sir.

Q Okay. In San Antonio. So it looks like, when I'm looking at this, we have a number of charges on January 31st in San Antonio?
A Yes, sir.
Q Do you recall what conference that was?
A I think there was something for the larger Hikma group, and we had a small meeting within that. But it was not -- that's what I believe it was.
Q Okay. Did you take any time off from or use any vacation time at HRO?
A I would have to look. But no -- I'd have to look if I used PTO or not. I don't recall.
Q Let's go above that. We've got February 24th of 2023, Southwest Airlines. It says "testimony in Baltimore"?
A Yes, sir.
Q Can you tell me what you were testifying about?
A Yes. At that time, there was an effort to change the standing order from Narcan to naloxone and to make all forms of naloxone available within the state.
Q So that was --
A Of Maryland.
Q That was on behalf, obviously, of Hikma?

A I believe Velocity. Yes, sir.
Q Velocity. I'm sorry. I apologize.
Did you take any time off from any -- you know, any personal time or vacation time from HRO?
A I would have to look. But I had a very flexible remote salary position, so I'm not sure if I flexed my time or if I took PTO.
Q Okay. Then go back to page 55.
A Okay.
Q And go to 3/3 of '23.
A Yes, sir.
Q It appears you went to Annapolis, Maryland?
A Yes, sir.
Q And that, again, was on behalf of Velocity?
A Yes, sir.
Q Okay. Do you know if you took any time off from HRO for that?
A As I said, I had a very flexible schedule. I would work very late. So I'm not sure.
Q You're just not sure?
A No, I'm not sure if I took PTO. Or I -- I very rarely took PTO.
Q Okay. Do you know if you would've used vacation time?
A I would have to look, sir. I don't recall.

Q Okay. What would you need to look at?
A PTO records, pay stubs, e-mail requests.
Q Okay. Then we go a couple lines above that. March 5th of '23, looks like you went to San Diego?
A Yes, sir.
Q Okay. Is that also on behalf of Velocity?
A Yes, sir.
Q Okay. Do you know if you took any time off from Harm Reduction Ohio for that trip?
A I don't recall.
Q Okay. Actually, let me ask you this. For any of these trips that you were absent from Ohio for, traveling to -- be it San Antonio, be it Annapolis, Maryland, be it San Diego, do you know if you informed anyone at HRO of those trips?
A Absolutely.
Q Okay. And who would you inform?
A Mallory Bolen, Linda Smolak, other team members. What time zone I would be in, how to reach me.
Q Okay. Do you have any emails or any other documentation of those reports to people?
A Yes, sir.
Q Okay. Is that stuff that you've maintained?
A I believe so. I don't know that I have all

of it, but there should be some.
Q Okay. And when you were taking these trips and you were missing days or you were away from Ohio for a while, do you know -- and for any of the trips that you've taken, and I want to -- just to save us time.
You know, we've got trips to Los Angeles. You know, we've got various trips on here. And so instead of me going through all of them separately, do you know if you took any time off from HRO to take those trips?
A I believe so.
Q Okay. Which ones would that have been?
A I don't recall.
Q Okay. Do you have any records that would show that?
A I believe so.
Q Okay. What would those records be?
A Personal emails, W-2s.
Q Would you be willing to provide those?
MS. SETHI: Objection.
THE WITNESS: In accordance with a subpoena or, you know, court processes. Sure. I'm not sure how that works.
//

BY MR. SHEARER:
Q Okay. But you would require a subpoena to turn them over?
A I don't know how it works. So I would do --
Q Yeah. But my question is -- like, you obviously -- if you asked me to hand you my keys out of my pocket, if I chose to, I could pull my keys out of my pocket and hand them to you.
If you asked me to go to my office, print off a piece of paper, and send it to you, I could do that.
And so my question to you is, are you willing to share these communications that you've referred to, share them with me absent a court subpoena?
MS. SETHI: Objection.
THE WITNESS: No.
(Confidential portion of transcript ends.)
//
//
//
//
//
//

(Nonconfidential portion of transcript begins.)

BY MR. SHEARER:

Q Okay. Thank you. So let's talk a little bit -- skip to Harm Reduction Ohio and the expectations.

MS. SETHI: David, real quick.

MR. SHEARER: Yep?

MS. SETHI: Or if you -- if we're done with Velocity stuff for the time being, we can probably go off the confidential designation.

MR. SHEARER: Oh, absolutely. Absolutely.

MS. SETHI: And then also, 12:15 now. We've been going for another hour. Do we want to take a break, come up with a plan for lunch, or do you want to just keep going?

MR. SHEARER: I don't care. So what do you guys -- so let me go talk to -- let me talk to him for a quick second.

MS. SETHI: Yeah.

MR. SHEARER: And see how much longer I think this will be.

MS. SETHI: Okay. Yeah. Let's do that, and then we can come up with a game plan.

MR. SHEARER: Yeah.
MS. SETHI: Let's go off the record. You guys take a little break, see what --
MR. SHEARER: Yeah. I will go --
MS. SETHI: Because if we're -- if you're going to go another 30 minutes, hour, then I don't see a reason to take a lunch break.
MR. SHEARER: I don't want -- I agree. I -- so here's --
MS. SETHI: But if it's going to be a few hours, then -- yeah.
MR. SHEARER: I don't want to jam anybody. I prefer to get it done, but I appreciate that everybody has to eat and all that stuff. So we will go talk real quick, and I will hopefully get out of here --
MS. SETHI: Sounds good. Yep.
THE REPORTER: All right. One moment.
The time is 12:15 p.m. We're now off the record.
(Off the record.)
THE REPORTER: We are back on the record. The time is 1:23 p.m.
BY MR. SHEARER:
Q Okay, Ms. Reese, let's move to talk a little

bit about your employment at Harm Reduction Ohio. So was there any sort of written expectation that you dedicate all of your professional time to HRO?
A All of my professional time?
Q Yes. All of your work time?
A No, sir.
Q Okay. One of the things that I understand was that a -- the major source of your funding came through a contract with the Ohio Department of Health?
A After a certain point. Yes, sir.
Q Okay. When was that point?
A I remember we applied in late July or early August of '23.
Q Okay. I had a '22 application.
A Maybe.
Q Well, let's do this. The whole -- the contract --
MR. CAUCHON: It was July '23.
MR. SHEARER: Oh, I'm sorry. Okay. He's right, July '23. You're right. I'm wrong.
So I have that HRO produced an entire -- we have the copies of -- yeah.
THE WITNESS: Thank you.
BY MR. SHEARER:
Q So this was produced by HRO through

discovery. And it's 128-page contract, but I just pulled out some various pages as opposed to giving you the entire thing.

(Exhibit 4 was marked for identification.)

And so it's my understanding that you did help create this request?

A The -- the application?

Q The application. Correct.

A Correct, sir.

Q Correct. So what all -- tell me, what all goes into the -- completing the application?

A What all goes into completing it? Or --

Q Yeah. I mean, who -- yeah. I don't know. I mean, I -- so I know -- so what I have here is excerpts from a 128-page document. The 128-page document is the -- what would you call it?

A I would say the application for the contract. Yes, sir.

Q Okay. So it's my understanding that HRO fills out the information. You then submit it to the Ohio Department of Health, and they either make a grant or don't make a grant? You tell me.

A My best understanding is that there was a bid, a notice for a bid placed, a competitive bid. It

had several pieces.
I -- we had to answer to those requests as a part of the -- of the bid and then submit a furnished final document. And it would be scored based on a rubric, and you would either get it or not.
Q Okay. And you guys did get it?
A Correct.
Q And my understanding was, like, for $650,000 maybe?
A I believe so.
Q Whatever it is. I think it was -- whatever it -- okay. It doesn't make -- whatever it is or -- too big -- well, it doesn't make any difference.
Okay. So did you help put that -- is it fair to call it an application?
A Yes, sir.
Q Did you help -- what was -- what -- let me do this. What was your role in putting that application together?
A I did several things for the application. Helped create the staffing plan; helped edit and work on the narrative; helped with a staffing matrix of sorts, there were several versions; helped with job descriptions, scope of work. Helped create, you know, several pieces of the final application.

Q Okay.
A There are probably more than that, but that's what I remember right now.
Q Okay. So when I'm looking at what is numbered HRO 668, that is the staffing plan?
A Yes, sir.
Q Did you put the staffing plan together?
A In this final form? No.
Q Did you contribute to the information or contribute to the staffing plan?
A Yes.
Q Okay. Who had the final approval of the staffing plan?
A Dennis.
Q Okay. So I see under "staffing plan," for example, it's got Dennis listed as president. Okay? Very top line.
A Yes, sir.
Q And it says "FTE each." So I think "FTE," can we agree, stands for full-time employee?
A Equivalent.
Q Oh, full-time equivalent?
A Yes, sir.
Q All right. There you go. So Dennis was a full-time employee of HRO at the time; correct?

A Correct.
Q Okay. But this has "0.5" for him, so I'm going to assume that means that he dedicates half his time to this -- would dedicate half his time to administering this grant or not? You tell me.
A I can't assume. That -- that could mean many things.
Q Okay. Like what?
A It could mean that half his salary; it could mean half his time; it could mean whatever the agreement for what an FTE is within here, he's taking half of that. It could mean a lot of things.
Q But it could mean salary because they're giving you X amount of money, you guys have to account for where X amount of money is going to go? Yep?
A Correct.
Q Okay. So next one, you're listed as project manager?
A Correct.
Q And "reports to president." And so there's one full-time equivalent. So you are a -- you are the only person that looks to me like it was a "1.0"?
A On this document that --
Q On this document. Correct.
A Yes, sir.

Q So to you, what does that -- what did you -- what's your understanding of what that "1.0" means?
A That of the allotment for the contract, I would be given full-time equivalent for work done under this contract.
Q Okay. And is "full-time equivalent," is there any definition as to the hours that it -- and I think there is on the next page.
A Oh, at the top. Yes, sir.
Q Yeah. Okay.
A Yep.
Q So for project manager Amandalynn Reese "40 hours, 1.0 FTE."
A Yes, sir.
Q So my as a layman reading this, it would seem to indicate that you are representing to the health department that you would be dedicating 40 hours to this?
MS. SETHI: Objection.
Go ahead.
THE WITNESS: In this application, that 40 hours is equivalent to one full FTE.
BY MR. SHEARER:
Q Okay. And you were put down as one FTE on

the staffing plan, which is on page 668?
A Yes.
Q Got you. Okay. So then if I go to -- it's marked page 770. It has "Candidate's name, Amandalynn Reese; candidates for position, project manager." Okay. That is you.
Next page, page -- it's numbered HRO 685. Looks like I have these rolled out of order. But that has your basic qualifications? That's where you have your Ohio State University?
A Yes, sir.
Q And then down below that "Certifications, the National Harm Reduction Coalition Conference, Puerto Rico." What was that exactly?
A It was a conference hosted by the National Harm Reduction Coalition. And I attended that, attended several sessions and learnings there. A CEU-qualifying, like, education courses and certificates of completion, you can get those at many conferences.
Q Okay. And for that conference, it was "anti-stigma and cultural competency"? Or is that --
A No. That's just -- I have certifications in those.
Q Oh, okay. Those don't --

A Necessarily correlate. Yes, sir.
Q Got you. Got you. I was thinking that -- I was reading straight across, thinking "National Harm Reduction Coalition Conference" and "certification in anti-stigma and cultural competency" -- those are two separate things?
A Yes, sir.
Q Got you. Okay. So like, that Harm Reduction Ohio, then across from that, it says "Trained in the foundations of harm reduction, certified opioid overdose responder."
Those two, again, don't necessarily correlate?
A Not necessarily, but I definitely did that work with Harm Reduction Ohio as well, of course. We certified people. I was a "train the trainer."
Q Got you. So those two dates, October 2022 and September 2020, what do those go with?
A I joined Harm Reduction Ohio in late summer of 2020. So I assume that's --
Q That goes with the left-side entry?
A Mm-hmm.
Q Okay. Got you. Got you. And then the October of 2022, what does that go to?
A I -- I believe the -- the conference.

Q Conference?

A Yes. Because that's where I would've gotten CEUs.

Q Got you. Okay. So is this something that you filled out as part of the application?

A Yes, sir.

Q And then if I jump to page 768, that's "Experience"? It's got the title "Experience" at the top?

A Yes, sir.

Q Okay. Is that something you put together?

A I believe it was pulled with AI from my LinkedIn profile. But yes. Generated by me.

MR. SHEARER: Okay. What was this? Was this number --

THE REPORTER: Four.

MR. SHEARER: Four. Okay. Thank you.

That's almost done. You know, why don't we just do -- so okay. We'll mark this as 5.

(Exhibit 5 was marked for identification.)

BY MR. SHEARER:

Q And so take a minute to look at it. It looks like the first four -- two, three -- so it looks to me like the first six pages are actually just

emails back and forth regarding the approval and implementation of the handbook. I don't see where you authored any of those, did you?

A The e-mails? It looks like the first one with the finalized copy came from me.

Q Oh, "from Amanda Reese." I'm sorry.

A It's okay.

Q I'm sorry. You're right. September 15, 2022.

A Yep.

Q Okay. So what role, if any, did you have in formulating the handbook?

A I worked with two other staffers in compiling almost, like, a lit review of multiple organizations' handbooks and our previous handbook and suggesting parts of it and then putting it together.

And then, like, copy editing, just going through and seeing if there were typos or asking questions about things that are relevant. And then some formatting, I believe.

Q Okay. So who were the other two staff members?

A Mallory Bolen and Linda Smolak.

Q Linda Smolak. Okay. I see them on there.

A And then Dennis, of course, worked on it as

well.

Q Okay. So the four of you worked on this at some point. Okay. So is this the -- if I can just have you take all the time you need.

And it looks like this is pages 17 through 44 of the handbook, and it's -- the Bates numbers are 355 through 385. And I just want to make sure if this looks -- I'm not going to ask you, obviously, about all of it.

A Mm-hmm.

Q But if it looks like -- I mean, this is what was produced by HRO. So I just want to make sure that it --

MS. SETHI: Are you done with the question? I just was --

THE WITNESS: Yeah.

MS. SETHI: I was just going to put an objection on the record, but I just want to make sure you were actually done with your question before I --

MR. SHEARER: Yeah. Yeah. Okay. Yeah. What's your objection to --

MS. SETHI: It -- I -- my objection is just -- I was just going to object that we're -- we don't have the full document here.

MR. SHEARER: I know. That's why

I'm --

MS. SETHI: And so I just want to put that on for record.

MR. SHEARER: Right.

MS. SETHI: You can ask her whatever you need to.

MR. SHEARER: I'm -- no, I am -- I can ask her. I'm wondering whether --

MS. SETHI: Just -- we just only have, like, a few pages from the middle of it.

MR. SHEARER: They're what?

MS. SETHI: I said we just have -- like, we're missing the first 16 pages of it. So --

MR. SHEARER: Well, I know we are.

MS. SETHI: Oh, to the extent you want to ask her about stuff that's in here, that's fine. We can keep moving. I --

MR. SHEARER: No, I do. But I'm just wondering whether -- for the sake of and to the extent we may use it somewhere else, whether we want -- and we're going to -- if we're reusing things, have the entire --

MS. SETHI: Yeah. Do you --

MR. SHEARER: -- handbook. I just

think that would be cleaner.
MS. SETHI: If you -- do you want to -- can we go off the record for just a minute?
THE REPORTER: All right. One moment.
The time is 1:41 p.m. We're now off the record.
(Off the record.)
THE REPORTER: We are back on the record. The time is 1:51 p.m.
BY MR. SHEARER:
Q Okay, Ms. Reese, we are back. Sorry about that. I think what we have is the entire employee handbook.
(Exhibit 6 was marked for identification.)
And I just wanted to take you -- have you look -- I have 47 pages. Can you -- just have you look through and make sure you think that is the handbook?
A Appears to be. Yes.
Q Okay. So back to that, what do you -- did you help author any specific portion of it? Or just -- not that you can --
A It was a collaborative effort.
Q Okay. And I know, like, some handbooks have

a signature page. This does not appear to. Does not look like there was one on this?

A No, sir. Do you mean, like, a signature of author?

Q No. Like, sometimes when you get a handbook, you, like, have to acknowledge receipt and -- you know, acknowledge receipt and review of the handbook. But that -- not on this one.

But it didn't make any difference, because you did help out with this, so obviously you had reviewed it?

A Yes, sir.

Q So what I'd like to do is direct you to page 377. Please let me know when you get there.

A I'm there.

Q Okay. The very bottom line says "Conflict of Interest"?

A The -- the header? Yes, sir.

Q Yeah. And then it looks like the conflict of interest section actually is now on to the next page.

A Okay.

Q And as I -- could you read that -- the first paragraph and then the single sentence after that?

A Yes, sir.

Q Okay. So the handbook does generally allow employees "to engage in activities," it says, "outside of their employment, which are of a private nature and unrelated to our business."
Do you see that?
A Yes, sir.
Q Do you believe that by working for Velocity, that is something that is unrelated to HRO's business?
MS. SETHI: Objection.
Go ahead.
THE WITNESS: Yes, sir.
BY MR. SHEARER:
Q Okay. The business of Velocity on behalf of Hikma is not related to HRO's business?
A Correct.
Q Okay. It then says "However, the employee must disclose any possible conflicts so that HRO may assess and prevent potential conflicts of interest from arising."
I read that correctly?
A Yes, sir.
Q When this handbook went into effect in September of 2022, did you disclose any potential conflicts of interest?
A Yes, sir.

Q Okay. What potential conflicts of interest did you disclose?
A In September of 2022? Just that I worked for the daycare, the various boards I served on, volunteer opportunities. Just other things I did outside of HRO.
Q Okay. How did you disclose those? Was there a form or an e-mail, a writing?
A No, sir.
Q Okay. How did you disclose that? Was it verbally?
A Yes, sir.
Q Okay. And who would that have been to?
A Either of my supervisors at the time.
Q Okay. And your supervisors were?
A It would've been Linda Smolak or Mallory Bolen.
Q How long was Mallory your supervisor?
A Depending on the program. I think over a year.
Q Okay. And so -- I forget. You were a member -- when did you go to work for Velocity?
A December of '22.
Q The next sentence in the handbook says "A potential or actual conflict of interest occurs

whenever an employee is able to influence a decision that may result in a personal gain for the employee or an immediate family member," it defines family members, "as a result of the agency's business dealings."

I read that correctly?

A Yes, sir.

Q Okay. Going back to the first sentence, you indicated that you would have disclosed potential conflicts to your two supervisors or one of your two supervisors. What response did they have?

A In September of '22?

Q Uh-huh.

A They understood my work, and there didn't seem to be an issue.

Q Okay. When you went to work for Velocity, did you disclose that to anyone?

A Yes, sir.

Q Okay. Who did you disclose that to?

A I disclosed to both Linda and Mallory, and that I had an opportunity to Dennis.

Q And what?

A And that I had an opportunity for outside employment to Dennis.

Q Okay. So you had a conversation with Dennis

in December of '22 that you had an opportunity with Velocity?
A In the fall of -- it -- yes, I did.
Q Fall of '22?
A Yes, sir.
Q Got you. And tell me, was that in e-mail? Was that in writing? Was that -- what exactly -- how did that -- how did it take place with regard to Dennis?
A Verbally.
Q Okay. Do you recall where it took place?
A I can recall where I was during one of the conversations. Yes, sir.
Q Okay. How many conversations were there with Dennis, that you recall, regarding a potential conflict with Velocity?
A I talked about --
MS. SETHI: Objection.
Go ahead.
THE WITNESS: -- an opportunity. I don't know that I posed it as a potential conflict at the time.
BY MR. SHEARER:
Q Got you. Got you. Okay. I understand. Yeah.

So how many occasions did you talk to Dennis about the opportunity with Velocity?
A At least twice.
Q Okay. And tell me what you can recall about each of those conversations.
A The first one being that I had been approached about an opportunity; and the second conversation, I was on an escalator at the airport on my way to meet with them about the opportunity.
Q Okay. And what did you describe the opportunity to -- what did you describe the opportunity as to Dennis?
A What I understood it to be at that time. Outreach and engagement; talking about naloxone, saturation, substance use disorder; all of those things.
Q And what was Dennis's response?
A To let him know. You know? And you know, "What is it?" And I told him what I knew at the time.
Q Okay. And what was his -- I mean, did he approve, disapprove? I mean, what --
A It was brief, and I don't recall much.
Q But in any event, you did ultimately -- you ultimately were offered and accepted a position?
A Yes, sir.

Q And what was your start date?
A It was sometime in December of 2022.
Q So that first contract -- let me grab it a little bit so we're on the same page. What was it dated? December 1st of 2022?
A Yes, sir.
Q Okay. Once you signed the contract on December 1, 2022, did you have any additional conversations with Dennis regarding the scope of your work for Velocity on behalf of Hikma?
A I don't recall.
Q Okay. Did you exchange any emails at any time, or text messages, with Dennis regarding -- in this time frame, late '22, when you when you were considering going to work for Velocity with Dennis, were there any emails, text messages?
A I don't recall.
Q Okay. And there was no form that you were required to fill out regarding potential conflicts?
A Correct.
Q The next section of the handbook is labeled "Outside Employee" -- I'm sorry, "Employment."
"HRO does not limit an employee's activities during non-working hours unless these activities -- unless those activities interfere with

or are in conflict with the performance of a job or create a conflict of interest.

"In general, outside activities are not allowed when they" -- number 1 is "prevent the employee from fully performing work for which they are employed at HRO, including overtime assignments."

Do you consider that your full-time employment at Velocity interfered with your full-time employment at HRO?

A No, sir.

Q Okay. And to me, this is a common sense -- common -- it's just a matter of common sense. It would seem to me that having two full-time jobs -- it's tough to serve two masters, it would seem to me.

MS. SETHI: Objection.

BY MR. SHEARER:

Q But you feel like you -- that -- you feel like having two full-time jobs did not cause either to interfere with the other?

MS. SETHI: Objection.

Sorry. Go ahead.

THE WITNESS: No, sir. I come from a large system of poverty. Having two full-time jobs is the norm.

BY MR. SHEARER:
Q Okay. Did you ever disclose to anyone at HRO that your job at Velocity was considered to be full-time?
A Yes.
Q And who would that have been and when?
A Mallory and Linda. Sometime after becoming full-time with Velocity, which would've been in 2023.
Q Your first month, that was a prorated contract. And it looked like after the first month is when it kicked into that full $10,416 per month. So what month would that have been?
A I was compensated at a full-time equivalency, but it took time to onboard and things like that. So it might have been later, February or so, when I was doing more.
Q Okay. The next heading under the "Outside Employment" is "that involves organizations that are doing or seek to do business with HRO, including actual or potential vendors or customers"?
A Yes, sir.
Q Do you believe that Hikma is an organization that has done or has sought to do business with HRO?
MS. SETHI: Objection.
THE WITNESS: Yes.

BY MR. SHEARER:
Q In what way?
A They provided donations to HRO.
Q Hikma has provided donations to HRO? Do you recall when or the amount of those donations?
A At least a thousand boxes of naloxone. May have been greater than that, there might have been more than one donation, and it was a pass-through donation to another agency that HRO represented. And that would've been in late '22 or early '23.
Q Okay. What was that other organization? Do you recall?
A Columbus Kappa Foundation.
Q Columbus what?
A Columbus Kappa Foundation.
Q Okay. Has HRO done any other business with Hikma other than that one donation?
A A literature review and learning about the product from people on their team, I believe, in -- sometime in the summer or spring of '21. But no business dealings that I know of.
Q So HRO has never -- to your mind, has never done any business with Hikma other than what you've just talked about?
MS. SETHI: Objection.

