**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| *Dennis Cauchon, et al.*, | : | |
| Plaintiffs, | : | Case No. 2:25-cv-00075 |
| v. | : | Judge Edmund A. Sargus, Jr. |
| *Dwayne Steward, et al.*, | : | Magistrate Judge Chelsea M. Vascura |
| Defendants. | : | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed.R.Civ.P. 56, Defendants Harm Reduction Ohio ("HRO"), Dwayne Stewart, Raina (William) Golden, and Tasha-Turner Bicknell (collectively, "Defendants"), move for summary judgment as to all claims asserted in the Second Amended Complaint filed by Plaintiff Dennis Cauchon ("Plaintiff") on September 9, 2025 (the "Complaint"). Plaintiff's claims for retaliation under the False Claims Act and for declaratory judgment fail as a matter of law.

Respectfully submitted,

*/s/ Steven A. Chang*

Steven A. Chang, Esq. (Trial Attorney) (0088321)
Melvin J. Davis, Esq. (0079224)
Mrinali Sethi, Esq. (0101295)
Reminger Co., L.P.A.
200 Civic Center Drive, Suite 800
Columbus, Ohio 43215
(614) 228-1311; FAX: (614) 232-2410
mdavis@reminger.com
schang@reminger.com
msethi@reminger.com
*Counsel for Defendants Dwayne Steward, Raina (William) Golden and Tasha Turner-Bicknell*

**COMBINED TABLE OF CONTENTS AND SUMMARY OF THE ARGUMENT**

**PAGE**

TABLE OF CONTENTS ........................................................................................................ iii

INTRODUCTION .................................................................................................................1

I. STATEMENT OF THE FACTS..........................................................................................3

A. HRO is Founded In 2018 With the Mission to Save Lives from Drug Overdose Deaths. ..........................................................................................3

B. HRO Implements an Employee Handbook in 2022 That Permits HRO Employees to Have Outside Employment ..........................................................4

C. Third-Party AmandaLynn Reese Discloses her Job Offer from Velocity BioGroup to Her Immediate Supervisor ..........................................................4

D. Plaintiff Allegedly "Discovers" Ms. Reese's Outside Employment In July 2024 and Agrees to Maintain the Status Quo While HRO's Lawyer Conducted a Review and Updates HRO's Conflict of Interest Policies ..........................................6

E. Despite No Change in Circumstances, Plaintiff Unilaterally Places Ms. Reese on Administrative Leave After Consulting ChatGPT and Conducting "Legal Research." ..........................................................7

F. Plaintiff is Placed on Administrative Leave After the Board Receives at Least Three Hostile Work Environment and Discrimination Complaints Against Plaintiff ..........................................................7

G. Plaintiff Refuses to Comply with His Administrative Leave, Refuses to Participate in the Investigation in Violation of HRO's Policy, and Purposefully Obstructs HRO from Fulfilling its Duties Without His Participation..........................................8

H. Plaintiff is Removed as An Alleged Board Member and His Employment is Terminated on the Advice of Counsel..........................................................9

II. STANDARD OF LAW ..........................................................................................10

III. ARGUMENT..........................................................................................12

A. Plaintiff's FCA Retaliation Claims Fails as a Matter of Law as Plaintiff Was Not Engaged in a Protected Activity and HRO Terminated Him – on the Advice of Counsel – For Multiple Legitimate, Nondiscriminatory Reasons .........................12

1. Retaliatory Discharge Under the FCA .....................................................12

Where, as here, a plaintiff offers only circumstantial evidence of retaliation, the Court applies the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*. *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394 (6th Cir. 2015). Pursuant to that framework, the plaintiff must establish a prima facie case by demonstrating that: "(1) she was engaged in a protected activity; (2) her employer knew that she engaged in the protected activity; and (3) her employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Id.* at 398. Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a "legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the defendant meets its burden, the plaintiff must "demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination." *Id.*

2. Plaintiff's FCA Retaliation Claim Fails as a Matter of Law as Plaintiff Was Not Engaged in a Protected Activity. .......................................................13

i. Plaintiff Has Failed to Establish That He Had *Any* Belief – Let Alone a *Reasonable Belief* – That A Violation of the Anti-Kickback Statute Was Occurring...................................................................13

It is well settled that in order to be engaged in an "protected activity" a plaintiff must prove that they had: (1) "a subjective, good-faith belief' and (2) "[an] objectively reasonable belief," that "fraud is being committed against the [federal] government[.]" *Miller v. Abbot Labs.*, 648 Fed. Appx. 555, 560 (6th Cir. 2016). Plaintiff cannot meet this standard where, as here: (1) he admits he did not have a subjective belief Ms. Reese's position affected her ordering of Kloxxado at the time of his report to the Ohio Department of Health; and (2) he could not have had an "objectively reasonably belief," fraud was occurring when all he knew – and could point to – was Ms. Reese's job title.

ii. Allegations of State Fraud Are Insufficient as a Matter of Law to Constitute "Protected Activity" Under the FCA ...........................17

An FCA retaliation claim predicated on an AKS violation requires a plaintiff to show they had a reasonable belief "a claim submitted to the government for reimbursement includes items or services

resulting from a violation of the AKS [or] cost reports submitted to the government for reimbursement includes an express certification that the underlying claims comply with the AKS." *Jones-McNamar v. Holzer Health Sys.*, 630 Fed. Appx. 394, 400 (6th Cir. 2015) (emphasis added). Here, Plaintiff does not identify ay "claims" or "cost reports" – at all. In addition, the Sixth Circuit has repeatedly held that allegations of fraud against a state government cannot be the basis for an FCA retaliation claim. *Fakorede v. Mid-South Heart Ctr., P.C.*, 709 Fed. Appx 787, 790 (6th Cir. 2017).

iii. Plaintiff Was Neither Placed on Administrative Leave Nor Discharged by HRO for Merely Reporting an Alleged Conflict of Interest.....19

It is beyond dispute that Plaintiff was placed on administrative leave because of multiple hostile work environment and discrimination complaints against him. It is further beyond dispute that Plaintiff was terminated – at the advice of HRO's counsel – because of his insubordination and defiance to the Board. Accordingly, reasonable minds can only conclude that Plaintiff was not terminated as a result of being involved in any alleged "protected activity."

3. Plaintiff's FCA Claim Fails as a Matter of Law as HRO Had Multiple, Legitimate, Nondiscriminatory Reasons For His Termination .....20

In addition to failing to satisfy the *prima facie* case requirement, there are multiple, legitimate, nondiscriminatory reasons that resulted in Plaintiff's termination including: (1) Plaintiff's admitted insubordination to the Board; (2) HRO counsel's explicit recommendation to terminate Plaintiff as a result of that insubordination; and (3) Plaintiff's repeated attempts to obstruct HRO's mission including changing the locks and denying the Board access to HRO's financial accounts. Plaintiff's baseless speculation that the investigation of HRO's counsel was a "sham" is insufficient to preclude summary judgment. The Sixth Circuit has repeatedly held that "a nonmoving party cannot create a genuine issue of fact through 'mere speculation, conjecture, or fantasy.'" *Thompson I.G., LLC v. Edgetech I.G., Inc.*, 590 Fed. App'x 532, 537 (6th Cir. 2014).

4. At Minimum, Plaintiffs' Retaliation Claims Against the Individually Named Defendants Fail as a Matter of Law as They Were Not Plaintiff's Employers. .....23

Federal courts have overwhelmingly held that the FCA's retaliation provisions do not create a private cause of action against individual supervisors. *See, e.g.*, *Roberto v. Kent State Univ.*, No. 5:16-cv-1305, 2017

U.S. Dist. LEXIS 45509, 2017 WL 1155563, at *2-3 (N.D. Ohio Mar. 28, 2017) (collecting cases). Consequently, any FCA retaliation claim against Ms. Turner-Bicknell, Mr. Steward, and Mr. Golden must be dismissed because they were not Plaintiff's "employer" as a matter of law. *Id.*

B. Plaintiff's Claims for Declaratory Judgment Fails for Lack of a Justiciable Controversy and Because HRO's Actions Substantially Complied with HRO's Policies and Ohio Law ........ 24

1. Plaintiff's Claim for Declaratory Judgment as to the Validity of His Administrative Leave Fails as a Matter of Law Due to a Lack of a Justiciable Controversy ........ 24

It is well settled one of the threshold requirements for a declaratory judgment (whether arising in state or federal law) is that Plaintiff must demonstrate "there is a substantial controversy, between parties having adverse legal interests, of sufficient and reality to warrant the issuance of a declaratory judgment." *City of Parma v. Cingular Wireless, LLC*, 278 Fed. Appx. 636, 641 (6th Cir. 2008) (emphasis added). There is no longer a "justiciable controversy" here, as Plaintiff is no longer on administrative leave.

