LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

**Privileged and Confidential**

**Attorney-Client Privilege**

**Attorney Work Product**

To: Board of Directors of Harm Reduction Ohio ("**HRO**")

From: Maritza S. Nelson, Law Office of Maritza S. Nelson, LLC

Date: October 9, 2024

Re: HRO's internal investigation of alleged conflicts of interest, hostile work environment and retaliation claims

---

## Table of Contents

***I. BACKGROUND*** ........ **2**

***II. INVESTIGATIVE ACTIVITIES*** ........ **2**

*A. Scope of Investigation* ........ 2

*B. Witnesses Interviewed* ........ 3

*C. Materials Reviewed* ........ 4

***III. FACTUAL FINDINGS*** ........ **6**

*A. Timeline* ........ 6

*B. Amanda Lynn's Alleged Conflict of Interest* ........ 10

*C. Dennis' Retaliation Claim* ........ 17

[redacted]

***IV. LEGAL CONCLUSIONS*** ........ **26**

*A. AmandaLynn's Alleged Conflict of Interest* ........ 26

[redacted]



Sophisticated Legal Counsel for Serious Entrepreneurs
www.msnlawoffice.com

EXHIBIT A-10

HRO_001398

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

*E. Retaliation* .......... *30*

***V. RECOMMENDATIONS* .......... *32***

[redacted]

*B. Personnel Recommendations* .......... *33*

[redacted]

## I. BACKGROUND

HRO retained the Law Office of Maritza S. Nelson, LLC ("**MSN Law Office**") to conduct an internal investigation of:

- a potential conflict of interest accusation made by HRO's Founder and Executive Director, Dennis Cauchon[1], against AmandaLynn Reese, HRO's Chief Program Officer;

[redacted]

The purpose of the internal investigation is to provide legal advice to HRO. HRO initiated the investigation because Dennis reported the alleged conflict of interest to the Ohio Department of Health ("**ODH**"), a major funder of HRO, without conducting a formal investigation and against the Board's advice and guidance. Following Dennis' report to ODH, Dennis unilaterally placed AmandaLynn on administrative leave. AmandaLynn then submitted her formal grievance to the Board, and similar complaints soon followed from Kelsey, Molly and Shae. HRO anticipated litigation at the time it retained counsel.

## II. INVESTIGATIVE ACTIVITIES

### A. Scope of Investigation

On or about September 13, 2024, HRO retained MSN Law Office to conduct this internal investigation. No representative of HRO reviewed or edited this report. The report represents the independent opinions of Maritza S. Nelson, Esq. and their colleagues. In addition to Maritza S.

[1] Because everyone within the organization operates on a first name basis, we will refer to HRO employees and board members by their first names throughout this report to avoid any confusion.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

Nelson, Esq., the MSN Law Office team included James Douglas.[2] The MSN Law Office team spent approximately 95 hours conducting the investigation and preparing this report.

Counsel reached the conclusions set out herein at the end of an extensive and thorough investigation, and based them on the totality of the evidence collected and reviewed. Counsel investigated all matters they believe were relevant to reaching their conclusions.

HRO did not impose any constraints on the investigation and provided its full cooperation. HRO provided access to all relevant materials counsel requested. HRO implemented a litigation hold on or about September 17, 2024. The litigation hold applied to all board members and employees who might have information relevant to the investigation, including any emails, records of phone calls or text messages, HR policies, personnel files, and agreements. Counsel was able to request to interview any relevant individual for any amount of time.

**B. Witnesses Interviewed**

We interviewed the following individuals:

| No. | Name | Date of Interview | Title |
|---|---|---|---|
| 1. | Kelsey Caitlin (Bates) | 9/18/24 | Regional Coordinator / Black Community Strategy Director |
| 2. | Patrick Bourland | 9/19/24 | Regional Coordination / Interim Operations Manager |
| 3. | Molly Fantini | 9/20/24 | Naloxone Distribution and Social Media Manager |
| 4. | Abby Spears | 9/23/24 | Southeast Regional Coordinator |
| 5. | Kyle Johnston | 9/23/24 | Regional Distributor / Black Community Strategy Specialist |
| 6. | Cecile Katz | 9/25/24 | Administrator |
| 7. | Jen Phillips | 9/25/24 | Financial Manager |
| 8. | Chris Hawkins | 9/26/24 | Former Volunteer |

[2] Mr. Douglas is an unlicensed-JD working under the supervision of Maritza S. Nelson, Esq. while awaiting the results of the July 2024 Ohio bar exam.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

| | | | |
|---|---|---|---|
| 9. | AmandaLynn Reese | 10/2/24 | Chief Program Officer / Director of Programming |

On September 17, 2024, MSN Law Office requested to interview former employee Shae Dalrymple about her complaint, but to-date, she has not responded. Similarly, on September 20, 2024, MSN Law Office requested Dennis Cauchon to schedule an interview about his complaint and the allegations against him, but to-date, he has not responded or otherwise scheduled an interview. On September 24, 2024, MSN Law Office received a letter from David Martin, an attorney representing Dennis with respect to his alleged membership on the Board. While Attorney Martin did not indicate that he was also representing Dennis with respect to this employment investigation, ethically, we have not made any further attempts to secure Dennis' cooperation.

**C. Materials Reviewed**

Counsel collected and reviewed a broad range of materials during the course of the investigation, including the following:

- July 25, 2023 HRO application for the ODH Naloxone distribution contract
- October 27, 2023 Mandatory Use Contract For: Statewide Naloxone Mail Order & Lay Distributor Network
- July 18, 2024 emails between Dennis and Cecile re AmandaLynn and conflict policy
- July 23-24, 2024 emails between Dennis and AmandaLynn
- July 30, 2024 emails between Dennis and Cecile regarding changes to the employee handbook
- July 31, 2024 Memorandum of Agreement between HRO and the Ohio Department of Administrative Services regarding renewal of the ODH naloxone distribution contract
- August 8, 2024 emails from Cecile to the HRO staff sending them the "updated (and shortened) version of the HRO Employee Handbook" and asking staff to read and sign the new conflict of interest policy (sharing the Google form link) and fill out the new conflict of interest disclosure form (also via Google forms)
- August 15-16, 2024 emails between Dennis and Cecile re "A few Friday things"
- August 16, 2024 email from Tasha Turner-Bicknell (a Board member) to Dennis and the HRO Board re "Board Discussion – concerns and questions"
- August 19-20, 2024 emails between Dennis and Dwayne Steward (acting Board chair) re Conflict of interest form
- August 20, 2024 email from Tasha to Dennis and the HRO Board expressing concerns with only one person (presumably Dennis) deciding whether a conflict of interest exists rather than the Board making the decision

