**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| DENNIS CAUCHON,<br>Plaintiff,<br>v.<br>DWAYNE STEWARD, et al.,<br>Defendants. | Case No. 2:25-cv-00075-EAS-CMV<br><br>Judge Edmund A. Sargus, Jr.<br>Magistrate Judge Chelsey M. Vascura |

**PLAINTIFF DENNIS CAUCHON'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 107)**

**TABLE OF CONTENTS**

**PAGE**
**TABLE OF AUTHORITIES**....iii
**SUMMARY OF THE ARGUMENT**....v
**INTRODUCTION**....1
**COUNT ONE — RETALIATION UNDER 31 U.S.C. § 3730(h)**
**I. HRO's termination letter gives Cauchon's report to the State as a reason for firing him**....2
**II. Cauchon's investigation and reports were protected activity**....3
A. The statute protects efforts to stop a violation, not only the filing of a lawsuit....3
B. HRO's conflict-disclosure duty came from the State contract, not its employee handbook or the Anti-Kickback Statute....4
C. Each act is judged on what was known when it was taken....6
D. The record contradicts the motion's account of what Cauchon knew....7
**III. HRO invoiced for money that came from the federal government**....10
**IV. HRO knew what Cauchon was reporting, and its own records tie the firing to his September 3 report to ODH**....12
A. HRO was told in writing that federal money was at risk, and its own minutes show it understood....12
B. HRO planned the September 5 meeting before the written complaints it says caused it....13
**V. A jury could find that HRO's stated reasons for termination are not the real ones**....15
A. The explanation has changed with each telling....15
B. Seven of the reasons post-date the decision HRO says it made....17
C. The decisionmakers wanted this outcome before the investigation began....19
D. The agreement does not establish the promise HRO says Cauchon broke....20
E. Advice of counsel is evidence of good faith, not immunity from examining it....24
**VI. Cauchon does not oppose summary judgment for the individual Defendants on Count One, which leaves HRO and Count Two unaffected**....28

**COUNT TWO — THE VALIDITY OF FOUR 2024 BOARD ACTIONS**

**I. The requested declarations resolve the authority for four actions taken against Cauchon.....29**

**II. Cauchon was a director entitled to notice when the challenged actions occurred.....30**

**III. The October 27 meeting did not satisfy the Bylaws' notice requirement.....33**

A. The Bylaws required fourteen days and Defendants admit twelve.....33

B. Cauchon objected before and at the start of the meeting, so he did not waive the notice defect.....33

C. Cauchon did not waive notice, and *Robb* and *Resnick* do not excuse the admitted shortfall here.....34

D. Even if substantial compliance applies, the Board's conduct falls short.....35

**IV. Neither the October 13 vote nor the November 4 letter supplied valid authorization.....38**

A. Defendants do not defend the October 13 vote.....38

B. The November 4 letter fails under either of Defendants' accounts.....38

**V. The challenge to the September 5 suspension is not moot because HRO still relies on it to justify termination.....40**

**VI. The redundancy argument reaches only the retaliation declaration, which Cauchon does not oppose dismissing.....41**

**CONCLUSION.....42**

**CERTIFICATE OF SERVICE.....43**

## TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Briggs v. University of Cincinnati*, 11 F.4th 498 (6th Cir. 2021)........................................20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...................................................................31

*Cherry Lane Development, L.L.C. v. Walnut, C & DD, L.L.C.*, 2012-Ohio-3559.............35

*Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579 (6th Cir. 2002)............................16

*Fakorede v. Mid-South Heart Center, P.C.*, 709 F. App'x 787 (6th Cir. 2017).................11

*Haji v. Columbus City Schools*, 621 F. App'x 309 (6th Cir. 2015)....................................18

*Harris v. Metropolitan Government of Nashville & Davidson County*, 594 F.3d 476 (6th Cir. 2010)........................................................................................15

*Howell v. Town of Ball*, 827 F.3d 515 (5th Cir. 2016).......................................................29

*In re Tri-Star Pictures, Inc. Litigation*, 1995 Del. Ch. LEXIS 27 (Del. Ch. Mar. 9, 1995)...................................................................................................40

*Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.*, 176 F.3d 904 (6th Cir. 1999)......................41

*Jones-McNamara v. Holzer Health Systems*, 630 F. App'x 394 (6th Cir. 2015).......4, 6, 11

*Kempcke v. Monsanto Co.*, 132 F.3d 442 (8th Cir. 1998)...................................................17

*Kuhn v. Washtenaw County*, 709 F.3d 612 (6th Cir. 2013)..................................................31

*McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508 (6th Cir. 2000).............28

*Miller v. Abbott Labs.*, 648 F. App'x 555 (6th Cir. 2016)...............................................4, 11

*Niepsuj v. Giulitto*, 2020 U.S. App. LEXIS 34657 (6th Cir. Nov. 2, 2020).......................41

*Pettit v. Steppingstone, Center for the Potentially Gifted*, 429 F. App'x 524 (6th Cir. 2011)..............................................................................................24

*Resnick v. Camp Tuscazoar Foundation, Inc.*, 1997 Ohio App. LEXIS 3973 (5th Dist. Aug. 12, 1997)..........................................................................34, 35, 36

*Robb v. Chagrin Lagoons Yacht Club, Inc.*, 75 Ohio St.3d 264 (1996)................34, 35, 36

*Roberto v. Kent State Univ.*, No. 5:16-cv-1305, 2017 U.S. Dist. LEXIS 45509 (N.D. Ohio Mar. 28, 2017)...................................................................28

*Sander v. Country Brook Homeowners' Assn., Inc.*, 2020-Ohio-1555 (12th Dist.)............39

*Shazor v. Professional Transit Management, Ltd.*, 744 F.3d 948 (6th Cir. 2014)..............24

*Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998)...............................................24, 27

*State ex rel. Jones v. Bd. of Edn. of Dayton Pub. Schs.*, 2018-Ohio-676...........................34

*Steele v. Great Basin Scientific, Inc.*, No. 2:16-cv-00628, 2016 U.S. Dist. LEXIS 161818 (D. Utah Nov. 21, 2016)...................................................................11

*Stepak v. Schey*, 51 Ohio St.3d 8 (1990)..............................................................................40

*Stuble v. Bd. of Edn. of the Cuyahoga Valley Joint Vocational Sch. Dist.*, 8th Dist. Cuyahoga No. 44412, 1982 Ohio App. LEXIS 12318 (Oct. 7, 1982)......................35

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).......................15

*Thompson v. Quorum Health Resources, LLC*, 485 F. App'x 783 (6th Cir. 2012)............25

*Tingle v. Arbors at Hilliard*, 692 F.3d 523 (6th Cir. 2012)..............................................24

*Tuttle v. Collins*, 2020-Ohio-4062.......................................................................................40

*United States v. United Technologies Corp.*, 626 F.3d 313 (6th Cir. 2010).......................12

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016)........11

*Wisconsin Bell, Inc. v. United States ex rel. Heath*, 604 U.S. 140 (2025)..........................11

*Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634 (6th Cir. 2015)...........17

**Statutes**

31 U.S.C. § 3729(b)(2)(A)(ii)..........................................................................11, 12

31 U.S.C. § 3730(h)..........................................................................................4, 6, 24

42 U.S.C. § 1320a-7b(b)(2)..................................................................................4

Ohio Rev. Code § 121.22...................................................................................35

Ohio Rev. Code § 519.12...................................................................................35

Ohio Rev. Code § 1702.19......................................................................1, 33, 34, 35

Ohio Rev. Code § 1702.25...............................................30, 36, 38, 39, 40, 41

Ohio Rev. Code § 3313.16.................................................................................35

Ohio Rev. Code § 3313.66.................................................................................35

**Rules**

Fed. R. Civ. P. 56(a)........................................................................................36

S.D. Ohio Civ. R. 7.2(a)(2)...............................................................................32

## SUMMARY OF THE ARGUMENT

Count One asks whether a jury could find that HRO fired Cauchon because of his protected investigation and internal and external reports concerning possible fraud involving federal funds. Count Two asks whether four identified 2024 Board actions were validly authorized. The section numbers below are the section numbers of the memorandum.

### Count One — retaliation under 31 U.S.C. § 3730(h)

**Section I — the termination letter (pp. 2–3).** HRO's own termination letter states that the September 3 report to the Ohio Department of Health was not "an act of good faith or reasonable grounds," and gives it as a ground for discharge. ECF No. 101-25, PageID 1658–59. ECF 107 describes that letter as resting on four bases and omits its first. ECF No. 107, PageID 2976. Where the employer wrote the reason down, the connection does not rest on inference.

**Section II — protected activity (pp. 3–9).** Section 3730(h)(1) protects "other efforts to stop 1 or more violations," a branch that does not require a contemplated qui tam suit. 31 U.S.C. § 3730(h)(1); *Miller v. Abbott Labs.*, 648 F. App'x 555, 560 (6th Cir. 2016). Defendants' compensation-for-orders test addresses a kickback theory and does not answer the separate concern that HRO was obtaining federal money while its no-conflict representation and required disclosures were inaccurate. The disclosure duty came from the State contract, not from the employee handbook or the criminal Anti-Kickback Statute, and Defendants' own investigator read the contract the same way. ECF No. 107-11, PageID 3017–18 & n.7. Each act is measured on what was known when it was taken, *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 401 (6th Cir. 2015), and the record contradicts the motion's account of what Cauchon knew and when he knew it.

**Section III — federal money (pp. 10–12).** A request for payment is a claim under the Act when it is made to a recipient of federal funds, the money advances a Government program, and the United States supplied any portion of it. The request need not be made to a federal agency. 31 U.S.C. § 3729(b)(2)(A)(ii); *Wisconsin Bell, Inc. v. United States ex rel. Heath*, 604 U.S. 140, 149 (2025). HRO invoiced ODH $59,319.14, and Ohio paid it from the appropriation line "Federal Public Health Programs."

**Section IV — employer knowledge and causation (pp. 12–14).** Cauchon told the Board in writing that HRO was "a state contractor receiving federal funds" and that an undisclosed conflict could end the contract; Defendants' own Exhibit A-12 records his contemporaneous claim of retaliation over HRO's "federally funded naloxone contract." ECF No. 107-13, PageID 3047. Their own minutes show the directors understood. Defendants do not argue that HRO lacked knowledge. On chronology, the September 5 emergency meeting was proposed before any written complaint.

**Section V — pretext (pp. 15–28).** The September 7 minutes record directors calling for Cauchon's termination before HRO retained an investigator. Seven of the grounds HRO now gives post-date the October 13 vote. And the documents recording what counsel was actually asked to do describe a policy review, not the investigation-and-report promise the termination letter says Cauchon broke. A jury may find pretext where a stated reason has no basis in fact or did not actually motivate the action. *Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 486 (6th Cir. 2010). Materially inconsistent explanations can support a finding of pretext, *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002), and reasons

that post-date a decision cannot explain it, *Haji v. Columbus City Schools*, 621 F. App'x 309, 313 (6th Cir. 2015). An honest belief that a reason was true does not answer whether it actually motivated the discharge, *Briggs v. University of Cincinnati*, 11 F.4th 498, 515–16 (6th Cir. 2021), and the protection reaches only a reasonably informed decision, *Smith v. Chrysler Corp.*, 155 F.3d 799, 807–08 (6th Cir. 1998).

