**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DENNIS CAUCHON, | : | Case No. 2:25-cv-00075-EAS-CMV |
| | : | |
| Plaintiff, | : | Judge Edmund A. Sargus, Jr. |
| | : | |
| v. | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| DWAYNE STEWARD, et al., | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF DENNIS CAUCHON'S REPLY IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 101)**

## INTRODUCTION

This Reply returns to the structure of ECF 101 (Plaintiff's Motion for Partial Summary Judgment):

- Count Two first, because the validity of Harm Reduction Ohio's actions suspending and terminating Cauchon as President and removing him from the Board of Directors is a threshold issue that frames the parties' cross-motions. Cauchon remained a board member entitled to notice under Ohio law and HRO's corporate Bylaws.
- Count One second, because it seeks four specific False Claims Act determinations—protected activity, involvement of federal funds, HRO's knowledge, prima facie causation—while reserving ultimate causation and pretext for trial.

HRO's Count One defenses and counterclaims assume the challenged Board actions validly withdrew Cauchon's authority, both as President and as a Director of the Corporation. To avoid repetition, this Reply uses "Fuller analysis" citations to direct the Court to specific pages in ECF Nos. 101-1 and 112 where evidence and legal arguments are addressed in greater detail.

**COUNT TWO — BOARD GOVERNANCE**

**I. The Board actions lacked the authorization the Bylaws and Chapter 1702 require.**

ECF 101 asks the Court to enforce the notice requirements in HRO's Bylaws and Ohio Revised Code Chapter 1702. In ECF 113, Defendants do not dispute that (a) the Bylaws required that each director receive written notice of board meetings at least 14 days in advance (ECF No. 101-5 at PageID 1535–36), and (b) they did not comply with this requirement for the three meetings at issue in this motion. Specifically, Defendants admit or do not dispute that:

- **One day's notice** was provided to select directors (but not Cauchon) for a September 5 meeting at which Cauchon was suspended as President. (ECF No. 101-26 at PageID 1663; ECF No. 107-12 at PageID 3045.)
- **Two days' notice** was provided to select directors (but not Cauchon) for an October 13 meeting in which attending directors voted to terminate Cauchon. (ECF No. 101-26 at PageID 1664; ECF No. 107-12 at PageID 3045; ECF No. 101-24 at PageID 1652.)
- **Twelve days' notice** was provided to all directors (including Cauchon) for the October 27 meeting to vote Cauchon off the Board of Directors. (Defs.' Opp., ECF No. 113 at PageID 3197.) Cauchon expressly refused in writing on October 26 and orally on October 27 to waive defective notice, thereby preserving the notice objection under Ohio Rev. Code § 1702.19(B). (ECF No. 101-33 at PageID 1709, 1711; ECF No. 107-12 at PageID 3045; Defs.' Opp., ECF No. 113 at PageID 3198.)

Cauchon objected to the notice failures immediately, in September 2024. Since then, Defendants have offered shifting reasons why the notice violations either did not occur or do not matter. (Pl.'s Mem., ECF No. 101-1 at PageID 1478–80, briefly answers four earlier arguments.) In ECF 113 and ECF 107, Defendants offer new rationales: (1) the September 5 and October 13 violations are moot, and (2) the October 27 meeting met a "substantial compliance" standard that

Defendants say is "controlling Ohio law" and lets courts excuse defective notice. (Defs.' Mot., ECF No. 107 at PageID 2980–84; Defs.' Opp., ECF No. 113 at PageID 3196–99.)

The "controlling Ohio law" is Chapter 1702, the statute governing nonprofit corporations:

- Ohio Rev. Code § 1702.31(C) requires notice to each director and lets a corporation's bylaws set the notice required.
- Ohio Rev. Code § 1702.19 states how defective notice may be waived.

Defendants cite no Ohio statute or court decision that uses a "substantial compliance" theory to override Chapter 1702. Defendants don't mention or address these provisions governing notice anywhere in ECF 107 or ECF 113—nor do any of the five non-applicable cases they cite to support their "substantial compliance" theory. The "substantial compliance" theory is addressed further in Section I.D. Mootness is addressed in Section I.E.

### A. The Bylaws and Chapter 1702 control.

*Fuller analysis: Mem., ECF No. 101-1 at PageID 1471–72.*

HRO's Bylaws require that "each board member have written notice at least two weeks in advance" of an official Board meeting and repeat the requirement for special meetings. (ECF No. 101-5 at PageID 1535–36, Art. III, §§ 3, 10.) Ohio Rev. Code § 1702.31 applies "[u]nless otherwise provided in the articles, regulations, or bylaws." HRO's two-week requirement therefore replaces subsection (C)'s two-day default.