THE WITNESS: To the best of my knowledge.
BY MR. SHEARER:
Q Okay. Has Hikma ever been a customer of HRO?
MS. SETHI: Objection.
THE WITNESS: HRO doesn't have customers.
BY MR. SHEARER:
Q So the answer to that would be "no"?
A No. Yes, sir. Sorry. Thank you.
Q Has HRO -- I mean, has Hikma ever been a vendor?
A No.
MS. SETHI: Objection.
Go ahead.
THE WITNESS: No.
BY MR. SHEARER:
Q What would be an example of some vendors?
A For HRO, you mean?
Q Mm-hmm.
A I believe our, like, IT consultant, potentially. They provide services for us or security, cybersecurity, that kind of thing.
Q Okay. I'm going to hand you what we'll mark

as -- I think up to 7.
MR. SHEARER: Yeah. I think we're probably done with the handbook for right now.
THE REPORTER: And you did want to mark that as Exhibit 6?
MR. SHEARER: Yes. I apologize. In fact, I thought I -- could I not stick one on there?
THE WITNESS: The sticker's on it. Yes, sir.
MR. SHEARER: Yeah. I think we have a 6 on there.
THE REPORTER: Okay.
MR. SHEARER: And then 7 will be a couple of emails. We'll mark those now.
(Exhibit 7 was marked for identification.)
MR. CAUCHON: I think you have the copies, or do I have them?
MR. SHEARER: Oh, I very well may have them.
MS. SETHI: And these are different emails from the ones that we looked at before?
MR. SHEARER: Yes.
MS. SETHI: Okay. Just want to make sure.

MR. SHEARER: Yeah. Okay. Here we go. Here's yours.
MS. SETHI: Thank you.
THE WITNESS: Thank you.
BY MR. SHEARER:
Q And so the first page of this appears to be an e-mail to you dated July the 23rd of '23?
A Yes, sir.
Q The subject is "Can you sign this and PDF it back?"
A Yes, sir.
Q And then page 2 is -- looks like a document probably authored by you. It's not signed, but it is -- has your name at the bottom, dated July 20th of 2023?
A Yes. I believe it was authored by Dennis, but he was asking me to sign it for the purposes of the contract.
Q Okay. Got you. Did you sign this and return it?
A Yes, sir.
Q Okay. So even though we don't have your signature on this one --
A We do on the last page, sir.
Q You're right. We have your signature. And

then you did sign that and return it to him, it looks like, on -- yeah, July 23rd at 5:12 p.m.?

A Yes, sir.

Q Okay. Got it. That was 7.

So at HRO, what was your role in ordering naloxone?

A It depends on at what time.

Q Well, why don't we start at the beginning through current, and you tell me how it was initially and then how it's changed over time?

A When I was a volunteer lay distributor for Harm Reduction Ohio, I would ask for naloxone and it would be given to me.

Once I was an employee of Harm Reduction Ohio, I would put it out at tables; I would help people put in inquiries for it, requests from it from the agency; I would sometimes recycle expired naloxone that we redistributed; I would request from our internal inventory.

When I moved on to director of outreach and engagement, find out what the needs of different geographic areas of the state were, communicate that to leadership so they could order appropriately.

And then when I became director of programming, again, continued to contribute inventory,

like, awareness. Like, "Okay. We did this much in this quarter of last year. We might need this much. We have a big event coming up; we might need more for this."

And until Mallory left the agency, I had never submitted an official request for naloxone outside of, like, a special event like Overdose Awareness Day, where I might have been at the meeting where they said, "What does your agency want?"

And I would say, "What's the max?" We would take the max.

Q Okay. So how does HRO get naloxone from product manufacturers?

MS. SETHI: Objection.

Go ahead.

THE WITNESS: From product manufacturers specifically? They --

BY MR. SHEARER:

Q Or not manufacturers, suppliers. I mean -- so you have a --

A There's numerous ways to procure naloxone.

Q Okay. Exactly. And that's where I want you -- that's --

A Okay.

Q Educate me on how HRO procures -- obtains --

A Okay.
Q Yeah.
A So there is a nonprofit pharmacy called Direct Relief that HRO would sometimes get donations from. People and agencies in other states, other municipalities throughout the state of Ohio, might have a surplus. They might have expired or short-dated products that we can collect.

There is the Ohio Department of Health Project DAWN program. And how you obtain naloxone through the Ohio Department of Health has changed over the years. There's been many iterations of how to get that naloxone.

But typically, it is a REDCap request form that anyone can fill out. It's a link that anybody can fill out, and you put a contact e-mail in to send a copy of that receipt to. You can send it to anybody.

Then there is also donations. Like we -- like we talked about, you can get a donation from a manufacturer, as you mentioned manufacturers.

But yeah. And I guess depending on the formulation of naloxone, too. There's intramuscular; there's intranasal. There's been autoinjectors. There's been atomizers. But those are all the typical

ways that one would obtain naloxone.
Q Okay. So let's back up a little bit.
A Okay.
Q So the grant that we -- or the application that you filled earlier with the State of Ohio, the one that we looked through, the 128-page document.
Obviously some portion of those funds were set aside for salaries and other administrative costs. But would it be fair to say that the majority of the funds were dedicated to the purchase of naloxone?
A Absolutely not. Not a dollar of it.
Q Okay. Who pays for the naloxone?
A I don't know entirely, but I believe that -- agencies within the state of Ohio.
Q Correct. Okay. When you -- so the grant from State of Ohio, where does that money go?
A To the -- to HRO.
Q Correct. And what does HRO do with that, say, $650,000?
A Pay salary; pay operational costs, overhead; they pay postage; they pay for printed materials; they pay their utilities, et cetera.
Q Okay. And then the naloxone is ultimately paid for by the Ohio Department of Health?
A I don't know. It it could also be the Ohio

Department of Behavioral Health. It could be the state pharmacy. It could be a lot of things. I don't know how they get their naloxone.
Q Okay. Got you.
A They have multiple hands in that.
Q But you guys don't write any actual checks?
A No.
Q You do the ordering? Or you -- I mean, you're --
A I request naloxone from an inventory.
Q From an inventory. And the inventory is maintained by some government --
A Some of those entities I disclosed.
Q Some of those -- some government entity is -- some Ohio government entity?
A I believe so.
Q Okay. And then you submit the request, and then the naloxone is sent to HRO?
A Yeah. They vet the request, they might ask some follow-ups about why or how we're going to use that, and then they ultimately decide what we receive based on our request.
Q Okay. So the requests that are submitted, was that part of your job responsibilities?
A At times. But not always.

Q Okay. When was it part of your responsibilities?
A When there wasn't somebody else to do it. And then I'd say by 2024, if the naloxone program manager wasn't doing it, because it was under their purview and job responsibilities, I would do it.
Q And --
A Or Dennis would do it.
Q Okay. Who was the naloxone program manager in 2024?
A I believe it was either Shae or Kelsey.
Q Shae and Kelsey -- can I have last names?
A Bates and -- it starts with a "D." I always say Shae's last name wrong. I'm sorry.
Q Okay.
THE REPORTER: I'm sorry. Can you repeat that?
THE WITNESS: I don't know how to say her last name. It's on the staffing plan. I can read it to you. I'll mess it up.
Yeah. Dalrymple. I know I know I'm butchering that.
And later in that year -- sorry?
MR. SHEARER: Yeah. Slow --
MS. SETHI: Let him ask a question.

THE WITNESS: I was answering the same question.
MS. SETHI: Let him ask a question.
THE WITNESS: Okay. I was answering the same one. My bad.
BY MR. SHEARER:
Q So you submit -- or HRO submits a request. And I've seen some forms with REDCap. What is REDCap?
A It's an acronym for something, but you can create forms with it. It's like a -- it's like a CRM, like a -- it -- it's a data -- you can -- it hosts data. It hosts forms. Yeah. It's -- it's a customer management type of programming.
Q Okay. And then you have filled those those in is that how you submit requests for Project DAWN?
A Yes, sir.
Q And Project DAWN, would you tell me what that is please?
A Project DAWN is a program initiative by the Ohio Department of Health. DAWN means "Deaths Avoided With Naloxone." A young woman lost her life, and this was her namesake.
Q Okay. So I think we're up to number 8. So I will hand you Exhibit 8, and this is titled "Project DAWN Order Request"?

(Exhibit 8 was marked for identification.)

A Yes, sir.

Q And so this looks like an order submitted to Project DAWN through the REDCap program?

A Yes, sir.

Q Okay. And then if I look at page 2 of the document -- have you ever seen this document before or a document like this before?

A Yes, sir.

Q Okay. It has a number of organizations listed on pages 1, 2, and 3, and 4. And so there's a box for the organization, and I'm looking at the bottom of the first page -- or bottom of page 2. And it looks like that "Harm Reduction Ohio" box is checked?

A Yes, sir.

Q Okay. Then I go to page 2; I don't see anything checked. I go to page 3; I don't see anything checked.

But then I go to 4, and it has the county of the program, which is separate from the organization. And about halfway down, I see Licking County?

A Yes, sir.

Q So it looks to me like this is a form that

HRO requested naloxone to be, I guess, distributed in Licking County?

A No. No, sir. HRO is headquartered in Licking County, which means it's a project on region. Licking County is a part of -- this looks like -- these are all from a dropdown menu.

Q Right.

A Yes, sir.

Q So when it says "Licking County," that's where HRO is located. But where the naloxone may be distributed is -- there's -- that's something totally separate, then?

A Potentially. Potentially.

Q Okay. Just -- where was most of HRO's naloxone distributed?

A In all 88 counties.

Q Okay. Okay.

A I'm very proud of that.

Q Then it has "contact name," and that's -- it's got you?

A Yes, sir.

Q And e-mail address. That is you?

A Yes, sir.

Q So did you complete this form?

A I may have, yes.

Q Okay. Then it has what is requested as "naloxone"?
A Yes, sir.
Q And then on the next the -- page that's titled page 6 on the top, there's a box for Kloxxado?
A Yes, sir.
Q And that is checked?
A Yes, sir.
Q And that would've been you that checked "Kloxxado"?
MS. SETHI: Objection.
THE WITNESS: I may have. Yes, sir.
BY MR. SHEARER:
Q Okay. If it wasn't you, who else would it have been?
A Molly -- potentially -- well, now -- July 26, '23? Sorry. I want to look at the date.
Q Yeah.
A It was likely me. And at this time -- it was likely me, but it could have been Molly, Patricia, Shae, Kelsey, or myself.
Q Okay. If someone else would have requested, would they have used their own contact name and e-mail or would they have used yours?
A Not typically. They would've used mine.

Q Okay. And why would they use yours?
A To keep a clean record so that I would get the notice. The way REDCap works, I'm the contact.
Q Okay. So when REDCap gets an order, they then notify you?
A Yes, sir. And sometimes there's a dropdown. It might have my name, Dennis's name, Mallory's name.
Q Okay. But on this one, the contact name is you, the e-mail's you. The confirmation would've come to you?
A Yes, sir.
Q Got you. So you would've been aware -- even if you had not filled this out, you would've been aware of this?
A Correct. Yes, sir. That was the idea.
Q Okay. And then on this one, it was "Kloxxado, 8 milligrams"?
A Mm-hmm.
Q And looks like -- is that 2,500 boxes?
A Yes, sir. Each box is a dose with two doses. And there's -- there's other ways the -- it comes in other ways, in kits and stuff, and we always just got the boxes.
Q Okay. And then the final box to click is that -- the "agree to terms and conditions"?

A Yes, sir.
Q Do you have any idea of how many times HRO requested Kloxxado from Project DAWN?
MS. SETHI: Objection.
THE WITNESS: I'd say 10 percent. Between 2021 and sometime in 2024, '25, maybe 3 to 10 percent of our orders were Kloxxado.
MR. SHEARER: Can I steal a copier for a quick moment and use the restroom?
MS. SETHI: Sure. We can take a break.
THE WITNESS: I would like to use the restroom too. Thank you.
THE REPORTER: One moment.
The time is 2:23 p.m. We're now off the record.
(Off the record.)
THE REPORTER: We are back on the record. The time is 2:27 p.m.
BY MR. SHEARER:
Q So why don't we go to Exhibit 9? We are getting close.
(Exhibit 9 was marked for identification.)
A Thank you.
Q So can you tell me what this document is

that we are looking at?

A It looks like --

MS. SETHI: Objection.

THE WITNESS: It looks like a record, I don't know who it was created by, of some orders of naloxone.

BY MR. SHEARER:

Q Okay. This is not a type of document that you've ever seen before?

A No, sir.

Q Okay. Okay. So if you wanted to as -- you, as a employee of HRO, wanted to find out order history of naloxone, what would -- what documents would you refer to?

A Internal inventory tracking documents. I would look at our donation documents, our complete inventory, carryover from past quarters, counts made by the office team that's doing the shipping.

Q Okay. So let's just say, for example, the first line where it says "record ID." You would have no idea what "record ID" means?

A No, sir.

Q Okay. And it goes on, and it has the next columns --

MS. SETHI: Just listen to his

questions and --
THE WITNESS: Sorry.
BY MR. SHEARER:
Q Yeah. And the next columns over just has "agency, HRO, e-mail, Amandalynn," generic boxes.
So like, say, for example, the first -- very first column dated 7/26 of '23. It just says "generic boxes, 3,000; Kloxxado boxes, 1,500"; and then "contact name, Amandalynn Reese"?
A Yes, sir.
Q That does not have any -- in this context of this form, that does not have any significance to you?
A No. Not in this context, sir.
Q Okay. So you would have no idea, just looking at this document, if you, in fact, placed an order for 3,000 generic boxes or 1,500 Kloxxado boxes on 7/26 of '23?
A Correct. I can make assumptions, but this would not --
Q No. Yeah.
A Mm-hmm.
Q Okay. Then I have no other questions about that document for you.
A Thank you.
Q So there came a time in 2024 where there was

a -- you were asked -- or was everyone asked to complete a conflict of interest disclosure? And well, we can do this.

Maybe let's be -- let's have Exhibit Number 10. And so this -- the Bates number on this is Reese --

(Exhibit 10 was marked for identification.)

MS. SETHI: Are you going to hand her that one? Or are you going to --

MR. SHEARER: Oh, I'm sorry.

MS. SETHI: Sorry.

THE WITNESS: It's okay.

Thank you.

BY MR. SHEARER:

Q This one is Reese -- on the bottom is Reese 32, is the Bates number.

A Okay.

Q And this looks like an e-mail sent from you to Dwayne Steward?

A Mm-hmm.

Q And just so the record's clear, can you tell me who Dwayne Steward is?

A Dwayne Steward is -- was formerly a member of HRO's board and a consultant we had hired to help

us with operations at HRO.

Q Okay. So this -- well, I'll just read it. "I hope you're doing well. I'm reaching out because I'm feeling a bit overwhelmed, as you know, with the task of completing the conflict of interest disclosure by tomorrow."

So how did a conflict of interest disclosure being due tomorrow on -- it would've been August 23, 2024. So what happened that led up to that, to your -- to the -- to your recollection?

A Leadership asked us to disclose and engage in a conflict of interest disclosure.

THE REPORTER: I'm sorry, Counsel, was that an objection?

MS. SETHI: No, I didn't.

THE REPORTER: Okay. I saw you --

MS. SETHI: I was going to, and then I didn't.

THE REPORTER: I apologize.

BY MR. SHEARER:

Q Okay. And when you say -- did you "leadership" or "management"? "Leadership"?

A Leadership.

Q Leadership. Okay. When you say "leadership," do you mean Dennis, or is there somebody

else?

A Dennis and -- I think Aaron, had gone by that time, so Cecile may have been a part of that. And I'm assuming the board was engaged in it, but I'm making assumptions. So "leadership," people above my pay grade.

Q Okay. Who's Cecile?

A Cecile Katz was an -- titles at HRO are challenging. She was an administrator with HRO.

Q Okay. So was there actually a form given to you to fill out, or were you just asked to create a conflict of interest disclosure? And again, this is to the best of your recollection.

A Yes. I believe at this time there was a -- a direct guidance, like a -- of -- of what to disclose. Like, there was a -- there was questions.

I don't remember the format of how they wanted that presented to them, but there was, like, itemized requests.

Q Okay. That may have been in an e-mail? Or do you have --

A I worked fully remote, so it would've been an e-mail.

Q Okay. So "The scope feels so broad. I'm struggling to identify all potential vendors,

customers, and partners of HRO, which is making it difficult to be fully transparent while maintaining my professional autonomy and privacy.

"Full disclosure, I paid three attorneys' consulting fees, and they basically laughed at the document and told me there was nothing they could do."

So the -- I guess what I'm trying to figure out, what document is it are you referring to in there? What --

A To the best of my recollection, the request. The -- the many itemized requests pertaining to the COI disclosure.

Q Okay. Can you tell me who the three attorneys were that you consulted?

A Not off the top of my head, but I do have those records.

Q Okay. So then if we go to page 2 of the document, you then list "Contract-based consulting number 1, with Velocity Bio Group"?

A Yes, sir.

Q Why did you decide to include each of these organizations or entities that you listed on your -- on the form?

A I believe it was requested.

Q Okay. So you believe there was a request

for basically "Contract-based consulting; 2, board memberships; 3, ownership; 4, volunteer; 5, ethics committee roles."

So you think those -- do you believe those categories were given to you to --

A It -- I do not recall those -- or believe that those were the exact categories. But it was a very broad request, including -- it was a very broad request.

Q Did you ever have any conversations with Dennis about ordering Kloxxado or any other Hikma product and whether that was a real potential -- or real or potential conflict of interest?

MS. SETHI: Objection.

THE WITNESS: No, sir. Because I fulfilled the requests based on interest from our programming. I didn't determine the requests.

BY MR. SHEARER:

Q Right. No, what I'm saying is, were there ever any communications via e-mail, via text, via phone, in person, between you and Dennis where he was inquiring about the ordering of Kloxxado?

A Yeah. We talked about why and who and when Kloxxado would be appropriate.

Q Do you recall anything else -- but can you

tell me when those conversations took place?
A From 2021 until present.
Q Well, not until present.
A Well, it feels like that's what's happening now. So --
Q Okay. And when do you believe that Dennis was aware -- became aware that you were working for Velocity?
A I don't know. I believe July 17th is when he approached me with -- about it, of '24.
Q Okay. And when he approached you, what did he say about it?
A I remember mentioning -- he had seen a bio of mine on a website or something, social media posts from another organization I was affiliated with.
Q And it mentioned on there --
A Correct. My -- my employment. It was on my LinkedIn. It was on my Facebook. It was all -- yes.
Q Okay. And he --
A It was easily accessible.
Q You believe that he saw that somewhere?
A Correct.
Q And then he approached you, and you all had -- like, was it a conversation, e-mail? Kind of what --

A We were on Zoom.
Q Tell me what you recall.
A We were on a Zoom call. It was Zoom or a Teams meeting. There was a video conference.
Q And who was on that video conference?
A Dennis and I.
Q Just the two of you?
A Correct.
Q Okay. Do you know if either one of you recorded it?
A I did not record that conversation.
Q You did not record it. Okay. The way you worded that, it seems like you probably did record or -- did you record some conversations with Dennis?
A I do record some conversations; I did not record that conversation.
Q Okay. Did you record any conversations with Dennis?
A Yes. I believe some conversations have been transcribed with AI and things like that when I use video conferencing. Yes, sir.
Q Okay. Would those have -- any of those, would those have preceded the July of 2024 date, or would they all be after July of 2024?
A Oh, depending on what platform I use, they

would definitely precede that.
Q Precede that?
A Yes, sir.
Q And how do you store or maintain those recorded conversations?
A They were -- some might be in a cloud. Some might be on a device. Some might be gone forever.
Q Okay. When you say "a device," what type of device?
A A phone, laptop, hard drive.
Q Got you. Got you. But you have at least -- you don't know whether they all exist, but you have some conversations with Dennis that have been recorded?
A Yes. Yes, sir.
Q Would they apply to -- would they be pertinent to various topics, or would they all be with regard to a potential conflict and the ordering of Kloxxado?
A Oh, They'd be various topics.
Q Everything?
A Yes, sir.
Q Okay.
A Yeah. Just, you know, an -- an AI note taker and things like that.

Q Got you. Got you. Okay. Was everyone, to your knowledge, and again, all this is just what you know or you recall, asked to complete a conflict of interest disclosure?
A Eventually.
Q Were you the first?
A I believe I was a catalyst. Yes, sir.
Q Why do you believe you were a catalyst?
A Based on the conversation I had with Dennis where he said, "This is partially my fault, HRO's fault. We don't have a formal policy. We need to create one."
Q Okay. A formal policy about what?
A Disclosure.
Q Okay. And why were you -- why do you believe you were the catalyst? Because of the Velocity -- what do you -- no, I don't want to put words in your mouth. You tell me.
A Because of his reaction and questions regarding the social media or other posts that he saw in relationship to my biography on that post.
Q Okay. Did you have a biography on the HRO website?
A Yes. That Dennis wrote.
Q What?

A Yes. That Dennis wrote.
Q Okay. And I assume you reviewed it for accuracy, et cetera, et cetera?
A Yeah. Our website was not always updated, but at the time it was posted, probably. Yes, sir.
Q Okay. Do you know if, on your HRO bio, you listed Velocity?
A I don't believe it was there.
Q Okay. But you mentioned it was on your LinkedIn?
A Yes, sir.
Q And it's on your Facebook?
A Yes, sir.
Q And then what other type of social media would it have been posted on?
A Probably anything Meta was connected to. I don't know offhand there. The Whova app where you attend conferences and things like that, which is public. Those sorts of places.
Q So is the --
A Indeed.
Q Okay. So is the only social media site that you're aware of that did not list your Velocity employment would've been the HRO website?
MS. SETHI: Objection.

THE WITNESS: It's not a social media platform.

BY MR. SHEARER:

Q Okay. Do you know of any other platforms, online platforms, that listed -- that did not list your work for Velocity other than the bio on the HRO website?

MS. SETHI: Objection.

Go ahead.

THE WITNESS: Probably, you know, Best Buddies's page when I had one, which we don't anymore. I'm -- I doubt the Girl Scouts of America when they had my bio had that in there.

If it wasn't relevant to my professional capacity -- like, the -- these were my pages where this was listed, so things relevant to me. Those things wouldn't have been relevant to me.

BY MR. SHEARER:

Q Got you. So the ones that you know -- and I apologize, you gave me a list. The ones you know where it would've been listed would've been LinkedIn, Indeed --

A Whova.

Q Whova.

A Facebook, and maybe anything in the

Meta-verse.
Q Got you.
A Like, my personal pages with my information. And those were all public.
Q Got you. So ultimately, did you -- ultimately, is this the form -- what we have numbered Reese 33 and 34, is this the final version of the conflict of interest disclosure document?
A No, sir.
Q Okay. Is there -- so what -- so is this a draft?
A Yes, sir.
Q Okay. Because this is dated -- the e-mail to you isdated August 22, '24. And the date on this one is dated August 19, 2024. After talking to Mr. Steward, did you make some modifications or changes to it?
A No, sir. The -- no, sir.
Q Okay. Was it changed -- you said this is not the final version. Can you tell me generally what was changed from this to the final version?
A What was being asked changed, and guidance from leadership and what they were requesting changed and then halted. So I -- there was no, like, final submission.

Q Okay. Tell me a little bit about the changes and the halting.

A I don't recall everything. But I know that the board wanted to review the final conflict of interest policy, and we were -- like, just said "Hold until we review the policy," and then we were to await guidance.

Q Okay. And then you were actually never sent a final form?

A I -- there has been, since, a final form because I'm still employed by HRO.

Q Okay. When was that?

A There's been maybe two, I think. But there's been one very recently, even, in the last three months.

Q So when was the first "final form"?

A Had to be -- it had to be sometime in 2025.

Q Okay. The first one was in 2025?

A Outside of the employee handbook?

Q Yeah.

A Yes, sir. I believe. So after this -- after this request and then the board taking time to review, I think we were given something sometime in 2025. And then we just had an attestation for this year a couple of months ago.

Q Okay. So when Dennis first approached you about seeing this, seeing your work at Velocity on a website, he set up a Zoom call?

A Yeah. He asked if I had time to meet. And we often met on Zoom or talked on the phone.

Q Okay. And how would you describe the communications? Was it hostile? Was it cordial? Was it -- you tell me. I wasn't there. You were there.

A Uncomfortable. Tense, confused, concerned.

Q Okay. So concerned about what exactly?

A Understanding what we were talking about, how we got here. The energy was kind of all over the place, so I don't know how else to answer that.

Q Okay.

A I don't know else to answer that.

Q Okay. I mean, was it your perception that he was angry with you? I'm just trying --

A It was my perception that he was frustrated and -- not our typical decorum in conversation.

Q Okay. How was the typical decorum in conversation?

A Up until the summer of 2024, we got along very well. You know, there would be times we disagreed, but he was ultimately the boss. You know, I think there was a mutual respect and understanding

most of the time.