2. Plaintiff's Claim for Declaratory Judgment as to His Removal as an Alleged Board Member Fails as a Matter of Law Because The Board Substantially Complied with HRO Bylaw's Notice Requirements ........ 26

Ohio law imposes a "substantial compliance" standard when determining an organization's compliance with its own organizational documents. *See, e.g.*, *Robb v. Chagrin Lagoon Yacht Club*, 75 Ohio St.3d 264, 268 (1996). There is no dispute that Plaintiff had notice of, and appeared at, the board meeting where he was removed as an alleged board member. Nothing more is required to meet the "substantial compliance" standard under Ohio law.

3. Plaintiff's Request for Declaratory Relief Contesting The Validity of His Termination on Procedural Grounds Fails as Ohio Law Expressly Authorizes the Board to Take Actions by Written Unanimous Consent ........ 28

R.C. 1702.25 expressly authorizes the Board to act without a meeting. As Plaintiff's termination letter was unanimously signed by the entire Board of Directors of HRO, the action was effective under Ohio law.

4. Plaintiff's Request for Declaratory Relief on the Basis of "Retaliation" is Duplicative of his FCA and State Law Claim(s) and Must Be Dismissed ........ 30

Declaratory judgment is appropriate only "before an injury-in-fact has occurred." *Krawczyszyn v. Columbian Life Ins. Co.*, S.D. No. 1:21-CV-85, 2021 U.S. Dist. LEXIS 121711, at *4 (S.D. Ohio June 30, 2021). Plaintiff's request for declaratory judgment as to the Board's alleged "retaliation" is not subject to declaratory judgment and is duplicative of his FCA claim.

IV. CONCLUSION ....................................................................................................31

CERTIFICATE OF SERVICE ..................................................................................32

## MEMORANDUM IN SUPPORT

On November 4, 2024, **at the explicit advice of counsel**, Plaintiff was terminated by a **unanimous** decision of HRO's board of directors after he:

(1) **refused to participate** in an independent investigation by HRO's counsel of several hostile work environment and discrimination complaints against him;

(2) **refused to comply** with his administrative (paid) leave while HRO's counsel investigated those allegations;

(3) **continued to access, and attempted to block, HRO** from accessing its own financial accounts;

(4) **had the locks replaced in HRO's office** to deny HRO employees access to HRO's own supplies;

(5) **removed HRO's staff** from accounts necessary for their work, and

(6) proclaimed **he was going to "assert his power"** against the entire HRO board, among other things, all while on administrative leave.

(Deposition of Harm Reduction Ohio ("HRO Dep."), Doc. # 103-1, at 22:16-24:6); (*see also* Declaration of Tasha Turner-Bicknell ("Turner-Bicknell Decl."), attached hereto as **Exhibit A**, at Exs. A-2 through A-9, and A-12). Indeed, the record is so replete with evidence that Plaintiff purposefully obstructed HRO's mission – and was a danger to the organization – that Judge Miller of the Franklin County Court of Common Pleas denied Plaintiff's motion for preliminary injunction ***without a hearing***, determining that "[t]o reinstate Plaintiff Cauchon as president and a board member of HRO would thus jeopardize HRO's status as a non-profit organization and its ability to perform its mission." (*See* Order, Doc. # 45-2, PageID # 798).

To this day, Plaintiff continues to obstruct HRO's mission, brazenly masquerading as the "President of HRO" in communications to HRO's funders, the ODH, and even the Ohio Attorney General, despite his employment having been properly terminated by HRO's Board of Directors.

Plaintiff has made clear he will not stop until this Court orders it and **it is time for Plaintiff's farce to end**. Plaintiff's claims for retaliation and declaratory judgment fail as a matter of law – based on the undisputed facts – for multiple, independent, reasons.

***First***, Plaintiff's claim for retaliation under the False Claims Act ("FCA") fails as a matter of law because:

(1) ***He was not engaged in a protected activity.*** Plaintiff admits he did not believe at the time of his report to the Ohio Department of Health ("ODH") that Ms. Reese's outside employment affected her ordering decisions, in any way. Accordingly, he could not have had a "reasonable belief" federal fraud was occurring.

(2) ***There were multiple, legitimate reasons for his termination.*** Plaintiff's insubordination and purposeful obstruction of HRO's activities during his administrative leave was more than enough to demonstrate he was unfit to lead the organization and that his employment should be – as HRO's counsel recommended – terminated.

(3) ***Plaintiff has no evidence that the proffered reasons for his termination were pretextual***. Plaintiff's only "evidence" that the independent investigation against him was a "sham" is that Mr. Steward and Attorney Nelson were social friends. Speculation and conjecture alone are not sufficient to overcome summary judgment.

(4) ***The FCA retaliation provision does not create a private cause of action against individuals***. At minimum, any FCA retaliation claims as against the individually named Defendants fail as a matter of law, as they are not "employers" subject to liability under the statute. *Roberto v. Kent State Univ.*, No. 5:16-cv-1305, 2017 U.S. Dist. LEXIS 45509, 2017 WL 1155563, at *2-3 (N.D. Ohio Mar. 28, 2017) (collecting cases).

***Second***, Plaintiff's claims for declaratory judgment also fail as a matter of law because:

(1) ***Any claim contesting the validity of his administrative leave is moot***. It is well settled that the Ohio and Federal Declaratory Judgment Acts are reserved for real cases and controversies. Plaintiff's termination moots any claim for declaratory judgment as to his paid administrative leave.

(2) ***HRO substantially complied with board meeting notice requirements***. There is no dispute that Plaintiff had notice of the October 27, 2024, board meeting which removed him as an alleged board member, as he appeared at the meeting and was given an opportunity to speak at the meeting. Nothing more was required.

(3) ***R.C. 1702.25 permitted the Board to terminate Plaintiff without a meeting***. There is no genuine dispute that Plaintiff's termination letter was unanimously signed by all seven (7) board members entitled to vote on Plaintiff's termination.

(4) ***Any claim for declaratory judgment based on "retaliation" is duplicative of Plaintiff's FCA claim***. Both Ohio and Federal law is clear that declaratory judgment is only appropriate before an alleged "injury-in-fact" has occurred. Plaintiff's FCA claim precludes a duplicative declaratory judgment claim on the same issue(s).

For these reasons, summary judgment should be granted without delay in favor of all Defendants and Plaintiff's claims dismissed, with prejudice.

## I. STATEMENT OF FACTS.

### A. HRO Was Founded In 2018 With the Mission to Save Lives from Drug Overdose Deaths.

Harm Reduction Ohio is a non-profit organization that was founded in 2018 to combat overdose death and other harms caused by drug use and policies in Ohio. (Deposition of Dennis Cauchon ("Cauchon Dep."), Doc. # 102-1, at 13:7-14:18);[1] The organization has expanded to become the largest distributor of naloxone in Ohio – distributing 42,000 naloxone kits in 2022 alone, saving thousands of lives.[2] Plaintiff Dennis Cauchon is the founder of HRO and is the individual who personally selected board members to serve (in a volunteer role capacity, only) on the Board of Directors during his tenure as President from 2019 through 2024. (Cauchon Dep. at 13:7-16:11). Board members were selected based on their expertise and lived experience. (*Id.* at 38:17-44:14). Plaintiff hand-picked each and every one of the seven (7) board members who ultimately voted to terminate his employment. (*Id.*). In accordance with the organization's Bylaws, none of the board members of HRO receive compensation for their work as a board

---

[1] Plaintiff's deposition was conducted over two days. The second volume of Mr. Cauchon's deposition, Doc. # 102-2, shall hereinafter be referred to as "Cauchon Dep. II."

[2] *See* https://www.harmreductionohio.org/about/, last accessed August 27, 2026.

member, (*Id.* at 15:20-16:11), which is important for HRO to maintain its 501(c)(3) non-profit organization status.

**B. HRO Implements an Employee Handbook in 2022 That Permits HRO Employees to Have Outside Employment.**

As a non-profit organization with limited resources, it is important that its employees who perform live-saving work (with limited pay) are still able to support themselves. As such, HRO expressly permitted employees to obtain outside employment provided that the work does not "interfere with or are in conflict with the performance of their job or create a conflict of interest." (Cauchon Dep., 45:19-46:12, Ex. 2 ("HRO Handbook"), at HRO_000378). The HRO Handbook specifically defined a "conflict of interest," as "whenever an employee is able to influence a decision that may result in a personal gain for the employee or an immediate family member … as a result of the agency's business dealings." (Cauchon Dep. at 52:22-53:24, and Ex. 2).