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

- August 22, 2024 email from Cecile to HRO staff (cc'ing Dwayne) instructing the staff to disregard the August 23 deadline to complete the conflict of interest disclosure form.
- August 22-30, 2024 emails between AmandaLynn and Brittany Burns at ODH re a large naloxone order in advance of Save a Life Day. On August 30, Dennis forwarded these emails to Dwayne "To keep you up to date on AmandaLynn's role in ordering Kloxxado."
- August 26, 2024 emails between Dennis and David Ball re "Harm Reduction Ohio – thanks for representing us"
- August 29, 2024 emails between Dennis and the Board re "Next board meeting . . . employee handbook, conflict form"
- August 29, 2024 email from Dennis to Dwayne proposing that HRO maintain the status quo while the ODH contract is "nearing renewal"
- August 29, 2024 emails between Dennis and the staff announcing the renewal of the ODH contract
- August 29, 2024 letter from DAS to Dennis regarding the renewal of the naloxone distribution contract
- August 30, 2024 emails between AmandaLynn and Cecile (with Dennis cc'd) recapping a meeting
- August 31, 2024 emails between Dennis and Dwayne re AmandaLynn meeting
- September 2, 2024 emails between Dennis and Cecile re "Conflict of interest advice from Chat GPT" with "chat" attached
- September 3, 2024 letter from Dennis to ODH and related emails Dennis sent to the Board
- September 3, 2024 emails between Dennis, Cecile and ODH employees re Dennis' conflict disclosure letter
- September 3, 2024 letter from Dennis to AmandaLynn (sent via email from Cecile) to "formalize" the decision to place AmandaLynn on leave, along with subsequent emails between Cecile and AmandaLynn
- September 4, 2024 Grievance Formal Complaint Regarding Retaliation and Hostile Work Environment (email from AmandaLynn to board members Billy Golden and Dwayne Steward, including a statement from Mallory Bolen, AmandaLynn's former supervisor)
- September 4, 2024 email from Dennis to Dwayne, Attorney Ball, and Cecile asking everyone to review a proposed disclosure request that Dennis wanted to send to Amanda Lynn the next day.
- September 5, 2024 Letter of Concern Regarding the Behavior and Actions of the President of Harm Reduction Ohio (email from Kelsey to Dwayne and Billy) and attached letter
- September 5, 2024 Email from Dwayne to Dennis (cc'ing Billy) re Cease and Desist

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

- September 5-6, 2024 Emails re Update Regarding Harm Reduction Ohio Leadership between the Board and HRO Staff
- September 6, 2024 Email complaint from former employee Shae re Dennis and HRO
- September 6, 2024 Emails between the Board and Dennis re "Formal request for details on allegations made against me" and re "Contractual obligation to inform ODH you took the web site [*sic*] down"
- September 9, 2024 Emails between Anne Trinh (Board member) and Juan Devis (web developer)
- September 10, 2024 Email from volunteer Christopher Hawkins
- September 10, 2024 Email from the Board to Kelsey and Molly letting them know the Board decided to honor Patrick's interim promotion
- September 11, 2024 emails from the Board to HRO staff
- Undated Conflict of Interest statement submitted to ODH certifying no HRO staff had a conflict of interest with respect to the naloxone distribution project
- Portions of the 2022 HRO Employee Handbook (the most recent version that was actually approved by the Board and acknowledged by staff) and available job descriptions
- AmandaLynn's resume
- AmandaLynn's written testimony to the Maryland legislature
- AmandaLynn's draft conflict disclosure response

Counsel did not receive, and was therefore unable to review:

- Abby's recording of the September 5 staff meeting at which Dennis announced AmandaLynn's leave. Abby has offered to provide the recording, but to date, she has not done so. Nevertheless, everyone's account of that staff meeting has been fairly consistent.

## III. FACTUAL FINDINGS

### A. Timeline

October 27, 2023

- HRO was initially awarded a contract by the state to setup a Naloxone mail order and distribution network.

July 17, 2024

- Dennis had a conversation with AmandaLynn about her work for Velocity and the potential conflict of interest.

July 23, 2024

- Dennis emailed AmandaLynn: "Don't forget to let me know what you decided."

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

August 8, 2024

- Cecile sent emails to the HRO staff with a new HRO employee handbook and asking them to sign a new conflict of interest policy and fill out the new conflict of interest disclosure form, both via Google forms, by August 23.

August 16, 2024

- Tasha Turner-Bicknell emailed Dennis and the Board requesting that a Board meeting take place the following week to discuss the conflict of interest form Dennis had created. All employees were being asked to sign the form, but the Board had neither seen it nor approved it.

August 22, 2024

- Cecile sent the HRO staff an email instructing them to disregard the August 23 deadline to complete the new conflict of interest disclosure form so that "HRO and its Board of Directors" could "update the form."

August 26, 2024

- Dennis sent an email to Attorney David Ball confirming his representation of HRO. Specifically, Dennis asked Attorney Ball to review HRO's new employee handbook, conflict of interest policy, and conflict reporting form.

August 29, 2024

- Dennis sent an email to the Board confirming HRO's hiring of Attorney Ball. He also stated that Attorney Ball's review would take at least 30 days.
- In a separate email to Dwayne and Cecile (2:34pm), Dennis proposed that HRO maintain the status quo while HRO pursued funding from the SOS 4.0 grant and renewal of the ODH contract. "The handbook and conflict issue is unlikely to be resolved" before HRO applies for the SOS 4.0 grant funds. "I suggest we prepare the grant application assuming the status quo, i.e., existing employees in existing roles." Regarding the renewal of the ODH contract, "There is nothing directly involving specific staff or policies in the renewal. However, to the extent it may be an issue, I recommend we proceed with the status quo." He also suggested that he and Cecile speak with AmandaLynn the following week "and apprise her of this: specifically, the status quo will hold until the handbook and conflict review is completed."
- Later that day (4:16pm), Dennis sent an email letting everyone know that HRO's contract renewal with the state was finalized that afternoon. "This contract renewal gives HRO's naloxone program – and your jobs – a strong level of security through September 30, 2026 – and we hope beyond."

August 30, 2024

- Cecile sent AmandaLynn an email to "send a quick written recap of what was said regarding how HRO is moving forward." Cecile confirmed that a lawyer was reviewing

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

HRO's new employee handbook along with the new conflict of interest policy and disclosure form and that the Board would review and edit the documents and then approve. Following Board approval, employees would be given the documents to read, fill out and sign and then HRO would follow a process approved by the Board to assess any potential conflicts. "In the meantime, all your duties stay the same as they have been" (emphasis in original).

August 31, 2024

- Dennis sent an email to Dwayne (cc'ing Cecile) with the subject line "AmandaLynn meeting." Dennis stated, "The meeting went OK. I think we all understand things are status quo until the lawyer finishes his review."

September 2, 2024

- Dennis sought legal advice from Chat GPT regarding AmandaLynn's alleged conflict.

September 3, 2024

- Dennis, acting on his own and without Board approval, sent a letter to ODH alleging that AmandaLynn had a significant conflict of interest with respect to the naloxone distribution contract with ODH.
- Dennis notified the Board that he had made this report to ODH and briefly reported on his subsequent conversations with ODH.
- Dennis met with Molly and Patrick and informed them of his decision to place AmandaLynn on leave.
- Dennis (through Cecile) sent a letter to AmandaLynn to "formalize" the decision to place her on paid leave "while a review is conducted of a potential conflict caused by your outside employment."

September 4, 2024

- AmandaLynn sent the Board an email "Grievance Formal Complaint Regarding Retaliation and Hostile Work Environment." AmandaLynn's complaint also included a statement from Mallory Bolen regarding AmandaLynn's role at Velocity BioGroup ("**Velocity**").
- Dennis sent an email to Dwayne, Attorney Ball, and Cecile asking everyone to review a proposed disclosure request that Dennis wanted to send to Amanda Lynn the next day. The draft disclosure request instructed AmandaLynn to provide detailed information related to "potential conflicts of interest you may have or have had regarding your outside employment" by no later than 5pm on September 9. The letter also instructed her to "prioritize full disclosure related to your work as Director of Government Advocacy for Velocity BioGroup." In a subsequent email, Dennis proposed a timeline for reviewing any information received from AmandaLynn. According to his proposed timeline, Dennis would make a decision on AmandaLynn's conflict by September 13 and inform



Sophisticated Legal Counsel for Serious Entrepreneurs
www.msnlawoffice.com

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

AmandaLynn and the Board. Then, on September 15, the Board could meet to discuss the conflict report and Dennis' decision.