**Section VI — the individual Defendants (pp. 28–29).** Plaintiff does not oppose summary judgment for Steward, Golden and Turner-Bicknell on Count One on the ground that they were not his employers. *Roberto v. Kent State Univ.*, 2017 U.S. Dist. LEXIS 45509, at *5–7 (N.D. Ohio Mar. 28, 2017); *Howell v. Town of Ball*, 827 F.3d 515, 529–30 (5th Cir. 2016). Any judgment should be confined to Count One as to those three Defendants.

**Count Two — the validity of four 2024 Board actions**

**Section I — the four actions (pp. 29–30).** Plaintiff asks the Court to declare that four Board actions were not validly authorized: the September 5 suspension, the October 13 termination vote, the October 27 removal, and the November 4 letter. ECF No. 101-1, PageID 1502–03. Defendants list only three and omit October 13, the only vote to terminate Cauchon, although their motion excludes from its no-controversy argument any meeting "addressing his suspension and/or termination." ECF No. 107, PageID 2980. Plaintiff does not ask who presently controls HRO.

**Section II — director status (pp. 30–32).** Defendants call Cauchon an "alleged" board member eight times but cite no bylaw, statute or case, and have not established that he lawfully ceased to be a director before the challenged actions. HRO's own minutes list him as a director through March 2024 and as an absent board member on September 5 and October 13. At the October 27 meeting Steward answered "Yes. Actually, yes" when asked whether Cauchon was a voting member, and the Board then voted to remove him. ECF No. 101-33, PageID 1710. Judge Sargus directed Defendants to present their evidence first at the proposed hearing on director status. ECF No. 27, PageID 575.

**Section III — the October 27 meeting (pp. 33–37).** The Bylaws require two weeks' written notice to each director, and Defendants admit twelve days. ECF No. 107, PageID 2982–83. Cauchon objected in writing the day before and again at the start of the meeting, so he did not waive the defect under Ohio Rev. Code § 1702.19. Neither of Defendants' principal substantial-compliance cases, *Robb* and *Resnick*, forgave a missed notice rule that names a number of days, or a failure to notice a director. Even under that standard the Board fails: the directors planned the removal in their group texts, left its purpose off the agenda, scripted the motion and second, and withheld from Cauchon the minutes every other director had. The meeting lasted eight minutes.

**Section IV — the October 13 vote and the November 4 letter (pp. 38–40).** ECF No. 107 never mentions the October 13 meeting, held on two days' notice. The November 4 letter fails under either of Defendants' accounts. If it memorialized October 13, it rests on a meeting they never defend. If it was a new action, Ohio Rev. Code § 1702.25 required the signature of every director "entitled to notice," and Defendants count only those "entitled to a vote." ECF No. 107, PageID 2984; *Sander v. Country Brook Homeowners' Assn., Inc.*, 2020-Ohio-1555, ¶¶ 15–16, 23. Seven directors signed; Cauchon did not. Defendants' conflict-of-interest cases concern abstention, not notice.

**Section V — mootness (pp. 40–41).** HRO still relies on the September 5 leave: the termination letter and ECF No. 107 both cite Cauchon's refusal to comply with it. ECF No. 107, PageID 2977. The leave was the first step toward termination; two days in, the Board's minutes record that "Dennis needs to be fired from HRO immediately. An investigation is useless at this point." Ex. 65, HRO_000103. Defendants' own case was moot because the challenged order had been vacated. *Niepsuj v. Giulitto*, 2020 U.S. App. LEXIS 34657, at *4 (6th Cir. Nov. 2, 2020). HRO continues to invoke the September 5 directive as a justification for termination, so Plaintiff seeks a determination whether the Board validly authorized the September 5 directive in this ongoing dispute, not an advisory ruling about an ended period of paid leave.

**Section VI — redundancy (p. 41).** Defendants' redundancy argument targets only the request that the Court declare the suspension and termination "retaliatory." ECF No. 107, PageID 2986. Cauchon's motion does not seek that declaration, and he does not oppose dismissal of that request as duplicative of Count One. The motion's seven requested declarations concern notice, director status, waiver and authorization, which a verdict on retaliation will not decide. ECF No. 101-1, PageID 1502–03.

## INTRODUCTION

The termination letter from Harm Reduction Ohio (HRO) names Dennis Cauchon's report to the Ohio Department of Health as a reason for firing him. Defendants omit that reason when describing the letter and omit the October 13 termination vote from their governance analysis. ECF No. 101-25, PageID 1658–59; ECF No. 107, PageID 2976, 2980.

**Count One.** Cauchon investigated and reported whether HRO was obtaining federal money while its required conflict disclosures were inaccurate. He warned the Board that an undisclosed conflict could jeopardize the contract. ECF No. 101-59, PageID 1841. Ohio paid HRO entirely from federal State Opioid Response grant funds. ECF No. 101-45, PageID 1776, 1781; ECF No. 101-43, PageID 1770. Before HRO's investigation began, its minutes recorded that Cauchon should be fired immediately. Ex. 65, HRO_000103, 000105. A jury could find retaliation behind HRO's stated reasons.

**Count Two.** Four Board actions are challenged. The September 5 suspension and October 13 termination meetings excluded Cauchon from notice. The October 27 meeting had twelve days' notice despite Bylaws requiring fourteen. ECF No. 101-2, PageID 1514, ¶ 20; ECF No. 101-5, PageID 1535–36; ECF No. 107, PageID 2982–83. Cauchon objected in writing before the meeting and again at its start, so his attendance did not waive the notice defect under Ohio Rev. Code § 1702.19(B). ECF No. 101-33, PageID 1709, 1711. The November 4 letter either recorded the challenged October 13 vote or required approval by every director entitled to notice as a new written action. Authorization presents a separate question from HRO's motive.

Cauchon does not oppose summary judgment for the individual Defendants on Count One on the ground that they were not his employers, or dismissal of the duplicative retaliation declaration. Except for those limited concessions, the Court should deny Defendants' motion on both counts.

## COUNT ONE — RETALIATION UNDER 31 U.S.C. § 3730(h)

### I. HRO's termination letter gives Cauchon's report to the State as a reason for firing him.

When Harm Reduction Ohio fired Dennis Cauchon on November 4, 2024, it named his September 3 report to the Ohio Department of Health as a reason:

> Your September 3 letter to ODH claiming that a conflict of interest existed and should have been reported by HRO was based on and contained numerous inaccurate and misleading statements. . . . We do not consider this an act of good faith or reasonable grounds for your report to ODH.

Termination Letter, ECF No. 101-25, PageID 1658–59. ODH administers the federally funded naloxone contract at issue. Between those passages, HRO quoted its whistleblower policy protecting good-faith reports of suspected illegality and making malicious or knowingly false allegations a disciplinary offense. HRO concluded that Cauchon's report "violated this policy." *Id.* at PageID 1658.

Defendants omit that reason from their account of the letter. They list ignoring counsel, a prior agreement, equal-pay exposure, and insubordination, then argue that no evidence shows Cauchon was discharged for reporting. ECF No. 107, PageID 2976. But HRO expressly condemned the report and named it as a ground for discharge. The connection is in the letter itself.

The letter does not establish that the report lacked good faith or reasonable grounds; it supplies HRO's assessment of those questions. It does refute the motion's claim that no evidence connects reporting to discharge. Sections II through IV address protected activity, federal funding, and HRO's knowledge, preserving the affirmative determinations Plaintiff requests in ECF No. 101-1, PageID 1503–04. Section V addresses the pretext and ultimate-causation questions reserved for trial. Even if the Court declines to grant Plaintiff's requested

determinations, the evidence must still be assessed for whether it creates genuine disputes requiring denial of Defendants' motion. The two requests are not interchangeable.

## II. Cauchon's investigation and reports were protected activity.

Cauchon investigated and reported a possible conflict affecting HRO's representations under a federally funded contract. His claim encompasses that course of conduct. Paragraph 180 of the Second Amended Complaint alleges efforts before, during, and after the September 3 disclosure to prevent or investigate HRO's receipt of federal funds through false information or omissions under a duty to disclose, potentially influenced naloxone orders, and federally funded expense requests. ECF No. 59, PageID 1127–28. It is not confined to one letter or to an Anti-Kickback Statute theory.

Defendants nevertheless focus their protected-activity analysis on what Cauchon believed "at the time of his alleged report to the ODH," treating that letter as his "sole articulated concern." ECF No. 107, PageID 2969, 2974. Their own exhibits document more. On October 4 he asked the Board to address "HRO compliance with federal and state contracting regulations and laws, including the False Claims Act." ECF No. 107-5, PageID 2999. Their October 14 exhibit identifies obligations "to the State of Ohio and the federal government under the current contract." ECF No. 107-6, PageID 3000. His October 22 complaint also names the Act. ECF No. 101-63, PageID 1867. Defendants' state-funding argument reaches these acts, but their September 3 analysis does not dispose of the later conduct.

### A. The statute protects efforts to stop a violation, not only the filing of a lawsuit.

Defendants say Cauchon had to hold a good-faith, objectively reasonable belief that Reese was "specifically being compensated to order more Kloxxado from the State of Ohio." ECF No. 107, PageID 2970–71. That compensation-for-orders test addresses a particular

kickback theory, not the separate concern that HRO was obtaining federal money while its no-conflict representation and required disclosures were inaccurate.

Section 3730(h)(1) protects lawful acts in furtherance of an FCA action and "other efforts to stop 1 or more violations" of the Act. The second branch does not require a contemplated qui tam suit. *Miller v. Abbott Labs.*, 648 F. App'x 555, 560 (6th Cir. 2016). Cauchon sought information and correction of representations HRO had made to obtain government money before it submitted further payment requests. ECF No. 101-50, PageID 1800; ECF No. 101-55, PageID 1823; see ECF No. 101-47, PageID 1787 (the representation).

The employee must have a subjective good-faith and objectively reasonable belief connecting the conduct to possible federal fraud. But he "need not complete an investigation into potential fraud or uncover an actual FCA violation"; the law protects him while collecting information. *Miller*, 648 F. App'x at 560; *Jones-McNamara v. Holzer Health Systems*, 630 F. App'x 394, 399–401 (6th Cir. 2015). Defendants quote that qualification themselves. ECF No. 107, PageID 2970. The criminal kickback elements they then invoke do not replace the broader retaliation standard or answer the pleaded false-information theory.

### B. HRO's conflict-disclosure duty came from the State contract, not its employee handbook or the Anti-Kickback Statute.