Ohio Rev. Code § 1702.19(A)–(B) provides two statutory forms of waiver for notice required by the bylaws: a written waiver or attendance "without protesting prior to or at the commencement of the meeting." Action without a meeting requires approval in signed writings, including qualifying electronic approvals, from all directors "who would be entitled to notice of a meeting for that purpose." Ohio Rev. Code § 1702.25(A)–(B).

Ohio courts enforce corporate notice and written-action requirements. *Mt. Eaton Cmty. Church, Inc. v. Ladrach*, 2009-Ohio-77, ¶ 13 (9th Dist.) (changing the meeting time without proper notice invalidated the meeting); *Niehaus v. Columbus Maennerchor*, 2008-Ohio-4067, ¶ 56 (10th Dist.) (failure of required notice left the corporate action unauthorized and invalid); *Am. Hungarian Fed'n v. Nadas*, 35 Ohio App.3d 72, 75 (8th Dist. 1987) (notice to only some members failed to properly convene the meeting).

Action without a meeting that fails § 1702.25 is "ineffective." *Sander v. Country Brook Homeowners' Assn., Inc.*, 2020-Ohio-1555, ¶¶ 15, 23 (12th Dist.).

### B. Cauchon remained a director entitled to notice.

*Fuller analysis: Mem., ECF No. 101-1 at PageID 1472–75, 1478; Resp., ECF No. 112 at PageID 3118–19.*

Under § 1702.28(A), unless the articles or regulations "provide for a different term," a director remains in office until a successor is elected or until earlier resignation, removal, or death. HRO's Bylaws set two-year terms and direct elections "to replace those whose terms will expire," but do not state that a seat becomes vacant when no successor is elected. (ECF No. 101-5 at PageID 1535–36, Art. III, §§ 2, 4, 9.) HRO's Articles named Cauchon its initial trustee. (ECF No. 101-4 at PageID 1533.) No record identifies a resignation, pre-October 27 removal, successor election, or other event ending that service. (Pl.'s Mem., ECF No. 101-1 at PageID 1473–74.)

*Solon* applied § 1702.28(A) and held that nonprofit trustees remained in office where there was no evidence they refused to act, explaining that abandonment "is not presumed by the corporation's failure to meet and observe formalities." *Solon Chamber of Commerce v. Women's Gen. Hosp.*, 81 Ohio App.3d 687, 696 (8th Dist. 1992). *Jovenall* is a close analogy under the parallel for-profit statute: directors whose fixed one-year terms expired "maintain[ed] their status

as board members" because no successors had been elected. *Jovenall v. Zerco Sys. Internatl., Inc.*, 2004-Ohio-3932, ¶¶ 13–15 (11th Dist.).

HRO's records confirm that continuity. The March 9, 2024 minutes list Cauchon among the "Board members in attendance," the October 13 minutes list him as an absent Board member, and Steward answered "Yes. Actually, yes" when asked on October 27 whether Cauchon was a voting Board member. The Board then voted to remove him "as an official board member." (ECF No. 101-7 at PageID 1546; ECF No. 101-24 at PageID 1652; ECF No. 101-33 at PageID 1710; ECF No. 107-12 at PageID 3045–46.)

Defendants selectively invoke term expiration against Cauchon. By September 5, the listed terms of five of eight directors had expired. (Pl.'s Mem., ECF No. 101-1 at PageID 1478.) Defendants nevertheless gave meeting notice to the other four expired-term directors, but not Cauchon. (ECF No. 101-27 at PageID 1673.) Turner-Bicknell's listed term ended the same day as Cauchon's, yet Defendants rely on her seconding and vote on the October 13 termination. Trinh's had expired more than a year earlier, yet Defendants rely on her motion and vote to remove Cauchon from the Board on October 27. (ECF No. 101-21 at PageID 1644; ECF No. 101-24 at PageID 1652; ECF No. 107-12 at PageID 3046.) Those same four directors—Turner-Bicknell, Trinh, Golden, and Decker—signed the November 4 termination letter on which Defendants rely. (ECF No. 101-25 at PageID 1659.)

The two witnesses ECF 113 cites deny Cauchon's directorship, but neither identifies any event ending the service established by HRO's records. (ECF No. 103-1 at PageID 2505, 12:14–13:2; ECF No. 103-2 at PageID 2609, 16:7–15.) Their testimony therefore creates no genuine dispute defeating the director-status ruling ECF 101 requests. Nor is there inconsistency: continued service and meeting notice rest on separate rules. ECF 101 cites the March 9 minutes

as recognition of Board membership, not as proof of re-election. (Pl.'s Mem., ECF No. 101-1 at PageID 1460, ¶ 5; Defs.' Opp., ECF No. 113 at PageID 3198 & n.7.)