Q Okay. From your perception, what changed in the summer of '24?

A I wish I knew. Until the -- until that conversation, I -- I don't know.

Q Do you think it had anything to do with your employment at Velocity?

A Yes.

Q Okay. Did Dennis ever ask you to resign your position at Velocity?

A Not explicitly. No.

Q Okay. Implicitly?

A No. Not to my understanding.

Q Okay. Okay. The way you answered that was somewhat equivocal, so I'm just trying to kind of get an idea of what you meant -- you know, what you meant by that.

A What I meant by that is he would ask me what I had decided, but had never given me terms of a decision. Would tell me that there would be a policy in place for me to engage with, but that policy had not yet been created.

And so it created confusion on me and how to act or what I should do. But I had made my priorities clear to him, I had believed, and so it was confusing.

Q Okay. Your priorities being what?
A The people we serve at HRO. And whatever is in their best interest would be what I would do.
Q Okay. So backing up just a little bit; Dwayne Steward, at the time on August 22nd of 2024, what was his role with HRO?
A A consultant for HRO and a member of the board.
Q Okay. And when you reached out to him, I -- so this is an e-mail you produced?
A Yes, sir.
Q When you reached out to him, what type of response did he have for you?
A We had been meeting biweekly in consulting. So when I reached out with this e-mail specifically, I don't even remember what he responded, honestly. Yeah.
Q Okay. Did -- so when were you informed that you did not need to complete the conflict of interest disclosure document?
A I don't remember the exact date, but within a couple of weeks or days of. A board e-mail went out or an e-mail went out to the whole team, I believe, that said "We're reviewing this" or something of the ilk.

Q So I'll just hand you what we'll mark as 11. And to -- these are documents that HRO has produced, numbers 142 through 145, 146.

(Exhibit 11 was marked for identification.)

And this, the first one, is a letter or an e-mail from you to Billy Golden and Dwayne Steward. So I understand Dwayne Steward was on the board at the time?

A Correct.

Q Billy Golden was, my understanding, also a board member at the time?

A Correct.

Q Who were the other board members?

A It would've been Colleen, Molly, Tasha, Ann. I believe that's it. I may be missing somebody.

Q Okay. So why did you choose to only send this -- you're making a formal complaint. Why did you forward it to -- make a decision to forward it to two board members versus the entire board?

A They were serving as chairs.

Q Okay. Got you. That's why I -- yeah. I was wondering why. Okay.

A Jamie. Jamie is the other one. I forgot.

Q So the second document is numbered 143. And

it's addressed -- this is not from you.
A Correct.
Q But it is a letter dated September 4th of 2024, which is the same day that you filed your formal complaint; correct?
A Yes, sir.
Q Okay. So how did this letter, if you know, come to be created?
A When we were engaging in the conflict of interest conversations, I had followed the policy according to the handbook in talking to my direct supervisor. So I reached out to my direct supervisor to get that information for the purposes of my conflict of interest disclosure.
Q Okay. And so did you ask Ms. Bolen to prepare this letter? I mean -- well, she must have known about it. And you had to tell her the situation, what was going on?
A Yes.
Q Okay. And then you asked her to prepare the letter, and it looks like this was sent to -- well, it was sent to you, since it was attached to your -- or no. Was it?
A I -- I received a copy, but I believe she was -- she had the contact information for the board

as well.
Q Got you. Okay. Okay. And what did -- when did Ms. Bolen leave HRO?
A She was doing some work for us in -- through 2023. Very limited work, but through 2023. I don't think she was compensated for all of that, but definitely.
Q Was there still?
A Yes. Yeah.
Q Okay. And so who is, exactly, Ms. Bolen?
A Mallory? She was at HRO. She was our director of operations, I believe was her title at one point. But yeah. Titles are nebulous.
Q So I want to talk to you a little bit about -- so let's go to the actual complaint, which is HRO 144.
A Yes.
Q The "retaliation" refers to a July 24, 2024, conversation. Is that the conversation that we touched on before, the Zoom -- or no, you -- I don't want to put words in your mouth.
A Okay. This is a second -- the -- the conversation where he raised concerns were prior to the 2024 conversation, I believe. Yes.
Q Okay. When you had the Zoom meeting -- that

you did not record? I believe you said you --
A The -- the first conversation where Dennis reached out to me was not recorded on my end. Yes, sir.
Q And that was Zoom?
A Yes, sir. A Zoom or Team, some video conferencing. Yeah.
Q Yeah. And do you recall what the date was for that?
A I believe it was July 17th, but I -- some wiggle room there. I know where I was at the time. So --
Q Okay. Where were you?
A I was attending the Native American Harm Reduction Summit, and so it would've been on the dates of that summit.
Q Okay. Okay. Got you. So when we talk about -- you talk about retaliation. "I raised concerns under retaliation regarding a blindsiding and hostile conversation."
What was the topic of that conversation?
A Again, asking questions about my employment, my board leadership, and my right to do so. Frustrations about -- you know, "It's a peer board. We might do this. We were going to do the funding for

that."

It -- it wasn't a -- a very coherent conversation, but just -- a lot of frustrations with assumptions being made on behaviors.

Q Okay. When you say your role -- on you just mentioned, like, a -- your role on a board?

A Yes, sir.

Q What board?

A On the Front Lines Community Alliance.

Q Okay. What is the Front Line Community Alliance?

A It is a PRO, which is a peer recovery organization.

Q You then -- the next sentence "I've experienced retaliatory actions."

I assume the retaliatory actions all -- did those all begin after this July 17, or did you experience retaliatory actions prior to July 17th of 2024?

A No. All after.

Q All after July 17th of 2024?

A Yes, sir.

Q Okay. What were the retaliatory actions?

A Limiting my scope of work, taking my -- taking me out of meetings, having conversations

embedded in a meeting that wasn't in the agenda of said meeting. Just assumptions about behaviors and, you know, lots of accusations. It felt very accusatory.

Q Okay. When you say, like, responsibilities were taken away from you, what responsibilities were taken away?

A At that time, I was not included in a leadership meeting. I was not going to be talking on certain calls. Things that I would normally be doing in my day-to-day activities and purview started changing a little bit.

Q Okay. Was your ability to order any product, was that changed or restricted?

MS. SETHI: Objection.

THE WITNESS: The live link from REDCap that anyone has access to that knows of it wasn't -- you know, I wasn't restricted from that. No.

BY MR. SHEARER:

Q Okay. So you could have still ordered the naloxone?

A Yes.

MS. SETHI: Objection.

THE WITNESS: I believe so.

BY MR. SHEARER:
Q Okay. Did you?
A I don't know. It was August. It was Overdose Awareness Day. It's very possible I placed orders at that time; it's our busiest time of the year.
Q Okay. Why is that?
A Overdose Awareness Day. We do the largest scales.
Q Oh, oh. Okay.
A And then early September is also Save a Life Day, which is the largest nationwide naloxone distribution day of the year. It is high time, very busy for HRO.
Q Okay. We did have the "creation of false narratives." That, again, you -- I think we've referred to that. That's with -- you did disclose the -- you've testified you did disclose the relationship with Velocity to Mallory?
A Yes.
Q Okay. And I assume that's what you're -- when you say under that heading "Despite the fact my former supervisor was fully aware of my role"?
A Both of my former supervisors.
Q Got you. I got you. That's right.

The other, number 2, is " pressure to distance myself from the other nonprofit boards." Which boards were those?
A On the Front Lines and it -- it sounded like anything I was doing without his approval was a non-starter.
Q As far as boards?
A Yes.
Q Okay. Were other people in the organization on different boards?
A I wouldn't know.
Q Okay. Yeah. Then the third bullet point we have is the "unsubstantiated accusations regarding outside employment."
A Yes. That was --
Q That you -- that's referring to the Kloxxado or not? It says -- okay. "Dennis has falsely claimed to past employees and volunteers that I'm responsible for the organization distributing a particular brand of naloxone manufactured by a pharmaceutical company he personally believes is widely disliked."
A Correct.
Q Okay. Is that referring to Kloxxado? Or --
A Yes. And other -- yes.
Q And other what?

A I -- I assume -- yeah, just Kloxxado. Yeah. Yeah.
Q Hikma products?
A Yeah. I was going to say the full portfolio. But yes. Yeah.
Q Okay. In the harm reduction community, is there something different or unusual about that manufacturer?
A Not necessarily the manufacturer. But the dosage? Yes.
Q Okay. Oh, that's what we talked about, the 2 versus 4 versus 8?
A And 10 and so on. There's others. Yes, sir.
Q Okay. So there is -- there are disputes in the community as to the efficacy of giving 2 versus 4 versus 8?
A Correct.
MS. SETHI: Objection.
BY MR. SHEARER:
Q Got you.
A Correct.
Q When it goes down next -- after this, it says "This narrative ignores the fact" that you "conducted two separate research studies"?

A Mm-hmm.
Q So tell me what those consisted of.
A I was a part of a literature review with our team. I was a part of a survey where we asked community members about their dosage and their overdose response and which brand they used, which -- how many doses they used, how long they waited between doses.
Just meaningful information about which naloxone is best for which community and, you know, the community's input on that. Yeah.
Q Okay. When you mentioned that -- back -- I'm jumping around, and I apologize. I'm trying to get out of here and get us all out of here.
Under the "retaliation" section, you've "experienced retaliatory actions that follow the pattern of behavior Dennis has exhibited with other employees in the past"?
A Yeah.
Q Who are the other employees that you're referring to?
A Linda. Well, she was not an employee. She was a volunteer, but she had a lot of responsibilities at Harm Reduction Ohio.

Q And what's Linda's last name?
A Smolak.
Q Oh, yeah. Okay. Right. You told me about --
A Yeah.
Q She was your supervisor for a little while?
A Yes.
Q Got you.
A Mary Losch, who was also my supervisor at one time at the organization. And earnestly, anybody who he had a fundamental disagreement on something, and he was ultimately leadership. So.
Q Okay. So you've got, sorry, Linda?
A Yeah. And Mary. Those two are the -- are the ones of note.
Q Okay. Are there any others?
A No, sir.
MR. SHEARER: Okay. Why don't we take a couple minutes?
THE WITNESS: Sure.
MS. SETHI: Okay.
THE REPORTER: All right.
The time is 3:07 p.m. We're now off the record.
(Off the record.)

THE REPORTER: We are back on the record. The time is 3:15 p.m.

BY MR. SHEARER:

Q Okay, Ms. Reese, I have one -- hopefully one final question for you.

A Yes, sir.

Q We have talked about your hostile work environment complaint and read your complaint. I just wanted to clarify; some people, when they hear "hostile work environment," they think that involves something of a sexual nature. I assume there was none of that involved in this?

A Absolutely not.

MR. SHEARER: Okay. That's all the questions I have for you. Thank you.

THE WITNESS: Thank you.

MS. SETHI: Do you have any -- were you going to do any questions for her?

MS. SUDHOFF: Very few.

MS. SETHI: Do you want to go ahead first, and then I'll do my -- at the end?

MS. SUDHOFF: Sure.

THE WITNESS: You guys are questioning me too? Okay.

//

EXAMINATION

BY MS. SUDHOFF:

Q Briefly. Ms. Reese, are you a Kloxxado lobbyist?

A No, ma'am.

Q Is the statement "Amandalynn Reese is a Kloxxado lobbyist" or "Kloxxado's lobbyist," would that be accurate?

A No, ma'am.

Q Why would that be inaccurate?

A I'm not a lobbyist.

Q Following Dennis's termination from Harm Reduction Ohio, did you have to take on any expenses on behalf of Harm Reduction Ohio?

A Yes. I had to pay for postage and supplies and delivery of many items to keep programmatic day-to-day things running.

Q And what was your understanding of why you had to bear those costs on behalf of Harm Reduction Ohio?

A There was, after a certain point, restriction to access to saved accounts and credit cards that were previously maintained by Harm Reduction Ohio.

Q And who do you believe had access to those

accounts at that time?

A Dennis.

Q Were you ever reimbursed by Harm Reduction Ohio?

A Yes.

MS. SUDHOFF: No further questions.

MS. SETHI: All right. So I also just have a few.

EXAMINATION

BY MS. SETHI:

Q And I'm going to pull up Exhibit 3. I'm going to have you look at Exhibit 3 again, so this part of the transcript will get designated confidential again.

(Nonconfidential portion of transcript ends.)

//

//

//

//

//

//

//

//

//

(Confidential portion of transcript begins.)

BY MS. SETHI:

Q And again, Exhibit 3 is the expenses that you submitted for -- to Velocity?

A Yes.

Q All right. So just again, take a second to look at those. Amandalynn, did you ever submit expenses for the same expense to both HRO and Velocity?

A No.

Q Were there ever times when you submitted expenses from the same conference to both HRO and Velocity?

A Yes.

Q Okay. But it was never the same exact fees?

A Correct.

Q Okay. And why is that?

A Multiple times, a member or staffer of Harm Reduction Ohio may have been attending the same conference and not had a credit card or ability to pay for a room, and I could put that on my credit card.

And I know at two separate times, somebody used my vehicle to travel. And I could, you know, bill HRO for that because they were an HRO employee,

but I paid for it. And so it was my card doing the payment.

Q Okay. Is it fair to say HRO is a small organization?

A Incredibly small. Yes.

Q Okay. Would it be fair to say that they have limited funding?

A Yes. Absolutely. And no budget for, you know, reimbursement for those things.

(Confidential portion of transcript ends.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

(Nonconfidential portion of transcript begins.)

BY MS. SETHI:

Q Okay. All right. So that's all the questions I have about that. Once -- you can put that away, and we'll be off the confidential designation now.

All right. And then give me one second. Amanda, I'm going to have you grab what was marked as Exhibit 4. Make sure you have all the pages there.

MR. SHEARER: Which one is four?

MS. SETHI: Four is the staffing plan and et cetera.

MR. SHEARER: Oh, okay. All right.

BY MS. SETHI:

Q So previously when you looked at this, you were told that this was some documents that were submitted to the Ohio Department of Health as part of the application; is that correct?

A Correct.

Q Okay. I want you to look at the last two pages of the exhibit that are marked HRO 768 and 769.

A Okay.

Q Okay. Were these documents -- or was this document something that was submitted to the Ohio

Department of Health in this form?

A I don't believe so.

Q Okay. All right. And then I want to look at -- now I'll have you go a few pages ahead. It is at the bottom, HRO 770. All right. And so for this, can you tell me what this page is?

A Yes. It looks like our references.

Q Okay. And these are references that were submitted to the Ohio Department of Health as part of the application?

A Yes.

Q All right. Tell me what each of these references are.

A The first one is for some funders and grant managers for a prior project that I had with Interact for Health.

Actually, my first hire at HRO had to do with one of those grants and projects, talking about the scope of that role and what it did as relevant to this contract. So a reference for why that would be pertinent.

The next one is another project that I did with Ohio MHAS at the time working on special community populations, special anti-stigma work, things that would be relevant to this contract and for

the rubric of the bid.

And the last one was a project I worked on with Velocity Bio Group and the tribal leaders and law enforcement in Montana. As relevant, again, to the contract to try to, you know, get a higher score so we could -- so we could obtain the contract.

Q Okay. And in the description on that bottom box there with the Rocky Mountain Tribal Leaders Council.

It says "The Rocky Mountain Tribal Leaders Council partnership with Velocity Bio Group and the Rocky Mountain High Intensity Drug Trafficking Area was developed to address the disproportionate impact of fatal and non-fatal overdoses within tribal communities in Montana and Wyoming."

Did I read that correctly?

A Correct.

Q Okay. And can you tell me about what you did with that project?

A Yes. While with Velocity Bio Group, I did education and awareness around naloxone; traveled and did educational trainings, did "train the trainer" programs; went through Blackfeet Nation, Lakota Nation; helped provide donations of product, various naloxone products and how to best use them; and helped

saturate naloxone in an area that had never had any.
Q Okay. And in this reference, you mentioned that you worked -- that this was in partnership with Velocity Bio Group?
A Correct.
MS. SETHI: Okay. All right. That's all the questions I have about that document, and those are all the questions I have.
MR. SHEARER: I have nothing else.
MS. SETHI: Okay.
MR. SHEARER: You are done.
THE WITNESS: All right.
THE REPORTER: All right. Will there be a read or waive of signature?
MS. SETHI: We'll -- you have the option to read a copy of the transcript before it is finalized. And if there are any errors, mistakes, things like that, you have the opportunity to correct those. Or you can --
THE WITNESS: I would not like to waive my rights to correct those.
MS. SETHI: Okay. Okay. All right. We will read.
THE WITNESS: Thank you.
THE REPORTER: All right. And then

transcript orders. Counsel Shearer, will you be ordering today?

MR. SHEARER: No. I will have to send you an e-mail just because my carrier requires me to send them an e-mail first saying, "Can I order?"

If they say "yes," then I order. So I've got to keep my little time frame straight.

THE REPORTER: Yes, sir.

And Counsel Sethi, will you be ordering today?

MS. SETHI: Let me check. Just a quick question, how long do you think it might take to get a rough?

THE REPORTER: I am -- I'm not really sure. I can double-check that.

MS. SETHI: Okay. Let me double-check if we need to order.

THE REPORTER: Yes, ma'am.

MS. SETHI: And let me know.

THE REPORTER: Yeah.

MS. SETHI: Because we might want that.

THE REPORTER: Might -- rough?

MS. SETHI: Yes.

THE REPORTER: Okay. And then Counsel Sudhoff?

MS. SUDHOFF: I will rely on what she does.

THE REPORTER: All right. All right. One moment.

The time is 3:25 p.m. We're now off the record.

(Signature reserved.)

(Whereupon, at 3:25 p.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, ASIA MAYS, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

ASIA MAYS
Notary Public in and for the
State of Ohio

[X] Review of the transcript was requested.

# CERTIFICATE OF TRANSCRIBER

I, SAMUEL CHRISTIE, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

SAMUEL CHRISTIE

MRINALI SETHI, ESQUIRE
msethi@reminger.com

August 20, 2026

RE: Cauchon, Dennis Et Al v. Steward, Dewayne Et Al

7/24/2026, Amanda Reese (#8349307)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Cauchon, Dennis Et Al v. Steward, Dewayne Et Al
Amanda Reese (#8349307)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________
____________________________________________________
REASON______________________________________________
PAGE_____ LINE_____ CHANGE________________________
____________________________________________________
REASON______________________________________________
PAGE_____ LINE_____ CHANGE________________________
____________________________________________________
REASON______________________________________________
PAGE_____ LINE_____ CHANGE________________________
____________________________________________________
REASON______________________________________________
PAGE_____ LINE_____ CHANGE________________________
____________________________________________________
REASON______________________________________________
PAGE_____ LINE_____ CHANGE________________________
____________________________________________________
REASON______________________________________________

________________________________ _______________
Amanda Reese Date

Cauchon, Dennis Et Al v. Steward, Dewayne Et Al
Amanda Reese (#8349307)

ACKNOWLEDGEMENT OF DEPONENT

I, Amanda Reese, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Amanda Reese Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

**&**

**&** 2:4 3:4

**0**

**0.5** 103:2
**0075** 1:8
**07/23/23** 4:17
**09/04/24** 4:23
**09/15/22** 4:14

**1**

**1** 4:9,9 35:25 37:13 38:10,14 39:24 41:5,21 55:11 118:8 119:4 132:12 142:19
**1,000** 46:17 47:10
**1,500** 46:17 47:11 138:8,16
**1.0** 103:22 104:2,14
**10** 4:21 136:5,6 139:5,7 163:13
**10,400** 46:16 47:9
**10,416** 45:16,25 47:23 120:11
**100** 4:12
**107** 4:14
**1099** 22:1,12 73:24 74:1
**10:36** 38:3
**10:39** 38:7
**11** 4:22 80:7,9 155:1,4
**11,000** 46:13,16
**11,250** 73:13
**111** 4:15
**11:16** 65:20
**11:27** 65:24
**11:46** 78:22
**11:50** 79:1
**12** 91:23
**12,000** 46:13,16
**12/1/22** 79:9
**120** 24:16
**123** 4:17
**128** 100:1,16,16 128:6
**12:15** 97:14 98:19
**130,000** 46:6
**132** 4:18
**136** 4:20
**139** 4:21
**14** 81:24 83:8
**142** 155:3
**143** 155:25
**144** 157:16
**145** 155:3
**146** 155:3
**14th** 81:2,13 84:2 88:4
**15** 108:8
**155** 4:23
**16** 110:13
**167** 4:4
**168** 4:5
**169-170** 1:22
**17** 13:24 109:5 159:17
**170.39** 84:23
**17th** 144:9 158:10 159:18 159:21
**19** 150:15
**1:23** 98:23
**1:41** 111:5
**1:51** 111:9
**1st** 118:5

**2**

**2** 4:10,10 21:20 21:23,25 45:14 55:15,25 72:1 73:2,16,20 75:18 124:12 132:7,12,14,18 142:17 143:1 162:1 163:12 163:16
**2,500** 135:19
**20** 179:3 181:15
**2006** 17:9
**2011** 17:18
**2017** 13:19 15:14
**2020** 15:25 20:4,5,7 31:1 106:18,20
**2021** 136:6 144:2
**2022** 15:14,15 21:22 26:25 27:1,8 28:23 39:24 45:24 46:21 47:9 91:15,17 106:17,24 108:9 113:23 114:3 118:2,5 118:8
**2023** 27:6,9 81:2,13 83:8 84:2,19 85:2 86:1 88:5,12 89:1 92:14 120:8 124:15 157:5,5
**2024** 25:13 26:2 72:16 80:8,9 130:4 130:10 136:6 138:25 140:9 145:23,24 150:15 152:22 154:5 156:4 157:18,24 159:19,21
**2025** 20:13,16 21:22 46:25

151:17,18,24
**2026** 1:14 5:8 179:3
**20th** 124:14
**21** 121:20
**21st** 26:1
**22** 20:3,13 29:10 33:16 47:15 91:16 99:14 114:23 115:12 116:1,4 118:14 121:10 150:14
**227-1915** 3:8
**22nd** 154:5
**23** 27:16 29:10 30:7 32:9,10 32:19 81:24 91:16 93:10 94:4 99:13,18 99:20 121:10 124:7 134:17 138:7,17 140:8
**232-2440** 2:18
**2388** 2:5
**23rd** 124:7 125:2
**24** 1:14 5:8 144:10 150:14 153:3 157:18
**24th** 92:14
**25** 24:13,21,22 24:23,24 136:6
**26** 134:17
**272.62** 84:19
**2800-3200** 3:5
**29th** 88:12,25
**2:23** 136:14
**2:25** 1:8
**2:27** 136:18
**2s** 95:19

**3**

**3** 4:11 49:9,25 54:3,3 56:20 56:20 74:23,25 79:4,6 132:12 132:19 136:6 143:2 168:11 168:12 169:4
**3,000** 138:8,16
**3/3** 93:10
**30** 98:6 179:16
**308-1490** 2:8
**31st** 91:14,17 91:22,23 92:3
**32** 48:1 139:17
**33** 58:2 67:8 150:7
**330** 1:17 2:15 5:9
**33838** 177:18
**34** 68:13 150:7
**35** 45:11
**355** 109:7
**35656** 178:14
**37** 71:4
**37-96** 1:22
**377** 112:14
**38** 4:9 39:20
**385** 109:7
**39** 72:5
**3:07** 165:23
**3:15** 166:2
**3:25** 176:5,8
**3rd** 84:19,21 86:1

**4**

**4** 4:12 55:15,25 57:10,11 58:2 59:4 85:2 100:4 132:12 132:21 143:2 163:12,16 171:10
**40** 104:13,18,23
**401k** 74:8
**41** 3:5
**41017** 1:18 2:6
**43212** 2:16 5:10
**43215** 3:6
**44** 109:6
**47** 111:17
**48** 72:5,11
**4th** 156:3

**5**

**5** 4:13 59:1,1 107:19,20 143:2
**513** 50:22
**54** 81:8
**55** 93:8
**56** 91:15
**5:12** 125:2
**5th** 94:4

**6**

**6** 4:15 60:10 111:14 123:5 123:11 134:5
**614** 2:18 3:8
**62,500** 32:21
**650,000** 101:8 128:19
**668** 102:5 105:1
**685** 105:7