**C. Third-Party AmandaLynn Reese Discloses her Job Offer from Velocity BioGroup to Her Immediate Supervisor.**

Consistent with HRO's policy, Ms. Reese worked as the Director of Government Advocacy for Velocity from 2022 through 2025. Contrary to Plaintiff's allegations, Ms. Reese's education, training, and advocacy work for Velocity was not a secret at HRO (or to anyone else). Quite to the contrary, prior to accepting the position, Ms. Reese discussed the job offer and the position with her immediate supervisor – Mallory Bolen – who approved **and** encouraged her to take the job on December 13, 2022. (Declaration of AmandaLynn Reese ("Reese Decl.'), attached hereto as **Exhibit B**, at ¶¶ 2-4 and Ex. B-1) ("**You really need to take the other job to keep your life stable**. We might all be out of a job soon.") (emphasis added); (*see also* Cauchon Dep., Ex. 26) (text message thread detailing Ms. Bolen's due diligence prior to Ms. Reese accepting the

position); (Turner-Bicknell Decl., **Ex. A-1**, at HRO_000143) (containing Ms. Bolen's statement relating to her due diligence).

Further, Ms. Reese disclosed part of her work and projects with Velocity directly to the ODH as part of HRO's application for a Statewide Naloxone Mail Order & Lay Distributor Network Contract. Specifically, the application required each candidate to disclose three references with examples of their work. (*See* Cauchon Dep. II, Ex. 43, at HRO_000545). In Ms. Reese's portion, she specifically disclosed one project she performed for Velocity:

| | | |
|---|---|---|
| Company Name: Rocky Mtn Tribal Leaders Council | Contact Name: Cinda Ironmaker | |
| Address: 2929 3rd Avenue North, 3rd Floor Billings, MT 59101 | Phone Number: 406-839-395<br>E-mail: Cinda.ironmaker@rmtlc.org | |
| Project Name: TECPHI Project | Beginning Date of Project: Month/Year 12/202 | Ending Date of Project: Month/Year 03/2023 |
| Description of the nature and scope of the project, the project size, complexity, and the Candidate's role in this project.<br><br>The Rocky Mountain Tribal Leaders Council partnership with Velocity Bio Group and the Rocky Mountain High Intensity Drug Trafficking Area (HIDTA) was developed to address the disproportionate impact of fatal and non-fatal overdoses within Tribal communities in MT and WY.<br>With the active involvement of the Candidate, this initiative has seen the distribution of 2,000 boxes of Naloxone (4,000 doses), representing a substantial surge of naloxone within Tribal communities. Crucially, Candidate conducted comprehensive training for over 160 individuals from Tribes and Urban Indian Centers. These participants gained the ability to identify the signs of an opioid overdose and effectively administer naloxone. By emphasizing the use and destigmatization of naloxone and raising awareness about Good Samaritan Laws, Candidate's expertise has proven instrumental in enhancing the capacity of these communities to navigate the opioid crisis. | | |

(*Id.*). Plaintiff admits that he fully read and reviewed HRO's application prior to its submission to the ODH. (Cauchon Dep. II, at 141:1-14).[3] As such, he too was directly aware of Ms. Reese's work with Velocity as of July 2023.

At the very least, Plaintiff knew that Ms. Reese's supervisor was aware of her work at Velocity as of September 2024. Plaintiff contacted Mallory Bolen on September 5, 2024, to confirm whether Ms. Reese disclosed her outside work. (Cauchon Dep. at 242:22-245:17 and Ex. 26). Ms. Bolen confirmed that: (1) Ms. Reese informed both her about the job; (2) she thought

[3] It should be noted that Ms. Reese's work, as illustrated here, with Velocity Biogroup is consistent with HRO's mission. Providing training for individuals to effectively administer naloxone to save lives is also worked performed at HRO as part of its mission.

Plaintiff "knew about her other job for a while now"; (3) she specifically spoke to Velocity about what Ms. Reese's job responsibilities were; (4) she was aware of Ms. Reese's Maryland testimony and Ms. Reese freely shared it; (5) she was aware the position was related to Kloxxado and Hikma and that it was a non-sales position; and (6) she was aware of Ms. Reese's traveling for Velocity and ensured it was "[n]ever on HRO funds." (*Id.*, Ex. 26). Nonetheless, Plaintiff continues to falsely assert that Ms. Reese's work was somehow "undisclosed" both to the ODH, the Board, and this Court. (*See, e.g.*, Compl., Doc. # 59, ¶ 3, 13, 49).

### D. Plaintiff Allegedly "Discovers" Ms. Reese's Outside Employment In July 2024 and Agrees to Maintain the Status Quo While HRO's Lawyer Conducted a Review and Updates HRO's Conflict of Interest Policies.

Plaintiff claims that he "discovered" Ms. Reese's outside employment in early July 2024 (Cauchon Dep. at 60:18-61:7).[4] Subsequently, Plaintiff held multiple meetings with Ms. Reese regarding her employment between July 17 and August 28, 2024. (*See generally* Cauchon Dep. at 62:15-140:5). However, on August 28, 2024, Plaintiff expressly agreed to maintain the status quo until HRO's lawyer could review and revise HRO's COI policy and advise HRO accordingly:

> Great talking to you, just wanted to send a quick written recap of what was said regarding how HRO is moving forward:
>
> 1. Lawyer is looking into the new HRO's employee handbook:
>    a. Lawyer will make edits and make sure that it is in compliance with employment law(s).
>    b. HRO's Board will review/edit and then approve.
> 2. Lawyer is looking into HRO's conflict of interest policy and process, as well as the conflict of interest disclosure form:
>    a. Lawyer will make edits and make sure that it is in compliance with employment law(s) and best practice(s).
>    b. HRO's Board will review/edit and then approve.
> 3. Once these documents are ready, all employees will be given the documents to read, fill out/sign.
> 4. HRO will follow the process approved by the Board to assess any potential conflict of interest.
>
> In the meantime, all your duties stay the same as they have been.

[4] This is contrary to both the collective recollection of Ms. Reese and Ms. Bolen and the HRO's ODH application. *See* supra, Section I(C). Regardless, the timing of when Plaintiff knew of Ms. Reese's outside position is immaterial.

(Cauchon Dep. at 133:24-135:25 and Ex. 13). Plaintiff confirmed this understanding again in an email on August 31, 2024, to the Chairman of the Board, in which he agreed "I think we all understand things **are status quo until the lawyer finishes his review**." (*Id.* at 136:1-137:5 and Ex. 14) (emphasis added).

### E. Despite No Change in Circumstances, Plaintiff Unilaterally Places Ms. Reese on Administrative Leave After Consulting ChatGPT and Conducting "Legal Research."

A mere three (3) days later, Plaintiff unliterally changed his mind, despite no change in circumstances. (Cauchon Dep. at 139:16-21) ("Mr. Cauchon, what, if anything, did Ms. Reese do between the date of this email and September 3rd at 1:30 p.m. that required her to be placed on administrative leave. A: **There's nothing I know that she did**.") (emphasis added). On September 2, 2024, Plaintiff admits he consulted ChatGPT and then purportedly performed an entire day of "legal research" rather than waiting for HRO's attorney, David Ball, to advise the company. (Cauchon Dep. at 148:9-172:8). Despite having no legal training whatsoever, Plaintiff concluded of his own accord that Ms. Reese had a conflict and needed to be terminated immediately. (*Id.*; *see also* Cauchon Dep. at 186:16-187:17). Consequently, on September 3, 2024, he placed Ms. Reese on administrative leave, wrote the ODH with his purported legal "findings," and then advised the Board of his decision. (*Id.* at 177:6-178:8). Despite having ***already made the decision he was going to terminate her***, Plaintiff admits he placed Ms. Reese on administrative leave to further interrogate her. (*Id.* at 217:20-218:7; 221:16-224:12).

### F. Plaintiff is Placed on Administrative Leave After the Board Receives at Least Three Hostile Work Environment and Discrimination Complaints Against Plaintiff.