- Attorney Ball responded with the suggestion that AmandaLynn should be interviewed instead of being sent a disclosure form. His concern was that the form's request for documentation and other detailed questions might be more than AmandaLynn was willing to comply with. And if she resigned rather than providing details, HRO would be left "in a difficult situation . . . [o]ne in which HRO knows generally about a conflict but very little detail. The lack of detail might bother HRO's funders." He also explained that an interview is the more typical approach when investigating potential employee misconduct. In response, Dennis asked if the interview should be conducted by Attorney Ball.
- When Attorney Ball responded with suggestions for who might conduct the interview, suggesting that perhaps it should not be Denis if there is "tension" between Dennis and AmandaLynn, Dennis responded that an interview was no longer necessary: "The truth is the information known now from public information is more than enough for ODH to believe [AmandaLynn] can't be involved in the naloxone contract or program. So we don't really need more information. The contract with the Kloxxado lobbying firm + her position ordering Kloxxado is in itself a prohibited conflict that cannot be cured."
- In another email response, Dennis insisted that the "conflict itself is determining, not whether it affected decision-making." Further, "The conflict has gone through the first four staff layers of review. All consider it a serious and prohibited conflict."[3] And Dennis pressed for a "quick resolution . . . because we are applying for $500,000+ from the same funders on Sept. 23 and a closed conflict case/with mitigation plan in place is better than an open case."

September 4 or 5, 2024

- Dennis met with the HRO staff to explain his decision to put AmandaLynn on leave and his decision to notify ODH. Dennis also promoted Patrick to Naloxone Distribution Manager, a position already held by Molly. Patrick's promotion included a raise from $21 to $28 per hour, which was more than Molly was earning ($23/hr) in the same position.

September 5, 2024

- Kelsey emailed Dwayne and Billy "Letter of Concern Regarding the Behavior and Actions of the President of Harm Reduction Ohio" attaching her own statement about Dennis' behavior at HRO. Kelsey also expressed interest in "any guidance or advice on forming a union," as well as her plans to reach out to a state representative and the staff.
- The Board held an emergency meeting and voted to place Dennis on administrative leave. Among other reasons, the Board determined that Dennis' letter to ODH included lies and inaccuracies that placed nearly $1 million in funding in jeopardy.

---

[3] We have not been able to determine what Dennis meant by "four staff layers of review" or who considered AmandaLynn's work a serious conflict other than Dennis himself.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

- Dwayne sent Dennis a cease-and-desist email letting Dennis know that the Board had received several staff complaints and instructing Dennis to stop communicating with funders, staff and community partners.
- The Board sent an email to the HRO staff informing them that Dennis had been placed on administrative leave.

September 6, 2024

- Shae sent an email complaint to the Board regarding her experiences with Dennis.
- Molly replied to the Board's September 5 email "to let you know what I've experienced and observed in the past week."
- On or around this date, the HRO website went down, briefly preventing the organization from taking any naloxone orders.[4]
- Dennis changed Patrick's new title from Naloxone Distribution Manager to Interim Operations Manager.

**B. Amanda Lynn's Alleged Conflict of Interest**

HRO's 2022 employee handbook includes a conflict of interest policy requiring employees "to conduct business according to the highest ethical standards." The policy requires the disclose of possible conflicts and defines a "potential or actual conflict" as a situation in which "an employee is able to influence a decision that may result in a personal gain for the employee or an immediate family member . . . as a result of the agency's business dealings."

HRO's policy goes on to permit outside employment and other activities outside of working hours as long as such activities do not "interfere with" the employee's job performance or "create a conflict of interest." Most relevant to this situation, the policy prohibits outside activities that:

- Involve organizations that are doing or seek to do business with HRO, including actual or potential vendors or customers
- Violate provisions of law or HRO's policies or rules

Despite this, Patrick told us that he did not think HRO ever had a concrete or "appropriately shared" conflict of interest policy or any procedures for responding to allegations that a conflict of interest existed. Molly stated that she was not aware HRO had any kind of conflict of interest policy until August of this year when the staff received an email saying they needed to disclose any potential conflicts. (Cecile subsequently told the staff to disregard this email.) Kye also told

[4] Juan Devis, the website developer who had been working with Dennis, determined that the HRO website was "redirected" when the domain, which is owned by Dennis, was pointed to servers at Bluehost (where Dennis has his account) rather than SiteGround (where HRO has a website hosting account). Mr. Devis blamed the failure on Dennis "adding domain privacy protection" which can "sometimes . . . cause the domain registrar to automatically switch the DNS settings to their own hosting service." Mr. Devis was adamant that this was not a "malicious" action, "but rather a mistake on the part of the domain provider (Bluehost)."

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

us that he was unaware of any official HRO policies regarding outside employment and that HRO has never defined the term "conflict of interest." Cecile also stated that HRO's policy on conflicts of interest was vague. Jen recalled signing the conflict form that was sent out but was not aware of any policies against having a second job. Similarly, AmandaLynn told us that HRO did not have a conflict of interest policy until Dennis created one after their July conversation.

In applying for the ODH naloxone distribution contract, HRO was required to "include a statement indicating whether [HRO] or any people that work on the Project through [HRO] have a possible conflict of interest (e.g., employed by the State, etc.) and, if so, the nature of that conflict. The State has the right to reject a Proposal in which a conflict of interest is disclosed or cancel the Contract if any interest is later discovered that could give the appearance of a conflict." We did not find anything else in the documents related to the naloxone distribution contract that otherwise defined "conflict of interest."

Dennis told Cecile that he learned about AmandaLynn's alleged conflict from her social media posts and that he investigated further on his own. (AmandaLynn confirmed that this is what Dennis told her as well.) He told her that he was worried that AmandaLynn's consulting decisions would influence her ordering decisions for HRO and that AmandaLynn's "lobbying" work would hurt HRO's reputation within the broader harm reduction community.

On or around July 17, Dennis had a conversation with AmandaLynn about her work for Velocity and the potential conflict of interest. According to Cecile, Dennis told AmandaLynn that her work for Velocity would be "water under the bridge" so long as AmandaLynn resigned from her consulting position. AmandaLynn described this and her subsequent interactions with Dennis as hostile, unprofessional and intimidating. According to AmandaLynn, Dennis was agitated and emotional from the very beginning of their conversation, immediately demanding that she answer for her work with Velocity and an unrelated nonprofit organization, On the Front Lines. AmandaLynn did not feel like Dennis was giving her a chance to participate in the conversation or explain her role at Velocity. Throughout the conversation, Dennis described feeling betrayed and hurt. At the end of the conversation, Dennis gave AmandaLynn a short deadline to "make a decision."

Following Dennis' conversation with AmandaLynn, he told Cecile that he was expecting AmandaLynn to step down from the other groups she was involved with, but he "wanted to make sure that's of her own volition." He also told Cecile that he made some suggested changes to the proposed conflict policy. In addition to potential financial conflicts, he wanted to address "alignment conflicts, particularly areas in which HRO's reputation and efforts may conflict with the financial interests of [*sic*] policies of others." He concluded his email to Cecile by telling her that HRO needed to have a simple form for reporting potential conflicts annually or when they arise. Cecile suggested using a Google form that would go to her and Dennis and then Dennis could make a decision about what was reported. Around this same time, Cecile, who told us that she had no background in HR and had been learning as she goes, was revising the employee handbook for Dennis. In response, Dennis took a template from Jotform and then adjusted it

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

(https://form.jotform.com/241995895490173).[5] Here, Dennis defined a conflict as any situation in which "a person or close relative . . . is involved in an organization, transaction, event or relationship that may be relevant to an employees' duties or the mission of Harm Reduction Ohio."[6]

On July 23, Dennis emailed AmandaLynn: "Don't forget to let me know what you decided."