ECF 107 invokes two different standards in discussing Cauchon's September 3 report. In its Statement of Facts, it describes HRO's employee handbook, which permitted outside employment subject to an internal conflict-of-interest rule. ECF No. 107, PageID 2960. Defendants do not return to that conflict standard in their protected-activity argument. Instead, the Argument section invokes the criminal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b)(2), and asks whether Cauchon reasonably believed Reese was "specifically being compensated to order more Kloxxado from the State of Ohio." *Id.* at PageID 2970–71. The

handbook and the AKS answer different questions, and neither defined what HRO was required to disclose to ODH.

Whether Reese complied with HRO's internal handbook rule did not determine HRO's separate disclosure obligations to ODH.[1] Cauchon did not report a handbook violation. He reported under the State contract. The State's Request for Proposal (the "RFP") required each proposal to state whether HRO or anyone who might work on the project had a "possible conflict of interest" and, if so, its nature. It also reserved the State's right to cancel the contract if an interest later discovered "could give the appearance of a conflict." ECF No. 101-41, PageID 1760.

In response to the RFP, HRO's contract bid made a categorical representation: "Harm Reduction Ohio confirms that no employees or contractors associated with the organization have a conflict of interest working on the statewide Naloxone project." ECF No. 101-47, PageID 1787. The contract separately required HRO to "disclose to the State" knowledge of a person who acquires "an incompatible or conflicting personal interest related to this Contract" and to keep that person from participating in contract work unless the State determined otherwise. ECF No. 101-41, PageID 1761. The contract expressly incorporated both the RFP and HRO's contract bid. *Id.* at PageID 1762. Under those provisions, HRO supplied the disclosure; the State retained authority over the consequence. Defendants' own investigator read the contract the same way: "The language in the contract documents did require reporting any 'possible conflict.'" ECF No. 107-11, PageID 3017–18 & n.7. She also wrote that, on the facts then known, it was understandable that Reese's Velocity work might be perceived as a "possible conflict." *Id.* at PageID 3032.

[1] Plaintiff does not concede that Reese's outside employment complied with the employee handbook.

ECF 107's AKS argument addresses a different question. It says Cauchon had to believe Reese was "specifically being compensated to order more Kloxxado" and that the quid pro quo it describes would constitute an actual AKS violation. ECF No. 107, PageID 2970–71. That is not the contract's disclosure threshold, and Count One is not confined to an AKS theory. Section II.A explains the broader § 3730(h) protected-activity standard.

For protected activity, the contract matters because it gave Cauchon a concrete basis to investigate whether HRO's categorical no-conflict representation remained accurate and whether Reese's outside relationship required disclosure to ODH. Section III addresses the federal-funding nexus. The Court need not decide here that the contract was breached, that Reese had an actual conflict, or that an AKS violation occurred. The question is whether Cauchon's investigation and reports rested on a good-faith, objectively reasonable concern about a potential FCA problem.

**C. Each act is judged on what was known when it was taken.**

Each act must be judged on the facts Cauchon knew when he took it, not in hindsight. *Jones-McNamara*, 630 F. App'x at 401; ECF No. 107, PageID 2970–71 & n.6. Plaintiff accepts that rule. It prevents later evidence from retroactively justifying September 3, but it does not make September 3 the only date that matters.

Plaintiff's motion identifies the July 16 and September 3 reports and the October 4 and October 22 writings for protected-activity determinations. ECF No. 101-1, PageID 1503–04. The investigation and requests between those acts belong to the same pleaded course of conduct. Each act must be evaluated on its own contemporaneous information; naming the FCA later does not itself establish that every earlier or later act was protected.

For example, Cauchon requested the State's naloxone ordering records on August 22 and received them September 16. ECF No. 101-56, PageID 1825, 1829. The results cannot support

his September 3 belief, but they were available for his October acts. Conversely, Nelson's October conclusion about the conflict cannot retroactively make his earlier belief unreasonable. The use HRO made of that report belongs in the pretext analysis, addressed in § V.E.

**D. The record contradicts the motion's account of what Cauchon knew.**

Defendants say Cauchon knew only two job titles, had not investigated ordering, and conceded that the outside job might be a "fancy name." ECF No. 107, PageID 2971–72. The documents and the deposition passages they cite show a substantial inquiry whose unanswered questions Cauchon acknowledged.

Cauchon knew the contract's federal source before learning of Reese's outside work. His December 12, 2023 Board report explained that federal State Opioid Response funds flowed through Ohio's mental health agency and that Reese would oversee daily contract operations. Ex. 70, CAUCHON_000128–130. He also knew HRO had represented that project employees had no conflict and committed Reese to the project at 1.0 FTE. ECF No. 101-47, PageID 1787; ECF No. 101-48, PageID 1791–93.

On July 16 he told Steward that Reese was listed as Director of Government Advocacy for Velocity BioGroup, which performed advocacy and lobbying promoting Kloxxado, and that she had publicly defended its manufacturer, Hikma. He also disclosed his uncertainty: "It's likely a paid, contract position, but I am not sure." ECF No. 101-50, PageID 1800.

By August 21 his inquiry had produced a second concern and a way to test it. He told Steward he had found "what I consider Hikma work and travel done on HRO time," adding that he could not "be sure because we have no details other than she didn't take PTO for Hikma event." Steward answered that he had told Reese "none of her external work could be done on HRO time anymore and she was fine with that." "Anymore" gave Cauchon reason to believe that outside work had been occurring on HRO time, and HRO had committed Reese to the contract at

1.0 FTE. ECF No. 101-48, PageID 1791–93. Cauchon replied, "The first issue is she needs to disclose." Later in the same exchange he wrote that "[w]e need to know the facts to make any decision," and closed: "That's why it's important for the conflict forms to be completed. Speculation is not good." ECF No. 101-55, PageID 1823.

He then sought the ordering records on August 22. Defendants' claim that he "didn't even bother to look" overlooks that request and his explanation that HRO's data showed shipments, not what recipients ordered. Cauchon Dep. I 254:15–19, 256:22–257:3, ECF No. 102-1, PageID 1967; ECF No. 101-56, PageID 1825, 1829. An unanswered records request is evidence of investigation, not evidence that he made none.

The page ECF 107 cites for "the only two pieces of information" names three. Asked what he had concluded and on what, Cauchon answered: "Based on the information we knew, that she was director of government advocacy for Velocity BioGroup, the lobbyist, and that she ordered, that in and of itself is a conflict." Cauchon Dep. I 208:10–14, ECF No. 102-1, PageID 1955. The "fancy name" answer is conditional in the same way, and it is about a single decision. Asked why, on September 3, he had placed Reese on paid leave rather than terminating her, he answered:

> I think that she likely needed to be terminated because of the relationship and declining to disclose; however, you have to remain open. If it turns out that like director of government advocacy was just a fancy name that did nothing, then . . . you just have to keep an open mind.

Cauchon Dep. I 222:13–20, ECF No. 102-1, PageID 1959.

The September 3 sentence Defendants call fatal should be read with the two sentences preceding it:

> AmandaLynn tasks at Harm Reduction Ohio includes overseeing our naloxone program, ordering naloxone from the state pharmacy and providing information on naloxone volume used in monthly contract invoices. Since December 2022, AmandaLynn, as Harm Reduction Ohio's representative, has ordered

> approximately 15,000 Kloxxado kits from the state. At present, I have no reason to believe that AmandaLynn's outside contract influenced her ordering decisions.

ECF No. 101-58, PageID 1834. Plaintiff accepts the disclaimer: he then had no reason to believe the outside contract influenced particular orders. That did not eliminate his concern about an undisclosed relationship affecting HRO's contract representations, staffing, and payment requests. In the same report he explained: "[T]he full details of the conflict or potential are not clear because AmandaLynn has declined to disclose details on her outside employment." He requested ODH's "guidance in how we should proceed to mitigate all issues caused by this conflict." *Id.* at PageID 1834–35. He distinguished the facts he had from the question he was investigating. The Act protects that inquiry without requiring its result to be known beforehand.

Defendants' own witnesses called the same facts reasonable grounds to investigate. HRO's Rule 30(b)(6) designee, asked whether HRO believed there were "reasonable grounds for conducting an investigation into the potential conflict of AmandaLynn Reese," answered: "For HRO, just bringing something like that forward seemed like reasonable grounds to look into it, so we conducted an investigation." ECF No. 101-9, PageID 1570–71. Steward, asked whether he agreed at the time that it was a potential conflict, answered "[a]t the time, not knowing the details and on face value, yes," and confirmed that he held that belief "with the limited details that you had." ECF No. 101-10, PageID 1583–84. Nelson wrote that "[i]t is understandable how her work with Velocity might be perceived as a 'possible conflict' if the only known facts were that she had a government advocacy position with Velocity, a known lobbyist for Hikma Pharmaceuticals, the manufacturer of Kloxxado." ECF No. 107-11, PageID 3032. Cauchon had those facts on September 3. This evidence supports Plaintiff's requested determinations. At a minimum, it creates a genuine dispute about the motion's claim that his belief was unreasonable or not held in good faith.

## III. HRO invoiced for money that came from the federal government.

HRO's request for payment is in the record, and so is Ohio's payment of it. Plaintiff's motion sets out the funding chain and the records that prove it at ECF No. 101-1, PageID 1481–83 and 1493–94; this section answers the two points ECF 107 makes against that showing. ECF 107 argues that Cauchon "has failed to identify any 'claims' or 'cost reports' to the federal government that he believes were submitted by HRO," and that "it is beyond dispute that the ODH is a state agency, not a federal agency, and therefore beyond the scope of the FCA." ECF No. 107, PageID 2973–74. Neither point survives the documents. On August 5, 2024, HRO invoiced ODH $59,319.14 for July services under Contract CSP016816. ECF No. 101-44, PageID 1773–74. A week later Ohio paid that invoice in full under the appropriation line "Federal Public Health Programs," one of eleven payments ODH made to HRO under that line in fiscal year 2025. ECF No. 101-43, PageID 1770.

HRO's own pleading connects that money to this contract. Answering the Second Amended Complaint, HRO admitted that it distributes naloxone as part of ODH's Project DAWN program, that it "receives some funding through federal grants," and that it completed the contract's first-year work plan and was paid $650,000. ECF No. 62, PageID 1204, 1205, 1221 (¶¶ 20, 25, 177). The interagency agreement that funds Project DAWN allocates the same $650,000 to the "Statewide Mail-Order & Lay Dist. Contract," and a further $1,486,000 to buy the naloxone HRO ships under it. ECF No. 101-45, PageID 1781. That agreement applies money the federal Substance Abuse and Mental Health Services Administration granted to Ohio's mental health and addiction services department, which was to "provide funding to ODH" for naloxone distribution during the contract year HRO invoiced, September 30, 2023 through September 29, 2024. *Id.* at PageID 1776, 1778.

Whether that invoice is a "claim" does not turn on who received it. The Act reaches a request for money made "to a contractor, grantee, or other recipient," where the money is "to be spent or used . . . to advance a Government program or interest" and the United States "provides or has provided any portion of the money . . . requested." 31 U.S.C. § 3729(b)(2)(A)(ii)(I). The Supreme Court applied that definition in *Wisconsin Bell, Inc. v. United States ex rel. Heath*, holding that "providing some funds is just as good as providing all." 604 U.S. 140, 149 (2025). HRO's invoice went to a recipient of federal grant money, the funds it requested paid for a federal naloxone program, and the United States supplied them.