**C. None of the four challenged acts was validly authorized.**

*Fuller analysis: Mem., ECF No. 101-1 at PageID 1475–77; Resp., ECF No. 112 at PageID 3120–21, 3125–28.*

**September 5.** Cauchon did not receive notice and did not waive notice. (Cauchon Decl., ECF No. 101-2 at PageID 1514–15, ¶¶ 20–21.) The minutes record no suspension motion or vote. (ECF No. 101-23 at PageID 1649.) If no vote occurred, the Board did not authorize the leave; if an unrecorded vote occurred, it occurred at a meeting for which Cauchon had no notice. ECF 101 explains why the Bylaws gave Steward no unilateral authority to suspend Cauchon. (Pl.'s Mem., ECF No. 101-1 at PageID 1475.)

**October 13.** Cauchon did not receive notice and did not waive notice. (Cauchon Decl., ECF No. 101-2 at PageID 1514–15, ¶¶ 20–21.) The minutes record the termination vote: "All remaining present board members voted unanimously to terminate Dennis Cauchon." (ECF No. 101-24 at PageID 1652.) Defendants distinguish *Am. Hungarian* because some members "did not receive any type of notice at all." (Defs.' Opp., ECF No. 113 at PageID 3199.) *Am. Hungarian* invalidated a meeting for a failure to notify all members—the same failure that occurred here on September 5 and October 13. *Am. Hungarian*, 35 Ohio App.3d at 75. HRO's Bylaws make its directors its only members. (ECF No. 101-5 at PageID 1535, Art. II, § 1.)

**October 27.** Cauchon preserved his notice objection under § 1702.19(B) through his written October 26 protest and his oral protest at the meeting's commencement. Defendants' minutes record the objection. (ECF No. 107-12 at PageID 3045.) Under materially identical waiver language, *Endres Floral Co. v. Endres*, 72 Ohio St.3d 526, 529–30 (1995), held that attendance waives defective notice when an attendee fails to protest before or at commencement. Cauchon protested twice, so his attendance waived nothing.

**November 4.** Defendants say the Board "memorialized its unanimous decision" in the November 4 letter. (Defs.' Mot., ECF No. 107 at PageID 2966.) The accompanying email also states that the Board "voted unanimously to terminate your employment." (ECF No. 101-25 at PageID 1657.) The only recorded vote was October 13. A letter implementing the vote carries the authorization defect. If November 4 was instead a new action without a meeting, § 1702.25 required approval from every director "who would be entitled to notice of a meeting for that purpose." Because October 27 did not validly remove Cauchon, his approval was required. He transmitted no signed or electronic approval and authorized none on his behalf. (Cauchon Decl., ECF No. 101-2 at PageID 1512, ¶ 13.)

ECF 107 quotes § 1702.25's "entitled to notice" requirement, then substitutes "entitled to a vote." A voting restriction does not itself eliminate the right to notice. Nor was the Board "gridlocked": HRO could have acted at a properly noticed meeting, with conflicted directors abstaining if required. (Defs.' Mot., ECF No. 107 at PageID 2984–85.)

### D. Substantial compliance does not excuse the October 27 notice defect.

*Fuller analysis: Resp., ECF No. 112 at PageID 3121–24.*

Neither *Robb* nor *Resnick* supports Defendants' position that a fixed notice period may be shortened over a timely objection. *Robb*'s constitution did "not stipulate how much time must pass" between the trustees' recommendation and the membership vote. *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 75 Ohio St.3d 264, 268 (1996). In *Resnick*, the foundation met its express thirty-day interval, and the court excused different procedural objections. *Resnick v. Camp Tuscazoar Found., Inc.*, 1997 Ohio App. LEXIS 3973, at *2–6 (5th Dist. Aug. 12, 1997).

*Mt. Eaton* invalidated a meeting moved to a different time that day without proper notice, despite the voting members' attendance. *Mt. Eaton*, 2009-Ohio-77, ¶¶ 2–4, 13. *Niehaus* involved an asset sale, but the court's decision rested on "a failure of notice." *Niehaus*, 2008-Ohio-4067, ¶

56. Actual notice, attendance, and a final vote do not themselves cure a failure to give the notice required by the governing statute or bylaws.

Cauchon did not request shortened notice: he requested a meeting “consistent with the two-week advance notice requirement.” (ECF No. 101-38 at PageID 1750.) His deposition testimony about Board authority began, “At a properly noticed meeting,” and concerned termination of employment, not the October 27 removal. (ECF No. 102-1 at PageID 1918, 60:12–17; Defs.’ Mot., ECF No. 107 at PageID 2982 n.9.) The Nelson report on which Defendants rely advised a removal vote only “[a]fter providing two weeks’ notice.” (ECF No. 107-11 at PageID 3039.)