**7**

**7** 4:3,16 78:12 123:1,13,15 125:4
**7/24/2026** 179:5
**7/26** 138:7,17
**72** 4:10
**72,500** 32:15
**72.5** 32:14

**768** 107:7 171:22
**769** 171:22
**770** 105:4 172:5
**79** 4:11

**8**

**8** 4:18 40:12,16 54:10 55:2,6 55:12,21 56:6 56:12 57:1,4 131:23,24 132:1 135:17 163:12,17
**8349307** 179:5 180:2 181:2
**859** 2:8
**88** 133:16
**8931** 8:5
**8th** 72:16

**9**

**9** 4:19 136:20 136:22
**955** 1:17 2:15 5:9
**9:57** 1:15 5:5

**a**

**a.m.** 1:15 5:5 38:3,7 65:20 65:24 78:22 79:1
**aaron** 141:2
**ability** 49:21 160:13 169:21 177:10 178:7
**able** 8:24 115:1
**above** 35:14 53:21 84:25 88:9 91:19 92:13 94:3 141:5 179:6 181:7
**absence** 10:25 39:2
**absent** 5:13 94:12 96:14
**absolutely** 65:14 68:11 86:3 94:16 97:12,13 128:11 166:13 170:8
**abuse** 23:3,7,10
**accept** 63:24
**accepted** 117:24
**access** 28:12 54:10 56:25 57:3 69:17 160:17 167:22 167:25
**accessible** 144:20
**accordance** 68:15,20 69:2 69:5 91:11 95:22
**account** 51:6 77:23 103:14
**accounts** 50:16 50:17 51:5 53:12 77:19 78:7 167:22 168:1
**accuracy** 148:3 179:9
**accurate** 41:9 167:8 177:9 178:5
**accusations** 160:3 162:13
**accusatory** 160:4
**achieve** 50:7,10 53:11 75:2
**acknowledge** 112:6,7
**acknowledge...** 181:3
**acknowledg...** 179:12
**acknowledg...** 5:12
**acronym** 131:9
**act** 153:24
**action** 177:12 177:16 178:8 178:12
**actions** 159:15 159:16,18,23 164:17
**activities** 16:22 84:8 113:2 118:23,25,25 119:3 160:11
**actual** 17:2 18:4 19:25 25:5 29:23 31:17 32:21 114:25 120:20 129:6 157:15
**actually** 25:25 37:23 49:2 59:16 69:1 82:23 87:19,20 94:11 107:25 109:19 112:20 141:10 151:8 172:17
**added** 26:12,13
**addition** 43:8 55:7
**additional** 26:12 30:9,11 118:8
**additionally** 5:13
**additions** 181:6
**address** 39:3,11 41:12 133:22 173:13

**addressed** 156:1
**administer** 5:12
**administering** 103:5
**administrative** 8:13 29:25 128:8
**administrator** 141:9
**advancement** 30:10
**advocacy** 20:25 25:8 42:6 48:16 49:11 50:1,13,19,20 51:8 52:1 53:10,12 59:2 60:4,15 61:5 62:1 67:15,18 67:20,24 68:6 68:14 71:2 75:1
**advocate** 54:20
**affairs** 51:16 51:23 53:1,18
**affiliated** 144:15
**afforded** 31:25
**agencies** 127:5 128:14
**agency** 121:9 125:17 126:5,9 138:5
**agency's** 115:4
**agenda** 160:1
**ago** 53:14 151:25
**agree** 5:15 66:25 67:22 68:1 70:13,13 85:18 87:23 90:6,9 98:8 102:20 135:25
**agreed** 38:10 69:3
**agreement** 4:9 4:10 13:10 33:5 40:4 43:14,22 65:10 66:3,7 67:9,14 69:9 71:4 74:22 103:11
**agreements** 44:1,4,11,21,22
**ahead** 45:7 51:10 55:4 63:5 89:22 104:21 113:10 116:19 119:22 122:16 126:15 149:9 166:20 172:4
**ai** 107:12 145:20 146:24
**aid** 17:23 18:6
**airlines** 80:8 92:14
**airport** 117:8
**al** 1:5 5:7,8 179:4,4 180:1 180:1 181:1,1
**alamo** 91:24
**alliance** 159:9 159:11
**alliances** 60:14 60:22
**allocate** 50:4 53:10 75:1
**allocation** 59:6
**allotment** 104:4
**allotted** 179:19
**allow** 113:1
**allowables** 89:8
**allowed** 44:10 59:13 119:4
**alternative** 55:2
**amanda** 5:6 7:25 108:6 171:9 179:5 180:2,24 181:2 181:4,12
**amandalynn** 1:13 6:12,16 6:22 7:7,8,22 79:5 104:13 105:4 138:5,9 167:6 169:8
**amelia** 17:7
**america** 149:12
**american** 80:11 80:17,19 158:14
**amneal** 71:18
**amount** 46:2 103:14,15 121:5
**amounts** 46:9
**amphastar** 71:17
**analysis** 4:11 79:5 85:19
**anderson** 1:13 6:22 7:7,11,12 7:13,17,19
**angeles** 95:7
**angry** 152:17
**ann** 155:15
**annapolis** 93:12 94:13
**annoying** 9:12
**annual** 32:20 46:5
**answer** 9:6,14 9:19 22:5 39:1 52:6 70:12 76:3 101:2 122:10 152:13 152:15
**answered** 21:5 28:3 153:14

**answering** 131:1,4
**anti** 16:18 105:22 106:5 172:24
**anticipated** 11:8
**antonio** 92:1,3 94:13
**anybody** 98:13 127:15,18 165:10
**anymore** 149:11
**apah** 82:9 88:3
**apha** 82:3,5
**apologize** 26:19 44:20 80:5 81:1 93:2 123:6 140:19 149:20 164:13
**app** 148:17
**appalachia** 23:17
**appear** 112:1
**appears** 85:24 86:2 93:12 111:20 124:6
**appended** 181:7
**applicable** 5:19 179:8
**application** 34:16 99:14 100:8,9,12,18 101:15,19,20 101:25 104:22 107:5 128:4 171:19 172:10
**applied** 99:12
**apply** 61:8 67:15,23 146:16
**appointments** 13:8
**appreciate** 59:16 68:25 98:13
**approached** 117:7 144:10 144:11,23 152:1
**appropriate** 143:24
**appropriately** 125:23
**approval** 102:12 108:1 162:5
**approve** 117:21
**approved** 68:16,20 69:2 69:5
**approximately** 47:10
**area** 16:20 22:20,22,22 23:22 28:7,7 35:15,19 91:6 173:12 174:1
**areas** 125:22
**arena** 49:11
**arising** 113:19
**arthur** 3:4
**asia** 1:19 5:3 177:2,19
**aside** 128:8
**asked** 10:6 11:7 13:23 16:23 90:24 91:1 96:6,9 139:1,1 140:11 141:11 147:3 150:22 152:4 156:20 164:4
**asking** 9:5,18 19:9 24:2 25:23 55:10 83:4,7 108:18 124:17 158:22
**assess** 60:16 61:5,11,17 63:20 113:18
**assessed** 61:19 61:20
**assigned** 5:3 28:4,4 30:2 75:10
**assignments** 119:6
**assist** 63:3
**assistance** 24:10
**associated** 30:13
**association** 82:6
**assume** 9:4 21:16 30:9 33:18 80:15 89:6 90:16 103:3,6 106:20 148:2 159:16 161:21 163:1 166:11
**assumed** 28:25
**assuming** 141:4
**assumption** 53:7
**assumptions** 90:19 138:18 141:5 159:4 160:2
**atlanta** 88:8,9
**atomizers** 127:25
**attached** 12:24 156:22 179:11
**attachment** 12:25
**attempting** 57:3
**attend** 76:24 86:16 87:9,12 87:15 148:18

**attendance** 6:1 84:9 87:16 89:6 91:9
**attended** 58:5 58:23 75:21 76:7 77:7,13 80:16 82:14 105:16,17
**attending** 28:17 58:3,19 76:21 85:8,16 86:19 158:14 169:20
**attestation** 151:24
**attorney** 6:2,9 177:14 178:10 179:13
**attorneys** 142:4 142:14
**audiences** 42:24
**audio** 177:8 178:3
**august** 99:13 140:8 150:14 150:15 154:5 161:3 179:3
**author** 111:22 112:4
**authored** 108:3 124:13,16
**authority** 88:19
**authorized** 5:11
**autoinjectors** 127:24
**autonomy** 142:3
**available** 74:14 92:21 179:6
**avoid** 9:9 59:23
**avoided** 131:20
**await** 151:6
**aware** 33:11 71:16 135:12 135:14 144:7,7 148:23 161:23
**awareness** 16:15 50:14 126:1,8 161:4 161:8 173:21

**b**

**b** 4:7 59:1 71:8
**ba** 17:24
**bachelor's** 17:3 17:15
**back** 9:11,21 15:16,19 16:24 17:5 19:2 26:15 38:6 45:10 47:25 63:12 65:23 66:4 67:8 74:21 78:25 93:8 98:22 108:1 111:8,11 111:21 115:8 124:10 128:2 136:17 164:13 166:1
**background** 16:25 18:12 23:14 40:6,11 55:11
**backing** 154:4
**bad** 131:5
**baltimore** 92:15
**barely** 91:16
**barriers** 18:23 19:17
**based** 24:5 30:9 32:1 49:1,17 49:23 53:6 101:4 129:22 142:18 143:1 143:16 147:9
**basic** 57:8 105:9
**basically** 11:23 142:5 143:1
**basis** 23:3
**bates** 72:5 81:6 81:8 109:6 130:13 139:5 139:17
**bear** 167:19
**becoming** 120:7
**began** 16:7,9 20:2 25:6,7 33:8
**beginning** 19:11 29:22 30:3 31:14,22 32:2 47:15 125:8
**begins** 37:2 97:2 169:2 171:2
**behalf** 2:2,10 3:2 6:12 58:5 63:2 66:7,11 66:19 67:1,16 67:21,25 68:3 68:7 75:21 76:7 79:24 83:22,23 84:10 84:12,13 88:22 89:7,13 92:25 93:14 94:6 113:13 118:10 167:14,19
**behavior** 164:18
**behavioral** 129:1
**behaviors** 159:4 160:2
**belief** 52:2
**believe** 20:14 24:22 25:15 26:25 32:9,14

32:21,24 33:2 39:5,9,11 41:9 41:10 44:4 47:10 51:22 56:3 63:16 66:18 70:15 71:1 72:6,22 74:18,23 76:12 77:8 82:6 83:14,20,24 84:14 86:5 88:21,23 89:3 92:8 93:1 94:25 95:12,17 101:10 106:25 107:12 108:20 113:7 120:22 121:19 122:22 124:16 128:13 129:16 130:11 141:14 142:24 142:25 143:4,6 144:6,9,21 145:19 147:7,8 147:16 148:8 151:21 154:23 155:16 156:24 157:12,24 158:1,10 160:25 167:25 172:2
**believed** 55:24 153:25
**believes** 162:21
**belong** 14:1
**benefits** 42:23 43:3 48:2,20 74:5,12
**best** 8:7,9,15 9:14 13:18 14:3 15:5,8,11 20:8 38:20 49:17,23 52:6 54:21,21,23 57:24 72:8 76:4 77:2 89:2 100:24 122:1 141:13 142:10 149:10 154:3 164:10 173:25 177:9 178:6
**better** 10:8 27:6
**beyond** 35:14 67:5
**bicknell** 1:9 2:11 6:14
**bid** 100:25,25 100:25 101:3 173:1
**big** 101:13 126:3
**bigger** 78:12
**bill** 85:13,15,17 86:20,23 87:19 169:25
**billed** 83:24 86:18,21 89:5
**billy** 6:13 155:7 155:11
**bio** 20:10 35:7 35:18 67:10 71:3 142:19 144:13 148:6 149:6,13 173:3 173:11,20 174:4
**bioemergent** 71:17
**biography** 147:21,22
**bit** 10:4 13:16 16:24 18:10 19:15 20:22 26:16 35:4 51:10 75:19 76:10 80:2 97:5 99:1 118:4 128:2 140:4 151:1 154:4 157:14 160:12
**biweekly** 32:3 154:14
**blackfeet** 173:23
**blindsiding** 158:19
**block** 54:10 56:25 57:3
**board** 139:25 141:4 143:1 151:4,22 154:8 154:22 155:8 155:12,14,20 155:20 156:25 158:23,24 159:6,8
**boards** 114:4 162:2,3,7,10
**bolen** 94:18 108:23 114:17 156:15 157:3 157:10
**boss** 152:24
**bottom** 67:10 112:16 124:14 132:14,14 139:16 172:5 173:7
**box** 132:13,15 134:5 135:20 135:24 173:8
**boxes** 121:6 135:19,23 138:5,8,8,16,16
**bradley** 3:11
**brand** 162:19 164:6
**breadth** 35:11
**break** 8:23,24 65:11,17 97:16 98:3,7 136:10

**brief** 117:22
**briefly** 75:20 167:3
**bring** 40:22
**broad** 56:18 60:6 141:24 143:8,8
**buddies** 8:7,9 8:16 13:18 14:3 15:5,8,11 20:8
**buddies's** 149:11
**budget** 170:8
**built** 91:6
**bullet** 162:12
**bunch** 71:20
**bus** 82:17 83:1 83:8
**busiest** 161:5
**business** 15:17 27:12 50:7,9 52:3 53:11 56:10 75:2 113:4,8,13,14 115:4 120:19 120:23 121:16 121:21,23
**businesses** 35:9
**busy** 161:14
**butchering** 130:22

**c**

**c** 2:1 3:1 5:1 6:7 6:7
**calendar** 11:22 11:24 12:2,3,6 12:13,15,18,24 12:25 13:5
**call** 7:23 16:2 100:17 101:15 145:3 152:3
**called** 6:23 18:3 127:3
**calling** 28:11
**calls** 28:16 160:10
**candidate's** 105:4
**candidates** 105:5
**capacity** 149:15
**card** 79:24 169:21,22 170:1
**cards** 27:12 167:23
**care** 62:11 97:18
**carried** 83:20
**carrier** 175:4
**carryover** 137:17
**case** 1:7
**casually** 13:13
**catalyst** 147:7 147:8,16
**categories** 42:9 143:5,7
**cauchon** 1:5 2:2 3:12 5:7 6:6,6 37:3,23 77:18,21,25 78:4,6,11,15 99:18 123:17 179:4 180:1 181:1
**cause** 119:19
**cecile** 141:3,7,8
**centers** 48:16
**central** 84:2
**ceo** 71:3
**certain** 23:1 29:21 31:23,25 31:25 75:10,15 99:10 160:10 167:21
**certificate** 177:1 178:1
**certificates** 105:19
**certification** 106:4
**certifications** 105:12,23
**certified** 5:16 106:11,16
**certify** 177:3 178:2
**cetera** 24:6,6 34:6,6 128:22 148:3,3 171:13
**ceu** 105:18
**ceus** 107:3
**chairs** 155:21
**challenging** 39:1 141:9
**chance** 79:12
**change** 25:9,12 26:8 30:18 46:24 47:2 92:20 180:4,7 180:10,13,16 180:19
**changed** 25:13 26:7,13 27:1 27:17 28:23,24 125:10 127:11 150:19,21,22 150:23 153:2 160:14
**changes** 150:17 151:2 179:10 181:6
**changing** 25:21 160:12
**charge** 81:15 84:25 87:15,23 87:25 91:23
**charged** 85:1 87:20

**charges** 86:2 92:2
**check** 19:21 175:11,15,16
**checked** 132:16 132:19,20 134:7,9
**checks** 129:6
**chief** 27:17,18 30:7
**childcare** 18:16
**choose** 155:17
**chose** 96:7
**christie** 178:2 178:15
**cincinnati** 8:3 19:2 76:23
**circulating** 28:16
**claimed** 162:17
**claims** 6:14
**clarification** 72:24
**clarify** 166:9
**class** 17:2
**clean** 15:1 135:2
**cleaner** 111:1
**clear** 9:2 32:17 64:9 86:24 139:22 153:25
**clearly** 33:17
**click** 135:24
**client** 43:15 58:6 66:15,22
**client's** 67:16 67:21,24 68:2 68:7
**clients** 21:1 35:12,13 43:12 43:19,20,23 44:10
**clinical** 42:23 43:2,10 48:1,4 48:19 50:12 52:1 58:10 71:2
**close** 136:21
**cloud** 146:6
**coalition** 28:18 105:13,16 106:4
**coalitions** 54:8 56:23
**coherent** 159:2
**cohr** 82:18
**coi** 142:12
**collaborative** 111:24
**collect** 127:8
**collecting** 64:16
**colleen** 155:15
**college** 17:11 17:13,18 19:3 19:4,4
**columbus** 1:18 2:16 3:6 5:10 82:19 88:14,18 121:13,14,15
**column** 138:7
**columns** 137:24 138:4
**combined** 4:19
**come** 16:1,4 23:18 45:10 65:10 97:16,25 119:23 135:9 156:8
**comes** 23:21 135:22
**comfortable** 38:18
**coming** 126:3
**committee** 143:3
**common** 119:11,12,12
**communicate** 42:23 43:2 48:1,25 54:24 125:22
**communicating** 48:2,19
**communication** 57:11
**communicati...** 57:5 96:13 143:20 152:7
**communities** 23:1 50:15 64:15 173:15
**community** 19:18 28:11,12 28:14 29:19 48:8 49:16,19 49:21 51:8 54:7,22,24 56:23 58:8 62:16 159:9,10 163:6,16 164:5 164:10 172:24
**community's** 164:11
**companies** 71:12,15
**company** 19:20 33:8 43:5 162:20
**compatible** 62:19
**compensated** 15:7 31:8,17 31:21,22 46:12 120:13 157:6
**compensation** 15:11 45:14,16 45:21 73:13
**compete** 71:5
**competency** 105:22 106:5
**competitive** 100:25

**competitors** 71:7,11
**compiling** 108:14
**complaint** 155:18 156:5 157:15 166:8,8
**complete** 38:18 75:11,12 133:24 137:16 139:2 147:3 154:19 181:8
**completed** 179:16
**completing** 100:12,13 140:5
**completion** 18:3 105:19
**components** 59:3,18,19
**computer** 12:3
**concerned** 152:9,10
**concerns** 157:23 158:19
**concluded** 176:9
**conditions** 135:25
**conduct** 57:12
**conducted** 163:25
**conference** 58:3 76:14,15 76:22 77:5,7 80:12,17,19 82:3,5,10 83:9 83:11,13 85:4 85:5,7,16 86:4 86:6,7,13,16,19 87:9,12,16 88:1,3 89:13 89:14 91:5,9 91:12 92:5 105:13,15,21 106:4,25 107:1 145:4,5 169:13 169:21
**conferences** 58:4,8,8,9,9,10 58:11,14,14,17 58:22 76:6,6 76:10 80:16 105:20 148:18
**conferencing** 145:21 158:7
**confidential** 1:22 36:3 37:1 96:18 97:11 168:14 169:1 170:10 171:6
**confidentiality** 44:11
**confirmation** 135:9
**conflict** 112:16 112:19 114:25 116:16,21 119:1,2 139:2 140:5,7,12 141:12 143:13 146:18 147:3 150:8 151:4 154:19 156:9 156:14
**conflicts** 113:17,18,24 114:1 115:10 118:19
**confused** 38:22 152:9
**confusing** 153:25
**confusion** 153:23
**conjunction** 60:13
**connected** 148:16
**consider** 119:7
**considered** 120:3
**considering** 118:15
**consisted** 164:2
**consistent** 66:10 68:12
**constant** 31:1
**constitute** 5:23
**consult** 35:9 90:4
**consultant** 20:24 122:22 139:25 154:7
**consulted** 142:14
**consulting** 20:17 22:19,21 22:23 35:7,17 49:9 142:5,18 143:1 154:14
**cont'd** 3:1
**contact** 60:2,3 90:23 127:16 133:19 134:23 135:3,8 138:9 156:25
**context** 40:2 138:11,13
**continue** 51:8
**continued** 125:25
**contract** 20:19 20:21 25:1 36:2 38:13,19 45:24 46:1,19 47:9 56:19 71:23,24 72:7 72:7 74:24 99:9,17 100:1 100:19 104:4,6 118:3,7 120:10

124:18 142:18 143:1 172:20 172:25 173:5,6
**contracting** 22:12
**contracts** 25:3 35:11,18 37:24 44:9,12,14,16 45:19 46:9 47:3,11 72:19 72:20
**contribute** 102:9,10 125:25
**conversation** 48:8 115:25 117:8 144:24 145:11,16 147:9 152:19 152:21 153:5 157:19,19,23 157:24 158:2 158:20,21 159:3
**conversations** 10:3 28:20 116:13,14 117:5 118:9 143:10 144:1 145:14,15,17 145:19 146:5 146:13 156:10 159:25
**coordinating** 29:4
**coordinator** 16:11,13 26:22 26:23,24 27:24 28:25 30:23
**copier** 136:8
**copies** 37:4,6 77:16,18,22 99:22 123:18 179:14
**coping** 23:19
**copy** 71:24 108:5,17 127:17 156:24 174:16
**cordial** 152:7
**corporation** 14:4,12
**correct** 9:25 11:16 23:7 27:22 30:21,21 30:25 39:25 40:9 43:13,17 47:14 48:23 52:25 53:19 55:13,23 60:20 62:7,10 67:18 67:19 68:1,1 74:3,15 80:1 80:13 85:21 87:1,10 100:9 100:10,11 101:7 102:25 103:1,16,19,24 113:15 118:20 128:15,18 135:15 138:18 144:17,22 145:8 155:10 155:13 156:2,5 162:22 163:18 163:22 169:17 171:19,20 173:17 174:5 174:18,21 181:8
**corrections** 181:6
**correctly** 55:18 113:20 115:6 173:16
**correlate** 106:1 106:13
**corresponden...** 4:13,16,22
**cosi** 18:24
**costs** 128:8,20 167:19
**cota** 82:16,17 83:1,8 88:15 88:17,25
**council** 173:9 173:11
**counsel** 7:2 10:4,20,22 72:24 140:13 175:1,9,24 177:10,13 178:7,10 179:14
**counterclaim** 6:7
**counterclaims** 6:4,10
**counties** 16:16 29:21 31:23 133:16
**counts** 137:17
**county** 82:13 82:21 88:21 132:21,23 133:2,4,5,9
**couple** 39:4 94:3 123:14 151:25 154:22 165:19
**course** 18:5 106:15 108:25
**courses** 24:10 105:18
**court** 1:1 8:19 95:23 96:14
**coworkers** 12:22
**create** 29:15 30:13 34:17,18 34:21 54:6 100:7 101:21 101:24 119:2 131:10 141:11 147:12

**created** 33:13 33:16 34:15 137:5 153:22 153:23 156:8
**creates** 56:21
**creating** 28:1,2 28:2 29:18
**creation** 16:19 161:15
**credit** 79:24 167:22 169:21 169:22
**crevecoeur** 70:18,20
**crm** 131:10
**cs** 179:15
**cs8349307** 1:24
**cultural** 105:22 106:5
**current** 13:17 31:14 32:13 125:9
**currently** 8:2,6 22:16 24:13 30:24
**customer** 122:4 131:12
**customers** 120:20 122:8 142:1
**cv** 1:8
**cybersecurity** 122:24

**d**

**d** 4:1 5:1 57:11 130:13
**dalrymple** 130:21
**dash** 7:15,16
**data** 64:4,16 131:11,12
**date** 1:14 4:13 4:16,22 24:25 39:24 72:15 79:9 81:10 118:1 134:17 145:23 150:14 154:21 158:8 180:24 181:12
**dated** 118:5 124:7,14 127:8 138:7 150:13 150:15 156:3
**dates** 12:25 20:11 25:23,24 26:4 106:17 158:15
**david** 2:3 6:3 65:3 81:4 97:7
**dawn** 4:18 127:10 131:15 131:17,19,20 131:25 132:5 136:3
**day** 13:8 30:2,2 126:8 156:4 160:11,11 161:4,8,12,13 167:17,17 181:15
**daycare** 8:10 114:4
**days** 95:3 154:22 179:16
**dealings** 115:5 121:21
**deaths** 131:20
**december** 20:13 21:21 39:24,24 91:14 91:17 114:23 116:1 118:2,5 118:8
**decide** 129:21 142:21
**decided** 153:19
**decision** 115:1 153:20 155:19
**decisions** 59:5
**declare** 181:4
**decorum** 152:19,20
**dedicate** 99:3 103:4
**dedicated** 128:10
**dedicates** 103:3
**dedicating** 24:14 104:18
**deemed** 181:6
**defendant** 3:2 6:8
**defendant's** 35:25 37:13
**defendants** 1:11 2:10 6:13
**defense** 35:16
**define** 28:22
**defined** 24:9
**defines** 115:3
**definitely** 33:2 39:3 106:14 146:1 157:7
**definition** 52:9 52:12 104:8
**deflection** 76:15,17
**degree** 17:1,17 17:20 18:1 24:8
**deliverable** 28:13
**deliverables** 28:3 31:25 41:25 75:11
**delivery** 30:14 167:16
**delta** 80:8
**dennis** 1:5 2:2 3:12 5:7 6:6 102:14,16,24 108:25 115:21 115:24,25