No immediate action was taken by the Board in response to Plaintiff's unilateral decision. Over the next two days, however, the Chair and Vice Chair of the Board received several

complaints, including a detailed written complaint by Ms. Reese alleging hostile work environment and discrimination claims against Plaintiff and two verbal complaints from other employees at HRO also alleging hostile work environment and sex/gender discrimination against Plaintiff. (Cauchon Dep. at 231:8-233:4 and Exs. 23-24; Deposition of Dwayne Steward ("Steward Dep."), Doc. # 103-2, at 38:16-44:4; Turner-Bicknell Decl., Ex. A-1). As a result of these complaints, the Board convened an emergency meeting on September 5, 2024, and unanimously voted to place Plaintiff on administrative leave pending an investigation, pursuant to HRO's policy. (*See* Cauchon Dep., Ex. 24).

### G. Plaintiff Refuses to Comply with His Administrative Leave, Refuses to Participate in the Investigation in Violation of HRO's Policy, and Purposefully Obstructs HRO from Fulfilling its Duties Without His Participation.

Plaintiff made clear he had no intention of complying with the Board's directive or with HRO's policies. **<u>Within eleven (11) minutes</u>** of receiving notice of being placed on administrative leave, Plaintiff wrote to the ODH, baselessly claiming that an "AmandaLynn-led coup attempt [was] underway," at HRO. (Cauchon Dep. 235:25-236:12 and Ex. 25). From there, Plaintiff's hubris and obstruction of HRO's mission only grew.

- **On September 6, 2024 (in the morning)**, he advised the Board he would not comply with his administrative leave and that he would be returning to – and refusing to leave – HRO's office space. (Turner-Bicknell Decl., Ex. A-12).

- **On September 6, 2024 (in the evening)**, he accused the Board of purposefully taking down HRO's website – despite no one on the Board even having access to it. (*Id.*, Ex. A-2).

- **On September 11, 2024**, he proclaimed that he was somehow now a "member" of the board, demanding all materials from the Board relating to HRO business – including those obviously pertaining to the investigation against him. (*Id.*, Ex. A-3).

- **In September 2024**, Plaintiff declined to sit for an interview with Attorney Nelson as part of her investigation. (Cauchon Dep. II, at 13:2-7).

- **On October 4, 2024**, he again demanded to participate in the Board's affairs, and providing an update to him personally on the investigation into Ms. Reese, the investigation into him, and "HRO's compliance with federal and state" laws. (Turner-Bicknell Decl., Ex. A-4).

- **On October 14, 2024**, he again demanded to meet with the Board and accused the Board of failing to follow the law. (*Id.*, Ex. A-5)

- **On October 28, 2024**, he again asserted he was still a director and demanded all materials relating to Ms. Nelson's investigation against him. (*Id.*, Ex. A-6).

- **In or around October 30, 2024**, he advised Chase bank to speak only to him regarding HRO's financial accounts. (Cauchon Dep. Ex. 30).

- **On November 1, 2024**, he informed an HRO staff member he is going to "assert his power as President" against the Board and that he would "be back Monday" despite his administrative leave. (Turner-Bicknell Decl., Ex. A-7.

- **On November 1, 2024**, he wrote to First Federal Saving Bank of Newark seeking to block anyone *but him* from having access to HRO's accounts. (Cauchon Dep., Ex. 29).

- **On November 4, 2024**, he demanded access, and discussions relating to, HRO's QuickBooks accounts. (Turner-Bicknell Decl., Ex. A-9).

- **In or around Nov. 4, 2024,** he changed the locks in HRO's office, including its supply room. (HRO Dep., at 53:7-56:19).

This is far from an exhaustive list; these are simply *some* examples of Plaintiff's insubordination known to the Board during this time period. Plaintiff does not dispute that he did not comply with his administrative leave and that he continued to obstruct the Board to prevent them from assuming temporary control. (*See, e.g.*, Cauchon Dep. II, at 13:8-21) ("I would say that's correct. I was still president, so I was still, you know, trying to prevent the coup, as we call it[.]").

### H. Plaintiff is Removed as An Alleged Board Member and Terminated at the Advice of Counsel.

Independent counsel Attorney Nelson was hired by HRO to conduct an investigation, and advise the Board, as to Ms. Reese's alleged conflict of interest and Plaintiff's retaliation claim. (*See* Turner-Bicknell Decl., Ex. A-10). The investigation was extensive and included hours of

interviews with nine (9) HRO employees, a review of hundreds of pages of documents and other correspondence, and a thorough, 37-pages report with Ms. Nelson's factual findings, legal conclusions, and personnel recommendations. (*See Id.*).

Ms. Nelson concluded that Ms. Reese did not, in fact, have a conflict of interest. (*Id.* at HRO_1423-25). Ms. Nelson also recommended that Plaintiff's employment as HRO's President be terminated and that he be removed as an (alleged) member of the Board. (*Id.* at HRO_1430).

On October 15, 2024 – both due to Ms. Nelson's report and as a response to Plaintiff's repeated demand for a board meeting – Mr. Steward noticed a Board meeting for October 27, 2024. (Steward Dep., Ex. 6) (confirming notice and link sent on Oct. 15, 2024). After Plaintiff was given a full opportunity to address the Board, the Board voted unanimously to remove him as an alleged Board member. (Cauchon Dep. II, at 20:25-23:21); (Turner-Bicknell Decl., Ex. A-11). Plaintiff – despite having demanded the meeting and confirmed his availability – contends that the meeting was somehow "invalid" solely because it was noticed two (2) days shy of the 14-day standard timeframe for Board meetings. (Cauchon Dep. II, at 24:6-24:15).

Finally, on November 4, 2024, the Board memorialized its unanimous decision to terminate Plaintiff's employment as President of HRO. (*See* Cauchon Dep. II, Ex. 31).

## II. STANDARD OF LAW

Summary judgment to be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct.

2505, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists only where "evidence is such that a reasonable [finder of fact] could return a [judgment] for the nonmoving party." *Id.*

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once established, an opposing party cannot rely upon mere allegation but must instead set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. Merely alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. *Id.*

On summary judgment, a court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claims." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, the nonmoving party must go beyond the pleadings and, by affidavits or other evidentiary materials of record, designate specific facts showing that there is a genuine issue for trial. *Id.* at 110-11 (citing Fed. R. Civ. P. 56(e) and *Celotex Corp.*, 477 U.S. at 324).

All inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus., Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 511 (6th Cir. 2003). Nonetheless, mere conclusory allegations or unsupported opinions of the nonmovant are insufficient to defeat a motion for summary judgment. *Matsushita*, 475 U.S. at 586-88.

## III. ARGUMENT

### A. Plaintiff's FCA Retaliation Claims Fails as a Matter of Law as Plaintiff Was Not Engaged in a Protected Activity and HRO Terminated His Employment – On the Advice of Counsel – For Legitimate, Nondiscriminatory Reasons.

Plaintiff simply cannot meet his burden to establish a *prima facie* case for an FCA retaliation claim where, as here, he was not engaged in a protected activity and the record is replete with multiple, independent, and objectively legitimate reasons for his termination. There is simply no dispute that HRO's independent counsel recommended Plaintiff's termination based on Plaintiff's gross insubordination and behavior. The Board fulfilled their fiduciary duty to protect the organization and Plaintiff's claims fail as a matter of law.

#### 1. Retaliatory Discharge Under the FCA

The FCA prohibits a person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). "To protect employees who expose fraud against the federal government, the FCA's anti-retaliation provision forbids discharging an employee 'because of lawful acts done … in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.'" *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 397 (6th Cir. 2015) (quoting 31 U.S.C. § 3730(h)(1)). "The plaintiff may establish a case of retaliation by presenting either direct or circumstantial evidence of a retaliatory motive." *Id.* (citations omitted).

Where, as here, a plaintiff offers only circumstantial evidence of retaliation,[5] the Court applies the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*,

---

[5] As set forth in the Complaint, Plaintiff alleges that Defendants' reasons for firing him were merely a "pretext" and the independent investigation a "sham." (*See, e.g.*, Doc. # 59, PageID # 1114, 1126, ¶¶ 113, 116, 172). As this "requires an inference that unlawful retaliation motivated an

411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394 (6th Cir. 2015). Pursuant to that framework, the plaintiff must establish a prima facie case by demonstrating that: "(1) she was engaged in a protected activity; (2) her employer knew that she engaged in the protected activity; and (3) her employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Id.* at 398. Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a "legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the defendant meets its burden, the plaintiff must "demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination." *Id.*

**2. Plaintiff's FCA Retaliation Claim Fails as a Matter of Law as Plaintiff Was Not Engaged in a "Protected Activity."**

This case lives and dies at the very first prong of the Court's test. Put simply, Plaintiff was not engaged in a "protected activity" within the meaning of the FCA where, as here: (1) he did not have an actual or reasonable belief that a violation of the anti-kickback statute was occurring at the time of his alleged report to the ODH; and (2) allegations of state fraud are insufficient, as a matter of law, to constitute "protected activity" under the FCA.