In his August 19 email to Dwayne, Dennis insisted that the HRO staff needed to submit conflict forms by Friday, August 23. Dennis wrote:

> We cannot delay this. The ODH contract required us to submit a statement listing all people working on the contract for HRO who may have a conflict or possible conflict . . . . I do not think it's likely this conflict or possible conflict would affect the ODH contract, but that's not our decision. We are required to report all conflict and possible conflicts when we learn of them. [AmandaLynn's] paid work for the advocacy firm is clearly a possible conflict . . . . We need to disclose conflicts promptly as part of this renewal.

In response, Dwayne argued that HRO should not send ODH "anything that would jeopardize the contract over an unproven conflict." Dwayne also stated that the ODH documentation did not require reporting "perceived conflicts."[7] Dwayne also expressed concern that the conflict of interest form Dennis created was targeted at AmandaLynn ("a female over the age of 40") rather than aimed at all employees. "If this is truly an issue, then EVERY employee that has a second job, has served on a board, or crossed paths in any way with a company that distributed naloxone would need to also be reported." Because of this, "an employee law attorney really needs to take a look at this first."

Dennis wrote back, acknowledging that HRO needed "to know the details" surrounding AmandaLynn's work for Velocity "before we can make a decision." However, Dennis was worried that AmandaLynn had "declined to disclose details of her work." Dennis then reiterated, "We need facts before we make a decision" and suggested that attorney David Ball "do the fact-finding and provide a report." He also suggested additional attorneys if Attorney Ball was not available.

Cecile confirmed that after consulting an attorney, Dennis was satisfied that everything should remain status quo until an internal investigation was conduct. In his emails, Dennis repeatedly stated that everything should remain "status quo" until Attorney Ball finished reviewing the updated employee handbook, conflict of interest policy, and conflict disclosure form. His emails indicated that it was especially important to maintain the status quo and keep all employees

---

[5] The form was later moved to Google docs but remained substantially the same (https://docs.google.com/forms/d/e/1FAIpQLSeh5Vbget64iDx8Xy6rUObmszgpC8IhzM0sYjqDggtJTqQvnw/viewform). We could not determine what specific form Dennis used because JotForm provides several conflict of interest templates.

[6] By this definition, nearly everyone involved with HRO has a conflict because nearly everyone at HRO is involved in another organization that might be relevant to their duties or the mission of HRO.

[7] The language in the contract documents did require reporting any "possible conflict."

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

in their current positions while HRO applied for additional funding and sought renewal of the ODH contract. And on Saturday, August 31, he confirmed that "we all understand things are status quo until the lawyer finishes his review." AmandaLynn confirmed that she met with Dennis on Friday, August 30, and Dennis told her that HRO was maintaining the status quo while HRO's lawyer investigated the potential conflict.

Rather than maintaining the status quo, on September 2, 2024, Dennis sought legal advice from Chat GPT. Chat GPT's terms of service are clear: "Output may not always be accurate. You should not rely on Output from our Services as a sole source of truth or factual information, or as a substitute for professional advice." And "You must not use any Output relating to a person for any purpose that could have a legal or material impact on that person, such as making credit, educational, employment, housing, insurance, legal, medical, or other important decisions about them."

In his discussion with Chat GPT, Dennis posed his questions regarding AmandaLynn's potential conflict three different times, receiving a slightly different answer each time. The full conversation is attached, but in Dennis' presentation to Chat GPT, he claimed that AmandaLynn "had an undisclosed financial contract" with a manufacturer of naloxone.[8] Chat GPT responded be recommending immediate disclosure to the Board, conducting an internal review, consulting with legal counsel and *then* notifying the state, along with an action plan for remedying the situation and preventing a reoccurrence.

Dennis then suggested to Chat GPT that AmandaLynn "handles all ordering of the medicine under the grant." HRO orders three different medicines, two that cost about $35 and one that cost about $50. He then explained that AmandaLynn "oversees the program and ordering product" and "has a financial relationship to advocate for the pharmaceutical company making the $50 product." Chat GPT then responded that AmandaLynn's "relationship with the pharmaceutical company could influence [her] to favor the more expensive product." Chat GPT also changed its recommendations. Now, it suggested that step 1 was notifying the state government.

Dennis followed up a third time to inform Chat GPT about the Conflict of Interest Statement HRO submitted in response to the state's Request for Proposal. Again, Chat GPT highlighted AmandaLynn's alleged "financial relationship to the pharmaceutical company," noting this was "precisely the type of issue that should have been disclosed under the RFP requirements." Chat GPT then recommended immediate disclosure to the state.

Regardless, Dennis wrote to Cecile (and not the Board or Attorney Ball), "I think this is sound advice: immediate disclosure/create mitigation plan." In response, Cecile reminded Dennis that "we need to tread carefully here, especially as we just had a conversation with [AmandaLynn] saying that everything is on status quo until the policy and disclosure process is reviewed by the lawyer." She also suggested that Dennis explain his concerns to the Board or that the details could be shared with Attorney Ball "and he could advise what we need to do in regard to the State's contract . . . ."

---

[8] AmandaLynn confirmed that she does not have any direct relationships with pharmaceutical manufacturers, let alone a "financial contract" with Hikma or any other pharmaceutical company.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

Despite: (i) not having all of the information, (ii) not seeking legal advice from legal counsel, (ii) not sharing his concerns with the Board (and acting against the Board's advice and instructions to the contrary), Dennis decided to notify ODH of the existence of the alleged conflict on the basis of *legal advice from Chat GPT*.

In his September 3 letter to ODH, Dennis asserted that AmandaLynn "has a conflict of interest" that "should have been reported in [HRO's] original contract application and our request for contract renewal. He went on to admit that he did not have "full details of the conflict or potential" but blamed this on AmandaLynn allegedly declining to disclose details about her outside employment. His letter connected AmandaLynn's advocacy work for Velocity to the fact that, among other things, Velocity is a lobbyist for Hikma, the pharmaceutical company that manufactures Kloxxado, a naloxone nasal spray. Based on this series of connections and the fact that AmandaLynn oversees HRO's naloxone program, including ordering naloxone from the state pharmacy, Dennis concluded that there was a conflict or potential conflict of interest. And according to Molly, Dennis told her and Patrick that "AmandaLynn was put on paid leave because he thought she worked for a company that lobbied for Hikma and that we could lose our contract if she weren't immediately put on paid leave." According to Kelsey, Dennis stated that AmandaLynn was a sales representative for Velocity, which is false.

In reality, as Director of Government Advocacy for Velocity, AmandaLynn researches the efficacy of various forms of naloxone, educates Velocity about communities' needs and preferences related to naloxone, and advises Velocity on how to communicate with different communities about naloxone products. In this educational and communications capacity, AmandaLynn sometimes testifies before state legislatures, and in some states, this has meant she was required to register as a lobbyist. However, she was adamant that she does not promote any specific company or product. Rather, she advocates for expanding access to naloxone and harm reductions services generally. This is consistent with what we found in her Maryland testimony, discussed below.

We asked AmandaLynn directly about the relationship between herself, Hikma and Velocity. She confirmed that Velocity represents Hikma, but stated that she has no direct relationship with Hikma. She does not receive any compensation from Hikma. Velocity pays her a retainer and an hourly rate, and her Velocity compensation is not in any way tied to sales or distribution of Kloxxado. In fact, Velocity has a firewall between the advocacy division she works in and their sales teams.

We also asked AmandaLynn why she did not give Dennis this information. She replied that the conflict of interest policy and disclosure form Dennis asked her to submit appeared to be "targeted" at her, and she did not trust that he was creating a fair process. Despite this, she did complete the form and send it to the Board, not Dennis or Cecile, along with her concerns about the process. According to AmandaLynn, the Board instructed her to effectively ignore it until HRO could implement a proper disclosure and investigation process.