ECF 107 quotes the Act's "focus" on "those who present or directly induce the submission of false or fraudulent claims." ECF No. 107, PageID 2974–75. Those words are the Supreme Court's, and the sentence that follows them answers this motion: a claim "now includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 182 (2016) (claims submitted to Massachusetts's Medicaid program, not to the United States). Medicaid providers bill state agencies, and a rule putting every request paid by a state agency outside the Act would take Medicaid fraud with it.

The missing connection in Defendants' state-fraud cases is present here. *Fakorede v. Mid-South Heart Center, P.C.*, 709 F. App'x 787, 790 (6th Cir. 2017), found allegations insufficiently related to federal fraud; *Steele v. Great Basin Scientific, Inc.*, No. 2:16-cv-00628, 2016 U.S. Dist. LEXIS 161818, at *15 (D. Utah Nov. 21, 2016), involved no submitted or induced Government-payment claims. Neither holds that a documented request for federal grant money falls outside the FCA because a state agency receives it. Nor do *Miller* and *Jones*-

*McNamara*, which require a reasonable connection to potential federal fraud, defeat the documentary connection shown here.

Cauchon investigated the accuracy of representations HRO made to obtain and keep that funding. Section II.B identifies the no-conflict certification and continuing disclosure terms. An otherwise accurate invoice can implicate the FCA when submitted under a contract procured by a material misrepresentation. *United States v. United Technologies Corp.*, 626 F.3d 313, 319–20 (6th Cir. 2010). Plaintiff does not ask the Court to find actual fraud. His motion seeks the narrower determination that HRO's payment requests were claims under § 3729(b)(2)(A)(ii). ECF No. 101-1, PageID 1503. The funding records support that determination and foreclose Defendants' categorical state-agency argument.

## IV. HRO knew what Cauchon was reporting, and its own records tie the firing to his September 3 report to ODH.

### A. HRO was told in writing that federal money was at risk, and its own minutes show it understood.

The September 3 notice made the funding problem explicit. Cauchon told every director that the relationship should have been disclosed in HRO's contract application and its extension paperwork, identified HRO as "a state contractor receiving federal funds," described a continuing duty to disclose, and warned that an undisclosed conflict could end the federally funded contract. ECF No. 101-59, PageID 1841. He was not objecting to how a colleague was treated. He was telling the Board that representations HRO had made to obtain government money were wrong.

Defendants' own Exhibit A-12 supplies an especially direct contemporaneous notice. On September 6 Cauchon wrote that evicting him would be retaliation for his conflict disclosure concerning HRO's "federally funded naloxone contract" and would violate federal protections

for reporting possible federal-contracting violations. Steward forwarded that email to the Board. ECF No. 107-13, PageID 3047. Their Exhibit A-4 then records the October 4 request expressly invoking the FCA. ECF No. 107-5, PageID 2999. The formal complaint dated October 22 was transmitted October 23 and acknowledged that evening. ECF No. 101-63, PageID 1864–68. HRO's knowledge does not depend on an inference from an ordinary workplace grievance. The September 7 minutes confirm the directors understood the subject: "He (Dennis) is bringing up violation of federal regulations while his actions are in question of numerous federal regulations." Ex. 65, HRO_000103.

HRO's response confirms its understanding. On September 5 Steward ordered Cauchon "to cease and desist all activities related to conflict of interest matters, including but not limited to communications with funders, staff, and community partners." ECF No. 101-29, PageID 1677. Its termination letter later named the report as a ground, and its Rule 30(b)(6) designee included it among the acts leading to termination. ECF No. 101-25, PageID 1658–59; ECF No. 103-1, PageID 2508, 2512. Defendants do not dispute knowledge; the record establishes it.

### B. HRO planned the September 5 meeting before the written complaints it says caused it.

Defendants say employee complaints produced the September 5 emergency meeting and the ODH report was "entirely irrelevant" to leave. ECF No. 107, PageID 2963–64, 2975. Their documents place the meeting proposal first. This chronology bears on motive for termination; Plaintiff does not ask the Court to adjudicate the complaints' merits.

On September 3, after telling two directors that Cauchon intended to disclose the conflict and place Reese on leave, Steward proposed "an emergency meeting of the board without him after he sends the email." ECF No. 101-32, PageID 1689, 1691. Cauchon's disclosure notice to

the Board followed at 1:57 p.m. ECF No. 101-59, PageID 1841. The proposal therefore preceded the written complaints and expressly responded to the planned disclosure.

Although Reese's complaint is dated September 3, Defendants' exhibit shows transmission at 1:45 p.m. September 4. ECF No. 107-2, PageID 2991, 2993. The complaint itself challenges allegations concerning outside employment and Cauchon's "ongoing fact-finding"; it is not unrelated to the investigation he was conducting. *Id.* at PageID 2993. Nelson dates the other complaint emails September 5 and 6. ECF No. 107-11, PageID 3015–16. Earlier oral complaints are possible, but Steward could not supply dates or specifics establishing one before the September 3 meeting proposal. ECF No. 103-2, PageID 2615–16.

Steward's September 5 explanation to ODH supplies the connection directly. After discussing Cauchon's conflict report, he wrote: "Given this information and the following complaints, the board has officially placed Mr. Cauchon on administrative leave pending an investigation." ECF No. 101-64, PageID 1871. The leave notice likewise included the conflict within the investigation. ECF No. 101-30, PageID 1679. A handbook deadline for investigating complaints does not explain away the inclusion of Cauchon's ODH report. HRO later voted to terminate based on Nelson's investigation and final report. Ex. 67, HRO_000108. The documents contradict the claim that the ODH disclosure played no part in the process that led to termination. Nelson's report likewise opens by explaining that HRO initiated the investigation because Cauchon reported the conflict to ODH without a formal investigation and against the Board's advice. ECF No. 107-11, PageID 3008. Plaintiff offers that account to show what the Board's investigation addressed, not to concede that the disclosure violated a binding instruction. The process HRO invokes to explain termination included the very reporting it now calls irrelevant.

## V. A jury could find that HRO's stated reasons for termination are not the real ones.

HRO has articulated facially legitimate reasons, satisfying its burden of production. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254–56 (1981). Plaintiff reserves ultimate causation and pretext for trial. ECF No. 101-1, PageID 1504. The question is whether the reasons given actually explain the discharge.

Plaintiff relies on the first two pretext routes: the stated reasons lacked a basis in fact or did not actually motivate HRO. *Harris v. Metropolitan Government of Nashville & Davidson County*, 594 F.3d 476, 486 (6th Cir. 2010); ECF No. 107, PageID 2978. Because HRO offers its reasons as independently sufficient, each must be answered. The evidence is its own minutes, correspondence, termination letter, investigation, and testimony—not speculation or temporal proximity alone.

### A. The explanation has changed with each telling.

At the October 13 meeting where the Board voted to terminate him, one of its directors listed the reasons. Turner-Bicknell — the director HRO later designated to testify on its behalf — said there were "clear bulleted items for why Dennis should be dismissed: 1) He was told to cease and desist, 2) He tampered with the wrbsite, 3) He threatened the board, 4) he was consistently dishonest, and 5) what the investigation turned up." Ex. 67, HRO_001463 (errors in original). Steward, the vice chair, gave his own account in the same session: after he "began to hear there was no legal ground for retaliation," he "felt we (as a board) did the right thing — that Dennis put $1-million at risk and lied to ODH (about AmandaLynn)." *Id.*

The letter HRO sent three weeks later gave a different list. It named four grounds: that Cauchon reported to the State in bad faith and in violation of HRO policy, that he disregarded counsel in favor of ChatGPT, that Bourland's promotion exposed the organization to equal-pay risk, and that he was insubordinate. ECF No. 101-25, PageID 1658–59. The equal-pay ground

appears nowhere in the visible minutes of the October 13 discussion. The website ground given on October 13 appears nowhere in the letter. And the Board made the website accusation even though Nelson's report, received four days earlier, already recorded the developer who examined the outage as "adamant that this was not a 'malicious' action." ECF No. 107-11, PageID 3016.

Two limits qualify that comparison. The October 13 executive session minutes carry a redaction, so they do not establish everything that was said. And the counsel ground was foreshadowed: Turner-Bicknell said Cauchon "did not listen to sound advice," and Decker urged the Board to "listen and defer to the legal council we hired." Ex. 67, HRO_001462.

The account has continued to move. HRO's Rule 30(b)(6) designee testified that Cauchon was "terminated for insubordination," identifying several acts, with the report to ODH third in the initial list. ECF No. 103-1, PageID 2508. The introduction to Defendants' motion lists six acts, "among other things." ECF No. 107, PageID 2957. The argument section then describes the termination letter as resting on four bases — ignoring counsel's advice, ignoring the asserted prior agreement, equal-pay risk, and insubordination. *Id.* at PageID 2976. Absent from that description of HRO's own letter is the letter's first ground: Cauchon's September 3 report to ODH.

Different levels of detail in different documents prove nothing by themselves, and Plaintiff does not argue otherwise. But an employer's "changing rationale for making an adverse employment decision can be evidence of pretext," because the inconsistency "raises an issue whether the proffered reason truly motivated the defendants' decision." *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). Timing is part of that showing, and here it is not the whole of it. The directors wrote their reasons down as they went, and what changed is not only when a reason appeared but what it said. The dispute is not that the list grew or shrank. It is

that the ground HRO put first in writing to Cauchon, and the one its vice chair named at the vote, is the ground Defendants' own summary of that letter leaves out.

HRO's answer is that the report was not protected activity but insubordination — a violation of an agreement about process. Whether that label fits is the subject of the three subsections that follow. But applying that label does not bypass the jury. At summary judgment a court "cannot accept an employer's conclusory claim that an employee was insubordinate when the alleged 'insubordination consists of refusing to cease what a jury could find to be reasonable [Title VII]-protected activity.'" *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 652 (6th Cir. 2015) (Title VII retaliation) (quoting *Kempcke v. Monsanto Co.*, 132 F.3d 442, 446 (8th Cir. 1998)). Just as the decisionmaker in *Yazdian* cited the employee's protected complaints as examples of his "unwillingness to accept and apply constructive coaching," *id.* at 648, HRO's designee listed the report to ODH among the acts of insubordination for which Cauchon was fired. ECF No. 103-1, PageID 2508. A reasonable jury could therefore conclude that what HRO calls insubordination was the protected activity itself. That does not by itself answer HRO's other stated reasons; the subsections that follow take each of them up.