Defendants have not shown substantial compliance even under the cases they invoke. They assert Cauchon knew of the meeting and the outcome would have been unchanged even with proper notice. (Defs.’ Mot., ECF No. 107 at PageID 2983.) But *Robb* required a meaningful opportunity to respond, not merely an opportunity to attend. 75 Ohio St.3d at 268–69.

The record contradicts Defendants’ claimed “full and fair opportunity to be heard.” (Defs.’ Opp., ECF No. 113 at PageID 3197.) Before the meeting, other directors scripted a predetermined outcome—Cauchon’s removal—in a group text exchange that excluded him. On October 26, Steward instructed the group to “Ignore everything else he has to say” and declared, “What he has to say doesn’t matter at this point.” Steward texted the removal motion and asked for a volunteer to introduce it. Trinh volunteered. (Board texts, ECF No. 112-6 at PageID 3164, 3167, 3170, 3172.) At the meeting, Steward asked for the motion, Trinh presented it nearly word for word. There was no debate. The meeting lasted eight minutes. (ECF No. 101-33 at PageID 1713–14; ECF No. 107-12 at PageID 3045.)

A majority vote does not substitute for required corporate procedure. *Sander*, 2020-Ohio-1555, ¶ 27. Even if substantial compliance could excuse the notice shortfall, the October 27 process failed the meaningful-opportunity standard Defendants' own authority requires. *See also* Pl.'s Resp., ECF No. 112 at PageID 3123–24 (undisclosed removal agenda; Cauchon denied records other directors received).

**E. The requested rulings are not moot.**

*Fuller analysis: Mem., ECF No. 101-1 at PageID 1470–71; Resp., ECF No. 112 at PageID 3116–18, 3127–29.*

HRO's reliance on the September 5 suspension keeps its validity consequential even if the later removal or termination was valid. HRO invokes Cauchon's alleged noncompliance with the suspension as a ground for discharge. (ECF No. 101-25 at PageID 1659; Defs.' Mot., ECF No. 107 at PageID 2965, 2977.) A later removal or termination cannot retroactively authorize the September 5 suspension. Its validity still matters to HRO's own insubordination rationale.

HRO's counterclaims keep the October 27 removal and November 4 termination disputes live. HRO alleges its November 4 "unanimous board action" ended Cauchon's employment and access to its accounts and property, making his later access unauthorized. Cauchon's defense is that the invalid termination left his authority as President intact. HRO defends both actions as valid and calls Cauchon's Board status a disputed material fact. (Answer, ECF No. 62 at PageID 1226, ¶¶ 12–13; Pl.'s Countercl. Mot., ECF No. 105 at PageID 2706–07; HRO Countercl. Opp., ECF No. 114 at PageID 3205, 3214–16.) Whether those actions validly ended his authority matters to several pending counterclaims.

ECF 113 argues that the October 27 removal "resolves all issues," assuming the disputed removal was valid and citing no authority holding that Cauchon's removal from the board mooted the challenges to his September 5 employment suspension or October 13 termination. (Defs.' Opp., ECF No. 113 at PageID 3196–97.) Even a valid removal could not retroactively

authorize those acts. Nor did removal as a director end Cauchon's employment. Steward said Cauchon would "move forward as executive director but no longer as a board member." (ECF No. 101-33 at PageID 1714.) Under any theory, the earlier acts remain material.

Defendants agree that Count Two concerns suspension, removal, and termination. (Defs.' Opp., ECF No. 113 at PageID 3196.) ECF 101 seeks authorization rulings on the four challenged acts, not unrelated meetings or present control of HRO. (Pl.'s Mem., ECF No. 101-1 at PageID 1502–04; Pl.'s Resp., ECF No. 112 at PageID 3128–29.) A case remains live while the Court can grant effectual relief. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).

## COUNT ONE — FALSE CLAIMS ACT RETALIATION

### II. The record supports the four Count One determinations.

Defendants argue that HRO's stated reasons for discharge would "obviate entirely the need to address Plaintiff's motion." (Defs.' Opp., ECF No. 113 at PageID 3187.) Those reasons satisfy a burden of production, not an entitlement to judgment. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–56 (1981). ECF 112 acknowledges that burden is met and answers pretext in full. (Pl.'s Resp., ECF No. 112 at PageID 3102–15.) ECF 101 seeks narrower Count One determinations and reserves ultimate causation and pretext for trial. (Pl.'s Mem., ECF No. 101-1 at PageID 1504.)