116:9,15 117:1 117:12 118:9 118:13,15 124:16 130:8 140:25 141:2 143:11,21 144:6 145:6,14 145:18 146:13 147:9,24 148:1 152:1 153:9 158:2 162:17 164:18 168:2 179:4 180:1 181:1
**dennis's** 117:17 135:7 167:12
**department** 35:16 82:13,19 82:22 99:9 100:22 104:18 127:9,11 128:24 129:1 131:20 171:18 172:1,9
**depended** 64:25
**depending** 31:8 114:19 127:22 145:25
**depends** 125:7
**deponent** 179:13 181:3
**deposed** 11:14
**deposing** 179:13
**deposition** 1:13 5:6,21 9:24 10:5,6,23 11:3 11:4,6,7,8,17 12:8 57:23 177:1
**describe** 117:10,11 152:6
**described** 66:8 86:25 87:4
**describes** 71:12
**description** 4:8 34:11,19 40:7 41:17,23 42:13 50:11 53:4 54:14 56:10 58:25 77:11 173:7
**descriptions** 34:14 101:24
**designate** 36:2
**designated** 168:13
**designation** 97:11 171:6
**desiree** 70:18 70:20
**desiree's** 71:1
**despite** 161:22
**destination** 91:11
**determine** 143:17
**develop** 53:12
**developed** 55:21 173:13
**development** 40:15
**developmental** 18:23
**device** 146:7,8 146:9
**dewayne** 179:4 180:1 181:1
**diego** 94:4,14
**difference** 101:13 112:9
**differences** 57:20
**different** 27:20 34:14 38:24 39:10,12 41:10 41:16,17,17,19 43:12,25 44:3 47:3,4 52:14 53:22 63:7 74:18 83:5 123:21 125:21 162:10 163:7
**differently** 37:24
**difficult** 142:2
**digital** 177:8 178:3
**dinner** 7:24
**diploma** 17:3 18:5
**direct** 19:18,24 28:1 45:11 53:20 66:4 74:21 112:13 127:4 141:15 156:11,12
**directed** 58:16
**direction** 56:16
**directly** 17:10 70:16,17 71:11
**director** 25:7 25:14,17 27:2 27:6,11,14 28:23 29:11,13 42:5 50:1,12 53:10 59:2 60:13,21 67:15 67:17,20,24 68:6,14 71:1,3 74:25 125:20 125:24 157:12
**disabilities** 18:23
**disagree** 66:20 67:1 69:11
**disagreed** 152:24
**disagreement** 69:10 165:11
**disapprove** 117:21

**disclose** 44:10 113:17,23 114:2,7,10 115:17,19 120:2 140:11 141:16 161:17 161:18
**disclosed** 115:9 115:20 129:13
**disclosing** 45:20
**disclosure** 4:21 139:2 140:5,7 140:12 141:12 142:4,12 147:4 147:14 150:8 154:20 156:14
**discovery** 100:1
**discuss** 83:20
**discussed** 27:25 32:25 84:6
**discussion** 39:5
**discussions** 57:12,16
**disliked** 162:21
**disorder** 21:1 22:24 23:5,10 35:21 40:24 58:12 117:15
**disordered** 35:22
**disproportion...** 173:13
**disputes** 163:15
**dissemination** 49:18
**distance** 162:2
**distinction** 21:8 21:12
**distribute** 61:22,23
**distributed** 133:1,11,15
**distributing** 162:19
**distribution** 40:15 161:13
**distributor** 125:11
**district** 1:1,2
**division** 1:3
**doctors** 48:16
**document** 56:17 73:10 79:13,15 85:19 100:16,17 101:4 103:23 103:24 109:24 124:12 128:6 132:8,8,9 136:25 137:8 138:15,23 142:6,8,18 150:8 154:20 155:25 171:25 174:7
**documentation** 50:22 94:22
**documents** 11:18 12:20,23 13:2,6 137:13 137:15,16 155:2 171:17 171:24
**dod** 35:11
**doing** 19:24 20:17 22:10,15 23:8 28:9 29:3 29:7,22 30:1 30:14 59:9 60:5 120:16,19 130:5 137:18 140:3 157:4 160:10 162:5 170:1
**dollar** 128:11
**dollars** 46:16 46:17 47:9,11
**donation** 49:4 49:6 51:7 61:24 63:24 64:3,15 65:1 89:3 121:8,9 121:17 127:20 137:16
**donations** 48:9 50:13,18 54:16 60:5 61:9 121:3,4,5 127:4,19
173:24
**doors** 28:15
**dosage** 163:10 164:5
**dose** 135:20
**doses** 55:16 59:6 135:21 164:7,8
**double** 175:15 175:16
**doubt** 149:12
**dozen** 58:24
**draft** 4:21 150:11
**draw** 15:5,21
**draws** 15:21
**drive** 2:5 146:10
**drop** 58:1
**dropdown** 133:6 135:6
**drug** 173:12
**drugs** 71:13,16 77:5
**dshearer** 2:7
**due** 13:14 140:8
**duly** 6:23 177:5
**duties** 26:8,11 26:12 28:4 29:8 30:2,11 41:3,6,21 45:10 68:2

**dwayne** 1:8 2:10 5:8 6:13 139:20,23,24 154:5 155:7,8
**dysregulated** 22:25

**e**

**e** 2:1,1 3:1,1 4:1 4:7 5:1,1 94:2 108:4 114:8 116:6 124:7 127:16 133:22 134:23 135:9 138:5 139:19 141:20,23 143:20 144:24 150:13 154:10 154:15,22,23 155:7 175:4,5 180:3,3,3
**earlier** 128:5
**early** 27:5 99:12 121:10 161:11
**earnest** 26:10 30:1
**earnestly** 76:4 165:10
**easier** 9:10,20 9:21
**easily** 78:7,9 144:20
**eastern** 1:3
**eat** 98:14
**eating** 22:25 35:22
**economic** 42:23 48:2,4,19
**ecosystem** 57:24
**edit** 101:21
**editing** 108:17
**educate** 126:25
**education** 16:15 18:4,8 19:18 20:25 24:2,9 25:14 25:18,20 28:1 43:6 49:18,19 50:14 53:5 64:17 89:4 105:18 173:21
**educational** 16:17,25 24:7 28:17 173:22
**effect** 113:22
**effective** 45:24 55:16
**efficacy** 64:7 163:16
**effort** 30:13 92:19 111:24
**efforts** 51:8
**either** 77:13 100:22 101:5 114:14 119:19 130:11 145:9
**elements** 42:16
**elicit** 12:7
**eligible** 74:5,8
**email** 4:13,16 4:22
**emails** 12:22 94:21 95:19 108:1 118:12 118:16 123:14 123:22
**embedded** 160:1
**emphasis** 56:6
**employ** 33:4
**employed** 8:6 53:15 66:7,11 66:19 67:1 119:6 151:11 177:11,14 178:8,11
**employee** 21:2 21:6 30:25 31:6,8 33:6,10 33:11,19 41:3 41:6,21 42:4 66:15,23 74:5 74:23 90:4,18 102:20,25 111:12 113:16 115:1,2 118:22 119:5 125:14 137:12 151:19 164:23 169:25 177:13 178:10
**employee's** 118:23
**employees** 34:1 34:9 51:19 113:2 162:18 164:19,21
**employer** 86:11 86:13,18 90:22
**employment** 4:9,10 13:3,7 13:10 18:21,24 18:24 19:17 20:8,18 33:5 34:8 35:4 43:21 44:1,4 45:13 67:13 86:16,24 87:3 99:1 113:3 115:24 118:22 119:8,9 120:18 144:17 148:24 153:7 158:22 162:14
**ems** 58:9
**ended** 20:17 24:21
**ends** 36:7 96:19 168:16 170:11
**energy** 152:12
**enforcement** 18:20 58:10 173:4

**engage** 23:19 64:15 113:2 140:11 153:21
**engaged** 48:10 141:4
**engagement** 27:3 28:24 117:14 125:21
**engaging** 156:9
**entire** 38:18 99:22 100:3 110:23 111:12 155:20
**entirely** 128:13
**entities** 44:8,24 45:5 46:18,18 48:14,18 49:1 49:2 61:20 73:19 77:14 82:9 129:13 142:22
**entity** 45:20 46:3,11 129:14 129:15
**entity's** 63:20
**entry** 80:7 83:5 91:14,20 106:21
**environment** 166:8,10
**equals** 46:5
**equivalency** 120:14
**equivalent** 102:21,22 103:21 104:5,7 104:23
**equivocal** 153:15
**errata** 179:11 179:13,16
**erratas** 179:15
**errors** 174:17
**es** 177:4
**escalator** 117:8
**especially** 30:21 32:2
**esquire** 2:3,13 3:3 179:1
**et** 1:5 5:7,8 24:6,6 34:6,6 128:22 148:3,3 171:13 179:4,4 180:1,1 181:1 181:1
**ethics** 143:2
**event** 80:21 89:10 117:23 126:3,7
**events** 16:14 28:14
**eventually** 147:5
**everybody** 98:14
**evidence** 49:17 49:23 53:6
**evidentiary** 5:20
**exact** 24:25 25:24 26:4 34:2 143:7 154:21 169:16
**exactly** 8:12 35:6 105:14 116:7 126:22 152:10 157:10
**examination** 4:2 7:3 167:1 168:9
**examined** 6:25
**example** 45:23 80:3 90:13 91:4 102:16 122:19 137:19 138:6
**excerpts** 100:16
**exchange** 118:12
**exhibit** 4:9,10 4:11,12,13,15 4:16,18,19,21 4:22 35:25 37:13 38:10,14 72:1,25 75:18 79:4,6 100:4 107:20 111:14 123:5,15 131:24 132:1 136:20,22 139:4,7 155:4 168:11,12 169:4 171:10 171:22
**exhibited** 164:18
**exist** 41:12,16 146:12
**existed** 33:14
**expansion** 29:8
**expect** 89:18
**expectation** 75:13 99:2
**expectations** 97:6
**expected** 75:14
**expense** 4:11 77:19 78:7 79:5 84:22 85:19,24 87:23 169:9
**expenses** 79:20 79:23 85:20 90:22 167:13 169:4,9,13
**experience** 23:20 24:11 107:8,8 159:18
**experienced** 159:15 164:17
**experiences** 23:24
**experiencing** 29:17

**expert** 20:24 22:19,21 23:8 23:15,21 30:14 35:17 49:9
**expertise** 22:20 22:22 23:1,2,4 23:5,6 24:5 35:19 40:24
**expiration** 69:8
**expired** 25:2,4 125:17 127:7
**explain** 31:20 53:25
**explained** 30:12
**explaining** 52:21
**explanation** 90:21
**explicitly** 153:11
**extent** 30:20 48:6 110:16,20
**extra** 26:9

**f**

**f** 58:1,2
**facebook** 144:18 148:12 149:25
**fact** 38:17 44:15 123:7 138:15 161:23 163:24
**factual** 12:9
**fails** 179:18
**fair** 18:18 42:20 89:11 101:15 128:9 170:3,6
**fall** 20:13,16 21:22 24:22,23 24:24 46:24 116:3,4
**false** 161:15
**falsely** 162:17
**familiar** 28:5
**family** 115:3,3
**far** 31:12,13 162:7
**fast** 9:13
**fatal** 173:14,14
**fault** 147:10,11
**fcph** 88:15,20 88:25
**february** 72:15 92:13 120:15
**federal** 18:6
**feedback** 16:19 28:2 50:15 53:5 54:17 64:6,13
**feel** 69:13 119:18,18
**feeling** 140:4
**feelings** 11:9,10
**feels** 141:24 144:4
**fees** 142:5 169:16
**felt** 54:22 160:3
**field** 45:1
**figure** 21:9 142:7
**filed** 156:4
**fill** 118:19 127:15,16 141:11
**filled** 107:5 128:5 131:14 135:13
**fills** 100:21
**final** 101:4,25 102:8,12 135:24 150:7 150:20,21,24 151:4,9,10,16 166:5
**finalized** 108:5 174:17
**finally** 9:12
**financial** 15:10 17:23 18:6
**financially** 15:16 177:15 178:11
**find** 33:23 63:23 125:21 137:12
**finding** 19:22 28:12
**fine** 7:25 16:3 36:5 78:15 82:20 110:17
**finish** 22:5 34:24 65:4 70:4
**finished** 17:18
**firewalled** 59:11
**firewalls** 59:24
**firm** 35:7
**first** 6:23 13:8 16:7 32:19 33:11 40:5,5,5 42:22 56:19 65:10 66:5 71:23 74:24 80:7 107:24,25 108:4 110:13 112:23 115:8 117:6 118:3 120:9,10 124:6 132:14 137:20 138:6,7 147:6 151:16,18 152:1 155:6 158:2 166:21 172:14,17 175:5
**fit** 27:7
**five** 24:15 65:17 73:9
**flexed** 93:7

**flexible** 93:6,18
**flight** 80:10 91:20
**flow** 9:20
**fly** 68:24
**flyers** 28:16
**flying** 80:20
**focus** 43:15 54:8 56:24
**folks** 10:24 19:23 48:9 54:15,16 61:25 62:1,2
**follow** 68:4 89:23 129:20 164:17
**followed** 156:10
**following** 42:6 59:3,18,18 71:11 167:12
**follows** 6:25 14:18
**font** 78:12
**food** 18:15
**foregoing** 177:3,4 178:4 181:5
**forever** 146:7
**forget** 114:21
**forgot** 155:24
**form** 41:16 53:2 102:8 114:8 118:18 127:14 132:25 133:24 138:12 141:10 142:23 150:6 151:9,10 151:16 172:1
**formal** 18:8 24:9 147:11,13 155:18 156:4
**format** 141:17
**formatting** 108:20
**former** 161:23 161:24
**formerly** 139:24
**forms** 59:6 61:23 92:21 131:8,10,12
**formulating** 108:12
**formulation** 127:23
**fort** 2:6
**forth** 108:1
**forty** 73:9
**forward** 155:19 155:19
**foundation** 121:13,15
**foundations** 106:10
**four** 27:20 37:10 107:16 107:17,24 109:2 171:11 171:12
**frame** 25:25 118:14 175:7
**frames** 26:5
**franklin** 82:13 82:21 88:21
**friday** 1:14 5:8
**front** 38:25 39:7 44:13 90:5 159:9,10 162:4
**frustrated** 152:18
**frustrations** 158:24 159:3
**fte** 102:19,19 103:11 104:14 104:23,25
**ftes** 31:25
**fulfilled** 143:16
**full** 7:6 15:18 21:2,4,6,7 24:18,19,20 30:24 31:2,5,7 31:8,15,16,17 35:10 50:4,5 53:11 75:1,5,8 86:25 87:4,6 90:18 102:20 102:22,25 103:21 104:5,7 104:23 109:24 119:7,8,13,19 119:24 120:4,8 120:11,13 142:4 163:4
**fully** 32:22 119:5 141:22 142:2 161:23
**fundamental** 165:11
**funded** 32:22
**funders** 29:23 30:15 172:14
**funding** 29:17 31:9 34:15,16 54:10,17 56:25 99:8 158:25 170:7
**funds** 128:7,10
**funny** 60:25 61:2
**furnished** 101:3
**further** 17:5 168:6 177:12 178:9

**g**

**g** 5:1
**gain** 76:23 115:2
**gained** 26:9
**game** 97:25
**gardening** 18:17

**garvey** 2:4
**general** 11:9,10 25:25 34:9 41:22 90:6 119:3
**generalities** 48:12
**generally** 113:1 150:20
**generated** 12:21 107:13
**generic** 138:5,7 138:16
**generics** 48:5
**geographic** 125:22
**geographical** 23:1 29:5 35:22
**getting** 25:15 136:21
**girl** 149:12
**give** 7:6 8:18 9:9 10:14 16:19 18:12 35:17 48:13 58:21 64:4,6 77:22 78:2 80:2 91:4 171:8
**given** 8:20 34:9 42:5 74:19 104:5 125:13 141:10 143:5 151:23 153:19 181:9
**gives** 80:14
**giving** 48:12 100:2 103:14 163:16
**go** 7:22 10:9 15:16 17:5,6 17:10,13 19:23 26:15 37:20 39:20 41:24 42:8,10 47:25 54:3 55:4 59:1 60:10 63:5 67:8,9 68:13 68:13 71:4 78:19 80:4,6 80:25 81:1 82:16 84:18 88:9 89:22 90:13 92:13 93:8,10 94:3 96:9 97:11,19 98:2,4,6,15 102:24 103:15 104:21 105:3 106:18,24 111:3 113:10 114:22 116:19 119:22 122:16 124:1 126:15 128:16 132:18 132:19,21 136:20 142:17 149:9 157:15 166:20 172:4
**goals** 62:8
**goes** 31:13 34:22 100:12 100:13 106:21 137:23 163:23
**going** 9:4,6,17 18:14 36:1 39:19 40:17 41:14,23 45:7 62:11,12 63:24 64:3 65:5 84:6 84:7 95:9 97:15,17 98:6 98:10 103:3,15 108:17 109:8 109:17,23 110:22 115:8 118:15 122:25 129:20 139:9 139:10 140:17 156:18 158:25 160:9 163:4 166:18 168:11 168:12 171:9
**golden** 1:9 2:11 6:13 155:7,11
**good** 5:2 65:12 65:18 98:17
**goodwill** 19:16
**gotten** 107:2
**government** 25:7 42:5 51:16,23 52:25 53:18 59:2,7 67:15,17,20,24 68:6,14 71:2 75:1 129:12,14 129:15
**governmental** 50:1 53:10
**grab** 118:3 171:9
**grade** 141:6
**graduate** 17:8
**grandview** 2:5
**grant** 16:5 29:6 29:18 31:9 34:23 50:24 51:7 63:24 64:4,16 100:23 100:23 103:5 128:4,15 172:14
**grants** 28:3 29:23 31:24 50:19 54:16 59:7 60:5 61:8 172:18
**granville** 85:1 85:25 86:1 87:25
**great** 25:24 26:2 28:21 58:11 71:18
**greater** 121:7

**grid** 4:20
**ground** 8:19
**group** 20:10 35:7,18 67:11 71:3 84:3 92:7 142:19 173:3 173:11,20 174:4
**groups** 48:17 54:8,24 56:23 60:4 61:22
**growth** 29:17
**gsn** 2:7
**guess** 127:22 133:1 142:7
**guidance** 22:17 141:15 150:22 151:7
**guys** 97:19 98:3 101:6 103:14 129:6 166:23

**h**

**h** 4:7 6:7 180:3
**habit** 9:12
**half** 103:3,4,9 103:10,12
**halfway** 132:23
**halted** 150:24
**halting** 151:2
**hand** 35:24 37:11 96:6,8 122:25 131:24 139:9 155:1
**handbook** 4:15 33:6,10,12,19 34:1,2,9 90:5 108:2,12,15 109:6 110:25 111:13,19 112:6,8 113:1 113:22 114:24 118:21 123:3 151:19 156:11
**handbooks** 108:15 111:25
**handed** 79:3
**hands** 29:23 129:5
**hanging** 8:25
**happen** 86:22
**happened** 140:9
**happening** 144:4
**hard** 81:25 88:5 146:10
**harm** 1:10 2:11 3:2 4:15 6:10 6:14,15 8:7 11:2 12:21 15:23,24 19:10 30:3 54:8 56:23 58:10 84:2,10 86:8 94:9 97:5 99:1 105:13,16 106:3,8,10,15 106:19 125:12 125:14 132:15 158:14 163:6 164:25 167:12 167:14,19,23 168:3 169:19
**hawaii** 90:14
**head** 9:8,8 76:13 142:15
**header** 112:18
**heading** 41:5 41:24 71:5 120:17 161:22
**headquartered** 133:3
**health** 25:14,18 25:20 49:19 74:6 82:7,7,13 82:19,21 83:2 88:21 99:9 100:22 104:18 127:9,11 128:24 129:1 131:20 171:18 172:1,9,16
**healthcare** 18:21 19:21 35:12 58:9
**hear** 166:9
**hearing** 6:19
**held** 76:14 86:13 87:6
**helen** 3:3 6:9
**help** 16:16 18:22 19:23 50:24 63:2 80:15 100:7 101:14,17 111:22 112:10 125:15 139:25
**helped** 16:19 34:18 101:21 101:21,22,23 101:24 173:24 173:25
**helpful** 15:2
**helping** 29:15
**helps** 80:22
**hepatitis** 80:11 80:18
**hereto** 177:14 178:11 181:7
**hey** 80:15
**high** 3:5 17:5,6 17:7 18:11 19:3 161:13 173:12
**higher** 173:5
**hikma** 40:7,10 43:15,16,19,23 44:8 45:25 47:10 50:7,25 51:2 53:11,15 54:18,23 55:1 55:5,20 58:6 60:15,17,19 61:10,12,18,21

62:6,11,22
63:2,2,3,20
64:2,10,11,21
64:21,24 65:1
66:7,12,15,20
66:22 67:2,16
67:22,25 68:3
68:8,10,15,19
69:1,13,21,23
69:25 70:9,10
70:14 72:20
75:2,24 77:14
78:6 92:7,25
113:14 118:10
120:22 121:4
121:17,23
122:4,12
143:11 163:3
**hikma's** 40:12
42:24 62:9
**hire** 34:12
172:17
**hired** 33:14
40:19,21,23
51:17 139:25
**hiring** 16:6
31:17
**history** 13:17
17:4 18:11
137:12
**hmm** 14:7
49:12 50:3
51:13 60:12
81:17,19
106:22 109:10
122:21 135:18
138:21 139:21
164:1
**hmms** 14:17
**hold** 18:25 37:9
38:1 73:9
77:24 151:5
**holding** 26:3
**holidays** 34:6
**home** 19:21
91:5
**honest** 76:18
**honestly**
154:16
**hope** 140:3
**hopefully** 62:19
66:3 98:15
166:4
**hoping** 12:7
65:9
**hospital** 48:15
**hosted** 105:15
**hostile** 152:7
158:20 166:7
166:10
**hosts** 131:11,12
**hotel** 82:2
85:11,13
**hour** 65:5
97:15 98:6
**hourly** 15:22
31:22 32:3
**hours** 24:15,16
31:16 75:15
98:11 104:8,14
104:19,23
118:24
**house** 81:18
**hro** 4:19 16:2,4
16:5,7,9 18:11
18:14 19:12
20:3,7 26:16
27:21,24 29:20
30:24 31:18
33:4,20 34:8
74:12,17 83:23
84:13 86:4,7,8
86:16,25 87:8
92:10 93:4,17
94:15 95:10
99:3,21,25
100:20 102:5
102:25 105:7
109:12 113:17
114:6 118:23
119:6,9 120:3
120:19,23
121:3,4,9,16,22
122:5,7,12,20
125:5 126:12
126:25 127:4
128:17,18
129:18 131:7
133:1,3,10
136:2 137:12
138:5 140:1
141:8,9 142:1
147:22 148:6
148:24 149:6
151:11 154:2,6
154:7 155:2
157:3,11,16
161:14 169:9
169:13,25,25
170:3 171:22
172:5,17
**hro's** 113:8,14
133:14 139:25
147:10
**hsudhoff** 3:7
**huh** 7:20 16:10
115:13
**huhs** 9:10
**husband** 10:24
13:25 15:17

**i**

**idea** 34:10 35:6
58:21 135:15
136:2 137:21
138:14 153:16
**identification**
38:15 72:2
79:7 100:5
107:21 111:15
123:16 132:2
136:23 139:8
155:5
**identify** 6:1
60:14 141:25