**i. Plaintiff Has Failed to Establish That He Had *Any* Belief – Let Alone a *Reasonable Belief* – That A Violation of the Anti-Kickback Statute Was Occurring.**

At the outset, Plaintiff cannot meet his burden to establish a *prima facie* case for retaliation against him where, as here, he neither had a subjective good-faith belief, nor an objectively reasonable belief, that fraud was occurring against the federal government at the time of his

employer's action," Plaintiff is proceeding under a circumstantial evidence theory. *See Jones-McNamara*, 630 F. App'x at 397.

reporting, as required by Sixth Circuit law. *See Miller v. Abbot Labs.*, 648 Fed. Appx. 555, 560 (6th Cir. 2016).

It is well settled that in order to be engaged in an "protected activity" a plaintiff must prove that they had: (1) "a subjective, good-faith belief" and (2) "[an] objectively reasonable belief," that "fraud is being committed against the [federal] government[.]" *Miller v. Abbot Labs.*, 648 Fed. Appx. 555, 560 (6th Cir. 2016) (internal quotation and citation omitted). Although "[the plaintiff] need not establish that [the employer] actually violated the FCA, she must show that her allegations of fraud grew out of a reasonable belief in such fraud." *Id.* (citation omitted, emphasis added). Importantly, the objectively reasonable belief prerequisite is determined based on the "facts in [plaintiff's knowledge] <u>**at the time she reported AKS violations**</u>," and not in hindsight. *Jones-McNamara v. Holzer Health Sys*, 630 Fed. Appx. 394, 401 (6th Cir. 2015) (emphasis added).

As applied here, Plaintiff must do more than simply assert (and believe) there was a perceived conflict of interest. The AKS does not criminalize perceived "conflicts of interest." Rather, it provides criminal penalties for anyone who:

> knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program

*Miller v. Abbot Labs.*, 648 Fed. Appx. 555, 561 (6th Cir. 2016) (quoting 42 U.S.C. § 1320a-7b(b)(2)). To put it plainly, Plaintiff must show he had an actual (and reasonable) belief that Ms.

Reese was **specifically being compensated** to order more Kloxxado from the State of Ohio. (*See Id.*) (holding that a "kickback violation entails 1) renumeration to a person or entity in a position to refer Federal health care program patients 2) that could reasonably induce the person or entity to refer such patients"). It is that *quid pro quo* – not the mere appearance of a nebulous "conflict of interest" – that would be an actual AKS violation. *Id.* By Plaintiff's own admission, he had no belief – let alone evidence – that this has ever occurred.

***First***, the record is beyond dispute that Plaintiff ***did not*** have a subjective, good-faith belief that federal fraud was occurring where, as here, he **openly admitted to the ODH that he <u>had no reason to believe</u>** that Ms. Reese's position at Velocity Biogroup, in any way, influenced her ordering from the State of Ohio:

> AmandaLynn tasks at Harm Reduction Ohio includes overseeing our naloxone program, ordering naloxone from the state pharmacy and providing information on naloxone volume used in monthly contract invoices. Since December 2022, AmandaLynn, as Harm Reduction Ohio's representative, has ordered approximately 15,000 Kloxxado kits from the state. At present, I have no reason to believe that AmandaLynn's outside contract influenced her ordering decisions.

(Cauchon Dep. at 196:21-197:21 and Ex. 18, at 2). Not only did Plaintiff have no reason to believe Ms. Reese's outside contract influenced her ordering decisions, **he openly admitted in his deposition that <u>he didn't even bother to look</u>**. (*Id.* at 253:2-256:12). These admissions are fatal to his claim.[6]

[6] Even now – two years later – Plaintiff admitted in his deposition that he *still* has no evidence that there was anything untoward occurring with respect to Ms. Reese's ordering beyond mere speculation relating to the *general volume* of Kloxxado ordered. (Cauchon Dep. at 253:2-257:18). Although this Court does not evaluate whether an FCA violation occurred in hindsight, this admission further evidences the specious nature of Plaintiff's claims, which are based on pure speculation and conjecture.

***Second***, even if Plaintiff believed federal fraud was somehow occurring, such belief was **not objectively reasonable** based on the information he had at the time of his report to the ODH on September 3, 2024. Plaintiff admitted in his deposition that the only two pieces of information he had were: (1) Ms. Reese's job title at Velocity BioGroup, taken from the internet; and (2) Ms. Reese's job title and position at HRO. (Cauchon Dep. at 208:10-14) (admitting the "information we knew" about Ms. Reese's work was her job title, which he believed to be "in and of itself" a conflict); (*See also Id.* at 60:18-63:7) (testifying that his "knowledge" of Ms. Reese's work was simply her job title on social media and google searches of Velocity). Plaintiff admitted he did not have – nor did could he recall even asking for – Ms. Reese's contract with Velocity. (*Id.* at 67:3-11). Plaintiff admitted he had no knowledge of what she actually did for Velocity. (*Id.* at 222:10-22) (admitting he did not know if "director of government advocacy was just a fancy name that did nothing"). Plaintiff admitted that he did not have – nor could he get – any evidence that Ms. Reese exercised discretion to fulfill orders with Kloxxado instead of other forms of Naloxone. (Cauchon Dep. at 255:11 (testifying "the information wasn't there") and 256:15-257:7) (testifying "all he had" after the fact was the amount of Kloxxado orders)). Finally, as noted previously, Plaintiff admitted that he had no reason to believe Ms. Reese's ordering was, in any way, influenced by her position at Velocity as of September 3, 2024. (*Id.* at 196:21-197:21 and Ex. 19, at 2).

Sixth Circuit law is clear that Plaintiff cannot "walk this back" with evidence that he discovered after the fact and/or during the course of this litigation. *Jones-McNamara*, 630 Fed. Appx. at 401 (holding that the subjective and objective tests are determined by "the facts in [plaintiff's]' knowledge **at the time [he] reported AKS violations**") (emphasis added). This Court has already acknowledged this well-settled law when it **denied** Plaintiff's motion to compel Ms. Reese to produce documents related to her work at Velocity, explicitly holding that "only the

evidence in an FCA retaliation plaintiff's possession **at the time of the alleged protected conduct is relevant**[.]" (Doc. # 61, PageID # 1200) (emphasis added, citing *Jones-McNamara*).

The Sixth Circuit has repeatedly affirmed summary judgment on FCA claims where – as here – Plaintiff's belief is either unfounded or based on mere speculation and conjecture. *See Jones-McNamara*, 630 Fed. Appx. at 404 (affirming summary judgment on FCA claim where plaintiff "cannot meet her burden of demonstrating the reasonableness of her belief that Holzer violated the AKS"); *Miller*, 648 Fed. Appx. at 562 (affirming summary judgment on FCA claim where "[plaintiff's] belief that any offer of anything of value violates the FCA is not objectively reasonable,"). Likewise, this Court should grant summary judgment here.

**ii. Allegations of State Fraud Are Insufficient as a Matter of Law to Constitute "Protected Activity" Under the FCA.**

In addition to failing to meet the subjective and objective belief requirements for an FCA retaliation claim, Plaintiff's claim also fails because Plaintiff has failed to identify any "claims" or "cost reports" ***to the federal government*** that he believes were submitted by HRO that could possibly constitute federal fraud.

Sixth Circuit law is well settled that merely being concerned about potential violations of federal law is inadequate to constitute "protected" activity under the FCA. Quite to the contrary, the law is clear that where, as here, an FCA retaliation claim is predicated on an AKS violation, a plaintiff must have a reasonable belief and assert that "**<u>a claim</u> submitted to the government** for reimbursement includes items or services resulting from a violation of the AKS [or] **cost reports** submitted to the government for reimbursement includes an express certification that the underlying **<u>claims</u>** comply with the AKS." *Jones-McNamar v. Holzer Health Sys.*, 630 Fed. Appx. 394, 400 (6th Cir. 2015) (emphasis added); *see also Miller v. Abbott Labs.*, 648 Fed. App. 555, 561

(6th Cir. 2016) (holding that plaintiff must have "a reasonable [belief] that fraudulent Medicare or Medicaid claims **would be submitted to the government** as a result of an AKS violation" to pursue an FCA claim).