In his letter to ODH, Dennis also acknowledged that he had "no reason to believe that AmandaLynn's outside contract influenced her ordering decisions" for HRO. Molly confirmed that she had never seen AmandaLynn "show any preference for Kloxxado over other forms of

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

naloxone." In fact, (according to Molly) AmandaLynn has always been adamant that clients get the form of naloxone that they ask for, regardless of what AmandaLynn might prefer or think is best. According to Shae's complaint, Shae was the one who initially argued for HRO to carry Kloxxado because people were asking for it; AmandaLynn initially actually argued against it "recognizing that a higher dose could mean more intense precipitated withdrawal for our participants." After further discussions, including two separate assessments of the community's demand for Kloxxado, "AmandaLynn was adamant that [HRO] had to make sure we properly educated participants of the risks if we carried it. She made sure that happened."[9] And according to AmandaLynn, HRO distributes less Kloxxado than other forms of Naloxone. AmandaLynn also confirmed that she has ordered naloxone products from the state pharmacy for HRO, but what products are ordered and in what amounts are not in her discretion. Orders are placed based on what clients are requesting, inventory use, and external metrics and reporting.

Dennis' letter went on to assert that while working for Velocity, AmandaLynn submitted testimony to the Maryland legislature in support of a bill that would "require the Maryland Department of Health ("**MDH**") to provide Kloxxado access," a position opposed by the MDH. This statement gave the appearance that AmandaLynn goes around the country lobbying for Kloxxado to boost Hikma's sales even where health departments oppose the use of Kloxxado. In reality, AmandaLynn's testimony supported expanding access to all forms of naloxone and promoting "autonomy of choice." She cited HRO's own surveys that showed ¼ of respondents and 1/3 of HRO community distribution respondents reported using 3 or more doses of naloxone, leading to some requesting the higher dose form provided in Kloxxado. She also pointed to the fact that since Ohio expanded access to all forms of naloxone, the cost of 4mg naloxone had been cut nearly in half. Her conclusion was that "widespread distribution of and training about naloxone **<u>of any form</u>** at a lower cost is an important tool in reducing deaths from accidental drug overdoses" (emphasis in original).

AmandaLynn was not alone in her testimony in support of the proposed legislation. Statements in support were also submitted by:

- Johns Hopkins University ("This bill allows providers that receive naloxone from the [MDH] to choose the formulation or dosage of the drug");
- BrightView Health in Cincinnati ("We strongly support increasing accessibility to all forms of FDA approved opioid overdose reversal medications");[10]
- the Maryland Chiefs of Police Association and Maryland Sheriffs' Association ("This bill requires the [MDH] to provide choice in the selection of formulation or dosage of opioid overdose reversal drugs approved by the [FDA]"); and

[9] Here, AmandaLynn's account different from Shae's email complaint. Unlike Shae, AmandaLynn told us that she had no part in HRO's decision to begin distributing Kloxxado; the decision was made entirely based on clients' requests.

[10] Ironically, HRO's application for the ODH contract included a letter of support from BrightView Health.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

- the Maryland Association of Counties ("This bill would require the [MDH] to authorize local programs to treat and reverse overdoses to choose their preferred formulation of medication for these purposes").

The MDH did oppose the legislation, not because of some philosophical opposition to Kloxxado, which MDH was already providing to its Overdose Response Programs ("**ORPs**"), but because MDH felt the bill would require it to "honor ORP requests for higher priced naloxone formulations." MDH went on to state that it did not want to be forced to purchase naloxone without consideration of cost because of the unknown fiscal impact on MDH.

Dennis' letter to ODH then asserted his belief that HRO should have reported AmandaLynn's alleged conflict of interest when HRO first applied for the naloxone distribution contract with ODH (July 2023) and when applying for the contract extension in July of 2024. In her interview, Kelsey stated that as part of the process for applying for the ODH contract, ODH requested information about HRO employees and their outside employment. Kelsey helped to format resumes that were submitted to ODH, and AmandaLynn's resume does in fact include her role as Director of Government Advocacy for Velocity BioGroup (December 2022 – Present).[11] To Kelsey's knowledge, ODH did not ask any follow-up questions about anyone's outside employment.

Finally, Dennis claimed that he did not know about the alleged conflict when HRO applied for the contract or the contract extension and that, as far as he knew, no one else at HRO other than AmandaLynn knew of the alleged conflict. This was blatantly untrue—the alleged conflict had been discussed among Dennis, AmandaLynn and the Board as early as July 17, 2024, before the ODH contract was renewed on August 29. Dennis knew about the alleged conflict; he just chose not to disclose it to ODH until after ODH renewed the contract with HRO.

Further, in Mallory's September 4 statement, she stated that AmandaLynn had disclosed her role at Velocity to Mallory while Mallory was the Director of Operations at HRO. Not only was Mallory aware of AmandaLynn's outside employment while HRO was finalizing its proposal for the ODH contract, but Mallory "conducted a thorough review and engaged in discussions with a representative from Velocity." From those discussions, Mallory learned that "AmandaLynn's role involved harm reduction outreach and did not encompass any pharmaceutical sales activities." Further, HRO was already distributing Kloxxado before Velocity hired AmandaLynn.

Kelsey's interview also confirmed that "everyone" at HRO, including Dennis, knew about AmandaLynn's work for Velocity.[12] Velocity began pursuing AmandaLynn for a consulting position after AmandaLynn presented at a harm reduction conference in Puerto Rico. According

---

[11] We could not determine whether the resumes were actually submitted to ODH. They are not included in HRO's 128-page application for the contract dated July 25, 2023. There is an education and training summary (AmandaLynn's summary is page 79 of the application) and a "candidate experience requirement" (AmandaLynn's is on page 91), but neither mentions AmandaLynn's work with Velocity.

[12] Kyle, Abby and Chris all confirmed that everyone, not just at HRO, but in the broader harm reduction community as well, knew AmandaLynn worked as a consultant for another organization. AmandaLynn never treated her position at Velocity as a secret.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

to Kelsey, AmandaLynn told Dennis "all about" the interview and the work she would be doing for Velocity. AmandaLynn also discussed the role with various HRO Board members and sought their advice and guidance. And AmandaLynn discussed her work with Velocity openly with HRO staff and included travel for her Velocity work on the shared calendar. Kelsey also vaguely recalled Dennis asking about and commenting on AmandaLynn's work with Velocity, but she could not recall any specifics.

Patrick told us that it was possible AmandaLynn had told Dennis about her work with Velocity and Dennis had either forgotten or not paid any attention. (Kyle also mentioned the possibility that Dennis had simply forgotten about AmandaLynn's consulting work.) Patrick went on to explain that Dennis tends to focus intensely on his own work and interests, but he does not always seem aware of what is happening around him or at HRO. Patrick did not seem convinced that the first time Dennis learned about AmandaLynn's work for Velocity was in the summer of 2024.

After sending his letter to ODH, Dennis sent an email to the Board informing the Board that he had reported the alleged conflict to ODH. According to his email, he then had a conversation with the Project DAWN administrator, Sierra Dantzler, "in which she described the conflict as an actual and significant conflict that needed to be addressed. She agreed that then [*sic*] employee could no longer be involved with our naloxone program or contract in any way."

When Dennis met with members of the HRO staff on or around September 5, he stated that he had placed AmandaLynn on leave and notified ODH because of AmandaLynn's "factual conflict of interest." However, Kelsey told us that Dennis blamed the decision to put AmandaLynn on leave on ODH, telling the staff that ODH made the decision. According to Patrick, Dennis said there was nothing to do after notifying ODH except to place AmandaLynn on leave. ODH required it as part of their investigation, and Dennis simply had no choice in the matter. According to Molly, Dennis told everyone that AmandaLynn was placed on leave because she was lobbying and doing sales for Hikma, which he said jeopardized the ODH contract. Abby also confirmed that Dennis told the staff he was forced to place AmandaLynn on leave as part of ODH's investigation, and he implied that AmandaLynn's administrative leave would be permanent.