**B. Seven of the reasons post-date the decision HRO says it made.**

Plaintiff does not concede that he was insubordinate. But even on Defendants' own account of when they decided, seven of the reasons they now give could not have motivated the decision. ECF 107 says that on November 4 "the Board memorialized its unanimous decision to terminate." ECF No. 107, PageID 2966. Memorialized is their word, and it presupposes a decision already made. The motion never says when that decision was made. Across thirty-eight pages it does not mention the October 13 meeting at all. The minutes of that meeting record what the motion leaves out:

> Colleen [Garlock] entered a motion to terminate Dennis Cauchon as Executive Director/President of Harm Reduction Ohio, based on the investigation conducted by Law Office of Maritza S. Nelson, LLC, and the final report issued to the board of HRO; the terms of dismissal are pending . . . . Tasha [Turner-Bicknell] seconded. . . . All remaining present board members voted unanimously to terminate Dennis Cauchon.

Ex. 67, HRO_000108; ECF No. 101-24, PageID 1652. What remained on October 13 were the terms, not the decision.

The relevant date is when Defendants became motivated to terminate, not merely the formal termination date. *Haji v. Columbus City Schools*, 621 F. App'x 309, 313 (6th Cir. 2015). Seven acts the motion offers post-date October 13: the October 14 meeting demand, October 28 demand for investigative materials, October 30 Chase instruction, November 1 assertion of presidential power and letter to First Federal, and November 4 QuickBooks demand and changed locks. ECF No. 107, PageID 2965; ECF Nos. 107-8 through 107-10, PageID 3003–06. Those events could not have motivated a decision already made, including the bank and lock incidents emphasized at PageID 2977–78.

If November 4 was a fresh decision, the intervening evidence matters. HRO had received Cauchon's October 22 FCA complaint. ECF No. 101-63, PageID 1864–67. On November 4 Garlock wrote that they "still need to send the letter and terminate him," while identifying a problem: "he can say we terminated him in retaliation"; Turner-Bicknell emphasized cease-and-desist and leave violations and declared there was no whistleblowing or retaliation. ECF No. 101-65, PageID 1888–89. Plaintiff offers those later messages only for the later-decision theory. He does not concede that the October 13 meeting validly authorized termination; that is Count Two's question.

The insubordination label also must be considered against the president's assigned role. The Bylaws delegate day-to-day operations and give the president responsibility for carrying out

HRO's goals and policies. ECF No. 101-5, PageID 1535, 1537. A jury could find that Cauchon understood himself to be carrying out those responsibilities rather than defying a lawful withdrawal of authority. Count One does not ask the Court to decide director status or the validity of Board meetings, and continuing operational authority does not itself establish protection for every disputed act.

**C. The decisionmakers wanted this outcome before the investigation began.**

Two days after placing Cauchon on leave, and before any investigator had been retained, the Board met in executive session. The minutes record: "Dennis needs to be fired from HRO immediately. An investigation is useless at this point as his behaviors have clearly shown over the last week." They do not name the board member speaking. Garlock said she "would fire Dennis if this was up for a vote today," and Steward said he "feels like we need to terminate Dennis too- if he messed with the website, Dennis actively harmed our constituency." The minutes add that "[h]is intent was to handle this in a way that let Dennis leave gracefully." Ex. 65, HRO_000103. The Board was already looking for his successor: Golden had "talked to Blyth regarding being interim director," and when Blyth hesitated the discussion turned to a staff member Steward called "a good candidate for permanent director." The directors "discussed how to handle Dennis leaving," noted that security could be "on standby duriinng this action," and set an action item to "Move forward with Interim ED candidate," due September 10 to 13. Ex. 65, HRO_000104–105.

The same action items show that the investigation had not started. They list it as something to begin, due September 9, alongside a meeting with an attorney due September 10 and "Meet with Dennis and try to get him to leave if possible," due September 9. Ex. 65, HRO_000105. The investigator's own report dates HRO's retention of her office to on or about September 13. ECF No. 101-34, PageID 1720. Plaintiff does not contend that a final vote

occurred on September 7, or that the staff and office concerns the same minutes record were all unfounded. But the investigation ECF 107 describes as the cause of the termination had not begun, and a jury could find that it became the justification for a departure the Board was already planning.

When the report came back, the directors discussed his reporting. On October 13, in the executive session that preceded both votes, the minutes record that the "Board discussed, led by Dwayne, Billy and Tasha the recommendation to re-instate AmandaLynn, mainly due to how Dennis Cauchon handled reporting to ODH and, there was no conflict of interest." Ex. 67, HRO_001462. When the executive session ended, the Board voted at the same meeting to reinstate Reese effective October 16 and then to terminate Cauchon. Ex. 67, HRO_000108. A jury could find that what moved the directors when they voted was how Cauchon had reported to the State.

Honest belief addresses whether a reason lacked a factual basis; it does not resolve whether that reason actually motivated the employer. *Briggs v. University of Cincinnati*, 11 F.4th 498, 515–16 (6th Cir. 2021). The September 7 and October 13 records independently support that second pretext route. Section V.E also addresses whether HRO made a reasonably informed decision.

**D. The agreement does not establish the promise HRO says Cauchon broke.**

HRO says Cauchon broke this promise: "You agreed that legal counsel should conduct an investigation and prepare a report." ECF No. 101-25, PageID 1658. The motion instead describes an agreement "to maintain the status quo until HRO's lawyer could review and revise HRO's COI policy and advise HRO accordingly." ECF No. 107, PageID 2962. Reviewing a policy and investigating a person's conduct are different assignments. Plaintiff accepts that an interim arrangement existed; he disputes the broader promise to await a factual investigation and report

before disclosing to ODH. The termination letter charges Cauchon with breaking the broader promise. The motion describes the interim arrangement, and so do the contemporaneous records of what counsel was actually asked to do, discussed below.

The document ECF 107 prints to establish that agreement is an email from HRO's administrator to Reese, copying Cauchon, sent August 30 at 11:51 a.m. under the subject line "Quick recap of today's meeting." Cauchon Dep. Ex. 13, REESE_000037–039, ECF No. 102-1, PageID 2120–22. It describes the lawyer's role as drafting: he was "looking into" the employee handbook and the conflict-of-interest policy and disclosure form, after which "HRO's Board will review/edit and then approve." The fourth and last item promises only that HRO "will follow the process approved by the Board to assess any potential conflict of interest" — a process that did not yet exist, since the lawyer was still writing it. The closing line, "In the meantime, all your duties stay the same as they have been," is addressed to Reese and is about Reese's job. Nothing in the email, or in the four-message thread it belongs to, mentions an investigation, a report, or disclosure to the State. The email records an arrangement, but a jury could find that it does not establish the broader promise the termination letter attributes to it.

An arrangement did exist, and Plaintiff does not deny it. Defendants' own questions define its scope: Reese would remain in her role and continue "her day-to-day responsibilities," she was "not going to be placed on administrative leave, at least as of that time," and there would be "no operational changes" while Ball reviewed the handbook, the conflict policy and the disclosure form. Cauchon Dep. I 124:9–125:4, 134:3–135:11, ECF No. 102-1, PageID 1934, 1937. Those admissions support HRO's argument that placing Reese on leave departed from that arrangement. But the report to the State answered a different question — when HRO's contract

and the regulations required a conflict to be disclosed. Nothing in the arrangement addressed that question, or made disclosure to the State a disciplinary offense.

Cauchon's testimony is to the same effect. Asked about the theory that "there would be an investigation, and that we would wait for the advice of counsel before doing anything," he testified:

> No, there was no decision reached. I suggested that we could have the outside — David Ball do it. He said it wasn't really appropriate for him. . . . Then we agreed to the status quo.

Cauchon Dep. I 204:22–205:5, ECF No. 102-1, PageID 1954. Asked whether HRO had engaged Ball to investigate and report on Reese's conflict, he answered: "To do the report, no, we did not." *Id.* at 118:9–18, PageID 1933.

The August 31 exchange contains both an acknowledgment of the status quo and a request for the information needed to assess the conflict. Cauchon wrote: "I think we all understand things are status quo until the lawyer finishes his review." In the same message he asked that Reese's disclosure material be forwarded "to me, Cecile and Dave Ball." Steward forwarded the request to Reese: "Are you comfortable with this? I wanted to check in before I sent Dennis anything you sent me." After she objected, he wrote to her, "I will hold off on sending for now." Cauchon Dep. Ex. 14, ECF No. 102-1, PageID 2124–25. The acknowledgment is evidence for HRO's position and cannot be read out of the exchange. But neither does the exchange identify a promise to await an investigative report before making a disclosure to ODH. It shows Cauchon seeking the underlying information while counsel's review remained unfinished.

The lawyer Cauchon referred to on August 31 was David Ball, and his own September 4 emails show what he was actually asked to do. Cauchon asked, "Would it make sense for you to do the interview?" Ball answered that an outside investigator exists to address "the risk of

litigation and the risk of accusations of bias," said "I don't see the risk of litigation here," and suggested "maybe the interview could be done by Cecile and Dwayne?" Twenty-five minutes later he wrote, "Makes sense. I green light the form." ECF No. 101-60, PageID 1853–55. HRO said the same thing in writing the next day. Steward told the Board that "[t]he board plans to bring in a third party to investigate," while the attorney already under contract "will remain on contract and his scope will be tailored to the completion of the Handbook and the Conflict of Interest policy and disclosure form." Cauchon Dep. Ex. 24, HRO_000150, ECF No. 102-1, PageID 2187. That does not by itself prove no earlier understanding existed. It is evidence of what HRO understood counsel's engagement to be.

Steward expressly left the disclosure decision with Cauchon. On September 2 Cauchon told Steward that he and the administrator had a meeting with the Ohio Department of Health the next day and that "I think we have a duty to disclose." Steward answered:

> Have you talked to Dave to get his advice on what you should or shouldn't disclose to ODH? I think his advice is crucial here. Whether you tell ODH or not is ultimately up to you as the ED. I just think it's better to tell ODH when there's a clear plan on how we're solving the issue.

Ex. 66, CAUCHON_003019. Steward did not approve the disclosure. He preferred delay and counsel first. What he did was place the decision with Cauchon, the day before the report. Defendants' verified answer identifies the first September board meeting as September 5, noticed September 4 — after the report. ECF No. 101-26, PageID 1663.

Cauchon explained what changed: "It wasn't about a conflict. It was disclosure that I was researching, when we had to disclose" under "regulations and the contract." Cauchon Dep. I 153:2–10, ECF No. 102-1, PageID 1941. New conduct by Reese was not necessary for him to reassess an existing disclosure duty. The question is not whether he preferred a different process. It is whether HRO honestly relied on a promise that included postponing the report, and whether

that was its actual reason for discharge. The contemporaneous descriptions of counsel's task and Steward's September 2 answer permit a jury to reject that explanation.

**E. Advice of counsel is evidence of good faith, not immunity from examining it.**

Defendants call reliance on counsel "fatal to Plaintiff's claim." ECF No. 107, PageID 2976. It is a legitimate explanation, not immunity from pretext review. *Pettit v. Steppingstone, Center for the Potentially Gifted*, 429 F. App'x 524, 534–38 (6th Cir. 2011), treated counsel's involvement within the burden-shifting analysis. The employer prevailed, but not because advice ended the inquiry.