### A. HRO's payment requests were "claims" because federal money paid them.

*Fuller analysis: Mem., ECF No. 101-1 at PageID 1481–83, 1493–94; Resp., ECF No. 112 at PageID 3097–99.*

Defendants answer the funding element with two facts: the interagency agreement on how to spend federal State Opioid Response grant money runs between two Ohio agencies, and HRO's invoices went to Ohio. (Defs.' Opp., ECF No. 113 at PageID 3192.) Both are true. Neither is the test.

A request for money is a claim when it is made to a "contractor, grantee, or other recipient," the money is to be spent "to advance a Government program or interest," and the United States "provides or has provided any portion of the money," "whether or not the United States has title to the money." 31 U.S.C. § 3729(b)(2)(A)(ii)(I). The definition does not require that the payment request be submitted to a federal agency. The Supreme Court has ruled on the issue: Reimbursement requests submitted to a private administrator were claims because the Treasury supplied a portion of the fund that paid them: "providing some funds is just as good as providing all." *Wisconsin Bell, Inc. v. United States ex rel. Heath*, 604 U.S. 140, 146, 149–50 (2025). In ECF 113, Defendants ignore the statute and *Wisconsin Bell.*

**B. Cauchon's investigation and reports were protected activity.**

**1. The claim pleaded is not confined to the Anti-Kickback Statute.**

*Fuller analysis: Mem., ECF No. 101-1 at PageID 1494–95; Resp., ECF No. 112 at PageID 3090–93.*

Defendants' protected-activity argument rests on a single, flawed premise: that Count One is "entirely predicated on alleged violations of the AKS," meaning Cauchon had to believe a quid pro quo was occurring. (Defs.' Opp., ECF No. 113 at PageID 3190.) The Second Amended Complaint says otherwise. Paragraph 179 explicitly alleges Cauchon's good-faith belief that HRO's continued federal funding was conditioned on disclosing Reese's conflict to ODH. Paragraph 180 further alleges that Cauchon's conduct comprised efforts to prevent HRO from "receiving federal funds by submitting false information, either affirmatively or through omission under a duty to disclose." (Second Am. Compl., ECF No. 59 at PageID 1127–28, ¶¶ 179–80.)

That theory requires no kickback. It requires only a good-faith, objectively reasonable belief connecting the conduct to possible fraud on the government, not proof of an actual violation. *Miller v. Abbott Labs.*, 648 F. App'x 555, 560 (6th Cir. 2016); *Jones-McNamara v.*

*Holzer Health Sys.*, 630 F. App'x 394, 399–401 (6th Cir. 2015). The connection here is HRO's own representation. HRO certified that "no employees or contractors associated with the organization have a conflict of interest working on the statewide Naloxone project." Its contract required it to disclose later conflicts to the State. (ECF No. 101-47 at PageID 1787; ECF No. 101-41 at PageID 1761–62.) Defendants' opposition does not mention either one.

**2. The September 3 letter reflected an ongoing investigation, not a "fatal" concession.**

*Fuller analysis: Mem., ECF No. 101-1 at PageID 1485–87, 1495–97; Resp., ECF No. 112 at PageID 3093–96.*

Defendants cite a single sentence in the September 3 disclosure—"At present, I have no reason to believe that AmandaLynn's outside contract influenced her ordering decisions"[1]—and declare it a concession fatal to the FCA retaliation claim. (Defs.' Opp., ECF No. 113 at PageID 3183–84, 3190.) It is no such thing. Cauchon stands by the sentence, beginning with its first two words: "At present." Defendants quote those words and then restate them as "at any time."[2] The "At present" sentence was an accurate statement about an open question in an ongoing investigation. As the letter promised, HRO would "continue to seek all information related [to] this conflict" and report what it learned. (ECF No. 101-58 at PageID 1835.) The timeline of a diligent, ongoing investigation is documented:

- **August 22:** Cauchon filed a public records request with the State for HRO's naloxone ordering records. (ECF No. 101-56 at PageID 1825–27.)

---

[1] The full paragraph reads: "AmandaLynn tasks at Harm Reduction Ohio includes overseeing our naloxone program, ordering naloxone from the state pharmacy and providing information on naloxone volume used in monthly contract invoices. Since December 2022, AmandaLynn, as Harm Reduction Ohio's representative, has ordered approximately 15,000 Kloxxado kits from the state. At present, I have no reason to believe that AmandaLynn's outside contract influenced her ordering decisions." (ECF No. 101-58 at PageID 1834.)

[2] Defendants similarly overstate Cauchon's declaration, saying he "concedes that he did not actually believe" Reese's ordering was influenced. (Defs.' Opp., ECF No. 113 at PageID 3190.) Paragraph 41 says instead that he "did not know at the time whether" it had been influenced, believed the ordering patterns "needed to be reviewed," and requested the State's pharmacy records. (Cauchon Decl., ECF No. 101-2 at PageID 1521–22, ¶ 41.) Their statement that he "didn't even look" concerns testimony about examining individual recipient orders for product substitution, not his investigation of Reese's orders to the State. (ECF No. 102-1 at PageID 1966–67, 253:2–257:7.)