**identifying** 29:17 60:19 61:7
**identity** 45:20 46:10
**ignorance** 51:4
**ignores** 163:24
**ilk** 154:25
**immediate** 115:3
**impact** 173:13
**impetus** 40:17
**implementati...** 108:2
**implicitly** 153:12
**improve** 16:21
**improved** 57:7
**inaccurate** 167:10
**inadequate** 55:16
**include** 29:13 49:14 62:5 142:21
**included** 49:13 160:8
**includes** 54:9 56:24 64:21
**including** 119:6 120:19 143:8
**income** 21:20 73:16,20
**increase** 54:9 56:24 62:9 73:12
**incredibly** 170:5
**incurred** 79:23
**independent** 22:12
**indicate** 104:17
**indicated** 115:9
**individual** 51:6 52:13 56:8
**individuals** 28:13
**industries** 19:16
**influence** 115:1
**influencers** 59:4,19,22 60:2,4
**influential** 54:7 56:22
**inform** 24:11 94:17
**information** 12:6 48:3 64:4 100:21 102:9 150:3 156:13 156:25 164:9
**informed** 94:14 154:18
**initial** 26:21 47:9
**initially** 125:9
**initiative** 131:19
**inn** 85:1 86:1 87:25
**input** 164:11
**inquiries** 125:16
**inquiring** 143:22
**insight** 80:3
**instances** 58:19
**insurance** 74:6 91:20
**intended** 5:18
**intensity** 173:12
**interact** 172:15
**interest** 112:17 112:20 113:18 113:24 114:1 114:25 119:2 139:2 140:5,7 140:12 141:12 143:13,16 147:4 150:8 151:5 154:3,19 156:10,14
**interested** 60:21 61:8 63:25 65:2 177:15 178:12
**interfere** 118:25 119:20
**interfered** 119:8
**internal** 125:19 137:15
**interns** 29:6
**interrupt** 25:22
**intramuscular** 127:23
**intranasal** 127:24
**introduced** 55:21
**introduction** 40:12
**inventory** 125:19,25 129:10,11,11 137:15,17
**involve** 77:13
**involved** 28:6 44:25 59:13 166:12
**involves** 120:18 166:10
**involving** 76:11 76:11
**isdated** 150:14
**issue** 115:15
**issued** 74:1,2
**issues** 59:24
**it'd** 46:17
**it'll** 8:22 9:20
**itemized** 141:19 142:11

**items** 167:16
**iterations** 127:12

**j**

**jam** 98:12
**jamie** 155:24 155:24
**january** 26:1 91:22,23 92:3
**job** 1:24 16:8 19:10 21:13 25:6,21 26:7,8 26:12 27:7 34:11,13,18 42:5,12,13,17 50:11 53:3 54:13 56:10 58:25 60:18 62:8 63:1 68:2 77:11 101:23 119:1 120:3 129:24 130:6
**jobs** 18:15,19 18:21,25 28:6 87:6 119:14,19 119:24
**joined** 106:19
**jr** 2:3
**july** 1:14 5:8 80:7,9 99:12 99:18,20 124:7 124:14 125:2 134:16 144:9 145:23,24 157:18 158:10 159:17,18,21
**jump** 16:24 45:7 51:10 73:8 107:7
**jumping** 164:13
**jumps** 41:18
**justice** 52:16

**k**

**k** 3:3
**kappa** 121:13 121:15
**katz** 141:8
**keep** 97:17 110:18 135:2 167:16 175:7
**kelsey** 130:11 130:12 134:21
**key** 42:24 59:4 59:19,21 60:2 60:3
**keys** 96:6,7
**kicked** 120:11
**kind** 10:7 12:6 18:12 19:9 20:22 22:18 26:19 34:5 40:17 41:22,22 48:12 65:4 80:22 122:24 144:24 152:12 153:15
**kits** 135:22
**kloxxado** 60:15 60:20 61:10 134:5,10 135:17 136:3,7 138:8,16 143:11,22,24 146:19 162:16 162:23 163:1 167:3,7
**kloxxado's** 167:7
**knew** 26:1 50:22 52:23,25 53:3 117:19 153:4
**knocking** 28:15
**know** 8:19,21 8:23 9:2,17 10:2,25 12:19 13:1,8 20:8 23:1 24:16,24 26:1,2,3 28:7,7 28:8,20 29:6,8 30:15 33:16 34:5,16 35:22 35:23 38:24 39:14 40:2,22 42:16 43:9 44:9,11 46:10 48:7 49:16,20 49:21 52:7 53:15 57:7,25 58:14 59:10,14 59:21 65:3 69:3 70:25 76:6,11,18,20 77:8 80:4 83:1 83:25 93:4,16 93:23 94:8,14 94:25 95:4,7,8 95:10,23 96:4 100:14,15 101:24 107:18 109:25 110:15 111:25 112:7 112:14 116:21 117:18,18,18 121:21 128:13 128:25 129:3 130:18,21,21 137:5 140:4 144:9 145:9 146:12,24 147:3 148:6,17 149:4,10,19,20 151:3 152:13 152:15,23,24 153:5,16 156:7 158:11,24 160:3,18 161:3 162:11 164:10 169:23,24 170:9 173:5 175:19
**knowing** 50:21 59:11

**knowledge** 76:23 122:2 147:2 177:9 178:6
**known** 156:17
**knows** 160:17
**ky** 2:6

**l**

**label** 68:16,20 69:2,5
**labeled** 118:21
**labels** 68:23
**lack** 10:8
**lakota** 173:23
**landscaping** 18:17
**language** 74:24
**laptop** 146:10
**large** 52:16 54:18 55:5,7 119:24
**larger** 92:6
**largest** 161:8 161:12
**late** 7:24 15:25 20:3 21:22 24:13,21,24 93:19 99:12 106:19 118:14 121:10
**laughed** 142:5
**law** 58:10 173:3
**law.com** 2:7
**laws** 5:20
**lay** 125:11
**layman** 104:16
**leaders** 173:3,8 173:10
**leadership** 29:24 30:12 35:1 125:23 140:11,22,22 140:23,24,25 141:5 150:23 158:23 160:9 165:12
**learn** 42:22 43:2 62:1,4
**learned** 43:5
**learning** 16:21 43:8 121:18
**learnings** 105:17
**leave** 20:15 38:2 157:3
**led** 140:9
**left** 106:21 126:5
**legal** 59:14 179:23
**legalese** 67:4
**legislation** 52:14
**length** 13:12
**letter** 155:6 156:3,7,16,21
**letting** 22:5
**level** 29:16 30:14
**liberty** 45:6 73:19
**licking** 132:23 133:2,4,5,9
**life** 23:24 131:21 161:11
**lifesaving** 69:17
**likely** 134:19 134:20
**likewise** 9:16
**limit** 118:23
**limited** 157:5 170:7
**limiting** 159:24
**linda** 94:18 108:23,24 114:16 115:20 120:7 164:23 165:13
**linda's** 165:1
**line** 23:18 88:9 102:17 112:16 137:20 159:10 180:4,7,10,13 180:16,19
**lines** 94:3 159:9 162:4
**lingo** 28:6 57:23
**link** 127:15 160:16
**linkedin** 107:13 144:18 148:10 149:21
**list** 142:18 148:23 149:5 149:20
**listed** 102:16 103:17 132:12 142:22 148:7 149:5,16,21
**listen** 57:5 137:25
**lit** 108:14
**literature** 16:19 121:18 164:3
**little** 8:22 10:4 13:16 15:18 16:24 17:20 18:10,12 19:7 19:15 20:22 26:15 27:9 35:4 38:22 46:7,8 51:10 65:5 75:19 76:9 80:2 97:4 98:3,25 118:4 128:2 151:1 154:4 157:14 160:12 165:6 175:7

**live** 8:3 160:16
**lived** 23:20 24:5,11 49:7
**lives** 12:18
**living** 8:2 24:11
**llp** 3:4
**lobbying** 52:3,5 52:7
**lobbyist** 51:12 51:14,15,19,20 51:21,24 52:9 52:12,17,24 53:4,13,24 54:1 57:12,17 167:4,7,7,11
**lobbyists** 51:17 51:17,22 53:1 53:15,16,18
**local** 58:13
**located** 133:10
**location** 1:16
**lodging** 81:25
**logistics** 19:1
**long** 8:21,24 13:17 23:18 26:23 114:18 164:7 175:12
**longer** 97:22
**look** 12:23 20:21 33:24 38:11,16 39:13 39:15 40:4 44:17 49:25 55:10 58:25 72:3,6,10 73:8 85:22 89:9 91:13,19 92:11 92:12 93:5,25 94:1 107:23 111:17,18 112:2 132:7 134:17 137:16 168:12 169:8 171:21 172:3
**looked** 38:22 120:10 123:22 128:6 171:16
**looking** 56:9 83:5 92:2 102:4 132:13 137:1 138:15
**looks** 73:15 74:5 79:20 81:15 91:22 92:1 94:4 103:22 105:8 107:24,24 108:4 109:5,8 109:11 112:19 124:12 125:1 132:4,15,25 133:5 135:19 137:2,4 139:19 156:21 172:7
**loops** 28:2
**los** 95:7
**losch** 165:9
**lost** 131:21
**lot** 15:16 16:18 16:20 19:17,17 19:18,18,25 29:22,24,25 76:8 103:12 129:2 159:3 164:24
**lots** 11:13 18:22 29:24 58:7 160:3
**lpa** 1:16 5:9
**lunch** 97:16 98:7

**m**

**ma'am** 167:5,9 175:18
**made** 33:11 46:13,16 137:17 153:24 159:4 181:5
**mail** 94:2 114:8 116:6 124:7 127:16 133:22 134:23 138:5 139:19 141:20 141:23 143:20 144:24 150:13 154:10,15,22 154:23 155:7 175:4,5
**mail's** 135:9
**mails** 108:4
**maintain** 44:15 146:4
**maintained** 94:24 129:12 167:23
**maintaining** 142:2
**major** 17:23 24:3 60:14 99:8
**majority** 46:15 128:9
**make** 14:25 22:4 29:16 31:12 38:17 81:20 90:19 92:21 100:22 100:23 101:12 101:13 109:7 109:12,18 111:18 112:9 123:24 138:18 150:16 155:19 171:10
**makes** 9:10 23:15 60:8 61:9 70:10
**making** 28:16 50:21 141:5 142:1 155:18
**maladaptive** 23:18

**mallory** 94:18 108:23 114:16 114:18 115:20 120:7 126:5 157:11 161:19
**mallory's** 135:7
**manage** 8:12 8:13 50:16,17 51:5 53:12
**management** 131:13 140:22
**manager** 103:18 104:13 105:5 130:5,9
**managers** 172:15
**managing** 29:5
**manner** 5:21
**manufactured** 162:20
**manufacturer** 48:6 127:21 163:8,9
**manufacturers** 126:13,17,19 127:21
**march** 94:4
**marital** 14:2
**mark** 35:24 38:10 107:19 122:25 123:4 123:14 155:1
**marked** 38:14 72:1 79:6 100:4 105:4 107:20 111:14 123:15 132:1 136:22 139:7 155:4 171:9,22
**marketing** 63:3 63:17
**marking** 37:13 72:24 79:4
**mary** 165:9,14
**maryland** 92:24 93:12 94:14
**masters** 119:14
**materials** 16:17 28:1,17 128:21
**matrix** 101:22
**matter** 5:7 119:12
**max** 126:10,11
**mays** 1:19 5:3 177:2,19
**mcphail** 70:18 70:20
**meals** 82:2
**mean** 14:25 25:24 26:1 28:9,10,11,13 28:14,15,15,16 28:17,18,20,21 35:16 52:22 56:16 64:2 75:8 100:14,15 103:6,9,10,10 103:12,13 109:11 112:3 117:20,21 122:12,20 126:20 129:8 140:25 152:16 156:16
**meaning** 14:16
**meaningful** 164:9
**means** 5:22 52:8 64:11 103:3 104:3 131:20 133:4 137:21
**meant** 52:18 153:16,16,18
**mechanisms** 23:19
**media** 144:14 147:20 148:14 148:22 149:1
**medicaid** 19:22
**medical** 71:2 74:6,12
**medication** 49:24
**medications** 54:23 69:18
**medicine** 68:22
**meet** 83:10,12 117:9 152:4
**meeting** 28:13 28:18 82:12,15 83:7,19,22 84:1,2,5,9 88:14,25 90:17 90:22 92:7 126:8 145:4 154:14 157:25 160:1,2,9
**meetings** 28:18 29:24,25 75:20 75:21 77:12 89:15 159:25
**member** 53:21 114:22 115:3 139:24 154:7 155:12 169:19
**members** 57:12 57:17 94:19 108:22 115:4 155:14,20 164:5
**memberships** 143:2
**memos** 12:21
**mention** 56:14 62:5 76:25
**mentioned** 17:19 29:15 76:7 127:21 144:16 148:9 159:6 164:12 174:2
**mentioning** 144:13

**menu** 133:6
**mess** 130:20
**messages** 118:13,16
**met** 82:9 152:5
**meta** 148:16 150:1
**mhas** 172:23
**micro** 50:19 51:7
**middle** 7:10 110:10
**mileage** 87:24
**miles** 84:20
**milligram** 40:12,16 54:10 55:2,6,12,15,15 55:21,25,25 56:6,12 57:1,4
**milligrams** 135:17
**mind** 21:8,12 121:22
**mine** 134:25 144:14
**mini** 50:19
**minors** 17:3,22
**minute** 38:1 65:17 78:20 107:23 111:3
**minutes** 98:6 165:19
**missing** 38:24 95:3 110:13 155:16
**misspoke** 89:16
**mistakes** 174:17
**mitchell** 2:6
**mm** 14:7,17 49:12 50:3 51:13 60:12 81:17,19 106:22 109:10 122:21 135:18 138:21 139:21 164:1
**modifications** 150:16
**molly** 134:16 134:20 155:15
**moment** 37:25 41:6 53:14 63:13 65:19 78:21 98:18 111:4 136:9,13 176:4
**money** 18:4 50:25 51:1 64:5 103:14,15 128:16
**montana** 173:4 173:15
**month** 24:15 45:17,25 46:13 46:16,17 47:17 75:15 120:9,10 120:11,12
**monthly** 21:18 46:12 47:21 73:13
**months** 151:15 151:25
**moon** 68:24
**morning** 5:2
**morris** 3:4
**mountain** 173:8,10,12
**mouth** 147:18 157:21
**move** 9:15 66:3 98:25
**moved** 125:20
**moving** 65:7 110:18
**mrinali** 2:13 6:11 179:1
**msethi** 2:17 179:2
**multiple** 20:20 35:12,13,17 43:20 61:23 108:14 129:5 169:19
**municipalities** 49:20 127:6
**municipality** 52:15
**music** 17:4
**mutual** 152:25

**n**

**n** 2:1 3:1 4:1 5:1 6:7
**naloxone** 4:19 16:17 40:12,16 40:16 49:15,17 49:22,22 54:10 54:11,18,18,21 55:2,6,6,8,12 55:15,21 56:12 56:14,15,16,25 57:1,4,20,21 59:6 61:22 68:10,24 69:7 69:17 70:3,10 70:11 83:21,21 89:4 92:20,21 117:14 121:6 125:6,12,17 126:6,12,21 127:10,13,23 128:1,10,12,23 129:3,10,18 130:4,9 131:21 133:1,10,15 134:2 137:6,13 160:22 161:12 162:20 164:10 173:21,25 174:1
**name** 5:2 6:3 7:6,10,12,19 70:19 77:4,6,8

105:4 124:14 130:14,19 133:19 134:23 135:7,7,7,8 138:9 165:1
**names** 44:7 45:4 130:12
**namesake** 131:22
**narcan** 92:20
**narrative** 101:22 163:24
**narratives** 161:16
**nasal** 40:13 55:12
**nation** 52:15 173:23,24
**national** 49:7 58:18 60:14 76:13 105:13 105:15 106:3
**nations** 48:15
**nationwide** 161:12
**native** 80:11,17 80:19 158:14
**nature** 13:1 87:22 113:3 166:11
**nebulous** 27:10 157:13
**necessarily** 106:1,12,14 163:9
**necessary** 181:6
**necessity** 68:9
**need** 10:25 39:13 44:19 59:21 60:19 85:15,17 94:1 109:4 110:6 126:2,3 147:11 154:19 175:17
**needed** 60:15 61:4
**needs** 125:21
**neither** 177:10 178:7
**never** 11:14 68:21 74:19,19 121:22,22 126:6 151:8 153:19 169:16 174:1
**new** 11:11 28:25 65:8
**noble** 69:20
**nodding** 9:7
**non** 6:12,17 71:5 118:24 162:6 173:14
**nonconfident...** 36:6 97:1 168:15 171:1
**nonprofit** 14:5 14:6,12 18:22 28:7 31:24 127:3 162:2
**nonprofits** 48:16
**nordstrom** 2:4
**norm** 119:25
**normally** 160:10
**notary** 5:11 177:20 181:13 181:19
**note** 146:24 165:15 179:10
**noted** 181:7
**notes** 11:23 12:11,11,13,15
**notice** 100:25 135:3
**notify** 135:5
**november** 81:1 81:13,24 83:8 84:1,19,21 85:2 86:1 88:4 88:12,25
**number** 9:7 28:21 35:25 43:12 45:14 49:9 58:11 59:1 60:10 73:2 74:23 75:15 81:6,8 92:2 107:15 119:4 131:23 132:11 139:4,5 139:17 142:19 162:1
**numbered** 102:5 105:7 150:7 155:25
**numbers** 72:5 109:6 155:3
**numerous** 18:15 126:21
**nutraceutical** 22:18

**o**

**o** 5:1 6:7 76:19
**oaths** 5:12
**object** 109:23
**objection** 5:13 6:19 23:16 47:13 55:3 56:1 62:14,21 63:4 64:12 66:13 67:3 69:15 87:17 89:21 95:21 96:16 104:20 109:18,21,22 113:9 116:18 119:16,21 120:24 121:25 122:6,15 126:14 134:11 136:4 137:3 140:14 143:14 148:25 149:8

160:15,24 163:19
**objectives** 50:8 50:10 53:12 75:2
**observer** 3:11
**obtain** 16:17 18:24 49:21 127:10 128:1 173:6
**obtains** 126:25
**obviously** 43:5 92:25 96:6 109:8 112:10 128:7
**occasions** 117:1
**occurs** 114:25
**october** 106:17 106:24
**od2a** 76:15,16
**odh** 4:19
**offer** 74:12
**offered** 117:24
**offhand** 148:17
**office** 96:9 137:18
**officer** 27:17,18 30:7 177:1,2
**official** 82:15 126:6
**oh** 1:18 2:16 3:6 14:20 17:21 21:14 22:10 23:12 24:19 47:19 48:21 68:25 73:1 81:22 83:6 97:12 99:19 102:22 104:10 105:25 108:6 110:16 123:19 139:11 145:25 146:20 161:10,10 163:11 165:3 171:14
**ohio** 1:2,10 2:12 3:2 4:15 5:10,12 6:10 6:14,15 8:3,8 11:3 12:21 15:23,24 16:16 17:14,22 18:18 18:19 19:10 30:3 48:20,22 49:1,8 58:13 58:16,17,19,22 75:23,23,24 76:1,10,11,14 77:8,13,13,14 84:2,10 85:25 86:9 88:15,18 94:9,12 95:3 97:5 99:1,9 100:22 105:10 106:9,15,19 125:12,15 127:6,9,11 128:5,14,16,24 128:25 129:15 131:20 132:15 164:25 167:13 167:14,20,24 168:4 169:20 171:18,25 172:9,23 177:21
**okay** 7:8,10,21 8:4,15,18 9:23 10:2 11:5,10 11:12,14,20,24 12:2,5,20 13:6 13:16 14:20 15:7,15,23 16:7,23 17:5,8 17:13,17 18:1 18:7,10,13 19:5,14 20:2 20:11,15 21:2 21:5,19,24 22:3,8,14,14,20 23:2,13,24 24:12,18,20 25:1,5,9,12,20 26:11,23 27:1 27:4,11,23 28:5,11,23 30:5,9,19,22 31:1,5,12,19 32:5,15,19 33:7,10,18,22 34:13 35:3,8 35:15,19 38:9 38:22 39:9,16 39:18,23,23 40:1,1,4,10,15 40:20,25 41:3 41:8,9,14,21 42:1,4,19,22 43:4,11,14,18 43:21,25 44:3 44:7,14,24 45:3,7,9,15,19 45:23 46:5,8 46:15,24 47:2 47:5,25 48:11 48:18,22 49:25 50:7 51:3,10 51:14,19 52:11 52:17,23,23 53:23 55:14,20 56:5,9,20 57:10,16 58:20 60:10,24 62:8 62:25 64:19 66:2,18,18,24 67:8,13 68:12 68:19 69:6,9 70:12,21,23 71:7,20,22 72:10,15,18 73:12,15,22 74:4,21 75:5,8 76:25 77:10,20 79:3,8,15,18,22 80:2,10,14,21

80:21 81:14
82:5,8,16,23
83:15,18,22
84:1,12,16,22
84:25 85:8,13
85:18,22 86:24
88:3,11,13,20
88:22,24 89:12
89:18 90:24
91:4,8,18 92:1
92:9 93:8,9,16
93:23 94:1,3,6
94:8,11,17,21
94:24 95:2,13
95:15,18 96:2
97:4,24 98:25
99:7,11,14,19
100:20 101:6
101:12,14
102:1,4,12,15
102:16 103:2,8
103:17 104:7
104:11,25
105:3,6,21,25
106:8,23 107:4
107:11,14,17
107:19 108:7
108:11,21,24
109:2,3,20
111:11,21,25
112:16,22
113:1,13,16
114:1,7,10,13
114:15,21
115:8,16,19,25
116:11,14,24
117:4,10,20
118:7,12,18
119:11 120:2
120:17 121:11
121:16 122:4
122:25 123:12
123:24 124:1
124:19,22
125:4 126:1,12
126:22,24
127:1 128:2,3
128:12,15,23
129:4,17,23
130:1,9,15
131:4,14,23
132:7,11,18
133:14,17,17
134:1,14,22
135:1,4,8,16,24
137:8,11,11,19
137:23 138:14
138:22 139:13
139:18 140:2
140:16,21,24
141:7,10,20,24
142:13,17,25
144:6,11,19
145:9,12,17,22
146:8,23 147:1
147:13,15,22
148:2,6,9,22
149:4 150:10
150:13,19
151:1,8,12,18
152:1,6,10,14
152:16,20
153:2,9,12,14
153:14 154:1,4
154:9,18
155:17,22,23
156:7,15,20
157:2,2,10,22
157:25 158:13
158:17,17
159:5,10,23
160:5,13,21
161:2,7,10,15
161:21 162:9
162:12,17,23
163:6,11,15
164:12 165:3
165:13,16,18
165:21 166:4
166:14,24
169:16,18
170:3,6 171:4
171:14,21,23
171:24 172:3,8
173:7,18 174:2
174:6,10,22,22
175:16,24
**onboard** 120:14
**onboarding** 29:7 33:15
**once** 32:21 118:7 125:14 171:5
**ones** 29:21 37:11 42:17 47:7 56:13 95:13 123:22 149:19,20 165:15
**online** 149:5
**operational** 128:20
**operations** 140:1 157:12
**opinions** 64:7
**opioid** 69:17 71:12,16 77:5 106:11
**opportunities** 29:18 114:5
**opportunity** 60:16 61:10 115:21,23 116:1,20 117:2 117:7,9,11,12 174:18
**opposed** 100:2
**option** 174:16
**order** 4:18 25:15 57:19 92:20 105:8 125:23 131:25 132:4 135:4 137:12 138:16