No such "claims" against the federal government exist here. Indeed, Plaintiff's sole articulated concern – as evidenced by his letter to the ODH – was to ensure that HRO was following ODH's general reporting requirements. (Cauchon Dep., Ex. 19); (*see also* Cauchon Dep. II, at 36:5-15) (testifying that his concern was whether "there was a violation of the ODH contract"). Plaintiff did not assert in his report to the ODH that there were any fraudulent "claims" being made against the federal government. (*See* Cauchon Dep., Ex. 19). Plaintiff did not assert that that there were any "cost reports" submitted to the federal government for reimbursement that included an "express certification that the underlying claims comply with the AKS." (*Id.*). And, even if Plaintiff thought there was some type of "fraud" occurring, it is beyond dispute that the ODH is a **state agency**, not a federal agency, and therefore beyond the scope of the FCA.

These undisputed facts mandate dismissal. Federal courts routinely dismiss FCA retaliation lawsuits based on alleged AKS violations where, as here, the alleged "whistleblowing" does not concern actual ***claims*** for reimbursement to ***the federal government***. *Fakorede v. Mid-South Heart Ctr., P.C.*, 709 Fed. Appx 787, 790 (6th Cir. 2017) (affirming dismissal of FCA retaliation claim where plaintiff's allegations of purported fraud against a state hospital – and alleged violations of AKS – did not constitute "protected activity" under the FCA); *Accord Steele v. Great Basic Sci, Inc.*, *Steele v. Great Basin Sci., Inc.*, No. 2:16-cv-00628, 2016 U.S. Dist. LEXIS 161818, at *15 (Dist. Utah Nov. 21, 2016) (dismissing FCA retaliation claim where plaintiff did not allege that defendant had "submit[ted] or directly induce[d] claims for payment from the Government," noting that the "Act's focus remains on those who present or **directly induce** the

submission of false or fraudulent **claims**") (emphasis added, citation omitted); *Accord Jones-McNamar v. Holzer Health Sys.*, 630 Fed. Appx. 394, 400 (6th Cir. 2015); *Miller v. Abbott Labs.*, 648 Fed. App. 555, 561 (6th Cir. 2016) (both confirming an alleged FCA violation predicated on the AKS must involve **actual claims** submitted to the federal government). This Court should do the same here.

**iii. Plaintiff Was Neither Placed on Administrative Leave Nor Discharged by HRO for Merely Reporting an Alleged Conflict of Interest.**

Finally, Plaintiff fails to meet his burden to establish the third element required for a prima facie FCA retaliation claim where, as here, there is simply no actual evidence that Plaintiff was placed on paid administrative leave and/or terminated merely because he reported what he believed to be a conflict of interest to the ODH.

*As to his administrative leave,* Plaintiff's report to the ODH was entirely irrelevant. On September 5, 2024, the Board of HRO received multiple complaints (by Ms. Reese and at least two other employees) of hostile work environment and/or discrimination against Plaintiff. (Cauchon Dep. at 231:8-233:4 and Exs. 23-24; Steward Dep., at 38:16-44:4; Turner-Bicknell Decl., Ex. A-1). Upon receiving these complaints, the Board properly initiated an investigation pursuant to HRO's policies. (*See* HRO Handbook, at 6, HRO_000344) (requiring that an investigation be initiated within five (5) business days). Accordingly, there is simply no support for Plaintiff's speculation that he was placed on paid administrative leave because of his report.

*As to his termination*, there can be no genuine dispute that Plaintiff was terminated by the Board at the advice of counsel due to his insubordination. On or around October 9, 2024, after completing her investigation, Attorney Nelson explicitly recommended that the Board terminate Plaintiff due to his volatile and insubordinate behavior, which placed HRO at risk. (*See* Tasha

Decl., Ex. A-10, at HRO_001430) ("Dennis Cauchon should be terminated and removed from the Board. Dennis' behavior clearly warrants termination. We do not see any viable path forward that would create a serious change in Dennis' behavior and attitudes and allow Dennis to remain at HRO in any capacity.").

Further, Plaintiff's termination letter makes clear that it was this insubordination that led to his termination. As set forth in the letter, the bases for his termination were: (1) ignoring the advice of HRO's counsel; (2) ignoring his prior agreement with the Board that HRO would procure legal advice *before* acting; (3) putting HRO at risk of violating equal pay laws; and (4) his insubordination throughout the entire investigative process and while he was on administrative leave. (Cauchon Dep. II, Ex. 31). Thus, there is simply no evidence in which reasonable minds could conclude that Plaintiff was terminated because he tried to report any type of "fraud."

**3. Plaintiff's FCA Claim Fails as a Matter of Law as HRO Had Multiple, Legitimate, Nondiscriminatory Reasons For His Termination.**

In addition to failing to establish a *prima facie* case of FCA retaliation, Plaintiff's claim also fails as HRO has presented several legitimate and non-discriminatory reasons for his termination: (1) the Board hired, and followed, the advice of counsel; (2) Plaintiff was repeatedly insubordinate to the Board; and (3) Plaintiff purposefully obstructed HRO's mission during his paid administrative leave. All of this is beyond dispute.

***First*, *HRO's reliance on the advice of counsel is fatal to Plaintiff's claim*.** It is hard to imagine stronger evidence of a legitimate, nondiscriminatory reason for a Board to terminate an employee than **following the advice of counsel**. It is undisputed that HRO hired counsel to perform an investigation, HRO's counsel recommended Plaintiff's termination, and HRO acted accordingly. (*See* Turner-Bicknell Decl. Ex. A-10, at HRO_1430). Plaintiff's position that the

entire Board of Directors should have *ignored* their attorney in favor of legal analysis from ChatGPT is simply untenable. (*See* Cauchon Dep. II, at 43:2-25) (testifying that the Board should have ignored Ms. Nelon's advice).

***Second, Plaintiff's insubordination is well documented and a reasonable basis for termination.*** Plaintiff does not dispute he refused to comply with the Board's decision to place him on administrative leave. (Cauchon Dep. II, at 13:8-21). Plaintiff does not dispute that he would not cooperate with the investigation against him (and did not sit for an interview with Attorney Nelson). (*See, e.g., Id.* at 13:2-7). Plaintiff does not dispute that he repeatedly attempted to insert himself into the Board's affairs and demanded information relating to the ongoing investigation against him. (*See, e.g.*, Turner-Bicknell Decl., Exs. A-2 through A-9, and A-12; Cauchon Dep. Exs 29 and 30). Plaintiff does not dispute that he continued to contact HRO's funders – including the ODH – during his administrative leave even after he was told to cease and desist. (Cauchon Dep. 235:25-236:12 and Ex. 25). And Plaintiff does not dispute that he made statements to the effect he was going to "assert his power" against the Board. (Turner-Bicknell Decl., Ex. A-7).[7] These actions – even standing alone – each provide a reasonable basis to terminate the employment of a rogue president. Put together, they provide overwhelming support for the Board's decision to end his employment.

***Third, Plaintiff's obstruction of HRO's mission is well documented and a reasonable basis for his termination.*** Perhaps the greatest justification for terminating Plaintiff is when he became a direct threat to HRO's mission itself. It is beyond dispute that Plaintiff openly defied

---

[7] Cauchon testified that he believes he used the word "authority" instead of "power." (Cauchon Dep. II, at 26:23-27:19). He does specifically recall, however, informing the Board that he had no intention of relinquishing control. (*Id.* at 27:16-19).

the Board's direction to "cease and desist" communications with HRO's funders (including the ODH), attempted to block HRO's access to its own financial accounts, and changed the locks on the supply room at HRO's office. (HRO at 22:16-24:6). These actions simply had no justification.

***Finally***, Plaintiff simply has no evidence that any of these proffered reasons are "pretextual." The only way for Plaintiff to overcome these legitimate, nondiscriminatory reasons for his termination is to show, for each reason, that they: "(1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) were insufficient to motivate the employer's action." *Harris v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010).

He cannot do so here. Plaintiff's contention that Attorney Nelson investigation was somehow a pretextual "sham" against him merely because Mr. Steward and Ms. Nelson had a prior social friendship, (*see* Cauchon Dep. II, at 101:17-102:7), is simply insufficient as a matter of law to overcome summary judgment. The Sixth Circuit has repeatedly held that "a nonmoving party cannot create a genuine issue of fact through 'mere speculation, conjecture, or fantasy.'" *Thompson I.G., LLC v. Edgetech I.G., Inc.*, 590 Fed. App'x 532, 537 (6th Cir. 2014) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). It is further well settled that "temporal proximity cannot be the sole basis for finding pretext[.]" *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015). As Plaintiff has no evidence beyond speculation that Ms. Nelson's 37-page report was a "sham," he cannot meet his burden to prove that any of these reasons are "pretextual" and Defendants are entitled to judgment as a matter of law. *See White v. FCA US LLC*, 2026 U.S. Dist. LEXIS 53953, at *26-27 (granting summary judgment where employer had legitimate, nondiscriminatory reasons for plaintiff's termination by failing to return to work); *Buggs v. FCA US, LLC*, 2023 U.S. App. LEXIS 1591 (6th Cir. 2023) (affirming summary judgment where

employer had a legitimate, nondiscriminatory reason in terminating plaintiff based on the belief he had altered an FMLA form).