Dennis' efforts to blame ODH for AmandaLynn being placed on leave are not consistent with the emails from ODH employees. On September 3, 2024, Jennifer Voit at ODH emailed Dennis: "Please keep us posted on the results of your internal investigation and [AmandaLynn's] employment status."[13]

On September 9, Cecile wrote in an email to AmandaLynn that "the decisions that were taken were shortsighted, in my opinion. For what is [*sic*] worth, I was made aware of Dennis' decision at the last minute and I will forever regret that I was able to delay it or stop it."

**C. Dennis' Retaliation Claim**

The 2022 HRO employee handbook also includes a whistleblower policy requiring all directors, officers, employees and volunteers to "practice honesty and integrity in fulfilling our

[13] Dennis forwarded Ms. Voit's email to Cecile, noting that Ms. Voit was Ms. Dantzler's boss.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

responsibilities" and to "comply with all applicable laws and regulations." The policy encourages everyone affiliated with HRO "to raise serious concerns internally so that HRO can address and correct inappropriate conduct and actions." The policy expressly forbids anyone from retaliating "against any board member, officer, employee, or volunteer who *in good faith* reports an ethics violation, or a suspected violation of law . . . or suspected violation of any regulation governing the operations of HRO" (emphasis added). Furthermore, "Anyone filing a written complaint concerning a violation or suspected violation must be acting in good faith *and have reasonable grounds for believing the information disclosed indicates a violation*. Any allegations that prove not to be substantiated and which prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense" (emphasis added). Finally, the policy tasks the Director of Operations with investigating and resolving all complaints about unethical or illegal conduct and advising the President and/or the Board.

In response to Dennis' September 3 letter to ODH, Dwayne and Billy, in their capacity as acting Board Chair and Board Vice Chair respectively, sent Dennis a cease-and-desist email. The email informed Dennis that the Board had "received several complaints from staff alleging a hostile work environment" and that the Board had an obligation to take those complaints seriously and launch an investigation. The Board further instructed Dennis to "cease and desist all activities related to conflict of interest matters, including but not limited to communications with funders, staff, and community partners. No staff decisions should be made until the [B]oard officially contacts you with further directions . . ."

The day after Dennis was placed on leave, he went to the HRO office. Patrick asked him what he was doing there, and Dennis stated that the Board was retaliating against him for going to ODH against their advice. Dennis also stated that he (Dennis) was a member of the Board and that the Board acted wrongfully by failing to consult with him about the decision to place him on administrative leave. Dennis also acknowledged that employees would accuse him of creating a hostile work environment, but he was confident they could not satisfy the legal elements. Dennis then bragged about being "11 and 1" in court cases, indicating that he expected to win any case brought against him.

[redacted]

[redacted]

---

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]



Sophisticated Legal Counsel for Serious Entrepreneurs
www.msnlawoffice.com

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

## IV. LEGAL CONCLUSIONS

[redacted]

### A. AmandaLynn's Alleged Conflict of Interest

AmandaLynn's work for Velocity does not present a conflict of interest with HRO's work on naloxone distribution. It is understandable how her work with Velocity might be perceived as a "possible conflict" if the only known facts were that she had a government advocacy position with Velocity, a known lobbyist for Hikma Pharmaceuticals, the manufacturer of Kloxxado. But a simple, professional conversation with AmandaLynn and Mallory would have quickly cleared up any lingering doubts or suspicions about AmandaLynn's role with Velocity.

It is difficult to reach any conclusion regarding what initially made Dennis so upset in July when he claims that he first learned AmandaLynn had a position with Velocity, a claim we find highly unlikely. But consistent with the employees' statements, it seems likely that Dennis simply dug his heels in. He had already taken the position that he was right and AmandaLynn was wrong, and there could be no backing him down from that position. From July to his report to ODH in September, Dennis' position progressively escalated:

MSN
LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

On August 23, Dennis wrote: I do not think it's likely this conflict or possible conflict would affect the ODH contract." Dennis initially agreed that HRO needed to "know the details" before making a decision, and even agreed to Attorney Ball should investigate and prepare a report. Dennis repeatedly acknowledged the need to maintain the status quo until Attorney Ball could advise HRO.

But suddenly and inexplicably over Labor Day Weekend, Dennis decided that he could no longer wait for the details or Attorney Ball's advice. Instead, he painted a one-sided and false picture for Chat GPT, a service widely known for sometimes presenting unreliable and inaccurate information. Dennis made his requests to Chat GPT three times, subtly changing the facts each time, in an apparent attempt to manipulate the chat bot into providing his preferred conclusion.

- Dennis had already acknowledged that he did not have all of the facts, but he (falsely) told Chat GPT that AmandaLynn had a financial contract with Hikma.
- After Chat GPT recommended several steps *before* contacting the state, Dennis (falsely) told Chat GPT that AmandaLynn had a financial relationship to advocate for Hikma, which makes the more expensive form of naloxone as compared to other naloxone forms purchased by HRO.
- Dennis then effectively told Chat GPT that HRO had failed to disclose AmandaLynn's alleged financial relationship to Hikma.

After getting his preferred conclusion from Chat GPT (immediately disclosure to the state), Dennis told the state that AmandaLynn definitively had a conflict (or at least a potential conflict) of interest. Throughout his letter to the state and his subsequent conversations with HRO staff, he implied that AmandaLynn was effectively paid to promote Kloxxado on behalf of Hikma. He also falsely represented AmandaLynn's testimony before the Maryland legislature and even the MDH's position on the bill.

On several occasions in his letter, Dennis blatantly lied to ODH—He told ODH that that he was not aware of the alleged conflict when HRO applied for the contract extension. In reality, he wanted to "maintain the status quo" right up until the time that the contract extension was awarded. His statement that no one else knew about AmandaLynn's consulting work was also false. Apparently "everyone" at HRO knew, and most seem to have suspected that Dennis had simply buried his head in the sand. Dennis either outright lied or greatly exaggerated his claims that ODH forced him to place AmandaLynn on leave. It is not clear from the few available emails from ODH whether ODH made any determinations, and the last email from ODH on the matter implied that ODH was waiting for HRO to conduct an investigation.

After AmandaLynn was placed on leave, Dennis quickly became resistant to idea of any investigation or further fact-finding regarding AmandaLynn's actual work at Velocity. He insisted that having someone interview AmandaLynn was no longer necessary. "We don't really need more information." And he argued that it didn't matter whether AmandaLynn's work actually impacted her naloxone orders at HRO (which it did not). As far as Dennis was concerned, the mere fact that she worked for Velocity, which did work for Hikma, was the end of the story.

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

While no one at HRO seems to have been aware of what was in the 2022 employee handbook, it is equally clear that with regard to AmandaLynn's non-existent conflict of interest, Dennis did not "conduct [HRO's] business according to the highest ethical standards."

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

**E. Retaliation**

Retaliation, in the legal context, occurs when an employer harasses, discriminates against, or otherwise punishes an employee for engaging in a *protected* activity. Simply complaining about an employer's decision or general behavior is not, in and of itself, a protected activity that can give rise to a retaliation claim. Instead, protected activity, for the purposes of a retaliation claim, is expressly defined by various statutes. In general, federal statutes protect employees who report an employer's criminal activity to authorities.[31] Title VII further states that it is unlawful for an employer to take an adverse employment action against an employee because they made a complaint under Title VII or supported or assisted in an investigation related to such a complaint.[32] Title VII retaliation claims require proof that the alleged unlawful retaliation would not have occurred in the absence of the alleged wrongful action of the employer.[33]

---

[redacted]

[31] See https://www.whistleblowers.gov/sites/wb/files/2024-09/Whistleblower-Statutes-Summary-Chart.pdf for a comprehensive summary of federal whistleblower statutes.