Honest reliance must rest on particularized facts available when the decision was made and a reasonably informed and considered decision. Courts do not automatically accept an employer's account as honest. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807–08 (6th Cir. 1998). The protection is tied to the nature of the investigation and disciplinary decision. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012).

HRO obtained a substantial outside investigation: Nelson recorded ninety-five hours, nine interviews, and review of numerous materials. ECF No. 107-11, PageID 3009–12. Plaintiff challenges whether that work supports the conclusions used to fire him, not its volume. In *Shazor v. Professional Transit Management, Ltd.*, 744 F.3d 948, 960–61 (6th Cir. 2014), one conversation did not establish particularized facts supporting a dishonesty finding. This investigation was much larger, but the question remains what it established about the specific reason asserted.

First, the disclosed retaliation analysis addresses Title VII and Ohio law, then concludes that Cauchon was not engaged in federally protected activity. It does not apply § 3730(h). ECF No. 107-11, PageID 3036–38; ECF No. 101-34, PageID 1725. Plaintiff draws no inference from court-ordered redactions and does not claim the statute appears nowhere in the complete report.

But the disclosed analysis supplies no FCA basis for treating Cauchon's September 3 report to ODH as unprotected.

Second, the compensation finding is attributed to Reese's account: "Velocity pays her a retainer and an hourly rate." ECF No. 107-11, PageID 3020. The materials list identifies no Velocity employment agreement, wage, expense, or travel records. *Id.* at PageID 3010–12. The agreement later produced instead describes full-time employment on Hikma's behalf at a fixed monthly salary. VELOCITY_000031–32, 000035 (ECF No. 60, filed under seal, Ex. 35); *see* ECF No. 111, PageID 3063 (redacted). The list is nonexclusive, and later production alone does not prove earlier dishonest reliance. The narrower question is whether accepting the subject's compensation account adequately supported the conclusion used against the person seeking the facts.

Third, the report calls a possible-conflict concern "understandable" on the facts then known, yet later says it is "simply impossible to believe that he was acting in good faith when he chose to rely on Chat GPT over HRO's actual attorney." ECF No. 107-11, PageID 3032, 3038. The first statement is conditional and the report gives other reasons, but a jury can examine the leap from disagreement with counsel to bad faith, especially given § V.D's evidence about counsel's actual assignment. *Thompson v. Quorum Health Resources, LLC*, 485 F. App'x 783, 792–93 (6th Cir. 2012), likewise permits examination of whether an outside investigation established the asserted reason. It reviewed a jury verdict involving an omitted central document, not these facts; it supports scrutiny, not an automatic finding that Nelson's investigation was a sham.

HRO also relies on a ground that does not depend on the investigation's quality: that Cauchon did not sit for an interview. He did not, and Plaintiff does not pretend otherwise. But

the motion claims more than its own citation gives it. ECF 107 states that "Plaintiff does not dispute that he would not cooperate with the investigation against him," and cites six lines of deposition. ECF No. 107, PageID 2977. Those lines establish two things and stop there: Nelson "requested an interview, yes," and that interview "never took place." Cauchon Dep. II 13:2–7, ECF No. 102-2, PageID 2203. Whether that amounted to a refusal to cooperate is a question the cited testimony does not answer.

Cauchon explained his own decision under oath. Asked whether he had ever agreed to sit down with Nelson, he answered no, and explained that his attorney, David Martin, had advised against it and that he "did not want to legitimize the investigation, because I knew that the board had not hired Maritza, had not taken any official action to conduct the investigation." Cauchon Dep. I 265:25–266:14, ECF No. 102-1, PageID 1969–70. He also said what would have changed his answer: "If she had been lawfully hired by the board, if she had disclosed her conflict." *Id.* at 267:8–14, PageID 1970. Plaintiff does not ask the Court to decide whether that belief was correct, and he does not claim that counsel's advice immunized his conduct from employment consequences. Count Two raises the authorization questions on their own record. The point here is narrower. The testimony supplies an explanation that the motion's account omits. Nelson stopped asking as well. Her report gives the reason — a September 24 letter from an attorney who, in her words, "did not indicate that he was also representing Dennis with respect to this employment investigation," after which "we have not made any further attempts to secure Dennis' cooperation." ECF No. 107-11, PageID 3010.

The correspondence says more than the motion allows as well. On September 18 Cauchon wrote that he planned to participate "to the extent possible," asked what the investigation covered, and asked whether the firm had prior relationships with the Board or staff.

Ex. 68, HRO_001366. Nelson answered on September 20 with a three-page letter. She wrote that "repeatedly demanding access to this information is inappropriate," that "[i]nstead of full cooperation" he had qualified his participation, and directed him to "[p]romptly clarify what, if anything, would prevent your full participation in this investigation." She added that "there is some concern that these repeated requests are an attempt by you to harass and intimidate the board," called them "unfounded demands," and warned that "any attempts to impede the investigation may result in disciplinary action, up to and including termination." Ex. 68, HRO_001368–370. Part of that letter helps HRO: it asked for his cooperation. But Nelson wrote it before interviewing Cauchon. A jury could weigh whether an investigator who had already characterized his requests for information as inappropriate, unfounded and a possible attempt to harass the Board was placed to weigh his account with an open mind. Those statements bear on whether HRO reasonably relied on the investigation when it decided to terminate Cauchon. The question is whether HRO made the reasonably informed decision the honest-belief rule requires. *Smith*, 155 F.3d at 807–08.

The record also permits a separate finding that nonparticipation did not actually motivate termination. Nelson's nine interviewees included no director. ECF No. 107-11, PageID 3009–10. The investigation therefore did not test the decisionmakers' motives through interviews, and the September 7 minutes already recorded the desire for Cauchon's departure. That evidence remains relevant even if HRO honestly believed he should have participated.

The equal-pay ground also has a documentary answer independent of the complaint's merits. After learning of the promotion complaint, the Board chose to honor Bourland's interim promotion. ECF No. 107-11, PageID 3012 (Defendants' investigator recording the "September 10, 2024 Email from the Board to Kelsey and Molly letting them know the Board decided to

honor Patrick's interim promotion"). That did not eliminate possible exposure, but a jury could question whether the same promotion truly motivated firing when HRO had decided to let it stand. Plaintiff does not ask the Court to adjudicate anyone's qualifications or the complaint's truth. That is an actual-motivation argument, not an assertion that keeping the promotion erased a possible claim or made the original decision lawful.

The record supports causation even under a but-for standard. The published Sixth Circuit formulation asks whether protected conduct motivated the employer at least in part. *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 518 (6th Cir. 2000). The Court need not resolve whether a stricter formulation governs because a jury could find termination would not have occurred without the reporting: the letter names it, the investigation arose from it, and directors wanted termination before the investigation began. Later events cannot explain an earlier decision, while the asserted agreement and particular investigative conclusions remain disputed. These are grounds to test each explanation, not merely the timing of discharge. Plaintiff asks the jury to resolve those disputes, consistently with the matters reserved in ECF No. 101-1, PageID 1504. Viewed together, the documents permit a finding that the asserted independent reasons were not the reasons HRO actually acted. Plaintiff seeks denial of Defendants' motion on that ground; he does not ask the Court to resolve the disputed motives in his favor on summary judgment.

## VI. Cauchon does not oppose summary judgment for the individual Defendants on Count One, which leaves HRO and Count Two unaffected.

Defendants argue in the alternative that if any FCA retaliation claim survives, Steward, Golden and Turner-Bicknell must be dismissed because they were not Cauchon's employers. ECF No. 107, PageID 2979. Plaintiff does not oppose summary judgment for those three Defendants on Count One on that ground. See *Roberto v. Kent State Univ.*, No. 5:16-cv-1305,

2017 U.S. Dist. LEXIS 45509, at *5–7 (N.D. Ohio Mar. 28, 2017); *Howell v. Town of Ball*, 827 F.3d 515, 529–30 (5th Cir. 2016).

The argument goes no further. It assumes the claim survives, so it leaves Count One against HRO, whose counterclaim alleges that Cauchon "was terminated from his employment as president of HRO" on November 4, 2024. ECF No. 62, PageID 1226, ¶ 12. Plaintiff's nonopposition concedes nothing about what these three Defendants did; their knowledge and conduct remain evidence of HRO's motive, as §§ IV and V explain. And it does not reach Count Two, pleaded against all Defendants on separate grounds.

Any judgment on the not-employer argument should therefore be confined to Count One as to those three Defendants.

## COUNT TWO — THE VALIDITY OF FOUR 2024 BOARD ACTIONS

### I. The requested declarations resolve the authority for four actions taken against Cauchon.

Both parties have moved for summary judgment on similar board governance questions. Plaintiff asks the Court to declare that four Board actions taken against him in 2024 were not validly authorized: three were taken at meetings held without the two weeks' written notice to each director that the Bylaws require, and the fourth was taken in writing without the approval of every director entitled to notice. Defendants ask the Court to hold that "HRO's Actions Substantially Complied with HRO's Policies and Ohio Law." ECF No. 107, PageID 2980. Their answer is that the shortfalls did not matter: they do not contest defective notice for the September 5 suspension meeting, answering only that the relief sought is moot because Plaintiff was later terminated;[2] the October 27 meeting substantially complied; and the November 4 termination

[2] The September 5 minutes record no motion, second or vote placing Cauchon on administrative leave. ECF No. 101-23, PageID 1649. The record HRO kept shows actions on other business but does not show the leave being authorized.

letter was signed by every director entitled to vote. *Id.* at PageID 2980–84. Both motions turn on the same documents — HRO's meeting minutes, notices and verified interrogatory answers — and should be decided together.

Board actions on four dates are contested: (1) September 5, 2024 (the suspension), a meeting held on one day's notice and none to Cauchon, a director; (2) October 13, 2024 (the termination vote), a meeting held on two days' notice and none to Cauchon; (3) October 27, 2024 (removal as a director), a meeting held on twelve days' notice rather than fourteen, at which Cauchon was given materially different records than the other directors; and (4) November 4, 2024 (the termination letter), an action taken without any meeting and defended under Ohio Rev. Code § 1702.25. ECF No. 101-1, PageID 1502–03, ¶¶ 4–7.

Defendants do not explain why October 13 is absent from their list. It is the only vote to terminate Cauchon in this record, and their own statement of facts says the November 4 letter "memorialized" that decision. ECF No. 101-24, PageID 1652–53; ECF No. 107, PageID 2966. Their motion asks the Court to deny relief as to "any board meeting other than those addressing his suspension and/or termination." ECF No. 107, PageID 2980. That standard reaches the October 13 meeting. Their enumeration of three dates cannot be squared with the limit they announce one sentence later. ECF No. 107 does not address the October 13 vote or offer a basis for excusing its notice defect.