- **September 4:** The day after the disclosure, HRO's lawyer, David Ball, approved a written request for Reese to disclose her Velocity contracts, pay, and work performed, stating: "I green light the form." (ECF No. 101-60 at PageID 1850, 1853.)
- **September 5 (Morning):** Steward opposed the documentation request, writing "asking for the contracts and the amounts of money is egregious." (ECF No. 101-60 at PageID 1855.)
- **September 5 (Afternoon):** Steward and Golden directed Cauchon to "cease and desist all activities related to conflict of interest matters." (Pl.'s Mem., ECF No. 101-1 at PageID 1464, ¶ 14(a).)
- **September 16:** The State produced the ordering records. (*Id.* at PageID 1485, ¶ 54.)

Cauchon relies on the September 3 letter as contemporaneous evidence of his good-faith belief that Reese's outside employment warranted investigation into whether it had influenced her ordering of federally funded naloxone and whether HRO's contract disclosures and payment requests were accurate. (ECF No. 101-58 at PageID 1834; Cauchon Decl., ECF No. 101-2 at PageID 1521–22, ¶ 41.)

Defendants assert Cauchon had "no reason to believe an Anti-Kickback violation was occurring, at any time," and "[e]ven now – two years later" has only "mere speculation" about Kloxxado volume. (Defs.' Opp., ECF No. 113 at PageID 3184; Defs.' Mot., ECF No. 107 at PageID 2971 n.6.) He testified that State data showed a sixfold increase in HRO's Kloxxado orders. Statewide Kloxxado orders were falling except for two requesters, with HRO accounting for 25 percent of orders statewide. He considered alternatives but found no explanation for the increase. He distinguished the unexplained anomalous ordering from proof that Reese's Velocity

employment had caused it. (ECF No. 102-2 at PageID 2232–34, 129:22–131:24, 135:20–136:17.)

The FCA does not require an employee to finish an investigation before receiving statutory protection—especially when the employer quashes that investigation. *Jones-McNamara*, 630 F. App'x at 399–400.

**3. Cauchon knew far more than two job titles.**

*Fuller analysis: Mem., ECF No. 101-1 at PageID 1483–85, 1494–95; Resp., ECF No. 112 at PageID 3094–96.*

Defendants attempt to minimize the record by reducing Cauchon's knowledge to Reese's two job titles. (Defs.' Opp., ECF No. 113 at PageID 3191.) But the very deposition page they cite refutes this, naming three distinct facts: "that she was director of government advocacy for Velocity BioGroup, the lobbyist, and that she ordered." (ECF No. 102-1 at PageID 1955, 208:10–14.) Cauchon's point was that the *combination* of these roles constituted the conflict. Furthermore, the letter Defendants reproduce in their own brief adds a fourth fact: Reese had ordered approximately 15,000 Kloxxado kits. (Defs.' Opp., ECF No. 113 at PageID 3184; ECF No. 101-58 at PageID 1834.)

Even measured as of September 3, Defendants' chosen cutoff, Cauchon knew far more than two job titles, including:

- HRO certified that project personnel had no conflicts, and Reese was paid with contract funds to work full-time on it (1.0 FTE in staffing plan). (ECF No. 101-47 at PageID 1787; ECF No. 101-48 at PageID 1791–93.)
- Reese signed a commitment to "work fulltime on the project and not have my ability to execute the project reduced by other duties." (ECF No. 101-49 at PageID 1796–97.)
- Velocity represented Kloxxado's manufacturer, yet Reese actively declined to disclose the details of her work for the lobbyist. (ECF No. 101-53 at PageID 1816.)

- On August 21, Cauchon texted Steward about "what I consider Hikma work and travel done on HRO time." Steward replied that he had told Reese "none of her external work could be done on HRO time anymore and she was fine with that." (ECF No. 101-55 at PageID 1823.)

Steward's "anymore" supported Cauchon's reason to believe outside work had occurred on HRO time despite Reese's full-time project commitment. Those facts supported investigating the accuracy of HRO's contract representations and payment requests. HRO's Rule 30(b)(6) designee Tasha Turner-Bicknell testified that "just bringing something like that forward seemed like reasonable grounds to look into it." (ECF No. 101-9 at PageID 1570–71, 71:22–72:3.)