160:13 175:5,6 175:17
**ordered** 160:21
**ordering** 125:5 129:8 143:11 143:22 146:18 175:2,9
**orders** 4:19 136:7 137:5 161:5 175:1
**organization** 29:16 30:6 31:24 32:4 49:7 51:7 74:20 120:22 121:11 132:13 132:22 144:15 159:13 162:9 162:19 165:10 170:4
**organizations** 50:20 54:7,22 56:22 57:3 76:11 108:15 120:18 132:11 142:22
**original** 26:11 38:13,25 39:3 39:6,13,15 77:19
**osu** 17:1,24 18:7,20
**outcome** 177:15 178:12
**outlined** 89:24
**outlines** 67:14
**outreach** 16:11 16:12,21 19:17 19:24 25:14,18 25:20 26:22,23 26:24 27:2,24 27:25 28:8,9 28:10,24,25 29:4,5,7 30:22 48:8 84:8 117:14 125:20
**outside** 51:24 58:17,22 83:12 113:2 114:6 115:23 118:22 119:3 120:17 126:7 151:19 162:14
**overdose** 49:18 106:11 126:7 161:4,8 164:6
**overdoses** 173:14
**overhead** 128:20
**overseeing** 29:15
**overtime** 119:6
**overwhelmed** 140:4
**owe** 18:4
**own** 8:11,13 15:20 79:23 134:23
**owned** 13:18 68:10
**owner** 8:15 13:20,22
**ownership** 15:8 143:2
**owns** 13:21

**p**

**p** 2:1,1 3:1,1 5:1
**p.m.** 98:19,23 111:5,9 125:2 136:14,18 165:23 166:2 176:5,8
**package** 45:21
**packet** 33:15
**padagis** 71:18
**page** 4:2,8 39:20,22 40:2 42:8 45:11 55:11 56:19 58:2 66:5 67:8 67:10 68:13,13 71:4 72:11 73:9 74:22 80:7,25 81:3 91:15 93:8 100:1,16,16 104:9 105:1,4 105:7,7 107:7 112:1,13,21 118:4 124:6,12 124:24 128:6 132:7,14,14,18 132:19 134:4,5 142:17 149:11 172:6 180:4,7 180:10,13,16 180:19
**pages** 1:22 100:2 107:25 109:5 110:10 110:13 111:17 132:12 149:16 150:3 171:10 171:22 172:4
**paid** 15:22 20:1 21:19 32:1,3 45:24 46:1,2 85:24 128:24 142:4 170:1
**paper** 12:2 96:10
**paperwork** 49:5
**paragraph** 40:5,6,11 41:5 56:20 66:6 112:24
**parking** 18:20 82:2
**part** 19:22 21:21 31:23 49:7 52:3 53:3 54:12,13 60:18

63:1 64:1,20 68:2 77:11 86:15 91:8 101:3 107:5 129:24 130:1 133:5 141:3 164:3,4 168:13 171:18 172:9
**partially** 147:10
**participate** 61:25 74:8
**particular** 162:19
**parties** 5:14 48:7 177:11,14 178:8,11
**partner** 51:17 60:17 61:6,11 61:17,21 62:12 63:20,23 64:2 64:10,10,20,25 65:1
**partners** 28:12 50:19,20 51:24 142:1
**partnership** 173:11 174:3
**parts** 108:16
**party** 6:12,17
**pass** 121:8
**past** 137:17 162:18 164:19
**pat** 70:22 71:3
**patricia** 134:20
**pattern** 164:18
**pay** 17:2 18:5 73:10 74:4 91:1 94:2 128:20,20,21 128:21,22 141:6 167:15 169:21
**paycheck** 32:3
**paying** 15:19
**payment** 170:2
**pays** 128:12
**pdf** 124:9
**peer** 158:24 159:12
**pennsylvania** 80:10,17,19
**people** 9:13 16:16 18:22 19:21 23:18 49:6 50:18,22 60:19 61:7,19 62:6 94:22 106:16 121:19 125:16 127:5 141:5 154:2 162:9 166:9
**percent** 136:5,7
**perception** 152:16,18 153:2
**performance** 119:1
**performed** 89:12
**performing** 30:20 89:6,19 90:17 119:5
**period** 11:25 45:13 46:3
**permitted** 5:18
**person** 23:20 41:1 60:8 103:22 143:21
**personal** 79:24 84:8 91:7 93:4 95:19 115:2 150:3
**personally** 13:13 69:16 162:21
**perspective** 60:16 61:5,11
**pertaining** 72:20 142:11
**pertinent** 146:17 172:21
**pfizer** 71:18
**pharmaceutical** 44:25 45:1 58:8 162:20
**pharmaceutic...** 35:13 62:23 66:8,20 67:2
**pharmacovig...** 57:9 62:3
**pharmacy** 127:3 129:2
**phone** 28:16 143:21 146:10 152:5
**phrase** 64:10 64:20 67:1
**physically** 76:1
**piece** 96:10
**pieces** 101:1,25
**place** 74:17 116:8,11 144:1 152:13 153:21
**placed** 100:25 138:15 161:4
**places** 48:17 148:19
**plaintiff** 1:6 2:2 3:12 6:4,7
**plan** 4:12 74:16 74:17 97:16,25 101:21 102:5,7 102:10,13,15 105:1 130:19 171:12
**planned** 11:1
**plant** 75:24
**platform** 145:25 149:2
**platforms** 149:4,5

**play** 8:7,9
**players** 60:15 61:4
**please** 6:1 7:6 37:7 63:12 73:2 78:2 81:11 112:14 131:18
**pocket** 96:7,8
**point** 8:22 25:4 32:5 48:24 65:13 78:12 99:10,11 109:3 157:13 162:12 167:21
**points** 28:12 39:4 74:18
**policies** 33:19 67:11,14 68:5 89:24 90:2
**policy** 34:4 42:25 49:11 54:7 56:22 90:7,7 147:11 147:13 151:5,6 153:20,21 156:10
**policymakers** 48:17
**populations** 172:24
**porter** 3:4
**porterwright....** 3:7
**portfolio** 43:3,9 54:18,23 55:6 55:7,8 56:15 56:18 62:17 63:25 69:23 163:5
**portion** 24:21 36:3,6 37:1 96:18 97:1 111:22 128:7 168:15 169:1 170:10 171:1
**posed** 116:21
**position** 50:5 75:6 93:6 105:5 117:24 153:10
**positioning** 42:25
**positions** 34:14
**possession** 44:21,22
**possible** 12:10 39:14 113:17 161:4
**post** 147:21
**postage** 128:21 167:15
**posted** 16:6 148:5,15
**posts** 144:14 147:20
**potential** 90:22 113:18,23 114:1,25 115:9 116:15,21 118:19 120:20 141:25 143:12 143:13 146:18
**potentially** 122:23 133:13 133:13 134:16
**poverty** 119:24
**practices** 49:17 49:23 53:6
**precede** 146:1 146:2
**preceded** 145:23
**prefer** 98:13
**preferences** 57:6
**prepare** 10:5 11:17 156:16 156:20
**prepared** 178:3
**prescribing** 68:23
**present** 3:10 22:9 30:15 32:11 79:9 144:2,3
**presentations** 58:3
**presented** 33:14 39:6 141:18
**president** 102:16 103:20
**pressure** 162:1
**pretty** 60:6
**prevent** 113:18 119:4
**previous** 108:15
**previously** 27:25 88:4 167:23 171:16
**prices** 59:11
**print** 96:9
**printed** 128:21
**prior** 19:11 30:10 31:17 157:23 159:18 172:15 177:5
**priorities** 153:24 154:1
**privacy** 142:3
**private** 113:3
**pro** 159:12
**probably** 8:22 9:6 20:21 73:16 75:17 80:14 97:11 102:2 123:3 124:13 145:13 148:5,16 149:10
**problem** 9:22 10:17 73:3 78:18

**procedural** 5:19
**procedures** 33:20 89:24 90:3
**proceed** 7:2
**proceeding** 5:4 5:17 176:9 178:4
**proceedings** 177:3,4,6,8 178:6
**process** 19:23
**processes** 95:23
**processing** 49:6
**procure** 126:21
**procurement** 59:12
**procures** 126:25
**produced** 5:16 79:10 99:21,25 109:12 154:10 155:2
**product** 42:25 43:7 55:12,22 56:7,8,11,14 64:5 121:19 126:13,16 143:12 160:14 173:24
**products** 21:1 22:16 42:24 50:15,25 51:2 54:17,19 56:16 56:17,18 59:6 62:2,3,6,13,17 62:19,20 63:3 63:25 64:11,14 64:22,24 65:1 67:16,21,25 68:3,7,10,15,20 69:1,4,4,14,22 69:24 70:2,9 70:14 77:12,14 127:8 163:3 173:25
**professional** 24:14 30:16 41:2 99:3,4 142:3 149:15
**profile** 107:13
**program** 24:7 27:17,18 114:19 127:10 130:4,9 131:19 132:5,22
**programmatic** 167:16
**programming** 27:6,11,15 29:11,13 30:7 125:25 131:13 143:17
**programs** 29:20 50:14 173:23
**project** 4:18 103:17 104:13 105:5 127:10 131:15,17,19 131:24 132:5 133:4 136:3 172:15,22 173:2,19
**projects** 172:18
**promise** 68:22 68:23
**promote** 55:1 67:21 68:2,7 68:15,19 69:1 69:10,11,16
**promoted** 56:8 69:13,21,25 70:9,10,14
**promotes** 67:16 67:24
**promoting** 56:6 77:11,14
**promotion** 30:11
**promotional** 67:11
**prompt** 14:23
**pronouncing** 40:8
**prorated** 47:17 120:9
**proud** 133:18
**provide** 50:13 50:13 66:8 95:20 122:23 173:24
**provided** 20:24 33:8 34:11,13 39:16 75:13 121:3,4
**provides** 52:13
**providing** 52:3
**pto** 92:12 93:7 93:21,22 94:2
**public** 25:14,17 25:18,20 82:7 82:7,13 83:2 88:21 148:19 150:4 177:20 181:19
**puerto** 105:14
**pull** 96:7 168:11
**pulled** 100:2 107:12
**purchase** 50:25 51:1 62:6 128:10
**purchasing** 59:5 60:8 64:21,23
**purpose** 12:5 59:9 76:21 83:18 88:24
**purposes** 9:24 35:2 49:5 72:24 90:23 124:17 156:13

**pursuant** 79:11
**pursuits** 84:8
**purview** 35:14 53:22 130:6 160:11
**put** 34:22 101:14 102:7 104:25 107:11 109:17 110:2 125:15,16 127:16 147:17 157:21 169:22 171:5
**putting** 101:18 108:16

**q**

**qualifications** 105:9
**qualified** 177:7
**qualifying** 105:18
**quality** 19:1
**quarter** 24:17 126:2
**quarters** 137:17
**question** 8:25 9:15,17 22:5 23:13 39:1 44:20 52:6 61:15 63:7,12 64:19 69:1,21 70:5,7 84:18 96:5,12 109:15 109:19 130:25 131:2,3 166:5 175:12
**questioning** 166:23
**questions** 9:1,7 10:6 22:17 66:2 75:17 108:19 138:1 138:22 141:16 147:19 158:22 166:15,18 168:6 171:5 174:7,8
**quick** 25:22 37:21 38:11 45:8 97:7,20 98:15 136:9 175:11

**r**

**r** 2:1 3:1 5:1 180:3,3
**raina** 1:8 2:10
**raised** 47:16 157:23 158:18
**rarely** 93:22
**rate** 47:21
**rational** 90:20
**reach** 94:19
**reached** 154:9 154:12,15 156:12 158:3
**reaching** 140:3
**reaction** 147:19
**read** 9:11,21 41:7 53:9 55:14,17,17 63:11 75:3 112:23 113:20 115:6 130:19 140:2 166:8 173:16 174:14 174:16,23 179:9 181:5
**readable** 78:7,9
**readiness** 62:16
**reading** 55:20 104:16 106:3
**real** 25:22 37:20 38:11 45:7 97:7 98:15 143:12 143:13
**realize** 37:15
**really** 9:12 39:13 49:8 52:18 58:16 66:24 175:14
**realm** 44:25 48:4
**reason** 13:23 19:9 24:1 41:10 55:10 86:21 98:7 179:11 180:6,9 180:12,15,18 180:21
**reasons** 23:19
**recall** 11:21 13:7 32:20 48:19 77:9 82:12 83:15,18 83:25 84:1,11 84:15 85:4,5,7 85:8,10,13,23 85:23 89:12,17 92:5,12 93:25 94:10 95:14 116:11,12,15 117:4,22 118:11,17 121:5,12 143:6 143:25 145:2 147:3 151:3 158:8
**recalled** 83:5,7
**receipt** 112:6,7 127:17 179:17
**receive** 21:20 61:23 64:3 129:21
**received** 15:10 49:4 50:18 51:7 64:14 65:1 74:19 156:24
**receiving** 64:16
**recently** 151:14
**recognition** 30:19

**recollection** 38:21 72:9 77:3 80:22 89:2 140:10 141:13 142:10
**record** 5:4,5,14 6:1 14:25 37:20 38:4,5,7 63:14 65:21,22 65:24 78:20,23 78:24 79:1 98:2,20,21,23 109:18 110:3 111:3,6,7,9 135:2 136:15 136:16,18 137:4,20,21 145:11,12,13 145:14,15,16 145:17 158:1 165:24,25 166:2 176:6 177:9 178:5
**record's** 139:22
**recorded** 5:21 145:10 146:5 146:14 158:3 177:6
**recording** 5:16 177:8 178:4
**records** 94:2 95:15,18 142:16
**recovery** 159:12
**recycle** 125:17
**redcap** 127:14 131:8,8 132:5 135:3,4 160:16
**redistributed** 125:18
**reduced** 177:6
**reduction** 1:10 2:11 3:2 4:15 6:10,14,15 8:8 11:2 12:21 15:23,24 19:10 30:3 54:8 56:23 58:11 84:3,10 86:9 94:9 97:5 99:1 105:13,16 106:4,9,10,15 106:19 125:12 125:14 132:15 158:15 163:6 164:25 167:13 167:14,19,24 168:3 169:20
**reese** 1:13 5:6 6:12,16,16,22 7:5,7,12,14,17 7:19,21,23 10:2 66:2 79:3 79:5 98:25 104:13 105:5 108:6 111:11 138:9 139:6,16 139:16 150:7 166:4 167:3,6 179:5 180:2,24 181:2,4,12
**refer** 137:14
**reference** 172:20 174:2
**referenced** 56:12 179:6
**references** 57:11 172:7,8 172:13
**referred** 96:14 161:17
**referring** 54:4 57:14 68:17 71:13 82:24 86:8 142:8 162:16,23 164:22
**refers** 49:9 55:11,14 157:18
**reflects** 87:24
**refresh** 80:22
**regard** 12:7 13:2 23:9 90:3 116:8 146:18
**regarding** 13:6 62:3 108:1 116:15 118:9 118:13,19 147:20 158:19 162:13
**region** 29:5 133:4
**regulatory** 19:23
**reimburse** 85:11 89:19 90:14
**reimbursed** 79:21 86:2 168:3
**reimbursement** 79:25 87:24 90:3,10 170:9
**related** 43:19 86:3 89:3 90:11 113:14 177:11 178:7
**relating** 12:16 12:17 51:9 58:11 68:5
**relationship** 53:20 147:21 161:19
**relationships** 29:19 54:6 56:22
**relative** 177:13 178:10
**relevance** 68:9
**relevant** 20:1 28:12 29:21 108:19 149:14 149:16,17

172:19,25 173:4
**relief** 127:4
**rely** 176:1
**remained** 32:10
**remember** 25:24 73:4 77:2,4 82:8 85:15 86:5 99:12 102:3 141:17 144:13 154:16,21
**remind** 80:15
**reminder** 10:11
**reminger** 1:16 2:14 5:9
**reminger.com** 2:17 179:2
**remote** 76:1 93:6 141:22
**repeat** 63:10 81:10 130:17
**repeated** 63:14
**report** 4:11 79:5 85:19,24 87:23
**reported** 1:19 70:17
**reporter** 5:2,3 6:18 7:1 14:8 38:3,6 63:13 63:14 65:19,23 72:23 73:3,6 78:21,25 98:18 98:22 107:16 111:4,8 123:4 123:12 130:16 136:13,17 140:13,16,19 165:22 166:1 174:13,25 175:8,14,18,20 175:22,24 176:3
**reporter's** 8:20
**reports** 94:22 103:20
**represent** 79:10
**represented** 121:9
**representing** 6:4 9:24 104:17
**request** 4:18 100:7 125:18 126:6 127:14 129:10,17,19 129:22 131:7 131:25 142:10 142:25 143:8,9 151:22
**requested** 57:13 63:15 133:1 134:1,22 136:3 142:24 177:23
**requesting** 150:23
**requests** 94:2 101:2 125:16 129:23 131:15 141:19 142:11 143:16,17
**require** 96:2
**required** 71:10 86:15 87:8,11 118:19 181:13
**requirements** 42:6
**requires** 175:4
**research** 62:3 163:25
**reservations** 57:8
**reserved** 176:7
**resign** 153:9
**respect** 14:1 152:25
**respects** 30:4
**responded** 154:16
**responder** 106:11
**response** 115:11 117:17 154:13 164:6
**responsibilities** 12:14 26:9 27:7 29:1,2,9 29:14 30:18 74:23 129:24 130:2,6 160:5 160:6 164:24
**responsible** 162:18
**restricted** 160:14,18
**restriction** 167:22
**restroom** 136:9 136:12
**result** 115:2,4
**resulted** 26:13
**retainer** 21:17 46:12
**retaliation** 157:18 158:18 158:19 164:16
**retaliatory** 159:15,16,18 159:23 164:17
**retirement** 74:16,17
**return** 124:20 125:1 179:13 179:16
**reusing** 110:22
**reverb** 81:24 88:5
**reversal** 49:18 69:18 71:13,16
**review** 12:12 12:20 13:2,10 38:11 44:18,20

79:12 108:14 112:7 121:18 151:4,6,23 164:3 177:23 179:7
**reviewed** 11:18 11:22,22 112:11 148:2
**reviewing** 11:21 12:5 13:7 44:9 154:24
**revival** 55:16
**rico** 105:14
**right** 9:22 21:14,15 23:12 31:13 37:17 40:8 47:19,20 47:21 53:9 65:16,19 77:25 78:1,1,21 79:22 82:24 91:19 98:18 99:20,20 102:3 102:24 108:8 110:4 111:4 123:3 124:25 133:7 143:19 158:23 161:25 165:3,22 168:7 169:7 171:4,8 171:14 172:3,5 172:12 174:6 174:12,13,22 174:25 176:3,3
**rights** 174:21
**road** 8:5,5
**roadblocks** 59:15
**robust** 52:16
**rock** 81:25 88:5
**rocky** 173:8,10 173:12
**role** 10:7 50:12 56:6 59:12 63:17 64:1 90:17 101:18 108:11 125:5 154:6 159:5,6 161:23 172:19
**roles** 143:3
**rolled** 105:8
**room** 158:11 169:22
**rough** 26:4 58:21 175:13 175:22
**rubric** 101:5 173:1
**rules** 5:20 8:19
**run** 26:20 42:15
**running** 167:17

**s**

**s** 2:1 3:1 4:7 5:1 180:3
**safe** 90:16
**sake** 110:20
**salaried** 21:14 24:21 30:25 32:6,10,20
**salaries** 47:4 128:8
**salary** 15:5,21 15:21 21:18 32:13,20,22 46:5 93:6 103:9,13 128:20
**sales** 59:11 62:9
**samuel** 178:2 178:15
**san** 92:1,3 94:4 94:13,14
**saturate** 174:1
**saturation** 49:23 117:15
**save** 95:5 161:11
**saved** 167:22
**saw** 16:6 82:14 140:16 144:21 147:20
**saying** 19:3 31:13 44:18,19 47:21 143:19 175:5
**says** 39:23 42:4 42:22 49:25 50:16 51:11 54:6 55:15 57:10 58:2 59:16,17 66:6 66:19 67:10,13 68:14 71:5,10 74:25 80:8,10 82:2 86:23 90:8 92:14 102:19 106:9 112:16 113:2 113:16 114:24 133:9 137:20 138:7 162:17 163:24 173:10
**scales** 161:9
**schedule** 93:18
**school** 17:6,6,7 18:11 19:3
**scope** 53:7 101:24 118:9 141:24 159:24 172:19
**score** 173:5
**scored** 101:4
**scouts** 149:12
**second** 38:16 38:23 66:6 71:24 72:4,7 74:22 78:2,3 78:17 81:1 97:20 117:7 155:25 157:22 169:7 171:8

**section** 65:8 112:20 118:21 164:16
**security** 122:24
**see** 39:5 40:11 42:2 47:16 54:3 55:17 56:9,11,12 57:14,15 67:11 68:17 71:5,7 71:13 75:3 84:19 85:2,15 85:17 86:20,21 86:22 87:19,19 90:8 91:14 97:22 98:3,7 102:15 108:2 108:24 113:5 132:18,19,23
**seeing** 16:20 29:4 108:18 152:2,2
**seek** 120:19
**seeking** 48:9
**seem** 69:10 104:17 115:15 119:13,14
**seems** 43:15 145:13
**seen** 131:8 132:8 137:9 144:13
**sell** 71:16
**selling** 71:12
**send** 96:10 127:16,17 155:17 175:3,5
**sending** 85:10
**senior** 71:1
**sense** 60:9 61:9 119:12,12
**sent** 13:14 129:18 139:19 151:8 156:21 156:22 179:14
**sentence** 51:11 66:19 67:13 112:24 114:24 115:8 159:14
**separate** 34:8 42:9 43:21 45:21 106:6 132:22 133:12 163:25 169:23
**separately** 83:12 95:9
**september** 106:18 108:8 113:23 114:3 115:12 156:3 161:11
**serve** 119:14 154:2
**served** 114:4
**service** 18:16 19:19,24 28:1
**services** 18:22 41:25 52:4,6,7 52:10 66:8 122:23
**serving** 155:21
**sessions** 76:24 105:17
**set** 128:8 152:3
**sethi** 2:13 4:5 6:11,11 9:25 10:11,14 14:16 14:23 22:4 23:16 36:1 37:6,12,15,18 37:22,25 47:13 55:3 56:1 61:15 62:14,21 63:4 64:12 65:3,7,12,16 66:13 67:3 69:15 70:4 78:19 81:3,6,9 81:20 87:17 89:21 95:21 96:16 97:7,9 97:14,21,24 98:2,5,10,17 104:20 109:14 109:17,22 110:2,5,9,12,16 110:24 111:2 113:9 116:18 119:16,21 120:24 121:25 122:6,15 123:21,24 124:3 126:14 130:25 131:3 134:11 136:4 136:10 137:3 137:25 139:9 139:12 140:15 140:17 143:14 148:25 149:8 160:15,24 163:19 165:21 166:17,20 168:7,10 169:3 171:3,12,15 174:6,10,15,22 175:9,11,16,19 175:21,23 179:1
**sets** 41:1
**seven** 16:15 42:9 56:11
**several** 48:15 67:14 101:1,20 101:23,25 105:17
**sexual** 166:11
**shae** 130:11,12 134:21
**shae's** 130:14
**shaking** 9:8
**share** 57:24 96:13,14

**shearer** 2:3,4 4:3 6:3,3 7:4 9:23 10:1,13 10:16,18 14:10 14:18,21 15:4 22:7 23:23 36:4 37:5,8,14 37:17,20 38:1 38:8 47:18 55:9 56:4 61:16 62:18,24 63:8,11,18 64:18 65:6,9 65:14 66:1,17 67:7 69:19 70:8 73:1,4,7 77:16,20,24 78:1,5,9,13,16 79:2 81:5,7,12 81:23 87:21 90:1 96:1 97:3 97:8,12,18,22 98:1,4,8,12,24 99:19,24 104:24 107:14 107:17,22 109:20,25 110:4,7,11,15 110:19,25 111:10 113:12 116:23 119:17 120:1 121:1 122:3,9,18 123:2,6,10,13 123:19,23 124:1,5 126:18 130:24 131:6 134:13 136:8 136:19 137:7 138:3 139:11 139:15 140:20 143:18 149:3 149:18 160:20 161:1 163:20 165:18 166:3 166:14 171:11 171:14 174:9 174:11 175:1,3