**4. At Minimum, Plaintiffs' Retaliation Claims Against the Individually-Named Defendants Fail as a Matter of Law as They Were Not Plaintiff's Employers.**

Alternatively, if any FCA retaliation claim survives, the individually named Defendants Tasha Turner-Bicknell, Dwayne Steward, and Billy Golden must nonetheless be dismissed as they were not Plaintiff's "employers" as a matter of law.

The overwhelming majority of courts – including several in this circuit – have readily concluded that the anti-retaliation provision of the FCA is entirely inapplicable to individual defendants and/or supervisors. *See, e.g.*, *Roberto v. Kent State Univ.*, No. 5:16-cv-1305, 2017 U.S. Dist. LEXIS 45509, 2017 WL 1155563, at *2-3 (N.D. Ohio Mar. 28, 2017) (collecting cases) ("This Court joins the growing majority of courts and concludes that the anti-retaliation provision of the [FCA] does not permit a cause of action against individual supervisors."). *See also Georgandellis v. Holzer Clinic, Inc.*, No. 2:08-cv-626, 2009 U.S. Dist. LEXIS 47334, 2009 WL 1585772, at *7 (S.D. Ohio June 5, 2009) (granting motion to dismiss FCA retaliation claim against the individual defendants because they were never the plaintiff's employer); *Mehlman v. Cincinnati Children's Hosp. Med. Ctr.*, No. 1:20-cv-813, 2021 U.S. Dist. LEXIS 152162, at *15-16 (S.D. Ohio Apr. 26, 2021) (dismissing FCA retaliation claim against individually named defendants).

Here, there is no dispute that the three individually named Defendants were simply Board members. (Cauchon Dep. at 38:17-44:14). Accordingly, they were not Plaintiff's "employer" as a matter of law and any FCA retaliation claim against them must fail.

### B. Plaintiff's Claims for Declaratory Judgment Fails for Lack of a Justiciable Controversy and Because HRO's Actions Substantially Complied with HRO's Policies and Ohio Law.

Plaintiff's second claim seeks to nullify his termination as President and as an alleged Board Member of HRO on pure procedural grounds. (*See* Compl. ¶¶ 183-85). Although Plaintiff asks the Court to nullify "all board meetings" since September 5, 2024, the only actual justiciable controversy that he identifies is whether his "termination and removal … as President of HRO and board member [were] proper[.]" (*Id.* at ¶ 184).

Thus, before the Court is only the validity of *three* actions by the Board: (1) Plaintiff being placed on paid administrative leave on September 5, 2024; (2) the October 27, 2024, board meeting (attended by Plaintiff) in which he was removed as an *alleged* "board member"; and (3) the Board's unanimous action in writing on November 4, 2024, terminating Plaintiff. Any request to "nullify" any board meeting other than those addressing his suspension and/or termination must be denied on its face for lack of a justiciable controversy. *City of Parma v. Cingular Wireless, LLC*, 278 Fed. Appx. 636, 641 (6th Cir. 2008) (holding a justiciable controversy is a requirement for summary judgment).

As to the three actions identified above, all actions taken by the Board were valid under Ohio law and Plaintiff's claims must be dismissed.

#### 1. Plaintiff's Claim for Declaratory Judgment as to the Validity of His Administrative Leave Fails as a Matter of Law Due to a Lack of a Justiciable Controversy.

At the outset, Plaintiff's claim for declaratory judgment as to the validity of his paid administrative leave is easily dismissed. (*See* Compl., ¶ 185, bullet point one). Put simply, the validity of Plaintiff's administrative leave has been mooted by the subsequent termination of his employment by HRO. He is no longer "suspended" and, therefore, a declaratory judgment on an

issue of law that is now moot is precluded under both the Ohio and Federal Declaratory Judgment Acts.

It is well settled one of the threshold requirements for a declaratory judgment (whether arising in state or federal law) is that Plaintiff must demonstrate "there is a substantial controversy, between parties having adverse legal interests, **of sufficient and reality to warrant the issuance of a declaratory judgment**." *City of Parma v. Cingular Wireless, LLC*, 278 Fed. Appx. 636, 641 (6th Cir. 2008) (emphasis added). Notably, "[a] court looks not to whether the parties once satisfied the requirement, but whether there is an *existing case* or controversy." *Id.* (emphasis in original) (citing *Midwest Media Prop., LLC v. Symmes Twp.*, 503 F.3d 456, 460 (6th Cir. 2007) ("Even when an action presents a live case or controversy at the time of filing, subsequent developments … may moot the case.").

Here, it is undisputed that Plaintiff's suspension came to an end prior to the filing of this lawsuit when his administrative leave was ended, and he was terminated as the President of HRO, on November 4, 2024. (Cauchon Dep. II, Ex. 31). It is further well settled that Plaintiff is not entitled to an advisory opinion on a moot issue. *Niepsuj v. Giulitto*, No. 20-3077, 2020 U.S. App. LEXIS 34657, at *4 (6th Cir. Nov. 2, 2020) (holding that, where an issue was moot, "a declaratory judgment would be nothing more than an impermissible advisory opinion.") (citing *Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 715 (6th Cir. 2011) ("The 'case or controversy' requirement prohibits all advisory opinions . . . .")).

As Plaintiff is not currently on administrative leave – and he is not seeking any damages relating to his administrative leave (as he was paid for the full duration) – the claim is moot and fails as a matter of law. *Id*,

**2. Plaintiff's Claim for Declaratory Judgment as to His Removal as an Alleged Board Member Fails As The Board Substantially Complied with HRO Bylaw's Notice Requirements.**

Next, Plaintiff seeks to invalidate the HRO Board's unanimous decision to remove him as an "alleged"[8] board member on pure procedural grounds, claiming that the October 27, 2024, board meeting was "improperly noticed" because the meeting was scheduled twelve (12) days in advance rather than fourteen (14). (*See* Compl., ¶ 185, bullet point two).[9] This claim also fails as a matter of law as the Board substantially complied with HRO Bylaw's notice requirements.

It is well settled Ohio follow a "substantial compliance" standard when determining an organization's compliance with its own organizational documents. *See, e.g., Robb v. Chagrin Lagoon Yacht Club*, 75 Ohio St.3d 264, 268 (1996) (holding that the "substantial compliance" standard applies where the case concerns private governance documents and not due process rights afforded under the U.S. Constitution); *Resnick v. Camp Tuscazoar Found.*, 1997 Ohio App. LEXIS 3973, at *4 (Ohio Ct. App. 1997) (applying "substantial compliance" standard to the validity of a non-profit's removal of one of its members); *accord State ex rel. Jones v. Bd. of Educ. Of the Dayton Pub. Schs.*, 2018-Ohio-676 (Ohio Ct. App. 2018) (applying a "substantial compliance" standard to notice requirements for special educational board meetings); *Stuble v. Board of Education of the Cuyahoga Valley Joint Vocational Sch. Dist.*, 1982 Ohio App. LEXIS 13318 (Ohio Ct. App. 2006) (same); *Cherry Lane Dev., LLC v. Walnut*, 2012-Ohio-3559 (Ohio Ct. App.

---

[8] Despite his allegations, Plaintiff has not identified any HRO board meeting minutes, nor has HRO found any, that demonstrate Plaintiff was elected or re-elected to the Board after he became President and a paid employee of HRO.

[9] Plaintiff does not contest that the Board has authority under the HRO ByLaws to remove him. (Cauchon Dep. at 60:12-17) ("[Y]es, for any reason"); (*see also Id.*, Ex. 1, Article III, Section 8) ("A board member may be removed for other reasons by a three-fourths vote of the remaining directors.").

2012) (applying "substantial compliance" standard to notice requirements for "nonlegislative bodies"). Accordingly, "strict compliance" with an organization's bylaws are not required where, as here, the purpose of the underlying requirements are fulfilled. *See generally Id.*

Here, it is undisputed that: (1) Plaintiff **requested** the meeting, (2) Plaintiff received **actual** notice of the meeting twelve (12) days in advance, (3) Plaintiff **appeared** at the meeting, (4) Plaintiff was given the unfettered opportunity to **speak and plead his case** at the meeting; and (5) **all board members except one**[10] attended the meeting. (Cauchon Dep. II, at 20:25-23:21); (Steward Dep., Ex. 6) (confirming notice and link sent on Oct. 15, 2024); (Turner-Bicknell Decl., Ex. A-11) (board meeting minutes confirming board members' attendance and memorializing Plaintiff's statements).