[32] 42 U.S.C. § 2000e-3(a).

[33] *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

Under Ohio's whistleblower statute, an employer cannot take disciplinary action against an employee for reporting criminal activity of the employer or a fellow employee.[34] Ohio's law is further limited—not only is an employee only protected as a whistleblower when they report violations of specific statutes, but they must also follow a very specific reporting procedure. The law also explicitly denies whistleblower protections to employees who fail to "make a reasonable and good faith effort to determine the accuracy of any information reported…"[35]

[redacted]

Dennis has alleged that HRO engaged in retaliation by placing him on administrative leave in response to his act of reporting a suspected conflict of interest to ODH. His claim must be viewed in the larger context of the law on wrongful termination.

Generally, Ohio law recognizes the at-will employment doctrine and grants employers the freedom to terminate employment relationships for any or no reason. However, the Ohio Supreme Court also recognizes an exception to the doctrine when an at-will employee is fired for a reason that is against clear public policy.[36] At least one Ohio court has acknowledged that an employee may be protected when they are fulfilling their fiduciary or ethical duties by raising concerns to the company. [37] However, that court also declined to protect an employee who repeatedly raised such claims after the company and its attorney determined that they were without merit.[38]

While Dennis did not technically comply with the Ohio whistleblower statute when he wrote the letter to ODH (and he was not engaging in any federally protected activities at the time), an Ohio court is likely to at least consider the argument that an employee's act of reporting a suspected conflict of interest should be treated as a protected activity. Dennis could make the argument that he was trying to fulfil his ethical and fiduciary duties. He tried to report his concerns to the Board, but that the Board would not take action. However, his argument would be undermined by the fact that the Board had engaged Attorney Ball on Dennis' own recommendation and the fact that Dennis ignored Attorney Ball's advice on the matter and turned to Chat GPT instead.

---

[34] O.R.C. § 4113.52

[35] O.R.C. § 4112.52(C)

[36] *Greenley v. Miami Valley Maintenance Contrs., Inc.*, 49 Ohio St.3d 228 (1990).

[37] *See, e.g., Urda v. Buckingham, Doolittle, & Burroughs*, 2006-Ohio-6915, P30.

[38] *Id.*

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

In determining whether an employee has been wrongfully terminated, Ohio courts consider:

1. Whether a clear public policy exists and is manifested in Ohio's laws, constitution, or common law;
2. Whether dismissing the employee under the circumstances would jeopardize the public policy;
3. Whether the employee's dismissal was motivated by conduct related to the public policy; and
4. Whether the employer lacked an overriding legitimate business justification for dismissing the employee.

Even if a court decides that encouraging directors and employees of a nonprofit organization to make conflict of interest reports is a cognizable public policy, HRO could still argue that it had an overriding legitimate business justification for placing Dennis on leave. HRO's 2022 employee handbook requires all HRO directors and employees to "practice honesty and integrity." HRO's whistleblower policy further required that all reports be made *in good faith* and based on *reasonable grounds*. Not only was Dennis' letter to ODH wildly inaccurate, but it is simply impossible to believe that he was acting in good faith when he chose to rely on Chat GPT over HRO's actual attorney. And when he sent the letter to ODH, Dennis did so despite knowing that HRO needed "to know the details . . . before we can make a decision." Per HRO's whistleblower policy, "Any allegations that prove not to be substantiated and which prove to have been made maliciously or knowingly to be false will be viewed as a serious disciplinary offense."

**V. RECOMMENDATIONS**

[redacted]

[redacted]

[redacted]

[redacted]

LAW OFFICE OF
MARITZA S. NELSON, LLC

Phone: 614.944.5171
4200 Regent St., Ste. 200
Columbus, OH 43219

[redacted]

[redacted]

**B. Personnel Recommendations**

Dennis Cauchon should be terminated and removed from the Board. Dennis' behavior clearly warrants termination. We do not see any viable path forward that would create a serious change in Dennis' behavior and attitudes and allow Dennis to remain at HRO in any capacity. Nevertheless, se suspect that he will not go quietly and without threatening or pursuing legal action. While we believe HRO can defend itself against any claims of retaliation or wrongful termination that Dennis might attempt to bring it, the Board must also consider the fact that litigation is incredibly time consuming and expensive. And given Dennis' background in journalism, he would almost certainly endeavor to present his case in the media just as much as he would try to make his case in court.

It is also rather unusual for a nonprofit's executive director to also having a voting role on the board of directors. Here, there has been quite a bit of confusion and conflicting information about whether Dennis actually has a vote on the HRO Board. Regardless, as a compensated employee, he cannot serve as an independent voting member of the Board when it comes to decisions about his employment. To the extent that Dennis is a voting member outside of his capacity as an employee/President, then the Board should consider voting to remove him as a director pursuant to Article III, Section 9: After providing two weeks' notice of a regular or special board meeting, "a board member may be removed for reasons other than excessive absences "by a three-fourths vote of the remaining directors."

AmandaLynn should be reinstated as soon as possible. Given that AmandaLynn does not actually have a conflict of interest, she should be reinstated. However, in order to do so, the Board will need to share some of the findings from this investigation with ODH. In order to preserve attorney-client privilege with respect to the other matters in this report, please do not share the entire report with ODH. The Board may cut out portions relevant to the conflict of interest portion of the investigation to present to the ODH. Better still, we can "ghost write" a letter for the Board to send to ODH explaining the relevant findings.

[redacted]

[redacted]

**You said:**

Our nonprofit organization has a large contract from the state government to distribute a medicine made by a variety of providers. We largely let our customers decide which brand of product to choose. Recently, we discovered the employee overseeing this program had an undisclosed financial contract with one of the medicine's manufacturer. To get the contract, we signed a form saying our organizations and its employees had no conflicts or potential conflicts. How should we handle this issue?

**ChatGPT said:**

ChatGPT
Handling this situation requires careful attention to both ethical and legal considerations. Here's a step-by-step approach:

### 1. Immediate Disclosure and Internal Review

- **Disclosure:** Immediately disclose the conflict of interest to your board of directors or governing body. Transparency is key in addressing the situation.
- **Internal Review:** Conduct a thorough internal review to assess the extent of the conflict and any impact it may have had on your operations, particularly the state contract.

### 2. Consult Legal Counsel

- Given the legal implications, particularly regarding the form signed stating there were no conflicts, consult with your legal counsel to understand the potential consequences and to guide your actions.

### 3. Communicate with the State Government

- **Notification:** Inform the relevant state government department or contract manager about the situation. It's essential to do this proactively to demonstrate good faith and maintain trust.
- **Action Plan:** Present a clear plan on how you are addressing the issue, including any steps to remedy the situation and prevent future occurrences.

### 4. Assess and Mitigate Damage

- **Evaluate Impact:** Determine whether the conflict of interest affected any decisions or operations, such as influencing the choice of medicine provided to customers.
- **Corrective Actions:** If any decisions were improperly influenced, consider steps to correct these, such as revisiting past procurement decisions or offering customers an opportunity to change their selection.

### 5. Disciplinary Action and Policy Review

- **Disciplinary Action:** Based on your internal policies and the findings of your review, consider appropriate disciplinary action against the employee involved. This could range from a warning to termination, depending on the severity of the breach.
- **Policy Review:** Review and update your conflict of interest policies to ensure they are robust and that all employees are aware of their responsibilities. Consider implementing regular training on conflicts of interest.