Whether Cauchon was a director entitled to notice is a threshold question: it decides whether three of the four actions were taken at validly convened meetings, and whether the November 4 writing required his approval. It reaches past Count Two. HRO's counterclaim alleges that a "unanimous board action" terminated Cauchon and ended his authority to access HRO's property and accounts. ECF No. 62, PageID 1226, ¶¶ 12–13. Count Two asks whether

that board action was validly authorized. Plaintiff seeks no declaration invalidating unrelated meetings, does not ask who presently controls HRO, and does not seek an order installing Cauchon in a Board seat. The Court should deny Defendants' summary judgment motion and grant the specific authorization determinations requested in ECF No. 101.

## II. Cauchon was a director entitled to notice when the challenged actions occurred.

Defendants call Cauchon an "alleged" board member eight times. ECF No. 107, PageID 2952, 2955, 2958, 2965, 2982 (twice), 2985 (twice). They have not established that Cauchon lawfully ceased to be a director before the challenged actions, and cite no bylaw, statute, or case that supports the claim. As evidence cited in this response and even more provided in ECF 101 shows, Cauchon was a board member during the relevant period and the fact is supported by voluminous undisputed corporate records. ECF No. 101-1, PageID 1472–75. A movant bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Arguments "adverted to in only a perfunctory manner[] are waived." *Kuhn v. Washtenaw County*, 709 F.3d 612, 624–25 (6th Cir. 2013).

HRO treated Cauchon as a director before the dispute and voted to remove him as one during it. The September 2018 minutes list him as a Board member and record his election as Chairman. The March 9, 2024 minutes again identify him among the "Board members in attendance." ECF No. 101-6, PageID 1539–40; ECF No. 101-7, PageID 1546. Former director Laura Cash confirms that he voted, made and seconded motions, and participated as a director throughout her service from 2018 through 2022, and that she observed no action removing or replacing him. ECF No. 101-20, PageID 1638, ¶¶ 2, 4–8.

Even the records of contested meetings support Cauchon's director status. The September 5 and October 13 minutes list Cauchon as an absent board member. ECF No. 101-23, PageID 1649; Ex. 67, HRO_000108. At the October 27 meeting, Cauchon asked whether he was recognized as a voting member. Steward answered, "Yes. Actually, yes." ECF No. 101-33, PageID 1710. Steward volunteered why Cauchon had not been noticed for meetings held during his leave: "During your administrative leave, the board felt it unethical for you to be a part of the investigation that was about you, which is why you weren't in attendance."[3] *Id.* at PageID 1711. The minutes record a motion to remove him "as an offical board member." ECF No. 107-12, PageID 3045–46 (error in original). A non-director does not have to be removed as a director.

Before discovery, Judge Sargus said he could not "move forward until his status as a board member is cleared up," and set a hearing on it. ECF No. 27, PageID 574. He directed Defendants to present first: "we'll start with the defense because you're making the affirmative claim that he is not, so you will present whatever testimony you believe is pertinent to his board member status, or not." *Id.* at PageID 575. When Cauchon later moved for an evidentiary hearing, Defendants opposed, telling the Court the issue "can be evaluated through the normal course of discovery." ECF No. 78, PageID 1353. The Court denied that motion without prejudice and never reached the question. ECF No. 89, PageID 1406, 1408 n.2. Discovery has closed. Defendants have not established that Cauchon lawfully ceased to be a director before the challenged actions. The threshold question is ripe: was Cauchon a board member entitled to notice of meetings during the relevant period?

Plaintiff requests leave to respond if Defendants supply the missing rule or argument challenging Cauchon's director status for the first time in reply. S.D. Ohio Civ. R. 7.2(a)(2).

[3] ECF No. 107 offers legal theories to explain Defendants' failure to follow the Bylaws requirement to notice "each director," but it does not address the explanation Defendants gave at the time for excluding Cauchon. Steward, also a subject of the investigation for retaliation, received notice for meetings.

## III. The October 27 meeting did not satisfy the Bylaws' notice requirement.

### A. The Bylaws required fourteen days and Defendants admit twelve.

HRO's Bylaws say: "An official board meeting requires that each board member have written notice at least two weeks in advance." The special-meeting provision repeats the two-week requirement. ECF No. 101-5, PageID 1535–36, Art. III, §§ 3, 10. Defendants' counsel identified the notice for the October 27 meeting as Steward's October 15 email. ECF No. 101-28, PageID 1675. Defendants admit that is twelve days rather than fourteen. ECF No. 107, PageID 2982–83.

### B. Cauchon objected before and at the start of the meeting, so he did not waive the notice defect.

Ohio Rev. Code § 1702.19 governs notice required by corporate bylaws. It describes the two ways a director waives defective notice: (1) a written waiver "filed with or entered upon the records of the meeting," or (2) attending "without protesting prior to or at the commencement of the meeting." Cauchon did neither.

On October 26, he wrote an email to all fellow board members: "I do not waive proper notice for a board meeting to be held tomorrow. … The lack of proper notice and equal access to board materials denies me adequate time and information to prepare for a board meeting." ECF No. 101-33, PageID 1709. At the start of the October 27 meeting, he said: "I do not waive proper notice and object to this meeting. This meeting was improperly convened under Ohio law and our bylaws." *Id.* at PageID 1711. Defendants' minutes record the objection. ECF No. 107-12, PageID 3045.

Defendants' list of undisputed facts does not supply a waiver. ECF No. 107, PageID 2983. Defendants admit twelve days rather than fourteen. Their other items describe Cauchon asking for a meeting and other directors attending on the same defective notice. These facts are

not relevant to waiver. Under § 1702.19, waiver belongs to each individual director, not a majority.

Defendants' own words at the meeting describe a majority-rules view of meeting notice that contradicts Ohio law, HRO's Bylaws and the instruction of their own attorney. Cauchon said, "I asked for a properly noticed meeting. I did not ask for an improperly noticed meeting." ECF No. 101-33, PageID 1713. Steward responded that it

> sounds like we have a different definition of proper notice. Which is fine. Everyone was noticed at the same way to get into this meeting today. So there are six folks who believe this is a properly noticed meeting, and one who does not. So I think that is important for the record.

*Id.* (errors in original). The meeting minutes record it the same way: "Dwayne stated there must be a different definition of a properly noticed meeting, as everyone was noticed the same way about the meeting. Dwayne then noted there are 6 who voted noting that this is a properly noticed meeting and one that is not." ECF No. 107-12, PageID 3046.

Defendants' own counsel instructed them that two weeks' notice was required for a removal vote. In her October 9 report, Nelson advised removal "[a]fter providing two weeks' notice of a regular or special board meeting." ECF No. 107-11, PageID 3039; ECF No. 107, PageID 2975. Defendants rely on the report's same page (HRO_001430) for their claim that Cauchon was "Terminated at the Advice of Counsel." ECF No. 107, PageID 2965–66.

### C. Cauchon did not waive notice, and *Robb* and *Resnick* do not excuse the admitted shortfall here.

Defendants rely principally on two cases to excuse violating HRO's board-meeting notice requirements: *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 75 Ohio St.3d 264, 268–69 (1996), and *Resnick v. Camp Tuscazoar Foundation, Inc.*, 1997 Ohio App. LEXIS 3973, at *4–5 (5th Dist. Aug. 12, 1997).[4]

[4] Defendants also cite three public-body cases that have little relevance here. *State ex rel. Jones v. Bd. of Edn. of Dayton Pub. Schs.*, 2018-Ohio-676, excused defects in a school board's special-meeting notice under Ohio Rev.

Neither case forgave an organization for breaking a notice rule that names a number of days required for a valid meeting. Neither forgave an organization for failing to notice a director for a board meeting. Neither applied Ohio Rev. Code § 1702.19, which describes how defective notice may be waived.

In *Robb*, the constitution specified no minimum interval between the trustees' recommendation and the membership vote. The Court upheld at least seven days' notice because the members knew the charges and had a meaningful opportunity to respond. 75 Ohio St.3d at 268–69. In *Resnick*, the foundation had a thirty-day waiting period on a disciplinary vote and kept it; the court forgave a disputed ballot. 1997 Ohio App. LEXIS 3973, at *6.

*Robb* upheld an expulsion despite a trustees' hearing closed to the members, because they had notice and a meaningful chance to address the final decisionmakers. Neither case involved twelve days' notice under a fourteen-day rule.

HRO's Bylaws are clear, the notice requirement (14 days to each director) is stated twice, and Defendants were told of the requirement by their attorney before failing to follow it. ECF No. 101-5, PageID 1535–36; ECF No. 107-11, PageID 3039. Substantial compliance, offered here for the first time, illustrates shifting defenses for defective notice. ECF No. 101 answers several earlier rationales. ECF No. 101-1, PageID 1454.

### D. Even if substantial compliance applies, the Board's conduct falls short.

Defendants argue substantial compliance only for the October 27 removal. ECF No. 107, PageID 2958, 2982–83. Their heading and conclusion extend it to "HRO's Actions" and to

---

Code § 3313.16 because the complaining party had actual notice, *id.* ¶¶ 27–28, but held the board's action invalid under the Open Meetings Act, Ohio Rev. Code § 121.22, where substantial compliance does not apply, *id.* ¶¶ 3, 34. *Stuble v. Bd. of Edn. of the Cuyahoga Valley Joint Vocational Sch. Dist.*, 8th Dist. Cuyahoga No. 44412, 1982 Ohio App. LEXIS 12318, at *9–13 (Oct. 7, 1982), applies the pupil-expulsion statute, Ohio Rev. Code § 3313.66, and excused a hearing held outside the statutory window because the notice came earlier than required. *Cherry Lane Development, L.L.C. v. Walnut, C & DD, L.L.C.*, 2012-Ohio-3559, applies the township zoning statute, Ohio Rev. Code § 519.12, and excused missing written notice because the objectors were told of the hearing orally, attended, and "participated fully." *Id.* ¶¶ 28–29. None involves a private nonprofit, its bylaws, or a director's notice rights under Chapter 1702.

"properly terminating Plaintiff." *Id.* at PageID 2980, 2987. But their substantial-compliance analysis addresses October 27, not the October 13 termination vote. They defend November 4 separately as written action under § 1702.25. *Id.* at PageID 2984.

The considerations Defendants' cases emphasize are whether the affected person knew what the organization planned to do, whether he had a real chance to answer before it decided, and whether anyone was harmed by the defect. *Robb*, 75 Ohio St.3d at 268–69; *Resnick*, 1997 Ohio App. LEXIS 3973, at *5–6. On their own motion, Defendants must show there is no genuine dispute that these considerations support substantial compliance. Fed. R. Civ. P. 56(a). The record shows they do not.

The directors planned Cauchon's removal in their group text and kept its purpose from him. Four days before the meeting, Director Billy Golden asked whether there would "still be a quorum to vote him off" if the three directors accused of retaliation recused. Director Molly True replied "Yup" and then "Thank god." ECF No. 101-35, PageID 1733. Garlock texted that Cauchon had asked for the meeting's agenda. *Id.* at PageID 1738–39. Steward replied the agenda "should be short and sweet." The brief agenda did not mention that the meeting's purpose was to remove him from the board. *Id.* at PageID 1740; ECF No. 101-33, PageID 1708. In the group texts, Steward wrote the motion for Cauchon's removal and told the group "someone will need to bring forward the motion" and "we'll need someone to second." Ex. 69, HRO_001044–45. Director Anne Trinh volunteered to make the motion. *Id.* at HRO_001047. At the meeting, she read the motion nearly word for word; Garlock seconded. ECF No. 107-12, PageID 3046. The meeting lasted eight minutes. *Id.* at PageID 3045.