**4. September 3 is not a cutoff for all evidence supporting Count One.**

*Fuller analysis: Mem., ECF No. 101-1 at PageID 1497–98; Resp., ECF No. 112 at PageID 3093–94, 3096.*

Defendants ask the Court to disregard "any and all evidence" supporting Cauchon's prima facie FCA retaliation claim that he did not know on September 3, including directors' texts and depositions. (Defs.' Opp., ECF No. 113 at PageID 3185–86, 3191–92.) Cauchon agrees that facts he learned later, such as Reese's full-time Velocity status, cannot support his September 3 disclosure. *Jones-McNamara*, 630 F. App'x at 401 n.4. But the date Cauchon obtained evidence does not decide what it may prove. The same opinion relied on later testimony from other witnesses, because "evidence outside [the employee's] subjective point of view is not only on point but absolutely essential to assessing the reasonableness of her belief." *Id.* at 403 & n.6.

Steward's testimony shows the difference. Asked whether he agreed that Reese's Velocity role was a potential conflict, Steward answered, "At the time, not knowing the details and on face value, yes," and he recommended "a full investigation into the matter." (ECF No. 101-10 at PageID 1583–84.) That testimony does not add facts to what Cauchon knew. It does corroborate the reasonableness of Cauchon's concern at the relevant time.

The limit on later-acquired facts does not reach HRO's knowledge, motive, causation or pretext. *Jones-McNamara* applied that limit only to facts used "for purposes of assessing whether she was engaged in protected activity." 630 F. App'x at 401 n.4. Defendants themselves rely on the October 9 Nelson report and argue the meaning of the directors' texts on pretext and causation. (Defs.' Opp., ECF No. 113 at PageID 3188, 3195.) The order they cite concerned a subpoena for Reese's Velocity records, not board texts. There, the Court said that even if such records were relevant to "Defendants' motive for retaliation," they would be limited to documents "in Defendants' possession at the time they took adverse action." (ECF No. 61 at PageID 1199–1200.) The order looks to what Defendants possessed when they acted, not to when Cauchon obtained the documents.

ECF 101 also seeks protection for Cauchon's October 4 Board request and retaliation complaint filed October 23 under 31 U.S.C. § 3730(h)(1). (Pl.'s Mem., ECF No. 101-1 at PageID 1503–04.) Each act is judged on what he knew when he took it, including information learned after September 3.

### C. HRO knew of the protected activity before October 13 and November 4.

*Fuller analysis: Mem., ECF No. 101-1 at PageID 1498–1500; Resp., ECF No. 112 at PageID 3099–3100.*

Defendants concede that the Board knew of Cauchon's September 3 ODH letter; their objection is that it was not protected activity. (Defs.' Opp., ECF No. 113 at PageID 3193.) Section II.B answers that objection. The Board also knew the federal-contract concern: Cauchon's September 3 email to every director identified HRO as "a state contractor receiving federal funds" and said Reese's conflict "should have been disclosed in our July 2023 application." (ECF No. 101-59 at PageID 1841.)

The October communications expressly named the FCA. Cauchon's October 4 request to every director invoked "the False Claims Act"; on October 23, Board Secretary Garlock

forwarded his retaliation complaint invoking the FCA to the directors. (ECF No. 107-5 at PageID 2999; Pl.'s Mem., ECF No. 101-1 at PageID 1489, ¶ 77.) HRO had express FCA notice before both the October 13 termination vote and the November 4 letter.

**D. HRO's own documents establish the prima facie causal connection.**

*Fuller analysis: Mem., ECF No. 101-1 at PageID 1500–02; Resp., ECF No. 112 at PageID 3089–90, 3102–07.*

ECF 101 seeks a ruling on the prima facie causal connection for termination, reserving ultimate causation, pretext, and the other adverse acts alleged in Count One for trial. The causation element asks whether the retaliation was "motivated at least in part by the employee's engaging in protected activity." *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 518 (6th Cir. 2000). That prima facie burden is met by Defendants' own documents:

- The termination letter quotes HRO's whistleblower policy, declares "Your September 3 report to ODH violated this policy," and states, "We do not consider this an act of good faith or reasonable grounds for your report to ODH." (ECF No. 101-25 at PageID 1658–59.)
- HRO's Rule 30(b)(6) designee testified that the September 3 ODH letter was one of the acts of insubordination that led to termination. (ECF No. 103-1 at PageID 2508, 2512.)
- Before the October 13 termination vote, Turner-Bicknell shared with the Board "clear bulleted items for why Dennis should be dismissed: 1) He was told to cease and desist," a reference to the September 5 directive to "cease and desist all activities related to conflict of interest matters." (ECF No. 112-4 at PageID 3146; ECF No. 101-29 at PageID 1677.)
- The same minutes record Steward's request for "a motion to dismiss based on the investigation and report." The investigator's report states: "HRO initiated the investigation because Dennis reported the alleged conflict of interest" to ODH. (ECF No. 112-4 at PageID 3147; ECF No. 107-11 at PageID 3008.)