**sheet** 179:11

**shell** 81:16

**shift** 21:13

**shipping** 137:18

**short** 17:20 127:8

**show** 36:2 95:16

**sic** 71:17 82:9 88:3

**side** 43:10 51:25 52:1 106:21

**sign** 124:9,17 124:19 125:1 179:12

**signature** 39:21 39:22 40:3 72:13 112:1,3 124:23,25 174:14 176:7 177:18 178:14

**signed** 41:19 118:7 124:13 179:19

**significance** 138:12

**similar** 19:11 26:20

**simply** 11:5

**single** 112:24

**sir** 7:9,16,18 18:9 20:6 22:2 22:13 24:19 25:4 26:14,17 29:12 30:8 31:4 32:7,12 32:16,18,22 33:9,21 34:3 40:3 41:4,13 41:20 42:3,7 42:21 45:12,18 46:7 47:24 54:2,5 57:15 67:12 68:18 69:18 70:24 71:14 72:14,17 73:3,11,14,17 73:25 74:7,9 74:11,13 75:4 75:7,16 77:15 79:14 82:11,15 83:17 84:21,24 85:3,7,9,12 86:10,12,14,17 86:20 87:2,5,7 87:13 88:2,6 88:16 91:18,21 91:25 92:4,16 93:1,11,13,15 93:25 94:5,7 94:23 99:6,10 100:10,19 101:16 102:6 102:18,23 103:25 104:10 104:15 105:11 106:1,7 107:6 107:10 112:3 112:12,18,25 113:6,11,21,25 114:9,12 115:7 115:18 116:5 116:13 117:25 118:6 119:10 119:23 120:21 122:11 123:9 124:8,11,21,24 125:3 131:16 132:3,6,10,17 132:24 133:3,8 133:21,23 134:3,6,8,12 135:6,11,15,20 136:1 137:10 137:22 138:10 138:13 142:20

143:15 145:21 146:3,15,22 147:7 148:5,11 148:13 150:9 150:12,18,18 151:21 154:11 156:6 158:4,6 159:7,22 163:14 165:17 166:6 175:8
**sit** 45:3 78:2
**site** 148:22
**situation** 156:18
**six** 12:1 107:25
**skill** 41:1
**skills** 177:10 178:6
**skip** 97:5
**slow** 130:24
**small** 30:6 80:4 92:7 170:3,5
**smolak** 94:18 108:23,24 114:16 165:2
**smoother** 9:20
**social** 144:14 147:20 148:14 148:22 149:1
**sole** 13:20,22
**solution** 71:17
**solutions** 179:23
**somebody** 49:4 63:23 130:3 140:25 155:16 169:23
**somewhat** 153:15
**sorry** 7:10 14:22 20:5 34:24 37:14 70:6,19 73:1,2 81:7,13 82:25 89:16 93:2 99:19 108:6,8 111:11 118:22 119:22 122:11 130:14,16,23 134:17 138:2 139:11,12 140:13 165:13
**sort** 24:4 43:5 76:17 99:2
**sorts** 13:9 16:22 101:23 148:19
**sought** 120:23
**sounded** 162:4
**sounds** 60:18 65:18 98:17
**source** 99:8
**south** 3:5
**southern** 1:2
**southwest** 16:15 92:14
**speak** 48:25 56:2 62:22 69:4
**special** 126:7 172:23,24
**specific** 13:1 48:13 56:11 59:5 111:22
**specifically** 16:16 48:18 55:11 126:17 154:15
**specifics** 86:23
**spend** 75:14
**spit** 9:18
**spoke** 68:9
**spoken** 11:2
**spray** 40:13,16 55:12
**spreadsheet** 79:20
**spring** 27:16 121:20
**ssp** 86:6
**staff** 29:7,15,22 108:21
**staffer** 169:19
**staffers** 29:3 108:13
**staffing** 4:12 101:21,22 102:5,7,10,13 102:15 105:1 130:19 171:12
**stakeholders** 28:19 30:16 48:7
**stand** 39:2 66:21 76:19
**standing** 57:19 92:20
**stands** 76:18 82:6 102:20
**start** 9:19 15:24 79:9 118:1 125:8
**started** 7:5 8:18 13:19,24 15:17 20:7 26:18 27:8 30:22 160:11
**starter** 162:6
**starts** 130:13
**state** 17:14,22 18:18,19 54:9 56:24 60:15 61:4 76:8 92:22 105:10 125:22 127:6 128:5,14,16 129:2 177:21
**stated** 66:21 67:6
**statement** 67:23 167:6
**states** 1:1 56:19 127:5

**status** 20:18
**stay** 8:7,9 88:5
**staying** 85:1,25
**steal** 136:8
**stenographic** 5:22
**step** 78:16
**stephanie** 3:11
**steward** 1:8 2:10 5:8 6:13 139:20,23,24 150:16 154:5 155:7,8 179:4 180:1 181:1
**stick** 123:7
**sticker's** 123:8
**stigma** 16:18 105:22 106:5 172:24
**stipulation** 5:23
**stop** 15:15
**stopping** 65:13
**store** 146:4
**stories** 50:23
**straight** 106:3 175:7
**straighten** 9:3
**strategic** 60:14 60:22
**strategies** 54:9 56:24
**streams** 29:18 31:9
**street** 1:17 2:15 3:5 5:9
**strike** 69:11
**struggling** 141:25
**stubs** 94:2
**studies** 163:25
**study** 18:19
**stuff** 94:24 97:10 98:14 110:17 135:22
**sub** 54:3 56:20
**subject** 10:19 124:9
**submission** 150:25
**submit** 79:25 100:21 101:3 129:17 131:7 131:15 169:8
**submits** 131:7
**submitted** 84:22 85:20 87:24 90:21 126:6 129:23 132:4 169:5,12 171:18,25 172:9
**submitting** 85:13
**subpoena** 39:17 79:11 95:23 96:2,15
**subscribed** 181:14
**substance** 20:25 22:24 23:3,5,6,9,9,11 23:12,12,15,21 35:21 40:24 58:7,12 117:15
**substances** 23:20
**substantial** 24:18
**sud** 22:16 43:3 43:9 51:9 56:17,18 62:17 68:10
**sudhoff** 3:3 4:4 6:9,9 166:19 166:22 167:2 168:6 175:25 176:1
**suggesting** 108:16
**suggestion** 30:17
**suite** 1:17 2:15 5:9
**suites** 3:5
**summary** 67:10 77:21
**summer** 15:25 20:3 21:22 24:24 27:16 106:19 121:20 152:22 153:3
**summit** 62:1 80:11,18 158:15,16
**superior** 55:24
**supervising** 29:6
**supervisor** 114:18 156:12 156:12 161:23 165:6,9
**supervisors** 114:14,15 115:10,11 161:24
**suppliers** 126:19
**supplies** 167:15
**support** 51:11 52:13,17 53:4 53:13,24,25
**sure** 14:25 22:4 31:12 36:4 38:17 39:8,14 39:15 40:19 50:21 68:25 71:18 76:2 80:24 81:20 84:18 87:22 93:6,19,20,21 95:23,24 109:7 109:12,18 111:18 123:25 136:10 165:20

166:22 171:10 175:15
**surplus** 127:7
**surrounding** 49:24
**survey** 164:4
**surveys** 19:20
**sustainable** 29:16
**sway** 59:5
**swear** 6:19
**switched** 17:23
**sworn** 5:14 6:23 177:5 181:14
**synergistic** 54:6 56:21
**system** 52:16 58:9 82:17 83:8 119:24
**systems** 16:21 28:2 29:15 48:15

**t**

**t** 4:7 180:3,3
**tabled** 16:14
**tables** 125:15
**tabling** 28:14
**take** 5:4,11 8:23,24 9:20 38:11,16 41:6 56:13 61:1 65:11,16 72:3 72:4,10 78:19 92:9 93:3 95:10 97:15 98:3,7 107:23 109:4 111:16 116:8 126:11 136:10 165:18 167:13 169:7 175:12
**taken** 5:7 24:9 80:23 95:5 160:6,7 177:3 177:12 178:9
**taker** 146:25
**talk** 10:4 11:6 13:16 26:15 35:4 42:11 48:13 64:6 69:3 75:19 76:9 86:23 97:4,19,19 98:15,25 117:1 157:14 158:17 158:18
**talked** 10:15,19 10:23 43:22 72:19 75:20 88:4 116:17 121:24 127:20 143:23 152:5 163:11 166:7
**talking** 9:13,13 11:25 56:21 60:7 76:5 82:18,23 117:14 150:15 152:11 156:11 160:9 172:18
**talks** 40:6,10 40:11 45:14
**tasha** 1:9 2:11 6:13 155:15
**task** 140:5
**tasks** 12:14,16 12:16 75:10
**tax** 49:5
**taxes** 32:14
**teach** 43:6
**team** 16:20 50:13 51:12,14 51:15,16,19,20 51:21,23 52:18 52:24 53:1,4 53:13,18,21,22 53:24 54:1 57:10,12,17 94:18 121:19 137:18 154:23 158:6 164:4
**teams** 145:4
**technical** 24:10
**tell** 6:24 8:1 11:20 16:12,24 18:10 19:14 20:22 27:23 31:20,20,21 34:25 35:5 41:15 42:17 44:7 45:4 46:8 49:13 54:12 57:16 58:4 60:22 61:18 72:3,6 73:19 84:5 91:16 92:17 100:11 100:23 103:5 116:6 117:4 125:9 131:17 136:25 139:22 142:13 144:1 145:2 147:18 150:20 151:1 152:8 153:20 156:17 164:2 172:6,12 173:18
**telling** 46:10 62:25
**tense** 152:9
**tenure** 21:21 25:10 31:7,11
**tenured** 30:16
**term** 44:16 60:6
**termination** 167:12
**terms** 135:25 153:19
**testified** 6:25 161:18
**testifying** 92:17 177:5

**testimony** 92:14 179:9,17 181:8
**teva** 71:17
**text** 118:13,16 143:20
**thank** 6:18 7:1 14:15,22 15:2 22:6 26:6 37:12 73:6 81:9 97:4 99:23 107:17 122:11 124:3,4 136:12,24 138:24 139:14 166:15,16 174:24
**theater** 17:3,16 17:25 18:2 24:3
**thing** 9:19 22:19 34:5 100:3 122:24
**things** 12:13,14 12:24,25 13:5 13:9,15 14:1 15:19 22:25 24:10 28:21 39:2 53:6 57:7 58:19 59:13 60:4 84:6,7 99:7 101:20 103:7,12 106:6 108:19 110:22 114:5 117:16 120:14 129:2 145:20 146:25 148:18 149:16 149:17 160:10 167:17 170:9 172:25 174:18
**think** 13:25 14:1 19:2 33:13 34:1,1 35:3,6 38:23 40:20 41:11,15 41:18 60:6,25 73:24 75:17 76:13 79:17 88:18 89:11 90:20 92:6 97:23 101:11 102:19 104:9 111:1,12,18 114:19 123:1,2 123:10,17 131:23 141:2 143:4 151:13 151:23 152:25 153:6 157:6 161:16 166:10 175:12
**thinking** 37:23 61:2 106:2,3
**third** 40:11 162:12
**thirds** 80:6
**thought** 37:9,9 123:7
**thousand** 121:6
**three** 18:25 27:12 44:6 84:17 107:24 142:4,13 151:15
**ticketmaster** 18:18
**time** 1:15 5:25 8:23 11:25 14:23,24 15:18 16:14 18:25 21:2,3,4,6,7,24 24:14,18,19,20 25:25 26:4 30:24 31:2,5,7 31:8,9,13,15,16 31:17,23 34:12 38:3,7 46:3,19 48:10,24 50:4 50:5 53:11 56:13 60:8 65:20,24 72:4 75:2,5,8,11,25 78:22 79:1 86:5,25 87:4,6 90:18 91:6,7 92:9,10,19 93:3,4,4,7,16 93:24 94:8,19 95:6,10 97:10 98:19,23 99:3 99:4,5 102:20 102:22,25,25 103:4,4,10,21 104:5,7 109:4 111:5,9 114:14 116:22 117:13 117:19 118:13 118:14 119:7,8 119:13,19,24 120:4,8,13,14 125:7,10 134:19 136:14 136:18 138:25 141:3,14 148:5 151:23 152:4 153:1 154:5 155:9,12 158:11 160:8 161:5,5,13 165:10,23 166:2 168:1 172:23 175:7 176:5 179:18
**timeframe** 179:8
**times** 31:10,10 34:10 69:17 129:25 136:2 152:23 169:12 169:19,23
**title** 16:8,11 25:6,21 26:7 26:13,18 27:14 27:17 28:25

30:10,17 42:5 107:8 157:12
**titled** 39:20 40:5 79:4 131:24 134:5
**titles** 27:13,21 70:25 141:8 157:13
**today** 10:23 11:3,17 12:8 175:2,10
**today's** 10:5
**together** 15:20 26:20 34:21 101:19 102:7 107:11 108:16
**told** 10:24 53:14,17 117:19 142:6 165:3 171:17
**tomorrow** 140:6,8
**took** 19:20 75:12 93:7,16 93:21,22 94:8 95:10 116:11 120:14 144:1
**top** 58:2 76:13 102:17 104:10 107:9 134:5 142:15
**topic** 65:4 158:21
**topics** 10:19 11:7,8 56:11 146:17,20
**total** 19:1
**totally** 133:11
**touched** 75:20 157:20
**tough** 119:14
**towards** 73:9
**tracking** 137:15
**trafficking** 173:12
**train** 50:14 59:2 106:16 173:22
**trained** 59:17 106:10
**trainer** 50:14 106:16 173:22
**training** 16:18 29:2 83:21 89:3
**trainings** 173:22
**transcribed** 145:20
**transcriber** 178:1
**transcript** 5:16 36:3,6 37:1 96:18 97:1 168:13,15 169:1 170:10 171:1 174:16 175:1 177:23 178:3,5 179:6 179:19 181:5,8
**transcriptionist** 177:7
**transit** 88:18
**transparent** 142:2
**travel** 85:11,14 87:8,11 88:14 89:8 90:3 169:24
**traveled** 75:25 173:21
**traveling** 85:16 85:25 91:5,5 94:13
**travels** 79:22 80:3
**treatment** 48:16
**tribal** 48:15 173:3,8,10,14
**tried** 57:24
**trifunov** 70:22
**trip** 85:4 91:23 94:9
**trips** 80:23 89:19 91:1 94:12,15 95:2 95:4,7,8,11
**true** 177:9 178:5 181:8
**truth** 6:24,24 6:25
**truthful** 12:9
**try** 9:8,14 33:23 173:5
**trying** 14:24,25 21:8 22:18 23:7 25:25 26:4 50:10 55:1 76:3 77:2 142:7 152:17 153:15 164:14
**turn** 96:3
**turner** 1:9 2:11 6:14
**twice** 117:3
**two** 37:10 72:21 76:12 77:1 80:6 87:6 106:5,12,17 107:24 108:13 108:21 115:10 115:10 119:13 119:14,19,24 135:20 145:7 151:13 155:19 163:25 165:14 169:23 171:21
**type** 22:14 33:3 33:5 57:2 58:4 74:16,17 80:4 131:13 137:8 146:8 148:14 154:12

**types** 35:8 69:23
**typewriting** 177:7
**typical** 127:25 152:19,20
**typically** 33:25 35:1 90:9,12 127:14 134:25
**typos** 108:18

**u**

**u** 6:7
**u.s.** 42:25
**uh** 7:20 9:10,10 16:10 115:13
**uhs** 9:10
**ultimately** 117:23,24 128:23 129:21 150:5,6 152:24 165:12
**uncomfortable** 152:9
**under** 5:19 16:5 20:18,19 40:11 41:3,21 41:21,24 45:13 49:25 50:12 54:3 56:20 57:10,11 58:25 59:1 66:6 67:9 71:7,8 73:10 74:4,4,22,23,25 88:4 102:15 104:6 120:17 130:5 158:19 161:22 164:16
**underneath** 58:1 59:4
**understand** 5:15 9:2,4 10:8 26:6 35:10 42:12 52:9,10 52:18,20 53:20 54:17 57:5,18 57:19,20,22 59:3,12,14,17 62:15 79:15 99:7 116:24 155:8
**understanding** 38:12,20 43:11 49:15,16,19,20 49:22 51:15,18 51:24 52:5,11 53:8 54:21,22 56:5,17 57:7 59:23 63:1,19 64:9,20 66:10 66:14,25 67:5 68:21 72:8 73:23 76:24 79:18 100:6,20 100:24 101:8 104:2 152:11 152:25 153:13 155:11 167:18
**understandings** 35:23
**understood** 33:16 50:23 52:21,22 53:17 56:15 66:21 68:4 115:14 117:13
**united** 1:1
**university** 17:14,22 18:19 105:10
**unrelated** 91:2 113:4,8
**unsubstantiat...** 162:13
**unusual** 163:7
**updated** 148:4
**ups** 129:20
**use** 12:19 21:1 22:18,24 23:5 23:11,12,12,15 23:18,21 35:21 40:24 49:18 50:25 51:1 54:9,21 56:24 58:7,12 59:5 60:19 62:12,20 68:24 69:7 92:9 110:21 117:15 129:20 135:1 136:9,11 145:20,25 173:25
**used** 35:1 49:15 64:5,5,7 65:2 92:12 93:23 134:23,24,25 164:6,7 169:24 179:19
**uses** 5:18 69:9
**using** 37:17 57:21 64:11,21 64:24 81:20
**usually** 18:25 22:24
**utilities** 128:22
**utilizing** 29:20

**v**

**v** 1:7 179:4 180:1 181:1
**va** 35:12
**vacation** 34:4 90:13 92:10 93:4,24
**validate** 24:11
**value** 30:13
**various** 95:8 100:2 114:4 146:17,20 173:24
**vbg** 66:7,11,15 66:16,19,22,22 67:1,14
**vehicle** 169:24
**velocity** 13:3,7 13:11 20:10,12

20:15,23 21:3 21:4,19,25 22:11,15 23:8 24:14 25:5 35:5,6,7,18,20 38:13 39:16,20 40:18,19,21,22 43:12,15,19 44:5 45:11,25 46:14 47:11 48:1,25 51:16 51:20,22 52:2 58:5,21 60:1 63:2 67:10 69:14 70:17 71:3,23 72:5,5 72:11,20 74:2 75:14,22 76:7 79:10,24 83:23 83:24 84:10,12 84:22 85:1,10 85:20,24 86:19 87:3,11,15 88:22 89:5,7 89:13,18 90:14 90:18 91:1,2 93:1,2,14 94:6 97:10 113:7,13 114:22 115:16 116:2,16 117:2 118:10,15 119:8 120:3,8 142:19 144:8 147:17 148:7 148:23 149:6 152:2 153:7,10 161:19 169:5 169:10,14 173:3,11,20 174:4

**velocity's** 52:3
**vendor** 122:13
**vendors** 120:20 122:19 141:25
**verbally** 114:11 116:10
**verify** 179:9
**veritext** 3:11 5:3 179:14,23
**veritext.com** 179:15
**verse** 150:1
**version** 39:10 39:12 41:11,19 78:8,10 150:7 150:20,21
**versions** 101:23
**versus** 49:21 155:20 163:12 163:12,16,17
**vet** 129:19
**video** 145:4,5 145:21 158:6
**viral** 80:11,18
**virtue** 23:24
**volunteer** 19:25 114:5 125:11 143:2 164:24
**volunteers** 29:3 162:18
**vs** 5:7

**w**

**w** 21:20,23,25 73:16,20 95:19
**waffle** 81:18
**wage** 15:22 32:3
**wait** 38:1
**waited** 164:8
**waive** 174:14 174:20
**want** 7:23 8:23 8:24 10:2,12 37:18 38:16 42:15 48:11 61:23,25 62:1 62:2,6 65:3 66:4 72:4 75:19 90:19 95:5 97:15,16 98:8,12 109:7 109:12,18 110:2,16,21 111:2 123:4,24 126:9,22 134:17 147:17 157:14,21 166:20 171:21 172:3 175:21
**wanted** 61:7 111:16 137:11 137:12 141:18 151:4 166:9
**way** 15:7 21:5 21:11 63:7,9 64:10 80:6 117:9 121:2 135:3 145:12 153:14
**ways** 126:21 128:1 135:21 135:22
**we've** 65:4 77:10 92:13 95:7,8 97:15 161:16
**website** 144:14 147:23 148:4 148:24 149:7 152:3
**week** 75:15
**weeks** 154:22
**went** 17:7 29:10 58:7 93:12 94:4 113:22 115:16 154:22,23 173:23
**where'd** 17:6
**whova** 148:17 149:23,24
**wide** 56:15 69:23

**widely** 162:21
**wiggle** 158:11
**william** 1:8 2:10
**willing** 45:4 63:23 95:20 96:13
**willingness** 60:16 61:5,11 61:17,19,20 62:16 63:20
**winton** 8:5,5
**wish** 77:3 153:4
**withhold** 71:10
**witness** 5:14,15 6:20,23 10:17 14:9,20,22 15:2 22:6 23:17 47:14 55:5 56:2 62:15,22 63:6 63:16 64:13 65:18 66:14 67:4 69:16 70:6 78:18 81:10,22 87:18 89:23 95:22 96:17 99:23 104:22 109:16 113:11 116:20 119:23 120:25 122:1,7,17 123:8 124:4 126:16 130:18 131:1,4 134:12 136:5,11 137:4 138:2 139:13 143:15 149:1 149:10 160:16 160:25 165:20 166:16,23 174:12,20,24 177:4 179:8,10 179:12,18
**woman** 131:21
**wondering** 110:8,20 155:23
**word** 7:8 10:8 60:21 69:9,11
**worded** 145:13
**wording** 41:17
**words** 25:16 26:19 147:18 157:21
**work** 8:11,14 12:16 13:17,17 13:17 15:8 16:1,4,5 18:11 18:19,22 19:19 19:24,25 20:1 20:11,17 21:4 21:7,23,24 22:10,14 23:8 26:16 28:1 29:23,24,25 30:3,14,15,20 31:7 34:20 35:16 40:17 43:9,12,18,22 45:25 46:2 48:22,25 51:25 53:7 54:15,20 57:2 58:15,15 58:20,20 59:15 59:24 60:1 70:17 73:18 75:19 83:23,23 89:7,13,20 90:11,17,23,25 90:25 91:2 93:19 99:5 101:21,24 104:5 106:15 114:22 115:14 115:16 118:10 118:15 119:5 149:6 152:2 157:4,5 159:24 166:7,10 172:24
**worked** 16:15 18:15,16,16,17 18:18,19,20,24 19:1,16 20:10 51:17,23 53:1 53:18 75:25 108:13,25 109:2 114:3 141:22 173:2 174:3
**workflow** 10:8
**working** 15:17 15:24 16:9 29:22 31:15 69:14 71:11 113:7 118:24 144:7 172:23
**works** 51:4 95:24 96:4 135:3
**worksheet** 4:20
**would've** 34:18 48:5 58:5,22 59:25 74:2 83:15 93:23 107:2 114:16 120:8 121:10 134:9,25 135:9 135:12,13 140:8 141:22 148:24 149:21 149:21 155:15 158:15
**wright** 3:4
**write** 129:6
**writing** 114:8 116:7
**written** 5:23 99:2
**wrong** 38:24 99:20 130:14
**wrote** 147:24 148:1

**wyoming** 173:15

**x**

**x** 4:1,7 46:2 103:14,15 177:23

**y**

**yard** 1:17 2:15 5:9
**yeah** 10:13,16 10:20 14:18,21 15:22 16:3 19:6,8 21:11 21:17 24:22 25:3,19 36:4 37:22 54:25 57:9 60:7,21 61:3,7,9,10 64:8 65:6,10 65:12,18 71:21 76:3,5 77:2 78:19 81:7,13 82:20 83:4 96:5 97:21,24 98:1,4,11 99:22 100:14 100:14 104:11 109:16,20,20 109:21 110:24 112:19 116:25 123:2,10 124:1 125:2 127:2,22 129:19 130:21 130:24 131:12 134:18 138:4 138:20 143:23 146:24 148:4 151:20 152:4 154:17 155:22 157:9,13 158:7 158:8 162:12 163:1,1,2,4,5 164:11,20 165:3,5,14 175:20
**year** 17:8 27:5 34:6 75:15 114:20 126:2 130:23 151:25 161:6,13
**years** 12:1 24:9 32:2 44:16 84:17 127:12
**yep** 14:14 24:12 48:17 78:4 97:8 98:17 103:15 104:12 108:10
**young** 131:21

**z**

**zone** 94:19
**zoom** 29:25 145:1,3,3 152:3,5 157:20 157:25 158:5,6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.