The obvious intent of a "notice" requirement for board meetings is to ensure that each board member can attend. Plaintiff himself admits that this is the purpose of the 14-day notice requirement. (Cauchon Dep. at 35:2-7) (admitting that the purpose of the 14-day notice provision "is to give the board members sufficient time in order for them to be able to attend the meeting"). That purpose is fulfilled where – as here – it is undisputed that the board provided their availability and all but one member *did* intend the meeting at issue. Ohio courts have routinely held that purported "procedural defects" will not invalidate the results of board meetings where – as here – the alleged non-compliance could not have changed the results of the meeting had it occurred differently. *Resnick v. Camp Tuscazoar Found.*, 1997 Ohio App. LEXIS 3973, at *4 (upholding validity of board vote to remove plaintiff holding that, even if one member's vote technically "violated the by-laws," the vote would have nonetheless passed and the claimed procedural defect

[10] Board Member Molly True did not attend the Board meeting. However, as the Board decision was unanimous, her absence did not affect the outcome of the Board's vote.

would not have changed the results). This Court should hold the same here and deny Plaintiff's request for declaratory relief.

**3. Plaintiff's Request for Declaratory Relief Contesting The Validity of His Termination on Procedural Grounds Fails as Ohio Law Expressly Authorizes the Board to Take Actions by Written Unanimous Consent.**

Next, Plaintiff also contests the validity of his termination on procedural grounds but does not set forth in the Second Amended Complaint his basis for doing so. (*See generally* Compl. ¶¶ 185, bullet point three) (generically alleging that the Board's actions in terminating him were "invalid under HRO's Bylaws, Ohio law, and Federal law"). In his deposition, Plaintiff could not coherently articulate the basis for this claim. (*See generally* Cauchon Dep. II, at 31:21-34:21). Nonetheless, despite claiming "he didn't know" the law, he appeared to take the position that: (1) he can ***only be fired*** through a Board meeting, which required his attendance; and (2) he ***could not be terminated*** without him signing his own termination letter because he was a purported "board member." (Cauchon Dep. II, at 31:21-34:21) (*see also Id.* at 106:11-13 (testifying he would have to sign his own termination letter for it to be effective). Neither of these statements are correct under Ohio law.

***First***, it is beyond dispute that the board can act without a meeting through a unanimous action in writing. *See* R.C. 1702.25 (providing that the board is authorized to take an action without a meeting through a writing signed by "all of the directors … who would be entitled to notice of a meeting for that purpose"). It is further beyond dispute that Plaintiff's termination letter was signed by all board members entitled to a vote. (Cauchon Dep., Ex. 31). Nothing more is required by Ohio law.

***Second***, Plaintiff's contention that he could not be fired without him actually casting a vote on his own termination is nonsensical and without support. Plaintiff was not a board member – in

any scenario – as of November 4, 2024. (*See supra* Section III(B)(2)). Thus, he could not have "gridlocked" the Board by refusing to sign his own termination letter even if he wanted to.

However, even if he *was* an alleged board member as of November 4, 2024, the action in writing is nonetheless valid, as he would not be entitled to notice of a meeting – or a vote – as to his own termination. It is well settled that "R.C. 1702.30 imposes fiduciary duties on a nonprofit corporation's board of directors." *Tuttle v. Collins*, 2020-Ohio-4062, ¶ 29 (Ohio Ct. App. 2020) (citation omitted). One of the duties imposed upon a director by operation of law is the duty of loyalty. *Id.* Ohio courts have held that the duty of loyalty is breached when a "director places **himself in a position of conflicting loyalties and subsequently violates his primary obligation to the corporation**[.]" *Id.* (quoting *Stepak v. Schey* 51 Ohio St.3d 8, 14, 553 N.E.2d 1072 (1990) (emphasis added)). Where, as here, a director "[has] a conflict of interest relating to a proposed transaction," they have a fiduciary duty to "**abstain from participating in the board's consideration**[.]" *In re Tri-Star Pictures Litig.*, 1995 Del. Ch. LEXIS 27, at *10 (Del. Ct. App. 1995) (emphasis added). Thus, *even if* Plaintiff was an alleged board member, he was neither entitled to notice of a meeting – or a vote – on his own termination as President.

As applied here, there can be no dispute that Plaintiff had a conflict with respect to voting on his own termination. The term "conflict of interest" has been defined as "a real or seeming incompatibility between one's private interests and one's public or fiduciary duties." *Tuttle v. Collins*, 2020-Ohio-4062, at ¶ 29, n. 3 (Ohio Ct. App. 2020). Plaintiff was certainly not a disinterested party when voting on his own termination for a paid position with a non-profit organization. Accordingly, he would have been required to abstain from voting on the issue and there is no basis for seeking declaratory judgment contesting the validity of the Board's unanimous decision.

**4. Plaintiff's Request for Declaratory Relief on the Basis of "Retaliation" is Duplicative of his FCA and State Law Claim(s) and Must Be Dismissed.**

Plaintiff's third request for declaratory relief on the basis that the Board "retaliated" against him in violation of Ohio and/or federal law is easily denied. It is well settled that declaratory judgment is appropriate typically only "before an injury-in-fact has occurred." *Krawczyszyn v. Columbian Life Ins. Co.*, S.D. No. 1:21-CV-85, 2021 U.S. Dist. LEXIS 121711, at *4 (S.D. Ohio June 30, 2021) (citing *National Rifle Ass'n*, 132 F.3d 272, 279). While courts have discretion to decide whether to entertain a declaratory judgment action, they typically deny declaratory judgment when that request is duplicative and redundant with other claims and remedies sought in the litigation. *See Jerome-Duncan, Inc. v. Auto-By-Tell, LLC*, 176 F.3d 904, 908 (6th Cir. 1999) ("it is clear in the present case that declaratory judgment would be redundant with the relief already sought for breach of contract"); *McGlone v. Centrus Energy Corp.*, 2020 U.S. Dist. LEXIS 135784, at *16 (S.D. Ohio July 31, 2020) (dismissing claim for declaratory judgment as duplicative of plaintiff's claim for breach of contract); *Waldren v. Allstate Vehicle & Prop. Ins. Co.*, 2020 U.S. Dist. LEXIS 159161, at *9 (S.D. Ohio Sept. 1, 2020) (same); *Transworld Delivery, Inc. v. Fleurop Interflora*, 261 F.Supp.2d 837 (E.D. Mich. 2003) (same); *Pakideh v. Ahadi*, 99 F. Supp. 2d 805, 809 (E.D. Mich. 2000) (same). Here, there is no need for this Court to entertain a declaratory judgment action to determine whether "the Board of Directors' suspension and termination of Mr. Cauchon" violated state and/or federal law," as Plaintiff is already asserting direct claims for the exact same suspension and termination here. (*See* Compl, Count I). Accordingly, Plaintiff's claim for declaratory judgment is duplicative of his FCA claim and must be dismissed as a matter of law.

## IV. CONCLUSION

Plaintiff's claims simply cannot withstand summary judgment. It is beyond dispute that Plaintiff was not engaged in a protected activity, there were multiple, independent and legitimate reasons for his termination, and HRO substantially complied with its bylaws in properly terminating Plaintiff. Plaintiff's repeated assertions that HRO's counsel's 37-page report was somehow a "sham" is baseless speculation and conjecture that warrants no consideration by the Court. Accordingly, Defendants are entitled to judgment as a matter of law on all counts of Plaintiff's Complaint.

Respectfully submitted,

*/s/ Steven A. Chang*

Steven A. Chang, Esq. (Trial Attorney) (0088321)
Melvin J. Davis, Esq. (0079224)
Mrinali Sethi, Esq. (0101295)
Reminger Co., L.P.A.
200 Civic Center Drive, Suite 800
Columbus, Ohio 43215
(614) 228-1311; FAX: (614) 232-2410
mdavis@reminger.com
schang@reminger.com
msethi@reminger.com

*Counsel for Defendants Dwayne Steward, Raina (William) Golden and Tasha Turner-Bicknell*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and that said filing will be served via the Court's CM/ECF system upon Plaintiff, *pro se*, and all counsel of record.

*/s/ Steven A. Chang*
Steven A. Chang (0088321)