### 6. Documentation

- **Record-Keeping:** Document all actions taken, including internal discussions, legal advice, communications with the state, and any corrective measures. This documentation may be important for legal or audit purposes.

### 7. Long-Term Prevention

- **Strengthen Controls:** Implement stronger internal controls, such as regular audits of employee relationships with vendors, to prevent similar issues in the future.
- **Continuous Monitoring:** Establish ongoing monitoring of conflicts of interest as part of your organization's compliance and ethics programs.

### 8. Evaluate Impact on Funding and Compliance

- **Audit Implications:** Consider how this incident may impact your upcoming "single audit" and ensure that all necessary disclosures are made during the audit process.
- **Funding Compliance:** Review any other funding agreements to ensure that this issue does not create compliance problems elsewhere.

Taking these steps will help address the immediate problem while also reinforcing your organization's commitment to ethical conduct and compliance with all contractual obligations.

4o

**You said:**

The employee with the conflict handles all ordering of the medicine under the grant. The way it works is we ask the state government to purchase specific amounts of three or four similar medical products. Then, the state buys the products and delivers them to us. We do not purchase the products directly ourselves. Rather, we tell the state what we need and the state purchases the products and delivers them to us. We receive three medicines that are similar. Two cost about $35. The other costs about $50. Overall, the state buys about $2.2 million a year in products for us to distribute to people who need it. The employee who oversees the program and ordering product has a financial relationship to advocate for the pharmaceutical company making the $50 product. What should we know about the importance of this conflict? And what should the organization do about the conflict?

**ChatGPT said:**

ChatGPT
Memory updated

## Importance of the Conflict

The conflict of interest in this situation is significant due to the following reasons:

1. **Financial Impact:** The employee's relationship with the pharmaceutical company could influence them to favor the more expensive product, leading to higher overall costs for the state government and potentially reducing the number of people your organization can serve with the available funds.

2. **Ethical Concerns:** The undisclosed financial relationship raises serious ethical issues. The integrity of your organization could be questioned if it appears that decisions were made based on personal gain rather than the best interest of the people you serve.

3. **Compliance and Legal Risks:** Since your organization signed a form declaring no conflicts of interest, this undisclosed relationship could put you at risk of violating the terms of your contract with the state. This could lead to legal consequences, including the potential for the state to seek damages, cancel the contract, or take other punitive actions.

4. **Reputation Risk:** If this conflict becomes public, it could damage your organization's reputation, potentially leading to loss of trust from stakeholders, donors, and the communities you serve.

## What the Organization Should Do

1. **Immediate Disclosure and Remediation:**
   - **Notify the State Government:** Inform the state government immediately about the conflict of interest, disclosing all relevant details about the employee's financial relationship with the pharmaceutical company.
   - **Cease Involvement:** Remove the employee from any decision-making or oversight roles related to the ordering or management of these products until the matter is fully resolved.
2. **Internal Investigation:**
   - **Conduct a Review:** Perform an internal investigation to determine the extent of the influence this employee may have had on product ordering decisions. Assess whether the more expensive product was recommended more frequently than necessary due to the employee's conflict.
   - **Evaluate Past Orders:** Review past orders to see if the conflict may have led to an over-purchase of the more expensive product, and calculate any financial impact.
3. **Rectify Potential Bias:**

- **Rebalance Orders:** If bias is found in past orders, work with the state to rebalance future orders to ensure that purchasing decisions are made purely on the basis of cost-effectiveness and patient needs, rather than personal financial gain.
- **Seek Advice:** Consult with your legal counsel on how to address any financial discrepancies or potential overpayment issues with the state government.

4. **Implement Corrective Actions:**
   - **Disciplinary Action:** Based on the findings of your internal investigation, take appropriate disciplinary action against the employee. This could include termination if the breach is deemed severe.
   - **Strengthen Policies:** Update your conflict of interest policies and ensure all employees understand and comply with them. This may include requiring regular disclosures and implementing a more rigorous review process for those involved in procurement or other sensitive roles.
5. **Strengthen Oversight and Controls:**
   - **Independent Oversight:** Consider involving an independent committee or external auditor to oversee product ordering decisions to prevent future conflicts.
   - **Training:** Provide ongoing ethics and compliance training to all employees to reinforce the importance of transparency and integrity in all operations.
6. **Monitor and Report:**
   - **Ongoing Monitoring:** Establish a system for ongoing monitoring of employee relationships with vendors to detect and address potential conflicts early.
   - **Reporting Mechanism:** Implement a clear mechanism for employees to report potential conflicts of interest in a confidential manner.

By addressing this conflict swiftly and transparently, your organization can mitigate potential damage and demonstrate a strong commitment to ethical operations and compliance with your obligations.

When our organization received the state contract, the contract Request for Proposal said the following about conflicts of interest: "Conflict of Interest Statement. Each Proposal must include a statement indicating whether the Offeror or any people that may work on the Project through the Offeror have a possible conflict of interest (e.g., employed by the State, etc.) and, if so, the nature of that conflict. The State has the right to reject a Proposal in which a conflict is disclosed or cancel the Contract if any interest is later discovered that could give the appearance of a conflict." In our successful application, we said our organization had no conflicts. How would the situation described earlier in this conversation related to the conflict language in the contract Request for Proposal?

**ChatGPT said:**

ChatGPT
The situation you described earlier is directly related to the conflict of interest language in the contract's Request for Proposal (RFP). Here's how:

## 1. Conflict of Interest Disclosure Requirement

- **RFP Language:** The RFP explicitly required that each proposal include a statement indicating whether there is a possible conflict of interest involving the offeror or anyone who may work on the project.
- **Your Organization's Statement:** In your successful application, you stated that your organization had no conflicts of interest. This was a crucial part of your proposal, as the RFP language gives the state the right to reject a proposal or cancel the contract if a conflict of interest is discovered.

## 2. Relevance of the Undisclosed Conflict

- **Nature of the Conflict:** The conflict of interest involving the employee with a financial relationship to the pharmaceutical company is precisely the type of issue that should have been disclosed under the RFP requirements. This relationship could influence purchasing decisions, leading to higher costs for the state and potentially impacting the fairness and integrity of the procurement process.
- **Breach of Contract Terms:** By not disclosing this conflict, your organization inadvertently breached the terms of the RFP and the resulting contract. The state could view this as a material omission, particularly since the conflict involves a financial relationship that could be seen as compromising the objectivity of decisions related to state-funded purchases.

## 3. Potential Consequences

- **Contract Cancellation:** The state has the right, as outlined in the RFP, to cancel the contract if a conflict of interest that could give the appearance of impropriety is later discovered. This means the current contract could be at risk.
- **Reputational Damage:** Beyond the potential for contract cancellation, the failure to disclose the conflict could harm your organization’s reputation with the state and other stakeholders, affecting future contract opportunities and relationships.

## 4. Recommended Actions

- **Immediate Disclosure:** As mentioned previously, it's critical to immediately disclose the conflict of interest to the state, explaining the situation fully and transparently.
- **Corrective Measures:** Outline the steps your organization is taking to address the conflict, such as removing the employee from the relevant role, conducting an internal investigation, and implementing stronger conflict of interest policies.
- **Seek State Guidance:** Engage with the state to understand their concerns and work collaboratively to resolve the issue. This could include revisiting past orders and potentially adjusting future procurement processes to ensure fairness.
- **Legal Consultation:** Consult with legal counsel to navigate the potential legal implications and to prepare for any possible actions the state might take, including negotiating any remedies or adjustments to the contract.

Addressing this issue promptly and openly with the state will be essential to maintaining your organization’s credibility and ensuring compliance with the terms of the contract.