The Board also withheld from Cauchon the minutes from the previous October 13 meeting that were supplied to all other directors and listed on the agenda for approval. On the

evening of October 13, the other directors were provided complete minutes – two pages for a regular meeting, three pages for an executive session – that recorded a unanimous vote to terminate him. Ex. 67, HRO_000108–109, 001462–465. On October 25, Garlock asked the group which minutes to send Cauchon with the agenda. Steward answered, "I think we redact it." ECF No. 101-35, PageID 1742–43. At 12:43 p.m. on October 26, Garlock sent Cauchon a copy of the regular session minutes with his termination blacked out. ECF No. 1-33, PageID 335–38; ECF No. 101-24, PageID 1654–55. She did not provide the executive session minutes in any form. At 4:54 p.m., Cauchon objected in writing to the defectively noticed meeting, stated he refused to waive notice, and asked for "unredacted meeting minutes for the 10/13/24 gathering plus any other material provided to the other board members." ECF No. 101-33, PageID 1709. At 5:59 p.m. Garlock texted the group, "Read Dennis's email." Steward answered: "Ignore everything else he has to say." Ex. 69, HRO_001038–39.

The Board's conduct fails each of those considerations. Cauchon did not know what the Board planned: the agenda left out his removal, and he was excluded from discussions of the meeting's purpose. He had no real chance to answer because the outcome was scripted before the meeting began. After the meeting, Golden offered a reason why the meeting lasted just eight minutes: "Maybe because nobody gave in to debating his narrative?" He then asked, "Can someone explain what proper notice is supposed to mean?" Ex. 69, HRO_001053. And Defendants cannot show he was unharmed. He asked in writing for the minutes every other director had. He was expected to vote on approving October 13 minutes that had been redacted only for him, and the executive session minutes were withheld from him entirely. The day before the meeting, Steward told the others to ignore him.

## IV. Neither the October 13 vote nor the November 4 letter supplied valid authorization.

### A. Defendants do not defend the October 13 vote.

The Board fired Cauchon on October 13, two weeks before it tried to remove him from the Board. ECF No. 101-24, PageID 1652–53. The October 27 removal cannot explain why he was shut out of a meeting held two weeks earlier.

Defendants say the October 13 meeting was noticed by text on October 11. ECF No. 101-26, PageID 1664. Two days is not the fourteen required by HRO's bylaws. The minutes list two absent directors: Cauchon and Trinh. The minutes state "All remaining present board members voted unanimously to terminate Dennis Cauchon." Ex. 67, HRO_000108. Cauchon was not noticed for the meeting, did not attend and did not waive notice. ECF No. 101-2, PageID 1510, 1512, 1514, ¶¶ 9, 13, 20. ECF No. 107 does not mention the October 13 meeting. Yet their motion limits its no-controversy argument to meetings other than those "addressing his suspension and/or termination." ECF No. 107, PageID 2980. October 13 is the meeting where the Board voted to terminate Cauchon. Ex. 67, HRO_000108. Defendants offer no defense of its two-day notice.

### B. The November 4 letter fails under either of Defendants' accounts.

Defendants describe the November 4 termination letter in two ways. Their statement of facts says the Board "memorialized its unanimous decision to terminate Plaintiff's employment." ECF No. 107, PageID 2966. The letter's transmittal email says the same: "The HRO Board of Directors have voted unanimously to terminate your employment." ECF No. 101-25, PageID 1657. The only unanimous vote to terminate in this record is October 13. Their argument then calls the letter a new action taken without a meeting under Ohio Rev. Code § 1702.25. ECF No. 107, PageID 2984.

Either way, the letter fails. If it memorialized October 13, it is only as good as a two-day-notice meeting Defendants never defend. If it was a new action, it had to meet § 1702.25.

Section 1702.25 allows action without a meeting only "in a writing or writings signed by, … all of the directors … who would be entitled to *notice* of a meeting for that purpose." Ohio Rev. Code § 1702.25 (emphasis added). Action that falls short is ineffective. *Sander v. Country Brook Homeowners' Assn., Inc.*, 2020-Ohio-1555, ¶¶ 15–16, 23 (12th Dist.). Defendants quote the statute, then count only the directors they assert are "entitled to a *vote*." ECF No. 107, PageID 2984. The word swap – vote for notice – matters. It lets Defendants replace the statute's test with a fiduciary-duty argument that a conflicted director should not vote on his own termination. *Id.* at PageID 2985. The statute asks who is entitled to notice, not who may vote.

Seven board members signed the termination letter. Cauchon did not. ECF No. 101-25, PageID 1659; ECF No. 101-2, PageID 1512, ¶ 13. Defendants' answer is that he "was not a board member — in any scenario — as of November 4, 2024." For that, they point to their October 27 argument that untimely notice was excused by substantial compliance. ECF No. 107, PageID 2985. Under the new-action theory, the letter stands or falls with October 27. If the removal was invalid, Cauchon was still a director on November 4, and § 1702.25 required his signature for a board to act outside a meeting. Under Defendants' account that the November 4 letter memorialized a termination vote, it fails with the October 13 meeting. That meeting was held on two days' notice, two weeks before any vote to remove Cauchon, and the minutes list him as absent. ECF No. 101-26, PageID 1664; Ex. 67, HRO_000108.

Defendants also argue that even if Cauchon was a director, his conflict of interest meant he was "neither entitled to notice of a meeting – or a vote – on his own termination." ECF No. 107, PageID 2985. Neither the cases nor the statute support this. Section 1702.25 counts every

director "who would be entitled to notice of a meeting for that purpose." HRO's Bylaws require that "each board member have written notice." ECF No. 101-5, PageID 1535–36. Neither makes an exception for a director whose own job is on the agenda. Defendants' cases concern fiduciary duties and abstention, not notice. *Tuttle v. Collins*, 2020-Ohio-4062, ¶¶ 29–31, discusses fiduciary duties and the business-judgment rule. The language Defendants quote from *Stepak v. Schey* comes from a concurrence. 51 Ohio St.3d 8, 14 (1990) (Holmes, J., concurring). *In re Tri-Star Pictures, Inc. Litigation*, 1995 Del. Ch. LEXIS 27, at *7–10 (Del. Ch. Mar. 9, 1995), is a Delaware trial-court decision holding that directors who did not participate in the challenged transaction's decisionmaking process could not be held liable on the theory asserted there. It does not involve notice or construe Ohio's written-consent statute. Even if Cauchon had to abstain, § 1702.25 still required the signature of every director entitled to notice.

**V. The challenge to the September 5 suspension is not moot because HRO still relies on it to justify termination.**

Defendants call Cauchon's September 5 suspension moot because it ended with his termination. ECF No. 107, PageID 2980–81. But HRO still relies on it in this case. The termination letter fires Cauchon in part for "threatening to return to the office despite being placed on administrative leave." ECF No. 101-25, PageID 1659. The motion says it again: "Plaintiff does not dispute he refused to comply with the Board's decision to place him on administrative leave." ECF No. 107, PageID 2977. HRO cannot use the directive to justify the firing and then call its validity moot.

The leave was not a separate event. It was the first step toward termination. Two days into the leave, and before the investigation began, the Board's minutes record that "Dennis needs to be fired from HRO immediately. An investigation is useless at this point." Ex. 65, HRO_000103, 000105. The same meeting redirected his HRO email. *Id.* at HRO_000104.

Whether the Board validly began that process bears directly on the termination HRO still defends.

Defendants' motion itself treats suspension and termination together. It excludes from its no-controversy argument any board meeting "addressing his suspension and/or termination." ECF No. 107, PageID 2980. September 5 is the suspension meeting. The case they cite was moot because the order under challenge had been vacated and judgment entered for the challenger. *Niepsuj v. Giulitto*, 2020 U.S. App. LEXIS 34657, at *4 (6th Cir. Nov. 2, 2020). Nothing here has been vacated or withdrawn. The notice defect is plain: the meeting had one day's notice and excluded Cauchon, a director. ECF No. 101-26, PageID 1663; ECF No. 101-2, PageID 1514, ¶ 20. The Court should reach the merits of September 5.

## VI. The redundancy argument reaches only the retaliation declaration, which Cauchon does not oppose dismissing.

Defendants' last argument targets one request: the third bullet of ¶ 185, asking the Court to declare the suspension and termination "retaliatory." ECF No. 107, PageID 2986; ECF No. 59, PageID 1129, ¶ 185. They say it duplicates Count One. ECF No. 107, PageID 2986 (citing *Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.*, 176 F.3d 904, 908 (6th Cir. 1999)). Cauchon's motion does not ask for that declaration. Its seven requested declarations concern notice, director status, waiver and whether the challenged actions were validly authorized. ECF No. 101-1, PageID 1502–03. None depends on why the Board acted. Cauchon does not oppose dismissal of that request as duplicative of Count One. He opposes judgment on the authorization declarations.

A jury deciding why HRO fired Cauchon will not decide whether the Board gave the notice its Bylaws require, or whether seven signatures satisfy § 1702.25. Count One does not answer those questions. The Court should deny Defendants' motion on Count Two's remaining authorization claims.

## CONCLUSION

HRO's termination letter names Cauchon's report to the State as a reason for firing him, and the record leaves genuine disputes over HRO's real motive and the reasons it now gives. The Court should deny Defendants' motion on Count One as to HRO. That ruling does not depend on Cauchon's own motion. If the Court declines the Count One determinations he requested, ECF No. 101-1, PageID 1503–04, those disputes still require a trial.

On Count Two, whether the Board validly authorized the four challenged actions turns on director status, notice, waiver and written consent—not on HRO's motive. The Court should deny Defendants' motion on Count Two's remaining authorization claims.

Cauchon does not oppose summary judgment for Steward, Golden and Turner-Bicknell on Count One on the ground that they were not his employers. ECF No. 107, PageID 2979. Count One would then proceed against HRO. Cauchon also does not oppose dismissal of Count Two's duplicative request to declare the suspension and termination retaliatory. The remaining Count Two claims would proceed against all Defendants. The Court should grant Defendants' motion to that extent and deny it in all other respects.

Respectfully submitted,

/s/ Dennis Cauchon
Dennis Cauchon, pro se
327 East Broadway
Granville, Ohio 43023
(740) 973-3814
denniscauchon@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on the date of its filing, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve notice of the filing on all counsel of record, including counsel for Defendants Dwayne Steward, Billy Golden, Tasha Turner-Bicknell and Harm Reduction Ohio.

/s/ Dennis Cauchon
Dennis Cauchon, pro se
327 East Broadway
Granville, Ohio 43023
(740) 973-3814
denniscauchon@gmail.com