Defendants invoke five asserted reasons and say Cauchon admitted "all the actions that ultimately led to his termination," so those reasons were not "made up." (Defs.' Opp., ECF No. 113 at PageID 3188, 3193–94.) Cauchon does not admit all the acts. Acknowledging conduct would not establish that it motivated termination, as Defendants' own motion recognizes. (Defs.' Mot., ECF No. 107 at PageID 2978.) Because Defendants' cross-motion seeks judgment on the entire discharge claim, ECF 112 answers each reason and explains why a jury could reject it as an independent cause. (Pl.'s Resp., ECF No. 112 at PageID 3102–15.)

Even under Defendants' stricter but-for standard, the record defeats their demand for judgment on independent grounds:

- **Insubordination:** HRO explicitly counted the conflict report itself and a refusal to "cease and desist" investigating as insubordination. A court "cannot accept an employer's conclusory claim that an employee was insubordinate" when the alleged insubordination is the protected activity. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 652 (6th Cir. 2015) (Title VII retaliation).
- **Demands for Termination Before Investigation:** On September 7—before HRO even retained an investigator—the minutes recorded: "Dennis needs to be fired from HRO immediately. An investigation is useless at this point as his behaviors have clearly shown over the last week." (ECF No. 112-2 at PageID 3137.)
- **Chronological Impossibility:** Defendants use acts that occurred after the October 13 termination vote to justify a decision that had already occurred. (Pl.'s Resp., ECF No. 112 at PageID 3105.)

Defendants' remaining arguments concern the September 5 suspension, an adverse act that ECF 101 reserves for trial. (Defs.' Opp., ECF No. 113 at PageID 3194–95.)

## III. In the alternative, Rule 56(g) should establish documentary facts.

Cauchon renews his Rule 56(g) request. (Pl.'s Mem., ECF No. 101-1 at PageID 1505.) The following state documentary facts and dates, not legal conclusions.

1. HRO's Bylaws require written notice to each board member "at least two weeks in advance." (ECF No. 101-5 at PageID 1535–36.)
2. Defendants' verified answer identifies September 4 and October 11 as notice dates for the September 5 and October 13 meetings; counsel identified the October 15 email as notice of the October 27 meeting. (ECF No. 101-26 at PageID 1663–64; ECF No. 101-27 at PageID 1671; ECF No. 101-28 at PageID 1675.)
3. Cauchon objected in writing October 26 ("I do not waive proper notice") and orally at the meeting's start. (ECF No. 101-33 at PageID 1709, 1711.)
4. The October 13 minutes list Cauchon absent and record a motion, second, and unanimous vote of those present to terminate him based on the investigation and final report, with dismissal terms pending. (ECF No. 101-24 at PageID 1652.)
5. The November 4 letter bears seven directors' signatures, not Cauchon's, and states his September 3 ODH report violated HRO's whistleblower policy. (ECF No. 101-25 at PageID 1658–59.)
6. The OMHAS–ODH agreement identifies SAMHSA funding and $650,000 for the "Statewide Mail-Order & Lay Dist. Contract"; HRO invoiced $59,319.14 under CSP016816; Ohio records the payment under "Federal Public Health Programs." (ECF No. 101-45 at PageID 1776, 1781; ECF No. 101-44 at PageID 1773–74; ECF No. 101-43 at PageID 1770.)
7. Cauchon's September 3 email called HRO "a state contractor receiving federal funds"; his October 4 email raised "the False Claims Act"; and the Board Secretary

acknowledged his October 22 complaint on October 23. (ECF No. 101-59 at PageID 1841; ECF No. 107-5 at PageID 2999; ECF No. 101-63 at PageID 1864.)

Establishing these facts would remove disputes over notice chronology, votes, funding, payments, and communications while leaving director status, waiver, corporate validity, protected activity, and motive unresolved.

**CONCLUSION**

The Court should grant the Count Two authorization declarations and the four Count One determinations against HRO requested in ECF 101, leaving ultimate causation, pretext, damages, and the other reserved issues for trial. As stated in ECF 112, Cauchon does not oppose dismissal of Count Two's separate retaliation declaration or summary judgment for the individual Defendants on Count One. If the Court declines any requested relief, it should establish the undisputed material facts identified in Section III under Rule 56(g).

Respectfully submitted,
/s/ Dennis Cauchon
Dennis Cauchon, pro se
327 East Broadway
Granville, Ohio 43023
(740) 973-3814
denniscauchon@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2026, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve notice of the filing on all counsel of record, including counsel for Defendants Dwayne Steward, Billy Golden, Tasha Turner-Bicknell, and Harm Reduction Ohio.

/s/ Dennis Cauchon
Dennis Cauchon